✓ FILED ___ LODGED
___ RECEIVED ___ COPY

NOV - 1 2011

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ Z DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

PRESCOTT DIVISION

| | |
|---|---|
| GREGORY YOUNT | ) |
| | ) Case No. CIV 11 8171 PCT FJM |
| Plaintiff, | ) |
| | ) |
| v. | ) COMPLAINT FOR |
| | ) DECLARATORY AND |
| | ) INJUNCTIVE RELIEF |
| KEN SALAZAR, Secretary of the Interior; | ) |
| and | ) |
| U.S. BUREAU OF LAND MANAGEMENT | ) |
| | ) |
| Defendants. | ) |

Gregory Yount
807 W. Butterfield Rd
Chino Valley, Arizona 86323
928-899-7029
*Plaintiff Pro Se*

COMPLAINT

-1-

## INTRODUCTION

1.       Plaintiff challenges Defendant Bureau of Land Management's ("BLM") refusal to take actions required by environmental laws and regulation to publish, for public comment, a Supplemental Draft Environmental Impact Statement ("SDEIS") for the entirety of the Northern Arizona Proposed Withdrawal  Environmental Impact Statement ("EIS") before the final action of publication of the EIS on October 27, 2011. The Northern Arizona Proposed Withdrawal EIS was ordered by Defendant U.S. Department of the Interior ("DOI") upon Defendant's Segregation Order of July 21, 2009, (74 Fed Reg. 35887 July 21, 2009) which segregated public lands north and south of the Grand Canyon from mining activities for two years with the stated goal of protecting these areas from the adverse affects of locatable hard rock mineral exploration and mining while "various studies and analyses" could be completed to support the writing of the Northern Arizona Proposed Withdrawal EIS.

2.       BLM published for public comment the Northern Arizona Proposed Withdrawal ("NAPW") Draft Environmental Impact Statement ("DEIS") on February 18, 2011. The public comment period was set at 45 days and was to end on April 4, 2011. Plaintiff  and others petitioned the BLM to extend the public comment period due to the voluminous size of the DEIS and the overwhelming number of factual errors, omissions, and lack of scientific rigor upon which they wished to comment. The BLM extended the public comment period for an additional 30 days.

3.       Accordingly, Plaintiff submitted 102 pages of substantive comments citing errors, omissions, and lack of scientific rigor for the NAPW DEIS.  Others submitting substantive comments detailing errors, omissions, or new information for this DEIS include: The American Clean Energy Resources Trust submitted 151 pages of detailed comments; DIR Exploration, Inc submitted 12 pages; Quaterra Resources, Inc. submitted 73 pages; Energy Fuels Resources submitted 12 pages; the Arizona Mining Association submitted 5 pages; Jerry H. Smith for the Arizona Department of Environmental Quality submitted 24 pages; Katie Sweeny for the

COMPLAINT

National Mining Association submitted 9 pages; Laura Skaer for the Northwest Mining Association submitted  8 pages; Patrick Hillard submitted 3 pages; Ted Jensen submitted 3 pages; Steve Trussel for the Arizona Rock Products Association submitted 8 pages; and Kris Hefton of Vane Minerals submitted 5 pages of comments.  In all, the above named individuals submitted 415 pages of substantive comments that detail the errors, omissions, new information, and/or lack of scientific rigor for a Draft EIS that itself totals just over 1000 pages. The submitted comments also include relevant and significant new information that was not considered by the BLM in the writing of the DEIS. These comments submitted to the BLM  and entered into the Public Record by the BLM are incorporated by reference.

4.      Plaintiff alleges that the BLM is violating NEPA (40 CFR 1502.9(c)) by failing to prepare and circulate for public review and comment an SDEIS to the Draft EIS for the NAPW. As mentioned above, significant new information was submitted during the public comment period that is relevant to environmental concerns and has bearing on the proposed withdrawal action or its impacts.  This includes: new information regarding the mineable uranium endowment of the withdrawal area that is about five to six times greater that what the BLM reported in the DEIS, new information regarding blind breccia pipes and their additional contribution to the uranium endowment of the withdrawal area above that previously expected by federal agencies, new information regarding rights-of-way issues across Federal lands in the NAPWA to access State Trust or Private lands for mineral exploration projects, and new information from the Arizona Geological Survey that shows that uranium mining cannot possibly contaminate the Colorado River.

5.      In addition, many of the "Relevant Issues for Detailed Analysis" as set forth in Table 1.5-1 of the DEIS were purposely and wrongly excluded from analysis provided in the DEIS itself. With no exceptions, these exclusions have had the effect of biasing the DEIS and the subsequent EIS against the "No Action" alternative.  Among these are: the Air Quality Cumulative Impact Analysis; the Energy Value of the Uranium in the Northern Arizona Proposed Withdrawal Area ("NAPWA") was never calculated as required by Table 3.1-1 of

COMPLAINT

Chapter 3 of the DEIS ( estimated 560 billion dollars); the energy value of the uranium resource previously withdrawn was not calculated; and the equivalent amount of other energy-producing commodities represented by uranium production was not analyzed as required by Table 3.1-1 of the DEIS. Each of these analyses was excluded  from the NAPW DEIS in violation of NEPA.

6.      Further issues not addressed in the DEIS also to the detriment of the case of the "No Action" alternative and clearly mandated by NEPA regulations are:

a) Mitigating measures were not explored, discussed, or proposed for most of the potential problems identified and analyzed as required by NEPA. Nearly all mitigating measures mentioned in the NAPW DEIS are normal or standard operating procedures that are required by existing law and regulation, and do not address the particular issues and problems that would be in effect under the various proposed alternatives considered under the DEIS and the subsequent EIS.  This failure is especially significant because mitigation measures historically have frequently permitted economically-significant natural resource operations to occur with no significant negative impact to the civil or natural environment.

b) Not analyzed are the issue of "prior existing rights" and the most probable outcome that nearly all mining claims could be voided by the withdrawal when subject to a mineral examination. Failing this explanation in the DEIS and EIS, the general public has been left to believe that existing claims could proceed and generally does not understand what "Valid Existing Rights" means. Further, the direct impact that any of the withdrawal Alternatives has on the claim owners was not analyzed. The economic impact on the claim holders (loss of time and money invested) was not analyzed and the loss of revenue to the BLM for the maintenance fees paid by the claim owners was also not analyzed.

c) Not analyzed is the effectiveness of the existing regulatory framework: federal, state, and local laws and regulatory bodies. An analysis of this framework would have determine any flaws and weaknesses in the existing regulatory framework and would have permitted the proposal of mitigating measures in the DEIS as required by NEPA. During the scoping period

COMPLAINT

-4-

prior to the development of the DEIS,  the National Mining Association specifically proposed just such analysis be done as part of the EIS.

d) The analysis of Green House Gas (GHG) reduction by the production and utilization of the uranium resource within the NAPWA was improperly excluded from analysis. The GHG production from uranium exploration and mining was calculated, but the reduction of GHGs by the use of the uranium from the NAPWA was excluded. NEPA regulations require that all positive and negative direct and indirect effects be analyzed in EIS studies.

e) Analysis and identification of the more than 30 ore-grade to weakly-mineralized uranium breccia pipes within the Grand Canyon National Park should have been performed and some estimation of their yearly erosion of uranium and other metals from these naturally exposed deposits and the distribution of the contaminating metals in the surrounding Grand Canyon watershed should have been estimated as part of the current resource condition analysis for Chapter 3 of the DEIS.

7.      The BLM failed to include and reconcile the results and conclusions of its own work from its most recent Resource Management Plan (RMP) in the DEIS. The 2008 RMP developed by the BLM concluded that most of the Arizona Strip should remain open to mineral entry.

8.      The Arizona Wilderness Act of 1984 is not mentioned in the DEIS at all even though it is the landmark piece of legislation that defined the land areas available for mineral entry and uranium exploration and mining. Analysis and reconciliation of this Act and the historical context with regard to the current situation is essential to understanding why the No Action Alternative of the NAPW DEIS and FEIS may yet prove to be a viable alternative.

9.      NEPA requires that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason. The validity of assumptions and the general low level quality of scientific analysis performed in the Water Resources sections of the DEIS alone create a reasonable basis for stating that the requirements of NEPA regarding credible scientific analysis have not been met.

COMPLAINT

10.     Additionally, NEPA requires that every effort be made to disclose and discuss. "...in the draft statement all *major points of view* on the environmental impacts of the alternatives." This responsibility was grossly neglected throughout the DEIS and the subsequent EIS.

11.     The multitude of errors in the DEIS is amply documented in the public comments submitted to Defendant BLM and available on the BLM's Website. Any one of the many omissions in analysis or incidences of lack of scientific rigor cited above, provide sufficient justification for an SDEIS in and of themselves. The fact that there are so many errors and omissions of such a serious nature that are relevant to environmental concerns, and have direct and strong bearing on the proposed withdrawal action or its impacts, makes a supplemental DEIS mandatory under the NEPA-implementing regulations.

12.     The Defendants published the NAPW Final Environmental Impact Statement (FEIS) on October 27, 2011. A reading of Chapter Five of the FEIS repeatedly shows that critical new information supportive of an SDEIS was arbitrarily dismissed, minimized, and/or otherwise marginalized using faulty reasoning or by ignoring the requirements of NEPA and its implementing regulations. This continued long-term trend of behavior is consistent with the biased presentation and purposely limited consideration of relevant issues first made evident in the DEIS. From this, it is apparent that Defendant BLM and its cooperating agencies and consultants have manipulated the EIS process to further a policy agenda held by the Secretary of the Interior Ken Salazar. This has resulted, in the end, in a very deeply flawed EIS that does not support the upcoming formal decision-making with regard to the proposed withdrawal by Secretary of Interior Ken Salazar.

13.     A first example of the BLM's arbitrary answers to comments from the public ("peer review") presented in the FEIS will begin to illustrate the unfortunate inability of the BLM and its agents to function professionally and objectively in this particular EIS process. Plaintiff's comment regarding the exclusion of an estimate of the amount of Green House Gas reduction due to the uranium mined in the NAPW area was answered with:

COMPLAINT

"The EIS does not include an analysis of GHG "offsets" (i.e., uranium as a replacement for other energy sources) for several reasons. First, there is no guarantee that uranium mined from the proposed withdrawal area would be allocated exclusively to energy production. Some percentage may go to defense uses, medical applications, or other uses. In addition, with notable exceptions such as Iran and North Korea, processed uranium may be legally sold on the open market and shipped anywhere in the world. Finally, there is no assurance uranium would be used to replace—rather than simply augment—other energy sources such as coal, natural gas, hydroelectric, solar, or wind power."

14.     This answer is entirely nonsensical and can only be conceived as a biased attempt to exclude an analysis that would be supportive of Alternative A, the No Action Alternative. First, the percentages of the uses of mined uranium are documented by the U.S. Energy Information Administration and therefore a concrete value for the amount of uranium used as nuclear fuel can, in fact, be easily determined and utilized in the NAPW EIS. In addition, it makes no difference when estimating the Global Warming-related beneficial effects of mining uranium from the NAPWA where in the world the uranium is used as nuclear fuel. After all, the issue at hand is **Global** Warming, not warming exclusive to the NAPW area or even the US. However, in the spirit of its customary bias, the authors of the FEIS and DEIS state specifically that the production of GHGs from mining in the NAPWA might have GLOBAL consequences. Finally, nuclear power plants like fossil fuel power plants provide nearly all of the world's base load electricity and as such, any use of nuclear power is automatically a (perfect) substitute for base load electricity generated using fossil fuels. Thus, the predominant future use of uranium from the NAPWA as power plant fuel would be as replacement of fossil fuels in base load power plants, whether or not this fuel is used to augment or maintain current base load electricity generating capacity.

15.     A second example from the FEIS is even more disturbing. DIR Exploration, Inc., and Quaterra Resources, Inc., both submitted comments providing new and substantive information regarding the uranium endowment of the NAPWA. Their comments indicate that the

COMPLAINT

Department of Interior underestimated the uranium endowment of the NAPWA by a very appreciable 500 to 600%. This new information was provided by certified, licensed, and/or registered professional geologists ("Qualified Persons" under Canadian 43-101 regulations) with decades of experience in the NAPWA, and is based on the cumulative knowledge that companies engaged in mineral and petroleum exploration and metals mining in the NAPWA have garnered after having expended tens of millions of dollars, and tens of thousands of man-hours exploring and drilling in the NAPWA. Their exploration experience and professional analysis of the NAPWA consequently represents very credible knowledge and experience that in most instances exceeds that possessed by relevant workers in the USGS or BLM. It is from mining industry companies (past and present), in fact, that the USGS initially obtained most of its information and data on uranium-mineralized breccia pipes in the NAPWA. The BLM's odd responses to the new information contained in these comments were as follows:

"The full comment letter questions the approach of assigning mineral potential to regions of Northern Arizona that was used in the 2010 USGS estimate of uranium availability, and concludes that the preferential presence of breccia pipe mineralization on the proposed withdrawal lands is not properly incorporated into the estimates of uranium availability. While the commenter provided a statistical correlation of known mineralized breccia pipes to underlying geologic structures, no geologic explanation or new information was provided to justify the hypothesis that mineralized breccia pipes occur preferentially on the proposed withdrawal lands.

The USGS Report is a peer-reviewed publication that provided the estimated uranium endowment for the proposed withdrawal area. While some commenters have presented alternate or supplemental approaches to assessing the uranium endowment from that provided by USGS, these alternate approaches have not been developed or peer reviewed to the extent that they can replace or supersede the USGS endowment assessment presented in SIR 2010-5025. As with many scientific fields, new information is constantly being collected which leads to new or refined conclusions. However, at present, the USGS Report contains the best credible

COMPLAINT

information available regarding the uranium endowment estimate and was therefore used as the basis for the reasonably foreseeable development scenarios in the EIS.

No change is warranted to the 2010 USGS estimate of uranium availability, or the use of this estimate in the FEIS."

16.     The BLM's response to this new information is anathema to the public (peer) review process that is, by design, intrinsic to the NEPA regulatory procedures. NEPA regulation requires that new and significant information submitted during the public comments (or peer review) period that is relevant to environmental concerns and has bearing on the proposed withdrawal action or its impacts be followed by creation of an SDEIS subject to an additional public comments period.   The additional BLM-provided response above in essence suggests, with circular logic, that only new information *already known or recognized by the agency* can be considered to be significant in the creation of the NAPW EIS. The BLM readily admits that although this information is new and could lead to a new or refined conclusions for the NAPWA uranium endowment, but because it has not already been made publicly known in a fashion acceptable to the BLM and its cooperating agencies the information is inadmissible. Recall, however, that this is exactly why NEPA requires that a public comments period follow a DEIS, and requires that an SDEIS to be published in response to critical new information brought forward during the public comment period -- so that significant new information can be reviewed, **developed** and incorporated into the Final EIS by the responsible agency. To act otherwise would grant a Government Agency responsible for an EIS the power to arbitrarily dismiss ANY and ALL (inconvenient) new significant information as having no credibility simply because it is first brought to the public domain during the NEPA process. One of the establishing principles of NEPA is that an EIS is a vehicle for public input for the EIS process. The present BLM actions, if taken to their logical extreme, could eventually deny all significant public input in the development of an EIS. In sum, this BLM answer to public comment is again entirely nonsensical and indicates that the Defendants are purposefully excluding significant new

COMPLAINT

information that does not support the policy goal of the Secretary of the Interior Ken Salazar, the complete withdrawal of the lands designated by Alternative B in the NAPW.

17.    These two examples are representative of the arbitrary and dismissive responses to many of the substantive comments submitted. Judging by the DEIS and FEIS, it is evident to Plaintiff that the BLM as the responsible agency has purposely shaped both the NAPW DEIS and FEIS to support a withdrawal decision already preferred and made by the Secretary of the Interior Ken Salazar, by dismissing new information as irrelevant, omitting critical analyses as unnecessary, and by not responding to the central premises of certain substantive public comments by only addressing the particular aspects of these comments that can be made to appear to be insignificant.

18.    To remedy all of these violations of law, Plaintiff seeks injunctive relief enjoining the Secretary of the Interior, Ken Salazar, from making his withdrawal decision until the Defendants have answered this complaint, and the BLM as the lead agency for the NAPW EIS complies with all applicable laws and regulations, and publishes for public review and comment a supplemental Draft EIS for the Northern Arizona Proposed Withdrawal EIS.

# JURISDICTION

19.    Jurisdiction is proper in this Court under 28 U.S.C. § 1331, 5 U.S.C. § 701, *et seq.*, 16 U.S.C. § 1540, and 28 U.S.C. § 1346, because this action involves the United States as a defendant and arises under the laws of the United States, as set forth in NEPA and the implementing regulations of this law. An actual, justiciable controversy exists between Plaintiff and Defendants. The requested relief is proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705 and 706. The challenged agency actions and/or in-actions are subject to this Court's review under the Administrative Procedure Act, 5 U.S.C. §§ 702, 704, and 706 ("APA") and the citizen suit provision of the ESA, 16 U.S.C. § 1540(g).

COMPLAINT

# VENUE

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the Northern Arizona Proposed Withdrawal area is located on federal lands within Arizona. In addition, Plaintiff resides in Arizona and is the owner of mining claims subject to the proposed withdrawal. Defendants U.S. Department of the Interior and U.S. Bureau of Land Management have offices within the district. Assignment is proper in the Prescott Division because the Northern Arizona Proposed Withdrawal is located in Coconino and Mohave Counties.

# PARTIES

21.     Plaintiff  is the owner of two mining claims in the Tusayan Ranger District of the Kaibab National Forest south of the Grand Canyon in the Southern Withdrawal Parcel. Plaintiff resides in Chino Valley, Arizona and manages the exploration of the Makapuu #2 and Makapuu #3 from this location. The Plaintiff has spent substantial money and time in exploring and developing these Federal lode mining claims and intends to continue to do so into the future. Plaintiff also has a procedural interest in the proper management of these federal lands that is in full compliance with public lands and environmental laws and regulations. Defendants' failure to comply with NEPA as described herein injures Plaintiff and denies Plaintiff the ability to adequately participate in the public review process and denies Plaintiff information concerning environmental and other impacts that NEPA require the agencies to disclose and analyze, and solicit public review of, prior to a decision on the NAPW  by the Secretary of the Interior.

22.     The Plaintiff has real past and present economic injuries and the potential future loss and injury of millions of dollars should the Makapuu #2 and #3 mining claims not be developed into working mines because the Northern Arizona Proposed Withdrawal is approved based upon the refusal of the BLM to comply with NEPA and its implementing regulations. The injuries will be redressed by the relief sought.

COMPLAINT

23.    Defendant Ken Salazar is sued in his official capacity as DOI Secretary. Mr. Salazar is the official that requested the NAPW EIS to inform his decision on the proposed withdrawal and is the official with management responsibility over the public lands surrounding the Grand Canyon National Park including, by agreement,  the mineral resources contained in lands administered by the Department of Agriculture in the Kaibab National Forest also subject to his withdrawal order.

24.    Defendant BLM is an agency within DOI, and is the agency responsible for writing the Northern Arizona Proposed Withdrawal EIS which has refused to comply with the requirements of NEPA as discussed in this complaint.

# FACTUAL ALLEGATIONS

25.    The Northern Arizona Proposed Withdrawal EIS was ordered by Defendant U.S. Department of the Interior ("DOI") Secretary of Ken Salazar upon that Defendant's Segregation Order of July 21, 2009, (74 Fed Reg. 35887 July 21, 2009) which segregated public lands north and south of the Grand Canyon from mining activities for two years with the stated goal of protecting these areas from the adverse effects of locatable hard rock mineral exploration and mining while "various studies and analyses" could be completed to support the writing of the Northern Arizona  Proposed Withdrawal EIS.

26.    The BLM hired SWCA Environmental Consultants to write and manage the EIS process for the NAPW EIS under supervision of the BLM and initiated the formal public scoping process on August 26, 2009, and solicited public comment to assist in formulating the relevant issues to be analyzed.

27. The Draft EIS was published for public comment on February 18, 2011 and the sections of the DEIS cited by NEPA regulations at Section 1502.7 **Page limits** - totaled over 700 pages and the Final EIS totals 648 pages. The Draft EIS is incorporated by reference.

28.    The National Mining Association in their comments submitted to the BLM for the Draft EIS, stated that they had specifically submitted during the scoping process a

COMPLAINT

recommendation that an analysis of the effectiveness of the existing regulatory framework -- federal, state, and local laws and regulatory bodies -- be carried out to determine any flaws and weaknesses in the existing regulatory framework. Mitigating measures could then be proposed in the DEIS as required by NEPA.

29.     The Draft EIS at page ES-3 states the following under the heading **Laws and Policies**: "Mining operations must comply with a variety of environmental and mining laws, including the 1872 Mining Law and BLM and Forest Service management plans. Compliance with federal law (including the National Environmental Policy Act [NEPA]), regulations, and policies and consideration of state and local statutes should be **paramount** [emphasis added] in the development of the EIS."

30.     Nevertheless, the Draft EIS fails to include an analysis for the effectiveness of current laws and regulations on the impact of hard rock exploration and mining in the NAPW area. This is plainly a violation of NEPA as the effectiveness of existing laws and regulations has a direct impact on any decisions concerning the NAPW.

31.     The Draft EIS on page 1-21 states in Table 1-5.1 under the heading of Air Quality and Climate - Release of particulates: "The release of particulates (dust) from exploration drilling operations, mining, and ore hauling traffic and other vehicles on unpaved roads could have an effect on the regional air quality. This could occur in combination with pre-existing emissions from coal plants, cities, traffic, and other sources of regional air pollution to create a cumulative regional effect on air quality."

32.     Nevertheless, the detailed analysis for the Cumulative Regional Effect on Air Quality was excluded from the Draft EIS.

33.     The Draft EIS on page 3-10 Table 3-1.1 section 3.16 Economic Resources under the sub-heading **Energy resources available** states: "The withdrawal of uranium deposits in the study area would remove a potential source of energy production, which would then be replaced by energy produced from other sources, either additional mining elsewhere, imports of uranium

COMPLAINT

from foreign sources, or production from equivalent amounts of other sources like coal, petroleum, natural gas, wind power, or solar."

34. The relevant indicators for the above Economic Resource are stated as: "1) Value of energy produced from study area, and  2) Equivalent amount of other energy-producing commodity represented by uranium production." Nevertheless, analysis of these economic resources and their relevant indicators was excluded from the Draft EIS.  Additionally, an analysis of the cumulative impacts for these economic resources and relevant indicators was excluded from the Draft EIS.

35. The Draft EIS on page B-38 of Appendix B states: "The proposed withdrawal area currently contains approximately 5,300 mining claims that predate the Secretary's publication of the Notice of Proposed Withdrawal, subject to valid existing rights, on July 21, 2009.  New mineral exploration and development could still be authorized under the Proposed Action, Alternative B. However, neither the BLM nor the Forest Service will process a new Notice or plan of operations until the surface managing agency conducts a mineral examination and determines that the mining claims on which the surface disturbance would occur were valid as of the date the lands were segregated. Determining the validity of a mining claim is a complex and time-consuming legal, geological, and economic evaluation that is done on a claim-by-claim basis. Discovery can occur before or after location of a mining claim, but in any case discovery is based on the actual physical exposure of the mineral deposit within the claim boundaries. For the locatable minerals associated with breccia pipe deposits, unless erosion has exposed mineralization in a canyon, this would probably require exploratory drilling and sampling. The discovery would need to have taken place as of the date of segregation, July 21, 2009, and have been maintained until the time of the mineral examination.  None of the assumptions in this analysis, even if referring to specific breccia pipes, should be construed as a determination or indication that certain mining claims may contain a discovery."

36. Nevertheless, the Draft EIS does not analyze the issue of prior existing rights and the direct impact that nearly all mining claims will be voided by the withdrawal when subject to a

COMPLAINT

mineral examination.  The direct impact of a mineral exam and the economic loss of mining claims on the claim holder (loss of time and money invested in current mining claims held) was not analyzed.  The loss of revenue to the BLM for the maintenance fees paid by the claim owners whose claims are made invalid was also not analyzed.

37.     The Draft EIS on page 3-5, Table 3.1-1, Section 3.2 states that for Green House Gases (GHG), the resource condition indicator is: "The quantity of GHG emissions emitted under each alternative."

38.     The Draft EIS on page 1-24, section 1.5.3 Issues Eliminated [emphasis added] from Detailed Analysis states with regards to GHGs : "The extent to which uranium energy production offsets the use of carbon-based fuels that contribute to the release of greenhouse gases (GHGs), which have been linked to global climate change."

39.     The Draft EIS on page 4-7 further states: "Uranium mining activities in the proposed withdrawal will likely cause localized increases in air pollutant emissions, with the exception of GHG emissions, which are considered by scientists to contribute to global climate change and which could have global impacts."

40.     An analysis for the offset of GHGs due to the production and use as nuclear fuel of uranium *produced from* the NAPWA was improperly excluded from the DEIS. An analysis of the cumulative impact on GHG offset *for areas previously* withdrawn was also excluded. Reduction of GHGs by the use of uranium produced from the NAPWA is a direct impact of mining uranium the the NAPWA.

41.     The Draft EIS on page 3-6, Table 3.1-1, Section 3.5 Soil Resources states: "Potential distribution of contaminants in soil could result from erosion and subsequent deposition of mine waste-rock or ore from water and/or wind action, or leakage from retention ponds in the vicinity of each mine site." The condition indicator is stated as: "Extent of projected concentrations of uranium and arsenic compared to background levels and Soil Remediation Level standards."

COMPLAINT

42.     Section 3.4 Water Resources, Table 3.1-1, of the DEIS states: "Contamination of surface runoff from active or reclaimed mines", and the description of the relevant issue is: "Surface runoff from active or reclaimed mine sites could contain elevated uranium and other metals that would affect downstream water quality." The Condition indicator is stated as: "Estimated uranium and arsenic levels in surface runoff."

43.     Chapter 3 of the DEIS does analyze the current condition for Soil and Water resources with regard to uranium contamination due to active or reclaimed mines.

44.     Chapter 3 of the DEIS does not, however, analyze the current resource conditions within the Grand Canyon watershed and specifically the Grand Canyon National Park with regards to soils and surface water contamination due to the presently identified naturally exposed breccia pipe ore bodies containing ore grade uranium or otherwise elevated uranium and arsenic levels in order to put potential mine-related contamination into its natural (background) context.

45.     Further, the DEIS does not analyze the cumulative effects of uranium exploration and mining on soil contamination and surface water runoff contamination in relation or in comparison to the existing conditions from naturally eroded breccia pipe ore bodies with elevated uranium and arsenic exposures within the Grand Canyon watershed.

46.     The BLM failed to include its own work from its most recent Resource Management Plan (Arizona Strip Field Office ROD & Approved RMP 2008) in the DEIS.

47.     A discussion of the Arizona Wilderness Act of 1984 is not included in the DEIS even though it is the landmark piece of legislation that originally defined the land areas available for mineral entry and uranium exploration and mining within the NAPWA.

48.     The validity of assumptions in the Water Resources sections of the DEIS was challenged by the Plaintiff and others in comments submitted to the BLM for the DEIS.

49.     New and substantial information was submitted by Quaterra Resources, Inc. during the DEIS comment period that the mineable uranium endowment of the NAPWA is much greater than what the BLM reported in the DEIS and substantive comments submitted by DIR

COMPLAINT

-16-

Exploration, Inc., estimate the mineable uranium within the NAPWA at about six times greater that what the BLM reported in the DEIS.

50.     New and substantive information regarding blind breccia pipes and their additional contribution to the uranium endowment of the withdrawal area were submitted by Quaterra Resources, Inc., that even further expands reasonable assessments of the uranium endowment for the NAPWA.

51.     New and substantive information was submitted by DIR Exploration, Inc., in its DEIS comments that challenges the BLM's assertion that the withdrawal represents only 12% of the uranium endowment for the NAPWA. DIR's analysis and submitted comments indicate that withdrawing the NAPWA represents a 76% reduction of the uranium available to mine production in the most favorable northern Arizona area for uranium exploration and mining.

52.     New information regarding rights-of-way issues across Federal lands in the NAPWA to access State Trust or Private lands for mineral exploration projects was submitted.

53.     New and substantive information from the Arizona Geological Survey was submitted by comment that shows that uranium mining and exploration cannot possibly contaminate the Colorado River.

54.     The BLM failed to discuss in the Draft EIS conflicts between the proposed actions and the objectives of regional, State, and local land use plans, policies and controls for the area concerned. The Draft EIS did not discuss any inconsistency of a proposed action with any approved State or local plan and describe the extent to which the agency would reconcile its proposed action with the plan or law. The Governor of the State of Arizona, the Legislature of the State of Arizona, the County of Mohave in Arizona, the City of Fredonia in Arizona, and the Southern Counties of Utah have all submitted by comment or resolution their opposition to the Northern Arizona Proposed Withdrawal action. In addition, the BLM failed to discuss conflicts between the proposed actions and the Arizona Strip Wilderness Act of 1938 (H.R. 3562) which was subsequently incorporated into the Arizona Wilderness Act of 1984 at Title III. House Committee Report 98-643, Part 1, pages 34-35 specifically recognized the uranium potential of

COMPLAINT

Northern Arizona, stating "[T]he Committee has not included these lands in wilderness in recognition of their significant mineral (especially uranium) potential."

55.     Plaintiff submitted a letter to Mr. Scott Florence, District Manager, U.S. Bureau of Land Management, Arizona Strip District Office on July 11, 2011, detailing the requirements that NEPA placed upon the BLM as the lead agency in the preparation of the NAPW EIS in regard to the BLM's responsibility under NEPA to publish for public comment a Supplemental Draft EIS and that Plaintiff's letter was a legal notification that the BLM must follow the laws and regulations for the preparation of an EIS. Mr. Florence responded on August 4, 2011 that the BLM does "not plan to issue a Supplemental DEIS".

56.  Despite this failure of the lead agency to follow the regulatory requirements of NEPA, the Final EIS was published in *The Federal Register* on October 27, 2011. The Final EIS is incorporated by reference.

# STATUTORY AND REGULATORY BACKGROUND

## The National Environmental Act (NEPA)

57.     NEPA requires federal agencies to consider the environmental consequences of their actions. 42 U.S.C. § 4331, *et seq*. NEPA ensures that the agency will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to a larger audience to ensure that the public can play a role in both the decision making process and the implementation of the agency's decision.

58.     Pursuant to NEPA's implementing regulations, federal agencies must review the direct and indirect impacts of their actions, as well as the cumulative impacts of such actions. Direct effects are those effects "which are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). Indirect effects are those effects "which are

COMPLAINT

caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). Cumulative impacts include impacts of "other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.

59. Regulations implementing NEPA require federal agencies to prepare supplements to either draft or final EIS's or EA's if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.0(c)(1)(ii).

60.    NEPA directs federal agencies to comply with its procedures "to the fullest extent possible." 42 U.S.C. § 4332.

61.    NEPA at part 1502.9 (a) states:  "If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion."

62.    Additionally, NEPA at part 1502.9 (c) requires: "Agencies: 1. Shall prepare supplements to either draft or final environmental impact statements if: (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. 2. May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so."

63.    NEPA at Sec. 1502.22: "**Incomplete or unavailable information**. When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

COMPLAINT

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

1.      A statement that such information is incomplete or unavailable;

2.      A statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment;

3.      A summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and

4.      The agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason."

64.     NEPA at section 1502.9 (a): "The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action."

65.     NEPA at section 1502.14(f):  "**Alternatives including the proposed action.** This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (Sec. 1502.15) and the Environmental Consequences (Sec. 1502.16), it should present the environmental impacts of the

COMPLAINT

proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decision maker and the public. In this section agencies shall:

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives."

66.     NEPA at Sec. 1502.16: "**Environmental consequences.** This section forms the scientific and analytic basis for the comparisons under Sec. 1502.14. ...This section should not duplicate discussions in Sec. 1502.14. It shall include discussions of: ... (c) Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See Sec. 1506.2(d).) ...(h) Means to mitigate adverse environmental impacts (if not fully covered under Sec. 1502.14(f))."

67.     NEPA at Sec. 1506.2 (d):  "To better integrate environmental impact statements into State or local planning processes, statements shall discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law."

68.     NEPA at Sec. 1502.2(g): "Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made."

69.     NEPA at Sec. 1502.7 Page limits: "The text of final environmental impact statements (e.g., paragraphs (d) through (g) of Sec. 1502.10) shall normally be less than 150 pages and for proposals of unusual scope or complexity shall normally be less than 300 pages."

COMPLAINT

70.     NEPA at Sec. 1502.2**(a)** Implementation: To achieve the purposes set forth in Sec. 1502.1 agencies shall prepare environmental impact statements in the following manner: **(a)** Environmental impact statements shall be analytic rather than encyclopedic.

# CLAIMS FOR RELIEF

**First Claim**

**Defendant BLM Has Failed to Prepare A Supplement to the Draft EIS to Consider Significant New Circumstances and Information Relevant to Environmental Concerns for The Northern Arizona Proposed Withdrawal, in Violation of NEPA.**

71.     Plaintiff hereby incorporate by reference all preceding paragraphs.

72.     NEPA's implementing regulations require federal agencies to prepare supplements to Draft EISs if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).

73.     Comments submitted by Quaterra Resources, Inc. (Eugene D. Spiering), DIR Exploration, Inc. (Larry D. Turner), and ACERT provide new information regarding the mineable uranium endowment of the withdrawal area , this information among other things, show that the Northern Arizona Proposed Withdrawal Area (NAPWA) could have around 110 economically viable breccia pipes or more containing 165,000 tons (330 million pounds) of $U_3O_8$ versus the 45 breccia pipes containing 33,155 tons (66.3 million pounds) $U_3O_8$ cited by the

COMPLAINT

the new information provided by Quaterra and ACERT, the BLM has underestimated the mineable uranium contained within the NAPWA by around 500 percent.

74.   New information submitted shows that the USGS's gross uranium endowment estimate was much less accurate than current geological knowledge permits.  Public comments provided by DIR Exploration, Inc., point out the basic geological control for the 45 mile wide by 100 mile long north-south trending area containing the bulk of historically discovered and mined uranium.  This most strongly endowed uranium-mineralized area open to mineral entry before July 2009 is *entirely* contained by the NAPWA. The USGS-estimated 12% withdrawal of northern Arizona uranium resources postulated in the DEIS and FEIS that would be a consequence of the NAPW has been shown by geological evidence pointed out by DIR Exploration, Inc., to instead constitute a 76% withdrawal of the economically-viable northern Arizona breccia pipe uranium resource available to mining before the start of the current segregation period. The FEIS and DEIS underestimate the impact of the NAPW on available mineable uranium endowment by about a factor of six (600%). This new information, like that very similar data independently originating from Quaterra Resources, has far-reaching effects on the accuracy of the subsequent analysis of the completed DEIS. The entire EIS will have to be adjusted to account for this basic DEIS and FEIS error in estimating the mineable uranium available in the NAPWA; i.e., *"There are [indeed] significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."*

75.    While the number of mines considered to be developed during the next 20 years may not have been changed much by this new information provided during the DEIS public comment period, the total value of the mineable uranium resource is drastically undervalued both in the NAPWA and in those lands previously withdrawn from mineral entry. The new information submitted indicates that the NAPWA contains a uranium resource that would be in production for several generations and provide a long-lasting economic contribution to northern Arizona and southern Utah. This being the case, according to the new information, the economic

COMPLAINT

-23-

analysis in the DEIS is materially deficient as it does not consider the extended time frame for mining, the greater total amount of uranium produced, nor the probabilities that a work force of greater size will be operating in Northern Arizona for a longer period of time.

76.    New and significant information regarding blind breccia pipes and their additional contribution to the uranium endowment of the withdrawal area was submitted by Quaterra Resources, Inc., information that further expands a reasonable estimate of the uranium endowment for the NAPWA. The DEIS and the USGS's model for estimating the uranium endowment for the NAPWA did not include the fact that present mineral exploration technology can locate these "blind breccia pipes" and the uranium contained within them. As a result, the BLM's oversimplified estimate for the uranium endowment of the NAPWA is in further error.

77.    New information regarding rights-of-way issues across Federal lands in the NAPWA to access State Trust or Private lands for mineral exploration projects was submitted. The DEIS prepared by the BLM does not address this issue.

78.    New and significant information from the Arizona Geological Survey was submitted by comment that shows that uranium mining and exploration cannot possibly contaminate the Colorado River. Open File Report 11-04 V1.0, Breccia-Pipe Uranium Mining in the Grand Canyon Region and Implications for Uranium Levels in Colorado River Water, April 2011, was submitted by comment to the BLM for the NAPW by the Arizona Department of Environmental Quality. The report found that uranium mining could in no way harmfully contaminate Colorado River water. This new information has important implications for the NAPW EIS that have not been fully considered by either the DEIS or FEIS, the BLM, or Secretary of Interior Ken Salazar .

79.    In summary, BLM's refusal to prepare a supplemental Draft EIS for the NAPW prior to publishing the Final NAPW EIS is a violation of NEPA's implementing regulations, and is agency action unlawfully withheld and/or unreasonably delayed within

COMPLAINT

-24-

the meaning of section 706(1) of the APA. 40 C.F.R. § 1502.9(c)(1)(ii); 5 U.S.C. § 706(1). BLM's actions are also an abuse of discretion, are done without observance of procedure required by law, are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2).

**Second Claim**

**Defendant BLM Has Failed to Prepare A Supplement to The Draft EIS in Response to the Large Number of Substantive Comments Received that Directly Challenge the Accuracy, Validity, Adequacy, and Scientific Rigor to the Point that the DEIS Precludes Meaningful Analysis in Direct Violation of NEPA.**

80.   Plaintiff hereby incorporates by reference all preceding paragraphs.

81.   NEPA's implementing regulations require federal agencies to prepare an SDEIS "...if a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion." 40 C.F.R. § 1502.9(a).

82.   Analysis for the effectiveness of current laws and regulations on regulating and controlling the impact of hard rock exploration was improperly excluded from the Draft EIS.

83.   The detailed analysis for the cumulative regional effect on air quality was improperly excluded from the Draft EIS.

84.   The analysis required by the DEIS itself on Table 3.1-1 for the sub-heading "Energy Resource Available" to determine 1) the **value of energy** produced from study area [estimated $560 Billion], and  2) Equivalent amount of other energy-producing commodity represented by uranium production [for example Coal: 2.7 Billion tons]. Analysis of these economic resources and their relevant indicators was improperly excluded from the Draft EIS. Additionally, an analysis of the cumulative impacts for these economic resources (energy values and equivalent other energy- producing commodity) and relevant indicators for lands previously

COMPLAINT

withdrawn (cumulative affects) was improperly excluded from the Draft EIS.

85.    The Draft EIS does not analyze the issue of prior existing rights and the direct impact that nearly all mining claims will be voided by the withdrawal when subject to a mineral examination.  The direct impact of a mineral exam and the economic loss of mining claims on the claim holder (loss of time and money invested in current mining claims held due to exploration costs and maintenance fees paid to the BLM) was not analyzed.  The loss of revenue to the BLM for the annual claims maintenance fees paid by the claim owners whose claims are made invalid was not analyzed.

86.    The Draft EIS does not analyze the offset of GHGs due to the production and use of uranium *produced from the NAPWA*. The cumulative impact on GHG offset *for areas previously* withdrawn was not calculated for uranium that could have been produced for nuclear fuel. These analyses must be performed as this is a direct impact of the mining of the NAPWA for uranium and provide context (meaningful analysis) for the DEIS calculations of GHGs that would be produced due to uranium exploration and mining in the NAPW area.

87.    The DEIS does not analyze the current resource conditions within the Grand Canyon watershed and specifically the Grand Canyon National Park with regard to soils and surface water contamination due to the presently identified naturally exposed breccia pipe ore bodies containing ore grade uranium or otherwise elevated uranium and arsenic values. Excluding this analysis of background conditions before mining does not allow context (meaningful analysis) for the analysis of the potential contamination from mining sites both active and reclaimed.

88.    The DEIS does not analyze the cumulative effects of uranium exploration and mining on soil contamination and *surface water runoff* contamination in relation to the existing conditions from naturally eroded breccia pipe ore bodies with elevated uranium and arsenic exposures within the Grand Canyon watershed. Excluding this comparative analysis does not allow context (meaningful analysis) for the analysis of the impact of potential contamination from mining sites both active and reclaimed.

COMPLAINT

-26-

89.    The BLM excluded the results of its own Resource Management Plan ( Arizona Strip Field Office ROD & Approved RMP 2008) from the DEIS. The BLM's RMP concluded that most of the Arizona Strip should remain open to mineral entry. This 5 year previous effort by the BLM involved the inputs of thousands of stakeholders and, accordingly, its results should have been integrated into the NAPW DEIS.

90.    A discussion of the Arizona Wilderness Act of 1984 was excluded from the DEIS even though it is the landmark piece of legislation that originally defined the land areas available for mineral entry and uranium exploration and mining. The development of this Act recognized the uranium potential of Northern Arizona and left these lands designated for multiple use, specifically including uranium mining.

91.    The validity of assumptions in the Water Resources sections of the DEIS was challenged by the Plaintiff and others in comments submitted for the DEIS. The Water Resource section analysis was based on a theoretical approach that does not meet the requirements of NEPA at Section 1502.22(b)4.  NEPA at Section 1502.22(b)4 states that "the agency's evaluation of such impacts based upon theoretical approaches or research methods [be] generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by "..**credible scientific evidence, is not based on pure conjecture, and is within the rule of reason"** [emphasis added]. The analyses included in the Water Resource sections of the DEIS are not supported by credible scientific evidence, and instead are based on, and limited by, biased conjecture and are not within the rule of reason.

92.    The BLM failed to discuss in the Draft EIS conflicts between the proposed actions and the objectives of  regional, State, and local land use plans, policies and controls for the area concerned. The Draft EIS did not discuss any inconsistency of a proposed action with any approved State or local plan and did not describe the extent to which the agency would reconcile its proposed action with the plan or law. The Governor of the State of Arizona, the Legislature of

COMPLAINT

-27-

the State of Arizona, the County of Mohave in Arizona, the City of Fredonia in Arizona, and the Southern Counties of Utah have all submitted by comment or resolution their opposition to the Northern Arizona Proposed Withdrawal action.

93.     NEPA at Sec. 1502.16 (c) states: "Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See Sec. 1506.2(d)) should be addressed by the NAPW EIS. This subject was not addressed in the DEIS in violation of NEPA. Additionally, NEPA at Sec. 1506.2 (d)...To better integrate environmental impact statements into State or local planning processes, statements shall discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally-sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law." This regulation was not followed in the DEIS and is a violation of NEPA.

94. NEPA at section 1502.14     **(f)**: "Alternatives including the proposed action**.** This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (Sec. 1502.15) and the Environmental Consequences (Sec. 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decision maker and the public."

In this section agencies shall: "**(f) Include appropriate mitigation measures not already included in the proposed action or alternatives"** [emphasis added].

Considering the very large number of relevant issues addressed in a Draft EIS that is over 1000 pages in length, the Draft EIS for the NAPWA provides only a very few mitigating measures . Nearly all mitigating measures mentioned in the NAPW DEIS are normal standard operating procedures and are required by existing law and regulation. NEPA requires that mitigating

COMPLAINT

measures be proposed for **all** relevant issues analyzed.

95.     The above examples of missing or inadequate analysis taken as a whole or even in part illustrate that the Draft EIS does not meet the basic requirement of NEPA at Section 1502.9(a) to provide "meaningful analysis". The large number of excluded required analyses cited in this complaint and neglect of the comments submitted to the BLM for the NAPW does not provide the public and the decision maker the correct context (meaningful analysis) from which to make an informed decision. The above examples are only a small sample of the large number of substantive public comments submitted in response to the NAPW Draft EIS that were ignored, dismissed, or otherwise left unanswered by the Defendants.  The improperly excluded analyses and discussions of relevant issues are distributed over the entirety of the Draft EIS for the NAPW and so the complete document is affected and should be subject to the required issuance of a supplemental Draft EIS.

96.     In summary, BLM's refusal to prepare a supplemental Draft EIS for the NAPW is a violation of NEPA's implementing regulations, and is agency action unlawfully withheld and/or unreasonably delayed within the meaning of section 706(1) of the APA. 40 C.F.R. § 1502.9(c)(1)(ii); 5 U.S.C. § 706(1). BLM's actions are also an abuse of discretion, are done without observance of procedure required by law, are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2).

**Third Claim**

**The BLM Has Written A Draft and Final EIS To Justify A Policy Decision Already Made by Secretary of the Interior, Ken Salazar,  by  Purposely Shaping, Mis-interpreting, and Disregarding Scientific and Technical Findings to Support the Secretary's Prior Decision To Withdraw over One Million Acres of Land as Proposed in the NAPW Action in Direct**

COMPLAINT

**Violation of NEPA, and the BLM Refuses To Publish a Supplemental Draft EIS to Correct this Violation of NEPA.**

97.    Plaintiff hereby incorporate by reference all preceding paragraphs.

98.    NEPA at Sec. 1502.2(g):"Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made."

99.    NEPA at section 1502.9 (a)."The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action."

100.    The Draft EIS for the NAPW does not make an effort to disclose and discuss the major point of view that Alternative A is a viable alternative. Quite the opposite is true, the numerous omissions of analysis cited in Plaintiff's Second Claim, in addition to the voluminous comments submitted to the BLM in response to the NAPW DEIS, and the analyses specifically called for by the Draft EIS that were improperly discarded in the DEIS, were precisely those analyses that support Alternative A of the NAPW DEIS; i.e., the No Action Alternative. This purposeful bias is extensive and permeates the whole of the DEIS and minimizes supporting analysis for Alternative A, while arbitrarily exaggerating the analytical results supportive for withdrawal. Given the extent and consistency of this purposeful bias in the DEIS and FEIS, the BLM's refusal to produce an SDEIS in response to public identification of the deficiencies of the NEPA work performed by the BLM, and Secretary Salazar's premature and hurried election of a preferred alternative to withdraw based on fatally flawed EIS studies, it is evident that this bias on the part of the Defendants has been designed to purposely justify a decision already made by the Secretary of the Interior Ken Salazar.

101.    The Final EIS for the NAPW continues this bias, as illustrated by the BLM response to the comments submitted that provided new and significant information regarding the uranium endowment for the NAPWA. The BLM's response is to claim that the new information had no standing because it was not "peer reviewed" even though the comments were submitted

COMPLAINT

by certified, registered, or licensed professional geologists with decades of experience in exploration of the NAPWA for uranium, and despite the fact that their conclusions are based upon tens of thousands of man-hours and millions of dollars expended by various exploration companies over the last few decades in on-the-ground exploration including geochemical, geophysical, exploration drilling, and aerial VTEM mapping methodologies, and published (peer reviewed) geological data, including that published by the USGS.

102.    The BLM admits that this information is new and could lead to a new or refined conclusion for the NAPW uranium endowment, but because it has not been sufficiently developed (in the opinion of the BLM) and "peer reviewed" it has no standing, according to the BLM. However, this is exactly why NEPA requires that a Supplemental DEIS to be published in response to critical new information. It is so that significant new information can be thoroughly examined, **developed,** and incorporated into the Final EIS by the responsible agency; i.e., so that the new information can be "peer reviewed". It is the responsible agencies' responsibility under NEPA to develop and incorporate such wide-reaching and strongly impacting new information. To do otherwise would grant a Government Agency responsible for an EIS the power to dismiss ANY and ALL new significant information as not being credible simply because it was submitted by the general public or by otherwise thoroughly competent non-academic professionals who have not previously published the information in an academically-oriented, peer-reviewed journal.

103.    The BLM developed its Resource Management Plan ( Arizona Strip Field Office ROD & Approved RMP 2008 ) and concluded that most of the Arizona Strip should remain open to mineral entry. The Secretary of the Interior, Ken Salazar, initiated the withdrawal proceeding and the EIS process at the behest of environmental groups and not as a result of any analysis and request from the BLM itself, and without any scientific data whatsoever that suggested that an emergency existed, or that extraordinary measures must be taken to preserve values that would otherwise be lost, or without any finding that existing laws and regulations ( including NEPA-required EISs for each proposed mining operation) were inadequate to protect the lands of

COMPLAINT

northern Arizona. The consulting company, SWCA Environmental Consultants ("SWCA") was hired to manage part of the EIS process and to write the NAPW EIS under the supervision of high level BLM administrators. The BLM and USGS scientists were relegated to a supporting role of providing data, scientific papers, and commentary to SWCA. As documented in the BLM's Arizona Strip Field Office ROD & Approved RMP (2008), the BLM itself had previously found no grounds to restrict uranium exploration and mining from any lands in the NAPWA. Therefore, SWCA has written a DEIS and FEIS in a manner intended to shape scientific and technical analysis and findings to conform to the implied if not stated policy goals and desires of BLM and the DOI policy-makers at the highest administrative levels.

104.    In prematurely choosing Alternative B (a complete withdrawal of the lands proposed for withdrawal) for the Final EIS as the preferred alternative when the Draft EIS provides no substantive scientific reasons for doing so, the Secretary of the Interior has publicly admitted to politically-based, biased Administrative and Executive policy that evidently has guided BLM and DOI actions from the beginning of the NAPW NEPA process.

105.    By declaring a second temporary emergency withdrawal without presenting any tangible evidence that an emergency exists or that extraordinary measures must be taken to preserve values that would otherwise be lost further indicates that the Secretary of the Interior has, in complete functional disregard of the NEPA decision-making process, arbitrarily and purposely already chosen to put the 20-year NAPW into effect solely by using his executive authority as Secretary of the Interior.

106.    The BLM is the responsible agency for the NAPW EIS and its scientific and technical integrity. The BLM and its agents shaped and interpreted scientific and technical findings both in the DEIS and the FEIS (including the responses to submitted comments) to support a policy decision prematurely and improperly made by the Secretary of the Department of Interior. These violations of NEPA and its attendant administrative process are so grievous, and the so-called scientific and technical analyses represented as supporting these violations are so devoid of logic and scientific credibility, that it is plain that the BLM and its cooperating

COMPLAINT

agencies and agents no longer deserve the deference generally accorded by the courts to a government agency in regard to expertise in scientific and technical matters.

107.    In direct violation of NEPA, the BLM has written the NAPW Draft EIS to justify Alternative B in support of a decision that Secretary Salazar has already made; i.e., to execute the complete withdrawal of over 1 million acres of mineral-bearing land in Northern Arizona from mining for a period of 20 years.

108.    In summary, BLM's refusal to prepare a supplemental Draft EIS for the NAPW to correct the biased analysis as currently incorporated into the Draft EIS is a violation of NEPA's implementing regulations, and is agency action unlawfully withheld and/or unreasonably delayed within the meaning of section 706(1) of the APA. 40 C.F.R. § 1502.9(c)(1)(ii); 5 U.S.C. § 706(1).  BLM's actions are also an abuse of discretion, are done without observance of procedure required by law, are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2).

**Forth Claim**

**The BLM Has Written An Overly Encyclopedic Draft EIS For The NAPW EIS That Exceeds Page Limitations As Set Forth In  NEPA.**

109.    Plaintiff hereby incorporate by reference all preceding paragraphs.

110.    NEPA's implementing regulations at Section 1502.7 require federal agencies to prepare final environmental impact statements (e.g., paragraphs (d) through (g) of Sec. 1502.10) shall normally be less than 150 pages *and for proposals of unusual scope or complexity shall normally be less than 300 pages* (emphasis added). Due to the overly encyclopedic writing, the repetitive nature of the Draft EIS format, and the unnecessary and extraordinary length of many of the sections in the Draft EIS, the cited sections of the Draft EIS are over 700 pages in lengths in a clear violation of the intent of the NEPA regulations to provide a concise analytic format for an EIS.

COMPLAINT

-33-

111.    The BLM admits in a response to a comment on the extraordinary length of the DEIS that "Although the EIS exceeds the number of pages suggested by CEQ regulations, it contains the number of pages needed to provide the information necessary to inform the Secretary of Interior's decision."

112.    NEPA requirements at  Section 1502.7 are very clear and the BLM's assertion that the needs of the Secretary of the DOI supersede NEPA is unsupportable. The BLM has clearly violated NEPA regarding the size of the Draft and Final EIS.

113.    One of the founding principles of NEPA and its implementing regulations is that public participation is an integral part of the EIS process. When a government agency greatly exceeds the page length requirement as specified in NEPA regulations at Section 1502.7, the Agency is abridging the Public's right to both participate in the decision making process and the implementation of the agency's decision in the EIS process because it places too large of a barrier to active participation. This abridgment of the public's right to fair and active participation is protected under the principle of equal protection guarantees provided by the U.S. Constitution in accordance with the Fifth and Fourteenth Amendments.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Declare that Defendants are in Violation of NEPA-implementing regulations for the cited laws, and the APA;

B.    Declare that Defendants have abused the customary civil, legislative, and judicial deference accorded to Government Agency expertise as illustrated by the blatant manipulation of basic scientific and technical knowledge, assumptions, findings, analyses, and exclusions of new significant information in the NAPW EIS process to support a policy decision already made by Defendant Secretary of Interior Ken Salazar.

COMPLAINT

-34-

C.     Immediately enjoin Defendant Secretary of the Interior, Ken Salazar, from withdrawing any lands cited in the Northern Arizona Proposed Withdrawal until Defendant BLM and Defendant Ken Salazar have answered this complaint and until this complaint has been adjudicated by the Court. Secretary Salazar has indicated that he will withdraw the lands specified by Alternative B of the NAPW after the 30 day public comment period that started on October 28, 2011.

D.     Enjoin Defendant Secretary of the Interior, Ken Salazar, from withdrawing any lands cited in the Northern Arizona Proposed Withdrawal until the BLM has published, for public comment, a complete Supplemental Draft EIS and until a subsequently re-issued Final NAPW EIS has been published and recorded in *The Federal Register*.

E.     Order the BLM to withdraw the Final NAPW EIS published October 27, 2011 and publish for public comment a complete Supplemental Draft EIS for all sections of the Draft EIS, that fully conforms with the requirements of NEPA, prior to republishing the Final EIS for the Northern Arizona Proposed Withdrawal.

F.     Declare that the BLM's excessively long DEIS and FEIS is an unconstitutional abridgment of the Public's right to fairly and completely engage in the EIS process.

F.     Order the BLM to specifically conform to NEPA at Section 1502.7 and limit those sections in the Final EIS referenced by Section 1502.7 to about 300 pages.

G.     Award to Plaintiff his costs, expenses, expert witness fees, and reasonable attorney fees pursuant to the ESA, 16 U.S.C. § 1540, and the Equal Access to Justice Act, 28 U.S.C. § 2412; and,

H.     Grant Plaintiff such further relief as may be just, proper, and equitable.

COMPLAINT

-35-

1

2

3  Respectfully Submitted,

4

5  November 1, 2011

6

7                                          Gregory D. Yount

8                                          *Plaintiff pro se*

9                                          807 W. Butterfield Rd

10                                         Chino Valley, Arizona 86323

11                                         Tel: 928-899-7029

12                                         gregory_yount@northern-arizona-uranium-

13                                         project.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29  COMPLAINT