FILED _____ LODGED
_____ RECEIVED _____ COPY

JAN 2 5 2012

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

1

2 **IN THE UNITED STATES DISTRICT COURT**

3 **FOR THE DISTRICT OF ARIZONA**

4 **PRESCOTT DIVISION**

5 GREGORY YOUNT ) Case No. 3:11-cv-08171-FJM
 )
6                    Plaintiff, )
 )
7    v. ) **PLAINTIFF'S FIRST AMENDED**
 ) **COMPLAINT FOR**
8 KEN SALAZAR, Secretary of the Interior; ) **DECLARATORY AND**
 and ) **INJUNCTIVE RELIEF**
9 U.S. BUREAU OF LAND MANAGEMENT )
 )
10                    Defendants. )
 )

11

12 Gregory Yount
 807 W. Butterfield Rd
13 Chino Valley, Arizona 86323
 928-899-7029
14 *Plaintiff Pro Se*

15 **INTRODUCTION**

16    1.        Gregory Yount, appearing pro se, files his First Amended Complaint to challenge

17 the failure of the Defendants Department of the Interior (DOI) Secretary Ken Salazar and the

18 Bureau of Land Management (BLM) to fully comply with the National Environmental Policy Act

19 (NEPA) procedures in the preparation of the Northern Arizona Proposed Withdrawal (NAPW)

20 Final Environmental Impact Statement (FEIS).  Plaintiff is filing suit in accordance with section

21 XIII of  Interior Secretary's Record of Decision (ROD) signed on January 9, 2012  which adopts

22 the Secretary's preferred alternative to withdraw more than one million acres of federal land from

1   mining and its signed public land order effecting the closure for up to 20 years, and requires that

2   any challenge to the final ROD be brought in Federal District Court.

3       2.      The completed FEIS reveals numerous violations of the procedures required by

4   NEPA and the implementing regulations issued by the Council on Environmental Quality (CEQ).

5   Specifically, the FEIS fails to acknowledge or adequately address the scientific controversies that

6   have environmental significance; fails to adequately address the material and substantive public

7   comments; and further fails to provide for public comment on the changed focus and rationale of

8   the withdrawal.  After the close of the public comment period on the draft environmental impact

9   statement (DEIS), the Interior Secretary directed BLM to adopt Alternative B, thus making much

10  if not all, of the public comment irrelevant.  In doing so, the Secretary committed the Department

11  to a particular course of action before BLM had completed its analysis.  This means that there

12  was no good faith or objective analysis of the withdrawal or of the specific public comments

13  demonstrating that the assumptions said to justify the withdrawal were wrong.

14      3.      Accordingly the FEIS must be set aside and remanded for revision and public

15  comment to address the changed focus and rationale of the withdrawal and address the

16  unresolved scientific controversies raised in the public comments on the DEIS. These unresolved

17  scientific controversies raised by public comment include the amount of uranium reserves to be

18  foreclosed, the lack of any impacts on the watershed for the Colorado River system, the lack of

19  new scientific study to provide information essential to a reasoned choice, and the adequacy of

20  existing regulatory measures to mitigate the impacts of mining on public land resources.  Finally,

21  by understating the amount of the uranium resource endowment, the FEIS failed to adequately

22

1   analyze and disclose the long-term social and economic impacts of foreclosing mining on more

2   than one million acres of federal land.

3       4.      Plaintiff asks that this Court set aside the FEIS, the ROD, and any public land

4   order relying on the ROD and FEIS in light of the Defendants' failure to follow the NEPA

5   procedures.  Plaintiff further asks that this Court enjoin BLM from implementing the preferred

6   alternative identified in the FEIS unless and until BLM prepares a revised DEIS or supplements

7   the FEIS to correct these violations of NEPA.

8                                        **JURISDICTION**

9       5.      Jurisdiction is proper in this Court under 28 U.S.C. §1331, 5 U.S.C. §§701, 702,

10  706, and 28 U.S.C. §1361, because this action involves the United States as a defendant and

11  arises under the laws of the United States, as set forth in NEPA and the implementing

12  regulations, 40 C.F.R. Part 1500.  An actual, justiciable controversy exists between Plaintiff and

13  Defendants. The requested relief is proper under 28 U.S.C. §§2201-02 and 5 U.S.C. §§705 and

14  706. The challenged agency actions and/or the failures to act are subject to this Court's review

15  under the Administrative Procedure Act (APA), 5 U.S.C. §§702, 704, and 706.

16                                          **VENUE**

17  6.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(e) because the case and

18  controversy pertains to federal lands within Arizona. In addition, Plaintiff resides in Arizona and

19  is the owner of mining claims subject to the proposed withdrawal. Defendants U.S. Department

20  of the Interior and U.S. Bureau of Land Management have offices within the district. Assignment

21  is proper in the Prescott Division because the Northern Arizona Proposed Withdrawal Area

22  (NAPWA) is located in Coconino and Mohave Counties.

1

2

3                                     **PARTIES**

4          7.        Plaintiff owns two mining claims in the Tusayan Ranger District of the Kaibab

5    National Forest south of the Grand Canyon in the Southern Withdrawal Parcel. Plaintiff resides

6    in Chino Valley, Arizona and manages the exploration of the Makapuu #2 and Makapuu #3

7    mining claims from this location. The Plaintiff has spent substantial money and time in

8    exploring, discovering valuable minerals, and developing these Federal lode mining claims, and

9    enjoys a recreational and esthetic enjoyment of the lands withdrawn by the Secretary's order in

10   pursuit of mineral exploration and intends to continue to do so into the future.  Plaintiff also

11   enjoys a legally-protected procedural interest to ensure that Defendants manage these federal

12   lands in accordance with federal land and environmental laws and regulations.  Plaintiff has

13   participated in all of the processes provided by BLM, including filing of scoping comments,

14   comments on the DEIS, and attending and actively engaging BLM personnel and their agents at

15   public meetings.  Defendants' failure to comply with NEPA as described herein injures Plaintiff

16   and denies Plaintiff the ability to meaningfully participate in the public review process and denies

17   Plaintiff information concerning environmental and other impacts that NEPA require the

18   agencies to disclose and analyze, and solicit public review of, prior to a decision on the NAPW

19   by the Secretary of the Interior.

20         8.        The Plaintiff suffers, and will suffer, past and present economic injuries and the

21   potential future loss and injury of millions of dollars should the Makapuu #2 and #3 mining

22   claims not be developed into working mines due to the withdrawal.  Plaintiff also suffers

4 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

1   recreational and esthetic injury from the curtailment of mineral exploration activities on the land

2   withdrawn. Plaintiff also suffers procedural injuries based on the fact that he and other

3   commentators identified the errors that would affect or change the decision and Defendants have

4   declined to follow the procedures that would require a change in Defendants' course of action,

5   including not making the withdrawal.  The Interior Secretary's order to BLM mandating

6   selection of the withdrawal alternative predecides the issues without regard to fact or analysis and

7   without regard to the NEPA procedures.

8        9.      The injuries will be redressed by the relief sought.  If BLM had to consider the

9   new information and address the scientific controversies, it is more likely than not, that

10  Defendants could reasonably find that the proposed withdrawal is unnecessary to protect public

11  values.  Similarly, if Defendants considered the lost revenues to the State of Arizona and the

12  local communities, BLM could not conclude that the withdrawal would not have severe adverse

13  impacts on the state, its programs, or on the communities.  These factors would weigh heavily

14  against proceeding with the proposed withdrawal.

15       10.     Defendant Ken Salazar is sued in his official capacity as DOI Secretary.  Mr.

16  Salazar is the official that ordered the preparation of the NAPW EIS to document the impacts of

17  the proposed withdrawal and is the official with ultimate management responsibility over the

18  federal lands surrounding the Grand Canyon National Park including, by agreement, the mineral

19  resources contained in lands administered by the Department of Agriculture in the Kaibab

20  National Forest also subject to his withdrawal order.

21

22

5 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

1    11.    Defendant BLM is an agency within DOI, and is the agency responsible for

2    writing the Northern Arizona Proposed Withdrawal EIS which has failed to comply with the

3    requirements of NEPA as discussed in this complaint.

4

5                              **FACTUAL ALLEGATIONS**

6    12.    The DOI Secretary pursuant to the Secretary's Segregation Order of July 21, 2009,

7    74 Fed Reg. 35887 (July 21, 2009), closed more than one million acres of federal lands outside

8    of the northern and southern boundaries of the Grand Canyon National Park from mining

9    activities for two years with the stated goal of protecting the Colorado River watershed in these

10   areas from the adverse effects of locatable hard rock mineral exploration and mining while

11   "various studies and analyses" could be completed to support the preparation of the NAPW EIS.

12   13.    The NAPW EIS was ordered by Defendant Interior Secretary Salazar when he

13   signed the Segregation Order of July 21, 2009, referenced above.  BLM published a notice of

14   intent to prepare an EIS on August 26, 2009 and solicited public comment to assist in

15   formulating the relevant issues to be analyzed.  74 Fed. Reg. 43152 (Aug. 26, 2009).

16   14.    BLM published the notice of availability of the NAPW DEIS for public comment

17   on February 18, 2011.  76 Fed. Reg. 9594 (Feb. 18, 2011).  Even though the NEPA rules, 40

18   C.F.R. §1502.7, charge the agencies to prepare a concise statement, the NAPW DEIS with

19   appendices exceeded 1000 pages.  The public comment period was set for only 45 days ending

20   on April 4, 2011. Plaintiff and others petitioned the BLM to extend the public comment period

21   due to the voluminous size of the DEIS and the overwhelming number of factual errors,

22

6 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

1   omissions, and lack of scientific rigor upon which they wished to comment. The BLM extended

2   the public comment period for an additional 30 days.

3         15.    Plaintiff submitted 102 pages of substantive comments identifying actual

4   scientific controversies, factual and scientific errors, omissions, and generally documenting the

5   lack of scientific rigor for the NAPW DEIS.  Additional substantive comments detailing errors,

6   omissions, or new information for this DEIS were filed by:  The American Clean Energy

7   Resources Trust, DIR Exploration, Inc., Quaterra Resources, Inc., Energy Fuels Resources, the

8   Arizona Mining Association, Jerry H. Smith for the Arizona Department of Environmental

9   Quality, Katie Sweeney for the National Mining Association, Laura Skaer for the Northwest

10   Mining Association, Patrick Hillard, Ted Jensen, Steve Trussel for the Arizona Rock Products

11   Association and Kris Hefton of Vane Minerals.  In all, the above-named individuals and entities

12   submitted approximately 415 pages of substantive comments that document the errors,

13   omissions, new environmentally significant information, and/or lack of scientific rigor for the

14   DEIS that itself exceeded 1000 pages. The submitted comments also included relevant and

15   significant new information that was not considered by the BLM in the writing of the DEIS.

16   These comments submitted to the BLM  and entered into the Public Record by the BLM are

17   incorporated by reference.

18   **New Information**

19       16.    The public comments submitted on the DEIS included significant new information that is

20   relevant to environmental concerns and directly bearing on the stated objectives of the proposed

21   withdrawal action or its impacts.  They include: (1) new information regarding the mineable

22   uranium endowment of the withdrawal area that is about five to six times greater that what the

7 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

1    BLM reports in the DEIS, (2) new information regarding blind breccia pipes and their additional

2    contribution to the uranium endowment of the withdrawal area above that previously projected

3    by federal agencies, (3) new information regarding rights-of-way issues across Federal lands in

4    the NAPW to access State Trust or private lands for mineral exploration and development, and

5    (4) new information from the Arizona Geological Survey documenting how uranium mining

6    cannot possibly contaminate the Colorado River or its watershed.

7        17.    Plaintiff and others in comments submitted to the BLM challenged the validity of

8    assumptions in the Water Resources sections of the DEIS.  The FEIS fails to adequately deal

9    with this critical issue, although the FEIS now justifies the withdrawal as necessary to protect

10   cultural resources and the uncertainties in water resource analyses as the primary rationale for a

11   withdrawal.

12       18.    In addition, many of the "Relevant Issues for Detailed Analysis" as set forth in

13   Table 1.5-1 of the DEIS were excluded from analysis provided in the DEIS and FEIS, even

14   though NEPA regulations require such analysis. With no exceptions, these exclusions have had

15   the effect of biasing the DEIS and the subsequent FEIS against the "No Action" alternative.

16   Among these excluded analyses are: the Air Quality Cumulative Impact Analysis; the Energy

17   Value of the Uranium in the Northern Arizona Proposed Withdrawal Area, which was never

18   calculated as required by Table 3.1-1 of Chapter 3 of the FEIS (estimated 560 billion dollars); the

19   energy value of the uranium resource previously withdrawn was not calculated; and the

20   equivalent amount of other energy-producing commodities represented by uranium production

21   was not analyzed as required by Table 3.1-1 of the FEIS. Each of these relevant and material

22

8 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

1 | issues was excluded from the NAPW DEIS and, thus, the FEIS failed to deal with material

2 | matters raised in the public comments.

3 | 19.     Further issues not addressed in the DEIS also to the detriment of the case of the "No

4 | Action" alternative and clearly mandated by NEPA regulations are:

5 |         a.     Mitigation measures were not explored, discussed, or proposed regarding the

6 | impacts of mining, even though NEPA requires consideration of mitigation measures.  Nearly all

7 | mitigation measures mentioned in the NAPW FEIS are the standard operating procedures that are

8 | required by existing law and regulation, and do not address the particular issues and problems

9 | that would be in effect under the various proposed alternatives considered under the DEIS and

10 | the subsequent EIS.  This failure is especially significant because mitigation measures

11 | historically have frequently permitted economically-significant natural resource operations to

12 | occur with no significant negative impact to the natural environment.

13 |         b.     The FEIS fails to disclose and analyze the issue of "prior existing rights" and the

14 | most probable outcome that nearly all mining claims could be voided by the withdrawal when

15 | subject to a mineral examination.  By failing to accurately disclose the legal effects of the

16 | withdrawal and, thus, the fate of most mining claims, the DEIS and FEIS represent incorrectly to

17 | the general public that the existing mining claims could proceed to be mined.  The FEIS

18 | disingenuously states that "Valid Existing Rights" will be protected without then stating that any

19 | mining claims that BLM deems not to meet the legal definition of a valid existing right will be

20 | declared void. The FEIS does not estimate the number of claims that BLM will invalidate after

21 | the withdrawal nor does the FEIS disclose the economic losses in terms of investment already

22 | made.  Further, the FEIS failed to analyze the direct impact that any of the withdrawal

1    Alternatives has on the mining claim owners, including the economic impact on the claim

2    holders (loss of time and money invested), the loss of revenue to the BLM for the maintenance

3    fees paid by the claim owners, and the significant loss of revenues to state and local

4    governments. One of the purposes stated in the ROD for the withdrawal is to prevent new mining

5    claims and sites from being located and property rights from being established without disclosing

6    or analyzing in the DEIS/FEIS that the withdrawal will similarly affect 99% of currently located

7    claims.

8         c.       The FEIS fails to analyze the effectiveness of the existing regulatory framework:

9    federal, state, and local laws and regulatory bodies. An analysis of this framework would have

10   documented the effectiveness under the existing rules, including any flaws and weaknesses in the

11   existing regulatory framework, and would have considered mitigation measures in the DEIS as

12   required by NEPA. During the scoping period prior to the development of the DEIS, the National

13   Mining Association specifically commented that such analysis should be part of the EIS.  Had the

14   FEIS incorporated existing regulatory measures into its analysis, especially with respect to the No

15   Action Alternative, the FEIS would have had to conclude that uranium mining could proceed

16   without significant adverse environmental effects.

17        d.       The analysis of Green House Gas (GHG) reduction by the production and

18   utilization of the uranium resources as opposed to continued reliance on hydrocarbon fuel

19   sources (coal, oil, and natural gas) to produce electrical power was improperly excluded from

20   analysis. The FEIS calculated GHG production from uranium exploration and mining activities

21   (emissions from drilling rigs and trucks, etc.), but the FEIS omitted the indirect offsets that

22

1   would come with the use of uranium to produce electrical power.  NEPA regulations require that

2   all positive and negative direct and indirect and cumulative effects be analyzed in EIS studies.

3          e.          Analysis and identification (a scientific field study to provide essential

4   information) of the more than 30 ore-grade to weakly-mineralized uranium breccia pipes within

5   the Grand Canyon National Park (GCNP) and other natural mineral exposures in the NAPWA

6   should have been performed to estimate the yearly erosion of uranium and other metals from

7   these naturally exposed deposits and the distribution of the contaminating metals in the

8   surrounding watershed of the GCNP.  This information is directly relevant to the current resource

9   condition analysis for Chapter 3 of the FEIS and the claims that future uranium mining rather

10  than erosion from natural or undisturbed mineral exposures within the boundaries of the GCNP

11  or the NAPWA may account for any detected radiation in the watershed.  Because protection of

12  the Colorado River watershed is the stated purpose of the withdrawal such a scientific analysis is

13  relevant to provide essential information and its absence is a material flaw in the FEIS

14  conclusions.

15         20.     The FEIS failed to include and reconcile the results and conclusions of its own

16  work from its most recent Resource Management Plan (RMP) in the DEIS. The 2008 Arizona

17  Strip RMP adopted by the BLM concluded that most of the Arizona Strip should remain open to

18  mineral entry and development.

19         21.     The Arizona Wilderness Act of 1984 was not mentioned in the DEIS even though

20  it is the landmark piece of legislation that defined the land areas available for mineral entry and

21  uranium exploration and mining as well as the public lands to be preserved for wilderness. The

22  FEIS mentions the Arizona Wilderness Act of 1984 in the context that it defined areas to

11 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

1  wilderness and left the rest open to multiple use.  Analysis and reconciliation of this Act and the

2  historical context with regard to the current situation is essential to understanding why the No

3  Action Alternative of the NAPW DEIS and FEIS is the best alternative. No mention is made that

4  the lands left open were specifically recognized for their large uranium potential or that the Act

5  itself was a historic negotiated compromise between mining, environmental, ranching, and other

6  users with vested interests in  these lands.

7      22.    Chapter Five of the NAPW FEIS (Responses to Public Comments) repeatedly

8  shows how Defendants arbitrarily dismissed, minimized, and/or otherwise marginalized critical

9  new information set forth in the public comments.  If  BLM had followed NEPA procedures

10  correctly the rationale used to support a withdrawal, as stated in the Secretary's ROD, would be

11  unsupportable. It would then be clear that the Secretary is imposing on the communities of

12  northern Arizona and southern Utah significantly higher economic and social costs when there

13  are no significant adverse environmental affects on the NAPWA.

14      23.    One example of the BLM's arbitrary answers to comments from the public ("peer

15  review") presented in the FEIS illustrate the failure of the FEIS to professionally and objectively

16  consider the comments.  Plaintiff commented that the EIS must consider an estimate of the

17  amount of GHG reductions that would occur due to the uranium mined in the NAPW area and

18  which would replace coal as the fuel to produce electrical power.  The FEIS answered:

19  The EIS does not include an analysis of GHG "offsets" (i.e., uranium as a replacement for other

20  energy sources) for several reasons. First, there is no guarantee that uranium mined from the

21  proposed withdrawal area would be allocated exclusively to energy production. Some percentage

22  may go to defense uses, medical applications, or other uses. In addition, with notable exceptions

12 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

1    such as Iran and North Korea, processed uranium may be legally sold on the open market and

2    shipped anywhere in the world. Finally, there is no assurance uranium would be used to replace-

3    rather than simply augment-other energy sources such as coal, natural gas, hydroelectric, solar, or

4    wind power.

5         24.    The above response in the FEIS is entirely nonsensical.  It can only be construed

6    as a biased attempt to exclude an analysis that would support Alternative A, the No Action

7    Alternative.  First, the percentages of the uses of mined uranium are documented by the U.S.

8    Energy Information Administration and, therefore, provide a concrete value for the amount of

9    uranium used as nuclear fuel.  BLM could easily determine in the FEIS the potential volume of

10   uranium produced that would be utilized for electrical power.  In addition, in the context of

11   global impacts of GHG, it does not make any difference whether uranium mined in the NAPW

12   area is used locally, nationally or internationally to provide nuclear fuel for the production of

13   electricity.  The issue is Global Warming, not carbon-based emissions in the NAPW area or even

14   the US. However, as additional evidence of bias, the authors of the FEIS and DEIS state

15   specifically that the production of GHGs attributed to motor vehicles and engines used in mining

16   in the NAPW might have GLOBAL consequences but omit entirely any consequences from

17   continued reliance on coal to produce electrical power.  Finally, nuclear power plants, like fossil

18   fuel power plants, provide nearly all of the world 's base load electricity and, as such, any use of

19   nuclear power is automatically a substitute and recognized non-GHG emitting power generating

20   alternative for base load electricity versus fossil fuels. Thus, the predominant future use of

21   uranium from the NAPW as power plant fuel would be replacing fossil fuels in base load power

22   plants, whether or not this fuel is used to augment or maintain current base load electricity

13 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

1    generating capacity. The DEIS and FEIS fail to recognize and analyze that the uranium minerals

2    mined in the NAPWA are a "fuel mineral" and have an impact outside the NAPWA beyond

3    being a commodity.

4         25.    A second example from the FEIS is even more disturbing. DIR Exploration, Inc.,

5    and Quaterra Resources, Inc., both submitted comments providing new and substantive

6    information regarding the uranium endowment of the NAPW. Their comments conclude that the

7    DOI understated the uranium endowment of the NAPW by a very appreciable 500 to 600%. This

8    new information was provided by certified, licensed, and/or registered professional geologists

9    ("Qualified Persons" under Canadian 43-101 regulations) with decades of experience in the

10   NAPW.  The comments also reflected the cumulative knowledge that companies engaged in

11   mineral and petroleum exploration and metals mining in the NAPW have garnered after having

12   expended tens of millions of dollars, and tens of thousands of man-hours drilling and mining in

13   the NAPW. Their exploration experience and professional analysis of the NAPW  consequently

14   represents very credible current knowledge and experience that in most instances exceeds that

15   possessed by relevant workers in the USGS or BLM.  The USGS initially obtained most of its

16   information and data on uranium-mineralized breccia pipes in the NAPW from mining industry

17   companies (past and present), and the FEIS fails to explain why this same source is now

18   unreliable.

19        26.    The FEIS responds as follows:

20   " The full comment letter questions the approach of assigning mineral potential to regions of

21   Northern Arizona that was used in the 2010 USGS estimate of uranium availability, and

22

1    concludes that the preferential presence of breccia pipe mineralization on the proposed

2    withdrawal lands is not properly incorporated into the estimates of uranium availability.

3    While the commenter provided a statistical correlation of known mineralized breccia pipes to

4    underlying geologic structures, no geologic explanation or new information was provided to

5    justify the hypothesis that mineralized breccia pipes occur preferentially on the proposed

6    withdrawal lands. The USGS Report is a peer-reviewed publication that provided the estimated

7    uranium endowment for the proposed withdrawal area. While some commenters have presented

8    alternate or supplemental approaches to assessing the uranium endowment from that provided by

9    USGS, these alternate approaches have not been developed or peer reviewed to the extent that

10   they can replace or supersede the USGS endowment assessment presented in SIR 2010-5025. As

11   with many scientific fields, new information is constantly being collected which leads to new or

12   refined conclusions. However, at present, the USGS Report contains the best credible

13   information available regarding the uranium endowment estimate and was therefore used as the

14   basis for the reasonably foreseeable development scenarios in the EIS. No change is warranted to

15   the 2010 USGS estimate of uranium availability, or the use of this estimate in the FEIS."

16        27. The BLM's response to this new and material information utterly fails to explain

17   the reasons that Defendants would accept a USGS report relying on 23-year old data over reports

18   based on more recent data and activity.  While the USGS report bears a 2010 date, it used only

19   data from the 1980s, thereby excluding more recent and highly relevant geological work.

20        28.      The NEPA regulations require that new and significant information submitted

21   during the public comments (or peer review) period that is relevant to environmental concerns

22   and has bearing on the proposed withdrawal action or its impacts be addressed in the EIS.  If the

15 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

1   agency fails to do so, then the FEIS must be, according to NEPA regulations, remanded for

2   revision or must be supplemented and subject to an additional public comment period.  The

3   above BLM response suggests, with circular logic, that only new information already known or

4   recognized by the agency can be considered to be significant enough to require changes in the

5   NAPW EIS. The BLM readily admits that although this information is new and could lead to a

6   new or refined conclusions for the NAPW uranium endowment, it then discards the information

7   solely because it was not peer-reviewed.  Recall, however, that this is exactly why NEPA

8   requires a public comment period for a DEIS, and requires a federal agency to either revise an

9   EIS when it fails to consider material public comments or to prepare a supplemental document.

10  The reason that critical new information is brought forward during the public comment period is

11  so that significant new information can be reviewed, developed and incorporated into the final

12  EIS by the responsible agency. To act otherwise would grant a Government Agency responsible

13  for an EIS the power to arbitrarily dismiss ANY and ALL (inconvenient) new significant

14  information as having no credibility simply because it is first brought to the public domain during

15  the NEPA process.

16      29.     One of the establishing principles of NEPA is that an EIS is a vehicle for public

17  input for the EIS process. The present BLM actions, if taken to their logical extreme, could

18  eventually exclude all significant public input in the development of an EIS. In sum, this BLM

19  answer to public comment illustrates how the Defendants purposefully excluded significant new

20  information that does not support the policy mandate announced by the Interior Secretary Salazar

21  to withdraw all of the identified lands identified in Alternative B of the EIS.

22

16 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

30.     These two examples also demonstrate the arbitrary and dismissive responses to many of the substantive comments submitted. Judging by the DEIS and FEIS, it is evident that the BLM purposely wrote the NAPW FEIS to support a withdrawal decision mandated by the Interior Secretary even if this meant dismissing new and material information as irrelevant, omitting critical analyses as unnecessary, and by not responding to the central premises of substantive public comments by only addressing the particular aspects of these comments that can be made to appear to be insignificant.

**No Action Alternative Not Adequately Analyzed**

31.     The National Mining Association in their scoping comments recommended that the EIS analyze the effectiveness of the existing regulatory framework -- federal, state, and local laws and regulatory bodies --  to determine any flaws and weaknesses in the existing regulatory framework. Mitigation measures could then be proposed in the DEIS as required by NEPA. The FEIS at page ES-3 states the following under the heading Laws and Policies: Mining operations must comply with a variety of environmental and mining laws, including the 1872 Mining Law and BLM and Forest Service management plans. Compliance with federal law (including the National Environmental Policy Act [NEPA]), regulations, and policies and consideration of state and local statutes should be paramount [emphasis added] in the development of the EIS.

32.     Nevertheless, the FEIS fails to include an analysis for the effectiveness of current laws and regulations on the impact of hard rock exploration and mining in the NAPW area.  This is plainly a violation of NEPA as the effectiveness of existing laws and regulations has a direct impact on any decisions concerning the NAPW.

1    33.    The FEIS on page 1-21 states in Table 1-5.1 under the heading of Air Quality and

2    Climate - Release of particulates: "The release of particulates (dust) from exploration drilling

3    operations, mining, and ore hauling traffic and other vehicles on unpaved roads could have an

4    effect on the regional air quality. This could occur in combination with pre-existing emissions

5    from coal plants, cities, traffic, and other sources of regional air pollution to create a cumulative

6    regional effect on air quality."

7    34.    Nevertheless, the detailed analysis for the Cumulative Regional Effect on Air

8    Quality was excluded from the FEIS.  By not looking at the cumulative regional air quality

9    impacts, the FEIS omits air quality impacts from existing and planned coal-fired power plants.

10    35.    The FEIS on page 3-10 Table 3-1.1 section 3.16 Economic Resources under the

11    sub-heading Energy resources available states: "The withdrawal of uranium deposits in the study

12    area would remove a potential source of energy production, which would then be replaced by

13    energy produced from other sources, either additional mining elsewhere, imports of uranium

14    from foreign sources, or production from equivalent amounts of other sources like coal,

15    petroleum, natural gas, wind power, or solar."

16    36.    The relevant indicators for the above Economic Resource are stated as:  "1) Value

17    of energy produced from study area, and  2) Equivalent amount of other energy-producing

18    commodity represented by uranium production." Nevertheless, analysis of these economic

19    resources and their relevant indicators was excluded from the FEIS.  Additionally, an analysis of

20    the cumulative impacts for these economic resources and relevant indicators was excluded from

21    the FEIS. These analyses provide the basis for meaningful analysis as they create a point of

22    comparison for the amount of energy production lost to a withdrawal. The FEIS provides no

1    qualitative or quantitative easily understood value for the energy potential of the NAPWA and

2    those lands previously withdrawn.

3         37.    The FEIS on page B-38 of Appendix B states: "The proposed withdrawal area

4    currently contains approximately 5,300 mining claims that predate the Secretary's publication of

5    the Notice of Proposed Withdrawal, subject to valid existing rights, on July 21, 2009.  New

6    mineral exploration and development could still be authorized under the Proposed Action,

7    Alternative B. However, neither the BLM nor the Forest Service will process a new Notice or

8    plan of operations until the surface managing agency conducts a mineral examination and

9    determines that the mining claims on which the surface disturbance would occur were valid as of

10   the date the lands were segregated. Determining the validity of a mining claim is a complex and

11   time-consuming legal, geological, and economic evaluation that is done on a claim-by-claim

12   basis. Discovery can occur before or after location of a mining claim, but in any case discovery is

13   based on the actual physical exposure of the mineral deposit within the claim boundaries. For the

14   locatable minerals associated with breccia pipe deposits, unless erosion has exposed

15   mineralization in a canyon, this would probably require exploratory drilling and sampling. The

16   discovery would need to have taken place as of the date of segregation, July 21, 2009, and have

17   been maintained until the time of the mineral examination.  None of the assumptions in this

18   analysis, even if referring to specific breccia pipes, should be construed as a determination or

19   indication that certain mining claims may contain a discovery."

20        38.    Nevertheless, the FEIS does not analyze the issue of prior existing rights and the

21   direct impact that nearly all of the mining claims will be voided by the withdrawal when subject

22   to a mineral examination.  The Secretary's ROD recognizes that only seven breccia pipes will

19 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

1  probably have existing rights and could be developed leaving the other 99% of mining claims

2  voided when subject to a mineral exam. The direct impact of a mineral exam and the economic

3  loss of mining claims on the claim holder (loss of time and money invested in current mining

4  claims held) was not analyzed.  The loss of revenue to the BLM for the maintenance fees paid by

5  the claim owners whose claims are made invalid was also not analyzed.  The FEIS

6  disingenuously uses the term exploration of mining claims, when by definition a valid mining

7  claim does not require exploration since the discovery has been made.

8      39.    The FEIS on page 3-5, Table 3.1-1, Section 3.2 states that for GHG, the resource

9  condition indicator is: "The quantity of GHG emissions emitted under each alternative."

10      40.    The FEIS on page 1-24, section 1.5.3 Issues Eliminated from Detailed Analysis

11  states with regards to GHGs : "The extent to which uranium energy production offsets the use of

12  carbon-based fuels that contribute to the release of greenhouse gases (GHGs), which have been

13  linked to global climate change."

14      41.    The FEIS on page 4-7 further states: "Uranium mining activities in the proposed

15  withdrawal will likely cause localized increases in air pollutant emissions, with the exception of

16  GHG emissions, which are considered by scientists to contribute to global climate change and

17  which could have global impacts."

18      42.    An analysis for the offset of GHGs due to the production and use as nuclear fuel

19  from uranium produced from the NAPW area was improperly excluded from the DEIS. An

20  analysis of the cumulative impact on GHG offset for areas previously withdrawn was also

21  excluded. Reduction of GHGs by the use of uranium produced from the NAPW area to fuel

22

20 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

1  electric power plants and replace coal as the primary fuel for electrical power is a direct impact of

2  mining uranium the NAPW area.

3       43.     The FEIS on page 3-6, Table 3.1-1, Section 3.5 Soil Resources states: "Potential

4  distribution of contaminants in soil could result from erosion and subsequent deposition of mine

5  waste-rock or ore from water and/or wind action, or leakage from retention ponds in the vicinity

6  of each mine site." The condition indicator is stated as: "Extent of projected concentrations of

7  uranium and arsenic compared to background levels and Soil Remediation Level standards."

8       44.     Section 3.4 Water Resources, Table 3.1-1, of the FEIS states: "Contamination of

9  surface runoff from active or reclaimed mines", and the description of the relevant issue is:

10  "Surface runoff from active or reclaimed mine sites could contain elevated uranium and other

11  metals that would affect downstream water quality." The Condition indicator is stated as:

12  "Estimated uranium and arsenic levels in surface runoff."

13       45.     Chapter 3 of the FEIS does analyze the current condition for Soil and Water

14  resources with regard to uranium contamination due to active or reclaimed mines.

15       46.     Chapter 3 of the FEIS does not, however, analyze the current resource conditions

16  within the Grand Canyon watershed (the NAPWA) and specifically the Grand Canyon National

17  Park with regards to soils and surface water contamination due to the presently identified

18  naturally exposed breccia pipe ore bodies or other natural mineral exposures containing ore grade

19  uranium or otherwise elevated uranium and arsenic levels in order to put potential mine-related

20  contamination into its natural (background) context.

21       47.     Further, the FEIS does not analyze the cumulative effects of uranium exploration

22  and mining on soil contamination and surface water runoff contamination in relation or in

21 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

1   comparison to the existing conditions from naturally eroded breccia pipe ore bodies with elevated

2   uranium and arsenic exposures within the Grand Canyon watershed.

3       48.     The BLM failed to include its own work from its most recent land use plan, the

4   Arizona Strip Field Office ROD & Approved RMP 2008 in the FEIS.

5       49.     A meaningful discussion of the Arizona Wilderness Act of 1984 which provides

6   essential context of this Act is not included in the FEIS even though it is the landmark piece of

7   legislation that originally defined the land areas available for mineral entry and uranium

8   exploration and mining within the NAPW area.

9       50.     New and substantial information was submitted by Quaterra Resources, Inc.

10  during the DEIS comment period that the mineable uranium endowment of the NAPW area is

11  much greater than what the BLM reported in the DEIS and substantive comments submitted by

12  DIR Exploration, Inc., estimate the mineable uranium within the NAPW area at about six times

13  greater that what the BLM reported in the DEIS.

14      51.     New and substantive information regarding blind breccia pipes and their

15  additional contribution to the uranium endowment of the withdrawal area were submitted by

16  Quaterra Resources, Inc.,  that even further expands reasonable assessments of the uranium

17  endowment for the NAPW area.

18      52.     New and substantive information was submitted by DIR Exploration, Inc., in its

19  DEIS comments that challenges the BLM's assertion that the withdrawal represents only 12% of

20  the uranium endowment for the NAPW area.  DIR's analysis and submitted comments indicate

21  that withdrawing the NAPW area represents a 76% reduction of the uranium available to mine

22  production in the most favorable northern Arizona area for uranium exploration and mining.

22 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

53.     New information regarding rights-of-way issues across Federal lands in the

NAPW area to access State Trust or Private lands for mineral exploration projects was submitted.

54.     New and substantive information from the Arizona Geological Survey (AZGS)

was submitted by comment that shows that uranium mining and exploration cannot possibly

contaminate the Colorado River. The Secretary of the Interior's ROD cites three time that

"millions of people living in seven states in the U.S. And Mexico depend on the Colorado River

for water for drinking, irrigation, and industrial uses as well as hydro-power" implying that a

withdrawal is required to preserve this resource when in fact the FEIS does not support this

conclusion and the AZGS study conclusively demonstrates that it is impossible for uranium

mining to endanger the Colorado River.

55.     The BLM failed to discuss in the FEIS conflicts between the proposed actions and

the objectives of regional, State, and local land use plans, policies and controls for the area

concerned. The FEIS did not discuss any inconsistency of a proposed action with any approved

State or local plan and describe the extent to which the agency would reconcile its proposed

action with the plan or law. The Governor of the State of Arizona, the Legislature of the State of

Arizona, the County of Mohave in Arizona, the City of Fredonia in Arizona, and the Southern

Counties of Utah have all submitted comments or resolutions documenting their opposition to

the Northern Arizona Proposed Withdrawal action. In addition, the BLM failed to discuss

conflicts between the proposed actions and the Arizona Strip Wilderness Act of 1983 (H.R.

3562) which was subsequently incorporated into the Arizona Wilderness Act of 1984 at Title III.

House Committee Report 98-643, Part 1, pages 34-35 specifically recognized the uranium

1   potential of Northern Arizona, stating "[T]he Committee has not included these lands in

2   wilderness in recognition of their significant mineral (especially uranium) potential."

3       56.     Plaintiff submitted a letter to Mr. Scott Florence, District Manager, U.S. Bureau

4   of Land Management, Arizona Strip District Office on July 11, 2011, detailing the requirements

5   that NEPA placed upon the BLM as the lead agency in the preparation of the NAPW EIS in

6   regard to the BLM's responsibility under NEPA to publish for public comment a Supplemental

7   DEIS and that Plaintiff's letter was a legal notification that the BLM must follow the laws and

8   regulations for the preparation of an EIS. Mr. Florence responded on August 4, 2011 that the

9   BLM does "not plan to issue a Supplemental DEIS".

10      57.     Despite BLM's failure to follow the procedural requirements of NEPA, the Final

11  EIS was published in The Federal Register on October 27, 2011.  The Final EIS is incorporated

12  by reference.

## Statutory and Regulatory Background

14      58.     NEPA requires federal agencies to consider the environmental consequences of

15  their actions. 42 U.S.C. §4331, et seq. NEPA ensures that the agency will have available, and

16  will carefully consider, detailed information concerning significant environmental impacts and

17  the social and economic consequences; it also guarantees that the relevant information will be

18  made available to a larger audience to ensure that the public can play a role in both the decision

19  making process and the implementation of the agency's decision.

20      59.     Pursuant to NEPA's implementing regulations promulgated by the CEQ, 40

21  C.F.R. Part 1500, federal agencies must review the direct and indirect impacts of their actions, as

22  well as the cumulative impacts of such actions. Direct effects are those effects "which are caused

24 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

by the action and occur at the same time and place." 40 C.F.R. §1508.8(a). Indirect effects are those effects "which are caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable." 40 C.F.R. §1508.8(b). Cumulative impacts include impacts of "other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. §1508.7.

60.     The CEQ rules implementing NEPA require federal agencies to prepare supplements to either draft or final EIS's or EA's if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. §1502.0(c)(1)(ii).

61.     NEPA directs federal agencies to comply with its procedures "to the fullest extent possible." 42 U.S.C. §4332.

62.     CEQ rules at §1502.9 (a) states:  "If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion."

63.     Additionally, CEQ rules at §1502.9 (c) requires:

"Agencies: 1. Shall prepare supplements to either draft or final environmental impact statements if: (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. 2. May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so."

64.     The CEQ rules also state at §1502.22:

1    "Incomplete or unavailable information.  When an agency is evaluating reasonably foreseeable

2    significant adverse effects on the human environment in an environmental impact statement and

3    there is incomplete or unavailable information, the agency shall always make clear that such

4    information is lacking.

5

6    (a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is

7    essential to a reasoned choice among alternatives and the overall costs of obtaining it are not

8    exorbitant, the agency shall include the information in the environmental impact statement.

9    (b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be

10   obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not

11   known, the agency shall include within the environmental impact statement:

12   1.      A statement that such information is incomplete or unavailable;

13   2.      A statement of the relevance of the incomplete or unavailable information to evaluating

14   reasonably foreseeable significant adverse impacts on the human environment;

15   3.      A summary of existing credible scientific evidence which is relevant to evaluating the

16   reasonably foreseeable significant adverse impacts on the human environment, and

17   4.      The agency's evaluation of such impacts based upon theoretical approaches or research

18   methods generally accepted in the scientific community. For the purposes of this section,

19   "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their

20   probability of occurrence is low, provided that the analysis of the impacts is supported by

21   credible scientific evidence, is not based on pure conjecture, and is within the rule of reason."

22

26 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

65.     CEQ rules at §1502.9 (a): "The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action."

66.     CEQ rules at §1502.2(g): "Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made."

## CLAIMS FOR RELIEF

### FIRST CLAIM

**Defendants Must Revise the FEIS or Prepare a Supplement to Address Significant New Circumstances and Information Identified in the Comments on The Northern Arizona Proposed Withdrawal**

67.     Plaintiff hereby incorporates by reference the allegations in paragraphs one through 66.

68.     The implementing rules for NEPA require the agency to provide for public comment and to give appropriate weight to material and relevant comments.  40 C.F.R. §§1502.9(b); 1503.4.

69.     The CEQ rules also require the Defendants to address controversies which generally apply to scientific issues.  40 C.F.R. §§1503.4; 1502.12; 1508.27(b)(4).

70.     NEPA requires federal agencies to either revise the FEIS by issuing a new draft or to prepare and circulate for public review and comment a supplemental NEPA document, because the Defendants failed to follow NEPA procedures, including consideration of new

1   information, resolution of material scientific controversies, and material public comments.  40

2   C.F.R. §1502.9(c).

3       71.     NEPA requires that the analysis of the impacts be supported by credible scientific

4   evidence, not based on pure conjecture, and must be within the rule of reason. The validity of

5   assumptions and the general low quality of scientific analysis performed in the Water Resources

6   sections of the DEIS alone create a reasonable basis for stating that the requirements of NEPA

7   regarding credible scientific analysis have not been met.

8       72.     Additionally, NEPA requires that every effort be made to disclose the scientific

9   controversies and discuss. "...in the draft statement all major points of view on the environmental

10   impacts of the alternatives." This responsibility was grossly neglected throughout the DEIS and

11   the subsequent FEIS.

12      73.     The multitude of errors in the DEIS is amply documented in the public comments

13   submitted to Defendant BLM and available on the BLM's website. The FEIS did not correct these

14   errors.  Any one of the many omissions in analysis or incidences of lack of scientific rigor cited

15   above, provide sufficient justification for a revised DEIS or supplement to the FEIS in and of

16   themselves. The fact that there are so many errors and omissions of such a serious nature that are

17   relevant to environmental concerns, and have direct and strong bearing on the proposed

18   withdrawal action or its impacts, require remand and revision.

19      74.     NEPA's implementing regulations require federal agencies to prepare supplements

20   to a NEPA document if there are "significant new circumstances or information relevant to

21   environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. §1502.9(c)

22   (1)(ii).

28 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

1    75.    Comments submitted by Quaterra Resources, Inc. (Eugene D. Spiering), DIR

2    Exploration, Inc. (Larry D. Turner), and ACERT provided new information regarding the

3    mineable uranium endowment of the withdrawal area.  This information demonstrates that the

4    NAPW area could have around 110 economically viable breccia pipes or more containing

5    165,000 tons (330 million pounds) of U3O8 versus the 45 breccia pipes containing 33,155 tons

6    (66.3 million pounds) U3O8 assumed in the DEIS and revised to 789.3 million pounds in the

7    FEIS. According to the new information provided by Quaterra and ACERT, the BLM has

8    underestimated the mineable uranium contained within the NAPW area by around 500 percent.

9         76.    New information submitted shows that the USGS gross uranium endowment

10   estimate was much less accurate than current geological knowledge permits.  Public comments

11   provided by DIR Exploration, Inc., point out the basic geological control for the 45 mile wide by

12   100 mile long north-south trending area containing the bulk of historically discovered and mined

13   uranium. *This most strongly endowed uranium-mineralized area, which was open to mineral*

14   *entry before July 2009 is entirely contained by the NAPW area.* The USGS-estimated 12%

15   withdrawal of northern Arizona uranium resources postulated in the DEIS and FEIS that would

16   be a consequence of the NAPW has been shown by geological evidence pointed out by DIR

17   Exploration, Inc., to instead constitute a 76% withdrawal of the economically-viable northern

18   Arizona breccia pipe uranium resource available to mining before the start of the current

19   segregation period. The FEIS and DEIS underestimate the impact of the NAPW on available

20   mineable uranium endowment by about a factor of six (600%). This new information, like that

21   very similar data independently originating from Quaterra Resources, has far-reaching effects on

22   the accuracy of the subsequent analysis of the completed FEIS. The entire EIS will have to be

1  adjusted to account for this basic DEIS and FEIS error in estimating the mineable uranium

2  available in the NAPW; i.e., "There are [indeed] significant new circumstances or information

3  relevant to environmental concerns and bearing on the proposed action or its impacts."

4      77.    While the number of mines considered to be developed during the next 20 years

5  may not have been changed much by this new information provided during the DEIS public

6  comment period, the total value of the mineable uranium resource is drastically undervalued both

7  in the NAPW FEIS and in those lands previously withdrawn from mineral entry. The new

8  information submitted indicates that the NAPW contains a uranium resource that would be in

9  production for several generations and provide a long-lasting economic contribution to northern

10  Arizona and southern Utah. This being the case, according to the new information, the economic

11  analysis in the FEIS is materially deficient as it does not consider the extended time frame for

12  mining, the greater total amount of uranium produced, nor the probabilities that a work force of

13  greater size will be operating in Northern Arizona for a longer period of time.

14      78.    New and significant information regarding blind breccia pipes and their additional

15  contribution to the uranium endowment of the withdrawal area was submitted by Quaterra

16  Resources, Inc.  The information from Quaterra Resources further expands a reasonable estimate

17  of the uranium endowment for the NAPW. The FEIS and the USGS's model for estimating the

18  uranium endowment for the NAPW did not include the fact that present mineral exploration

19  technology can locate these "blind breccia pipes" and the uranium contained within them. As a

20  result, the FEIS oversimplified estimate for the uranium endowment of the NAPW is in further

21  error.

22      79.    New information regarding rights-of-way issues across Federal lands in the

1    NAPW to access State Trust or Private lands for mineral exploration projects was submitted. The

2    FEIS prepared by the BLM does not address this issue.

3         80.     New and significant information from the Arizona Geological Survey was

4    submitted by comment that shows that uranium mining and exploration cannot possibly

5    contaminate the Colorado River watershed. Open File Report 11-04 V1.0, Breccia-Pipe Uranium

6    Mining in the Grand Canyon Region and Implications for Uranium Levels in Colorado River

7    Water, April 2011, was submitted to the BLM for the NAPW FEIS by the Arizona Department

8    of Environmental Quality. The report found that uranium mining could in no way adversely

9    affect the Colorado River watershed. This new information has important implications for the

10   NAPW FEIS that have not been fully considered by Defendants as demonstrated by the miss-use

11   of the claim that the Colorado River is endangered, as justification for a withdrawal as cited in

12   the Secretary's ROD..

13        81.     Plaintiff and others in comments challenged the validity of assumptions in the

14   Water Resources sections of the DEIS.  The Water Resource section analysis was based on a

15   theoretical approach that does not meet the requirements of CEQ rules at §1502.22(b), which

16   states:

17   the agency's evaluation of such impacts based upon theoretical approaches or research methods

18   [be] generally accepted in the scientific community. For the purposes of this section, "reasonably

19   foreseeable" includes impacts which have catastrophic consequences, even if their probability of

20   occurrence is low, provided that the analysis of the impacts is supported by "*.credible scientific*

21   *evidence, is not based on pure conjecture, and is within the rule of reason*" [emphasis added].

22

1    82.    The analyses included in the Water Resource sections of the FEIS are not

2    supported by credible scientific evidence and, instead, are based on, and limited by, biased

3    conjecture and are not within the rule of reason.

4    83.    In summary, BLM failed to address the scientific controversy or the material

5    public comments adequately.  Thus the NAPW FEIS fails to conform to the mandatory

6    procedures set out in the CEQ rules which implement NEPA.  BLM's actions are an abuse of

7    discretion, are done without observance of procedure required by law, are in excess of statutory

8    jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the

9    meaning of the APA, 5 U.S.C. §706(2).

10   **SECOND CLAIM**

11   **Scientific Studies and Analyses Were Not Performed To Provide Information Essential To**

12   **A Reasoned Choice Between Alternatives.**

13   84.    Plaintiff hereby incorporates by reference the allegations in paragraphs 1 through

14   83.

15   85.    Footnote 1 of the Secretary's ROD indicates that there is acknowledged

16   uncertainty regarding the Water Resources section of the FEIS, but that information (data

17   collection and scientific study) that would help resolve that uncertainty is not "essential to

18   making a reasoned choice among alternatives". The footnote further claims that the EIS used

19   reasonable conservative assumptions to estimate impacts as a method to address such unknowns.

20   These claims and assertions are without merit. The Water Resources section of the FEIS is one of

21   the major scientific controversies of the EIS. The assumptions and analysis in this section are not

22   in compliance with 40 C.F.R. § 1502.22.

32 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

86.     The footnote continues that while "obtaining additional data to address the uncertainty regarding impacts on water quantity and quality is not essential to a reasoned choice, such data, particularly data collected on a site-specific basis as mines are developed, will nevertheless be helpful for future decision makers in the area." This logic is completely at odds with NEPA and its implementing regulations and illustrates that the FEIS was written to support a decision already made by the Secretary of the Interior. The underlying justification for the Secretary's withdrawal is so that **future** decision makers can perform additional studies that might allow the withdrawn lands to be become open to mining again, because there is not enough adequate data and scientific study available currently to choose the No Action Alternative. However, the DOI and the BLM are refusing to do any substantive data collection and analysis at all, and are thus themselves creating the underlying justification for a withdrawal.

87.     40 C.F.R. §1502.22(a) states: " If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement."

88.     40 C.F.R. §1502.22(a) requires that the BLM obtain the information for the EIS now, and not for the Secretary to use the lack of data and uncertainty as justification for a withdrawal decision. Taken to an extreme, absolutely no information is required at all to make a withdrawal decision because future decision makers can do the required studies and reopen the withdrawn lands. The DEIS and FEIS rejected alternatives that required future decision makers to implement studies, regulations, laws, etc.

89.     While the Secretary contends in his ROD that no additional data needs to be collected to support a withdrawal decision, the withdrawal is only one of the alternatives to be considered. CEQ rules at. §1502.9 (a) and §1502.22(a) require that "The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action" and that information required to make a reasoned choice among alternative be acquired.  Evaluating the No Action Alternative requires that additional information based on data collection and analysis be done and to provide analysis of existing research or information that would supply context to the various impacts considered, to properly disclose and discuss that the No Action Alternative point of view is a viable and reasoned choice amongst alternatives.

90.     For example: an analysis of the energy value represented by the uranium in the NAPWA would reveal that it would be equivalent to a coal mine 80 square miles in extent strip-mined to a depth of 400 feet. Alternative comparisons could be made for an oil field, solar power plant array, wind farm, etc.

91.     An analysis of the cumulative impacts on air quality that actually compared projected air quality impacts from exploration and mining to existing conditions would have shown that the projected affects were negligible.

92. An analysis of the existing regulatory framework would have revealed that each proposed mine would have its own EIS performed using the specific location and circumstances to preclude the uncertainties inherent in a global approach as represented by the current EIS.

93.     Collecting soil and water data from existing mineral and breccia pipe exposure areas with ore-grade or otherwise elevated levels of uranium or arsenic would provide a means of

1    comparing these natural levels and associated contamination risks to those at reclaimed and

2    operating mines.

3           94. Gathering actual data to support a credible Water Resource analysis instead of

4    creating a hypothetical "model" based on conjecture and faulty assumptions would provide

5    essential information to make a reasoned choice among alternatives.

6           95.     In summary, the failure to obtain information essential to making a reasoned

7    choice among alternatives requires that the FEIS be set aside and remanded.  The refusal to

8    obtain and analyze essential information for the FEIS is a violation of NEPA's implementing

9    regulations, and is an abuse of discretion, and is done without observance of procedure required

10   by law, and is in excess of statutory jurisdiction, authority, or limitations, and are otherwise not

11   in accordance with law, within the meaning of the APA, 5 U.S.C. §706(2).

12   **THIRD CLAIM**

13   **The FEIS Failed to Adequately Respond to the Numerous Substantive Comments Received**

14   **that Directly Challenge the Accuracy, Validity, Adequacy, and Scientific Rigor to the Point**

15   **that the FEIS Precludes Meaningful Analysis in Direct Violation of  NEPA.**

16          96.     Plaintiff hereby incorporates the allegations made in paragraphs 1 through 95.

17          97.     NEPA is often described as furthering the twin goals of an informed public and an

18   informed decision maker.  The CEQ rules require each federal agency to respond to material

19   public comments.  40 C.F.R. §§1502.9(b); 1503.4.  Failure to do so adequately is grounds to set

20   aside the FEIS and remand it to the agency to prepare a revised draft or a supplement.

21          98.     Analysis for the effectiveness of current laws and regulations on regulating and

22   controlling the impact of hard rock exploration was improperly excluded from the DEIS.

35 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

99.     The detailed analysis for the cumulative regional effect on air quality was improperly excluded from the DEIS.

100.    The analysis required by the FEIS itself on Table 3.1-1 for the sub-heading "Energy Resource Available" was to determine 1) the value of energy produced from study area [estimated $560 Billion], and 2) Equivalent amount of other energy-producing commodity represented by uranium production [for example Coal: 2.7 Billion tons]. Analysis of these economic resources and their relevant indicators was improperly excluded from the FEIS. Additionally, an analysis of the cumulative impacts for these economic resources (energy values and equivalent other energy- producing commodity) and relevant indicators for lands previously withdrawn (cumulative affects) was improperly excluded from the FEIS.

101.    The FEIS does not analyze the issue of prior existing rights and the direct impact that nearly all mining claims (99%) will be voided by the withdrawal when subject to a mineral examination. The direct impact of a mineral exam and the economic loss of mining claims on the claim holder (loss of time and money invested in current mining claims held due to exploration costs and maintenance fees paid to the BLM) was not analyzed. The loss of revenue to the BLM for the annual claims maintenance fees paid by the claim owners whose claims are made invalid was not analyzed.

102.    The FEIS does not analyze the offset of GHGs due to the production and use of uranium produced from the NAPW. The cumulative impact on GHG offset for areas previously withdrawn was not calculated for uranium that could have been produced for nuclear fuel. These analyses must be performed as this is a direct impact of the mining of the NAPW for uranium

1    and provide context (meaningful analysis) for the FEIS calculations of GHGs that would be

2    produced due to uranium exploration and mining in the NAPW area.

3          103.    The FEIS does not analyze the current resource conditions within the Grand

4    Canyon watershed (NAPWA) and specifically the Grand Canyon National Park with regard to

5    soils and surface water contamination due to the presently identified natural mineral exposures

6    and exposed breccia pipe ore bodies containing ore grade uranium or otherwise elevated uranium

7    and arsenic values. Excluding this analysis of background conditions before mining does not

8    allow context (meaningful analysis) for the analysis of the potential contamination from mining

9    sites both active and reclaimed.

10         104.    The FEIS does not analyze the contribution of the existing conditions from

11   naturally eroded breccia pipe ore bodies with elevated uranium and arsenic exposures within the

12   Grand Canyon National Park watershed and how these impacts affect the cumulative effects and

13   other assumptions in the FEIS. Excluding this comparative analysis does not allow context

14   (meaningful analysis) for the analysis of the impact of potential contamination from mining sites

15   both active and reclaimed.

16         105.    The RMP considered cultural resources protection and undertook an inventory in

17   accordance with BLM procedures.  The RMP did not recommend withdrawing the 646,000 acres

18   of public lands from operation of the mining laws to protect cultural resources, because the RMP

19   and regulatory measures were sufficient.  The RMP did identify specific areas to be withdrawn

20   and adopted other measures to protect cultural resources.  These measures and the facts that

21   supported them are not part of the FEIS.

22

106.    The FEIS omits the role of the Arizona Wilderness Act of 1984, which is the landmark legislation that originally defined the land areas to be designated wilderness and the areas available for mineral entry and uranium exploration and mining. The development of this Act recognized the uranium potential of Northern Arizona and left these lands designated for multiple use, specifically including uranium mining.

107.    The above examples of missing or inadequate analysis taken as a whole or even in part illustrate that the FEIS does not meet the basic requirement of NEPA, 40 C.F.R. §1502.9(a) to provide "meaningful analysis". The large number of required analyses that were excluded from the FEIS cited in this complaint and neglect of the comments submitted to the BLM for the NAPW do not provide the public and the decision maker the correct context (meaningful analysis) from which to make an informed decision. The above examples are only a small sample of the large number of substantive public comments submitted in response to the NAPW FEIS that were ignored, dismissed, or otherwise left unanswered by the Defendants.  The improperly excluded analyses and discussions of relevant issues are distributed over the entirety of the FEIS for the NAPW and so the complete document is affected and should be subject to complete revision or a supplemental NEPA document.

108.    In summary, BLM's refusal to prepare a supplemental NEPA document to correct the errors in the FEIS for the NAPW violates NEPA's implementing regulations, and is agency action unlawfully withheld and/or unreasonably delayed within the meaning of section 706(1) of the APA. 40 C.F.R. §1502.9(c)(1)(ii); 5 U.S.C. §706(1).

109.   BLM's actions are also an abuse of discretion, are done without observance of procedure required by law, are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. §706(2).

**FOURTH CLAIM**

**The DEIS and FEIS Merely Justify A Policy Decision Already Made by Secretary Salazar, by  Purposely Shaping, Mis-interpreting, and Disregarding Scientific and Technical Findings to Support the Secretary's Prior Decision To Withdraw over One Million Acres of Land as Proposed in the NAPW Action in Direct Violation of NEPA**

110.   Plaintiff hereby incorporates by reference the allegations in paragraphs 1 through 109.

111.   CEQ rules at §1502.2(g) provide: "Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made."

112.   CEQ rules at §1502.9(a) provide. "The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action."

113.   It is intended that the NEPA process produce a good faith and objective inquiry into the environmental impacts as well as the social and economic consequences.  As a result, a federal agency cannot predetermine that process by mandating an outcome.

114.   Defendant Secretary Salazar's premature mandate that BLM adopt Alternative B as the preferred alternative to withdraw more than one million acres of land pre-determines the NEPA process.  The Secretary's mandate forced BLM to discard the facts, the science and

1    analysis that did not support the outcome that the Secretary had already told BLM it must

2    support.

3         115.    The FEIS for the NAPW continues this bias, as illustrated by the BLM response to

4    the comments regarding the uranium endowment for the NAPW. The FEIS states that the new

5    information had no standing because it was not "peer reviewed," even though the comments were

6    submitted by certified, registered, or licensed professional geologists with decades of experience

7    in exploration of the NAPW for uranium.  In any other context, such credible information would

8    be described as the best available data and would be adopted.  The data and conclusions represent

9    tens of thousands of man-hours and millions of dollars expended by various exploration

10   companies over the last few decades in on-the-ground exploration including geochemical,

11   geophysical, exploration drilling, and aerial VTEM mapping methodologies, and published (peer

12   reviewed) geological data, including that published by the USGS.

13        116.    NEPA does not impose peer review as the criteria for distinguishing a public

14   comment from a scientific controversy.  NEPA requires that the agency resolve scientific issues

15   and explain the resolution, or have the FEIS set aside for revision or a supplemental NEPA

16   document in response to critical new information.  It is so that significant new information can be

17   thoroughly examined, developed, and incorporated into the FEIS by the responsible agency; i.e.,

18   so that the new information can be "peer reviewed."  It is the responsible agencies' responsibility

19   under NEPA to assess and respond to new information, not merely dismiss it for lack of peer

20   review.  Indeed, if peer review were the criteria, much of the federal agency scientific work could

21   not be used.

22

117.    To do otherwise would grant a Government Agency responsible for an EIS the power to dismiss ANY and ALL new significant information as not being credible simply because it was submitted by the general public or by otherwise thoroughly competent non-academic professionals who have not previously published the information in an academically-oriented, peer-reviewed journal.

118.    In prematurely choosing Alternative B (a complete withdrawal of the lands proposed for withdrawal) for the Final EIS as the preferred alternative when the DEIS provides no substantive scientific reasons for doing so, the Secretary of the Interior has publicly admitted to a politically-based, biased Administrative and Executive policy that evidently has guided BLM and DOI actions from the beginning of the NAPW NEPA process.

119.    The Interior Secretary declared an emergency to support a withdrawal after the segregation order had expired, without presenting any tangible evidence that an emergency exists or that extraordinary measures must be taken to preserve values that would otherwise be lost. These facts support how the Interior Secretary has, in complete functional disregard of the NEPA decision-making process, arbitrarily and purposely already chosen to put the 20-year NAPW into effect solely by using his executive authority as Secretary of the Interior.

120.    The BLM is the responsible agency for the NAPW EIS and its scientific and technical integrity. The BLM and its agents shaped and interpreted scientific and technical findings in the FEIS (including the responses to submitted comments) to support a policy decision prematurely and improperly made by the Secretary of the Department of Interior. These violations of NEPA and its attendant administrative process are so grievous, and the so-called scientific and technical analyses represented as supporting these violations are so devoid of logic

41 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

1  and scientific credibility, that it is plain that the BLM and its cooperating agencies and agents no

2  longer deserve the deference generally accorded by the courts to a government agency in regard

3  to expertise in scientific and technical matters.

4      121.   In direct violation of NEPA, the BLM has written the NAPW FEIS to justify

5  Alternative B in support of a decision that Secretary Salazar has already made; i.e., to execute the

6  complete withdrawal of over 1 million acres of mineral-bearing land in Northern Arizona from

7  mining for a period of 20 years.

8      122.   In summary, the failure to correct the FEIS to address the bias requires that the

9  FEIS be set aside and remanded.  The biased analysis as currently used in the FEIS is a violation

10  of NEPA's implementing regulations, and is an abuse of discretion, and is done without

11  observance of procedure required by law, and is in excess of statutory jurisdiction, authority, or

12  limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5

13  U.S.C. §706(2).

14  **FIFTH CLAIM**

15  **The NAPW FEIS Fails to Adequately Analyze the Merits of the No Action Alternative**

16      123.   Plaintiff hereby incorporates by reference the allegations in paragraphs 1 through

17  122.

18      124.   NEPA imposes a substantive obligation on the agency to fully analyze the no

19  action alternative.  42 U.S.C. §4332(2)(E).

20      125.   CEQ rules §1502.9 (a) provide: "The agency shall make every effort to disclose

21  and discuss at appropriate points in the draft statement all major points of view on the

22  environmental impacts of the alternatives including the proposed action."

42 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

1      126.    CEQ rules §1502.14(f) provide:

2  Alternatives including the proposed action.  This section is the heart of the environmental impact

3  statement. Based on the information and analysis presented in the sections on the Affected

4  Environment (Sec. 1502.15) and the Environmental Consequences (Sec. 1502.16), it should

5  present the environmental impacts of the proposal and the alternatives in comparative form, thus

6  sharply defining the issues and providing a clear basis for choice among options by the decision

7  maker and the public.

8      127.    In this section agencies shall: "*(f) Include appropriate mitigation measures not

9  already included in the proposed action or alternatives*" [emphasis added].  The FEIS considers

10  very few mitigation measures.  Nearly all mitigation measures mentioned in the NAPW FEIS are

11  normal standard operating procedures and are required by existing law and regulation. NEPA

12  requires that mitigation measures be proposed for all relevant issues analyzed.

13      128.    The FEIS for the NAPW does not make an effort to disclose and discuss the major

14  point of view that Alternative A is a viable alternative. Quite the opposite is true, the numerous

15  omissions of analysis and scientific inquiry cited in Plaintiff's previous Claims, in addition to the

16  voluminous comments submitted to the BLM in response to the NAPW DEIS, and the analyses

17  specifically called for by the DEIS that were improperly discarded in the FEIS, were precisely

18  those analyses that support Alternative A, the No Action Alternative. This purposeful bias

19  permeates the whole of the FEIS and minimizes supporting analysis for Alternative A, while

20  arbitrarily exaggerating the analytical results supportive for withdrawal. Given the extent and

21  consistency of this purposeful bias in the DEIS and FEIS, the BLM's refusal to produce a

22

1    supplemental NEPA document in response to identification of the deficiencies of the DEIS even

2    further violates NEPA regulations and procedures.

3         129.    The FEIS failed to discuss the conflicts between the proposed actions and the

4    objectives of regional, State, and local land use plans, policies and controls for the area

5    concerned. The FEIS did not discuss any inconsistency of a proposed action with any approved

6    State or local plan and did not describe the extent to which the agency would reconcile its

7    proposed action with the plan or law.  40 C.F.R. §1506.2(d).  The Governor of the State of

8    Arizona, the Legislature of the State of Arizona, the County of Mohave in Arizona, the City of

9    Fredonia in Arizona, and the Southern Counties of Utah have all submitted by comment or

10   resolution their opposition to the Northern Arizona Proposed Withdrawal action and their

11   support for the No Action Alternative.

12        130.    CEQ rules at §1502.16 (c) require a discussion of: "Possible conflicts between the

13   proposed action and the objectives of Federal, regional, State, and local (and in the case of a

14   reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See Sec.

15   1506.2(d)) should be addressed by the NAPW FEIS. This subject was not addressed in the FEIS

16   in violation of NEPA.

17        131.    Additionally, CEQ rules at §1506.2 (d) provide: "To better integrate

18   environmental impact statements into State or local planning processes, statements shall discuss

19   any inconsistency of a proposed action with any approved State or local plan and laws (whether

20   or not federally-sanctioned). Where an inconsistency exists, the statement should describe the

21   extent to which the agency would reconcile its proposed action with the plan or law." This

22   regulation was not followed in the FEIS and is a violation of NEPA.

44 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

1      132.    The facts in this complaint show that Defendants deliberately omitted or

2    minimize the economic harm to the region and to the Arizona State revenues.  The Defendants

3    also misrepresent the potential environmental threats and failed to incorporate the role of existing

4    regulations and land use plans that provide for resource protection which would have supported

5    the No Action Alternative.

6      133.    If Defendants had committed to a good faith and objective analysis, it would have

7    been clear that the existing regulatory scheme protects the identified resources and that the

8    alleged threats to the Colorado River watershed do not, in fact, exist.  Thus, Defendants would

9    have not been able to support the withdrawal as necessary to protect public resources.

10      134.    NEPA requires that the flawed and biased FEIS be remanded for revision or

11    supplementation.  Any agency actions that occur pursuant to the flawed FEIS should be set aside

12    and Defendants should be enjoined from implementing any actions that would support the

13    withdrawal or the FEIS.

14    **SIXTH CLAIM**

15    **The Secretary of the Interior's ROD Is Not Substantiated By the FEIS, Is Not In**

16    **Accordance With Established Law, And Is An Abuse Of  Discretion And Authority.**

17      135.    Plaintiff hereby incorporates by reference the allegations in paragraphs 1 through

18    134.

19      136.    The Secretary of the Interior's rationale for a withdrawal as stated in his Record of

20    Decision is substantially based on granting an unconstitutional preference for the religious beliefs

21    of Native Americans proximate to the NAPWA. The Secretary is granting Native American

22    Tribes in the area a religious preferential use of over 1 million acres of land in the NAPWA.

45 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

1    Nonetheless, the Secretary's ROD notes that there is only one eligible traditional cultural property

2    (Red Butte on the South Parcel) in all of the NAPWA. The Red Butte parcel was litigated as a

3    cultural property in Havasupai v. United States in an attempt to prevent Canyon mine operations.

4    The decision in this case allowed the mine to go forward. Similarly, the Ninth Circuit Court of

5    Appeal in its Snow Bowl case in Navajo Nation v. USFS  considered the same situation for the

6    Snow Bowl and the mountain area containing the Snow Bowl, whether to grant a religious

7    preferential use of federal public land to area Native Americans ( as now granted by the Secretary

8    of the Interior in his ROD for the NAPWA) and concluded that no relief was due to Native

9    American Tribes for the subjective decrease of the spiritual fulfillment they would get from

10   practicing their religion. The court noted that a government action that decreases the spirituality,

11   the fervor, or the satisfaction with which a believer practices his religion is not what Congress

12   has labeled a "substantial burden"—a term of art chosen by Congress to be defined by reference

13   to Supreme Court precedent —on the free exercise of religion. Because there was no showing the

14   government had coerced the Plaintiffs (Native American Tribes) to act contrary to their religious

15   beliefs under the threat of sanctions, or conditioned a governmental benefit upon conduct that

16   would violate the Plaintiffs' religious beliefs, there was no "substantial burden" on the exercise

17   of their religion.

18        137.    In the Snow Bowl case, the land affected was a small fraction of the mountain

19   where Native American Tribes practice their religion. Similarly, proposed exploration and

20   mining activities, according to the RFD of the EIS, affects only 0.14% of the over 1 million acres

21   of land in the NAPWA and Red Butte represents only 0.4% of the NAPWA.

22

138.    The Secretary is granting preemptive relief to Native American Tribes via the withdrawal of over 1 million acres that which they could not receive under the law for a mere 20 acre mine site (Canyon Mine) as was decided in Havasupai Tribe v. United States. The Secretary's action is not in accordance with established law.

139.    Although the Secretary acknowledges that the EIS shows that the the risk of negative water resource impacts are low, the Secretary attempts to justify his decision to withdrawal by proposing that a twenty year withdrawal is required so as to allow for additional data to be gathered and a more thorough investigation of groundwater flow paths, travel times, and radionuclide contributions from mining be researched and analyzed by some future decision maker. However, this is not in accordance with established law and regulation. These analyses are required by the current EIS that was written for the NAPW decision and cannot be made the responsibility of future decision makers as a convenient justification for the current withdrawal. It is unknown whether this future research proposed by the Secretary will, in fact, ever be performed.

140.    The Secretary also states as a rationale for his withdrawal decision that millions of people living in seven states depend on the Colorado River for drinking, irrigation, and industrial use, implying that this water source is endangered from uranium exploration and mining activities. The FEIS and the results of other studies carried out in support of this EIS do not support this rationale, and the Secretary's use of it is an abuse of discretion and is done without observance of procedure required by law.

141.    Additionally, the Secretary's justifies his decision for withdrawal by claiming that the uranium resource in the NAPWA will continue to be developed in the event of a withdrawal.

1    While this is true for a very few claims and claimants, the vast majority of claim holders will

2    have their claims voided when subject to a mineral exam and will be unable to continue

3    exploration of their claim to establish a property right that a "discovery" confers upon a claim

4    holder. Thus, the millions of dollars and tens of thousands of man hours expended in good faith

5    to date on exploring the NAPWA will be "taken" as a result of the withdrawal with total

6    disregard to the effects on the claim holder. While this taking is not a taking in the established

7    legal sense, the loss of actual wealth and potential wealth is quite real and the effects of this loss

8    were not analyzed in the DEIS or FEIS as required by 40 C.F.R. §1508.8(a) and (b).

9          142.    In summary, the rationales used to justify the Secretary's withdrawal are not

10   supported by established law, are not supported by the FEIS, and are based on an FEIS that is

11   materially deficient and purposefully did not obtain the information essential to making a

12   reasoned decision, so as to justify the Secretary's predecided withdrawal decision. These actions

13   by the BLM, DOI, and the Secretary of the Interior, Ken Salazar, are a grievous violation of

14   NEPA's implementing regulations, and are an abuse of discretion, and are done without

15   observance of procedure required by law, and are in excess of statutory jurisdiction, authority, or

16   limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5

17   U.S.C. §706(2).

18                                    **RELIEF REQUESTED**

19   WHEREFORE, Plaintiff respectfully requests that this Court:

20          A.    Immediately set aside the Secretary of the Interior's Record of Decision for the

21   NAPW signed January 9, 2012, because it is substantively based on an unconstitutional

22   preference for Native American religious beliefs.

48 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

1    B.      Declare that Defendants are in Violation of NEPA-implementing regulations for

2    the cited laws, and the APA.

3    C.      Declare that Defendants have abused the customary civil, legislative, and judicial

4    deference accorded to Government Agency expertise as illustrated by manipulating scientific and

5    technical knowledge, assumptions, findings, analyses, and by excluding new significant

6    information in the NAPW EIS process in order to support a policy decision already made by

7    Defendant Secretary of Interior Ken Salazar.

8    D.      Immediately enjoin Defendant Secretary of the Interior, Ken Salazar, from

9    withdrawing any lands cited in the Northern Arizona Proposed Withdrawal until Defendant BLM

10   and Defendant Ken Salazar have answered this complaint and until this complaint has been

11   adjudicated by the Court.

12   E.      Enjoin Defendant Secretary of the Interior, Ken Salazar, from withdrawing any

13   lands cited in the Northern Arizona Proposed Withdrawal until the BLM has published, for

14   public comment, a complete Supplemental DEIS and until a subsequently re-issued Final NAPW

15   EIS has been published and recorded in The Federal Register.

16   F.      Order the BLM to withdraw the Final NAPW EIS published October 27, 2011,

17   and publish for public comment a complete Supplemental DEIS for all sections of the DEIS, that

18   fully conforms with the requirements of NEPA, prior to republishing the Final EIS for the

19   Northern Arizona Proposed Withdrawal.

20          G.      Grant Plaintiff such further relief as may be just, proper, and equitable.

21

22

49 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief

1 | Respectfully Submitted,

2 | January 23, 2012

3 |

4 |

5 | Gregory D. Yount

6 | Plaintiff pro se

7 | 807 W. Butterfield Rd

8 | Chino Valley, Arizona 86323

9 | Tel: 928-899-7029

10 | gregory_yount@northern-arizona-uranium-project.com

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

50 of 50 - Plaintiff's First Amended Complaint for Declaratory and Injunctive Relief