Melanie R. Kay (*pro hac vice pending*)
Kenneth R. Scott *(pro hac vice pending)*
Edward B. Zukoski (*pro hac vice pending*)
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO  80202
mkay@earthjustice.org
kscott@earthjustice.org
tzukoski@earthjustice.org
Telephone: (303) 623-9466
Fax: (303) 623-8083

Roger Flynn *(pro hac vice pending)*
Western Mining Action Project
P.O. Box 349, 440 Main St., #2
Lyons, CO  80540
wmap@igc.org
Telephone: (303) 823-5738
Fax: (303) 823-5732

Attorneys for Grand Canyon Trust, the Havasupai Tribe,
Center for Biological Diversity, Sierra Club, and
National Parks Conservation Association

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PRESCOTT DIVISION

| | |
|---|---|
| Gregory Yount, | ) |
| Plaintiff, | ) Case No. 3:11-cv-08171-PCT-FJM |
| vs. | ) |
| Ken Salazar, Secretary of the Interior; and | ) **MEMORANDUM IN SUPPORT** |
| U.S. Bureau of Land Management, | ) **OF MOTION OF GRAND** |
| Defendants, and | ) **CANYON TRUST ET AL. TO** |
| | ) **INTERVENE AS DEFENDANTS** |
| Grand Canyon Trust; | ) |
| The Havasupai Tribe; | ) |
| Center for Biological Diversity; | ) |
| Sierra Club; and | ) |
| National Parks Conservation Association, | ) |
| Proposed Defendant-Intervenors. | ) |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND ............................................................................... 2

I.    THE GREATER GRAND CANYON REGION AND ITS
      RESOURCES ............................................................................................ 2

II.   URANIUM MINING THREATENS THE GRAND CANYON
      REGION .................................................................................................... 3

III.  PROPOSED INTERVENORS HAVE LONG FOUGHT TO
      PROTECT THE GRAND CANYON REGION FROM URANIUM
      MINING ..................................................................................................... 5

IV.   THE MINERAL WITHDRAWAL AND THE PENDING
      LITIGATION ............................................................................................. 8

ARGUMENT ...................................................................................................... 9

I.    THE PROPOSED INTERVENORS ARE ENTITLED TO
      INTERVENE AS A MATTER OF RIGHT............................................... 9

      A.    The Motion To Intervene Is Timely................................................ 10

      B.    Each Of The Proposed Intervenors And Their Members Have
            Significantly Protectable Interests In The Subject Of This
            Action .............................................................................................. 10

      C.    This Lawsuit Threatens The Interests Of The Proposed
            Intervenors And Their Members In Protecting The Grand
            Canyon Region ................................................................................ 12

      D.    The Interior Department May Not Adequately Represent The
            Interests Of The Proposed Intervenors And Their Members .......... 14

II.   THE PROPOSED INTERVENORS SHOULD BE GRANTED
      PERMISSIVE INTERVENTION UNDER RULE 24(B) .......................... 17

CONCLUSION .................................................................................................. 17

TABLE OF EXHIBITS ...................................................................................... 19

1

TABLE OF AUTHORITIES

FEDERAL CASES

Arizona v. California,
  460 U.S. 605 (1983) ......................................................................................15, 17

California ex. rel. Lockyer v. United States,
  450 F.3d 436 (9th Cir. 2006)...............................................................................9

County of Fresno v. Andrus,
  622 F.2d 436 (9th Cir. 1980)............................................................................16

Forest Conservation Council v. United States Forest Service,
  66 F.3d 1489 (9th Cir. 1995).........................................................10, 13, 14, 15

Glamis Imperial Corporation v. United States Department of the Interior,
  No. 01-530 (RMW), 2001 WL 1704305 (D.D.C. Nov. 13, 2001).......... 14, 15-16

Havasupai Tribe v. Robertson,
  943 F.2d 32 (9th Cir. 1991)..............................................................................16

Idaho Farm Bureau Federation v. Babbitt,
  58 F.3d 1392 (9th Cir. 1995).............................................................9, 10, 13, 16

Kootenai Tribe of Idaho v. Veneman,
  313 F.3d 1094 (9th Cir. 2002) ..........................................................................17

Natural Resources Defense Council, Inc. v. U.S. Nuclear Regulatory
  Commission, 578 F.2d 1341 (10th Cir. 1978) .....................................................13

Norton v. Southern Utah Wilderness Alliance,
  542 U.S. 55 (2004) ...........................................................................................15

Northwest Forest Resource Council v. Glickman,
  82 F.3d 825 (9th Cir. 1996)..............................................................................11

Prete v. Bradbury,
  438 F.3d 940 (9th Cir. 2009).............................................................................15

Sagebrush Rebellion, Inc. v. Watt,
  713 F.2d 525 (9th Cir. 1983).............................................................11, 13, 14

Southwest Center for Biological Diversity v. Berg,
  268 F.3d 810 (9th Cir. 2001)........................................................................14, 15

Trbovich v. United Mine Workers of America,
  404 U.S. 528 (1972) .....................................................................................14, 15

United States v. Alisal Water Corporation,
  370 F.3d 915 (9th Cir. 2004).............................................................................10

Venegas v. Skaggs,
  867 F.2d 527 (9th Cir. 1989).............................................................................17

ii

Wilderness Society v. U.S. Forest Service,
   630 F.3d 1173 (9th Cir. 2011) ........................................................................ passim

## FEDERAL STATUTES

16 U.S.C. §§ 528-531 ...............................................................................................15

43 U.S.C. § 1701(a)(12) ..........................................................................................15

Fed. R. Civ. P. 24(a)(2) ........................................................................................ 9, 13

Fed. R. Civ. P. 24(b)(1)(B)......................................................................................17

## OTHER

7C Federal Practice And Procedure § 1904 (3d ed.)...............................................17

74 Fed. Reg. 35,887 (July 21, 2009) .........................................................................7

77 Fed. Reg. 2317 (Jan. 17, 2012).............................................................................8

Grand Canyon Watersheds Protection Act of 2008, H.R. 5583,
   110th Cong., 2d Sess. (2008) ...............................................................................6

Public Land Order No. 7787, 77 Fed. Reg. 2563 (Jan. 18, 2012).............................8

**INTRODUCTION**

In this case, Plaintiff Gregory Yount seeks to enjoin the Department of the Interior's ("DOI's") January 9, 2012 decision to protect over one million acres of mostly public lands adjacent to Grand Canyon National Park from the damaging impacts of unrestrained uranium exploration and mine development.  The challenged DOI decision institutes a 20-year moratorium on the filing of new mining claims and permits development of only valid existing mineral rights.  The relief Mr. Yount seeks would open the lands around the Grand Canyon to unlimited staking of new mining claims, and lift restrictions that the withdrawal places on existing claims in the withdrawn area.

Grand Canyon Trust ("the Trust"), the Havasupai Tribe, Center for Biological Diversity ("CBD"), National Parks Conservation Association ("NPCA"), and Sierra Club (collectively, "Proposed Intervenors") move to intervene on DOI's behalf to defend the mineral withdrawal, a decision the Proposed Intervenors urged DOI to adopt for years through letters, rallies, petitions, meetings, and litigation.

Proposed Intervenors satisfy the four-part test for intervention as-of-right under Federal Rule of Civil Procedure 24(a)(2).  First, this motion is timely, as it is filed the same day DOI is to file its answer.  Second, Proposed Intervenors have long-standing and intense interests in the protection of the natural and cultural values of the lands at stake in this case, and have pressed for years to protect these lands from the damaging impacts of hard-rock mining.  The Ninth Circuit has held such interests merit intervention of right. Third, a decision in Mr. Yount's favor may impair Proposed Intervenors' interests in protecting the natural and cultural resources they enjoy, given the well-documented and damaging impacts of uranium mining.  Finally, DOI's broad mandate to balance multiple uses of federal lands (as opposed to Proposed Intervenors' narrower focus on protection of environmental and cultural values) demonstrates that DOI may not adequately represent the Proposed Intervenors' interests.  Further, DOI has repeatedly favored mining interests over Proposed Intervenors' interests in other litigation regarding the very

1

1  lands covered by the withdrawal.  This Court thus should grant the Proposed Intervenors

2  intervention of right.  The Proposed Intervenors also meet the test for permissive

3  intervention, which this Court should also grant.

4                           **FACTUAL BACKGROUND**

5  **I.      THE GREATER GRAND CANYON REGION AND ITS RESOURCES.**

6          The Grand Canyon is recognized around the world as one of the planet's greatest

7  natural and geologic wonders.  The mile-deep, 277-mile-long canyon is protected as a

8  national park and surrounded by millions of additional acres of public lands that are home

9  to an array of geological, biological, cultural, and recreational resources.  These lands

10  range from colorful desert landscapes to towering ponderosa pine forests.  Lush

11  groundwater-fed springs dot the area, supporting a diversity of species up to 500 times

12  greater than the surrounding, more arid, lands.  See Bureau of Land Management

13  ("BLM"), Northern Arizona Proposed Withdrawal Final Environmental Impact

14  Statement at 3-34, 3-114, 4-130 (Oct. 26, 2011) ("FEIS"), excerpts attached as Exh. 1.

15          The region's diverse ecosystems provide habitat for a variety of wildlife, including

16  mule deer, desert bighorn sheep, pronghorn, western burrowing owl, northern goshawk,

17  and desert horned lizard, among others.  Id. at 3-120 – 3-124.  Endangered species such

18  as the California condor and Mexican spotted owl forage in the area, while the Colorado

19  River and its tributaries provide habitat for the endangered humpback chub and other

20  sensitive aquatic species.  See id. at 3-150, 3-154 – 3-155, 3-157 – 3-159.

21          The Grand Canyon region also comprises the ancestral homelands of American

22  Indian tribes, including the Havasupai Tribe.  See id. at 3-211 – 3-219 & App. I at I-11 –

23  I-16.  The Havasupai reservation, located within the Grand Canyon, encompasses a

24  portion of the Tribe's ancestral homelands, which includes lands on both rims of the

25  Canyon.  Havasupai Tribal Council Resolution No. 19-12 (Feb. 27, 2012) at 1-3

26  ("Havasupai Resolution"), attached as Exh. 2.  For thousands of years, the Havasupai

27  people have sustained themselves through hunting, gathering, farming, and other

28

                                        2

traditional land-based activities.  Tribal members have for centuries collected native plants, hunted, held religious ceremonies and buried their dead in the Grand Canyon region.  FEIS at 3-212, 3-217 – 3-218, App. I at I-15; Havasupai Resolution at 1-3.  The Tribe's history, culture, and spiritual identities are intimately and inextricably connected to the Grand Canyon landscape and its abundant resources, and the area contains many sites of great religious and cultural significance that remain vital to the Tribe today. Havasupai Resolution at 2-3; Testimony of Matthew Putesoy (July 21, 2009), attached as Exh. 3.

Together, these natural and cultural resources and American Indian lands provide a recreational mecca that welcomes five million tourists a year and supports the local economy.  See FEIS at 1-6, 3-226 – 3-233, 3-288 – 3-294.  Visitors enjoy hiking, camping, and other activities that allow them to experience the scenic vistas, diverse flora and fauna, traditional cultural sites, and natural quiet and solitude of the area.  See, e.g., Declaration of Roger Clark (Feb. 29, 2012) ¶¶ 17-22 ("Clark Decl."), attached as Exh. 4; Declaration of Taylor McKinnon (Feb. 29, 2012) ¶¶ 5-16 ("McKinnon Decl."), attached as Exh. 5; Declaration of Kim Crumbo (Feb. 28, 2012) ¶¶ 7 ("Crumbo Decl."), attached as Exh. 6; Declaration of David Nimkin (Feb. 28, 2012) ¶¶ 3 ("Nimkin Decl."), attached as Exh. 7; Putesoy Testimony (Exh. 3); Havasupai Resolution at 2-3.

II.     URANIUM MINING THREATENS THE GRAND CANYON REGION.

Uranium mining threatens the environment and human health in the Grand Canyon region.  The area is no stranger to uranium mining's harmful impacts.  Uranium mining in the area began during the 1950s Cold War uranium boom and continued until the market crashed in the late 1980s.  FEIS at 3-35.  This mining left a legacy of radioactive contamination that continues to threaten the region's public health, ecosystems, tribal interests, and recreational opportunities.

DOI's environmental analysis demonstrates the harms uranium mining has caused, and will likely cause in the future if allowed to occur absent DOI's withdrawal.  Uranium

is a radioactive substance, and inhalation, ingestion, or skin exposure can cause cancer, kidney disease, lung toxicity, and other ailments.  Id. at 3-254 – 3-257.  Former uranium mine workers and their families – many of them American Indian – suffered devastating health impacts from exposure to radioactive dust and debris, and water contamination from the region's last uranium boom.  Id. at 3-253 – 3-254.

Future uranium mining in this region also threatens the water upon which people and wildlife depend.  Except for the mainstem Colorado River, perennial streams in the region originate from springs and seeps, which in turn come from aquifers.  FEIS at 3-64 – 3-65.  Plants and animals rely on these springs for habitat and drinking water, and American Indian tribes consider them sacred.  Id. at 3-214 – 3-218, 4-130.  Uranium mining can deplete groundwater and create a risk of contamination from uranium and other heavy metals.  See id. at 4-51 – 4-52, 4-60 – 4-63, 4-71 – 4-92.  The result is that springs and seeps – and the streams that they supply – may dry up or become toxic to the people, plants, and animals that rely on them.  See id.  Contamination from past uranium mining already has left a toxic legacy on the region's water resources, including polluted streams inside Grand Canyon National Park.  See Clark Decl. ¶ 21 (noting National Park Service warnings of uranium pollution in streams); McKinnon Decl. ¶¶ 10, 14 (same); Nimkin Decl. ¶ 6.

Uranium mining also threatens to transform portions of the region's wild landscapes into industrial zones with webs of roads and power lines, mine facilities and drill rigs, and hundreds of thousands of truck trips.  Such development would fragment and disturb habitat and sensitive areas, including nesting areas for the endangered California condor, calving and fawning grounds for mule deer, elk, and antelope, and critical big-game winter range.  See FEIS at 4-140 – 4-144.  Noise, pollution, visual disturbance, and roads would also diminish the area's high degree of naturalness and outstanding opportunities for solitude and primitive forms of recreation.  See id. at 4-227 – 4-236.  These impacts make it difficult for the lands to be protected by Congress as

wilderness.  Past and renewed uranium mining already has impacted long-time visitors to the region by disturbing the area's uncommon natural beauty and solitude.  See, e.g., Clark Decl. ¶¶ 20- 28; McKinnon Decl. ¶¶ 11-12, 17.

Future uranium mining would also have disproportionate and destructive impacts on American Indian traditional, cultural, and health interests.  Cultural and sacred sites, traditional hunting and gathering areas, and other locations vital to the Havasupai and other tribes' practices, beliefs, and identities face disturbance, disruption, or contamination.  See FEIS at 4-212 – 4-227.  The Havasupai Tribe faces disproportionate potentially harmful health impacts from mining that would occur adjacent to its reservation and on public lands that the Tribe's members still use and enjoy for traditional purposes.  Id. at 4-261.  Damage to the Tribe's traditional cultural places from uranium mining "could have the potential to cause harm to modern day tribal cultures; therefore, disturbance to these places is permanent and irreversible and considered a major long-term direct impact."  Id. at 5-41.  Some of these harms to traditional cultural places cannot be mitigated.  Id. at 4-220; see also letter of B. Jones, Havasupai Tribal Council to BLM (Mar. 23, 2011), attached as Exh. 8; Havasupai Resolution at 6.

## III.  PROPOSED INTERVENORS HAVE LONG FOUGHT TO PROTECT THE GRAND CANYON REGION FROM URANIUM MINING.

In 2007, a spike in global uranium prices sparked renewed commercial interest in mining the Grand Canyon region.  Thousands of new mining claims were filed.  FEIS at 1-3.  BLM and the Forest Service initially were receptive to this interest.  For example, in late 2007, the Forest Service authorized uranium exploration activities at several sites in the Kaibab National Forest just south of the Grand Canyon (and within lands now withdrawn by the DOI).  McKinnon Decl. ¶ 22.

Others were alarmed at the prospect of development of thousands of uranium claims.  Tribes in the area, including the Havasupai, enacted or renewed bans on uranium mining on their lands.  FEIS at 1-22.  The Trust, CBD, and Sierra Club opposed the Forest Service's 2007 decision approving some uranium exploration, and sued the agency

5

in early 2008 for approving those exploration projects without proper analysis under the National Environmental Policy Act ("NEPA").  See Cmplt., Ctr. for Biological Diversity v. Stahn, No. 08-CV-8031-MHM (D. Ariz.) (Mar. 12, 2008), attached as Exh. 9; see also Clark Decl. ¶ 5; McKinnon Decl. ¶¶ 22-23.

Some in Congress heard these concerns and took action.  With the Proposed Intervenors' support, in March 2008 Arizona Congressman Raul Grijalva introduced legislation to permanently withdraw over one million acres surrounding the Park from new mining claims.  See Grand Canyon Watersheds Protection Act of 2008, H.R. 5583, 110th Cong., 2d Sess. (2008), attached as Exh. 10; see also Clark Decl. ¶ 6; McKinnon Decl. ¶ 24; Nimkin Decl. ¶¶ 7-11; C. Sislin, Grand Canyon uranium threatens tribal water, High Country News (May 18, 2010), attached as Exh. 11 (discussing Havasupai Tribe advocacy).  The lands proposed for protection in Rep. Grijalva's bill are the very same lands DOI ultimately withdrew in January 2012.[1]

As a result of Rep. Grijalva's proposed legislation, and advocacy from the Proposed Intervenors and others, the House Natural Resources Committee issued an emergency resolution in June 2008 directing the Interior Secretary to immediately withdraw for three years the million acres identified in the legislation pursuant to the Federal Land Policy and Management Act ("FLPMA").  Resolution of the Comm. on Natural Resources (June 25, 2008), attached as Exh. 12.  The Proposed Intervenors supported this measure, and several of them petitioned DOI to immediately issue a rule

---

[1]  The lands proposed for withdrawal by Rep. Grijalva – and those ultimately withdrawn in January 2012 – encompass three parcels.  See map of proposed withdrawal, FEIS at 1-2.  The North Parcel of approximately 550,000 acres is situated on the North Rim, borders the Grand Canyon-Parashant National Monument, the Kanab Creek Wilderness Area, and the Kaibab Paiute Indian Reservation, and encompasses three areas designated to protect cultural resources and threatened and endangered species.  Id. at 1-1, 2-9, 3-2.  Also on the North Rim, the East Parcel of approximately 135,000 acres borders the Vermilion Cliffs National Monument, the Paria Canyon-Vermilion Cliffs Wilderness Area, and the Navajo Reservation.  Id.  Scenic Highway 89A also traverses the East Parcel and provides access to the North Rim and its various attractions.  Id. at 3-230.  Finally, the South Parcel of approximately 322,000 acres serves as the gateway to the Park's South Rim and borders the Havasupai Reservation.  Id. at 1-1, 2-9.  Roads accessing the National Park's South Rim cross this parcel.  Id.

6

withdrawing from the lands mineral entry.  Clark Decl. ¶ 7; McKinnon Decl. ¶¶ 24, 26; Nimkin Decl. ¶ 8; Havasupai Resolution at 4.  DOI ignored the House Committee's directive and the petition.  The Trust, CBD, and Sierra Club then sued to force the agency to implement the emergency withdrawal, and to halt new uranium exploration projects.  See Cmplt., Ctr. for Biological Diversity v. Kempthorne, No. 08-CV-8117-NVW (D. Ariz.) (Sept. 29, 2008), attached as Exh. 13; Clark Decl. ¶ 8; McKinnon Decl. ¶¶ 25-28.

In the context of this political and legal pressure, DOI changed course.  See Clark Decl. ¶ 9.  In July 2009, DOI announced a proposal to withdraw the one million acres identified in Rep. Grijalva's legislation from mineral entry for 20 years in order to "protect the Grand Canyon watershed from adverse effects of locatable hardrock mineral exploration and mining."  74 Fed. Reg. 35,887 (July 21, 2009).  DOI began an environmental analysis of the proposed withdrawal.  To preserve its future options, DOI also put in place an emergency two-year "segregation" to protect the area from new mining claims while the agency completed its analysis.  Id.[2]  The Proposed Intervenors submitted comments in support of the proposed 20-year withdrawal both during the "scoping" period and on the Draft EIS, and encouraged their members, the public, and other stakeholders to do the same.  See, e.g., Clark Decl. ¶ 11; McKinnon Decl. ¶ 31; Nimkin Decl. ¶ 12; letter of T. McKinnon to K. Salazar (May 4, 2011), attached as Exh. 14; Havasupai Resolution at 4.  After more than two years of analysis, BLM published its Final EIS on October 26, 2011, identifying as its "preferred alternative" closure of the million acres to mineral entry.  Proposed Intervenors strongly supported that alternative.[3]

---

[2]  When this two-year segregation was set to expire, but before the FEIS was complete, DOI issued an emergency six-month withdrawal effective July 19, 2011.  See FEIS at 1-5.

[3]  Even after adopting the emergency two-year segregation in 2009, DOI continued to approve damaging uranium mining proposals within the proposed withdrawal area.  In late 2009, BLM acquiesced to renewed operations of a uranium mine (the "Arizona 1") — which had been defunct for two decades — just north of the Park, again without the environmental review required by law.  The Trust, CBD, Sierra Club, and the Havasupai Tribe sued to halt these operations.  See Cmplt., Ctr. for Biological

The Final EIS reveals the stark contrast between doing nothing to limit uranium mining, and withdrawing the million acres at issue for 20 years.  If the million acres are not withdrawn, the Final EIS predicts 26 new uranium mines and more than 700 exploration projects and would be developed.  Such development would cause 1,364 acres of surface disturbance and directly or indirectly disturb more than 15,000 acres of wildlife habitat, use 316 million gallons of water, and require over 300,000 ore hauling trips.  FEIS at 2-11 – 2-13; 4-143.  Mining and related activities could contaminate Havasupai Springs.  Id. at 4-223.  Increased uranium mining "could result in disturbance to American Indian traditional cultural and sacred places over time and space," which "could reduce the functionality of traditional cultural and sacred places."  Id.

The impacts of such development to the region's people and natural resources are far greater than those that would occur under the 20-year moratorium, which is predicted to include only 11 new exploration projects and 7 new mines.  Id. at 2-15 – 2-16.  When compared to the "no withdrawal" alternative, the withdrawal would:  result in about one-tenth of the surface disturbance; cause less than a third of the impacts to wildlife habitat; better protect threatened and endangered wildlife; result in less than half the air pollutant emissions; and cut water usage and ore-hauling trips by about two thirds.  See id. at 2-14 – 2-16, 4-30 – 4-31, 4-144, 4-155.  The withdrawal would result in less likelihood of harm to cultural and American Indian resources.  Id. at 4-215 – 4-216, 4-224.  It would be less likely to result in uranium contamination at certain South Rim springs.  Id. at 4-96.

## IV.    THE MINERAL WITHDRAWAL AND THE PENDING LITIGATION.

On January 9, 2012, the Secretary of Interior announced his decision to withdraw approximately 1,006,545 acres adjacent to Grand Canyon National Park from new hard rock mining claims.  See 77 Fed. Reg. 2317 (Jan. 17, 2012) (announcing decision).  The withdrawal was effective January 21, 2012.  See Public Land Order No. 7787, 77 Fed. Reg. 2563 (Jan. 18, 2012).

---

Diversity v. Salazar, No. 09-CV-8207-DGC (D. Ariz.) (Nov. 16, 2009), attached as Exh. 15; Clark Decl. ¶ 10; McKinnon Decl. ¶ 29.

On November 1, two months <u>before</u> the Secretary issued his decision, Mr. Yount filed this suit challenging the Final EIS, alleging that DOI failed to comply with various NEPA requirements.  Dkt. # 1 ¶¶ 71-113.  Upon issuance of the mineral withdrawal, Mr. Yount amended his complaint, which seeks to set aside the mineral withdrawal, and prevent DOI from issuing a new withdrawal until another, potentially years-long, environmental review process is complete.  Plaintiff's First Amended Cmplt. (Jan. 25, 2012), Dkt. # 9 at 48-49.  The relief he seeks would terminate the mineral withdrawal indefinitely, and potentially permanently.

## ARGUMENT

### I.    THE PROPOSED INTERVENORS ARE ENTITLED TO INTERVENE AS A MATTER OF RIGHT.

Rule 24(a)(2) "requires a court, upon timely motion, to permit intervention of right by anyone" who satisfies the rule's four-part test:

> (1) the motion must be timely; (2) the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action.

<u>Wilderness Soc'y v. U.S. Forest Serv.</u>, 630 F.3d 1173, 1177 (9th Cir. 2011) (<u>en banc</u>) (quotations and citations omitted).  "In evaluating whether Rule 24(a)(2)'s requirements are met," this Circuit "construe[s] the Rule broadly in favor of proposed intervenors," recognizing that "a liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts."  <u>Id.</u> at 1179 (quotations and citations omitted).  <u>See also</u> <u>California ex. rel. Lockyer v. United States</u>, 450 F.3d 436, 440 (9th Cir. 2006) (Ninth Circuit "construe[s] Rule 24(a) liberally in favor of potential intervenors."); <u>Idaho Farm Bureau Fed'n v. Babbitt</u>, 58 F.3d 1392, 1397 (9th Cir. 1995) (Rule 24 "is construed broadly in favor of the applicants").  The Ninth Circuit, sitting <u>en banc</u>, recently noted "our consistent approval of intervention of right on the side of the federal defendant in cases asserting violations of environmental statutes."  <u>Wilderness</u>

1    Soc'y, 630 F.3d at 1179.[4]

2        Proposed Intervenors meet each part of Rule 24(a)(2)'s four-part test.

3    **A.    The Motion To Intervene Is Timely.**

4        Timeliness is measured by examining "(1) the stage of the proceeding at which an

5    applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and

6    length of the delay." United States v. Alisal Water Corp., 370 F.3d 915, 921 (9th Cir.

7    2004) (quotations omitted).  Here, there has been no delay, as this motion has been filed

8    at the very earliest stage of this case.  Federal Defendants are due to answer the First

9    Amended Complaint today; Mr. Yount intends to file a Second Amended Complaint on

10   March 16, with DOI responding thereafter; no administrative record has been submitted

11   to the Court, and no proceedings have been scheduled.  See Idaho Farm Bureau Fed'n, 58

12   F.3d at 1397 (holding an intervention motion timely when filed four months after the

13   complaint and two months after the government's answer -- "at a very early stage, before

14   any hearings or rulings on substantive matters").  No parties are prejudiced by the timing

15   of this motion.  This motion is thus timely.

16   **B.    Each Of The Proposed Intervenors And Their Members Have
        Significantly Protectable Interests In The Subject Of This Action.**

17       "Whether an applicant for intervention demonstrates sufficient interest in an action

18   is a practical, threshold inquiry." Forest Conservation Council v. U.S. Forest Serv., 66

19   F.3d 1489, 1493 (9th Cir. 1995) (quotations and citations omitted), abrogated on other

20   grounds, Wilderness Soc'y, 630 F.3d at 1177-78, 1180.  The requirement of a protectable

21   interest is not a rigid, technical or onerous requirement, in that Rule 24(a)(2) "does not

22   require a specific legal or equitable interest." Wilderness Soc'y, 630 F.3d at 1179.

23   Rather, it is a "practical guide to disposing of lawsuits by involving as many apparently

24   concerned persons as is compatible with efficiency and due process." Id. (quotations and

25

26   _____
        [4] Although the Ninth Circuit previously held private parties could only intervene
27   as defendants in NEPA cases at the remedy phase, the Circuit, en banc, in January 2011,
     fully discarded this position and held that the same rules concerning intervention apply to
28   NEPA cases as in all other cases. Wilderness Soc'y, 630 F.3d at 1176, 1180-81.

citation omitted). "[I]t is generally enough that the interest is protectable under some law, and that there is a relationship between the legally protected interest and the claims at issue." Id. (citation and quotations omitted).

The Proposed Intervenors' and their members' have recreational, aesthetic, and environmental protection interests, as well as their cultural and spiritual interests, in the property at issue in this case – the one million acres DOI withdrew.  These interests are exactly the type the Ninth Circuit has long held meet the "interest" test for intervention as of right.  The Proposed Intervenors' members make frequent use of the withdrawal areas for recreation, wildlife viewing, and scenic enjoyment, and traditional cultural purposes, and have a demonstrated interest and history in seeking to protect the area's natural, recreational, and cultural values.  See supra at 3; Clark Decl. ¶¶ 3-20; McKinnon Decl. ¶¶ 5-16, 18-32; Crumbo Decl. ¶¶ 2-8; Nimkin Decl. ¶¶ 3-13; Putesoy Testimony (Exh. 3); Havasupai Resolution at 1-5.  Such "environmental, conservation and wildlife interests" have long been held sufficient for intervention of right.  See Sagebrush Rebellion, Inc. v. Watt, 713 F.2d 525, 526-28 (9th Cir. 1983).

Further, the Ninth Circuit has repeatedly concluded that a public interest group is entitled to intervene as of right to defend the federal government's compliance with environmental laws.  As that Court recently stated:

> In Sagebrush Rebellion, Inc. v. Watt, for example, we held that several conservation groups could intervene of right to defend the federal government's compliance with the Federal Land Policy and Management Act of 1976 in designating a conservation area for birds of prey.  In doing so, we noted that there could "be no serious dispute" concerning the existence of a protectable interest supporting the conservation groups' right to intervene.  Similarly, in Idaho Farm Bureau … we approved intervention of right by environmental groups as defendants in an action challenging the Fish and Wildlife Service's compliance with the Endangered Species Act ….

Wilderness Soc'y, 630 F.3d at 1179-80 (footnote and citations omitted).  Similarly, the Ninth Circuit has held conservation groups merit intervention of right where a plaintiff challenges the legality of a measure that the organization had supported.  See Nw. Forest Res. Council v. Glickman, 82 F.3d 825, 837-38 (9th Cir. 1996) (public interest groups

11

1   allowed to intervene as of right when groups "were directly involved in the enactment of

2   the law or in the administrative proceedings out of which the litigation arose").[5]

3        The Proposed Intervenors here are in exactly the same position as those

4   environmental groups the Ninth Circuit held demonstrated sufficient interest to intervene.

5   Like them, the groups in this case are seeking to defend federal defendants' compliance

6   with environmental laws – here, NEPA.  See Proposed Answer, attached as Exh. 16.

7   Like them, the Proposed Intervenors in this case strongly supported the measure the

8   plaintiff challenges – here the withdrawal that Mr. Yount seeks to enjoin.  The Proposed

9   Intervenors supported legislation to accomplish a withdrawal, used advocacy and

10  litigation to urge DOI to give effect to the temporary withdrawal that the House Natural

11  Resources Committee directed DOI to adopt, and vigorously supported DOI's proposed

12  20-year withdrawal through written comments and by encouraging their members and the

13  public to support the withdrawal.  See supra at 6-7.  The Trust, CBD, Sierra Club, and the

14  Havasupai Tribe have also filed multiple suits to halt damaging uranium exploration or

15  mining proposals in the withdrawal area.  See supra at 5-7 & n.3.  Indeed, the Plaintiff

16  has recognized the vigorous role conservation groups have played, alleging that DOI

17  initiated the EIS for the proposed withdrawal "at the behest of environmental groups."

18  Complaint (Nov. 1, 2011) Dkt. # 1 at ¶ 103.

19       In sum, each of the Proposed Intervenors and their members has a deep interest in

20  the public lands at issue, and a strong interest in defending the withdrawal which they

21  long sought.  These interests are sufficient for intervention as of right.

22  **C.    This Lawsuit Threatens The Interests Of The Proposed Intervenors
            And Their Members In Protecting The Grand Canyon Region.**

23

24       Rule 24(a) requires that an applicant for intervention of right be "so situated that

25  disposing of the action may as a practical matter impair or impede the movant's ability to

26      _____

27        [5]  Mr. Yount alleges tribal interests are at stake, asserting that DOI's withdrawal
        grants tribes, including the Havasupai, "religious preferential use over 1 million acres of
        lands," a purported benefit he suit seeks to eliminate.  First Amended Cmplt. Dkt. # 9
28      ¶ 136.

1    protect its interest." Fed. R. Civ. P. 24(a)(2) (emphasis added). "Rule 24 refers to

2    impairment 'as a practical matter.' Thus, the court is not limited to consequences of a

3    strictly legal nature." Forest Conservation Council, 66 F.3d at 1498 (quotations and

4    citation omitted); see also Natural Res. Def. Council, Inc. v. U.S. Nuclear Regulatory

5    Comm'n, 578 F.2d 1341, 1345 (10th Cir. 1978) (court "may consider any significant

6    legal effect in the applicant's interest"). Rather, "a prospective intervenor has a sufficient

7    interest for intervention purposes if it will suffer a practical impairment of its interests as

8    a result of the pending litigation." Wilderness Soc'y, 630 F.3d at 1179 (quotations and

9    citation omitted). The Ninth Circuit applies this test liberally in favor of intervention.

10   See, e.g., Sagebrush Rebellion, 713 F.2d at 527-28.

11        This case threatens Proposed Intervenors' longstanding interests in protecting the

12   one million acres of the Grand Canyon region that DOI's decision withdrew from new

13   mining claims. Mr. Yount seeks to "[i]mmediately set aside" the mineral withdrawal,

14   and enjoin DOI from withdrawing "any lands" in the area until a potentially years-long

15   environmental review process is complete. First Amended Cmplt., Dkt. # 9 at pp. 48-49.

16   Such relief would open up the million acres to mining claims, paving the way for scores

17   of uranium exploration projects and mine development. It is precisely such development

18   that the Proposed Intervenors have long sought to prevent. Proposed Intervenors and

19   their members have been and will be injured by such mining activities, which can

20   degrade habitat for wildlife, cultural and spiritual values, air quality, precious water

21   sources, and the scenic and recreational enjoyment that they find in the natural areas near

22   the Grand Canyon. See supra at 3-5; Clark Decl. ¶¶ 20-29; McKinnon Decl. ¶¶ 17, 32;

23   Crumbo Decl. ¶ 8; Nimkin Decl. ¶¶ 14-15; Havasupai Resolution at 5-6.

24        The Ninth Circuit has long permitted conservation groups to intervene where, as

25   here, the litigation at issue may result in harm to natural and other resource values that

26   are important to the groups' missions and where the groups have worked to protect those

27   values. See, e.g., Idaho Farm Bureau Fed'n, 58 F.3d at 1398 (concluding impairment

28

                                          13

prong of intervention test was satisfied when plaintiff's claim could impair conservation groups' ability to protect an interest in a threatened species for which they had advocated); Sagebrush Rebellion, 713 F.2d at 527-28 (holding that there "can be no serious dispute" regarding, inter alia, potential impairment of interest where lawsuit seeks to invalidate conservation area designation, and proposed intervenor conservation group had interests in protecting wildlife and habitat).  Further, in a case very similar to this one, the D.C. District Court held that an American Indian tribe demonstrated harm to its interests when it alleged that litigation to overturn a DOI mining ban might result in damage to lands used by the tribe for religious, spiritual and other uses.  See Glamis Imperial Corp. v. U.S. Dep't of the Interior, No. 01-530 (RMW), 2001 WL 1704305, at *3 (D.D.C. Nov. 13, 2001).

Because the interests of Proposed Intervenors and their members are threatened by a lawsuit that seeks to terminate the mineral withdrawal for which they have worked for years, the Proposed Intervenors demonstrate that this suit "may impair" their interests.

**D.    The Interior Department May Not Adequately Represent The Interests Of The Proposed Intervenors And Their Members.**

The fourth prong of Rule 24(a)(2) requires courts to consider "whether the interest of a present party is such that it will undoubtedly make all the intervenor's arguments; whether the present party is capable and willing to make such arguments; and whether the intervenor would offer any necessary elements to the proceedings that other parties would neglect."  Forest Conservation Council, 66 F.3d at 1498-99.  Ultimately, "[t]he requirement of [Rule 24(a)(2)] is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal."  Trbovich v. United Mine Workers of Am., 404 U.S. 528, 538 n.10 (1972) (emphasis added); see also id. at 538 (Rule 24(a)(2) intervention held warranted where there was "sufficient doubt about the adequacy of representation"); Sagebrush Rebellion, 713 F.2d at 528 (burden of showing potentially inadequate representation "is minimal"); Sw. Ctr. for Biological Diversity v. Berg, 268 F.3d 810, 823 (9th Cir. 2001) (same).

14

1    Here, DOI will not adequately represent the Proposed Intervenors' focused

2    interests on environmental and cultural resource protection.  While it is "presumed that

3    [the government] adequately represents its citizens when the applicant shares the same

4    interest," Prete v. Bradbury, 438 F.3d 940, 956 (9th Cir. 2009) (citations and quotations

5    omitted), the Proposed Intervenors and DOI do not share the same interests.  Rather, "[a

6    federal department or agency] is required to represent a broader view than the more

7    narrow, parochial interests" of the applicant organizations and their members.  See Forest

8    Conservation Council, 66 F.3d at 1499.  That is especially true here, where BLM – which

9    manages over 600,000 acres of the million-acre withdrawal – has been directed by

10   Congress to manage its lands, inter alia, "in a manner which recognizes the Nation's need

11   for domestic sources of minerals," and for multiple uses including mining, not just for

12   environmental protection.  43 U.S.C. § 1701(a)(12); see also Norton v. S. Utah

13   Wilderness Alliance, 542 U.S. 55, 58 (2004) (describing the "enormously complicated"

14   balancing act required by BLM's multiple use mandate).  Forest Service lands, which

15   comprise most of the remainder of the withdrawal area, are also managed for "multiple

16   uses."  See 16 U.S.C. §§ 528-531 (Multiple Use-Sustained Yield Act of 1960).

17   By contrast, the Proposed Intervenors' interests focus more narrowly on

18   environmental and cultural resource protection of the Grand Canyon region.  See Clark

19   Decl. ¶¶ 27-29; McKinnon Decl. ¶¶ 17, 32; Crumbo Decl. ¶¶ 2, 6, 8; Nimkin Decl. ¶¶ 3-

20   13 (describing conservation groups' interests).  The Havasupai Tribe has banned uranium

21   mining on its reservation, and has strenuously opposed mining on its aboriginal lands in

22   the withdrawal area.  Havasupai Resolution at 1, 3-5.  Accordingly, no presumption of

23   adequate representation applies in this case.[6]  Further, with respect to the Havasupai

24   Tribe, federal courts favor allowing Indian nations to represent their own interests

25   directly.  See Arizona v. California, 460 U.S. 605, 615 (1983); Glamis Imperial Corp.,

---

26   [6]  See, e.g., Trbovich, 404 U.S. at 538 (there was "clear[ly] … sufficient doubt

27   about the adequacy of representation" of applicant's interest where the relevant statute
     "plainly impose[d] on the [government] the duty to serve two distinct interests, which

28   [we]re related, but not identical"); Sw. Ctr. for Biological Diversity, 268 F.3d at 823-24.

1    2001 WL 1704305, at *4 (finding DOI might not adequately represent a tribe's interest

2    because, as here, the agency managed lands for multiple use, and, as here, the tribe's

3    interests were focused on "safeguarding the environmental and religious values, the

4    traditional use, and the cultural patrimony associated with the site at issue").

5         Further, Ninth Circuit precedent recognizes that an important factor in finding

6    inadequacy of representation is a history of adversarial proceedings between the proposed

7    intervenor and the party upon which the proposed intervenor must rely.  See Idaho Farm

8    Bureau Fed'n, 58 F.3d at 1398 (finding federal agency would not adequately represent

9    environmental group where challenged agency decision was compelled by that group's

10   prior litigation); Cnty. of Fresno v. Andrus, 622 F.2d 436, 439 (9th Cir. 1980) (finding

11   "further reason to doubt that" DOI would protect intervenor's interest in a rulemaking

12   because "the Department began its rulemaking only reluctantly after [the proposed

13   intervenor] brought a law suit against it").

14        Here, the Trust, CBD, Sierra Club, and the Havasupai Tribe have repeatedly sued

15   DOI for failing to protect the lands at stake from uranium mining, and for failing to

16   withdraw the lands from mineral entry, further demonstrating that DOI's interests diverge

17   from those of the Proposed Intervenors.  See supra at 5-7 (describing litigation); Exhs. 9,

18   13, 15; Havasupai Tribe v. Robertson, 943 F.2d 32 (9th Cir. 1991), cert denied, 503 U.S.

19   959 (1992) (suit challenging Forest Service approval of Canyon mine in the withdrawal

20   area's North Parcel).  DOI initially refused to comply with the House Natural Resource

21   Committee's direction that DOI withdraw the million acres, even after months of

22   advocacy by the Proposed Intervenors and others, prompting one suit.  Supra at 6-7.

23   Another suit was filed even after DOI began its EIS on the 20-year withdrawal, indicating

24   the agencies' continued embrace of uranium mining in the area.  See supra at 7 n.3;

25   Exh. 15.  DOI continues to defend that suit to this day.  Given that DOI previously failed

26   to implement a withdrawal that, except for the duration, was virtually the same as that

27   challenged here, Proposed Intervenors should not be forced in this case to rely on DOI –

28

16

1    a litigation foe in other uranium mining cases in this same area – to protect their interests.

2          Because DOI cannot adequately represent Proposed Intervenors' interests, the

3    fourth and final requirement for intervention as of right is satisfied.

4    **II.      THE PROPOSED INTERVENORS SHOULD BE GRANTED PERMISSIVE
             INTERVENTION UNDER RULE 24(B).**

5          If the Court determines that one or more of the Proposed Intervenors has not

6    satisfied all of the requirements for intervention as of right, the Court should grant them

7    permissive intervention under Rule 24(b).  Rule 24(b) permits intervention where an

8    applicant's claim or defense, in addition to being timely, possesses questions of law or

9    fact in common with the existing action.  Fed. R. Civ. P. 24(b)(1)(B); see also Venegas v.

10   Skaggs, 867 F.2d 527, 529-30 (9th Cir. 1989), aff'd sub nom. Venegas v. Mitchell, 495

11   U.S. 82 (1990).[7]  This is a substantially lower burden than the test for intervention as of

12   right under Rule 24(a) since it entirely omits any requirement relating to interests or

13   adequacy of representation.  As shown above, this motion is timely and granting the

14   motion will not prejudice the proceedings or the existing parties.  See supra at 10.

15   Moreover, Proposed Intervenors intend to respond directly to the Plaintiff's challenges to

16   the lawfulness of the Federal Defendants' actions.  See Kootenai Tribe of Idaho v.

17   Veneman, 313 F.3d 1094, 1110 (9th Cir. 2002) (applicants "satisfied the literal

18   requirements of Rule 24(b)" where they "asserted defenses … directly responsive to the

19   [plaintiff's] claims"), abrogated on other grounds, Wilderness Soc'y, 630 F.3d at 1177-

20   78, 1180.[8]  For example, Proposed Intervenors intend to argue that, contrary to Mr.

21   Yount's allegations, the Final EIS does not violate NEPA.  See Proposed Answer

22   (Exh. 16).  Accordingly, permissive intervention is also warranted.

23                              **CONCLUSION**

24          For the foregoing reasons, this Court should grant the motion to intervene.

25

26          [7]  Like intervention of right, permissive intervention is to be granted liberally.  See
     7C Federal Practice and Procedure § 1904 (3d ed.).

27          [8]  See also Arizona, 460 U.S. at 615 (finding tribes seeking to intervene before the
     Supreme Court met the standard for permissive intervention and stating a preference for

28   enabling American Indian tribes to "participat[e] in litigation critical to their welfare").

                                    17

Respectfully submitted March 12, 2012.


 /s/ Melanie R. Kay
Melanie R. Kay (*pro hac vice pending*)
Kenneth R. Scott *(pro hac vice pending)*
Edward B. Zukoski (*pro hac vice pending*)
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO  80202
mkay@earthjustice.org
kscott@earthjustice.org
tzukoski@earthjustice.org
Telephone: (303) 623-9466
Fax: (303) 623-8083

Roger Flynn *(pro hac vice pending)*
Western Mining Action Project
P.O. Box 349, 440 Main St., #2
Lyons, CO  80540
wmap@igc.org
Telephone: (303) 823-5738
Fax: (303) 823-5732

Attorneys for Grand Canyon Trust, the Havasupai Tribe,
Center for Biological Diversity, Sierra Club, and
National Parks Conservation Association

**TABLE OF EXHIBITS**

Exhibit 1.    Bureau of Land Management (BLM), Northern Arizona Proposed Withdrawal Final Environmental Impact Statement (Oct. 26, 2011) (excerpts)

Exhibit 2.    Havasupai Tribal Council Resolution No. 19-12 (Feb. 27, 2012)

Exhibit 3.    Testimony of Matthew Putesoy (July 21, 2009)

Exhibit 4.    Declaration of Roger Clark (Feb. 29, 2012)

Exhibit 5.    Declaration of Taylor McKinnon (Feb. 29, 2012)

Exhibit 6.    Declaration of Kim Crumbo (Feb. 28, 2012)

Exhibit 7.    Declaration of David Nimkin (Feb. 28, 2012)

Exhibit 8.    Letter of B. Jones, Havasupai Tribal Council to BLM (Mar. 23, 2011)

Exhibit 9.    Complaint, Ctr. for Biological Diversity v. Stahn, No. 08-CV-8031-MHM (D. Ariz.) (Mar. 12, 2008)

Exhibit 10.    Grand Canyon Watersheds Protection Act of 2008, H.R. 5583, 110th Cong., 2d Sess. (2008)

Exhibit 11.    C. Sislin, Grand Canyon uranium threatens tribal water, High Country News (May 18, 2010)

Exhibit 12.    Resolution of the Committee on Natural Resources (June 25, 2008)

Exhibit 13.    Complaint, Ctr. for Biological Diversity v. Kempthorne, No. 08-CV-8117-NVW (D. Ariz.) (Sept. 29, 2008)

Exhibit 14.    Letter of T. McKinnon to K. Salazar (May 4, 2011)

Exhibit 15.    Complaint, Ctr. for Biological Diversity v. Salazar, No. 09-CV-8207-DGC (D. Ariz.) (Nov. 16, 2009)

Exhibit 16.    Proposed Answer

19

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have caused the foregoing MEMORANDUM IN SUPPORT OF
MOTION OF GRAND CANYON TRUST ET AL. TO INTERVENE AS
DEFENDANTS with supporting exhibits to be served upon counsel of record through the
Court's electronic service system (ECF/CM) and by first class mail to Gregory Yount at
the following address: 807 West Butterfield Road, Chino Valley, Arizona 86323.

Respectfully submitted March 12, 2012.

<u>/s/ Edward B. Zukoski</u>