FILED _____ LODGED
_____ RECEIVED _____ COPY

MAR 15 2012

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ 2 DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

PRESCOTT DIVISION

GREGORY YOUNT )
                                                    )
            Plaintiff,                )
                                                    )
v.                                                 )
                                                    )
KEN SALAZAR, Secretary of the Interior; )
and                                                )
U.S. BUREAU OF LAND MANAGEMENT )
                                                    )
            Defendants.               )
_____ )

Case No.  3:11-cv-08171-FJM

**PLAINTIFF'S SECOND AMENDED
COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Gregory Yount
807 W. Butterfield Rd
Chino Valley, Arizona 86323
928-899-7029
*Plaintiff Pro Se*

## INTRODUCTION

1.      Gregory Yount, appearing pro se, files his Second Amended Complaint to

challenge the failure of the Defendants Department of the Interior (DOI) Secretary Ken Salazar

and the Bureau of Land Management (BLM) to fully comply with the National Environmental

Policy Act (NEPA) procedures in the preparation of the Northern Arizona Proposed Withdrawal

(NAPW) Final Environmental Impact Statement (FEIS).  Plaintiff is filing suit in accordance

with section XIII of  Interior Secretary's Record of Decision (ROD) signed on January 9, 2012

which adopts the Secretary's preferred alternative to withdraw more than one million acres of

1 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1   federal land from mining and its signed public land order effecting the closure for up to 20 years,

2   and requires that any challenge to the final ROD be brought in Federal District Court. Plaintiff

3   also challenges Defendant's ROD under the Establishment Clause of the First Amendment to the

4   U.S. Constitution.

5        2.     The completed FEIS reveals numerous violations of the procedures required by

6   NEPA and the implementing regulations issued by the Council on Environmental Quality (CEQ).

7   Specifically, the FEIS fails to acknowledge or adequately address the scientific controversies that

8   have environmental significance; fails to adequately address the material and substantive public

9   comments; and further fails to provide for public comment on the changed focus and rationale of

10  the withdrawal.  After the close of the public comment period on the draft environmental impact

11  statement (DEIS), the Interior Secretary directed BLM to adopt Alternative B, thus making much

12  if not all, of the public comment irrelevant.  In doing so, the Secretary committed the Department

13  to a particular course of action before BLM had completed its analysis.  This means that there

14  was no good faith or objective analysis of the withdrawal or of the specific public comments

15  demonstrating that the assumptions said to justify the withdrawal were wrong.

16       3.     Accordingly the FEIS must be set aside and remanded for revision and public

17  comment to address the changed focus and rationale of the withdrawal and address the

18  unresolved scientific controversies raised in the public comments on the DEIS. These unresolved

19  scientific controversies raised by public comment include the amount of uranium reserves to be

20  foreclosed, the lack of any impacts on the watershed for the Colorado River system, the lack of

21  new scientific study to provide information essential to a reasoned choice, and the adequacy of

22  existing regulatory measures to mitigate the impacts of mining on public land resources.  Finally,

1   by understating the amount of the uranium resource endowment, the FEIS failed to adequately

2   analyze and disclose the long-term social and economic impacts of foreclosing mining on more

3   than one million acres of federal land.

4         4.      Plaintiff asks that this Court set aside the FEIS, the ROD, and any public land

5   order relying on the ROD and FEIS in light of the Defendants' failure to follow the NEPA

6   procedures.  Plaintiff further asks that this Court enjoin BLM from implementing the preferred

7   alternative identified in the FEIS unless and until BLM prepares a revised DEIS or supplements

8   the FEIS to correct these violations of NEPA. Additionally, Plaintiff asks the court to

9   permanently set aside the Defendants ROD because the Defendant's rationale for the ROD

10  substantially relies on deferring to Native American religious and cultural beliefs and has the

11  appearance of conveying a message of endorsement of their religious beliefs contrary to

12  established law.

**JURISDICTION**

13

14        5.      Jurisdiction is proper in this Court under 28 U.S.C. §1331, 5 U.S.C. §§701, 702,

15  706, and 28 U.S.C. §1361, because this action involves the United States as a defendant and

16  arises under the laws of the United States, as set forth in NEPA and the implementing

17  regulations, 40 C.F.R. Part 1500.  An actual, justiciable controversy exists between Plaintiff and

18  Defendants. The requested relief is proper under 28 U.S.C. §§2201-02 and 5 U.S.C. §§705 and

19  706. The challenged agency actions and/or the failures to act are subject to this Court's review

20  under the Administrative Procedure Act (APA), 5 U.S.C. §§702, 704, and 706.

21

22

**VENUE**

6.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(e) because the case and controversy pertains to federal lands within Arizona. In addition, Plaintiff resides in Arizona and is the owner of mining claims subject to the proposed withdrawal. Defendants U.S. Department of the Interior and U.S. Bureau of Land Management have offices within the district. Assignment is proper in the Prescott Division because the Northern Arizona Proposed Withdrawal Area (NAPWA) is located in Coconino and Mohave Counties.

**PARTIES**

7.      Plaintiff owns two hard rock mining claims ("claims") for uranium in the Tusayan Ranger District of the Kaibab National Forest south of the Grand Canyon in the Southern Withdrawal Parcel. Plaintiff resides in Chino Valley, Arizona and manages the exploration of the Makapuu #2 and Makapuu #3 mining claims from this location. Plaintiff intended and intends to develop these mining claims by the responsible harvesting of natural resources (uranium) by ecologically and environmentally friendly means, to provide abundant energy for the citizens of the US. I intend to develop and then restore a small area of land (less than 20 acres) and extract enough uranium to power a city the size of Phoenix for five years, and then return that land to such a natural state that there is nearly no visible evidence that I was even there. It is the responsible environmental productive use of the withdrawn lands that I seek to protect and that Defendant's withdrawal has injured.

4 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

8.      These mining claims were valuable properties and plaintiff asserts a right of possession on these mining claims by properly filing with the BLM and by occupying and defending these claims from other claimants and from unlawful government actions, by improving and developing these claims by means of geochemical and geophysical testing and survey in furtherance of discovery and valid existing rights. Plaintiff established to a high degree of certainly that a uranium mineralized breccia pipe exists on these claims and submitted a Plan of Operations to the US Forest Service (USFS) for exploration drilling. Plaintiff has expended hundreds of man hours and tens of thousands of dollars exploring the physical environment of these two claims which are located in the lands withdrawn by the Defendant.

9.      These two claims were valuable unpatented mining properties (even without "discovery") until the Defendant segregated the now withdrawn lands subject to Public Land Order ("PLO") 7787. They now have minimal or no value as a mining property. Only mining claims with prior existing rights due to a confirmed "discovery" survive the Defendants withdrawal and retain any mining property value.

10.     Plaintiff was prevented from establishing  a "discovery" of valuable minerals on these claims when the Defendant segregated the NAPWA lands and the USFS stop processing Plans of Operations for exploration drilling and returned plaintiff 's submitted Plan without action.

11.     The Plaintiff suffers, and will suffer, past and present economic injuries that are intimately tied  and interrelated to the physical environment of the lands withdrawn by the Defendant by not being able to develop by ecologically and environmentally friendly means the plaintiff's claims. Plaintiff's interests, are therefore NOT "purely" economic interests as defined

5 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1  in Ashley Creek *v.* Norton 420 f 3d, but are interests and injuries within the "zones of interests"

2  protected by NEPA. Plaintiff asserts that the completed FEIS reveals numerous violations of the

3  procedures required by NEPA and the implementing regulations issued by the Council on

4  Environmental Quality (CEQ). The EIS that was written is expressly about the effects of hard

5  rock mining and exploration for uranium on the Grand Canyon watershed for the withdrawn

6  lands. Plaintiff's injuries are redress-able by a favorable decision on the claims and remedies set

7  forth in this complaint.

8      12.      The Secretary's order prevents Plaintiff from enjoying previously authorized and

9  encouraged recreational and aesthetic activities on the withdrawn lands in an environmentally

10  responsible manner.

11      13.      Plaintiff is a hobbyist prospector/miner or mineral explorationist. Plaintiff's

12  interaction with the lands withdrawn are by primarily hiking and observing the geology, surface

13  land form, and surface mineralizations of the land. The crux of my injury as a recreational

14  prospector is the injury to my "enjoyment" of the activity that has been prohibited by the

15  withdrawal based on an EIS that does not conform to the regulations of NEPA.

16      14.      The area under consideration is not a wilderness area, but is a multiple use area

17  and as such, is designated to be put to multiple productive uses. I am protecting the aesthetic of

18  responsible harvesting of natural resources by ecologically and environmentally friendly means

19  to provide abundant energy for the citizens of the US. I am protecting the symmetry of taking a

20  small previously undeveloped area of land and extracting enough uranium to power a city and

21  population the size of Phoenix for five years, and then returning that land to such a natural state

22  that there is nearly no visible evidence that I was even there. It is the aesthetic of responsible

6 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1   environmental productive use of the land that I seek to protect and that the withdrawal has

2   injured.

3       15.    Plaintiff also enjoys a legally-protected procedural interest to ensure that

4   Defendants manage these federal lands in accordance with federal land and environmental laws

5   and regulations.  Plaintiff has participated in all of the processes provided by BLM, including

6   filing of scoping comments, comments on the DEIS, and attending and actively engaging BLM

7   personnel and their agents at public meetings.  Defendants' failure to comply with NEPA as

8   described herein injures Plaintiff and denies Plaintiff the ability to meaningfully participate in the

9   public review process and denies Plaintiff information concerning environmental and other

10  impacts that NEPA require the agencies to disclose and analyze, and solicit public review of,

11  prior to a decision on the NAPW by the Secretary of the Interior.

12      16.    Plaintiff also suffers procedural injuries based on the fact that he and other

13  commentators identified the errors that would affect or change the decision and Defendants have

14  declined to follow the procedures that would require a change in Defendants' course of action,

15  including not making the withdrawal.  The Interior Secretary's order to BLM mandating

16  selection of the withdrawal alternative predecides the issues without regard to fact or analysis and

17  without regard to the NEPA procedures.

18      17.    Plaintiff asserts standing under Article III of the Constitution and "prudential

19  standing" in fact, due to satisfying the "geographic nexus requirement" and the "zone of

20  interest"requirement of NEPA by linking his pecuniary interest to the physical environment and

21  the environmental impacts evaluated in the FEIS for the NAPW as set forth in Ashley Creek *v.*

22

7 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1   Norton 420 F.3d 934(2006) and that plaintiff's enjoyment of recreational and aesthetic activities

2   of the withdrawn lands have been prohibited and by demonstrating that these are injuries in-fact.

3       18.     The injuries will be redressed by the relief sought.  If BLM had to consider the

4   new information and address the scientific controversies, it is more likely than not, that

5   Defendants could reasonably find that the proposed withdrawal is unnecessary to protect public

6   values.  Similarly, if Defendants considered the lost revenues to the State of Arizona and the

7   local communities, BLM could not conclude that the withdrawal would not have severe adverse

8   impacts on the state, its programs, or on the communities. These factors would weigh heavily

9   against proceeding with the proposed withdrawal.

10      19.     Defendant Ken Salazar is sued in his official capacity as DOI Secretary.  Mr.

11  Salazar is the official that ordered the preparation of the NAPW EIS to document the impacts of

12  the proposed withdrawal and is the official with ultimate management responsibility over the

13  federal lands surrounding the Grand Canyon National Park including, by agreement, the mineral

14  resources contained in lands administered by the Department of Agriculture in the Kaibab

15  National Forest also subject to his withdrawal order.

16      20.     Defendant BLM is an agency within DOI, and is the agency responsible for

17  writing the Northern Arizona Proposed Withdrawal EIS which has failed to comply with the

18  requirements of NEPA as discussed in this complaint.

19

20                          **FACTUAL ALLEGATIONS**

21      21.     The DOI Secretary pursuant to the Secretary's Segregation Order of July 21, 2009,

22  74 Fed Reg. 35887 (July 21, 2009), closed more than one million acres of federal lands outside

8 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

of the northern and southern boundaries of the Grand Canyon National Park from mining

activities for two years with the stated goal of protecting the Colorado River watershed in these

areas from the adverse effects of locatable hard rock mineral exploration and mining while

"various studies and analyses" could be completed to support the preparation of the NAPW EIS.

22. The NAPW EIS was ordered by Defendant Interior Secretary Salazar when he

signed the Segregation Order of July 21, 2009, referenced above. BLM published a notice of

intent to prepare an EIS on August 26, 2009 and solicited public comment to assist in

formulating the relevant issues to be analyzed. 74 Fed. Reg. 43152 (Aug. 26, 2009).

23. BLM published the notice of availability of the NAPW DEIS for public comment

on February 18, 2011. 76 Fed. Reg. 9594 (Feb. 18, 2011). Even though the NEPA rules, 40

C.F.R. §1502.7, charge the agencies to prepare a concise statement, the NAPW DEIS with

appendices exceeded 1000 pages. The public comment period was set for only 45 days ending

on April 4, 2011. Plaintiff and others petitioned the BLM to extend the public comment period

due to the voluminous size of the DEIS and the overwhelming number of factual errors,

omissions, and lack of scientific rigor upon which they wished to comment. The BLM extended

the public comment period for an additional 30 days.

24. Plaintiff submitted 102 pages of substantive comments identifying actual

scientific controversies, factual and scientific errors, omissions, and generally documenting the

lack of scientific rigor for the NAPW DEIS. Additional substantive comments detailing errors,

omissions, or new information for this DEIS were filed by: The American Clean Energy

Resources Trust, DIR Exploration, Inc., Quaterra Resources, Inc., Energy Fuels Resources, the

Arizona Mining Association, Jerry H. Smith for the Arizona Department of Environmental

1   Quality, Katie Sweeney for the National Mining Association, Laura Skaer for the Northwest

2   Mining Association, Patrick Hillard, Ted Jensen, Steve Trussel for the Arizona Rock Products

3   Association and Kris Hefton of Vane Minerals.  In all, the above-named individuals and entities

4   submitted approximately 415 pages of substantive comments that document the errors,

5   omissions, new environmentally significant information, and/or lack of scientific rigor for the

6   DEIS that itself exceeded 1000 pages. The submitted comments also included relevant and

7   significant new information that was not considered by the BLM in the writing of the DEIS.

8   These comments submitted to the BLM  and entered into the Public Record by the BLM are

9   incorporated by reference.

10  **New Information**

11          25.     The public comments submitted on the DEIS included significant new

12  information that is relevant to environmental concerns and directly bearing on the stated

13  objectives of the proposed withdrawal action or its impacts.  They include: (1) new information

14  regarding the mineable uranium endowment of the withdrawal area that is about five to six times

15  greater that what the BLM reports in the DEIS, (2) new information regarding blind breccia pipes

16  and their additional contribution to the uranium endowment of the withdrawal area above that

17  previously projected by federal agencies, (3) new information regarding rights-of-way issues

18  across Federal lands in the NAPW to access State Trust or private lands for mineral exploration

19  and development, and (4) new information from the Arizona Geological Survey documenting

20  how uranium mining cannot possibly contaminate the Colorado River or its watershed.

21          26.     Plaintiff and others in comments submitted to the BLM challenged the validity of

22  assumptions in the Water Resources sections of the DEIS.  The FEIS fails to adequately deal

with this critical issue, although the FEIS now justifies the withdrawal as necessary to protect cultural resources and the uncertainties in water resource analyses as the primary rationale for a withdrawal.

27.     In addition, many of the "Relevant Issues for Detailed Analysis" as set forth in Table 1.5-1 of the DEIS were excluded from analysis provided in the DEIS and FEIS, even though NEPA regulations require such analysis. With no exceptions, these exclusions have had the effect of biasing the DEIS and the subsequent FEIS against the "No Action" alternative. Among these excluded analyses are: the Air Quality Cumulative Impact Analysis; the Energy Value of the Uranium in the Northern Arizona Proposed Withdrawal Area, which was never calculated as required by Table 3.1-1 of Chapter 3 of the FEIS (estimated 560 billion dollars); the energy value of the uranium resource previously withdrawn was not calculated; and the equivalent amount of other energy-producing commodities represented by uranium production was not analyzed as required by Table 3.1-1 of the FEIS. Each of these relevant and material issues was excluded from the NAPW DEIS and, thus, the FEIS failed to deal with material matters raised in the public comments.

28.     Further issues not addressed in the DEIS also to the detriment of the case of the "No Action" alternative and clearly mandated by NEPA regulations are:

a.     Mitigation measures were not explored, discussed, or proposed regarding the impacts of mining, even though NEPA requires consideration of mitigation measures. Nearly all mitigation measures mentioned in the NAPW FEIS are the standard operating procedures that are required by existing law and regulation, and do not address the particular issues and problems that would be in effect under the various proposed alternatives considered under the DEIS and

1    the subsequent EIS. This failure is especially significant because mitigation measures

2    historically have frequently permitted economically-significant natural resource operations to

3    occur with no significant negative impact to the natural environment.

4          b.      The FEIS fails to disclose and analyze the issue of "prior existing rights" and the

5    most probable outcome that nearly all mining claims could be voided by the withdrawal when

6    subject to a mineral examination. By failing to accurately disclose the legal effects of the

7    withdrawal and, thus, the fate of most mining claims, the DEIS and FEIS represent incorrectly to

8    the general public that the existing mining claims could proceed to be mined. The FEIS

9    disingenuously states that "Valid Existing Rights" will be protected without then stating that any

10   mining claims that BLM deems not to meet the legal definition of a valid existing right will be

11   declared void. The FEIS does not estimate the number of claims that BLM will invalidate after

12   the withdrawal nor does the FEIS disclose the economic losses in terms of investment already

13   made. Further, the FEIS failed to analyze the direct impact that any of the withdrawal

14   Alternatives has on the mining claim owners, including the economic impact on the claim

15   holders (loss of time and money invested), the loss of revenue to the BLM for the maintenance

16   fees paid by the claim owners, and the significant loss of revenues to state and local

17   governments. One of the purposes stated in the ROD for the withdrawal is to prevent new mining

18   claims and sites from being located and property rights from being established without disclosing

19   or analyzing in the DEIS/FEIS that the withdrawal will similarly affect 99% of currently located

20   claims.

21         c.      The FEIS fails to analyze the effectiveness of the existing regulatory framework:

22   federal, state, and local laws and regulatory bodies. An analysis of this framework would have

12 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1    documented the effectiveness under the existing rules, including any flaws and weaknesses in the

2    existing regulatory framework, and would have considered mitigation measures in the DEIS as

3    required by NEPA. During the scoping period prior to the development of the DEIS, the National

4    Mining Association specifically commented that such analysis should be part of the EIS.  Had the

5    FEIS incorporated existing regulatory measures into its analysis, especially with respect to the No

6    Action Alternative, the FEIS would have had to conclude that uranium mining could proceed

7    without significant adverse environmental effects.

8          d.      The analysis of Green House Gas (GHG) reduction by the production and

9    utilization of the uranium resources as opposed to continued reliance on hydrocarbon fuel

10    sources (coal, oil, and natural gas) to produce electrical power was improperly excluded from

11    analysis. The FEIS calculated GHG production from uranium exploration and mining activities

12    (emissions from drilling rigs and trucks, etc.), but the FEIS omitted the indirect offsets that

13    would come with the use of uranium to produce electrical power.  NEPA regulations require that

14    all positive and negative direct and indirect and cumulative effects be analyzed in EIS studies.

15          e.      Analysis and identification (a scientific field study to provide essential

16    information) of the more than 30 ore-grade to weakly-mineralized uranium breccia pipes within

17    the Grand Canyon National Park (GCNP) and other natural mineral exposures in the NAPWA

18    should have been performed to estimate the yearly erosion of uranium and other metals from

19    these naturally exposed deposits and the distribution of the contaminating metals in the

20    surrounding watershed of the GCNP.  This information is directly relevant to the current resource

21    condition analysis for Chapter 3 of the FEIS and the claims that future uranium mining rather

22    than erosion from natural or undisturbed mineral exposures within the boundaries of the GCNP

13 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1  or the NAPWA may account for any detected radiation in the watershed.  Because protection of

2  the Colorado River watershed is the stated purpose of the withdrawal such a scientific analysis is

3  relevant to provide essential information and its absence is a material flaw in the FEIS

4  conclusions.

5      29.     The FEIS failed to include and reconcile the results and conclusions of its own

6  work from its most recent Resource Management Plan (RMP) in the DEIS. The 2008 Arizona

7  Strip RMP adopted by the BLM concluded that most of the Arizona Strip should remain open to

8  mineral entry and development.

9      30.     The Arizona Wilderness Act of 1984 was not mentioned in the DEIS even though

10  it is the landmark piece of legislation that defined the land areas available for mineral entry and

11  uranium exploration and mining as well as the public lands to be preserved for wilderness. The

12  FEIS mentions the Arizona Wilderness Act of 1984 in the context that it defined areas to

13  wilderness and left the rest open to multiple use.  Analysis and reconciliation of this Act and the

14  historical context with regard to the current situation is essential to understanding why the No

15  Action Alternative of the NAPW DEIS and FEIS is the best alternative. No mention is made that

16  the lands left open were specifically recognized for their large uranium potential or that the Act

17  itself was a historic negotiated compromise between mining, environmental, ranching, and other

18  users with vested interests in  these lands.

19      31.     Chapter Five of the NAPW FEIS (Responses to Public Comments) repeatedly

20  shows how Defendants arbitrarily dismissed, minimized, and/or otherwise marginalized critical

21  new information set forth in the public comments. If  BLM had followed NEPA procedures

22  correctly the rationale used to support a withdrawal, as stated in the Secretary's ROD, would be

14 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1   unsupportable. It would then be clear that the Secretary is imposing on the communities of

2   northern Arizona and southern Utah significantly higher economic and social costs when there

3   are no significant adverse environmental affects on the NAPWA.

4       32.    One example of the BLM's arbitrary answers to comments from the public ("peer

5   review") presented in the FEIS illustrate the failure of the FEIS to professionally and objectively

6   consider the comments.  Plaintiff commented that the EIS must consider an estimate of the

7   amount of GHG reductions that would occur due to the uranium mined in the NAPW area and

8   which would replace coal as the fuel to produce electrical power.  The FEIS answered:

9   The EIS does not include an analysis of GHG "offsets" (i.e., uranium as a replacement for other

10   energy sources) for several reasons. First, there is no guarantee that uranium mined from the

11   proposed withdrawal area would be allocated exclusively to energy production. Some percentage

12   may go to defense uses, medical applications, or other uses. In addition, with notable exceptions

13   such as Iran and North Korea, processed uranium may be legally sold on the open market and

14   shipped anywhere in the world. Finally, there is no assurance uranium would be used to replace-

15   rather than simply augment-other energy sources such as coal, natural gas, hydroelectric, solar, or

16   wind power.

17       33.    The above response in the FEIS is entirely nonsensical.  It can only be construed

18   as a biased attempt to exclude an analysis that would support Alternative A, the No Action

19   Alternative.  First, the percentages of the uses of mined uranium are documented by the U.S.

20   Energy Information Administration and, therefore, provide a concrete value for the amount of

21   uranium used as nuclear fuel.  BLM could easily determine in the FEIS the potential volume of

22   uranium produced that would be utilized for electrical power.  In addition, in the context of

15 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1   global impacts of GHG, it does not make any difference whether uranium mined in the NAPW

2   area is used locally, nationally or internationally to provide nuclear fuel for the production of

3   electricity.  The issue is Global Warming, not carbon-based emissions in the NAPW area or even

4   the US. However, as additional evidence of bias, the authors of the FEIS and DEIS state

5   specifically that the production of GHGs attributed to motor vehicles and engines used in mining

6   in the NAPW might have GLOBAL consequences but omit entirely any consequences from

7   continued reliance on coal to produce electrical power.  Finally, nuclear power plants, like fossil

8   fuel power plants, provide nearly all of the world 's base load electricity and, as such, any use of

9   nuclear power is automatically a substitute and recognized non-GHG emitting power generating

10   alternative for base load electricity verses fossil fuels. Thus, the predominant future use of

11   uranium from the NAPW as power plant fuel would be replacing fossil fuels in base load power

12   plants, whether or not this fuel is used to augment or maintain current base load electricity

13   generating capacity. The DEIS and FEIS fail to recognize and analyze that the uranium minerals

14   mined in the NAPWA are a "fuel mineral" and have an impact outside the NAPWA beyond

15   being a commodity.

16        34.     A second example from the FEIS is even more disturbing. DIR Exploration, Inc.,

17   and Quaterra Resources, Inc., both submitted comments providing new and substantive

18   information regarding the uranium endowment of the NAPW. Their comments conclude that the

19   DOI understated the uranium endowment of the NAPW by a very appreciable 500 to 600%. This

20   new information was provided by certified, licensed, and/or registered professional geologists

21   ("Qualified Persons" under Canadian 43-101 regulations) with decades of experience in the

22   NAPW.  The comments also reflected the cumulative knowledge that companies engaged in

mineral and petroleum exploration and metals mining in the NAPW have garnered after having

expended tens of millions of dollars, and tens of thousands of man-hours drilling and mining in

the NAPW. Their exploration experience and professional analysis of the NAPW consequently

represents very credible current knowledge and experience that in most instances exceeds that

possessed by relevant workers in the USGS or BLM.  The USGS initially obtained most of its

information and data on uranium-mineralized breccia pipes in the NAPW from mining industry

companies (past and present), and the FEIS fails to explain why this same source is now

unreliable.

35.     The FEIS responds as follows:

" The full comment letter questions the approach of assigning mineral potential to regions of

Northern Arizona that was used in the 2010 USGS estimate of uranium availability, and

concludes that the preferential presence of breccia pipe mineralization on the proposed

withdrawal lands is not properly incorporated into the estimates of uranium availability.

While the commenter provided a statistical correlation of known mineralized breccia pipes to

underlying geologic structures, no geologic explanation or new information was provided to

justify the hypothesis that mineralized breccia pipes occur preferentially on the proposed

withdrawal lands. The USGS Report is a peer-reviewed publication that provided the estimated

uranium endowment for the proposed withdrawal area. While some commenters have presented

alternate or supplemental approaches to assessing the uranium endowment from that provided by

USGS, these alternate approaches have not been developed or peer reviewed to the extent that

they can replace or supersede the USGS endowment assessment presented in SIR 2010-5025. As

with many scientific fields, new information is constantly being collected which leads to new or

1   refined conclusions. However, at present, the USGS Report contains the best credible

2   information available regarding the uranium endowment estimate and was therefore used as the

3   basis for the reasonably foreseeable development scenarios in the EIS. No change is warranted to

4   the 2010 USGS estimate of uranium availability, or the use of this estimate in the FEIS."

5       36. The BLM's response to this new and material information utterly fails to explain

6   the reasons that Defendants would accept a USGS report relying on 23-year old data over reports

7   based on more recent data and activity.  While the USGS report bears a 2010 date, it used only

8   data from the 1980s, thereby excluding more recent and highly relevant geological work.

9       37.    The NEPA regulations require that new and significant information submitted

10  during the public comments (or peer review) period that is relevant to environmental concerns

11  and has bearing on the proposed withdrawal action or its impacts be addressed in the EIS.  If the

12  agency fails to do so, then the FEIS must be, according to NEPA regulations, remanded for

13  revision or must be supplemented and subject to an additional public comment period.  The

14  above BLM response suggests, with circular logic, that only new information already known or

15  recognized by the agency can be considered to be significant enough to require changes in the

16  NAPW EIS. The BLM readily admits that although this information is new and could lead to a

17  new or refined conclusions for the NAPW uranium endowment, it then discards the information

18  solely because it was not peer-reviewed.  Recall, however, that this is exactly why NEPA

19  requires a public comment period for a DEIS, and requires a federal agency to either revise an

20  EIS when it fails to consider material public comments or to prepare a supplemental document.

21  The reason that critical new information is brought forward during the public comment period is

22  so that significant new information can be reviewed, developed and incorporated into the final

18 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1   EIS by the responsible agency. To act otherwise would grant a Government Agency responsible

2   for an EIS the power to arbitrarily dismiss ANY and ALL (inconvenient) new significant

3   information as having no credibility simply because it is first brought to the public domain during

4   the NEPA process.

5       38.     One of the establishing principles of NEPA is that an EIS is a vehicle for public

6   input for the EIS process. The present BLM actions, if taken to their logical extreme, could

7   eventually exclude all significant public input in the development of an EIS. In sum, this BLM

8   answer to public comment illustrates how the Defendants purposefully excluded significant new

9   information that does not support the policy mandate announced by the Interior Secretary Salazar

10  to withdraw all of the identified lands identified in Alternative B of the EIS.

11      39.     These two examples also demonstrate the arbitrary and dismissive responses to

12  many of the substantive comments submitted. Judging by the DEIS and FEIS, it is evident that

13  the BLM purposely wrote the NAPW FEIS to support a withdrawal decision mandated by the

14  Interior Secretary even if this meant dismissing new and material information as irrelevant,

15  omitting critical analyses as unnecessary, and by not responding to the central premises of

16  substantive public comments by only addressing the particular aspects of these comments that

17  can be made to appear to be insignificant.

18  **No Action Alternative Not Adequately Analyzed**

19      40.     The National Mining Association in their scoping comments recommended that

20  the EIS analyze the effectiveness of the existing regulatory framework -- federal, state, and local

21  laws and regulatory bodies --  to determine any flaws and weaknesses in the existing regulatory

22  framework. Mitigation measures could then be proposed in the DEIS as required by NEPA.

1   The FEIS at page ES-3 states the following under the heading Laws and Policies: Mining

2   operations must comply with a variety of environmental and mining laws, including the 1872

3   Mining Law and BLM and Forest Service management plans. Compliance with federal law

4   (including the National Environmental Policy Act [NEPA]), regulations, and policies and

5   consideration of state and local statutes should be paramount [emphasis added] in the

6   development of the EIS.

7        41.     Nevertheless, the FEIS fails to include an analysis for the effectiveness of current

8   laws and regulations on the impact of hard rock exploration and mining in the NAPW area.  This

9   is plainly a violation of NEPA as the effectiveness of existing laws and regulations has a direct

10  impact on any decisions concerning the NAPW.

11       42.     The FEIS on page 1-21 states in Table 1-5.1 under the heading of Air Quality and

12  Climate - Release of particulates: "The release of particulates (dust) from exploration drilling

13  operations, mining, and ore hauling traffic and other vehicles on unpaved roads could have an

14  effect on the regional air quality. This could occur in combination with pre-existing emissions

15  from coal plants, cities, traffic, and other sources of regional air pollution to create a cumulative

16  regional effect on air quality."

17       43.     Nevertheless, the detailed analysis for the Cumulative Regional Effect on Air

18  Quality was excluded from the FEIS.  By not looking at the cumulative regional air quality

19  impacts, the FEIS omits air quality impacts from existing and planned coal-fired power plants.

20       44.     The FEIS on page 3-10 Table 3-1.1 section 3.16 Economic Resources under the

21  sub-heading Energy resources available states: "The withdrawal of uranium deposits in the study

22  area would remove a potential source of energy production, which would then be replaced by

20 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1    energy produced from other sources, either additional mining elsewhere, imports of uranium

2    from foreign sources, or production from equivalent amounts of other sources like coal,

3    petroleum, natural gas, wind power, or solar."

4        45.    The relevant indicators for the above Economic Resource are stated as: "1) Value

5    of energy produced from study area, and  2) Equivalent amount of other energy-producing

6    commodity represented by uranium production." Nevertheless, analysis of these economic

7    resources and their relevant indicators was excluded from the FEIS.  Additionally, an analysis of

8    the cumulative impacts for these economic resources and relevant indicators was excluded from

9    the FEIS. These analyses provide the basis for meaningful analysis as they create a point of

10   comparison for the amount of energy production lost to a withdrawal. The FEIS provides no

11   qualitative or quantitative easily understood value for the energy potential of the NAPWA and

12   those lands previously withdrawn.

13       46.    The FEIS on page B-38 of Appendix B states: "The proposed withdrawal area

14   currently contains approximately 5,300 mining claims that predate the Secretary's publication of

15   the Notice of Proposed Withdrawal, subject to valid existing rights, on July 21, 2009.  New

16   mineral exploration and development could still be authorized under the Proposed Action,

17   Alternative B. However, neither the BLM nor the Forest Service will process a new Notice or

18   plan of operations until the surface managing agency conducts a mineral examination and

19   determines that the mining claims on which the surface disturbance would occur were valid as of

20   the date the lands were segregated. Determining the validity of a mining claim is a complex and

21   time-consuming legal, geological, and economic evaluation that is done on a claim-by-claim

22   basis. Discovery can occur before or after location of a mining claim, but in any case discovery is

21 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1   based on the actual physical exposure of the mineral deposit within the claim boundaries. For the

2   locatable minerals associated with breccia pipe deposits, unless erosion has exposed

3   mineralization in a canyon, this would probably require exploratory drilling and sampling. The

4   discovery would need to have taken place as of the date of segregation, July 21, 2009, and have

5   been maintained until the time of the mineral examination.  None of the assumptions in this

6   analysis, even if referring to specific breccia pipes, should be construed as a determination or

7   indication that certain mining claims may contain a discovery."

8         47.    Nevertheless, the FEIS does not analyze the issue of prior existing rights and the

9   direct impact that nearly all of the mining claims will be voided by the withdrawal when subject

10  to a mineral examination.  The Secretary's ROD recognizes that only seven breccia pipes will

11  probably have existing rights and could be developed leaving the other 99% of mining claims

12  voided when subject to a mineral exam. The direct impact of a mineral exam and the economic

13  loss of mining claims on the claim holder (loss of time and money invested in current mining

14  claims held) was not analyzed.  The loss of revenue to the BLM for the maintenance fees paid by

15  the claim owners whose claims are made invalid was also not analyzed.  The FEIS

16  disingenuously uses the term exploration of mining claims, when by definition a valid mining

17  claim does not require exploration since the discovery has been made.

18        48.    The FEIS on page 3-5, Table 3.1-1, Section 3.2 states that for GHG, the resource

19  condition indicator is: "The quantity of GHG emissions emitted under each alternative."

20        49.    The FEIS on page 1-24, section 1.5.3 Issues Eliminated from Detailed Analysis

21  states with regards to GHGs : "The extent to which uranium energy production offsets the use of

22

1   carbon-based fuels that contribute to the release of greenhouse gases (GHGs), which have been

2   linked to global climate change."

3        50.    The FEIS on page 4-7 further states: "Uranium mining activities in the proposed

4   withdrawal will likely cause localized increases in air pollutant emissions, with the exception of

5   GHG emissions, which are considered by scientists to contribute to global climate change and

6   which could have global impacts."

7        51.    An analysis for the offset of GHGs due to the production and use as nuclear fuel

8   from uranium produced from the NAPW area was improperly excluded from the DEIS. An

9   analysis of the cumulative impact on GHG offset for areas previously withdrawn was also

10   excluded. Reduction of GHGs by the use of uranium produced from the NAPW area to fuel

11   electric power plants and replace coal as the primary fuel for electrical power is a direct impact of

12   mining uranium the NAPW area.

13        52.    The FEIS on page 3-6, Table 3.1-1, Section 3.5 Soil Resources states: "Potential

14   distribution of contaminants in soil could result from erosion and subsequent deposition of mine

15   waste-rock or ore from water and/or wind action, or leakage from retention ponds in the vicinity

16   of each mine site." The condition indicator is stated as: "Extent of projected concentrations of

17   uranium and arsenic compared to background levels and Soil Remediation Level standards."

18        53.    Section 3.4 Water Resources, Table 3.1-1, of the FEIS states: "Contamination of

19   surface runoff from active or reclaimed mines", and the description of the relevant issue is:

20   "Surface runoff from active or reclaimed mine sites could contain elevated uranium and other

21   metals that would affect downstream water quality." The Condition indicator is stated as:

22   "Estimated uranium and arsenic levels in surface runoff."

23 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

54.     Chapter 3 of the FEIS does analyze the current condition for Soil and Water resources with regard to uranium contamination due to active or reclaimed mines.

55.     Chapter 3 of the FEIS does not, however, analyze the current resource conditions within the Grand Canyon watershed (the NAPWA) and specifically the Grand Canyon National Park with regards to soils and surface water contamination due to the presently identified naturally exposed breccia pipe ore bodies or other natural mineral exposures containing ore grade uranium or otherwise elevated uranium and arsenic levels in order to put potential mine-related contamination into its natural (background) context.

56.     Further, the FEIS does not analyze the cumulative effects of uranium exploration and mining on soil contamination and surface water runoff contamination in relation or in comparison to the existing conditions from naturally eroded breccia pipe ore bodies with elevated uranium and arsenic exposures within the Grand Canyon watershed.

57.     The BLM failed to include its own work from its most recent land use plan, the Arizona Strip Field Office ROD & Approved RMP 2008 in the FEIS.

58.     A meaningful discussion of the Arizona Wilderness Act of 1984 which provides essential context of this Act is not included in the FEIS even though it is the landmark piece of legislation that originally defined the land areas available for mineral entry and uranium exploration and mining within the NAPW area.

59.     New and substantial information was submitted by Quaterra Resources, Inc. during the DEIS comment period that the mineable uranium endowment of the NAPW area is much greater than what the BLM reported in the DEIS and substantive comments submitted by

1   DIR Exploration, Inc., estimate the mineable uranium within the NAPW area at about six times

2   greater that what the BLM reported in the DEIS.

3        60.     New and substantive information regarding blind breccia pipes and their

4   additional contribution to the uranium endowment of the withdrawal area were submitted by

5   Quaterra Resources, Inc.,  that even further expands reasonable assessments of the uranium

6   endowment for the NAPW area.

7        61.     New and substantive information was submitted by DIR Exploration, Inc., in its

8   DEIS comments that challenges the BLM's assertion that the withdrawal represents only 12% of

9   the uranium endowment for the NAPW area.  DIR's analysis and submitted comments indicate

10  that withdrawing the NAPW area represents a 76% reduction of the uranium available to mine

11  production in the most favorable northern Arizona area for uranium exploration and mining.

12       62.     New information regarding rights-of-way issues across Federal lands in the

13  NAPW area to access State Trust or Private lands for mineral exploration projects was submitted.

14       63.     New and substantive information from the Arizona Geological Survey (AZGS)

15  was submitted by comment that shows that uranium mining and exploration cannot possibly

16  contaminate the Colorado River. The Secretary of the Interior's ROD cites three time that

17  "millions of people living in seven states in the U.S. And Mexico depend on the Colorado River

18  for water for drinking, irrigation, and industrial uses as well as hydro-power" implying that a

19  withdrawal is required to preserve this resource when in fact the FEIS does not support this

20  conclusion and the AZGS study conclusively demonstrates that it is impossible for uranium

21  mining to endanger the Colorado River.

22

1    64.    The BLM failed to discuss in the FEIS conflicts between the proposed actions and

2    the objectives of regional, State, and local land use plans, policies and controls for the area

3    concerned. The FEIS did not discuss any inconsistency of a proposed action with any approved

4    State or local plan and describe the extent to which the agency would reconcile its proposed

5    action with the plan or law. The Governor of the State of Arizona, the Legislature of the State of

6    Arizona, the County of Mohave in Arizona, the City of Fredonia in Arizona, and the Southern

7    Counties of Utah have all submitted comments or resolutions documenting their opposition to

8    the Northern Arizona Proposed Withdrawal action. In addition, the BLM failed to discuss

9    conflicts between the proposed actions and the Arizona Strip Wilderness Act of 1983 (H.R.

10   3562) which was subsequently incorporated into the Arizona Wilderness Act of 1984 at Title III.

11   House Committee Report 98-643, Part 1, pages 34-35 specifically recognized the uranium

12   potential of Northern Arizona, stating "[T]he Committee has not included these lands in

13   wilderness in recognition of their significant mineral (especially uranium) potential."

14   65.    Plaintiff submitted a letter to Mr. Scott Florence, District Manager, U.S. Bureau

15   of Land Management, Arizona Strip District Office on July 11, 2011, detailing the requirements

16   that NEPA placed upon the BLM as the lead agency in the preparation of the NAPW EIS in

17   regard to the BLM's responsibility under NEPA to publish for public comment a Supplemental

18   DEIS and that Plaintiff's letter was a legal notification that the BLM must follow the laws and

19   regulations for the preparation of an EIS. Mr. Florence responded on August 4, 2011 that the

20   BLM does "not plan to issue a Supplemental DEIS".

21

22

66.     Despite BLM's failure to follow the procedural requirements of NEPA, the Final EIS was published in The Federal Register on October 27, 2011.  The Final EIS is incorporated by reference.

### Statutory and Regulatory Background

67.     NEPA requires federal agencies to consider the environmental consequences of their actions. 42 U.S.C. §4331, et seq. NEPA ensures that the agency will have available, and will carefully consider, detailed information concerning significant environmental impacts and the social and economic consequences; it also guarantees that the relevant information will be made available to a larger audience to ensure that the public can play a role in both the decision making process and the implementation of the agency's decision.

68.     Pursuant to NEPA's implementing regulations promulgated by the CEQ, 40 C.F.R. Part 1500, federal agencies must review the direct and indirect impacts of their actions, as well as the cumulative impacts of such actions. Direct effects are those effects "which are caused by the action and occur at the same time and place." 40 C.F.R. §1508.8(a). Indirect effects are those effects "which are caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable." 40 C.F.R. §1508.8(b). Cumulative impacts include impacts of "other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. §1508.7.

69.     The CEQ rules implementing NEPA require federal agencies to prepare supplements to either draft or final EIS's or EA's if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. §1502.0(c)(1)(ii).

70.     NEPA directs federal agencies to comply with its procedures "to the fullest extent possible." 42 U.S.C. §4332.

71.     CEQ rules at §1502.9 (a) states:  "If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion."

72.     Additionally, CEQ rules at §1502.9 (c) requires:

"Agencies: 1. Shall prepare supplements to either draft or final environmental impact statements if: (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. 2. May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so."

73.     The CEQ rules also state at §1502.22:

"Incomplete or unavailable information.  When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

1.     A statement that such information is incomplete or unavailable;

2.     A statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment;

3.     A summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and

4.     The agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason."

74.     CEQ rules at §1502.9 (a): "The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action."

75.     CEQ rules at §1502.2(g): "Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made."

## **CLAIMS FOR RELIEF**

## **FIRST CLAIM**

1 **Defendants Must Revise the FEIS or Prepare a Supplement to Address Significant New**

2 **Circumstances and Information Identified in the Comments on The Northern Arizona**

3 **Proposed Withdrawal**

4      76.    Plaintiff hereby incorporates by reference the allegations in paragraphs one

5 through 75.

6      77.    The implementing rules for NEPA require the agency to provide for public

7 comment and to give appropriate weight to material and relevant comments.  40 C.F.R.

8 §§1502.9(b); 1503.4.

9      78.    The CEQ rules also require the Defendants to address controversies which

10 generally apply to scientific issues.  40 C.F.R. §§1503.4; 1502.12; 1508.27(b)(4).

11      79.    NEPA requires federal agencies to either revise the FEIS by issuing a new draft or

12 to prepare and circulate for public review and comment a supplemental NEPA document,

13 because the Defendants failed to follow NEPA procedures, including consideration of new

14 information, resolution of material scientific controversies, and material public comments.  40

15 C.F.R. §1502.9(c).

16      80.    NEPA requires that the analysis of the impacts be supported by credible scientific

17 evidence, not based on pure conjecture, and must be within the rule of reason. The validity of

18 assumptions and the general low quality of scientific analysis performed in the Water Resources

19 sections of the DEIS alone create a reasonable basis for stating that the requirements of NEPA

20 regarding credible scientific analysis have not been met.

21      81.    Additionally, NEPA requires that every effort be made to disclose the scientific

22 controversies and discuss. "...in the draft statement all major points of view on the environmental

1   impacts of the alternatives." This responsibility was grossly neglected throughout the DEIS and

2   the subsequent FEIS.

3       82.    The multitude of errors in the DEIS is amply documented in the public comments

4   submitted to Defendant BLM and available on the BLM's website. The FEIS did not correct these

5   errors.  Any one of the many omissions in analysis or incidences of lack of scientific rigor cited

6   above, provide sufficient justification for a revised DEIS or supplement to the FEIS in and of

7   themselves. The fact that there are so many errors and omissions of such a serious nature that are

8   relevant to environmental concerns, and have direct and strong bearing on the proposed

9   withdrawal action or its impacts, require remand and revision.

10       83.    NEPA's implementing regulations require federal agencies to prepare supplements

11   to a NEPA document if there are "significant new circumstances or information relevant to

12   environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. §1502.9(c)

13   (1)(ii).

14       84.    Comments submitted by Quaterra Resources, Inc. (Eugene D. Spiering), DIR

15   Exploration, Inc. (Larry D. Turner), and ACERT provided new information regarding the

16   mineable uranium endowment of the withdrawal area.  This information demonstrates that the

17   NAPW area could have around 110 economically viable breccia pipes or more containing

18   165,000 tons (330 million pounds) of $U_3O_8$ versus the 45 breccia pipes containing 33,155 tons

19   (66.3 million pounds) $U_3O_8$ assumed in the DEIS and revised to 78.93 million pounds in the

20   FEIS. According to the new information provided by Quaterra and ACERT, the BLM has

21   underestimated the mineable uranium contained within the NAPW area by around 500 percent.

22

31 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

85.     New information submitted shows that the USGS gross uranium endowment estimate was much less accurate than current geological knowledge permits.  Public comments provided by DIR Exploration, Inc., point out the basic geological control for the 45 mile wide by 100 mile long north-south trending area containing the bulk of historically discovered and mined uranium. *This most strongly endowed uranium-mineralized area, which was open to mineral entry before July 2009 is entirely contained by the NAPW area.* The USGS-estimated 12% withdrawal of northern Arizona uranium resources postulated in the DEIS and FEIS that would be a consequence of the NAPW has been shown by geological evidence pointed out by DIR Exploration, Inc., to instead constitute a 76% withdrawal of the economically-viable northern Arizona breccia pipe uranium resource available to mining before the start of the current segregation period. The FEIS and DEIS underestimate the impact of the NAPW on available mineable uranium endowment by about a factor of six (600%). This new information, like that very similar data independently originating from Quaterra Resources, has far-reaching effects on the accuracy of the subsequent analysis of the completed FEIS. The entire EIS will have to be adjusted to account for this basic DEIS and FEIS error in estimating the mineable uranium available in the NAPW; i.e., "There are [indeed] significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."

86.     While the number of mines considered to be developed during the next 20 years may not have been changed much by this new information provided during the DEIS public comment period, the total value of the mineable uranium resource is drastically undervalued both in the NAPW FEIS and in those lands previously withdrawn from mineral entry. The new information submitted indicates that the NAPW contains a uranium resource that would be in

32 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1   production for several generations and provide a long-lasting economic contribution to northern

2   Arizona and southern Utah. This being the case, according to the new information, the economic

3   analysis in the FEIS is materially deficient as it does not consider the extended time frame for

4   mining, the greater total amount of uranium produced, nor the probabilities that a work force of

5   greater size will be operating in Northern Arizona for a longer period of time.

6       87.     New and significant information regarding blind breccia pipes and their additional

7   contribution to the uranium endowment of the withdrawal area was submitted by Quaterra

8   Resources, Inc.  The information from Quaterra Resources further expands a reasonable estimate

9   of the uranium endowment for the NAPW. The FEIS and the USGS's model for estimating the

10  uranium endowment for the NAPW did not include the fact that present mineral exploration

11  technology can locate these "blind breccia pipes" and the uranium contained within them. As a

12  result, the FEIS oversimplified estimate for the uranium endowment of the NAPW is in further

13  error.

14      88.     New information regarding rights-of-way issues across Federal lands in the

15  NAPW to access State Trust or Private lands for mineral exploration projects was submitted. The

16  FEIS prepared by the BLM does not address this issue.

17      89.     New and significant information from the Arizona Geological Survey was

18  submitted by comment that shows that uranium mining and exploration cannot possibly

19  contaminate the Colorado River watershed. Open File Report 11-04 V1.0, Breccia-Pipe Uranium

20  Mining in the Grand Canyon Region and Implications for Uranium Levels in Colorado River

21  Water, April 2011, was submitted to the BLM for the NAPW FEIS by the Arizona Department

22  of Environmental Quality. The report found that uranium mining could in no way adversely

1    affect the Colorado River watershed. This new information has important implications for the

2    NAPW FEIS that have not been fully considered by Defendants as demonstrated by the miss-use

3    of the claim that the Colorado River is endangered, as justification for a withdrawal as cited in

4    the Secretary's ROD..

5          90.    Plaintiff and others in comments challenged the validity of assumptions in the

6    Water Resources sections of the DEIS.  The Water Resource section analysis was based on a

7    theoretical approach that does not meet the requirements of CEQ rules at §1502.22(b), which

8    states:

9    the agency's evaluation of such impacts based upon theoretical approaches or research methods

10   [be] generally accepted in the scientific community. For the purposes of this section, "reasonably

11   foreseeable" includes impacts which have catastrophic consequences, even if their probability of

12   occurrence is low, provided that the analysis of the impacts is supported by "*.credible scientific*

13   *evidence, is not based on pure conjecture, and is within the rule of reason*" [emphasis added].

14         91.    The analyses included in the Water Resource sections of the FEIS are not

15   supported by credible scientific evidence and, instead, are based on, and limited by, biased

16   conjecture and are not within the rule of reason.

17         92.    In summary, BLM failed to address the scientific controversy or the material

18   public comments adequately.  Thus the NAPW FEIS fails to conform to the mandatory

19   procedures set out in the CEQ rules which implement NEPA.  BLM's actions are an abuse of

20   discretion, are done without observance of procedure required by law, are in excess of statutory

21   jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the

22   meaning of the APA, 5 U.S.C. §706(2).

34 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

**SECOND CLAIM**

**Scientific Studies and Analyses Were Not Performed To Provide Information Essential To A Reasoned Choice Between Alternatives.**

93.    Plaintiff hereby incorporates by reference the allegations in paragraphs 1 through 92.

94.    Footnote 1 of the Secretary's ROD indicates that there is acknowledged uncertainty regarding the Water Resources section of the FEIS, but that information (data collection and scientific study) that would help resolve that uncertainty is not "essential to making a reasoned choice among alternatives". The footnote further claims that the EIS used reasonable conservative assumptions to estimate impacts as a method to address such unknowns. These claims and assertions are without merit. The Water Resources section of the FEIS is one of the major scientific controversies of the EIS. The assumptions and analysis in this section are not in compliance with 40 C.F.R. § 1502.22.

95.    The footnote continues that while "obtaining additional data to address the uncertainty regarding impacts on water quantity and quality is not essential to a reasoned choice, such data, particularly data collected on a site-specific basis as mines are developed, will nevertheless be helpful for future decision makers in the area." This logic is completely at odds with NEPA and its implementing regulations and illustrates that the FEIS was written to support a decision already made by the Secretary of the Interior. The underlying justification for the Secretary's withdrawal is so that **future** decision makers can perform additional studies that might allow the withdrawn lands to be become open to mining again, because there is not enough adequate data and scientific study available currently to choose the No Action Alternative.

1    However, the DOI and the BLM are refusing to do any substantive data collection and analysis at

2    all, and are thus themselves creating the underlying justification for a withdrawal.

3        96.    40 C.F.R. §1502.22(a) states: " If the incomplete information relevant to

4    reasonably foreseeable significant adverse impacts is essential to a reasoned choice among

5    alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the

6    information in the environmental impact statement."

7        97.    40 C.F.R. §1502.22(a) requires that the BLM obtain the information for the EIS

8    now, and not for the Secretary to use the lack of data and uncertainty as justification for a

9    withdrawal decision. Taken to an extreme, absolutely no information is required at all to make a

10   withdrawal decision because future decision makers can do the required studies and reopen the

11   withdrawn lands. The DEIS and FEIS rejected alternatives that required future decision makers

12   to implement studies, regulations, laws, etc.

13       98.    While the Secretary contends in his ROD that no additional data needs to be

14   collected to support a withdrawal decision, the withdrawal is only one of the alternatives to be

15   considered. CEQ rules at. §1502.9 (a) and §1502.22(a) require that "The agency shall make every

16   effort to disclose and discuss at appropriate points in the draft statement all major points of view

17   on the environmental impacts of the alternatives including the proposed action" and that

18   information required to make a reasoned choice among alternative be acquired.  Evaluating the

19   No Action Alternative requires that additional information based on data collection and analysis

20   be done and to provide analysis of existing research or information that would supply context to

21   the various impacts considered, to properly disclose and discuss that the No Action Alternative

22   point of view is a viable and reasoned choice amongst alternatives.

36 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

99.     For example: an analysis of the energy value represented by the uranium in the NAPWA would reveal that it would be equivalent to a coal mine 80 square miles in extent strip-mined to a depth of 400 feet. Alternative comparisons could be made for an oil field, solar power plant array, wind farm, etc.

100.    An analysis of the cumulative impacts on air quality that actually compared projected air quality impacts from exploration and mining to existing conditions would have shown that the projected affects were negligible.

101.    An analysis of the existing regulatory framework would have revealed that each proposed mine would have its own EIS performed using the specific location and circumstances to preclude the uncertainties inherent in a global approach as represented by the current EIS.

102.    Collecting soil and water data from existing mineral and breccia pipe exposure areas with ore-grade or otherwise elevated levels of uranium or arsenic would provide a means of comparing these natural levels and associated contamination risks to those at reclaimed and operating mines.

103.    Gathering actual data to support a credible Water Resource analysis instead of creating a hypothetical "model" based on conjecture and faulty assumptions would provide essential information to make a reasoned choice among alternatives.

104.    In summary, the failure to obtain information essential to making a reasoned choice among alternatives requires that the FEIS be set aside and remanded.  The refusal to obtain and analyze essential information for the FEIS is a violation of NEPA's implementing regulations, and is an abuse of discretion, and is done without observance of procedure required

1    by law, and is in excess of statutory jurisdiction, authority, or limitations, and are otherwise not

2    in accordance with law, within the meaning of the APA, 5 U.S.C. §706(2).

3    **THIRD CLAIM**

4    **The FEIS Failed to Adequately Respond to the Numerous Substantive Comments Received**

5    **that Directly Challenge the Accuracy, Validity, Adequacy, and Scientific Rigor to the Point**

6    **that the FEIS Precludes Meaningful Analysis in Direct Violation of NEPA.**

7         105.    Plaintiff hereby incorporates the allegations made in paragraphs 1 through104.

8         106.    NEPA is often described as furthering the twin goals of an informed public and an

9    informed decision maker.  The CEQ rules require each federal agency to respond to material

10   public comments.  40 C.F.R. §§1502.9(b); 1503.4.  Failure to do so adequately is grounds to set

11   aside the FEIS and remand it to the agency to prepare a revised draft or a supplement.

12        107.    Analysis for the effectiveness of current laws and regulations on regulating and

13   controlling the impact of hard rock exploration was improperly excluded from the DEIS.

14        108.    The detailed analysis for the cumulative regional effect on air quality was

15   improperly excluded from the DEIS.

16        109.    The analysis required by the FEIS itself on Table 3.1-1 for the sub-heading

17   "Energy Resource Available" was to determine 1) the value of energy produced from study area

18   [estimated $560 Billion], and  2) Equivalent amount of other energy-producing commodity

19   represented by uranium production [for example Coal: 2.7 Billion tons]. Analysis of these

20   economic resources and their relevant indicators was improperly excluded from the FEIS.

21   Additionally, an analysis of the cumulative impacts for these economic resources (energy values

22

1   and equivalent other energy- producing commodity) and relevant indicators for lands previously

2   withdrawn (cumulative affects) was improperly excluded from the FEIS.

3        110.   The FEIS does not analyze the issue of prior existing rights and the direct impact

4   that nearly all mining claims (99%) will be voided by the withdrawal when subject to a mineral

5   examination.  The direct impact of a mineral exam and the economic loss of mining claims on

6   the claim holder (loss of time and money invested in current mining claims held due to

7   exploration costs and maintenance fees paid to the BLM) was not analyzed.  The loss of revenue

8   to the BLM for the annual claims maintenance fees paid by the claim owners whose claims are

9   made invalid was not analyzed.

10       111.   The FEIS does not analyze the offset of GHGs due to the production and use of

11  uranium produced from the NAPW. The cumulative impact on GHG offset for areas previously

12  withdrawn was not calculated for uranium that could have been produced for nuclear fuel. These

13  analyses must be performed as this is a direct impact of the mining of the NAPW for uranium

14  and provide context (meaningful analysis) for the FEIS calculations of GHGs that would be

15  produced due to uranium exploration and mining in the NAPW area.

16       112.   The FEIS does not analyze the current resource conditions within the Grand

17  Canyon watershed (NAPWA) and specifically the Grand Canyon National Park with regard to

18  soils and surface water contamination due to the presently identified natural mineral exposures

19  and exposed breccia pipe ore bodies containing ore grade uranium or otherwise elevated uranium

20  and arsenic values. Excluding this analysis of background conditions before mining does not

21  allow context (meaningful analysis) for the analysis of the potential contamination from mining

22  sites both active and reclaimed.

39 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1   113.   The FEIS does not analyze the contribution of the existing conditions from

2   naturally eroded breccia pipe ore bodies with elevated uranium and arsenic exposures within the

3   Grand Canyon National Park watershed and how these impacts affect the cumulative effects and

4   other assumptions in the FEIS. Excluding this comparative analysis does not allow context

5   (meaningful analysis) for the analysis of the impact of potential contamination from mining sites

6   both active and reclaimed.

7   114.   The RMP considered cultural resources protection and undertook an inventory in

8   accordance with BLM procedures.  The RMP did not recommend withdrawing the 646,000 acres

9   of public lands from operation of the mining laws to protect cultural resources, because the RMP

10   and regulatory measures were sufficient.  The RMP did identify specific areas to be withdrawn

11   and adopted other measures to protect cultural resources.  These measures and the facts that

12   supported them are not part of the FEIS.

13   115.   The FEIS omits the role of the Arizona Wilderness Act of 1984, which is the

14   landmark legislation that originally defined the land areas to be designated wilderness and the

15   areas available for mineral entry and uranium exploration and mining. The development of this

16   Act recognized the uranium potential of Northern Arizona and left these lands designated for

17   multiple use, specifically including uranium mining.

18   116.   The above examples of missing or inadequate analysis taken as a whole or even in

19   part illustrate that the FEIS does not meet the basic requirement of NEPA, 40 C.F.R. §1502.9(a)

20   to provide "meaningful analysis". The large number of required analyses that were excluded from

21   the FEIS cited in this complaint and neglect of the comments submitted to the BLM for the

22   NAPW do not provide the public and the decision maker the correct context (meaningful

40 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1   analysis) from which to make an informed decision. The above examples are only a small sample

2   of the large number of substantive public comments submitted in response to the NAPW FEIS

3   that were ignored, dismissed, or otherwise left unanswered by the Defendants.  The improperly

4   excluded analyses and discussions of relevant issues are distributed over the entirety of the FEIS

5   for the NAPW and so the complete document is affected and should be subject to complete

6   revision or a supplemental NEPA document.

7        117.   In summary, BLM's refusal to prepare a supplemental NEPA document to correct

8   the errors in the FEIS for the NAPW violates NEPA's implementing regulations, and is agency

9   action unlawfully withheld and/or unreasonably delayed within the meaning of section 706(1) of

10  the APA. 40 C.F.R. §1502.9(c)(1)(ii); 5 U.S.C. §706(1).

11       118.   BLM's actions are also an abuse of discretion, are done without observance of

12  procedure required by law, are in excess of statutory jurisdiction, authority, or limitations, and

13  are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. §706(2).

14  **FOURTH CLAIM**

15  **The DEIS and FEIS Merely Justify A Policy Decision Already Made by Secretary Salazar,**

16  **by  Purposely Shaping, Mis-interpreting, and Disregarding Scientific and Technical**

17  **Findings to Support the Secretary's Prior Decision To Withdraw over One Million Acres of**

18  **Land as Proposed in the NAPW Action in Direct Violation of NEPA**

19       119.   Plaintiff hereby incorporates by reference the allegations in paragraphs 1 through

20  118.

21

22

1    120.    CEQ rules at §1502.2(g) provide: "Environmental impact statements shall serve as

2    the means of assessing the environmental impact of proposed agency actions, rather than

3    justifying decisions already made."

4    121.    CEQ rules at §1502.9(a) provide. "The agency shall make every effort to disclose

5    and discuss at appropriate points in the draft statement all major points of view on the

6    environmental impacts of the alternatives including the proposed action."

7    122.    It is intended that the NEPA process produce a good faith and objective inquiry

8    into the environmental impacts as well as the social and economic consequences.  As a result, a

9    federal agency cannot predetermine that process by mandating an outcome.

10    123.    Defendant Secretary Salazar's premature mandate that BLM adopt Alternative B

11    as the preferred alternative to withdraw more than one million acres of land pre-determines the

12    NEPA process.  The Secretary's mandate forced BLM to discard the facts, the science and

13    analysis that did not support the outcome that the Secretary had already told BLM it must

14    support.

15    124.    The FEIS for the NAPW continues this bias, as illustrated by the BLM response to

16    the comments regarding the uranium endowment for the NAPW. The FEIS states that the new

17    information had no standing because it was not "peer reviewed," even though the comments were

18    submitted by certified, registered, or licensed professional geologists with decades of experience

19    in exploration of the NAPW for uranium.  In any other context, such credible information would

20    be described as the best available data and would be adopted.  The data and conclusions represent

21    tens of thousands of man-hours and millions of dollars expended by various exploration

22    companies over the last few decades in on-the-ground exploration including geochemical,

42 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1  geophysical, exploration drilling, and aerial VTEM mapping methodologies, and published (peer

2  reviewed) geological data, including that published by the USGS.

3      125.    NEPA does not impose peer review as the criteria for distinguishing a public

4  comment from a scientific controversy.  NEPA requires that the agency resolve scientific issues

5  and explain the resolution, or have the FEIS set aside for revision or a supplemental NEPA

6  document in response to critical new information.  It is so that significant new information can be

7  thoroughly examined, developed, and incorporated into the FEIS by the responsible agency; i.e.,

8  so that the new information can be "peer reviewed."  It is the responsible agencies' responsibility

9  under NEPA to assess and respond to new information, not merely dismiss it for lack of peer

10  review.  Indeed, if peer review were the criteria, much of the federal agency scientific work could

11  not be used.

12      126.    To do otherwise would grant a Government Agency responsible for an EIS the

13  power to dismiss ANY and ALL new significant information as not being credible simply

14  because it was submitted by the general public or by otherwise thoroughly competent non-

15  academic professionals who have not previously published the information in an academically-

16  oriented, peer-reviewed journal.

17      127.    In prematurely choosing Alternative B (a complete withdrawal of the lands

18  proposed for withdrawal) for the Final EIS as the preferred alternative when the DEIS provides

19  no substantive scientific reasons for doing so, the Secretary of the Interior has publicly admitted

20  to a politically-based, biased Administrative and Executive policy that evidently has guided BLM

21  and DOI actions from the beginning of the NAPW NEPA process.

22

128.   The Interior Secretary declared an emergency to support a withdrawal after the segregation order had expired, without presenting any tangible evidence that an emergency exists or that extraordinary measures must be taken to preserve values that would otherwise be lost. These facts support how the Interior Secretary has, in complete functional disregard of the NEPA decision-making process, arbitrarily and purposely already chosen to put the 20-year NAPW into effect solely by using his executive authority as Secretary of the Interior.

129.   The BLM is the responsible agency for the NAPW EIS and its scientific and technical integrity. The BLM and its agents shaped and interpreted scientific and technical findings in the FEIS (including the responses to submitted comments) to support a policy decision prematurely and improperly made by the Secretary of the Department of Interior. These violations of NEPA and its attendant administrative process are so grievous, and the so-called scientific and technical analyses represented as supporting these violations are so devoid of logic and scientific credibility, that it is plain that the BLM and its cooperating agencies and agents no longer deserve the deference generally accorded by the courts to a government agency in regard to expertise in scientific and technical matters.

130.   In direct violation of NEPA, the BLM has written the NAPW FEIS to justify Alternative B in support of a decision that Secretary Salazar has already made; i.e., to execute the complete withdrawal of over 1 million acres of mineral-bearing land in Northern Arizona from mining for a period of 20 years.

131.   In summary, the failure to correct the FEIS to address the bias requires that the FEIS be set aside and remanded.  The biased analysis as currently used in the FEIS is a violation of NEPA's implementing regulations, and is an abuse of discretion, and is done without

1  observance of procedure required by law, and is in excess of statutory jurisdiction, authority, or

2  limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5

3  U.S.C. §706(2).

4  **FIFTH CLAIM**

5  **The NAPW FEIS Fails to Adequately Analyze the Merits of the No Action Alternative**

6         132.    Plaintiff hereby incorporates by reference the allegations in paragraphs 1 through

7  131.

8         133.    NEPA imposes a substantive obligation on the agency to fully analyze the no

9  action alternative.  42 U.S.C. §4332(2)(E).

10         134.    CEQ rules §1502.9 (a) provide: "The agency shall make every effort to disclose

11  and discuss at appropriate points in the draft statement all major points of view on the

12  environmental impacts of the alternatives including the proposed action."

13         135.    CEQ rules §1502.14(f) provide:

14  Alternatives including the proposed action.  This section is the heart of the environmental impact

15  statement. Based on the information and analysis presented in the sections on the Affected

16  Environment (Sec. 1502.15) and the Environmental Consequences (Sec. 1502.16), it should

17  present the environmental impacts of the proposal and the alternatives in comparative form, thus

18  sharply defining the issues and providing a clear basis for choice among options by the decision

19  maker and the public.

20         136.    In this section agencies shall: "*(f) Include appropriate mitigation measures not*

21  *already included in the proposed action or alternatives*" [emphasis added].  The FEIS considers

22  very few mitigation measures.  Nearly all mitigation measures mentioned in the NAPW FEIS are

45 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1   normal standard operating procedures and are required by existing law and regulation. NEPA

2   requires that mitigation measures be proposed for all relevant issues analyzed.

3       137.    The FEIS for the NAPW does not make an effort to disclose and discuss the major

4   point of view that Alternative A is a viable alternative. Quite the opposite is true, the numerous

5   omissions of analysis and scientific inquiry cited in Plaintiff's previous Claims, in addition to the

6   voluminous comments submitted to the BLM in response to the NAPW DEIS, and the analyses

7   specifically called for by the DEIS that were improperly discarded in the FEIS, were precisely

8   those analyses that support Alternative A, the No Action Alternative. This purposeful bias

9   permeates the whole of the FEIS and minimizes supporting analysis for Alternative A, while

10  arbitrarily exaggerating the analytical results supportive for withdrawal. Given the extent and

11  consistency of this purposeful bias in the DEIS and FEIS, the BLM's refusal to produce a

12  supplemental NEPA document in response to identification of the deficiencies of the DEIS even

13  further violates NEPA regulations and procedures.

14      138.    The FEIS failed to discuss the conflicts between the proposed actions and the

15  objectives of regional, State, and local land use plans, policies and controls for the area

16  concerned. The FEIS did not discuss any inconsistency of a proposed action with any approved

17  State or local plan and did not describe the extent to which the agency would reconcile its

18  proposed action with the plan or law.  40 C.F.R. §1506.2(d).  The Governor of the State of

19  Arizona, the Legislature of the State of Arizona, the County of Mohave in Arizona, the City of

20  Fredonia in Arizona, and the Southern Counties of Utah have all submitted by comment or

21  resolution their opposition to the Northern Arizona Proposed Withdrawal action and their

22  support for the No Action Alternative.

46 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1    139.    CEQ rules at §1502.16 (c) require a discussion of: "Possible conflicts between the

2    proposed action and the objectives of Federal, regional, State, and local (and in the case of a

3    reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See Sec.

4    1506.2(d)) should be addressed by the NAPW FEIS. This subject was not addressed in the FEIS

5    in violation of NEPA.

6    140.    Additionally, CEQ rules at §1506.2 (d) provide: "To better integrate

7    environmental impact statements into State or local planning processes, statements shall discuss

8    any inconsistency of a proposed action with any approved State or local plan and laws (whether

9    or not federally-sanctioned). Where an inconsistency exists, the statement should describe the

10   extent to which the agency would reconcile its proposed action with the plan or law." This

11   regulation was not followed in the FEIS and is a violation of NEPA.

12   141.    The facts in this complaint show that Defendants deliberately omitted or

13   minimized the economic harm to the region and to the Arizona State revenues.  The Defendants

14   also misrepresent the potential environmental threats and failed to incorporate the role of existing

15   regulations and land use plans that provide for resource protection which would have supported

16   the No Action Alternative.

17   142.    If Defendants had committed to a good faith and objective analysis, it would have

18   been clear that the existing regulatory scheme protects the identified resources and that the

19   alleged threats to the Colorado River watershed do not, in fact, exist.  Thus, Defendants would

20   have not been able to support the withdrawal as necessary to protect public resources.

21   143.    NEPA requires that the flawed and biased FEIS be remanded for revision or

22   supplementation.  Any agency actions that occur pursuant to the flawed FEIS should be set aside

47 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1    and Defendants should be enjoined from implementing any actions that would support the

2    withdrawal or the FEIS.

3    **SIXTH CLAIM**

4    **The Secretary of the Interior's ROD Is Not Substantiated By the FEIS, Is Not In**

5    **Accordance With Established Law, And Is An Abuse Of Discretion And Authority.**

6         144.    Plaintiff hereby incorporates by reference the allegations in paragraphs 1 through

7    143.

8         145.    The Secretary of the Interior's rationale for a withdrawal as stated in his Record of

9    Decision is substantially based on granting an unconstitutional preference for the religious beliefs

10   of Native Americans proximate to the NAPWA. By deferring to Native American religious and

11   cultural beliefs this appears to convey a message of government endorsement of their religious

12   beliefs contrary to established law. The Secretary has granted Native American Tribes in the area

13   a religious preferential use of over 1 million acres of land in the NAPWA and has therefore

14   granted *de facto* beneficial ownership of a rather spacious tract of public property. Nevertheless,

15   the Secretary's ROD notes that there is only one eligible traditional cultural property (Red Butte

16   on the South Parcel) in all of the NAPWA. The Red Butte area was litigated as a cultural

17   property in an attempt to prevent Canyon Mine operations in Havasupai v. United States 943

18   F.2d 32 (1991) by contending that the mine property would restrict access to cultural and

19   religious sites that the Havasupai claimed they had aboriginal title to.  The decision in this case

20   allowed the mine to go forward. The Ninth Circuit Court of Appeal in its "Snow Bowl" case in

21   Navajo Nation *v.* USFS 535 F.3d 1058  (2008) considered, in essence, whether to grant

22   aboriginal title for the Snow Bowl and the mountain area containing the Snow Bowl, to Native

48 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1    enforce their religious convictions by mandating land use restrictions on public property.

2    Contrary to the Defendants actions, the 9th Circuit Court declined to endorse a religious

3    preferential use of federal public land for area Native Americans ( as now granted by the

4    Secretary of the Interior in his ROD for the NAPWA) and concluded that no relief was due to

5    Native American Tribes for the subjective decrease of the spiritual fulfillment they would get

6    from practicing their religion. The court noted that a government action that decreases the

7    spirituality, the fervor, or the satisfaction with which a believer practices his religion is not what

8    Congress has labeled a "substantial burden"—a term of art chosen by Congress to be defined by

9    reference to Supreme Court precedent —on the free exercise of religion. Because there was no

10   showing the government had coerced the Plaintiffs (Native American Tribes) to act contrary to

11   their religious beliefs under the threat of sanctions, or conditioned a governmental benefit upon

12   conduct that would violate the Plaintiffs' religious beliefs, there was no "substantial burden" on

13   the exercise of their religion.

14       146.    In the "Snow Bowl" case, the land affected was a small fraction, about 1%, of the

15   mountain (74,000 acres) where Native American Tribes practice their religion. Similarly,

16   proposed exploration and mining activities, according to the RFD of the EIS, affects only 0.14%

17   of the over 1 million acres of land in the NAPWA and Red Butte represents only 0.4% of the

18   NAPWA. The NAPWA is over 13 times as large as the mountains containing the Snow Bowl

19   and contains only one small area (Red Butte) eligible for the National Register of Historic Places

20   (NRHP). The entire NAPWA has not been claimed to be eligible for the NRHP and therefore is

21   not eligible for consideration of religious and cultural accommodations granted by decisions such

22

1    as Access Fund  v.  United States Department of Agriculture 499 F. 3d 1036 (2007) ("Access

2    Decision").

3        147.    Further, granting such accommodations for the NAPWA does not satisfy the

4    "effect prong" of *Lemon* as described in the "Access Decision" at 1045 that "asks whether

5    irrespective of the government's actual purpose, the practice under review in fact conveys a

6    message of endorsement or disapproval."  In light of the 9th Circuit decision in Navajo Nation *v.*

7    USFS, the Defendants actions are clearly an attempt to find any reason to find rationale and

8    substance to support a withdrawal of over 1 million acres of the NAPWA. As such, it is clearly

9    perceived as an outrageous endorsement of Native American religious and cultural beliefs on

10   land use decisions regarding national public land.

11       148.    Defendant's rationale for the ROD substantially relies on deferring to, and

12   accommodations for,  Native American religious and cultural beliefs and has the appearance of

13   conveying a message of endorsement of their religious beliefs contrary to established law.

14       149.    Further, although the Secretary acknowledges that the EIS shows that the the risk

15   of negative water resource impacts are low, the Secretary attempts to justify his decision to

16   withdrawal by proposing that a twenty year withdrawal is required so as to allow for additional

17   data to be gathered and a more thorough investigation of groundwater flow paths, travel times,

18   and radionuclide contributions from mining be researched and analyzed by some future decision

19   maker. However, this is not in accordance with established law and regulation. These analyses

20   are required by the current EIS that was written for the NAPW decision and cannot be made the

21   responsibility of future decision makers as a convenient justification for the current withdrawal.

22   The Defendants two year segregation order was premised on the idea that "studies and analyses"

1   would be performed for the EIS.  It is unknown whether future research proposed by the

2   Secretary in his ROD will, in fact, ever be performed.

3         150.    The Secretary also states as a rationale for his withdrawal decision that millions of

4   people living in seven states depend on the Colorado River for drinking, irrigation, and industrial

5   use, implying that this water source is endangered from uranium exploration and mining

6   activities. The FEIS and the results of other studies carried out in support of this EIS do not

7   support this rationale, and the Secretary's use of it is arbitrary, not based on the evidence at hand,

8   and is an abuse of discretion and is done without observance of procedure required by law.

9         151.    Additionally, the Secretary's justifies his decision for withdrawal by claiming that

10   the uranium resource in the NAPWA will continue to be developed in the event of a withdrawal.

11   While this is true for a very few claims and claimants, the vast majority of claim holders will

12   have their claims voided when subject to a mineral exam and will be unable to continue

13   exploration of their claim to establish a property right that  a "discovery" confers upon a claim

14   holder. Thus, the millions of dollars and tens of thousands of man hours expended in good faith

15   to date on exploring the NAPWA will be "taken" as a result of the withdrawal with total

16   disregard to the effects on the claim holder. While this taking is not a taking in the established

17   legal sense, the loss of actual wealth and potential wealth is quite real and the effects of this loss

18   were not analyzed in the DEIS or FEIS as required by 40 C.F.R. §1508.8(a) and (b).

19         152.    Further, the Secretary justifies his decision for withdrawal by citing the small

20   chance that perched aquifers in the NAPWA could be affected by uranium mining operations

21   while at the same time the FEIS for the NAPW did not analyze the effectiveness of  existing

22   regulatory framework: federal, state, and local laws and regulatory bodies. Including the fact that

51 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1   each proposed mine site will have its own EIS or EA conducted and if the "small chance"

2   occurred that a perch aquifer might be affected, that mitigating measure would need to be found

3   to allow the mine to go forward. Absent measures that would mitigate effects to a perched

4   aquifer, the proposed mine's Plan of Operation could be denied and thus eliminate the potential

5   harm to that perched aquifer. In other words, the Defendant has at his disposal other less

6   restrictive means and means that rely on the actual location and circumstances of a proposed

7   mine to protect lands in the NAPWA, than relying on the hypothetical locations and

8   circumstances that are considered in the FEIS. The global approach taken for the DEIS and the

9   FEIS, without analyzing the effectiveness of site specific EIS's for proposed mines, leads to

10  overstating and unduly amplifying the impacts on the effects of locatable hard rock mineral

11  exploration and mining on the NAPWA.

12      153.    The FEIS is replete with qualifying statements that better and more definitive

13  analysis for a given impact could be provided if a specific mine site were analyzed and that the

14  impacts reported for the current EIS are inflated by the uncertainty inherent in a global EIS. Thus,

15  the Defendant is using a jackhammer when a dental pick will do.

16      154.    In summary, the rationales used to justify the Secretary's withdrawal are not

17  supported by established law (constitutional or otherwise), are not supported by the FEIS, and are

18  based on an FEIS that is materially deficient and purposefully did not obtain the information

19  essential to making a reasoned decision, so as to justify the Secretary's predecided withdrawal

20  decision. These actions by the BLM, DOI, and the Secretary of the Interior, Ken Salazar, are a

21  grievous violation of NEPA's implementing regulations, and are an abuse of discretion, and are

22  done without observance of procedure required by law, and are in excess of statutory jurisdiction,

52 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1   authority, or limitations, and are otherwise not in accordance with law, within the meaning of the

2   APA, 5 U.S.C. §706(2).

3        155.    Additionally, even if the Defendant corrected all deficiencies cited by the plaintiff

4   and others under NEPA in the preparation of the FEIS, this would not improve the Secretary's

5   rationale for his current ROD as the currently rationale is not supported by the FEIS as written

6   anyway. When reduced to its core, the withdrawal is based on an unconstitutional premise and

7   that some mining will continue after the withdrawal.

8                        **RELIEF REQUESTED**

9   WHEREFORE, Plaintiff respectfully requests that this Court:

10       A.      Immediately and permanently set aside and void the Secretary of the Interior's

11   Record of Decision for the NAPW signed January 9, 2012, because it is substantively based on

12   an unconstitutional preference for Native American religious beliefs.  Defendant's rationale for

13   the ROD substantially relies on deferring to and accommodation for  Native American religious

14   and cultural beliefs and has the appearance of conveying a message of endorsement of their

15   religious beliefs contrary to established law.

16       B.      Immediately and permanently set aside and void the Secretary of the Interior's

17   Record of Decision for the NAPW signed January 9, 2012, because it is an abuse of discretion,

18   and was  done without observance of procedure required by law, and are in excess of statutory

19   jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the

20   meaning of the APA, 5 U.S.C. §706(2) and that even if the FEIS was supplemented to correct all

21   deficiencies under NEPA claimed by the Plaintiff , there would still be no justification or

22

53 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief

1  rationale for a withdrawal decision as the decision is contrary to and unsupported by evidence in

2  the FEIS.

3         C.      Declare that Defendants are in Violation of NEPA-implementing regulations for

4  the cited laws, and the APA.

5         D.      Declare that Defendants have abused the customary civil, legislative, and judicial

6  deference accorded to Government Agency expertise as illustrated by manipulating scientific and

7  technical knowledge, assumptions, findings, analyses, and by excluding new significant

8  information in the NAPW EIS process in order to support a policy decision already made by

9  Defendant Secretary of Interior Ken Salazar.

10        E.      Immediately enjoin Defendant Secretary of the Interior, Ken Salazar, from

11  withdrawing any lands cited in the Northern Arizona Proposed Withdrawal until Defendant BLM

12  and Defendant Ken Salazar have answered this complaint and until this complaint has been

13  adjudicated by the Court.

14        F.      Enjoin Defendant Secretary of the Interior, Ken Salazar, from withdrawing any

15  lands cited in the Northern Arizona Proposed Withdrawal until the BLM has published, for

16  public comment, a complete Supplemental DEIS and until a subsequently re-issued Final NAPW

17  EIS has been published and recorded in The Federal Register.

18        G.      Order the BLM to withdraw the Final NAPW EIS published October 27, 2011,

19  and publish for public comment a complete Supplemental DEIS for all sections of the DEIS, that

20  fully conforms with the requirements of NEPA, prior to republishing the Final EIS for the

21  Northern Arizona Proposed Withdrawal.

22              H.      Grant Plaintiff such further relief as may be just, proper, and equitable.

1   Respectfully Submitted,

2   March 14, 2012

3

4

5   Gregory D. Yount

6   Plaintiff pro se

7   807 W. Butterfield Rd

8   Chino Valley, Arizona 86323

9   Tel: 928-899-7029

10   gregory_yount@northern-arizona-uranium-project.com

11

12

13

14

15

16

17

18

19

20

21

22

55 of 55 - Plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief