IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

DOMINIKA TARCZYNSKA, NY Bar No. 4431573
JOHN S. MOST, VA Bar No. 27176
Natural Resources Section
P.O. Box 7611 Washington, D.C. 20044-7611
 (202) 305-0447 (Tarczynska)
 (202) 616-3353 (Most)
 (202) 305-0506 (fax)
DOMINIKA.TARCZYNSKA@USDOJ.GOV
JOHN.MOST@USDOJ.GOV
Counsel for Defendants

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
### PRESCOTT DIVISION

| | |
|---|---|
| GREGORY YOUNT,<br><br>Plaintiff, *pro se*,<br><br>v.<br><br>KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.*,<br><br>Federal Defendants,<br>and<br><br>GRAND CANYON TRUST, *et al.*,<br><br>Intervenor-Defendants. | Case No. 3:11-cv-08171-PCT-DGC<br><br><br>**FEDERAL DEFENDANTS' MOTION TO DISMISS CIVIL ACTION NUMBER 12-CV-8075 (QUATERRA ALASKA INC. *ET AL.*)  AND MEMORANDUM IN SUPPORT** |

| | |
|---|---|
| NATIONAL MINING ASSOCIATION, *et al.*, | Case No. 3:12-cv-08038-PCT-DGC |
| Plaintiffs, | |
| v. | |
| KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.*, | |
| Federal Defendants, | |
| and | |
| GRAND CANYON TRUST, *et al.*, | |
| Intervenor-Defendants | |
| NORTHWEST MINING ASSOCIATION, *et al.*, | Case No. 3:12-cv-08042-PCT-DGC |
| Plaintiffs, | |
| v. | |
| KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.*, | |
| Federal Defendants, | |
| and | |
| GRAND CANYON TRUST, *et al.*, | |
| Intervenor-Defendants. | |
| QUATERRA Alaska Incorporated, *et al.*, | Case No. 3:12-cv-08075-PCT-DGC |
| Plaintiffs, | |
| v. | |
| KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.*, | |
| Federal Defendants, | |
| and | |
| GRAND CANYON TRUST, *et al.*, | |
| Intervenor-Defendants. | |

# TABLE OF CONTENTS

FEDERAL DEFENDANTS' MOTION TO DISMISS ............................................... 1

FEDERAL DEFENDANTS' MEMORANDUM OF LAW ................................................. 1

INTRODUCTION ........................................................................................... 1

LEGAL BACKGROUND ................................................................................. 3

      A.     Mining Law of 1872 .................................................................... 3
      B.     Federal Land Policy and Management Act ................................ 5

FACTUAL BACKGROUND .............................................................................. 5

      A.     The Affected Lands .................................................................... 5
      B.     Administrative and Judicial Proceedings ................................. 6

STANDARD OF REVIEW ............................................................................... 8

ARGUMENT ............................................................................................... 9

I.      Plaintiffs' Claims Fail to Establish an Article III Case or Controversy .................... 9

      A.     By failing to identify any affected mining claims, Plaintiffs have not alleged facts essential to show standing as to any count ........................................................................................ 9

      B.     Plaintiffs fail to demonstrate that their claims are ripe ................................... 14

II.     The Economic Coalition Lacks Standing as to All Five Counts Because its Member Municipalities, Asserting Civil Claims Against the Federal Government *Qua Parens Patriae*, Lack Standing. ........................................ 15

III.    Plaintiffs' NEPA Claims Fail to Demonstrate Prudential Standing ........................... 18

CONCLUSION ........................................................................................... 22

i

**FEDERAL DEFENDANTS' MOTION TO DISMISS**

Pursuant to Fed. R. Civ. P. 12(b)(1), Federal Defendants respectfully move to dismiss the First Amended Complaint, Dkt. 30 ("Am. Compl."), filed June 19, 2012, by Plaintiffs Quaterra Alaska, Inc. ("Quaterra") and the Arizona Utah Local Economic Coalition ("Economic Coalition") due to lack of subject-matter jurisdiction. Plaintiffs have not met their burden of demonstrating Article III standing or ripeness, or prudential standing, as explained in the following memorandum.

**FEDERAL DEFENDANTS' MEMORANDUM OF LAW**

**INTRODUCTION**

The Mining Law of 1872 ("Mining Law"), authorizes citizens to "locate" mining claims on federal lands that are "open to exploration" upon "discovery" of valuable mineral deposits and compliance with applicable legal requirements. *Chrisman v. Miller*, 197 U.S. 313, 322-23 (1905). Section 204(c)(1) of the Federal Land Policy and Management Act of 1976 ("FLPMA") authorizes the Secretary of the Interior to withdraw lands from "settlement, sale, location, or entry" under the general land laws (including the Mining Law), in order to "maintain other public values in the area." 43 U.S.C. §§ 1702(j), 1712(e)(3), 1714(c)(1).

The Economic Coalition, suing on behalf of its member Mohave County, *see* Am. Compl., caption, ¶ 1, and Quaterra, holder of unpatented mining claims on withdrawn lands, challenge the Secretary's recent exercise of this Section 204(c)(1) authority. *See, e.g., id.* ¶¶ 1, 3, 6. They ask the Court in a five-count complaint to invalidate the Secretary's decision to withdraw for twenty years from location and entry

under the Mining Law approximately one million acres of public and National Forest System lands in the Grand Canyon watershed, subject to valid existing rights.  *See* Record of Decision ("ROD") at 1 (Jan. 9, 2012) (attached herewith as Ex. 1).  Without alleging a specific FLPMA violation, the first two claims challenge the Secretary's exercise of FLPMA authority as arbitrary under the Administrative Procedure Act ("APA") because: (i) the decision was contrary to the evidence on environmental impacts of mining, Am. Compl. ¶ 139; (ii) it ignored relevant factors, *id.*; and (iii) it was based on consideration of an improper factor, the "subjective, emotional sensibilities" of Native Americans.  *Id.* ¶ 146.  The third and fourth claims assert various violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA").  The fifth and final claim asserts that the Secretary violated FLPMA by not properly coordinating with officials from Mohave County during the decision-making process.  Based on these supposed infirmities – but without identifying any affected mining claims – Quaterra and the Economic Coalition ask that the decision be set aside.

The Court should not do so and instead should dismiss the action for lack of subject-matter jurisdiction because the Amended Complaint fails to identify imminent harm to the legally protected interests of either Quaterra or any Economic Coalition member.  Instead it asserts, first, that the decision will undermine Quaterra's investment in its unpatented mining claims, without explaining how or identifying any mining claim adversely affected; and second, that the decision will, in some unexplained way, deprive Economic Coalition members of revenue and jobs.  However, nowhere in the Amended Complaint do Plaintiffs specifically identify impairment of a protected

interest, or suggest that they have attempted to develop their unpatented mining claims. In the absence of an allegation that Plaintiffs are threatened in a concrete and particularized way, none of these allegations is meaningful.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992).   Consequently, all five counts should be dismissed for lack of subject-matter jurisdiction, as explained in argument I, *infra*.

Finally, should the Court conclude Plaintiffs have properly alleged a case or controversy, it should nonetheless dismiss any claims that rely solely on the Coalition's allegations of injury to establish standing.   As explained in argument II, *infra*, the Economic Coalition is not a proper plaintiff because its member municipalities lack standing to sue *qua parens patriae*.   The Court should also dismiss the two NEPA counts because the alleged harm is economic in nature and thus falls outside the "zone of interests" that NEPA, an environmental statute, protects.  *See* argument III, *infra*.

For these and additional reasons set out below, we respectfully request that the Court dismiss the Amended Complaint for lack of subject-matter jurisdiction.

## LEGAL BACKGROUND

### A.  Mining Law of 1872

The Mining Law, 30 U.S.C. §§ 22-54, made public lands available to American citizens "for the purpose of mining valuable mineral deposits . . . ."   *United States v. Coleman*, 390 U.S. 599, 602 (1968); *Cameron v. United States*, 252 U.S. 450, 460 (1920); 30 U.S.C. § 22.   It authorizes citizens to "locate" valid mining claims upon "discovery" of valuable mineral deposits and compliance with applicable legal

3

requirements.  *Chrisman,* 197 U.S. at 322-23.  As long as lands remain "open" to location and entry, a citizen may locate a mining claim.  *See* 43 C.F.R. Part 3832.[1]

Before conducting most extractive mining activities, operators must obtain approval of a plan of operations, either from the Forest Service ("Service"), 36 C.F.R. § 228.4, or from the Bureau of Land Management ("BLM").  43 C.F.R. §§ 3809.11, 3809.412.  On withdrawn lands, the surface-managing agency conducts a mineral examination before processing a proposed plan or allowing notice-level operations.[2] *See* 43 C.F.R. § 3809.100 (BLM-managed public land); May 31, 2012 Declaration of Rody Cox ¶¶ 6, 7 (Dkt 27-2, Civ No. 3:12-cv-8042) ("Cox Decl.") (same); May 31, 2012 Decl. of Thomas Mutz ¶¶ 5, 6 (Dkt 27-3, Civ No. 3:12-cv-8042) ("Mutz Decl.") (Forest lands).  A mineral examination determines the validity of a mining claim; that is, whether the claimant had discovered a valuable mineral deposit at the time of withdrawal which continues to date.  *See United States v. Pass Minerals, Inc.*, 168 IBLA 115, 122 (2006).  If the mineral examination concludes there has been no discovery, BLM, either on its own or on behalf of the surface-managing agency,

---

[1] Mining claimants often locate claims before making a discovery, to protect their interests as against rival claimants while working to make the physical exposure required to establish a valid claim.  This act of pre-discovery location gives the mining claimant the right of *pedis possessio*, as against other claimants.  *See Union Oil Co. v. Smith*, 249 U.S. 337, 346-47 (1919).  However, only upon discovery of a valuable mineral deposit is a mining claim valid and enforceable against the United States.  *Id.* at 348-49; *Hafen v. United States*, 30 Fed. Cl. 470, 473 (1994).  A valid claim affords its holder the right to possess, occupy, and extract minerals from federal lands.  30 U.S.C. § 26; *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 47 (D.D.C. 2003).

[2] The term "notice" or "notice-level" operations in this brief refers both to operations under a "notice" under the BLM's regulations at 43 C.F.R. § 3809.300 and to a "notice of intent to operate" filed under the Forest Service's regulations at 36 C.F.R. § 228.4.

institutes a contest proceeding to have the mining claims declared invalid.  *See* 43 C.F.R. § 4.451-1; Cox Decl. at ¶ 8; Mutz Decl. at ¶ 6.

### B.  Federal Land Policy and Management Act

Section 204(c) of FLPMA authorizes the Secretary to withdraw lands from the operation of the general land laws, including the Mining Law, 43 U.S.C. § 1714(a), in order to, *inter alia*, "maintain other public values in the area."  *Id*. § 1702(j).  Such withdrawals are made subject to valid existing rights.  *Id*. § 1701 Note, Pub. L. 94-579 § 701; *see also* 43 U.S.C. § 1714.  This authority extends to lands managed by BLM or other federal agencies.  *Id*. § 1702(j) (defining withdrawal authority as applying to "Federal land"); *id*. § 1714(i) (authorizing the Secretary to withdraw lands administered by another agency only with the agency's consent).

### FACTUAL BACKGROUND

### A.  The Affected Lands

The lands withdrawn consist principally of three parcels, two managed primarily by BLM (the north and east parcels on the Kanab Plateau, north of the Grand Canyon, consisting of 684,449 acres) and one located on the Kaibab National Forest, south of the park (the south parcel, consisting of 322,096 acres).  ROD at 4-7, 8 (Map 1) (Ex. 1).

Uranium is a mineral locatable under the Mining Law, *see* 43 C.F.R. §§ 3830.11, 3830.12(a), and has occurred in northern Arizona as pipe-shaped "breccia bodies," generally no more than 300 feet in diameter and extending as far as 2,000 feet below the surface.  Ex. 1 at 2.  Uranium exploration and mining began in northern Arizona in the 1940s and 1950s and, following significant price increases, expanded in the 1970s.

5

From 1978 to 1992, prospectors drilled more than 900 exploratory holes in the withdrawal area. *Id.* at 3. By the early 1990s, six of seven uranium mines in the withdrawn area had produced almost 1.5 million tons of uranium. *Id.* Recent price spikes spurred renewed interest in mining, as prospectors located thousands of new claims in the mid-2000s. *Id.* at 3. This demand generated concern about impacts on the natural, cultural, and social resources of the Grand Canyon watershed. *Id.*

### B. Administrative and Judicial Proceedings

In July 2009, upon application of BLM, the Secretary proposed the withdrawal and the Department gave public notice thereof. *See* 74 Fed. Reg. 35,887-01 (July 21, 2009). Its purpose was "to protect the Grand Canyon watershed from adverse effects of locatable hardrock mineral exploration and mining." *Id.* at 35,887. By operation of law, the notice segregated the lands from location and entry for a period of two years. *Id.; see also* 43 U.S.C. § 1714(b)(1). BLM then commenced analysis of the proposal, including environmental analysis under NEPA. 74 Fed. Reg. at 35,887.

In February 2011, the Environmental Protection Agency ("EPA") published a notice of availability of a draft environmental impact statement ("DEIS"), which initiated a 45-day comment period. 76 Fed. Reg. 9575 (Feb. 18, 2011). BLM later extended the comment period to 75 days. 76 Fed. Reg. 19,772 (Apr. 8, 2011). Given the complexity of issues and volume of comments received, it became apparent the effort could not be completed during the two-year segregation. Consequently, the Secretary, under FLPMA's broad grant of emergency authority, *see* 43 U.S.C. § 1714(e), 43 C.F.R. § 2310.5, issued Public Land Order 7773, withdrawing the lands

for an additional 6 months, to January 20, 2012.  76 Fed. Reg. 37,826-01 (Jun. 28, 2011).  This preserved the status quo as the agency completed decision making.  *Id*.  The Secretary also announced he was directing BLM to identify Alternative B in the DEIS (i.e., full withdrawal) as the preferred alternative in the Final EIS.  *See* http://www.doi.gov/news/pressreleases/Secretary-Salazars-Remarks-from-Mather-Point-at-the-Rim-of-the-Grand-Canyon.cfm (last visited Sept. 5, 2012).

In October 2011, EPA published a notice of availability of the Final EIS ("FEIS").  76 Fed. Reg. 66,925-02 (Oct. 28, 2011).  Among other things, the FEIS responded to over a quarter million comments, FEIS at 5-6 to 5-320,[3] and identified the proposed withdrawal as the "preferred" alternative.  *Id*. at 2-30; *see also* 40 C.F.R. § 1502.14(e) (requiring agencies to identify preferred alternative in a final EIS); *Natural Res. Def. Council, Inc. v. Hodel*, 819 F.2d 927, 929-30 (9th Cir. 1987).  On January 9, 2012, the Secretary selected the preferred alternative, and signed the ROD and a Public Land Order implementing it.  Am. Compl. ¶ 53; 77 Fed. Reg. 2563-01 (Jan. 18, 2012).  The withdrawal does not eliminate agency authority to acknowledge notices or to approve mining plans of operation under 43 C.F.R. subpart 3809  (BLM) or 36 C.F.R. Part 228, Subpart A (Forest Service), but so long as the lands remain withdrawn, the agencies would conduct mineral examinations before processing any such requests, to verify claim validity.  Cox Decl. at ¶ 6, 7; Mutz Decl. at ¶¶ 5, 6.

---

[3]  The eight-chapter FEIS and its eleven appendices are available online at http://www.blm.gov/az/st/en/prog/mining/timeout/feis.html (last visited Sept. 5, 2012).  Substantial portions of the FEIS are also available at Dkt. 18-1, Civ. No. 12-cv-8042.

1
2
3
4   Plaintiff Quaterra and Mohave County commenced this litigation on April 17,
5   2012, Dkt. 1, and amended their complaint on June 19, 2012, to substitute the
    Economic Coalition for the county as plaintiff, and to assert additional claims for relief.
    Despite these added elements, the Amended Complaint nonetheless fails to assert harm
    to the protected interests of either Quaterra or the Economic Coalition's members, and
6
7   identifies no mining claim that either plaintiff has attempted to develop.
8
9                                **STANDARD OF REVIEW**
10      Jurisdiction is a threshold issue that must be addressed before considering the
11  merits of a case.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-96 (1998);
12  *McCarthy W. Constructors, Inc. v. Phoenix Resort Corp.*, 951 F.2d 1137, 1140 (9th Cir.
13  1991).  The burden of proving subject matter jurisdiction rests with plaintiff, the "party
14  invoking the federal court's jurisdiction."  *Thompson v. McCombe*, 99 F.3d 352, 353
15  (9th Cir. 1996).  Federal courts are courts of "limited jurisdiction," and are presumed to
16
17  lack jurisdiction unless a plaintiff establishes its existence.  *Kokkonen v. Guardian Life
18  Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  The plaintiff "must allege in his pleading
19  the facts essential to show jurisdiction."  *McNutt v. Gen. Motors Acceptance Corp.*, 298
20  U.S. 178, 189 (1936); *see also Legal Aid Soc'y of Alameda Cnty. v. Brennan*, 608 F.2d
21  1319, 1333 n.26 (9th Cir. 1979) ("To invoke federal jurisdiction, plaintiffs must allege
22
23  facts adequate to confer standing") (citations omitted).  If the Court finds it lacks
24  subject matter jurisdiction, it "must dismiss the action."  Fed. R. Civ. P. 12(h)(3).
25
26      "Defects in subject matter jurisdiction may be raised at any time, by the parties
27  or by the court . . .  and may never be waived."  *Cripps v. Life Ins. Co. of N. Am.*, 980
28

8

F.2d 1261, 1264 (9th Cir. 1992) (citation omitted).  Under Rule 12(b)(1), a party may move to dismiss based on "lack of subject-matter jurisdiction."  On such a motion, a party may attach materials outside the pleadings to prove jurisdictional matters.  *See, e.g., McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) (on a motion to dismiss, the court is "not restricted to the face of the pleadings, but may review any evidence . . . to resolve factual disputes concerning the existence of jurisdiction."). Consideration of such evidence does not convert the motion to one for summary judgment. *Biotics Research Corp. v. Heckler*, 710 F.2d 1375, 1379 (9th Cir. 1983).

**ARGUMENT**

Federal courts are presumed to lack jurisdiction unless the plaintiff establishes its existence, *Kokkonen,* 511 U.S. at 377, which plaintiff must do "affirmatively" and "clearly." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).  This includes demonstrating Article III and prudential standing, *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998), as well as ripeness.  *Warth v. Seldin*, 422 U.S. 490, 516 (1975) (affirming dismissal of organization's complaint that failed to show injury to a member of "sufficient immediacy and ripeness . . .").  Plaintiffs have not satisfied these requirements and thus the Amended Complaint should be dismissed.

**I.  Plaintiffs' Claims Fail to Establish an Article III Case or Controversy.**

    **A. By failing to identify any affected mining claims, Plaintiffs have not alleged facts essential to show standing as to any count.**

In order to establish Article III standing, a plaintiff must show that: (1) he has "suffered an 'injury-in-fact'" to a legally protected interest that is both "concrete and

particularized" and "actual or imminent," as opposed to "conjectural or hypothetical;" (2) there is a "causal connection between the injury and the conduct complained of;" and (3) it is "likely" – not merely "speculative" – "that [his] injury will be 'redressed by a favorable decision.'" *Defenders*, 504 U.S. at 560-61 (citations omitted).  Such injury must be present "at the commencement of the litigation." *Davis v. Fed. Election Comm'n,* 554 U.S. 724, 732 (2008) (citation omitted).

Requiring imminent and concrete injury assures that "the essential dimension of [factual] specificity" is present in a case. *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974).  This promotes resolution of legal questions "not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action," *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).

The amended complaint does not achieve these purposes.  Plaintiffs' scant allegations of economic harm depend on speculation and thus offer no basis for the Court to find injury in fact.  Quaterra declares, without support, that it is deprived of its investments in its mining claims, Am. Compl., ¶ 1, and that its economic interests are impacted, *id.,* ¶ 3, but makes no assertion that it has even sought surface-use authorization, or otherwise attempted to develop its claims.[4]  Importantly, no decision, statute, or regulation prevents Quaterra from pursuing available administrative avenues

---

[4] Notably, since withdrawal, only Uranium One Americas (not a party hereto) has sought surface-use authorization. Second Cox Declaration, Dkt 72-1, No. 12-cv-8038 (discussing company's request to explore claim previously drilled and fully reclaimed).

for mining claim development that it could have pursued before withdrawal.  The company is free to follow the appropriate agency's requirements for obtaining surface-use authorization but has not done so.  Quaterra's present inability to develop the claims is its own doing, not that of Federal Defendants.  Its allegations of economic harm fail to demonstrate the imminent injury that Article III requires.[5]

The Economic Coalition, for its part, declares that the municipalities are deprived of "tens of millions of dollars in revenues and jobs," Am. Compl., ¶ 1, and that the economic interests of its members are impacted by the decision, *id.,* ¶ 3, but they fail to explain how the decision does this.  Such allegations are insufficient to establish standing.  An injury must be "fairly ... trace[able] to the challenged action of the defendant," and must not be the result of the "independent action of some third party not before the court."  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). Plaintiffs' theory that they will suffer financial losses depends on a series of independent future events by third parties about which the Court could only speculate.

---

[5]  Quaterra also alleges that it "seeks to expand its exploration activities and locate additional mining claims." Am. Compl. ¶ 18.  However, it does not allege that it is harmed by the decision's twenty-year restriction on location and entry.  Even if paragraph 18 could be construed to allege harm to a protected interest, there is no allegation that Quaterra had any specific plans, when this action commenced, to engage in location and entry.  Thus Plaintiffs' vague assertion is even less definitive than the "'some day' intentions" found inadequate in *Defenders of Wildlife*, which were not supported by "any description of concrete plans." 504 U.S. at 564.

1   Such a causal chain is simply too attenuated to support standing, particularly where the

2   decision does not prohibit development of mining claims.[6]

3        Plaintiffs' environmental allegations fare no better.  In paragraph 3, the

4   Economic Coalition declares, in a conclusory fashion, that the municipalities'

5   environmental interests are impacted by the decision, but does not explain how.  Am.

6   Compl. ¶ 3.  It declares in paragraph 7 that "local government[s] have a procedural right

7   to protect [their] concrete interests under NEPA," *id*. ¶ 7, which, as a general

8   proposition, is true, but it fails to identify any such interest impacted by the decision,

9

10  such as an aesthetic or recreational interest in the withdrawn lands.   *See Summers v.*

11  *Earth Island Inst.*, 555 U.S. 488, 494 (2009) (recognizing that harm to a plaintiff's

12  recreational and aesthetic interests is sufficient to confer standing) (citing *Sierra Club v.*

13  *Morton*, 405 U.S. 727, 734-36 (1972)).  The best the Economic Coalition can offer is

14

15  that the municipalities have a "direct" or "significant" interest in the "environmental

16  impacts caused by uranium mining, transportation and processing," *id*. ¶ 7, 8, and that

17  the withdrawal "impacts [Mohave County's] environmental interests," *id*. ¶ 11, but such

18

19  generalized concerns do not confer standing.  Quaterra further asserts that it "suffered

20  procedural injuries" when the agency dismissed or ignored its comments during the

21  NEPA process, *id*. ¶ 21, but the allegation, even if true, also fails to identify a protected

22

23

24  _____

[6] The only other contentions of economic harm advanced by Plaintiffs appear in
25  paragraphs 9 and 10, where Plaintiffs assert, unremarkably, that the municipalities have
    "direct interests" in their local economies.  *Id.,* ¶ 9-10.  This may well be true but, in
26  simply saying so, Plaintiffs do not demonstrate that a protected interest is threatened by
    imminent harm.  Neither assertion resolves the inadequacy of the causal chain on which
27  plaintiffs rely to trace the alleged economic harms to the decision.

28

interest of Quaterra.  *See Summers v. Earth Island Inst.*, 555 U.S. at 496 ("deprivation of a procedural right without some concrete interest that is affected by the deprivation – a procedural right *in vacuo* – is insufficient to create Article III standing").  None of these environmental allegations establishes injury in fact.

The Economic Coalition also claims that the counties have a "direct interest" in the "environmental impacts caused by uranium mining," *id.* ¶ 9, and that the City of Fredonia has a "direct interest" in the "environmental impacts of the [withdrawal]." *Id.* ¶ 10.  Neither assertion identifies harm to a protected interest, such as a recreational or aesthetic interest in the lands affected by the withdrawal.  Mohave County further asserts it is harmed by the decision because it has an interest in air and water quality. *Id.,* ¶ 31.  In its behalf, the Economic Coalition states its members' collective belief that less uranium mining will translate to increased air pollution, as relatively more coal is burned to provide local customers with electrical power.  *Id.,* ¶ 25.  However the allegations of the amended complaint simply fail to establish that harm to the County's interests in air and water quality will imminently flow from the decision.  Again, the causal chain is too attenuated.[7]  The County also asserts that if uranium mining is restricted, it will receive less revenue, and thus roads which would otherwise have been paved will not be, and, consequently, the County's residents will suffer increased dust

---

[7] Plaintiffs assert that Mohave County receives electricity from a nuclear power plant, Am. Compl. ¶25, and then vaguely claim that its air quality will be adversely affected "due to the fact that it will otherwise rely on coal-fired power plants," *id.* ¶ 181. Plaintiffs have offered no basis to conclude that the withdrawal will have any impact on the operations of the nuclear power plant that provides electricity to Mohave County. Such speculative insinuations are insufficient to establish Article III standing.

1
2
3
4

emissions and erosion.  *Id.,* ¶ 28-29.  Because Plaintiffs' causal theory plainly depends on the "independent action[s] of . . . third part[ies] not before the court," *Simon*, 426 U.S. at 42, it fails to meet the causation standard of *Defenders*.

5
6
7
8
9
10
11
12

The imminence requirement is a safeguard that ensures the existence of a case or controversy.  If Quaterra were to submit a request for surface-use authorization on one of its unpatented mining claims, the appropriate agency would conduct a validity determination.  *See* Ex. 1 at 6.  Until this happens, Plaintiffs have not shown "certainly impending" injury, *Defenders*, 504 U.S. at 564 n.2 (citation omitted), and they have not been affected by the decision in the least.  For these reasons, Plaintiffs lack Article III standing and the Amended Complaint should be dismissed.

13
14

### B.  Plaintiffs fail to demonstrate that their claims are ripe.

15
16
17
18
19
20
21
22
23
24
25

The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).  A case is not "'ripe' for judicial review . . . until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

26
27
28

In deciding whether an issue is ripe, a court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court

consideration." *Abbott Labs*., 387 U.S. at 149; *see also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998).   Here, the first prong of the *Abbott* test strongly counsels that the Court decline involvement.   As noted, Quaterra makes no allegation that it has sought surface-use authorization.   If it were to do so and trigger a mineral examination, then the appropriate agency would act and the effects of the decision might be "felt in a concrete way." *Abbott Labs*., 387 U.S. at 148.   Only at this juncture would judicial review be meaningful.   As to the second prong, Plaintiffs have not sought surface–use authorization on their existing claims and, accordingly, cannot claim they have suffered any hardship.

For all these reasons, the Court should dismiss the Complaint because it fails to establish a justiciable case or controversy under Article III.

## II.   The Economic Coalition Lacks Standing as to All Counts Because its Member Municipalities, Asserting Civil Claims Against the Federal Government *Qua Parens Patriae*, Lack Standing.

An association has standing to bring suit on behalf of its members when they would otherwise have standing to sue in their own right, when the interests at stake are germane to the organization's purpose, and when neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.   *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

Here, the Economic Coalition fails to satisfy the first requirement, because prudential considerations prevent Mohave County from suing in its own right.   In a civil action brought *qua parens patriae,* a state or local government may only sue to protect three general types of interests: (1) sovereign interests, such as the authority to enforce

its civil and criminal codes; (2) proprietary interests, such as land ownership; and (3) quasi-sovereign interests relating to the general welfare of its populace under the doctrine of *parens patriae*. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601-02 (1982). When suing the federal government in regard to the third interest, a state lacks standing to protect quasi-sovereign *parens patriae* interests because, with respect to the relationship between citizens and the federal government, the United States, and not the state, is presumed to represent the interests of the citizens as *parens patriae*. *Id*. at 610 n.16 (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923)); *Nevada v. Burford*, 918 F.2d 854, 858 (9th Cir. 1990), *cert. denied*, 500 U.S. 932 (1991). The same principle applies to local government entities, such as counties. *See Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1453 n.3 (10th Cir. 1994). The Ninth Circuit has further explained that "'political subdivisions such as cities and counties, whose power is derivative and not sovereign, cannot sue as *parens patriae* . . . .'" *City of Rohnert Park v. Harris*, 601 F.2d 1040, 1044 (9th Cir. 1979) (quoting *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 131 (9th Cir. 1973).

In an apparent attempt to circumvent these restrictions, Mohave County and other municipalities also opposed to withdrawal, formed an association (in 2011, based on information and belief), called the Arizona Utah Local Economic Coalition. Am. Compl. ¶ 6.[8] Plaintiffs aver that the Economic Coalition was established for "two

---

[8] The Board of Supervisors, Mohave County was a named plaintiff in the initial complaint filed in April 2012, *see* Dkt. 1 ¶¶ 6-8. It was only in the Amended Complaint, filed two months later, that the Coalition, acting on behalf of Mohave County, was substituted as a plaintiff, Am. Compl. ¶¶ 6-12.

primary purposes:" (i) to facilitate coordination between the Secretary and the municipalities regarding the proposed withdrawal, and, (ii) to allow member municipalities to "consolidate their resources" in a "struggle to protect their citizens from the serious economic, environmental, and social impacts" of withdrawal.  *Id*. Several of the municipalities were designated as cooperating agencies under NEPA and participated in the public participation phases of the NEPA process.  *See* ROD at 21 (Ex. 1).  Dissatisfied with the outcome of that process, the Economic Coalition now brings suit in this Court.  It does so, according to the Amended Complaint's caption, "on behalf of named member the Board of Supervisors, Mohave County, Arizona." [9]

In support of its standing, the Economic Coalition asserts, in a scant seven paragraphs, the economic and environmental harms its members allegedly suffer.  Am. Compl. ¶¶ 1, 3, 9, 10 (economic harm); *id*. ¶¶ 3, 7-11, 25, 28-29, 31 (environmental harm).  None of these allegations is sufficient to confer standing because, by their plain language, none fits within the recognized circumstances under which state or local government might bring suit *qua parens patriae* against the federal government. Plaintiffs' allegations of harm and their claims for relief assert neither a sovereign nor a proprietary interest.  Since these are the only recognized forms of local action

---

[9] The Economic Coalition does not claim to bring suit on behalf of any other municipality, though it does allege harm suffered by the City of Fredonia, Arizona, and four Utah Counties (Garfield, Kane, San Juan and Washington).  Am. Compl. ¶¶ 3, 7-11.  If Plaintiffs are deemed to have sued on behalf of these municipalities, their implied claim of standing fails for the same reasons that Mohave County's claim fails.

permissible in a suit against the federal government, *Alfred L. Snapp & Son,* 458 U.S. at 602, *Massachusetts*, 262 U.S. at 486, the Coalition's claims are non-justiciable.

### III.    Plaintiffs' NEPA Claims Fail to Demonstrate Prudential Standing.

Even if Plaintiffs could establish Article III standing and ripeness, and prudential standing for an action *qua parens patriae*, they nonetheless lack prudential standing to bring their NEPA claims (Third and Fourth Causes of Action, Am. Compl. ¶¶ 150-164). It has long been the law of the Ninth Circuit that "[t]he purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions."  *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993).  Plaintiffs "'who assert[] purely economic injuries do[] not have standing to challenge an agency action under NEPA.'"  *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005) (quoting *Nev. Land Action*, 8 F.3d at 716); *see also Ranchers Cattleman v. U.S. Dept. of Agric.,* 415 F.3d 1078, 1103 (9th Cir. 2005) ("[A] plaintiff must allege injury to the environment; economic injury will not suffice."); *W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 903 (9th Cir. 1996); *Port of Astoria v. Hodel*, 595 F.2d 467, 475 (9th Cir. 1979) (holding that "pecuniary losses and frustrated financial expectations that are not coupled with environmental considerations" are "outside of NEPA's zone of interests and are not sufficient to establish standing").

Plaintiffs' alleged economic injuries are outside NEPA's environmental "zone of interests." *Ranchers Cattlemen,* 415 F.3d at 1103.  Quaterra contends that it will be economically harmed as a result of the withdrawal because it has invested more than $12 million in mineral exploration in the withdrawn area and the withdrawal "freezes

18

[its] development plans." Am. Compl. ¶¶ 18-19.  Whereas, the Economic Coalition asserts that the local economies of Mohave County and its other members will be impaired as a result of the withdrawal.  *See id.* ¶¶ 3, 7, 9-11, 123-127.  Specifically, the Amended Complaint alleges that "without the withdrawal, uranium mining would contribute $168 million to Arizona over a 42-year period from severance taxes alone. Corporate and individual income taxes would contribute another $2 billion over the same time period.  The [withdrawal] will cost the State of Arizona nearly 400 jobs directly related to mining and 688 jobs indirectly related to mining."  *Id.* ¶ 124; *see also id.* ¶ 127 ("Socio-economically, Mohave County is . . . adversely impacted by [the withdrawal]" because "but for the withdrawal, there would be over a 40-year period: 1,078 new jobs . . . ; $40 million annually from payroll; $29.4 billion in output; $2 billion in federal and state corporate income taxes; $168 million in state severance taxes; and $9.5 million in mining claims payments and fees to local governments.").  The Economic Coalition's primary concern is that, as a result of the withdrawal, the region will not be able to reap the economic benefits of "becoming part of the second most important uranium-producing region in the United States."  *Id.* ¶ 157.  It is apparent Plaintiffs' real objective in this action is to protect their economic interests.

Quaterra vaguely asserts that its interests fall within NEPA's zone of interests because (1) it "has effectively reclaimed its drilling and mine sites to protect air and water quality and restore vegetation," and (2) its activities also "contributed to the knowledge of cultural and archeological resources since each drill site was inventoried before beginning work," *Id.* ¶20.  The Ninth Circuit recently rejected identical attempts

by mining companies to bring their economic interests within NEPA's zone of interests by pointing to their "commitment to environmental studies and mitigation activities." *Am. Indep. Mines & Minerals Co. v. U.S. Dep't of Agric.*, No. 11-35123, 2012 WL 3542264, at *2 (9th Cir. Aug. 17, 2012).  The Ninth Circuit held that "these activities . . . are undertaken only as part of the pursuit of American Mines' economic interest in mining in the Payette Forest.  These purely economic interests do not fall within NEPA's environmental zone of interests."  *Id.; see also Am. Indep. Mines & Minerals Co. v. U.S. Dep't of Agric.*, 733 F. Supp. 2d 1241, 1251, 1266 (D. Idaho 2010), *aff'd* No. 11-35123, 2012 WL 3542264 (9th Cir. Aug. 17, 2012) (holding that mining companies' "assert[ion] that their mining and resource development interests are completed 'in a fashion that minimizes and/or mitigates and remediates environmental impact' . . . only demonstrates the manner in which Plaintiffs operate their business and not whether [their] interests also align with the environmental interests protected by NEPA"); *City of Williams v. Dombeck*, No. 00CV66, 2000 WL 33675559, at *3 (D.D.C. Aug. 17, 2000) (rejecting claims that plan to "develop a model, environmentally-sustainable, gateway community" on the outskirts of Grand Canyon National Park creates a cognizable environmental interest under NEPA).

Likewise, the purported interest in the environment that the Economic Coalition asserts does not bring its economic interests within NEPA's zone of interests.  The Economic Coalition's members participated in the NEPA process to protect their economic interests, as is apparent from their very name (Arizona Utah Local *Economic* Coalition) and as they openly stated in the letters they submitted to the BLM: "We

openly acknowledge up front that our purpose for being involved in [the NEPA] process is to protect the economic potential for our counties and our region."   Ex.2 (May 5, 2010 Letter from Counties of Kane, Washington, San Juan and Mohave); *see also* Ex. 3 (May 24, 2011 Letter from Mohave County) ("Our interest in this issue is based on the detrimental economic impact a withdrawal will have on Arizona and surrounding states.").   In these letters, they argued that BLM underestimated economic impacts and overstated the environmental impacts of uranium mining.[10]

Now, Mohave County suddenly expresses concern about its air quality if, as a result of the withdrawal, it were forced to switch from nuclear power to coal-fired power plants.  Am. Compl. ¶¶ 25, 181.  It also now asserts an interest in the reduction of soil erosion and dust emissions resulting from paving of roads that it speculates would be funded as a result of the increased demand for access if the lands were not withdrawn, *id.* ¶¶ 27-30.  It does not appear that either Mohave County or the Economic Coalition or any of its other members expressed such environmental concerns during the NEPA process, and therefore cannot now invoke them to bring their economic interests within NEPA's zone of interests.  *See Am. Indep. Mines*, 733 F. Supp. 2d at 1266-67 (holding that where mining companies did not present argument regarding

---

[10] No matter how they try to spin their interests, at their core Plaintiffs challenge the withdrawal decision in an effort to allow *more* mining to occur in the withdrawn area, which is not an interest that is systematically aligned with NEPA's environmental interests. *See Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1237 (10th Cir. 2012) (holding that State and county, which alleged injury because the National Park Service "could have promulgated a rule allowing *more* snowmobiles into Grand Teton without adverse environmental effects," lacked standing because "NEPA does not protect against such an injury") (emphasis added).

21

sediment load impacts of road closure during NEPA comment period they were "foreclosed from raising the argument" in the district court to establish standing). Because it is apparent that their newfound interest in these environmental issues is nothing more than a pretext for advancing their economic interests, the Economic Coalition lacks prudential standing to bring the NEPA claims. *See Cal. Forestry Ass'n v. Thomas*, 936 F. Supp. 13, 22 (D.D.C. 1996) ("Plaintiffs' interest must be 'systematically, not fortuitously' or 'accidentally' aligned with those that 'Congress sought to protect.'") (quoting *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 924-25 (D.C. Cir. 1989)); *City of Williams*, 2000 WL 33675559 at *3 ("[Plaintiff] may not use ostensibly environmental concerns to mask its purely economic interests."); *Kanoa, Inc. v. Clinton*, 1 F. Supp. 2d 1088, 1093 (D. Haw. 1998) (requiring showing of "non-pretextual environmental injury"); *Am. Indep. Mines*, 733 F. Supp. 2d at 1266 ("Plaintiffs' attempts to articulate claims that are linked to the environment continue to be economic injuries in disguise.").  Moreover, as explained above, these alleged environmental injuries are entirely speculative and dependent upon the actions of third parties.  *See* pp. 11-13, *supra.*

Allowing either plaintiff to assert NEPA claims is more "likely to frustrate than to further [NEPA's] objectives." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 n.12 (1987).  For all these reasons, Plaintiffs' NEPA claims should be dismissed.

## CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that the Court dismiss the complaint for lack of a subject-matter jurisdiction.

1    Dated: September 5, 2012

2                                   Respectfully Submitted,

3
                                    IGNACIA S. MORENO,
4                                   Assistant Attorney General
                                    Environment and Natural Resources Division
5

6                                    /s/ John S. Most
                                    JOHN S. MOST, Trial Attorney
7                                   Virginia Bar, No. 27176
                                    DOMINIKA TARCZYNSKA, Trial Attorney
8                                   New York Bar, No. 4431573
                                    Natural Resources Section
9                                   P.O. Box 7611
                                    Washington, D.C. 20044-7611
10                                  (202) 305-0447(Tarczynska)
                                    202-616-3353 (Most)
11                                  202-305-0506 (fax)
                                    DOMINIKA.TARCZYNSKA@USDOJ.GOV
12                                  JOHN.MOST@USDOJ.GOV
13
                                    Counsel for Defendants
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23

1

## <u>CERTIFICATE OF SERVICE</u>

2

3        I hereby certify that I have caused the foregoing to be served upon counsel of
record through the Court's electronic service system (ECF/CM).

4

Dated:  September 5, 2012

5

6

7                                         */s/ John S. Most*
                                        *Counsel for Federal Defendants*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24

# RECORD OF DECISION

# NORTHERN ARIZONA WITHDRAWAL

**Mohave and Coconino Counties, Arizona**

**January 9, 2012**

# RECORD OF DECISION

# NORTHERN ARIZONA WITHDRAWAL

## Mohave and Coconino Counties

---  ERRATA  ---

# January 2012

Section VII contains a typographical error which incorrectly reports the acres the U.S. Forest Service (USFS) consented to withdrawing on the Kaibab National Forest in Northern Arizona as 134,454 acres.  The actual approximate acreage as documented in the Northern Arizona Proposed Withdrawal Final Environmental Impact Statement (Alternative B, October 2011, Table 2.7-1, page 2-31) and the USFS letter of consent dated January 6, 2012 is 355,874 acres. In all other respects the language of the Record of Decision is accurate.

JAN 1 1 2012

**RECORD OF DECISION**

**NORTHERN ARIZONA WITHDRAWAL**

**Mohave and Coconino Counties, Arizona**

# I.  SUMMARY

This document constitutes the Record of Decision (ROD) of the U.S. Department of the Interior (DOI) for the Northern Arizona Withdrawal. Pursuant to the authority granted to the Secretary of the Interior by section 204 of the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1714, this ROD documents the decision to select Alternative B identified in the Northern Arizona Proposed Withdrawal Final Environmental Impact Statement (EIS) and withdraw from location and entry under the Mining Law, subject to valid existing rights, approximately 1,006,545 acres of federal land in Northern Arizona for a 20-year period in order to protect the Grand Canyon Watershed from adverse effects of locatable mineral exploration and development. The withdrawal does not affect use, management, or disposition of the lands other than under the Mining Law of 1872, 30 U.S.C. §§ 22-54 (Mining Law).

The lands are located near Grand Canyon National Park in northern Arizona and consist of lands managed by the Bureau of Land Management (BLM) and the U.S. Forest Service (USFS).  They contain significant environmental and cultural resources as well as substantial uranium deposits. The USFS has consented to the withdrawal of the lands under its jurisdiction.

# II.   INTRODUCTION

President Theodore Roosevelt withdrew the North Kaibab Ranger District of the Kaibab National Forest from mineral location and entry when he first created the Grand Canyon Preserve in 1906. Tribal lands bordering the park became off limits to uranium development when the Grand Canyon Parashant and Vermilion Cliffs National Monuments were created and the lands were withdrawn from mineral entry.

Uranium ore deposits were discovered and mines were opened in northern Arizona in the 1940s and 1950s.  A price spike in uranium in the late 1970s triggered increased demand for exploration by mining companies.  In the 1980s, the U.S. Geological Survey began studying the uranium deposits of the area and produced maps.  These deposits consist of pipe-shaped breccia bodies generally no more than 300 feet in diameter that can extend 2,000 feet below the surface.  Copper production from breccia pipes dates back to the late 1800s.

Exploration activities resulted in six new uranium mines that together produced 1,471,942 tons of uranium during the late 1980s-early1990s.  Three of seven mines have been reclaimed.  The remaining four were put into "maintenance" or standby status in the early 1990s due to declining prices for uranium and economic considerations.

From the period of 1978 – 1992, over 900 exploration holes were completed on the USFS-managed Tusayan Ranger District.  One underground mine, the Canyon Mine, was proposed and approved on the District in the late 1980s in the same area.

Uranium is a mineral locatable under the Mining Law.  Historically, the number of claims located and interest in development of existing claims appear to relate to the price of uranium. In 2004, mining-related activities increased on BLM and USFS managed lands tracking another surge in uranium prices.  In 2007, the demand for uranium pushed the commodity price to over $130/lb before returning to the $40/lb range in 2009.  This price spike prompted new interest in the breccia pipe uranium deposits on federal lands to the north and south of Grand Canyon National Park, causing thousands of new mining claims to be located in the area.  In late 2007 and into 2008 mining-related activities slowed due to a downturn in uranium prices.  The price of uranium declined from $135 per pound to below $42 per pound in June 2007.  The price currently is at about $48 per pound.  The increase in new mining claim locations during the period of 2004 to 2008 generated public concern that uranium mining could adversely affect natural, cultural, and social resources in the Grand Canyon watershed, which includes resources in Grand Canyon National Park.  Over 10,000 mining claims had been located within the withdrawal area by 2009.

In response to the concern over potential environmental effects of uranium exploration and mining, a number of events occurred in 2008 and 2009 to bring attention to these lands and the potential for long term or permanent impacts to the Grand Canyon watershed.  Among those events was legislation introduced by Representative Raúl Grijalva (D-AZ) in March 2008 (H.R. 4483) to permanently withdraw over 1 million acres from location and entry under the Mining Law, as well as from mineral leasing, geothermal leasing, mineral material sales, and the public land laws.  The area proposed for legislative withdrawal includes federal lands north of Grand Canyon National Park administered by the Bureau of Land Management's (BLM) Arizona Strip Field Office and the USFS's North Kaibab Ranger District, and lands south of the Park in the Tusayan Ranger District administered by the USFS.  The legislative withdrawal was reintroduced as H.R. 644 on January 22, 2009, and again in March 2011 as H.R. 855.

On July 21, 2009, the Department of the Interior published notice of the Secretary of the Interior's proposed 20-year withdrawal under the authority of FLPMA.  The Secretary's proposed 20-year withdrawal covered essentially the same area (the "withdrawal area") as the proposed legislative withdrawal in H.R. 4483 and the subsequent bills; however, under the Secretary's proposal, the subject lands would only be withdrawn from location and entry under the Mining Law and would remain available for mineral leasing, geothermal leasing, and mineral materials sales and open to the public land laws generally.

Under section 204 of FLPMA, the July 21, 2009, publication of the *Federal Register* notice of the proposed withdrawal (Appendix A of the Environmental Impact Statement [EIS]) had the effect of segregating the lands involved for up to 2 years from the location and entry under the Mining Law, subject to valid existing rights, while the BLM evaluated the withdrawal application.  On June 21, 2011, the Department of the Interior published Public Land Order 7773, which effected a six-month emergency withdrawal of the withdrawal area.  The emergency withdrawal prevented the lands from opening to location and entry under the Mining Law upon expiration of the two-year segregation while the Department completed the decision-making process on the proposed withdrawal.  The emergency withdrawal became effective on July 21, 2011, and ends January 20, 2012.  The BLM, along with its cooperating agencies, has completed various studies and analyses of resources in the withdrawal area, including an environmental impact statement (EIS) under the National Environmental Policy Act of 1969, as amended 42 U.S.C. §§ 4321–4347 (NEPA).  These

studies and analyses provided the basis for the final decision regarding whether or not to proceed with the proposed withdrawal or to select an alternative action.

The EIS addresses the potential direct, indirect, and cumulative effects on the human environment of the proposed withdrawal and alternatives to the proposed withdrawal. The EIS also discloses any unavoidable adverse impacts, impacts to the long-term productivity of affected resources, and any irreversible or irretrievable commitments of resources that result from the proposed withdrawal or the alternatives to the proposed withdrawal, including the No Action Alternative.

## III.   AUTHORITY

Section 204 of FLPMA provides the Secretary of the Interior with the authority to make, modify, revoke and extend withdrawals, subject to valid existing rights (43 U.S.C. § 1714). Withdrawals can be used to remove lands from the operation of the public land laws generally, including the Mining Law. The Secretary of the Interior can withdraw lands under the jurisdiction of another agency, but only with the consent of that agency (43 U.S.C. § 1714(i)).

FLPMA also directs that lands under BLM jurisdiction are to be managed under principles of multiple-use and sustained yield unless another law provides otherwise (43 U.S.C. § 1732(a)). FLPMA defines multiple-use as "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values" (43 U.S.C. § 1702(c)). The USFS has a similar multiple-use mandate (16 U.S.C. § 529, 531). This grants BLM and the USFS substantial discretion to balance the competing uses on particular parcels of land; it does not require every use on every parcel.

## IV.   OVERVIEW OF THE WITHDRAWAL AREA

The withdrawal area in northwest Arizona is located adjacent to Grand Canyon National Park and consists of three parcels: the North Parcel, with approximately 549,995 acres; the East Parcel, with approximately 134,454 acres; and the South Parcel, with approximately 322,096 acres. The North and East parcels are both north of the Park, while the South Parcel is south of the Park. The withdrawal will have no effect on mine development of any non-federal lands within its exterior boundaries. However, they are included within the boundary of the withdrawal in the event that they are acquired by the federal government sometime in the future, at which point the lands would become subject to the withdrawal.

Approximately 982,552 acres within the boundaries of the withdrawal are managed by the BLM or the USFS. The remaining 23,993 acres are split estate lands where the surface is non-federal but the locatable minerals are owned by the federal government. The withdrawal will withdraw all lands from location and entry under the Mining Law, subject to valid existing rights, regardless of surface ownership. This means that no new mining claims can be established to develop the locatable minerals in those lands or interests in lands. The withdrawal will not limit development of non-federal mineral estate or federal leasable or salable minerals (e.g., oil and gas leasing, sand and gravel permits), which are not subject to appropriation under the Mining Law.

Crafted by the immense power of the Colorado River, the Grand Canyon and the greater ecosystem that surrounds it have long been recognized as one of the Nation's most treasured landscapes. This area is known as a home or sacred place of origin to many Native Americans,

including the Havasupai, Hualapai, Navajo, Hopi, Zuni, Southern Paiute, and others, and its cultural significance goes back thousands of years.  Although first afforded federal protection in 1893 as a Forest Reserve and later as a National Monument, the Grand Canyon achieved National Park status in 1919, three years after the creation of the National Park Service (NPS).  The Park is a world heritage site and an international icon.  The Grand Canyon National Park is dominated by the Grand Canyon, a twisting, 1-mile deep, 277-mile-long gorge formed during some 6 million years of geological activity and erosion by the Colorado River on the upraised earth's crust.  The river divides the Park into the North and South rims, which overlook the approximately 10-mile-wide canyon.  The Park encompasses 1,217,403.32 acres and in 2010 received 4,388,389 visitors.  The Park is closed to location and entry under the Mining Law.

The three withdrawal parcels are located within the Colorado Plateau, which is characterized by highlands to the north and lowlands to the south and west.  The three withdrawal parcels contain many of the unique geographical features that characterize the Colorado Plateau, such as river narrows, natural bridges, and slot canyons.  The three withdrawal parcels contain a variety of plant life, from desert-type vegetation in the low-lying rocky areas to forests of ponderosa pine (*Pinus ponderosa*), Douglas fir (*Pseudotsugamenziesii*) and aspen (*Populus*sp.) in the higher elevations.

The Grand Canyon and the greater ecosystem surrounding it is a cornerstone of the region's economy with hunting, fishing, tourism, and other outdoor recreation generating billions of dollars in economic activity in the area.  Millions of people living in seven states in the U.S. and in Mexico depend upon the Colorado River for water for drinking, irrigation, and industrial use, as well as for hydropower.  The National Forest System lands in the area are located in the Kaibab National Forest, including lands on the Tusayan Ranger District and on the North Kaibab Ranger District.  These lands are set aside for public recreation and a habitat for birds and animals.

Mineral resources, particularly high-grade uranium, are found in this area.  Uranium mineralization was first discovered in the breccia pipes of northern Arizona in 1947.  The uranium occurred in association with copper mineralization at the Orphan mine 2 miles west of the visitor center on the South Rim of the Grand Canyon (not within the withdrawal area).  The first uranium ore was shipped by the Golden Crown Mining Company in 1956 to a buying station in Tuba City, Arizona.  Before closing in 1969, the Orphan operation produced a reported total of 2,200 tons of processed uranium ($U_3O_8$).

Since the discovery of uranium in the Orphan Mine, extensive fieldwork has been conducted by government and private concerns to define the spatial extent of the breccia pipes in northern Arizona.  The recognition of a relationship between uranium and copper mineralization sparked an investigation of several small copper deposits in the area.  Uranium was identified in the Hack Canyon copper mine on the Arizona Strip in the 1950s.  From the 1950s through the 1990s, 10 breccia pipes were developed or mined for uranium ore within the withdrawal area.  Until the 1980s, the only mine producing uranium within the withdrawal area was the original Hack Canyon Mine, which had ceased production in 1964.  Additional pipes were discovered in Hack Canyon in the 1970s, and production from these breccia pipes began in 1981.  As the price of uranium went up in the late 1970s and 1980s, along with the demand for uranium products, exploration for uranium increased dramatically.  Exploration uncovered six other breccia pipes with minable uranium ore during the early and mid-1980s, and production from these mines began with the Pigeon mine in 1984.  By the end of 1990, collapse of the Soviet Union and decommissioning of large numbers of nuclear warheads made huge stockpiles of material available for use in nuclear electrical production.  The subsequent plunge in uranium prices resulted in the cessation of all uranium production from the withdrawal area.  Six breccia pipes, accessed from three mines, were

considered mined out and were closed or reclaimed (the four Hack Complex pipes, Pigeon, and Hermit) and four mines were placed in interim management until prices recovered.

In 2010 U.S. Geological Survey (USGS) was directed by the Secretary to develop the scientific basis for analysis in the Northern Arizona Proposed Withdrawal EIS. As a consequence, it developed Scientific Investigation Report 2010-5025 to characterize breccia pipe uranium ore and mining in Northern Arizona. That study estimates the undiscovered uranium endowment within the three withdrawal parcels, which was estimated to be 162,964 tons of $U_3O_8$ (about 326 million pounds). The endowment, as defined by USGS, included ore concentrations as low as 0.01%, which is lower than would be economical to mine. The Reasonably Foreseeable Development (RFD) scenarios developed for the Northern Arizona Proposed Withdrawal EIS estimated the quantity of uranium that could be mined economically to be 39,664 tons of $U_3O_8$ (79,328,000 pounds).

With the passage of FLPMA in 1976, the BLM was directed to conduct inventories for areas meeting the characteristics of wilderness as defined in the Wilderness Act of 1964. Several areas were determined to have those characteristics within what is now the proposed withdrawal area and, as a consequence, were designated as Wilderness Study Areas. The Arizona Wilderness Act of 1984 was an historic piece of legislation negotiated by a coalition of interests including representatives of environmental groups, uranium mining interests, the livestock industry, and others. That Act, specifically Title III, designated wilderness areas within the Arizona Strip, including Kanab Creek Wilderness, Mount Logan Wilderness, Mount Trumbull Wilderness, Paria Canyon–Vermilion Cliffs Wilderness, and Saddle Mountain Wilderness. The Act "release[d] certain lands not designated as wilderness for such management as is determined appropriate through the land management planning process of the administering agency." Areas previously designated as Wilderness Study Areas, including any within the withdrawal area, that were not designated by Congress as Wilderness in the act, were "released" from that designation and protections for maintaining wilderness characteristics were removed. The Act designated Wilderness in furtherance of the purposes of the Wilderness Act of 1964. The legislation recognized the uranium resource in the region and the Congressional Record notes that the boundary of one Wilderness area was adjusted to accommodate development of a uranium mine.

There are four mines within the withdrawal area that have approved plans of operations that predate the Secretary's withdrawal proposal. The Pinenut, Kanab North, and Canyon mines were approved in the late 1980s and are operating under the interim management plans contained in their approved mining plans of operation, but are not currently producing uranium ore. The Kanab North mine has been largely mined out and only a very small amount of ore remains. It is now being prepared for reclamation. The Pinenut mine was partially mined and is moving towards active mining and could be in production in the near future. The Canyon Mine was just being developed when uranium prices plummeted in the late 1980s, and though it has only about 50 feet of shaft, is being prepared for further development. The Arizona 1 mine has been operating since late 2009 and is expected to be mined out within the next year.

As of December 11, 2011, the withdrawal area contains 3,156 mining claims that predate the publication of the Notice of Proposed Withdrawal on July 21, 2009. Withdrawals under section 204 of FLPMA must be made subject to valid existing rights, which means that new mineral exploration and development could still be authorized under the withdrawal on valid existing mining claims. The RFD scenarios developed for the EIS indicate that potentially 11 mines could develop with a full withdrawal, including the four mines currently approved, as opposed to 30 mines (including the four mines currently approved) with no withdrawal. On withdrawn lands, neither the BLM nor the USFS will process a new notice or plan of operations until the surface managing agency conducts a mineral examination and determines that the mining claims

on which the surface disturbance would occur were valid as of the date the lands were segregated or withdrawn. Determining the validity of a mining claim is a complex and time-consuming legal, geological, and economic evaluation that is done on a claim-by-claim basis. For a mining claim to be valid, the claimant must make an actual physical exposure of the mineral deposit within the claim boundaries. For the mining claims containing breccia pipe deposits, unless erosion has exposed mineralization in a canyon, this would probably require exploratory drilling and sampling. The mining claim or site would need to have been valid as of the date of segregation, July 21, 2009, and have been maintained until the time of the mineral examination.

There are 26 confirmed breccia pipes within the withdrawal area known to have some level of mineralization. Of these, seven have been confirmed to have uranium resources, and those uranium resources have been estimated. It was assumed for purposes of determining the impacts of withdrawing the lands from the Mining Law that any mining claim containing these seven breccia pipes would be able to demonstrate valid existing rights and would be mined. Based on this reasonably foreseeable development, the analysis in the EIS assumes that there will still be mining activities in the withdrawal area under all alternatives, including the Preferred Alternative, which could result in impacts to the resources discussed below. However, mining activities would be limited with implementation of this withdrawal, since mining claims that do not constitute valid existing rights would not be developed and no new mining claims could be located.

## V.    DECISION

**Department of the Interior:** It is the decision of the Department of the Interior to select Alternative B as described in the EIS and withdraw from location and entry under the Mining Law, subject to valid existing rights, approximately 1,006,545 acres of federal land in Northern Arizona, as depicted on Map 1, for a 20-year period. A complete legal description of the withdrawal is contained in the Public Land Order. The withdrawal only affects the disposition of lands and locatable minerals under the Mining Law, subject to valid existing rights, and does not restrict the disposition, use, or management of the lands for any minerals subject to disposition by lease or sale. It also does not affect disposition, use, or management of the lands other than under the Mining Law, including access to and across the lands. In addition, the withdrawal does not apply to private mineral estate, although the withdrawal will remove from the operation of the Mining Law any lands or interests in lands within the outside boundaries of the withdrawal acquired in the future by the United States as long as the withdrawal is in effect. On Federal lands, exploration and mining would be subject to Federal surface management regulations and other applicable State and Federal laws. The USFS has consented to the withdrawal of land under its administration that is subject to this decision.

**Map 1**



# VI.   RATIONALE FOR THE DECISION

### Summary

Based on the analysis in the Northern Arizona Proposed Withdrawal EIS, the Department of the Interior has decided that, in accordance with the preferred alternative, a withdrawal of 1,006,545 acres from location and entry under the Mining Law, subject to valid existing rights, is warranted. Several key factors were considered in making this decision.  In particular, the USGS report (SIR 2010-5025) included in the EIS acknowledged uncertainty due to limited data.  The potential impacts estimated in the EIS due to the uncertainties of subsurface water movement, radionuclide migration, and biological toxicological pathways result in low probability of impacts, but potential high risk.  The EIS indicates that the likelihood of a serious impact may be low, but should such an event occur, significant.  A twenty-year withdrawal will allow for additional data to be gathered and more thorough investigation of groundwater flow paths, travel times, and radionuclide contributions from mining as recommended by USGS.  Millions of people living in seven states depend on the Colorado River for drinking, irrigation, industrial use.  Second, it is likely that the potential impacts to tribal resources could not be mitigated.  Any mining within the sacred and traditional places of tribal peoples may degrade the values of those lands to the tribes that use them.  Third, the RFD projected that potentially eleven mines, including the four mines currently approved, could proceed under a withdrawal of the 1,006,545 acres.  This pace of development for the next twenty years is roughly equivalent to the pace of development that occurred during the peak of uranium interest in the 1980s when ten breccia pipes were developed and six were mined out.  Thus, development of the uranium resource will continue even if all of the lands in the proposal are withdrawn.  And finally, the set of circumstances and the unique resources located in this area support a cautious and careful approach.  It is for these reasons that a decision is being made to withdraw 1,006,545 acres.

## 1.   USGS Analyses and Water Resources

The USGS developed the Scientific Investigative Report 2010-5025 prior to preparation of the Draft EIS, which incorporates that Report by reference.  As part of its evaluation, the USGS analyzed soil and sediment samples at six sites that experienced various levels of uranium mining in the Kanab Creek area north of Grand Canyon National Park, including mined and reclaimed sites, 3 approved mined sites where operations have been temporarily suspended, and exploratory drill sites that were drilled but not mined. Uranium and arsenic were two elements consistently detected in the areas disturbed by mining in quantities above natural background levels.  Samples from 15 springs and five wells in the region contained dissolved uranium concentrations greater than the U.S. Environmental Protection Agency maximum allowed contaminant for drinking water.  The springs and wells sampled are close by or in direct contact with mineralized ore bodies, and the concentrations detected are related to natural processes, mining, or both.  The USGS also looked at surface water in the region.  The report found that floods, flash floods, and debris flows caused by winter storms and intense summer thunderstorms occur in the region and can transport substantial volumes of trace elements and radionuclides.  The USGS report notes that fractures, faults, sinkholes, and breccia pipes occur throughout the area and are potential pathways for downward migration of surface water and groundwater.

The USGS report acknowledges uncertainty as data is sparse in this region and often limited[1]. The timing and location of water quality information in the area is important because the potential effects of breccia pipe uranium mining may be localized and appear rapidly or may be more dispersed during longer time scales. The data evaluated for 1,014 water samples from 428 sites indicate that about 70 sites have exceeded the primary or secondary maximum contaminant levels for certain major ions and trace elements, such as arsenic, iron, lead, manganese, radium, sulfate, and uranium. The USGS concluded that a more thorough investigation is required to better understand groundwater flow paths, travel times, and contributions from mining.

The most prominent example of the uncertainty of impacts is with respect to how mining might affect perched aquifers. The EIS acknowledged that "… change in the quantity or chemical quality of the discharge from perched aquifer springs cannot be projected with the data available." For that reason, the EIS assumed that "… any mine located within the groundwater drainage area calculated for a spring might cause an impact ranging from none to major to that spring." A similar effect was projected for wells which are dependent on perched aquifers. Although the probability of any impact to springs ranged from 0% (in the South and East Parcels with full withdrawal) to 13.3%, (in the North Parcel with no withdrawal) the risk of those impacts to animal or human users of the water is unacceptable.

Uncertainty also affects the potential impacts to deep aquifer springs. Because the potential for migration of mine released radionuclides is unknown, the EIS assumes a relatively high concentration of potential discharge from mines to the R-aquifer. The R-aquifer is the principal aquifer in the area and includes the carbonate rocks of the Redwall Limestone, Muav Limestone, and Temple Butte Formation. Although, using this assumption, no R-aquifer spring would exceed Environmental Protection Agency minimum concentrations for drinking water, increases in radionuclides could occur.

The uncertainties of effects to water quantity and quality, also leads to uncertainties of effects to animals and humans. The effects of exposure of native plants and animals to increased levels of radionuclides are unknown. Some research has been performed, but Hinck noted in the 2010 USGS study that "… chemical and radiation effects thresholds for radionuclides are consistently limited to only a few species for most biological receptors, and limited data are available for wildlife species (Hinck et al. 2010). During the USGS study (Hinck et al. 2010), minimal chemical toxicity data were available for microbes, aquatic vascular plants, terrestrial invertebrates, and amphibians, and no data were found for reptiles, birds, or mammalian wildlife. Toxicity data are most abundant, but still limited, for aquatic invertebrates, fish, and laboratory test mammals." The potential effects of increased radionuclides in wildlife, livestock, or humans would be unacceptable.

---

[1] Although the USGS report, the EIS, and this ROD acknowledge uncertainty with respect to water quality and quantity as explained below, information that would help resolve that uncertainty is not "essential to making a reasoned choice among alternatives" (see 40 C.F.R. § 1502.22) since, as explained in the preceding paragraph, there is data regarding dissolved uranium concentrations near six previously-mined sites to inform a reasoned choice, and the EIS used reasonable conservative assumptions to estimate impacts as a method of addressing such unknowns. Although obtaining additional data to address the uncertainty regarding impacts on water quantity and quality is not essential to a reasoned choice, such data, particularly data collected on a site-specific basis as mines are developed, will nevertheless be helpful for future decisionmaking in the area.

### 2. Cultural and Tribal Resources

Although there is only one eligible traditional cultural property (Red Butte on the South Parcel) the entire area is recognized as the traditional homeland and use area for seven tribes. Many of these tribes include the Grand Canyon in their creation stories, and all continue to use all or portions of the withdrawal area for traditional tribal purposes. All seven tribes, the Havasupai Tribe, Hualapai Tribe, Hopi Tribe, Navajo Nation, Kaibab Band of Paiutes, the Paiute Indian Tribe of Utah, and the Zuni Tribe, uniformly believe that continued uranium mining will result in the loss of their functional use of the area's natural resources.

### 3. Other Resources

Many of the roads within the withdrawal area are unpaved. The volume of truck traffic expected without a withdrawal could create a major cumulative effect to visual resources resulting from dust emissions of vehicle passage. The withdrawal would likely reduce truck traffic by 98% for exploration, 63% at mines, and 67% related to ore transport.

As a result of projected surface and groundwater effects, wildlife may be impacted. These impacts may result in mortality of aquatic-dependent species such as aquatic plants, algae, benthic invertebrates, amphibians, fish, and other wildlife dependent on these rare surface water resources. Mining activity can result in changes to these habitats that may increase exposure of the biological resources to chemical elements, including uranium, radium, and other radioactive decay products. As discussed by the USGS (Hinck et al. 2010), uranium and other radionuclides can be transported through the environment and contribute to exposure of biological receptors via atmospheric deposition, dust, runoff, erosion and deposition, groundwater and surface water, and the food chain. As a result, biological receptors can be exposed to radionuclides through various pathways, including ingestion, inhalation, cell membrane–mediated uptake, cutaneous absorption, and biotic uptake/trophic transfer. The use of subterranean habitats (e.g., burrows), by birds, reptiles and mammals in uranium-rich areas or reclaimed mining areas, is of particular concern. These species spend a considerable amount of time in subterranean habitats, where individuals could potentially inhale, ingest, or be directly exposed to uranium and other radionuclides. The further identification of biological pathways of exposure and the compilation of the chemical and radiological hazards for these radionuclides are important for understanding potential effects of uranium mining on the northern Arizona ecosystem.

### 4. Continued Mining

Withdrawal of the entire withdrawal area will not result in cessation of uranium mining. Four mines are currently approved within the withdrawal. In addition, the RFD scenario in the EIS indicates that seven other breccia pipes could be developed if they are located within the boundaries of mining claims which are determined to have valid existing rights. Assuming these pipes were to be developed over the next 20 years, the total number of mines developed would be similar to the pace of development in the 1980s when the price of uranium was high and the region experienced a surge in mining interest. Consequently, even with a full withdrawal, the economic benefits of continued uranium mining could still be realized by local communities. While the lands are withdrawn, studies can be initiated to help shed light on many of the uncertainties identified by USGS in SIR 2010-5025 and by BLM in the EIS.

The withdrawal area is located in the Grand Canyon watershed and its environs and adjacent to the Grand Canyon National Park. As this area contains unique landscapes, is a sacred place for

11

numerous tribes, and receives visitors from all over the world, it is appropriate to tread carefully. Millions of people living in seven states depend on the Colorado River for drinking water, irrigation use, and industrial use. Unlike the Mineral Leasing Act, which provides the Secretary with discretionary authority to lease oil, gas, and other minerals, the Mining Law operates under principles of self-initiation by the miners themselves. Thus, on lands that are "open" to the Mining Law, individuals can locate new mining claims and sites without seeking prior approval from the Secretary. These mining claims and sites may become vested property interests if the claimant complies with the requirements in the Mining Law for validity. A withdrawal prevents new mining claims and sites from being located and property rights from being established. Withdrawals under FLPMA are made subject to valid existing rights, which means that mining activities in withdrawan areas may still be authorized, provided the mining claim or site is valid.

### 5. Conclusion

In sum, the RFD projects a greater increase in uranium mining activity over the next twenty years if these lands remain open to location and entry under the Mining Law. Even if all of the lands are withdrawn, such as under the preferred alternative, potentially 11 mines, including the 4 mines currently approved, are projected to be developed over the next 20 years—with as many as six operating at any given time. The EIS states that impacts are possible from uranium mining in the area, including, in particular, impacts to water resources. It also expresses uncertainty with respect to hydrology and groundwater flow in the area as well as the potential effects of increased radionuclides to plants and animals.

Given these factors, a withdrawal is the most appropriate option to influence the pace of reasonably foreseeable hardrock mining, particularly uranium, in this area to not only ensure protection of water resources, but also to ensure sustainable, long term uranium development. As development moves forward on previously-approved mines and mining claims with valid existing rights, the impacts associated with uranium mining on the Grand Canyon watershed will continue to be monitored and studied. Based on any such monitoring and study, it may well be that these lands or a portion thereof will be appropriate for re-opening to the Mining Law at some point in the future. This decision slows the pace of hardrock mineral development in a sensitive area and preserves the remaining uranium deposits in that area for possible future development.

## VII. USDA CONSIDERATIONS

### Consent by the Department of Agriculture

The Department of Agriculture consents to the withdrawal of approximately 134,454 acres of Kaibab National Forest lands in northern Arizona from location and entry under the Mining Law, subject to valid existing rights. A withdrawal is appropriate to help protect the natural, cultural, and social resources in the Grand Canyon watershed from the adverse effects of the locatable mineral exploration and development.

### Kaibab National Forest Land Management Plan

Withdrawal decisions are outside the authority of National Forest Planning, so no plan amendment is required. Any development on existing mining claims that can prove valid existing rights will follow the same standards and guidelines identified in applicable Forest Plans.

## VIII. CONSISTENCY WITH ARIZONA FIELD OFFICE RESOUCE MANAGEMENT PLAN (RMP)

The withdrawal decision is consistent with the Arizona Strip Field Office RMP decision DFC-MI-05 which states "Allow the ASFO to remain open to mineral leasing, location and sale except where restricted by wilderness designation, withdrawals or specific areas identified in this RMP."

Decision LA-MI-03 is changed through plan maintenance under 43 CFR 1610.5-4 to update acreages open or withdrawn to mineral entry.

## IX. PRACTICABLE MEANS TO AVOID OR MINIMIZE ENVIRONMENTAL HARM

The withdrawal does not result in environmental harm, and is, itself, a practicable means to minimize or avoid such harm.  For this reason, no additional means have been adopted for this action.

## X. OVERVIEW OF THE ALTERNATIVES

The following alternatives were analyzed in the Northern Arizona Proposed Withdrawal Final EIS:

### Alternative A:  No Action
The proposed withdrawal would not be implemented and the proposed withdrawal area would remain open to location and entry under the Mining Law.  New mining claims could be located, and exploration and mine development proposals would continue to be processed by the BLM or the USFS.  This alternative serves as the baseline for measuring the impacts of the other action alternatives and reflects the management situation for all federal land within the withdrawal area at the time that the withdrawal proposal was published in the Federal Register.

### Alternative B:  Proposed Action (Preferred Alternative)
The proposed withdrawal would be implemented and the entire 1,006,545 acres of federal locatable mineral estate within the three parcels would be withdrawn for 20 years from the operation of the Mining Law, subject to valid existing rights.  On mining claims where valid existing rights are determined to exist, authorizations for new exploration and mining activities would continue to be processed by the BLM or the USFS.

### Alternative C:  Partial Withdrawal
Under this alternative, 648,802 acres of federal lands within the three parcels would be withdrawn for 20 years from the operation of the Mining Law, subject to valid existing rights.  This alternative would withdraw a large proportion of those areas, identified by analysis, having concentrations of cultural, hydrologic, recreational, visual, and biological resources that could be adversely affected by locatable mineral exploration and development.  Alternative C would leave the remaining portion of the proposed withdrawal area with isolated or lower concentrations of these resources open to the operation of the Mining Law.  The mitigation of potential effects from exploration or development would continue under the applicable surface managing agency regulations.

### Alternative D:  Partial Withdrawal

Under this alternative, 292,086 acres of federal lands within the three parcels would be withdrawn for 20 years from the operation of the Mining Law, subject to valid existing rights. This alternative would withdraw areas, identified by analysis, where there is a relatively high concentration of cultural, hydrologic, recreational, visual, and biological resources that could be adversely affected by locatable mineral exploration and development. Alternative D would leave the remaining portion of the proposed withdrawal area with isolated or relatively low concentrations of these resources open to the operation of the Mining Law. The mitigation of potential effects from exploration or development would continue under the applicable surface managing agency regulations.

**Environmentally Preferable Alternative**

An Environmentally Preferable Alternative is judged using the criteria in the NEPA and subsequent guidance by the Council on Environmental Quality (CEQ), 1981. The CEQ has defined the environmentally preferable alternative as the alternative that will promote the National policy as expressed in Section 101 of NEPA. This section lists six broad policy goals for all federal plans, programs, and policies as follows:

- Fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
- Assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings;
- Attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;
- Preserve important historic, cultural, and natural aspects of our National heritage, and maintain, whenever possible, an environment which supports diversity and variety of individual choice;
- Achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and
- Enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

Based on these criteria, identification of the most environmentally preferable alternative involves a balancing of current and potential resource uses with that of resource protection, and the Preferred Alternative best fulfills that role. Therefore, the Preferred Alternative best meets the definition of the environmentally preferable alternative as it minimizes impacts through providing the greatest reduction in the potential impacts of hardrock mining to the environment.

**Alternatives Considered But Eliminated From Detailed Analysis**

***Change in Duration of Withdrawal***
An alternative was initially considered to change the time frame of the proposed withdrawal from 20 years to 10 years, or even to 5 years. However, it was determined a shorter term withdrawal does not warrant evaluation as a separate alternative because withdrawals can be renewed by the Secretary of the Interior, provided that the underlying reason for the withdrawal is still valid. Therefore, an alternative that consisted solely of changing the duration of the proposed withdrawal was eliminated from further detailed analysis.

***Withdraw Only Lands with Low Mineral Potential***
It was suggested early in scoping that a partial withdrawal of only the lands with low mineral resource potential be considered for withdrawal. Such an alternative was suggested as a possible

means to leave the high-potential lands available for mineral development, with a withdrawal to remove other lands with high nonmineral natural resource values from location and entry under the Mining Law. This alternative was eliminated from detailed analysis for several reasons. All the lands in the proposed withdrawal area are rated as having a high potential for uranium resources, lying within what USGS terms Favorable Area A (USGS 2010b). While certain specific areas within the proposed withdrawal area have attracted greater industry interest than others (the North and South parcels in particular), all of the lands involved in the proposed withdrawal are considered to be lands with some of the highest uranium potential in the country. Another factor affecting the feasibility of this alternative is that much of the uranium exploration and development activity to date tends to coincide with many of the areas that have the highest concentration of nonmineral resource values. This is evident when comparing the active and existing mines shown on the figures in this chapter with the areas depicted as having high concentrations of nonmineral resources. This coincidence suggests that mineral potential, or mineral development interest, would not be a useful discriminating factor in designing a partial withdrawal alternative that would meet the purpose of and need for action.

### No Withdrawal—Phased Mine Development

This alternative was considered as a way to limit the level of exploration and development activity in place of a withdrawal. Under this alternative, potential impacts to resources in the Grand Canyon watershed would be protected by limiting mineral development to certain areas at certain times, with a limited amount of mineral exploration and development activity occurring at any one time. This "phased development" alternative was eliminated from detailed analysis because it does not address the relevant aspect of the mining issue—the location of the activity—and the effects from specific individual mines on area resources. The RFD scenarios described in Appendix B do not indicate the likelihood of multiple mines overlapping in time or location and creating such extensive cumulative impacts that phased development would be a particularly useful mitigation approach. The alternatives that prohibit mining in areas with sensitive resources under one of the withdrawal alternatives address more directly the issue of impacts from the development of multiple mines. Therefore, the phased mine development alternative, as a separate alternative, was eliminated from further analysis.

### Permanent Withdrawal

During scoping, it was suggested that a permanent withdrawal be implemented instead of the proposed withdrawal for 20 years. The rationale for this is that if Grand Canyon resources require protection from the potential adverse effects of mining that protection should be for longer than 20 years.

This alternative was considered but eliminated from detailed analysis. Because a permanent withdrawal would require congressional action, the Secretary does not have the ability to implement a withdrawal for more than 20 years for areas aggregating more than 5,000 acres (FLPMA Section 204(c)).

### Change the Mining Law

Many comments received in response to the Notice of Proposed Withdrawal and during scoping suggested that reforming or changing the Mining Law would address potential environmental impacts to the Grand Canyon watershed from development of locatable minerals. While the Mining Law is fundamentally a law for acquiring property rights, rather than an environmental law, presumably the comments were directed at increasing agency discretion to prevent mining. Making or amending law is an explicit function of the Congress, and proposals to change the Mining Law are currently under consideration before Congress. As such, it has been eliminated from detailed analysis.

*New Mining Regulations*

During scoping, it was suggested by members of the public and the Resource Advisory Council that instead of the withdrawal, the BLM and USFS should consider new locatable mineral exploration and development requirements, along with certain program initiatives, to protect the resources in the Grand Canyon watershed from the potential adverse effects of uranium exploration and development. During alternative formulation, the interagency team identified a number of potential new requirements for uranium exploration and development within the area proposed for withdrawal. Such requirements included processing and review requirements specific to notices and plans of operation, as well as regional monitoring programs, remediation efforts, targeted research initiatives, and coordinated interagency oversight, including the following:

- The BLM and USFS would require a plan of operations for all activity exceeding casual use in the area. Surface disturbance exceeding casual use, including exploratory drilling, could not be conducted under a notice but would require a plan of operations and be subject to NEPA analysis and the opportunity for public comment.
- The BLM and USFS would not approve a plan of operations in which the environmental analysis determines that substantial irreparable harm would occur to significant natural or cultural resources in the Grand Canyon watershed that could not be effectively mitigated. This requirement would be used where the plan of operations was considered unreasonable because it posed a substantial risk of causing impacts that would result in the permanent loss of significant values and irreplaceable resources that could not be mitigated using available technology.
- Before approving a plan of operations, the BLM or USFS would consult with the NPS on the operating and reclamation standards needed to prevent the impairment of Grand Canyon National Park System resources. Such measures would be incorporated into the BLM or USFS decision as conditions of approval when determined necessary to protect National Park System resources.
- The BLM and USFS would assess civil penalties, when necessary, in order to enforce their respective operating requirements.
- A compensatory off-site mitigation program would be established that could be used for regional mitigation at legacy uranium mine sites that require cleanup, or for responding to unanticipated events or conditions at mine operations that are found to be adversely affecting natural, cultural, or social resources in the Grand Canyon watershed.
- A cost recovery program would be used to fund federal agency monitoring and compliance activities determined necessary to oversee individual mining operations.
- The BLM and USFS would undertake an initiative, in conjunction with other federal and state agencies, to establish regional programs to monitor wildlife indicator species for effects resulting from uranium mining.
- The BLM and USFS would undertake an initiative, in conjunction with other federal and state agencies, to establish regional programs to identify, characterize, and monitor area groundwater and spring conditions for effects associated with uranium mining.
- The BLM and USFS would undertake an initiative, in conjunction with other federal agencies and tribal governments, to establish regional programs to identify and monitor other natural and cultural resources for effects associated with uranium mining.
- The BLM and USFS would establish a standing regional interagency workgroup to advise the federal land managing agencies on monitoring, research needs, and operating and reclamation performance standards.

Most of the requirements described above would require changing the BLM and USFS surface management regulations at 43 CFR 3809 and 36 CFR 228A, respectively, in order to be implemented.  The rulemaking process is a public process that can be lengthy, and the final outcome is not certain until a final rule is published.  Because any new regulations would depend on the outcome of some future regulatory process yet to be initiated, and its ability to be implemented is speculative, a separate alternative considering such measures and their effectiveness was eliminated from detailed analysis.

# XI.  PUBLIC INVOLVEMENT

Scoping

The scoping process used for the withdrawal EIS was initiated by publication of a Notice of Intent in the *Federal Register* on August 26, 2009.  The formal period for submitting scoping comments was from August 26, 2009, through October 30, 2009, although scoping does not end until the EIS is completed.

BLM hosted two public meetings, one in Fredonia, Arizona, and one in Flagstaff, Arizona, in September and October 2009, respectively.

Draft Environmental Impact Statement

The Draft EIS was released to the public for a 45-day review and comment period on February 18, 2011. The review period was initiated by a Notice of Availability (NOA) published in the *Federal Register* by the Environmental Protection Agency, and announced by NOA published in the *Federal Register* by BLM on that date.  The comment period was later extended 45 days, to total 75 days, concluding on May 4, 2011.

During the public comment period, four public meetings were held during the week of March 7 to 11, 2011.  Meetings were held in Phoenix, Arizona; Flagstaff, Arizona; Fredonia, Arizona; and Salt Lake City, Utah.  In addition, community meetings were held for tribes in Moccasin, Arizona, (Kaibab band of Paiute); Peach Springs, Arizona (Hualapai Tribe); and Cameron, Arizona (Western Navajo Nation).

Over the course of the public comment period, 296,339 comment submittals were received, approximately 1,400 of which included individual substantive comments.

Final Environmental Impact Statement

The Final EIS was released to the public on October 28, 2011.  A Notice of Availability (NOA) was published in the *Federal Register* by BLM on October 27 and by the Environmental Protection Agency on October 28, 2011.  The Final EIS includes responses to comments consistent with 40 CFR 1503.4 and guidance in BLM Handbook 1790-1, section 6.9.2.1.  Changes to the Draft EIS for the Final included:

- Identification of the Proposed Action as the Preferred Alternative;
- An adjustment to the boundary of the North Parcel to exclude the Kanab Creek Wilderness Area, which is already withdrawn by Congress;
- An adjustment to the boundary of the North Parcel that corrected a mapping error discovered in the Draft, aligning the boundary along the Grand Canyon Game Preserve boundary.

- An adjustment to the South Parcel Boundary excluding 40 acres within the Navajo Nation that was erroneously included;
- Boundary adjustments noted above resulted in adjustments to Alternative acreages.
- Detailed legal descriptions of the withdrawal alternatives by Parcel included in an appendix;
- Numerous edits to improve the clarity and consistency of the analysis; and
- A refined economic analysis.

# XII.   ADDITIONAL INFORMATION

Although public comment was not sought, after release of the Final EIS and prior to publication of this Record of Decision, BLM received several hundred form letters and postcards supporting the withdrawal in the Preferred Alternative.  In addition, two letters that contained substantive comments were received from industry representatives.  The letters received during the review period were considered in making the decision on the withdrawal, and following are responses to substantive comments submitted.

One of the comments received stated that multiple commenters during the public comment period provided "…new information regarding the mineable uranium endowment of the withdrawal area that is about five to six times greater than what the BLM reported in the DEIS, new information regarding blind breccia pipes and their additional contribution to the uranium endowment of the withdrawal area above that previously expected by federal agencies…"   BLM determined that this comment did not warrant any additional analysis or changes to the Final EIS, which had already considered this point and noted that:

> While the commenter provided a statistical correlation of known mineralized breccia pipes to underlying geologic structures, no geologic explanation or new information was provided to justify the hypothesis that mineralized breccia pipes occur preferentially on the proposed withdrawal lands.
>
> The USGS Report is a peer-reviewed publication that provided the estimated uranium endowment for the proposed withdrawal area.  While some commenters have presented alternate or supplemental approaches to assessing the uranium endowment from that provided by USGS, these alternate approaches have not been developed or peer reviewed to the extent that they can replace or supersede the USGS endowment assessment presented in SIR 2010-5025.  As with many scientific fields, new information is constantly being collected which leads to new or refined conclusions.  However, at present, the USGS Report contains the best credible information available regarding the uranium endowment estimate and was therefore used as the basis for the reasonably foreseeable development scenarios in the EIS." (Northern Arizona Proposed Withdrawal final EIS Table 5.6-4, page 5-169.)

Because the USGS report relied on published and peer reviewed data and was peer reviewed itself, BLM considered it the most credible information available regarding the uranium endowment.

One commenter also stated that the EIS should have contained an analysis of the reduction in greenhouse gas (GHG) emissions resulting from use of the mined uranium for electrical production in place of other fuels.  BLM determined that this comment did not warrant any additional analysis or changes to the Final EIS, which noted that

The EIS does not include an analysis of GHG "offsets" (i.e., uranium as a replacement for other energy sources) for several reasons.  First, there is no guarantee that uranium mined from the proposed withdrawal area would be allocated exclusively to energy production.  Some percentage may go to defense uses, medical applications, or other uses.  In addition, with notable exceptions such as Iran and North Korea, processed uranium may be legally sold on the open market and shipped anywhere in the world.  Finally, there is no assurance uranium would be used to replace—rather than simply augment— other energy sources such as coal, natural gas, hydroelectric, solar, or wind power.  The analysis the commenter requests is beyond the scope of the EIS because the proposed action is a withdrawal of certain lands from location of hardrock mining claims that might result in the production of uranium, not the approval of any particular plan of operations or even consideration of the sitting and/or development of a nuclear reactor that might use uranium to produce electricity.

In sum, any attempted analysis of possible "offsets" from GHG emissions would be speculative.

A commenter also stated that the Arizona Wilderness Act of 1984 was not mentioned in the Draft EIS.  BLM determined that this comment did not warrant any additional analysis or changes to the Final EIS which does recognize the act, and notes its effect in the area.  The Arizona Wilderness Act of 1984 represented an historic piece of legislation negotiated by a coalition of people representing diverse views and interests.  Neither the Act nor its legislative history contain any indication of an intent to remove from the Secretary the authority to withdraw land provided under FLPMA.  The purpose of the Arizona Wilderness Act was to designate certain lands for inclusion in the National Wilderness System.  This withdrawal, in contrast, is focused strictly on whether to withdraw lands from location and entry under the Mining Law, subject to valid existing rights.  The withdrawal does not designate any lands within its boundaries as wilderness and has no impact on activities in the withdrawal area other than location and entry under the Mining Law, including activities that could impair wilderness characteristics.  Nothing in the Arizona Wilderness Act demonstrates intent to resolve the wilderness question in Arizona for all time so as to prohibit future wilderness designations.  Finally, most of the lands covered by this withdrawal were never considered or reviewed by Congress for possible Wilderness designation as part of the Arizona Wilderness Act because BLM inventory in the 1970s determined they do not possess characteristics of wilderness.

Another commenter asserted that the Purpose and Need changed frequently through the NEPA Process.  BLM determined that this comment did not warrant any additional analysis or changes to the Final EIS because the Purpose and Need in the Draft EIS was derived directly from the stated purpose in the Secretary of Interior's *Federal Register* Notice of July 21, 2009, and refined to describe the agency's Purpose and Need in accordance with BLM NEPA Handbook H-1790-1.  Once published in the Draft EIS, the Purpose and Need remained consistent throughout the EIS process.

Two commenters stated that the mining analysis from the RMP for the Arizona Strip BLM lands (completed in 2008) was not mentioned in the Northern Arizona Proposed Withdrawal EIS.  BLM determined that these comments did not warrant any additional analysis or changes to the Final EIS.  Although the RMP was completed relatively recently, uranium mining was not a major issue at the time it was being written.  The RMP did not contain an analysis to the depth needed to satisfy the Purpose and Need of the Northern Arizona Proposed Withdrawal, which in part responded to the significant increase in the location of mining claims in the area at the time the planning process was completed.  Finally, closing of lands to location and entry under the Mining Law is, by law, not a

decision that can be made through BLM's planning process (see section 202(e)(2) of FLPMA, 43 U.S.C. § 1712(e)(3)). The withdrawal process, which culminates in this ROD, is the appropriate decision-making process to evaluate the potential impacts of a closure to location and entry under the Mining Law.

Finally, two commenters stated that new information provided by themselves and others during the review period pertaining to the uranium resource and the changes to the EIS from Draft to Final constitute sufficient "new information" to warrant a Supplemental EIS.  BLM determined that this comment did not warrant any additional analysis or changes to the Final EIS.  As noted in Section 1.5.4 of the Final EIS, "most changes made to the EIS were editorial or clarified the EIS in response to public comments.  However, in response to public comment and to correct errors discovered after release of the DEIS, the sections discussed below did undergo some changes beyond those of an editorial or clarifying nature."  As explained further in the FEIS, BLM did not substantially alter the Proposed Action or any of the alternatives in a way that is relevant to environmental concerns.  In addition, none of the information relied upon in support of these changes constitutes significant new information relevant to environmental concerns and bearing on the proposed action or its impacts.  Therefore, supplementation of either the DEIS or FEIS is not required under CEQ regulations at 40 CFR 1502.9(c).  None of the comments resulted in a substantial alteration to the Proposed Action and, to the extent any of them relied on new information, that information was not sufficient to show that the Proposed Action would affect the quality of the human environment to a significant extent not already considered.

Consultation with U.S. Fish and Wildlife Service

Consultation with the U.S Fish and Wildlife Service (FWS) in compliance with section 7 of the Endangered Species Act was conducted.  A memorandum was sent on August 8, 2011, from the Arizona Strip District Manager requesting concurrence with a finding that "the Proposed Action May Affect, but is Not Likely to Adversely Affect" the 12 listed species within the Proposed Withdrawal area.  BLM received a memo from the FWS concurring with that finding dated August 29, 2011.  This completed the Section 7 consultation process.

Consultation with Arizona State Historic Preservation Officer

Consultation with the Arizona State Historic Preservation Officer (SHPO) in compliance with section 106 of the National Historic Preservation Act was conducted in coordination with the EIS process.  A letter was sent to the Arizona SHPO on June 16, 2011, requesting concurrence with the determination by the BLM that the Proposed Withdrawal "…does not have the potential to cause adverse effects on historic properties."  The Arizona SHPO responded with his concurrence on June 20, 2011. This completed the Section 106 process.

Tribal Participation

In August 2009, the BLM and USFS initiated government-to-government consultation via letter with the following American Indian governments regarding the proposed withdrawal: Chemehuevi Tribe, Colorado River Indian Tribes, Havasupai Tribe, Hopi Tribe, Hualapai Tribe, Kaibab Band of Paiute Indians, Las Vegas Paiute Tribe, Moapa Band of Paiute Indians, Pahrump Band of Paiutes, Paiute Indian Tribe of Utah, Pueblo of Zuni, San Juan Southern Paiute Tribe, Navajo Nation, White Mountain Apache Tribe, Yavapai-Apache Nation, and Yavapai-Prescott Indian Tribe. Seven tribes elected to actively participate in consultation on the project: the Havasupai Tribe, Hopi Tribe, Hualapai Tribe, Kaibab Band of Paiute Indians, Paiute Indian Tribe of Utah, Pueblo of Zuni, and Navajo Nation. Throughout the EIS process, nearly 40 meetings were held with these tribes.

Cooperating Agencies

The CEQ regulations at 40 CFR 1508.5 define a cooperating agency as any federal agency (other than the lead agency) and any state or local agency or Indian tribe with jurisdictional authority or special expertise with respect to any environmental impact involved in a proposal.  Because of the size of the proposed withdrawal area and the resources potentially affected by the proposed withdrawal or alternatives, 15 agencies (federal, state, tribal, and county) with jurisdictional authority and/or applicable special expertise cooperated in the development of this EIS.

The cooperating agencies assisted with EIS preparation in a number of ways, including conducting or providing studies and inventories, reviewing baseline condition reports, identifying issues, assisting with the formulation of alternatives, and reviewing Preliminary Draft EIS text and other EIS materials.  Not all of the cooperating agencies participated in all aspects of the EIS preparation. As lead agency, the BLM is responsible for the content of the EIS.

Coordination with Local Governments/Consistency with Local Government Plans

The BLM coordinated with local governments by attending meetings conducted by local government organizations and by maintaining open channels of communications between the Arizona Strip District Manager and elected county officials.  Four Southern Utah Counties and two Northern Arizona counties participated as Cooperating Agencies.  In addition, Washington, Kane, San Juan and Garfield Counties in Utah and Mohave County in Arizona formed the AZ/UT Coalition of Coordinating Counties.  This coalition held four meetings, three of which were attended by managers from the BLM, and/or USFS.  These meetings were held with industry representatives and others in attendance to discuss the withdrawal and to coordinate comments on the EIS and directly to the Secretary of the Interior.  The meeting/hearing dates attended by BLM or National Forest management were: March 21, 2011, meeting in St. George, Utah; April 18, 2011, meeting in Fredonia, Arizona; and September 7, 2011, hearing in St. George, Utah.  At the meeting held on April 18, 2011, the Coalition passed a resolution supporting Alternative A (No Action) as the Preferred Alternative.

The withdrawal affects federal lands in Coconino and Mohave counties in Arizona.  Review of plans in those counties indicates that the withdrawal is not inconsistent with either plan.  However, Mohave County passed a resolution on May 12, 2008, (County Resolution 2008-10) that supports multiple-use of public lands in general, and lists uranium mining as one of those uses. It also passed a resolution in February, 2009, (County Resolution 2009-040) that supports continued uranium mining on the Arizona Strip. Coconino County passed a resolution in 2008, (County Resolution 2008-09) opposing uranium mining in the county.  The withdrawal will be consistent with the Coconino County Resolution 2008-09, but inconsistent with Mohave County Resolutions 2008-10 and 2009-040.

***FEDERAL COOPERATING AGENCIES***

- •   U.S. Forest Service
- •   National Park Service
- •   U.S. Fish and Wildlife Service
- •   U.S. Geological Survey

*STATE OF ARIZONA COOPERATING AGENCIES*

- Arizona Game and Fish Department
- Arizona Geological Survey
- Arizona Department of Mines and Mineral Resources
- Arizona State Land Department

*TRIBAL GOVERNMENTS AS COOPERATING AGENCIES*

- Hualapai Tribe
- Kaibab Band of Paiute Indians

*COUNTY GOVERNMENTS AS COOPERATING AGENCIES*

- ***Coconino County, Arizona***:  The majority of the withdrawal area is located in Coconino County.  Arizona Department of Commerce (ADOC) official population estimates for Coconino County are 136,735 for July 1, 2009 (ADOC 2009b).  Coconino County's commercial economy is largely tourism-based accounting for a large percentage of the county's jobs and tax income.

- ***Mohave County, Arizona:***  A large portion of the withdrawal area north of the Grand Canyon is in Mohave County.  The official ADOC population estimates for Mohave County are 206,763 for July 1, 2009 (ADOC 2009c).  Leading industries in the county are retail trade, tourism, construction, and health care and social services.

- ***Kane County, Utah:***  Because of its proximity to the withdrawal area and its historic dependence on the Arizona Strip as a significant source of income and employment for its residents, Kane County participated as a cooperating agency in the EIS process.  Kane County had an estimated population of 6,577 in 2008 (U.S. Census Bureau [Census Bureau] 2008a). Like Coconino County, Kane County's economy is primarily tourism based. Lake Powell, Zion National Park, and other recreation sites attract tens of thousands of visitors each year.  As a result, the leisure/hospitality services sector is the leading employment sector.  The mining industry is also a significant employer in Kane County.  Mining wages and salaries per job have consistently been the largest in the study area and have experienced steady growth from 1980 through 2000.  However, it should be noted that the number of mining jobs in Kane County has been low since at least 1980 (BLM 2008c).

- ***San Juan County, Utah***:  San Juan County had an estimated population of 15,055 in 2008 (Census Bureau 2008a).  One of the major employment sectors driving San Juan County's economy is mining.  Denison Mines (USA) Corporation (Denison) and the recently closed Lisbon Valley Copper Mine are located in the county and have both historically, as well as recently, provided employment for county residents.  The White Mesa Uranium Mill, located 6 miles south of Blanding, is used for processing uranium ore mined in the proposed withdrawal area.  The proposed withdrawal or alternatives could change the amount of ore transported to the mill.  Because of its economic connection with mining in the proposed withdrawal area, San Juan County participated as a cooperating agency in the EIS process.

- ***Washington County, Utah:*** Washington County had an estimated population of 137,589 in 2008 (Census Bureau 2008a). The Arizona Strip (where the North and East parcels are located) has historically been recognized as a primary source of income and employment for many of southern Utah's residents. For this reason, Washington County was a cooperating agency in the EIS process. Over the past decade, Washington County has experienced major population growth. From 1990 to 2008, the total population increased by 183.3% and is expected to continue growing. Manufacturing, wholesale and retail trade, construction, and tourism- and recreation-related services are the leading industries. Nearby Grand Canyon National Park, Zion National Park, Dixie National Forest, and Snow Canyon State Park are important recreational attractions.

- ***Garfield County, Utah***: Garfield County had an estimated population of 5,172 in 2010, up from 3,980 in 1990 (Census Bureau 1990; 2008a). It is located in south central Utah, north of Kane County and west of San Juan County and includes large swaths of open desert as well as nationally designated scenic places such as Bryce Canyon National Park, Grand Staircase-Escalante National Monument, Capital Reef National Park, and a portion of Canyonlands National Park. Garfield County joined the EIS process as a cooperating agency in August 2011. The Shootaring Canyon Uranium Processing Facility (mill) is located in Garfield County near the small town of Ticaboo. The mill has been in stand-by status since 1982.

## XIII. FINAL AGENCY ACTION

Pursuant to section 204 of the Federal Land Policy and Management Act of 1976, it is my decision to withdraw from location and entry under the Mining Law, subject to valid existing rights, approximately 1,006,545 acres of federal land in Northern Arizona, as depicted on Map 1, for a 20-year period. My approval constitutes the final decision of the Department of the Interior and, in accordance with the regulations at 43 CFR 4.410(a)(3), is not subject to appeal under Departmental regulations at 43 CFR Part 4. Any challenge must be brought in federal district court.

Ken Salazar                                    1/9/2012

Ken Salazar                                    Date
Secretary
U.S. Department of the Interior

Kane County Commission, Kane County, Utah
76 North Main Street
Kanab, UT 84741

Washington County Commission, Washington County, Utah
197 East Tabernacle
St. George, UT 84770

San Juan County Commission, San Juan County, Utah
117 South Main, P.O. Box 338
Monticello, UT 84535

Mohave County Board of Supervisors, Mohave County, Arizona
700 W. Beale Street
Kingman, AZ 86401

Mr. Robert Abbey
Director, BLM
Room #5662
1849 C St. NW
Washington, D.C. 20240

April 12, 2010

Dear Director Abbey:

As Cooperating Agency participants in the Environmental Impact Statement now being prepared as a result of the Secretary's July 20, 2009, Segregation Order for the Arizona Strip and Kaibab National Forest, we are writing to express our concerns over key points in the process. We openly acknowledge up front that our purpose for being involved in this process is to protect the economic potential for our counties and our region, which will benefit from ongoing uranium mining. Among our concerns with what we have seen so far are these:

1) After thorough review, the identification of four alternatives in the initial working draft leaves the conclusion that the outcome of this process maybe predetermined by BLM to eliminate viable uranium mining opportunities in the region.

2) The USGS preliminary findings clearly assert that 326 million lbs of uranium remain viable for mining in the proposed withdrawal area, yet neither alternative 2 nor 3 retain enough breccia pipe uranium deposits for credible companies to continue mining. This demonstrates that the intended outcome of the document is to stop mining.

3) Thus, three out of the four initial alternatives presented to cooperators on February 23, 2010, effectively remove most of the 326 million lbs of economically viable uranium which USGS identified on federal lands in northern Arizona.

4) Of the four alternatives presented in the draft, only the NO Action alternative would allow uranium mining to occur under the Mining Law.

5) The full withdrawal option allows no exploration and only extremely limited mining to occur on valid claims despite the Interior Secretary's statement accompanying the July 20, 2009, Segregation Order. Secretary Salazar's Press Release accompanying the Segregation specifically said that only future claims would be placed in "time out" (his words) and that existing claims would be honored. That commitment has not been honored or reflected in the draft EIS.

6) Dennison Mines Inc., which currently operates the Arizona #1 Mine, is allowed to mine only because BLM acknowledges their Plan of Operation.

7) Proof of discovery for uranium has long been known to be different from gold, silver and other hard rock minerals due to different metal characteristics.

8) BLM's failure to allow time-tested and historically accepted uranium analytical technologies (such as gamma ray logs) as proof of discovery leaves only 3-5 known breccia pipe deposits

1

to be protected as valid existing rights under the segregation order.  The remaining 8000 claims are rendered worthless simply because they are not far enough along in the discovery process.   The draft document fails to point out these factual differences in any sort of intellectually honest way.

9)  The draft fails to recognize the clear decision made by Congress in the 1984 Arizona Wilderness Act to release from WSA status the lands in question. Congressional record statements demonstrating the clear intent by Congress that these lands were intended to be mined were not included in the draft nor factored in to the preparation of the document. BLM knows that, geologically, very little has changed on the lands in question since 1984; it is the politics that have changed.

10) The American people need to know, and this draft EIS must clearly state that the worth of those 326 million lbs of uranium located in the proposed withdrawal area represents the energy equivalent of the entire Prudhoe Bay Oil field. Said another way, the uranium contained in these lands is capable of providing enough electrical production to power the current populations (based on current use) of: a) New York City for 57 years, b) Los Angeles, CA for 127 years, Chicago, IL for 167 years, Houston, TX for 213 years, and Phoenix, AZ for 304 years.  (See attached chart)

We respectfully request that you address this omission by including a thorough explanation of the energy worth of the uranium deposits in the area and request minimum, a 5th alternative which reflects the existence of those uranium-rich breccia pipe lands identified by USGS in their findings of February 18, 2010.

During the most recent cooperating agency meeting, the USGS representative admitted that the hydrology study in the draft is incomplete.   It is unacceptable for this environmental document to be rushed through a process which omits a definitive finding.   The uranium producers correctly assert that there has never been a definitive finding by any credible entity, which corroborates environmentalists' allegations of Colorado River watershed contamination.  Given that fact, we have every reason to believe the allegations which led to this process in the first place are without foundation.

Whether the Secretary opts to select an alternative which allows uranium mining going forward is his decision to make.   The preparation of an intellectually honest EIS, however, is something over which you as BLM Director do have control and must assure.

We respectfully request that you act now to make certain that the integrity of this BLM EIS is protected and that the American public knows the truth about the implications of each alternative, which appears in the final EIS.   We are confident that the Secretary will act in the national interest if this document meets that test.

Sincerely,

Kane County                                                   Washington County

San Juan County                                             Mohave County

2

## *ELECTRICITY EQUIVALENCY OF NORTHERN ARIZONA URANIUM*

### Average Per Capita Consumption (Includes residential, commercial, and industrial)

#### Using Info from U.S. Energy Information Administration, released Jan 2010

| | | |
|---|---|---|
| Total Annual Consumpt | 3,724,570,294,380 | kWh |
| Population: | 301,621,157 | |
| | | |
| Total Annual Consumption per person: | | (2008 data) |
| | 12,349 | kWh |

#### Using info cited from CIA World Factbook by Wikipedia

1460 watts/person avg per capita

Annual KWh usage per person is (avg watts/person x 365.25 d/y x 24 hr/d)/1000:

| | | |
|---|---|---|
| Total Annual Consumption per person: | | (2005 data) |
| | 12,798 | kWh |

#### Average, based upon above two sources:

| | |
|---|---|
| 12,573 | kWh |

### Uranium - Electricity Relationship (from world-nuclear.org "Economics of Nuclear Power", Jan 2010)

| | |
|---|---|
| Uranium Ore (U3O8): | 8.9 kg |
| is needed to produce (after processing and refining): | |
| Reactor Fuel (UO2): | 1 kg |
| 1 kg fuels yields: | 360,000 kWh |

### Northern Arizona Uranium Potential for Electricity Generation

| | | |
|---|---|---|
| Uranium Ore | 326,000,000 | lbs U3O8 |
| which is: | 148,181,818 | kg U3O8 |
| And becomes fuel: | 16,649,642 | kg UO2 |
| Which generates: | 5,993,871,297,242 | kWh of electricity |

### Electricity demands vs Potential Supply from Northern Arizona Uranium

| Incorporated City | Population (2008 est. by Census Bureau) | Annual usage (kWh) Based upon average per capita usage | Potential Yrs Supplied from No. AZ Uranium |
|---|---|---|---|

| | | | |
|---|---|---|---|
| New York | 8,363,710 | 105,160,542,151 | 57 |
| Los Angeles | 3,833,995 | 48,206,476,887 | 124 |
| Chicago | 2,853,114 | 35,873,435,958 | 167 |
| Houston | 2,242,193 | 28,192,062,074 | 213 |
| Phoenix | 1,567,924 | 19,714,186,395 | 304 |

| EIA 2008 data - total state electric consumption | http://www.eia.doe.gov/cneaf/electricity/st_profiles/e_profiles_sum.html | |
|---|---|---|
| State | KWh | Year |
| US-TOTAL | 3,728,873,677 | 1.6 |
| TX | 343,205,493 | 17.5 |
| CA | 268,155,219 | 22.4 |
| FL | 226,172,795 | 26.5 |
| OH | 159,388,807 | 37.6 |
| PA | 150,400,589 | 39.9 |
| IL | 144,619,914 | 41.4 |
| NY | 144,052,936 | 41.6 |
| GA | 135,173,514 | 44.3 |
| NC | 130,054,113 | 46.1 |
| VA | 110,106,337 | 54.4 |
| IN | 106,980,704 | 56.0 |
| MI | 105,781,271 | 56.7 |
| TN | 104,169,779 | 57.5 |
| KY | 93,428,414 | 64.2 |
| AL | 89,707,279 | 66.8 |
| WA | 87,332,884 | 68.6 |
| MO | 84,381,676 | 71.0 |
| SC | 80,650,572 | 74.3 |
| NJ | 80,519,543 | 74.4 |
| LA | 78,721,932 | 76.1 |
| AZ | 76,267,916 | 78.6 |
| WI | 70,121,827 | 85.5 |
| MN | 68,791,615 | 87.1 |
| MD | 63,325,777 | 94.7 |
| OK | 56,278,866 | 106.5 |

| | | |
|---|---|---|
| MA | 55,884,105 | 107.3 |
| CO | 52,142,473 | 115.0 |
| OR | 49,187,475 | 121.9 |
| MS | 47,721,235 | 125.6 |
| AR | 46,134,681 | 129.9 |
| IA | 45,488,070 | 131.8 |
| KS | 39,516,085 | 151.7 |
| NV | 35,192,496 | 170.3 |
| WV | 34,221,103 | 175.2 |
| CT | 30,956,544 | 193.6 |
| NE | 28,810,989 | 208.0 |
| UT | 28,191,511 | 212.6 |
| ID | 23,901,490 | 250.8 |
| NM | 22,037,928 | 272.0 |
| WY | 16,690,249 | 359.1 |
| MT | 15,326,400 | 391.1 |
| ND | 12,416,074 | 482.8 |
| DE | 11,748,783 | 510.2 |
| ME | 11,673,673 | 513.5 |
| DC | 11,616,234 | 516.0 |
| NH | 10,977,289 | 546.0 |
| SD | 10,974,086 | 546.2 |
| HI | 10,390,279 | 576.9 |
| RI | 7,818,594 | 766.6 |
| AK | 6,324,855 | 947.7 |
| VT | 5,741,204 | 1,044.0 |

4,119,387,760.00
1.46



USA FIRST-CLASS FOREVER

USA FIRST-CLASS FOREVER

Las Vegas PROC 89199

TUE 27 APR 2010 PM

Mr. Robert Abbey
Director, BLM
Room #5662
1849 C St. NW
Washington, D.C. 20240

# MOHAVE COUNTY BOARD of SUPERVISORS



P.O. Box 7000          700 West Beale Street          Kingman, Arizona 86402-7000
Website – www.co.mohave.az.us                    TDD - (928) 753-0726

District 1                          District 2                          District 3
Gary Watson                   Tom Sockwell               Buster D. Johnson
(928) 753-0722               (928) 758-0713               (928) 453-0724

County Manager                                                              Clerk of the Board
Ron Walker                                                                    Barbara Bracken
Telephone (928) 753-0729                                        Telephone (928) 753-0731
FAX (928) 718-4957                                                      FAX (928) 753-0732

May 24, 2011

Northern Arizona Proposed Withdrawal Project
ATTN:  Mr. Scott Florence, District Manager
Bureau of Land Management
Arizona Strip District Office
345 East Riverside Drive
St. George, UT 84790-6714

Dear Mr. Florence:

I am writing in opposition to the withdrawal of 993,549 acres of public land and National Forest System land from mining and am hereby registering Mohave County's support for Alternative A - No Action as presented in the Northern Arizona Proposed Withdrawal Draft Environmental Impact Statement.

Our interest in this issue is based on the detrimental economic impact a withdrawal will have on Arizona and surrounding states.  Uranium mining represents a direct and indirect infusion of $29 billion for my region over the life of these mines.  On February 5, 2009, the Mohave County Board of Supervisors, in concert with National Association of Counties (NACo) adopted Resolution 2009-040 urging Congress to preserve access to these vitally necessary ore bodies.

Mohave County's experience dealing with federal land issues has not been favorable.  On January 11, 2000, under Presidential Proclamation 7265, more than one million acres were set aside for the Grand Canyon—Parachant National Monument.  This land mass is larger than the State of Rhode Island.  There was no coordination with local governments.  This resulted in the loss of one of the richest, cleanest coal reserves in the United States.  We had no choice in the matter.  It did not matter what the economic impact would be on the surrounding states.

Again, we face the same issue even though it is clear under 43 USC 1712—Sec. 1712.  Land Use Plans that "(a) Development, maintenance and revision by Secretary.  The Secretary shall, with public involvement, and consistent with the terms and conditions of this act, develop, maintain and, when appropriate, revise land use plans which provide by tracts or area for the use of public lands."  There has been no coordination with local governments to devise or alter any land use plans.

Northern Arizona Proposed Withdrawal Project
May 24, 2011
Page Two


The notice of segregation stated that the Northern Arizona Proposed Withdrawal was necessary to preserve the Grand Canyon watershed.  74 Fed. Reg. 35887 (July 17, 2009).  The scientific documentation provided to the DEIS by the Department of the Interior's agencies has clearly demonstrated that uranium mining does not threaten the watershed of the Grand Canyon and a withdrawal is not necessary.  Since no such threat has been credibly documented, the proposed withdrawal does not meet the essential criteria for a withdrawal.

On February 16, 2010, Mohave County entered into Agreement No. AZ-2010-17 a Memorandum of Understanding as a Cooperating Agency to prepare an Environmental Impact Statement for the proposed withdrawal of lands for up to 20 years from location and entry under the Mining Law of 1872.  It soon became apparent that BLM had a predetermined outcome to this EIS.

For the above reasons, as well as in the interest of the economic well being of the people of Mohave County and the region, I urge you NOT to withdraw these lands.

Sincerely,



Buster D. Johnson
Chairman
Mohave County Board of Supervisors