Ignacia S. Moreno
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

Dominika Tarczynska, NY Bar No. 4431573
John S. Most, VA Bar No. 27176
Natural Resources Section
P.O. Box 7611 Washington, D.C. 20044-7611
 (202) 305-0447 (Tarczynska)
 (202) 616-3353 (Most)
 (202) 305-0506 (fax)
Dominika.Tarczynska@usdoj.gov
John.Most@usdoj.gov
Counsel for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
## PRESCOTT DIVISION

| | |
|---|---|
| GREGORY YOUNT, | Case No. 3:11-cv-08171-PCT-DGC |
| Plaintiff, *pro se*, | |
| v. | **FEDERAL DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS CIVIL ACTION NUMBER 12-CV-8038 (NATIONAL MINING ASSOCIATION *ET AL.*)** |
| KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.*, | |
| Federal Defendants, | |
| and | |
| GRAND CANYON TRUST, *et al.,* | |
| Intervenor-Defendants. | |

| | |
|---|---|
| 1 | |
| 2 | NATIONAL MINING ASSOCIATION, *et al.,* |
| 3 | Plaintiffs, |
| 4 | v. |
| 5 | KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.,* |
| 6 | |
| 7 | Federal Defendants, and |
| 8 | GRAND CANYON TRUST, *et al.,* |
| 9 | |
| 10 | Intervenor-Defendants |

Case No. 3:12-cv-08038-PCT-DGC

NORTHWEST MINING ASSOCIATION, *et al.,*

Plaintiffs,

v.

KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.,*

Federal Defendants, and

GRAND CANYON TRUST, *et al.,*

Intervenor-Defendants.

Case No. 3:12-cv-08042-PCT-DGC

QUATERRA Alaska Incorporated, *et al.,*

Plaintiffs,

v.

KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.,*

Federal Defendants, and

GRAND CANYON TRUST, *et al.,*

Intervenor-Defendants.

Case No. 3:12-cv-08075-PCT-DGC

1

# **TABLE OF CONTENTS**

2

3   INTRODUCTION .................................................................................................... 1

4   ARGUMENT ............................................................................................................ 1

5   I.        Plaintiffs' Claims Fail to Establish an Article III Case or Controversy .................... 2

6
            A.        Plaintiffs have not demonstrated standing as to any
7                     count ................................................................................................... 2

8
            B.        Plaintiffs fail to demonstrate that their claims are ripe ................................ 1
9

10  II.       Plaintiffs Lack Prudential Standing to Assert NEPA Claims. ................................ 8

11  CONCLUSION ...................................................................................................... 18

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Federal Defendants submit this reply brief in support of their motion to dismiss, Dkt. 39 ("Mem."), as supplemented on August 10, 2012, Dkt. 72 ("Suppl. Mem."), following Plaintiffs' amendment of the complaint.  *See* Dkt 56 ("Am. Compl.").

## INTRODUCTION

Plaintiffs National Mining Association ("NMA") and Nuclear Energy Institute ("NEI"), trade organizations representing the interests of their members, challenge the January 9, 2012 decision of the Secretary of the Interior to withdraw for twenty years certain public lands and National Forest System Lands in the Grand Canyon watershed from location and entry under the Mining Law of 1872, subject to valid existing rights. Plaintiffs contend the decision fails to comply with requirements of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"), and the Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.* ("FLPMA"), and further that the Secretary's FLPMA withdrawal authority is unconstitutional.  Am. Compl. ¶¶ 97-121. The case should be dismissed because neither the amended complaint nor the opposition, Dkt. 60 ("Pls' Opp."), with its supporting evidence, Dkts. 60-1 to 60-5, demonstrates standing and ripeness.  Federal Defendants therefore ask the Court to dismiss the action for lack of subject-matter jurisdiction.

## ARGUMENT

To overcome the presumption that federal courts lack jurisdiction, a plaintiff must "affirmatively" and "clearly" establish its existence.  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).  This includes demonstrating Article III and prudential standing, *see Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522

U.S. 479, 488 (1998), as well as ripeness.  *Warth v. Seldin*, 422 U.S. 490, 516 (1975) (affirming dismissal of association's complaint that failed to show injury to a member of "sufficient immediacy and ripeness to warrant judicial intervention.").  The burden of doing so rests on the plaintiff, as the "party invoking the federal court's jurisdiction." *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir. 1996) (per curiam).

## I. Plaintiffs' Claims Fail to Establish an Article III Case or Controversy.

### A. Plaintiffs have not demonstrated standing as to any count.

In order to establish Article III standing, a plaintiff must show that: (1) he has "suffered an 'injury-in-fact'" to a legally protected interest that is both "concrete and particularized" and "actual or imminent," as opposed to "conjectural or hypothetical;" (2) there is a "causal connection between the injury and the conduct complained of;" and (3) it is "likely" – not merely "speculative" – "that [his] injury will be 'redressed by a favorable decision.'"  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992) ("*Defenders")*.  Such injury must be present "at the commencement of the litigation." *Davis v. Fed. Election Comm'n,* 554 U.S. 724, 732 (2008); *see also Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 189 (2000) (same).

Requiring imminent and concrete injury assures that "the essential dimension of [factual] specificity" is present in a case.  *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 221 (1974).  This promotes resolution of legal questions "not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action," *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).

The Amended Complaint does not achieve these purposes, and Plaintiffs' opposition and declarations do not cure its defects.  No doubt, these filings catalogue in great detail the potential economic impacts of withdrawal and of the required mineral examinations, *see* Pls' Opp. at 4-8 (and citations therein), but potentialities do not confer standing.  As the Supreme Court has explained, the "irreducible constitutional minimum of standing" requires a party seeking review to demonstrate concrete and imminent injury to a protected interest, *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009), *Defenders*, 504 U.S. at 560.  Injury must be present at the commencement of the litigation.  *Davis,* 554 U.S. at 732; *Friends of the Earth, Inc.*, 528 U.S. at 189; *Reynolds v. United States*, 748 F.2d 291, 293 (5th Cir. 1984); *Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 776, 780 (Fed. Cir. 1996).  An association must also show its member was threatened by harm, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), and is thus "among the injured."  *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972).  Plaintiffs' attempts to meet these requirements, particularly their reliance on Uranium One's belated exploration notices, are unavailing.

Plaintiffs filed this action on February 27, 2012.  *See* Dkt 1 (original complaint).  On May 25, Federal Defendants moved for dismissal, based in part on the complaint's failure to identify any affected mining claimants or claims.  Dkt. 39.  On this same day, Uranium One submitted to the Bureau of Land Management ("BLM") two exploration notices relating to a mineral body near an area of the withdrawn lands known as Findlay Tank, *see* Am. Cmplt. ¶ 83, which Uranium One had previously explored, drilled, and fully reclaimed.  Second Cox Decl. at 5-7 (Dkt. 72-1).  Plaintiffs then amended their

complaint on June 26, identifying Uranium One for the first time and making various allegations about the May 25 exploration notices.  *See* Am. Compl. ¶¶ 80-85.  On August 10, Federal Defendants filed a supplement to their motion to dismiss, contending that, at the time the action commenced, the withdrawal had no effect on plaintiffs, since no member, including Uranium One, had attempted to develop its mining claims or otherwise participate in available administrative processes relating to mining claim development.  This deficiency is fatal to Plaintiffs' claim of standing and underscores the absence of any effect on either association as a result of the withdrawal.

Plaintiffs argue in opposition that the decision injures not just Uranium One, but rather all who hold unpatented mining claims, regardless of whether any attempts at claim development have been made.  Pls' Opp. at 8 (arguing the late notices "do not diminish [Uranium One's] pre-existing injury," and that "injury is certain" with respect to as many as 5,300 unpatented mining claims in the withdrawal area).  In support, they cite *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979) ("*UFW*"), which explains that a plaintiff, seeking to invalidate a statute on constitutional grounds, need not await actual injury; rather, injury that is "certainly impending" is sufficient. *Id*. at 298; *cf. Defenders,* 504 U.S. at 560 (requiring injury that is "actual or imminent"). However, because the challenge in *UFW* is so patently distinct from that at issue here, the decision does not aid Plaintiffs' theory in the least.

In *UFW,* migratory workers brought a facial constitutional challenge to various provisions of Arizona's 1972 farm labor statute.  The court found a justiciable case or controversy only with respect to the provisions on union publicity and union elections,

and a provision imposing criminal penalties for certain prohibited forms of union publicity.  *UFW*, 442 U.S. at 299.  Given the certainty of the statute's effects and its implication of fundamental rights (due process and free speech and association), the court found plaintiffs need not await actual injury.  In this case, the 5,300 unpatented mining claims sit in an entirely different posture.  It is possible that some are valid (such that the further expenditure of resources in attempting to develop a mine is reasonable and not precluded by withdrawal), and that some are not; however, until a mineral examination occurs, their validity is unknown.   Further factual development would allow meaningful judicial review "in a concrete factual context." *Valley Forge Christian Coll.,* 454 U.S. at 472.   Plaintiffs' are incorrect in stating that further administrative proceedings would not clarify matters.

Plaintiffs also contend that, as a result of the withdrawal, their members are unable to locate additional mining claims and thus Uranium One's "planned, future location of additional mining claims" has been thwarted.  Pls' Opp. at 9; *see also, id.* at 4 (inability to locate new mining claims is "sufficient injury, by itself, to establish standing").  These contentions fail because Plaintiffs present no evidence of such plans. *See Defenders*, 504 U.S. at 564 (requiring some "description of concrete plans"). Although the declarations generally discuss Uranium One's investments in mineral development, they are silent as to any specific plans to locate additional claims.  Thus, with respect to this claim, Plaintiffs have not met their burden of clearly and affirmatively demonstrating jurisdiction.  *FW/PBS, Inc*., 493 U.S. at 231.

5

1   Plaintiffs further argue that courts routinely allow mining interests to challenge

2   withdrawals, Pls' Opp. at 2, but two of the three cases they cite in support (*Sagebrush*

3   *Rebellion, Inc. v. Hodel*, 790 F.2d 760 (9th Cir. 1986) and *Mt. Royal Joint Venture v.*

4   *Kempthorne*, 477 F.3d 745 (D.C. Cir. 2007)) do not even discuss standing.

5   Importantly, "unstated assumptions on non-litigated issues are not precedential holdings

6   

7   binding future decisions." *Proctor v. Vishay Intertech. Inc.*, 584 F.3d 1208, 1226 (9th

8   Cir. 2009).   Moreover, *Mount Royal* actually supports the view that the administrative

9   process should be allowed to run its course.  *See id.* at 752-53 (plaintiffs brought suit

10   only after they had located claims on segregated lands, BLM had administratively

11   voided the claims, and the Interior Board of Land Appeals had affirmed the decision).

12   The third case, *Pacific Legal Foundat'n v. Watt*, 529 F. Supp. 982 (D. Mont. 1981),

13   involved oil and gas leasing applications under the Mineral Leasing Act of 1920, not

14   unpatented mining claims under the Mining Law of 1872.  Although the Court found

15   standing, it did so because the agency had not properly considered the applications.

16   529 F. Supp. at 990 (discussing harm to the "right to have a lease application properly

17   processed").   No comparable circumstances are present here.   Plaintiffs' apparent

18   suggestion of a *per se* rule for standing should be rejected.[1]

19   

20   

21   

22   

23   _____

[1] The Court also lacks subject-matter jurisdiction over Count Four of the Amended
Complaint for the additional reason that FLPMA section 701(i) expressly prohibits
judicial review of reports to Congress.  *See* Pub. L. 94-579, § 701(i), 90 Stat. 2743,
2787 (1976) ("the adequacy of reports required by this act to be submitted to the
Congress or its committees shall not be subject to judicial review"); *accord*, 5 U.S.C.
§ 702 ("nothing herein affects other limitations on judicial review or the power or duty
of the court to dismiss any action or deny relief on any other appropriate legal or
equitable ground").

**B. Plaintiffs fail to demonstrate that their claims are ripe.**

In their opening brief, Federal Defendants explained that the ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). A case is not "'ripe' for judicial review . . . until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

Plaintiffs respond that further factual development is unnecessary, as they are raising a purely legal challenge. Pls' Opp. at 26. With respect to the first point, further factual development is indeed necessary in order to distinguish valid and invalid mining claims from among the 5,300 claims (including Uranium One's) on which Plaintiffs base their standing. *See*, *supra* at 4, citing Plaintiffs' Opp. at 8. Until this occurs, Plaintiffs cannot even know whether they are harmed, because if in fact their claims are invalid, the decision has no effect on them at all. In this setting, the Court should stay its hand, avoid premature adjudication, and allow BLM to conduct required mineral examinations in accordance with its regulations and guided by its policies. Any parties aggrieved at that stage would then be free to challenge the agency's action. As explained in Federal Defendants' supplemental brief, mineral examinations harm no

protected interest.   Suppl. Mem. at 8-9.   They are simply a step in the mineral development process that these claimants consented to in filing their mining claims with BLM in the first place.   Moreover, unpatented mining claims have always been subject to investigation.  *See Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 336 (1963) ("no right arises from an invalid claim of any kind").

Plaintiffs' second point, that they raise a purely legal challenge, is irrelevant.  Of course their underlying challenge on the merits raises questions of law, as do all proper APA challenges.  Here, however, the question of imminent harm and ripeness, essential elements of a case or controversy, are highly-fact based.  Should the Court address the merits of Plaintiffs' "purely legal" issues before claim validity is determined, it would, in the case of invalid claims, be resolving only an abstract disagreement and thus issuing what is tantamount to an advisory opinion.  *See Mass. v. E.P.A.*, 549 U.S. 497, 516 (2007); *Hayburn's Case*, 2 Dall. 409, 1 L.Ed. 436 (1792).

For all these reasons, the Court should dismiss the Amended Complaint because it fails to establish a justiciable case or controversy under Article III.

## II.   Plaintiffs Lack Prudential Standing to Assert NEPA Claims.

In the opening briefs, Federal Defendants explained that even if Plaintiffs were able to establish an Article III case or controversy, , they lack prudential standing to bring NEPA claims because their economic interests are outside of NEPA's environmental zone of interests.  *See* Mem. 17-21; Supp. Mem. 72 at 11-17.  Plaintiffs argue that it is "absurd, arbitrary, and inequitable" that they, as representatives of the mining industry, cannot bring NEPA claims challenging the withdrawal.  Pls' Opp. 16-

17.  However, "Congress, in enacting §702 [of the APA], had not intended to allow suit by every person suffering injury in fact" as a result of an agency decision.  *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 395 (1987).   The "zone of interests" prudential standing test "exclude[s] those plaintiffs whose suits are more likely to frustrate than to further statutory objectives." *Id.* at 397 n.12.  Because "the purpose of NEPA is to protect the environment, not the economic interest of those adversely affected by agency decisions," Plaintiffs may not use NEPA claims as a vehicle to advance their economic interests.  *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993).  None of Plaintiffs' arguments changes this result.

## A. Plaintiffs Must Show That Their Interests Are Within NEPA's Environmental "Zone of Interests."

Plaintiffs attempt to avoid the "zone of interests" test by arguing that they are the "targets" of the withdrawal, relying on language in *Clarke* which states that the "zone of interests" test applies in cases "where plaintiff is not itself the subject of the contested regulatory action."  Pls' Opp. at 17-18 (quoting *Clarke*, 479 U.S. at 399).  Plaintiffs, however, were not the "subjects" of the NEPA process challenged in the NEPA claims.  The cases Plaintiffs cite are readily distinguishable because they involve challenges to agency determinations on a plaintiff's specific project and do not involve NEPA claims.  For example, in *Stock West Corp. v. Lujan*, 982 F.2d 1389 (9th Cir. 1993), the court analyzed a "challenge [to the [Interior Board of Indian Appeals ("IBIA")]'s refusal to hear the merits of [the plaintiff's] administrative appeal" regarding its contracts.  *Id.* at 1397.  Similarly in *Snoqualmie Indian Tribe v. FERC*,

545 F.3d 1207 (9th Cir. 2008), the court found that a hydroelectric power plant operator was "the party *directly* subject to the [agency] action in question[,] *[a]s the applicant for the license under consideration,*" and "possesse[d] standing to challenge the relicensing of its hydroelectric project." *Id.* at 1217 (emphasis added). These cases are akin to a mining company challenging the results of a validity exam or restrictions imposed on a plan of operations to mine its claims, not to the facts before the Court here. Ninth Circuit courts consistently apply the "zone of interests" test to analyze the prudential standing of plaintiffs who challenge the NEPA analysis performed in connection with an agency policy that they claim directly restricts their conduct.[2]

Plaintiffs next try to bypass NEPA's environmental zone of interests by arguing that they are "regulated" by the withdrawal. The question, however, is not whether they will be "regulated" by the withdrawal, which is an exercise of FLPMA, not NEPA; rather the question is whether they "'assert an interest arguably within the zone of interests to be protected or regulated' *by NEPA*." *W. Radio Serv. Co., Inc. v. Espy*, 79 F.3d 896, 902-03 (9th Cir. 1996) (quoting *Nev. Land Action*, 8 F.3d at 715-16) (emphasis added); *see also Citizens for Better Forestry v. USDA,* 341 F.3d 961, 976 (9th Cir. 2003) (quoting *Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1019 (9th Cir. 2003) (plaintiff's "injury [must] fall[] within the zone of interests *of the statutory*

---

[2] *See, e.g., Nev. Land Action*, 8 F.3d at 715 (finding that organization with members that held grazing permits in the Toiyabe National Forest lacked prudential standing to bring NEPA claims challenging a plan adopted for management of that Forest); *Am. Independence Mines*, 733 F. Supp. 2d at 1258-59, *aff'd* No. 11-35123, 2012 WL 3542264 (9th Cir. Aug. 17, 2012) (unpublished) (mining company lacked prudential standing to bring NEPA claims challenging Forest Service Travel Management Rule, which would have closed roads needed for access to mining claims).

*provision the plaintiff claims was violated.*'") (emphasis added).  NEPA "regulates" the conduct of federal agencies—not private parties.  *See Envtl. Def. Fund, Inc. v. Massey*, 986 F.2d 528, 532 (D.C. Cir. 1993) ("Regulated Conduct Under NEPA[:] NEPA is designed to control the decisionmaking process of U.S. federal agencies . . . . ").  Thus, when applied to NEPA claims, the "zone of interests" test requires the alleged interests to be "protected by" NEPA.  *See, e.g., Nev. Land Action*, 8 F.3d at 716 (NEPA plaintiff "must allege that its injury is within the zone of interests protected by NEPA").

Finally, without citing a single case, Plaintiffs argue they need not establish prudential standing to bring their NEPA claims because *FLPMA* declares the policy of the United States that "judicial review of public land adjudication decisions be provided by law."  Pls' Opp. at 20 (quoting 43 U.S.C. § 1701(a)(6)).  However, a right of action under a different statute does not allow Plaintiffs to bypass their obligations to establish all elements of standing with respect to their NEPA claims.  *See Nev. Land Action*, 8 F.3d at 716 n.2 (rejecting suggestion that standing under NEPA may be "derived from standing under other statutes which refer to NEPA").  Moreover, "FLPMA does not provide a private right of action."  *Ctr. for Biological Diversity v. Veneman*, 394 F.3d 1108, 1111 (9th Cir. 2005).  The mechanism 'provided by law' to bring FLPMA claims—just like NEPA claims—is the APA, which also requires satisfying the zone of interests test.  *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 484 (9th Cir. 2011) ("[A] plaintiff bringing suit under the APA for a violation of NEPA or FLPMA must show that the alleged injury falls within NEPA's 'zone of interests.'").

1

2

**B.  Plaintiffs' Newfound Interest In The Environment Does Not Bring Their Economic Interests Into NEPA's Environmental "Zone of Interests."**

3      Plaintiffs' next argue they are advancing environmental interests in their NEPA

4   claims.  Pls' Br. at 20-24.  Specifically, they claim to be interested in "minimizing" the

5   physical and environmental impacts of mining and argue that the NEPA analysis

6   ignored "increased" physical environmental impacts of the withdrawal.    As Federal

7   Defendants have explained, neither argument has merit.  *See* Suppl. Mem. at 13-17.

8

9      Since Federal Defendants filed their renewed motion to dismiss, the Ninth

10   Circuit affirmed the District of Idaho's *American Independence Mines* decision

11   rejecting very similar attempts by mining companies to bring their economic interests in

12   mining within NEPA's zone of interests.  *Am. Independence Mines*, 2012 WL 3542264.

13   The Ninth Circuit held that the mining companies' "commitment to environmental

14   studies and mitigation activities" were "activities . . . undertaken only as part of the

15   pursuit of [their] economic interest in mining" and concluded that "[t]hese purely

16   economic interests do not fall within NEPA's environmental zone of interests." *Id.* at

17   *2.  Likewise, here, Plaintiffs' purported interest in minimizing environmental impacts

18   is undertaken only in pursuit of their economic interest in mining the withdrawn area.[3]

19

20

21

22   _____

23   [3] Plaintiffs attempt to distinguish the cases Federal Defendants cited by arguing that the only environmental impacts alleged in those cases were those "avoided by agency action," whereas Plaintiffs contend they are advancing "additional, increased environmental impacts caused by agency action."  Pls' Br. at 23.  That distinction is without merit.  In *American Independence Mines*, plaintiffs argued that "their interest in keeping the roads open and maintained for their use in mining exploration is linked to NEPA's objectives because closure of road may increase sediment load, *thereby harming the environment.*" 733 F. Supp. 2d at 1263 (emphasis added).  The court nonetheless found that their interests did not fall within NEPA's zone of interests.

24

25

26

27

28

Plaintiffs' secondary argument, that the BLM failed to consider the potential that the withdrawal will result in "greater aggregate environmental impacts to the *region*" because ore deposits (outside the withdrawn area) of "lower grade and concentration" will have to be mined instead, Pls' Opp. 21 (emphasis added), likewise lacks merit.  As an initial matter, because Plaintiffs failed to raise these issues in their comments submitted during the NEPA process they should be "foreclosed from raising the argument" now.   *Am. Indep. Mines*, 733 F. Supp. 2d at 1266-67.  *See* Exhibit 1 (NMA's May 4, 2011 comments).[4]   It is clear that Plaintiffs' sudden interest in the environment is nothing more than pretext to advance their economic interests.[5] Moreover, despite submitting three declarations, Plaintiffs still have not identified where these "other" deposits are located, what they mean by the "region," or any

---

[4] The Declaration of Katie Sweeney quotes a paragraph of her letter to BLM in which she argued that the withdrawal was unnecessary to protect Grand Canyon National Park because the area had been mined in an environmentally protective matter and the breccia pipes were high grade deposits that produce uranium with "less environmental footprint."  Dkt. 60-1 ¶ 9. This, however, is insufficient to put the BLM on notice of an argument that it underestimated the environmental impacts of the withdrawal because it failed to consider the effects of mining operations outside the withdrawn area.  *See Dept. of Transp. v. Pub. Citizen,* 541 U.S. 752, 764-65 (2004) (holding that plaintiffs "forfeited any objection to the EA" that they failed to raise in their comments because "[p]ersons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] positions and contentions,' in order to allow the agency to give the issue meaningful consideration.") (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 553-54 (1978)).  NEI and Uranium One (the only member that NEI and NMA have identified) did not even submit comments on the Draft Environmental Impact Statement.

[5] "NEPA was not intended to be a 'general enabling statute allowing opponents of federal projects to sue solely by invoking the magic word "environment" . . . .'" *City of Los Angeles v. USDA*, 950 F. Supp. 1005, 1013 (C.D.Ca. 1996) (quoting *Hiatt Grain & Feed, Inc. v. Bergland*, 446 F. Supp. 457, 488 (D. Kan. 1978)).

concrete plans to mine these unidentified deposits.  *See* Dkts. 60-1 ¶ 9, 60-2 ¶¶ 8-9, 60-3 ¶ 6.  As explained in the supplemental motion to dismiss, Plaintiffs cannot satisfy their burden of establishing standing with such vague assertions that, at some point in the future, some unspecified mining companies may mine some undisclosed location, which could result in greater environmental impacts.  *See* Supp. Mem. at 14-15.

Moreover, Plaintiffs have not established that these environmental interests are germane to their organizational purposes.  Organizations that, like Plaintiffs, are created to protect their members' economic interests lack associational standing to bring NEPA claims.  *See Ranchers Cattlemen*, 415 F.3d at 1104 (finding no connection between "the purported environmental interest that [non-profit cattle producers' association] attempts to raise . . . and the 'trade and marketing' interests it is organized to protect").[6]  At a minimum, the germaneness prong requires "'that an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together.'" *Cal. Sportfishing Prot. Alliance v. Diablo Grande, Inc.*, 209 F. Supp. 2d 1059, 1067 (E.D. Cal. 2002) (quoting *Humane Soc'y v. Hodel,* 840 F.2d 45, 56 (D.C. Cir. 1988)); *see also Med. Assoc. of Ala. v. Schweiker,* 554 F. Supp. 955, 965 (M.D. Ala. 1983) ("[O]rganization may [represent the interests of its members] only when the injury to its members has some reasonable connection with the reason the members joined the

---

[6] *See also Fitzgerald Reno, Inc. v. U.S. Dep't of Transp.*, 60 Fed. Appx. 53, 53-54 (9th Cir. 2003) (unpublished) ("taxpayer organization whose purported environmental interests are not germane to its members" lacks standing); *Consejo de Desarrollo Economico de Mexicali, AC v. United States,* 438 F. Supp. 2d 1194, 1203 (D. Nev. 2006) ("[N]on-profit organization of business and civic leaders that promotes sustainable economic growth to improve quality of life" lacks standing because "environmental interest[s] . . . are not germane to [its] economic-related purposes.").

organization and with the objectives of the organization.").  Neither NMA nor NEI has asserted a "special expertise" in advancing environmental interests, nor have they shown that such environmental interests are the grounds that bring their memberships together.  It is insufficient for Plaintiffs to point to NMA's "sustainable development pledge," which commits its members to "integrating social, environmental, and economic principles in [their] mining operations," Dkt. 60-1 at 8, or NEI's statement of purpose, which includes the development of nuclear energy to meet the nation's "energy, environmental and economic goals," Pls' Opp. at 23-24, to transform themselves from what they are at their core—industry organizations promoting the economic interests of their members, *see* Am. Compl. ¶¶ 7-8.

### C. Plaintiffs' Purely Economic Interests Are Not Protected By NEPA

Plaintiffs urge the Court to reject decades of Ninth Circuit precedent and find that in light of *Bennett v. Spear*, 520 U.S. 154 (1997), Plaintiffs' *purely* economic interests provide NEPA standing.  Pls' Br. 24.  The Ninth Circuit, however, has already considered the impact of *Bennett* and affirmed that "purely economic interests do not fall within NEPA's zone of interests." *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940-45 (9th Cir. 2005); [7]*Ranchers Cattlemen*, 415 F.3d at 1103 n.17 ("Even since *Bennett*, [the Ninth Circuit] has continued to apply the zone of interests test to [NEPA]

---

[7] Contrary to Plaintiffs' contention, the prudential standing rulings in *Ashley Creek* are not dicta, but rather "an alternate basis for [the Ninth Circuit's] decision."  420 F.3d at 939.  Indeed, Plaintiffs' reliance on the opinion of the concurring judge who wrote that he "would leave for another day deciding whether the prudential standing doctrine forecloses any plaintiff asserting a purely economic injury from bringing suit under § 102 of NEPA," *id.* at 945 (Beezer, J. concurring in part, concurring in the judgment), actually supports the conclusion that the Ninth Circuit has already ruled on this issue.

claims."); *Ariz. Cattle Growers' Ass'n v. Cartwright*, 29 F. Supp. 2d 1100, 1107-09 (D.

Ariz. 1998) (rejecting argument that *Bennett* implicitly overruled *Nevada Land Action*).

In *Ashley Creek*, the Ninth Circuit rejected the "distinction [that Plaintiffs

attempt to draw] between cases involving NEPA's threshold applicability (i.e., whether

an EIS is necessary) and cases in which an EIS is clearly required" and found that such

a "theory is undone by the structure of NEPA and the purpose of §102." *Ashley Creek*,

420 F.3d at 941.  The Ninth Circuit analyzed the Eighth Circuit cases Plaintiffs rely on,

*Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115 (8th Cir. 1999)

and *Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031, 1038 (8th Cir. 2002), and

explicitly "disagree[d] with [its] sister circuit that § 102 protects purely economic

interests or that it can be severed from NEPA's overarching purpose." *Ashley Creek*,

420 F.3d at 942.[8]  Most recently in *American Independence Mines*, the Ninth Circuit

reaffirmed that "§102 cannot be divorced from the overall purpose of NEPA, which [is]

. . . 'a national commitment to protecting and promoting environmental quality.'" 2012

WL 3542264 at *2 (quoting *Ashley Creek*, 420 F.3d at 944-45).

**D.  Procedural Interests Alone Do Not Establish Prudential Standing.**

Finally, Plaintiffs cannot establish prudential standing merely by invoking

---

[8] Plaintiffs' reliance on CEQ regulations is misplaced, Pls' Opp. at 24, because NEPA's "statutory text and the regulations are consistent: both permit consideration of economic interests that are *interrelated* with the environmental effects of an action, but neither protects *purely* economic interests." *Ashley Creek*, 420 F.3d at 943 fn.4 (emphasis in original)*; see also Town of Stratford v. Fed. Aviation Admin*., 285 F.3d 84, 89 (D.C. Cir. 2002) ("[W]e do not read the CEQ regulation as purporting to extend prudential standing. It does indicate that when economic and social effects are interrelated with natural and physical environmental effects the EIS will 'discuss' all of these effects, but it does not require government agencies to take economic effects into account.").

procedural interests.  To the contrary, the Supreme Court has long held that a plaintiff alleging procedural injury must show that the "procedures in question are designed to protect some concrete interest of his that is the ultimate basis of his standing." *Defenders*, 504 U.S. at 573 n.8; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  Plaintiffs invoking violations of NEPA's procedures must show that they have environmental interests which fall within the zone of interests those procedures were intended to protect.  *See Ranchers Cattlemen*, 415 F.3d at 1103.

Plaintiff's reliance on *Wilderness Society v. U.S. Forest Service*, 630 F.3d 1173 (9th Cir. 2011), is likewise misplaced. *Wilderness Society* overruled the categorical prohibition on intervention by private litigants *as defendants* in NEPA litigation and held that "courts should be permitted to engage in the contextual, fact-specific inquiry as to whether private parties meet the requirements for intervention of right on the merits." *Id.* at 1179.  This inquiry looks to whether the proposed defendant-intervenor "will suffer a practical impairment of its interests *as a result of the pending litigation*." *Id.* at 1180 (emphasis added).  The Ninth Circuit expressly recognized "that a prospective intervenor's asserted interest *need not be protected by the statute under which the litigation is brought* to qualify as 'significantly protectable'" for intervention purposes.  *Id.* at 1179 (emphasis added). Thus, *Wilderness Society* does not define the zone of interests protected by NEPA.  Moreover, the proposed defendant-intervenors in *Wilderness Society* represented "recreation interests," *id.* at 1176—which are within the zone of interests protected by NEPA, *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990)—not purely economic interests as those asserted here.

17

1

**CONCLUSION**

2

3

For the foregoing reasons, Federal Defendants respectfully request that the Court

dismiss the Amended Complaint for lack of subject-matter jurisdiction.

4

5

Dated:  September 21, 2012

6

Respectfully Submitted,

7

IGNACIA S. MORENO,
Assistant Attorney General
Environment and Natural Resources Division

8

9

 /s/ John S. Most
JOHN S. MOST, Trial Attorney
Virginia Bar, No. 27176
DOMINIKA TARCZYNSKA, Trial Attorney
New York Bar, No. 4431573
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0447(Tarczynska)
202-616-3353 (Most)
202-305-0506 (fax)
DOMINIKA.TARCZYNSKA@USDOJ.GOV
JOHN.MOST@USDOJ.GOV

10

11

12

13

14

15

16

17

18

*Counsel for Defendants*

19

20

21

22

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

2

3       I hereby certify that I have caused the foregoing to be served upon counsel of
record through the Court's electronic service system (ECF/CM).

4

Dated:  September 21, 2012

5

6

7                                                     /s/ John S. Most
                                                  *Counsel for Federal Defendants*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Kimberly MacMillan**

From: **Sweeney,Katie** <KSweeney@nma.org>
Date: Wed, May 4, 2011 at 4:32 PM
Subject: National Mining Association Comments
To: NAZproposedwithdrawal@azblm.org

Attached please find the comments of the National Mining Association regarding the draft environmental impact statement (DEIS) for the Northern Arizona Proposed Withdrawal.  76 Fed. Reg. 9594.  If you have any questions or problems opening the comments,  please contact me.

*Katie Sweeney*

General Counsel

National Mining Association

101 Consitution Avenue, Suite 500 West

Washington, DC 20001

ksweeney@nma.org

202/463-2627



May 4, 2011

Northern Arizona Withdrawal Project
ATTN: Scott Florence, District Manager
Bureau of Land Management
Arizona Strip District Office
345 East Riverside Drive
St. George, UT 84790–6714

Dear Mr. Florence:

On February 18, 2011, the Bureau of Land Management (BLM) announced the availability of the draft environmental impact statement (DEIS) for the Northern Arizona Proposed Withdrawal.  76 Fed. Reg. 9594.  The National Mining Association (NMA) opposes the proposed withdrawal of more than one million acres of mineral-rich public land in Northern Arizona in the vicinity of the Grand Canyon National Park (GCNP).  NMA's members are producers of most of America's coal, metals, industrial and agricultural minerals; manufacturers of mining and mineral processing machinery and supplies; transporters; financial and engineering firms; and other businesses related to mining.  Our members employ or support over 1.3 million high-wage jobs, have a significant interest in the exploration for, and development of, minerals on federal lands, including the vast mineral resources in Arizona.

NMA opposes the proposed withdrawal of any of these lands from new mining claims and supports Alternative A, the no action/no withdrawal alternative.  These lands have potential metals resources and known uranium resources.  The action purportedly is intended to protect the GCNP, obviously a national treasure that merits protection.  However, the park itself is already closed to mining.  The additional acreage that would be withdrawn by BLM under Alternatives B, C or D, is an overreaching effort to protect the GCNP from vague and unsubstantiated threats outside the park boundaries.

**The DEIS Fails to Provide Credible Evidence that the Withdrawal is Necessary**

There is no doubt that the GCNP is a national treasure.  However, creation of an additional one million of acres buffer zone around the park is not justified given the lack of evidence in the DEIS that the GCNP is at risk from mining given existing protections.  The 1.2 million acres of federal land included in the GCNP are already protected from the impacts of mining as these lands appropriately have been withdrawn from the operation of the Mining Law.  The park was created with a built

1

in buffer zone to protect park resources from activities taking place outside the park boundaries.

- **Many Impacts under "Alternative A" Are Not Significant**

For many categories of potential impacts, the Department's DEIS notes that allowing mining in that proposed withdrawal area would only have minor or temporary impacts or that actions would be taken to minimize impacts. As indicated in the DEIS the impacts to key resources are frequently not significant.

Air Emissions: "Since these emissions would occur at ground level and would likely cause temporary increases in the air pollutant emissions in the immediate vicinity if the exploration and development sites, it is unlikely that these emissions would be transported more than a few kilometers, except on windy days and during significant wind events. The compliance measures discussed in Section 4.2.4 would be expected to reduce these impacts." DEIS p. 4-27.

Water Resources: As shown in Table 4.4-3, most of the impacts to water resources under alternative A are characterized as none, or negligible. For the few identified as potentially moderate or major, most fall into a range where the potential impacts have a range that includes none/negligible. As to duration of impacts, the DEIS notes that many will be temporary due to reclamation requirements in current applicable regulations. *See* DEIS at p. 4-69.

Soil Resources: "Soil impacts would be expected to be effectively controlled under current regulatory requirements." DEIS p. 4-110.

Vegetation Resources: "Direct impacts from mining activity to specific vegetation communities cannot be calculated at this time because exact locations of mines are not known. In general, these impacts are estimated to be minor to moderate, depending on the location of the impacts." DEIS p. 4-116.

Fish and Wildlife: Plans of operations include standards operating and reclamation measures to minimize or mitigate impacts to fish and wildlife resources. DEIS p. 4-119. "In summary, Alternative A could increase uranium levels at area seeps, springs and other water bodies and could result in the mortality of individuals or reduced visibility of individuals; however, these impacts are not anticipated to alter the overall distribution of fish and aquatic organisms, nor result in changes to overall fish or wildlife population." DEIS p. 4-127.

Wilderness Resources: Alternative A "would not result in any direct impacts to designated and proposed wilderness areas." DEIS at p. 4-217.

Recreation and Tourism: Under Alternative A, tourists and recreation activity could be displaced as mineral activity increases in specific areas; however, overall regional tourist activity and associated employment are unlikely to be affected. DEIS at 4-248.

2

- **No Evidence that Existing Regulations Fail to Protect Park Resources**

Neither does the DEIS identify failures with existing regulations for mining on public lands that would put the GCNP at risk.  In fact, as mentioned above, chapter 4 of the DEIS discusses compliance with environmental regulations and permits as methods of minimizing or mitigating any potential mining impacts on various resources.  Thus, to some degree the department acknowledges the role of existing regulations but the DEIS should contain a more complete picture of the comprehensive framework of federal and state environmental, ecological, and reclamation laws and regulations that ensure operations are fully protective of public health and safety, the environment, and wildlife.  indeed, any proposed mining project would be evaluated as required by each of these laws to ensure that mining could be completed in a manner that is protective of the environment.  Since each proposed mine would be evaluated on its own merits, it is not necessary to withdrawal this land on a generic basis.  Mining on public lands, including uranium mining in proximity of the GCNP, is subject to:

- ♦ Specific mining environmental standards administered by the Bureau of Land Management and the Forest Service, the federal surface land management agencies, and supplemented by state laws;
- ♦ All major applicable federal environmental laws such as the National Environmental Policy Act, the Clean Air Act, the Clean Water Act, the Solid Waste Disposal Act, the Resource Conservation and Recovery Act, Superfund, the Safe Drinking Water Act, the Toxic Substances Control Act and many others; Wildlife protection statutes administered by the Department of the Interior and/or States such as the Endangered Species Act; and
- ♦ Comprehensive Western State laws and regulations dealing with the protection of groundwater quality and quantity, both for operations and closure, the management and disposal of solid waste, and the reclamation of mining sites, which typically focus on the establishment of post-mining habitat for wildlife.

As seen by the number of approvals and permits the typical mining operation on federal lands must obtain before commencing construction, mining is heavily and thoroughly regulated.  Depending on a project's complexity, the environmental assessment and permitting process can take many years to complete.  Typical environmental permits and approvals that address many of the environmental resources identified for evaluation in the DEIS include:

- ♦ A plan of operations from the BLM or Forest Service, requiring a reclamation plan, closure plan, and cultural resources plan.  The plan of operations is scrutinized under the National Environmental Policy Act (NEPA), usually requiring the preparation of an environmental impact statement (EIS), which evaluates potential environmental impacts of the mining operation, assesses alternatives and requires the identification of mitigation measures to reduce potentially significant environmental impacts.  The EIS process

3

has evolved to address broader issues and many times it is known as the ESIA or Environmental and Social Impact Assessment.

♦ Air quality permits from EPA or state agencies with delegated programs under the Clean Air Act. The complexity of the air quality permits increases if there are substantial onsite processing facilities. All sites must have an approved fugitive dust control program.

♦ Water quality permits from EPA or state agencies with delegated programs under the Clean Water Act. Water quality permits can include discharge permits, stormwater management permits and section 404 permits. States also require permits to address potential impacts to ground water, both during operations and closure to protect the reasonably foreseeable beneficial uses of groundwater resources.

♦ Rights to use or consume water from appropriate state authorities.

♦ Hazardous waste permits that govern storage, transportation and disposal of laboratory or processing wastes.

♦ Authorization under the National Historic Preservation Act if cultural or historic resources are present.

♦ Permits to construct tailings ponds or other impoundments.

These laws and regulations that govern mining on federal lands are "cradle to grave," covering virtually every aspect of mining from exploration through mine reclamation and closure.  The National Academy of Sciences (NAS) reviewed the existing federal and state regulatory framework for hardrock mining and concluded that the existing laws were "generally effective" in ensuring environmental protection. *Hardrock Mining on Federal Lands,* National Academy of Sciences, National Academy Press, 1999, p. 89.

As acknowledged in the DEIS, the mining operations that have been conducted in the proposed withdrawal area have been properly operated and reclaimed in an environmentally protective manner and as such, do not provide evidence that a withdrawal in the area surrounding the park is necessary to protect the park.  Since the uranium deposits in proximity of the GCNP developed are typically breccia pipe formations, the surface disturbance has historically been remarkably small because of the high-grade, compact nature of the mineralization and use of underground waste rock back-fill procedures during breccia pipe mine development work.  Higher grade deposits, such as the breccia pipes, produce more uranium with less environmental footprint.

On BLM lands adjacent to the GCNP, 18 uranium deposits were discovered and nine mines constructed in the 1980s.  Four of the mines are undergoing care and maintenance and are in the process of redevelopment. The other five mines have been closed and reclaimed.  From its experience in the 1980s until mining ceased in 1990, BLM reached several conclusions about the low impact nature of breccia pipe uranium mining in the area near the Grand Canyon:

- Uranium mines, from initial development to reclamation, last approximately 10 years;

4

- Disturbances at each mine site generally result in approximately 20 acres of surface area impacted; and
- The reclaimed mines have responded very well to reclamation efforts.

*See* Final Environmental Impact Statement (FEIS) for the Arizona Strip RMP at p. 3-137 and 4-279.

- **DEIS is Silent on Ability to Address Impacts through Land Use Planning Process**

Comments submitted by NMA during the scoping period prior to development of the DEIS, requested the department identify specific deficiencies with the existing land use planning process to explain why the process was insufficient to protect GCNP resources from the impacts of mining.  Receipt of this and similar comments is noted in the BLM March 2010 Proposed Withdrawal Scoping Report, "BLM is ignoring its 5-year effort to revise its management plan, which would have kept much of the land in question open for mining activities."  Scoping Report, p. 43. One purpose of scoping is to identify issues and concerns to be considered in the environmental impact statement.  Yet the DEIS fails to provide any discussion of the Resource Management Plan (RMP) developed by BLM that covered much of the land within the proposed withdrawal.

A key purpose of the federal land management agencies' land use planning processes is to identify natural or cultural resources or environmental and social sensitivities that require special consideration. Specifically, these processes are used to identify areas that need to be withdrawn as well as any terms, conditions, or other special considerations needed to protect other resource values while conducting activities under the operation of the mining laws.  BLM recently completed such a process for nearly two million acres of federal lands adjacent to the GCNP, a five year efforts that culminated in a revised Arizona Strip RMP.  The revised RMP guides the management of 1,679,896 acres of BLM-administered lands in northern Arizona, much of which would be withdrawn from operation of the Mining Law under the July 21 proposal.

The RMP was developed through a public process with input from tens of thousands of interested stakeholders.  Through the RMP process, BLM reviewed the involved lands to determine which lands were suitable for mining activity.  The RMP concludes that most of the Arizona Strip FO should remain open to location under the Mining Law.  The RMP applies the following designations for locatable minerals within the Arizona Strip:

- 1,534,396 acres: Open to the operation of mining laws
- 145,226 acres: Open with restrictions
- 182,699 acres: Open only with a plan of operations
- 118,743 acres: Withdrawn to mining location subject to valid existing rights.

Using the planning process discussed above, BLM provided additional protections for special resources as needed.  For example, the RMP requires new reclamation stipulations for exploration and development plans directed toward maintaining naturalness and unique features and/or remoteness on the Arizona Strip.  In addition, the RMP requires special mitigation in mining plans of operation to avoid impacts to cultural resources, special status species, and/or other sensitive resources.

**DEIS Fails to Adequately Assess the Far Reaching Implications of the Proposed Withdrawal**

The wide-ranging consequences of the withdrawal have not been adequately assessed in the DEIS, particularly potential implications for national economic or energy security.  The Mineral Report prepared in conjunction with the DEIS accurately notes that "failure to develop uranium resources on the subject lands that have the potential of becoming the second most important uranium-producing region in the United States has far reaching economic implications," but concludes that those implications are "beyond the scope of this report."  Mineral Report at p. 23.  The Mineral Report may not be the appropriate vehicle for addressing such implications but certainly the Socioeconomic Report or the DEIS would be.  But these documents fail to acknowledge the implications to our national economic and energy security.  Instead, the Socioeconomic Report and DEIS dismiss the potential benefits of mining domestic sources of uranium with statements such as:

> Like oil and lumber, uranium mined in the United States can be sold to consumers domestically or abroad, based on demand and subsequent market prices.  Currently, there are no laws in place that would require domestic uranium to be solely purchased and consumed within the United States.  As a result, uranium mined and produced in the United States would not necessarily move the United States toward energy independence. [and thus would not represent an impact to national energy resources] DEIS at 4-253.

Socioeconomic Report at 39 and DEIS at 3-276.

Such a statement is without merit.  There are many commodities from agricultural to livestock to oil that are sold on the global market but that are still important to develop domestically in order to further our national and economic security.

Historically, the lands within the proposed withdrawal area have "produced some of the highest grade mineralization and most profitable uranium production in the U.S." And there is much more uranium available. Mineral Report, p. 22.  According to the DEIS, the undiscovered uranium endowment in the proposed withdrawal area is approximately 326 million pounds, of which about 33,155 tons (or more than enough to fuel all 104 US reactors for over a year) would be economically viable Furthermore, these numbers do not appear to factor in the Mineral Report conclusion that

6

> **it is possible the majority of uranium resources on the subject lands have yet to be discovered. There is potentially a large number of hidden breccia pipes that remain to be discovered by advanced geophysical techniques.**

(Emphasis added.)  Mineral Report at p. 22.  And the statement on hidden breccia pipes is not speculative:

> However, the potential to discover additional hidden mineralized pipes with airborne VTEM geographical surveys is high.  Hack II, the largest and one of the highest grade uranium deposits ever discovered on the land involved, is a hidden breccia pipe.

Mineral Report at p. 27.  For reasons unclear to NMA, neither the DEIS nor the Socioeconomic Report track or follow up on the suggestion that there may be a large potential for future discovery of hidden breccia pipes.  In fact, the DEIS appears to disavow such statements by concluding that:

> With respect to breccia pipe uranium deposits, such changes may not be a major factor in identifying new deposits since northern Arizona breccia pipe deposits are not marginal in terms of percent uranium, being already higher in grade than 85% of uranium deposits worldwide. Where uranium mineralized deposits exist, they can be classified as either minable or not, without having to rely on anticipated improvements in technology.

DEIS Appendix B, p. B-21.  The failure of the DEIS to mention or incorporate the information about hidden breccia pipes seems to be a deliberate attempt to discount the true impacts of the proposed withdrawal.  The dismissiveness of the DEIS regarding the ability of domestic uranium to assist in achieving the U.S.' energy independence goals ignores how development of domestic uranium promotes economic and energy security.  The U.S. has the world's largest fleet of nuclear reactors (now 104), which produce nearly 20 percent of our country's electricity.  The U.S. has one of the world's largest resource bases of uranium of any country in the world and as noted in the DEIS, some of the richest uranium deposits in the U.S. are in the proposed withdrawal area.  Despite these resources and the size of our nuclear fleet, however, the U.S. produces less than 10 percent of its own uranium and imports over 90 percent of what is needed to operate our reactors.  At a time when energy costs are rising and all available sources of energy must be utilized to meet increased demand, preventing access to the resources to provide such energy is bad public policy, especially when such actions are unnecessary to provide effective protection of the environment and special places like the GCNP.

If the DEIS underestimates the amount of uranium that can be recovered from the proposed withdrawal area, it similarly underestimates the potential economic benefits of uranium mining.  As noted in the Socioeconomic Report, the proposed

withdrawal area has suffered during the recent recession, "Arizona has been hard hit by the recent national economic downturn, leading the nation in job losses and housing foreclosures." Socioeconomic Report, p. 14.  The current precarious economic situation only highlights the need to carefully consider a withdrawal that puts at risk hundreds of high-paying mining jobs—with an average annual wage of $59,000, 33 percent higher than the combined annual average for all industrial jobs—in Arizona, and Utah.  The difference in wages is magnified when one examines the average wages in the counties that would be impacted by the withdrawal since these counties generally lag behind the average state wage. *See* Socioeconomic Report at p. 20 (2007 wages for Mohave and Coconino Counties lag behind the Arizona average wage of $42,214 at $35,123 and $32,135 respectively; and Socioeconomic Report at p. 22 (2007 wages for Kane, San Juan and Washington Counties lag behind the Utah average wage of $37,722, at $26,836, $29,212 and $30,310 respectively.)

Obviously, the high-paying mining jobs would be a boon to these counties. And while many of the commenters during the scoping period may claim otherwise, tourism jobs cannot compete with mining jobs.  As accurately portrayed in the Socioeconomic Report, "tourism related jobs are often seasonal, require unskilled labor, and provide low income.  These jobs are often part-time jobs and do not provide insurance benefits." Socioeconomic Report, p. 24.

**Conclusion**

NMA appreciates the opportunity to submit these comments.  NMA believes the proposed withdrawal of nearly one million acres adjacent to the GCNP is unwise from a minerals and energy security standpoint and wholly unnecessary to protect the resources within the park.  Careful consideration of the facts regarding uranium mining and reclamation in the proposed withdrawal area demonstrate that uranium mining on the Arizona Strip has been carried out responsibly in the past and with no significant impacts to public health, safety or the environment, while at the same time allowing for the recovery of these valuable resources.

New mining operations are already either restricted or banned on more than half of all federally owned public lands.  Given the vast amount of federal lands already closed to mining operations, caution should be exercised when determining whether additional lands should be withdrawn.  Access to federal lands for mineral exploration and development is critical to maintain a strong domestic mining industry as these lands historically have, and will continue to, provide a large share of the metals and hardrock minerals produced in this country.  As noted in the DEIS, in all "approximately 5,100 square miles of high mineral potential lands have previously been withdrawn accounting for approximately 56% of the high mineral potential lands identified by the USGS in northern Arizona and southern Utah.

We request BLM review the impacts of the proposed withdrawal given its multiple use mission under FLPMA.  The agency can take other less restrictive measures to protect park resources, such as those outlined in BLM's RMP for the Arizona Strip.

If you have any questions regarding these comments, please contact me at ksweeney@nma.org or (202)463-2627.

Sincerely,

Katie Sweeney
General Counsel