DECONCINI MCDONALD YETWIN & LACY, P.C.
2525 East Broadway Blvd., Suite 200
Tucson, AZ 85716-5300
(520) 322-5000

John C. Lacy (AZ #2084)
jlacy@dmyl.com
Gary F. Urman (AZ #11748
gurman@dmyl.com
Marian C. LaLonde (AZ #25132)
mlalonde@dmyl.com
Attorneys for Intervenor VANE Minerals (US), LLC

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GREGORY YOUNT, | ) |
| | ) Case No. CV11-8171-PCT-DGC |
| Plaintiff, | ) (Consolidated) |
| | ) |
| v. | ) |
| | ) **DECLARATION OF KRIS** |
| KENNETH L. SALAZAR, Secretary, | ) **HEFTON** |
| Department of the Interior, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

I, Kris Hefton, declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following statements are true and correct.

1. I am geologist with over 30 years experience discovering, exploring, evaluating, and developing mineral deposits, including breccia pipe uranium deposits in Northern Arizona. I obtained a B.Sc. in Geology from the University of Texas at Austin in 1978. My uranium exploration career on the Colorado Plateau began with Century Geophysical Corp. in 1976. Starting in 1978, I spent nine years with the uranium exploration division of Energy Fuels Nuclear Inc., working as a geologist on projects in Utah and Arizona. In Arizona, I was assigned to projects in the breccia pipe district on the Arizona Strip beginning in 1979. I joined Freeport-McMoRan in 1988 and later

headed the mine site exploration team at Freeport's Grasberg Mine in Indonesia and managed exploration programs for Homestake Mining Co. and Barrick Gold Corp. in Europe and South American from 1997 to 2002. Since 2004, I have overseen the uranium exploration program for VANE Minerals (U.S.) L.L.C. My combined uranium experience totals 19 years. I am the Chairman of the Uranium Committee of the Arizona Mining Association, a board member of the Arizona Mining Association, a board member of the Northwest Mining Association, a member of the Arizona State Mining Advisory Council, and I previously served as a member representing energy minerals on the Ad Hoc Committee on Mining Regulations of the Arizona 49th Legislature.

2. I am currently the Chief Operating Officer for VANE Minerals (U.S.), L.L.C., a Delaware limited liability company that is authorized to do business and conduct operations in the State of Arizona, where it owns, explores, and develops mineral properties.

3. VANE is a member of Northwest Mining Association ("NWMA") and fully supports NWMA's mission and is committed to NWMA's environmental principles.

4. VANE is actively engaged in, *inter alia*, an exploration and development program designed to locate, delineate, and develop high-grade breccia pipe uranium deposits in Northern Arizona. Since October, 2004, VANE has invested more than $8.5 million in its uranium program.

5. VANE is committed to following mining practices that comply with all applicable laws and all restrictions and conditions imposed by governmental entities, and which result in as little impact to the land and environment as possible. VANE recognizes that irresponsible activities on public lands often result in adverse political, regulatory and financial consequences, so VANE willingly and routinely incurs expenses to minimize the impact of its activities upon the environment. VANE takes pride in leaving behind little or no lasting environmental disturbances, so that the lands can be better enjoyed by other users. For example, sites in the Kaibab National Forest where

VANE conducted exploratory drilling in 2008 were fully reclaimed under the supervision of the Forest Service so that, today, it is difficult, if not impossible, to tell that any mineral exploration activities were conducted on the sites. Throughout my career, the mining companies for which I worked that pursued activities in Northern Arizona employed a similar mindset.

6. VANE owns 678 mining claims in Northern Arizona. These properly located and maintained mining claims vest in VANE constitutionally protected property rights, including but not limited to, the right to use and occupy the mining claims for prospecting, mining, and processing and all uses reasonably incident thereto.

7. On July 21, 2009, notice was published in the *Federal Register* of Secretary Salazar's proposal to withdraw approximately 1 million acres in Northern Arizona from location and entry under the Mining Law for 20 years. 74 Fed. Reg. 35,887–88 (July 21, 2009). Publication of this notice automatically segregated these acres from location and entry under the Mining Law for two years. The lands that were segregated included 626,678 acres of land managed by the Bureau of Land Management ("BLM"), and located within the "Arizona Strip" portion of Northern Arizona, as well as 355,874 acres of land managed by the United States Forest Service, and located within the Tusayan Ranger District of the Kaibab National Forest. The segregated lands collectively are referred to as the "Withdrawal Area." VANE's claims are within the Withdrawal Area. The segregation drastically altered the legal regime under which VANE could explore for and locate new claims and corroborate its discoveries and develop the valuable mineral deposits on its existing claims.

8. For example, immediately prior to the segregation, VANE was ready, willing, and able to explore for and locate new claims adjacent to and/or near its existing claims. Because of the 2-year segregation period, VANE was prohibited from exploring for and locating any new claims.

9. More specifically, up to the time that the Secretary of the Interior issued his notice of segregation applicable to the Withdrawal Area, VANE was continually

identifying targets for locating new claims using ground and air reconnaissance, among other strategies. But for the notice of segregation, and later the withdrawal order, VANE would have continued to locate claims in the Withdrawal Area. To this day, VANE maintains a list of targets that are ready for "staking."

10. In addition, before the segregation, VANE could generally engage in notice-level operations on its existing claims on BLM-managed lands 15 calendar days after providing notice to the BLM. 43 C.F.R. § 3809.21. However, on segregated lands, the BLM generally chooses to prepare a mineral examination report to confirm the existence of valid claims before notice-level operations may proceed. *See* 43 C.F.R. § 3809.100. It is my experience that it takes the BLM several years to prepare a mineral examination report. During the preparation of the mineral examination report, VANE would be limited to only casual use of its claims. Casual use is generally limited to the use of hand-tools, and does not include the use of mechanized earth-moving equipment or truck-mounted drilling equipment. 43 C.F.R. § 3809.5. Needless to say, VANE could not effectively explore or develop its mining claims located on the segregated lands.

11. At the time of the notice of segregation, VANE had submitted plans of operations to the United States Forest Service (the Forest Service, rather than the BLM, has jurisdiction over national forest lands within the Withdrawal Area) to conduct exploratory drilling on claims located by VANE within the Kaibab National Forest. When the notice of segregation was issued, the Forest Service notified VANE that, as a result of the segregation, no action could be taken on the pending plans of operations until the Forest Service conducted a mineral examination of each affected claim to determine the existence of "valid existing rights."

12. The Forest Service took the position that VANE was required to demonstrate a "discovery" of minerals in such concentrations and quantities that it would be commercially reasonable to begin mining within each claim subject to the pending plans of operations. If VANE could make such a showing for a claim, using data that existed on the date of the notice of segregation, then consideration of the plans of

Declaration of Kris Hefton                                                                                              4

operations would be permitted to proceed. On the other hand, if such a showing could not be made for a particular claim, then the entire claim would be invalidated by the Forest Service.

13. The problem with the impending mineral examinations is that extensive drilling and other exploratory activities are required to demonstrate the existence of a "discovery," as defined by the Forest Service. VANE did not possess the data demanded by the Forest Service because it had not conducted the necessary drilling and other exploratory activities; in other words, the pending plans of operations sought approval to conduct the very activities that were necessary to gather the data which would be needed before the activities would be approved.

14. Knowing that VANE previously did not have the opportunity to conduct necessary drilling and other exploration activities on the claims that were subject to its plans of operations, the Forest Service suggested that VANE withdraw its plans of operations. The alternative, VANE was told, would be mineral examinations and the potential invalidation of its claims. Faced with no real choice, VANE withdrew its plans of operations.

15. Had the segregation, and later the withdrawal, not been in effect, the Forest Service would not have required mineral examinations as a condition of approving VANE's plans of operations.

16. In February 2011, the BLM issued the draft Environmental Impact Statement ("DEIS") for the proposed withdrawal. VANE timely submitted comments on the DEIS. These comments are attached hereto as Exhibit A, and are incorporated herein by reference. Among VANE's comments was the observation that uranium mining would have the positive impact of removing uranium from the local environment. The BLM failed to consider these comments, including the comment that uranium mining would actually improve the environment, during the NEPA process.

17. On January 9, 2012, Secretary Salazar signed the Record of Decision ("ROD") for the Northern Arizona Withdrawal. That same day, Secretary Salazar also

signed Public Land Order ("PLO") 7787, which implemented the ROD by withdrawing the Withdrawal Area from location and entry under the Mining Law for twenty years. 77 Fed. Reg. 2,563–66 (Jan. 9, 2012).

18. Like the segregation before it, the 20-year withdrawal drastically altered the legal regime under which VANE could explore for and locate new claims and corroborate its discoveries and develop the valuable mineral deposits on its existing claims.

19. But for the 20-year withdrawal, VANE would explore for and locate additional claims within the Withdrawal Area. Moreover, VANE would do so without the fear of premature mineral examinations by the BLM or the Forest Service. Thus, VANE has suffered injury in fact and is adversely affected and aggrieved by the 20-year withdrawal.

20. Because of the withdrawal, VANE cannot engage in notice- or plan-level operations until after the BLM or the Forest Service performs a mineral examination report for the claims at issue to confirm their validity. Indeed, as explained by Secretary Salazar in his ROD, the preparation of a single mineral examination report "is a complex and time-consuming" process:

> On withdrawn lands, neither the BLM nor the USFS will process a new notice or plan of operations until the surface managing agency conducts a mineral examination and determines that the mining claims on which the surface disturbance would occur were valid as of the date the lands were segregated or withdrawn. Determining the validity of a mining claim *is a complex and time-consuming* legal, geological, and economic evaluation that is done on a claim-by-claim basis.

ROD at 6–7 (emphasis added). Moreover, the BLM announced that the cost of mineral examinations performed during the segregation and withdrawal will be charged to the holder of the claim. In the absence of a segregation or withdrawal, the BLM would have paid the cost of the mineral examinations. Thus, because of the 20-year withdrawal, VANE is effectively limited to engaging in only casual use on its existing claims, unless it wishes to engage in an expensive and time-consuming validity examination. As a

Declaration of Kris Hefton                                                                                                   6

result, the value of VANE's mining claims has significantly decreased. Moreover, VANE must pay annual fees to maintain its claims, even though it is effectively barred from developing them.

21. The 20-year withdrawal has resulted in significant financial impacts on VANE. Prior to the 2-year segregation and the 20-year withdrawal, VANE and other operators obtained substantial investor financing by representing an active presence in the development of uranium resources. In addition to depriving VANE of the opportunity to recover its direct investment in its uranium exploration program totaling in excess of $8,500,000.00, as well as to add significant value and returns through the discovery and mining of uranium, VANE also has suffered an adverse impact on the value of its stock. Beginning with the announcement of the 2-year segregation, VANE's stock price began to fall. The impact on VANE's share value from the 2-year segregation and the subsequent 20-year withdrawal is estimated to be as much as $32,900,000.00. Finally, the BLM concluded in its EIS that, without the 20-year withdrawal, VANE's claims in the withdrawal area could be expected to result in no less than one producing mine. VANE's projected return from a single uranium deposit is approximately $94,000,000.00.

22. Development of hard-rock minerals has long been undertaken through the unpatented mining claim system, which is the only avenue to obtain, control, and protect rights to develop hard-rock minerals on federal lands in the U.S. and has been and continues to be used extensively by corporations and individuals. VANE followed established precedence in investing in its mining claims and was unaware that Secretary Salazar might withdrawal these lands without warning and without compensation for VANE's investment. VANE (a prudent company) would not have invested shareholder funds had it suspected that the Interior Department would withdrawal these lands, ultimately resulting in the loss of VANE's investment. Therefore, VANE has suffered injury in fact and is adversely affected and aggrieved by the 20-year withdrawal.

23. The mandate of the BLM is to promote the responsible development of

natural resources on federal lands as established by Congress. The development of hard-rock minerals on federal lands enjoys equal protection with other "multiple uses" such as recreation, hunting, and timber harvesting. Mineral development is managed under FLPMA and NEPA regulations routinely used for activities VANE undertook and proposed. The very lands in the Withdrawal Area have a 30-year history of successful uranium exploration and mining under established regulation and of the same level as VANE intended in its own operations. Based on these factors, VANE made its decision to invest in uranium exploration in Northern Arizona.

24. During the period from 2007 to 2008, environmental groups pressured then Secretary of Interior Dirk Kempthorne that an emergency existed with respect to increased uranium exploration activities in Northern Arizona and that he should close the area to uranium exploration and mining. In March 2008, then Governor Janet Napolitano sent a letter to Secretary Kempthorne requesting that he withdraw the federal lands in the area. However, the number of mining claims in the area in 2008 was less than 20% the number that existed in the 1980s and the actual drilling and mining activities were much less than in the 1980s. Secretary Kempthorne did not determine that an emergency existed to justify a withdrawal. In 2009, with a new political regime, newly appointed Secretary of Interior Ken Salazar issued the two-year segregation order and recommended a withdrawal. This action clearly indicates the subjective nature of and political motivation behind this issue because an emergency situation would have been clear regardless of which Secretary held office.

DATED this 11th day of October 2012.

Kris Hefton
Chief Operating Officer
VANE Minerals (U.S.), L.L.C.

# EXHIBIT A



VANE Minerals (US) LLC
7400 North Oracle Road, Suite 131
Tucson, Arizona 85704
Telephone: 520 797-1393
Facsimile: 520 742-7280
E-mail: kris.hefton@vaneminerals.com

April 30, 2011

Northern Arizona Proposed Withdrawal Project
Mr. Scott Florence, District Manager
U.S. Bureau of Land Management
Arizona Strip District Office
345 East Riverside Drive
St. George, UT 84790

Dear Mr. Florence,

This letter is to comment on behalf of myself and VANE Minerals (US) LLC on the Draft Environmental Impact Statement for the proposed withdrawal of approximately 1M acres. I am a geologist and my experience in the area spans from 1979, while employed by Energy Fuels Nuclear Inc., to the present. I lived and worked in the district from 1979 to 1988, and resumed work in the district in 2004. I have over 18 years of combined uranium experience in the area and am one of few people with this level of knowledge of the industry and the district.

VANE Minerals (US) LLC (VANE) has been active in the district since 2004 and has spent several million dollars on exploration for uranium in the breccia pipes. Due to the segregation order issued by Secretary of Interior Ken Salazar, a cloud of uncertainty was cast over the district and as a consequence, VANE was forced to halt its exploration efforts on public lands and has, along with our investors, suffered tens of millions of dollars in losses. I would like to point out that all funds were spent in good faith and trust in the BLM mandate to develop natural resources on public lands, a benefit to the United States.

Following are my comments on specific sections of the DEIS:

If one looks at the map of the proposed withdrawal area relative to the density of mining claims, the boundary directly overlays the greatest density of mining claims. The boundary does not follow some thoughtful process such as being located a set distance from the Colorado River or its tributaries or the boundary of a Park or Monument, and even leaves several miles of public land encompassing upper Kanab Creek out of the proposed withdrawal area. There happened to be few or no mining claims in that area at the time the boundary was drawn. One would reason that if the Colorado River and its tributaries are the worry, then the boundary would be drawn reflecting the shape of these features. That indicates that the intent of the proposed withdrawal is on mining claims rather than a set distance to the Colorado River and its tributaries.

A further deduction from the above comment is that the mining companies have excellent knowledge as to where the best potential lies and therefore, the withdrawal of these lands will kill the industry as well as cause undue personal burden and hardship on families due to job loss and the loss of economic opportunity to businesses in the area. The DEIS states that the average annual wage for the tourism-related sector which is a major employer in the region is $21,230 for Arizona, and $20,200 for Utah. The US Poverty Line for a family of four in 2009 was $22,050. The mining industry represents one of the last alternative economic opportunities available on public lands in the region and a decision to withdraw these lands will help encourage a future of poverty.

The United States Geological Survey was charged with producing USGS Scientific Investigations Report 2010-5025 (USGSsir2010-5025) to provide data for the EIS. Although, the DEIS relies heavily on data from this report, nowhere in the DEIS is it explained that USGS Scientific Investigations Report 2010-5025 was completed for the expressed purpose of the EIS. It should be noted that none of the credentials of the authors of USGSsir2010-5025 are provided to authenticate their qualifications for this project. Specifically, with respect to Chapters A and B which present mineral exploration and mining data, it is not clear whether the authors are geologists or have a background in mining. Further to this, the editor of USGSsir2010-5025, Andrea Alpine, is not a geologist or mining engineer. The data provided for the DEIS is flawed from the intrinsic reason that, given the main issue in the withdrawal is mining, the United States Geological Survey should have charged the responsibility of this to a geologist or engineer with mining qualifications. The need to ensure that the best qualified people are put on this project is critical since the EIS process is for the purpose of deciding whether to withdraw a large tract of land for 20 years and thereby permanently affecting people's lives. The DEIS should clearly state what the purpose of USGSsir2010-5025 was, the credentials of the authors with respect to their being qualified, and the fact that this document is heavily relied on and referred to in the DEIS.

The DEIS conclusions contain contradictions and flawed reasoning. For example, on page ES-13 of the Executive Summary under the Impacts on Cultural Resources, the following statements are made:

1) Under all alternatives, there would be no direct impacts to the disturbance of historic and prehistoric sites, assuming that direct impacts on sites by individual projects are mitigated through established regulations and policies.
2) "If direct impact mitigation were not possible, Alternative A would have a major direct impact..."

In Statement 1 above, the inclusion of the word "assuming" is unnecessary because all exploration and mining activities are regulated. Statement 2 implies "major direct impact" would happen if no mitigation measures were taken and established regulations and policies were violated in all cases. These are frantic assumptions.

With respect to Impacts on American Indian Resources, page ES-13, the DEIS states:

1) There are no tribal trust resources or assets within the proposed withdrawal area.
2) Alternative A will have major long-term impact on resources on all three parcels, including disturbance to a Traditional Cultural Place...

Statement 1 above directly contradicts statement 2. Statement one states there are no resources while statement two describes major long-term impacts to resources. With all due respect, the BLM's "multiple use" mandate should not prohibit one user at the benefit of another. Using this as a basis for the withdrawal will be in direct violation of that mandate. Further to this, the DEIS clearly describes reclamation and implies short-term use and impact. Statement 2, in using "major long-term", contradicts this.

Under Impacts on Fish and Wildlife in the Executive Summary, page ES-14, when discussing wildlife habitat and habitat fragmentation, the DEIS states: "Alternative A would have a minor to major long-term impact on aquatic and terrestrial habitats...". What exactly, is the quantitative basis for this statement? Further to this, Table 4.10-7 (Page 4-198) predicts, for the South Parcel (which encompasses the entire Tusayan Ranger District), the construction of 3.6 miles of new road. The DEIS does not mention that the USFS is considering plans to close over 140 miles of existing roads while leaving over 560 miles of road open in the Tusayan Ranger District alone . Nor does the DEIS clarify that reclamation of new mine roads can be required, therefore making impacts temporary. The DEIS inference of minor or major long-term impact on habitat fragmentation from 3.6 miles of "temporary" road is unfounded.

With respect to Impacts on Economic Conditions as addressed on page ES-14 of the DEIS document, the application of simple proportional economic impacts to the various alternatives is wrong and reflects the inexperience, if not naivety, of the author. It is not simply a math problem whereby, when decreasing the area of lands open to mining, the economic benefit decreases proportionally. Any of the withdrawal alternatives (except A, no withdrawal) will likely drive companies from the district as the entire area needs to be available and open for exploration in order to have economic viability. While Alternative D might result in some continued interest, Alternative C will likely have the same impact as Alternative B (full withdrawal). Further to this, the DEIS does not reveal that exploration is essentially dead since the segregation order was handed down, due to the use of "heavy-handed" interpretation of the "prudent man rule" in the Mining Act of 1872. And, the DEIS does not recognize that in Alternative B, upon mining out the known deposits, activity in the district will stop. Further to this, the DEIS does not disclose the economic impacts of what will happen when all activity stops. Jobs and taxes directly related to mining and indirect impacts such as income for local businesses will all end.

The above comment also pertains to the Impacts on Social Conditions presented on page ES-15. The DEIS states, "Alternative A could result in minor long-term impacts..." We disagree with this conclusion because Alternative A "will" result in long-term impacts and it can be argued that those impacts "would" be moderate and

"could" be major. However, more important is that the DEIS ignores the impacts on Social Conditions should Alternatives B, C, or D be implemented. The implementation of Alternative B will result in immediate, as well as eventual, long-term impacts on employees of the industry through job loss. Alternatives B, C, and D, will also result in long-term impact on those directly benefiting from mining. The immediate impacts will be from employees losing jobs that were being retained in anticipation of the area not being withdrawn. Eventual impacts will be the loss of jobs when the existing mines are mines out. One cannot put a price on the permanent impacts on a family due to the loss of a job, especially one due to a political action.

Section 1.4.3, Authorities, does not list the Arizona Strip Wilderness Act of 1983. The DEIS does not mention that the withdrawal is in direct conflict with this act and implementation of the withdrawal would likely violate this act and therefore be illegal.

Section 4.1.1. The DEIS assumes a large number of documented mineralized pipes have the potential of being mines, when in fact most of the pipes listed do not contain enough reserves nor have the exploration potential to be economic. It does not appear that the authors are experienced in mining economics or checked with industry experts familiar with the details to confirm their assumptions.

A key issue in the DEIS can be found in Section 4.2.5 (Page 4-25), Assumptions for Impact Analysis. This key issue is the mention of reclamation. This implies "temporary" when describing impacts and is the most significant fact in determining whether uranium exploration and mining pose potential harm and proves that a 20-year withdrawal is unjustified and that the segregation was unjustified for that matter.

Energy Resources, page 4-253, third paragraph "... there are no laws in place that would require domestic uranium to be solely purchased and consumed..." and "...uranium mined and produced from within the parcels would not necessarily move the United States toward energy independence...". This conclusion misses the point. That being, at present the United States imports 90% of the uranium it consumes for its nuclear power industry. This means that the present capacity of domestic uranium mines is 10% of the US demand. Production of uranium from the area will increase domestic production so that in the event some protectionist policies are needed due to foreign instability, that production can be called upon. Uranium production (or any mined commodity) cannot be "turned on" when needed, but requires many years of lead time for exploration and mine development to come on stream. Having 100% of the US demand covered with domestic production whether or not it is used domestically is a healthy strategic policy. One needs only to look at US oil demand and production to get the picture. Therefore, it is a fact that uranium produced from within the parcels would move the United States toward energy independence.

The DEIS continually uses the term "could" in describing potential impacts. This interpretation is clearly flawed in that it is not quantitative. The basis for a withdrawal is not justifiable on the qualitative term "could", but must be justified based on quantitative impacts described as "will" or "would".

Page 4

Nowhere in the DEIS does it state that a direct positive impact of mining uranium from breccia pipes is that it removes the uranium that is the source of concern in the first place.

In spite of the several comments detailing deficiencies in the DEIS document, the document as is does not support the decision for a 20-year withdrawal. Modification of the document to correct deficiencies commented on herein would further prove that exploration and mining will not significantly impact the area to justify a withdrawal. Nor does the document provide data indicating that an emergency existed (or exists) which is the main requirement for issuing a segregation order.

VANE Minerals (US) LLC fully supports the NO ACTION ALTERNATIVE (Alternative A, no withdrawal) and looks forward to resuming activities in the district and providing opportunity and benefit to the local community. Should you have any questions, please contact me.

Sincerely,

Kris Hefton
Chief Operating Officer

April 30, 2011

Northern Arizona Proposed Withdrawal Project
Mr. Scott Florence, District Manager
U.S. Bureau of Land Management
Arizona Strip District Office
345 East Riverside Drive
St. George, UT 84790

RE: Comments on Northern Arizona Proposed Withdrawal

Dear Mr. Florence,

Paragraph 1 on Page ES-1 of the DEIS states, "The withdrawal was proposed in response to increased mining interests in the region's uranium deposits, as reflected in the number of new mining claim locations..."

This is a misleading statement and I would like to clarify the facts:

1) The number of new mining claims is about 1/3 of the number of claims that existed in the district in the early 1980s, at which time the Arizona Strip Wilderness Act of 1983 was implemented as a mitigating action.

2) The current proposed withdrawal is the result of various environmental groups including Grand Canyon Trust, Center for Biological Diversity, and the Sierra Club, lobbying Former Secretary of Interior, Dirk Kempthorne to withdraw the acreage. Secretary Kempthorne refused on the grounds that there was no evidence of long-term irreparable harm nor did an emergency condition exist. Upon being elected, President Obama appointed Ken Salazar to Secretary of Interior and he soon issued the segregation order and proposed withdrawal of the 1M acres. There is insufficient data to indicate to any reasonable authority that uranium exploration and mining activities would cause immediate or long-term environmental harm. Clearly, this illustrates the political involvement in this issue whereby a decision was made on subjective, rather than objective reasoning.

3) The environmental lobby base their recommendation and support of the withdrawal on preserving the Grand Canyon for recreation and tourism. Recently, these environmental interest groups have challenged tour company overflights of the Grand Canyon which resulted in public hearings in Phoenix. This is a direct contradiction to their reasoning for support of the withdrawal in favor of protecting the interest of tourists.


These facts should be placed in the DEIS. Mr. Florence, I sincerely hope that you, the BLM, and your boss recognize what is going on here and that your boss will make the

**Kris K. Hefton**
**Tucson, AZ**

correct decision with respect to the withdrawal. The correct decision is the No Action alternative (Alternative A). Any other decision will be detrimental as it will be based on political reasons. No counter can void this fact.

Thank you for your time in this matter.

Sincerely,

*[signature]*

Kris K. Hefton
Tucson, AZ