1   IGNACIA S. MORENO
    Assistant Attorney General
2   Environment and Natural Resources Division
3   U.S. Department of Justice

4   DOMINIKA TARCZYNSKA, NY Bar No. 4431573
    JOHN S. MOST, Virginia Bar No. 27176
5   Natural Resources Section
6   P.O. Box 7611 Washington, D.C. 20044-7611
     (202) 305-0447 (Tarczynska)
7    (202) 616-3353 (Most)
8    (202) 305-0506 (fax)
    DOMINIKA.TARCZYNSKA@USDOJ.GOV
9   JOHN.MOST@USDOJ.GOV
    Counsel for Defendants
10

11

12

13                **IN THE UNITED STATES DISTRICT COURT**
                    **FOR THE DISTRICT OF ARIZONA**
14                      **PRESCOTT DIVISION**

15

16

17

18   GREGORY YOUNT,                        Case No. 3:11-cv-08171-PCT-DGC

19              Plaintiff, *pro se*,

20        v.                               **FEDERAL DEFENDANTS' REPLY**
                                           **IN SUPPORT OF MOTION TO**
21                                         **DISMISS CIVIL ACTION NUMBER**
     KEN SALAZAR, SECRETARY               **12-CV-8075 (QUATERRA ALASKA**
22   OF THE INTERIOR, *et al.*,            **INC. *ET AL.*)**

23              Federal Defendants,
24        and

25   GRAND CANYON TRUST, *et al.,*

26              Intervenor-Defendants.

27

28

| | |
|---|---|
| NATIONAL MINING ASSOCIATION, *et al.,*<br><br>Plaintiffs,<br><br>v.<br><br>KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.*,<br><br>Federal Defendants,<br><br>and<br><br>GRAND CANYON TRUST, *et al.,*<br><br>Intervenor-Defendants | Case No. 3:12-cv-08038-PCT-DGC |
| NORTHWEST MINING ASSOCIATION, *et al.,*<br><br>Plaintiffs,<br><br>v.<br><br>KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.*,<br><br>Federal Defendants,<br><br>and<br><br>GRAND CANYON TRUST, *et al.,*<br><br>Intervenor-Defendants. | Case No. 3:12-cv-08042-PCT-DGC |
| QUATERRA Alaska Incorporated, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.*,<br><br>Federal Defendants,<br><br>and<br><br>GRAND CANYON TRUST, *et al.,*<br><br>Intervenor-Defendants. | Case No. 3:12-cv-08075-PCT-DGC |

1

**TABLE OF CONTENTS**

2

INTRODUCTION ........................................................................................... 1

3

ARGUMENT .................................................................................................. 1

4

5

I.      Plaintiffs' Claims Fail to Establish an Article III Case or Controversy.................... 2

6

        A.      Plaintiffs  have not alleged facts essential to show standing on
                any count ................................................................................. 2

7

8

        B.      Plaintiffs fail to demonstrate that their claims are ripe ................................. 7

9

II.     The Economic Coalition Lacks Standing as to All Five Counts Because its
        Member Municipalities, Asserting Civil Claims Against the Federal Government

10

        *Qua Parens Patriae*, Lack Standing. ........................................................ 9

11

12

III.    Plaintiffs' NEPA Claims Fail to Demonstrate Prudential Standing........................... 9

13

CONCLUSION ............................................................................................. 16

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Federal Defendants submit the following reply brief in support of their motion to

2    dismiss.  ECF No. 62 ("Mem.").

3                                     **INTRODUCTION**

4

5    This action challenges the January 9, 2012 decision of the Secretary of the

6    Interior withdrawing for twenty years certain public lands and National Forest System

7    Lands in the Grand Canyon watershed from location and entry under the Mining Law

8    of 1872, subject to valid existing rights.  Plaintiff Quaterra Alaska, Inc. ("Quaterra") is

9    a mining company that holds unpatented mining claims on withdrawn lands but has not

10   undertaken any administrative steps to pursue mining those claims since the

11   withdrawal.  Plaintiff Arizona Utah Local Economic Coalition ("Economic Coalition"),

12   is a coalition of local counties organized to oppose the withdrawal, and brings this

13

14   action on behalf of its member Mohave County.  Plaintiffs contend that the withdrawal

15   decision fails to comply with the requirements of the National Environmental Policy

16   Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA") and the Federal Land Policy and Management

17   Act, 43 U.S.C. § 1701 *et seq.* ("FLPMA").  The challenge should be dismissed because

18

19   neither the Amended Complaint ("Am. Compl.") nor the opposition brief ("Pls' Opp."),

20   with its supporting evidence and declarations, demonstrates standing and ripeness.

21

22                                      **ARGUMENT**

23

24   To overcome the presumption that federal courts lack jurisdiction, Plaintiffs

25   must "affirmatively" and "clearly" establish its existence.  *FW/PBS, Inc. v. City of

26   Dallas*, 493 U.S. 215, 231 (1990).  This includes demonstrating Article III and

27   prudential standing, *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522

28

U.S. 479, 488 (1998), as well as ripeness.  *Warth v. Seldin*, 422 U.S. 490, 516 (1975) (affirming dismissal of organization's complaint that failed to show injury to a member of "sufficient immediacy and ripeness . . .").  Plaintiffs have not met their burden of satisfying these requirements.

**I.      Plaintiffs' Claims Fail to Establish an Article III Case or Controversy.**

      **A. Plaintiffs have not alleged facts essential to show standing on any count.**

As Federal Defendants explained in their opening brief, to establish Article III standing, a plaintiff must show, among other things, that he has "suffered an 'injury-in-fact'" to a legally protected interest that is both "concrete and particularized" and "actual or imminent," as opposed to "conjectural or hypothetical;" and that there is a "causal connection between the injury and the conduct complained of."  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992) ("*Defenders*").   Requiring imminent and concrete injury assures that "the essential dimension of [factual] specificity" is present in a case.  *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 221 (1974).  This promotes resolution of legal questions "not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action."  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).

The Amended Complaint does not achieve these purposes, and Plaintiffs' opposition and declarations do not cure its defects.  With respect to Quaterra, Plaintiffs identify no mining claims adversely impacted by the decision yet they argue that the withdrawal "interrupts" the company's development plans, Pls' Opp. at 4, while at the

same time conceding that Quaterra voluntarily discontinued its development efforts. *See id.* at 6 (stating Quaterra "did not pursue drilling because the threat of a mineral examination . . . stifled investment"). Plaintiffs' attempt to establish harm based on the "threat of a mineral examination" should be rejected because a mineral examination injures no one. The Supreme Court has long recognized that Interior's authority over mineral lands is plenary. *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 336 (1963). Quaterra's unpatented mining claims have at all times been subject to mineral examination or contest, as the Supreme Court has made clear over decades:

> "A mining location which has not gone to patent is of no higher quality and no more immune from attack and investigation than are unpatented claims under the homestead and kindred laws. If valid, it gives to the claimant certain exclusive possessory rights, and so do homestead and desert claims. But no right arises from an invalid claim of any kind. All must conform to the law under which they are initiated; otherwise they work an unlawful private appropriation in derogation of the rights of the public."

*Best,* 371 U.S. at 337 (quoting *Cameron v. United States*, 252 U.S. 450, 460 (1920)); *see also Payne v. United States*, 31 Fed. Cl. 709, 711 (1994) (noting Interior's authority "to inquire into the validity of mining rights claimed against the Government"). Consistent with these holdings, Interior's relevant regulations provide that the government "may initiate contests for any cause affecting the legality or validity of any entry or settlement or mining claim." 43 C.F.R. § 4.451-1.

Plaintiffs' opposition identifies no authority establishing that holders of unpatented mining claims have a legally protected interest in developing their unpatented claims free from mineral examination. Their reliance on *U.S. v. Shumway*, 199 F.3d 1093 (9th Cir. 1999), to inflate the legal status of their unpatented mining

claims is unavailing.  Pls' Opp. at 5.  There, the Ninth Circuit recognized that a mining claim represents a "federally recognized right in real property," but did so based on the holding in *Benson Mining & Smelting Co. v. Alta Mining & Smelting Co.*, 145 U.S. 428, 434 (1892).  In *Benson*, the Supreme Court held that once the owners of a mining claim had applied for a patent and paid the fees, *and the right to a patent existed*, they had "full equitable title."  In contrast, Plaintiffs here have not established that any of their mining claims are economically valuable, and thus valid and patentable.  For this reason, a mineral examination does not harm any "legally protected interest," as is required by the case law to establish standing.  *See Defenders*, 504 U.S. at 560.

Quaterra also contends it has suffered injury to its procedural rights of notice and comment under FLPMA.  Pls' Opp. at 9.  The Court should reject this claim as a basis for standing because it was not pled.  Even if it had been pled, the argument fails because, as Federal Defendants noted in their opening brief, deprivation of a procedural right *in vacuo* is "insufficient to create Article III standing."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  Because Quaterra has not identified any protected interest that is affected by the challenged decision, their additional claim of injury to the company's procedural rights under FLPMA is unfounded.

With respect to the Economic Coalition, the amended complaint asserts that the municipalities are deprived of "tens of millions of dollars in revenues and jobs," Am. Compl., ¶ 1, and that the economic interests of its members are impacted by the decision.  *Id.*, ¶ 3.  The amended complaint makes no other allegation of economic harm.  As Federal Defendants explained in their opening brief, these allegations are

insufficient because an injury must be "fairly ... trace[able] to the challenged action of the defendant," and must not be the result of the "independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).  Mem. at 11-12.  Plaintiffs' attenuated causal theory depends on a series of independent future events by third parties about which the Court could only speculate. As such, the theory is insufficient to establish the required causation, even if the Economic Coalition were entitled to protect the interests of county citizens as *parens patriae* against the United States, a point discussed in argument II, *infra*.

Plaintiffs respond by arguing that both FLPMA and NEPA establish procedural rights "specific to state and local governments."  Pls' Opp. at 13; *see also id*. at 14-18 (discussing requirements for demonstrating procedural injury).  To circumvent the 2009 holding in *Summers* – i.e., that a procedural right *in vacuo*, unconnected to any concrete interest, is inadequate to support standing – Plaintiffs rely on an unpublished 2002 decision of the Ninth Circuit sustaining a BLM land use plan and argue that the noted procedural rights are "legally protected interests."  Pls' Opp. at 13 (citing *Hall v. Abbey*, 32 Fed. Appx. 920, 921-22 (9th Cir. 2002)).  Plaintiffs' reliance on *Hall* is unwarranted, as there is no indication in the panel's short memorandum that the circumstances of the plaintiff, who lived in the vicinity of the affected land and was impacted its airborne pollutants, are in any way comparable to those of the Economic Coalition.[1]

---

[1] Plaintiffs also liken the impacts Mohave County will allegedly suffer as a result of the withdrawal to those facing the plaintiff in *City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004), but the circumstances of the two cases could not be more distinct.  In *City of Sausalito*, the National Park Service ("NPS") sought to implement plans for

5

Finally, despite Plaintiffs' lengthy and almost exclusive emphasis on procedural harm in support of the coalition's standing, Pls' Opp. at 13-18, their arguments fail because the causal chain is simply too attenuated, as discussed in detail in Federal Defendants' opening brief.  Mem. at 11-12 (noting absence of any allegation asserting recreational or aesthetic interest, and the speculative nature of alleged economic impacts).   As the Supreme Court has explained, the "irreducible constitutional minimum of standing" requires a party seeking review to demonstrate concrete and imminent injury, *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009), *Defenders*,

---

development and rehabilitation of historic Fort Baker, a former military base located within NPS lands, immediately south of Sausalito near the Golden Gate Bridge.  Plans included development of a conference and retreat center, with 350 guest rooms and parking for 455 vehicles, as well as expanded parking for an existing museum and expansion of existing Coast Guard facilities, also within NPS lands.   The court concluded the city had demonstrated a concrete interest underlying its claim of procedural deprivation: in particular, harm to its proprietary interests resulting from a project that would attract an estimated 2,700 visitors daily, which in turn would cause congestion of streets, sidewalks, and parking lots in quaint and historic Sausalito, would add to the cost of providing police, fire and other emergency services and impede the delivery of those services, and would increase crime, noise, and trash, among other things.   Mohave County suffers no such harm as a result of a decision which is projected to reduce the reasonably foreseeable number of mines from 30 to 11.  While the county would likely lose some revenue due to decreased mining on federal land, the withdrawal adds no burden to county services, and actually decreases truck traffic, fugitive dust, and emissions from exploration and development activity.  Final EIS at ES-2, ES-13, 4-26 to 4-31.   See http://www.blm.gov/az/st/en/prog/mining/timeout/feis.html  (last visited October 22, 2012).  Plaintiffs' claim of harm to Mohave's proprietary interests also relies on *Douglas County v. Babbitt*, 48 F.3d 1495 (9th Cir. 1995), where the court concluded that Interior's critical habitat designation posed a direct threat to county lands by increasing the risk of wildfire and insect infestation.  No such circumstances exist here.  Moreover, the decision has no impact on Mohave's ability to enforce its own land-use and health regulations, nor on its powers of revenue collection and taxation, despite Plaintiffs' implication to the contrary.  Pls' Opp. at 16.

504 U.S. at 560, and thus to establish that it is "among the injured." *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972).  Plaintiffs' have not met these requirements.

### B.  Plaintiffs fail to demonstrate that their claims are ripe.

As explained in Federal Defendants' opening brief, the ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).  A case is not "'ripe' for judicial review . . . until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

Plaintiffs contend the withdrawal is ripe for challenge and argue in support that the Secretary's decision is final agency action.  While it may be true that the decision is final agency action for purposes of the Administrative Procedure Act, *see* 5 U.S.C. § 704, this does not mean the effects of the decision have been "felt in a concrete way." *Abbott Labs.*, 387 U.S. at 149.  Plaintiffs' challenge is unripe because no mineral examination has occurred, and thus meaningful judicial review is not possible. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).  At present, the validity of Quaterra's 1,000 unpatented mining claims is simply unknown.  It is possible that some mining claims are valid (such that the further expenditure of resources in attempting to develop

1   a mine is reasonable and not precluded by withdrawal), and that some are not.  Further

2   factual development would allow meaningful judicial review "in a concrete factual

3   context." *Valley Forge Christian Coll.,* 454 U.S. at 472.

4

5   **II.      The Economic Coalition Lacks Standing as to All Counts Because its
6           Member Municipalities, Asserting Civil Claims Against the Federal
        Government *Qua Parens Patriae*, Lack Standing.**

7           As explained in the opening brief, the Economic Coalition lacks standing

8   because it seeks to assert quasi-sovereign interests of the citizens of its member

9   counties as *parens patriae* against the United States.  *See* Mem. at 15-18.   Allegations

10  of injury to the local economy, the loss of jobs, the air quality impacts of coal-fueled

11

12  power plants and other environmental harms are all alleged injuries to the counties'

13  citizens.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 602-07  (1982)

14
    (summarizing cases recognizing that pollution and economic impacts were interests that
15
    states represent as *parens patriae*).  Likewise, claims of injury resulting from reduction
16
    in tax revenues—irrespective of how the counties intend to use such tax revenues—are
17

18  derivative of injuries to the counties' citizens, which the counties cannot bring as

19  *parens patriae* against the Federal Government.  *See Am. Motorcyclist Assoc. v. Watt*,

20  534 F. Supp. 923, 931-32 (C.D. Calif. 1981) (aff'd on other grounds, 714 F.2d 962 (9th

21  Cir. 1983) ( "Although impairment of the County's tax base will result in harm to the
22
    County as an entity, this harm will merely be derivative of the Plan's impact on tax
23

24

25

26

27

28

8

payers; therefore it should not be considered harm to the County's 'proprietary interests.'").[2]

In the opposition brief the Economic Coalition focuses on alleged injuries to the counties' procedural interests. However, the Economic Coalition must still "show a 'concrete interest' that underlies its procedural interest" that is a sovereign or propriety interest of the counties. *Douglas Cnty,* 48 F.3d at 1501 (county had procedural standing based on "proprietary interest in its lands adjacent to the critical habitat" which would be impaired as a result of the agency decision). The counties do not own the withdrawn lands, so they do not have a proprietary interest in the withdrawal. *See Nevada v. Burford*, 918 F.2d 854, 857-58 (9th Cir. 1990) (holding Nevada lacks proprietary standing to challenge BLM grant of right-of-way because it does not own the affected property). Moreover, to the extent that the Economic Coalition asserts an interest in the counties' planning processes and land use plans, as explained below, it has not shown a conflict between the withdrawal and such plans and thus has not established injury on the basis of this asserted interest. *See* p. 15 *infra*.

**III.    Plaintiffs' NEPA Claims Fail to Demonstrate Prudential Standing.**

   **A.    Quaterra's Economic Interests Are Outside of NEPA's Environmental Zone of Interests**

Quaterra does not dispute that its interests in challenging the withdrawal are

---

[2] *Scotts Valley Band of Pomo Indians of Sugar Bowl Rancheria v. United States*, 921 F.2d 924 (9th Cir. 1990), is inapposite since it involved the question of whether a city could intervene as a defendant to defend an action alongside the United States, not whether a city or county could represent the interests of its citizens as *parens patriae* against the United States.

economic.  Instead, it argues that it and the other mining companies were the "subject" of the withdrawal, and therefore their interests fall within the zone of interests of the Environmental Impact Statement ("EIS"), which was used to justify the withdrawal. Pls' Opp. at 21-22.  However, in analyzing NEPA's zone of interests, Courts looks to whether a plaintiff "assert[s] an interest arguably within the zone of interests to be protected or regulated' *by NEPA*"—not by the underlying agency action that is being analyzed in the NEPA document.  *W. Radio Serv. Co. v. Espy*, 79 F.3d 896, 902-03 (9th Cir. 1996) (quoting *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 715-16 (9th Cir. 1993) (emphasis added)); *see also Citizens for Better Forestry v. USDA,* 341 F.3d 961, 976 (9th Cir. 2003) (quoting *Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1019 (9th Cir. 2003) (plaintiff's "injury [must] fall[] within the zone of interests *of the statutory provision the plaintiff claims was violated*.'") (emphasis added)).[3] NEPA "regulates" the conduct of federal agencies—not private parties.  *See Envtl. Def. Fund, Inc. v. Massey*, 986 F.2d 528, 532 (D.C. Cir. 1993) ("Regulated Conduct Under NEPA[:]  NEPA is designed to control the decisionmaking process of U.S. federal agencies . . . .  ").  Thus, when applied to NEPA claims, the "zone of interests" test requires the alleged interests to be "protected by" NEPA.  *See, e.g., Nev. Land Action*,

_____

[3] *See, e.g., Nev. Land Action*, 8 F.3d at 715 (finding that organization with members that held grazing permits in the Toiyabe National Forest lacked prudential standing to bring NEPA claims challenging a plan adopted for management of that Forest); *Am. Independence Mines & Minerals v. USDA*, 733 F. Supp. 2d 1241, 1258-59 (D. Idaho 2010), *aff'd*  No. 11-35123, 2012 WL 3542264 (9th Cir. Aug. 17, 2012) (unpublished) (mining company lacked prudential standing to bring NEPA claims challenging Forest Service Travel Management Rule, which would have closed roads needed for access to mining claims).

8 F.3d at 716 (NEPA plaintiff "must allege that its injury is within the zone of interests protected by NEPA").   Quaterra has not shown that it seeks to advance such environmental interests.  *See* Mem. at 18-20.

Next, ignoring Ninth Circuit case law, Quaterra argues that its economic interests are within NEPA's zone of interests under *Bennett v. Spear*, 520 U.S. 154 (1997).  The Ninth Circuit, however, has considered *Bennett* and affirmed that "purely economic interests do not fall within NEPA's zone of interests." *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940-45 (9th Cir. 2005); *Ranchers Cattlemen Action Legal Fund v. USDA*, 415 F.3d 1078, 1103 n.17 (9th Cir. 2005) ("Even since *Bennett*, [the Ninth Circuit] has continued to apply the zone of interests test to [NEPA] claims."); *Ariz. Cattle Growers' Ass'n v. Cartwright*, 29 F. Supp. 2d 1100, 1107-09 (D. Ariz. 1998) (rejecting argument that *Bennett* implicitly overruled *Nevada Land Action*).

In *Bennett,* the Supreme Court analyzed the "zone of interests" of the Endangered Species Act ("ESA")—not NEPA's zone of interests.  The Court analyzed ESA § 7, which requires the agency to "use the best scientific and commercial data available," *Bennett*, 520 U.S. at 176 (quoting 16 U.S.C. § 1536(a)(2)), and concluded its purpose was to "avoid needless economic dislocation," *id.*  The Court recognized:

> That economic consequences are an explicit concern of the ESA is evidenced by § 1536(h), which provides exemption from §1536(a)(2)'s no jeopardy mandate where there are no reasonable and prudent alternatives to the agency action and the benefits of the agency action clearly outweigh the benefits of any alternatives. We believe the 'best scientific and commercial data' provision is similarly intended, at least in part, to prevent uneconomic (because erroneous) jeopardy determinations.

*Id.* at 177.  However, as the Ninth Circuit has held, "NEPA and the ESA are different

statutes that create different zones of interests." *Ashley Creek*, 420 F.3d at 944.  NEPA does not contain an equivalent provision that elevates economic concerns over environmental ones.  To the contrary, "[e]ach of NEPA's various procedural provisions is designed to further the goal of environmental protection." *Id.* at 945; *see also Az. Cattle Growers*, 29 F. Supp. 2d. at 1109 ("Congress enacted NEPA solely to provide a procedure to achieve the overall goal of protecting the environment.  Thus, each section of NEPA is designed with this goal in mind . . . .").

Here, Plaintiffs challenge the adequacy of the EIS, which the agency was required to prepare pursuant to NEPA §102, 43 U.S.C. §4332.  *See* Am. Compl. ¶¶ 150-164.  The Ninth Circuit has repeatedly affirmed that the purpose of "§102 cannot be divorced from the overall purpose of NEPA, which [is] . . . 'a national commitment to protecting and promoting environmental quality.'"  *Am. Independence Mines,* 2012 WL 3542264 at *2 (quoting *Ashley Creek*, 420 F.3d at 944-45).  Thus, the Ninth Circuit has continued to hold that Plaintiffs seeking to advance purely economic interests lack prudential standing to bring §102 NEPA claims.  *Id.*

Plaintiffs reliance on the Council of Environmental Quality (CEQ) regulations adopted to implement NEPA section § 102 does not change this result.  The Ninth Circuit in *Ashley Creek* declined to decide whether it was appropriate to rely on the regulations to define NEPA's zone of interests and concluded that NEPA's "statutory text and the regulations are consistent: both permit consideration of economic interests that are *interrelated* with the environmental effects of an action, but neither protects *purely* economic interests." *Ashley Creek*, 420 F.3d at 943 fn.4 (emphasis in original)*;*

12

1   *see also Town of Stratford v. Fed. Aviation Admin.*, 285 F.3d 84, 89 (D.C. Cir. 2002)

2   ("[W]e do not read the CEQ regulation as purporting to extend prudential standing. It

3   does indicate that when economic and social effects are interrelated with natural and

4   physical environmental effects the EIS will 'discuss' all of these effects, but it does not

5   require government agencies to take economic effects into account."); 40 C.F.R.

6

7   1508.14 ("[E]conomic or social effects are not intended by themselves to require

8   preparation of an environmental impact statement.").

9

10   **B. The Economic Coalition's Interests Are Outside of NEPA's Zone of Interests**

11

12          The Economic Coalition similarly does not dispute that it participated in the

13   NEPA process out of a concern about the impacts on the economies of its member

14   counties.   Instead, the Economic Coalition devotes a long discussion to Mohave

15   County's interest in its land use plans and environmental protection, and argues that

16   such interests are protected by NEPA's procedures.  Pls' Opp. at 24-26.  This, however,

17   does not change the result that the Economic Coalition has failed to establish how such

18   environmental interests would be impaired as a result of the withdrawal.  *See* Mem. at

19   12-14. *Cf. Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1237 (10th Cir. 2012) ("In

20   order to show an injury in fact from a procedural violation of NEPA, Petitioners must

21   show the agency's violation 'created an increased risk of actual, threatened, or

22   imminent *environmental harm.*'") (emphasis in original); *Ranchers Cattlemen*, 415

23   F.3d at 1103 ("[A] plaintiff must allege injury to the environment.").[4]  Simply pointing

24

25

26

27   _____

28   [4] The cases Plaintiffs cite demonstrate that a county asserting procedural injury must

13

to sections of its land use plan that promote environmental values does not mean that

the interests that the Coalition and its members are seeking to advance through their

NEPA claims are environmental ones within NEPA's zone of interests.   To the

contrary, the Amended Complaint and the letters submitted by the Economic Coalition

and its members during the NEPA process make it clear that they were concerned

solely with the economic impacts of the withdrawal.  *See, e.g.,* Am. Compl. ¶ 127; ECF

No. 62 at 52, 59.[5] Moreover, arguing that the withdrawal is *unnecessary* to protect

---

still demonstrate that the environmental interests it asserts are threatened by the proposed agency action. *See Douglas Cnty,* 48 F.3d at 1501 (county's assertion that federal land management practices fail to properly manage for insect and disease control and fire and thus threaten productivity and environment of the adjoining county land were "concrete, plausible interests, within NEPA's zone of concern for the environment, which underlie the County's asserted procedural interests."); *City of Davis v. Coleman*, 521 F.2d 661, 671-72 (9th Cir. 1975) (city located adjacent to proposed freeway interchange asserting adverse impacts on  city's water supply and danger of industrial waste contamination had standing to allege procedural injury resulting from agency's failure to prepare EIS).

[5] Plaintiffs' argue that Economic Coalition members submitted comments "linking road improvement (less dust and erosion) to mining development."  Opp. at 25.  The pages of the EIS that Plaintiffs cite simply do not support this assertion.  The only comment that mentions roads on the pages that Plaintiffs cite is a comment from the San Juan County Commission that states: "Many roads were improved during [the period of time since the 1950's when uranium mines have been active in the county] to provide access to the mines and to the mills.  These roads have remained and are used by a variety of users including hunters, grazers, recreation users, and others." Ex. 1 at 5-88.  Likewise, no environmental benefits of reduced dust and erosion resulting from paving were mentioned in the comments submitted by other parties.  *See id.* at 5-114 (Arizona State Land Department comments expressing concern that "there is no mention of hauling or transportation licenses or permits" in the Draft EIS; concerns about "truck traffic and hauling," and concern regarding "right-of-way agreement[s]" across non-federal lands to access mines or right[s]-of-way across federal lands that are closed to location or entry if there is a withdrawal; and noting that Draft EIS discusses that "new roads would benefit driving for pleasure" and that "mining companies would be responsible for maintenance of *unpaved* public roads for hauling.").

water quality by disputing that uranium mining impacts water quality is not an assertion of an interest protected by NEPA.  *See Wyoming*, 674 F.3d at 1237 (holding that "NEPA does not protect against" alleged harm resulting from assertion that more snowmobilers could have been allowed into Grand Teton without adverse environmental effects).

Although Mohave County attaches its land use plan as an exhibit, it has not actually explained how any plan provision conflicts with the withdrawal.[6]  Moreover, while NEPA requires cooperation with State and local governments, 42 U.S.C. § 4331(a), it does not allow local plans to trump NEPA's environmental objectives. The CEQ regulations Plaintiffs cite merely require the EIS to discuss possible conflicts with local land use plans, *see* 40 C.F.R. §1502.16(c), and, if an inconsistency is identified, to "describe the extent to which the agency would reconcile its proposed action with the plan or law" 40 C.F.R. §1506.2(d).  Neither NEPA nor CEQ regulations impose substantive obligations for the agency to change the action to avoid such conflict.[7]  Moreover, CEQ regulations require Federal agencies to cooperate with State

---

[6] In its declaration, Mohave County highlights plan provisions that generally promote the importance of environmental concerns, air quality and water quality.  *See* ECF No. 72-2 ¶¶ 10, 32-33.  It also cites a provision of the Plan that states that "paving of roads may be considered in cases where reduction of dust is desired."  *Id.* at ¶ 54.

[7] Plaintiffs also cite provisions of FLPMA: the first deals with the development of land use plans on federal lands (not withdrawals), 43 U.S.C. § 1712(c)(9), and the second states that after making a withdrawal the Secretary provide the Congressional committees a "statement indicating the effect of the proposed uses [that led to the withdrawal], if any, on State and local government interests and the regional economy" 43 U.S.C. §1714(c)(2)(8).  Neither of these imposes requirements or creates rights under NEPA.

or environmental impact statement requirements only when such requirements are "in addition to but not in conflict with those in NEPA." 40 C.F.R. §1506.2(c).  This further highlights that NEPA's requirements trump when there is a conflict between the two.

Despite the Economic Coalition's current attempts to create the appearance that it is seeking to protect the counties' environmental interests, it is clear that its interests in challenging the withdrawal are and have always been economic.  Therefore, the Coalition lacks prudential standing to bring NEPA claims.

## CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that the Court dismiss the complaint for lack of subject-matter jurisdiction.

Dated: October 22, 2012

Respectfully Submitted,

IGNACIA S. MORENO,
Assistant Attorney General
Environment and Natural Resources Division

 /s/ John S. Most
JOHN S. MOST, Trial Attorney
Virginia Bar, No. 27176
DOMINIKA TARCZYNSKA, Trial Attorney
New York Bar, No. 4431573
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0447(Tarczynska)
202-616-3353 (Most)
202-305-0506 (fax)
DOMINIKA.TARCZYNSKA@USDOJ.GOV
JOHN.MOST@USDOJ.GOV

*Counsel for Defendants*

16

1

2

## <u>CERTIFICATE OF SERVICE</u>

3

I hereby certify that I have caused the foregoing to be served upon counsel of
record through the Court's electronic service system (ECF/CM).

4

Dated:  October 22, 2012

5

6

_/s/ John S. Most_

7

*Counsel for Federal Defendants*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Table 5.6-4.** Response to Comments (Continued)

| Organization | Letter Submittal No. | Comment No. | Comment Text | Response |
|---|---|---|---|---|
| | | | is supplied by other nations such as Australia, Canada, or Russia. | supplies is provided in Section 4.17 of the FEIS. |
| Washington County Commission | 225251 | 10 | The USGS estimates that northern Arizona contains at least 375 million pounds of the highest grade uranium ore in the United States. This is the equivalent of 27 billion kilowatt hours of electricity. This is the equivalent of all the electricity generated by all of the coal plants in the United States for 10 years. It has been estimated to be the equivalent of 13.3 billion barrels of oil, which is the total amount of recoverable oil in Prudhoe Bay. The conclusion for us is straight forward and simple. | The economically viable uranium resource under the lands considered in this EIS is estimated at 39,666 tons (about 79.3 million pounds) per Appendix B. |
| San Juan County Commission | 243250 | 2 | The DEIS has not completely identified, evaluated and considered the impact of the historical mining activities that have and will continue to occur in this County. Uranium mining has been an active part of the County's tax base since the 1950's. During some periods of time, there were at least three active uranium mills operating in the County. The mining portion of the uranium industry has been operating on and off during the last 60 plus years. Generation after generation has engaged in the mining process and this industry has provided for some of the highest paying jobs in the area. One particular company, Young's Machine Company located in Monticello still produces underground mining equipment such as the Young Buggy which has been sold worldwide. The industry has provided the County, the School District, and other taxing entities with large amounts of property and other taxes. Many roads were improved during this period of time to provide access to the mines and to the mills. These roads have remained and are used by a variety of users including hunters, grazers, recreation users, and others. Many important public facilities were constructed during these times including a hospital, nursing home, medical clinics, and libraries to name a few. | The DEIS provided information on historical mining activity in Appendix B. Additional information on the historic contribution of mining to the economy in the study area is included in Section 3.17 of the FEIS. |
| San Juan County Commission | 243250 | 3 | The County's Master Plan specifically demonstrates the need and support for hard rock mining and its importance in the local economy. We would specifically request that the language in the County's Master Plan be analyzed and reflected in the final EIS. The State of Utah understands the importance of the nuclear industry in its new Energy Plan, specifically detailing information on how the uranium industry has and will play an important role in providing cost effective energy for generations to come. San Juan County has the only licensed and operating uranium mill. | Section 3.15 of the DEIS and Section 3.16 of the FEIS discusses stakeholder values and support for uranium mining. |
| San Juan County Commission | 243250 | 4 | The U.S. Uranium industry is only currently providing about 8% of the current national need. The demand will grow and it makes sense to use the high grade uranium that is currently being mined on the Arizona Strip to continue and to make the Nation self supporting in its portion of energy needs. There is no reason to rely on foreign sources when this energy source can be totally developed internally: President Obama has indicated in past speeches the need for a portion of the overall energy needs of the Nation to be provided in this area. | A revised discussion of uranium supply and demand and the potential contribution of uranium resources within the Proposed Withdrawal Area to U.S. uranium supplies is provided in Section 4.17 of the FEIS. The role of nuclear energy in the nation's energy future is an issue that was eliminated from detailed analysis, as described in Section 1.5.3. |
| San Juan County | 243250 | 5 | The impacts of mining on the local economy was not generally studied for | San Juan County was included in the analysis |

**EXHIBIT 1**

**Table 5.6-4.** Response to Comments (Continued)

| Organization | Letter Submittal No. | Comment No. | Comment Text | Response |
|---|---|---|---|---|
| | | | trade in the mid $50/lb. to low $60/lb. range thru April. All of these recent prices are well above the $40/lb. level assumed in the RFD. | |
| Arizona State Land Department | 225280 | 19 | Also in Section B.8.1 on page 8-25, in the discussion of Undiscovered Uranium Resources the RFD references the Finch, et al. 1990 USGS Circular 1051 report. In the USGS Scientific Investigations Report 201 0-5025 , several of the figures from Finch, et al. 1990, were reproduced in Chapter A on uranium resource availability, specifically Figures 3 and 5, and it might be helpful to repeat those figures here. On page B-28, it refers to Figure B-5, but the report skips from Figure B-4 to B-6 and it is not clear if it is really Figure B-6 that is being referenced. Also on page B-28, in discussing Uncertainty Factors in Commodity Prices, the RFD refers to uranium prices recovering at the end of the 1990's as shown on Figure B-4; however, Figure B-4 does not start showing uranium prices until 1995 and it doesn't look like there is any real recovery in price until 2003 or 2004. This is another reason to show the earlier price fluctuations in Figure 8-4, as commented on earlier. | Figure B-5 has been added to Appendix B of the FEIS. |
| Arizona State Land Department | 225280 | 20 | At the end of the RFD, in Table B.1-1, with the exception of mentioning the hauling of explosives regulated by the ATF, there is no mention of hauling or transportation licenses or permits. At the Arizona Department of Environmental Quality's (ADEQ) recent public meetings and hearings for air and water quality permits for Denison's Canyon, EZ and Pinenut Mines, many of the questions and concerns raised by the attendees regarded the truck traffic and hauling. The relative disappearance of transportation as an issue for the DEIS is even more surprising since it was identified as a main issue during the public scoping process (page 2.2). The only other real mention of transportation is in Table 2.8-1, where on page 2-43 the table notes that the 22.4 miles of new roads would benefit driving for pleasure, and on page 2-45 where the table notes that the mining companies would be responsible for maintenance of unpaved public roads used for hauling. Another issue for hauling is rights-of-way across nonfederal lands. For any new roads associated with new mines that would cross non-federal lands, a right-of-way agreement would be required with the land owner, either the ASLD or the private entity. In the case of a withdrawal, the converse is whether a mine operator on ASLD or private lands would be able to obtain a right-of-way across the federal lands that are now closed to location or entry. | The haul trucks are designed such that the material being transported is covered and sealed; therefore, emissions from the ore being hauled are not allowed to escape the vehicle as a fugitive source. It is the applicable regulatory agency's responsibility to protect human health and the environment. Each site-specific mine plan will include mitigation and control measures for the transportation of uranium ores from the mine site to the processing facility. Language has been added to EIS Section 3.2.2., Legal and Regulatory Requirements, to identify the applicability of 49 CFR Part 171, 172, and 177 to the transport of uranium ore from the mine location to the processing facility.<br><br>Transportation conflicts are discussed in Chapter 3, Section 3.16, under Public Health and Safety, and potential impacts are discussed in the Public Health and Safety section of Chapter 4, Section 4.16.<br><br>Neither the proposed withdrawal nor any alternative withdrawal would have any effect on rights-of-way (ROWs) or access to non-federal lands within the project parcels. ROW applications would continue to be processed as before. The FEIS has been revised to provide clarification on this issue. |

EXHIBIT 1