**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gregory Yount,<br><br>              Plaintiff,<br><br>v.<br><br>Ken Salazar, et al.,<br><br>              Defendants. | No. CV11-8171-PCT DGC<br>(Lead case) |
| National Mining Association,<br><br>              Plaintiff<br><br>v.<br><br>Ken Salazar, et al.,<br><br>              Defendants | No.  CV12-8038 PCT DGC |
| Northwest Mining Association,<br><br>              Plaintiff<br><br>v.<br><br>Ken Salazar, et al.,<br><br>              Defendants. | No. CV12-8042 PCT DGC |
| Quaterra Alaska Incorporated, et al.,<br><br>              Plaintiff<br><br>v.<br><br>Ken Salazar, et al.,<br><br>              Defendants. | No. CV12-8075 PCT DGC |

On November 1, 2011, Plaintiff Gregory Yount, a self-employed prospector and miner, filed a *pro se* complaint seeking declaratory and injunctive relief in response to Defendants' actions withdrawing more than one million acres of federal land in Northern Arizona from mining location and entry activities. Doc. 1, *amended by* Doc. 27. Other Plaintiffs in the above-captioned actions – the National Mining Association ("NMA") and the Nuclear Energy Institute ("NEI"); the Northwest Mining Association ("NWMA"); Quaterra Alaska, Inc. and Quaterra Resources, Inc. (collectively "Quaterra"); and the Arizona Utah Local Economic Coalition ("the Coalition"), on behalf of the Board of Supervisors of Mohave Country, Arizona ("Mohave County"), also filed complaints challenging the withdrawal. On August 20, 2012, the Court consolidated the cases and permitted Vane Minerals, LLC ("Vane Minerals") to intervene as a plaintiff. Doc. 56.

Defendants Kenneth L. Salazar, Secretary of the Department of the Interior; the Department of the Interior ("DOI"); the Bureau of Land Management ("BLM"); the Forest Service; and the Department of Agriculture (collectively, "Defendants") have filed motions to dismiss each of these actions. The Court held oral argument on October 26, 2012. For the reasons set forth below, the Court will grant the motions in part and deny them in part.

I.      **Relevant Statutory and Regulatory Scheme.**

Pursuant to the General Mining Law of 1872, 30 U.S.C. § 22, "all valuable mineral deposits in lands belonging to the United States . . . shall be free and open to exploration and purchase[.]"  Vacant public land is "open to prospecting, and upon discovery of mineral, to location and purchase." 43 C.F.R. § 3811.1. To locate a mining claim, a person establishes the boundaries of the land claimed and records a notice or certificate of location. 43 C.F.R. § 3832.1. The claim is not valid until a discovery is made within the boundaries of the claim. 43 C.F.R. § 3832.11. "If the validity of the claim is contested, the claimant must prove that he has made a 'discovery' of a valuable mineral deposit thereon." *McCall v. Andrus*, 628 F.2d 1185, 1188 (9th Cir. 1980),

*abrogated on other grounds by Miranda v. Anchondo*, 684 F.3d 844, 846 (9th Cir. 2012).

There is a "distinction between the exploration work which must necessarily be done before a discovery, and the discovery itself." *Converse v. Udall*, 399 F.2d 616, 621 (9th Cir. 1968). Proof of discovery is judged by the prudent person test. "Where minerals have been found, and the evidence is of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine, the requirements of the statute have been met." *Chisman v. Miller*, 197 U.S. 313, 322 (1905). The mineral must be physically exposed to constitute a valid discovery. *Wilderness Society v. Dombeck*, 168 F.3d 367, 375 (9th Cir. 1999).

"The Secretary of the Interior is charged with seeing that valid claims are recognized, invalid ones eliminated, and the rights of the public preserved." *United States v. Coleman*, 390 U.S. 599, 600 n.1 (1968) (internal quotation, ellipses, and brackets omitted). Under § 204(c) of the Federal Land Policy and Management Act ("FLPMA"), the Secretary may withdraw federal land "from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values." 43 U.S.C. § 1702(j). For withdrawals of more than 5,000 acres, the Secretary must notify both houses of Congress and provide them with a comprehensive report of the withdrawal. *Id.* at § 1714(c)(1)-(2). The statute states that Congress may terminate the withdrawal by adopting a concurrent resolution within 90 days. *Id.* at § 1714(c)(1). Withdrawals by the Secretary are limited to twenty years. *Id.*

Land withdrawals under the FLPMA are subject to valid existing rights, 43 U.S.C. § 1701, Note (h), but the BLM or another federal land management agency must conduct a mineral examination before allowing the development of noticed claims. *See, e.g.*, 43 C.F.R. § 3809.100(a) (BLM regulations). The purpose of this examination is to determine whether the claimant had a valid claim before withdrawal and whether the claim remains valid. *Id.* Because the right to prospect for minerals ceases on the date of

1  withdrawal, a discovery must have existed – meaning that minerals must have been

2  exposed – by the date of withdrawal.  *Lara v. Sec'y of Interior*, 820 F.2d 1535, 1542 (9th

3  Cir. 1987).

4  **II.   Background.**

5       On July 21, 2009, Secretary Salazar published notice of his intent "to withdraw

6  approximately 633,547 acres of public lands and 360,002 acres of National Forest System

7  lands for up to 20 years from location and entry under the Mining Law of 1872."  Notice

8  of Proposed Withdrawal, 74 Fed. Reg. 35,887, (July 21, 2009) (the "2009 Notice").  The

9  2009 Notice had the effect of withdrawing the land from location and entry for up to two

10 years to allow time for analysis, including environmental analysis under the National

11 Environmental Protection Act ("NEPA").  *Id.*

12      On August 26, 2009, the BLM, an agency within DOI, published notice of its

13 intent to prepare an Environmental Impact Statement ("EIS") under NEPA addressing the

14 proposed withdrawal.   74 Fed. Reg. 43,152 (Aug. 26, 2009).   The purpose of the

15 withdrawal as explained in the notice was "to protect the Grand Canyon watershed from

16 adverse effects of locatable mineral exploration and mining, except for those effects

17 stemming from valid existing rights."  *Id.* at 43,152-53.

18      On February 18, 2011, after soliciting public comments, the BLM issued a notice

19 of availability of a Draft EIS.   76 Fed. Reg. 9,594 (Feb. 18, 2011).   The Draft EIS

20 considered four alternatives in detail:   a "No Action" alternative; the withdrawal of

21 approximately 1,010,776 acres for 20 years; the withdrawal of approximately 652,986

22 acres for 20 years; and the withdrawal of 300,681 acres for 20 years.  *Id*. at 9,595.  After

23 an additional, extended opportunity for public comment, the BLM published a notice of

24 availability of the Final EIS on October 27, 2011.  76 Fed. Reg. 66,747 (Oct. 27, 2011).

25 The Secretary issued a Record of Decision ("ROD") on January 9, 2012, choosing to

26 "withdraw from location and entry under the Mining Law, subject to valid existing rights,

27 approximately 1,006,545 acres of federal land in Northern Arizona for a 20-year period."

28 *See* No. 3:12-cv-08042, Doc. 27-1 at 3.

Plaintiffs have filed claims under the FLPMA, NEPA, the National Forest Management Act ("NFMA"), and the Establishment Clause of the United States Constitution.  Plaintiffs ask the Court to set aside the Secretary's withdrawal decision as arbitrary and capricious under the Administrative Procedure Act ("APA").  Plaintiffs NWMA, NMA, and NEI also challenge the constitutionality of the FLPMA provision from which the Secretary derived his authority to make the withdrawal, and ask the Court to set aside the withdrawal as unconstitutional.

Defendants move to dismiss Plaintiffs' complaints under Rule 12(b)(1) on the following grounds: (1) Plaintiffs lack Article III standing to challenge the withdrawal, (2) Plaintiffs' claims are not ripe, (3) Plaintiffs lack prudential standing under NEPA, and (4) Plaintiffs lack standing to challenge the constitutionality of the FLPMA.  The Court will address each of these arguments as they apply to individual plaintiffs.

## III.    Article III Standing.

The burden of establishing standing falls on the party asserting federal jurisdiction. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006).  "Standing includes two components:  Article III constitutional standing and prudential standing." *Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, 654 F.3d 919, 932 (9th Cir. 2011).  The "core component of standing" is the case-or-controversy requirement found in Article III of the United States Constitution.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Constitutional standing requires a plaintiff to "demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision."  *Bennett v. Spear*, 520 U.S. 154, 162 (1997).  Prudential standing examines whether "a particular plaintiff has been granted a right to sue by the statute under which he or she brings suit."  *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1199 (9th Cir. 2004).

To seek injunctive relief, a party must establish a present injury or an "actual and imminent" – not "conjectural or hypothetical" – threat of future injury.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  Such injury must be present "at the

commencement of the litigation." *Davis v. Fed. Election Comm'n,* 554 U.S. 724, 732 (2008) (citation omitted).

### A.      Plaintiffs with Mining Interests.

Plaintiffs Yount, Quaterra, and Vane Minerals assert losses to their own mining interests as the primary basis for their injuries (Docs. 27, ¶¶ 9-11; *30, ¶¶ 17-19; *35-1, ¶¶ 11-12, 17),[1] while Plaintiffs NMA, NEI, and NWMA assert losses to the mining interests of their members (Docs. *1, ¶¶ 5, 7-8; *56, ¶¶ 80-85, 88).  Defendants argue that each of these Plaintiffs lacks Article III standing because they have failed to allege actual and imminent injuries.  Because standing requires that a plaintiff's alleged injury be "concrete and particularized," *Defenders*, 504 U.S. at 555, the Court will analyze each of the mining Plaintiffs' claims separately.

### 1.      NMA and NEI.

An association has standing to bring suit on behalf of its members when they would otherwise have standing to sue in their own right, when the interests at stake are germane to the organization's purpose, and when neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

NMA is a national trade association representing the mining industry, whose members include "the producers of most of America's locatable minerals and coal; manufacturers of mining and mineral processing machinery, equipment, and supplies; and engineering and consulting firms that serve the mining industry."  Doc. *56, ¶¶ 1, 7. NEI is a national policy organization representing the nuclear energy industry, whose members include "all companies licensed to operate commercial nuclear power plants in the United States, nuclear plant designers, major architect/engineering firms, suppliers of fuel, materials licensees, uranium mining companies, and other organizations involved in

---

[1] The Court will use an asterisk before document numbers to indicate when a document was filed prior to consolidation and was docketed using the original case number.

the nuclear energy industry." *Id.*, ¶¶ 1, 8.

NMA and NEI alleged in their original complaint that the Secretary's withdrawal decision injures their members because it imposes immediate costs and delays in uranium mining, jeopardizes mining claims, and deprives claimants of the value of their investments. Doc. *1, ¶ 1. Defendants argue that NMA and NEI have not identified any members with mining claims who have suffered alleged delays and increased costs in developing these claims as a result of the withdrawal. Doc. *39 at 13.

NMA and NEI amended their complaint to identify Uranium One as a member of both associations that holds approximately 500 unpatented mining claims in the withdrawal area. Doc. *56, ¶ 82. NMA and NEI allege that prior to the withdrawal Uranium One was able to explore and develop its claims following an expedited notice procedure that did not require formal approval, but now it cannot conduct exploration or mining operations until BLM completes a mandatory mineral examination that will likely take years to complete. *Id.*, ¶¶ 83-84, 87.[2] NMA and NEI allege that Uranium One has invested approximately $3.5 million in acquisition costs and an additional $5 million in exploration and drilling costs, and must pay annual fees of approximately $75,000 to maintain its claims even though it is restricted by the withdrawal from all but "casual use" – limited, hand-tool exploration and development – pending the now-required mineral examinations. *Id.*, ¶¶ 85-86; *see also*, Decl. of James D. Rassmussen, Doc. 64-1, ¶ 12.

Defendants contend that these allegations are insufficient to show injury in fact because unpatented mining claims have always been subject to contest, and Uranium One

---

[2] In support, Plaintiffs cite a statement in the ROD that "[d]etermining the validity of a mining claim is a complex and time-consuming legal, geological, and economic evaluation that is done on a claim-by-claim basis," and the BLM's statement in the EIS that the examination "process could significantly lengthen the planning/permitting time frame for mining operations under any of the action alternatives and represents a factor of uncertainty in the mine life cycle[.]" Doc. 64 at 13. Plaintiffs also attach the declaration of former BLM mineral examiner David C. Fedley, which states that "merely initiating the required mineral examination can take years" and attests to a prior mineral examination that took thirteen years for final resolution. Doc. 64-1, ¶ 14.

has no legally protected interest in being free from the mineral examination requirement. Doc. *72 at 10-11. *See Defenders*, 504 U.S. at 560 (defining "injury in fact" as "an invasion of a legally protected interest") (internal citations omitted). The Court is not persuaded. Defendants' argument – that NMA and NEI members are in essentially the same position as they were before the withdrawal – fails to account for the practical difference between the regulatory scheme governing open lands, under which NMA and NEI members made their mining claims and upon which they relied when making significant exploratory investments, and the regulatory scheme in place after the withdrawal. Doc. *64 at 17, 17 n. 8. The prior regulatory scheme permitted discretionary mineral examinations (*see* 43 C.F.R. § 4.451-1) that rarely occurred (*see, e.g.*, Decl. of David C. Fredley, Doc. *65 at 3, ¶ 6). The regulation applying to withdrawn lands makes individualized mineral examinations mandatory on all claims. 43 C.F.R. § 3809.100. The withdrawal has thus imposed on NMA and NEI members an expensive and years-long examination process that rarely occurred before the withdrawal. In addition, NMA and NEI members must continue to pay annual maintenance fees while the now-mandatory and time-consuming examination process proceeds. *See, e.g.*, Decl. of James D. Rassmussen, Doc. *64-1 at 71, ¶ 12.

Plaintiffs have also alleged that the withdrawal and the complications it presents for location and development of mining claims has significantly reduced the value of existing claims and the value of claim investments made to date. Doc. 56, ¶ 85. Courts have routinely found private economic losses due to governmental action sufficient to show injury in fact for purposes of Article III standing. *See Clark v. City of Lakewood*, 259 F.3d 996, 1007 (9th Cir. 2001) (finding injury in fact requirement satisfied where a business enterprise alleged economic losses incurred from a newly-enacted city zoning ordinance); *Clinton v. City of New York*, 524 U.S. 417, 432-33 (1998) ("The Court routinely recognizes probable economic injury resulting from governmental actions . . . as sufficient to satisfy the Article III 'injury in fact' requirement.") (internal quotation marks and citation omitted). This is true for agency action that reduces a plaintiff's

property value on federal land. *See Barnum Timber Co. v. EPA*, 633 F.3d 894, 898-901 (9th Cir. 2011) (finding alleged diminishment of a plaintiff's property value on national forest land due to EPA's Clean Water Act regulations "sufficient to demonstrate injury in fact at the pleading stage."). Unpatented mining claims are sufficient to convey real property interests. *U.S. v. Shumway*, 199 F.3d 1093, 1095, 1100, 1103 (9th Cir. 1999) (stating that "an unpatented mining claim is property," and – equating mill sites and mining claims – "[the fact] that an applicant has yet to receive, or even apply for, a patent does not mean that the government has plenary power over the mill site.").

Defendants' argument that NMA and NEI do not have standing because unpatented mining claims are not a "legally protected interest" also lacks merit. This argument was addressed in *Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228, 1233 (D.C. Cir. 1996). The district court rejected a logging company's claims of injury in fact due to the Forest Service's delay in approving logging that resulted in closure of the company's mill and the lay-off of 25 workers. The district court found that the company did not have "a legally cognizable economic interest in a specified level of timber." *Id.* The Court of Appeals disagreed, holding that although "[t]he plaintiffs may not have any particular right to federal timber contracts, . . . no such 'right' is required any more than a 'right' to view crocodiles in foreign sites was necessary for the plaintiffs in [*Defenders*]." *Id.* The Court of Appeals concluded that "[g]overnment acts constricting a firm's supply of its main raw material clearly inflict the constitutionally necessary injury." *Id.*

The sufficiency of NMA and NEI's allegation of injury does not depend, as Defendants argue, on evidence that their members have actually been subjected to the new examination requirement. *See* Doc. *72 at 8-9. NMA and NEI have alleged that the mineral examination requirement to which its members became subject at the time of the withdrawal has effectively barred their members from continuing all mining operations and has significantly diminished the market value of their claims. Doc. *56, ¶¶ 84-85, 87. Even if the full extent of member losses incurred while awaiting the now-mandatory

mineral examinations cannot be quantified before they initiate such action, NMA and NEI have alleged current and ongoing harm to their members that did not exist prior to the withdrawal.  As the Supreme Court has stated, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief.  If the injury is certainly impending, that is enough."  *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (internal quotation marks, citation omitted).  NMA and NEI have alleged current and impending economic harm.  This is sufficient for the injury in fact requirement of Article III standing.

### 2. NWMA.

NWMA is a trade association whose stated purpose is "to support and advance the mining related interests of its approximately 2,300 members; to represent and inform its members on technical, legislative, and regulatory issues; to provide for the dissemination of educational material related to mining; and to foster and promote economic opportunity and environmentally responsible mining."  Doc. *1, ¶¶ 1-2.  NWMA alleges that many of its members are actively engaged in exploration programs to discover and produce high grade uranium found in breccia pipe deposits in Northern Arizona.  *Id.*, ¶ 7.

Defendants argue that NWMA has failed to show any legally-protected interests of its members that have been harmed or are under imminent threat of harm due to the withdrawal.  Doc. *27 at 10-12.  Defendants claim that NWMA has not identified any members who hold existing mining claims in the withdrawal area and has not asserted that its members have pursued currently-available procedures for surface-use authorization, making any alleged injury merely conjectural.  *Id.* at 13-15.

Contrary to Defendants' assertion, the complaint alleges that several NWMA members "have properly located and currently maintain hundreds of unpatented mining claims" in Northern Arizona, virtually all of which are located within the withdrawal area.  Doc. *1, ¶ 8.  It also alleges that, but for the withdrawal, its members would seek to locate new claims on the withdrawn lands.  *Id.*

The fact that NWMA has not specifically identified these members does not

deprive it of standing at the pleading stage.  *See Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999) (an association need not "name members on whose behalf suit is brought").  Although the Supreme Court did say in *Summers*, 555 U.S. at 498, that organizations must "make specific allegations establishing that at least one identified member had suffered or would suffer harm," the Court cited to a summary judgment case – *Defenders*, 504 U.S. 555, 563.  *Summers* also cited *Sierra Club v. Morton*, 405 U.S. 727 (1972), which addressed standing at the pleading stage, but *Morton* found a lack of standing not because the Sierra Club failed to identify individual members, but because it "failed to allege that it or its members would be affected in any of their activities or pastimes by the . . . development."  *Id.* at 735.  "Nowhere in the pleadings or affidavits did the Club state that its members use Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents."  *Id.*

Unlike *Morton*, NWMA alleges that its members' use of the withdrawn lands has been and will be curbed or significantly affected by the withdrawal.  Doc. *1, ¶¶ 7, 8, 58(c).  NWMA has provided affidavits from its executive director and individual members (Doc. *55-1 at 22-30, 41-47; Doc. *55-2 at 11-14, 16-20), each attesting to the economic injury specific members have incurred and will incur as a result of the withdrawal.  *See, e.g.*, Decl. of Thomas H. Howell, Doc. *55-2 at 11-14, ¶¶ 4-10 (alleging loss of market value and lease income on existing claims, inability to engage in more than casual use absent a lengthy mineral examination, inability to explore for and locate additional claims).  For purposes of standing, the Court must "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *Warth v. Seldin*, 422 U.S. 490. 501 (1975).  Additionally, the Court has discretion "to allow . . . the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing."  *Id.* at 502.  NWMA has done so here.

Defendants argue that these allegations of injury – both as to existing claims and the inability to locate new claims – fail for lack of imminence.  Doc. *59 at 5-10.  As to

existing claims, Defendants argue that NWMA has not alleged that any of its members have pursued the administrative process available to them to validate these claims in order to go forward with mining operations and thus cannot show that the members have been harmed by the mineral examination requirement.  *Id.* at 6.  This argument fails for the reasons already discussed with respect to NMA and NEI.  Like those plaintiffs, NWMA asserts that prior to the withdrawal its members had to wait only 15 days after providing notice before engaging in notice-level operations (Doc. *55 at 27 n. 17, 28 n. 18; Decl. of Kris Hefton, Doc. *55-2 at 36, ¶ 8; *see* 43 C.F.R. § 3809.321(a)), whereas they now must pay for and undergo a mineral examination that the ROD itself describes as "complex and time-consuming."  Doc. *55 at 27 n. 17, 28 n. 18; *see* 43 C.F.R. § 3800.5(b); Doc. *55-1 at 4, ROD at 7.   NWMA has presented member affidavits documenting the chilling effect this has had on their pursuit of claims.  Doc. *55 at 28; *see, e.g.*, Decl. of Lawrence D. Turner, Doc. *55-1 at 45-46, ¶ 17 (stating that "it is hard to justify the time and money to prepare and submit a notice only to be subjected to a lengthy and costly mineral examination process.").  As noted above, NWMA members also attest to the current loss of market value and lease revenue while their claims are restricted to no more than casual use.  Defendants' argument that NWMA's injuries are not imminent until its members subject their claims to the mineral examination process ignores the fact that NWMA has alleged both immediate and ongoing financial injury to their investments as a result of the new regulatory scheme – allegations the Court must accept as true at this stage of the litigation.

Defendants also argue that the alleged intention of NWMA's members to pursue future claims is too conjectural to confer standing.  Doc. 59 at 8-9.  Defendants cite the declarations of two NWMA member company presidents, representing DIR Exploration and Vane Minerals, as stating that their companies were "ready, willing, and able" to explore for new claims at the time of the 2009 Notice.  *Id.* at 9; *see* Decl. of Lawrence D. Turner, Doc. *55-1 at 43, ¶8; Decl. of Kris Hefton, Doc. *55-2 at 35-36, ¶ 7.  Defendants argue that these statements represent only vague intentions and are even less definitive

than the environmental plaintiffs' intentions to return "someday" to lands they "had visited" that the Supreme Court found too speculative to confer standing in *Defenders*, 505 U.S. at 563-64.  Doc. *59 at 9.

This argument fails for two reasons.  First, as already noted, *Defenders* dealt with standing at the motion for summary judgment stage, not the pleading stage where the Court must take the allegations made as true.  Second, the Court cannot conclude that a company in the business of mining that has invested substantial time and money locating claims in a particular area can be characterized as having only hypothetical plans to engage in such activities in the future.  The above-cited declarations show that DIR Explorations previously located over 600 mining claims in Northern Arizona and spent roughly $2.9 million in its mining endeavors.  Decl. of Lawrence D. Turner, Doc. *55-1 at 42, ¶6.  Vane has located 678 claims in Northern Arizona since October 2004 and spent more than $8.5 million.  Decl. of Kris Hefton, Doc. *55-2 at 35, ¶¶ 4-5.  NWMA's other declarations are similar.  *See, e.g.*, Decl. of Thomas H. Howell, Doc. *55-2 at 12-13, ¶¶ (Nu Star located 128 mining claims in Northern Arizona and expended $165,000, and – but for the withdrawal – would seek further notice- or plan-level operations).  The fact that these companies engaged in these activities in the past, and continue to hold substantial numbers of claims in the withdrawal area, is sufficient evidence of their intentions to locate new mining claims in the area in the future.  It is more than vague speculation.  NWMA's allegations of harm to their mining investments are sufficient to show injury in fact.

### 3.    Yount.

Yount alleges that he owns two hard rock uranium mining claims in the South Parcel of the withdrawal area.  Doc. 27. ¶ 7.  He alleges that he properly filed notice of these claims and, after expending hundreds of man hours and tens of thousands of dollars developing and exploring them, he determined to a high degree of certainty that they contain uranium breccia pipes.  *Id.*, ¶8.  He then submitted a plan of operations to the Forest Service ("USFS") for exploration drilling.  *Id*.  Yount alleges that after the

1    Secretary issued the 2009 Notice, the USFS stopped processing plans of operations and
2    returned his plan without action, preventing him from drilling and making "discovery" of
3    uranium on his claims.  *Id.*, ¶ 9-10.  Yount alleges that his unpatented claims went from
4    being valuable mining properties to having little or no value because he was prevented
5    from exposing the minerals prior to the withdrawal, and, after the withdrawal, only
6    claims with exposed minerals will be deemed valid and open to mining.  *Id.*

7    Defendants argue that Yount has failed to allege an actual and imminent injury
8    because he is still free to seek approval for exploration and development of his claims,
9    just as he was prior to the withdrawal.  Doc. 33 at 13-14.  They argue that Yount's claim
10   is speculative until he submits a proposed plan of operations and subjects his claims to a
11   validity determination.  *Id.*  Defendants argue that the USFS would either validate
12   Yount's claims, in which case he would suffer no injury, or would initiate "contest
13   proceedings," and Yount would have the opportunity to demonstrate that his claims
14   constitute valid existing rights that are not disturbed by the withdrawal decision.  *Id.*

15   Defendants' arguments ignore the fact – acknowledged by defense counsel at oral
16   argument – that minerals must first be exposed to the surface before a valid "discovery"
17   can be made.  Before withdrawal, Yount could explore the land prior to exposure of
18   minerals at the surface, obtain the right to drill and thereby expose the minerals, and,
19   having exposed the minerals, secure a valid claim that he could sell or mine.  After
20   withdrawal, Yount can conduct drilling activities on the land only if he has a valid claim,
21   which he does not have because he has not yet been permitted to drill and expose
22   minerals on the surface.  Yount has effectively lost his opportunity to validate the claims
23   in which he has made substantial personal investments.  Although it is true that Yount's
24   claims could have been subjected to examination at any time under the pre-withdrawal
25   law, Plaintiffs have presented evidence that such examinations rarely occurred,
26   particularly at the exploration stage.  They are now mandatory, and mean that Yount will
27   have no opportunity to validate his claims.

28   Yount's injury is not merely speculative.  He alleges that he invested significant

time and money in the exploration and development of claims he cannot now perfect. Additionally, although Defendants argue that the validity of Yount's claims is as-yet-unknown (Doc. 48 at 4), Yount attests to conducting substantial exploratory work, including geophysical and electromagnetic surveys and laboratory analyses, which indicated a high probability of breccia pipe formations. Doc. 44, ¶¶ 6-9. Yount credibly asserts that this work established economic value even without discovery (Doc. 27, ¶ 9), and that the value is now lost because he is barred by the withdrawal from taking the few additional steps needed to validate his claims.

Yount need not go through the exercise of seeking a mineral examination before he can allege injury. The results of such an examination are known – his claims will be found invalid because no mineral has been exposed. Forcing Yount to go through the formality of obtaining this certain determination is not necessary for the Court to conclude that Yount has shown injury in fact.

### 4. Quaterra.

Quaterra alleges that it holds 1,000 unpatented mining claims located entirely within the North Parcel of the withdrawal area. Doc. *30, ¶¶ 17-18. Since 2005, it has invested more than $12 million – approximately 30% of its exploration expenditures in North America – in this region, and it seeks to expand its operations and locate more claims. *Id.*, ¶ 18. Quaterra further alleges that it cannot locate new claims in light of the withdrawal, and its development plans for its existing claims are now frozen absent a lengthy and expensive mineral examination for each claim. *Id.*, ¶ 19.

These allegations mirror those made by NMA, NEI, and NWMA on behalf of their mining-company members. For reasons already stated with respect to those plaintiffs, Quaterra's allegations are sufficient to show injury in fact.

### 5. Vane.

Vane alleges that it holds 678 unpatented mining claims located entirely within the withdrawal area. Doc. *35-1, ¶¶ 11-12. Since 2004, it has invested more than $8.5 million in mineral exploration and location of these claims, and it seeks to expand its

operations and locate additional claims.  *Id.*, ¶ 12.  Vane alleges that it received approval from the USFS on December 20, 2007 to conduct exploratory drilling and surface disturbing activities within an area of the Kaibab National forest currently within the withdrawal area, but that this approval became subject to a lawsuit that ended in a settlement whereby the USFS agreed to perform an EIS before allowing Vane to drill. *Id.*, ¶¶ 13-15.  Vane alleges that the USFS failed to complete the EIS as it had agreed, and that it ceased preparing for an EIS after the Secretary issued his 2009 Notice.  *Id.*, ¶ 16. Vane alleges that the Secretary's subsequent withdrawal freezes Vane's development plans and negates the prior settlement agreement because Vane must now submit each of its claims to a lengthy and expensive mineral examination before it can proceed with mining operations.  *Id.*, ¶ 17.

Vane makes allegations of injury similar to Yount.  Vane alleges that it submitted, but then withdrew, a plan of operations for drilling on many of its claims after the Secretary's 2009 Notice because it was told it could not get approval for its plan absent the exposure of minerals, but it also could not drill to expose minerals until it got approval of its plan.  Doc. 76 at 5; *see* Decl. of Kris Hefton, Doc. 77 at 5, ¶ 13.  Vane also makes allegations of injury similar to those of NWMA with respect to the restriction against locating new mining claims.  Even more specifically than NWMA, Vane supports its intention to make new mining claims with the declaration that it was continually identifying targets for such claims and that it currently maintains a list of these targets ready for staking in the withdrawal area.  Decl. of Kris Hefton, Doc. 77 at 3-4, ¶¶ 7-9. For the reasons already stated, Vane's allegations are sufficient to show injury in fact.

### B.     The Arizona Utah Local Economic Coalition.

The Arizona Utah Local Economic Coalition ("the Coalition") filed suit on behalf of named member Mohave County.  Doc. *30.  Mohave County is a unit of local government within Arizona that contains a large portion of the North Parcel of the withdrawal area within its borders.  *Id.*, ¶ 11. Mohave County and other members of the coalition were granted cooperating agency status in developing the EIS.  *Id.*, ¶ 7.

Mohave County also developed its own Comprehensive Land Use Plan to protect its environmental interests. *Id.*, ¶ 12.

The Coalition alleges that Defendants failed to coordinate with its members to avoid conflicts with local plans, Defendants failed to follow proper FLPMA and NEPA procedures, the withdrawal decision ignored scientific data, and the decision will cost Mohave County and other members "tens of millions of dollars in revenue and jobs," inhibiting their current efforts at economic recovery. *Id.*, ¶ 1. The Coalition also alleges that the withdrawal adversely impacts Mohave County's ability to protect its air and water quality, both because nuclear energy is less harmful to the environment than coal, oil, or gas, and because Mohave County depends on revenue from the use of its lands to pave its roads, thereby reducing dust and erosion, and to manage its desert tortoise habitat, which are stated goals of its Land Use Plan. *Id.*, ¶¶ 25-31; 181.

Defendants argue that the Coalition lacks Article III standing because an association has standing to sue on behalf of a member only if that member would have standing to sue in its own right (*see Hunt*, 432 U.S. at  343), and Mohave County does not have such standing. Doc. 62 at 18. Citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601-02 (1982), Defendants argue that a state or local government may sue only to protect three types of interests: (1) sovereign interests, such as enforcement of civil and criminal codes, (2) proprietary interests, and (3) interests relating to the general welfare of the populace under the doctrine of *parens patriae*. Doc. 62 at 19. The third type of interest does not give a county standing in suits against the federal government because "it is the United States, and not the State, which represents [its citizens] as *parens patriae*." *Snapp*, 458 U.S. at 610, n. 16; *see also Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1453 n.3 (10th Cir. 1994) (applying *Snapp* to counties). The Ninth Circuit has also held that "political subdivisions such as cities and counties, whose power is derivative and not sovereign, cannot sue as *parens patriae*[.]" *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 131 (9th Cir. 1973). Defendants argue that because Mohave County does not have standing to bring a

*parens patriae* action and is not attempting to assert injury to sovereign or proprietary interests, it lacks Article III standing.  Doc. 62 at 20-21.

The cases cited above make clear that the County cannot establish standing on the basis of *parens patriae*.  If the County has standing, therefore, it must be based on one of the other two grounds recognized by the Supreme Court in *Snapp* – the assertion of sovereign interests or proprietary interests.

The Ninth Circuit has explained that the phrase "proprietary interests" has a broader than normal meaning when the claimant is a local government: "The term 'proprietary' is somewhat misleading, for a municipality's cognizable interests are not confined to protection of its real and personal property.  The 'proprietary interests' that a municipality may sue to protect are as varied as a municipality's responsibilities, powers, and assets."  *City of Sausalito*, 386 F.3d at 1197.  Thus, a local government's proprietary interests can include "its ability to enforce land-use and health regulations," "its powers of revenue collection and taxation," and its "interest in protecting its natural resources from harm."  *Id.* at 1198.  The Ninth Circuit has found constitutionally sufficient injury to proprietary interests where land management practices on federal land could affect adjacent city-owned land.  *Id.*; *Douglas County v. Babbitt*, 48 F.3d 1495 (9th Cir. 1995).

In *American Motorcyclist Association v. Watt*, 534 F. Supp. 923 (C.D. Cal. 1981), the District Court for the Central District of California applied this principle to conclude that where "the harm caused by the disruption of local comprehensive planning falls directly on the County, [it] may be fairly characterized as harm to the County in a propriety sense."  *Id.* at 931-32.  The court went on to find that a county's allegations that a federal land use plan would impair its ability to adopt and implement its own comprehensive plan were sufficient to show direct injury to the political entity itself.  *Id.; c.f. Bd. of County Supervisors of Prince William County, VA v. U.S.*, 48 F.3d 520, 524 (Fed. Cir. 1995) ("It is basic law that when local governments engage in land use planning and control, they do so by exercising the sovereign's police power delegated to them by the state.").

In arguing that the County has suffered sufficient injury to its sovereign and proprietary interests, the Coalition focuses primarily on procedural injury.  The Ninth Circuit explained the nature of procedural injury in *City of Sausalito*:  "We have recently stated, with respect to 'procedural injury,' that 'to show a cognizable injury in fact, [a plaintiff] must allege . . . that (1) the [agency] violated certain procedural rules; (2) these rules protect [that plaintiff's] concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests.'"  386 F.3d at 1197 (quoting *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969-70 (9th Cir. 2003)).  Defendants do not directly address each element of this three-part test, but argue instead that the Coalition has not shown that it is reasonably probable that the withdrawal will threaten any concrete interests of Mohave County.  The Coalition responds that Mohave County "has a mandate to retain environmental quality and to capitalize on its wealth of natural, built and human resources."  Doc. 30, ¶ 24.  This includes "the 'growth of communities that maintain the health and integrity of its valuable environmental features'; the protection of 'wetlands, washes, aquifer recharge areas, areas of unique flora and fauna, and areas with scenic, historic, cultural and recreational value'; and avoiding industrial development that has the 'undesired effect of increasing air pollution.'"  *Id.* (quoting Mohave County General Plan, p. 23).  These interests clearly appear to be proprietary within the Ninth Circuit's broad definition of that phrase, as discussed above.

To show that it is reasonably probable that the withdrawal will threaten these concrete interests, the Coalition alleges that the withdrawal will lead to the use of coal-fired power plants or other sources of energy that are more harmful to Mohave County's air and water quality than nuclear energy, and will reduce Mohave County's available funds to pave its roads (thereby reducing dust and erosion) and protect desert tortoise habitat.  Doc. 30, ¶¶ 25-30; 181.  The Coalition additionally argues that Mohave County cannot adequately plan for future growth as it relates to the development of mining claims on state lands because the BLM has broad discretion to grant access across federal

1   land to these state-land sites, and although the EIS states that right-of-way permits will be

2   processed as usual, it does not say that access will be granted.  Doc. 72 at 27.  The Court

3   will focus on the second of these alleged injuries.[3]

4       The Coalition has alleged facts showing that projected state revenues that flow to

5   Mohave County from the mining industry will be significantly reduced as a result of the

6   withdrawal.  The Coalition alleges that but for the withdrawal "there would be over a 40-

7   year period: 1,078 new jobs in the project area; $40 million annually from payroll; $29.4

8   billion in output; $2 billion in federal and state corporate income taxes; $168 million in

9   state severance taxes; and $9.5 million in mining claims payments and fees to local

10  governments."  Doc. 30, ¶ 127; *see also* Decl. of Buster Johnson, Doc. 72-2 at 13-14,

11  ¶¶ 36-37.  The complaint plausibly alleges, and the Court must take as true, that loss of

12  Mohave County's share of this revenue will impair the county's ability to carry out

13  county functions, including paving its 1,277 miles of unpaved roads and managing its

14  desert tortoise habitat, both stated goals of its Land Use Plan.  *Id.*, ¶¶ 25-31; 181.

15      Defendants argue that loss of tax revenue represents a *parens patriae* interest, not

16  a proprietary interest.  Doc. 84 at 11-12.  Defendants rely on a statement in *Watt* that

17  "[a]lthough impairment of the County's tax base will result in harm to the County as an

18  entity, this harm will merely be derivative of the Plan's impact on taxpayers; therefore, it

19  should not be considered harm to the County's "'proprietary interests.'" 534 F.Supp. at

20  931-32 (internal citations omitted).   In *Watt*, Inyo County, a California political

21

22      [3] The Coalition has not alleged sufficient facts to show that the withdrawal will
23  adversely affect air and water quality in Mohave County.  Although the Coalition alleges
    that Mohave County receives its energy from the Palo Verde Nuclear Generating Station
24  and that it will "otherwise rely on coal-fired power plants" that are more harmful to its air
    and water quality (Doc. 30, ¶¶ 25-26, 181), it fails to allege any facts showing that the
25  withdrawal will cause the Palo Verde plant to close, scale back its operations, or
    otherwise cease providing power to Mohave County, thereby forcing the County to turn
26  to coal-fired plants for its energy needs.  Nor, on a more general level, has the Coalition
    alleged facts showing that the withdrawal will lead to a reduction in the overall
27  availability of nuclear-generated electricity and an increase in coal-fired plant usage of a
    kind and in locations that will affect the air quality in Mohave County, Arizona.

28

subdivision with statutory authority to adopt a comprehensive general plan, alleged that the DOI and the BLM violated NEPA and the FLPMA when they adopted the California Desert Conservation Area Plan ("CDCA").  534 F.Supp at 926, 931.  Inyo County's asserted injury was based in part on allegations that adoption of the CDCA would impair the county's tax base due to a loss of revenue from recreation and mining in the area.  *Id.* at 931.  The county also alleged that the CDCA significantly impaired its ability to adopt its own comprehensive general plan where over half of the county was within the area now managed under the CDCA.  *Id.*  Although the court found that loss to the county's tax base was derivative of economic harm to its taxpayers and therefore did not constitute harm to a proprietary interest, there is no evidence in *Watt* that the county alleged any causal connection between the loss to its tax base and its alleged inability to carry out its comprehensive plan.  Nor do the cases upon which *Watt* relied contain the facts presented here in which the Coalition has alleged that loss of revenue to the County will directly impair its ability to implement identified municipal functions.  *See, e.g.*, *Pennsylvania Ex Rel Shapp v. Kleppe*, 533 F.2d 668, 672-73 (D.C. Cir. 1976) (finding that state's general assertion of injury to its tax base due to allegedly inequitable disaster relief distributions to small businesses did not constitute sufficient injury to state's proprietary interests); *Puerto Rico Ex Rel Quiros v. Snapp*, 469 F.Supp 928 (W.D. Va. 1979) (harm to the general economy due to loss of employment not a sufficient state proprietary interest); *City of Rohnert Park v. Harris*, 601 F.2d 1040, 1044 (9th Cir. 1979) (loss of tax revenue and profits to businesses in the City's commercial zone was a *parens patriae*, not a proprietary, interest).

*Watt* went on to find that Inyo County had satisfied the injury in fact requirement for Article III standing because the harm it had shown with respect to carrying out its plan was a direct harm to the County, and such harm "may be fairly characterized as harm to the County in a proprietary sense."  *Id.* at 932.  This finding, coupled with the Ninth Circuit's broad statement in *City of Sausalito* that "[t]he 'proprietary interests' that a municipality may sue to protect are as varied as a municipality's responsibilities,

powers, and assets," suggest that Mohave County's projected economic losses resulting in an alleged inability to carry out specific plan objectives are sufficient to show injury to its proprietary interests.  Among the harms that *City of Sausalito* found to be proprietary were detrimental impacts to the city's roads, destruction of the historic character of the town resulting in both aesthetic and economic injury, and harm to the city's natural resources.  386 F. 3d at 1198-99; *see also Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 944 (9th Cir. 2002) ("[The City of] Lodi retains its independent authority to protect its proprietary interest in natural resources held in trust by the City.") (cited in *City of Sausalito*, 386 F.3d at 1189).  The Coalition's allegations in this case – that the withdrawal will have economic consequences for Mohave County that will directly impair its ability to carry out its governmental functions, including implementation of its Land Use Plan – shows injury to the County's concrete proprietary interests.  The fact that taxpayers also feel the effects of decreased revenue does not mean that the County lacks standing.  *In Re Multidistrict*, 481 F.2d at 131.  The County has an independent interest in securing funding sufficient to discharge its governmental duties.  *City of Sausalito*, 386 F.3d at 1197.[4]

Mohave County also satisfies the additional requirements for procedural injury. First, it has alleged that Defendants violated procedural rules under the FLPMA and NEPA.  Doc. *30, ¶ 1.  This includes allegations that the Secretary did not consult with local governments in selecting the preferred alternative despite stating that their comments would influence his decision (*Id.*, ¶ 74); the Secretary tainted the NEPA process by announcing a decision before the BLM had reviewed all comments and completed the final EIS (*Id.*, ¶¶ 109-10); and neither the Secretary nor his designees made an effort to resolve inconsistencies between the withdrawal and local plans and

---

[4] Because the Coalition has made a sufficient showing that economic loss to the County as a result of the withdrawal will impair its ability to carry out specific objectives of its Land Use Plan, the Court need not address the Coalition's additional argument that the BLM's discretion to limit access to uranium claims on state lands in the withdrawal area will impair the County's ability to plan for future growth.

policies (*Id.*, ¶¶ 170, 176).  Both the FLPMA and NEPA require meaningful participation of and consultation with local governments, and, to the extent possible, consistency of federal actions with local land use plans.  *See* 43 U.S.C. § 1712(a) and (c)(9); 42 U.S.C. §§ 4331(a), 4332(2)(C)(v), 40 U.S.C. §§ 1502.9(b), 1502.16(c), 1506.2(d).

Second, the procedural rules cited above are intended to protect the concrete interests of Mohave County.  NEPA requires agencies to take into account the comments and views of local governments that are authorized to develop environmental standards. 42 U.S.C. § 4332(2)(C).  Mohave County is authorized under state law to implement environmental standards and to develop a comprehensive plan to conserve natural resources and promote the "health, safety, convenience and general welfare of the public."  Doc. 72-2 at 5-6, ¶¶ 7-9.  As discussed above, Mohave County has alleged that the withdrawal decision interferes with its ability to carry out identified environmental objectives of its Land Use Plan.  These are the types of concrete interests that the procedural requirements of NEPA were designed to protect.  *See, e.g.*, *City of Davis v. Coleman*, 521 F.2d 661, 672 (9th Cir. 1975) (municipality entrusted under state law with enforcing environmental standards and developing a general plan had "municipal interests [that] fall within the scope of NEPA's protections."); *Douglas County v. Babbitt*, 48 F.3d 1495 (9th Cir. 1995) (County that was authorized by state law to develop environmental standards and had statutory right to comment on proposed federal action had "concrete, plausible interests, within NEPA's zone of concern for the environment" underlying its asserted procedural interests.).

Like NEPA, the procedural requirements of the FLPMA are designed to protect the interests of local governments whenever federal agencies develop or implement federal land-use plans.  43 U.S.C. § 1712(a), (c)(9).  Because the FLPMA includes environmental objectives similar to those of NEPA (*see id.* § 1701(8)), the concrete interests asserted by Mohave County that merit procedural protection under NEPA also merit protection under the FLPMA.  Additionally, the FLPMA represents broader land-use objectives, including that land management "be on the basis of multiple use and

sustained yield" (*id.* § 1701(7)), so the alleged harms to Mohave County's employment and economic interests also implicate concrete interests that fall within the scope of the FLPMA's protections.

The Coalition has shown that Mohave County has suffered injury in fact sufficient for Article III standing.  The Coalition therefore has standing to bring these claims on the County's behalf.

**IV.    Ripeness.**

The doctrine of ripeness prevents premature judicial decisions.  *See Abbott Labs v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).  Where administrative action is involved, ripeness also "protects the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Id.* at 148-149.  The ripeness doctrine also prevents courts from "entangling themselves in abstract disagreements over administrative policies."  *Id.* at 148.

Ripeness involves a two-factor test: (1) whether the issues are fit for judicial decision, and (2) whether the parties would suffer hardship if judicial consideration is withheld.  *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 201 (1983).  Ripeness depends on whether the dispute presents purely legal questions, whether further administrative action will be taken, and whether the dispute concerns future events that are uncertain or may not occur.  *See Abbott Labs,* 387 U.S. at 149-152; *Standard Alaska Prod. Co. v. Schaible,* 874 F.2d 624, 627 (9th Cir.1989); *see also Texas v. United States,* 523 U.S. 296, 300 (1998).  Generally, if a claim is not ripe, a federal court does not have subject matter jurisdiction.  *See Richardson v. City & Cnty. of Honolulu,* 124 F.3d 1150, 1160 (9th Cir.1997).

Defendants argue that the mining plaintiffs' claims are not ripe.  *See, e.g.*, Mot. to Dismiss NWMA, Doc. *27 at 19; Mot. to Dismiss Quaterra, et al., Doc. *62 at 17-18.  This argument mirrors Defendants' injury in fact argument that allegations of economic losses on existing mining claims are not cognizable until Plaintiffs avail themselves of

1    the administrative procedures for reviewing claims under the withdrawal.  The Court has

2    already rejected this argument.  For the reasons stated above, and because Defendants'

3    actions effectuating the withdrawal and its regulatory scheme are complete, the Court

4    finds that the mining plaintiffs' allegations of economic loss constitute a concrete injury.

5    The mining plaintiffs' alleged inability to locate and develop new claims is also a

6    concrete injury that does not depend on further factual or administrative development.

7    The claims of the mining plaintiffs are ripe for review.

8    **V.    Prudential Standing under NEPA.**

9            Prudential standing examines whether "a particular plaintiff has been granted a

10   right to sue by the statute under which he or she brings suit."  *City of Sausalito*, 386 F.3d

11   at 1199.  "Because NEPA does not provide for a private right of action, plaintiffs

12   challenging an agency action based on NEPA must do so under the [APA]."  *Ashley*

13   *Creek Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005) (citation omitted).  To

14   meet the APA statutory requirements for standing, a plaintiff "must establish (1) that

15   there has been a final agency action adversely affecting the plaintiff, and (2) that, as a

16   result, it suffers legal wrong or that its injury falls within the 'zone of interests' of the

17   statutory provision the plaintiff claims was violated."  *Ocean Advocates v. U.S. Army*

18   *Corps of Engineers*, 402 F.3d 846, 861 (9th Cir. 2005) (quotation omitted).  The zone of

19   interests test asks "whether the interest sought to be protected by the complainant is

20   arguably within the zone of interests to be protected or regulated by the statute or

21   constitutional guarantee in question."  *Ass'n of Data Processing Serv. Orgs., Inc. v.*

22   *Camp*, 397 U.S. 150, 153 (1970).  While "there need be no indication of congressional

23   purpose to benefit the would-be plaintiff," the zone of interests test "denies a right of

24   review if the plaintiff's interests are so marginally related to or inconsistent with the

25   purposes implicit in the statute that it cannot reasonably be assumed that Congress

26   intended to permit the suit."  *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399-400

27   (1987).

28           NEPA seeks to protect environmental interests.  "The overall purpose of NEPA is

- 25 -

to declare a national commitment to protecting and promoting environmental quality." *Ashley Creek*, 420 F.3d at 945.  As a result, "purely economic interests do not fall within NEPA's zone of interests" and a plaintiff asserting such interests lacks prudential standing under NEPA.  *Id.* at 940.

Defendants argue that even if Plaintiffs have Article III standing and their claims are ripe, they do not have prudential standing to bring NEPA claims.  *See, e.g.*, Mot. to Dismiss NMA & NEI, Doc. *39 at 19.  Defendants assert that Plaintiffs' interests in challenging the withdrawal are economic, not environmental, and that their injuries therefore do not fall within NEPA's zone of interest.

## A.     NMA and NEI.

Defendants argue that Plaintiffs NMA and NEI lack prudential standing under NEPA because their interests are solely economic; the environmental interests they allege in their amended complaint are merely pretext for economic interests; and, to the extent they have alleged legitimate environmental interests, such interests would not give them associational standing because such interests do not comport with the purposes of their associations.  Docs. *39 at 19-24; *72 at 13-19.

NMA and NEI make two main arguments in response: (1) they have prudential standing under NEPA apart from the zone of interests test because their members' activities are the targets of the withdrawal and they are therefore "regulated by" the withdrawal, and (2) they have alleged environmental, economic, and procedural interests, all of which are protected by NEPA.  Doc. 64 at 25-34.

### 1.     Does the Zone of Interests Test Apply?

In a case that did not concern NEPA, the Supreme Court said that the zone of interests test applies "[i]n cases where the plaintiff is not itself the subject of the contested regulatory action[.]"  *Clarke*, 479 U.S. at 399.  NMA and NEI rely on this statement to argue that where plaintiffs are in fact the subjects of the "contested regulatory action," the zone of interests test does not apply.  Doc. 64 at 25.  Claiming that they are the subject of the withdrawal at issue in this case, NMA and NEI assert that they

1    need not satisfy the zone of interests test in light of *Clarke*.

2    NMA and NEI present an interesting reading of the statement in *Clarke*, but they

3    cite no case (and we have found none) in which a court has held that a plaintiff making a

4    NEPA claim can avoid the zone of interests test if the plaintiff is the subject of the

5    regulatory action.  Plaintiffs cite two cases that quote the statement from *Clarke* but do

6    not apply it.  *See Ashley Creek*, 420 F.3d at 940; *Am. Greyhound Racing, Inc. v. Hull*, 146

7    F. Supp. 2d 1012, 1040 (D. Ariz. 2001).  Those cases provide no guidance to the Court.

8    NMA and NEI cite *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1216-17 (9th Cir.

9    2008), but the plaintiff power company in that case challenged a requirement imposed on

10   it under the Clean Water Act.  NMA and NEI do not contend that requirements have been

11   imposed on them under NEPA.  Finally, NMA and NEI cite *Stock West Corp. v. Lujan*,

12   982 F.2d 1389, 1396-97 (9th Cir, 1993), but the plaintiff there was challenging a denial

13   of its appeal under agency rules governing administrative appeals.  No NEPA claim was

14   made.  In contrast, numerous Ninth Circuit cases have applied the zone of interests test

15   when addressing prudential standing to assert NEPA claims.  *See, e.g., Ranchers*

16   *Cattleman v. United States Dep't of Agric.*, 415 F.3d 1078, 1102 (9th Cir. 2005); *Western*

17   *Radio Servs. Co. v. Espy*, 79 F.3d 896, 903 (9th Cir. 1996); *Nevada Land Action Ass'n v.*

18   *United States Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993); *Port of Astoria v. Hodel*, 595

19   F.2d 467, 475 (9th Cir. 1979).

20   NMA and NEI bear the burden of proving that they have standing.  *Defenders*, 504

21   U.S. at 561.  In the absence of some authority supporting their broad reading of the

22   statement in *Clarke*, and in the face of numerous Ninth Circuit cases applying the zone of

23   interests test to NEPA claims, the Court concludes that the zone of interests test applies

24   here.  This conclusion is buttressed by the fact that the "contested regulatory action" in

25   this case is the Secretary's withdrawal of land under the FLPMA.  The Secretary did not

26   withdraw land under NEPA.  Thus, the statement in *Clarke* would grant NMA and NEI

27   prudential standing for a challenge under the FLPMA, but it would not necessarily apply

28   to a claim under NEPA.

1    Moreover, NEPA regulates the conduct of federal agencies, not private parties.  It

2  is "designed to control the decisionmaking process of U.S. federal agencies" to ensure

3  protection of the environment.  *Envtl. Def. Fund, Inc. v. Massey*, 986 F.2d 528, 532 (D.C.

4  Cir. 1993).  If there is a subject of NEPA requirements in this case, it would appear to the

5  Secretary and the DOI, not NMA and NEI.

6    Quoting from *Association of Data Processing*, 397 U.S. at 153, NMA and NEI

7  also argue that a plaintiff has prudential standing if "the interests sought to be protected

8  by the complainant is arguably within the zone of interests to be protected or regulated by

9  the statute . . . in question."  Doc. 64 at 27.  Because they have been regulated by the

10 withdrawal, NMA and NEI argue that they have prudential standing.  Again, however,

11 NMA and NEI cite no case holding that a plaintiff "regulated by" NEPA is exempt from

12 the zone of interests test.  Nor do NMA and NEI make a plausible showing that they are

13 regulated by NEPA.  As noted above, NEPA regulates federal agencies, not private

14 parties.

15    Finally, NMA and NEI argue that FLPMA policy gives them standing to assert

16 their NEPA claims.  The FLPMA does state that "it is the policy of the United States that

17 . . . judicial review of public land adjudication decisions be provided by law" (43 U.S.C.

18 § 1701(a)(6)), but this statement merely underscores that NMA and NEI have an avenue

19 to assert their claims under the FLPMA.  NMA and NEI present no authority for

20 converting the language in the FLPMA into a basis for asserting prudential standing

21 under NEPA, bypassing the zone of interests test.  In fact, the Ninth Circuit rejected just

22 such an argument in *Nevada Land Action Association*, 8 F.3d at 716 n.2, holding that the

23 zone of interests inquiry "would be meaningless if standing under NEPA could be

24 automatically derived from standing under other statutes which refer to NEPA."

25    **2.    Are NMA and NEI within NEPA's Zone of Interest?**

26    NMA and NEI assert that they have environmental interests in reducing aggregate

27 mining impacts and conducting environmentally responsible mining operations.  Doc. 64

28 at 28-31.  They allege that the BLM underestimated the amount of high-grade uranium

within the withdrawal area by ignoring U.S. Geological Survey studies that estimated up to 320 million pounds of uranium deposits.  Doc. *56, ¶ 73.  The declaration of the Vice President of Uranium One states that these deposits are some of the richest uranium resources in the United States and that the high concentration of uranium in breccia pipes permits these deposits to be mined with less surface disturbance and fewer environmental impacts than other uranium sources.  Decl. of Norman M. Schwab, Doc. 64-1 at 48. ¶ 6. NMA and NEI allege that the withdrawal will necessitate the mining of less-concentrated uranium over larger areas, resulting in a greater environmental impact to the region. Docs. *56, ¶ 95(a); 64 at 29.  NMA and NEI claim that their economic interests in challenging the withdrawal are sufficiently related to their interests in minimizing the environmental impacts of mining – interests in keeping with their organizational missions (Doc. *56, ¶ 90) – to give them prudential standing under NEPA.  Doc. 64 at 30-31.

For a plaintiff's interest to fall within NEPA's zone of interests, it "must be 'systematically, not fortuitously' or 'accidentally' aligned with those that 'Congress sought to protect.'"  *Cal. Forestry Ass'n v. Thomas*, 936 F. Supp. 13, 22 (D.D.C. 1996) (quoting *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 924-25 (D.C. Cir. 1989) (hereinafter "*HWTC IV*")).  Applying this standard, *California Forestry* found a timber company's and trade association's purported environmental interest in reducing the risk of forest fires for purposes of challenging a Forest Service Plan that would reduce logging not credible where the plaintiffs admitted that their environmental interest in maintaining a healthy forest was to "provide for current and sustained timber production."  936 F.Supp. at 22.  The court cited *Trinity County Concerned Citizens v. Babbit*, No. CIV. A. 92-1194, 1993 WL 650393 (D.D.C. Aug. 27, 1996), a factually-similar case in which the plaintiffs alleged economic injuries that would result from logging reductions and added that the reductions would also cause environmental injury by increasing the risk of fire.  The court in *Trinity* found that the "plaintiffs' attempt to articulate concern for the health of the forest is in fact no more than an economic injury in disguise."  *Id.* at *6 (quoted in *Cal. Forestry*, 936 F. Supp. at 22).  *California Forestry*

1    agreed with this analysis and concluded that "[t]he timber industry is a peculiarly

2    *un*suitable proxy for those whom Congress intended to protect [under NEPA], and is

3    therefore not within the zone of interests."  *Cal. Forestry*, 936 F. Supp. at 22 (quoting

4    *HWTC IV*, 885 F.2d at 927) (emphasis in original).

5        The District Court for the District of Idaho came to a similar conclusion with

6    respect to mining companies in *American Independence Mines and Minerals Co. v. U.S.*

7    *Department of Agriculture*, 733 F.Supp.2d 1241 (D. Idaho 2010), *aff'd*, No. 11-35123,

8    2012 WL 3542264 (9th Cir. Aug. 17, 2012).  Three mining companies challenged the

9    imposition of a rule limiting motorized vehicle use in the area where they were actively

10   engaged in mining and environmental assessment.  *Id*. at 1248.  The court found that the

11   plaintiffs lacked prudential standing for their NEPA claims because they had not linked

12   their pecuniary interest in mining to an environmental interest contemplated by NEPA.

13   *Id.* at 1251.  The court reasoned that the companies' asserted interests in mining in a

14   manner that reduces environmental impact only related to the methods they used to

15   operate their business and did not show that their interests also aligned with those

16   protected by NEPA.  *Id.* at 1252.  As to the environmental assessments, the mining

17   plaintiffs admitted that these studies were only conducted in pursuit of the companies'

18   mineral development activities, and the court reasoned that because the inability to

19   continue these assessments only impeded the companies' mining-related interests, the

20   plaintiffs were not within the zone of interests protected by NEPA.  *Id.*

21       The mining companies sought to amend their complaint to add evidence that the

22   road closures would harm the environment by increasing sediment load, but the court

23   determined that this would not bring their claims within the interests protected by NEPA.

24   *Id.* at 1264-66.  The court reasoned that the companies' interests in the maintenance and

25   use of roads arose from their economic interests in mining, and those interests were not

26   intertwined with the environment.  *Id.* at 1266.  As with *California Forestry*, the court

27   found that even if the plaintiffs could show that the road-use restrictions would result in

28   some environmental harm, "Plaintiffs' attempts to articulate claims that are linked to the

environment continue to be economic injuries in disguise." *Id.*

NMA and NEI present a stronger case when they allege that mining the uranium-rich breccia pipes in the withdrawal area is both the most economically beneficial and least environmentally damaging way to mine uranium.  Unlike ancillary interests regarding road use, their interest in mining the claims that produce the greatest economic gain is alleged to be inextricably "coupled with" environmental considerations.  *C.f. Port of Astoria*, 595 F.2d at 475 ("pecuniary losses and frustrated financial expectations that are not coupled with environmental considerations . . . are outside of NEPA's zone of interests and are not sufficient to establish standing.").  NMA and NEI argue that their "economic interests cannot be divorced from their environmental interests, as their members' costs are directly related to the scale of physical disturbance and environmental impacts."  Doc. 64 at 30.  This alleged link between economic and environmental interests is sufficient to show that the environmental interests of NMA and NEI members are systematically, rather than merely fortuitously, within the zone of interests protected by NEPA.  The Court cannot say, on this record, that "the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Clarke*, 479 U.S. at 399.

The Court also cannot find at this stage in the pleadings that NMA's and NEI's alleged environmental interests are merely pretextual.  The above-cited cases regarding logging and mining companies arose at the summary judgment stage and not, as here, at the pleading stage.  NMA and NEI have alleged that both organizations have environmental missions that include conducting environmentally friendly mining operations.  Doc. *56, ¶ 91.  This includes the interest in minimizing the aggregate physical disturbances from uranium mining that NMA and NEI allege is directly implicated by the withdrawal.  *Id.*, ¶ 90.  As the Ninth Circuit has stated, "[a] plaintiff can . . . have standing under NEPA even if his or her interest is primarily economic, as long as he or she also alleges an environmental interest or economic injuries that are 'causally

related to an act within NEPA's embrace.'" *Ranchers Cattlemen Action Legal Fund*, 415 F.3d at 1103 (quoting *Port of Astoria*, 595 F.2d at 476). In a day when environmentally-friendly business is often good business, the fact that NMA and NEI have economic interests like those asserted by the logging companies in *California Forestry* and *Trinity* and by the mining companies in *American Independence* does not make their asserted environmental interests invalid. *See* Doc. *56, ¶¶ 90-94. *American Independence* noted that it did not "categorically find that pro-business plaintiffs cannot find standing in similar cases[,]" but instead limited its ruling "to the facts and record of this case." 733 F.Supp. 2d at 1266, n. 9. In light of the fact that the test for prudential standing is "not meant to be especially demanding" (*Clarke*, 479 U.S. at 399), the Court finds that NMA and NEI have alleged sufficient environmental interests to bring them within the zone of interests of NEPA.

Defendants argue that NMA and NEI's assertion that greater aggregate environmental harms will occur as a result of the withdrawal is too speculative to support standing. Although NMA and NEI allege that closing off the rich breccia pipe deposits in the withdrawal area will lead to a greater aggregate environmental impact "in the region" (Doc. *56, ¶ 95(a)), Defendants assert that they allege no facts showing where these other sources of uranium are located or that they have concrete plans to mine these unidentified deposits. Doc. *72 at 16-17. This argument appears to conflate the requirement of particularized injury for purposes of Article III standing with the zone of interests test. Although NMA's and NEI's asserted environmental interests may not be sufficient to confer Article III standing because they lack an actual or imminent concrete injury, Defendants cite no cases stating that this is a requirement for prudential standing. As Defendants acknowledge (*id.* at 17, n. 6), the cases upon which they rely deal with Article III standing, not prudential standing. Article III standing requirements arise out of the case or controversy provision of the Constitution, a provision which limits federal court jurisdiction to concrete disputes. Prudential standing is a judicially-imposed limitation designed to ensure that a plaintiff has a legitimate interest in suing under a

1    particular statute.  The Court cannot conclude that the purposes of prudential standing

2    demand the same injury in fact as Article III standing.

3           The language of relevant cases confirms this conclusion.  The Ninth Circuit and

4    other courts have made clear that the test is not demanding.  *See Presidio Golf Club .v*

5    *National Park Service*, 155 F.3d 1153, 1158 (9th Cir. 1998) ("Because the zone of

6    interests test is 'not a demanding one,' and the asserted interest need only be '*arguably*

7    within the zone of interests to be protected or regulated by the statute,' a rough

8    correspondence of interests is sufficient." (citations omitted; emphasis in original));

9    *Alaska State Snowmobile Ass'n, Inc. v. Babbitt*, 79 F. Supp. 2d 1116, 1125, 1125 n. 55

10   (D. Alaska 1999), *vacated as moot*, No. 00-35113, 2001 WL 770442 (9th Cir. Jan. 10,

11   2001) (snowmobile association challenging closure of Denali Park to snowmobile use

12   had shown injury in fact to their interest in snowmobiling, and their stated purpose of

13   "protection of the environment from irreparable harm," together with a commitment to

14   use the natural environment responsibly, brought their claims within the zone of interests

15   of NEPA).[5]

16          Thus, the Court concludes that NMA and NEI can satisfy Article III standing by

17   their members' very real economic injuries discussed above, and satisfy NEPA prudential

18   standing by the environmental interests they and their members possess in limiting the

19   disruptive effects of uranium mining.  This does not mean that interests that arguably fall

20   within the zone of interests of NEPA need not be affected by the challenged agency

21   action.  In first articulating the zone of interests test, the Supreme Court stated that "the

22   question is whether *the interest sought to be protected by the complainant* is arguably

23

24          [5] Defendants argue for the first time in their reply that NMA and NEI are

25   foreclosed from raising the argument that the withdrawal will result in greater aggregate
     environmental harms because they did not raise this issue in their comments during the

26   NEPA process.  Doc. 70 at 16 (citing *Am. Indep. Mines*, 733 F. Supp. 2d at 1266-67).
     The Court will not consider arguments made for the first time in a reply brief.  *See, e.g.,*

27   *Delgadillo v. Woodford*, 527 F.3d 919, 930 n. 4 (9th Cir.2008); *Marlyn Nutraceuticals,*
     *Inc. v. Improvita Health Products*, 663 F.Supp.2d 841, 848 (D.Ariz.2009).

28

1    within the zone of interests to be protected or regulated by the statute or constitutional

2    guarantee in question." *Ass'n. of Data Processing*, 397 U.S. at 153 (emphasis added).

3    The Court cited to the provision of the APA, upon which claimants necessarily rely to

4    bring their NEPA claims, which states, in part, that "[a] person . . . *adversely affected* or

5    aggrieved by agency action *within the meaning of a relevant statute*, is entitled to judicial

6    review thereof."  5 U.S.C. ¶ 702.  (emphasis added).  Thus, as will become important in

7    the upcoming discussion of NWMA's prudential standing under NEPA, the zone of

8    interests test does require that the party asserting an interest within NEPA's zone of

9    interests also seek protection of that interest or allege that it has been harmed or

10   aggrieved.   But Defendants cite no authority suggesting that the injury must be as

11   concrete and immediate as that required for Article III standing.  In this case, NMA and

12   NEI have alleged injury to their stated environmental interests – namely, that greater

13   environmental harm will result from an inability to carry out the least environmentally

14   harmful form of uranium mining – that is plausibly intertwined with the injuries to their

15   economic interests that the Court has found sufficient for purposes of Article III standing.

16   The Court is not persuaded that case law requires more for Plaintiffs' claims to come

17   within NEPA's zone of interests.[6]

18        Nor is the Court persuaded that NMA and NEI lack associational standing to bring

19   NEPA claims because their asserted environmental interests are not germane to their

20   organizational purposes.  *See* Doc. 70 at 17.  In addition to alleging that they have strong

21

22        [6] Defendants cite *Hiatt Grain & Feed, Inc. v. Berglund*, 446 F. Supp. 457, 486-88
23   (D. Kan. 1978), but the Court does not find it persuasive.  *Hiatt* begins its discussion of
     standing under NEPA with a discussion of injury in fact for purposes of Article III
24   standing.  It then appears to conflate the injury in fact requirement for Article III standing
     with the zone of interests test for prudential standing.  *See Hiatt*, 446 F.Supp. at 488
25   (finding grain dealers' allegations that new regulations will lead to increased air pollution
     due to additional needs for grain transportation and storage construction to be "so
26   attenuated, so speculative, and so obviously subordinate to plaintiff's primary economic
     interest" that they could not support the plaintiffs' NEPA claim).  In *Hiatt*, the grain
27   dealers sought to bring NEPA claims on behalf of the public where their only asserted
     injury was economic.  The court found that they had not alleged any injury within the
28   zone of interests of NEPA and could not bring their purely economic injuries within the
     zone of interests by asserting speculative injury to the public.

environmental missions (Doc. *56, ¶ 90), NMA and NEI allege that each NMA member is expected to adhere to a "Sustainable Development Pledge" and to adopt specifically enumerated environmental principles, including "being a leader in developing, establishing, and implementing good environmental practices." *Id.*, ¶ 91. They allege that NEI's organizational purpose as stated in its bylaws includes encouraging "'the continued safe utilization and development of nuclear energy to meet the nation's energy, *environmental* and economic goals'" (*id.*, ¶ 92) (emphasis in complaint), and that the organization has identified numerous environmental concerns such as clean air, environmental stewardship, and sustainable development, among the "key issues" concerning the organization. *Id.* These allegations are sufficient to satisfy the germaneness test that "courts have generally found . . . to be undemanding." *Presidio Golf Club v. National Park Service*, 155 F.3d 1153, 1159 (9th Cir. 1998); *accord Cal. Sportfishing Prot. Alliance v. Diablo Grande*, 209 F. Supp. 2d 1059, 1066-67 (E.D. Cal. 2002).

Defendants argue that NMA and NEI's statements do not transform their organizations from being industry organizations established to promote the economic interests of their members (Doc. 70 at 17-18), but the germaneness inquiry does not require centrality of purpose. *See Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 56 (rejecting the argument that germaneness requires centrality of purpose and finding that the germaneness test was meant to prevent federal courts from having to resolve issues "as to which the organizations themselves enjoy little expertise and about which few of their members demonstrably care."). NMA and NEI have alleged sufficient facts from which to conclude that their organizations have expertise and demonstrably care about the issues they have raised.

In summary, NMA and NEI have plausibly alleged injury to an environmental interest that is sufficiently intertwined with their economic interests to bring them within NEPA zone of interests. Accordingly, the Court finds that these plaintiffs have prudential standing to assert their NEPA claims.

**B.     NWMA.**

**1.     NWMA's Environmental Interests.**

NWMA argues that is has prudential standing under NEPA because it has environmental interests that were implicated by the NEPA process.  Doc. *55 at 40-41.  NWMA cites to allegations in its complaint that its organizational purpose is, in part, to foster "environmentally responsible mining" and that it is "committed to principles that embody the protection of human health, the natural environment, and a prosperous economy."  Doc. *1, ¶¶ 5-6.  It also cites to declarations of its executive director and a number of member presidents stating that they are committed to NWMA's environmental principles.  Doc. *55 at 40-41.  NWMA argues that the withdrawal causes injury to its environmental objectives because (1) existing laws and regulations were sufficient to protect the environment apart from the withdrawal, and (2) the withdrawal has national and global environmental impacts because it locks up an important source of energy production.  *Id.* at 41.

Although NWMA has alleged facts showing that it and its members have stated environmental interests, the Court is not persuaded that NWMA has alleged injurious effects on those interests that would bring them within NEPA's zone of interests.  NWMA's allegation that existing laws were sufficient to protect the environment without the withdrawal does not show that the withdrawal has harmed NWMA's asserted objectives of environmental preservation.   NEPA claimants in *Wyoming v. U.S. Department of Interior*, 674 F.3d 1220 (10th Cir. 2012), similarly argued that the National Park Service could have promulgated a less restrictive rule against snowmobile usage in Grand Teton National Park "without adverse environmental effects."  *Id.* at 1237.  The Tenth Circuit rejected this argument, finding that "NEPA does not protect against such an injury."  *Id.*

NWMA has not alleged facts showing that locking up the uranium resource in the withdrawal area will harm its alleged environmental interests.  NWMA cites to comments that it or its member companies made during the NEPA process claiming that not

developing the uranium resource in the withdrawal area will increase the country's reliance on foreign uranium production and is contrary to public policy and the current administration's agenda of reducing the country's reliance on fossil fuels because it "does nothing to reduce America's CO2 footprint." Doc. 51-1 at 28-29, Decl. of Laura E. Skaer, ¶¶ 16, 19. But these general assertions do not plausibly show that NWMA or its members are "adversely affected or aggrieved" by agency action within the meaning of NEPA (5 U.S.C. ¶ 702) or that the organization's generalized commitment to mining in an environmentally responsible manner encompasses these concerns.

## 2.    NWMA's Non-Environmental Interests.

NWMA argues that because NEPA is geared toward protecting the quality of the "human environment," purely economic interests are enough to merit prudential standing. Doc. *55 at 37-38.  The Court does not agree.  The Ninth Circuit consistently has held that purely economic interests are not within the zone of interests NEPA was intended to protect.  *Ashley Creek*, 420 F.3d at 941 (citing cases), 945 (holding that a "purely economic injury that is not entwined with an environmental interest" is not sufficient for prudential standing under NEPA).

NWMA cites *Bennett v. Spear*, 520 U.S. 154 (1997), and argues that the Court should consider non-environmental interests sufficient for prudential standing as long as they pertain to the particular provisions of NEPA at issue in this case.  Doc. *55 at 39, 39 n. 26.  *Bennett* stated that whether a plaintiff's claim satisfies the zone of interests test "is to be determined not by reference to the overall purpose of the Act in question" (there, the Endangered Species Act), but by reference "to the particular provision of law upon which the plaintiff relies." 520 U.S. at 175-176.  NWMA cites cases in which the Eighth Circuit has applied *Bennett* to find that as long as the plaintiffs cite to particular provisions of NEPA that encompass their interests, they have satisfied the zone of interests test.  Doc. *55 at 39-40 (citing *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1126-27 (8th Cir. 1999); *Cent. South Dakota Coop. Grazing*

1  *Dist. v. U. S. Dep't of Agric.*, 266 F.3d 889, 895–96 (8th Cir. 2001).[7]

2      The Ninth Circuit addressed the Eighth Circuit line of cases in *Ashley Creek* and

3  agreed that *Bennett* instructs courts to define the zone of interests of a statute with respect

4  to the specific provisions at issue.   420 F.3d at 942.   The Ninth Circuit disagreed,

5  however, with the Eighth Circuit's extension of this principle to confer prudential

6  standing under NEPA for purely economic interests.  *Id.  Ashley Creek* addressed the text

7  of § 102(2)(C) of NEPA (the EIS provision found in § 4332(2)(C)(iv)) and concluded

8  that "nothing in the text of [this section] suggests that an EIS must address an economic

9  concern that is not tethered to the environment."   420 F.3d at 943.   The Ninth Circuit

10  found this conclusion to be consistent with more than a quarter century of case law which

11  has interpreted the EIS requirement as protecting the environment (*id.*), and concluded

12  that "[i]f the text of § 102(2)(C) were not enough to demonstrate that the section does not

13  protect purely economic interests, that conclusion is strengthened by the impossibility of

14  divorcing § 102 from the overall purpose of NEPA" (*id.* at 944).

15      NWMA cites to § 4332 and other provisions of NEPA that require consideration

16  of the effects of an action on the human environment and economics or call for using

17  high quality information and scientific analyses (*see* Doc. *55 at 38-39, 39 n. 26 (citing

18  42 U.S.C §§ 4321, 4331-32; C.F.R. 40 §§ 1500.1(b), 1502.2(g), 1502.6, 1502.14,

19  1502.22-24, 1503.4, 1508.14)), but these provisions, like the EIS requirement, are clearly

20  entwined with environmental concerns.   In § 4332(2)(C), "the relationship between local

21  short-term uses of man's environment and the maintenance and enhancement of long-

22  term productivity" is one of five factors for consideration, the first two of which are "the

23  environmental impact of the proposed action" and "any adverse environmental effects

24  which cannot be avoided should the proposal be implemented."  § 4332(C)(i)-(ii).

25  Similarly, § 4331(b)(5) includes the objective of "achiev[ing] a balance between

26  _____

27      [7] NMA and NEI make a nearly identical argument in their response brief.  Doc. 64
    at 32, 32 n. 26 (citing *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d
28  1115, 1126-27 (8th Cir. 1999); *Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031, 1038
    (8th Cir.2002)).

1   population and resource use which will permit high standards of living and a wide

2   sharing of life's amenities" and begins its list of objectives with "fulfill[ing] the

3   responsibilities of each generation as trustee of the environment for succeeding

4   generations." § 4331(b)(5).

5          The implementing regulations that NWMA cites do not lead to a different

6   conclusion.  Section 1508.14 requires that an EIS address the effects of a proposed action

7   "on the human environment," but this is only when the "economic or social and natural or

8   physical environmental effects are interrelated."  40 C.F.R. § 1508.14.  The regulation

9   clarifies that "economic or social effects are not intended by themselves to require

10  preparation of an environmental impact statement."  *Id.*  Thus, this regulation makes clear

11  that consideration of the interests NWMA relies on for its NEPA claims only come into

12  play where environmental concerns first trigger the NEPA process.  Section 1500.1(b)

13  calls for the use of high quality information, accurate scientific analysis, and public

14  scrutiny, but § 1500.1(c) goes on to underscore that "[t]he NEPA process is intended to

15  help public officials make decisions that are based on understanding of environmental

16  consequences, and take actions that protect, restore, and enhance the environment."

17  § 1500.1(c).  In short, none of the regulations to which NWMA cites can be convincingly

18  isolated from NEPA's overriding environmental purpose.

19         In light of the clear emphasis on environmental concerns in NEPA and its

20  attendant regulations, and the Ninth Circuit's analysis in *Ashley Creek*, the Court cannot

21  conclude that an interest in the economic or human environment, divorced from

22  environmental interests, is enough to bring a plaintiff's claims within NEPA's zone of

23  interests.

24              **3.     NWMA's Other Argument's for Prudential Standing.**

25         NWMA argues that because its members have been barred from exploring and

26  developing new mining claims or developing their existing claims they are "'regulated'

27  within the meaning of NEPA" and therefore within its zone of interests.  Doc. *55 at 40.

28  Although NWMA does not provide support for this proposition, to the extent it attempts

1  to make the same argument made by NMA and NEI that entities regulated by a statute
2  have standing to challenge it apart from the usual zone of interests test, the Court has
3  already rejected this argument.

4       NWMA argues that allowing environmental plaintiffs to assert claims under
5  NEPA while preventing plaintiffs with solely economic interests from challenging the
6  same process creates a "one way street."  Doc. *55 at 40.  This argument ignores the fact,
7  repeatedly affirmed in NEPA cases, that NEPA is an environmental statute aimed at
8  ensuring proper consideration of environmental consequences of agency action.  NWMA
9  cites no case law showing that those with non-environmental interests must be afforded
10  equal opportunity with environmental plaintiffs to challenge a process that was designed
11  to protect environmental interests.  *Wilderness Society v. U.S. Forest Service*, 639 F.3d
12  1173, 1171-1181 (9th Cir. 2011), upon which NWMA relies, does not refute the NEPA
13  zone of interests jurisprudence already discussed at length in this order.  Rather, the Ninth
14  Circuit in that case rejected its prior holding that only federal entities were permitted to
15  intervene of right in defense of a NEPA process.  *Wilderness Society*, 639 at  1171-1181.
16  That holding has no bearing on the arguments NWMA makes here.

17       **4.**    **NWMA's Argument for Procedural Standing.**

18       NWMA asserts that it has procedural standing under NEPA because it has alleged
19  procedural violations that have impaired its concrete interests.  Doc. *55 at 33-34.  These
20  interests, NWMA argues, are (1) ensuring that the lands to which it and its member
21  mining companies have a geographical nexus are not unlawfully and arbitrarily closed to
22  mining, and (2) ensuring that its members' property rights are not unlawfully or
23  arbitrarily subjected to a new legal regime.  *Id.* at 34.  In essence, NWMA asserts an
24  interest in having the government comply with its procedural duties before withdrawing
25  open lands from mining or subjecting them to new regulations.  This interest is not,
26  however, a sufficient basis for procedural standing absent an underlying interest in
27  keeping with the interests the procedural statute – in this case NEPA – was designed to
28  protect.  *See Defenders*, 504 U.S. at 573, n. 8 ("We do *not* hold that an individual cannot

enforce procedural rights; he assuredly can, so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing.") (emphasis in original).  Because the Court already has found that NEPA procedures are not designed to protect the non-environmental interests NWMA asserts, its assertion of procedural standing fails.

### 5.   NWMA Conclusion.

NWMA has failed to allege adversely affected environmental interests that are within NEPA's zone of interests, and therefore lacks NEPA prudential standing.

### C.   Quaterra.

### 1.   Quaterra's Environmental Interests.

Quaterra alleges that its interests are within NEPA's zone of interests because it has reclaimed its drilling and mining sites to protect air and water quality and to restore vegetation, and it has contributed to cultural and archeological knowledge through its inventories of mining sites prior to drilling.  Doc. 30, ¶ 20.  Defendants argue that these allegations are insufficient to satisfy NEPA's zone of interests test, and the Court agrees.

Quaterra cannot plausibly allege that the withdrawal harms its environmental interests in reclaiming mining sites when the withdrawal will preserve the withdrawn land in its original condition and eliminate the need for reclamation.  And the fact that Quaterra's inventories of potential drill sites have incidentally contributed to cultural and archeological knowledge does not show that Quaterra is a proper claimant to assert such interests, particularly where it has alleged that these surveys were done in preparation for drilling, and has alleged no facts plausibly showing that it also has an interest in cultural and archeological research.  *See Am. Indep. Mines*, 733 F.Supp.2d at 1251-52 (mining companies' environmental assessments done solely in pursuit of mineral development activities did not bring their interests within the zone of interests of NEPA).  Even if Quaterra had alleged an independent interest in making cultural and archeological discoveries, it has alleged no facts showing that the ability to survey public lands for this purpose will be harmed by the withdrawal.

2.     **Quaterra's Additional Arguments for Prudential Standing.**

Quaterra argues that it has standing to assert NEPA claims because it is the subject of the regulatory action.  Doc. 72 at 30-31.  It also joins the arguments made by NMA, NEI, and NWMA on the basis of *Bennett v. Spear*, 520 U.S. 175-76, that prudential standing is to be determined by the particular provision of the statute at issue, not its overall purpose, and that NEPA's zone of interests therefore encompasses non-environmental harms.  *Id.* at 31-32.  Related to this assertion, Quaterra argues that its interest in agency compliance with specific NEPA procedures, such as the requirement that the agency use accurate scientific analysis or that it consult with local governments, is sufficient to bring Quaterra within the zone of interests of NEPA.  *Id.* at 32-33.

Quaterra's "regulated by" argument fails for the reasons already discussed with respect to NMA and NEI.  Quaterra's argument that it has non-environmental interests within NEPA's zone of interests fails for the reasons already addressed with respect to NWMA.  And, for the reasons already discussed with respect to NWMA, the Court rejects Quaterra's attempt to come under NEPA's zone of interests on the basis of alleged procedural violations absent a showing of an underlying environmental interest that the procedures were intended to protect.  In summary, the Court finds that Quaterra has failed to meet its burden of showing that it has prudential standing to assert NEPA claims.

**D.     Vane.**

Vane makes two arguments in support of its asserted environmental interests: (1) its interest in mining the uranium from exposed breccia pipes in the withdrawal area coincides with an environmental interest in removing uranium and its harmful effects from the environment, and (2) Vane engages in mitigation efforts to minimize the harmful effects of uranium mining.  Doc. 76 at 10.

As previously discussed with respect to Quaterra, the Court is not persuaded that the withdrawal adversely affects Vane's interest in mitigating the environmental effects of mine sites.  In support of its assertion that removal of uranium by mining breccia pipes is beneficial to the environment, Vane cites the declaration of its Chief Operating Officer,

Kris Hefton, together with the attachment of Vane's comments submitted during NEPA process, stating that "[n]owhere in the DEIS does it state that a direct positive impact of mining uranium from breccia pipes is that it removes the uranium that is the source of the concern in the first place."  Doc. 77 at 5, Decl. of Kris Hefton, ¶ 16; Doc. 77 at 14. Although Vane faults the BLM for not addressing this comment, Vane does not allege that it ever presented evidence that mining uranium from breccia pipes reduces the net environmental impact of uranium deposits on the environment.  Thus, even if Vane has an environmental interest in minimizing the harmful effects of naturally-occurring uranium, it has not alleged facts showing that extraction of uranium through continued mining would lead to less harmful effects than leaving the uranium in place.

Vane makes other standing arguments already rejected by the Court.  Vane has failed to show that it has prudential standing to assert NEPA claims.

### E.   Yount.

#### 1.   Yount's Environmental Interests.

Yount contends that his economic interests in mining in the withdrawal area are sufficiently tied to environmental interests to come within NEPA's zone of interests. Doc. 44 at 13.  Yount alleges that he seeks to use the land in accordance with federal and state environmental laws and to conduct mining operations with as little environmental impact possible.  Doc. 44 at 13.  As the Court has already discussed, however, an interest in protecting the environment from the potential harmful effects of mining is not impaired by the withdrawal's elimination or reduction of mining.

#### 2.   Yount's Recreational and Aesthetic Interests.

Yount asserts that he has suffered a loss of enjoyment in his recreational use of the lands in the withdrawal area.  Doc. 44 at 14.  He argues that his aesthetic enjoyment includes being able to perceive the beauty of nature as well as the man-made works on the land, including "roads, hunting camps, cattle fences, water catchments, old copper prospects, and transient uranium mines."  *Id.* at 20.  He also contends that the loss of exploration drilling diminishes his enjoyment of hiking and camping because, as a

1  prospector, such exploration through drilling is a key to his recreational enjoyment of the

2  land.  *Id.* at 20-21.

3       The Court is not persuaded that NEPA's concern with aesthetic and recreational

4  enjoyment of the natural environment extends to protecting the specific interests in

5  continued uranium mining and exploratory drilling Yount asserts.  Nothing in the ROD

6  prevents Yount from perceiving the beauty of the Kaibab forest, including its natural and

7  man-made works, or continuing to hike and observe the geology and surface of the land.

8  *See* Doc. 33, ex. 1 at 7 (The withdrawal "does not affect disposition, use, or management

9  of the lands other than under the Mining Law, including access to and across the lands.").

10 Although Yount asserts that he had looked forward to enjoying the beauty of the Kaibab

11 Forest while drilling on his claims and developing mining operations (Doc. 44 at 29,

12 ¶ 16), the withdrawal has only restricted Yount's drilling and mining operations.  It has

13 not otherwise prohibited him from enjoying and recreating in the Kaibab forest.

14 Moreover, the mineral development activities that Yount contends add to his aesthetic

15 enjoyment of the land are activities the Mining Law has recognized as being for the

16 purpose of economic gain and not for other purposes.  *United States v. Coleman*, 390

17 U.S. 599, 602 (1968).  Yount points to no authority showing that such interests are within

18 the zone of interests NEPA protects.  The Court concludes that Yount has failed to show

19 that he has prudential standing to assert a NEPA claim.

20       **F.    The Coalition.**

21       The Coalition alleges that Mohave County "has a mandate to retain environmental

22 quality and to capitalize on its wealth of natural, built and human resources."  Doc. 30,

23 ¶ 24.  This includes "the 'growth of communities that maintain the health and integrity of

24 its valuable environmental features'; the protection of 'wetlands, washes, aquifer

25 recharge areas, areas of unique flora and fauna, and areas with scenic, historic, cultural

26 and recreational value'; and avoiding industrial development that has the 'undesired

27 effect of increasing air pollution.'"  *Id.* (quoting Mohave County General Plan, p. 23).

28       NEPA requires agencies to take into account the comments and views of local

governments that are authorized to develop environmental standards.   42 U.S.C. § 4332(2)(C).  Mohave County is authorized under state law to implement environmental standards and to develop a comprehensive plan to conserve natural resources and promote the "health, safety, convenience and general welfare of the public."  Doc. 72-2 at 5-6, ¶¶ 7-9.   As discussed above, Mohave County has alleged that the withdrawal decision interferes with its ability to carry out identified environmental objectives of its state-authorized plan.  These are interests that the procedural requirements of NEPA were designed to protect.  *See, e.g.*, *City of Davis*, 521 F.2d at 672 (municipality entrusted under state law with enforcing environmental standards and developing a general plan had "municipal interests [that] fall within the scope of NEPA's protections."); *Douglas County*, 48 F.3d 1495 (County that was authorized by state law to develop environmental standards and had statutory right to comment on proposed federal action had "concrete, plausible interests, within NEPA's zone of concern for the environment" underlying its asserted procedural interests.).

Defendants argue that the Coalition is precluded from bringing NEPA claims because it did not raise these issues during the NEPA process.  Doc. 62 at 24.   To challenge agency action under NEPA, plaintiffs are required "to first raise their concerns with the agency to allow the agency to give the issue meaningful consideration."  *Am. Indep. Mines*, 733 F.Supp.2d. at 1267 (internal quotation marks and citations omitted). The Coalition cites to the declaration of Buster Johnson, Chairman of the Mohave County Board of Supervisors, stating that the BLM did not allow the local governments to submit supplemental economic data about how the withdrawal would affect their communities, the BLM disregarded Mohave County's comprehensive plan, and the Secretary ignored notices and invitations from Coalition members demanding coordination with them and reconciliation of inconsistencies between the withdrawal and their local plans and policies.  Docs. 72 at 34; 72-2 at 9-10, Decl. of Buster Johnson, ¶¶ 21-23.   These allegations are sufficient at the pleading stage to show that the Coalition raised issues within the zone of interests of NEPA during the NEPA process.  The Coalition has shown

that it satisfies the zone of interests test for purposes of NEPA prudential standing.

**VI.     Standing to Assert Constitutional Claim.**

Plaintiffs NMA, NEI, and NWMA claim that the withdrawal is unlawful because § 204(c)(1) of the FLPMA, which allows Congress to block any administrative withdrawal of lands over 5,000 acres, is unconstitutional. Doc. *56, ¶¶ 97-107; Doc. *1, ¶¶ 127-145.  Plaintiffs assert that this provision constitutes an impermissible legislative veto because it allows Congress to act upon a concurrent resolution without presentment to the president. *See, e.g.*, Doc. *56, ¶ 99.  They further assert that § 204(c)(1) is not severable from § 204(c), which governs the Secretary's ability to withdraw public lands, because Congress would not have granted the Secretary authority to withdraw more than 5,000 acres without reserving for itself the authority to intervene. *Id.*, ¶¶ 102-106.  Thus, they allege, the Secretary's withdrawal decision, encompassing over one million acres of public land, was made pursuant to an unconstitutional provision and should be set aside. *Id.*, ¶ 107.

Defendants argue that Plaintiffs do not have standing to make this constitutional argument because the legislative veto at issue was not exercised in this case, Plaintiffs cannot claim to have been harmed by it, and its exercise in any case would have terminated rather than effectuated the withdrawal.  Doc. *39 at 17.  Defendants also argue that the FLPMA's severability clause would allow the court to sever the legislative veto from the rest of § 204(c) without disturbing the Secretary's actions under the remainder of that provision. *Id.* at 18.

Plaintiffs have standing to assert their constitutional claim.  They do not claim to have been harmed by a legislative veto.  They claim to have been harmed by the withdrawal of land under an unconstitutional law.  If the withdrawal provision of the FLPMA is found unconstitutional because it contains an impermissible legislative veto, the withdrawal will have been ineffective and Plaintiffs' claimed harms will be redressed. Whether the legislative veto provision is severable, as Defendants argue, is a question to be resolved on the merits and not at the pleading stage.

**VII.    Vane's Voluntary Dismissal.**

On December 26, 2012, Vane Minerals filed a notice of dismissal stating that it had voluntarily dismissed its complaint, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(1), in order to pursue a damages claim against the United States of America in the United States Court of Federal Claims based on the same operative facts.  Doc. 86. Accordingly, Vane's complaint in intervention will be dismissed without prejudice.

**IT IS ORDERED:**

1.    Defendants' motions to dismiss Plaintiffs Gregory Yount (Doc. 33), National Mining Association and Nuclear Energy Institute (Docs. 39 and 72, No. 3:12-cv-08038), Northwest Mining Association (Doc. 27, No. 3:12-cv-08042), Quaterra Alaska, Inc. and Quaterra Resources, Inc. (Doc. 62), and Vane Minerals (Doc. 68) are **denied** with respect to Plaintiffs' non-NEPA claims, and **granted** with respect to Plaintiffs Northwest Mining Association's, Quaterra's, Vane's, and Yount's NEPA claims.

2.    Defendants' motion to dismiss the Arizona Utah Local Economic Coalition on behalf of named member the Board of Supervisors, Mohave County (Doc. 62) is **denied**.

3.    Vane Mineral's complaint (Doc. 86) is **dismissed** without prejudice.

4.    The Court will address further scheduling issues in a separate order.

Dated this 8th day of January, 2013.

_David G. Campbell_
David G. Campbell
United States District Judge