Melanie R. Kay (*pro hac vice*)
Edward B. Zukoski (*pro hac vice*)
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO  80202
mkay@earthjustice.org
tzukoski@earthjustice.org
Telephone: (303) 623-9466
Fax: (303) 623-8083

Roger Flynn (*pro hac vice*)
Western Mining Action Project
P.O. Box 349, 440 Main St., #2
Lyons, CO  80540
wmap@igc.org
Telephone: (303) 823-5738
Fax: (303) 823-5732

Attorneys for Defendant-Intervenors
        Grand Canyon Trust, <u>et al.</u>,

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gregory Yount,<br>      Plaintiff,<br><br>v.<br><br>Ken Salazar, Secretary of the Interior, <u>et al.</u>;<br>      Defendants | Case No. 3:11-cv-08171-PCT-DGC<br>(Lead case) |
| National Mining Association, <u>et al.</u>;<br>      Plaintiffs,<br><br>v.<br><br>Ken Salazar, Secretary of the Interior, <u>et al.</u>;<br>      Defendants | Case No. 3:11-cv-08038-PCT-DGC |
| Northwest Mining Association,<br>      Plaintiff,<br><br>v.<br><br>Ken Salazar, Secretary of the Interior, <u>et al.</u>;<br>      Defendants, | Case No. 3:12-cv-08042-PCT-DGC |

1

Quaterra Alaska Incorporated, <u>et al.</u>,                    )
2        Plaintiffs,                                            )   Case No. 3:12-cv-08075-PCT-DGC
                                                                )
3   v.                                                          )
                                                                )
4   Ken Salazar, Secretary of the Interior, <u>et al.</u>;      )
         Defendants                                             )
5   _____                )

6   **DEFENDANT-INTERVENORS GRAND CANYON TRUST ET AL.'S CROSS-**
    **MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM IN**
7   **SUPPORT, AND MEMORANDUM IN OPPOSITION TO NATIONAL MINING**
    **ASSOCIATION <u>ET AL.</u>'S MOTIONS FOR SUMMARY JUDGMENT**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2

3    Table of Authorities ................................................................................................ ii

4    CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ....................................... 1

5    MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR PARTIAL SUMMARY
     JUDGMENT AND IN OPPOSITION TO NMA'S AND NORTHWEST'S MOTION
6    FOR PARTIAL SUMMARY JUDGMENT .................................................................. 1

7    STATUTORY BACKGROUND ................................................................................ 2

8    STANDARD OF REVIEW ...................................................................................... 3

9    ARGUMENT ......................................................................................................... 3

10   I.     THE EXECUTIVE'S AUTHORITY TO MAKE LARGE-TRACT
            WITHDRAWALS REMAINS INTACT EVEN IF SUBSECTION 204(C)'S
11          LEGISLATIVE VETO IS UNCONSTITUTIONAL ............................................ 3

12          A.     Because FLPMA Contains A Severability Clause, Plaintiffs Must Show
                   "Strong Evidence" That The Legislative Veto Is Not Severable ................. 4
13
            B.     FLPMA's Structure, Text And Legislative History Do Not Provide
14                 "Strong Evidence" That Congress Would Have Prohibited All Executive
                   Large-Tract Withdrawals Absent A Legislative Veto ................................. 7
15
                   1.     Background: The Public Land Law Review Commission ................. 8
16
                   2.     FLPMA's Structure And Text ........................................................ 10
17
                   3.     FLPMA's Legislative History ....................................................... 15
18
            C.     Severing Only The Veto Would Leave FLPMA Fully Operative As A
19                 Law, And The Remaining Law Comports With Congressional Intent ....... 19

20   CONCLUSION ...................................................................................................... 22

21

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Alaska Airlines, Inc. v. Brock,
    480 U.S. 678 (1987) ............................................................... passim

Am. Fed'n of Gov't Employees v. Pierce,
    697 F.2d 303 (D.C. Cir. 1982) .................................................... 21

Ashwander v. Tenn. Valley Auth.,
    297 U.S. 288 (1936) ...................................................................... 4

Ayotte v. Planned Parenthood of N. New Eng.,
    546 U.S. 320 (2006) ................................................................... 4, 8

Brockett v. Spokane Arcades, Inc.,
    472 U.S. 491 (1985) ...................................................................... 21

Buckley v. Valeo,
    424 U.S. U.S. 1 (1976) .................................................................. 7

City of New Haven, Conn. v. United States,
    809 F.2d 900 (D.C. Cir. 1987) .................................................... 17

Consumer Energy Council of Am. v. FERC,
    673 F.2d 425 (D.C. Cir. 1982) ...................................................... 5

Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,
    447 U.S. 102 (1980) ..................................................................... 17

Florida v. U.S. Dep't of Health & Human Servs.,
    648 F.3d 1235 (11th Cir. 2011) ................................................ 5, 6

Gulf Oil Corp. v. Dyke,
    734 F.2d 797 (Temp. Emer. Ct. App. 1984) .............................. 16

Hill v. Wallace,
    259 U.S. 44 (1922) ................................................................... 5, 19

I.N.S. v. Chadha,
    462 U.S. 919 (1983) .............................................................. passim

Leavitt v. Jane L.,
     518 U.S. 137 (1996) ................................................................................. 6, 22

Lujan v. Nat'l Wildlife Fed'n,
     497 U.S. 871 (1990) ..................................................................................... 8, 9

Nat'l Fed'n of Indep. Bus. v. Sebelius,
     132 S. Ct. 2566 (2012) .............................................................................. passim

New Mexico v. Watkins,
     969 F.2d 1122 (D.C. Cir. 1992) .................................................................... 11

New York v. United States,
     505 U.S. 144 (1992) ........................................................................................ 14

Regan v. Time, Inc.,
     468 U.S. 641 (1984) ........................................................................................ 21

Spokane Arcades, Inc. v. Brockett,
     631 F.2d 135 (9th Cir. 1980) .................................................................... 7, 21

United States v. Booker,
     543 U.S. 220 (2005) .......................................................................................... 8

United States v. Spokane Tribe of Indians,
     139 F.3d 1297 (9th Cir. 1998) ........................................................................ 7

Williams v. Standard Oil Co.,
     278 U.S. 235 (1929) .......................................................................................... 5

**STATUTES**

43 U.S.C. § 156 ....................................................................................................... 13

43 U.S.C. § 1701(a)(4) .......................................................................................... 10

43 U.S.C. § 1714(a) ................................................................................................. 2

43 U.S.C. § 1714(b)(1) .................................................................................... 11, 20

43 U.S.C. § 1714(c)(1) ..................................................................................... passim

43 U.S.C. § 1714(c)(2) .............................................................................. 3, 12, 20

43 U.S.C. § 1714(d) ................................................................................................. 2

43 U.S.C. § 1714(e) ........................................................................... 14, 15

43 U.S.C. § 1714(f) ................................................................................. 11

43 U.S.C. § 1714(j) ................................................................................. 10

43 U.S.C. § 1782 .................................................................................... 10

Pub. L. No. 94-579, § 707 (1976) ......................................................... 6

### OTHER AUTHORITIES

122 CONG. REC. H7600-H7603 (July 22, 1976) ........................................ 18, 19

122 CONG. REC. S12931 (July 30, 1976) ................................................... 16

Casey E. Folks, Jr.,
    183 IBLA 24 (2012 ) ...................................................................... 9, 10, 11

David H. Getches, Managing the Public Lands: The Authority of the Executive to
    Withdraw Lands, 22 Nat. Resources J. 279 (1982) ............................ 9, 11, 13

H.R. Rep. No. 94-1163 (1976) ................................................... 10, 16, 17, 18

H.R. Rep. No. 94-1724 (1976) (Conf. Rep.) .................................... 15

Pub. Land Law Review Comm'n, One Third of the Nation's Land ............. 8, 9

Public Land Policy and Management Act of 1975: Hearings on H.R. 5224 and
    H.R. 5622 Before the Subcomm. on Public Lands of the H. Comm. on Interior
    and Insular Affairs, 94th Cong. (1975) ............................................. 18

iv

## CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant-intervenors Grand Canyon Trust <u>et al</u>. ("the Trust") respectfully move for partial summary judgment pursuant to Fed. R. Civ. P. 56, and request that this court deny plaintiffs National Mining Association <u>et al.</u>'s ("NMA's") claim for relief on Count I of their Amended Complaint, and deny plaintiff Northwest Mining Association's ("Northwest's") Seventh Claim for relief.  Amended Compl. ¶¶ 97-107, 3:12-cv-8038, Dkt. #56 (June 26, 2012); Compl. ¶¶ 127-45, 3:12-cv-8042, Dkt. #1 (Mar. 6, 2012).[1]  The Trust also requests that this Court deny NMA's and Northwest's motions seeking summary judgment on these same counts.  Pls.' Mot. for Partial Summ. J'ment, 3:12-cv-0838, Dkt. #73 (Aug. 10, 2012) ("NMA Memo."); Nw. Mining Assn.'s Mot. for Partial Summ. J., Dkt. #90 (Jan. 18, 2013) ("Nw. Memo.").

The Trust hereby joins and incorporates the Statement of Material Facts by Federal Defendants field this day.  Fed. Defendants' Statement of Material Facts, attached to Dkt. #95 (Feb. 8, 2013).  The Trust submits herewith its Statement of Disputed Facts responding to NMA's Statement of Facts (3:12-cv-8038, Dkt. #73-1 (Aug. 10, 2012)).

## MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO NMA'S AND NORTHWEST'S MOTION FOR PARTIAL SUMMARY JUDGMENT

NMA and Northwest ask this Court to set aside the Secretary of the Interior's January 2012 decision to withdraw from mineral entry one million acres of public land in the Grand Canyon watershed because, they allege, the Secretary's authority to withdraw this land is invalid.  While Subsection 204(c)(1) of the Federal Land Policy and Management Act ("FLPMA") delegates to the Interior Secretary authority to make withdrawals of 5,000 acres ("large-tract withdrawals") or more, NMA and Northwest claim that a "legislative veto" in 204(c)(1) is unconstitutional and cannot be severed.  As

---

[1]  This memorandum identifies a filing's case number only where the filing occurred in a case other than the designated lead case prior to consolidation.

1   a result, they assert, this, and by implication any, exercise of the Secretary's large-tract

2   withdrawal authority is invalid.

3       This Court must deny NMA's and Northwest's claims, and enter partial summary

4   judgment for Defendants.  If this Court concludes Subsection 204(c)(1)'s legislative veto

5   is unconstitutional, the Court must wield a scalpel and not a meat axe in fashioning a

6   remedy.  Caselaw and canons of constitutional law and statutory construction mandate

7   that this Court sever as little of the act as possible and still leave a functioning statute.

8   Because FLPMA contains a severability clause, the Court may invalidate statutory

9   language beyond the veto only where the Court finds "strong evidence" that Congress

10   would have preferred to prevent the Executive from making any large-tract withdrawals

11   if Congress did not retain a veto option.  Neither FLPMA's language nor its legislative

12   history contains such evidence.  Absent the veto, FLPMA remains a fully functional

13   statute.  Excising only the legislative veto would leave the Secretary's large-tract

14   withdrawal authority intact and still subject to other procedural safeguards, consistent

15   with Congress's purposes in enacting FLPMA.  This Court must therefore deny NMA's

16   and Northwest's pending motions, and grant this motion.

17                       **STATUTORY BACKGROUND**

18       FLPMA authorizes the Secretary of the Interior to "make, modify, extend, or

19   revoke withdrawals but only in accordance with the provisions and limitations of this

20   section."  43 U.S.C. § 1714(a).  Section 204 of the Act establishes procedures that

21   regulate executive branch withdrawals of less than 5,000 acres, id. § 1714(d), and those

22   5,000 acres or greater.  Id. § 1714(c)(1).  For the latter category, Subsection 204(c)(1)

23   provides:

24         a withdrawal aggregating five thousand acres or more may be made … only

25         for a period of not more than twenty years by the Secretary on his own
            motion or upon request by a department or agency head.  The Secretary

26         shall notify both Houses of Congress of such a withdrawal no later than its
            effective date and the withdrawal shall terminate and become ineffective at

27         the end of ninety days … if the Congress has adopted a concurrent
            resolution stating that such House does not approve the withdrawal.

28

1    Id. § 1714(c)(1).  Subsection 204(c)(1) contains additional detail after the last sentence

2    quoted above describing how Congress would consider such a resolution.  Id.  Subsection

3    204(c)(2) provides that "[w]ith the notices required by" Subsection 204(c)(1), the

4    Secretary shall provide to the relevant Congressional committees a report containing

5    information on the proposed use for the withdrawal, the area's existing and potential

6    resources, and potential environmental and economic impacts, a description of

7    consultation with other agencies and local governments, the duration of the withdrawal,

8    and information concerning public hearings.  Id. § 1714(c)(2).  See also infra at 11-12.

9                                **STANDARD OF REVIEW.**

10        The Trust incorporates the section entitled "Standard of Review" in Federal

11   Defendants' memorandum filed today.  Fed. Defs.' Cross Mot. at 5-6, Dkt. #95 (Feb. 8,

12   2013).

13                                    **ARGUMENT**

14   **I.    THE EXECUTIVE'S AUTHORITY TO MAKE LARGE-TRACT
            WITHDRAWALS REMAINS INTACT EVEN IF SUBSECTION 204(C)'S
15          LEGISLATIVE VETO IS UNCONSTITUTIONAL.**

16        NMA and Northwest allege that Subsection 204(c)(1)'s provision allowing

17   Congress to disapprove of a withdrawal by concurrent resolution within 90 legislative

18   days of its effective date violates the presentment requirement of Article I of the

19   Constitution.  NMA Memo. 3-7; Nw. Memo. 8-12.  They rely on I.N.S. v. Chadha, which

20   held unconstitutional a one-house legislative veto of an executive branch action.  462

21   U.S. 919, 952-58 (1983).  NMA and Northwest further contend that Subsection

22   204(c)(1)'s legislative veto language cannot be severed from the remaining valid

23   provisions of Subsection 204(c)(1) or 204(c)(2) and so all of Subsection 204(c) must be

24   severed.  NMA Memo. 8; Nw. Memo. 12-16.  Because the Secretary explicitly relied on

25   Subsection 204(c) as authority for the withdrawal to protect the Grand Canyon

26   watershed, NMA and Northwest allege that that withdrawal must be set aside.

27

28

                                           3

1    Assuming that the mechanism whereby Congress could "veto" a large-tract

2  withdrawal is unconstitutional, the proper remedy is <u>not</u> to maximize the damage to

3  FLPMA's large-tract withdrawal provisions, as NMA and Northwest urge.  Instead, this

4  Court should sever only the constitutionally infirm language: the seven and a half

5  sentences in Subsection 204(c)(1) that make up the legislative veto.[2]  Doing so would

6  leave the Interior Secretary's large-tract withdrawal authority in place, and therefore

7  would have no effect on the Secretary's exercise of authority in making the Grand

8  Canyon watershed withdrawal.  Thus, assuming the legislative veto is unconstitutional,

9  this Court must deny NMA's and Northwest's summary judgment motions, and grant this

10  cross motion.

11    **A.    Because FLPMA Contains A Severability Clause, Plaintiffs Must Show "Strong Evidence" That The Legislative Veto Is Not Severable.**

12
       Once a court determines that a law contains unconstitutional language, it must

13  determine how much of Congress's language to invalidate.  Doing so requires "great

14  gravity and delicacy," given the separation of powers issues at play.  <u>Ashwander v. Tenn.</u>

15  <u>Valley Auth.</u>, 297 U.S. 288, 345 (1936) (Brandeis, J., concurring).  As the Supreme Court

16  has explained: "Generally speaking, when confronting a constitutional flaw in a statute,

17  we try to limit the solution to the problem …[and] try not to nullify more of a

18  legislature's work than is necessary."  <u>Ayotte v. Planned Parenthood of N. New Eng.</u>, 546

19  U.S. 320, 328-29 (2006).  "When a constitutional infirmity mars a statute, the Court

20  ordinarily removes the infirmity.  It undertakes a salvage operation; it does not demolish

21  the legislation.…"  <u>Nat'l Fed'n of Indep. Bus. v. Sebelius</u>, 132 S. Ct. 2566, 2630 (2012)

22

---

[2]  Severing only the legislative veto language would leave Subection 204(c)(1) to read in pertinent part as follows:

> a withdrawal aggregating five thousand acres or more may be made … only for a period of not more than twenty years by the Secretary on his own motion or upon request by a department or agency head.  The Secretary shall notify both Houses of Congress of such a withdrawal no later than its effective date.

Subsection 204(c)(2)'s reporting requirements would remain intact, and would bind the Secretary to fulfill them when making a withdrawal of 5,000 acres or larger.

4

1   (Ginsburg, J., concurring as to remedy) ("NFIB").  As a result, in the "overwhelming

2   majority of cases," the Supreme Court severs only the constitutionally infirm language

3   from the statute, leaving the remainder of the valid law intact.  See Florida v. U.S. Dep't

4   of Health & Human Servs., 648 F.3d 1235, 1321 (11th Cir. 2011) (citing line of modern

5   Supreme Court caselaw), aff'd in part and rev'd in part, NFIB, 132 S. Ct. 2566 (2012).

6          The court's mandate to salvage rather than demolish the remaining, valid portion

7   of a statute is especially clear where Congress has included a "severability" clause to

8   inform the courts that severing an invalid provision should not injure the remainder of the

9   law.  Severing only the constitutional infirm language "is plainly in order where …

10  Congress has expressly instructed courts to leave untouched every provision not found

11  invalid."  NFIB, 132 S. Ct. at 2630 (Ginsburg, J., concurring as to remedy).  The

12  inclusion of a severability clause is Congress's clearest indication of its intent that the

13  court should not sever valid statutory provisions, because a severability clause "serves to

14  assure the courts that separate sections or provisions of a partly invalid act may be

15  properly sustained 'without hesitation or doubt as to whether they would have been

16  adopted, even if the legislature had been advised of the invalidity of part.'"  Williams v.

17  Standard Oil Co., 278 U.S. 235, 241 (1929) (quoting Hill v. Wallace, 259 U.S. 44, 71

18  (1922)); NFIB, 132 S. Ct. at 2607 (2012) (prohibiting application of statute in

19  unconstitutional manner "fully remedies" the constitutional violation; the severability

20  clause "confirm[s] that we need go no further").  "The presence of a severability clause,

21  which expressly sets forth congressional intent that a statute stand in the event one of its

22  provisions is struck down, makes it extremely difficult for a party to demonstrate

23  inseverability."  Consumer Energy Council of Am. v. FERC, 673 F.2d 425, 441 (D.C.

24  Cir. 1982), aff'd sub nom., Process Gas Consumers Group v. Consumer Energy Council

25  of Am., 463 U.S. 1216 (1983).

26

27

28

1    For these reasons, when Congress has expressly instructed courts to preserve valid

2    language, a plaintiff faces a greater burden in establishing that the court should strike

3    additional language.

4    > [T]he inclusion of such a [severability] clause creates a presumption that
     > Congress did not intend the validity of the statute in question to depend on
5    > the validity of the constitutionally offensive provision.  In such a case,
     > unless there is strong evidence that Congress intended otherwise, the
6    > objectionable provision can be excised from the remainder of the statute.

7    Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 686 (1987) (emphasis added) (citations

8    omitted).[3]  An explicit statement of congressional intent excuses the court from engaging

9    in the "elusive inquiry" into legislative intent because "Congress could not have more

10   plainly authorized the presumption" that the infirm language is severable.  Chadha, 462

11   U.S. at 932.  See also Leavitt v. Jane L., 518 U.S. 137 (1996) (reversing appellate

12   decision to invalidate a valid provision it found inseverable from an unconstitutional

13   provision as irreconcilable with the legislature's expression of intent to sever based on

14   statute's severability clause).

15   Because FLPMA contains a severability clause, Plaintiffs face a heightened

16   burden – a showing of "strong evidence" – in their quest to strike down the entirety of

17   FLPMA's provisions concerning large-tract withdrawals.  Congress included a

18   severability clause in FLPMA to preserve valid statutory provisions should any other

19   provisions be found unconstitutional.  "If any provision of the Act or the application

20   thereof is held invalid, the remainder of the Act and the application thereof shall not be

21   affected thereby."  FLPMA, Pub. L. No. 94-579, § 707 (1976).  FLPMA's severability

22   provision is nearly identical to that in Chadha in which the Court excised only the

23   legislative veto language.  Chadha, 462 U.S. at 932 (quoting the severability provision:

24   "If any particular provision of this Act, or the application thereof to any person or

25   circumstance, is held invalid, the remainder of the Act and the application of such

26

27   [3] See Florida, 648 F.3d at 1327 (it must be "evident (as opposed to possible or
     reasonable)" that Congress would not have enacted the provisions containing the
28   infirmity (emphasis in original).

6

1  provision to other persons or circumstances shall not be affected thereby." (emphasis

2  omitted)).[4]

3          Despite Supreme Court precedent establishing a heightened burden of proof where

4  the law at issue contains a severability clause, NMA cites four cases to argue that "courts

5  have not hesitated to reject severability even where, as here, a statute contained a

6  severability clause."  NMA Memo. 12-13.  None of these cases help NMA.  In two of

7  them, contrary to NMA's representation, the Supreme Court did in fact sever the

8  unconstitutional language, leaving the remainder of the law intact; in one of these two the

9  Court severed a legislative veto.  Alaska Airlines, 480 U.S. at 697 (severing veto);

10  Buckley v. Valeo, 424 U.S. U.S. 1, 109 (1976).  In the third case, the Ninth Circuit made

11  no decision whether or not to sever, instead remanding the case for further record

12  development.  United States v. Spokane Tribe of Indians, 139 F.3d 1297, 1302 (9th Cir.

13  1998).  NMA cites only one case where the Court refused to sever the unconstitutional

14  provisions.  Spokane Arcades, Inc. v. Brockett, 631 F.2d 135 (9th Cir. 1980), aff'd, 454

15  U.S. 1022 (1981).  But Spokane Arcades is distinguishable because the court there found

16  multiple provisions to be unconstitutional, that the unconstitutional language represented

17  a "vital part of the statutory scheme," and that severing the infirm provisions "would

18  essentially eviscerate the statute."  Id. at 139.  Here, removing the legislative veto would

19  have no such drastic effect.  See infra at 10-15.  In sum, none of NMA's cases require

20  this Court to ignore the rule that movants face a heightened burden to show a

21  constitutionally infirm provision is inseverable.

22          **B.     FLPMA's Structure, Text And Legislative History Do Not Provide**

23  **"Strong Evidence" That Congress Would Have Prohibited All**
     **Executive Large-Tract Withdrawals Absent A Legislative Veto.**

24          The legislative veto can be severed from Subsection 204(c)(1) unless Plaintiffs

25  provide "strong evidence" that Congress would have wanted to completely prohibit the

26  ─────────────────
    [4]  See also NFIB, 132 S. Ct. at 2607 ("We then follow Congress's explicit textual
27  instruction to leave unaffected 'the remainder of the chapter, and the application of [the
    challenged] provision to other persons or circumstances.'" (quoting amended statute's
28  severability clause)).

7

1   Secretary from making large-tract withdrawals absent the option of vetoing such

2   withdrawals.  Courts look to the law's structure and text, and at its legislative history to

3   divine legislative intent.  <u>Alaska Airlines</u>, 480 U.S. at 687; <u>Ayotte</u>, 546 U.S. at 330 ("the

4   touchstone for any decision about remedy is legislative intent").  "Strong evidence" must

5   show more than that the law will be altered by the loss of the legislative veto, because

6   severing the veto will inevitably change the law.  <u>See</u> <u>United States v. Booker</u>, 543 U.S.

7   220, 265 (2005) (legislative intent should be determined "in light of the Court's

8   holding").  Movants must also show that Congress would not have wanted the rest of the

9   valid act to stand had it known the infirm language would be excised.  <u>NFIB</u>, 132 S. Ct.

10   at 2607; <u>Chadha</u>, 462 U.S. at 931-32.  Evidence of mere "reluctance" to delegate

11   authority to the Executive is not enough to demonstrate that a legislative veto is

12   inseverable.  <u>See</u> <u>Chadha</u>, 462 U.S. at 932.

13       Here, NMA and Northwest fail to provide the required "strong evidence" that the

14   loss of the veto provision would defeat Congressional intent behind FLPMA and

15   eliminate Congress's desire to delegate to the Secretary authority to make temporary

16   large-tract withdrawals.

17                    1.      Background: The Public Land Law Review Commission

18       Prior to FLPMA, the executive branch exercised virtually unchecked power over

19   withdrawals, and the results were not pleasing to some in Congress.  Management of

20   federal public lands in the mid-20[th] Century "became chaotic," in part a result of the

21   hodgepodge of hundreds of sometimes conflicting statutes that guided mining, forest

22   management, and other resource uses.  <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 876

23   (1990).  Congress responded in 1964 by establishing the Public Land Law Review

24   Commission ("PLLRC") to study and to make recommendations for improving public

25   land management.  <u>Id.</u>

26       The PLLRC's report, issued in 1970, concluded that Executive withdrawals had

27   occurred in "an uncontrolled and haphazard manner."  Pub. Land Law Review Comm'n,

28

One Third of the Nation's Land 43 (1970) ("PLLRC Report"), excerpts attached as Ex. 1;
see also Lujan, 497 U.S. at 876.  The PLLRC found it difficult to determine even basic
information such as the location and extent of Executive withdrawals and how various
withdrawals overlapped.  PLLRC Report at 52; Lujan, 497 U.S at 876-77.  Executive
withdrawals were plagued by "problems such as excessive size, indefiniteness of
boundaries, lack of uniformity, and interminable 'temporary' withdrawals."  PLLRC
Report at 55.  These problems stemmed in part from "the lack of adequate public
accountability" concerning Executive withdrawals, attributed to the fact that, with a few
exceptions, "there is no statutory restriction on the asserted permanent withdrawal
authority of the Executive."  Id. at 44, 55.  See also Casey E. Folks, Jr., 183 IBLA 24, 39
(2012); David H. Getches, Managing the Public Lands: The Authority of the Executive to
Withdraw Lands, 22 Nat. Resources J. 279, 290-99 (1982) (describing the Executive's
reliance on "implied authority" for large, permanent withdrawals prior to FLPMA),
attached as Ex. 2.

To address these issues, the PLLRC recommended a two-tier system for
withdrawals.  Congress should exercise complete authority over "permanent or
indefinite" withdrawals, and delegate "[a]ll other withdrawal authority" to the Executive
to establish limited-term withdrawals with procedural safeguards.  PLLRC Report at 54.[5]
Congress should reserve to itself authority to withdraw lands "for the purpose of
establishing or enlarging … national parks, national monuments … national forests, …
units of the wilderness system" and similar lands.  Id.  "Executive withdrawals" should
be limited in duration, should occur only after public involvement, and only after the
Executive first evaluated a series of factors, made specific findings on those factors, and
reported its findings to Congress.  Id. at 55.  The PLLRC did not recommend that

---

[5]  See also PLLRC Report at 2 (recommending that "Congress assert its constitutional
authority by enacting legislation reserving unto itself exclusive authority to withdraw or
otherwise set aside public lands for specified limited purpose uses and delineating
specific delegation of authority to the Executive as to the types of withdrawals and set
asides that may be effected without legislative action.") (emphasis added).

1   Congress enact a legislative veto as a check on Executive withdrawals.  Nor did it

2   recommend that Congress retain authority over all large, temporary withdrawals.

3               2.      FLPMA's Structure And Text

4        FLPMA's structure and text reflect the two-tier withdrawal system the PLLRC

5   recommended.[6]  "The Congress declares that it is the policy of the United States that …

6   the Congress exercise its constitutional authority to withdraw or otherwise designate or

7   dedicate Federal lands for specified purposes and that Congress delineate the extent to

8   which the Executive may withdraw lands without legislative action."  43 U.S.C.

9   § 1701(a)(4) (emphasis added).  Regarding the first tier, FLPMA forbids the Executive

10   from making, modifying or revoking any Congressional withdrawal.  43 U.S.C.

11   § 1714(j).[7]  FLPMA specifically prohibits the Executive from modifying withdrawals for

12   national monuments or national wildlife refuges.  Id.  And while FLPMA permits the

13   President to recommend Bureau of Land Management ("BLM") lands for preservation

14   under the Wilderness Act, Congress reserved the authority to designate wilderness.  43

15   U.S.C. § 1782.

16        Executive withdrawals under FLPMA follow the PLLRC Report's

17   recommendations.  FLPMA defines and prescribes the procedures and conditions under

18   which the Executive may withdraw lands "without legislative action."  First, Subsection

19   204(c)(1) eliminates indefinite Executive withdrawals by limiting to 20 years the duration

20   of withdrawals over 5,000 acres.  43 U.S.C. § 1714(c)(1).  FLPMA limits any Executive

21   attempt to turn a temporary withdrawal into an indefinite one by prescribing how the

22   Interior Secretary may extend withdrawals, and by requiring the Secretary to report any

23

24   [6]  See Casey E. Folks. Jr., 183 IBLA at 46 n.29 (PLLRC Report played key role in
     FLPMA's legislative history).

25   [7]  As the House report puts it, FLPMA "reserve[s] to the Congress the authority to create,
26   modify, and terminate withdrawals for national parks, national forests, the Wilderness
     System, Indian reservations, certain defense withdrawals, and withdrawals for National
27   Wild and Scenic Rivers, National Trails, and for other 'national' recreation units, such as
     National Recreation Areas and National Seashores."  H.R. Rep. No. 94-1163, at 9 (1976),
28   reprinted in 1976 U.S.C.C.A.N. 6175, 6177-78.

10

1   extensions to the appropriate Congressional committees.  43 U.S.C. § 1714(f).[8]  One

2   commentator has called the provisions ending the Executive's authority to make

3   indefinite withdrawals "<u>probably the most important limit on the executive's withdrawal</u>

4   <u>authority under the FLPMA</u>" because it "forces rethinking the wisdom of a withdrawal

5   periodically."  Getches (Ex. 2) at 324 (emphasis added).

6          These provisions have accomplished Congress's goals, having precluded the

7   unfettered revision and extension of Executive withdrawals.  <u>New Mexico v. Watkins</u>

8   examined an Interior Department decision to not only extend an existing withdrawal

9   pursuant to 43 U.S.C. § 1714(f) but to simultaneously modify that withdrawal's purpose

10  without preparing a new report to Congress, as it would need to for a new withdrawal

11  pursuant to 43 U.S.C. §§ 1714(c)(1) and (c)(2).  969 F.2d 1122, 1136 (D.C. Cir. 1992).

12  The Court held that 43 U.S.C. § 1714(f) mandates that "an extension [in duration] is to be

13  granted only to accomplish the purpose of the original withdrawal; it cannot be granted to

14  accomplish the purpose of a modification," and upheld a district court decision finding

15  the Interior Department's action illegal.  <u>Id.</u> at 1135; <u>see also id.</u> at 1137 (characterizing

16  FLPMA's limits on withdrawal renewals as a "prime means of securing [congressional]

17  control" over federal lands).

18         Second, Section 204 tracks the PLLRC Report's recommendations that withdrawal

19  legislation ensure considered deliberation and public notice and comment on proposed

20  Executive withdrawals.  Whenever the Interior Secretary or another department proposes

21  a withdrawal, the Secretary must publish a notice in the Federal Register within 30 days,

22  alerting Congress and the public to the proposal.  43 U.S.C. § 1714(b)(1).  For large-tract

23  withdrawals, the Secretary must submit to appropriate Congressional committees

24  information that explains the what, when, where, how and why of the withdrawal.  The

25

26  _____

    [8]  The Interior Secretary may extend temporary withdrawals "only upon compliance with
    the provisions of [Subsection 204] (c)(1) or (d) … and only if the Secretary determines
27  that the purpose for which the withdrawal was first made requires the extension, and then
    only for a period no longer than the length of the original withdrawal period."  43 U.S.C.
28  § 1714(f).  <u>See also</u> <u>Casey E. Folks, Jr.</u>, 183 IBLA at 48 (describing provision).

                                        11

1  Interior Department must describe, among other things: the proposed use for the

2  withdrawal; the area's existing and potential resources and potential environmental and

3  economic impacts; impacts to present users of the withdrawal; the withdrawal's effects

4  on state and local interests, and a description of consultation with other agencies and state

5  and local governments; the duration of the withdrawal; and the time and place of hearings

6  and other public involvement.  43 U.S.C. § 1714(c)(2).  These requirements ensure that

7  the Executive will undertake a considered evaluation before making a withdrawal, and

8  that Congress, state and local governments, and the public will be informed about and

9  have input into the proposal.[9]  The Secretary complied with all of these requirements in

10  making the Grand Canyon watershed withdrawal.

11  Through these provisions, Congress demonstrated its intent to authorize, with

12  several checks, the Executive to make temporary large-tract withdrawals, while Congress

13  retained complete authority over permanent withdrawals.  These checks on Executive

14  withdrawals remain even absent the legislative veto.  The Secretary's ability to make

15  large-tract withdrawals is still constrained by the 20-year limit, by limits on renewal and

16  amendment of such withdrawals, and by the requirement that the Executive justify such a

17  withdrawal, involve the public, and notify and report to Congress.  Accordingly, NMA

18  and Northwest are wrong to argue that severing the legislative veto would undermine

19  Congress's intent to reign in Executive withdrawals "by returning to the Secretary the

20  sort of unfettered withdrawal authority that predated FLPMA and drove its enactment."

21  NMA Memo. 10.[10]  FLPMA's structure and text contradict such allegations.

22

[9]  FLPMA's structure also comports with PLLRC recommendations and the statement of
23  Congressional policy that the Executive may withdraw lands "without legislative action."
See supra at 10.  The Act provides that temporary large-tract withdrawals take effect
24  upon completion of the report to the committees without an act of Congress.  While
Subsection 204(c)(1) contains a legislative veto provision, large withdrawals go into
25  effect immediately and remain in effect absent Congressional action.  43 U.S.C.
§ 1714(c)(1).
26
[10]  See also NMA Memo. 11 (removing legislative veto would allow BLM "to make large
27  tract withdrawals unsupervised by Congress"); id. at 13 (making similar statement); Nw.
Memo. 16 n.10 (removing veto "would essentially turn back the clock to pre-FLPMA
28  days when the Executive Branch had unbridled discretion to withdraw public lands").

1    One leading public lands scholar concluded that Subsection 204(c)(2)'s

2    requirement that the Interior Secretary prepare a report justifying and explaining the

3    withdrawal and involving the public is of great significance, while downplaying the

4    significance of the legislative veto as a check on Executive authority.  Professor Getches

5    concluded that Congress would rarely utilize Subsection 204(c)(1)'s legislative veto

6    because it requires Congress to exercise great vigilance, something he thought unlikely to

7    occur.  Getches (Ex. 2) at 324 ("unless an especially interested member of one of the key

8    committees chooses to scrutinize all withdrawals, the reporting requirements will be

9    essentially a means of forcing the executive to make a closer consideration of any

10   withdrawal decision.").  Further, Professor Getches argues that Subsection 204(c)(1)'s

11   90-day deadline for completing a legislative veto makes it unlikely to be used except in

12   the most extreme cases, leaving Congress with the remedy it always had: legislation to

13   reverse Executive action.  Id. at 325 ("most members of Congress would be

14   uncomfortable overruling the executive's conservation decision on such short notice

15   except in an outrageous case.  Most congressional disapprovals of executive withdrawals

16   are likely to be by legislation after full committee consideration as they were in the

17   past.").

18   A review of FLPMA's structure and language demonstrates that NMA and

19   Northwest cannot show evidence, let alone "strong evidence," that Congress would have

20   prohibited the Secretary from making temporary withdrawals over 5,000 acres absent the

21   legislative veto.  To the contrary, FLPMA's structure and text shows that Congress felt it

22   imperative to retain complete authority over some categories of withdrawals (e.g.,

23   permanent withdrawals to create national parks, wilderness, etc.), but specifically chose

24   not to do so for temporary withdrawals, including those 5,000 acres and larger. [11]

25

26   _____
     [11]  Congress knew how to retain control over large withdrawals, as it did for large-tract

27   defense withdrawals, but chose not to for temporary withdrawals in FLPMA.  See 43
     U.S.C. § 156 (reserving to Congress authority to withdraw more than 5,000 acres of land

28   for defense purposes).

1    The fact that procedural safeguards remain to limit the Executive's authority for
2    large-tract withdrawals even in the absence of a veto supports severing the veto.  The
3    Interior Department's ability to make large-tract withdrawals is still constrained by the
4    20-year limit, by limits on renewing or amending such a withdrawal, and by the need to
5    justify such a withdrawal, involve the public, and report to Congress.  The Supreme
6    Court has held that "where Congress has enacted a statutory scheme for an obvious
7    purpose, and where Congress has included a series of provisions operating as incentives
8    to achieve that purpose, the invalidation of one of the incentives should not ordinarily
9    cause Congress' overall intent to be frustrated."  New York v. United States, 505 U.S.
10   144, 186 (1992).  Here, severing Subsection 204(c)(1)'s veto leaves the law's other
11   procedural safeguards intact.

12       NMA suggests that this Court must demolish the remainder of Section 204(c)(1)
13   and all of Subsection 204(c)(2) because severing the veto alone "would render
14   ineffective" the "notice and reporting provisions" of Subsections 204(c)(1) and (c)(2).
15   NMA Memo. 11.  This argument is both irrelevant and incorrect.  It is irrelevant because
16   the Court's inquiry must focus not on whether severing the veto leaves the law's other
17   provisions ineffective, but on whether Congress would have preferred to retain absolute
18   authority over large-tract withdrawals if it could not have a chance to veto some such
19   withdrawals.[12]  See supra at 7-8.  NMA's argument is wrong because the Subsection
20   204(c)(2) report, even absent the veto, helps achieve Congress's goal of improving the
21   Secretary's decisionmaking and enabling Congressional oversight by requiring the
22   Executive to identify and justify a withdrawal, weigh the costs and benefits, hold
23   hearings and involve the public.[13]

24

---

25   [12]  Even if the veto's presence demonstrates some "reluctance" by Congress to delegate
26   authority to the Executive to make temporary withdrawals, such reluctance alone is not
     sufficient to demonstrate that the veto is inseverable.  Chadha, 462 U.S. at 932.

27   [13]  NMA also contends that "without the veto, the notices [in Subsections 204(c)(1) and
     (c)(2)] contribute nothing."  NMA Memo. 12 n.10.  This ignores the value Congress saw
28   in these reports, as evidenced by the requirement that the Secretary use Subsection
     204(c)(2)'s report provision to inform Congress of emergency withdrawals.  43 U.S.C.

1    Northwest further suggests that removing the legislative veto in Subsection

2  204(c)(1) would contradict FLPMA's structure because it would result in little difference

3  between the regulation of large-tract withdrawals and that of withdrawals smaller than

4  5,000 acres (which are regulated under Subsection 204(d)).  See Nw. Memo. 15 n.9.  See

5  also NMA Memo. 11 n.9.  This suggestion is incorrect.  Even absent a veto, large-tract

6  withdrawals may only last 20 years; and the reporting, public involvement, and

7  consultation provisions of Subsection 204(c)(2) apply.  Smaller withdrawals for a

8  "resource use" can be indefinite, and none of Subsection 204(c)(2)'s provisions that

9  inform Congress and the public of the justification for, and impacts of, a withdrawal

10  apply to small withdrawals.  Thus, even absent the veto, FLPMA places more constraints

11  on large-tract withdrawals than on smaller ones.

12    NMA and Northwest therefore cannot and do not provide "strong evidence" that

13  FLPMA's text and structure require that the Executive be stripped of all authority to

14  make large-tract withdrawals, absent the legislative veto.

15                          3.    FLPMA's Legislative History

16    Legislative history fails to provide "strong evidence" to overcome the presumption

17  that the Court should sever only Subsection 204(c)(1)'s veto provision.  The Conference

18  Report contains no explicit discussion of Section 204 beyond stating that the Senate

19  version failed to contain any provisions at all addressing withdrawals, although the

20  Senate ultimately adopted the House's withdrawal provisions.  H.R. Rep. No. 94-1724, at

21  58 (1976) (Conf. Rep.), reprinted in 1976 U.S.C.C.A.N. 6227, 6230.  Other legislative

22  history confirms that the Senate repeatedly rejected any checks on the Executive's

23  withdrawal authority prior to FLPMA's passage.  The Senate considered "[a] number of

24  policies in the House bill, such as … congressional review of withdrawals … in one form

25  _____

26  § 1714(e).  See also supra at 11-12.  The fact that FLPMA requires the information set
   out in Subsection 204(c)(2) three months after an emergency withdrawal takes effect, and
27  provides no legislative veto for emergency withdrawals, supports the conclusion that
   Congress believed the information contained in the Subsection 204(c)(2) report would
28  assist Congressional oversight independent of any legislative veto.

1   or another and rejected [them] during committee markups over the last three

2   Congresses." 122 CONG. REC. S12931 (July 30, 1976) (statement of Sen. Jackson) ),

3   reprinted in SENATE COMM. ON ENERGY & NATURAL RESOURCES, 95TH CONG.,

4   LEGISLATIVE HISTORY OF THE FEDERAL LAND POLICY AND MANAGEMENT ACT OF 1976,

5   at 743 (1978) ("FLPMA Leg. Hist.") (comparing House and Senate versions of FLPMA

6   bills).  In describing the differences between the final House and Senate bills prior to

7   conference on the law that became FLPMA, Senator Jackson notes repeatedly that "[t]he

8   Senate bill has no comparable provision" to the House's withdrawal provisions.  Id.

9        The House Report on its version of the act passed before the House-Senate

10  conference reinforces the conclusion that the House meant to delegate to the Executive

11  authority to make large-tract withdrawals, albeit with oversight and safeguards.  The

12  House Report declares that there should be "Congressional oversight of withdrawals."

13  H.R. Rep. No. 94-1163, at 4 (1976), reprinted in 1976 U.S.C.C.A.N. 6175, 6178.  See

14  also id. at 3-4 (large-tract withdrawals subject to "referral to Congress" due to "[p]ublic

15  concern," but not specifically addressing legislative veto).  The House Report also

16  identifies which branch should control temporary withdrawals, namely the Executive:

17        For the protection of statutory programs for the public lands and other
          statutory management programs, the bill grants to the Secretary of the
18        Interior, subject to certain procedural controls, authority to create, modify,
          and terminate all withdrawals and reservations for all public purposes and
19        departmental agency programs, existing and proposed other than those
          reserved by the bill to the Congress.

20
21  Id. at 9 (emphasis added).  See also id. at 29 ("The bill substitutes a general grant of

22  authority to the Secretary of the Interior to make and modify withdrawals subject to

23  certain procedural requirements.").  The House Report refers to "procedural controls" and

24  "procedural requirements" in the plural, suggesting that the House understood it was

25  relying on multiple mechanisms, not just the legislative veto.  While the House Report

26  describes generally the legislative veto provision, id. at 9, that is "not helpful" in

27  determining Congressional intent.  See Gulf Oil Corp. v. Dyke, 734 F.2d 797, 804

28

16

1  (Temp. Emer. Ct. App. 1984) (legislative history describing legislative veto's operation

2  "not helpful in determining what Congress would have intended").

3        In short, Congress was not unified in its desire for any checks on Executive

4  withdrawals, nor does evidence show it would not have allowed the Executive to make

5  large-tract withdrawals without the specific remedy of a legislative veto.  FLPMA is thus

6  unlike the law at issue in City of New Haven, Conn. v. United States where Congress was

7  "united in its furor" over unchecked Executive action.  809 F.2d 900, 906 (D.C. Cir.

8  1987) (finding legislative history supported that Congress would prefer no law to law

9  absent legislative veto).  There, bills from both houses sought to provide for

10  Congressional control of the agency action at issue.  One house provided for a legislative

11  veto provision; the other required advance Congressional approval of agency action

12  lasting more than 60 days.  Id. at 906, n.17.

13        NMA and Northwest do not provide a clear statement from the legislative history

14  that absent the legislative veto, Congress never would have chosen to delegate large-tract

15  withdrawal authority to the Secretary.  Nor does the legislative history they highlight

16  amount to "strong evidence" supporting such a proposition.  For example, Northwest

17  ignores relevant report language and contends that the House inserted the "legislative

18  veto provision to 'insure that the integrity of the great national resource management

19  systems will remain under the control of Congress.'"  Nw. Memo. 8 (quoting H.R. Rep.

20  No. 94-1163, at 9 (1976)).  But Northwest misrepresents the House Report it quotes.  The

21  House Report, like FLPMA itself, addresses the two-tier system regulating withdrawals,

22  and the Report's statement concerning "the great national resource management systems

23  [that] will remain under the control of Congress" relates to those withdrawals over which

24  Congress retained complete control:  the indefinite withdrawal of lands for national parks

25  and similar designations.  See H.R. Rep. No. 94-1163, at 9 (1976).  The language

26  Northwest quotes thus has no bearing on the Executive withdrawals subject to the

27  legislative veto.  Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102,

28

17

119 (1980) (statement of conference committee that does not interpret statutory provision in question is not persuasive).

Moreover, while NMA alleges that FLPMA's chief House sponsor, Rep. Melcher, "frequently highlighted the centrality of the legislative veto to granting the Interior Secretary some authority to make large-tract withdrawals," a fair reading of the legislative debate shows otherwise.  Rep. Melcher downplayed the law's significance as a check on the Executive's authority:  "The bill only carries with it when it is over 5,000 acres that either House has the <u>option</u> of within 90 legislative days to disagree with him [the Secretary].  <u>The bill does not in any way limit or interfere with his authority to make the withdrawal</u>."  122 CONG. REC. H7600 (July 22, 1976) (emphasis added), <u>reprinted in</u> FLPMA Leg. Hist. at 686.[14]  Severing Subsection 204(c) in its entirety (as NMA and Northwest urge) would not just "limit or interfere" with the Secretary's large-tract withdrawal authority, it would eliminate it, contradicting Rep. Melcher's interpretation of the law.[15]

Further, as Congress debated FLPMA, it lengthened the period of temporary Executive withdrawals.  When the bill that became FLPMA initially passed the House in 1976, it permitted the Executive to make large withdrawals for only 5 years.  H.R. Rep. No. 94-1163, at 9 (1976).  The bill that emerged from conference later that year allowed

---

[14]  When the legislation was mischaracterized in floor debate as putting a 5,000-acre limit on Executive withdrawals, Rep. Melcher quickly clarified that "[t]he bill in no way puts a 5,000-acre limit on withdrawals."  122 CONG. REC. H7600 (July 22, 1976), <u>reprinted in</u> FLPMA Leg. Hist. at 686.

[15]  Similarly, in a hearing on the House bill that became FLPMA, Rep. Melcher explained:

> I think for that very reason the committee adopted the [legislative] veto feature last year, <u>because we do not want to interfere</u>.  It does not take an affirmative action of the committee to approve an action [i.e., a temporary withdrawal].  <u>This leaves the agency free to act promptly, quickly, and in the public interest</u>.

<u>Public Land Policy and Management Act of 1975: Hearings on H.R. 5224 and H.R. 5622 Before the Subcomm. on Public Lands of the H. Comm. on Interior and Insular Affairs</u>, 94th Cong. 463 (1975) (emphasis added), excerpts attached as Ex. 3.

18

the Interior Secretary to withdraw lands for 20 years rather than 5 before seeking an extension.  See 43 U.S.C. § 1714(c)(1).  Further, the House was almost evenly split on whether the legislative veto provision would apply to too many withdrawals.  An amendment to limit Executive withdrawals subject to the procedural reporting and veto provisions from those larger than 5,000 to those larger than 25,000 acres lost by just two votes.  122 Cong. Rec. H7602-H7603 (July 22, 1976), reprinted in FLPMA Leg. Hist. at 688-89.  Thus, as debate over the Act went on, Congress gave the Executive more leeway in issuing temporary withdrawals.  This history does not support NMA's and Northwest's assertion that Congress would have wanted complete control over large temporary withdrawal if no veto was possible.

In sum, because FLPMA's legislative history fails to provide evidence, let alone "strong evidence," that Congress would have preferred to eliminate the Secretary's authority to make large withdrawals absent the legislative veto, this Court must sever only the veto.

## C. Severing Only The Veto Would Leave FLPMA Fully Operative As A Law, And The Remaining Law Comports With Congressional Intent.

"A provision is further presumed severable if what remains after severance is fully operative as a law." Chadha, 462 U.S. at 934 (quotations omitted).  See also Alaska Airlines, 480 U.S. at 684 (invalid part of statute "may be dropped if what is left is fully operative as a law" (quotations omitted)).  To determine whether a statute is fully operative, courts sometimes inquire into whether a provision is "so interwoven with [other provisions] that they cannot be separated." Hill, 259 U.S. at 70.  However, the Supreme Court has generally found "a legislative veto, … by its very nature is separate from the operation of the substantive provisions of a statute." Alaska Airlines, 480 U.S. at 684-85 (emphasis added).  In Alaska Airlines, the Court reasoned that Congress provided for a legislative veto to allow an activity to proceed if Congress did not disapprove it. Id.  Thus, the statute operates fully without a veto provision, because the

1    statute operates in exactly the same manner as it does when Congress does not exercise

2    the veto.

3          Courts also review whether the statute that remains continues to achieve

4    Congress's purpose in passing the law.  See NFIB, 132 S. Ct. at 2608 (examining

5    whether statute absent invalid provision "will still function in a way consistent with

6    Congress' basic objectives in enacting the statute" (quotations omitted)); Alaska Airlines,

7    480 U.S. at 685 ("more relevant inquiry in evaluating severability is whether the statute

8    will function in a manner consistent with the intent of Congress" (emphasis in original)).

9    In Chadha, for example, the Supreme Court concluded that the statute absent the

10   legislative veto was fully operational, and the statute that remained complied with

11   Congress's intent in enacting the law.  The Court found that "Congress' oversight of the

12   exercise of this delegated authority [to suspend deportations] is preserved [absent the veto

13   provision] since all such suspensions will continue to be reported to" Congress, giving

14   Congress the information to take action in response.  Chadha, 462 U.S. at 934-35.

15         Here, FLPMA remains operational absent the legislative veto.  The veto, like the

16   one in Alaska Airlines, is separate from the operation of the remainder of the statute.

17   When Congress does not exercise its veto (as it has never done, either before or after the

18   Chadha decision), the large-tract withdrawal provisions of Subsections 204(c)(1) and

19   (c)(2) act exactly as they do should the veto be severed.  Further, as in Chadha, severing

20   FLPMA's veto would not fundamentally alter the law's system of congressional

21   oversight, because the Secretary would still be required to provide a detailed report to

22   Congress concerning each large-tract withdrawal, and to notify the public and Congress

23   of each withdrawal proposal.  See 43 U.S.C. § 1714(b)(1), (c)(1) & (c)(2).  Congress is

24   thus empowered to oversee, question, review, and, if necessary, take action to overturn a

25   withdrawal, even absent the veto, in line with Congress's purpose in enacting FLPMA.

26         Despite Supreme Court precedent holding that statutes with invalid legislative

27   vetoes remain fully operational where veto language is severed, NMA and Northwest

28

                                              20

1    argue that FLPMA's veto is somehow different because of the veto's <u>location</u> within "the

2    same subsection as the delegation of authority" to make large-tract withdrawals.  Nw.

3    Memo. 13; NMA Memo. 11 (veto and delegation are "part and parcel" of withdrawal

4    provision).  They argue that the veto's placement in Subsection 204(c)(1), where the

5    delegation of authority for large-tract withdrawals also is found, means the authority and

6    the veto are "interwoven and cannot be separated."  Nw. Memo. 14 (quotations omitted).

7           Plaintiffs misapply the law.  Courts find provisions "inextricably bound" <u>not</u>

8    because they are in the same sentence, subsection, or paragraph, but because one

9    provision would not have been enacted without the other.  <u>See</u> <u>Am. Fed'n of Gov't</u>

10   <u>Employees v. Pierce</u>, 697 F.2d 303, 307 (D.C. Cir. 1982) (severing full sentence because

11   prohibition on Executive action would not have been enacted without invalid two-house

12   committee approval provision).[16]  As shown above, there is not "strong evidence" that the

13   delegation for authority for Executive withdrawals would not have been enacted without

14   the legislative veto.  In fact the PLLRC Report, which Congress followed, recommended

15   nearly all of the elements of 204(c)(2)'s reporting requirement but not the veto.  <u>See</u>

16   <u>supra</u> at 9-10.  The fact that FLPMA's legislative veto is in the same subsection as the

17   delegation authority does not evidence in the least that the veto was the <u>sine qua non</u> for

18   delegation of that authority.  Further, courts need not strike down all words in the same

19   "<u>the very same provision</u>" or paragraph because some of the words are unlawful.  NMA

20   Memo. 11.  The Supreme Court has repeatedly found invalid and severed clauses, and

21   even words <u>within</u> a clause or sentence, leaving operational the remaining parts of the

22   sentence.  <u>See</u> <u>Brockett v. Spokane Arcades, Inc.</u>, 472 U.S. 491, 504-506 (1985)

23   (remanding to consider whether to invalidate six words within subsection defining

24   "prurient"); <u>Regan v. Time, Inc.</u>, 468 U.S. 641, 649 (1984) (holding invalid an act's

25   "purpose requirement" of 15 words plus parenthetical phrase within a subparagraph).

26

27   _____

28   [16]  To sever all of Subsection 204(c) as Plaintiffs request, would eliminate valid statutory
     language and leave parts of FLPMA inoperable.  <u>See</u> NMA Memo. 12; <u>supra</u> at 14 n.3.

                                                   21

1    NMA's argument that invalidation of the veto renders other FLPMA provisions

2    inoperable misunderstands how the Supreme Court evaluates whether statutes remain

3    fully operational.  NMA Memo. 10-12.  Severing an unenforceable legislative veto does

4    not eviscerate Congress's decision in FLPMA to limit the Executive's authority to make

5    withdrawals because FLPMA retains checks on that formerly "unfettered" authority.  Nor

6    does severing the veto cause Subsection 204(a) to lose "full effect" because one of

7    several of FLPMA's limitations on Secretarial authority to withdraw lands is invalid.

8    Plaintiffs' reasoning falls into the trap of comparing FLPMA as enacted – which is

9    no longer an option if the legislative veto is found unconstitutional – with a FLPMA

10   whose legislative veto is unenforceable.  Such an approach misconstrues how courts must

11   analyze severability.  See Leavitt v. Jane L., 518 U.S. at 143 (explaining fallacy of such

12   an analytical approach).  In enacting FLPMA Congress preferred to have a legislative

13   veto as opposed to not having one; that is evident because the statute contains the veto.

14   The question for this Court is not whether Congress wanted to have a legislative veto, but

15   whether Congress would have preferred to eliminate completely the Executive's large-

16   tract withdrawal authority – and thus to prohibit all large-tract withdrawals unless made

17   by an act of Congress – if Congress could not have a veto.  There is not strong evidence

18   that Congress would have preferred a FLPMA in which Congress was solely responsible

19   for making large-tract withdrawals.

20                                    **CONCLUSION**

21   Because "strong evidence" does not exist that Congress would have retained

22   complete authority over large, temporary withdrawals absent a legislative veto, the Court

23   must deny NMA's and Northwest's motions for partial summary judgment and grant the

24   Trust's partial summary judgment motion.

25

26

27

28

1    Respectfully submitted February 8, 2013.

2

3     /s/ Edward B. Zukoski
     Melanie R. Kay (*pro hac vice*)
4    Edward B. Zukoski (*pro hac vice*)
     Earthjustice
     1400 Glenarm Place, Suite 300
5    Denver, CO  80202
     mkay@earthjustice.org
6    tzukoski@earthjustice.org
     Telephone: (303) 623-9466
7    Fax: (303) 623-8083

8    Roger Flynn (*pro hac vice*)
     Western Mining Action Project
9    P.O. Box 349, 440 Main St., #2
     Lyons, CO  80540
10   wmap@igc.org
     Telephone: (303) 823-5738
11   Fax: (303) 823-5732

12   Attorneys for Grand Canyon Trust, the Havasupai Tribe,
     Center for Biological Diversity, Sierra Club, and
13   National Parks Conservation Association

14

15

16                        **CERTIFICATE OF SERVICE**

17   I hereby certify that I have caused the foregoing DEFENDANT-INTERVENORS GRAND

18   CANYON TRUST ET AL.'S CROSS-MOTION FOR PARTIAL SUMMARY

19   JUDGMENT AND MEMORANDUM IN SUPPORT, AND MEMORANDUM IN

20   OPPOSITION TO NATIONAL MINING ASSOCIATION ET AL.'S MOTIONS FOR

21   SUMMARY JUDGMENT with supporting exhibits to be served upon counsel of record

22   through the Court's electronic service system (ECF/CM) and by first class mail to Gregory

23   Yount at the following address:  807 West Butterfield Road, Chino Valley, Arizona 86323.

24   Respectfully submitted February 8, 2013.

25    /s/ Edward B. Zukoski

26

27

28

                                          23

1

## TABLE OF EXHIBITS

2

3

4

Exhibit 1.    Public Land Law Review Commission, <u>One Third of the Nation's Land</u> (1970) (excerpts) (also available at <u>http://archive.org/details/onethirdofnation3431unit</u> (last viewed Feb. 8, 2013))

5

6

Exhibit 2.    David H. Getches, <u>Managing the Public Lands: The Authority of the Executive to Withdraw Lands</u>, 22 Nat. Resources J. 279 (1982)

7

8

9

Exhibit 3.    <u>Public Land Policy and Management Act of 1975: Hearings on H.R. 5224 and H.R. 5622 Before the Subcomm. on Public Lands of the H. Comm. on Interior and Insular Affairs</u>, 94th Cong. (1975) (excerpts) (also available at available at http://babel.hathitrust.org/cgi/pt?id=mdp.39015081207758 (last viewed Feb. 8, 2013))

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28