1  IGNACIA S. MORENO
   Assistant Attorney General
2  Environment and Natural Resources Division
3  U.S. Department of Justice

4  DOMINIKA TARCZYNSKA, NY Bar No. 4431573
5  JOHN S. MOST, VA Bar No. 27176
   Natural Resources Section
6  P.O. Box 7611 Washington, D.C. 20044-7611
    (202) 305-0447 (Tarczynska)
7   (202) 616-3353 (Most)
8   (202) 305-0506 (fax)
   DOMINIKA.TARCZYNSKA@USDOJ.GOV
9  JOHN.MOST@USDOJ.GOV
   Counsel for Defendants
10

11

12

13            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF ARIZONA
14                  PRESCOTT DIVISION

15

16

17
   ┌─────────────────────────────────┬──────────────────────────────
18 │ GREGORY YOUNT,                  │ Case No. 3:11-cv-08171-PCT-DGC
19 │              Plaintiff, *pro se*,│
20 │      v.                         │ **FEDERAL DEFENDANTS' CROSS-
21 │                                 │ MOTION FOR PARTIAL
   │ KEN SALAZAR, SECRETARY          │ SUMMARY JUDGMENT AND
22 │ OF THE INTERIOR, *et al.*,      │ COMBINED MEMORANDUM IN
23 │                                 │ SUPPORT AND IN OPPOSITION
   │              Federal Defendants,│ TO PLAINTIFFS' MOTION FOR
24 │      and                        │ PARTIAL SUMMARY JUDGMENT
25 │ GRAND CANYON TRUST, *et al.*,   │ (Lead Case)**
26 │                                 │
   │         Intervenor-Defendants.  │
27 │                                 │
28 └─────────────────────────────────┴──────────────────────────────

| | |
|---|---|
| NATIONAL MINING ASSOCIATION, *et al.,* | Case No. 3:12-cv-08038-PCT-DGC |
| Plaintiffs, | |
| v. | |
| KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.,* | |
| Federal Defendants, | |
| and | |
| GRAND CANYON TRUST, *et al.,* | |
| Intervenor-Defendants | |
| NORTHWEST MINING ASSOCIATION, *et al.,* | Case No. 3:12-cv-08042-PCT-DGC |
| Plaintiffs, | |
| v. | |
| KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.,* | |
| Federal Defendants, | |
| and | |
| GRAND CANYON TRUST, *et al.,* | |
| Intervenor-Defendants. | |
| QUATERRA Alaska Incorporated, *et al.,* | Case No. 3:12-cv-08075-PCT-DGC |
| Plaintiffs, | |
| v. | |
| KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.,* | |
| Federal Defendants, | |
| and | |
| GRAND CANYON TRUST, *et al.,* | |
| Intervenor-Defendants. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ................... Unnumbered

COMBINED MEMORANDUM OF LAW ........................................................ 1

INTRODUCTION ............................................................................................. 1

LEGAL BACKGROUND ................................................................................. 3

FACTUAL BACKGROUND ............................................................................ 4

STANDARD OF REVIEW ............................................................................... 5

ARGUMENT .................................................................................................... 6

I.      The Court Should Sever the Legislative Veto Provision and Preserve the
        Remainder of the Act, Consistent with Legislative Intent ........................................ 7

        A.  The Act's Severability Clause Presumptively Establishes Congressional
            Intent to Grant the Secretary Large-Tract Withdrawal Authority without
            Regard to Validity of the Legislative Veto. ........................................ 7

        B.  The Language and Structure of the Act do not Provide Strong Evidence
            that Congress Would Have Withheld Large-Tract Withdrawal
            Authority but for the Legislative Veto ................................................ 9

        C.  The Legislative History of the Act Does Not Provide Strong Evidence
            that Congress Would Have Withheld Large-Tract Withdrawal
            Authority but for the Legislative Veto ................................................ 12

II.     The Court Should Sever the Legislative Veto Provision and Preserve the
        Remainder of the Act because it is Fully Operational  ................................. 19

CONCLUSION ................................................................................... 21

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## FEDERAL DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56(a), Federal Defendants cross-move for partial summary judgment as to Count 1 of the amended complaint, Doc. *56, filed by the National Mining Association ("NMA") and the Nuclear Energy Institute ("NEI") in civil action 3:12-cv-08038, and as to Count 7 of the complaint, Doc. *1, filed by the Northwest Mining Association ("NWMA") in civil action 3:12-cv-08042.

Both complaints incorrectly assert that the entirety of subsection 204(c) of the Federal Land Policy and Management Act of 1976 ("FLPMA" or "the Act"), 43 U.S.C. § 1714(c) – which authorizes the Secretary of the Interior to withdraw large tracts of federal land (5,000 acres or greater) from operation of the general land laws, including the Mining Law of 1872  – is invalid due to the presence of an unconstitutional legislative veto provision.  In particular, Plaintiffs contend (1) that the veto provision cannot be severed from the withdrawal authority, such that both should be stricken; and (2) that, as a result, the Secretary's January 9, 2012 withdrawal decision constitutes conduct in excess of statutory authority under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(c).

Legislative vetos of this nature have consistently been held unconstitutional, and that is the position of the United States here as well.  Nonetheless, the Congressional grant of large-tract withdrawal authority in Section 204(c) is unaffected because controlling authority and the Act's text, structure, and legislative history establish that the veto provision can and should be severed.  As a result, the Secretary's withdrawal authority is undiminished, and the challenged actions comport with his statutory authority.  Federal Defendants are entitled to, and respectfully request, judgment in their favor on both counts as a matter of law.

**COMBINED MEMORANDUM OF LAW**

**INTRODUCTION**

On January 9, 2012, pursuant to subsection 204(c) of FLPMA, the Secretary of the Interior issued a record of decision ("ROD") and public land order withdrawing from mineral location and entry for twenty years approximately one million acres of public and National Forest System lands in the Grand Canyon watershed.  *See* Ex. 1 (ROD); Ex. 2 (public land order); 77 Fed. Reg. 2563-01 (Jan. 18, 2012).  Subject to valid existing rights, this action withdrew the subject lands from mineral location and entry under the Mining Law of 1872.  30 U.S.C. §§ 22-54.

Soon thereafter, four plaintiff groups brought separate actions, now consolidated, challenging the withdrawal on various theories.  Based on one of these theories, Plaintiffs NMA and NEI moved in August 2012 for partial summary judgment, contending the Secretary lacked legal authority to make such a withdrawal.  *See* Doc. *73 ("NMA Mem.").  In January 2013, NWMA filed a similar motion.  Doc. 90 ("NWMA Mem.").[1]  Both motions assert that the whole of subsection 204(c), which authorizes withdrawals of 5,000 acres or greater (hereafter, "large-tract withdrawals"), is invalid because it contains an unconstitutional legislative veto provision.[2]  This

---

[1] The NMA/NEI motion is based on Count 1 of their amended complaint, Doc. *56 at ¶ 97-107 (No. 3:12-cv-08038), and the NWMA motion is based on Count 7 of its complaint, Doc. *1 at ¶ 127-145 (No. 3:12-cv-08042).  Throughout this brief, use of an asterisk in a docket entry citation signals a pre-consolidation filing.

[2] The provision at issue in this case, 43 U.S.C. § 1714(c)(1) states, in relevant part:

> [A] withdrawal aggregating five thousand acres or more may be made . . . only for a period of not more than twenty years by the Secretary on his own motion or upon request by a department or agency head.  The Secretary

provision cannot be severed from the withdrawal authority, Plaintiffs argue, because Congress would not have enacted the withdrawal provision without retaining the ability to veto objectionable withdrawals.

These theories lack merit. Plaintiffs have failed to present "strong evidence" that Congress would have intended the large-tract withdrawal provision to fall if the legislative veto provision fails constitutional muster. And subsection 204(c) remains fully operative as a law without the legislative veto provision. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) ("'[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law'") (quoting *Buckley v. Valeo*, 424 U.S. 1, 108 (1976).

Notably, the Act contains a severability clause which directs that, if any provision of the Act is held invalid, the "remainder of the Act and the application thereof shall not be affected thereby." 43 U.S.C. § 1701, Note on Severability of Provisions, Pub. L. 94-579, § 707. Plaintiffs' motions fail to rebut the presumption created by this clause: that Congress intended the withdrawal authority regardless of the validity of the veto provision. In addition, the plain language and structure of the Act demonstrate Congress' intent that the withdrawal authority should survive regardless of the validity of the veto provision.

shall notify both Houses of Congress of such a withdrawal no later than its effective date and the withdrawal shall terminate and become ineffective at the end of ninety days . . . if the Congress has adopted a concurrent resolution stating that such House does not approve the withdrawal.

2

The legislative history of FLPMA, and nearly two centuries of federal land-management practice, similarly support the conclusion that Congress did not intend to condition the withdrawal authority on the validity of the veto provision.  From the early days of the Republic, *see Grisar v. McDowell*, 73 U.S. 363, 381 (1867), to the present, the executive branch has asserted its withdrawal authority, based on power inherent in Article II of the Constitution, implied by congressional acquiescence, or granted by statute.  Now, based on a mistaken assessment of congressional intent, Plaintiffs ask the Court to impose a land-management regime that has never been in force in the history of our Nation, one where large-tract withdrawal authority is vested solely in Congress and where Congress alone must bear the burden of responding to the exigencies and vagaries of land management – tasks best suited to the executive.

## LEGAL BACKGROUND

The Mining Law of 1872, 30 U.S.C. §§ 22-54, made public lands available to citizens "for the purpose of mining valuable mineral deposits . . . ."  *United States v. Coleman*, 390 U.S. 599, 602 (1968); *Cameron v. United States*, 252 U.S. 450, 460 (1920); 30 U.S.C. § 22.   It authorizes citizens to "locate" mining claims upon "discovery" of valuable minerals and compliance with applicable legal requirements.  *Chrisman v. Miller*, 197 U.S. 313, 322-23 (1905).  As long as lands remain "open" to location and entry, a citizen may locate a mining claim.  43 C.F.R. pt. 3832.

In 1976, Congress enacted FLPMA, 43 U.S.C. §§ 1701-1787, creating a "broad statutory framework" that sets forth "the goals and management requirements that [Congress] envisioned for public lands." *Gardner v. BLM*, 638 F.3d 1217, 1222 (9th

Cir. 2011).   Among other things, the Act directed the Secretary to "prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values," 43 U.S.C. § 1711(a); it required land-use planning for public lands and established criteria therefor, *id*. § 1712; it provided that existing land classifications were subject to review in the planning process, and that the Secretary could "modify or terminate any such classification consistent with such land use plans." *id*. § 1712(d). As most relevant here, the Act authorized the Secretary to "make, modify, extend, or revoke withdrawals but only in accordance with the provisions and limitations of this section." *Id*. § 1714(a).[3]   Subsection 204(c)(1), 43 U.S.C. § 1714(c)(1), in its first sentence, limits the withdrawal authority by providing that, for tracts of 5,000 acres or greater, withdrawals shall not exceed twenty years in duration.  The second sentence then sets forth certain notice and reporting requirements, and further provides that any large-tract withdrawal "shall terminate and become ineffective at the end of ninety days . . . if the Congress has adopted a concurrent resolution stating that such House does not approve the withdrawal." *Id*. § 1714(c)(1). Only the termination provision in the second sentence is at issue at the present stage of proceedings in this case.

## FACTUAL BACKGROUND

In July 2009, on application by the Bureau of Land Management ("BLM"), the Secretary proposed the withdrawal challenged in this action and the Department issued a public notice of the proposal.  *See* 74 Fed. Reg. 35,887-01 (July 21, 2009).   On

---

[3]   FLPMA defines a withdrawal as "withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws for the purpose of limiting activities under those laws in order to maintain other public values in the area . . . ."  43 U.S.C. § 1702(j).

January 9, 2012, following environmental review and extensive public comment on the 2009 proposal, the Secretary signed the ROD and a public land order implementing that decision.  77 Fed. Reg. 2563-01.  On the same day, the Secretary submitted a report to Congress pursuant to the requirements of subsection 204(c)(2).  *See* Ex. 3 (January 9, 2013 Report to Congress).  Congress has since taken no action under subsection 204(c)(1) to veto the withdrawal.  *See* Ex. 4, ¶ 6 (February 7, 2013 Declaration of Jeffrey O. Holdren ("Holdren Decl.").

The lands withdrawn consist principally of three parcels, two managed by the BLM (i.e., the north and east parcels on the Kanab Plateau, north of Grand Canyon National Park, consisting of 684,449 acres) and one, managed by the United States Forest Service, located on the Kaibab National Forest, south of the park (i.e., the south parcel, consisting of 322,096 acres).  ROD at 4-7, 8 (Map 1).[4]

### STANDARD OF REVIEW

In an action brought pursuant to the APA, agency actions "shall be set aside only when they are found to be 'arbitrary, capricious, an abuse of discretion,' 'in excess of statutory . . . authority,' or 'without observance of procedure required by law.'"  *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 934 n.4 (9th Cir. 2006) (quoting 5 U.S.C. § 706(2)(A), (C)-(D)).  APA review of the two counts now before the Court is appropriate, as both contend: that the entirety of subsection 204(c) should be invalidated because subsection 204(c)(1) contains an unconstitutional veto provision; and that, as a result, the Secretary exceeded his statutory authority.

---

[4] Federal Defendants' Statement of Material Facts, as required by LRCiv. 56.1(a), and Federal Defendants' Statement of Disputed Facts, as required by LRCiv. 56.1(b), accompany this filing as Exhibits 5 and 6, respectively.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Use of Rule 56 motions for summary judgment in this context, subject to limitations imposed by the APA, is also appropriate.  *See, e.g., Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994) (discussing the standards of review under both the APA and Fed. R. Civ. P. 56).  In a non-APA case, a "moving party is entitled to summary judgment as a matter of law where, viewing the evidence and the inferences arising therefrom in favor of the nonmovant, there are no genuine issues of material fact in dispute."  *Id.* at 1472. (citing Fed. R. Civ. P. 56(c)).  Here, however, there can be no genuine issues of material fact because the Court's role, under the APA, is not to find facts.  *See Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985) (district court is "not required to resolve any facts in a review of an administrative proceeding").  Instead, the Court here must resolve questions of a purely legal nature.  Under Fed. R. Civ. P. 56(c), summary judgment is an appropriate tool for doing so.  *See, e.g., Klass v. Fidelity & Guar. Life Ins. Co.*, No. 04-cv-2337, 2009 WL 886874, at *5 (D. Ariz. Mar. 31, 2009).

## ARGUMENT

Legislative vetoes of the type at issue in this case have consistently been held unconstitutional, and that is the position of the United States here as well.  Nonetheless, the Congressional grant of large-tract withdrawal authority in Section 204(c) is unaffected because the veto provision can, and therefore must, be severed from the statute, leaving the rest of Section 204(c) intact.  To prevail on their motions for partial summary judgment and successfully oppose this cross-motion, Plaintiffs must (1) present "strong evidence" that Congress would not have enacted the large-tract

withdrawal authority without the legislative veto provision; or (2) demonstrate that section 204(c), without the legislative veto provision, is not fully operative as a law.  As explained in Argument Sections I and II, below, Plaintiffs fail to accomplish either.

**I. The Court Should Sever the Legislative Veto Provision and Preserve the Remainder of the Act, Consistent with Legislative Intent.**

The language, structure, and legislative history of FLPMA provide no evidence, let alone the required "strong evidence," that Congress, in 1976, would have withheld large-tract withdrawal authority if it could not retain a legislative veto.

**A. The Act's Severability Clause Presumptively Establishes Congressional Intent to Grant the Secretary Large-Tract Withdrawal Authority without Regard to Validity of the Legislative Veto.**

It is an age-old and oft-quoted canon that a court, faced with a statute marred by a constitutional infirmity, should "'refrain from invalidating more of the statute than is necessary.'"  *United States v. Booker*, 543 U.S. 220, 258 (2005) (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652 (2005); *Alaska Airlines,* 480 U.S. at 684 (same); *Minority Television Project, Inc. v. FCC*, 676 F.3d 869, 881 (9th Cir. 2012) (same).[5]  Thus, if a statute contains objectionable and unobjectionable provisions, and the provisions are severable, "it is the duty of [a] court to so declare, and to maintain the act in so far as it is valid."  *Alaska Airlines,* 480 U.S. at 684 (quoting *Regan*, 468 U.S. at 652).

---

[5]  *See also Ayotte v. Planned Parenthood of Northern New England,* 546 U.S. 320, (2006) (the court "tr[ies] not to nullify more of a legislature's work than is necessary," lest it "frustrate[] the intent of the elected representatives of the people"); *El Paso & Northeastern R. Co. v. Gutierrez*, 215 U.S. 87, 96 (1909) ("whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it valid").

In applying this rule, the Court in this case must determine whether to sever the veto provision from the withdrawal authority and leave the latter intact.

> The standard for determining the severability of an unconstitutional provision is well established: "Unless it is *evident* that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law."

*Id.* (quoting *Buckley*, 424 U.S. at 108) (emphasis added); *see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3162 (2010) ("[N]othing in the statute's text or historical context makes it 'evident' that Congress . . . would have preferred no Board at all to a Board whose members are removable at will.").

But the decision is made even easier here because FLPMA – like the statute at issue in *INS v. Chadha*, 462 U.S. 919 (1983) – contains a severability provision. *See* 43 U.S.C. § 1701, Note on Severability of Provisions, Pub. L. 94-579, § 707, 90 Stat. 2743, 2792-94 (directing that if any provision of the Act is held invalid, the "remainder of the Act and the application thereof shall not be affected thereby").  The Supreme Court in *Chadha* held that a severability clause like the instant one "gives rise to a presumption that Congress did not intend the validity of . . . any part of the Act, to depend upon whether the veto clause . . . was invalid."  462 U.S. at 932.  Faced with this presumption, Plaintiffs must present "strong evidence" that Congress intended to prevent courts from severing the veto provision and leaving the rest of the statute in effect.  *Alaska Airlines,* 480 U.S. at 686.  Plaintiffs, however, have not presented the "strong evidence" – based on the Act's language, structure, or legislative history – that is required to prove Congress intended the grant of large-tract withdrawal authority to

be contingent on validity of the veto provision. *Id.* Plaintiffs fail to carry this burden and, accordingly, their motions for summary judgment must be denied.

### B. The Language and Structure of the Act do not Provide Strong Evidence That Congress Would Have Withheld Large-Tract Withdrawal Authority but for the Legislative Veto.

Plaintiffs offer no "strong evidence" that Congress intended to condition large-tract withdrawal authority on the validity of the veto provision. *Alaska Airlines,* 480 U.S. at 686. Both plaintiff groups argue that the withdrawal authority in the first sentence of subsection 204(c)(1) and the veto in the second sentence should be invalidated in their entirety simply because they appear in the same subsection. NMA Mem. at 12; NWMA Mem. at 13-14. The contention is meritless. Mere proximity of the two provisions does not indicate that Congress intended to condition the Secretary's large-tract withdrawal authority on validity of its veto. Further, it only makes sense from the standpoint of clarity that a veto relating solely to the withdrawal authority appear in close textual proximity to that authority.

Additionally, Plaintiffs' proximity theory is incompatible with the Supreme Court's decision in *Alaska Airlines*, where the Court severed only the unconstitutional portion of the subsection at issue while leaving the remainder of the subsection intact. *See Alaska Airlines,* 480 U.S. at 682, 689-90 (indicating that the "report and wait" provision in section 43(f)(3) of the Airline Deregulation Act of 1978 was severable from the unconstitutional Congressional veto provision *in the same subsection*). In other cases, courts have invalidated and severed portions *of a single sentence* while leaving the remainder of the sentence intact. *See Ala. Power Co. v. U.S. Dep't of*

*Energy*, 307 F.3d 1300, 1305 n.5 (11th Cir. 2002) (severing the italicized portions of the following provision: "The adjusted fee proposed by the Secretary shall be effective after a period of 90 days of continuous session have elapsed following the receipt of such transmittal, *unless during such 90-day period either House of Congress adopts a resolution disapproving the Secretary's proposed adjustment . . .*").  The fact that the large-tract withdrawal and veto provisions appear in the same subsection, therefore, does nothing to advance Plaintiffs' arguments.

Moreover, the structure and language of the remaining provisions of Section 204, which significantly constrain the executive's broad pre-FLPMA authority, demonstrate that the grant of withdrawal authority is consistent with Congressional intent, even without a legislative veto.  The Act limits large-tract withdrawals to twenty years in duration, § 204(c)(1), and it requires notice in the Federal Register of proposed withdrawals, § 204(b)(1), and the opportunity for public hearing, § 204(h).  In addition, the Act vests withdrawal authority solely in the Secretary, who may delegate the authority only to "individuals in the Office of the Secretary who have been appointed by the President, by and with the advice and consent of the Senate." § 204(a).  For these reasons, the Act satisfied Congress's perceived need to impose limited controls on the Secretary's withdrawal authority, even without the legislative veto provision.

Most significantly, without the legislative veto, subsection 204(c) nonetheless provides for Congressional oversight.  First, it obligates the Secretary to provide Congress notice of a withdrawal.  *See* § 204(c)(1).  Additionally, it requires the Secretary to provide a detailed report explaining the reasons for the withdrawal,

identifying present uses and users on the lands that are to be withdrawn, furnishing an explanation of why present uses are incompatible with proposed uses, identifying possible alternatives, explaining the process that has been followed in analyzing the withdrawal, analyzing impacts on local government interests and economies, and supplying a report prepared by a qualified mining engineer, engineering geologist, or geologist. *See* § 204(c)(2).  Such reporting requirements not only impose a duty to present certain information to Congress; they also force the Secretary to incorporate such considerations into his decision-making process prior to making a large-tract withdrawal.[6]  Thus, there is simply no merit to NMA/NEI's argument that without the legislative veto provision, subsection 204(c) would return to the Secretary "the sort of unfettered withdrawal authority that predated FLPMA . . . ."  *See* NMA Mem. at 10.

Moreover, even without the legislative veto, Congress may still overturn a withdrawal through legislative action.  It is important to note that the veto in subsection 204(c)(1) requires a *concurrent* resolution, passed by *both* the House and Senate to overturn a withdrawal (*see* 43 U.S.C. § 1714(c)(1)); thus, the veto provision streamlines Congress's efforts only insofar as it would allow Congress to avoid presentment.  Nothing in the structure or language of the Act supports the conclusion that Congress would have revoked large-tract withdrawal authority altogether, simply to avoid the presentment requirement.

---

[6] *See* David H. Getches, *"Managing the Public Lands: The Authority of the Executive to Withdrawal Lands,"* 22 NAT. RESOURCES J. 279, 320 (1982) ("[FLPMA's] requirement of a thorough assessment of the matters listed in Section 204(a)(2) . . . is reminiscent of the requirement in [the National Environmental Policy Act] that an environmental impact statement accompany proposals of a federal agency . . . . Presumably, an agency forced to identify and consider certain factors will not ignore them in formulating a decision.").

Finally, NWMA's reliance in this context on *Hill v. Wallace*, 259 U.S. 44 (1922), is simply misplaced.   *Hill* is inapposite because the portions of the Grain Futures Trading Act of 1921 that did not violate the Constitution's commerce clause could not, upon striking the constitutionally infirm provisions, operate fully as law without being revised.  As the Supreme Court explained, the Act's severability clause did not intend the court to dissect an unconstitutional measure and reframe a valid one out of it by inserting limitations it does not contain. This is legislative work beyond the power and function of the court. *Hill*, 259 U.S. at 70.  As further explained in argument II, *infra*, FLPMA remains fully functional even without the veto, and no textual insertions or other "legislative work" by the Court is required to make it so.

### C. The Legislative History of the Act Does Not Provide Strong Evidence that Congress Would Have Withheld Large-Tract Withdrawal Authority but for the Legislative Veto.

Plaintiffs also fail to identify "strong evidence" in the Act's legislative history that "the statute created in [the] absence [of the veto provision] is legislation that Congress would not have enacted." *Alaska Airlines*, 480 U.S. at 685.  Importantly, the question is not whether Congress would have preferred the statute with the legislative veto.  Rather, the question is whether Congress would have revoked the Secretary's large-tract withdrawal authority entirely, if it had known the veto is unconstitutional. *See Booker,* 543 U.S. at 265 ("We do not doubt that Congress, when it wrote the Sentencing Act, intended to create a form of mandatory Guidelines system.  But, we repeat, given today's constitutional holding, that is not a choice that remains open. Hence we have examined the statute in depth to determine Congress' likely intent *in*

1   *light of today's holding*.") (emphasis in original).[7]   The legislative history does not

2   support such a conclusion.

3          In evaluating legislative intent, it is important to remember the *status quo* prior

4   to passage of the legislation.  At the time, the executive had broad authority to make

5

6   withdrawals pursuant to implied authority, inherent authority, and statutory

7   authorization.  *See, e.g., United States v. Midwest Oil Co.*, 236 U.S. 459, 490-92 (1915)

8   (recognizing executive's implied withdrawal authority); 43 U.S.C. § 141 (Pickett Act);

9

10  *Portland Gen. Elec. Co. v. Kleppe*, 441 F. Supp. 859, 861 (D. Wyo. 1977) (recognizing

11  that the executive's inherent withdrawal authority survived passage of Pickett Act);

12  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 875-76 (1990) (summarizing pre-FLPMA

13
    statutory withdrawal authority); *see also* Laura Lindley, et al., "Formal and De Facto
14

15  Federal Land Withdrawals and Their Impacts on Oil And Gas And Mining

16  Development in the Western States," 48 *Rocky Mtn. Min. L. Inst.*, 48 RMMLF-INST 25

17  at 2-6 (2002) (same).   These authorities were not subject to formal congressional

18
    oversight or veto and imposed no limits with respect to the size or duration of a
19

20  withdrawal.  *See One Third of the Nation's Land*, *A Report to the President and the*

21  *Congress by the Public Land Law Review Commission* (1970) ("PLLRC Report") at 44.

22  Had FLPMA not passed, the executive would have continued to enjoy nearly unfettered

23
    authority in making withdrawals.  This affirms that there was nothing in the "nature of
24

25  the delegated authority . . . [that was] so controversial or so broad" that Congress would

26  ---
    [7] *See also Leavitt v. Jane L.*, 518 U.S. 137, 143 (1996) ("The relevant question, in other
27  words, is not whether the legislature would prefer (A+B) to B, because by reason of the
    invalidation of A that choice is no longer available.  The relevant question is whether
28  the legislature would prefer not to have B if it could not have A as well.").

have been unwilling to make the delegation without a legislative veto – since Congress, from the earliest days in our nation's history, allowed the executive to exercise that authority without oversight.  *See Alaska Airlines*, 480 U.S. at 685 (the Court should look to the "importance of the veto in the original legislative bargain" as well as the "nature of the delegated authority" in evaluating whether to sever a veto provision).

Section 204 of FLPMA was passed to impose a new degree of order and oversight in the management of public lands, and to impose some limitations on the manner in which the executive exercised its withdrawal authority.  It was not, however, intended to revoke large-tract authority altogether.  The Act grew out of the recommendations of the Public Land Law Review Commission ("PLLRC"), which was created in 1964 to conduct a comprehensive review of public land laws, rules, and regulations, as well as the policies and practices of the agencies charged with land administration in order "to determine whether and to what extent revisions thereof [were] necessary."   PLLRC Report at x; *see also Lujan*, 497 U.S. at 876-77 (recognizing role of PLLRC in passage of FLPMA).  Executive withdrawals were one of the many areas of public land law that the PLLRC reviewed.   In response to complaints from the timber and mining industry and some members of Congress about the executive's exercise of its withdrawal power, the PLLRC recommended that:

> Large scale limited or single use withdrawals of a permanent or indefinite term should be accomplished only by act of Congress.  *All other withdrawal authority should be expressly delegated with <u>statutory guidelines</u> to insure proper justification for proposed withdrawals, provide for public participation in their consideration, and establish criteria for Executive action.*

*Id.* at 54 (emphasis added).

14

NWMA's arguments rely heavily on the PLLRC Report, but its selective quotation of the Report is misleading. It fails to acknowledge that the recommendation that Congress "reserve[e] unto itself exclusive authority to withdraw . . . public land," NWMA Mem. at 6 (quoting PLLRC Report at 2), applied only to large scale withdrawals of a "permanent or indefinite term."  PLLRC Report at 54.  NWMA's brief also fails to acknowledge that the PLLRC Report continues *in the very same sentence* with the further recommendation that Congress "delineat[e] specific delegation of the authority to the executive as to the types of withdrawals and set asides that may be effected without legislative action."  PLLRC Report at 2.

Specifically, the PLLRC recommended "the enactment of a single statute which clearly replaced all existing authority expressly or impliedly delegated" under which executive withdrawals would be limited to ten years of duration, would require public notice and participation, and would be accompanied by a statement of findings on the justification for each withdrawal.  *Id.* at 55.  The PLLRC further recommended that the withdrawal authority be delegated solely to the Secretary of the Interior, subject to the continuing limitation that the Secretary cannot delegate to anyone other than an official of the Department appointed by the President. *Id.* at 56.  The recommendations did not, however, set any limits on the size of executive withdrawals, indicate that a Congressional veto should be provided, or recommend that the Secretary's authority to make withdrawals of 5,000 acres or greater should be revoked altogether.

In May 1976, a bill was introduced in the House that would ultimately lead to FLPMA's passage.  The bill adopted many of the PLLRC's recommendations regarding

withdrawals, but with some noteworthy exceptions.  For example, Congress did not

reserve unto itself "exclusive authority" to make withdrawals.  Federal Land Policy and

Management Act of 1976, H.R. 13777, 94th Cong. § 204 (1976), *reprinted in*

Legislative History of the Federal Land Policy and Management Act of

1976 (hereinafter "FLPMA Leg. His.") at 248.  To the contrary, Congress confirmed its

intent to grant the Secretary withdrawal authority, even as to large tracts.

The fact that Congress debated the inclusion of a veto provision in subsection

204(c)(1) is also of little moment.  As initially introduced in the Senate, the bill did not

address withdrawals at all (which would have left in place the Secretary's pre-FLPMA

authority).  *See* National Resource Lands Management Act, S. 507, 94th Cong. (1975).

The House version did address withdrawals and contained a one-house legislative veto

provision, which provision led to considerable congressional debate.  Federal Land

Policy and Management Act of 1976, H.R. 13777, 94th Cong. § 204 (1976), *reprinted*

*in* FLPMA Leg. His. at 248.  However, "[t]he mere presence of continued and heated

debates prior to the passage of the Acts cannot provide the evidence necessary for [the

court] to conclude that the legislative vetoes are inseverable and that the sections in

which they appear . . . must be invalidated."  *Gulf Oil Corp. v. Dyke*, 734 F.2d 797, 804

(Temp. Emer. Ct. App. 1984).  Contrary to Plaintiffs' assertion, the fact that the

provision was debated is not evidence that it was "central" to allowing the Secretary to

continue exercising authority over large-tract withdrawals.  *See id.*  As the court noted,

> Gulf cites numerous portions of the legislative history in an attempt to prove that
> the compromise between the flexibility desired by the executive and the
> oversight demanded by Congress was an extremely fragile one which could not
> have been enacted absent the legislative veto provisions.  In none of these

references, however, do we find a clear indication that the [Act] would not have been passed without such vetoes.

*Id.* Plaintiffs have pointed to nothing in the legislative history which would suggest that the veto was the crucial component of the "original legislative bargain" in subsection 204(c)(1) authorizing – or, more accurately, reauthorizing – the Secretary to make withdrawals of 5,000 acres or greater.

More significant here is the fact that the legislative history contains no debate or commentary, nor any proposed amendment purporting to repeal all of the existing express or implied authority for large-tract withdrawals if the veto were not adopted.[8] To the contrary, the legislative history suggests that Congress intended large-tract withdrawal authority to remain with the Secretary for two reasons. First, it was recognized that only the Secretary could act quickly enough when necessary to protect sensitive federal lands from private interests. *See, e.g.,* 95 Cong. Rec. H7600 (daily ed. July 22, 1976), *reprinted in* FLPMA LEG. HIS. at 686 (1978) (Rep. Seiberling: "The purpose of the withdrawal by the Secretary, without waiting for the lengthy process of legislation, is to be able to act promptly to set aside lands that have higher value for other public uses.").[9]  Indeed, to assuage concerns that the provision would frustrate

---

[8] *See Lindley, et al.* at 11 ("Although there is a strong indication that Congress wanted to limit the Executive's ability to withdraw lands outside the strict procedures provided for in FLPMA, there is no indication in FLPMA that Congress wanted to wholly eliminate the Executive's ability to withdraw lands.  Further, with the example of the withdrawal in excess of 5,000 acres, if only the legislative veto provision, but not the congressional notice requirements, was found to be unconstitutional, Congress would still have authority to prevent or terminate the proposed withdrawal [legislatively].").

[9] *See also* H.R. Rep. No. 94-1163, at 9 (1976), *reprinted in* FLPMA LEG. HIS. at 439 ("For the protection of statutory programs for the public lands and other statutory management programs, the bill grants to the Secretary . . . authority to create, modify,

this ability to act quickly, supporters of the bill emphasized to critics that the bill would not *"in any way limit or interfere with* [the Secretary's] authority to make the withdrawal." *Id.* (Rep. Melcher) (emphasis added).

Second, congressional debate about the workload burdens created by the legislative veto provision suggests that Congress would not have chosen to assume primary responsibility for undertaking large-tract withdrawals itself.   The bill, as initially introduced in the House, limited the duration of withdrawals to five years and emergency withdrawals to one year, and contained a one-house veto provision applicable to withdrawals greater than 5,000 acres.   *See* Federal Land Policy and Management Act of 1976, H.R. 13777, 94th Cong. § 204 (1976), *reprinted in* FLPMA LEG. HIS. at 248-52.   Debate in the House centered on concerns regarding the burdens that the legislative veto provision would impose on the congressional committees.  *See, e.g.*, H.R. Rep. No. 94-1163, at 231 (1976), *reprinted in* FLPMA LEG. HIS. at 658 (dissenting views of the committee); 122 Cong. Rec. 23,399, 23,441 (1976) (statement of Rep. Downey).  Many members believed that this burden would be greatly reduced if the term of withdrawals were extended or the acreage triggers for congressional oversight were substantially increased.   *See, e.g.*, 122 Cong. Rec. at 23,437-38 (statement of Rep. Mink, proposing an amendment to 50,000 acres and a term of 20 years), 23,440 (statement of Rep. Forsythe, concurring in amendment to increase term and acreage).   Ultimately, the House's bill was modified to extend the withdrawal

and terminate all withdrawals . . . ."); 95 Cong. Rec. H7583 *reprinted in* FLPMA LEG. HIS. at 669 (Rep. Seiberling: "Withdrawals by the Secretary . . . have, in particular, been the only protection many sensitive areas have against the abuses permissible under the mining law of 1872 which allows private individuals not only the rights to certain minerals on public lands, but to obtain actual title to the land itself.").

period to twenty years and require a concurrent resolution of both Houses to veto a withdrawal. *See* 122 Cong. Rec. H12008 (daily ed. Sept. 30, 1976) (Conference Report on S. 507) *reprinted in* FLPMA LEG. HIS. at 937. This history suggests Congress would not have chosen to assume the much greater burden of exclusive authority over large-tract withdrawals. *Cf. Chadha*, 462 U.S. at 934 ("Congress' desire to retain a veto in this area cannot be considered in isolation but must be viewed in the context of Congress' irritation with the burden of private immigration bills.").[10]

In sum, Plaintiffs have not presented "strong evidence" sufficient to rebut the presumption in favor of severability. They have not, and cannot, make a sufficiently strong showing that Congress, if given the choice, would have preferred the Secretary to have no large-tract withdrawal authority absent the veto provision, despite the various controls and oversight measures present in section 204.

## II. The Court Should Sever the Legislative Veto Provision and Preserve the Remainder of the Act because it is Fully Operational.

Plaintiffs fail to demonstrate that FLPMA subsection 204(c) would not be fully operative as a law if the legislative veto were severed. *Chada*, 462 U.S. at 934 ("A

---

[10] *See* 95 Cong. Rec. H7585 ("I am apprehensive of the added burden the withdrawal provision of H.R. 13777 would place on the already heavy work schedules of the House and Senate Interior Committees.") *reprinted in* FLPMA LEG. HIST. at 671 (Rep. Mink); *Id.* at H7587 ("While I do not disagree that Congress should more diligently exercise its oversight authority, I believe that H.R. 13777 bends too far in that direction and will result in additional paper work and a reluctance on the part of the Department to propose such withdrawals. Of more importance, however, is the likely possibility that the mining industry will descend on Congress every time a withdrawal is proposed to urge that it be disapproved.") (Rep. Forsythe) *reprinted in* FLPMA LEG. HIST. at 673; *Id.* at H7588 ("[S]ection 204, the new land withdrawal review, while establishing greater congressional oversight authority, does so in such a brief time frame that we would be seriously overburdened by the excessive paperwork.") (Rep. Downey) *reprinted in* FLPMA LEG. HIST. at 674.

provision is further presumed severable if what remains after severance is 'fully operative as a law.'") (quoting *Champlin Ref. Co. v. Corp. Comm'n of Okla.,* 286 U.S. 210, 234 (1932)).   The Supreme Court has recognized that this element of the severability analysis is generally "not a concern . . . when the invalid provision is a legislative veto, which by its very nature is separate from the operation of the substantive provisions of a statute." *Alaska Airlines*, 480 U.S. at 684-85.   This is because "when Congress enacted the legislative-veto provisions, it contemplated that activity under the legislation would take place so long as Congress *refrained* from exercising that power."  *Id.* at 685 (emphasis in original).

The legislative history of the withdrawal provision demonstrates that Congress was fully aware that if it took no action, a withdrawal would be effective just as if there were no veto provision.  *See* 95 Cong. Rec. H7599, *reprinted in* FLPMA LEG. HIS. at 685 ("If we do nothing, if neither House does nothing [sic], then the withdrawal goes into effect. . . .") (Rep. Melcher).  Indeed, the fact that the statute can function fully without the legislative veto provision is confirmed by more than thirty-five years of actual practice since FLPMA's passage, during which time the Department has ordered an estimated 82 withdrawals of 5,000 acres or greater, yet Congress has never exercised its veto to overturn any one of them.   Holdren Decl. ¶ 6.  Plaintiffs' assertion that subsection 204(c)(1) would not be fully operative as law without the veto provision is thus wholly without merit and should be rejected.

1

**CONCLUSION**

2

3        For the foregoing reasons, Federal Defendants respectfully request that the Court

4   deny plaintiffs motions for partial summary judgment and grant summary judgment in

5   favor of defendants as to Count 1 of the NMA/NEI amended complaint, Doc. *56 (no.

6   3:12-cv-08038), and as to Count 7 of the NWMA complaint, Doc. *1 (No. 3:12-cv-

7   08042).

8        Dated: February 8, 2013

9

10                              Respectfully Submitted,

11                              IGNACIA S. MORENO,
                                Assistant Attorney General
12                              Environment and Natural Resources Division

13
                                 /s/ John S. Most
14                              JOHN S. MOST, Trial Attorney
                                Virginia Bar, No. 27176
15                              DOMINIKA TARCZYNSKA, Trial Attorney
                                New York Bar, No. 4431573
16                              Natural Resources Section
                                P.O. Box 7611
17                              Washington, D.C. 20044-7611
                                (202) 305-0447(Tarczynska)
18                              202-616-3353 (Most)
                                202-305-0506 (fax)
19                              DOMINIKA.TARCZYNSKA@USDOJ.GOV
20                              JOHN.MOST@USDOJ.GOV
21

22                              *Counsel for Defendants*

23

24

25

26

27

28

1

2

## <u>CERTIFICATE OF SERVICE</u>

3

    I hereby certify that I am causing the foregoing to be served upon counsel of

4

record through the Court's electronic service system (ECF/CM).

5

Dated:  February 8, 2013

6

7

        _/s/ John S. Most_
        *Counsel for Federal Defendants*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

# RECORD OF DECISION

# NORTHERN ARIZONA WITHDRAWAL

**Mohave and Coconino Counties, Arizona**

**January 9, 2012**

# RECORD OF DECISION

# NORTHERN ARIZONA WITHDRAWAL

## Mohave and Coconino Counties

--- ERRATA ---

# January 2012

Section VII contains a typographical error which incorrectly reports the acres the U.S. Forest Service (USFS) consented to withdrawing on the Kaibab National Forest in Northern Arizona as 134,454 acres. The actual approximate acreage as documented in the Northern Arizona Proposed Withdrawal Final Environmental Impact Statement (Alternative B, October 2011, Table 2.7-1, page 2-31) and the USFS letter of consent dated January 6, 2012 is 355,874 acres. In all other respects the language of the Record of Decision is accurate.

*[signature]*

JAN 1 1 2012

1

**RECORD OF DECISION**

**NORTHERN ARIZONA WITHDRAWAL**

**Mohave and Coconino Counties, Arizona**

## I.   SUMMARY

This document constitutes the Record of Decision (ROD) of the U.S. Department of the Interior (DOI) for the Northern Arizona Withdrawal. Pursuant to the authority granted to the Secretary of the Interior by section 204 of the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1714, this ROD documents the decision to select Alternative B identified in the Northern Arizona Proposed Withdrawal Final Environmental Impact Statement (EIS) and withdraw from location and entry under the Mining Law, subject to valid existing rights, approximately 1,006,545 acres of federal land in Northern Arizona for a 20-year period in order to protect the Grand Canyon Watershed from adverse effects of locatable mineral exploration and development. The withdrawal does not affect use, management, or disposition of the lands other than under the Mining Law of 1872, 30 U.S.C. §§ 22-54 (Mining Law).

The lands are located near Grand Canyon National Park in northern Arizona and consist of lands managed by the Bureau of Land Management (BLM) and the U.S. Forest Service (USFS). They contain significant environmental and cultural resources as well as substantial uranium deposits. The USFS has consented to the withdrawal of the lands under its jurisdiction.

## II.   INTRODUCTION

President Theodore Roosevelt withdrew the North Kaibab Ranger District of the Kaibab National Forest from mineral location and entry when he first created the Grand Canyon Preserve in 1906. Tribal lands bordering the park became off limits to uranium development when the Grand Canyon Parashant and Vermilion Cliffs National Monuments were created and the lands were withdrawn from mineral entry.

Uranium ore deposits were discovered and mines were opened in northern Arizona in the 1940s and 1950s. A price spike in uranium in the late 1970s triggered increased demand for exploration by mining companies. In the 1980s, the U.S. Geological Survey began studying the uranium deposits of the area and produced maps. These deposits consist of pipe-shaped breccia bodies generally no more than 300 feet in diameter that can extend 2,000 feet below the surface. Copper production from breccia pipes dates back to the late 1800s.

Exploration activities resulted in six new uranium mines that together produced 1,471,942 tons of uranium during the late 1980s-early1990s. Three of seven mines have been reclaimed. The remaining four were put into "maintenance" or standby status in the early 1990s due to declining prices for uranium and economic considerations.

2

From the period of 1978 – 1992, over 900 exploration holes were completed on the USFS-managed Tusayan Ranger District. One underground mine, the Canyon Mine, was proposed and approved on the District in the late 1980s in the same area.

Uranium is a mineral locatable under the Mining Law. Historically, the number of claims located and interest in development of existing claims appear to relate to the price of uranium. In 2004, mining-related activities increased on BLM and USFS managed lands tracking another surge in uranium prices. In 2007, the demand for uranium pushed the commodity price to over $130/lb before returning to the $40/lb range in 2009. This price spike prompted new interest in the breccia pipe uranium deposits on federal lands to the north and south of Grand Canyon National Park, causing thousands of new mining claims to be located in the area. In late 2007 and into 2008 mining-related activities slowed due to a downturn in uranium prices. The price of uranium declined from $135 per pound to below $42 per pound in June 2007. The price currently is at about $48 per pound. The increase in new mining claim locations during the period of 2004 to 2008 generated public concern that uranium mining could adversely affect natural, cultural, and social resources in the Grand Canyon watershed, which includes resources in Grand Canyon National Park. Over 10,000 mining claims had been located within the withdrawal area by 2009.

In response to the concern over potential environmental effects of uranium exploration and mining, a number of events occurred in 2008 and 2009 to bring attention to these lands and the potential for long term or permanent impacts to the Grand Canyon watershed. Among those events was legislation introduced by Representative Raúl Grijalva (D-AZ) in March 2008 (H.R. 4483) to permanently withdraw over 1 million acres from location and entry under the Mining Law, as well as from mineral leasing, geothermal leasing, mineral material sales, and the public land laws. The area proposed for legislative withdrawal includes federal lands north of Grand Canyon National Park administered by the Bureau of Land Management's (BLM) Arizona Strip Field Office and the USFS's North Kaibab Ranger District, and lands south of the Park in the Tusayan Ranger District administered by the USFS. The legislative withdrawal was reintroduced as H.R. 644 on January 22, 2009, and again in March 2011 as H.R. 855.

On July 21, 2009, the Department of the Interior published notice of the Secretary of the Interior's proposed 20-year withdrawal under the authority of FLPMA. The Secretary's proposed 20-year withdrawal covered essentially the same area (the "withdrawal area") as the proposed legislative withdrawal in H.R. 4483 and the subsequent bills; however, under the Secretary's proposal, the subject lands would only be withdrawn from location and entry under the Mining Law and would remain available for mineral leasing, geothermal leasing, and mineral materials sales and open to the public land laws generally.

Under section 204 of FLPMA, the July 21, 2009, publication of the *Federal Register* notice of the proposed withdrawal (Appendix A of the Environmental Impact Statement [EIS]) had the effect of segregating the lands involved for up to 2 years from the location and entry under the Mining Law, subject to valid existing rights, while the BLM evaluated the withdrawal application. On June 21, 2011, the Department of the Interior published Public Land Order 7773, which effected a six-month emergency withdrawal of the withdrawal area. The emergency withdrawal prevented the lands from opening to location and entry under the Mining Law upon expiration of the two-year segregation while the Department completed the decision-making process on the proposed withdrawal. The emergency withdrawal became effective on July 21, 2011, and ends January 20, 2012. The BLM, along with its cooperating agencies, has completed various studies and analyses of resources in the withdrawal area, including an environmental impact statement (EIS) under the National Environmental Policy Act of 1969, as amended 42 U.S.C. §§ 4321–4347 (NEPA). These

studies and analyses provided the basis for the final decision regarding whether or not to proceed with the proposed withdrawal or to select an alternative action.

The EIS addresses the potential direct, indirect, and cumulative effects on the human environment of the proposed withdrawal and alternatives to the proposed withdrawal. The EIS also discloses any unavoidable adverse impacts, impacts to the long-term productivity of affected resources, and any irreversible or irretrievable commitments of resources that result from the proposed withdrawal or the alternatives to the proposed withdrawal, including the No Action Alternative.

## III.   AUTHORITY

Section 204 of FLPMA provides the Secretary of the Interior with the authority to make, modify, revoke and extend withdrawals, subject to valid existing rights (43 U.S.C. § 1714). Withdrawals can be used to remove lands from the operation of the public land laws generally, including the Mining Law. The Secretary of the Interior can withdraw lands under the jurisdiction of another agency, but only with the consent of that agency (43 U.S.C. § 1714(i)).

FLPMA also directs that lands under BLM jurisdiction are to be managed under principles of multiple-use and sustained yield unless another law provides otherwise (43 U.S.C. § 1732(a)). FLPMA defines multiple-use as "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values" (43 U.S.C. § 1702(c)). The USFS has a similar multiple-use mandate (16 U.S.C. § 529, 531). This grants BLM and the USFS substantial discretion to balance the competing uses on particular parcels of land; it does not require every use on every parcel.

## IV.   OVERVIEW OF THE WITHDRAWAL AREA

The withdrawal area in northwest Arizona is located adjacent to Grand Canyon National Park and consists of three parcels: the North Parcel, with approximately 549,995 acres; the East Parcel, with approximately 134,454 acres; and the South Parcel, with approximately 322,096 acres. The North and East parcels are both north of the Park, while the South Parcel is south of the Park. The withdrawal will have no effect on mine development of any non-federal lands within its exterior boundaries. However, they are included within the boundary of the withdrawal in the event that they are acquired by the federal government sometime in the future, at which point the lands would become subject to the withdrawal.

Approximately 982,552 acres within the boundaries of the withdrawal are managed by the BLM or the USFS. The remaining 23,993 acres are split estate lands where the surface is non-federal but the locatable minerals are owned by the federal government. The withdrawal will withdraw all lands from location and entry under the Mining Law, subject to valid existing rights, regardless of surface ownership. This means that no new mining claims can be established to develop the locatable minerals in those lands or interests in lands. The withdrawal will not limit development of non-federal mineral estate or federal leasable or salable minerals (e.g., oil and gas leasing, sand and gravel permits), which are not subject to appropriation under the Mining Law.

Crafted by the immense power of the Colorado River, the Grand Canyon and the greater ecosystem that surrounds it have long been recognized as one of the Nation's most treasured landscapes. This area is known as a home or sacred place of origin to many Native Americans,

4

including the Havasupai, Hualapai, Navajo, Hopi, Zuni, Southern Paiute, and others, and its cultural significance goes back thousands of years. Although first afforded federal protection in 1893 as a Forest Reserve and later as a National Monument, the Grand Canyon achieved National Park status in 1919, three years after the creation of the National Park Service (NPS). The Park is a world heritage site and an international icon. The Grand Canyon National Park is dominated by the Grand Canyon, a twisting, 1-mile deep, 277-mile-long gorge formed during some 6 million years of geological activity and erosion by the Colorado River on the upraised earth's crust. The river divides the Park into the North and South rims, which overlook the approximately 10-mile-wide canyon. The Park encompasses 1,217,403.32 acres and in 2010 received 4,388,389 visitors. The Park is closed to location and entry under the Mining Law.

The three withdrawal parcels are located within the Colorado Plateau, which is characterized by highlands to the north and lowlands to the south and west. The three withdrawal parcels contain many of the unique geographical features that characterize the Colorado Plateau, such as river narrows, natural bridges, and slot canyons. The three withdrawal parcels contain a variety of plant life, from desert-type vegetation in the low-lying rocky areas to forests of ponderosa pine (*Pinus ponderosa*), Douglas fir (*Pseudotsugamenziesii*) and aspen (*Populus*sp.) in the higher elevations.

The Grand Canyon and the greater ecosystem surrounding it is a cornerstone of the region's economy with hunting, fishing, tourism, and other outdoor recreation generating billions of dollars in economic activity in the area. Millions of people living in seven states in the U.S. and in Mexico depend upon the Colorado River for water for drinking, irrigation, and industrial use, as well as for hydropower. The National Forest System lands in the area are located in the Kaibab National Forest, including lands on the Tusayan Ranger District and on the North Kaibab Ranger District. These lands are set aside for public recreation and a habitat for birds and animals.

Mineral resources, particularly high-grade uranium, are found in this area. Uranium mineralization was first discovered in the breccia pipes of northern Arizona in 1947. The uranium occurred in association with copper mineralization at the Orphan mine 2 miles west of the visitor center on the South Rim of the Grand Canyon (not within the withdrawal area). The first uranium ore was shipped by the Golden Crown Mining Company in 1956 to a buying station in Tuba City, Arizona. Before closing in 1969, the Orphan operation produced a reported total of 2,200 tons of processed uranium ($U_3O_8$).

Since the discovery of uranium in the Orphan Mine, extensive fieldwork has been conducted by government and private concerns to define the spatial extent of the breccia pipes in northern Arizona. The recognition of a relationship between uranium and copper mineralization sparked an investigation of several small copper deposits in the area. Uranium was identified in the Hack Canyon copper mine on the Arizona Strip in the 1950s. From the 1950s through the 1990s, 10 breccia pipes were developed or mined for uranium ore within the withdrawal area. Until the 1980s, the only mine producing uranium within the withdrawal area was the original Hack Canyon Mine, which had ceased production in 1964. Additional pipes were discovered in Hack Canyon in the 1970s, and production from these breccia pipes began in 1981. As the price of uranium went up in the late 1970s and 1980s, along with the demand for uranium products, exploration for uranium increased dramatically. Exploration uncovered six other breccia pipes with minable uranium ore during the early and mid-1980s, and production from these mines began with the Pigeon mine in 1984. By the end of 1990, collapse of the Soviet Union and decommissioning of large numbers of nuclear warheads made huge stockpiles of material available for use in nuclear electrical production. The subsequent plunge in uranium prices resulted in the cessation of all uranium production from the withdrawal area. Six breccia pipes, accessed from three mines, were

considered mined out and were closed or reclaimed (the four Hack Complex pipes, Pigeon, and Hermit) and four mines were placed in interim management until prices recovered.

In 2010 U.S. Geological Survey (USGS) was directed by the Secretary to develop the scientific basis for analysis in the Northern Arizona Proposed Withdrawal EIS. As a consequence, it developed Scientific Investigation Report 2010-5025 to characterize breccia pipe uranium ore and mining in Northern Arizona. That study estimates the undiscovered uranium endowment within the three withdrawal parcels, which was estimated to be 162,964 tons of $U_3O_8$ (about 326 million pounds). The endowment, as defined by USGS, included ore concentrations as low as 0.01%, which is lower than would be economical to mine. The Reasonably Foreseeable Development (RFD) scenarios developed for the Northern Arizona Proposed Withdrawal EIS estimated the quantity of uranium that could be mined economically to be 39,664 tons of $U_3O_8$ (79,328,000 pounds).

With the passage of FLPMA in 1976, the BLM was directed to conduct inventories for areas meeting the characteristics of wilderness as defined in the Wilderness Act of 1964. Several areas were determined to have those characteristics within what is now the proposed withdrawal area and, as a consequence, were designated as Wilderness Study Areas. The Arizona Wilderness Act of 1984 was an historic piece of legislation negotiated by a coalition of interests including representatives of environmental groups, uranium mining interests, the livestock industry, and others. That Act, specifically Title III, designated wilderness areas within the Arizona Strip, including Kanab Creek Wilderness, Mount Logan Wilderness, Mount Trumbull Wilderness, Paria Canyon–Vermilion Cliffs Wilderness, and Saddle Mountain Wilderness. The Act "release[d] certain lands not designated as wilderness for such management as is determined appropriate through the land management planning process of the administering agency." Areas previously designated as Wilderness Study Areas, including any within the withdrawal area, that were not designated by Congress as Wilderness in the act, were "released" from that designation and protections for maintaining wilderness characteristics were removed. The Act designated Wilderness in furtherance of the purposes of the Wilderness Act of 1964. The legislation recognized the uranium resource in the region and the Congressional Record notes that the boundary of one Wilderness area was adjusted to accommodate development of a uranium mine.

There are four mines within the withdrawal area that have approved plans of operations that predate the Secretary's withdrawal proposal. The Pinenut, Kanab North, and Canyon mines were approved in the late 1980s and are operating under the interim management plans contained in their approved mining plans of operation, but are not currently producing uranium ore. The Kanab North mine has been largely mined out and only a very small amount of ore remains. It is now being prepared for reclamation. The Pinenut mine was partially mined and is moving towards active mining and could be in production in the near future. The Canyon Mine was just being developed when uranium prices plummeted in the late 1980s, and though it has only about 50 feet of shaft, is being prepared for further development. The Arizona 1 mine has been operating since late 2009 and is expected to be mined out within the next year.

As of December 11, 2011, the withdrawal area contains 3,156 mining claims that predate the publication of the Notice of Proposed Withdrawal on July 21, 2009. Withdrawals under section 204 of FLPMA must be made subject to valid existing rights, which means that new mineral exploration and development could still be authorized under the withdrawal on valid existing mining claims. The RFD scenarios developed for the EIS indicate that potentially 11 mines could develop with a full withdrawal, including the four mines currently approved, as opposed to 30 mines (including the four mines currently approved) with no withdrawal. On withdrawn lands, neither the BLM nor the USFS will process a new notice or plan of operations until the surface managing agency conducts a mineral examination and determines that the mining claims

on which the surface disturbance would occur were valid as of the date the lands were segregated or withdrawn.  Determining the validity of a mining claim is a complex and time-consuming legal, geological, and economic evaluation that is done on a claim-by-claim basis.  For a mining claim to be valid, the claimant must make an actual physical exposure of the mineral deposit within the claim boundaries.  For the mining claims containing breccia pipe deposits, unless erosion has exposed mineralization in a canyon, this would probably require exploratory drilling and sampling.  The mining claim or site would need to have been valid as of the date of segregation, July 21, 2009, and have been maintained until the time of the mineral examination.

There are 26 confirmed breccia pipes within the withdrawal area known to have some level of mineralization.  Of these, seven have been confirmed to have uranium resources, and those uranium resources have been estimated.  It was assumed for purposes of determining the impacts of withdrawing the lands from the Mining Law that any mining claim containing these seven breccia pipes would be able to demonstrate valid existing rights and would be mined.  Based on this reasonably foreseeable development, the analysis in the EIS assumes that there will still be mining activities in the withdrawal area under all alternatives, including the Preferred Alternative, which could result in impacts to the resources discussed below.  However, mining activities would be limited with implementation of this withdrawal, since mining claims that do not constitute valid existing rights would not be developed and no new mining claims could be located.

## V.   DECISION

**Department of the Interior:**  It is the decision of the Department of the Interior to select Alternative B as described in the EIS and withdraw from location and entry under the Mining Law, subject to valid existing rights, approximately 1,006,545 acres of federal land in Northern Arizona, as depicted on Map 1, for a 20-year period.  A complete legal description of the withdrawal is contained in the Public Land Order.  The withdrawal only affects the disposition of lands and locatable minerals under the Mining Law, subject to valid existing rights, and does not restrict the disposition, use, or management of the lands for any minerals subject to disposition by lease or sale.  It also does not affect disposition, use, or management of the lands other than under the Mining Law, including access to and across the lands.  In addition, the withdrawal does not apply to private mineral estate, although the withdrawal will remove from the operation of the Mining Law any lands or interests in lands within the outside boundaries of the withdrawal acquired in the future by the United States as long as the withdrawal is in effect.  On Federal lands, exploration and mining would be subject to Federal surface management regulations and other applicable State and Federal laws.  The USFS has consented to the withdrawal of land under its administration that is subject to this decision.

**Map 1**



# VI.   RATIONALE FOR THE DECISION

### Summary

Based on the analysis in the Northern Arizona Proposed Withdrawal EIS, the Department of the Interior has decided that, in accordance with the preferred alternative, a withdrawal of 1,006,545 acres from location and entry under the Mining Law, subject to valid existing rights, is warranted. Several key factors were considered in making this decision. In particular, the USGS report (SIR 2010-5025) included in the EIS acknowledged uncertainty due to limited data. The potential impacts estimated in the EIS due to the uncertainties of subsurface water movement, radionuclide migration, and biological toxicological pathways result in low probability of impacts, but potential high risk. The EIS indicates that the likelihood of a serious impact may be low, but should such an event occur, significant. A twenty-year withdrawal will allow for additional data to be gathered and more thorough investigation of groundwater flow paths, travel times, and radionuclide contributions from mining as recommended by USGS. Millions of people living in seven states depend on the Colorado River for drinking, irrigation, industrial use. Second, it is likely that the potential impacts to tribal resources could not be mitigated. Any mining within the sacred and traditional places of tribal peoples may degrade the values of those lands to the tribes that use them. Third, the RFD projected that potentially eleven mines, including the four mines currently approved, could proceed under a withdrawal of the 1,006,545 acres. This pace of development for the next twenty years is roughly equivalent to the pace of development that occurred during the peak of uranium interest in the 1980s when ten breccia pipes were developed and six were mined out. Thus, development of the uranium resource will continue even if all of the lands in the proposal are withdrawn. And finally, the set of circumstances and the unique resources located in this area support a cautious and careful approach. It is for these reasons that a decision is being made to withdraw 1,006,545 acres.

### 1.   USGS Analyses and Water Resources

The USGS developed the Scientific Investigative Report 2010-5025 prior to preparation of the Draft EIS, which incorporates that Report by reference. As part of its evaluation, the USGS analyzed soil and sediment samples at six sites that experienced various levels of uranium mining in the Kanab Creek area north of Grand Canyon National Park, including mined and reclaimed sites, 3 approved mined sites where operations have been temporarily suspended, and exploratory drill sites that were drilled but not mined. Uranium and arsenic were two elements consistently detected in the areas disturbed by mining in quantities above natural background levels. Samples from 15 springs and five wells in the region contained dissolved uranium concentrations greater than the U.S. Environmental Protection Agency maximum allowed contaminant for drinking water. The springs and wells sampled are close by or in direct contact with mineralized ore bodies, and the concentrations detected are related to natural processes, mining, or both. The USGS also looked at surface water in the region. The report found that floods, flash floods, and debris flows caused by winter storms and intense summer thunderstorms occur in the region and can transport substantial volumes of trace elements and radionuclides. The USGS report notes that fractures, faults, sinkholes, and breccia pipes occur throughout the area and are potential pathways for downward migration of surface water and groundwater.

The USGS report acknowledges uncertainty as data is sparse in this region and often limited[1]. The timing and location of water quality information in the area is important because the potential effects of breccia pipe uranium mining may be localized and appear rapidly or may be more dispersed during longer time scales. The data evaluated for 1,014 water samples from 428 sites indicate that about 70 sites have exceeded the primary or secondary maximum contaminant levels for certain major ions and trace elements, such as arsenic, iron, lead, manganese, radium, sulfate, and uranium. The USGS concluded that a more thorough investigation is required to better understand groundwater flow paths, travel times, and contributions from mining.

The most prominent example of the uncertainty of impacts is with respect to how mining might affect perched aquifers. The EIS acknowledged that "… change in the quantity or chemical quality of the discharge from perched aquifer springs cannot be projected with the data available." For that reason, the EIS assumed that "… any mine located within the groundwater drainage area calculated for a spring might cause an impact ranging from none to major to that spring." A similar effect was projected for wells which are dependent on perched aquifers. Although the probability of any impact to springs ranged from 0% (in the South and East Parcels with full withdrawal) to 13.3%, (in the North Parcel with no withdrawal) the risk of those impacts to animal or human users of the water is unacceptable.

Uncertainty also affects the potential impacts to deep aquifer springs. Because the potential for migration of mine released radionuclides is unknown, the EIS assumes a relatively high concentration of potential discharge from mines to the R-aquifer. The R-aquifer is the principal aquifer in the area and includes the carbonate rocks of the Redwall Limestone, Muav Limestone, and Temple Butte Formation. Although, using this assumption, no R-aquifer spring would exceed Environmental Protection Agency minimum concentrations for drinking water, increases in radionuclides could occur.

The uncertainties of effects to water quantity and quality, also leads to uncertainties of effects to animals and humans. The effects of exposure of native plants and animals to increased levels of radionuclides are unknown. Some research has been performed, but Hinck noted in the 2010 USGS study that "… chemical and radiation effects thresholds for radionuclides are consistently limited to only a few species for most biological receptors, and limited data are available for wildlife species (Hinck et al. 2010). During the USGS study (Hinck et al. 2010), minimal chemical toxicity data were available for microbes, aquatic vascular plants, terrestrial invertebrates, and amphibians, and no data were found for reptiles, birds, or mammalian wildlife. Toxicity data are most abundant, but still limited, for aquatic invertebrates, fish, and laboratory test mammals." The potential effects of increased radionuclides in wildlife, livestock, or humans would be unacceptable.

---

[1] Although the USGS report, the EIS, and this ROD acknowledge uncertainty with respect to water quality and quantity as explained below, information that would help resolve that uncertainty is not "essential to making a reasoned choice among alternatives" (see 40 C.F.R. § 1502.22) since, as explained in the preceding paragraph, there is data regarding dissolved uranium concentrations near six previously-mined sites to inform a reasoned choice, and the EIS used reasonable conservative assumptions to estimate impacts as a method of addressing such unknowns. Although obtaining additional data to address the uncertainty regarding impacts on water quantity and quality is not essential to a reasoned choice, such data, particularly data collected on a site-specific basis as mines are developed, will nevertheless be helpful for future decisionmaking in the area.

10

## 2. Cultural and Tribal Resources

Although there is only one eligible traditional cultural property (Red Butte on the South Parcel) the entire area is recognized as the traditional homeland and use area for seven tribes. Many of these tribes include the Grand Canyon in their creation stories, and all continue to use all or portions of the withdrawal area for traditional tribal purposes. All seven tribes, the Havasupai Tribe, Hualapai Tribe, Hopi Tribe, Navajo Nation, Kaibab Band of Paiutes, the Paiute Indian Tribe of Utah, and the Zuni Tribe, uniformly believe that continued uranium mining will result in the loss of their functional use of the area's natural resources.

## 3. Other Resources

Many of the roads within the withdrawal area are unpaved. The volume of truck traffic expected without a withdrawal could create a major cumulative effect to visual resources resulting from dust emissions of vehicle passage. The withdrawal would likely reduce truck traffic by 98% for exploration, 63% at mines, and 67% related to ore transport.

As a result of projected surface and groundwater effects, wildlife may be impacted. These impacts may result in mortality of aquatic-dependent species such as aquatic plants, algae, benthic invertebrates, amphibians, fish, and other wildlife dependent on these rare surface water resources. Mining activity can result in changes to these habitats that may increase exposure of the biological resources to chemical elements, including uranium, radium, and other radioactive decay products. As discussed by the USGS (Hinck et al. 2010), uranium and other radionuclides can be transported through the environment and contribute to exposure of biological receptors via atmospheric deposition, dust, runoff, erosion and deposition, groundwater and surface water, and the food chain. As a result, biological receptors can be exposed to radionuclides through various pathways, including ingestion, inhalation, cell membrane–mediated uptake, cutaneous absorption, and biotic uptake/trophic transfer. The use of subterranean habitats (e.g., burrows), by birds, reptiles and mammals in uranium-rich areas or reclaimed mining areas, is of particular concern. These species spend a considerable amount of time in subterranean habitats, where individuals could potentially inhale, ingest, or be directly exposed to uranium and other radionuclides. The further identification of biological pathways of exposure and the compilation of the chemical and radiological hazards for these radionuclides are important for understanding potential effects of uranium mining on the northern Arizona ecosystem.

## 4. Continued Mining

Withdrawal of the entire withdrawal area will not result in cessation of uranium mining. Four mines are currently approved within the withdrawal. In addition, the RFD scenario in the EIS indicates that seven other breccia pipes could be developed if they are located within the boundaries of mining claims which are determined to have valid existing rights. Assuming these pipes were to be developed over the next 20 years, the total number of mines developed would be similar to the pace of development in the 1980s when the price of uranium was high and the region experienced a surge in mining interest. Consequently, even with a full withdrawal, the economic benefits of continued uranium mining could still be realized by local communities. While the lands are withdrawn, studies can be initiated to help shed light on many of the uncertainties identified by USGS in SIR 2010-5025 and by BLM in the EIS.

The withdrawal area is located in the Grand Canyon watershed and its environs and adjacent to the Grand Canyon National Park. As this area contains unique landscapes, is a sacred place for

11

numerous tribes, and receives visitors from all over the world, it is appropriate to tread carefully. Millions of people living in seven states depend on the Colorado River for drinking water, irrigation use, and industrial use. Unlike the Mineral Leasing Act, which provides the Secretary with discretionary authority to lease oil, gas, and other minerals, the Mining Law operates under principles of self-initiation by the miners themselves. Thus, on lands that are "open" to the Mining Law, individuals can locate new mining claims and sites without seeking prior approval from the Secretary. These mining claims and sites may become vested property interests if the claimant complies with the requirements in the Mining Law for validity. A withdrawal prevents new mining claims and sites from being located and property rights from being established. Withdrawals under FLPMA are made subject to valid existing rights, which means that mining activities in withdrawan areas may still be authorized, provided the mining claim or site is valid.

### 5.  Conclusion

In sum, the RFD projects a greater increase in uranium mining activity over the next twenty years if these lands remain open to location and entry under the Mining Law. Even if all of the lands are withdrawn, such as under the preferred alternative, potentially 11 mines, including the 4 mines currently approved, are projected to be developed over the next 20 years—with as many as six operating at any given time. The EIS states that impacts are possible from uranium mining in the area, including, in particular, impacts to water resources. It also expresses uncertainty with respect to hydrology and groundwater flow in the area as well as the potential effects of increased radionuclides to plants and animals.

Given these factors, a withdrawal is the most appropriate option to influence the pace of reasonably foreseeable hardrock mining, particularly uranium, in this area to not only ensure protection of water resources, but also to ensure sustainable, long term uranium development. As development moves forward on previously-approved mines and mining claims with valid existing rights, the impacts associated with uranium mining on the Grand Canyon watershed will continue to be monitored and studied. Based on any such monitoring and study, it may well be that these lands or a portion thereof will be appropriate for re-opening to the Mining Law at some point in the future. This decision slows the pace of hardrock mineral development in a sensitive area and preserves the remaining uranium deposits in that area for possible future development.

## VII.  USDA CONSIDERATIONS

### Consent by the Department of Agriculture

The Department of Agriculture consents to the withdrawal of approximately 134,454 acres of Kaibab National Forest lands in northern Arizona from location and entry under the Mining Law, subject to valid existing rights. A withdrawal is appropriate to help protect the natural, cultural, and social resources in the Grand Canyon watershed from the adverse effects of the locatable mineral exploration and development.

### Kaibab National Forest Land Management Plan

Withdrawal decisions are outside the authority of National Forest Planning, so no plan amendment is required. Any development on existing mining claims that can prove valid existing rights will follow the same standards and guidelines identified in applicable Forest Plans.

## VIII.  CONSISTENCY WITH ARIZONA FIELD OFFICE RESOUCE MANAGEMENT PLAN (RMP)

The withdrawal decision is consistent with the Arizona Strip Field Office RMP decision DFC-MI-05 which states "Allow the ASFO to remain open to mineral leasing, location and sale except where restricted by wilderness designation, withdrawals or specific areas identified in this RMP."

Decision LA-MI-03 is changed through plan maintenance under 43 CFR 1610.5-4 to update acreages open or withdrawn to mineral entry.

## IX.  PRACTICABLE MEANS TO AVOID OR MINIMIZE ENVIRONMENTAL HARM

The withdrawal does not result in environmental harm, and is, itself, a practicable means to minimize or avoid such harm.  For this reason, no additional means have been adopted for this action.

## X.  OVERVIEW OF THE ALTERNATIVES

The following alternatives were analyzed in the Northern Arizona Proposed Withdrawal Final EIS:

*Alternative A:  No Action*
The proposed withdrawal would not be implemented and the proposed withdrawal area would remain open to location and entry under the Mining Law.  New mining claims could be located, and exploration and mine development proposals would continue to be processed by the BLM or the USFS.  This alternative serves as the baseline for measuring the impacts of the other action alternatives and reflects the management situation for all federal land within the withdrawal area at the time that the withdrawal proposal was published in the Federal Register.

*Alternative B:  Proposed Action (Preferred Alternative)*
The proposed withdrawal would be implemented and the entire 1,006,545 acres of federal locatable mineral estate within the three parcels would be withdrawn for 20 years from the operation of the Mining Law, subject to valid existing rights.  On mining claims where valid existing rights are determined to exist, authorizations for new exploration and mining activities would continue to be processed by the BLM or the USFS.

*Alternative C:  Partial Withdrawal*
Under this alternative, 648,802 acres of federal lands within the three parcels would be withdrawn for 20 years from the operation of the Mining Law, subject to valid existing rights.  This alternative would withdraw a large proportion of those areas, identified by analysis, having concentrations of cultural, hydrologic, recreational, visual, and biological resources that could be adversely affected by locatable mineral exploration and development.  Alternative C would leave the remaining portion of the proposed withdrawal area with isolated or lower concentrations of these resources open to the operation of the Mining Law.  The mitigation of potential effects from exploration or development would continue under the applicable surface managing agency regulations.

*Alternative D:  Partial Withdrawal*

Under this alternative, 292,086 acres of federal lands within the three parcels would be withdrawn for 20 years from the operation of the Mining Law, subject to valid existing rights. This alternative would withdraw areas, identified by analysis, where there is a relatively high concentration of cultural, hydrologic, recreational, visual, and biological resources that could be adversely affected by locatable mineral exploration and development. Alternative D would leave the remaining portion of the proposed withdrawal area with isolated or relatively low concentrations of these resources open to the operation of the Mining Law. The mitigation of potential effects from exploration or development would continue under the applicable surface managing agency regulations.

**Environmentally Preferable Alternative**

An Environmentally Preferable Alternative is judged using the criteria in the NEPA and subsequent guidance by the Council on Environmental Quality (CEQ), 1981. The CEQ has defined the environmentally preferable alternative as the alternative that will promote the National policy as expressed in Section 101 of NEPA. This section lists six broad policy goals for all federal plans, programs, and policies as follows:

- Fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
- Assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings;
- Attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;
- Preserve important historic, cultural, and natural aspects of our National heritage, and maintain, whenever possible, an environment which supports diversity and variety of individual choice;
- Achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and
- Enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

Based on these criteria, identification of the most environmentally preferable alternative involves a balancing of current and potential resource uses with that of resource protection, and the Preferred Alternative best fulfills that role. Therefore, the Preferred Alternative best meets the definition of the environmentally preferable alternative as it minimizes impacts through providing the greatest reduction in the potential impacts of hardrock mining to the environment.

**Alternatives Considered But Eliminated From Detailed Analysis**

***Change in Duration of Withdrawal***
An alternative was initially considered to change the time frame of the proposed withdrawal from 20 years to 10 years, or even to 5 years. However, it was determined a shorter term withdrawal does not warrant evaluation as a separate alternative because withdrawals can be renewed by the Secretary of the Interior, provided that the underlying reason for the withdrawal is still valid. Therefore, an alternative that consisted solely of changing the duration of the proposed withdrawal was eliminated from further detailed analysis.

***Withdraw Only Lands with Low Mineral Potential***
It was suggested early in scoping that a partial withdrawal of only the lands with low mineral resource potential be considered for withdrawal. Such an alternative was suggested as a possible

means to leave the high-potential lands available for mineral development, with a withdrawal to remove other lands with high nonmineral natural resource values from location and entry under the Mining Law. This alternative was eliminated from detailed analysis for several reasons. All the lands in the proposed withdrawal area are rated as having a high potential for uranium resources, lying within what USGS terms Favorable Area A (USGS 2010b). While certain specific areas within the proposed withdrawal area have attracted greater industry interest than others (the North and South parcels in particular), all of the lands involved in the proposed withdrawal are considered to be lands with some of the highest uranium potential in the country. Another factor affecting the feasibility of this alternative is that much of the uranium exploration and development activity to date tends to coincide with many of the areas that have the highest concentration of nonmineral resource values. This is evident when comparing the active and existing mines shown on the figures in this chapter with the areas depicted as having high concentrations of nonmineral resources. This coincidence suggests that mineral potential, or mineral development interest, would not be a useful discriminating factor in designing a partial withdrawal alternative that would meet the purpose of and need for action.

### No Withdrawal—Phased Mine Development

This alternative was considered as a way to limit the level of exploration and development activity in place of a withdrawal. Under this alternative, potential impacts to resources in the Grand Canyon watershed would be protected by limiting mineral development to certain areas at certain times, with a limited amount of mineral exploration and development activity occurring at any one time. This "phased development" alternative was eliminated from detailed analysis because it does not address the relevant aspect of the mining issue—the location of the activity—and the effects from specific individual mines on area resources. The RFD scenarios described in Appendix B do not indicate the likelihood of multiple mines overlapping in time or location and creating such extensive cumulative impacts that phased development would be a particularly useful mitigation approach. The alternatives that prohibit mining in areas with sensitive resources under one of the withdrawal alternatives address more directly the issue of impacts from the development of multiple mines. Therefore, the phased mine development alternative, as a separate alternative, was eliminated from further analysis.

### Permanent Withdrawal

During scoping, it was suggested that a permanent withdrawal be implemented instead of the proposed withdrawal for 20 years. The rationale for this is that if Grand Canyon resources require protection from the potential adverse effects of mining that protection should be for longer than 20 years.

This alternative was considered but eliminated from detailed analysis. Because a permanent withdrawal would require congressional action, the Secretary does not have the ability to implement a withdrawal for more than 20 years for areas aggregating more than 5,000 acres (FLPMA Section 204(c)).

### Change the Mining Law

Many comments received in response to the Notice of Proposed Withdrawal and during scoping suggested that reforming or changing the Mining Law would address potential environmental impacts to the Grand Canyon watershed from development of locatable minerals. While the Mining Law is fundamentally a law for acquiring property rights, rather than an environmental law, presumably the comments were directed at increasing agency discretion to prevent mining. Making or amending law is an explicit function of the Congress, and proposals to change the Mining Law are currently under consideration before Congress. As such, it has been eliminated from detailed analysis.

*New Mining Regulations*

During scoping, it was suggested by members of the public and the Resource Advisory Council that instead of the withdrawal, the BLM and USFS should consider new locatable mineral exploration and development requirements, along with certain program initiatives, to protect the resources in the Grand Canyon watershed from the potential adverse effects of uranium exploration and development. During alternative formulation, the interagency team identified a number of potential new requirements for uranium exploration and development within the area proposed for withdrawal. Such requirements included processing and review requirements specific to notices and plans of operation, as well as regional monitoring programs, remediation efforts, targeted research initiatives, and coordinated interagency oversight, including the following:

- The BLM and USFS would require a plan of operations for all activity exceeding casual use in the area. Surface disturbance exceeding casual use, including exploratory drilling, could not be conducted under a notice but would require a plan of operations and be subject to NEPA analysis and the opportunity for public comment.
- The BLM and USFS would not approve a plan of operations in which the environmental analysis determines that substantial irreparable harm would occur to significant natural or cultural resources in the Grand Canyon watershed that could not be effectively mitigated. This requirement would be used where the plan of operations was considered unreasonable because it posed a substantial risk of causing impacts that would result in the permanent loss of significant values and irreplaceable resources that could not be mitigated using available technology.
- Before approving a plan of operations, the BLM or USFS would consult with the NPS on the operating and reclamation standards needed to prevent the impairment of Grand Canyon National Park System resources. Such measures would be incorporated into the BLM or USFS decision as conditions of approval when determined necessary to protect National Park System resources.
- The BLM and USFS would assess civil penalties, when necessary, in order to enforce their respective operating requirements.
- A compensatory off-site mitigation program would be established that could be used for regional mitigation at legacy uranium mine sites that require cleanup, or for responding to unanticipated events or conditions at mine operations that are found to be adversely affecting natural, cultural, or social resources in the Grand Canyon watershed.
- A cost recovery program would be used to fund federal agency monitoring and compliance activities determined necessary to oversee individual mining operations.
- The BLM and USFS would undertake an initiative, in conjunction with other federal and state agencies, to establish regional programs to monitor wildlife indicator species for effects resulting from uranium mining.
- The BLM and USFS would undertake an initiative, in conjunction with other federal and state agencies, to establish regional programs to identify, characterize, and monitor area groundwater and spring conditions for effects associated with uranium mining.
- The BLM and USFS would undertake an initiative, in conjunction with other federal agencies and tribal governments, to establish regional programs to identify and monitor other natural and cultural resources for effects associated with uranium mining.
- The BLM and USFS would establish a standing regional interagency workgroup to advise the federal land managing agencies on monitoring, research needs, and operating and reclamation performance standards.

Most of the requirements described above would require changing the BLM and USFS surface management regulations at 43 CFR 3809 and 36 CFR 228A, respectively, in order to be implemented.  The rulemaking process is a public process that can be lengthy, and the final outcome is not certain until a final rule is published.  Because any new regulations would depend on the outcome of some future regulatory process yet to be initiated, and its ability to be implemented is speculative, a separate alternative considering such measures and their effectiveness was eliminated from detailed analysis.

# XI.  PUBLIC INVOLVEMENT

Scoping

The scoping process used for the withdrawal EIS was initiated by publication of a Notice of Intent in the *Federal Register* on August 26, 2009.  The formal period for submitting scoping comments was from August 26, 2009, through October 30, 2009, although scoping does not end until the EIS is completed.

BLM hosted two public meetings, one in Fredonia, Arizona, and one in Flagstaff, Arizona, in September and October 2009, respectively.

Draft Environmental Impact Statement

The Draft EIS was released to the public for a 45-day review and comment period on February 18, 2011. The review period was initiated by a Notice of Availability (NOA) published in the *Federal Register* by the Environmental Protection Agency, and announced by NOA published in the *Federal Register* by BLM on that date.  The comment period was later extended 45 days, to total 75 days, concluding on May 4, 2011.

During the public comment period, four public meetings were held during the week of March 7 to 11, 2011.  Meetings were held in Phoenix, Arizona; Flagstaff, Arizona; Fredonia, Arizona; and Salt Lake City, Utah.  In addition, community meetings were held for tribes in Moccasin, Arizona, (Kaibab band of Paiute); Peach Springs, Arizona (Hualapai Tribe); and Cameron, Arizona (Western Navajo Nation).

Over the course of the public comment period, 296,339 comment submittals were received, approximately 1,400 of which included individual substantive comments.

Final Environmental Impact Statement

The Final EIS was released to the public on October 28, 2011.  A Notice of Availability (NOA) was published in the *Federal Register* by BLM on October 27 and by the Environmental Protection Agency on October 28, 2011.  The Final EIS includes responses to comments consistent with 40 CFR 1503.4 and guidance in BLM Handbook 1790-1, section 6.9.2.1.  Changes to the Draft EIS for the Final included:

- Identification of the Proposed Action as the Preferred Alternative;
- An adjustment to the boundary of the North Parcel to exclude the Kanab Creek Wilderness Area, which is already withdrawn by Congress;
- An adjustment to the boundary of the North Parcel that corrected a mapping error discovered in the Draft, aligning the boundary along the Grand Canyon Game Preserve boundary.

- An adjustment to the South Parcel Boundary excluding 40 acres within the Navajo Nation that was erroneously included;
- Boundary adjustments noted above resulted in adjustments to Alternative acreages.
- Detailed legal descriptions of the withdrawal alternatives by Parcel included in an appendix;
- Numerous edits to improve the clarity and consistency of the analysis; and
- A refined economic analysis.

# XII.   ADDITIONAL INFORMATION

Although public comment was not sought, after release of the Final EIS and prior to publication of this Record of Decision, BLM received several hundred form letters and postcards supporting the withdrawal in the Preferred Alternative.  In addition, two letters that contained substantive comments were received from industry representatives.  The letters received during the review period were considered in making the decision on the withdrawal, and following are responses to substantive comments submitted.

One of the comments received stated that multiple commenters during the public comment period provided "…new information regarding the mineable uranium endowment of the withdrawal area that is about five to six times greater than what the BLM reported in the DEIS, new information regarding blind breccia pipes and their additional contribution to the uranium endowment of the withdrawal area above that previously expected by federal agencies…"   BLM determined that this comment did not warrant any additional analysis or changes to the Final EIS, which had already considered this point and noted that:

> While the commenter provided a statistical correlation of known mineralized breccia pipes to underlying geologic structures, no geologic explanation or new information was provided to justify the hypothesis that mineralized breccia pipes occur preferentially on the proposed withdrawal lands.
>
> The USGS Report is a peer-reviewed publication that provided the estimated uranium endowment for the proposed withdrawal area.  While some commenters have presented alternate or supplemental approaches to assessing the uranium endowment from that provided by USGS, these alternate approaches have not been developed or peer reviewed to the extent that they can replace or supersede the USGS endowment assessment presented in SIR 2010-5025.  As with many scientific fields, new information is constantly being collected which leads to new or refined conclusions.  However, at present, the USGS Report contains the best credible information available regarding the uranium endowment estimate and was therefore used as the basis for the reasonably foreseeable development scenarios in the EIS." (Northern Arizona Proposed Withdrawal final EIS Table 5.6-4, page 5-169.)

Because the USGS report relied on published and peer reviewed data and was peer reviewed itself, BLM considered it the most credible information available regarding the uranium endowment.

One commenter also stated that the EIS should have contained an analysis of the reduction in greenhouse gas (GHG) emissions resulting from use of the mined uranium for electrical production in place of other fuels.  BLM determined that this comment did not warrant any additional analysis or changes to the Final EIS, which noted that

The EIS does not include an analysis of GHG "offsets" (i.e., uranium as a replacement for other energy sources) for several reasons. First, there is no guarantee that uranium mined from the proposed withdrawal area would be allocated exclusively to energy production. Some percentage may go to defense uses, medical applications, or other uses. In addition, with notable exceptions such as Iran and North Korea, processed uranium may be legally sold on the open market and shipped anywhere in the world. Finally, there is no assurance uranium would be used to replace—rather than simply augment— other energy sources such as coal, natural gas, hydroelectric, solar, or wind power. The analysis the commenter requests is beyond the scope of the EIS because the proposed action is a withdrawal of certain lands from location of hardrock mining claims that might result in the production of uranium, not the approval of any particular plan of operations or even consideration of the sitting and/or development of a nuclear reactor that might use uranium to produce electricity.

In sum, any attempted analysis of possible "offsets" from GHG emissions would be speculative.

A commenter also stated that the Arizona Wilderness Act of 1984 was not mentioned in the Draft EIS. BLM determined that this comment did not warrant any additional analysis or changes to the Final EIS which does recognize the act, and notes its effect in the area. The Arizona Wilderness Act of 1984 represented an historic piece of legislation negotiated by a coalition of people representing diverse views and interests. Neither the Act nor its legislative history contain any indication of an intent to remove from the Secretary the authority to withdraw land provided under FLPMA. The purpose of the Arizona Wilderness Act was to designate certain lands for inclusion in the National Wilderness System. This withdrawal, in contrast, is focused strictly on whether to withdraw lands from location and entry under the Mining Law, subject to valid existing rights. The withdrawal does not designate any lands within its boundaries as wilderness and has no impact on activities in the withdrawal area other than location and entry under the Mining Law, including activities that could impair wilderness characteristics. Nothing in the Arizona Wilderness Act demonstrates intent to resolve the wilderness question in Arizona for all time so as to prohibit future wilderness designations. Finally, most of the lands covered by this withdrawal were never considered or reviewed by Congress for possible Wilderness designation as part of the Arizona Wilderness Act because BLM inventory in the 1970s determined they do not possess characteristics of wilderness.

Another commenter asserted that the Purpose and Need changed frequently through the NEPA Process. BLM determined that this comment did not warrant any additional analysis or changes to the Final EIS because the Purpose and Need in the Draft EIS was derived directly from the stated purpose in the Secretary of Interior's *Federal Register* Notice of July 21, 2009, and refined to describe the agency's Purpose and Need in accordance with BLM NEPA Handbook H-1790-1. Once published in the Draft EIS, the Purpose and Need remained consistent throughout the EIS process.

Two commenters stated that the mining analysis from the RMP for the Arizona Strip BLM lands (completed in 2008) was not mentioned in the Northern Arizona Proposed Withdrawal EIS. BLM determined that these comments did not warrant any additional analysis or changes to the Final EIS. Although the RMP was completed relatively recently, uranium mining was not a major issue at the time it was being written. The RMP did not contain an analysis to the depth needed to satisfy the Purpose and Need of the Northern Arizona Proposed Withdrawal, which in part responded to the significant increase in the location of mining claims in the area at the time the planning process was completed. Finally, closing of lands to location and entry under the Mining Law is, by law, not a

decision that can be made through BLM's planning process (see section 202(e)(2) of FLPMA, 43 U.S.C. § 1712(e)(3)). The withdrawal process, which culminates in this ROD, is the appropriate decision-making process to evaluate the potential impacts of a closure to location and entry under the Mining Law.

Finally, two commenters stated that new information provided by themselves and others during the review period pertaining to the uranium resource and the changes to the EIS from Draft to Final constitute sufficient "new information" to warrant a Supplemental EIS. BLM determined that this comment did not warrant any additional analysis or changes to the Final EIS. As noted in Section 1.5.4 of the Final EIS, "most changes made to the EIS were editorial or clarified the EIS in response to public comments. However, in response to public comment and to correct errors discovered after release of the DEIS, the sections discussed below did undergo some changes beyond those of an editorial or clarifying nature." As explained further in the FEIS, BLM did not substantially alter the Proposed Action or any of the alternatives in a way that is relevant to environmental concerns. In addition, none of the information relied upon in support of these changes constitutes significant new information relevant to environmental concerns and bearing on the proposed action or its impacts. Therefore, supplementation of either the DEIS or FEIS is not required under CEQ regulations at 40 CFR 1502.9(c). None of the comments resulted in a substantial alteration to the Proposed Action and, to the extent any of them relied on new information, that information was not sufficient to show that the Proposed Action would affect the quality of the human environment to a significant extent not already considered.

Consultation with U.S. Fish and Wildlife Service

Consultation with the U.S Fish and Wildlife Service (FWS) in compliance with section 7 of the Endangered Species Act was conducted. A memorandum was sent on August 8, 2011, from the Arizona Strip District Manager requesting concurrence with a finding that "the Proposed Action May Affect, but is Not Likely to Adversely Affect" the 12 listed species within the Proposed Withdrawal area. BLM received a memo from the FWS concurring with that finding dated August 29, 2011. This completed the Section 7 consultation process.

Consultation with Arizona State Historic Preservation Officer

Consultation with the Arizona State Historic Preservation Officer (SHPO) in compliance with section 106 of the National Historic Preservation Act was conducted in coordination with the EIS process. A letter was sent to the Arizona SHPO on June 16, 2011, requesting concurrence with the determination by the BLM that the Proposed Withdrawal "…does not have the potential to cause adverse effects on historic properties." The Arizona SHPO responded with his concurrence on June 20, 2011. This completed the Section 106 process.

Tribal Participation

In August 2009, the BLM and USFS initiated government-to-government consultation via letter with the following American Indian governments regarding the proposed withdrawal: Chemehuevi Tribe, Colorado River Indian Tribes, Havasupai Tribe, Hopi Tribe, Hualapai Tribe, Kaibab Band of Paiute Indians, Las Vegas Paiute Tribe, Moapa Band of Paiute Indians, Pahrump Band of Paiutes, Paiute Indian Tribe of Utah, Pueblo of Zuni, San Juan Southern Paiute Tribe, Navajo Nation, White Mountain Apache Tribe, Yavapai-Apache Nation, and Yavapai-Prescott Indian Tribe. Seven tribes elected to actively participate in consultation on the project: the Havasupai Tribe, Hopi Tribe, Hualapai Tribe, Kaibab Band of Paiute Indians, Paiute Indian Tribe of Utah, Pueblo of Zuni, and Navajo Nation. Throughout the EIS process, nearly 40 meetings were held with these tribes.

<u>Cooperating Agencies</u>

The CEQ regulations at 40 CFR 1508.5 define a cooperating agency as any federal agency (other than the lead agency) and any state or local agency or Indian tribe with jurisdictional authority or special expertise with respect to any environmental impact involved in a proposal.  Because of the size of the proposed withdrawal area and the resources potentially affected by the proposed withdrawal or alternatives, 15 agencies (federal, state, tribal, and county) with jurisdictional authority and/or applicable special expertise cooperated in the development of this EIS.

The cooperating agencies assisted with EIS preparation in a number of ways, including conducting or providing studies and inventories, reviewing baseline condition reports, identifying issues, assisting with the formulation of alternatives, and reviewing Preliminary Draft EIS text and other EIS materials.  Not all of the cooperating agencies participated in all aspects of the EIS preparation.  As lead agency, the BLM is responsible for the content of the EIS.

<u>Coordination with Local Governments/Consistency with Local Government Plans</u>

The BLM coordinated with local governments by attending meetings conducted by local government organizations and by maintaining open channels of communications between the Arizona Strip District Manager and elected county officials.  Four Southern Utah Counties and two Northern Arizona counties participated as Cooperating Agencies.  In addition, Washington, Kane, San Juan and Garfield Counties in Utah and Mohave County in Arizona formed the AZ/UT Coalition of Coordinating Counties.  This coalition held four meetings, three of which were attended by managers from the BLM, and/or USFS.  These meetings were held with industry representatives and others in attendance to discuss the withdrawal and to coordinate comments on the EIS and directly to the Secretary of the Interior.  The meeting/hearing dates attended by BLM or National Forest management were: March 21, 2011, meeting in St. George, Utah; April 18, 2011, meeting in Fredonia, Arizona; and September 7, 2011, hearing in St. George, Utah.  At the meeting held on April 18, 2011, the Coalition passed a resolution supporting Alternative A (No Action) as the Preferred Alternative.

The withdrawal affects federal lands in Coconino and Mohave counties in Arizona.  Review of plans in those counties indicates that the withdrawal is not inconsistent with either plan.  However, Mohave County passed a resolution on May 12, 2008, (County Resolution 2008-10) that supports multiple-use of public lands in general, and lists uranium mining as one of those uses. It also passed a resolution in February, 2009, (County Resolution 2009-040) that supports continued uranium mining on the Arizona Strip. Coconino County passed a resolution in 2008, (County Resolution 2008-09) opposing uranium mining in the county.  The withdrawal will be consistent with the Coconino County Resolution 2008-09, but inconsistent with Mohave County Resolutions 2008-10 and 2009-040.

### *FEDERAL COOPERATING AGENCIES*

- U.S. Forest Service
- National Park Service
- U.S. Fish and Wildlife Service
- U.S. Geological Survey

*STATE OF ARIZONA COOPERATING AGENCIES*

- Arizona Game and Fish Department
- Arizona Geological Survey
- Arizona Department of Mines and Mineral Resources
- Arizona State Land Department

*TRIBAL GOVERNMENTS AS COOPERATING AGENCIES*

- Hualapai Tribe
- Kaibab Band of Paiute Indians

*COUNTY GOVERNMENTS AS COOPERATING AGENCIES*

- ***Coconino County, Arizona***: The majority of the withdrawal area is located in Coconino County. Arizona Department of Commerce (ADOC) official population estimates for Coconino County are 136,735 for July 1, 2009 (ADOC 2009b). Coconino County's commercial economy is largely tourism-based accounting for a large percentage of the county's jobs and tax income.

- ***Mohave County, Arizona:*** A large portion of the withdrawal area north of the Grand Canyon is in Mohave County. The official ADOC population estimates for Mohave County are 206,763 for July 1, 2009 (ADOC 2009c). Leading industries in the county are retail trade, tourism, construction, and health care and social services.

- ***Kane County, Utah:*** Because of its proximity to the withdrawal area and its historic dependence on the Arizona Strip as a significant source of income and employment for its residents, Kane County participated as a cooperating agency in the EIS process. Kane County had an estimated population of 6,577 in 2008 (U.S. Census Bureau [Census Bureau] 2008a). Like Coconino County, Kane County's economy is primarily tourism based. Lake Powell, Zion National Park, and other recreation sites attract tens of thousands of visitors each year. As a result, the leisure/hospitality services sector is the leading employment sector. The mining industry is also a significant employer in Kane County. Mining wages and salaries per job have consistently been the largest in the study area and have experienced steady growth from 1980 through 2000. However, it should be noted that the number of mining jobs in Kane County has been low since at least 1980 (BLM 2008c).

- ***San Juan County, Utah***: San Juan County had an estimated population of 15,055 in 2008 (Census Bureau 2008a). One of the major employment sectors driving San Juan County's economy is mining. Denison Mines (USA) Corporation (Denison) and the recently closed Lisbon Valley Copper Mine are located in the county and have both historically, as well as recently, provided employment for county residents. The White Mesa Uranium Mill, located 6 miles south of Blanding, is used for processing uranium ore mined in the proposed withdrawal area. The proposed withdrawal or alternatives could change the amount of ore transported to the mill. Because of its economic connection with mining in the proposed withdrawal area, San Juan County participated as a cooperating agency in the EIS process.

- ***Washington County, Utah:*** Washington County had an estimated population of 137,589 in 2008 (Census Bureau 2008a). The Arizona Strip (where the North and East parcels are located) has historically been recognized as a primary source of income and employment for many of southern Utah's residents. For this reason, Washington County was a cooperating agency in the EIS process. Over the past decade, Washington County has experienced major population growth. From 1990 to 2008, the total population increased by 183.3% and is expected to continue growing. Manufacturing, wholesale and retail trade, construction, and tourism- and recreation-related services are the leading industries. Nearby Grand Canyon National Park, Zion National Park, Dixie National Forest, and Snow Canyon State Park are important recreational attractions.

- ***Garfield County, Utah***: Garfield County had an estimated population of 5,172 in 2010, up from 3,980 in 1990 (Census Bureau 1990; 2008a). It is located in south central Utah, north of Kane County and west of San Juan County and includes large swaths of open desert as well as nationally designated scenic places such as Bryce Canyon National Park, Grand Staircase-Escalante National Monument, Capital Reef National Park, and a portion of Canyonlands National Park. Garfield County joined the EIS process as a cooperating agency in August 2011. The Shootaring Canyon Uranium Processing Facility (mill) is located in Garfield County near the small town of Ticaboo. The mill has been in stand-by status since 1982.

## XIII. FINAL AGENCY ACTION

Pursuant to section 204 of the Federal Land Policy and Management Act of 1976, it is my decision to withdraw from location and entry under the Mining Law, subject to valid existing rights, approximately 1,006,545 acres of federal land in Northern Arizona, as depicted on Map 1, for a 20-year period. My approval constitutes the final decision of the Department of the Interior and, in accordance with the regulations at 43 CFR 4.410(a)(3), is not subject to appeal under Departmental regulations at 43 CFR Part 4. Any challenge must be brought in federal district court.

Ken Salazar          1/9/2012

Ken Salazar                              Date
Secretary
U.S. Department of the Interior

4310-32

## DEPARTMENT OF THE INTERIOR

**Bureau of Land Management**

**[LLAZ91000.L14300000.ET0000.LXSIURAM0000, AZA 35138]**

**Public Land Order No.7787   ; Withdrawal of Public and National Forest System Lands in the Grand Canyon Watershed; Arizona.**

**AGENCY:**   Bureau of Land Management, Interior.

**ACTION:**   Public Land Order.

**SUMMARY:** This order withdraws approximately 1,006,545 acres of public and National Forest System lands from location and entry under the Mining Law of 1872, 30 U.S.C. §§ 22-54, subject to valid existing rights, for a period of 20 years in order to protect the Grand Canyon Watershed from adverse effects of locatable mineral exploration and development.

**DATES:** *Effective Date*: January 21, 2012

**FOR FURTHER INFORMATION CONTACT:**  Chris Horyza, Bureau of Land Management, Arizona State Office, One North Central Avenue, Suite 800, Phoenix, Arizona 85004, 602-417-9446 or Liz M. Schuppert, U.S. Forest Service, Kaibab National Forest, 800 South 6th Street, Williams, Arizona 86046, 928-635-8367.  Persons who use a telecommunications device for the deaf (TDD) may call the Federal Information Relay Service (FIRS) at 1-800-877-8339 to reach the Bureau of Land Management or U.S. Forest Service contact during normal business hours.  The FIRS is available

1

24 hours a day, 7 days a week, to leave a message or question with either of the above individuals. You will receive a reply during normal business hours.

**SUPPLEMENTARY INFORMATION:** The public and National Forest System lands described in this order are within Coconino and Mohave Counties, Arizona. The lands will remain open to the mineral leasing laws, geothermal leasing laws, mineral material sales laws, and other public land laws. Non-Federal interests within the area described are not affected by this order. If the non-Federal interests within the boundaries of the area described in this order are subsequently acquired by the United States, the non-Federal interests will become subject to the withdrawal.

ORDER

By virtue of the authority vested in the Secretary of the Interior by section 204 of the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1714, it is ordered as follows:

1. Subject to valid existing rights, the following described public and National Forest System lands are hereby withdrawn from location and entry under the Mining Law of 1872 (30 U.S.C. §§ 22-54), but not from the mineral leasing, geothermal leasing, mineral materials or other public land laws, in order to protect the Grand Canyon Watershed from adverse effects of locatable mineral exploration and development:

Gila and Salt River Meridian

South Parcel

T. 28 N., R. 1 E.,

   sec. 1;

   sec. 2, lots 1 and 2, S½NE¼, and SE¼;

2

sec. 11, E½;

sec. 12.

T. 29 N., R. 1 E.,

secs. 1, 2, and, secs. 11 to 14, inclusive;

sec. 23, E½;

secs. 24 and 25;

sec. 26, E½;

sec. 35, NW¼NE¼NE¼, N½NW¼NE¼, SW¼NW¼NE¼, NW¼SE¼NW¼NE¼,

NW¼NW¼SW¼NE¼, SE¼SE¼SW¼NE¼, E½SE¼NE¼, E½NW¼SE¼NE¼,

SW¼SE¼NE¼, and SE¼;

sec. 36.

T. 30 N., R. 1 E.,

secs. 1 and 2:

secs. 11 to 14, inclusive;

secs. 23 to 26, inclusive;

secs. 35 and 36.

T. 31 N., R. 1 E.,

sec. 17, lots 2, 3, S½NE¼, W½, and SE¼;

secs. 18, 19, and 20;

sec. 21, lot 2, W½NE¼, SE¼NE¼, W½, and SE¼;

secs. 27 to 35, inclusive.

T. 28 N., R. 2 E.,

secs. 1 to 6, inclusive;

3

sec. 7, excluding MS 1419;

secs. 8 to 13, inclusive.

T. 29 N., Rs. 2, 3, and 4 E.

T. 30 N., R. 2 E.,

secs. 2 to 11, inclusive;

secs. 13 to 36, inclusive.

T. 27 N., R. 3 E.,

sec. 1.

T. 28 N., R. 3 E.,

secs. 1 to 18, inclusive;

secs. 23 to 25, inclusive;

sec. 36.

T. 30 N., R. 3 E.,

secs. 15 to 36, inclusive.

T. 27 N., R. 4 E.,

secs. 1 to 6, inclusive.

T. 28 N., Rs. 4 and 5 E.

T. 30 N., R. 4 E.,

sec. 13, 24, 25, and 26;

sec. 27, S½;

sec. 28, S½;

sec. 29, S½;

sec. 30, lots 3 to 7, inclusive, NE¼SW¼ and N½SE¼;

4

secs. 31 to 36, inclusive.

T. 27 N., R. 5 E.,

secs. 1 to 6, inclusive.

T. 29 N., R. 5 E., partly unsurveyed.

T. 30 N., R. 5 E.,

secs. 7 to 36, inclusive, unsurveyed.

T. 27 N., R. 6 E.,

secs. 1 to 6, inclusive.

T. 28 N., R. 6 E.,

secs. 2 to 11, inclusive;

sec. 12, S½;

secs. 13 to 36, inclusive.

T. 29 N., R. 6 E.,

secs. 3 to 9, inclusive;

secs. 15 and 16, unsurveyed;

secs. 17 to 21, inclusive;

sec. 22, unsurveyed;

secs. 27 to 34, inclusive.

T. 30 N., R. 6 E.,

secs. 7 to 9, inclusive;

secs. 15 to 22, inclusive, unsurveyed;

sec. 23, W½;

sec. 26, W½;

5

secs. 27 to 34, inclusive, unsurveyed.

T. 31 N., R. 1 W.,

sec. 2, lots 3 and 4, S½NW¼ and SW¼;

secs. 3, 4, 9, 10, and 11, secs. 13 to 16, inclusive;

secs. 21 to 28, inclusive;

secs. 33 to 36, inclusive.

North Parcel

T. 40 N., R. 1 E.,

secs. 4 to 9, inclusive;

secs. 16 to 21, inclusive;

secs. 28 to 33, inclusive.

T. 41 N., R. 1 E.

T. 38 N., R. 1 W.,

secs. 2 to 4, inclusive, excluding that part within the Grand Canyon National Game

Preserve and Kanab Creek Wilderness;

sec. 5;

secs. 6 to 11, inclusive, excluding that part within the Grand Canyon National Game

Preserve and Kanab Creek Wilderness.

T. 39 N., R. 1 W.,

secs. 2 to 11, inclusive;

secs. 14 to 23, inclusive;

secs. 26 to 35, inclusive.

Tps. 40 and 41 N., R. 1 W.

T. 38 N., R. 2 W.,

secs. 1 to 8, inclusive, unsurveyed, excluding that part within the Grand Canyon
National Game Preserve and Kanab Creek Wilderness;

secs. 10 to 12, inclusive, unsurveyed, excluding that part within the Grand Canyon
National Game Preserve and Kanab Creek Wilderness.

T. 39 N., Rs. 2 and 3 W.

T. 40 N., R. 2 W.,

secs. 1, 2, and 3;

secs. 10 to 15, inclusive;

secs. 22 to 27, inclusive;

secs. 31 to 36, inclusive.

T. 37 N., R. 3 W.,

secs. 4 and 5, unsurveyed, excluding that part within the Grand Canyon National
Game Preserve and Kanab Creek Wilderness;

secs. 6 and 7, unsurveyed;

secs. 8, 9, 16, and 17, unsurveyed, excluding that part within the Grand Canyon
National Game Preserve and Kanab Creek Wilderness;

secs. 18 and 19, unsurveyed;

secs. 20 and 21, unsurveyed, excluding that part within the Grand Canyon National
Game Preserve and Kanab Creek Wilderness;

secs. 29, 30, and 31, unsurveyed, excluding that part within the Grand Canyon
National Game Preserve and Kanab Creek Wilderness.

T. 38 N., R. 3 W.,

secs. 1 to 10, inclusive;

secs. 11 to 14, inclusive, excluding that part within the Grand Canyon National Game

Preserve and Kanab Creek Wilderness;

secs. 15 to 22, inclusive;

secs. 23, 26, and 27, excluding that part within the Grand Canyon National Game

Preserve and Kanab Creek Wilderness;

secs. 28 to 32, inclusive;

secs. 33 and 34, excluding that part within the Grand Canyon National Game Preserve

and Kanab Creek Wilderness.

T. 40 N., R. 3 W.,

secs. 31 to 36, inclusive.

T. 35 N., R. 4 W.,

sec. 5, unsurveyed, excluding that part within the Grand Canyon National Game

Preserve;

secs. 6 and 7, unsurveyed;

sec. 8, unsurveyed, excluding that part within the Grand Canyon National Game

Preserve;

sec. 17, unsurveyed, excluding that part within the Grand Canyon National Game

Preserve;

secs. 18 and 19, unsurveyed;

sec. 20, unsurveyed, excluding the part within the Grand Canyon National Game

Preserve.

T. 36 N., R. 4 W.,

sec. 1, unsurveyed, excluding that part within the Grand Canyon National Game Preserve and Kanab Creek Wilderness;

sec. 2, excluding that part within the Kanab Creek Wilderness;

secs. 3 to 10, inclusive, unsurveyed;

sec. 11, unsurveyed, excluding that part within the Kanab Creek Wilderness;

secs. 12 and 13, unsurveyed, excluding that part within Grand Canyon National Game Preserve and Kanab Creek Wilderness;

sec. 14, unsurveyed, excluding that part within the Kanab Creek Wilderness;

secs. 15 to 22, inclusive, unsurveyed;

sec. 23, unsurveyed, excluding that part within the Kanab Creek Wilderness;

sec. 29, unsurveyed, excluding that part within the Grand Canyon National Game Preserve;

sec. 30, unsurveyed;

sec. 31;

sec. 32, unsurveyed, excluding that part within the Grand Canyon National Game Preserve.

T. 37 N., R. 4 W.,

secs. 1, 2, and 3, unsurveyed;

sec. 4;

secs. 5 to 8, inclusive, unsurveyed;

sec. 9;

secs. 10 to 15, inclusive, unsurveyed;

secs. 16 to 18;

secs. 19 to 22, inclusive, unsurveyed;

secs. 23 and 24;

secs. 25, unsurveyed;

secs. 26, 27, and 28, unsurveyed, excluding that part within the Kanab Creek

Wilderness;

secs. 29, 30, and 31, unsurveyed;

secs. 32 to 35, inclusive, unsurveyed, excluding that part within the Kanab Creek

Wilderness;

sec. 36, unsurveyed, excluding that part within the Grand Canyon National Game

Preserve and Kanab Creek Wilderness.

Tps. 38 and 39 N., R. 4 W.,

T. 40 N., R. 4 W.,

secs. 31 to 36, inclusive.

T. 35 N., R. 5 W.,

secs. 1 to 24, inclusive.

T. 36 N., Rs. 5 and 6 W.

Tps. 37 to 39 N., Rs. 5 to 7 W.

T. 40 N., R. 5 W.,

secs. 31 to 36, inclusive.

T. 35 N., R. 6 W.,

secs. 1 to 24, inclusive.

T. 35 N. R. 7 W.,

secs. 1 and 2;

secs. 3 to 6, inclusive, excluding that part within the Grand Canyon-Parashant National Monument;

secs. 9 and 10, excluding that part within the Grand Canyon-Parashant National Monument;

secs. 11 to 15, inclusive;

secs. 16, 21, 22, and 23, excluding that part within the Grand Canyon-Parashant National Monument;

sec. 24;

secs. 27 and 28, excluding that part within the Grand Canyon-Parashant National Monument.

T. 36 N., R. 7 W.,

secs. 1 to 32, inclusive;

secs. 33 and 34, excluding that part within the Grand Canyon-Parashant National Monument;

secs. 35 and 36.

East Parcel

T. 37 N., R. 3 E.,

sec. 1, unsurveyed;

secs. 2 and 11 unsurveyed, excluding that part within the Grand Canyon National Game Preserve;

secs. 12 and 13, unsurveyed;

sec. 14, unsurveyed, excluding that part within the Grand Canyon National Game Preserve.

11

T. 38 N., R. 3 E.,

secs. 1 and 2, excluding that part within the Vermilion Cliffs National Monument;

sec. 3, unsurveyed;

secs. 4 and 9, unsurveyed, excluding that part within the Grand Canyon National Game Preserve;

secs. 10 and 11, unsurveyed;

sec. 12;

secs. 13 to 15, inclusive, unsurveyed;

secs. 16 and 21, unsurveyed, excluding that part within the Grand Canyon National Game Preserve;

secs. 22 to 27, inclusive, unsurveyed;

secs. 28 and 35, unsurveyed, excluding that part within the Grand Canyon National Game Preserve;

sec. 36, unsurveyed.

T. 39 N., R. 3 E.,

sec. 4, excluding that part within the Grand Canyon National Game Preserve and the Vermilion Cliffs National Monument;

secs. 5 and 8, inclusive, excluding that part within the Grand Canyon National Game Preserve;

secs. 9 and 15, inclusive, excluding that part within the Vermilion Cliffs National Monument;

sec. 16;

secs. 17 and 20, excluding that part within the Grand Canyon National Game Preserve;

sec. 21;

secs. 22 and 27, excluding that part within the Vermillion Cliffs National Monument;

sec. 28;

secs. 29 and 32, excluding that part within the Grand Canyon National Game Preserve;

secs. 33 and 34;

sec. 35, excluding that part within the Vermilion Cliffs National Monument.

T. 40 N., R. 3 E.,

secs. 3, 10, and 15, excluding that part within the Vermillion Cliffs National Monument;

sec. 21, unsurveyed, excluding that part within the Grand Canyon National Game Preserve;

secs. 22 and 27, excluding that part within the Vermillion Cliffs National Monument;

secs. 28 and 33, unsurveyed, excluding that part within the Grand Canyon National Game Preserve.

T. 36 N., R. 4 E.,

secs. 1 to 5, inclusive;

secs. 6 and 7, excluding that part within the Grand Canyon National Game Preserve;

secs. 8 to 17, inclusive;

secs. 18 to 24, inclusive, excluding that part within the Grand Canyon National Game Preserve.

T. 37 N., R. 4 E.,

secs. 1 to 18, inclusive;

sec. 19, excluding that part within the Grand Canyon National Game Preserve;

13

secs. 20 to 29, inclusive;

secs. 30 and 31, excluding that part within the Grand Canyon National Game Preserve;

secs. 32 to 36, inclusive.

T. 38 N., R. 4 E.,

secs. 5 and 6, excluding that part within the Vermilion Cliffs National Monument;

sec. 7;

secs. 8 to 13, inclusive, excluding that part within the Vermilion Cliffs National Monument;

secs. 14 to 36, inclusive.

T. 36 N., R. 5 E.,

sec. 2, unsurveyed, excluding that part within the Grand Canyon National Park;

secs. 3 to 9, inclusive;

sec. 10, partly surveyed, excluding that part within the Grand Canyon National Park;

secs. 11 and 15, unsurveyed, excluding that part within the Grand Canyon National Park;

sec. 16, excluding that part within the Grand Canyon National Park;

sec. 17;

sec. 18, excluding that part within the Grand Canyon National Park;

sec. 19, partly unsurveyed, excluding that part within the Grand Canyon National Park and the Grand Canyon National Game Preserve;

sec. 20, unsurveyed, excluding that part within the Grand Canyon National Game Preserve and the Grand Canyon National Park;

secs. 21, unsurveyed, excluding that part within the Grand Canyon National Park.

T. 37 N., R. 5 E.,

    secs. 1 to 12, inclusive;

    sec. 13, excluding that part within the Grand Canyon National Park;

    secs. 14 to 24, inclusive;

    sec. 25, unsurveyed, excluding that part within the Grand Canyon National Park;

    secs. 26 to 34, inclusive;

    sec. 35, partly unsurveyed, excluding that part within the Grand Canyon National
Park;

    sec. 36, unsurveyed, excluding that part within the Grand Canyon National Park and
Navajo Indian Reservation.

T. 38 N., R. 5 E.,

    secs. 13 and 14, 16 to 18, inclusive, excluding that part within the Vermilion Cliffs
National Monument;

    secs. 19 and 20;

    secs. 21, 22, and 23, excluding that part within the Vermilion Cliffs National
Monument;

    secs. 24 to 36, inclusive.

T. 37 N., R. 6 E.,

    sec. 4, unsurveyed, excluding that part within the Grand Canyon National Park and
Navajo Indian Reservation;

    sec. 5, partly unsurveyed, excluding that part within the Grand Canyon National Park;

    sec. 6;

    sec. 7, excluding that part within the Grand Canyon National Park;

sec. 8, partly unsurveyed, excluding that part within the Grand Canyon National Park;

sec. 9, unsurveyed, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation;

sec. 17, partly unsurveyed, excluding that part within the Grand Canyon National Park;

sec. 18, excluding that part within the Grand Canyon National Park;

sec. 19, partly unsurveyed, excluding that part within the Grand Canyon National Park;

secs. 20 and 30, unsurveyed, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation.

T. 38 N., R. 6 E.,

sec. 1, unsurveyed, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation;

secs. 2 and 3, excluding that part within the Grand Canyon National Park;

secs. 4, 5, 7, and 8, excluding that part within the Vermilion Cliffs National Monument;

secs. 9 and 10;

sec. 11, partly unsurveyed, excluding that part within the Grand Canyon National Park;

secs. 12 and 14, unsurveyed, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation;

sec. 15, partly unsurveyed, excluding that part within the Grand Canyon National Park;

16

secs. 16 and 17;

sec. 18, excluding that part within the Vermilion Cliffs National Monument;

sec. 19;

secs. 20 and 21, partly unsurveyed, excluding that part within the Grand Canyon National Park;

secs. 22 and 27, unsurveyed, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation;

secs. 28 and 29, partly unsurveyed, excluding that part within the Grand Canyon National Park;

secs. 30 to 32, inclusive, excluding that part within the Grand Canyon National Park;

secs. 33, unsurveyed, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation.

T. 39 N., R. 6 E.,

secs. 13, 23, and 24, excluding that part within the Vermilion Cliffs National Monument;

sec. 25;

sec. 26, excluding that part within the Vermilion Cliffs National Monument;

sec. 27, excluding that part within the Vermilion Cliffs National Monument and the Grand Canyon National Park;

sec. 33, S½NE¼, SE¼SW¼, and SE¼, excluding that part within the Vermilion Cliffs National Monument;

secs. 34 and 35, excluding that part within the Grand Canyon National Park;

sec. 36, partly unsurveyed, excluding that part within the Grand Canyon National Park.

T. 39 N., R. 7 E.,

sec. 3, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation;

sec. 4, partly unsurveyed, excluding that part within the Grand Canyon National Park, Vermilion Cliffs National Monument, and Navajo Indian Reservation;

secs. 5, 7, and 8, excluding that part within the Vermilion Cliffs National Monument;

secs. 9 and 16, partly unsurveyed, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation;

sec. 17, excluding that part within the Grand Canyon National Park;

sec. 18, excluding that part within the Vermilion Cliffs National Monument;

sec. 19;

sec. 20, and secs. 29 to 31, inclusive, partly unsurveyed, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation.

T. 40 N., R. 7 E.,

sec. 33, excluding that part within the Grand Canyon National Park and Vermilion Cliffs National Monument;

sec. 34, excluding that part within the Grand Canyon National Park and Navajo Indian Reservation.

The areas described aggregate approximately 1,006,545 acres of public and National Forest System lands in Coconino and Mohave Counties.

2. The withdrawal made by this order does not alter the applicability of the public land laws other than the Mining Law.

3. This withdrawal will expire 20 years from the effective date of this order unless, as a result of a review conducted before the expiration date pursuant to Section 204(f) of the Federal Land Policy and Management Act of 1976, 43 U.S.C. 1714(f), the Secretary determines that the withdrawal shall be extended.

(Authority:  43 CFR 2310.3-3(b)(1))


_____

Ken Salazar
Secretary of the Interior

_January   9 ,   2012_____
Date



THE SECRETARY OF THE INTERIOR
WASHINGTON

**JAN 0 9 2012**

The Honorable Jeff Bingaman
Chairman, Committee on Energy and Natural Resources
United States Senate
Washington, DC  20510

Dear Mr. Chairman:

In accordance with section 204(c) of the Federal Land Policy and Management Act of 1976
(FLPMA), 43 U.S.C. § 1714(c), we are notifying you that, subject to valid existing rights, the
Department of the Interior has withdrawn public and National Forest System lands within the
Grand Canyon watershed located in Coconino and Mohave Counties, Arizona, from location and
entry under the Mining Law of 1872, 30 U.S.C. §§ 22-54, but not from the mineral leasing,
geothermal leasing, material sales, or other public land laws.  The lands are managed by the
Bureau of Land Management and the U.S. Forest Service.  This 20-year withdrawal encompasses
approximately 1,006,545 acres of Federal lands and interests in lands.

The enclosed report summarizes the withdrawal process and addresses the requirements of
section 204(c)(2) of FLPMA.  Also enclosed is a copy of the Public Land Order making the
withdrawal.

Similar letters have been sent to Ranking Member Lisa Murkowski, Committee on Energy and
Natural Resources, United States Senate; Chairman Doc Hastings, Committee on Natural
Resources, House of Representatives; and Ranking Member Edward Markey, Committee on
Natural Resources, House of Representatives.

If you have any questions, please contact Director Robert V. Abbey, Bureau of Land
Management, at (202) 208-3801.

Sincerely,

Ken Salazar

Enclosures



THE SECRETARY OF THE INTERIOR

WASHINGTON

JAN 0 9 2012

The Honorable Doc Hastings
Chairman, Committee on Natural Resources
House of Representatives
Washington, DC  20515

Dear Mr. Chairman:

In accordance with section 204(c) of the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1714(c), we are notifying you that, subject to valid existing rights, the Department of the Interior has withdrawn public and National Forest System lands within the Grand Canyon watershed located in Coconino and Mohave Counties, Arizona, from location and entry under the Mining Law of 1872, 30 U.S.C. §§ 22-54, but not from the mineral leasing, geothermal leasing, material sales, or other public land laws. The lands are managed by the Bureau of Land Management and the U.S. Forest Service. This 20-year withdrawal encompasses approximately 1,006,545 acres of Federal lands and interests in lands.

The enclosed report summarizes the withdrawal process and addresses the requirements of section 204(c)(2) of FLPMA. Also enclosed is a copy of the Public Land Order making the withdrawal.

Similar letters have been sent to Ranking Member Edward Markey, Committee on Natural Resources, House of Representatives; Chairman Jeff Bingaman, Committee on Energy and Natural Resources, United States Senate; and Ranking Member Lisa Murkowski, Committee on Energy and Natural Resources, United States Senate.

If you have any questions, please contact Director Robert V. Abbey, Bureau of Land Management, at (202) 208-3801.

Sincerely,

Ken Salazar

Ken Salazar

Enclosures



THE SECRETARY OF THE INTERIOR

WASHINGTON

JAN 0 9 2012

The Honorable Edward Markey
Ranking Member
Committee on Natural Resources
House of Representatives
Washington, DC  20515

Dear Representative Markey:

In accordance with section 204(c) of the Federal Land Policy and Management Act of 1976
(FLPMA), 43 U.S.C. § 1714(c), we are notifying you that, subject to valid existing rights, the
Department of the Interior has withdrawn public and National Forest System lands within the
Grand Canyon watershed located in Coconino and Mohave Counties, Arizona, from location and
entry under the Mining Law of 1872, 30 U.S.C. §§ 22-54, but not from the mineral leasing,
geothermal leasing, material sales, or other public land laws.  The lands are managed by the
Bureau of Land Management and the U.S. Forest Service.  This 20-year withdrawal encompasses
approximately 1,006,545 acres of Federal lands and interests in lands.

The enclosed report summarizes the withdrawal process and addresses the requirements of
section 204(c)(2) of FLPMA.  Also enclosed is a copy of the Public Land Order making the
withdrawal.

Similar letters have been sent to Chairman Doc Hastings, Committee on Natural Resources,
House of Representatives; Chairman Jeff Bingaman, Committee on Energy and Natural
Resources, United States Senate; and Ranking Member Lisa Murkowski, Committee on Energy
and Natural Resources, United States Senate.

If you have any questions, please contact Director Robert V. Abbey, Bureau of Land
Management, at (202) 208-3801.

Sincerely,

Ken Salazar

Enclosures



THE SECRETARY OF THE INTERIOR

WASHINGTON

JAN 0 9 2012

The Honorable Lisa Murkowski
Ranking Member
Committee on Energy and Natural Resources
United States Senate
Washington, DC 20510

Dear Senator Murkowski:

In accordance with section 204(c) of the Federal Land Policy and Management Act of 1976
(FLPMA), 43 U.S.C. § 1714(c), we are notifying you that, subject to valid existing rights, the
Department of the Interior has withdrawn public and National Forest System lands within the
Grand Canyon watershed located in Coconino and Mohave Counties, Arizona, from location and
entry under the Mining Law of 1872, 30 U.S.C. §§ 22-54, but not from the mineral leasing,
geothermal leasing, material sales, or other public land laws. The lands are managed by the
Bureau of Land Management and the U.S. Forest Service. This 20-year withdrawal encompasses
approximately 1,006,545 acres of Federal lands and interests in lands.

The enclosed report summarizes the withdrawal process and addresses the requirements of
section 204(c)(2) of FLPMA. Also enclosed is a copy of the Public Land Order making the
withdrawal.

Similar letters have been sent to Chairman Jeff Bingaman, Committee on Energy and Natural
Resources, United States Senate; Chairman Doc Hastings, Committee on Natural Resources,
House of Representatives; and Ranking Member Edward Markey, Committee on Natural
Resources, House of Representatives.

If you have any questions, please contact Director Robert V. Abbey, Bureau of Land
Management, at (202) 208-3801.

Sincerely,

Ken Salazar

Enclosures

**2012**

## FEDERAL LAND POLICY AND MANAGEMENT ACT OF 1976, AS AMENDED

## SECTION 204(C) REPORT TO CONGRESS

## ON THE WITHDRAWAL TO PROTECT THE GRAND CANYON WATERSHED, ADJACENT TO THE GRAND CANYON NATIONAL PARK

## COCONINO AND MOHAVE COUNTIES, ARIZONA



# [NORTHERN ARIZONA WITHDRAWAL]

U.S. Bureau of Land Management, Arizona Strip Field Office & U.S. Forest Service, Kaibab National Forest

## January 2012

### INTRODUCTION

In compliance with section 204(c)(2) of the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1714(c)(2), this report has been prepared to provide information regarding the withdrawal of approximately 1,006,545 acres of Federal lands and interests in lands located within the boundary of the Grand Canyon Watershed, adjacent to the Grand Canyon National Park, within Coconino and Mohave Counties, Arizona (see tables 1 and 2 for the complete acreage of the three parcels by surface management ownership and total acreages for the withdrawal area). This report summarizes the withdrawal and addresses the planning and other notice requirements applicable to withdrawals aggregating 5,000 acres or more.

An Environmental Impact Statement (EIS) was prepared under the National Environmental Policy Act of 1969 (NEPA), which analyzes the impacts of the withdrawal. The withdrawal area is in three separate parcels north and south of the Grand Canyon. Table 1 shows the acres of Federal mineral interests within each parcel and the acres of the various surface jurisdictions overlying those Federal minerals. Table 2 summarizes total acres by surface jurisdiction.

Table 1 - Acres of Federal Mineral Estate and Surface Jurisdiction by Parcel

| North Parcel | |
|---|---|
| *Federal Mineral Acres Beneath:* | |
| BLM Surface | 524,246 |
| FS Surface | 3,466 |
| State Surface | 4,204 |
| Private Surface | 18,079 |
| *Total* | *549,995* |
| **East Parcel** | |
| *Federal Mineral Acres Beneath:* | |
| BLM Surface | 102,432 |
| FS Surface | 31,273 |
| State Surface | 0 |
| Private Surface | 749 |
| *Total* | *134,454* |
| **South Parcel** | |
| *Federal Mineral Acres Beneath:* | |
| BLM Surface | 0 |
| FS Surface | 321,135 |
| State Surface | 0 |
| Private Surface | 961 |
| *Total* | *322,096* |

Table 2 – Total Acres of Federal Mineral Estate and Surface Jurisdiction within Withdrawal

| **Total** | |
|---|---|
| *Federal Mineral Acres Beneath:* | |
| BLM Surface | 626,678 |
| FS Surface | 355,874 |
| State Surface | 4,204 |
| Private Surface | 19,789 |
| *Total* | *1,006,545* |

The Secretary of the Interior has made a 20-year withdrawal of public lands managed by the Bureau of Land Management (BLM) and National Forest System lands managed by the U.S. Forest Service (FS) from the Mining Law of 1872, as amended, 30 U.S.C. §§22-54 (the Mining Law) in accordance with FLPMA.  The withdrawn lands are managed by the BLM Arizona Strip Field Office, under the authority of FLPMA, and the Kaibab National Forest managed by the FS (Tusayan Ranger District and the North Kaibab Ranger District), under the authority of the Organic Act of 1897.  The U.S. Department of Agriculture has provided its consent to the withdrawal of the FS-managed lands.  The withdrawal is subject to valid existing rights in existence as of the publication of the withdrawal proposal on July 21, 2009, which segregated the lands from location and entry under the Mining Law for 2 years.

### ITEM 1 . A clear explanation of the proposed use of the land which led to the withdrawal.

A history of mining exploration for the withdrawal area is detailed in the Record of Decision (ROD), Section IV Overview of the Withdrawal Area (see Appendix A).

### ITEM 2. An inventory and evaluation of the current natural resource uses and values of the site and adjacent public and nonpublic land and how it appears they will be affected by the proposed use, including particularly aspects of use that might cause degradation of the environment, and also the economic impact of the change in use on individuals, local communities, and the Nation.

An inventory and evaluation of the natural, cultural, and social resources associated with the withdrawal was addressed in the *Final Environmental Impact Statement Northern Arizona Proposed Withdrawal and Record of Decision*, on portions of lands within the boundaries of the BLM Arizona Strip Field Office and the FS Kaibab National Forest, within the Tusayan Ranger District and the North Kaibab Ranger District, Coconino and Mohave Counties, Arizona, (NEPA Document Number: DOI-BLM-AZ-A010-2009-0030-EIS) and a copy of the EIS is attached in Appendix B (on compact disc). The major resources that were analyzed in the EIS are listed below:

| |
|---|
| Air Quality and Climate |
| American Indian Resources |
| Cultural Resources |
| Economic Conditions |
| Fish and Wildlife |
| Geology and Mineral Resources |
| Recreation |
| Social Conditions |
| Soils |
| Soundscapes |
| Special Status Species |
| Vegetation |
| Vegetation Resources |
| Visual Resources |
| Water Resources |
| Wilderness |
| Wilderness Characteristics |

Important foundational information for the EIS was provided by a scientific report prepared by the U.S. Geological Survey (USGS) in February 2010.  The USGS examined the possible effects of breccia pipe uranium mining on the natural resources of the lands proposed for withdrawal on July 21, 2009. Specifically, the USGS sought to:

1) estimate uranium resources in northern Arizona affected by possible withdrawal;
2) examine the environmental and biological effects of uranium mining;
3) summarize historical water chemistry data for streams and springs and collect and analyze some new water samples; and
4) investigate biological pathways of exposure to uranium and other radioactive contaminants in fish and wildlife.

The report's key findings were:

1) The area proposed for withdrawal is estimated to contain about 326 million pounds (163,000 tons) of uranium oxide, which is about 12 percent of the estimated total undiscovered uranium in northern Arizona (2.6 billion pounds or 1.3 million tons).
2) Soil and sediment samples were analyzed at six sites, five of which were mined and reclaimed, and one that was placed under interim management for over 20 years. Some waste rock and ore can be found at all sites, including those that were reclaimed.  The level of uranium is predominantly minor surface exposures of small patches of waste rock or wind- and water-redistributed radioactive sediment across former mine sites and adjacent

areas, but included a large pile of waste rock.

3) Wind has moved fine-grained material offsite a few hundred feet or more. Flash floods have moved material offsite from three mines in one canyon approximately one half mile.

4) Analysis of historical water-quality data for more than 1,000 water samples from 428 sites in northern Arizona shows that dissolved uranium concentrations in areas without mining were generally similar to those with active or reclaimed mines. Ninety-five percent of the sampled sites had dissolved uranium levels of less than 30 parts per billion (micrograms per liter), the Environmental Protection Agency maximum for drinking water.

5) Historical samples from 15 springs and 5 wells exhibited dissolved uranium concentrations greater than the Environmental Protection Agency maximum for drinking water. These springs and wells are close to or in direct contact with mineralized ore bodies. Concentration levels may be related to natural processes, mining, or a combination of both factors. Additional sampling is occurring now to examine current levels of uranium at these sites.

6) Many species that inhabit the area proposed for withdrawal are well adapted to the arid environment of the region and are considered special status species by State and Federal agencies. These adaptations may make these species more susceptible to the impacts of mining activities. Mining can potentially impact plants and animals by fragmenting their habitat, attracting animals to the site (water sources, scaffolding, and human activity), introducing invasive species, and contaminating food and water sources.

7) Uranium and other radionuclides are a concern in this region because these elements can affect the survival, growth, and reproduction of plants and animals. Water, soil/sediment, and food can become contaminated from mining activities. Plants and animals may come in contact with mining contaminants through absorption, ingestion, inhalation, and trophic transfer (bioaccumulation). Certain species of reptiles, amphibians, birds, and mammals in the segregation area spend significant amounts of time in burrows where they can inhale or ingest uranium and other radionuclides through digging, eating, preening, and hibernating. Herbivores may also be exposed though the ingestion of radionuclides that have been aerially deposited on vegetation.

8) Data gaps to assess the impact of increased mining in the withdrawal area to plants and animals are significant. Site-specific concentrations of uranium and other metals or metalloids (e.g. arsenic, selenium) have not been measured in plants and animals from the withdrawal areas; therefore, no baseline contaminant concentrations are available to gage potential changes in concentrations if mining would occur. Chemical toxicity information based on empirical data is not available for reptiles, birds, or wild mammals; therefore, the risks from uranium and other radionuclides are unknown for these animals.

A copy of the report, USGS Scientific Investigations Report 2010-5025, *Hydrological, Geological, and Biological Site Characterization of Breccia Pipe Uranium Deposits in Northern Arizona* is posted on the USGS website at http://pubs.usgs.gov/sir/2010/5025/.

The EIS included an analysis of impacts to economic conditions that may result from implementing the withdrawal. The analysis estimated there would be 216 fewer uranium mining-related jobs available per year as a result of the withdrawal as compared to the number of jobs projected if no withdrawal was selected. Although this would represent a potential decrease in mining related employment as compared to the number of mining jobs projected without a withdrawal, it would still represent an increase in employment as compared to the current levels of mining. An estimated 27% percent or 10,658 tons $U_3O_8$ of the potential uranium resources in the vicinity would remain available for mineral development on existing mining claims anticipated to have valid existing rights.

Potential degradation of the environment would be reduced since uranium mining is limited by the withdrawal to those existing approved operations and new operations on mining claims that were valid as of July 21, 2009, the date the lands were segregated from location by the publication of the proposed withdrawal in the *Federal Register*. Withdrawal of the lands from the Mining Law prohibits location and entry of new mining claims during the period of withdrawal. Mining claims, as referred to in this report, include mining claims, mill sites and tunnel sites. Withdrawals under the authority of FLPMA are subject to the valid existing rights of the claimants and thus, development of mining claims that predate the segregation can continue during the withdrawal, provided the claimant demonstrates that the mining claim was valid as of July 21, 2009, and remains valid. BLM and the FS will not process a request for new surface use authorization until they have verified valid existing rights.

**ITEM 3.** *An identification of present users of the land involved, and how they will be affected by the proposed use.*

Present users of the withdrawn lands are the general public, as well as those parties that have an interest in unpatented mining claims, mineral material permits, oil and gas leases, geothermal leases, grazing leases, land use authorizations (e.g. land use permits and rights-of-way authorized by the BLM) and special-use authorizations (e.g. land uses and rights-of-way authorized by the FS). With the exception of new activities occurring under the Mining Law, current public land uses and leasable and salable mineral and geothermal development will be unaffected by the withdrawal; the BLM and the FS will continue to manage the lands as they are being managed now as identified in the current agency land use plans: *BLM Arizona Strip Field Office Record of Decision and Approved Resource Management Plan* (2008) and *FS Kaibab National Forest Land Management Plan, as amended and Record of Decision* (1988), see Relationship to Existing Land Use Plans in Section 1.4.4 of the EIS. The subject lands are closed to location and entry of new mining claims under the Mining Law, and new operations will only be authorized if the claimant first demonstrates that the underlying mining claims comply with the requirements of the Mining Law and are otherwise valid.

The withdrawal area has additional potential for leasable and salable minerals, and development of these mineral resources could continue.  Authorization of any mineral leases and mineral material sales contracts is dependent on the outcome of processing applications, which includes site-specific NEPA analysis.  Appendix C identifies the current holders and applicants, associated case file numbers, and associated case types within the Northern Arizona Withdrawal area.

*ITEM 4. An analysis of the manner in which existing and potential resource uses are incompatible with or in conflict with the proposed use, together with a statement of the provisions to be made for continuation or termination of the existing uses, including an economic analysis of such continuation or termination.*

The rationale for withdrawal can be found in the ROD (see Appendix A) and the EIS impact analysis is summarized in the Final EIS in Chapter 2, Table 2.8-1 (see Appendix B.).

The withdrawal does not affect activities other than those undertaken under the Mining Law.  The withdrawal closes the lands to location and entry of new mining claims under the Mining Law, but allows for mining activities to continue on mining claims determined to be valid as of July 21, 2009, the date the proposed withdrawal was published in the *Federal Register* and which are maintained properly thereafter.  Access to existing unpatented mining claims will not be restricted.  In addition, mining companies with an approved plan of operations would be responsible for maintenance of unpaved public roads used to haul ore.

The agencies will conduct validity determinations on existing mining claims before any new exploration or mining operations could commence.  The mining claimants would be required to demonstrate that they had a valid mining claim, including the discovery of a valuable mineral deposit, at the time of the proposed withdrawal on July 21, 2009, and that the mining claim continues to be valid.  If a claimant has a physical exposure of a mineral deposit at the time of the proposed withdrawal, he or she can use information gathered from exploration or other means after July 21, 2009 to confirm or corroborate the deposit.

With regard to the economic analysis, the EIS analyzed the projected average annual economic effects of mining, the projected effects on taxes and revenues and the projected effects on tourism-related economy.  It is reasonably foreseeable that the withdrawal will decrease potential uranium mining employment and also decrease potential tax revenue to Federal, State and local governments.  The full economic analysis conducted can be found in the Final EIS (Appendix B) in Chapter 4, Section 4.17.

*ITEM 5. An analysis of the manner in which such lands will be used in relation to the specific requirements for the proposed use.*

Except for activities under the Mining Law, the withdrawal will not change the current use of the lands.  The lands are presently being managed for multiple-use with an emphasis on dispersed recreation and protection of open space, scenic qualities, wildlife habitat,

watersheds, and cultural resources.  The reasonably foreseeable development scenario described in the EIS analyzes potential development that could occur in this area, indicating that up to eleven mines could be developed over the next 20 years within the withdrawal area, including the four currently-approved mines.  The withdrawal would prohibit the location and entry of new mining claims.  Existing mining claims could be voluntarily relinquished or extinguished for failure to meet annual maintenance requirements.  If relinquished or extinguished such mining claims may not be relocated for the duration of the withdrawal. Mining claimants who seek to undertake new exploration or development of their mining claims would be required to undergo a validity exam whereby the existence of valid existing rights at the time of the proposed withdrawal on July 21, 2009, and the continuing validity of the mining claims, would need to be established.  Any development would occur subject to BLM's surface management regulations at 43 CFR part 3809 and the FS's regulations at 36 CFR part 228A.

### ITEM 6. *A statement as to whether any suitable alternative sites are available (including costs estimates) for the proposed use or for uses such a withdrawal would displace.*

Due to the specific location of the Grand Canyon watershed, there was no alternative location for the withdrawal considered in the EIS.  However, uranium resources do exist on Federal lands that remain open to location and entry under the Mining Law, including areas in Arizona, Colorado, Utah and Wyoming.

Alternatives included proposed withdrawals for only portions of the Grand Canyon watershed. One alternative considered a withdrawal of 648,805 acres (Alternative C in EIS) that would withdraw large portions of those areas, identified by analysis, having concentrations of cultural, hydrologic, recreational, visual, and biological resources that could be adversely affected by locatable mineral exploration and development.  Another alternative considered a withdrawal of 292,088 acres (Alternative D in EIS), identified by analysis, where there is relatively high concentration of cultural, hydrologic, recreational, visual, and biological resources that could be adversely affected by locatable mineral exploration and development.  Detailed information on the rationale for the alternative selection is in the Final EIS Chapter 2, section 2.2 (see Appendix B.)

### ITEM 7. *A statement of the consultation which has been or will be had with other Federal departments and agencies, with regional State and local government bodies, and with other appropriate individuals and groups.*

The BLM reached out extensively to a wide array of governmental and non-governmental stakeholders throughout the EIS process.  Federal, State, and local governmental agencies, advocacy groups (environmental and industry) mining industry, business owners, as well as individuals and others provided comments during the EIS process.  The EIS process also includes the requirement of Tribal consultation.  Cooperating agencies include Federal, State and local agencies, and two Tribes:  U.S. Forest Service, Kaibab National Forest; U.S. National Park Service, Grand Canyon National Park; U.S. Fish and Wildlife Service (FWS); U.S. Geological

Survey; Hualapai Tribe; Kaibab Band of Paiute Indians; Arizona Game and Fish Department; Arizona Geological Survey; Arizona Department of Mines and Mineral Resources; and Arizona State Land Department. Information on parties providing written comments and that were involved in EIS process is found in Chapter 5 (Coordination and Consultation), of the EIS (See Appendix B.). Complete documentation of coordination and consultation is on record in the official withdrawal case file noted under ITEM 11 below.

The EIS included a description of the Endangered Species Act Section 7 consultation with the FWS regarding potential effects on any federally-designated threatened or endangered plant or animal species or their habitat. The BLM requested concurrence on the determination that the withdrawal may affect, but is not likely to adversely affect, the endangered Brady pincushion cactus, the endangered California condor, the endangered humpback chub and its critical habitat, the endangered Kanab ambersnail, the threatened Mexican spotted owl and its critical habitat, the endangered razorback sucker and its critical habitat, the endangered sentry milk-vetch, the threatened Siler pincushion cactus, the endangered southwestern willow flycatcher and its critical habitat, the endangered Virgin River chub and its critical habitat, the endangered woundfin minnow and its critical habitat, and the endangered Yuma clapper rail. The FWS issued a concurrence letter on August 29, 2011, and it also participated as a cooperating agency as mentioned above.

The BLM conducted consultation with the State Historic Preservation Office (SHPO) in accordance with 36 CFR Part 60, and in accordance with Section 106 of the National Historic Preservation Act (NHPA). A Class I cultural resources overview, and a summary report on ethnographic resources of the region was submitted by the BLM to the SHPO on June 16, 2011. The SHPO concurred with the BLM findings that the withdrawal does not have the potential to cause adverse effects on historic properties on July 5, 2011.

The BLM conducted consultation with interested American Indian tribes in accordance with 36 CFR Part 800 and in accordance with Section 106 of NHPA. The BLM initiated tribal consultation with 16 Arizona and Utah American Indian tribes in August 2009. The Havasupai Tribe, Hopi Tribe, Hualapai Tribe, Kaibab Band of Paiute Indians, Paiute Indian Tribe of Utah, Pueblo of Zuni, and Navajo Nation all requested active participation. A summary of tribal meetings is listed in Chapter 5 of the EIS. In addition, the Hualapai Tribe and the Kaibab Band of Paiute Indians participated as cooperating agencies in the EIS process.

Six county agencies participated as cooperating agencies in the EIS process as discussed above. Additionally, the BLM participated in meetings and kept open communication with the AZ/UT Coalition of Coordinating Counties made up of entirely County governments. The counties involved in this coalition include Washington, Kane, San Juan and Garfield Counties in Utah, and Mohave County in Arizona.

*ITEM 8. A statement indicating the effect of the proposed uses, if any on State and local government interests and the regional economies.*

It is important to note that previously-approved mining operations and mining operations on mining claims with valid existing rights could continue under the withdrawal. The reasonably foreseeable development scenario in the EIS identifies eleven mines, including the four mines currently approved, that could continue to be developed even with a full withdrawal. This pace of development for the next twenty years is roughly equivalent to the pace of development that occurred during the peak of uranium interest in the 1980s when ten breccia pipes were developed and six were mined out which would be substantially less than that the reasonably foreseeable development identified under the no-action alternative, which is thirty mines including the four mines currently approved.

Throughout the entire withdrawal process, there were numerous opportunities for State, local, or regional economies to voice their comments and concerns on the Northern Arizona Proposed Withdrawal. Six County governments within and/or adjacent to the withdrawal area had concerns regarding the regional economic impacts from decreased mining. The concerned counties include Washington, Kane, San Juan and Garfield Counties in Utah, and Mohave and Coconino Counties in Arizona. Although the withdrawal encompasses lands within Mohave and Coconino Counties in Arizona, the EIS found there could be an economic effect on the four southern Utah counties as well.

Of the six counties listed above, Coconino County supported the withdrawal. Coconino County Board of Supervisors passed a resolution opposing uranium mining in proximity of the Grand Canyon National Park and its watersheds (Resolution No. 2008-09). The resolution requested a moratorium on the mineral leasing of State Trust lands and a permanent congressional withdrawal of the Tusayan Ranger District and House Rock Valley (the South and East parcels).

Mohave County passed Resolution 2009-040 on February 5, 2009. The resolution urges Congress to preserve access to the uranium reserves of northern Arizona in order to meet America's demand for clean non-carbon emitting energy and energy independence.

Kane County, Utah, passed county Resolution 2008-10 (passed on May 12, 2008). The resolution says the county supports multiple uses on public lands in general and lists uranium mining as one of the uses that should continue.

During the course of the withdrawal process, all four southern Utah counties and Mohave County in Arizona formed the AZ/UT Coalition of Coordinating Counties. That body passed a unanimous resolution on April 18, 2011, opposing the proposed withdrawal.

As discussed in Item 2 above, the EIS found that there could be a decrease in potential mining employment in the vicinity of the withdrawal that could potentially impact the economy in southern Utah and northern Arizona. Overall regional tourist activity and associated employment within the proposed withdrawal area would not be affected. However, the EIS also found that the withdrawal is projected to have a minor positive effect in Coconino County,

Arizona, on the recreation and tourism industry.  Tourism is a significant contributor to the local economy in this vicinity.

**ITEM 9.** *A statement of the expected length of time needed for the withdrawal.*

The withdrawal is for 20 years.

**ITEM 10.** *The time and place of hearings and of other public involvement concerning the withdrawal.*

Appendix D contains a listing of public notices and public meetings or hearings that were held. In addition, two newsletters were sent to interested parties during the EIS process, and the BLM maintained a project website accessible to the public throughout the EIS process.  There were also several BLM and Department of the Interior news releases to the media that solicited public comments and notified the public on updated information regarding the EIS.  A complete description of public involvement in the EIS process is described in Chapter 5 of the Final EIS (see Appendix B).

**ITEM 11.** *The place where the records on the withdrawal can be examined by interested parties.*

The case file AZA-35138 is available for inspection by the public at the BLM Arizona State Office, One North Central Avenue, Suite 800, Phoenix, Arizona 85004-4427.

**ITEM 12.** *Mineral Report - A report prepared by a qualified mining engineer, engineering geologist, or geologist which shall include but not be limited to information on:  general geology, known mineral deposits, past and present mineral production, mining claims, mineral leases, evaluation of future mineral potential, present and potential market demands.*

A mineral potential analysis was completed and approved on September 21, 2010, and is attached as Appendix E.  This report concluded:

- Mining claims, mineral material permits and oil and gas leases exist on the lands within the withdrawn area.  The mineral report contained dated information (January 2010) showing that on the North parcel (as of the date it was written) there were 7188 active mining claims, 7 mineral material permits, and 12 oil and gas leases; the South parcel had 1,107 active mining claims; the East parcel had 25 active mining claims and 3 mineral material permits.  Updated information on the current mining claims, mineral material permits and oil and gas leases from the BLM and FS records is in Appendix C. No geothermal, coal, or other mineral leases exist on the lands involved.
- Mining claim activity is almost exclusively focused on uranium exploration and production.  Documented uranium production from the North parcel has exceeded 19.03 million pounds of $U_3O_8$.

The subject lands were found to have no potential for coal, no potential for sodium and potassium, low potential for geothermal energy sources, and low potential for nonmetallic and industrial minerals.  The East and South parcels were found to have low potential for oil and gas, as erosion along major drainages of the Colorado River has lowered the potential for the preservation of hydrocarbon accumulations.  The North parcel was found to have moderate potential for oil and gas.  The subject parcels were found to have moderate to high potential for metallic minerals and high potential for uranium and common variety minerals.

APPENDICES

A   Northern Arizona Withdrawal Record of Decision

B   *Final EIS Northern Arizona Withdrawal*[1]

C   List of Present Land Uses

D   List of Public Meetings and Notices

E   Mineral Potential Report

---

[1] A compact disc of the Final EIS is provided in the hard copy version of this report. The Final EIS can also be found at http://www.blm.gov/az/st/en/prog/mining/timeout/feis.html.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
### PRESCOTT DIVISION

| | |
|---|---|
| GREGORY YOUNT, | Case No. 3:11-cv-08171-PCT-DGC |
| Plaintiff, *pro se*, | |
| v. | |
| KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.*, | |
| Federal Defendants, and | |
| GRAND CANYON TRUST, *et al.*, | |
| Intervenor-Defendants. | |
| NATIONAL MINING ASSOCIATION, *et al.*, | Case No. 3:12-cv-08038-PCT-DGC |
| Plaintiffs, | |
| v. | |
| KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.*, | |
| Federal Defendants, and | |
| GRAND CANYON TRUST, *et al.*, | |
| Intervenor-Defendants | |

| | |
|---|---|
| NORTHWEST MINING ASSOCIATION, *et al.,*<br><br>        Plaintiffs,<br><br>  v.<br><br>KEN SALAZAR, SECRETARY<br>OF THE INTERIOR, *et al.,*<br><br>        Federal Defendants,<br>  and<br><br>GRAND CANYON TRUST, *et al.,*<br><br>        Intervenor-Defendants. | Case No. 3:12-cv-08042-PCT-DGC |
| QUATERRA Alaska Incorporated, *et al.,*<br><br>        Plaintiffs,<br><br>  v.<br><br>KEN SALAZAR, SECRETARY<br>OF THE INTERIOR, *et al.,*<br><br>        Federal Defendants,<br>  and<br><br>GRAND CANYON TRUST, *et al.,*<br><br>        Intervenor-Defendants. | Case No. 3:12-cv-08075-PCT-DGC |

<u>DECLARATION OF JEFFREY O HOLDREN</u>

     1.     I am currently employed by the United States Department of the Interior, Bureau of Land Management ("BLM"), as a Realty Specialist in the Washington, D.C. Office. I have held this position as a retired annuitant since November 2010.

2.      I previously worked for the BLM from 1966 to 2009.  Prior to retiring officially in December 2009 and returning as a retired annuitant in my current position, I was the Division Chief for the Division of Lands, Realty and Cadastral Survey in BLM's Washington Office.  I served in that position from 2006 until 2009.  From 1997 until 2006, I was the Deputy Division Chief for the same Division.  From 1983 to 1997, I held various branch chief positions, including Branch Chief for Withdrawals (1989-1997), within the Lands and Realty Directorate.

3.      As the Division Chief for the Division of Lands, Realty and Cadastral Survey, I supervised the BLM Lands program, which includes responsibility and record-keeping for withdrawals under section 204 of the Federal Land Policy and Management Act (FLPMA).  Prior to that time, as Deputy Division Chief, I was also participating in the Lands program, which includes responsibility for withdrawals.  In my various branch chief positions, I also had significant involvement with the land withdrawals program, including having primary responsibility for that program as Branch Chief for Withdrawals.

4.      I have carefully reviewed  BLM records and conducted a diligent inquiry into withdrawals made under section 204 of FLPMA that aggregate more than 5000 acres.

5.      BLM's records show that, including the withdrawal at issue in this case, the Department has made approximately 82 such withdrawals.

6.     I am not aware, and BLM's records do not show, that any of those withdrawals were "vetoed" by Congress under section 204(c)(1) of FLPMA.

Pursuant to 28 U.S.C. §1746, I certify under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of February, 2013

_____

Jeffrey O. Holdren
Bureau of Land Management
20 M Street SE
Washington, D.C. 20003

1   IGNACIA S. MORENO
    Assistant Attorney General
2   Environment and Natural Resources Division
3   U.S. Department of Justice

4   DOMINIKA TARCZYNSKA, NY Bar No. 4431573
5   JOHN S. MOST, VA Bar No. 27176
    Natural Resources Section
6   P.O. Box 7611 Washington, D.C. 20044-7611
7    (202) 305-0447 (Tarczynska)
     (202) 616-3353 (Most)
8    (202) 305-0506 (fax)
    DOMINIKA.TARCZYNSKA@USDOJ.GOV
9   JOHN.MOST@USDOJ.GOV
    Counsel for Defendants
10

11

12

13              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF ARIZONA
14                      PRESCOTT DIVISION

15

16

17
    GREGORY YOUNT,                          Case No. 3:11-cv-08171-PCT-DGC
18
                    Plaintiff, pro se,
19
                                            **FEDERAL DEFENDANTS'**
20        v.                                **STATEMENT OF MATERIAL**
                                            **FACTS IN SUPPORT OF THEIR**
21                                          **CROSS-MOTION FOR PARTIAL**
    KEN SALAZAR, SECRETARY                  **SUMMARY JUDGMENT**
22  OF THE INTERIOR, et al.,                **(Lead Case)**

23                    Federal Defendants,
24        and

25  GRAND CANYON TRUST, et al.,

26                    Intervenor-Defendants.

27

28

| | |
|---|---|
| NATIONAL MINING ASSOCIATION, *et al.,*<br><br>          Plaintiffs,<br>     v.<br><br>KEN SALAZAR, SECRETARY<br>OF THE INTERIOR, *et al.*,<br><br>          Federal Defendants,<br>     and<br><br>GRAND CANYON TRUST, *et al.,*<br><br>               Intervenor-Defendants | Case No. 3:12-cv-08038-PCT-DGC |
| NORTHWEST MINING ASSOCIATION, *et al.,*<br><br>          Plaintiffs,<br>     v.<br><br>KEN SALAZAR, SECRETARY<br>OF THE INTERIOR, *et al.*,<br><br>          Federal Defendants,<br>     and<br><br>GRAND CANYON TRUST, *et al.,*<br><br>               Intervenor-Defendants. | Case No. 3:12-cv-08042-PCT-DGC |
| QUATERRA Alaska Incorporated, *et al.*,<br><br>          Plaintiffs,<br>     v.<br><br>KEN SALAZAR, SECRETARY<br>OF THE INTERIOR, *et al.*,<br><br>          Federal Defendants,<br>     and<br><br>GRAND CANYON TRUST, *et al.,*<br><br>               Intervenor-Defendants. | Case No. 3:12-cv-08075-PCT-DGC |

Pursuant to Local Rule of Civil Procedure 56.1(a), Federal Defendants submit this statement of material facts in support of their Cross-Motion for Partial Summary Judgment:

1. In July 2009, on application by the Bureau of Land Management, the Secretary of the Interior proposed the withdrawal challenged in this action and the Department of the Interior issued a public notice of the proposal.  *See* 74 Fed. Reg. 35,887-01 (Jul. 21, 2009).

2. On January 9, 2012, following environmental review and extensive public comment on the 2009 proposal, the Secretary signed a record of decision, *see* Ex. 1, and a public land order, *see* Ex. 2, implementing that decision.  *See also* 77 Fed. Reg. 2563-01 (Jan. 18, 2012).

3. On January 9, 2012, the Secretary notified Congress of the withdrawal pursuant to FLPMA subsection 204(c)(1) and submitted a report to Congress pursuant to FLPMA subsection 204(c)(2).  *See* Ex. 3 (Jan. 9, 2012 notification letters and report to Congress).  Congress has since taken no action under FLPMA subsection 204(c)(1) to veto the withdrawal.  *See* Ex. 4, ¶ 6 (Feb. 7, 2013 Decl. of Jeffrey O. Holdren).

Dated: February 8, 2013

Respectfully Submitted,

IGNACIA S. MORENO,
Assistant Attorney General
Environment and Natural Resources Division

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

_/s/_ John S. Most
JOHN S. MOST, Trial Attorney
Virginia Bar, No. 27176
DOMINIKA TARCZYNSKA, Trial Attorney
New York Bar, No. 4431573
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0447(Tarczynska)
202-616-3353 (Most)
202-305-0506 (fax)
DOMINIKA.TARCZYNSKA@USDOJ.GOV
JOHN.MOST@USDOJ.GOV

_Counsel for Defendants_

1  IGNACIA S. MORENO
   Assistant Attorney General
2  Environment and Natural Resources Division
3  U.S. Department of Justice

4  DOMINIKA TARCZYNSKA, NY Bar No. 4431573
5  JOHN S. MOST, VA Bar No. 27176
   Natural Resources Section
6  P.O. Box 7611 Washington, D.C. 20044-7611
7   (202) 305-0447 (Tarczynska)
    (202) 616-3353 (Most)
8   (202) 305-0506 (fax)
   DOMINIKA.TARCZYNSKA@USDOJ.GOV
9  JOHN.MOST@USDOJ.GOV
   *Counsel for Defendants*
10

11

12

13         IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF ARIZONA
14                PRESCOTT DIVISION

15

16

17
   ┌─────────────────────────────────┬──────────────────────────────
18 │ GREGORY YOUNT,                  │ Case No. 3:11-cv-08171-PCT-DGC
19 │           Plaintiff, *pro se*,  │
20 │     v.                          │ **FEDERAL DEFENDANTS'**
   │                                 │ **STATEMENT OF DISPUTED FACTS**
21 │ KEN SALAZAR, SECRETARY          │ **IN OPPOSITION TO PLAINTIFFS'**
22 │ OF THE INTERIOR, *et al.*,      │ **MOTIONS FOR PARTIAL**
   │                                 │ **SUMMARY JUDGMENT**
23 │           Federal Defendants,   │ **(Lead Case)**
24 │     and                         │
25 │ GRAND CANYON TRUST, *et al.*,   │
26 │           Intervenor-Defendants.│
27 │                                 │
28 └─────────────────────────────────┴──────────────────────────────

| | |
|---|---|
| NATIONAL MINING ASSOCIATION, *et al.,* | Case No. 3:12-cv-08038-PCT-DGC |
| Plaintiffs, | |
| v. | |
| KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.,* | |
| Federal Defendants, | |
| and | |
| GRAND CANYON TRUST, *et al.,* | |
| Intervenor-Defendants | |
| NORTHWEST MINING ASSOCIATION, *et al.,* | Case No. 3:12-cv-08042-PCT-DGC |
| Plaintiffs, | |
| v. | |
| KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.,* | |
| Federal Defendants, | |
| and | |
| GRAND CANYON TRUST, *et al.,* | |
| Intervenor-Defendants. | |
| QUATERRA Alaska Incorporated, *et al.,* | Case No. 3:12-cv-08075-PCT-DGC |
| Plaintiffs, | |
| v. | |
| KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.,* | |
| Federal Defendants, | |
| and | |
| GRAND CANYON TRUST, *et al.,* | |
| Intervenor-Defendants. | |

1    Pursuant to Local Rule of Civil Procedure 56.1(b), Federal Defendants submit

2  this statement of disputed facts in response to the "Statement of Facts" filed by

3
   Plaintiffs NMA *et al*. and in opposition to Plaintiffs' Motions for Partial Summary
4

5  Judgment.  Set out below are Federal Defendants responses to the statement filed by

6  NMA  (Doc *73-1) (no comparable statement was filed Plaintiff NWMA).

7
8  1.  On January 9, 2012, Defendant Ken Salazar, Secretary of the U.S. Department of the
   Interior ("Secretary"), issued Public Land Order ("PLO") 7787 under his purported
   authority under "section 204 of the Federal Land Policy and Management Act of 1976,
9  43 U.S.C. 1714."  77 Fed. Reg. 2563 (Jan. 18, 2012).

10
       Response - Federal Defendants dispute NMA's use of the term "purported," as it
11

12     implies the Secretary's actions exceeded his statutory authority.  Because this is

13     a legal conclusion, however, Federal Defendants' disagreement with it does not

14     present a "genuine dispute as to [a] material fact," Fed. R. Civ. P. 56(a), so as to

15     preclude summary judgment.

16
17 2.  PLO 7787 had the effect of withdrawing from location and entry under the General
   Mining Law of 1872 "approximately 1,006,545 acres of public and National Forest
18 System lands" for a period of twenty years, effective January 21, 2012. PLO 7787.

19     Response - Federal Defendants dispute NMA's characterization of Public Land
20
       Order 7787 to the extent it fails to reflect that the order was made "subject to
21
       valid existing rights."  *See* Ex. 2.  Because NMA is characterizing a document
22

23     that speaks for itself and is the best evidence of its contents, Federal Defendants

24     disagreement with the characterization does not present a "genuine dispute as to

25     [a] material fact," Fed. R. Civ. P. 56(a), so as to preclude summary judgment.

26

27

28

3. On January 9, 2012, Secretary Salazar submitted to Congress notices intended to comply with §§ 204(c)(1)-(2) of the Federal Land Policy and Management Act of 1976 ("FLPMA"), informing Congress of the Secretary's withdrawal under PLO 7787 and initiating a ninety-day period at the close of which Congress could have terminated the withdrawal by concurrent resolution. U.S. BUREAU OF LAND MANAGEMENT, SECTION 204(C) REPORT TO CONGRESS ON THE WITHDRAWAL TO PROTECT THE GRAND CANYON WATERSHED, ADJACENT TO THE GRAND CANYON NATIONAL PARK (2012).

> Response - Federal Defendants dispute NMA's characterization of the report it
>
> transmitted to Congress under section 204(c)(2) of FLPMA as a "notice."
>
> However, because NMA is characterizing a document that speaks for itself and
>
> is the best evidence of its contents, Federal Defendants' disagreement with the
>
> characterization does not present a "genuine dispute as to [a] material fact," Fed.
>
> R. Civ. P. 56(a), so as to preclude summary judgment.  Further, NMA asserts as
>
> fact the legal conclusion that, following notice by the Secretary, Congress could
>
> have terminated the withdrawal by concurrent resolution.  Federal Defendants
>
> disagree that Congress could have done so, but because NMA's statement is a
>
> legal conclusion, Federal Defendants' disagreement also does not present a
>
> "genuine dispute as to [a] material fact," Fed. R. Civ. P. 56(a), so as to preclude
>
> summary judgment.  Federal Defendants do not dispute the remaining factual
>
> allegations of this paragraph.

4. Congress did not issue a concurrent resolution terminating the withdrawal under PLO 7787.  The withdrawal currently remains in effect. See PLO 7787.

> Response - Federal Defendants do not dispute the factual allegations contained
>
> in this statement.

5. The withdrawal under PLO 7787 has the effect of changing the legal status of federal lands in the withdrawal area. PLO 7787; see also Plaintiffs' Amended Complaint [Dkt. 56],  100. As a result of the withdrawal, Plaintiffs' member companies, which include

1
2
3
4

uranium mining companies, are unable to pursue future uranium mining claims in the withdrawal area. They also must comply with and pass a mineral examination process for further development of existing mining claims in the withdrawal area. Without the withdrawal, Plaintiffs would not be subject to these limitations. See Amended Compl., 80-87; PLO 7787.

5

       Response - NMA's characterization of the legal effect of PLO 7787 is not a

6

"statement of fact" within the meaning of LRCiv 56.1(b) and thus requires no

7

response.

8

Dated: February 8, 2013

9

10

                        Respectfully Submitted,

11
12

                        IGNACIA S. MORENO,
                        Assistant Attorney General
                        Environment and Natural Resources Division

13
14
15
16
17
18
19
20
21

                         /s/ John S. Most
                        JOHN S. MOST, Trial Attorney
                        Virginia Bar, No. 27176
                        DOMINIKA TARCZYNSKA, Trial Attorney
                        New York Bar, No. 4431573
                        Natural Resources Section
                        P.O. Box 7611
                        Washington, D.C. 20044-7611
                        (202) 305-0447(Tarczynska)
                        202-616-3353 (Most)
                        202-305-0506 (fax)
                        DOMINIKA.TARCZYNSKA@USDOJ.GOV
                        JOHN.MOST@USDOJ.GOV

22

                        *Counsel for Defendants*

23
24
25
26
27
28