Melanie R. Kay (*pro hac vice*)
Edward B. Zukoski (*pro hac vice*)
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO  80202
mkay@earthjustice.org
tzukoski@earthjustice.org
Telephone: (303) 623-9466
Fax: (303) 623-8083

Roger Flynn (*pro hac vice*)
Western Mining Action Project
P.O. Box 349, 440 Main St., #2
Lyons, CO  80540
wmap@igc.org
Telephone: (303) 823-5738
Fax: (303) 823-5732

Attorneys for Defendant-Intervenors
    Grand Canyon Trust, et al.,

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Gregory Yount,<br>        Plaintiff,<br><br>v.<br><br>Ken Salazar, Secretary of the Interior, et al.;<br>        Defendants<br>_____<br><br>National Mining Association, et al.;<br>        Plaintiffs,<br><br>v.<br><br>Ken Salazar, Secretary of the Interior, et al.;<br>        Defendants<br>_____<br><br>Northwest Mining Association,<br>        Plaintiff,<br><br>v.<br><br>Ken Salazar, Secretary of the Interior, et al.;<br>        Defendants, | Case No. 3:11-cv-08171-PCT-DGC<br>(Lead case)<br><br><br><br><br><br>Case No. 3:11-cv-08038-PCT-DGC<br><br><br><br><br><br>Case No. 3:12-cv-08042-PCT-DGC |

1

2

3

4

5

| | | |
|---|---|---|
| Quaterra Alaska Incorporated, <u>et al.</u>, | ) | |
| Plaintiffs, | ) | Case No. 3:12-cv-08075-PCT-DGC |
| | ) | |
| v. | ) | |
| | ) | |
| Ken Salazar, Secretary of the Interior, <u>et al.</u>; | ) | |
| Defendants | ) | |
| | ) | |

6

7

8

**DEFENDANT-INTERVENORS GRAND CANYON TRUST ET AL.'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT, AND MEMORANDUM IN OPPOSITION TO NATIONAL MINING ASSOCIATION <u>ET AL.</u>'S MOTIONS FOR SUMMARY JUDGMENT**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Table of Authorities...................................................................................................... ii

CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ....................................... 1

MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO NMA'S AND NORTHWEST'S MOTION FOR PARTIAL SUMMARY JUDGMENT ...................................................................... 1

STATUTORY BACKGROUND ..................................................................................... 2

STANDARD OF REVIEW .............................................................................................. 3

ARGUMENT ................................................................................................................... 3

I.      THE EXECUTIVE'S AUTHORITY TO MAKE LARGE-TRACT WITHDRAWALS REMAINS INTACT EVEN IF SUBSECTION 204(C)'S LEGISLATIVE VETO IS UNCONSTITUTIONAL ............................................. 3

        A.      Because FLPMA Contains A Severability Clause, Plaintiffs Must Show "Strong Evidence" That The Legislative Veto Is Not Severable .................. 4

        B.      FLPMA's Structure, Text And Legislative History Do Not Provide "Strong Evidence" That Congress Would Have Prohibited All Executive Large-Tract Withdrawals Absent A Legislative Veto ................................. 7

                1.      Background: The Public Land Law Review Commission ................. 8

                2.      FLPMA's Structure And Text........................................................ 10

                3.      FLPMA's Legislative History........................................................ 15

        C.      Severing Only The Veto Would Leave FLPMA Fully Operative As A Law, And The Remaining Law Comports With Congressional Intent....... 19

CONCLUSION .............................................................................................................. 22

i

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**CASES**

4

Alaska Airlines, Inc. v. Brock,
5
    480 U.S. 678 (1987)........................................................................ passim

6
Am. Fed'n of Gov't Employees v. Pierce,
7
    697 F.2d 303 (D.C. Cir. 1982) ....................................................... 21

8
Ashwander v. Tenn. Valley Auth.,
    297 U.S. 288 (1936)........................................................................ 4
9

10
Ayotte v. Planned Parenthood of N. New Eng.,
    546 U.S. 320 (2006)........................................................................ 4, 8

11
Brockett v. Spokane Arcades, Inc.,
12
    472 U.S. 491 (1985)........................................................................ 21

13
Buckley v. Valeo,
    424 U.S. U.S. 1 (1976)..................................................................... 7
14

15
City of New Haven, Conn. v. United States,
    809 F.2d 900 (D.C. Cir. 1987) ....................................................... 17
16

17
Consumer Energy Council of Am. v. FERC,
    673 F.2d 425 (D.C. Cir. 1982) ....................................................... 5

18
Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,
19
    447 U.S. 102 (1980)........................................................................ 17

20
Florida v. U.S. Dep't of Health & Human Servs.,
21
    648 F.3d 1235 (11th Cir. 2011) ...................................................... 5, 6

22
Gulf Oil Corp. v. Dyke,
23
    734 F.2d 797 (Temp. Emer. Ct. App. 1984)................................... 16

24
Hill v. Wallace,
    259 U.S. 44 (1922)......................................................................... 5, 19
25

26
I.N.S. v. Chadha,
    462 U.S. 919 (1983)........................................................................ passim

27

28

Leavitt v. Jane L.,
    518 U.S. 137 (1996) ..................................................................................... 6, 22

Lujan v. Nat'l Wildlife Fed'n,
    497 U.S. 871 (1990) ..................................................................................... 8, 9

Nat'l Fed'n of Indep. Bus. v. Sebelius,
    132 S. Ct. 2566 (2012) ................................................................................ passim

New Mexico v. Watkins,
    969 F.2d 1122 (D.C. Cir. 1992) ..................................................................... 11

New York v. United States,
    505 U.S. 144 (1992) ......................................................................................... 14

Regan v. Time, Inc.,
    468 U.S. 641 (1984) ......................................................................................... 21

Spokane Arcades, Inc. v. Brockett,
    631 F.2d 135 (9th Cir. 1980) ......................................................................... 7, 21

United States v. Booker,
    543 U.S. 220 (2005) ........................................................................................... 8

United States v. Spokane Tribe of Indians,
    139 F.3d 1297 (9th Cir. 1998) ............................................................................ 7

Williams v. Standard Oil Co.,
    278 U.S. 235 (1929) ............................................................................................ 5

**STATUTES**

43 U.S.C. § 156 ...................................................................................................... 13

43 U.S.C. § 1701(a)(4) ........................................................................................... 10

43 U.S.C. § 1714(a) .................................................................................................. 2

43 U.S.C. § 1714(b)(1) ..................................................................................... 11, 20

43 U.S.C. § 1714(c)(1) ..................................................................................... passim

43 U.S.C. § 1714(c)(2) ................................................................................. 3, 12, 20

43 U.S.C. § 1714(d) .................................................................................................. 2

iii

43 U.S.C. § 1714(e) ........................................................................ 14, 15

43 U.S.C. § 1714(f) ................................................................................ 11

43 U.S.C. § 1714(j) ................................................................................ 10

43 U.S.C. § 1782 .................................................................................... 10

Pub. L. No. 94-579, § 707 (1976) ........................................................... 6

**OTHER AUTHORITIES**

122 CONG. REC. H7600-H7603 (July 22, 1976) ............................... 18, 19

122 CONG. REC. S12931 (July 30, 1976) ............................................. 16

Casey E. Folks, Jr.,
    183 IBLA 24 (2012 ) ................................................... 9, 10, 11

David H. Getches, Managing the Public Lands: The Authority of the Executive to
    Withdraw Lands, 22 Nat. Resources J. 279 (1982) ............................ 9, 11, 13

H.R. Rep. No. 94-1163 (1976) ................................... 10, 16, 17, 18

H.R. Rep. No. 94-1724 (1976) (Conf. Rep.) .................................. 15

Pub. Land Law Review Comm'n, One Third of the Nation's Land .............. 8, 9

Public Land Policy and Management Act of 1975: Hearings on H.R. 5224 and
    H.R. 5622 Before the Subcomm. on Public Lands of the H. Comm. on Interior
    and Insular Affairs, 94th Cong. (1975) ................................... 18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant-intervenors Grand Canyon Trust <u>et al</u>. ("the Trust") respectfully move for partial summary judgment pursuant to Fed. R. Civ. P. 56, and request that this court deny plaintiffs National Mining Association <u>et al.</u>'s ("NMA's") claim for relief on Count I of their Amended Complaint, and deny plaintiff Northwest Mining Association's ("Northwest's") Seventh Claim for relief.  Amended Compl. ¶¶ 97-107, 3:12-cv-8038, Dkt. #56 (June 26, 2012); Compl. ¶¶ 127-45, 3:12-cv-8042, Dkt. #1 (Mar. 6, 2012).[1]  The Trust also requests that this Court deny NMA's and Northwest's motions seeking summary judgment on these same counts.  Pls.' Mot. for Partial Summ. J'ment, 3:12-cv-0838, Dkt. #73 (Aug. 10, 2012) ("NMA Memo."); Nw. Mining Assn.'s Mot. for Partial Summ. J., Dkt. #90 (Jan. 18, 2013) ("Nw. Memo.").

The Trust hereby joins and incorporates the Statement of Material Facts by Federal Defendants field this day.  Fed. Defendants' Statement of Material Facts, attached to Dkt. #95 (Feb. 8, 2013).  The Trust submits herewith its Statement of Disputed Facts responding to NMA's Statement of Facts (3:12-cv-8038, Dkt. #73-1 (Aug. 10, 2012)).

## MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO NMA'S AND NORTHWEST'S MOTION FOR PARTIAL SUMMARY JUDGMENT

NMA and Northwest ask this Court to set aside the Secretary of the Interior's January 2012 decision to withdraw from mineral entry one million acres of public land in the Grand Canyon watershed because, they allege, the Secretary's authority to withdraw this land is invalid.  While Subsection 204(c)(1) of the Federal Land Policy and Management Act ("FLPMA") delegates to the Interior Secretary authority to make withdrawals of 5,000 acres ("large-tract withdrawals") or more, NMA and Northwest claim that a "legislative veto" in 204(c)(1) is unconstitutional and cannot be severed.  As

---

[1]  This memorandum identifies a filing's case number only where the filing occurred in a case other than the designated lead case prior to consolidation.

1

1  a result, they assert, this, and by implication any, exercise of the Secretary's large-tract

2  withdrawal authority is invalid.

3       This Court must deny NMA's and Northwest's claims, and enter partial summary

4  judgment for Defendants.  If this Court concludes Subsection 204(c)(1)'s legislative veto

5  is unconstitutional, the Court must wield a scalpel and not a meat axe in fashioning a

6  remedy.  Caselaw and canons of constitutional law and statutory construction mandate

7  that this Court sever as little of the act as possible and still leave a functioning statute.

8  Because FLPMA contains a severability clause, the Court may invalidate statutory

9  language beyond the veto only where the Court finds "strong evidence" that Congress

10 would have preferred to prevent the Executive from making <u>any</u> large-tract withdrawals

11 if Congress did not retain a veto option.  Neither FLPMA's language nor its legislative

12 history contains such evidence.  Absent the veto, FLPMA remains a fully functional

13 statute.  Excising only the legislative veto would leave the Secretary's large-tract

14 withdrawal authority intact and still subject to other procedural safeguards, consistent

15 with Congress's purposes in enacting FLPMA.  This Court must therefore deny NMA's

16 and Northwest's pending motions, and grant this motion.

17                              **STATUTORY BACKGROUND**

18      FLPMA authorizes the Secretary of the Interior to "make, modify, extend, or

19 revoke withdrawals but only in accordance with the provisions and limitations of this

20 section."  43 U.S.C. § 1714(a).  Section 204 of the Act establishes procedures that

21 regulate executive branch withdrawals of less than 5,000 acres, <u>id.</u> § 1714(d), and those

22 5,000 acres or greater.  <u>Id.</u> § 1714(c)(1).  For the latter category, Subsection 204(c)(1)

23 provides:

> a withdrawal aggregating five thousand acres or more may be made … only
> for a period of not more than twenty years by the Secretary on his own
> motion or upon request by a department or agency head.  The Secretary
> shall notify both Houses of Congress of such a withdrawal no later than its
> effective date and the withdrawal shall terminate and become ineffective at
> the end of ninety days … if the Congress has adopted a concurrent
> resolution stating that such House does not approve the withdrawal.

24

25

26

27

28

Id. § 1714(c)(1).  Subsection 204(c)(1) contains additional detail after the last sentence quoted above describing how Congress would consider such a resolution.  Id.  Subsection 204(c)(2) provides that "[w]ith the notices required by" Subsection 204(c)(1), the Secretary shall provide to the relevant Congressional committees a report containing information on the proposed use for the withdrawal, the area's existing and potential resources, and potential environmental and economic impacts, a description of consultation with other agencies and local governments, the duration of the withdrawal, and information concerning public hearings.  Id. § 1714(c)(2).  See also infra at 11-12.

<b>STANDARD OF REVIEW.</b>

The Trust incorporates the section entitled "Standard of Review" in Federal Defendants' memorandum filed today.  Fed. Defs.' Cross Mot. at 5-6, Dkt. #95 (Feb. 8, 2013).

<b>ARGUMENT</b>

**I.  THE EXECUTIVE'S AUTHORITY TO MAKE LARGE-TRACT WITHDRAWALS REMAINS INTACT EVEN IF SUBSECTION 204(C)'S LEGISLATIVE VETO IS UNCONSTITUTIONAL.**

NMA and Northwest allege that Subsection 204(c)(1)'s provision allowing Congress to disapprove of a withdrawal by concurrent resolution within 90 legislative days of its effective date violates the presentment requirement of Article I of the Constitution.  NMA Memo. 3-7; Nw. Memo. 8-12.  They rely on I.N.S. v. Chadha, which held unconstitutional a one-house legislative veto of an executive branch action.  462 U.S. 919, 952-58 (1983).  NMA and Northwest further contend that Subsection 204(c)(1)'s legislative veto language cannot be severed from the remaining valid provisions of Subsection 204(c)(1) or 204(c)(2) and so all of Subsection 204(c) must be severed.  NMA Memo. 8; Nw. Memo. 12-16.  Because the Secretary explicitly relied on Subsection 204(c) as authority for the withdrawal to protect the Grand Canyon watershed, NMA and Northwest allege that that withdrawal must be set aside.

1    Assuming that the mechanism whereby Congress could "veto" a large-tract

2    withdrawal is unconstitutional, the proper remedy is <u>not</u> to maximize the damage to

3    FLPMA's large-tract withdrawal provisions, as NMA and Northwest urge.  Instead, this

4    Court should sever only the constitutionally infirm language: the seven and a half

5    sentences in Subsection 204(c)(1) that make up the legislative veto.[2]  Doing so would

6    leave the Interior Secretary's large-tract withdrawal authority in place, and therefore

7    would have no effect on the Secretary's exercise of authority in making the Grand

8    Canyon watershed withdrawal.  Thus, assuming the legislative veto is unconstitutional,

9    this Court must deny NMA's and Northwest's summary judgment motions, and grant this

10   cross motion.

### A.   Because FLPMA Contains A Severability Clause, Plaintiffs Must Show "Strong Evidence" That The Legislative Veto Is Not Severable.

Once a court determines that a law contains unconstitutional language, it must

determine how much of Congress's language to invalidate.  Doing so requires "great

gravity and delicacy," given the separation of powers issues at play.  <u>Ashwander v. Tenn.</u>

<u>Valley Auth.</u>, 297 U.S. 288, 345 (1936) (Brandeis, J., concurring).  As the Supreme Court

has explained: "Generally speaking, when confronting a constitutional flaw in a statute,

we try to limit the solution to the problem …[and] try not to nullify more of a

legislature's work than is necessary."  <u>Ayotte v. Planned Parenthood of N. New Eng.</u>, 546

U.S. 320, 328-29 (2006).  "When a constitutional infirmity mars a statute, the Court

ordinarily removes the infirmity.  It undertakes a salvage operation; it does not demolish

the legislation.…"  <u>Nat'l Fed'n of Indep. Bus. v. Sebelius</u>, 132 S. Ct. 2566, 2630 (2012)

---

[2]  Severing only the legislative veto language would leave Subection 204(c)(1) to read in pertinent part as follows:

> a withdrawal aggregating five thousand acres or more may be made … only for a period of not more than twenty years by the Secretary on his own motion or upon request by a department or agency head.  The Secretary shall notify both Houses of Congress of such a withdrawal no later than its effective date.

Subsection 204(c)(2)'s reporting requirements would remain intact, and would bind the Secretary to fulfill them when making a withdrawal of 5,000 acres or larger.

1    (Ginsburg, J., concurring as to remedy) ("NFIB").  As a result, in the "overwhelming

2    majority of cases," the Supreme Court severs only the constitutionally infirm language

3    from the statute, leaving the remainder of the valid law intact.  See Florida v. U.S. Dep't

4    of Health & Human Servs., 648 F.3d 1235, 1321 (11th Cir. 2011) (citing line of modern

5    Supreme Court caselaw), aff'd in part and rev'd in part, NFIB, 132 S. Ct. 2566 (2012).

6          The court's mandate to salvage rather than demolish the remaining, valid portion

7    of a statute is especially clear where Congress has included a "severability" clause to

8    inform the courts that severing an invalid provision should not injure the remainder of the

9    law.  Severing only the constitutional infirm language "is plainly in order where …

10   Congress has expressly instructed courts to leave untouched every provision not found

11   invalid." NFIB, 132 S. Ct. at 2630 (Ginsburg, J., concurring as to remedy).  The

12   inclusion of a severability clause is Congress's clearest indication of its intent that the

13   court should not sever valid statutory provisions, because a severability clause "serves to

14   assure the courts that separate sections or provisions of a partly invalid act may be

15   properly sustained 'without hesitation or doubt as to whether they would have been

16   adopted, even if the legislature had been advised of the invalidity of part.'"  Williams v.

17   Standard Oil Co., 278 U.S. 235, 241 (1929) (quoting Hill v. Wallace, 259 U.S. 44, 71

18   (1922)); NFIB, 132 S. Ct. at 2607 (2012) (prohibiting application of statute in

19   unconstitutional manner "fully remedies" the constitutional violation; the severability

20   clause "confirm[s] that we need go no further").  "The presence of a severability clause,

21   which expressly sets forth congressional intent that a statute stand in the event one of its

22   provisions is struck down, makes it extremely difficult for a party to demonstrate

23   inseverability." Consumer Energy Council of Am. v. FERC, 673 F.2d 425, 441 (D.C.

24   Cir. 1982), aff'd sub nom., Process Gas Consumers Group v. Consumer Energy Council

25   of Am., 463 U.S. 1216 (1983).

26

27

28

1    For these reasons, when Congress has expressly instructed courts to preserve valid

2    language, a plaintiff faces a greater burden in establishing that the court should strike

3    additional language.

> [T]he inclusion of such a [severability] clause creates a presumption that
> Congress did not intend the validity of the statute in question to depend on
> the validity of the constitutionally offensive provision.  In such a case,
> <u>unless there is strong evidence that Congress intended otherwise</u>, the
> objectionable provision can be excised from the remainder of the statute.

7    <u>Alaska Airlines, Inc. v. Brock</u>, 480 U.S. 678, 686 (1987) (emphasis added) (citations

8    omitted).[3]  An explicit statement of congressional intent excuses the court from engaging

9    in the "elusive inquiry" into legislative intent because "Congress could not have more

10   plainly authorized the presumption" that the infirm language is severable.  <u>Chadha</u>, 462

11   U.S. at 932.  <u>See also</u> <u>Leavitt v. Jane L.</u>, 518 U.S. 137 (1996) (reversing appellate

12   decision to invalidate a valid provision it found inseverable from an unconstitutional

13   provision as irreconcilable with the legislature's expression of intent to sever based on

14   statute's severability clause).

15   Because FLPMA contains a severability clause, Plaintiffs face a heightened

16   burden – a showing of "strong evidence" – in their quest to strike down the entirety of

17   FLPMA's provisions concerning large-tract withdrawals.  Congress included a

18   severability clause in FLPMA to preserve valid statutory provisions should any other

19   provisions be found unconstitutional.  "If any provision of the Act or the application

20   thereof is held invalid, the remainder of the Act and the application thereof shall not be

21   affected thereby."  FLPMA, Pub. L. No. 94-579, § 707 (1976).  FLPMA's severability

22   provision is nearly identical to that in <u>Chadha</u> in which the Court excised only the

23   legislative veto language.  <u>Chadha</u>, 462 U.S. at 932 (quoting the severability provision:

24   "If any particular provision of this Act, or the application thereof to any person or

25   circumstance, is held invalid, the remainder of the Act and the application of such

26

27   _____

[3]  <u>See</u> <u>Florida</u>, 648 F.3d at 1327 (it must be "<u>evident</u> (as opposed to possible or
reasonable)" that Congress would not have enacted the provisions containing the
infirmity (emphasis in original).

28

provision to other persons or circumstances shall not be affected thereby." (emphasis omitted)).[4]

Despite Supreme Court precedent establishing a heightened burden of proof where the law at issue contains a severability clause, NMA cites four cases to argue that "courts have not hesitated to reject severability even where, as here, a statute contained a severability clause." NMA Memo. 12-13. None of these cases help NMA. In two of them, contrary to NMA's representation, the Supreme Court did in fact sever the unconstitutional language, leaving the remainder of the law intact; in one of these two the Court severed a legislative veto. Alaska Airlines, 480 U.S. at 697 (severing veto); Buckley v. Valeo, 424 U.S. U.S. 1, 109 (1976). In the third case, the Ninth Circuit made no decision whether or not to sever, instead remanding the case for further record development. United States v. Spokane Tribe of Indians, 139 F.3d 1297, 1302 (9th Cir. 1998). NMA cites only one case where the Court refused to sever the unconstitutional provisions. Spokane Arcades, Inc. v. Brockett, 631 F.2d 135 (9th Cir. 1980), aff'd, 454 U.S. 1022 (1981). But Spokane Arcades is distinguishable because the court there found multiple provisions to be unconstitutional, that the unconstitutional language represented a "vital part of the statutory scheme," and that severing the infirm provisions "would essentially eviscerate the statute." Id. at 139. Here, removing the legislative veto would have no such drastic effect. See infra at 10-15. In sum, none of NMA's cases require this Court to ignore the rule that movants face a heightened burden to show a constitutionally infirm provision is inseverable.

### B.     FLPMA's Structure, Text And Legislative History Do Not Provide "Strong Evidence" That Congress Would Have Prohibited All Executive Large-Tract Withdrawals Absent A Legislative Veto.

The legislative veto can be severed from Subsection 204(c)(1) unless Plaintiffs provide "strong evidence" that Congress would have wanted to completely prohibit the

---

[4] See also NFIB, 132 S. Ct. at 2607 ("We then follow Congress's explicit textual instruction to leave unaffected 'the remainder of the chapter, and the application of [the challenged] provision to other persons or circumstances.'" (quoting amended statute's severability clause)).

1    Secretary from making large-tract withdrawals absent the option of vetoing such

2    withdrawals.  Courts look to the law's structure and text, and at its legislative history to

3    divine legislative intent.  Alaska Airlines, 480 U.S. at 687; Ayotte, 546 U.S. at 330 ("the

4    touchstone for any decision about remedy is legislative intent").  "Strong evidence" must

5    show more than that the law will be altered by the loss of the legislative veto, because

6    severing the veto will inevitably change the law.  See United States v. Booker, 543 U.S.

7    220, 265 (2005) (legislative intent should be determined "in light of the Court's

8    holding").  Movants must also show that Congress would not have wanted the rest of the

9    valid act to stand had it known the infirm language would be excised.  NFIB, 132 S. Ct.

10   at 2607; Chadha, 462 U.S. at 931-32.  Evidence of mere "reluctance" to delegate

11   authority to the Executive is not enough to demonstrate that a legislative veto is

12   inseverable.  See Chadha, 462 U.S. at 932.

13          Here, NMA and Northwest fail to provide the required "strong evidence" that the

14   loss of the veto provision would defeat Congressional intent behind FLPMA and

15   eliminate Congress's desire to delegate to the Secretary authority to make temporary

16   large-tract withdrawals.

17                        1.    Background: The Public Land Law Review Commission

18          Prior to FLPMA, the executive branch exercised virtually unchecked power over

19   withdrawals, and the results were not pleasing to some in Congress.  Management of

20   federal public lands in the mid-20[th] Century "became chaotic," in part a result of the

21   hodgepodge of hundreds of sometimes conflicting statutes that guided mining, forest

22   management, and other resource uses.  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 876

23   (1990).  Congress responded in 1964 by establishing the Public Land Law Review

24   Commission ("PLLRC") to study and to make recommendations for improving public

25   land management.  Id.

26          The PLLRC's report, issued in 1970, concluded that Executive withdrawals had

27   occurred in "an uncontrolled and haphazard manner."  Pub. Land Law Review Comm'n,

28

One Third of the Nation's Land 43 (1970) ("PLLRC Report"), excerpts attached as Ex. 1;
see also Lujan, 497 U.S. at 876.  The PLLRC found it difficult to determine even basic
information such as the location and extent of Executive withdrawals and how various
withdrawals overlapped.  PLLRC Report at 52; Lujan, 497 U.S at 876-77.  Executive
withdrawals were plagued by "problems such as excessive size, indefiniteness of
boundaries, lack of uniformity, and interminable 'temporary' withdrawals."  PLLRC
Report at 55.  These problems stemmed in part from "the lack of adequate public
accountability" concerning Executive withdrawals, attributed to the fact that, with a few
exceptions, "there is no statutory restriction on the asserted permanent withdrawal
authority of the Executive."  Id. at 44, 55.  See also Casey E. Folks, Jr., 183 IBLA 24, 39
(2012); David H. Getches, Managing the Public Lands: The Authority of the Executive to
Withdraw Lands, 22 Nat. Resources J. 279, 290-99 (1982) (describing the Executive's
reliance on "implied authority" for large, permanent withdrawals prior to FLPMA),
attached as Ex. 2.

    To address these issues, the PLLRC recommended a two-tier system for
withdrawals.  Congress should exercise complete authority over "permanent or
indefinite" withdrawals, and delegate "[a]ll other withdrawal authority" to the Executive
to establish limited-term withdrawals with procedural safeguards.  PLLRC Report at 54.[5]
Congress should reserve to itself authority to withdraw lands "for the purpose of
establishing or enlarging … national parks, national monuments … national forests, …
units of the wilderness system" and similar lands.  Id.  "Executive withdrawals" should
be limited in duration, should occur only after public involvement, and only after the
Executive first evaluated a series of factors, made specific findings on those factors, and
reported its findings to Congress.  Id. at 55.  The PLLRC did not recommend that

---

[5]  See also PLLRC Report at 2 (recommending that "Congress assert its constitutional
authority by enacting legislation reserving unto itself exclusive authority to withdraw or
otherwise set aside public lands for specified limited purpose uses and delineating
specific delegation of authority to the Executive as to the types of withdrawals and set
asides that may be effected without legislative action.") (emphasis added).

1   Congress enact a legislative veto as a check on Executive withdrawals.  Nor did it

2   recommend that Congress retain authority over all large, temporary withdrawals.

3                   2.       FLPMA's Structure And Text

4          FLPMA's structure and text reflect the two-tier withdrawal system the PLLRC

5   recommended.[6]  "The Congress declares that it is the policy of the United States that …

6   the <u>Congress</u> exercise its constitutional authority to withdraw or otherwise designate or

7   dedicate Federal lands for specified purposes <u>and</u> that Congress delineate the extent to

8   which <u>the Executive</u> may withdraw lands <u>without legislative action</u>."  43 U.S.C.

9   § 1701(a)(4) (emphasis added).  Regarding the first tier, FLPMA forbids the Executive

10  from making, modifying or revoking any Congressional withdrawal.  43 U.S.C.

11  § 1714(j).[7]  FLPMA specifically prohibits the Executive from modifying withdrawals for

12  national monuments or national wildlife refuges.  <u>Id.</u>  And while FLPMA permits the

13  President to <u>recommend</u> Bureau of Land Management ("BLM") lands for preservation

14  under the Wilderness Act, Congress reserved the authority to designate wilderness.  43

15  U.S.C. § 1782.

16         Executive withdrawals under FLPMA follow the PLLRC Report's

17  recommendations.  FLPMA defines and prescribes the procedures and conditions under

18  which the Executive may withdraw lands "without legislative action."  First, Subsection

19  204(c)(1) eliminates indefinite Executive withdrawals by limiting to 20 years the duration

20  of withdrawals over 5,000 acres.  43 U.S.C. § 1714(c)(1).  FLPMA limits any Executive

21  attempt to turn a temporary withdrawal into an indefinite one by prescribing how the

22  Interior Secretary may extend withdrawals, and by requiring the Secretary to report any

23

24  _____

    [6]  <u>See</u> <u>Casey E. Folks. Jr.</u>, 183 IBLA at 46 n.29 (PLLRC Report played key role in
    FLPMA's legislative history).

25  [7]  As the House report puts it, FLPMA "reserve[s] to the Congress the authority to create,

26  modify, and terminate withdrawals for national parks, national forests, the Wilderness
    System, Indian reservations, certain defense withdrawals, and withdrawals for National

27  Wild and Scenic Rivers, National Trails, and for other 'national' recreation units, such as
    National Recreation Areas and National Seashores."  H.R. Rep. No. 94-1163, at 9 (1976),

28  <u>reprinted in</u> 1976 U.S.C.C.A.N. 6175, 6177-78.

extensions to the appropriate Congressional committees.  43 U.S.C. § 1714(f).[8]  One

commentator has called the provisions ending the Executive's authority to make

indefinite withdrawals "<u>probably the most important limit on the executive's withdrawal</u>

<u>authority under the FLPMA</u>" because it "forces rethinking the wisdom of a withdrawal

periodically."  Getches (Ex. 2) at 324 (emphasis added).

These provisions have accomplished Congress's goals, having precluded the

unfettered revision and extension of Executive withdrawals.  <u>New Mexico v. Watkins</u>

examined an Interior Department decision to not only extend an existing withdrawal

pursuant to 43 U.S.C. § 1714(f) but to simultaneously modify that withdrawal's purpose

without preparing a new report to Congress, as it would need to for a new withdrawal

pursuant to 43 U.S.C. §§ 1714(c)(1) and (c)(2).  969 F.2d 1122, 1136 (D.C. Cir. 1992).

The Court held that 43 U.S.C. § 1714(f) mandates that "an extension [in duration] is to be

granted only to accomplish the purpose of the original withdrawal; it cannot be granted to

accomplish the purpose of a modification," and upheld a district court decision finding

the Interior Department's action illegal.  <u>Id.</u> at 1135; <u>see also id.</u> at 1137 (characterizing

FLPMA's limits on withdrawal renewals as a "prime means of securing [congressional]

control" over federal lands).

Second, Section 204 tracks the PLLRC Report's recommendations that withdrawal

legislation ensure considered deliberation and public notice and comment on proposed

Executive withdrawals.  Whenever the Interior Secretary or another department proposes

a withdrawal, the Secretary must publish a notice in the Federal Register within 30 days,

alerting Congress and the public to the proposal.  43 U.S.C. § 1714(b)(1).  For large-tract

withdrawals, the Secretary must submit to appropriate Congressional committees

information that explains the what, when, where, how and why of the withdrawal.  The

---

[8]  The Interior Secretary may extend temporary withdrawals "only upon compliance with the provisions of [Subsection 204] (c)(1) or (d) … and only if the Secretary determines that the purpose for which the withdrawal was first made requires the extension, and then only for a period no longer than the length of the original withdrawal period."  43 U.S.C. § 1714(f).  <u>See also</u> <u>Casey E. Folks, Jr.</u>, 183 IBLA at 48 (describing provision).

1    Interior Department must describe, among other things: the proposed use for the

2    withdrawal; the area's existing and potential resources and potential environmental and

3    economic impacts; impacts to present users of the withdrawal; the withdrawal's effects

4    on state and local interests, and a description of consultation with other agencies and state

5    and local governments; the duration of the withdrawal; and the time and place of hearings

6    and other public involvement.  43 U.S.C. § 1714(c)(2).  These requirements ensure that

7    the Executive will undertake a considered evaluation before making a withdrawal, and

8    that Congress, state and local governments, and the public will be informed about and

9    have input into the proposal.[9]  The Secretary complied with all of these requirements in

10   making the Grand Canyon watershed withdrawal.

11           Through these provisions, Congress demonstrated its intent to authorize, with

12   several checks, the Executive to make temporary large-tract withdrawals, while Congress

13   retained complete authority over permanent withdrawals.  These checks on Executive

14   withdrawals remain even absent the legislative veto.  The Secretary's ability to make

15   large-tract withdrawals is still constrained by the 20-year limit, by limits on renewal and

16   amendment of such withdrawals, and by the requirement that the Executive justify such a

17   withdrawal, involve the public, and notify and report to Congress.  Accordingly, NMA

18   and Northwest are wrong to argue that severing the legislative veto would undermine

19   Congress's intent to reign in Executive withdrawals "by returning to the Secretary the

20   sort of unfettered withdrawal authority that predated FLPMA and drove its enactment."

21   NMA Memo. 10.[10]  FLPMA's structure and text contradict such allegations.

22   _____

[9]  FLPMA's structure also comports with PLLRC recommendations and the statement of
23   Congressional policy that the Executive may withdraw lands "without legislative action."
     See supra at 10.  The Act provides that temporary large-tract withdrawals take effect
24   upon completion of the report to the committees without an act of Congress.  While
     Subsection 204(c)(1) contains a legislative veto provision, large withdrawals go into
25   effect immediately and remain in effect absent Congressional action.  43 U.S.C.
     § 1714(c)(1).

26   [10]  See also NMA Memo. 11 (removing legislative veto would allow BLM "to make large
     tract withdrawals unsupervised by Congress"); id. at 13 (making similar statement); Nw.
27   Memo. 16 n.10 (removing veto "would essentially turn back the clock to pre-FLPMA
     days when the Executive Branch had unbridled discretion to withdraw public lands").

28

1    One leading public lands scholar concluded that Subsection 204(c)(2)'s

2    requirement that the Interior Secretary prepare a report justifying and explaining the

3    withdrawal and involving the public is of great significance, while downplaying the

4    significance of the legislative veto as a check on Executive authority.  Professor Getches

5    concluded that Congress would rarely utilize Subsection 204(c)(1)'s legislative veto

6    because it requires Congress to exercise great vigilance, something he thought unlikely to

7    occur.  Getches (Ex. 2) at 324 ("unless an especially interested member of one of the key

8    committees chooses to scrutinize all withdrawals, the reporting requirements will be

9    essentially a means of forcing the executive to make a closer consideration of any

10   withdrawal decision.").  Further, Professor Getches argues that Subsection 204(c)(1)'s

11   90-day deadline for completing a legislative veto makes it unlikely to be used except in

12   the most extreme cases, leaving Congress with the remedy it always had: legislation to

13   reverse Executive action.  Id. at 325 ("most members of Congress would be

14   uncomfortable overruling the executive's conservation decision on such short notice

15   except in an outrageous case.  Most congressional disapprovals of executive withdrawals

16   are likely to be by legislation after full committee consideration as they were in the

17   past.").

18        A review of FLPMA's structure and language demonstrates that NMA and

19   Northwest cannot show evidence, let alone "strong evidence," that Congress would have

20   prohibited the Secretary from making temporary withdrawals over 5,000 acres absent the

21   legislative veto.  To the contrary, FLPMA's structure and text shows that Congress felt it

22   imperative to retain complete authority over some categories of withdrawals (e.g.,

23   permanent withdrawals to create national parks, wilderness, etc.), but specifically chose

24   not to do so for temporary withdrawals, including those 5,000 acres and larger. [11]

25

26   _____

     [11]  Congress knew how to retain control over large withdrawals, as it did for large-tract

27   defense withdrawals, but chose not to for temporary withdrawals in FLPMA.  See 43
     U.S.C. § 156 (reserving to Congress authority to withdraw more than 5,000 acres of land

28   for defense purposes).

1   The fact that procedural safeguards remain to limit the Executive's authority for

2   large-tract withdrawals even in the absence of a veto supports severing the veto.  The

3   Interior Department's ability to make large-tract withdrawals is still constrained by the

4   20-year limit, by limits on renewing or amending such a withdrawal, and by the need to

5   justify such a withdrawal, involve the public, and report to Congress.  The Supreme

6   Court has held that "where Congress has enacted a statutory scheme for an obvious

7   purpose, and where Congress has included a series of provisions operating as incentives

8   to achieve that purpose, the invalidation of one of the incentives should not ordinarily

9   cause Congress' overall intent to be frustrated."  New York v. United States, 505 U.S.

10  144, 186 (1992).  Here, severing Subsection 204(c)(1)'s veto leaves the law's other

11  procedural safeguards intact.

12      NMA suggests that this Court must demolish the remainder of Section 204(c)(1)

13  and all of Subsection 204(c)(2) because severing the veto alone "would render

14  ineffective" the "notice and reporting provisions" of Subsections 204(c)(1) and (c)(2).

15  NMA Memo. 11.  This argument is both irrelevant and incorrect.  It is irrelevant because

16  the Court's inquiry must focus not on whether severing the veto leaves the law's other

17  provisions ineffective, but on whether Congress would have preferred to retain absolute

18  authority over large-tract withdrawals if it could not have a chance to veto some such

19  withdrawals.[12]  See supra at 7-8.  NMA's argument is wrong because the Subsection

20  204(c)(2) report, even absent the veto, helps achieve Congress's goal of improving the

21  Secretary's decisionmaking and enabling Congressional oversight by requiring the

22  Executive to identify and justify a withdrawal, weigh the costs and benefits, hold

23  hearings and involve the public.[13]

24

25  _____

    [12]  Even if the veto's presence demonstrates some "reluctance" by Congress to delegate
26  authority to the Executive to make temporary withdrawals, such reluctance alone is not
    sufficient to demonstrate that the veto is inseverable.  Chadha, 462 U.S. at 932.

27  [13]  NMA also contends that "without the veto, the notices [in Subsections 204(c)(1) and
    (c)(2)] contribute nothing."  NMA Memo. 12 n.10.  This ignores the value Congress saw
28  in these reports, as evidenced by the requirement that the Secretary use Subsection
    204(c)(2)'s report provision to inform Congress of emergency withdrawals.  43 U.S.C.

1   Northwest further suggests that removing the legislative veto in Subsection

2   204(c)(1) would contradict FLPMA's structure because it would result in little difference

3   between the regulation of large-tract withdrawals and that of withdrawals smaller than

4   5,000 acres (which are regulated under Subsection 204(d)).  See Nw. Memo. 15 n.9.  See

5   also NMA Memo. 11 n.9.  This suggestion is incorrect.  Even absent a veto, large-tract

6   withdrawals may only last 20 years; and the reporting, public involvement, and

7   consultation provisions of Subsection 204(c)(2) apply.  Smaller withdrawals for a

8   "resource use" can be indefinite, and none of Subsection 204(c)(2)'s provisions that

9   inform Congress and the public of the justification for, and impacts of, a withdrawal

10  apply to small withdrawals.  Thus, even absent the veto, FLPMA places more constraints

11  on large-tract withdrawals than on smaller ones.

12       NMA and Northwest therefore cannot and do not provide "strong evidence" that

13  FLPMA's text and structure require that the Executive be stripped of all authority to

14  make large-tract withdrawals, absent the legislative veto.

15                    3.      FLPMA's Legislative History

16       Legislative history fails to provide "strong evidence" to overcome the presumption

17  that the Court should sever only Subsection 204(c)(1)'s veto provision.  The Conference

18  Report contains no explicit discussion of Section 204 beyond stating that the Senate

19  version failed to contain any provisions at all addressing withdrawals, although the

20  Senate ultimately adopted the House's withdrawal provisions.  H.R. Rep. No. 94-1724, at

21  58 (1976) (Conf. Rep.), reprinted in 1976 U.S.C.C.A.N. 6227, 6230.  Other legislative

22  history confirms that the Senate repeatedly rejected any checks on the Executive's

23  withdrawal authority prior to FLPMA's passage.  The Senate considered "[a] number of

24  policies in the House bill, such as … congressional review of withdrawals … in one form

25  _____

26  § 1714(e).  See also supra at 11-12.  The fact that FLPMA requires the information set
    out in Subsection 204(c)(2) three months after an emergency withdrawal takes effect, and

27  provides no legislative veto for emergency withdrawals, supports the conclusion that
    Congress believed the information contained in the Subsection 204(c)(2) report would

28  assist Congressional oversight independent of any legislative veto.

1    or another and rejected [them] during committee markups over the last three

2    Congresses."  122 CONG. REC. S12931 (July 30, 1976) (statement of Sen. Jackson) ),

3    reprinted in SENATE COMM. ON ENERGY & NATURAL RESOURCES, 95TH CONG.,

4    LEGISLATIVE HISTORY OF THE FEDERAL LAND POLICY AND MANAGEMENT ACT OF 1976,

5    at 743 (1978) ("FLPMA Leg. Hist.") (comparing House and Senate versions of FLPMA

6    bills).  In describing the differences between the final House and Senate bills prior to

7    conference on the law that became FLPMA, Senator Jackson notes repeatedly that "[t]he

8    Senate bill has no comparable provision" to the House's withdrawal provisions.  Id.

9         The House Report on its version of the act passed before the House-Senate

10   conference reinforces the conclusion that the House meant to delegate to the Executive

11   authority to make large-tract withdrawals, albeit with oversight and safeguards.  The

12   House Report declares that there should be "Congressional oversight of withdrawals."

13   H.R. Rep. No. 94-1163, at 4 (1976), reprinted in 1976 U.S.C.C.A.N. 6175, 6178.  See

14   also id. at 3-4 (large-tract withdrawals subject to "referral to Congress" due to "[p]ublic

15   concern," but not specifically addressing legislative veto).  The House Report also

16   identifies which branch should control temporary withdrawals, namely the Executive:

17         For the protection of statutory programs for the public lands and other
           statutory management programs, the bill grants to the Secretary of the
18         Interior, subject to certain procedural controls, authority to create, modify,
           and terminate all withdrawals and reservations for all public purposes and
19         departmental agency programs, existing and proposed other than those
           reserved by the bill to the Congress.
20
21   Id. at 9 (emphasis added).  See also id. at 29 ("The bill substitutes a general grant of

22   authority to the Secretary of the Interior to make and modify withdrawals subject to

23   certain procedural requirements.").  The House Report refers to "procedural controls" and

24   "procedural requirements" in the plural, suggesting that the House understood it was

25   relying on multiple mechanisms, not just the legislative veto.  While the House Report

26   describes generally the legislative veto provision, id. at 9, that is "not helpful" in

27   determining Congressional intent.  See Gulf Oil Corp. v. Dyke, 734 F.2d 797, 804

28

1   (Temp. Emer. Ct. App. 1984) (legislative history describing legislative veto's operation

2   "not helpful in determining what Congress would have intended").

3          In short, Congress was not unified in its desire for any checks on Executive

4   withdrawals, nor does evidence show it would not have allowed the Executive to make

5   large-tract withdrawals without the specific remedy of a legislative veto.  FLPMA is thus

6   unlike the law at issue in City of New Haven, Conn. v. United States where Congress was

7   "united in its furor" over unchecked Executive action.  809 F.2d 900, 906 (D.C. Cir.

8   1987) (finding legislative history supported that Congress would prefer no law to law

9   absent legislative veto).  There, bills from both houses sought to provide for

10  Congressional control of the agency action at issue.  One house provided for a legislative

11  veto provision; the other required advance Congressional approval of agency action

12  lasting more than 60 days.  Id. at 906, n.17.

13         NMA and Northwest do not provide a clear statement from the legislative history

14  that absent the legislative veto, Congress never would have chosen to delegate large-tract

15  withdrawal authority to the Secretary.  Nor does the legislative history they highlight

16  amount to "strong evidence" supporting such a proposition.  For example, Northwest

17  ignores relevant report language and contends that the House inserted the "legislative

18  veto provision to 'insure that the integrity of the great national resource management

19  systems will remain under the control of Congress.'"  Nw. Memo. 8 (quoting H.R. Rep.

20  No. 94-1163, at 9 (1976)).  But Northwest misrepresents the House Report it quotes.  The

21  House Report, like FLPMA itself, addresses the two-tier system regulating withdrawals,

22  and the Report's statement concerning "the great national resource management systems

23  [that] will remain under the control of Congress" relates to those withdrawals over which

24  Congress retained complete control:  the indefinite withdrawal of lands for national parks

25  and similar designations.  See H.R. Rep. No. 94-1163, at 9 (1976).  The language

26  Northwest quotes thus has no bearing on the Executive withdrawals subject to the

27  legislative veto.  Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102,

28

17

119 (1980) (statement of conference committee that does not interpret statutory provision in question is not persuasive).

Moreover, while NMA alleges that FLPMA's chief House sponsor, Rep. Melcher, "frequently highlighted the centrality of the legislative veto to granting the Interior Secretary some authority to make large-tract withdrawals," a fair reading of the legislative debate shows otherwise.  Rep. Melcher downplayed the law's significance as a check on the Executive's authority:  "The bill only carries with it when it is over 5,000 acres that either House has the option of within 90 legislative days to disagree with him [the Secretary].  The bill does not in any way limit or interfere with his authority to make the withdrawal."  122 CONG. REC. H7600 (July 22, 1976) (emphasis added), reprinted in FLPMA Leg. Hist. at 686.[14]  Severing Subsection 204(c) in its entirety (as NMA and Northwest urge) would not just "limit or interfere" with the Secretary's large-tract withdrawal authority, it would eliminate it, contradicting Rep. Melcher's interpretation of the law.[15]

Further, as Congress debated FLPMA, it lengthened the period of temporary Executive withdrawals.  When the bill that became FLPMA initially passed the House in 1976, it permitted the Executive to make large withdrawals for only 5 years.  H.R. Rep. No. 94-1163, at 9 (1976).  The bill that emerged from conference later that year allowed

---

[14]  When the legislation was mischaracterized in floor debate as putting a 5,000-acre limit on Executive withdrawals, Rep. Melcher quickly clarified that "[t]he bill in no way puts a 5,000-acre limit on withdrawals."  122 CONG. REC. H7600 (July 22, 1976), reprinted in FLPMA Leg. Hist. at 686.

[15]  Similarly, in a hearing on the House bill that became FLPMA, Rep. Melcher explained:

> I think for that very reason the committee adopted the [legislative] veto feature last year, because we do not want to interfere.  It does not take an affirmative action of the committee to approve an action [i.e., a temporary withdrawal].  This leaves the agency free to act promptly, quickly, and in the public interest.

Public Land Policy and Management Act of 1975: Hearings on H.R. 5224 and H.R. 5622 Before the Subcomm. on Public Lands of the H. Comm. on Interior and Insular Affairs, 94th Cong. 463 (1975) (emphasis added), excerpts attached as Ex. 3.

the Interior Secretary to withdraw lands for 20 years rather than 5 before seeking an extension.  See 43 U.S.C. § 1714(c)(1).  Further, the House was almost evenly split on whether the legislative veto provision would apply to too many withdrawals.  An amendment to limit Executive withdrawals subject to the procedural reporting and veto provisions from those larger than 5,000 to those larger than 25,000 acres lost by just two votes.  122 Cong. Rec. H7602-H7603 (July 22, 1976), reprinted in FLPMA Leg. Hist. at 688-89.  Thus, as debate over the Act went on, Congress gave the Executive more leeway in issuing temporary withdrawals.  This history does not support NMA's and Northwest's assertion that Congress would have wanted complete control over large temporary withdrawal if no veto was possible.

In sum, because FLPMA's legislative history fails to provide evidence, let alone "strong evidence," that Congress would have preferred to eliminate the Secretary's authority to make large withdrawals absent the legislative veto, this Court must sever only the veto.

### C. Severing Only The Veto Would Leave FLPMA Fully Operative As A Law, And The Remaining Law Comports With Congressional Intent.

"A provision is further presumed severable if what remains after severance is fully operative as a law."  Chadha, 462 U.S. at 934 (quotations omitted).  See also Alaska Airlines, 480 U.S. at 684 (invalid part of statute "may be dropped if what is left is fully operative as a law" (quotations omitted)).  To determine whether a statute is fully operative, courts sometimes inquire into whether a provision is "so interwoven with [other provisions] that they cannot be separated."  Hill, 259 U.S. at 70.  However, the Supreme Court has generally found "a legislative veto, … by its very nature is separate from the operation of the substantive provisions of a statute."  Alaska Airlines, 480 U.S. at 684-85 (emphasis added).  In Alaska Airlines, the Court reasoned that Congress provided for a legislative veto to allow an activity to proceed if Congress did not disapprove it.  Id.  Thus, the statute operates fully without a veto provision, because the

statute operates in exactly the same manner as it does when Congress does not exercise the veto.

Courts also review whether the statute that remains continues to achieve Congress's purpose in passing the law.  See NFIB, 132 S. Ct. at 2608 (examining whether statute absent invalid provision "will still function in a way consistent with Congress' basic objectives in enacting the statute" (quotations omitted)); Alaska Airlines, 480 U.S. at 685 ("more relevant inquiry in evaluating severability is whether the statute will function in a manner consistent with the intent of Congress" (emphasis in original)). In Chadha, for example, the Supreme Court concluded that the statute absent the legislative veto was fully operational, and the statute that remained complied with Congress's intent in enacting the law.  The Court found that "Congress' oversight of the exercise of this delegated authority [to suspend deportations] is preserved [absent the veto provision] since all such suspensions will continue to be reported to" Congress, giving Congress the information to take action in response.  Chadha, 462 U.S. at 934-35.

Here, FLPMA remains operational absent the legislative veto.  The veto, like the one in Alaska Airlines, is separate from the operation of the remainder of the statute. When Congress does not exercise its veto (as it has never done, either before or after the Chadha decision), the large-tract withdrawal provisions of Subsections 204(c)(1) and (c)(2) act exactly as they do should the veto be severed.  Further, as in Chadha, severing FLPMA's veto would not fundamentally alter the law's system of congressional oversight, because the Secretary would still be required to provide a detailed report to Congress concerning each large-tract withdrawal, and to notify the public and Congress of each withdrawal proposal.  See 43 U.S.C. § 1714(b)(1), (c)(1) & (c)(2).  Congress is thus empowered to oversee, question, review, and, if necessary, take action to overturn a withdrawal, even absent the veto, in line with Congress's purpose in enacting FLPMA.

Despite Supreme Court precedent holding that statutes with invalid legislative vetoes remain fully operational where veto language is severed, NMA and Northwest

1   argue that FLPMA's veto is somehow different because of the veto's <u>location</u> within "the

2   same subsection as the delegation of authority" to make large-tract withdrawals.  Nw.

3   Memo. 13; NMA Memo. 11 (veto and delegation are "part and parcel" of withdrawal

4   provision).  They argue that the veto's placement in Subsection 204(c)(1), where the

5   delegation of authority for large-tract withdrawals also is found, means the authority and

6   the veto are "interwoven and cannot be separated."  Nw. Memo. 14 (quotations omitted).

7         Plaintiffs misapply the law.  Courts find provisions "inextricably bound" <u>not</u>

8   because they are in the same sentence, subsection, or paragraph, but because one

9   provision would not have been enacted without the other.  <u>See</u> <u>Am. Fed'n of Gov't</u>

10  <u>Employees v. Pierce</u>, 697 F.2d 303, 307 (D.C. Cir. 1982) (severing full sentence because

11  prohibition on Executive action would not have been enacted without invalid two-house

12  committee approval provision).[16]  As shown above, there is not "strong evidence" that the

13  delegation for authority for Executive withdrawals would not have been enacted without

14  the legislative veto.  In fact the PLLRC Report, which Congress followed, recommended

15  nearly all of the elements of 204(c)(2)'s reporting requirement but not the veto.  <u>See</u>

16  <u>supra</u> at 9-10.  The fact that FLPMA's legislative veto is in the same subsection as the

17  delegation authority does not evidence in the least that the veto was the <u>sine qua non</u> for

18  delegation of that authority.  Further, courts need not strike down all words in the same

19  "<u>the very same provision</u>" or paragraph because some of the words are unlawful.  NMA

20  Memo. 11.  The Supreme Court has repeatedly found invalid and severed clauses, and

21  even words <u>within</u> a clause or sentence, leaving operational the remaining parts of the

22  sentence.  <u>See</u> <u>Brockett v. Spokane Arcades, Inc.</u>, 472 U.S. 491, 504-506 (1985)

23  (remanding to consider whether to invalidate six words within subsection defining

24  "prurient"); <u>Regan v. Time, Inc.</u>, 468 U.S. 641, 649 (1984) (holding invalid an act's

25  "purpose requirement" of 15 words plus parenthetical phrase within a subparagraph).

26

27  _____

28  [16]  To sever all of Subsection 204(c) as Plaintiffs request, would eliminate valid statutory
    language and leave parts of FLPMA inoperable.  <u>See</u> NMA Memo. 12; <u>supra</u> at 14 n.3.

21

1     NMA's argument that invalidation of the veto renders other FLPMA provisions

2  inoperable misunderstands how the Supreme Court evaluates whether statutes remain

3  fully operational.  NMA Memo. 10-12.  Severing an unenforceable legislative veto does

4  not eviscerate Congress's decision in FLPMA to limit the Executive's authority to make

5  withdrawals because FLPMA retains checks on that formerly "unfettered" authority.  Nor

6  does severing the veto cause Subsection 204(a) to lose "full effect" because one of

7  several of FLPMA's limitations on Secretarial authority to withdraw lands is invalid.

8     Plaintiffs' reasoning falls into the trap of comparing FLPMA as enacted – which is

9  no longer an option if the legislative veto is found unconstitutional – with a FLPMA

10  whose legislative veto is unenforceable.  Such an approach misconstrues how courts must

11  analyze severability.  See Leavitt v. Jane L., 518 U.S. at 143 (explaining fallacy of such

12  an analytical approach).  In enacting FLPMA Congress preferred to have a legislative

13  veto as opposed to not having one; that is evident because the statute contains the veto.

14  The question for this Court is not whether Congress wanted to have a legislative veto, but

15  whether Congress would have preferred to eliminate completely the Executive's large-

16  tract withdrawal authority – and thus to prohibit all large-tract withdrawals unless made

17  by an act of Congress – if Congress could not have a veto.  There is not strong evidence

18  that Congress would have preferred a FLPMA in which Congress was solely responsible

19  for making large-tract withdrawals.

20                              **CONCLUSION**

21     Because "strong evidence" does not exist that Congress would have retained

22  complete authority over large, temporary withdrawals absent a legislative veto, the Court

23  must deny NMA's and Northwest's motions for partial summary judgment and grant the

24  Trust's partial summary judgment motion.

25

26

27

28

Respectfully submitted February 8, 2013.


 /s/ Edward B. Zukoski
Melanie R. Kay (*pro hac vice*)
Edward B. Zukoski (*pro hac vice*)
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO  80202
mkay@earthjustice.org
tzukoski@earthjustice.org
Telephone: (303) 623-9466
Fax: (303) 623-8083

Roger Flynn *(pro hac vice)*
Western Mining Action Project
P.O. Box 349, 440 Main St., #2
Lyons, CO  80540
wmap@igc.org
Telephone: (303) 823-5738
Fax: (303) 823-5732

Attorneys for Grand Canyon Trust, the Havasupai Tribe,
Center for Biological Diversity, Sierra Club, and
National Parks Conservation Association


## CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing DEFENDANT-INTERVENORS GRAND

CANYON TRUST ET AL.'S CROSS-MOTION FOR PARTIAL SUMMARY

JUDGMENT AND MEMORANDUM IN SUPPORT, AND MEMORANDUM IN

OPPOSITION TO NATIONAL MINING ASSOCIATION ET AL.'S MOTIONS FOR

SUMMARY JUDGMENT with supporting exhibits to be served upon counsel of record

through the Court's electronic service system (ECF/CM) and by first class mail to Gregory

Yount at the following address:  807 West Butterfield Road, Chino Valley, Arizona 86323.

Respectfully submitted February 8, 2013.

 /s/ Edward B. Zukoski

1

**TABLE OF EXHIBITS**

2

3

4

Exhibit 1.    Public Land Law Review Commission, <u>One Third of the Nation's Land</u> (1970) (excerpts) (also available at <u>http://archive.org/details/onethirdofnation3431unit</u> (last viewed Feb. 8, 2013))

5

6

Exhibit 2.    David H. Getches, <u>Managing the Public Lands: The Authority of the Executive to Withdraw Lands</u>, 22 Nat. Resources J. 279 (1982)

7

8

9

Exhibit 3.    <u>Public Land Policy and Management Act of 1975: Hearings on H.R. 5224 and H.R. 5622 Before the Subcomm. on Public Lands of the H. Comm. on Interior and Insular Affairs</u>, 94th Cong. (1975) (excerpts) (also available at available at http://babel.hathitrust.org/cgi/pt?id=mdp.39015081207758 (last viewed Feb. 8, 2013))

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2                                   **TABLE OF EXHIBITS**

3

4       Exhibit 1.     Public Land Law Review Commission, <u>One Third of the Nation's</u>
                        <u>Land</u> (1970) (excerpts) (also available at

5                       <u>http://archive.org/details/onethirdofnation3431unit</u> (last viewed Feb.
                        8, 2013))

6

7       Exhibit 2.     David H. Getches, <u>Managing the Public Lands: The Authority of the</u>
                        <u>Executive to Withdraw Lands</u>, 22 Nat. Resources J. 279 (1982)

8       Exhibit 3.     <u>Public Land Policy and Management Act of 1975: Hearings on H.R.</u>
                        <u>5224 and H.R. 5622 Before the Subcomm. on Public Lands of the H.</u>

9                       <u>Comm. on Interior and Insular Affairs</u>, 94th Cong. (1975) (excerpts)
                        (also available at available at

10                      http://babel.hathitrust.org/cgi/pt?id=mdp.39015081207758 (last
                        viewed Feb. 8, 2013))

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

*88003431*

KF
5601
.A55
P8

# One Third of the Nation's Land

A Report to the President
and to the Congress
by the Public Land
Law Review Commission

Bureau of Land Management
Library
Denver Service Center

WASHINGTON, D.C.
June 1970

# CONTENTS

| | Letter of Transmittal | iii |
|---|---|---|
| | The Commission | iv |
| | The Staff | v |
| | The Advisory Council | vi |
| | Preface | ix |
| | A Program for the Future | 1 |
| | Summary | 9 |
| CHAPTER ONE | Where and What Are Public Lands? | 19 |
| CHAPTER TWO | To Whom the Public Lands Are Important | 33 |
| CHAPTER THREE | Planning Future Public Land Use | 41 |
| CHAPTER FOUR | Public Land Policy and the Environment | 67 |
| CHAPTER FIVE | Timber Resources | 91 |
| CHAPTER SIX | Range Resources | 105 |
| CHAPTER SEVEN | Mineral Resources | 121 |
| CHAPTER EIGHT | Water Resources | 141 |
| CHAPTER NINE | Fish and Wildlife Resources | 157 |
| CHAPTER TEN | Intensive Agriculture | 177 |
| CHAPTER ELEVEN | The Outer Continental Shelf | 187 |
| CHAPTER TWELVE | Outdoor Recreation | 197 |
| CHAPTER THIRTEEN | Occupancy Uses | 219 |
| CHAPTER FOURTEEN | Tax Immunity | 235 |
| CHAPTER FIFTEEN | Land Grants To States | 243 |
| CHAPTER SIXTEEN | Administrative Procedures | 251 |
| CHAPTER SEVENTEEN | Trespass and Disputed Title | 259 |
| CHAPTER EIGHTEEN | Disposals, Acquisitions, and Exchanges | 265 |
| CHAPTER NINETEEN | Federal Legislative Jurisdiction | 277 |
| CHAPTER TWENTY | Organization, Administration, and Budgeting Policy | 281 |
| | Appendices | |
| | A. The Commission's Organic Act | 291 |
| | B. The Commission | 297 |
| | C. Governors' Representatives | 299 |
| | D. How the Work Was Accomplished | 305 |
| | E. Functions of the Public Land Management Agencies | 323 |
| | F. Acreage of Land Administered by Agency and State | 327 |
| | G. Credits for Photographs Used | 337 |
| | Index | 339 |
| | Public Lands Map Folded in Report | |

*cover photograph by Leland Prater*

that have never been classified or set aside for specific use.*

We, therefore, recommend that:

> An immediate review should be undertaken of all lands not previously designated for any specific use, and of all existing withdrawals, set asides, and classifications of public domain lands that were effected by Executive action to determine the type of use that would provide the maximum benefit for the general public in accordance with standards set forth in this report.

The result of these reviews will be the delineation of lands that should be retained in Federal ownership and those that could best serve the public through private ownership. For those to be retained in Federal ownership, there will be a further breakdown indicating which ones should be set aside for special-purpose use—which may or may not include several different uses.

As intimated above, our studies have also led us to the conclusions that the Congress has largely delegated to the executive branch its plenary constitutional authority over the retention, management, and disposition of public land;[2] that statutory delegations have often been lacking in standards or meaningful policy determinations; that the executive agencies, understandably, in keeping with the operation of the American political system, took the action they deemed necessary to fill this vacuum through the issuance of regulations, manuals, and other administrative directives; and that the need for administrative flexibility in meeting varying regional and local conditions created by the diversity of our public lands and by the complexity of many public land problems does not justify failure to legislate the controlling standards, guidelines, and criteria under which public land decisions should be made.

[2] U.S. Const., Art. IV, § 3.

* Commissioner Clark submits the following separate view: Some of the statements in this and other parts of the report may lead to interpretations in the minds of some readers which do not represent views of all members of the Commission. However, since this is a consensus effort, a brief caveat is appropriate regarding the language and subjective tone employed to describe some past actions affecting public lands which should not detract from the general utility of the recommendations. This report must be read against nearly 200 years of history and no doubt a nongovernment report would contain similar inferences that would emphasize perhaps disproportionately the past inaction, delays, and piecemeal approach of Congress.

2

We, therefore, recommend that:

> Congress should establish national policy in all public land laws by prescribing the controlling standards, guidelines, and criteria for the exercise of authority delegated to executive agencies.

Many types of public land have been reserved by executive action for governmental uses, such as defense installations and atomic energy testing areas. The result has been to materially restrict or preclude their availability for recreation and resource development purposes. In other cases, withdrawals and reservations have severely limited permissible types of uses on tremendous acreages of public land in order to further administrative land policies.

We find that when proposed land uses are passed on by the Congress, they receive more careful scrutiny in the executive branch before being recommended; furthermore, in connection with congressional action, the general public is given a better opportunity to comment and have its views considered. We conclude that Congress should not delegate broad authority for these types of actions.

We, therefore, recommend that:

> Congress assert its constitutional authority by enacting legislation reserving unto itself exclusive authority to withdraw or otherwise set aside public lands for specified limited-purpose uses and delineating specific delegation of authority to the Executive as to the types of withdrawals and set asides that may be effected without legislative action.

Our studies have convinced us that, with respect to lands retained in Federal ownership, the rules and regulations governing their use, to the extent that they exist, have not been adequate to fulfill the purpose; that they were promulgated without proper consultation with, and participation by, either those affected or the general public; that existing regulations are cumbersome; and that the procedures for users or other interested parties to exercise their rights to seek or oppose the grant of interests in public land are likewise cumbersome as well as expensive with no assurance of objective, impartial consideration of appeals from, or objections to, decisions by land managers.

We, therefore, recommend that:

> Public land management agencies should be required by statute to promulgate comprehensive rules and regulations after full consideration of all points of view, including

Management goals were not established for most of the withdrawn lands other than the national forests and national parks, and those that were established were broad and general.

Finally, in 1934, the Taylor Grazing Act [3] ended the era of unrestricted entry of the remaining unappropriated public domain and provided a classification authority to enable the Secretary of the Interior to determine how those public lands might best serve the public interest. Thus, by 1934, although numerous disposal laws remained on the statute books, Congress had armed the Secretary with broad authority to preclude the operations of all of them except the mining law, which had been excluded from the withdrawal and classification authority conferred in the Pickett and Taylor acts. Nevertheless, the Secretary continued to make withdrawals suspending the operation of the mining laws in certain situations without express statutory authority.

With increasing use pressures on all the public lands in the post-World War II period, Congress in 1960 and 1964 set forth broad public land management goals for the national forests and the unappropriated public domain administered by BLM. The Multiple Use and Sustained Yield Act of 1960 [4] declared that the national forests are established and "shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes," and directed the Secretary of Agriculture to develop and administer the renewable surface resources of the national forests for "multiple use" and "sustained yield."

The Classification and Multiple Use Act of 1964 [5] provided similar temporary authority for BLM administered lands and, in addition, directed the Secretary of the Interior to develop criteria to be used in determining which of those public lands should be disposed of and which should be retained in Federal ownership for multiple use management. But the basic thrust of both of these acts relative to the management of public lands was to give the agencies authority to manage the lands for recreation and other purposes for which prior authority was lacking or unclear.

The 1964 act was a recognition by Congress that the existing pattern, by which the old goals of the traditional disposal laws had generally been subordinated to broad Secretarial discretion to nullify them on a case-by-case basis in response to individual applications, was no longer an acceptable public land policy. Hence, it provided a new approach on an interim basis until this Commission could submit its recommendations. The new authority provided the

Secretary with a broad planning charter with directions to identify those factors which ought to be considered in determining whether lands should be disposed of or retained in Federal ownership. Moreover, it gave him a broader authority to suspend the operation of the public land laws in aid of his classification function than he possesses under the authority conferred on him by the Pickett Act or the Taylor Grazing Act. However, the act did not provide goals for either disposal or retention and, with respect to retained lands, the multiple use authority which it conferred suffered from the same vice as its 1960 predecessor for the national forests—failure to specify or provide standards for determining priorities of use or guidelines for resolving conflicts.

The lack of clear statutory direction for the use of the public lands has been the cause of problems ever since Congress started to provide for the retention of some of the public domain in permanent Federal ownership. The relative roles of the Congress and the Executive in giving needed direction to public land policy have never been carefully defined, and this has been a source of friction throughout the years. As related to land use planning, the use of the executive withdrawal power has long been a problem; and in recent years administrative actions under the multiple use acts have created new problems.

The 1960 and 1964 acts were primitive first steps toward sound public land management, and as such they take on an historical significance because the start had to be slow. If viewed nonetheless as being "late" for their purposes, we must remember that both the Executive and Congress share the responsibility for failure to anticipate the needs of the public that dictated a form of management guide for these lands.

## The Withdrawals Problem

Concern about problems associated with the "withdrawal" and "reservation" of public domain lands was strongly voiced in the deliberations which led to the creation of the Commission, and was a recurring subject of complaint in the Commission's public meetings. The contractor study of withdrawals indicates that they have been used by the Executive in an uncontrolled and haphazard manner.[6]

Withdrawals have been used since the earliest days of the Republic when the President was given statutory authority to set aside land for public purposes such as military reservations, Indian trading posts, lighthouses, and townsites. During the 19th century

---

[3] 43 U.S.C. §§ 315 et seq. (1964).
[4] 16 U.S.C. §§ 528–531 (1964).
[5] 43 U.S.C. §§ 1411–1418 (1964).

[6] Charles F. Wheatley, Jr., *Withdrawals and Reservations of Public Domain Lands*, Ch. XI. PLLRC Study Report, 1969.

43

the process was used to keep land available for disposition under various grants. Eventually, the process began to be used for land and resource preservation programs. The extensive forest and mineral reservations referred to above were related to congressional action providing for the management of those resources. This was also a method to allocate public domain lands among various Federal agencies for the conduct of their programs.

Recent criticism of withdrawal policies has come primarily from economic user groups, such as the timber and mining industries, since many withdrawals curtail economic uses of the public lands to favor recreation or noneconomic values. Also, concern has been expressed by some members of Congress about some Executive withdrawals on the ground that the actions should be taken by Congress or were in disregard of statutory limitations. In short, the excessive use of Executive withdrawals has become a source of increasing controversy.

The Commission has considered this problem in all its dimensions, looking beyond the traditional legal arguments over the respective roles of the legislative and executive branches in this field. We find the problem rooted in shortcomings of both branches. It seems clear that the Executive's liberal use of the withdrawal power stemmed from a necessity to meet public land management needs for which existing public land laws were either inadequate or nonexistent.

Congress, on the other hand, did relatively little to remedy the statutory deficiencies which spawned the liberal use of the withdrawal technique, nor did it attempt any restraint through legislation other than on a piecemeal basis.

Following enactment of the Pickett Act noted above, in *United States v. Midwest Oil Co.,*[7] a 1915 case challenging the validity of a pre-Pickett Act withdrawal, the Supreme Court interpreted the failure of Congress to object to the practices of the executive branch prior to 1910 as acquiescence equivalent to an implied grant of power to make temporary withdrawals. The court did not then or since then rule whether the act imposed a limitation on the inherent withdrawal power asserted by the Executive.

It may be argued that Congress intended to circumscribe all preexisting withdrawal power of the Executive. However, the Attorney General in 1941 held that the Pickett Act limited the President's asserted nonstatutory power only with regard to temporary withdrawals, and that he could continue to make permanent withdrawals without statutory authorization.[8] Congress has not acted to modify that interpretation.

At present Congress exercises the exclusive power over withdrawals for some single use purposes, such as national parks and wilderness areas. But with the exception of requiring congressional sanction for defense withdrawals in excess of 5,000 acres,[9] there is no statutory restriction on the asserted permanent withdrawal authority of the Executive. The only existing supervisory control is through an informal agreement of the Department of the Interior to notify the concerned committees of Congress of proposed withdrawals for nondefense purposes in excess of 5,000 acres.

As indicated by the preceding discussion, the use of the withdrawal power as a tool for land planning by the administrative agencies is ambiguous because its limitations are unclear. The continuing, and proper, concern of Congress limits the manner in which this tool is used, but congressional concern is uneven from time to time and place to place.

## The "Multiple Use" Problem

Congressional actions setting aside some public domain lands for parks recognized that these areas could produce more than one kind of value, but had to be protected to assure that the primary value was not lost because of other uses of these areas.

Congress has established national parks "to conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."[10] To accomplish this objective, most nonrecreational uses are prohibited or sharply limited. Use of wilderness areas established by the 1964 Act[11] are restricted in much the same way.

A somewhat different concept has been used for wildlife refuges and ranges, and for national recreation areas. These areas are designated for a primary use, but other uses are permitted to the extent that they are compatible with the primary use.

On the remaining public lands, the national forests and the Bureau of Land Management public domain, Congress has not defined the primary purpose of use of the lands, but rather has provided the broad "multiple use" authority referred to above with only very general statutory guidelines. However, because of their ambiguity, these acts have failed in some ways to provide adequate guidance.

Arguments have also arisen over the application of the term "multiple use" to lands that are set aside for specific purposes, such as the national parks and

---

[7] 236 U. S. 459 (1915).
[8] 40 Op. Atty. Gen. 73 (1941).

[9] 43 U.S.C. §§ 155–158 (1964).
[10] 16 U.S.C. § 1 (1964).
[11] 16 U.S.C. §§ 1131–1136 (1964).

It will also provide a guide for investment of Federal funds in management practices. For example, investments in timber management should be directed primarily to timber dominant areas, while investments in recreation should be directed primarily to recreation dominant areas, as we recommend elsewhere.

## Comprehensive Land Use Plans

Recommendation 5: All public land agencies should be required to formulate long range, comprehensive land use plans for each state or region, relating such plans not only to internal agency programs but also to land use plans and attendant management programs of other agencies. Specific findings should be provided in their plans, indicating how various factors were taken into account.

Legislative direction for land use planning by the Federal agencies is virtually absent. Nevertheless, as we have pointed out previously, the agencies do, in varying degrees, develop land use plans, and we commend them for their efforts. However, a statutory requirement to prepare such plans would give them greater credence and support and would assure that they are prepared in all cases as a matter of course. Further, formal plans will facilitate congressional oversight of the land use planning process and public scrutiny of the plans, as necessary ingredients of the planning coordination we recommend later in this chapter.

The plans, as part of a dynamic process, should not be inflexible, but subject to modification as conditions change. The lessons of city planning, which have long been preoccupied with "comprehensive" land use plans, demonstrate that static, fixed-arrangement plans are virtually useless to rapidly developing communities and areas with changing economic and social composition and, especially, changing values. Schematic land use plans are useful for crystallizing opinions and influencing expectations, but should be understood to be impermanent. The procedures by which they may be changed should be well known public information.

Agencies should provide specific findings in their plans which will clearly reveal how the general factors Congress has specified for consideration were treated. In this way other agencies and the public will not only be aware of the basis for the planning, but will also know what factors will influence changes in the original land use plan. Further, the information will be useful in determining whether the policy objectives and guidelines established by Congress have been properly and fully considered in the planning process.

## Land Classification and Withdrawals in Land Use Planning

The basic concept of classifying land for particular uses is an old one that is well recognized in zoning practices by local governments. It also has been used for years in public land management in the form of legislative and executive withdrawals and reservations of public domain lands for specific purposes.

We have previously endorsed the principle of designating or classifying lands for primary or dominant uses in this fashion as an appropriate and orderly means of planning for public land use. However, there is an urgent need to make a new start in the overall planning process on the public lands under better Congressional guidelines and with new administrative tools.

## Review of Withdrawals and Classifications

Recommendation 6: As an essential first step to the planning system we recommend, Congress should provide for a careful review of (1) all Executive withdrawals and reservations, and (2) BLM retention and disposal classifications under the Classification and Multiple Use Act of 1964.[22]

At present virtually all of the public domain in all 50 states has been withdrawn from entry under one or more of the public land laws. Approximately 264 million acres are withdrawn under specific orders for particular purposes. Some 163 million acres were withdrawn in 1934 and 1935 in the 11 contiguous western states to implement the Taylor Grazing Act. Early in 1969 entries and state selection of the public lands in Alaska were suspended for a period of two years to enable Congress to consider legislation to resolve the problem of native claims.

We experienced great difficulty in trying to determine with any precision the extent of existing Executive withdrawals and the degree to which withdrawals overlap each other. We have found that the agencies do not have accurate records that show the purposes for which specific areas have been withdrawn and the uses that can be made of such areas under the public land laws.

A complete review of all existing withdrawals should be undertaken immediately to provide a basis for eliminating those that no longer serve a useful purpose, and for modifying those that are unnecessarily large in scope and area. This is a necessary step to "free" the public lands of encumbrances to effective land use planning for the future. It should be carried out as the initial effort under the formal withdrawal review program we recommend later in

[22] n. 5, supra.

this chapter. In the opinion of the Commission 10 years is a reasonable time for a review of all existing withdrawals and rejustification for renewal of those found to be required. Consequently, *we recommend that all existing withdrawals terminate at the end of a 10-year period unless expressly effected as new withdrawals under the laws and procedures we recommend.*

## Reclamation and Petroleum Withdrawals

In order to carry out the recommendations we make in Chapter Ten relative to the retention and management or disposition of public lands for intensive agriculture use, *we recommend that priority be given to the review of reclamation withdrawals in situations where land may be needed for intensive agriculture and the land is arable under existing physical and hydrological conditions.*

The Bureau of Reclamation conducts many programs in the western states to bring supplemental water supplies to private lands already farmed and, to a limited extent, to develop Federal lands not currently under cultivation.

Some of the lands withdrawn for proposed reclamation projects may be desired now for private development with existing water supplies. A choice must be made between developing the lands at public expense in the future or making them available for private development and use at private expense now.

If all such withdrawn lands are made available for immediate private development only the best lands might be used and the remaining inferior lands may make the proposed reclamation project economically infeasible. These conflicting factors should be evaluated by an accelerated withdrawal review program. This would guard against extended withdrawals of land for proposed projects whose possible benefits cannot be realized, if at all, until so far into the future that they cannot match the benefits readily available from disposal of selected lands to private agricultural development.

In the process of reviewing all existing withdrawals, attention will be given, of course, to a review of the need for the naval petroleum reserves. We believe, however, that *early consideration should be given to a review of Naval Petroleum Reserve No. 4 on the North Slope of Alaska* under the same procedures that are established for reviewing other withdrawals.

## BLM Classification

We have also found that the actions of the Bureau of Land Management under the Classification and Multiple Use Act of 1964 have paralleled to a considerable extent the liberal use of the withdrawal power by the public land agencies. In less than four years, under the 1964 Act, as of April 1, 1970, it classified 154.4 million acres of public land for retention and either classified or "identified" about 4.5 million acres for disposal. These classifications have a very substantial effect on land uses in the future. Despite the obvious need for careful planning, it is apparent that they were made in a hurried manner on the basis of inadequate information.

It was found that, for various reasons of expediency, the Bureau concentrated on large scale retention with little land use planning on its part and virtually none on the part of local and state planning authorities (although coordination was effected with them). Thus, the classifications were not preceded by necessary comprehensive efforts to gather information pertinent to resource capabilities and future development probabilities or by systematic attempts to state alternative uses within the context of regional or state development goals.

The Commission recognizes that BLM acted under a congressional mandate to make its classifications "as soon as possible," pursuant to an authority of *temporary* duration. Moreover, the agency was attempting to develop a comprehensive planning approach, which it previously lacked, concurrently with its disposal-retention classifications. Furthermore, the Bureau did consult with local interests and was, at least to some extent, responsive to the immediate desires of local agencies and inhabitants. Nevertheless, the extensive acreage classified for retention within the relatively short time involved is in itself evidence that the classifications were not preceded by comprehensive land use planning.

Fortunately, such classifications are not irrevocable. They can and should be changed as BLM's planning system becomes more refined and extensive and new development pressures arise. Moreover, Congress can change them anytime it sees fit. In any event, as an initial and necessary step in the implementation of the Commission recommendations on land use planning, the classifications under the 1964 Act should be carefully reviewed by both the Congress and executive branch.

## Classification of National Forest and BLM Lands

> Recommendation 7: Congress should provide authority to classify national forest and Bureau of Land Management lands, including the authority to suspend or limit the operation of any public land laws in specified areas. Withdrawal authority should no longer be used for such purpose.

Land use "classifications" are currently a confusing amalgam of: (1) legislative and executive

53

"withdrawals and reservations" of widely differing categories; (2) "secondary" executive withdrawals within areas already set aside for particular uses by Congress or the Executive; (3) special purpose restricted use "designations" within withdrawn areas; and (4) Secretarial "classifications" of the unappropriated public domain lands for either disposal or retention and, for the lands proposed for retention, various provisions for limitation or exclusion of the operation of certain public land laws. We are convinced that this complex and confusing array of planning tools must be replaced with a simpler system.

As an integral part of the Commission's recommended land use planning and zoning system, the Forest Service and the BLM will need an effective classification authority. The kind of temporary authority provided the Secretary of the Interior in the Classification and Multiple Use Act of 1964 seems most appropriate for this purpose. To date it has been used primarily in a defensive manner to segregate large blocks of land from the operation of specified public land laws, usually without adequate information and planning, as we have pointed out. *We believe it can and should be used in a more positive fashion, after adequate planning, to classify lands for disposal or retention and to designate retained lands for appropriate dominant uses, in the manner of present national forest zoning.* In no event should it be used in the way that withdrawal authority has been traditionally employed by the Executive.

Since the 1964 Act applies only to BLM lands, the Forest Service must prevail upon the Secretary of the Interior to make a withdrawal of specified national forest lands when it wants to restrict the operation of any public land laws with respect to which it lacks final decisional authority. Our recommendation would give the administrators of both classes of multiple use lands similar authority. It also would provide a broader authority than is available under existing law to "segregate" lands from the operation of the public land laws. The Pickett Act[23] does not authorize the use of temporary withdrawals to preclude the operation of the mining law. Under the Taylor Grazing Act[24] and the blanket withdrawals made in 1934 and 1935 to implement it, the operation of all of the land laws, except the mining law, is suspended unless the Secretary "classifies" the requested land as suitable for the use applied for. The temporary 1964 Act,[25] however, provides that the notice of a proposed classification will segregate the subject lands from all forms of disposal except to the extent it "specifies that the land shall remain open for one or more of such forms of disposal." The actual

classification, when made, obviously operates with like segregative effect. Since the act provides that the segregative effect applies to all public land laws, including the mining law, it is broader than the authority conferred on the Secretary in both the Pickett and Taylor Acts in 1910 and 1934.

Under the planning system we recommend, executive withdrawals would play a very limited role. If our system is properly implemented, particularly its public participation aspects, arguments would be shifted from the fruitless controversy over whether the Secretary possesses legal authority to suspend the operation of certain laws to discussions on the merits of particular planning actions.

## Future Withdrawals Policy

> Recommendation 8: Large scale limited or single use withdrawals of a permanent or indefinite term should be accomplished only by act of Congress. All other withdrawal authority should be expressly delegated with statutory guidelines to insure proper justification for proposed withdrawals, provide for public participation in their consideration, and establish criteria for Executive action.

The withdrawal process involves a complex interrelationship between the legislative and executive branches of the Government as discussed earlier in this chapter. Under the Constitution Congress is given the exclusive authority for the disposition and regulation of Federal properties,[26] including the public lands. As indicated earlier, there are conflicting views on the limit of the Executive authority; Congress has delegated some of its authority; and Congress has exercised the withdrawal authority directly in many instances. We think it essential for Congress to specify clearly those kinds of withdrawals which should require legislative action and those which should be made by the Executive.

*The Commission recommends that large scale withdrawals and reservations for the purpose of establishing or enlarging any of the following should be reserved to congressional action: national parks, national monuments, national historic sites, national seashores, national recreation areas and other units of the National Park System looking toward permanent use, national forests, national riverways and scenic rivers, national trails, units of the wilderness system, other areas set aside for preservation or protection of natural phenomena or for scientific purposes, units of the national wildlife refuge and game range system, other areas set aside for protection of birds or animals, and reservations for defense purposes.*

We recognize the need for some continuing with-

---

[23] n. 2, supra.
[24] n. 3, supra.
[25] n. 5, supra.

[26] U.S. Const., Art. IV, § 3.

drawal authority to be lodged in the executive branch. However, this authority should be limited and exercised only within prescribed statutory guidelines. In the exercise of its land management functions, the executive branch is an agent of Congress and, as with any other agent, the extent of its power and authority should be clearly defined.

Delegation of the congressional authority should be specific, not implied, and should be made through the enactment of a single statute which clearly replaces all existing authority expressly or impliedly delegated.

We think that the Executive's use of withdrawals should generally be confined to the following broad purposes:

1. Allocation of public lands to nonresource use by other agencies, *e.g.*, relatively small areas for defense purposes.

2. Withdrawals in aid of legislation, such as for setting aside those areas of national significance mentioned above, water resource development projects, or special purpose legislation such as the Alaska native claims settlement legislation.

3. Emergency situations to preserve values that would otherwise be lost pending administrative or legislative action.

*Executive withdrawals should be limited to a period of ten years duration, other than those in aid of legislation or for emergency purposes which should not exceed five years,* subject to the provisions for review and renewal, where appropriate, discussed later in this chapter.

Agency standards are not definitive either in selecting land for new withdrawals or reviewing the status of past withdrawals. Although advisory services from other agencies may be available, qualified expertise to weigh conflicting resource benefits are often limited in the agency for whose benefit land may be withdrawn. The evidence available also indicates that little attention is paid to selecting areas from among alternative sites so as to minimize resource losses when public land is requested for exclusive agency use. Rather than be concerned with problems of multiple use benefits or resource development measures, Federal agencies obtain withdrawals which are far more restrictive than they need to be. These practices prevent the withdrawal system from being what it might otherwise be—an effective tool for proper land allocation.

An agency applying for a withdrawal should be required to establish the need for and effect of the withdrawal, particularly with respect to such matters as location, acreage required, intended duration, restrictions on use, and an evaluation of the impact on present and future uses and users and on the environment.

Mandatory legislative guidelines should require evaluation of the merits of proposed withdrawals and reservations, including express consideration of the relative value of conflicting uses, and all pertinent economic, environmental and social impacts. These are essential steps if the withdrawal process is to be consistent with sound land use planning.

*Public notice of proposed withdrawals and participation of the public and state and local governments, at least through invitation to comment and through hearings in appropriate cases, should be assured.*

Effective planning requires that all citizen interests have an opportunity to be heard and considered. Similarly, state and local governments are directly concerned with the withdrawal process. It affords an available tool to accomplish a segregation of public lands for necessary local facilities and is, therefore, a vital part of local and regional land use planning. Moreover, restriction on various kinds of uses can have a serious impact on the regional economy. Consideration of these interests, along with others, should be mandatory in the withdrawal process.

Regulations now provide for notice to the public of proposed withdrawals, opportunity to submit comments, and a discretionary hearing. *However, hearings are seldom held. We recommend that they be required upon request of a state.*

*The officer exercising delegated authority should be required to state his findings with respect to justification for each withdrawal.* The officer who makes the final decision on the application for withdrawal is now under no requirement to explain his action. Thus, the adequacy of the justification furnished by the applicant and the extent to which important factors have actually been considered are not matters of public knowledge. Meaningful judicial review or congressional oversight is dependent upon such disclosure. Furthermore, the lack of adequate public accountability has led to problems such as excessive size, indefiniteness of boundaries, lack of uniformity, and interminable "temporary" withdrawals. *At a minimum these findings should speak to (1) alternative sites, (2) weighted evaluation of existing and potential resource uses, including effect on the environment, (3) effects on present users, (4) effects on regional economy, (5) effects on state and local government interests, and (6) an explanation of the reasons for the duration of the proposed withdrawal as related to the purpose specified.*

The Pickett Act [27] delegated authority to the President to temporarily withdraw lands, but does not set any time limit on such withdrawals. Some temporary withdrawals made under the Act have remained in effect for almost sixty years. Other tem-

[27] n. 2, supra.

55

# EXHIBIT 2

117

Reprinted from



natural resources journal

the university of new mexico
school of law

118

David H. Getches*

# Managing the Public Lands: The Authority of the Executive to Withdraw Lands

### INTRODUCTION

Historically the executive branch of the federal government—primarily the President and the Secretary of the Interior—has protected public lands by withdrawing them from availability for private acquisition and use allowed under public land laws. Homesteading, mining and other uses ordinarily considered proper on the public domain were prevented in order to preserve resources or to dedicate them to a public purpose. Beginning soon after the nation's founding, numerous military bases and Indian reservations were set aside by executive orders withdrawing lands from the public domain. Other lands were set aside for wide ranging purposes dictated by the national interest. Although it is not widely appreciated, the use of withdrawals has been a major force in conservation law and history, especially during those eras when statutory law was not nearly as broad and diverse as it is today.

Withdrawal remains an important device in federal land use planning and management. Significant fragile wildlife habitat may need protection from mining pending consideration of legislation to designate it as a park or wildlife refuge. Lands rich in petroleum or oil shale may be removed from operation by statutes that would allow private uses and development because they can be developed most efficiently under a coordinated national program. Wild areas may be protected from commercial uses so that they may remain in their pristine state. Today, public land managers may have several ways to accomplish their desired results. Yet one of the most effective means is withdrawal.

Although Congress has plenary power over the public lands,[1] in the past most withdrawals were made by the executive on the assumption that no statutory delegation of authority was needed. Congress's failure to repudiate the executive's withdrawals led the courts to infer acquies-

*Associate Professor of Law, University of Colorado School of Law. The author appreciates the thoughtful review of an earlier draft of this article by Charles F. Wilkinson and Lee Laitala. The research assistance of Julia Ormes Robinson was extremely helpful. The Rocky Mountain Mineral Law Foundation kindly provided a grant to aid in the research.

1. U.S. CONST., art. IV, §3, cl. 2 (the Property Clause) states: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." *See generally* Kleppe v. New Mexico, 426 U.S. 529 (1976).

119

cence. The inference may have been unjustified but became a well en-
trenched justification. While Congress made some specific delegations of
withdrawal authority over the years, the executive's implied nonstatutory
authority was construed to fill all the interstices around express delega-
tions.

In the 1976 Federal Land Policy Management Act (FLPMA)[2] all non-
statutory authority and most earlier statutory authority were extinguished
and replaced with new procedures for making withdrawals.[3] The revo-
lutionary impact of the 1976 Act touches only withdrawals made after
its enactment.[4] Consequently, the effectiveness of earlier non-statutory
withdrawals of millions of acres throughout the country is governed by
legal principles as they existed before the Act. Recent exercises of au-
thority under both the FLPMA and the vestigial statutory withdrawal
authority have drawn fire from private development interests and state
governments. Multimillion acre withdrawals in Alaska have provoked
litigation,[5] and the "lock-up" by federal officials of resource-rich lands
elsewhere has spurred on the "Sagebrush Rebellion"—a movement seek-
ing greater state control of federal lands.[6]

This article reviews and analyzes judicial interpretations of executive
withdrawal authority in the past and makes suggestions for the construc-
tion and application of statutorily based withdrawal authority. The legal
basis for executive withdrawal authority was tenuous, at least at the time
the early withdrawals were made. Nevertheless, the Supreme Court has
upheld non-statutory executive authority in one major case. Based on the
reasoning in that case most withdrawals should withstand judicial chal-
lenge because of the passage of time and the Court's pragmatic desire
not to disturb an established allocation of power that has been accom-
modated by both the executive branch and Congress. There is likely to
be considerable deference to the executive's own interpretations of its
authority and to its decisions to exercise the statutory authority that now
must be invoked to support new withdrawals. Reviewing courts might
have curtailed executive withdrawals in an earlier era had they acted
consistently with apparent federal policy and congressional intent. But
today the same considerations in a milieu of resource conservation demand

---

2. 43 U.S.C. §§ 1701–1782 (1976).

3. *Id.* § 1714. *See* text section IV B, *infra.*

4. *Id.* § 1701 and § 1714(j). Although withdrawal provisions of the FLPMA are prospective,
the Act requires a study to be made of all existing withdrawals followed by a report to Congress.
*See also* notes 211–12, *infra.*

5. *See* notes 118–23, 245–54 *infra* and accompanying text.

6. The Sagebrush Rebellion and related legal arguments are discussed in Touton, *The Property
Power, Federalism, and the Equal Footing Doctrine,* 80 COLUM. L. REV. 817 (1980); Note, *The
Sagebrush Rebellion: Who Should Control the Public Lands?,* 1980 UTAH L. REV. 505; Leshy,
*Unravelling the Sagebrush Rebellion: Law, Politics and Federal Lands,* 14 U. CAL. DAVIS L.
REV. 317 (1980).

120

great latitude for officials who act to protect lands by withdrawals. Challenges to decisions to withdraw areas are likely to fail, except to the extent they demonstrate a departure from explicit statutory procedures.

## I. PUBLIC LAND WITHDRAWALS BEFORE THE 1910 PICKETT ACT

### A. Public Land Policy: A Shift from Disposal to Conservation

From the close of the Revolutionary War until the mid-nineteenth century the United States amassed more than two billion acres under its sovereignty and ownership[7]—a land area more than seven times the size of the original thirteen states.[8] The principal asset of the fledgling nation was the real property it obtained in bargains with foreign nations,[9] the original states[10] and Indian tribes.[11] No sooner was the vast public domain

---

7.  PUBLIC LAND LAW REVIEW COMM'N, ONE THIRD OF THE NATION'S LAND 327 (1970) [hereinafter PLLRC REPORT]. Acquisition of sovereignty and ownership was generally perfected in separate transactions, first a cession from a foreign nation or a state, followed by a treaty or agreement with an Indian tribe. In Johnson v. M'Intosh, 21 U.S. (8 Wheat.) 543 (1823) a settler who had received a patent from the United States prevailed over a settler who traced his title to a grant from the Indians. The result was based on tacit understandings among European discoverers of the New World that title would vest in the discovering nation, subject to limited Indian occupancy rights. Assertion of sovereignty by the Europeans deprived Indians of the ability to dispose of their lands to anyone but the sovereign. See note 11 infra.

8.  The territory of the 13 original states (including what is now the District of Columbia, then within Maryland and Virginia; Kentucky and West Virginia, then within Virginia; Maine, then within Massachusetts; and Vermont, then within New York) after they ceded their western land to the United States (see note 10 infra) amounted to some 266 million acres. Figures taken from PLLRC REPORT, supra note 7, Appendix F at 327.

9.  Major examples are: Louisianna Territory, 523 million acres west of the Mississippi River, purchased from France in 1803 for three cents an acre (8 Stat. 200, 206, 208, T.S. No. 86, 86-A, 86-B); Florida, acquired by treaty with Spain in 1819 (8 Stat. 252, T.S. No. 327); the border with Canada from Minnesota west, fixed at the 49th parallel by treaties with Great Britain in 1818, adding the Red River Basin (8 Stat. 248, T.S. No. 112) and in 1846 adding the Oregon Territory—180 million acres (9 Stat. 869, T.S. No. 120); California and the Southwest, acquired by the Treaty of Guadaloupe Hidalgo with Mexico in 1848 (9 Stat. 922, T.S. No. 207) and the Gadsden Purchase in 1853 (10 Stat. 1031, T.S. No. 208); and Alaska, purchased from Russia in 1867 for $7.2 million (15 Stat. 539, T.S. No. 301).

10.  Seven of the original states ceded lands, generally those lying west of their present boundaries, after the Constitution was ratified: New York, 1780: Virginia, 1783; Massachusetts, 1785; Connecticut, 1786; South Carolina, 1787; North Carolina, 1790; Georgia, 1802. See P. GATES, HISTORY OF PUBLIC LAND LAW DEVELOPMENT 51–55 (1968) [hereinafter GATES]. Texas sold 78.8 million acres to the United States in 1850. Id. at 82.

11.  The European nations asserted rights to the territory they claimed in America exclusive of other European countries, but recognized Indian rights of occupancy. Thus, they acquired a right to govern the area, but not title to real estate. This interest passed intact to the United States on its acquisition of the area by treaty or purchase. The new nation generally chose to extinguish Indian land claims by treaty and purchase from Indian tribes rather than by bitter and difficult conquest. See Johnson v. M'Intosh, 21 U.S. (8 Wheat.) 503 (1823); Joint Tribal Council of Passamaquoddy Tribe v. Morton, 528 F.2d 370 (1st Cir. 1975); Mohegan Tribe v. Connecticut, 483 F.Supp. 597 (D. Conn. 1980); Cohen, Original Indian Title, 32 MINN. L. REV. 28 (1947). See generally. F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW, Chs. 2A and 3A (2d ed. 1982); D. GETCHES, D. ROSENFELT, AND C. WILKINSON, FEDERAL INDIAN LAW: CASES AND MATERIALS 143–152 (1979).

121

acquired by the United States than the government began a purposeful effort to dispose of it.[12] This was to produce income from land sales. More significantly, in private hands the land became a vehicle for development at the frontier and beyond.

"Public land law"[13] historically referred to legislation providing for disposal of the public domain.[14] Homestead laws and government sales dispensed cheap land;[15] mining laws opened the west's mineral wealth, free to the first to claim it;[16] gifts of free land to railroads secured the rapid development of commerce linking the industrial east with the agricultural and resource rich west;[17] and land grants to new states aided education and local economics.[18]

---

12. Perhaps the primary motivation for disposal was the desperate need for revenues to discharge the public debt, much of which consisted of foreign obligations. Encouraging migration and promoting population were other goals. The Land Ordinance of 1785 was the first legislative attempt to provide for orderly disposal of the public lands, by sale after completion of surveys. *See generally,* GATES, *supra* note 10.

13. The term "public land law" is generally understood to mean statutes and regulations governing the retention, management, and disposition of the public lands. *See* Act of Sept. 19, 1964, Pub. L. No. 88-606, § 3, 78 Stat. 982, 983, creating a Public Land Law Review Commission to study such laws. *But see* Udall v. Tallman, 380 U.S. 1 (1965) (The Court stated that the term "public-land laws" does not include the mining or mineral leasing laws. The particular withdrawal orders had been construed as not preventing oil and gas leases. The court did not consider the use of the term generally or even under the statute authorizing the orders. Thus, the dictum is an aberration from the usual construction of the term. *See also* Mecham v. Udall, 369 F.2d 1 (10th Cir. 1966) (rejecting contention that executive order did not validly withdraw lands from mineral leasing). *Cf.* Mason v. United States, 260 U.S. 545 (1923) (executive order withdrawing lands "from settlement and entry, or other form of appropriation" removed the lands from the mining and mineral leasing laws). The term "withdrawal" as used in the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701–1782 (1976), has been held to include removal from oil and gas leasing. Pacific Legal Foundation v. Watt, No. CV-81-141-BLE (D.Mont., Memorandum Decision, Dec. 16, 1981); Mountain States Legal Foundation v. Andrus, 499 F.Supp. 383 (D.Wyo. 1980).

14. The focus on public land law as a body of private law involving rights of private individuals to federal land, minerals and other resources is demonstrated by the early treatises. *E.g.,* M. COPP, PUBLIC LAND LAWS (1875); G. SPAULDING, A TREATISE ON THE PUBLIC LAND SYSTEM OF THE UNITED STATES (1884); J. ZABRISKIE, THE PUBLIC LAND LAWS OF THE UNITED STATES (1870). Although Congress's power under the Property Clause is framed in terms of disposal, *see* note 1, *supra,* the property power has been much more broadly construed in recent years. *See, e.g.,* Kleppe v. New Mexico, 426 U.S. 529 (1976).

15. *See* Act of May 18, 1796, ch. 29, 1 Stat. 464 (1796); Act of April 24, 1820, ch. 51, 3 Stat. 566 (1820); Act of August 4, 1854, ch. 244, 10 Stat. 574 (1854); Homestead Act of 1862, ch. 75, 12 Stat. 392 (1862), (repealed 1976 by Pub. L. No. 94-579, 90 Stat. 2744); Desert Land Act of 1877, ch. 107, 19 Stat. 377 (1877); Kinkaid Act of 1904, ch. 1801, 33 Stat. 547 (1904); Enlarged Homestead Act of 1909, ch. 160, 35 Stat. 639 (1909); Stockraising Homestead Act of 1916, ch. 9, 39 Stat. 862 (1916).

16. Mining Act of 1866, ch. 262, 14 Stat. 251 (1866); Placer Act of 1870, ch. 235, 16 Stat. 217 (1870); Mining Law of 1872 (codified *as amended* at 30 U.S.C. §§ 22–24, 26–28, 29, 30, 33–43, 46–48, 50–52, 71–76 (1976)).

17. *See* GATES, *supra* note 10, at 357. *E.g.,* Act of September 20, 1850, ch. 61, 9 Stat. 466 (1850). *See also* Act of Aug. 4, 1852, ch. 80, § 2, 10 Stat. 28 (1852). Some ninety million acres were given to the railroads, most of which were sold by them to private parties to raise capital. *See* G. COGGINS AND C. WILKINSON, FEDERAL PUBLIC LAND AND RESOURCES LAW 88–89 (1981) [hereinafter COGGINS AND WILKINSON].

18. *E.g.,* Act of April 30, 1802, ch. 40, 2 Stat. 173–175 (1802); Agricultural College Act, ch. 130, 12 Stat. 503 (1862). *See generally,* GATES, *supra* note 10, chs. 12, 13.

122

A few early withdrawals of lands from availability under the disposal laws were made to preserve some sites for military or Indian reservations and for other public uses.[19] The device of "withdrawing" specific parcels of land from entry eventually was to become an important means of accomplishing federal purposes or policies when disposal laws threatened to sweep with too broad a brush.

As the west was settled and frontiers vanished, much land remained in federal ownership. By the end of the nineteenth century 67 per cent of the original public domain outside Alaska had been transferred to private ownership, but 473,836,402 acres were still owned by the United States.[20] Much of it was poor land that could not be used economically for the purposes for which it was available.[21] Other land had been exploited for its resources and once used was left behind.[22] Yet some good land survived. In a few instances land had been overlooked because of its inaccessibility or because the value of its resources was not apparent. Withdrawals and other legal impediments to availability for distribution also had saved valuable land.

Fulfillment of many of the national goals that had inspired the disposal policy and a changing vision of the future role of public lands prompted a policy shift. The conservation movement was born in a wake of reaction against the excesses—lawful and unlawful—of land barons and lesser exploiters of the public lands.[23] "Conservation" has always had diverse adherents, some favoring policies that enable perpetual use of resources, others insisting on preservation of lands in a pristine state. In the late nineteenth century disciples of both philosophies agreed that action was needed to protect the public domain from total dissipation. Lands that once were considered only to be temporarily warehoused for later dis-

19. For example, ch. 22, 3 Stat. 347 (1817) authorized withdrawals of timber land to supply the Navy; the Oregon Enabling Act, ch. 76, 9 Stat. 496, 500 (1850), preserved authority for the President to make necessary withdrawals for military installations and other needful public uses; ch. 148, 4 Stat. 411 (1830) authorized the President to make reservations of western land for Indians. *See also* note 67, *infra*. Other early statutes authorized withdrawals of town sites, salt springs, mineral deposits, or lighthouses in specified places. *See* WHEATLEY, STUDY OF WITHDRAWALS AND RESERVATIONS OF PUBLIC DOMAIN LANDS 55 (rev. 1969) [hereinafter WHEATLEY REPORT]. The report, prepared for the Public Land Law Review Commission is the most comprehensive source on withdrawals.

20. The amount of land remaining the the public domain was reported as of June 30, 1904 by the Public Lands Commission in S.Doc.No. 189, 58th Cong., 3d Sess. 13 (1905).

21. For example, homesteads were limited in size to an area that was too small for profitable cultivation or grazing in the arid West. COGGINS AND WILKINSON, *supra* note 17 at 71.

22. For example, huge amounts of timber were harvested from the public lands, particularly in Minnesota, Wisconsin, and Michigan, by loggers who cut the trees and then moved on, successfully resisting regulation. *See* Huffman, *A History of Forest Policy in the United States*, 8 ENVT'L L. 239 (1978) [hereinafter Huffman].

23. *See* S. DANA & S. FAIRFAX, FOREST AND RANGE POLICY 69–119 (1980). *See generally*, M. NICHOLSON, THE ENVIRONMENTAL REVOLUTION: A GUIDE FOR THE NEW MASTERS OF THE WORLD 1970; S. UDALL, THE QUIET CRISIS (1963); L. PEFFER, THE CLOSING OF THE PUBLIC DOMAIN (1951).

123

tribution to the private sector were now perceived as national resources to be protected. A trend developed toward more scientific management of forests with the goal of protecting timber supply and watersheds that were important both for flood prevention and for preserving a supply of water. Management, rather than disposal of resources, became the mission of agencies administering federal lands.

In 1891 Congress passed the General Revision Act.[24] The contents of the Act reflect the mix of views about the appropriate use of the public lands which was prevalent on the cusp between the eras of disposal and retention of public lands. On one hand, the 1891 act dealt gently with persons whose depredations upon the public timber lands could have been prosecuted but, on the other hand, it gave the executive authority to reserve forest lands that it had sought for several years.[25] Six years later, Congress passed the Forest Service Organic Act authorizing the establishment of an agency to manage forests.[26]

As concern for conservation grew within the government and among the general public there were occasional flurries of congressional interest in protecting areas that were distinguished for their aesthetic or recreational value. In 1872 a two million acre parcel, which later became known as Yellowstone National Park, was established by Congress "as a public park or pleasuring ground for the benefit and enjoyment of the people. . . ."[27] Before the end of the century several other national parks were established.[28]

The most remarkable development under the nation's new land policy was passage of the Taylor Grazing Act which, as amended, allowed the Secretary of Interior to classify and limit entry upon public lands.[29] This is generally considered the cardinal event in closing the public domain. A series of other congressional acts in the early 20th century further

---

24. Ch. 561, 26 Stat. 1095 (1891).

25. *Id.* § 24. This section is often referred to as the Forest Reserve Act.

26. Act of June 4, 1897, 30 Stat. 34 (codified as amended at 16 U.S.C. §§ 473–81 (1976)).

27. 16 U.S.C. § 21 (1976). Parcels which had earlier been withheld from disposal to private hands later became portions of national parks. Lands in what would become Hot Springs National Park in Arkansas were set aside for "future disposal" in 1832. Ch. 70, 4 Stat. 505 (1832). Parcels in California were granted to the State of California in 1864 to be held in trust by that state for public use, resort, and recreation. Ch. 184, 13 Stat. 325 (1864). In 1905 the California land was ceded back to the United States and became part of Yosemite National Park. J. Res. 27, 34 Stat. 831 (1906).

28. Mackinac Island, Michigan was set aside as a national park in 1875. Ch. 191, 18 Stat. 517 (1875). It was disestablished in 1895. Ch. 189, 28 Stat. 946 (1895). In 1890 the mountain area surrounding Yosemite Valley in California was "set aside as reserved forest lands," ch. 926, 26 Stat. 478 (1890), and lands which became part of Sequoia National Park in California were set aside as a park. Ch. 1263, 26 Stat. 650 (1890). Some of these lands are now part of Kings Canyon National Park. Mount Rainier in Washington became a park in 1899. 16 U.S.C. § 91 (1976).

29. Act of June 18, 1934, ch. 865, § 7, 48 Stat. 1269, amended, Act of June 26, 1936, ch. 842, title I, § 2, 49 Stat. 1976 (codified at 43 U.S.C. § 315f).

124

evinced a developing policy of conservation. At times, the executive moved more swiftly and extensively than pleased many members of Congress. But generally the conservation policy which conceded broad managerial authority to the executive enjoyed majority support. Of these developments, the leading historian of public land law has written:

> For a country whose policy from the outset had been to pass the public lands into private ownership as speedily as possible, this series of acts to preserve areas of considerable size in public ownership was a remarkable change in attitude. Together with the adoption of the Forest Reservation Act, they mark a turning point in public land policy.[30]

## B. Withdrawal as a Conservation Tool

Congress and the executive responded to growing concerns for the protection of the remaining public domain by making massive "withdrawals" of public lands—preventing certain uses on them, and by establishing "reservations"—dedicating lands to particular uses.[31] The scope and purposes of withdrawals have differed, as have the methods and authority by which they were created.[32] Withdrawals and reservations usually are made by a congressional or an executive act that designates specific land and the uses from which it is withdrawn or the purposes for which it is reserved. Withdrawals may be made with or without a reservation.[33] Virtually all of the present public land—about one-third the land area in the United States—has been withdrawn from some uses.[34] As such

---

30. GATES, *supra* note 10, at 567.

31. Congress withdrew Yellowstone National Park in 1872. ch. 24, 17 Stat. 32 1872); President Roosevelt withdrew 150 million acres as forest reserves under the General Revision Act of 1891 and 66 million acres of coal lands; President Taft withdrew three million acres of petroleum lands in 1909. *See* notes 23–29 *supra* and accompanying text.

32. Withdrawal of public lands occurs in one of four ways. Congress may make withdrawals by statute (*e.g.*, create a national park). Or it may authorize withdrawals by the executive branch, either at the executive's discretion, but for a specific purpose designated by Congress (*e.g.*, the Antiquities Act, 16 U.S.C. §§431–433 (1976)), or for a general public purpose, with both selection and purpose left to executive discretion (*e.g.*, the Pickett Act. ch. 421 §§ 1–3, 36 Stat. 847 (1910) (§§ 1 & 3 repealed 1976; § 2 codified *as amended* at 43 U.S.C. § 142 (1976)). Finally, the executive in the past has made withdrawals pursuant to authority delegated by congressional acquiescence. *E.g.*, United States v. Midwest Oil Co. 236 U.S. 459 (1915). *See* WHEATLEY REPORT, *supra* note 19, at A4.

33. In a few situations Congress has withdrawn certain resources without specifying the particular lands on which they are located. *E.g.*, Mineral Leasing Act, 30 U.S.C. §§ 181–287 (1976 & Supp. II 1978) (withdrawing all oil, gas, coal and other fuel minerals from operation of the mining laws); 43 U.S.C. § 300 (repealed by Act of Oct. 21, 1976, Pub. L. No. 94-579, § 704(a), 90 Stat. 2744, 2792) (withdrawing lands which contain a spring or waterhole); Exec. Order No. 5327, April 15, 1930 (withdrawing oil shale deposits and lands containing them from disposal under Mineral Leasing Act); Exec. Order No. 5389, July 30, 1930 (withdrawing lands containing hot springs).

34. WHEATLEY REPORT, *supra* note 19, at 1. Shortly after the enactment of the Taylor Grazing Act (43 U.S.C. §§ 315 et seq.; *see* note 29 and accompanying text), the President withdrew all unreserved public lands in all states from entry for purposes other than mining and mineral

125

*NATURAL RESOURCES JOURNAL* [Vol. 22

there is no more "pure" public domain, open to unrestricted private appropriation under the panoply of public land laws, yet most public land remains open to the public for more limited purposes, subject to authorization by the executive.

Congress has authorized a number of executive withdrawals. The first major example was the Forest Reserve provision in the General Revision Act.[35] It led to massive withdrawals of land as soon as it became law, and by 1909 the Act had been used to set aside more than 194 million acres.[36] The efforts of some congressmen to repeal the President's authority to withdraw forest lands were fruitless.[37] However, they were successful in revoking presidential authority to proclaim reserves in six states.[38] President Theodore Roosevelt signed the law, but not before proclaiming 32 new reserves and extending existing forest reserves in the six states where new reserves would be prohibited.[39]

In 1906 Congress enacted the Antiquities Act which permitted the President to proclaim national monuments where landmarks, structures, and "other objects of historic or scientific interest" are located.[40] Subsequently, the executive has been authorized by Congress to withdraw lands for other special purposes such as inclusion in proposed water power projects,[41] fish and game sanctuaries in national forests,[42] inclusion in grazing districts pursuant to the Taylor Grazing Act,[43] and national defense needs.[44]

There is no question that Congress has constitutional authority to make or to authorize withdrawals by legislative act.[45] But arguments that the executive has some inherent constitutional authority to make withdrawals of public lands are without merit.[46] Yet it is well-known that federal

leasing. Exec. Order No. 6910, November 26, 1934; Exec. Order No. 6964, February 5, 1935. Lands may be separately withdrawn for more than one purpose. A prior withdrawal is not affected by a subsequent one for a different purpose. Haley v. Seaton, 281 F.2d 620 (D.C. Cir. 1960); William H. Ward, 51 INTERIOR DEC. 158 (1925); Utah v. Lichliter, 50 INTERIOR DEC. 231 (1924).

35. Ch. 561, § 24, 26 Stat. 1095 (1891). *See* text accompanying notes 24–25, *supra.*

36. GATES, *supra* note 10, at 580. *See also* Huffman, *supra* note 22.

37. Huffman, *supra* note 22, at 259.

38. Ch. 2907, 34 Stat. 1271 (1907).

39. GATES, *supra* note 10, at 582; Huffman, *supra* note 22, at 269.

40. 16 U.S.C. §§ 431–433 (1976).

41. 16 U.S.C. § 818 (1976) (Federal Power Act).

42. 16 U.S.C. § 694 (1976).

43. 43 U.S.C. § 315 (1976).

44. 43 U.S.C. §§ 155–58 (1976).

45. A coalition of western states led by Nevada and Utah have raised constitutional questions about federal authority to retain ownership and management of large amounts of land within their borders. Their objections are based largely on the 10th Amendment guarantee of state sovereignty and the alleged violation of the equal footing doctrine. *See* [1979] 10 ENVIR. REP. (BNA) 530. *See also* note 6, *supra.*

46. The courts have recognized some inherent presidential authority in foreign affairs. This authority is not extensive enough to permit the President to exercise general powers delegated to

126

officials charged with managing public lands regularly make decisions to allow or deny private uses. To allow uses without some delegation of authority from Congress arguably usurps the authority of the legislative branch under the Property Clause. To deny private uses, on the other hand, preserves congressional prerogatives and flexibility. Conflicts have arisen, however, when private interests have sought to use public lands under some legislatively created program but were denied that use because an administrative official had withdrawn land from availability. Under these circumstances the action may be challenged as in excess of the official's authority. In absence of a statute permitting a withdrawal or some other protective classification of the land, it is argued that a restriction of congressionally authorized uses is invalid. In some instances courts have implied a delegation of authority from the failure of Congress to curtail executive actions; in others authority has been derived from the executive's interpretation of a general withdrawal statute.

Congress by the Constitution, such as disposing of public property. The power is not exclusive in Congress, however, as the President may dispose of property through his constitutional power to make treaties. Edwards v. Carter, 445 F.Supp. 1279 (D.D.C. 1978).

While the executive enjoys only limited inherent power over foreign relations, it has still less inherent power in domestic affairs. The modern cases in this area leave virtually no room for a finding of inherent authority. *See* United States v. United States District Court, 407 U.S. 297 (1977) (rejecting inherent executive authority to engage in warrantless electronic surveillance in domestic security cases). *Cf.* Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952) (rejecting executive authority to seize steel mills to avert strikes during wartime as usurpation of Congress's asserted legislative authority in labor matters). *See generally,* L. TRIBE, AMERICAN CONSTITUTIONAL LAW 181–84 (1978).

Given the sweeping grant to Congress of authority over public property, U.S. CONST., art. IV, § 3, cl. 2; Kleppe v. New Mexico, 426 U.S. 529 (1976), inherent executive authority to withdraw public lands cannot be sustained. The issue is discussed in the WHEATLEY REPORT, *supra* note 19, at 131–51. The executive nevertheless has occasionally maintained that it has some "inherent" authority under the Constitution (article 2, sec. 1) to make withdrawals. This has been done in recitations found in orders withdrawing lands. *e.g.,* Exec. Order No. 7373, May 20, 1936; in administrative decisions. *e.g.,* Denver R. Williams, 67 INTERIOR DEC. 315 (1960); P & G Mining Co., 67 INTERIOR DEC. 212 (1960); Noel Leuscher, 62 INTERIOR DEC. 210 (1955); in litigation, *e.g.,* Brief for Appellant, United States v. Midwest Oil Co., 236 U.S. 459 (1915); Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, at 2–3, Portland General Electric Co. v. Kleppe, 441 F.Supp. 859 (D. Wyo. 1977); and in congressional hearings. *e.g.,* *Hearings Before a Subcomm. of the S. Comm. on Public Lands and Surveys on the Administration and Use of Public Lands,* 79th Cong., 1st Sess., part 14, 4360, 4366, 4368 (1945).

In *Midwest Oil* the Supreme Court did not reach the government's contention that the President had inherent withdrawal authority, but rested its decision upholding a withdrawal solely on a delegated power implied from the acquiescence of Congress. 236 U.S. at 468–69. Nevertheless the decision has been cited for the proposition that "the power of withdrawal is inherent in the President. . . ." Shaw v. Work, 9 F.2d 1014, 1015 (D.C. Cir. 1925). *See also* P & G Mining Co., 67 INTERIOR DEC. 212 (1960). Administrative decisions relying on *Midwest Oil* were cited as grounds for inherent withdrawal authority in Portland General Electric Co. v. Kleppe, 441 F.Supp. 859 (D. Wyo. 1977). This reliance is misplaced. These and other references to "inherent authority" confuse it with impliedly delegated authority. No judicial decision was found: (1) where there was neither an authorizing statute nor a contention of impliedly delegated authority, and (2) in which the court or administrative agency relied entirely upon inherent executive authority.

127

Challenges to executive withdrawal authority have been frequent in the history of the public domain. The challengers include those who would develop or use the land for purposes fostered by the public land laws but who are precluded by the land's withdrawal. Thus, a mining company or a state interested in economic development may oppose restricting productive use of land by a withdrawal. The few judicial decisions on the executive's withdrawal authority fail to prescribe any limits on its exercise. The courts have been unmoved by private attacks on executive assertions of the public interest. The usual deference to the government in disputes asserting private interests in public lands[47] has combined with growing notions of federal stewardship of the public domain to persuade courts not to confine executive authority to make withdrawals.

Critics of withdrawal practices cite the importance to the country's well-being of having ready access to the resources contained in the public domain, especially minerals. They argue that "locking up" about two-thirds the public lands from entry under the mining laws seriously hampers the country's ability to cope with pressures for economic development and the demand for energy.[48] Dependence on foreign nations for energy resources and minerals is exacerbated by limiting access to publicly owned domestic resources.[49]

Congress has responded to concerns about the extent of withdrawals in the past. In a few instances, such as when President Theodore Roosevelt withdrew 150 million acres for forest reserves under delegated authority to reserve timber lands, Congress has returned withdrawn land to the public domain.[50] On other occasions Congress has acted to exert control over the withdrawal process by defining methods by which certain kinds of withdrawals could be made by the executive and the purposes for which they could be withdrawn.[51]

---

47. *See* note 274 *infra.*

48. *E.g.,* Bennethum & Lee, *Is Our Account Overdrawn?,* MINING CONGRESS J. 33 (Sept. 1975). The authors cite a U.S. Geological Survey report forecasting "that within the next 25 years the United States shall be 100 percent dependent on imports for 12 essential mineral commodities, more than 75 percent for 15 and more than 50 percent for 26 commodities." *Id.* at 36, 48. That two-thirds of the total land area is closed is doubtful. No accurate figures are available; there are multiple, overlapping withdrawals that distort most calculations. Furthermore, many withdrawn public lands would not be useful for mining in any event.

49. *See* Peck, *"And Then There Were None" Evolving Federal Restraints on the Availability of Public Lands for Mineral Development,* 25 ROCKY MT. MIN. L. INST. 3–1, 3–12, 3–13 (1979).

50. Ch. 2907, 34 Stat. 1269 (1970). The 150 million acres were withdrawn by more than 250 presidential proclamations between 1902 and 1909. *See, e.g.,* Presidential Proclamations, 32 Stat. 1988–2036, 33 Stat. 2307–88, 34 Stat. 2991–3310, 35 Stat. 2120–250.

51. *E.g.,* General Revision Act, ch. 561, 26 Stat. 1095 (1891) (authorized executive reservation of lands wholly or in part covered by timber); Antiquities Act, 16 U.S.C. §431 (1976) (authorized withdrawal of lands of historic and scientific value; limited size to the smallest area compatible with management for these values); General Withdrawal Act [Pickett Act], ch. 421, 36 Stat. 847 (1910), §§ 1 & 3 repealed (1976) (granted temporary withdrawal authority to executive but allowed contin-

128

The executive's use of withdrawals not authorized by statute and its expansive reading of statutes delegating withdrawal authority have often been questioned in litigation. Presidential action setting aside the Tetons and Grand Canyon were attacked in the past.[52] More recently, withdrawals in Alaska of 56 million acres under the Antiquities Act of 1906 and 105 million acres under the Federal Land Policy and Management Act of 1976[53] were challenged as inconsistent with the letter and the purpose of the acts.[54]

The courts generally sustain an implied delegation of authority to withdraw lands based on congressional deference to longstanding administrative practice, thus effectively rewarding the executive's otherwise unjustified perseverance in the practice. Similarly, the executive branch is given wide discretion to interpret its own statutory authority for withdrawals. The common thread is an apparent recognition that the obligation to protect public resources demands that the land management agencies be relatively unfettered in carrying out their duty. It is not practical for Congress, charged by the Constitution with ultimate responsibility for management and disposal of extensive public lands,[55] to do any more than to set broad policies. Consequently, Congress must entrust the executive with responsibility for implementing those policies. In turn, reviewing courts regularly defer to an administrative official's plausible interpretation of how legislation should be implemented, including the official's view of the scope of his delegated authority.[56] If an official acts outside the authority granted, of course, the action may be set aside.[57]

Modern policy, expressed in a host of federal laws, favors protection and preservation of publicly owned natural resources. Although some vestiges of the disposal policy of an earlier era remain law, today's goals

uation of hard-rock mineral entry on withdrawn lands; Taylor Grazing Act, 43 U.S.C. § 315 (1976) (authorized withdrawal of all public lands in 12 states pending classification and creation of districts of land chiefly valuable for grazing, which could be used by ranchers who paid a fee and obtained a license); Defense Withdrawal Act, 43 U.S.C. § 155 (1976) (required express act of Congress for defense withdrawals in excess of 5,000 acres); Federal Land Policy and Management Act, 43 U.S.C. § 1701 (1976) (repealed all implied withdrawal authority and numerous existing withdrawal statutes and set up statutory withdrawal scheme; *see* text at notes 207–235 *infra*).

52. *See* notes 128–132, 136–141 *infra* and accompanying text.

53. *See* 8 E.L.R. CURRENT DEVELOPMENTS 10245 (Dec. 1978).

54. Alaska v. Carter, 462 F.Supp. 1155 (D. Alaska 1978). *See* notes 118–123 *infra* and accompanying text.

55. *See* note 1 *supra*.

56. *E.g.*, Udall v. Tallman, 380 U.S. 1, 16–18 (1965), citing United States v. Midwest Oil, 236 U.S. 459, 472–473 (1915) for the proposition "that unauthorized acts [of the executive] would not have been allowed [by Congress] to be so often repeated as to crystallize into a regular practice." *Midwest Oil* is discussed in part IC of the text. *See also* Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945).

57. Administrative Procedure Act, 5 U.S.C. § 706(2)(A),(B),(C). *E.g.*, Wilderness Society v. Morton, 479 F.2d 842 (D.C. Cir.), *cert. denied*, 411 U.S. 917 (1973).

129

*NATURAL RESOURCES JOURNAL*                     [Vol. 22

outweigh the interests expressed in early statutes which were designed to expedite private exploitation and ownership of the public lands. Thus, the once noble schemes for bestowing gifts of public assets on those willing to develop them have become aberrations today when a conflict arises over how to manage a resource. Policies promoting transfers of public lands are subordinated to overriding policies of conservation and intensive management. There have been recent suggestions that Congress's policy should be revised, even to the extent of selling off public lands to pay the national debt, but there have been no indications that Congress is inclined to accept these novel ideas.

### C. *The* Midwest Oil *Case.*

Until 1910 Congress did not deal comprehensively with the authority of the President to make withdrawals. In that year the General Withdrawal Act of 1910 (Pickett Act)[58] was passed in response to President Taft's request for clarification of his authority to make withdrawals.[59] He had withdrawn 3,621,062 acres of oil and gas lands in 1909[60] to prevent an imminent loss of the government's oil and gas resources. Officials had warned that continuing to allow the mining laws to operate unchecked would lead to a complete transfer of all oil lands in California from government control within "a few months."[61] Oil and gas were then becoming essential as fuel for the Navy. Furthermore, intense competition for oil claims, then under the mining laws, was causing unwise and wasteful exploration and development practices, and was sacrificing other possible uses of the public lands.

The withdrawal made by Taft averted the threatened dissipation of public resources but brought a challenge from private interests whose claims to oil lands were affected. Saving language in the Pickett Act

---

58. Ch. 421, §§ 1–3, 36 Stat. 847 (1910) (§§ 1 & 3 repealed 1976) (§ 2 codified *as amended* at 43 U.S.C. § 142 (1976)).

59. The present statutes, except so far as they dispose of the precious metals and the purely agricultural lands, are not adapted to carry out the modern view of the best disposition of public lands to private ownership, under conditions offering on the one hand sufficient inducement to private capital to take them over for proper development, with restrictive conditions on the other which shall secure to the public that character of control which will prevent a monopoly or misuse of the lands or their products. The power of the Secretary of the Interior to withdraw from the operation of existing statutes tracts of land, the disposition of which under such statutes would be detrimental to the public interest, is not clear or satisfactory.

SPECIAL MESSAGE OF PRESIDENT TAFT TO CONGRESS, CONSERVATION OF NATIONAL RESOURCES, H.R. DOC. NO. 533, 61st Cong., 2d Sess. 4 (1910). The legislative history of the Pickett Act is fully discussed and analyzed in WHEATLEY REPORT, *supra* note 19, at 88–101.

60. Temporary Petroleum Withdrawal No. 5, by order of the Secretary of the Interior, dated September 27, 1909. *See* Record on Appeal, United States v. Midwest Oil Co., 236 U.S. 459 (1915).

61. United States v. Midwest Oil Co., 236 U.S. 456, 466 (1915).

130

stated that it should not be "construed as a recognition, abridgment, or enlargement of any asserted rights or claims initiated upon any oil- or gas-bearing lands after any withdrawal of such lands made prior to June 25, 1910."[62] Thus, Congress left the courts with the task of deciding whether the 1909 withdrawals challenged in *Midwest Oil* were lawful.

In *United States v. Midwest Oil Co.*[63] the Supreme Court upheld President Taft's withdrawal. It found that the executive possessed impliedly delegated authority to make withdrawals of public lands. The withdrawal in question had the effect of preventing entry pursuant to the Mining Act—legislation that was intended to distribute the bounties of the public lands for the national benefit by allowing mineral development. The Court declined to accept the government's broad assertion that the Constitution grants the President authority to withdraw public land.[64] But it sustained the President's withdrawal of land from mineral entry even though it was not based on any statute. The Court emphasized that Congress had apparently recognized the President's power and had acquiesced in its exercise. The Supreme Court relied on a "long continued practice" of making orders like the one in the case which withdrew all the public lands in an area over 3 million acres from the operation of the public land laws.[65] In support, the Court noted that there were "scores and hundreds" of orders establishing or enlarging Indian reservations, military reservations and oil reserves that had not been based on any statutory authority.[66]

It was true that many withdrawals had been made by the executive without direct statutory authorization, but in most cases they were compatible with an existing policy reflected in statute. The dissent in *Midwest Oil* argued that for each of the examples of apparent exercises of implied authority cited by the majority there existed a statute which directly or indirectly furnished authority for the withdrawal.[67] By contrast, the 1909

---

62. 43 U.S.C. § 142 (1976).

63. 236 U.S. at 459.

64. *See* note 46 *supra.*

65. 236 U.S. 456 (1915).

66. *Id.* at 469–71.

67. *Id.* at 492–504. The dissent's point may be overstated, but it is true that most then existing executive withdrawals could be seen as carrying out some congressionally accepted policy. In many situations the executive's authority was not expressed by Congress but could be based on vague directives. In Wilcox v. Jackson, 38 U.S. (13 Pet.) 266 (1839), the executive was held entitled to possession of a military post under a law authorizing the establishment of trading houses with the Indians and the erection of fortifications by the President. The law [Act of June 19, 1834, ch. 54, 4 Stat. 678] left the choice of location to the President's discretion. Other Indian reservations were established by executive order pursuant to a national policy of locating Indians on defined lands. The policy had been generally reflected in treaties and statutes, although particular reservations were not always for tribes covered by specific legislation. The Supreme Court held that the General Allotment Act, Act of Feb. 8, 1887, ch. 119, § 1, 24 Stat. 388, confirmed the validity of executive orders setting aside Indian reservations. In re Wilson, 140 U.S. 575 (1891).

131

withdrawal at issue in *Midwest Oil* was stated to be "in aid of proposed legislation affecting the use and disposition of the petroleum deposits," but it was many years before Congress considered a proposal to deal comprehensively with such matters.[68] In the meantime, the will of Congress had been established: statutes declared all mineral lands open and available to the public.[69] While the wisdom of literally giving away the nation's mineral wealth might be questioned, it did comport with a forthright congressional pronouncement of policy in the mining laws and it did accelerate expansion and development as Congress intended. Yet the Court sustained an overriding power to defeat these statutory objectives by implying acquiescence of Congress in several earlier withdrawals of public lands from entry.

## II. NON-STATUTORY WITHDRAWALS 1910–1976

Because the withdrawal that was upheld in *Midwest Oil* occurred before enactment of the Pickett Act of 1910, the Supreme Court did not have occasion to decide the question of the Act's impact on the executive's non-statutory withdrawal authority. The Court acknowledged the existence of an extensive executive withdrawal power before the Pickett Act that had been delegated by congressional acquiescence, but said in dicta that after 1910 the Act would "restrict the greater power already possessed."[70] To the extent Congress has entered the arena, one might infer an intent to limit executive authority. The Act stated that "the President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands . . . and reserve the same for . . . public purposes. . . ."[71] Significantly the Act required withdrawals under its authority to be "open to exploration, discovery, ocupation, and purchase under the mining laws. . . ."[72] That Congress was taking the subject of withdrawals under its control and limiting executive authority seems plain on the face of the statute. And that conclusion is supported by legislative history.[73]

---

68. Mineral Leasing Act of 1920, 30 U.S.C. §§ 22, 48, 181–287 (1976).

69. "[A]ny person authorized to enter lands under the mining laws of the United States may enter and obtain patent to lands containing petroleum or other mineral oils, and chiefly valuable therefor, under the provisions of the laws relating to placer mining claims. . . ." Act of February 11, 1897, ch. 216, 29 Stat. 526 (1897).

70. 236 U.S. at 482–83, citing S.REP.NO. 171, 61st Cong., 2d Sess. (1910). The report supports existence of presidential withdrawal authority but, contrary to the Court's suggestion, purports to change the existing authority only by requiring a report of all withdrawals to Congress. Other contemporary sources support the Court's interpretation. *See* note 73, *infra*. As late as 1924 the Interior Department agreed that the Pickett Act was a limitation on the executive's withdrawal authority. Utah v. Lichliter, 50 INTERIOR DEC. 231, 236 (1924).

71. Act of June 25, 1910, ch. 421, § 1, 36 Stat. 847 (1910) (repealed 1976).

72. 43 U.S.C. § 142 (1976).

73. *E.g.*,

"To sum up, in my judgment this bill restricts and limits the power of the President as it is to-day rather than enlarges it as interpreted by the courts. . . .

132

The executive was undaunted by the plain meaning of the statute, the thrust of the legislative history and a Supreme Court interpretation. Administrative officials have consistently denied that the Pickett Act was meant to be a full explication of its withdrawal authority. Instead of construing the Act as prohibiting any executive withdrawals except those permitted by its terms—temporary withdrawals of lands that remain open under the mining laws[74]—and those permitted under other statutes, the executive still felt that it possessed all the non-statutory authority it had before the Pickett Act. Whenever the executive felt that it needed to do what the Pickett Act would not allow, it would do so unhindered by the statute, on the assumption that it retained the full panoply of withdrawal authority recognized in *Midwest Oil,* virtually unaffected by the legislation. It is upon this "authority" that the United States has relied to succeed against adverse private claimants.

Between 1910 and 1976 millions of acres were withdrawn from the operation of public land laws, including the mining laws, without statutory authority. Remarkably, the government position upon which these withdrawals rest has not yet been fully tested.[75] For the Court in *Midwest Oil* to find that congressional acquiescence was tantamount to a delegation of authority to the executive was a long step. Yet that feat was easy compared to the leap that is necessary in order to find that the legislative definition of authority in the Pickett Act imposed no limitations on executive authority in spite of its apparently narrowing language.[76]

A 1941 opinion of the Attorney General substantially supports the executive's surprising position that the Pickett Act was only a Congressional footprint on the beachhead of withdrawal authority, not an artic-

---

I think it is a good plan, in view of the experiences we have had in recent years, that we put this power in direct and express statutory form rather than the common law of the courts, and limit it, as we propose to do in the bill.

45 CONG. REC. 7475 (1910) (remarks of Sen. Nelson, chairman of Senate Committee on Public Lands). One historian has argued that the legislative history is "inconclusive." L. PEFFER, THE CLOSING OF THE PUBLIC DOMAIN 117 (1951). *See* notes 81–82 *infra* and accompanying text.

74. *But see* Portland General Electric Co. v. Andrus, 441 F. 859 (D. Wyo. 1980) (upholding *temporary* withdrawal from mineral entry under "implied authority").

75. *See infra* notes 99–110 and accompanying text.

76. Justice Frankfurter's concurring opinion in a Supreme Court decision rejecting implied executive authority to seize steel mills is apt. In it he stated:

It is one thing to draw an intention of Congress from general language and to say that Congress would have explicitly written what is inferred, where Congress has not addressed itself to a specific situation. It is quite impossible, however, when Congress did specifically address itself to a problem, as Congress did to that of seizure, to find secreted in the interstices of legislation the very grant of power which Congress consciously withheld. To find authority so explicitly withheld is not merely to disregard in a particular instance the clear will of Congress. It is to disrespect the whole legislative process and the constitutional division of authority between President and Congress.

Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 609 (1952).

133

294                    *NATURAL RESOURCES JOURNAL*                    [Vol. 22

ulation of the limits of executive authority after the Act.[77] The opinion sustained a withdrawal from the mining laws of lands in Oregon needed for an agricultural research station.[78] The Attorney General found that the Pickett Act dealt only with the Secretary's temporary withdrawal authority. By considering the withdrawal "permanent," the Attorney General found that the Pickett Act's restriction against closures to metalliferous mining could be avoided. The opinion pointed out that the Act had germinated in circumstances that showed a concern mainly for temporary withdrawals for conservation purposes.[79] While admitting that earlier versions of the bill which became the Pickett Act were intended to deal with the entire area of presidential withdrawals, the Attorney General concluded that inclusion of the word "temporarily" in the bill that passed showed an intent not to impact the President's impliedly delegated authority to make permanent withdrawals or reservations.[80]

The history of Congress's deliberations on the Pickett Act reveals no unequivocal understanding by the Senate of the impact of its addition of the word "temporarily."[81] At least two perceptions of the effect of the change were expressed,[82] but there is nothing in the history to indicate

77. 40 Op. Att'y Gen. 73 (1941). By the time of the opinion other withdrawal statutes had been enacted. Taylor Grazing Act, 43 U.S.C. § 315 (1976); Antiquities Act, 16 U.S.C. § 431–433 (1976); General Revision Act, ch. 561, 26 Stat. 1095 (1891).

78. The station was established in connection with the Taylor Grazing Act, 43 U.S.C. § 315–315g, 315b–315m, 315n, 315o–1 (1976). The Act authorized the Secretary of the Interior to withdraw lands "chiefly valuable for grazing and raising forage crops" to be included in grazing districts. *Id.* § 315. But withdrawals under the Act were left subject to the mining laws. *Id.* § 315e. Thus, it was necessary to find some other source of authority for withdrawing the site from operation of the mining laws.

79. 40 Op. Att'y Gen. at 76–78.

80. *Id.* at 78–80.

81. *See* 45 CONG. REC. 7538–52, 7555, 8169–70, 8671 (1910). The administration's request was that Congress "authorize the Secretary of the Interior temporarily to withdraw lands pending submission to Congress of recommendations as to legislation to meet conditions or emergencies as they arise." Neither S. 5485 as reported out of the Senate Committee on Public Lands nor H.R. 24070 as reported out of the House Committee on Public Lands used the word "temporary." The Senate, without explanation, changed the language of the House bill somewhat, including the addition of "temporarily" to it. 45 CONG. REC. 8670 (1910).

82. House members concluded that the bill's meaning would not be changed at all. 45 CONG REC. 8667 (1910) (remarks of Rep. Mondell); *id.* at 8671 (remarks of Rep. Smith). Others suggested that it would refer to withdrawals limited in time. *Id.* at 7555 (remarks of Sen. Smoot); *id.* at 8671 (remarks by Sen. Taylor). *Cf. id.* at 7544 (remarks of Sen. Clark in support of an amendment imposing a definite time limit). It is likely that those senators who were clinging to the latter interpretation were feeling disappointment over their unsuccessful attempt to amend the Act to provide for automatic cessation of a withdrawal upon the expiration of the Congress to which the withdrawal was reported. *See* S.DOC. NO. 610, 61st Cong., 2d Sess. 14 (1910) (the minority report of the committee). *See also* 45 CONG.REC. 8170 (1910) where it is reported that on a motion to strike out "temporarily," the committee chair, Sen. Smoot, argued:

I do not take it as a limitation on the power of the President, but I do take it that it means that the withdrawals, many of which will be restored to the public domain, are temporary in their nature. Of necessity it should be so, because if the withdrawals were not temporary in their nature, there would be a permanent withdrawal, with no likelihood or thought of the land ever being restored to the public domain.

134

that the statute did not deal with all of the President's withdrawal authority as it appears to do on its face.[83] And "temporary" withdrawals lasting many years have been upheld with no requirement of a fixed expiration date.[84] Significantly, the Act deals distinctly with two types of authority: first, authority "temporarily [to] withdraw from settlement, location, sale, or entry any of the public lands . . ." and second, authority to "reserve the same for . . . public purposes to be specified in the orders of withdrawals."[85] It is reasonable to conclude that adding "temporarily" to the first type of authority was to make it clear that the Act applied to more than "permanent" withdrawals, *i.e.*, reservations (withdrawals with a designated public purpose). Presumably the statute might have been read before the amendment as authorizing the President only to "withdraw . . . public lands . . . *and* reserve the same . . . for public purposes . . ."[86] As enacted, the statute authorizes temporary withdrawals alone, or temporary withdrawals plus a reservation. The last sentence's reference to "such withdrawals or reservations" reinforces a construction that finds both types of authority to be included in the Act's compass. It is not surprising that the drafters of the Act would attempt to emphasize the extent of the Pickett Act in light of the rather narrow scope of the President's inquiry and the sharp differences over the proper limits of executive authority.[87]

In his 1941 opinion, the Attorney General strained to find authority for withdrawals and reservations outside the Pickett Act so that withdrawn lands might be closed to mining. The colorful story behind the opinion,

---

83.   The President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States, including Alaska, and reserve the same for waterpower sites, irrigation, classification of lands, or other public purposes to be specified in the orders of withdrawals, and such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress.

Act of June 25, 1910, ch. 421, § 1, 36 Stat. 847 (1910) (repealed 1976).

84.   *E.g.*, Mecham v. Udall, 369 F.2d 1 (10th Cir. 1966) (temporary withdrawal of 36 years' duration); Clinton D. Ray, 59 INTERIOR DEC. 466 (1947) (withdrawal in aid of legislation lasting 13½ years). *See also*, WHEATLEY REPORT, *supra* note 19, Appendix F at 51–54.

The authorities agree that the distinction between temporary and permanent withdrawals is not the duration but rather the nature of the withdrawal. Permanent withdrawals are dedicated to a particular use, while temporary withdrawals generally remove public land from most uses. Lowe, *Withdrawals and Similar Matters Affecting Public Lands*, 4 ROCKY MT. MIN. L. INST. 55 (1958). *See also* United States v. Midwest Oil Co., 236 U.S. 456, 478 (1915); Utah v. Lichliter, 50 INTERIOR DEC. 231 (1924); WHEATLEY REPORT, *supra* note 19, at 50–51. The somewhat artificial distinction was removed legislatively with the enactment of an all-inclusive definition for withdrawals in the Federal Land Policy and Management Act of 1976. *See* note 219 *infra*.

85.   Act of June 25, 1910, ch. 421, § 1, 36 Stat. 847 (1910) (repealed 1976).

86.   *Id.* (emphasis added).

87.   *Compare* S. REP. NO. 171, 61st Cong., 2d Sess. (1910) (Committee on Public Lands majority report stating that the authority expressly given in the bill already existed in the President) *with* S. DOC. NO. 610, 61st Cong. 2d Sess. (1910) (committee minority report urging strict limitations on presidential withdrawal authority).

135

*NATURAL RESOURCES JOURNAL* [Vol. 22

which only came to light in 1968 as a result of the Public Land Law Review Commission's hearings,[88] helps explain how the Attorney General reached his conclusion. Attorney General Robert H. Jackson was under intense pressure from several executive departments, including his own, to uphold nonstatutory withdrawal authority. After nearly a year of machinations the Attorney General adopted and published an opinion supporting the continued existence of an implied delegation of withdrawal authority. This necessitated withdrawing an earlier, unpublished opinion that had reached the opposite conclusion[89]—that the Act did "define and limit the power of the President to make withdrawals . . ." and that "withdrawals now made must be made in accordance with its terms, unless made under some other act or acts of Congress."[90]

Denial of impliedly delegated authority in the 1941 Attorney General's opinion not only would have prohibited a proposed withdrawal for the Squaw Butte Experimental Station in Oregon, the subject of the opinion, but also would have cast doubt upon the validity of numerous other executive withdrawals and reservations. Initially the Attorney General responded to entreaties that the first opinion be reconsidered by pointing out that the plain language of the Act contradicted the interpretation being urged, and he adhered to the views he voiced in the first opinion.[91] Yet his views changed within two months and the first opinion was revoked.[92] Shortly after the new opinion was signed, Attorney General Jackson was appointed to the United States Supreme Court.[93]

Two grounds that received but passing mention in the final Attorney General's opinion were strenuously pressed by those seeking reconsideration. The argument that unrestricted executive withdrawal authority is justified by long-standing administrative construction emerges as the enduring rationale for impliedly delegated withdrawal authority. The other argument, that the practical effect of leaving all lands withdrawn since the Act (for example, military reservations) open to mining would be anomalous, provides some support for the reasonableness of the admin-

---

88. Copies of exchanges of inter- and intra-departmental correspondence were made available to the Public Land Law Review Commission by Assistant Attorney General Clyde O. Martz to supplement his testimony before the Commission. Copies of the documents are collected in the WHEATLEY REPORT, *supra* note 19, Appendix B.

89. Unpublished opinion of the Attorney General (July 25, 1940) (*reprinted in* the WHEATLEY REPORT, *supra* note 19, Appendix B at 6).

90. *Id.* at 9.

91. Letter to Harold L. Ickes, Secretary of the Interior, from Robert H. Jackson, Attorney General (April 11, 1941) (*reprinted in* WHEATLEY REPORT, *supra* note 19, at 35).

92. 40 Op. Att'y Gen. 73 (1941).

93. Eight days after the opinion (June 12, 1941), Jackson was nominated as a Supreme Court Justice by President Roosevelt. He was confirmed by the Senate on July 7, 1941, and took the oath of office on July 11, 1941. There is no evidence to suggest that Jackson's appointment was in any way related to the matter of the withdrawal opinions.

136

istrative interpretation, not its legality. Deference to administrative construction and conduct was, of course, the basis for the Court's legitimation of pre-Pickett Act withdrawals in *Midwest Oil.*

One might have concluded reasonably that the realm of withdrawal authority had been subjected to plenary congressional control and that any implied authority had been repealed by the Pickett Act, but courts subsequently read the Act so narrowly that it was rendered almost meaningless. After *Midwest Oil* the executive continued to operate on the apparent assumption that whatever it could not do under the express terms of the Pickett Act it could still do under its implied delegation of authority. That assumption may have become a self-fulfilling prophecy. Each withdrawal after the Pickett Act that escaped the Congress's 'veto' became evidence of a continued congressional acquiescence. Although the 1941 Attorney General's opinion cited few examples of congressional acquiescence in the practices it validated,[94] the failure of Congress to respond to the opinion by denying the survival of implied authority gave the opinion legitimacy. The executive's actions based on the assumption that it had authority expressed in the opinion went unchallenged. The longer without challenge or congressional limitation, the less likely it became that a court would find an absence of authority. Indeed, the few instances of congressional termination of executive withdrawals[95] might be cited as indications that Congress would check any exercise of authority with which it disagreed.

The tortured interpretation indulged by the 1941 Attorney General's opinion cleverly preserved all the non-statutory "permanent" withdrawals made after the Pickett Act. If lands to be withdrawn did not need to be protected from mining activity or were not otherwise excluded by the Act's terms[96] the executive proceeded comfortably under the Pickett Act.[97] When in doubt, residual implied authority, covering the rest of the field,

---

94. Attorney General Jackson did quote from a previous opinion by his predecessor, Homer Cummings, relating to a proposed reservation of public lands for use as a migratory bird refuge: "Numerous Executive orders entirely similar in principle to the proposed order have been issued over a period of years and there has been no repudiation or disaffirmance of such orders by Congress." . 40 Op. Att'y Gen. 73, 83 (1941), quoting from 37 Op. Att'y Gen. 502, 503 (1934). Jackson also cited six executive orders not made under Pickett Act authority, 40 Op. Att'y Gen. at 82, three attorney generals' opinions and two court of appeals cases. *Id.* at 84. All of the latter five decisions seem to have been justified as the exercise of some inherent withdrawal authority of the executive— a questionable rationale, *see* note 46 *supra*—and congressional acquiescence was not expressly relied upon.

95. *See, e.g.,* discussion of Wyoming v. Franke, text accompanying notes 135–149 *infra;* 43 U.S.C. § 1616(d)(1) (1976) (repealing Exec. Order No. 4582 which withdrew lands in Alaska under Pickett Act authority).

96. Certain lands that were subject to valid settlements under homestead and other public land laws were excepted from operation of the Pickett Act. 43 U.S.C. § 142 (1976).

97. In such cases the burdens on the executive were minor. Ch. 421, § 1, 36 Stat. 847 (1910) (repealed 1976) required only that the public purpose of a reservation under the Act be specified.

137

was used. Later, even "temporary" withdrawals from mineral entry were defended as within the executive's impliedly delegated authority.[98]

The first court test of non-statutory executive authority to make withdrawals after the Pickett Act finally came in 1977. The court in *Portland General Electric Co. v. Kleppe*[99] found ample impliedly delegated executive authority based on 67 years of apparent congressional acquiescence in executive withdrawal authority, unbridled by the many congressional enactments in the area.[100] The case was a modern version of *Midwest Oil*. The Secretary of the Interior had temporarily withdrawn 3 million acres of oil shale lands in Wyoming, Colorado, and Utah from appropriation under the mining laws. Portland General Electric Co. then located 1,740 uranium claims on some of the withdrawn public lands. When the government threatened to bring a trespass action against the company in 1975, discovery work was stopped and the company sued Interior Department officials challenging the withdrawal order. At last, judicial attention could be focused on the argument that the Pickett Act comprehended the executive's withdrawal authority, except as otherwise dealt with by statute. But apparently the issue had arisen too late.

Without analysis, the court in *Portland General Electric* held that the withdrawal power recognized in *Midwest Oil* was not ended by the Pickett Act. The court went on to rule that even if "the Pickett Act did supersede the implied authority of the President to make withdrawals, Congress has, by its acquiescence restored that power."[101] In support of this proposition the court cited the 1941 Attorney General's opinion that had interpreted the Act as leaving permanent withdrawal authority unimpaired but as limiting the pre-existing authority for temporary withdrawals. Yet the court's decision upheld a temporary withdrawal, tacitly stating that "the President's power to make temporary withdrawals of lands from mineral entry was not destroyed by this Act."[102]

Recent indications that the understanding of Congress comported with the acquiescence theory were cited in *Portland General Electric*. One example was the legislative history of the Defense Withdrawal Act recognizing the existence of an implied delegation of authority.[103] Another was language in a section of the Alaska Native Claims Settlement Act referring to the Secretary's "existing" authority.[104]

98. *See, e.g.,* Portland General Electric Co. v. Kleppe, 441 F.Supp. 859 (D. Wyo. 1977) (upholding temporary withdrawal of oil shale lands from mineral entry; citing 40 Op. Atty. Gen. 73 (1941) as authority).

99. Portland General Electric Co. v. Kleppe, 441 F.Supp. 859 (D. Wyo. 1977).

100. *Id.*

101. *Id.* at 862.

102. *Id.* at 861.

103. 43 U.S.C. §§ 155–158 (1976). *See* notes 106–108, *infra* and accompanying text.

104. 43 U.S.C. § 1616(d)(2)(A) (1976). *See* note 105 *infra* and accompanying text.

138

In the Alaska Native Claims Settlement Act Congress directed the Secretary to withdraw some 84 million acres of public lands in Alaska for congressional consideration as national parks, forests, wildlife refuges, and wild and scenic river systems.[105] The Act specified that this should be done by the Secretary of Interior "acting under authority provided for in existing law." The directive to withdraw the lands from "all forms of appropriation under the public land laws, including the mining and mineral leasing laws," indicates that Pickett Act authority would be unavailable. The authority under existing law to which Congress referred could only have been the executive's implied authority.

A more forthright expression of Congress's understanding that it has impliedly granted withdrawal power to the executive by acquiescence is found in the legislative history of the Defense Withdrawal Act.[106] The Senate report on the bill indicates that its purpose is "the recapture by the Congress of those powers which the executive branch of the government has acquired over a long period of years with respect to the withdrawal of the public lands from settlement, entry, location, and sale under the public land laws—an Executive power acquired through acquiescence or silence on the part of Congress."[107] The report recognizes that Congress had "since 1941 remained silent, and has therefore indulged in a practice . . . equivalent to acquiescence and consent that the practice be continued until the power exercised is revoked.'" Thus, the bill was "specifically aimed at breaking that silence—if silence it be—with respect to the Federal property embraced by its terms."[108] The report confirms that the intent of the Act was to restrict the scope of authority under which the executive had been operating. Without fully admitting "silence," the report rather candidly admits acquiescence.

A further example of congressional acknowledgement that there has been an implied delegation is found in the Federal Land Policy and Management Act (FLPMA).[109] The Act repealed "the implied authority

---

105. 43 U.S.C. § 1616(d)(2)(A) (1976). In addition, § 1616 (d)(1) withdrew all unreserved public lands in Alaska for 90 days during which the Secretary of Interior was to review them "and determine whether any portion of these lands should be withdrawn under authority provided for in existing law to insure that the public interest in these lands is properly protected." It added that "[a]ny further withdrawal shall require an affirmative act by the Secretary under his existing authority." Other references to secretarial withdrawal authority are found in the Act's legislative history. *E.g.*, the conference committee determined that "all Native interests in subsistence resource lands can and will be protected by the Secretary through the exercise of his existing withdrawal authority." H. REP. NO. 92-746, 92d Cong., 1st Sess. 37 (1971).

106. S. REP. NO. 857, 85th Cong., 1st Sess. (1957); CONF. REP. NO. 1347, 85th Cong., 2d Sess. (1958). *reprinted in* [1958] U.S. CODE CONG. & AD. NEWS 2227, 2238.

107. S. REP. NO. 857, 85th Cong., 1st Sess. 10 (1957). *reprinted in* [1958] U.S. CODE CONG. & AD. NEWS 2227, 2235.

108. *Id.* at 12, *reprinted* at 2238.

109. Pub. L. No. 94-579, 90 Stat. 2744 (codified at 43 U.S.C. § 1701–1782 (1976).

139

*NATURAL RESOURCES JOURNAL* [Vol. 22

of the President to make withdrawals and reservations resulting from acquiescence of Congress."[110]

The Supreme Court's recognition in *Midwest Oil* of a "grant" of authority to the executive based on congressional acquiescence in practices before 1910 would not lead inexorably to the conclusion that there was a "born again" implied delegation of withdrawal authority that authorized withdrawals after the Pickett Act. Yet congressional attempts to take control of withdrawals beginning in 1910 have not deterred the executive from making non-statutory withdrawals. The acquiescence theory is even more plausible than it was at the time of *Midwest Oil* because of the strong policy of retention and management of public lands expressed in many congressional acts and by the accompanying general policy trend favoring conservation of natural resources. The same rationale would favor protective exercises of statutory withdrawal authority.

## III. INTERPRETING STATUTORY WITHDRAWAL AUTHORITY: THE EXAMPLE OF THE ANTIQUITIES ACT.

One of the earliest statutes vesting the executive with discretion to make withdrawals was the Antiquities Act authorizing the proclamation of national monuments by the President.[111] The Act was originally designed to protect objects of historic or scientific interest such as Indian ruins, but it has been interpreted expansively by the executive. It is the most important of the few statutes that survived Congress's wholesale repeal of statutes dealing with executive withdrawal authority in 1976.[112]

The Antiquities Act gave the President authority to withdraw lands with no limits on duration, unhindered by any procedural requirements,[113] with no provision for congressional review,[114] and with no fixed acreage limitation.[115] Attempts to limit executive discretion based on language in the Act that restricts withdrawals to the "smallest area compatible with the proper care and management of the object to be protected"[116] and on congressional intent to protect specific sites such as Indian ruins, rather than large land areas,[117] have been unsuccessful.

110. *Id.*, § 704(a), 90 Stat. at 2792, quoted in note 208 *infra. See* notes 207–215 *infra.*

111. 16 U.S.C. §§ 431–433 (1976).

112. *See* notes 209–210 *infra* and accompanying text.

113. Authority under the Antiquities Act is given to the President. 16 U.S.C. § 431 (1976). The President has delegated his withdrawal authority to the Secretary of the Interior. Exec. Order No. 10,355, 17 Fed. Reg. 4831 (1952).

114. Compare this broad discretion with the more detailed provisions and procedures for withdrawal in the FLPMA. *See* notes 226–241 *infra* and accompanying text.

115. By contrast the Defense Withdrawal Act, 43 U.S.C. §§ 155–158 (1976), permits only withdrawals of up to 5,000 acres for defense purposes without an act of Congress. *See* note 231, *infra. See also* the FLPMA procedures related to sizes of withdrawals, notes 226–230 *infra* and accompanying text.

116. 16 U.S.C. § 431 (1976). *See* notes 124–127 *infra* and accompanying text.

117. *Id.* See notes 128–134 *infra* and accompanying text.

140

Most recently the scope of the executive's discretion under the Antiquities Act was called into question as a result of President Carter's 1978 withdrawal of lands for seventeen national monuments encompassing fifty-six million acres in Alaska.[118] The action was motivated by the imminent expiration of extensive withdrawals under the Alaska Native Claims Settlement Act. The lands were being considered for inclusion in units of land to be managed under one of the federal conservation systems.[119] Challenges came from private interests[120] whose development of minerals under Mining Act claims would be thwarted by national monument designation, and from the State of Alaska[121] whose land selections would be limited.[122] As with every judicial challenge to the exercise of executive discretion under the Act in the past, the court dealing with the Alaska lawsuits upheld creation of the monuments.[123]

Congress did not have in mind authorizing withdrawals of vast areas for designation as national monuments when it passed the Antiquities

---

118. In a series of proclamations dated December 1, 1978, President Carter withdrew and reserved the following amounts of Alaska land as national monuments to protect the biological, geological, archaeological and historical value of each area:

    Admiralty Island National Monument: 1,100,000 acres
    Aniakchak National Monument: 350,000 acres
    Becharof National Monument: 1,200,000 acres
    Bering Land Bridge National Monument: 2,590,000 acres
    Cape Krusenstern National Monument: 560,000 acres
    Denali National Monument: 3,890,000 acres
    Gates of the Arctic National Monument: 8,220,000 acres
    Glacier Bay National Monument [Addition]: 550,000 acres
    Katmai National Monument [Addition]: 1,370,000 acres
    Kenai Fjords National Monument: 570,000 acres
    Kobuk Valley National Monument: 1,710,000 acres
    Lake Clark National Monument: 2,500,000 acres
    Misty Fiords National Monument: 2,285,000 acres
    Noatak National Monument: 5,800,000 acres
    Wrangell–St. Elias National Monument: 10,950,000 acres
    Yukon-Charley National Monument: 1,720,000 acres
    Yukon Flats National Monument: 10,600,000 acres

Proc. Nos. 4611-27, 3 C.F.R. §§69–102 (1979) *See* notes 153–157, *infra*.

119. *See* notes 245–255 *infra* and accompanying text.
120. Anaconda Copper Co. v. Andrus, 14 E.R.C. 1853 (D. Alas. 1980).
121. Alaska v. Carter, 462 F.Supp. 1155 (D. Alas. 1978). *See* note 123 *infra*.
122. *See* notes 249–250 *infra* and accompanying text.
123. Anaconda Copper Co. v. Andrus, 14 E.R.C. 1853 (D. Alas. 1980). *See* authorities cited in notes 129–146 *infra*. If pending or subsequent challenges to President Carter's Antiquities Act withdrawals of Alaska lands by persons who attempted to establish rights (*e.g.*, mining claims) on those lands should succeed, private rights may be sustained even if the land was withdrawn later under the 1980 Alaska National Interest Lands Conservation Act. Act of Dec. 2, 1980, Pub. L. No. 96-487, §§201–708, 94 Stat. 2371, 2377–2422. However, if the same lands were validly withdrawn, at the time of private entry under other authority as contemplated by § 17(d)(1) of the Alaska Native Claims Settlement Act, 43 U.S.C. § 1616(d)(1) (1976) (*see* note 105 *supra*), it is likely that private interests would be defeated.

    All of President Carter's withdrawals were rescinded and superseded by the 1980 legislation that placed the affected land in a variety of classifications (to be codified at 16 U.S.C. § 3209). This led the parties in Alaska v. Carter, 462 F.Supp. 1155 (D. Alas. 1978), involving challenges to the withdrawals, to dismiss the pending action. Stipulation of Dismissal dated Aug. 14, 1981.

141

Act. The purpose was to set aside minimal areas to protect ruins of archaeological interest in the American Southwest.[124] The intent of Congress is captured in the statute's reference to "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest" and in its limitation of withdrawn lands to the minimum size required to care for protected objects.[125] During the floor discussion of the bill which became the Antiquities Act, some members of Congress were apprehensive about the potential for using the Act to withdraw large land areas. Assurances were given by the floor manager that nothing of the kind was intended.[126] It appears that congressional understanding was that large, permanent areas would become national parks through congressional action rather than monuments withdrawn under the Antiquities Act.[127]

Whatever Congress thought it was doing in the Antiquities Act, the executive began using, and has since used, the Act's authority to withdraw large land areas for a variety of purposes, far removed from simply protecting Indian relics. President Theodore Roosevelt made more than a dozen withdrawals under the Act in the two years that followed its enactment. Although most were of small areas where ruins or some natural formation was located, some were of huge areas withdrawn for more general preservation purposes. Most notably, Grand Canyon National

---

124. H. R. REP. NO. 2224, 59th Cong., 1st Sess. 1 (1905) states:

> There are scattered throughout the Southwest quite a large number of very interesting ruins. Many of these ruins are upon the public lands, and the most of them are upon lands of but little present value. The bill proposes to create small reservations reserving only so much land as may be absolutely necessary for the preservation of these interesting relics of prehistoric times.

125. 16 U.S.C. § 431 (1976).

126. The following dialogue is illustrative:

> Mr. STEPHENS of Texas. Will that take this land off the market, or can they still be settled as part of the public domain?
>
> Mr. LACEY. It will take that portion of the reservation out of the market. It is meant to cover the cave dwellers and cliff dwellers.
>
> Mr. STEPHENS of Texas. How much land will be taken off the market in the Western States by the passage of the bill?
>
> Mr. LACEY. Not very much. The bill provides that it shall be the smallest area necessry [sic] for the care and maintenance of the objects to be preserved.
>
> Mr. STEPHENS of Texas. Would it be anything like the forest-reserve bill, by which seventy or eighty million acres of land in the United Staes have been tied up?
>
> Mr. LACEY. Certainly not. The object is entirely different. It is to preserve these old objects of special interest and the Indian remains in the pueblos of the Southwest, whilst the other reserves the forests and the water courses.

40 CONG. REC. 7888 (1906). The bill passed in 1906 was nearly identical to a bill passed in 1904 by the Senate (S. 5603) but omitted an amendment that appeared in the earlier bill limiting withdrawals to one section (640 acres) of land in one place. *See* 30 CONG. REC. 5627 (1904).

127. *See* H. R. REP. NO. 2224, 59th Cong., 1st Sess. 3, 7–8 (1905). *See also* S. DOC. NO. 314, 58th Cong., 2d Sess., 9–10 (1904).

142

Monument was set aside in Arizona because it was "an object of unusual scientific interest, being the greatest eroded canyon within the United States."[128] The United States later attempted to remove an enterprising mining claimant from a claim on the trailhead to the popular Bright Angel Trail on the south rim of the Grand Canyon where he sought to charge fees for access. When the claimant challenged the legality of the withdrawal, the Supreme Court in *Cameron v. United States*[129] upheld the designation of Grand Canyon as a national monument. The Court found that the canyon was of scientific interest, a purpose mentioned in the statute. The one paragraph the court devoted to the issue did not deal with the question of congressional intent or the language which seems to limit the land area to be withdrawn,[130] nor were these matters fully developed in the briefs of the parties.[131] By the time of the *Cameron* decision, at least nine other large national monuments had been set aside under the Act to preserve various geological phenomena, not for protecting ruins as contemplated by Congress.[132]

The Supreme Court considered another challenge to the President's authority under the Antiquities Act in *Cappaert v. United States*.[133] A rancher's pumping of groundwater had the effect of lowering the level of water pooled in a nearby limestone cavern known as Devil's Hole, a part of Death Valley National Monument. The federal government at-

---

128. Proc. No. 2022, 47 Stat. 2547 (1932).

129. 252 U.S. 450 (1920).

130. *Id.* at 455–56.

131. Appellants argued in their brief that the Grand Canyon National Monument was encompassed within a prior forest reserve and that § 1 of the Antiquities Act protected objects of historic and scientific interest on land already reserved. 16 U.S.C. § 433. Therefore, withdrawal under § 2 of the Act (16 U.S.C. § 431) was unnecessary to insure protection of objects of historic and scientific interest. Appellants also argued that the Grand Canyon was not a landmark, structure, or object of historic or scientific interest but merely an enormous canyon and that the President's attempt to set it apart as an object of unusual scientific interest merely because of its size was improper. Brief for Appellant at 44–48, Cameron v. United States, 252 U.S. 450 (1920).

The government responded that appellants' contentions about national monument status were not raised in the Court of Appeals nor by the assignment of error to the Supreme Court, and thus were not properly before the Court. It also argued that, in any event, the proclamation creating the Grand Canyon National Monument stated that the canyon was an object of unusual scientific interest, bringing it within the authority Congress granted to the President. Brief for Appellee at 23–24, *id.*

The question of whether the statute authorized such a large withdrawal was at issue in the case; *see* United States v. Cameron, E. No. 10 (D. Ariz., answer filed March 23, 1917). The Court did not address this question.

132. *E.g.*, Proc. No. 658, 34 Stat. 3236 (Devil's Tower; 1152.91 acres); 36 Stat. 2498 (Mukuntuweap); Proc. No. 1126, 37 Stat. 1681 (Colorado; 13,883 acres); Proc. No. 1166, 37 Stat. 1715 (Devil's Postpile; 800 acres); 34 Stat. 3266 (Petrified Forest; 60,776.02 acres); Proc. No. 1340, 39 Stat. 1792 (Capulin Mountain; 680 acres); Proc. No. 1313, 39 Stat. 1752 (Dinosaur); Proc. No. 1487, 40 Stat. 1855 (Katmai; 1700 square miles); Proc. No. 1547, 41 Stat. 1779 (Scott's Bluff; 2053 acres). Approximately 5 to 15 national monuments were set aside yearly, many of them quite small in size.

133. 426 U.S. 128 (1976).

143

*NATURAL RESOURCES JOURNAL* [Vol. 22

tempted to curtail the pumping to protect the Devil's Hole Pupfish, a rare species living in the pool. The rancher and the State of Nevada resisted on several grounds, including a contention that the Antiquities Act permitted the President to withdraw lands only to protect archaeological sites. In a paragraph the Court dismissed the argument, pointing out that the pool and the fish for which the monument was set aside were "objects of historic or scientific interest."[134] Although no reference was made to administrative practice to support the government's interpretation of the Act, it might have been pointed out that by 1976 use of the Antiquities Act for preservation of geological formations had become well established.

The most comprehensive treatment of the scope of executive authority under the Antiquities Act was in a district court case arising in Wyoming.[135] When John D. Rockefeller, Jr. offered to give the United States over 33,000 acres in the majestic Grand Tetons in Wyoming, it was upon the understanding that the area would be preserved and cared for by the United States as a park.[136] Historically parks have been created only by an act of Congress.[137] Consequently efforts to extend Grand Teton National Park to include the Rockefeller lands were begun. Proposals for increasing the park were defeated by strong local resistance to further reduction of a tax base already thinned by a heavy concentration of nontaxable public lands.[138] The state also objected that its control of fish and game, especially revenue producing management of the elk herd, was frustrated by the presence of large blocks of federal land. President Franklin D. Roosevelt responded to an eighteen-year impasse in Congress by declaring 221,610 acres to be the Jackson Hole National Monument.[139] Reacting strenuously, Congress attached a provision to Interior Department appropriations bills for several years following the proclamation which prohibited expenditures of the appropriations for administration of Jackson Hole National Monument.[140]

---

134. *Id.* at 141–42. The Presidential Proclamation setting aside the monument recited that its purpose was "for the preservation of the unusual features of scenic, scientific, and educational interest" and mentioned the fact that it was the habitat of "a peculiar race of desert fish . . . which is found nowhere else in the world." Proc. No. 2961, 3 C.F.R. § 147 (1979).

135. Wyoming v. Franke, 58 F.Supp. 890 (D. Wyo. 1945).

136. *See* H.R. REP. NO. 2910, 81st Cong., 2d Sess. 2 (1950).

137. *See* 16 U.S.C. §§ 21–410gg-5 (1976). The executive has never attempted to create a national park.

138. Less than 5% of the land in Teton County was taxable. H. R. REP. NO. 2910, 81st Cong., 2d Sess. 2 (1950).

139. Proc. No. 2578, 57 Stat. 731 (1943). A large area that had been within the Teton National Forest was also included in the monument.

140. *E.g.,* ch. 219, § 8, 57 Stat. 493 (1943); ch. 298, § 10, 58 Stat. 508 (1944); ch. 262, § 10, 59 Stat. 360 (1945); ch. 529, § 9, 60 Stat. 386 (1946); ch. 337, § 6, 61 Stat. 492 (1947); ch. 754, § 6, 62 Stat. 1149 (1948); and ch. 680, § 110, 63 Stat. 801 (1949).

144

The State of Wyoming brought suit in federal district court charging that the President had no authority to set aside the Grand Teton lands as a national monument. Wyoming alleged that the area contained no object of historic or scientific interest and that it had not been confined to the smallest area compatible with the proper care and management of a monument. The court upheld the President's creation of Jackson Hole National Monument.[141] Although the terse proclamation cast little light on the purposes of the monument,[142] the government was allowed to introduce evidence supportive of the President's action, such as the existence of trails and camps used in connection with early trapping and hunting, glacial formations, mineral deposits, and indigenous plant life.[143] The court determined that there was enough evidence of historic and scientific value to support a conclusion that the President had not acted beyond his discretion.

The court in *Wyoming v. Franke*[144] recognized that the President's action resulted in hardship and injustice to the state and seemed unpersuaded as to the wisdom of his action.[145] Nevertheless the court concluded that the Antiquities Act had given the President authority to determine what "objects" fall within the ambit of the legislation and to define the area that is compatible with proper care and management of those objects:

> [I]f the Congress presumes to delegate its inherent authority to Executive Departments which exercise acquisitive proclivities not actually intended, the burden is on the Congress to pass such remedial legislation as may obviate any injustice brought about as the power and control over and disposition of government lands inherently rests in the Legislative branch.[146]

Eventually Congress did restore some of the monument lands to Teton National Forest, placing some in an elk refuge, and merging the rest with Grand Teton National Park.[147] The Act also included provision for federal payments in lieu of taxes and for federal cooperation in the state's fish and game management.[148] As if to note congressional displeasure with Roosevelt's action and to assuage state fears of its repetition, the new legislation prohibited any future use of the Antiquities Act in Wyoming.[149]

---

141. *Wyoming v. Franke,* 58 F.Supp. 890 (D. Wyo. 1945).

142. The proclamation addressed the statutory criteria briefly: "the Jackson Hole country . . . contains historic landmarks and other objects of historic and scientific interest. . . ." Proc. No. 2578, 57 Stat. 731 (1943).

143. *Wyoming v. Franke,* 58 F.Supp. 890, 895 (D. Wyo. 1945).

144. *Id.*

145. *Id.* at 896–897.

146. *Id.* at 896.

147. Act of September 14, 1950, ch. 950, §§ 1–3, 64 Stat. 849 (1950).

148. *Id.* §§ 5–6.

149. *Id.* § 1.

145

Congressional correction remains the most potent check on excesses under the Antiquities Act. Short of a clear abuse of discretion, it appears that the courts will not be lured into disputes that demand neat interpretations of the Act. *Cameron's* early, almost contemporaneous conclusion that a behemoth geologic feature (Grand Canyon) could qualify as a "monument" under the Act's language set the stage for an unrestrained application of the Act by the executive. The *Cameron* court might have insisted on reading the Act to be limited to small land areas required for protection of archaeological objects. The decision instead concentrated on other issues, perhaps reflecting the relative importance attached to them by litigants.[150] Deference to the administrative officials charged with applying the statute is generally appropriate. But in *Cameron* the statute was so new, its language sufficiently ambiguous, and administrative interpretations far enough from the clear intent of Congress that such easy deference was unjustified. Nevertheless the *Cameron* decision seemed to license a liberal use of the Antiquities Act to withdraw large blocks of public land in the name of preserving "objects of historic or scientific interest." Of course it is difficult to imagine lands that would not feed some historic or scientific interest.[151]

The Antiquities Act has had a profound impact in Alaska. There is a long history of setting aside large national monuments there in areas needing special protection.[152] President Carter's 1978 action setting aside millions of acres in Alaska as national monuments[153] was in response to Congress's failure to take action to protect national interest lands in Alaska which, absent executive action, would have opened them to disposal and development.[154] Carter noted that the lands "contain resources of unequaled scientific, historic, and cultural value, and include some of the most spectacular scenery and wildlife in the world."[155] The purpose of

---

150. *See* note 131 *supra.*

151. In *Wyoming v. Franke*, 58 F.Supp. 890, 895 (D. Wyo. 1945), the court had suggested that: if a monument were to be created on a bare stretch of sage-brush prairie in regard to which there was no substantial evidence that it contained objects of historic or scientific interest, the action in attempting to establish it by proclamation as a monument, would undoubtedly be outside the scope and purpose of the Monument Act.

152. *E.g.,* Katmai National Monument, established by Proc. No. 1487, 40 Stat. 1855 (1918) (1700 square miles), enlarged by Proc. No. 1950, 47 Stat. 2453 (1931), Proc. No. 2564, 56 Stat. 1972 (1946), Proc. No. 8890, 83 Stat. 926 (1969), and Proc. No. 4619, 3 C.F.R. § 86 (1979); Glacier Bay National Monument, established by Proc. No. 1733, 43 Stat. 1988 (1925) (1820 square miles), enlarged by Proc. No. 2330, 53 Stat. 2534 (1939) (904,960 acres), modified by Proc. No. 3889, 69 Stat., ch. 27 (1955), and Proc. No. 4618, 3 C.F.R. § 84 (1979).

153. *See* note 118 *supra.*

154. *See* discussion of Alaska national interest lands withdrawals at notes 246–255 *infra.* The Alaska National Interest Lands Conservation Act was passed in 1980. It dealt with protection and administration of the lands set aside as monuments by President Carter. Act of Dec. 2, 1980, Pub. L. No. 96-487, 94 Stat. 2371 (1980).

155. 14 WEEKLY COMP OF PRES. DOC. 2111 (Dec. 4, 1978).

146

the withdrawals was to preserve fragile land areas intact for future leg-
islation that would establish national parks, wildlife refuges, and wil-
derness areas. Yet the correctness of the actions must be judged not by
the purity of their motives but by their conformity with statute. While
the proclamations and the President's statements accompanying them
included much general language that more appropriately describes parks,
wildlife refuges, and other land management systems,[156] there are plenty
of references to extraordinary features that qualify for the historic and
scientific rubrics of the Act.[157]

Like the criterion in the Antiquities Act that requires areas proclaimed
as monuments to include "objects of historic or scientific interest," the
restriction on reserving lands in the monument "to the smallest area
compatible with the proper care and management of the objects to be
protected" calls for an exercise of executive discretion. In Alaska immense
land areas had to be withdrawn in part because of the extent of the
"objects" being protected. As the President stated, among the areas to
be protected:

---

156. *E.g.,*

> there are hereby set apart and reserved as the Admiralty Island National Monument
> all lands, including submerged lands, and waters owned or controlled by the United
> States within the boundaries of the area described . . . The area reserved consists
> of approximately 1,100,000 acres, and is the smallest area compatible with the
> proper care and management of the objects to be protected.

Proc. No. 4611, 3 C.F.R. § 69 (1979);

> The Secretary of the Interior shall promulgate such regulations as are appropriate,
> including regulation of the opportunity to engage in a subsistence life-style by local
> residents. The Secretary may close the national monument, or any portion thereof,
> to subsistence uses of a particular fish, wildlife or plant population if necessary for
> reasons of public safety, administration, or to ensure the natural stability or continued
> viability of such population.

Proc. No. 4612, 3 C.F.R. § 72 (1979). In addition, each of the Alaskan national monument with-
drawals contain this provision:

> All lands, including submerged lands, and all waters within the boundaries of this
> monument are hereby appropriated and withdrawn from entry, location, selection,
> sale or other disposition under the public lands laws, other than exchange.

Proc. Nos. 4611–27, 3 C.F.R. §§ 69–103 (1979).

157. *E.g.,* Proc. No. 4611, 3 C.F.R. 69 (1979) states that Admiralty Island is "outstanding for
its superlative combination of scientific and historic objects," listing archaeological sites, cultural
history, and an ecology that includes a large population of nesting bald eagles, brown bears, and an
unspoiled coastal island ecosystem. Proc. No. 4612, 3 C.F.R. § 72 (1979), states that the Aniakchak
National Monument is valuable for its unique volcanic features, including one of the world's largest
calderas with a unique lake, examples of geological sequences and biological succession of plant
and animal species, and a unique, largely self-contained climate. Interacting with the caldera system
is a unique subsistence culture of local residents. Proc. No. 4617, 3 C.F.R. § 82 (1979) describes
Gates of the Arctic National Monument as both the site of "human habitation for approximately
7,000 years," and as an area that affords an excellent opportunity to study undisturbed communities
of animals and plants. Proc. No. 4627, 3 C.F.R. § 102 (1979) depicts Yukon Flats National Monument
as the largest Alaskan solar basin and as one of the continent's most productive habitats for wildlife
due to the pristine ecology of its lush wetlands.

A similar variety of qualities is cited in the other 1978 Alaska withdrawals.

147

*NATURAL RESOURCES JOURNAL* [Vol. 22

are the Nation's largest pristine river valley, the place where man may first have come into the New World, a glacier as large as the State of Rhode Island, and the largest group of peaks over 15,000 feet in North America.[158]

So long as the historic or scientific nature of the area can be justified, a decision to include a reasonable amount of surrounding territory would seem to be within the scope of executive discretion that is shielded from judicial disturbance. Indeed, once the executive determines that the Grand Canyon or the Malaspina Glacier is worthy of protection, a decision to include less than all of it within a national monument might be questioned as an abuse of discretion.

The continued practice of making huge withdrawals under the Antiquities Act, like the executive's use of implied authority, has become its own greatest vindication. By arrogation, authority to go well beyond the Antiquities Act's original intent has become vested in the executive. Congress has been aware of the executive's unfettered use of the Act. In a few instances Congress's disapproval has resulted in a reversal of executive action.[159] Although a sharp congressional response to the creation of Jackson Hole National Monument led to the curtailment of the executive's authority in Wyoming under the Act,[160] the statute has not otherwise been modified by Congress.[161] Indeed, when Congress enacted FLPMA in 1976 it left the Antiquities Act intact while repealing almost all other sources of executive withdrawal authority.[162] This leads to a conclusion, as in *Midwest Oil*, that Congress has impliedly approved, and thereby effectively granted, the broad authority under the Act that the executive has regularly exercised. Just as an implication of nonstatutory withdrawal authority was built on undisturbed executive practice, a history of expansive interpretation of authority under the Antiquities Act has legitimated a broad construction.

158. 14 WEEKLY COMP. OF PRES. DOC. 2111, 2112 (Dec. 4, 1978).
159. *E.g.*, Jackson Hole National Monument was legislatively abolished and the lands merged into other systems. *See* notes 147–149 *supra* and accompanying text. Grand Canyon National Monument was included in a National Park by an act of Congress. Act of Jan. 3, 1975, § 3, 88 Stat. 2090, Pub. L. No. 93-620 (codified at 16 U.S.C. § 228b (1976)).
160. *See* note 149 *supra*.
161. In reaction to the Alaska withdrawals under the Antiquities Act Congress curtailed executive withdrawal authority in that state by limiting withdrawals of more than 5000 acres to 1 year's duration unless Congress approves by a joint resolution. Alaska National Interest Lands Conservation Act, Act of Dec. 2, 1980, Pub. L. No. 96-487, § 132b, 94 Stat. 2488 (to be codified at 16 U.S.C. § 3213).
162. *See* notes 208–210 *infra*. It has been argued that the Antiquities Act is out of keeping with the purposes of FLPMA and should be repealed. Comment, *Public Land Withdrawal Policy and the Antiquities Act*, 56 WASH. L. REV. 439 (1981).

148

## IV. WITHDRAWALS IN AN ERA OF PUBLIC LAND STEWARDSHIP

### A. Modern Land Policy

A rather abrupt shift of public land policy accompanied the closing of the frontier around the turn of the century. As discussed above,[163] the focus on disposal of public lands to achieve national goals—expansion, economic development, settlement of the continent—was changed as manifest destiny was accomplished. Certain lands were to be preserved to protect resources that might be needed by the nation—oil and gas, other minerals, timber, water, wilderness and recreational areas. Instead of wholesale repeals of the earlier laws allowing unrestrained private exploitation of the public domain, antidotal laws were enacted to salvage lands and resources that might be needed. A near crisis had prodded the Taft administration to withdraw millions of acres of oil lands from appropriation under the public land laws. This in turn moved Congress to enact the Pickett Act to facilitate future withdrawals, although the Court's contemporary decision in *Midwest Oil* indicated that the President had the necessary authority to make the withdrawal in that case without a statute. In the same period Congress acted to protect other resources by defining authority for administrative officials to make withdrawals and to take other protective actions.[164]

It became clear early in the twentieth century that the public lands were to be used and developed in a manner that ultimately would satisfy long range national purposes. As the federal government's role changed from a temporary guardian of lands and resources for eventual disposal, to a trustee holding and managing property for the best interests of the citizenry, it became necessary to provide authority and direction to the officials who were in charge of the lands. Legislation supplied the framework for administering public lands professionally and responsibly in apparent recognition of the long term interests of the country in protecting and utilizing particular resources. Public land management policy evolved into a system of classification and management for particular uses. Management commands were included in the Forest Service Organic Act of 1897 that set up the Forest Service to manage the national forests.[165] But the most sweeping advance toward a system of federal land use planning was enactment of the Taylor Grazing Act in 1934.[166] This led to the

---

163. *See* notes 7–30 *supra*, and accompanying text.
164. *See* notes 31–44 *supra*, and accompanying text.
165. Act of June 4, 1897, 30 Stat. 34 (codified as amended at 16 U.S.C. §§ 473–481).
166. Act of June 18, 1934, ch. 865, 48 Stat. 1269 (codified as amended at 16 U.S.C. §§ 315–315r).

149

withdrawal of all public lands for classification.[167] No uses, except mining and mineral leasing, were allowed without the permission of the Bureau of Land Management. Although budgets and skills were so limited that the agency's authority to plan for and control land use could not be exercised fully, significant depredations that were rampant in the past could be prevented.

The modern trend in public land management is reflected in a host of statutes requiring intensive management of federal resources by government officials. The statutes include mandates to protect certain land from resource development. The earliest example is found in the mandate of the National Park Organic Act of 1916.[168] Officials were directed to manage the national parks "to conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."[169] Wilderness areas,[170] and to some extent national monuments,[171] are classified and managed not to promote any conventional "use" but rather to preserve them in a pristine state. This is done in the interests of science and history. It also satisfies national psychological needs to commune with past and future generations and pursues important aesthetic and emotional values.[172] Thus Congress has now made care of non-development resources such as recreation, wildlife, and wilderness an objective of public land management.[173]

Perhaps the general policy of demanding care and protection of federal lands is best illustrated not by statutes dealing with lands specifically

---

167. A few months after the Act became law the President withdrew from "settlement, location, sale or entry" all public lands in 12 western states. Exec. Order No. 6910, November 26, 1934. This covered more than the 80 million acres of lands chiefly valuable for grazing that the statute authorized to be included in grazing districts. Furthermore, the President also acted to withdraw all public lands not otherwise reserved or withdrawn. Exec. Order No. 6964, February 5, 1935. These executive orders may have been prudent, in that they prevented a land rush for the remaining public lands. But even if the actions were legally authorized, the classification authority of the Secretary was in doubt as to lands not covered by the 1934 Act. To remedy the situation Congress amended the Act to grant the Secretary discretionary authority "to examine and classify any lands withdrawn or reserved" under the two executive orders. Act of June 26, 1936, ch. 842, Title 1, § 2, 49 Stat. 1976. This amendment provided the authority for the secretary to determine what uses were proper on the previously "wide open" public domain. *See* Utah v. Andrus, 446 U.S. 500 (1980).

168. 16 U.S.C. § 1.

169. *Id.*

170. *E.g.,* the Wilderness Act of 1964 defines a federal land area characterized as "wilderness" as "an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions. . . ." 16 U.S.C. § 1131(c).

171. *See* notes 111–117 *supra* and accompanying text.

172. *See Wilderness Symposium,* 16 IDAHO L. REV. 379–535 (1980); M. McCloskey, *The Wilderness Act of 1964—Its Background and Meaning,* 45 ORE. L. REV. 288 (1966).

173. *See* Wilkinson, *Public Land Law: Some Connecting Threads and Future Directions,* 1 PUB. LAND L. REV. 1, 36 (1980).

150

targeted for preservation but by those which govern use of lands that are to remain available for resource development. The national forests and the lands administered by the Bureau of Land Management comprise most of the public lands[174] and continue to be available for grazing, timber harvesting, and mineral exploration and development as well as for wild-life habitat and recreation. Yet today administration of lands for these purposes is controlled by statutes[175] and is markedly different from management during the period of disposal of the public lands. The most comprehensive statutes are the Federal Land Policy and Management Act[176] and the National Forest Management Act.[177]

Public land managers are now required by statutes to consider all of the "multiple uses" to which an area might be adapted,[178] to impose fees for uses permitted to private parties, to engage in land use planning,[179] and to involve the public in decisionmaking.[180] These mandates evidence a congressional purpose to impose guidelines and limits on federal agencies in order to prevent unwise use or dissipation of public resources. Without necessarily removing federal lands from availability for private uses, Congress has required prudence in management, the kind of prudence that is exercised by a manager who must consider the public resources not merely as commodities to be expended for today's needs but as assets to be retained indefinitely and used for the benefit of future, as well as of present, generations.

In addition to statutes dealing with general management of the public lands, Congress has, through the National Environmental Policy Act (NEPA),[181] superimposed upon the statutory mission of every federal

---

174. In 1970 BLM and Forest Service land included over 85% of all public lands. PLLRC REPORT, *supra* note 7, Appendix F at 327–328. Since the enactment of the Alaska National Interest Lands Conservation Act, Act of Dec. 2, 1980, Pub. L. No. 96-487, 94 Stat. 2371, much land formerly managed by BLM will be under the management of other agencies.

175. *See* 16 U.S.C. §§ 528–531, 1600, 1601, 1602, 1604; 43 U.S.C. §§ 1701, 1712, 1713, 1714.

176. Act of October 21, 1976, Pub. L. No. 94-579, 90 Stat. 2743 (codified at 43 U.S.C. §§ 1701–1782 and scattered sections of Titles 7, 10, 16, 22, 25, 30, 40, 48 and 49 U.S.C.). *See* section IV B *infra*.

177. Act of October 22, 1976, Pub. L. No. 94-588, 90 Stat. 2949 (codified at 16 U.S.C. §§ 1600–1610 and scattered sections of Title 16 U.S.C.).

178. 16 U.S.C. §§ 528, 529, 531(a), 1600(3), 1601(d), 1604(e)(1), 1607; 43 U.S.C. §§ 1701(a)(7), 1712(c)(1), 1732(a). *See* Whaley, *Multiple Use Decision Making—Where Do We Go From Here?* 10 NAT. RES. J. 557 (1970); Strand, *Statutory Authority Governing Management of the National Forest System—Time for a Change?* 7 NAT. RES. J. 479 (1974); Dunsky, *Improved Policymaking for the Multiple Use of Public Lands,* 5 U. MICH. J. L. REF. 485 (1972); Comment, *Managing the Federal Lands: Replacing the Multiple Use System,* 82 YALE L. J. 787 (1973).

179. 16 U.S.C. § 1604(d), (f), (g), (i); 43 U.S.C. § 1712. *See also* Forest and Rangelands Renewable Resources Planning Act of 1974, which requires long range planning and research programs for the management, use and protection of Forest Service lands. 16 U.S.C. § 1601, amending Pub. L. No. 93-378, 88 Stat. 476.

180. 16 U.S.C. §§ 1600(3), 1601(c), 1604(d), 1612, 1643(c); 43 U.S.C. § 1712(f). *See* note 200 *infra*.

181. 42 U.S.C. §§ 4331–4361.

151

agency an obligation to assess the environmental impacts of any "proposals for . . . major Federal actions significantly affecting the quality of the human environment."[182] The stated purpose of the Act is "to create and maintain conditions under which man and nature can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations of Americans."[183] Enforceable obligations under NEPA seem to be limited to those concerning the preparation of environmental impact statements consistent with the Act's standards.[184] The prerequisite of an impact statement may be avoided only if it would pose a clear and unavoidable conflict with other statutory obligations[185] or if the agency involved exercises no discretion in the matter.[186] Consequently land management agencies have adopted appropriate regulations[187] and regularly must prepare environmental impact statements.[188]

182. *Id.* at § 4332(2)(c). It has been held that NEPA "makes environmental protection part of the mandate of every federal agency and department." Calvert Cliffs Coordinating Committee, Inc. v. Atomic Energy Commission, 419 F.2d 1109 (D.C. Cir. 1971). *Accord,* Natural Resources Defense Council v. Morton, 388 F.Supp. 829 (D.D.C. 1974) (NEPA supplements Secretary of Interior's powers under Taylor Grazing Act). *See also* 42 U.S.C. §§ 4333 (all agencies required to bring their regulations, policies and procedures into conformity with NEPA's purposes), and § 4334 (NEPA's policies and goals are to supplement existing authorizations of federal agencies).

Among NEPA's other requirements, agencies must: use "a systematic, interdisciplinary approach . . . in planning and in decisionmaking;" "identify and develop methods and procedures . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;" "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources;" and "initiate and utilize ecological information in the planning and development of resource-oriented projects." 42 U.S.C. § 4332(2)(A), (B), (E), and (H) (1976).

183. 42 U.S.C. § 4331(a) (1976).

184. *See* Stryckers Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223 (1980).

185. *E.g.,* Flint Ridge Dev. Co. v. Scenic Rivers Ass'n, 426 U.S. 776 (1976) (statutory time limit for federal action too short to allow for EIS preparation); Texas Comm. on Natural Resources v. Bergland, 573 F.2d 201 (5th Cir.), *cert. denied,* 439 U.S. 966 (1978) (legislative history of National Forest Management Act set forth standards for clear-cutting in national forests during period while permanent regulations were being developed).

186. Natural Resources Defense Council, Inc. v. Berklund, 609 F.2d 553 (D.C. Cir., 1979) (preference right coal lease must be granted to holder of prospecting permit if statutory requirements met; it cannot depend on preparation of EIS); South Dakota v. Andrus, 462 F.Supp. 905 (D. S.D. 1978), *affirmed,* 614 F.2d 1190 (1980) (no EIS required for patent to mining claim because issuance is nondiscretionary).

187. 7 C.F.R. § 3100 (Department of Agriculture), 18 C.F.R. § 707 (Water Resources Council), 43 C.F.R. § 3040 (Bureau of Land Management). *See* 40 C.F.R. part 1500 (regulations applying generally to NEPA compliance).

188. Natural Resources Defense Council, Inc. v. Berklund, 609 F.2d 553 (D.C. Cir., 1979) (Mineral Lands Leasing Act); Ventura County v. Gulf Oil Corporation, 601 F.2d 1080 (9th Cir. 1979) (Mineral Lands Leasing Act); Natural Resources Defense Council, Inc. v. Hughes, 437 F.Supp. 981 (D. D.C. 1977) (federal coal leasing program). *But see* Kleppe v. Sierra Club, 427 U.S. 390 (1976) (agency has discretion to determine when a "proposal" exists); Friends of the Earth v. Butz, 406 F.Supp. 742 (D. Mont. 1975) (agency's determination of whether EIS is required is necessarily governed by rule of reason).

152

## B. *The Federal Land Policy and Management Act.*

The conservation trend—insistence upon sound management of public lands and selective preservation—grew throughout the first three quarters of the 20th century. Public land laws were exhaustively reviewed by the Public Land Law Review Commission and the commission's conclusions were reported in 1970.[189] The report contained 137 principal recommendations and hundreds of other, lesser recommendations. Much commentary, discussion, and criticism followed issuance of the report,[190] but Congress took no action to implement the recommendations for five years. Finally, with the enactment of the Federal Land Policy and Management Act (FLPMA)[191] many of the recommendations in the report, or variations upon them, were adopted.[192]

A dominant theme in the Public Land Law Review Commission's report was the assertion of the public's interest in public resources. Although the 19th century motif of distributing public lands to private individuals and encouraging their private development had become largely outmoded, the vast majority of lands owned by the public were being managed with little direction from Congress. Congress expressly repudiated the old policy, declaring it to be federal policy that "the public lands be retained in Federal ownership" unless it is found through the FLPMA land planning procedures that disposal of certain parcels "will serve the national interest."[193]

Before the FLPMA was enacted, the Bureau of Land Management (BLM), steward of about 60% of the public domain, was confined to antiquated management systems by limited budgets and lack of congres-

189. PLLRC REPORT, *supra* note 7.

190. *See. Symposium Presenting an Analysis of the Public Land Law Review Commission Report,* 6 LAND & WATER L. REV. 1–457 (1970); 54 DEN. L. J. 383–664 (1977); Hagerstein, *One Third of the Nation's Land—Evolution of a Policy Recommendation,* 12 NAT. RESOURCES J. 56 (1972); Hillhouse, *Public Land Law Review Commission Report: Ice-Breaking in Reserved Waters,* 4 NAT. RESOURCES L. 368 (1971); Mays, *Environmental Recommendations of the Public Land Law Review Commission and Their Implementation,* 5 NAT. RESOURCES L. 271 (1972).

191. Act of October 21, 1976, Pub. L. No. 94-579, 90 Stat. 2743 (codified at 43 U.S.C. §§ 1701–1782 and scattered sections of Titles 7, 10, 16, 22, 25, 30, 40, 48 and 49 U.S.C.).

192. *See* Carver, *Federal Land Policy and Management Act of 1976: Fruition or Frustration,* 54 DEN. L. J. 387 (1977); Muys, *The Public Land Law Review Commission Impact on the Federal Land Policy and Management Act of 1976,* 21 ARIZ. L. REV. 301 (1979). Muys (at 307) points out that many commission recommendations not addressed by FLPMA were addressed in other legislation around the same time. *E.g.,* Public Rangelands Improvement Act, Act of October 25, 1978, Pub. L. No. 95-514, 92 Stat. 1803; Outer Continental Shelf Lands Act Amendments, Act of September 18, 1978, Pub. L. No. 95-372, 92 Stat. 629; National Forest Management Act, Act of October 22, 1976, Pub. L. No. 94-588, 90 Stat. 2949; Act of October 20, 1976, Pub. L. No. 94-565, 90 Stat. 2662 (codified at 31 U.S.C. §§ 1601–1607) (providing for federal payments in lieu of local taxes); Federal Coal Leasing Amendments Act of 1975, Act of August 4, 1976, Pub. L. No. 94-377, 90 Stat. 1083.

193. 43 U.S.C. § 1701(a)(1).

153

*NATURAL RESOURCES JOURNAL* [Vol. 22]

sional direction. Other land management agencies had the benefit of somewhat better resources and guidelines.[194] Until the enactment of the FLPMA, BLM had no organic act and had to grope through a maze of congressional enactments, resolving contradictions and filling gaps in its agency mission by divining the congressional will as expressed through the most recent legislation.

The FLPMA attempted to bring federal land management into the 20th century by insisting upon greater responsibility and managerial regularity. Better land use planning and management were sought by providing for inventories and for comprehensive land use plans.[195] Congress directed the use of criteria[196] that show an overriding concern for better protection of federal resources.[197] Procedures were set out for acquisitions, sales, and exchanges of public lands.[198] Detailed provisions specified how the Bureau of Land Management is to be administered,[199] and public participation was built into many of the bureau's activities.[200] The Act affirmed a national interest in maintaining a supply of domestic resources and stated that the public lands should be managed consistently with that goal,[201] and with the goals of the Mining and Minerals Policy Act of 1970.[202] But there were scant practical directives in the Act to carry out

---

194. *E.g.*, Forest Service, Act of June 4, 1897, ch. 2, 30 Stat. 34–36 (codified at 16 U.S.C. §§473–482, 551 (1976)); Bureau of Reclamation, Act of June 17, 1902, ch. 1093, 32 Stat. 388 (codified at 43 U.S.C. §§391, 411, 1457); National Park Service, Act of August 25, 1916, ch. 408, 39 Stat. 535 (codified at 16 U.S.C. §§ 1–3, 22, 43); Fish and Wildlife Service, Act of August 8, 1956, ch. 1036, 70 Stat. 1119 (codified at 16 U.S.C. § 742(a)).

195. 43 U.S.C. §§ 1711, 1712 (1976).

196. 43 U.S.C. § 1712(c) (1976).

197. *E.g.*, 43 U.S.C. § 1712(c)(3) provides that the Secretary shall "give priority to the designation and protection of areas of critical environmental concern," and § 1712(c)(6) requires him to "consider the relative scarcity of the values involved and the availability of alternative means (including recycling) and sites for realization of those values."

198. 43 U.S.C. § 1715 (acquisitions), § 1713 (sales), and § 1716 (exchanges).

199. 43 U.S.C. §§ 1731–1748 (1976).

200. *E.g.*, 43 U.S.C. §§ 1712(f), 1714(h) (1976). Involvement of the public in hearings, debates, reports, etc. was heralded by commentators as the most effective means of furthering the public interest. *E.g.*, Reich, *The Public and the Nation's Forests*, 50 CALIF. L. REV. 381, 403–406 (1962). Greater public participation in public land management was urged in the report of the Public Land Law Review Commission. *See* PLLRC REPORT, *supra* note 7, at 256. *See generally*, Achterman and Fairfax, *The Public Participation Requirements of the Federal Land Policy and Management Act*, 21 ARIZ. L. REV. 501 (1979).

201. 43 U.S.C. § 1701(a)(12). Another section of the Act states that "except as provided in [specified sections] and in the last sentence of this paragraph, no provision of this section or any other section of this Act shall in any way amend the Mining Law of 1872 or impair the rights of any locators of claims under this Act. . . ." 43 U.S.C. § 1732(b). The exceptions seem to have a potential for swallowing much of the saving language. This is especially true of the "last sentence" referred to, which reads: "In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." *Id.*

202. 30 U.S.C. § 21a. The Act declares it to be in the national interest to foster private enterprise in developing an "economically sound and stable" mining industry, in mining research, in development of domestic minerals, and in disposal and reclamation of mineral waste.

154

these purposes; the dominant theme was prudent, conservative management.[203] Indeed, in a number of respects practices under the 1872 General Mining Law[204] were restricted or modified,[205] and the Act included among its most extensive and specific provisions measures for the preservation of environmental values which often conflict with resource development.[206] It is in this context that the Act's provisions concerning executive withdrawals must be considered.

Taking a cue from the Public Land Law Review Commission's report,[207] Congress sought to deal with some of the mysteries of executive withdrawal authority. With extraordinary precision, Congress expressly repealed the President's implied delegation of authority, specifically citing *Midwest Oil* in the statute,[208] and repealed 29 statutory provisions for executive withdrawal authority.[209] Consequently only a few statutes granting executive withdrawal authority remained intact.[210]

As discussed above, *Midwest Oil* did not decide the validity of post-Pickett Act withdrawals. The FLPMA preserves all withdrawals "in effect" at the time of its enactment but does not purport to validate or cure defects in attempted withdrawals that suffered from a legal defect.[211] It

---

203. One court has said that the Secretary's rulemaking authority contained in the Act is extensive enough to authorize any regulations upon the use of the public lands so long as they are "reasonably related to the broad concerns for the management of public lands set forth in FLPMA." Topaz Beryllium Co. v. United States, 649 F.2d 775, 779 (10th Cir. 1981).

204. *See* note 16 *supra.*

205. 43 U.S.C. §§ 1732(b), 1744, 1781(f), 1782. *See* note 201 *supra.*

206. *E.g.,* 43 U.S.C. §§ 1701(a)(8), 1702(c), 1712(c)(2), 1712(c)(3), 1712(c)(6), 1712(c)(8), 1732.

207. PLLRC REPORT, *supra* note 7 at 54–57. The Commission's Recommendation 8 stated:
    Large scale limited or single use withdrawals of a permanent or indefinite term should be accomplished only by act of Congress. All other withdrawal authority should be expressly delegated with statutory guidelines to insure proper justification for proposed withdrawals, provide for public participation in their consideration, and establish criteria for Executive action.
At 54.

208. Effective on and after the date of approval of this Act, the implied authority of the President to make withdrawals and reservations resulting from acquiescence of the Congress (U.S. v. Midwest Oil Co., 236 U.S. 459) and the following statutes and parts of statutes are repealed. . . .
Pub. L. No. 94-579, § 704(a), 90 Stat. 2744, 2792 (1976).

209. *Id.*

210. *I.e.,* the Antiquities Act, 16 U.S.C. §§ 431 *et seq.;* the Fish and Game Sanctuaries Act, 16 U.S.C. § 694; the Taylor Grazing Act, 43 U.S.C. §§ 315 *et seq.;* the Defense Withdrawal Act, 43 U.S.C. §§ 155 *et seq.;* and the Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1610(a)(3), 1615(d)(1), 1616(d) (the authority of each, with the possible exception of § 1616(d)(1), has expired. *See* 43 U.S.C. § 1621(h)).

211. 43 U.S.C. § 1701(c) states:
    All withdrawals, reservations, classifications, and designations in effect as of the date of approval of this Act shall remain in full force and effect until modified under the provisions of this Act or other applicable law.
If an invalid withdrawal is discovered, the land can be withdrawn anew under the FLPMA procedures.

155

does require a substantial number of withdrawals to be reviewed by the Secretary and either revoked or continued.[212]

Most of the millions of acres that have been withdrawn are subject to the law as it existed before October 21, 1976, the FLPMA effective date. Therefore future challenges to withdrawals made after the Pickett Act and before the enactment of FLPMA may be expected.[213] While challengers may argue that the Pickett Act itself extinguished the authority found in *Midwest Oil*, the fact that Congress saw fit to repeal the President's "implied authority" under *Midwest Oil* suggests that the authority had not been extinguished by the Pickett Act; *Midwest Oil* had dealt with the issue only in a pre-Pickett Act context. Even if the Pickett Act extinguished the Presi-

---

*See* notes 226–235 *infra* and accompanying text. But this would not be effective to defeat established rights, *e.g.*, claims perfected under the mining law. Exercises of secretarial authority under the Act are to be "subject to valid existing rights." Act of Oct. 21, 1976, Pub. L. No. 94-579, § 701(h) (reprinted in note following 43 U.S.C. § 1701). Although "claims" are something less than "rights," Stockley v. United States, 200 U.S. 532, 544 (1923) (dictum), it has been held that dedication of public land to uses inconsistent with a mining claim can result in government liability for damages. United States v. North American Transp. v. Trading Co., 253 U.S. 330 (1920).

212. The Act directs the Secretary of the Interior to review within fifteen years existing withdrawals from mining or mineral leasing of Bureau of Land Management and Forest Service lands, and all withdrawals of certain lands administered by other agencies, in the eleven Western states. 43 U.S.C. § 1714(*l*)(1). The Secretary then is to report to the President recommendations concerning continuation of the withdrawals. The President in turn reports his recommendations to Congress. The Secretary then can terminate any withdrawals that were not made by Congress unless Congress objects by a concurrent resolution within 90 days. 43 U.S.C. § 1714(*l*)(2).

As of the end of fiscal year 1981, 233 withdrawals covering about 20.4 million acres had been revoked. Most of the lands had been closed to mineral leasing, mining location or both. U.S. Department of the Interior, Bureau of Land Management, Division of Land Resources and Realty, Withdrawal Review Year End Report, October 16, 1981. Some withdrawals not required to be reviewed by § 204(*l*) of FLPMA (43 U.S.C. § 1714 (*l*)) were revoked. Apparently none of the revocations were made according to the prescribed procedures for referral of the Secretary's recommendations for continuation or termination of withdrawals. The office of the Solicitor for the Department of the Interior has taken the position that FLPMA in § 204(a) provides the Secretary with independent revocation authority. *See* Memorandum from Associate Solicitor, Energy and Resources to Assistant Secretary, Land and Water Resources, Oct. 30, 1980. Section 204(a) states that "[T]he Secretary is authorized to make, modify, extend or revoke withdrawals but only in accordance with the provisions and limitations of this section." The memorandum points out that the provision of § 204(*l*) had its origin in a section of a predecessor bill separate from § 204(a). Furthermore, § 204(*l*) says that "the Secretary may *act to terminate* withdrawals other than those made by Act of Congress in accordance with the recommendations of the President . . . " (emphasis added). The Associate Solicitor's memorandum attaches great significance to the difference in terminology. Having treated the authority in §§ 204(a) and 204(*l*) distinctly, the memorandum argues that a withdrawal reviewed under § 204(*l*) can be revoked under either section. The argument is plausible with respect to withdrawals that were outside the required review process of § 204(*l*) (even if they are, in fact, reviewed), but for those that are within the purview of § 204(*l*) the most reasonable construction is that § 204(a) authority to revoke is not available. By its terms § 204(a) authority is restricted by "the provisions and limitations of this section [204]."

213. Portland General Electric Co. v. Kleppe, 441 F.Supp. 859 (D. Wyo. 1977) is the only such challenge brought so far. It was unsuccessful. *See* notes 99–104 *supra* and accompanying text.

156

dent's earlier implied delegation of authority, it could be argued that Congress has since acquiesced in post-Pickett Act withdrawals, giving rise to a new grant of authority. It might be urged that this authority was not extinguished by the repealer. The argument is not untenable, but it seems inconsistent with Congress's apparent intent. The most plausible interpretation of the repealer, supported by the legislative history,[214] is that it extinguished all implied authority that existed in 1976 and that the citation to *Midwest Oil* was not intended to limit it to pre-Pickett Act authority. By the time FLPMA was passed, many assumed that the Pickett Act did not limit executive withdrawal authority.[215] In any event, in the FLPMA Congress may simply have been rejecting all impliedly delegated withdrawal authority and used the citation to *Midwest Oil* to illustrate rather than to limit the type of authority being repealed.[216]

Having repealed most of the authority of the executive to make withdrawals, the Federal Land Policy and Management Act vested the executive with broad new withdrawal authority, subject to certain procedural requirements.[217] The authority was delegated not to the President, but directly to the Secretary of Interior.[218] The purposes for withdrawals were articulated for the first time in a new, functional definition,[219] and statutory procedures were engaged for a wide range of administrative actions that fall within the definition of a "withdrawal" and which are not undertaken in the exercise of independent authority to control the public lands.[220]

214. *See, e.g.*, H. R. REP. NO. 94-1163, 94th Cong., 2d Sess. 9 (1976), *reprinted in* [1976] U.S. CODE CONG. & AD. NEWS 6175, 6183 (indicating the Act would, "with certain exceptions . . . repeal all existing law relating to executive authority to create, modify, and terminate withdrawals and reservations"). Charles L. Wheatley, Jr., the leading authority on public land withdrawals, reaches the conclusion "that FLPMA bars all claims of implied authority in the Executive as far as Congress is concerned." Wheatley, *Withdrawals Under the Federal Land Policy Management Act of 1976*, 21 ARIZ. L. REV. 311, 319 (1979).

215. *E.g.*, 40 Op. Att'y Gen. 73 (1941) discussed at notes 77–98 *supra*.

216. Arguments that there is some non-statutory authority for withdrawals outside the FLPMA may be raised again. Should the executive embark on a program of non-FLPMA withdrawals that is not checked by Congress, the *Midwest Oil* rationale could be regenerated.

217. 43 U.S.C. §§ 1714(a)-1714(l) (1976). Final regulations implementing the provisions have been published. 46 Fed. Reg. 22,585 (1981) (to be codified in 43 C.F.R. §§ 2200, 2300, 2920).

218. Presidential authority had long been delegated to and exercised by the Secretary of the Interior. Exec. Order No. 10,355, 17 Fed. Reg. 4831 (1952); Exec. Order No. 9337, 8 Fed. Reg. 5516 (1943); Exec. Order No. 9146, 7 Fed. Reg. 3067 (1942).

219. 43 U.S.C. § 1702(j) defines "withdrawal" as:
　　withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program; or transferring jurisdiction over an area of Federal land, other than "property" governed by the Federal Property and Administrative Services Act, as amended from one department, bureau or agency to another department, bureau or agency.

220. The Secretary often may choose from several sources of authority in deciding to restrict activities on the public land. *See* notes 261–267 *infra* and accompanying text.

157

Few substantive restrictions were imposed. For instance, there was no restriction on removing lands from entry under the mining laws as in the Pickett Act. Indeed, the Secretary was expressly granted all of the authority that the executive possessed under its formerly implied delegation of authority. But Congress prescribed procedures and considerations to regulate the exercise of the Secretary's authority.[221] This was intended to regularize administrative practice that had in the past been used to effect withdrawals which were "not always in the best interest of all the people."[222]

The FLPMA withdrawal procedures were expected to achieve better "balance" between "public concern over the possibility of excessive disposals of public lands on the one hand and excessive restrictions on the other."[223] First, the Secretary was directed to take certain factors into account and follow specified procedures in effecting a withdrawal.[224] Second, the Secretary was required to report withdrawals to the Congress which may then reverse his decisions by following a simplified procedure.[225]

The applicable procedures under FLPMA depend on the amount of land withdrawn and the urgency of the need for protective action. Small

---

221. The administrative practices and regulations that applied to withdrawals before enactment of the FLPMA were found at 43 C.F.R. part 2351. They are described in Strauss, *Rules, Adjudications, and Other Sources of Law in an Executive Department: Reflections on the Interior Department's Administration of the Mining Law*, 74 COLUM. L. REV. 1231, 1249–53 (1974) and Moran, *Withdrawals and the Mineral Landman*, 16 ROCKY MT. MIN. L. INST. 757, 773–83 (1971).

222. H. R. REP. NO. 1163, 94th Cong., 2d Sess. 1 (1976), *reprinted in* [1976] U.S. CODE CONG. & AD. NEWS 6175.

223. *Id.* at 3, *reprinted in* [1976] U.S. CODE CONG. & AD. NEWS 6177.

224. *See* notes 226–235 *infra* and accompanying text. The Secretary may segregate land from the operation of any or all of the public land laws for up to two years while it is being considered for withdrawal. Segregation may be made to discharge a notice in the Federal Register indicating that a withdrawal is being considered. 43 U.S.C. § 1714(b)(1).

The procedures for making withdrawals prior to FLPMA were similar but far less detailed. *See* 43 C.F.R. part 2351 (1980). The regulations for withdrawals under FLPMA are found at 43 C.F.R. part 2300 (1981).

225. 43 U.S.C. § 1714(c)(1). The procedure for congressional veto is designed to avoid roadblocks that can normally inhibit or prevent legislation. Congress has only 90 days to act, and after 30 days a motion may be made to discharge a resolution from a committee that has not acted on it. It is then in order to move to introduce the resolution on the floor. Floor debate is limited to one hour, and the motion may not be amended.

The language of the provision is fraught with interpretive problems. For instance, § 1714(c)(1) states that the withdrawal will be ineffective "if *the Congress* has adopted a concurrent resolution stating that *such House* does not approve the withdrawal" (emphasis added). This inconsistency within the section is probably owing to haste in preparing the final version of the bill. The device of a veto by concurrent resolution was adopted by the Conference Committee in lieu of the House bill's provision for veto by either house of Congress. Another internal inconsistency arises from the section's reference to "the Presidential recommendation" while the power to make recommendations was given expressly to the Secretary of Interior. This probably arises from the fact that the entire section with regard to expediting the consideration of a resolution by Congress was added by the Conference Committee's adoption of the language of what is now § 1714(l) (providing for expedited

158

withdrawals—those aggregating less than 5,000 acres—may be set aside without restriction so long as they are for a "resource use."[226] Withdrawals for proprietary purposes, such as sites for administrative buildings or facilities, may be made for up to twenty years.[227] Small withdrawals may also be made to preserve the lands for a use being considered by Congress,

---

congressional review of presidential recommendations with regard to existing withdrawals; *see* note 212 *supra.*

Congressional vetoes have been employed increasingly in recent legislation. Their propriety can be questioned as a violation of the separation of powers doctrine in that it may allow usurpation of the constitutional allocation of decisionmaking authority. *E.g.,* Schwartz, *The Legislative Veto and the Constitution—A Reexamination,* 46 GEO. WASH. L. REV. 351 (1978); McGowan, *Congress, Court and Control of Delegated Power,* 77 COLUM. L. REV. 1119 (1977); Bruff and Gellhorn, *Congressional Control of Administrative Regulation: A Study of Legislative Vetoes,* 90 HARV. L. REV. 1369 (1977).

Specific objections to the legislative veto include: 1. It may deprive the executive of its constitutional power faithfully to execute the laws provided for in art. II, section 3; 2. It may deprive the executive of the ability to consider and approve or veto legislation provided for in Art. I, section 7; 3. It may deprive the judiciary of the authority to determine cases and controversies provided by Art. III, section 2 which, as implemented by Congress, allows review of agency decisions (*e.g.,* Administrative Procedure Act, 5 U.S.C. §§ 701–706); 4. If only one house can override a particular action, the principle of bicameralism expressed in Art. I, section 1 may be offended. *See* Chadha v. Immigration and Naturalization Service, 634 F.2d 408 (9th Cir. 1980), *prob. juris. noted,* 50 U.S.L.W. 3244 (Oct. 6, 1981) (holding unconstitutional 8 U.S.C. § 1254(c)(2) which allows a one house resolution to disapprove an agency suspension of a deportation order) and Consumer Energy Council of America v. Federal Energy Regulatory Comm'n, No. 80-2184 (D.C. Cir. Jan. 29, 1982) (holding unconstitutional § 202(c) of the Natural Gas Policy Act, 15 U.S.C. § 3342(c) which provides for one house veto resolution of rules for incremental pricing in natural gas deregulation).

Whether a court upholds or rejects specific legislative veto provisions may depend upon the extent to which the legislative branch has attempted to involve itself in enforcement or interpretation of laws, as opposed to its constitutional function of making laws. Thus, a delegated legislative function may be susceptible to a greater degree of retained authority to manipulate agency decisions than a function that is essentially judicial or administrative. As discussed earlier, authority to withdraw public lands is rooted in Congress's power under the Property Clause, Art. IV, section 3, clause 2. In the past, the power has been impliedly delegated to the executive, but the FLPMA dealt specifically with the terms on which such authority would be delegated and exercised in the future. Assuming the Courts of Appeals' decisions in *Chadha* and *Consumer Energy Council supra,* are upheld, the device in 43 U.S.C. § 1714(c)(1) for congressional disapproval of executive withdrawals by concurrent resolution nevertheless may be constitutional. Congress may have broader authority to oversee the exercise of legislative power it has delegated to the executive than it has to oversee executive enforcement of the laws made by Congress. Thus, decisions to withdraw public lands, encompassed within the authority of the Property Clause, are more appropriately reserved for legislative oversight than are decisions involving individual deportations that have been made in the course of administering the Immigration and Naturalization Act (enacted under Congress's power "To establish an uniform Rule of Naturalization" in Art. I, section 8, cl. 4). Decisions setting particular rate structures under the Natural Gas Policy Act (enacted under the commerce power, Art. I, section 8, cl. 3) present a closer question in that they may establish a nationally applicable legislative policy, a function less likely to offend separation of powers principles. *See also* note 243 *infra,* discussing 43 U.S.C. § 1714(e), a provision of the FLPMA under which the Secretary of the Interior is directed to withdraw lands upon a determination of emergency by a committee of either house.

226. 43 U.S.C. § 1714(d)(1) (1976). Given the coverage of other subsections of § 1714(d), "resource uses" must refer to those uses listed in § 1702(c), namely "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values."

227. 43 U.S.C. § 1714(d)(2) (1976).

159

*NATURAL RESOURCES JOURNAL* [Vol. 22]

but they are limited to five years duration.[228] As with larger withdrawals, the FLPMA requires that public hearings be held prior to a small withdrawal order.[229]

Withdrawals of significant size—those 5,000 acres and larger—may be made for up to 20 years for any purpose.[230] Whenever acting under this provision the Secretary must notify both houses of Congress that a withdrawal is being made and furnish extensive information to the relevant committee of each house. The required information includes the essential facts concerning the withdrawal,[231] environmental and economic factors,[232] consideration of impacts on other existing and potential uses,[233] intergovernmental effects,[234] and opportunities for public participation.[235]

The Acts' requirement of a thorough assessment of the matters listed in Section 204(a)(2) of the FLPMA is reminiscent of the requirement in NEPA that an environmental impact statement accompany proposals of a federal agency that would have a significant effect on the human environment.[236] Presumably, an agency forced to identify and consider certain factors will not ignore them in formulating a decision. Yet, as under NEPA, the agency need not reach a particular decision flowing from the information it considers.[237] And, as with NEPA decisionmaking, the lack

---

228. 43 U.S.C. § 1714(d)(3) (1976).

229. 43 U.S.C. § 1714(h) (1976).

230. 43 USE § 1714 (c)(1) (1976). Five thousand acres was the limit of executive withdrawal authority under the Defense Withdrawal Act, 43 U.S.C. § 156 (1976). The legislative history of that Act indicates that this size was selected because "'[t]estimony of witnesses for the Department of the Interior made it clear that the great majority of individual applications for any one project or facility in fact involve lands of less than 5,000 acres, . . . and the Department of Defense in its report does not object to this section of the act.'" S. REP. NO. 857, 85th Cong., 2d Sess. 69 (1957), *reprinted in* [1958] U.S. CODE CONG. & AD. NEWS 2227, 2240.

231. 43 U.S.C. § 1714(c)(2)(1), (9), (12) (1976).

232. 43 U.S.C. § 1714(c)(2)(2) (1976).

233. 43 U.S.C. § 1714(c)(2)(3)–(6) (1976).

234. 43 U.S.C. § 1714(c)(2), (7), (8) (1976).

235. 43 U.S.C. § 1714(c)(2), (10), (11) (1976).

236. 42 U.S.C. § 4332(2)(c) (1976). *See* notes 181–188 *supra* and accompanying text. Satisfying this provision does not render compliance with NEPA's requirement of an environmental impact statement (EIS) unnecessary. A withdrawal constituting a major federal action that will have a significant effect on the environment must still be accompanied by an EIS. *But cf.* Alaska v. Carter, 462 F.Supp. 1155 (D. Alas. 1978) (NEPA's requirements may be avoided to the extent that time constraints of an emergency withdrawal would prevent full compliance.) *See also* Forest and Range Land Renewable Resources Planning Act, 16 U.S.C. §§ 1600–1676 (1976). (Secretary of Agriculture to consider physical, biological, economic and other factors in developing resource management plans for the National Forests).

There is a potential for duplication among FLPMA's informational requirements for withdrawals, NEPA's EIS requirement, and requisites of the Renewable Resources Planning Act. Duplication may be minimized by combined reporting, which seems to be contemplated in the Council on Environmental Quality regulations under NEPA, 40 C.F.R. §§ 1500.2(c), 1500.4(k), 1502.25 (1981).

237. Under NEPA, an agency must show that it had information on the relevant factors listed in § 102(2)(c) (42 U.S.C. § 4332(2)(c) (1976)), but if the record shows that the factors were *considered*, the courts will not overturn an agency's decision. *E.g.*, in Calvert Cliffs Coordinating Comm., Inc.

160

of substantive direction in the statute makes unlikely any judicial reversal of an agency decision that may seem unwise in light of the information produced.[238] So long as the procedural requirements in the FLPMA are followed[239] and the information furnished to Congress is adequate, it is predictable that a court would refuse to set aside the action.[240] Only if the withdrawal decision is so unreasonable as to be arbitrary and capricious is a judicial challenge likely to succeed.[241]

The procedures and limitations for significant withdrawals may be avoided regardless of the size of a proposed withdrawal in an "emergency." Any time the Secretary of Interior determines that "extraordinary measures must be taken to preserve values that would otherwise be lost,"

---

v. United States Atomic Energy Comm'n, 449 F.2d 1109, 1112 (D.C. Cir. 1971), the court said:
> Thus the general substantive policy of the Act . . . leaves room for a responsible exercise of discretion and may not require particular substantive results in particular problematic instances. However, the Act also contains very important 'procedural' provisions—provisions which are designed to see that all federal agencies do in fact exercise the substantive discretion given them.

In Strycker's Bay Neighborhood Council v. Karlen, 444 U.S. 223, 227–28 (1980), the Court said "the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" citing Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21 (1976).

238. *See* Strycker's Bay Neighborhood Council v. Karlen, 444 U.S. 223 (1980). There the Court reversed a court of appeals' finding that environmental factors should be given determinative weight, holding that NEPA imposes duties that are essentially procedural. *Cf.* Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 546 (1978), in which the Court stated that "if courts continually review agency proceedings to determine whether the agency employed procedures which were, in the court's opinion, perfectly tailored to reach what the court perceives to be the 'best' or 'correct' result, judicial review would be totally unpredictable." The Court then observed that "the only procedural requirements imposed by NEPA are those stated in the plain language of the Act." *Id.* at 548.

239. *Cf.* Mountains States Legal Foundation v. Andrus, 499 F.Supp. 383 (D. Wyo. 1980) (prohibition against mineral leasing of lands subject to wilderness classification study was tantamount to "withdrawal" and thus invalid unless FLPMA procedures followed); *see* discussion in note 267 *infra*.

240. It may be argued that the requirement of furnishing information to Congress in 43 U.S.C. § 1714(d)(2) is for the benefit of Congress alone, not the public and therefore standing should be denied to a member of the public challenging the adequacy of the information. But informed public participation is a value that pervades the Act. *See* Achterman and Fairfax, *The Public Participation Requirements of the Federal Land Policy and Management Act*, 21 ARIZ. L. REV. 501 (1979). Therefore litigants may have a sufficient stake in the process to be within the zone of interests protected by the Act. *See* Atchison, Topeka, and Santa Fe R.R. v. Callaway, 431 F.Supp. 722, 727 (D.D.C. 1977) (private parties have standing to challenge impact statement prepared under NEPA for a legislative proposal because purpose was not only to inform Congress but also to inform the public and foster meaningful public participation).

241. The Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1976), provides for judicial review of agency action unless such review is prohibited by statute or committed to agency discretion by law (§ 701). The scope of review is described in § 706, which allows the reviewing court, among other things, to set aside agency actions that are arbitrary, capricious, an abuse of discretion, or not in accordance with law. 5 U.S.C. § 706(2)(A). These standards are discussed in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971). *See also* Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 549–555 (1978).

161

*NATURAL RESOURCES JOURNAL* [Vol. 22

a withdrawal is to be made immediately.[242] The chairman of the relevant committee of the House or Senate also can trigger mandatory emergency withdrawals by notifying the Secretary that an appropriate situation exists.[243] Emergency withdrawals may last a maximum of three years and may not be renewed except by following the procedures for withdrawals under other provisions of the FLPMA. The full informational report required when significant withdrawals are made must follow the making of emergency withdrawals within 90 days.[244]

The Federal Land Policy and Management Act's emergency withdrawal authority was used to set aside over 100 million acres in Alaska in 1978.[245] Congress had anticipated legislation to create several parks, forests, wildlife refuges and wild and scenic rivers, largely out of lands that it had directed the Secretary of Interior to withdraw under section 17(d)(2) of the 1971 Alaska Native Claims Settlement Act (ANCSA).[246] To the extent

242. 43 U.S.C. § 1714(e). Notice is to be given to the Committee on Interior and Insular Affairs of the House of Representatives and the Committee on Energy and Natural Resources of the Senate. The Senate Committee on Interior and Insular Affairs (named in the Act) was replaced by the Committee on Energy and Natural Resources effective February 11, 1977.

243. This procedure could be subject to some of the same objections that are made to the congressional veto device employed by the FLPMA in the case of executive withdrawals. *See* note 225, *supra*. It substitutes a hybrid decisionmaking procedure for those processes established in the Constitution, potentially disrupting the system of institutional decisionmaking and the checks and balances intended by the framers. But delegation of authority to a congressional committee to prompt emergency withdrawals by an executive official might be sustained on the ground that it is necessary in aid of legislation that may be proposed or subject to investigation. It is well established that Congress may exercise powers normally exercised by other branches when ancillary to its legislative functions. *E.g.*, McGrain v. Daugherty, 273 U.S. 135 (1927) (power to investigate and to subpoena witnesses). *Cf.* Pacific Legal Foundation v. Watt, 16 E.R.C. 1825 (D. Mont. 1981). In that case the court held that a FLPMA withdrawal under 43 U.S.C. § 1714(e) could be validly forced by a resolution finding an emergency situation passed by the House Committee on Interior and Insular Affairs but that the committee had no power under the statute to prescribe the scope and duration of the withdrawal. Because the disposition set aside the specific order of withdrawal as being based on an invalid direction of the House Committee, it did not reach the constitutional question, but it stated in dicta that the section would pass constitutional muster only if the court's interpretation of the committee's authority were correct. If the committee wielded greater authority, it would violate separation of powers principles. The case apparently involves the first attempt by a congressional committee to force a mandatory withdrawal under 43 U.S.C. § 1714(e). *But see* note 254 *infra*.

244. 43 U.S.C. § 1714(e).

245. Public Land Orders 5653 and 5654, 43 Fed. Reg. 59756 (1978). Some of the same lands were also withdrawn by the President under the Antiquities Act, which authorized him to proclaim national monuments. 16 U.S.C. § 431 (1976). Later, some 40 million acres were withdrawn as wildlife refuges under the Fish and Game Sanctuaries Act, 16 U.S.C. § 694, another statute authorizing executive withdrawals that was not repealed by the FLPMA.

246. *See* 43 U.S.C. § 1616(d)(2) and note 204, *supra*. The same lands were also withdrawn under § 17(d)(1) which authorized the Secretary to withdraw lands needed to protect the public interest under "existing authority" without a time limit. *See* note 103 *supra*. This apparently refers to impliedly delegated withdrawal authority and authority under statutes, principally the Pickett Act. If pending litigation challenging the executive's authority to withdraw lands covered by § 17(d)(2) after the statutory termination date (*see* notes 121 and 123 *supra*) results in a rejection of the government's contention that there was non-statutory authority for such withdrawals, their validity

162

such lands were recommended for inclusion in one of the land management systems, the Secretary's withdrawals were to expire on December 18, 1978, if Congress did not act on the recommendations.[247] As the expiration date grew near, congressional efforts to enact an Alaska lands bill were blocked by the senators from that state.[248]

With the termination of the Alaska withdrawals under ANCSA, millions of acres would be available for selection by the State of Alaska and by Native corporations formed under the Act. Alaska had been waiting for twenty years for the fulfillment of the promise made in its Statehood Act that it would be able to select and receive patents to 103,553,000 acres of public land[249]—about 28% of the state's total land area. At the time of statehood, almost all of the land in the state was federally owned and it was understood that the land would be needed for the state's economic growth and self sufficiency.[250]

Alaska became so anxious to get control of some of the resource-rich public lands that it purported to select about 41 million acres several

would depend on the Pickett Act which did not authorize withdrawals from the mining laws. Thus, mining claims on public lands in Alaska made in an otherwise valid manner after the § 17(d)(2) withdrawals expired but before Congress withdrew the same lands in 1980 (Act of Dec. 2, 1980, Pub. L. No. 96-487, §§ 201–708, 94 Stat. 2371–2422) may still be valid if it is found that there was no impliedly delegated authority at the time the withdrawals were made. *See generally* DeStefano, *The Federal Land Policy and Management Act and the State of Alaska*, 21 ARIZ. L. REV. 417 (1979) [hereinafter cited as DeStefano]. Valid withdrawals under FLPMA before expiration of § 17(d)(2) withdrawals would also protect the land from mineral entry. *See* notes 252–255 *infra* and accompanying text.

247. The withdrawals were to expire no later than five years after the date recommendations were made. 43 U.S.C. § 1616(d)(2)(D). Recommendations were to be made within two years of the Act's effective date (December 18, 1971). 43 U.S.C. § 1616(d)(2)(C). The Secretary submitted his final recommendations on December 17, 1973.

248. *See* DeStefano, *supra* note 246, at 419. The Senators objected to the amount of land that would be closed to development by inclusion in wilderness areas and other conservation units.

249. Alaska Statehood Act, Pub. L. No. 85-508, 72 Stat. 339 (1958). Congress allowed a period of 25 years for the selections because the vast land area had not been surveyed. *See* 104 CONG. REC. 9341 (1958) (remarks of Rep. Saylor). Initial state land selections were protested by the Bureau of Land Management on behalf of Native groups and Native claims were filed on about 80% of the state's lands. The Secretary finally instituted a "land freeze" suspending approval of all state selections and other applications. It was formalized in Public Land Order No. 4582, issued January 12, 1969 which withdrew all Alaska public lands. The state unsuccessfully challenged the land freeze in Alaska v. Udall, 420 F.2d 938 (9th Cir. 1969). *cert. denied*, 397 U.S. 1076 (1970). Approvals were then delayed on nearly all the lands for over eleven years by subsequent orders and withdrawals under the Alaska Native Claims Settlement Act. *See* notes 250–255 *infra* and accompanying text. Approvals were made possible by enactment of the Alaska National Interest Lands Conservation Act, which also extended the time limit for state selections to 35 years. Act of Dec. 2, 1980, Pub. L. No. 96-487, § 906(a), 94 Stat. 2371, 2437. As a part of the settlement of a lawsuit brought against the government by Alaska, the United States has agreed to convey at least 13 million acres a year to the state. Alaska v. Reagan, No. A 78-291 CIV (D. Alas. Stipulation of Settlement, Aug. 15, 1981). *See* note 123 *supra*.

250. *See* H .R. REP. NO. 624, 85th Cong., 1st Sess. 2 (1957), *reprinted in* [1958] U.S. CODE CONG. & AD. NEWS 2939, 2940.

163

weeks before the withdrawals under ANCSA expired.[251] Shortly afterward, the Secretary was moved by a letter from the Chairman of the House Committee on Interior and Insular Affairs to act under the FLPMA to make an emergency withdrawal of the expiring ANCSA withdrawals.[252] The letter cited the recent state selections and a lawsuit[253] that Alaska had filed seeking to prevent any government action to save the lands withdrawn under ANCSA from selection once the withdrawals expired.[254] The Secretary of Interior later withdrew the same lands that had been subject to the emergency withdrawals using his FLPMA authority to make withdrawals for twenty years.[255]

The facility with which the Secretary was able to withdraw millions of acres of Alaska lands is testimony to the simplicity of the new procedures. The executive has essentially the same substantive power it had under the earlier, impliedly delegated authority, but the twenty year limitation on most withdrawals forces rethinking the wisdom of a withdrawal periodically and it is probably the most important limit on the executive's withdrawal authority under the FLPMA. Executive authority is otherwise encumbered only by requirements for notice, information reporting, and public participation.

Congress can, of course, terminate a withdrawal of which it disapproves. Theoretically it will have more information on which to base any action it takes when the FLPMA procedures are followed. But unless an especially interested member of one of the key committees chooses to scrutinize all withdrawals, the reporting requirements will be essentially means of forcing the executive to make a closer consideration of any withdrawal decision.

---

251. DeStefano, *supra* note 246, at 419. The lands were later made available for selection (Public Land Order No. 5657, 44 Fed. Reg. 5433 (1979)), after which Alaska repeatedly notified the Department of Interior of its selections by letter. *Id.*, n.20. The 1980 Alaska National Interest Lands Conservation Act required the state to relinquish its claims to all selections of lands located within national interest areas as a condition of rescinding administrative withdrawals of lands designated in the Act. Act of Dec. 2, 1980, Pub. L. No. 96-487, § 1322(b), 94 Stat. 2371, 2487.

252. 43 U.S.C. § 1714(e) (1976).

253. Alaska v. Carter, 462 F.Supp. 1155 (D. Alas. 1978).

254. Letter from Morris K. Udall, Chairman, House Committee on Interior and Insular Affairs, to Cecil D. Andrus, Secretary of the Interior, November 15, 1978. A portion of the letter appears in Alaska v. Carter, 462 F.Supp. at 1158 n.5. The letter appears to be advisory only in that it simply "urges" the Secretary to exercise his discretionary emergency withdrawal authority, rather than reflecting a committee determination of an emergency that would trigger a duty to withdraw the lands. A similar letter of request was sent to the Secretary by the committee chairman on May 4, 1979 after the committee found that uranium exploration on public lands in the Casitas Reservoir watershed would endanger the water supply of Ojai and Ventura, California. Resolution of the Committee on Interior and Insular Affairs, United States House of Representatives, May 2, 1979. While such requests are not mandatory, the Secretary's failure to respond by making a protective withdrawal would court charges of abuse of discretion.

255. Public Land Order Nos. 56-5711, 45 Fed. Reg. 9562 (1980). These orders were superseded when the 96th Congress passed an Alaska lands bill which was signed into law on December 2, 1980. Pub. L. No. 96-487, 94 Stat. 2371.

164

Congress has always had the authority to terminate an executive withdrawal[256] but has rarely done so in the past.[257] Now, under the FLPMA, Congress's disapproval can be manifested in a concurrent resolution which may avoid some of the procedures encumbering ordinary legislation, although the action is subject to special procedural rules. Disapproval must be effected within 90 days after a notice of the withdrawal is given to Congress.[258] It would seem that most members of Congress would be uncomfortable overruling the executive's conservation decision on such short notice except in an outrageous case. Most congressional disapprovals of executive withdrawals are likely to be by legislation after full committee consideration as they were in the past.

The detailed FLPMA provisions for making withdrawals are not the only means of accomplishing results that are within the Act's definition of a "withdrawal." One method provided for in the Act itself is through "management decisions."[259] These decisions may be made to implement land use plans required by the FLPMA for all public lands.[260] The land use planning authority of officials under the Act is "fully as restrictive as traditional withdrawal."[261] Presumably, comprehensive planning was intended by Congress to supplant single-purpose land use and withdrawal decisions. Withdrawals may be used to carry out management decisions, but a formal withdrawal is necessary only if lands are removed from, or restored to, the operation of the 1872 Mining Act or lands are transferred to another department.[262] There are special procedures for notifying Congress if a management decision totally eliminates one or more uses on a tract of 100,000 acres or more of public lands.[263]

In addition to the ability of land managers to effect land use decisions that are the functional equivalents of withdrawals, other laws governing

256. Under any credible theory, executive authority to withdraw public lands is ultimately derived from Congress. *See* note 46 *supra*. An understanding of preexisting congressional oversight authority is reflected in the legislative history of the FLPMA. *See* 122 CONG. REC. 23438 (remarks of Rep. Mink), 23440 (remarks of Rep. Forsythe), 23453 (remarks of Rep. Seiberling).

257. *See* notes 37–39, 50, 95, 159–160 *supra* and accompanying text. Although the possibility of a presidential veto of a congressional termination of a withdrawal (or making of a withdrawal) exists, no such showdown between the executive and legislative branches has occurred over a withdrawal decision.

258. 43 U.S.C. § 1714(c)(1) (1976). *See* note 225 *supra*.

259. *See* 43 U.S.C. § 1712(e) (1976).

260. 43 U.S.C. § 1712(a) directs the Secretary to:
   develop, maintain, and, when appropriate, revise land use plans which provide by tracts and areas for the use of the public lands regardless of whether such lands previously have been classified, withdrawn, set aside, or otherwise designated for one or more uses.

261. Peck, *"And Then There Were None": Evolving Federal Restraints on the Availability of Public Lands for Mineral Development*, 25 ROCKY MTN. MIN. L. INST. 3-1, 3–87 (1979).

262. 43 U.S.C. § 1712(e)(3) (1976).

263. 43 U.S.C. § 1712(e)(2) (1976). The procedures for notice and congressional oversight are nearly identical to those for formal withdrawals. *See* 43 U.S.C. § 1714(c)(1), discussed in note 225 *supra*.

165

*NATURAL RESOURCES JOURNAL*

public land administration may permit the exercise of executive managerial authority that may in practice fit the FLPMA definition of a withdrawal. Officials often take protective action effectively "limiting activities under [laws making public lands available for private uses] in order to maintain other public values in the area. . . ."[264] These actions need not take the form of withdrawals when they are in furtherance of the officer's existing management authority. Thus, the Secretary of Agriculture may administratively determine that an area of a national forest is dedicated to recreation and thereby ban inconsistent uses that are permitted by statute.[265] Similarly, land managers regularly must decide what areas of a forest to withhold from timber cutting, what areas to limit to camping, whether to close a park to fishing, and whether to lease lands for mineral development. Congress did not intend to eliminate or erode existing authority of managers under public land laws except as it expressly stated in the FLPMA.[266] Although many actions might be taken under the withdrawal provisions of the Act, it is unnecessary to do so when the Secretary has managerial discretion under existing statutes to make determinations having the same effect.[267]

---

264. 43 U.S.C. § 1702(j) (1976).

265. McMichael v. United States, 355 F.2d 283 (9th Cir. 1965) (upholding designation of a "primitive area" in a national forest and the application of regulation prohibiting motorized vehicles); *see also* Foster, *Bureau of Land Management Primitive Areas—Are They Counterfeit Wilderness?*, 16 NAT. RES. J. 621 (1976) (discussing the practice of designating BLM lands administratively as wilderness beginning in 1969, before Congress directed wilderness studies). *Cf.* United States v. Gregg, 290 F.Supp. 706 (W.D. Wash. 1968) (upholding regulations restricting aircraft use in a wilderness area although the Wilderness Act (16 U.S.C. § 1133(d)(1) (1976)) provided that such uses may continue); United States v. Perko, 108 F.Supp. 315, *aff'd*, 204 F.2d 446 (8th Cir. 1953), *cert. denied*, 346 U.S. 832 (1953) (upholding aircraft ban in national forest roadless area designated for recreational purposes). *See generally*, United States v. Grimaud, 220 U.S. 506 (1911).

266. In enacting the FLPMA Congress overhauled much of the authority to manage public lands as it existed before the Act. Literally hundreds of public land laws were repealed. *See* Act of Oct. 21, 1976, Pub. L. No. 94-579, § 702, 90 Stat. 2743, 2787–91. However, the legislation assiduously provided that it was not to "repeal any existing law by implication." *Id.* § 701(f) (*reprinted in* note following 43 U.S.C. § 1701). *See also* 43 U.S.C. § 1701(b) (1976) (FLPMA is to be supplemental, and not in derogation of the public land statutes).

267. *But see* Mountain States Legal Foundation v. Andrus, 499 F.Supp. 383 (D. Wyo. 1980). A federal district court held that the Forest Service's failure to accept offers to lease lands for oil and gas pending a "RARE II" study of whether to include the lands in a wilderness system was tantamount to a "withdrawal" under the FLPMA definition and could only be effective if statutory withdrawal procedures were followed. The court in *Mountain States* erred in applying the definition mechanically and in a way that failed to comport with the comprehensive statutory framework.

First, it should be pointed out that inaction on lease applications while the Secretary studies the desirability of other uses in an area has never been considered to amount to withdrawal of the lands in question. It is simply not within the common usage of the term. Withdrawals are generally made by some specific public land order or statute, not by inaction. *See* Duesing v. Udall, 350 F.2d 748, 751 (D.C. Cir. 1965), *cert. denied*, 383 U.S. 912 (1966), citing Richard K. Todd, 68 INTERIOR DEC. 291 (1961). Current regulations so provide. 43 C.F.R. § 2310.3-3. This is particularly applicable to the mineral leasing statutes in which there is no right of a lease applicant to expect action issuing or rejecting a lease within a particular time. *E.g.*, Burglin v. Morton, 527 F.2d 486 (9th Cir.

166

1975), *cert. denied*, 425 U.S. 973 (1976) (failure to make decision on lease application for several years is not an action contrary to law); Rowe v. United States, 464 F.Supp. 1060, 1070 (D. Alas. 1979) (inaction on lease application for ten years is not unlawful). A lease applicant could only challenge the Secretary's failure to act if it were "unreasonably delayed." 5 U.S.C. § 706(1).

The *Mountain States* court seemed to recognize that inaction on a single lease could not constitute a "withdrawal," but found that the cumulative effect of inaction on pending applications amounted to a withdrawal. In light of the existence of discretion to withhold lands from leasing for a variety of reasons as discussed below, and the fact that the Secretary had obviously chosen not to use the option of withdrawal, the court should have deferred to the decision not to withdraw the lands. *Cf.* Kleppe v. Sierra Club, 427 U.S. 390 (1976) (whether series of proposed actions leading to coal leasing in large geographic areas are so related as to amount to a "proposal" requiring an environmental impact statement is a question for the agency to decide).

Second, the Secretary had ample statutory authority to hold lease applications pending a thorough designation. The legislative history of the FLPMA shows that the Department of the Interior had expressed concern that if FLPMA's broad definition were adopted it would give rise to arguments that the only way to accomplish results within its scope would be by withdrawal. Letter from Assistant Secretary of the Interior to James A. Haley, Chairman, Committee on Interior and Insular Affairs, U.S. House of Representatives, dated November 21, 1975, 1976 U.S. CODE CONG. & AD. NEWS 6215–16. But the concern was unjustified given the existence of alternate means to achieve those results within FLPMA itself and within other statutory programs for land management that were not repealed expressly or by implication (*see* note 256, *supra*).

The National Forest Management Act (NFMA), which was enacted almost simultaneously with the FLPMA, imposed planning responsibilities on the Secretary. It required that wilderness be among the "multiple use" considerations of the Secretary in his forest management land use planning. 16 U.S.C. § 1604(e)(1), (g)(3)(A), and 1606(d). *See also* 16 U.S.C. § 1642(a)(1). The Multiple Use, Sustained Yield Act also declares establishment and maintenance of wilderness to be consistent with its purposes. 16 U.S.C. § 529. The responsibility to consider wilderness options can only be fulfilled if wilderness characteristics are preserved during the planning stages; otherwise wilderness values may be irreversibly lost to development. Neither the NFMA, in the case of national forests, nor the FLPMA provisions, in the case of Bureau of Land Management lands, requires a withdrawal to be made during the planning process. It hardly seems advisable to impose the encumbrance of a withdrawal on an area that may not ultimately be recommended or set aside as wilderness.

RARE II should be considered a program that carries out land management planning responsibilities and authority of the Secretary of Agriculture. It was part of an ongoing wilderness review process that had begun in 1969. *See* California v. Bergland, 483 F.Supp. 465 (E.D. Calif. 1980). *appeal pending*, for a history of the RARE process. It would be reading FLPMA too broadly and out of context to say that it impliedly extinguished an ongoing land use planning process. There is no legislative history showing any such intent. Indeed, Congress seemed to validate the RARE process, which was pending and known to Congress when it enacted the NFMA in which the Secretary was made responsible for wilderness planning.

Even in absence of wilderness planning authority under land management statutes such as the FLPMA and the NFMA, the Secretary had authority under the Mineral Leasing Act to refuse leases for the protection of the public lands. The *Mountain States* court did acknowledge the well-established principle that the Secretary has discretion under the Mineral Leasing Act to decide what lands will be leased, Burglin v. Morton, 527 F.2d 486 (9th Cir. 1976); Pease v. Udall, 332 F.2d 62 (9th Cir. 1964), and to refuse any lease of particular lands. Udall v. Tallman, 380 U.S. 1 (1965). But it attempted to distinguish the case law as not supporting an exercise of discretion to withhold land from leasing "based on environmental concerns." 499 F.Supp. at 391–92. This distinction is ill-founded. In Udall v. Tallman the Supreme Court upheld the exercise of secretarial discretion to refuse leases where the purpose was to protect wildlife. An attempt to limit *Tallman* as permitting a refusal to lease only on a particular tract but not a closure of hundreds of square miles of public lands was rebuffed in Duesing v. Udall, 350 F.2d 748 (D.C. Cir. 1965), *cert. denied*, 383 U.S. 912 (1966). *Mountain States* incorrectly relied on "the proposition that the focus of [the Mineral Leasing] Act was mineral development despite the primitive nature of much of the public lands." 499 F.Supp. at 392. In Duesing v. Udall the court rejected an argument that "the Secretary can only exercise his discretion under the Mineral Leasing Act by taking action in furtherance of the objective of that act to promote mineral development in the public domain." 350 F.2d at 751. Because there are other

167

The FLPMA withdrawal provisions allow the Secretary of Interior to take extraordinary actions, required to protect public lands from disposal or particular uses. For example, the Secretary's withdrawal of much of the Alaska national interest lands pending congressional actions was made in reliance upon the statute.[268] Withdrawals may often be avoided, but

purposes for holding and using the land, the court held that decisions whether or not to lease need not consider solely the purpose of the lease, as urged by a disappointed lease applicant. The argument was characterized as a "tail wags dog construction [that] is not put forward as supported by legislative history," and the court upheld the Secretary's "reasonable construction" of his powers to determine whether to lease in light of a concern for wildlife protection. *Id. Cf.* Krueger v. Morton, 539 F.2d 235, 240 (D.C. Cir. 1976) (no abuse of discretion in Secretary's suspension of issuance of coal prospecting permits that was based on desire to provide "more 'orderly' development of coal resources upon the public lands . . . with a proper regard for the protection of the environment"); United States v. Cotter Corp., 486 F.Supp. 995 (D. Utah 1979) (BLM has authority to manage public lands to prevent impairment of wilderness characteristics).

A further reason that environmental protection as a goal would seem to fall easily within the scope of discretion allowed to the Secretary in making a leasing decision is that every agency is now required by the National Environmental Policy Act to consider such matters in all its decisions. *See* note 182 *supra. Cf.* Zabel v. Tabb, 430 F.2d 199 (10th Cir. 1970), *cert. denied,* 401 U.S. 910 (1971) (Under NEPA and the Fish and Wildlife Coordination Act, 16 U.S.L. §§ 601, 602, Corps of Engineers properly denied dredge and fill permit although the project would not interfere with navigation, flood control, or power production). And major federal actions in leasing lands under the Mineral Leasing Act require the preparation of environmental impact statements. *See* note 188 *supra.* Furthermore, the FLPMA manifests an intention that federal land be managed by the Secretary of the Interior according to multiple use principles, 43 U.S.C. § 1701(a)(7) (1976), and to further a variety of goals besides resource development. 43 U.S.C. § 1701(a)(8), (a)(12) (1976).

A separate ground for the court's decision in *Mountain States* was the failure of the Secretary to set forth in rules and regulations the procedure that was followed in coordinating applications for leases in national forests with the Department of Agriculture and the grounds for approving, rejecting, or denying them. 499 F.Supp. at 395–96. The court concluded that the absence of regulations violated the FLPMA section bringing public land management within the Administrative Procedure Act and requiring promulgation of rules and regulations to carry out the purposes of the FLPMA and other public land laws. 43 U.S.C. § 1740 (1976). This ignores the fact that administrative decisions and policies may be made by means other than rulemaking without violating the Administrative Procedure Act (APA). *E.g.,* NLRB v. Bell Aerospace Co., 416 U.S. 267, 294 (1974); SEC v. Chenery Corp., 332 U.S. 194 (1947).

The rulemaking provision was included in the FLPMA following a recommendation of the Public Land Law Review Commission that there be greater use of regulations in public land management. *See* PLLRC REPORT, *supra* note 7 at 251. The "hidden law" of the Department of the Interior has been notorious. *E.g.,* Strauss, *Rules, Adjudications, and Other Sources of Law in an Executive Department: Reflections on the Interior Department's Administration of the Mining Law,* 74 COLUM. L. REV. 1231 (1974). Matters involving "public property" have always been exempt from the APA. 5 U.S.C. § 553(a)(2) (1976). In the FLPMA Congress removed the exemption for public land management matters. This only meant that public land management was to be treated the same as other agencies' functions are treated under the APA. A general concern for openness in government, as well as the special concern in public land law found in 43 U.S.C. §§ 1701(a)(5) and 1740 make it desirable for the Secretary of the Interior to explicate formally the process to be followed in dealing with applications for mineral leasing in RARE II wilderness study areas. The APA does not necessarily require that rulemaking under § 553 be followed. But if rulemaking were required, presumably both the mineral leasing program and the RARE II program should be stayed pending appropriate rulemaking. The *Mountain States* court effectively required the leasing program to proceed and the RARE process to cease.

Notwithstanding several errors by the trial court in *Mountain States,* the United States dismissed its appeal of the decision on March 4, 1981 based on a directive of Reagan administration officials.

268. *See* notes 245–255 *supra* and accompanying text.

168

when they are used the FLPMA surrounds the process with new procedures and ultimate congressional checks that can undo executive actions swiftly in egregious cases.[269] The sobering effect of the procedural requisites and the specter of congressional oversight may assure greater responsibility in using the authority. However, the broadened definition of "withdrawal" in the Act[270] and explicit authority to use withdrawals as a means of implementing the land use planning requirements of FLPMA[271] suggest that the withdrawal device may have even greater importance as a land management device in the future than it had in the past.

## C. Judicial Review

The tide of legislation imposing obligations on managers of public lands to administer resources under careful standards and to consider environmental factors has been accompanied by greater judicial scrutiny of decisionmaking. In recent years there has been an unprecedented number of cases seeking review of agency decisions regarding the public lands.[272] Several reasons account for the growth in litigation. The most important is that Congress has enacted laws which provide standards to guide courts in their review of agency actions. Understandably, the earliest public lands cases were confined largely to challenges of agency actions refusing to dispense public property to private interests rather than cases asserting the interest of the public.[273] Even in that age, a rule of construction in public land law required that federal grants be viewed favorably to the United States.[274] Later, national policy began to prefer continued federal management of most remaining federal lands. Relevant statutes gave managers great discretion and little guidance. Authority was broadly delegated to the executive branch and courts regularly upheld these delegations[275] and their exercise.[276] With the exception of parks, which have been subject to rather specific management objectives since

---

269. *See* notes 221–235 *supra* and accompanying text.

270. 43 U.S.C. § 1702(j). *See* note 219 *supra*.

271. 43 U.S.C. § 1712(e)(3).

272. *See generally,* G. COGGINS AND C. WILKINSON, FEDERAL PUBLIC LAND AND RESOURCES LAW 226–227 (1981).

273. *See* Wilkinson, *Public Land Law: Some Connecting Threads and Future Directions,* 1 PUB. LAND L. REV. 1, 2–3 (1980). *See also* note 14 *supra*.

274. United States v. Union Pac. R.R., 353 U.S. 112, 116 (1957); Caldwell v. United States, 250 U.S. 14, 20 (1919), United States v. Oregon and California R.R., 164 U.S. 526, 541 (1896); Sioux City & St. Paul R.R. v. United States, 159 U.S. 349, 360 (1895); Leavenworth, Lawrence, and Galveston R.R. v. United States, 92 U.S. 733, 740 (1895); Dubuque and Pac. R.R. v. Litchfield, 64 U.S. (23 How.) 457, 462 (1859). The Court applied the principle recently in Andrus v. Charlestone Stone Products, Inc., 436 U.S. 604 (1978). *But see* Leo Sheep Co. v. United States, 440 U.S. 668 (1979).

275. *E.g.,* United States v. Grimaud, 220 U.S. 506 (1911) (Forest Service Organic Act's delegation of authority to make rules and regulations concerning use of forest reserves).

276. *E.g.,* Light v. United States, 220 U.S. 523 (1911) (Forest Reserve grazing regulations).

169

at least 1916,[277] there was little substantive law to curb or define the administrative discretion of public land managers until the 1970s.[278] Consequently, challenges to public land management decisions have not fared well in the courts.[279]

Congressional prescriptions for public land management were responsive to burgeoning conservationist sentiments.[280] An aware public insisted on responsible administration of its commonly held resources. The same public became the watchdog of the administrators, pooling their resources and power in organizations to assert the "public interest." These groups turned to the courts where they were generally received hospitably. The Supreme Court has recognized that harm to "aesthetic and environmental well-being" constitutes "injury" for the purpose of standing to sue, requiring only that there be allegations of an adverse effect on group members' "activities and pastimes" on affected public lands.[281] The Court has thus disavowed restrictions that would allow access to judicial review only to those suffering economic harm and harm that is not widely shared.[282] Once a party has access to court, it may argue the public interest in support of claims that an agency has not lived up to statutory mandates.[283] It appears that courts are now more liberal in allowing judicial review in cases against government agencies alleging environmental harm than they are in other contexts, such as constitutional violations resulting in economic harm.[284] The Supreme Court has inferred an intent by Congress to allow persons to act as "private attorneys general"[285] when asserting

---

277. *See* Park Service Organic Act. 16 U.S.C. § 1.

278. *See* statutes cited in notes 191–192 *supra*. The Multiple Use, Sustained Yield Act was enacted in 1960 but it appeared to be little more than a statement of policy accompanied by definitions. 16 U.S.C. §§ 528–31. Managers were left to interpret and apply the act according to their best guess as to its meaning. *See* Loesch, *Multiple Uses of Public Lands—Accommodation or Choosing Between Conflicting Uses*, 16 ROCKY MTN. MIN. L. INST. 1 (1971); Strand, *Statutory Authority Governing Management of the National Forest System—Time for a Change?*, 7 NAT. RES. LAW. 479 (1974); Comment, *Managing the Federal Lands: Replacing the Multiple Use System*, 82 YALE L. J. 787 (1973).

279. *See* Reich, *The Public and the Nation's Forests*, 50 CALIF. L. REV. 381, 393 (1962). Some have argued for closer judicial scrutiny. *E.g.*, Miller, *Judicial Control of Forest Service Discretion Under the Multiple Use Act*, 5 ENVT'L L. 127 (1974).

280. S. UDALL, THE QUIET CRISIS (1963); Martz, *Conservation of the Environment as a Public Resource*, 18 ROCKY MTN. MIN. L. INST. 225 (1973); Muskie, *An Environmental Program for America*, 1 ENV. LAW 2 (1970); Clary, Roe, and Swearingen, *Environmental Priorities of Opinion-Makers*, 6 ENVT'L AFFAIRS 33 (1977).

281. *E.g.*, Sierra Club v. Morton, 405 U.S. 727 (1972).

282. *Id.* at 734, 738. *See* Parker and Stone, *Standing and Public Law Remedies*, 78 COLUM. L. REV. 771, 772 (1978).

283. 405 U.S. at 737. *See also* United States v. Students Challenging Regulatory Agency Procedures. 412 U.S. 669, 686–90 (1973); Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 154 (1970).

284. *Compare* Warth v. Seldin, 422 U.S. 490 (1975) and Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26 (1976) *with* United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669 (1973).

285. *E.g.*, Sierra Club v. Morton, 405 U.S. 727, 734–41 (1972); Association of Data Processing Service Organization v. Camp, 397 U.S. 150, 154 (1970).

170

they are aggrieved within the scope of statutes which arguably protect the public's interest in management of publicly owned natural resources. The inference is supported by statutory provisions encouraging public involvement in decisionmaking,[286] expressing the policy that there should be judicial review,[287] and requiring more intensive land management.[288]

The increased activity in judicial review of land management agency decisions contrasts with the traditional approach of denying review to such matters. The approaches of courts in reviewing administrative decisions varies with the agency whose decision is being reviewed and the type of decision that is being challenged.[289] Courts have viewed public land management as being encumbered by vague mandates, broad discretion, and a need for expertise, so there has been little room for judicial oversight until recently.[290] The criterion is whether there is "law to apply" which would enable the court to decide the case without substituting its judgment for that of the agency.[291] Some statutes enabling agencies to manage public lands remain remarkably nondirective and without obvious standards.[292] When these non-directive laws are involved, courts will

---

286. *See* note 180 *supra*. *Cf.* Citizens for a Better Environment v. Environmental Protection Agency, 649 F.2d 522 (7th Cir. 1979) (requiring regulations providing for citizen participation in enforcement as condition of federal approval of state plan under Clean Water Act).

287. *See* Federal Land Policy and Management Act, 43 U.S.C. § 1701(a)(6) (1976). The policy expressed in that act is apparently limited to adjudicatory decisions. Landstrom, *An Operational View of the BLM Organic Act*, 54 DEN. L. J. 455, 458 (1977). *See also* provisions for citizen suits and awards of attorney's fees in environmental statutes (16 U.S.C. § 1540(g) (1974) (Endangered Species Act); 33 U.S.C. § 1365 (1978) (Clean Water Act); 33 U.S.C. § 1415(g) (1976) (Ocean Dumping Act); 42 U.S.C. § 300j-8 (1980 Supp.) (Safe Drinking Water Act); 42 U.S.C. §§ 7604, 7607(f) (1980 Supp.) (Clean Air Act); 42 U.S.C. § 4911 (1977) (Noise Control Act)).

288. *See* notes 175–180 *supra* and accompanying text; S. Rep. No. 93-686, *reprinted in* [1974] U.S. CODE CONG. & AD. NEWS 4072; House Report No. 94-1163, 94th Cong., 2d Sess., *reprinted in* [1976] U.S. CODE CONG. & AD. NEWS 6175, 6179–6181. *See also* Culham and Friesma, *Land Use Planning for the Public Lands*, 19 NAT. RES. J. 43 (1979) and Greenfield, *The National Forest Service and the Forest and Rangeland Renewable Resources Planning Act of 1974*, 15 NAT. RES. J. 603 (1975).

289. For an illuminating discussion of approaches to judicial review in public land law *see* Wilkinson, *Public Land Law: Some Connecting Threads and Future Directions*, 1 PUB. LAND L. REV. 1, 23–29 (1980). *Cf.* Environmental Defense Fund v. Ruckelshaus, 439 F.2d 584 (D.C. Cir. 1971) (suggesting an increased role for the judiciary in the administration of environmental laws).

290. *See* Comment, *The Conservationists and the Public Lands: Administrative and Judicial Remedies Relating to the Use and Disposition of the Public Lands Administered by the Department of the Interior*, 68 MICH. L. REV. 1200, 1236–42 (1970). Until enactment of the FLPMA, there was often an additional problem for reviewing courts because agency rulemaking concerning public land management was not subject to the Administrative Procedure Act, 5 U.S.C. § 553(a)(2). 43 U.S.C. § 1740; *see* note 267 *supra*.

291. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410 (1971). In a case challenging denial of homestead applications based on classification of land for retention in public ownership, the Ninth Circuit of Appeals said of the Classification and Multiple Use Act, 43 U.S.C. §§ 1411–1418 (expired Dec. 23, 1970): "The provisions of this statute breathe discretion at every pore. . . ." *Id.* at 469. The court declined to assert jurisdiction, finding no law to apply:

[T]he broader the language of a statute, the less specific it is, and the more nebulous the Congressional intent, the harder it will be for the court to say that an agency acted beyond the bounds of discretion committed to it by law.

*Id.* at 470 n.3.

171

usually refuse review, finding that "agency action is committed to agency discretion by law."[293] Thus, rarely applied exceptions to the Administrative Procedure Act's judicial review provisions have been utilized in public lands cases more often than in other fields.

Statutes mandating more intensive land management generally implement modern public lands policy: intensive management for a potpourri of uses and purposes, with a pervasive concern for environmental protection. The federal land manager must choose from an array of objectives and approaches. Formerly unbridled discretion is confined by definition of land management agency missions and specific procedures for accomplishing them.[294] Many decisions remain within an aura of discretion that ordinarily will not be curtailed or invaded by a court unless a congressional directive is violated. Choices among uses will generally be safe from judicial review so long as they do not depart from the procedures, the standards or the purposes of the statutes. But when a party alleges that the manager has forsaken the agency mission by ignoring the care and protection of certain lands, there may be "law to apply" and a court will review.[295] If land use priorities have been set by formal rulemaking, they may be judicially enforceable against the government if it departs from the plan without following procedures.[296] On the other hand, Congress has added little to its broad delegations of discretion for disposal of federal lands,[297] leaving the negative decision—not to develop, to dispose of or to allow entry upon particular lands—relatively free from review.

Once a court grants review, it is likely to defer to an agency practice or decision that comports with the agency's own established interpretation of the governing statute.[298] But agency interpretations that are out of step

292. *E.g.*, Forest Service Organic Act, 16 U.S.C. §§473–478, 479–482, 551 (1976); Multiple Use, Sustained Yield Act, 16 U.S.C. §§528–531 (1976); General Mining Act, 30 U.S.C. §22 (1976); Mineral Leasing Act, 30 U.S.C. §§181–287 (1976 & Supp.II 1978); Taylor Grazing Act, 43 U.S.C. §315 (1976).

293. 5 U.S.C. §701(a)(2) (1976). *E.g.*, Nelson v. Andrus, 591 F.2d 1265 (9th Cir., 1978); Santa Clara v. Andrus, 572 F.2d 660 (9th Cir., 1978); Strickland v. Morton, 519 F.2d 467 (9th Cir., 1975); Ness Inv. Corp. v. Department of Agriculture, 512 F.2d 706 (9th Cir., 1975).

294. *See* Wilkinson, *Public Land Law: Some Connecting Threads and Future Directions,* 1 PUB. LAND L. REV. 1, 6 (1980).

295. Parker v. United States, 448 F.2d 793, 795, 796, 797 (1971); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410; Sabin v. Butz, 515 F.2d 1061, 1065 (1975); National Forest Preservation Group v. Butz, 485 F.2d 408, 411 (1973). *See also* Comment, *The Conservationists and the Public Lands: Administrative and Judicial Remedies Relating to the Use and Disposition of the Public Lands Administered by the Department of Interior,* 68 MICH L. REV. 1260, 1236–42 (1970).

296. Peck, *"And Then There Were None"—Evolving Federal Restraints on the Availability of Public Lands for Mineral Development,* 25 ROCKY MTN. MIN. L. INST. 3-1, 3–87 (1979). *Cf.* Kaploski, *Power Plant Siting on Public Lands: A Proposal for Resolving the Environmental-Development Conflict,* 56 DEN. L. J. 179 (1979) (arguing that FLPMA may impose an environmental mandate on siting questions).

297. *See generally,* COGGINS & WILKINSON, *supra* note 17 at 231–233.

298. Udall v. Tallman, 380 U.S. 1 (1965).

172

with statutory language or purpose will not receive the same deference; statutory interpretation ultimately remains a judicial function.[299] In public land law, resort to the purpose of statutory schemes has often guided judicial construction.[300] On occasion the Supreme Court has strained to find an intent to preserve public resources and to deny private interests in them, although the statutes under which the private interests were asserted were passed in an age when disposal of public lands was in vogue.[301]

So long as the volume and thrust of statutory law is directed at protection and judicious use of public lands, it is reasonable to expect more deferential treatment of interpretations that deny development, demand caution in use, or prefer non-damaging uses than of interpretations that err on the side of facilitating development. Thus, it is predictable that an agency's broad interpretation of its own withdrawal authority under the FLPMA is more likely to be upheld if challenged than one that encourages development by restricting the ability of the Secretary to withdraw lands beyond the requirements of the Act.[302]

The only significant possibilities for judicial intrusion into the realm of administrative decisions to withdraw public lands will arise when an agency fails to adhere scrupulously to procedural mandates. FLPMA is quite specific as to the procedure for making withdrawals[303] and any party

---

299. *E.g.,* Wilderness Society v. Morton, 479 F.2d 842 (D.C. Cir.), *cert. denied,* 411 U.S. 917 (1973).

300. In West Virginia Div. of Izaak Walton League of America, Inc. v. Butz, 522 F.2d 945 (4th Cir. 1975) the court construed the Forest Service Organic Act's authority to sell "the dead, matured or large growth of trees" in national forests (16 U.S.C. § 476) as not broad enough to authorize clear-cutting. The Forest Service offered other interpretations of the literal language but the court found that Congress's primary concern in passing the Act was "preservation of the national forests." *Accord,* Zieske v. Butz, 406 F.Supp. 258 (D. Alas. 1975). The ban on clear-cutting was lifted when Congress enacted the National Forest Management Act of 1976, 16 U.S.C. §§ 1601–1613 in a context of required planning and generally more limited discretion.

*See also* Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971); Citizens for a Better Environment v. Environmental Protection Agency, 649 F.2d 522 (7th Cir., 1979); Buck v. Morton, 449 F.2d 600 (9th Cir. 1971); Sierra Club v. Department of the Interior, 398 F.Supp. 284 (N.D. Cal. 1975); Sierra Club v. Department of Interior, 376 F.Supp. 90 (N.D. Cal. 1974); Sierra Club v. Ruckelshaus, 344 F.Supp. 253 (D.D.C. 1972), *aff'd,* 412 U.S. 541 (1973).

301. *E.g.,* United States v. Union Pacific R.R. Co., 353 U.S. 112 (1957) (finding a mineral reservation in a right of way granted to railroad, though that section of act was silent and express reservations were in other sections and acts). *See also,* United States v. Union Oil Co., 549 F.2d 1271 (9th Cir. 1977). *cert. denied,* 435 U.S. 911 (1977); Western Nuclear, Inc. v. Andrus, 475 F.Supp. 654 (D. Wyo. 1979). *But cf.* Leo Sheep Co. v. United States, 440 U.S. 668 (1979) (U.S. did not impliedly reserve an easement allowing a road to be built across railroad grant lands without compensation). *See* discussion in Wilkinson, *Public Land Law: Some Connecting Threads and Future Directions,* 1 PUB. LAND L. REV. 1, 29–34 (1980).

302. *But cf.* Peck, *"And Then There Were None" Evolving Federal Restraints on the Availability of Public Lands for Mineral Development,* 25 ROCKY MTN. MIN. L. INST. 3–1, 3–13 (1976) (arguing that "national policies and statutory mandates" are contrary to executive decisions denying development).

303. *See* notes 226–244 *supra* and accompanying text.

173

*NATURAL RESOURCES JOURNAL* [Vol. 22

aggrieved by a failure to follow these procedures is assured judicial review.[304] Not only is it appropriate for a court to insist on exacting compliance with the procedures designed by Congress, but it is consistent with the type of review courts regularly indulge, even when the substantive mandate of a statute is vague.[305]

The thesis that courts should demand greater justification for an administrative decision opening or allowing development on public lands than for protecting or withdrawing the same lands also finds support in the public trust doctrine. Traditionally, the doctrine has been narrowly applied to restrict major state conveyances of tidelands,[306] but increasingly a variant of the doctrine is being urged and accepted as a means of construing obligations of federal agencies under the public land laws.[307] The theory is that public lands are to be held and managed consistently with a trust implied from the high standards set for stewardship of federal lands in modern statutes. Thus, as gaps must be filled and vague statutes interpreted, the context is to be one of protection of the public interest in federal lands and resources.[308] This inference flows from Congress's statutory scheme for public land management. It compels a broad construction of agency powers over federal property and even can be the basis of judicial mandates to exercise available authority to protect public lands.[309] To the extent the rationale of the conservation-oriented doctrine is accepted it would support protective exercises of executive withdrawal authority.

## V. CONCLUSION

The legal uncertainties concerning withdrawal that dominated the past are largely resolved. The Federal Land Policy and Management Act provides authority and intelligible standards for withdrawals made after its effective date. Compliance with the Act's procedural requirements is readily measurable. The validity of withdrawals made without statutory

---

304. The Administrative Procedure Act, 5 U.S.C. § 706(2)(D), directs a reviewing court to set aside agency decisions that were reached "without observance of procedure required by law."

305. E.g., Scenic Hudson Preservation Conference v. Federal Power Commission, 354 F.2d 608 (2nd Cir., 1965). *See generally* W. RODGERS, ENERGY AND NATURAL RESOURCES LAW 104–28 (1979).

306. Illinois Central R. Co. v. Illinois, 146 U.S. 387 (1892).

307. An enlightening and analytical explication of this subject is found in Wilkinson, *The Public Trust Doctrine in Public Land Law*, 14 U. CAL. D. L. REV. 269 (1981).

308. *Id.* at 311–13.

309. E.g., Sierra Club v. Department of Interior, 424 F.Supp. 172 (N.D. Cal. 1976); Sierra Club v. Department of Interior, 398 F.Supp. 284 (N.D. Cal. 1975); Sierra Club v. Department of Interior, 376 F.Supp. 90 (N.D. Cal. 1974). *But see* Sierra Club v. Watt, 659 F.2d 203 (D.C. Cir. 1981). *See generally,* Comment, *Proprietary Duties of the Federal Government Under the Public Land Trust*, 75 MICH. L. REV. 586 (1977).

174

authority after Congress's major entry into the field in 1910 may still be challenged, but the prospects for success are dim. Although the Supreme Court has not considered the question, Congress confirmed that authority to make withdrawals independent of statute had been delegated to the executive by repealing that authority in 1976. The same legislation should seal the fate of attempted non-statutory withdrawals after 1976. But other devices are available to effect the same results as withdrawals. Some are provided in the FLPMA; others are within the discretion of land managers to restrict the uses permitted on public land. Major actions involving timber sales, mineral leases, wildlife protection and recreational values may fall within administrative authority to classify and to manage public lands under the FLPMA or under other statutes not changed by the Act. Defining the reach of authority, as well as the authority under withdrawal statutes, is a task that belongs primarily to the executive itself. Pervasive congressional concern with conservation makes administrative actions that tend to protect publicly owned resources virtually invulnerable to judicial challenge.

○

# EXHIBIT 3

1023

# PUBLIC LAND POLICY AND MANAGEMENT ACT OF 1975

B 603228

The University
of Michigan
Reference

# HEARINGS

BEFORE THE

## SUBCOMMITTEE ON PUBLIC LANDS

OF THE

## COMMITTEE ON

## INTERIOR AND INSULAR AFFAIRS

## HOUSE OF REPRESENTATIVES

NINETY-FOURTH CONGRESS

FIRST SESSION

ON

## H.R. 5224 and H.R. 5622

TO PROVIDE FOR THE MANAGEMENT, PROTECTION, AND
DEVELOPMENT OF THE NATIONAL RESOURCE LANDS, AND
FOR OTHER PURPOSES

HEARINGS HELD IN WASHINGTON, D.C.
MARCH 21, 24, AND 25; APRIL 7 AND 11, 1975

## Serial No. 94–9

Printed for the use of the
Committee on Interior and Insular Affairs


UNIVERSITY OF MICHIGAN
LIBRARIES

NOV 26 1975

DEPOSITED BY THE
UNITED STATES OF AMERICA

Generated on 2013-02-08 18:16 GMT / http://hdl.handle.net/2027/mdp.39015081207758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

# PUBLIC LAND POLICY AND MANAGEMENT ACT OF 1975

## HEARINGS

### BEFORE THE

## SUBCOMMITTEE ON PUBLIC LANDS

#### OF THE

## COMMITTEE ON INTERIOR AND INSULAR AFFAIRS HOUSE OF REPRESENTATIVES

### NINETY-FOURTH CONGRESS

#### FIRST SESSION

ON

## H.R. 5224 and H.R. 5622

TO PROVIDE FOR THE MANAGEMENT, PROTECTION, AND DEVELOPMENT OF THE NATIONAL RESOURCE LANDS, AND FOR OTHER PURPOSES

HEARINGS HELD IN WASHINGTON, D.C.
MARCH 21, 24, AND 25; APRIL 7 AND 11, 1975

## Serial No. 94–9

Printed for the use of the
Committee on Interior and Insular Affairs



U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1975

54-005


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated on 2013-02-08 18:17 GMT  /  http://hdl.handle.net/2027/mdp.39015081207758
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

## COMMITTEE ON INTERIOR AND INSULAR AFFAIRS

### House of Representatives

#### JAMES A. HALEY, Florida, *Chairman*

ROY A. TAYLOR, North Carolina
HAROLD T. JOHNSON, California
MORRIS K. UDALL, Arizona
PHILLIP BURTON, California
ROBERT W. KASTENMEIER, Wisconsin
PATSY T. MINK, Hawaii
LLOYD MEEDS, Washington
ABRAHAM KAZEN, Jr., Texas
ROBERT G. STEPHENS, Jr., Georgia
JOSEPH P. VIGORITO, Pennsylvania
JOHN MELCHER, Montana
TENO RONCALIO, Wyoming
JONATHAN B. BINGHAM, New York
JOHN F. SEIBERLING, Ohio
HAROLD RUNNELS, New Mexico
ANTONIO BORJA WON PAT, Guam
RON de LUGO, Virgin Islands
BOB ECKHARDT, Texas
GOODLOE E. BYRON, Maryland
JAIME BENITEZ, Puerto Rico
JIM SANTINI, Nevada
PAUL E. TSONGAS, Massachusetts
ALLAN T. HOWE, Utah
JAMES WEAVER, Oregon
BOB CARR, Michigan
GEORGE MILLER, California
THEODORE M. (TED) RISENHOOVER,
 Oklahoma
WRIGHT PATMAN, Texas

JOE SKUBITZ, Kansas, *Ranking Minority
 Member*
SAM STEIGER, Arizona
DON H. CLAUSEN, California
PHILIP E. RUPPE, Michigan
MANUEL LUJAN, Jr., New Mexico
KEITH G. SEBELIUS, Kansas
ALAN STEELMAN, Texas
WILLIAM M. KETCHUM, California
DON YOUNG, Alaska
ROBERT E. BAUMAN, Maryland
STEVEN D. SYMMS, Idaho
JAMES P. (JIM) JOHNSON, Colorado
ROBERT J. LAGOMARSINO, California
VIRGINIA SMITH, Nebraska

CHARLES CONKLIN, *Staff Director*
LEE McELVAIN, *Counsel*
WILLIAM L. SHAFER, *Consultant on Mines, Minerals, and Public Lands*
MICHAEL C. MARDEN, *Minority Counsel*
JAMES ROCK, *Minority Staff Consultant on Public Lands*

---

### SUBCOMMITTEE ON PUBLIC LANDS

#### JOHN MELCHER, Montana, *Chairman*

PHILIP BURTON, California
GOODLOE E. BYRON, Maryland
HAROLD T. JOHNSON, California
WRIGHT PATMAN, Texas
THEODORE M. (TED) RISENHOOVER,
 Oklahoma
HAROLD RUNNELS, New Mexico
JIM SANTINI, Nevada
PAUL E. TSONGAS, Massachusetts
MORRIS K. UDALL, Arizona
JAMES WEAVER, Oregon

SAM STEIGER, Arizona
JOE SKUBITZ, Kansas
DON CLAUSEN, California
DON YOUNG, Alaska
JAMES P. (JIM) JOHNSON, Colorado

NOTE.—The first listed minority member is counterpart to the subcommittee chairman.

(II)


Generated on 2013-02-08 18:18 GMT / http://hdl.handle.net/2027/mdp.39015081207758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

# CONTENTS

Generated on 2013-02-08 18:18 GMT / http://hdl.handle.net/2027/mdp.39015081207758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

| | Page |
|---|---|
| Hearings held: | |
| March 21, 1975 | 1 |
| March 24, 1975 | 45 |
| March 25, 1975 | 87 |
| April 7, 1975 | 253 |
| April 11, 1975 | 353 |
| Text of: | |
| H.R. 5224 | 88 |
| Subcommittee Print No. 1 (bill) | 139 |
| H.R. 5622 | 254 |
| Statements: | |
| Alderson, George, Director of Federal Affairs, the Wilderness Society | 62, 395 |
| American Petroleum Institute | 491 |
| Berklund, Hon. Curt, Director, Bureau of Land Management, Department of the Interior | 2 |
| Clusen, Charles M., a Washington representative of the Sierra Club | 77, 474 |
| Edwards, Howard L., vice president and secretary, the Anaconda Co., on behalf of the American Mining Congress | 380 |
| Evenden, Fred G., executive director, the Wildlife Society | 473 |
| Garrett, Tom, conservation director, Friends of the Earth (plus affidavits, State of North Dakota) | 412 |
| Herbert, W. F., manager, Natural Resources, Southern Pacific Land Co., to the Statewide Natural Resources Committee, California Chamber of Commerce, April 24, 1973 | 495 |
| Horton, Hon. Jack O., Assistant Secretary, Land and Water Resources, Department of the Interior | 221 |
| Kimball, Thomas L., executive vice president, National Wildlife Federation | 451 |
| Landstrom, Karl S., Arlington, Va | 79, 340 |
| MacCleery, Douglas W., Forester for the National Forest Products Association (plus suggested amendments to Subcommittee Print No. 1, and H.R. 5224) | 315 |
| McGuire, Hon. John R., Chief, Forest Service, Department of Agriculture | 30, 246 |
| Rustad, Kenneth, commissioner, Fallon County, Mont., on behalf of the National Association of Counties, submitted by Jim Evans, NACo legislative representative | 354 |
| Summary | 353 |
| Smith, Dr. Spencer M., Jr., Citizens Committee on Natural Resources | 77 |
| Weber, John, representing the chairman of the Public Lands Council | 46 |
| Letters: | |
| Crandell, Harry B., director of Wilderness Reviews, the Wilderness Society, to Hon. John Melcher, dated May 16, 1975 | 482 |
| Datt, John C., director congressional relations, American Farm Bureau Federation, to Hon. John Melcher, dated March 26, 1975 | 485 |
| Denton, William R., vice president, Southern Pacific Transportation Co., to Hon. John Melcher, dated April 7, 1975 | 488 |
| Edwards, Howard L., chairman, AMC Public Lands Committee, to Hon. John Melcher, dated April 28, 1975 (plus amendments) | 392 |
| Garrett, Tom, conservation director, Friends of the Earth, to Hon. Joe Skubitz, dated June 11, 1975 | 448 |
| Hagenstein, W.D., executive vice president, Industrial Forestry Association, Portland, Oreg., to Hon. John Melcher, dated April 16, 1975 | 489 |
| Herbert, W.F., Southern Pacific Land Co., San Francisco, Calif., to Regional Forester, San Francisco, dated Dec. 9, 1972 | 495 |
| Jackson, Peter V., executive secretary, Montana Association of State Grazing Districts, to Hon. John Melcher, dated March 31, 1975 | 486 |

(III)

Generated on 2013-02-08 18:19 GMT / http://hdl.handle.net/2027/mdp.39015081207758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

IV

Letters—Continued

McGuire, John R., Chief, Forest Service, to Hon. John Melcher, dated
    May 6, 1975 ........................................... **Page** 33
Mineta, Hon. Norman Y., Member of Congress, to Hon. John Melcher,
    dated March 12, 1975 ................................... 40
Nesbit, Henry, president, Montana Association of State Grazing
    Districts, Malta, Mont., to Hon. John Melcher, dated May 8, 1975_ 491
Pettis, Shirley N., to Hon. John Melcher, dated March 21, 1975 ...... 39
Symms, Hon. Steve, Member of Congress, to Hon. John Melcher,
    dated May 5, 1975 ..................................... 484
Unruh, Russell S., president, North Fork Grazing District, Chinook,
    Mont., to O.M. Ueland, Administrator, Conservation District
    Division, Helena, dated March 10, 1975 ................... 486
Wilson, Cynthia E., Washington representative, National Audubon
    Society, to Cong. John Melcher, dated March 25, 1975 ........ 484

Additional information:

Affidavits submitted by Tom Garrett:

    Edwin Britton ......................................... 418
    Ezra E. Evans ......................................... 422
    Robert L. Evans ....................................... 424
    Roy Evans ............................................. 424
    Donald Goven .......................................... 425
    Earl L. Goven ......................................... 426
    Alvin Wall ............................................ 429
    Harold Sellon ......................................... 431
    Albert and Pearle Wall ................................ 432
    Ben Schatz ............................................ 434
    K.E. Peck ............................................. 435
    Richard Nathan ........................................ 436
    Herbert Nathan ........................................ 437
    Albert Klain .......................................... 440
    Kenneth Grabinger ..................................... 442
    Alvin Grabinger ....................................... 444

Financing National Forest roads, background information for county
    government policy (prepared for discussion at National Association
    of Counties' Western Region Conference, Albuquerque, N. Mex.,
    March 19–21, 1975) ................................... 364
Major considerations for changes in the grazing regulations, submitted
    by Curt Berklund, Director, Bureau of Land Management ..... 26
National Forest Roads and Trails Systems Act of Oct. 13, 1964 ..... 327
Questions submitted by Karl S. Landstrom, Arlington, Va ........... 347

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

463

exploring how you would include that kind of circumstance so that things do not fall through the cracks. At least, our organization is unhappy about that. I think it would be worth looking into just what kind of mechanism there is for dealing with that problem, if that is the problem; as you already know, that is one of the great controversies.

Mr. KIMBALL. I was going to say, just looking back a number of years that I have been associated in management affairs that cuts both ways: that there have been some withdrawals which, in our view, were exceptional. They reserve the values that our organization holds dear, and that was done by the Executive act, and we were pretty sure that had we had to go the legislative route it would have been a long and tedious, and, perhaps, many of the values that were protected would have been gone by that time. And there may have been others on the other side, so I say it works both ways.

I think to be honest about it is one of the reasons why we have some reservations about it, because at many of the areas that we look back on were the values that we hold dear. Our concern were done by the withdrawal route.

Mr. MELCHER. I think for that very reason the committee adopted the veto feature last year, because we do not want to interfere. It does not take an affirmative action of the committee to approve an action. This leaves the agency free to act promptly, quickly and in the public interest. We were using the veto portion to say if we do not agree we have got a right to say why we do not think it is in the public interest. We now have about a year and a half experience with the veto provision to put in the Alaskan pipeline bill, with respect to oil and gas pipelines across public lands.

We find ourselves quite often representing considerable interests that are limited to a geographic area. By that, I mean I represent a lot of acres, a huge, massive portion of Montana, and my colleague in North Dakota represents the whole State, but there are only two of us. To begin with, about the Arctic gas pipeline, which may bring natural gas across Alaska, down the MacKenzie Valley through Canada, and across our States and several other States and to bring gas to the Midwest.

As far as I am concerned, the application for the act would seem to preclude any opportunity for people in Montana, consumers in Montana and North Dakota, to have any access to the natural gas. It would cross our States for many hundred of miles. We felt that the FCC should review that. They would be joined by others now who are here in Congress and our respective States as intervenors. But we will not just be talking to the FCC which, after all, is one avenue by which to establish our concerns. We are also going to have the opportunity to discuss it in the subcommittee if and when the Department of Interior gives serious consideration to granting a permit across public lands in Alaska, or for that matter over the public lands that might be crossed in Montana or North Dakota.

In that review, we are going to find that we have an opportunity to express our concerns again for what is important to our States' health. These are the type of things that we have to look at here in Congress when we get our chance to express our concern of our people and to find a way of doing what is right. Oversight hearings are



Melanie R. Kay (*pro hac vice*)
Edward B. Zukoski (*pro hac vice*)
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO 80202
mkay@earthjustice.org
tzukoski@earthjustice.org
Telephone: (303) 623-9466
Fax: (303) 623-8083

Roger Flynn *(pro hac vice)*
Western Mining Action Project
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
wmap@igc.org
Telephone: (303) 823-5738
Fax: (303) 823-5732

Attorneys for Defendant-Intervenors
       Grand Canyon Trust, <u>et al.</u>,

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gregory Yount,<br>        Plaintiff,<br><br>v.<br><br>Ken Salazar, Secretary of the Interior, <u>et al.</u>;<br>        Defendants<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 3:11-cv-08171-PCT-DGC<br>(Lead case) |
| National Mining Association, <u>et al.</u>;<br>        Plaintiffs,<br><br>v.<br><br>Ken Salazar, Secretary of the Interior, <u>et al.</u>;<br>        Defendants<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 3:11-cv-08038-PCT-DGC |
| Northwest Mining Association,<br>        Plaintiff,<br><br>v.<br><br>Ken Salazar, Secretary of the Interior, <u>et al.</u>;<br>        Defendants,<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 3:12-cv-08042-PCT-DGC |

1

2     Quaterra Alaska Incorporated, et al.,          )
              Plaintiffs,                            )   Case No. 3:12-cv-08075-PCT-DGC
3                                                    )
      v.                                             )
4                                                    )
      Ken Salazar, Secretary of the Interior, et al.;)
5              Defendants                            )
      _____)

6              **DEFENDANT-INTERVENORS GRAND CANYON TRUST ET AL.'S
7          STATEMENT OF MATERIAL FACTS IN OPPOSITION TO NATIONAL
        MINING ASSOCIATION ET AL.'S MOTION FOR PARTIAL SUMMARY
8                                  JUDGMENT**

9              Pursuant to Local Rule of Civil Procedure 56.1(b), Defendant-Intervenors Grand

10    Canyon Trust et al. ("the Trust") submit this Statement of Disputed Facts in response to

11    the "Statement of Facts" filed by Plaintiffs National Mining Association et al. ("NMA")

12    and in opposition to Plaintiffs' Motions for Partial Summary Judgment.  See Statement of

13    Facts, 3:12-cv-8038, Dkt. #73-1 (Aug. 10, 2012).  Plaintiff Northwest Mining

14    Association did not submit a separate statement of material facts.  The Trust's responses

15    to the statement filed by NMA are below.

16

17    1.  On January 9, 2012, Defendant Ken Salazar, Secretary of the U.S. Department of the
      Interior ("Secretary"), issued Public Land Order ("PLO") 7787 under his purported
18    authority under "section 204 of the Federal Land Policy and Management Act of 1976, 43
      U.S.C. 1714."  77 Fed. Reg. 2563 (Jan. 18, 2012).

19            Response – The Trust disputes NMA's use of the term "purported," as it implies

20            the Secretary's actions exceeded his statutory authority.  Because this is a legal

21            conclusion, however, the Trust's disagreement with it does not present a "genuine

22            dispute as to [a] material fact," Fed. R. Civ. P. 56(a), that would preclude

23            summary judgment.

24    2.  PLO 7787 had the effect of withdrawing from location and entry under the General
      Mining Law of 1872 "approximately 1,006,545 acres of public and National Forest
25    System lands" for a period of twenty years, effective January 21, 2012. PLO 7787.

26            Response – the Trust disputes NMA's characterization of Public Land Order 7787

27            to the extent it fails to reflect that the order was made "subject to valid existing

28

                                                   1

rights."  Because NMA is characterizing a document that speaks for itself and is the best evidence of its contents, the Trust's disagreement with the characterization does not present a "genuine dispute as to [a] material fact," Fed. R. Civ. P. 56(a), so as to preclude summary judgment.

3. On January 9, 2012, Secretary Salazar submitted to Congress notices intended to comply with §§ 204(c)(1)-(2) of the Federal Land Policy and Management Act of 1976 ("FLPMA"), informing Congress of the Secretary's withdrawal under PLO 7787 and initiating a ninety-day period at the close of which Congress could have terminated the withdrawal by concurrent resolution. U.S. BUREAU OF LAND MANAGEMENT, SECTION 204(C) REPORT TO CONGRESS ON THE WITHDRAWAL TO PROTECT THE GRAND CANYON WATERSHED, ADJACENT TO THE GRAND CANYON NATIONAL PARK (2012).

Response – The Trust dispute NMA's characterization of the report transmitted to Congress under section 204(c)(2) of FLPMA as a "notice."  Because NMA is characterizing a document that speaks for itself and is the best evidence of its contents, the Trust's disagreement with the characterization does not present a "genuine dispute as to [a] material fact," Fed. R. Civ. P. 56(a), so as to preclude summary judgment.  The Trust does not dispute the remaining factual allegations of this paragraph.

4. Congress did not issue a concurrent resolution terminating the withdrawal under PLO 7787.  The withdrawal currently remains in effect.  See PLO 7787.

Response – The Trust does not dispute the factual allegations contained in this statement.

5. The withdrawal under PLO 7787 has the effect of changing the legal status of federal lands in the withdrawal area.  PLO 7787; see also Plaintiffs' Amended Complaint [Dkt. 56], 100.  As a result of the withdrawal, Plaintiffs' member companies, which include uranium mining companies, are unable to pursue future uranium mining claims in the withdrawal area.  They also must comply with and pass a mineral examination process for further development of existing mining claims in the withdrawal area. Without the withdrawal, Plaintiffs would not be subject to these limitations.  See Amended Compl., 80-87; PLO 7787.

Response - NMA's characterization of the legal effect of PLO 7787 is not a "statement of fact" within the meaning of LRCiv 56.1(b) and thus requires no response.  To the extent a response is required, the Trust denies it.

2

Respectfully submitted February 8, 2013.


 /s/ Edward B. Zukoski
Melanie R. Kay (*pro hac vice*)
Edward B. Zukoski (*pro hac vice*)
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO  80202
mkay@earthjustice.org
tzukoski@earthjustice.org
Telephone: (303) 623-9466
Fax: (303) 623-8083

Roger Flynn (*pro hac vice*)
Western Mining Action Project
P.O. Box 349, 440 Main St., #2
Lyons, CO  80540
wmap@igc.org
Telephone: (303) 823-5738
Fax: (303) 823-5732

Attorneys for Grand Canyon Trust, the Havasupai Tribe,
Center for Biological Diversity, Sierra Club, and
National Parks Conservation Association


## CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing DEFENDANT-INTERVENORS GRAND

CANYON TRUST ET AL.'S STATEMENT OF MATERIAL FACTS IN OPPOSITION

TO NATIONAL MINING ASSOCIATION ET AL.'S MOTION FOR PARTIAL

SUMMARY JUDGMENT to be served upon counsel of record through the Court's

electronic service system (ECF/CM) and by first class mail to Gregory Yount at the

following address:  807 West Butterfield Road, Chino Valley, Arizona 86323.

Respectfully submitted February 8, 2013.

 /s/ Edward B. Zukoski