Steven J. Lechner (*Pro Hac Vice*, CO No. 19853)
Jeffrey Wilson McCoy (*Pro Hac Vice*, CO No. 43562)
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
jmccoy@mountainstateslegal.com
lechner@mountainstateslegal.com

Attorneys for Plaintiff Northwest Mining Association

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GREGORY YOUNT,<br><br>            Plaintiff,<br><br>    v.<br><br>KENNETH L. SALAZAR, *et al.*,<br><br>            Defendants. | No. CV11-8171-PCT-DGC<br>(Lead Case)<br><br>**NORTHWEST MINING ASSOCIATION'S OPPOSITION TO DEFENDANTS' AND INTERVENORS' CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| NATIONAL MINING ASSOCIATION and NUCLEAR ENERGY INSTITUE,<br><br>            Plaintiffs,<br><br>    v.<br><br>KENNETH L. SALAZAR, *et al.*,<br><br>            Defendants. | No. CV12-8038-PCT-DGC |

| | |
|---|---|
| NORTHWEST MINING ASSOCIATION,<br><br>       Plaintiff,<br><br>    v.<br><br>KENNETH L. SALAZAR, *et al*.,<br><br>      Defendants. | No. CV12-8042-PCT-DGC |
| QUATERRA ALASKA, INC. *et al.,*<br><br>      Plaintiffs,<br><br>    v.<br><br>KENNETH L. SALAZAR, *et al*.,<br><br>      Defendants. | No. CV12-8075-PCT-DGC |

1

**<u>TABLE OF CONTENTS</u>**

2

<u>Page</u>

3

TABLE OF AUTHORITIES....................................................................... iv

4

INTRODUCTION ................................................................................... 1

5

ARGUMENT ......................................................................................... 2

6

7

I.      THE INTENT OF CONGRESS IS THE GUIDING PRINCIPLE...... 2

8

II.     THE DELEGATION OF AUTHORITY TO MAKE LARGE-
        TRACT WITHDRAWALS WILL NOT FUNCTION IN A
9
        MANNER CONSISTENT WITH THE INTENT OF
10      CONGRESS WITHOUT THE CONTROL PROVIDED BY
        THE VETO........................................................................................ 4
11

12

III.    CONGRESS WOULD NOT HAVE DELEGATED LARGE-
13      TRACT WITHDRAWAL AUTHORITY WITHOUT THE
        CONTROL PROVIDED BY THE VETO.......................................... 11
14

15      A.      FLPMA's Severability Clause Is Not A Panacea .................... 12

16
        B.      It Is Evident That Congress Would Not Have Delegated
17              The Authority To Make Large-Tract Withdrawals Without
18              The Control Provided By The Veto ........................................ 13

19      CONCLUSION ..................................................................................... 16

20

21      CERTIFICATE OF SERVICE............................................................... 18

22

23

24

25

26

27

28

1

## **TABLE OF AUTHORITIES**

2
**Page**

3   **Cases**

4   *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678 (1987) ...................................... 2, 3, 7, 11, 13

5
6   *American Fed'n of Gov't Employees v. Pierce*,
697 F.2d 303 (D.C. Cir. 1982) ......................................................... 9

7
8   *Ayotte v. Planned Parenthood of Northern New England*,
546 U.S. 320 (2006) ......................................................... 2, 10

9   *Califano v. Westcott*, 443 U.S. 76 (1979)......................................................... 2

10
11   *City of New Haven v. United States*, 809 F.2d 900 (D.C. Cir. 1987)............. 10, 16

12   *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546 (2005) .......... 14

13   *Garcia v. United States*, 469 U.S. 70 (1984)......................................... 14

14
15   *INS v. Chadha*, 462 U.S. 919 (1983)......................................................... 1

16   *Leavitt v. Jane L.*, 518 U.S. 137 (1996)......................................................... 12

17   *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)...................................... 12

18
19   *Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999) ......................................................... 3, 8

20
21   *Mountain States Legal Foundation v. Andrus*,
499 F. Supp. 383 (D. Wyo. 1980) ................................................. 7

22
23   *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012) ..................... 2

24   *Pac. Legal Found. v. Watt*, 529 F. Supp. 982 (D. Mont. 1981),
*supplemented by* 539 F. Supp. 1194 (D. Mont. 1982) .................................. 10

25
26   *United States v. Jackson*, 390 U.S. 570 (1968) .............................................. 12

27   *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915).................................. 6

28   *Utah Power & Light Co. v. United States*, 243 U.S. 389 (1917) .................... 4

**Constitutional Provisions**

U.S. Const. Art. IV, § 3, cl. 2 ................................................................ 4

**Statutes**

Administrative Procedure Act, 5 U.S.C. § 706(2)(C) ................................ 1

Defense Withdrawal Act, 43 U.S.C. §§ 155–158 ..................................... 5

       43 U.S.C. § 156 ................................................................... 8

Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq* ............. *passim*

       Section 102(a)(4), 43 U.S.C. 1701(a)(4) ................................ 6

       Section 103(*l*), 43 U.S.C. § 1702(*l*)..................................... 11

       Section 202(e)(2), 43 U.S.C. § 1712(e)(2) ............................ 11

       Section 203(c), 43 U.S.C. § 1713(c) .................................... 11

       Section 204(a), 43 U.S.C. § 1714(a) .................................... 6, 7

       Section 204(c), 43 U.S.C. § 1714(c) .................................... *passim*

       Section 204(c)(1), 43 U.S.C. § 1714(c)(1) ........................... 9

       Section 204(c)(2), 43 U.S.C. § 1714(c)(2) ........................... 10

       Section 204(e), 43 U.S.C. § 1714(e) .................................... 6, 10

       Section 204(*l*)(2), 43 U.S.C. § 1714(*l*)(2) ........................... 11

       Section 704(a) Pub. L. No. 94-579, § 704(a) 90 Stat. 2743, 2792 (1976), ...................................................................... *passim*

       Section 707, 43 U.S.C. § 1701 note ..................................... 12

**Legislative History**

122 Cong. Rec. 23,434–57 (July 22, 1976)................................................ 14

122 Cong. Rec. 23,436 (July 22, 1976)................................................ 15, 16

122 Cong. Rec. 23,437 (July 22, 1976)................................................ 15

122 Cong. Rec. 23,438 (July 22, 1976)................................................ 16

122 Cong. Rec. 23,451 (July 22, 1976)................................................ 16

122 Cong. Rec. 23,454 (July 22, 1976)................................................ 15

H.R. Conf. Rep. 94-1724, *reprinted in* 1976 U.S.C.C.A.N. 6227 ................. 14

H.R. Rep. No. 94-1163, *reprinted in* 1976 U.S.C.C.A.N. 6175 ..................... 13–14

**Other Authorities**

1 Pub. Nat. Resources L. § 4:3 (2nd ed.)........................................ 7, 9

Comment, *Chadha and the Public Lands:  Is FLPMA Affected?*, 5 Pub.
Land L. Rev. 55 (1984) .................................................... 7

Getches, *Managing the Public Lands: The Authority of the Executive to
Withdraw Lands*, 22 Nat. Resources J. 279 (1982)........................... 4

Glicksman, *Severability and the Realignment of the Balance of Power
over the Public Lands:  The Federal Land Policy and Management Act
of 1976 After The Legislative Veto Decisions*, 36 Hastings L.J. 1 (1984) ...... 6, 8–10

Office of Legislative Counsel, U.S. House of Representatives, House
Legislative Counsel's Manual on Drafting Style (Nov.1995)........................ 12

PLLRC, *One Third of the Nation's Land* (1970) ........................... 5

Wheatley, *Study of Withdrawals and Reservations of Public Domain
Lands* (1969)................................................................ 4, 5

Wheatley, *Withdrawals Under the Federal Land Policy Management
Act of 1976*, 21 Ariz. L. Rev. 310 (1979)....................................... 4, 6

NWMA's Opposition to Cross-Motions for Partial Summary Judgment
and Reply in Support of Motion for Partial Summary Judgment

vi

*Withdrawal of Public Lands*, 40 U.S. Op. Atty. Gen. 73 (1941) ...................   4

1

## INTRODUCTION

Northwest Mining Association ("NWMA") and National Mining Association and Nuclear Energy Institute (collectively "NMA") have separately moved for partial summary judgment seeking to hold unlawful the Secretary's actions in withdrawing over 1 million acres from operation of the Mining Law for 20 years.  It is undisputed that the only authority relied upon by the Secretary for his actions was Section 204(c) of FLPMA. 43 U.S.C. § 1714(c).  As conceded by Defendants, Section 204(c) contains an unconstitutional legislative veto.  Doc. 101 at 11 ("Legislative vetoes of the type at issue in this case have consistently been held unconstitutional, and that is the position of the United States here as well."); *see INS v. Chadha*, 462 U.S. 919, 944–59 (1983).  The unconstitutional legislative veto in Section 204(c), however, renders the delegation of authority in that subsection invalid.  Thus, the Secretary's 20-year withdrawal was unlawful as in excess of statutory authority.  5 U.S.C. § 706(2)(C).

Defendants and Intervenors argue that this Court should leave the 20-year withdrawal in place and simply sever the offending language.  In support of this argument, Defendants and Intervenors primarily contend that the remainder of Section 204(c) can operate independently without that language.  That, however, is not the relevant inquiry.

The relevant inquiry is whether Section 204(c) "will function in a manner consistent with the intent of Congress" in the absence of the veto.  Importantly, this is a necessary, but not sufficient, requirement for the balance of Section 204(c) to be preserved.  The ultimate question is whether Congress would have delegated authority to

the Secretary to make large-tract withdrawals without the veto.  Here, the answer is evident:  Congress considered the veto essential to the delegation of authority to make large-tract withdrawals and to achieve Congress' goal of reining in the Executive and reasserting its control over withdrawals.  This Court cannot simply sever the offending language and leave in place an unchecked delegation of authority without violating Congress' expressed intent.

## ARGUMENT[1]

## I.    THE INTENT OF CONGRESS IS THE GUIDING PRINCIPLE.

The issue of severability becomes relevant when, as here, language in a statutory scheme is unconstitutional.  *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 328–30 (2006).  The guiding principle "is legislative intent, for a court cannot 'use its remedial powers to circumvent the intent of the legislature.'"  *Id*. at 330 (quoting *Califano v. Westcott*, 443 U.S. 76, 94 (1979) (Powell, J., concurring in part and dissenting in part)).

The Supreme Court applies a "'well established'" two-part test in conducting a severability analysis.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2668 (2012) (Joint Opinion of Scalia, Kennedy, Thomas, and Alito, JJ., dissenting) (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987)).  First, because it is undisputed that the veto in Section 204(c) is unconstitutional, this Court must determine whether Section 204(c) "will function in a *manner* consistent with the intent of Congress[,]"

---

[1] NWMA is seeking to avoid duplicating NMA's arguments by focusing primarily on Intervenors' arguments.  NWMA hereby expressly adopts NMA's arguments.  NWMA's response to Defendants' Statement of Material Facts is attached here as Exhibit 1.

without the veto.  *Alaska Airlines,* 480 U.S. at 685 (emphasis in original).  In making this

determination:

> [I]t is necessary to recognize that the absence of the veto necessarily alters
> the balance of powers between the Legislative and Executive Branches of
> the Federal Government.  Thus, it is not only appropriate to evaluate the
> importance of the veto in the original legislative bargain, but also to
> consider the nature of the delegated authority that Congress made subject to
> a veto.  *Some delegations of power to the Executive . . . may have been so
> controversial or so broad that Congress would have been unwilling to
> make the delegation without a strong oversight mechanism.*

*Id*. at 685 (emphasis added).  If, after weighing these concerns, this Court determines that

Section 204(c) will not function in a manner consistent with the intent of Congress

without the veto, it must invalidate Section 204(c).  *Id*. at 685; *Minnesota v. Mille Lacs

Band of Chippewa Indians,* 526 U.S. 172, 194 (1999) (Because the President intended the

Executive Order to embody "one coherent policy," the offending language was not

severable.).

  Second, even if Section 204(c) without the veto can function in a manner

consistent with the intent of Congress, this Court must determine if Congress would have

delegated large-tract withdrawal authority to the Secretary without the veto.  If not,

Section 204(c) must be invalidated.  *See Alaska Airlines*, 480 U.S. at 685 ("[T]he

unconstitutional provision must be severed unless the statute created in its absence is

legislation that Congress would not have enacted.").  Application of this two-part test

proves that Section 204(c) must be invalidated.

## II.     THE DELEGATION OF AUTHORITY TO MAKE LARGE-TRACT WITHDRAWALS WILL NOT FUNCTION IN A MANNER CONSISTENT WITH THE INTENT OF CONGRESS WITHOUT THE CONTROL PROVIDED BY THE VETO.

The Property Clause vests in Congress the exclusive authority to manage federal lands.  U.S. Const. Art. IV, § 3, cl. 2; *Utah Power & Light Co. v. United States*, 243 U.S. 389, 404 (1917) (The authority of Congress under the Property Clause is "exclusive.").  Thus, for the Executive to exercise any authority over federal lands, Congress must delegate a portion of its exclusive Property Clause authority.[2]  Over the years, Congress expressly and impliedly delegated limited withdrawal authority.  The Executive's abuse of its delegated withdrawal authority led to passage of the Pickett Act in 1910, through which Congress intended to limit the Executive's withdrawal authority by delineating the full extent of that delegated authority.  *Wheatley Study* at 55–62.  Despite Congress' passage of the Pickett Act, the Executive continued to unlawfully make withdrawals outside the scope of its delegated power.  *See Withdrawal of Public Lands*, 40 U.S. Op. Atty. Gen. 73, 81–84 (1941) (opining that the Pickett Act applied only to temporary withdrawals and that the President retained authority to make permanent withdrawals); *but see Wheatley Study* at 106–30 (criticizing the 1941 Opinion and describing the Executive's abuses that it facilitated); Wheatley, 21 Ariz. L. Rev. at 315–17 (same).

---

[2] Contrary to Defendants' suggestion (Doc. 101 at 8, 18), the Executive has no "inherent" authority to make withdrawals.  Wheatley, *Study of Withdrawals and Reservations of Public Domain Lands* 55–62 (1969) ("*Wheatley Study*"); Wheatley, *Withdrawals Under the Federal Land Policy Management Act of 1976*, 21 Ariz. L. Rev. 310, 316–317 (1979); Getches, *Managing the Public Lands: The Authority of the Executive to Withdraw Lands*, 22 Nat. Resources J. 279, 286–87 (1982).

Congress' displeasure with the Executive acting outside of its delegated authority lead to passage of the Defense Withdrawal Act in 1958, through which Congress expressly prohibited the Executive from making defense withdrawals in excess of 5,000 acres.  43 U.S.C. §§ 155–158; *see Wheatley Study* at 310 (The Defense Withdrawal Act "represents a reassertion by Congress of its authority over all withdrawals for defense purposes in excess of 5,000 acres and a clear repudiation of the nonstatutory authority of the Executive to make such withdrawals under the 1941 Opinion . . . .").  Congress' displeasure also led to the creation of the Public Land Law Review Commission ("PLLRC"), whose recommendations were instrumental in the passage of FLPMA.  PLLRC, *One Third of the Nation's Land* 43 (1970) ("PLLRC Report") (noting the "concerns about problems associated with the 'withdrawal' and 'reservation' of public domain lands," which were voiced during the deliberations that eventually led to the PLLRC's creation.).  Based largely on the *Wheatley Study*, the PLLRC recommended that "Congress assert its constitutional authority by enacting legislation reserving unto itself exclusive authority to withdraw or otherwise set aside public land for specified limited-purpose uses and delineating specific delegations of authority to the Executive as to the types of withdrawals and set asides that may be effected without legislative action."  *Id*. at 2; *see id.* at 43 (noting that the PLLRC commissioned the *Wheatley Study*).

Congress' intent to rein in the Executive is plainly evident from the text of FLPMA.  In Section 704(a), Congress expressly revoked any implied authority of the Executive to make withdrawals and revoked nearly all of the previous expressed delegations of authority.  Pub. L. No. 94-579, § 704(a), 90 Stat. 2743, 2792–93 (1976)

(overturning *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915) and repealing 29 withdrawal provisions); *see* 43 U.S.C. 1701(a)(4) (National policy that "Congress delineate the extent to which the Executive may withdraw lands without legislative action.").  Congress' intent is further evidenced in Section 204(a), wherein Congress delegated limited authority to the Secretary to "make, modify, extend, or revoke withdrawals[,]" yet Congress stressed that that authority may be exercised only "in accordance with the provisions and *limitations* of [Section 204]."  43 U.S.C. § 1714(a) (emphasis added).[3]  With respect to large-tract withdrawals, the most important "limitation" is the veto, which evidences Congress' intent to reserve the authority to veto large-tract withdrawals.[4]  Glicksman, *Severability and the Realignment of the Balance of Power over the Public Lands:  The Federal Land Policy and Management Act of 1976 After The Legislative Veto Decisions*, 36 Hastings L.J. 1, 66 (1984).

---

[3] By ignoring Section 704(a) entirely and downplaying Section 204(a), Defendants make the baseless argument that FLPMA imposes only "some limitations" on the Executive withdrawal authority and that it did not "revoke large-tract [withdrawal] authority altogether."  Doc. 101 at 19.  Intervenors also conveniently ignore Section 704(a).  Yet, Sections 704(a) and 204(a) make it clear that the Executive has no authority to make large-tract withdrawals except "in accordance with the provisions and limitations" of Section 204.  43 U.S.C. § 1714(a); Wheatley, 21 Ariz. L. Rev. at 317 (In passing FLPMA, Congress, "[i]n unequivocal terms," "provided that it was setting statutory guidelines for all withdrawals of public lands, which in its view would govern all executive action.").

[4] In Section 204(e), Congress delegated limited authority to the Secretary to make large-tract withdrawals when an "emergency situation exists."  43 U.S.C. § 1714(e).  Because these large-tract emergency withdrawals are limited to 3 years, they are not subject to a veto.  43 U.S.C. § 1714(e).  Intervenors' suggestion that the instant 20-year withdrawal is "temporary," cannot be reconciled with the 3-year time limit for emergency withdrawals or any realistic conception of time, except, perhaps, geologic time.  To NWMA members, the 20-year withdrawal is permanent.

As the foregoing demonstrates, Congress' intent was to eliminate the Executive's withdrawal abuses by: (1) revoking any and all implied delegations of authority; (2) revoking most of the expressed delegations of authority; (3) clearly defining the scope and limitations of the Secretary's withdrawal authority; and (4) reserving to itself the ability to veto large-tract withdrawals.  *See Mountain States Legal Foundation v. Andrus*, 499 F. Supp. 383, 395 (D. Wyo. 1980). ("[I]t was the intent of Congress with the passage of FLPMA to limit the ability of the Secretary of the Interior to remove large tracts of public land from the operation of the public land laws . . . .").  More importantly, the delegation of authority to make large-tract withdrawals and the veto are inextricably intertwined, *i.e.*, Congress would not have delegated large-tract withdrawal authority without reserving the right to veto such withdrawals.[5]  Comment, *Chadha and the Public Lands:  Is FLPMA Affected?*, 5 Pub. Land L. Rev. 55, 65 (1984) ("Clearly, the circumstances surrounding the enactment of FLPMA, and the legislative history of that Act suggest that Congress would not have given the Interior Secretary such broad discretion without reserving for itself the power of review.").  Therefore, Section 204(c) will not function in a manner consistent with the intent of Congress, if only the veto is severed from Section 204(c).  1 Pub. Nat. Resources L. § 4:3 (2nd ed.) ("Invalidation of the vetoes only would return unfettered and unsupervised discretion to the executive branch, the very result that FLPMA was enacted to prevent." (footnotes omitted)); *see Alaska Airlines*, 480 U.S. at 678 ("Some delegations of power to the Executive . . . may

---

[5] Based upon Sections 704(a) and 204(a), an argument could be made that all of the subsections of Section 204 are inextricably intertwined.  NWMA is not advocating that the entirety of Section 204 be invalidated.

have been so controversial or so broad that Congress would have been unwilling to make the delegation without a strong oversight mechanism.").

Indeed, if only the veto were severed, the Secretary would have more authority to make large-tract withdrawals under FLPMA than is authorized for national security reasons under the Defense Withdrawal Act.  43 U.S.C. § 156.  But, as demonstrated above, Congress' limitation on the size of defense withdrawals was just the first step in reining in the Executive.  The final steps were performed in FLPMA, wherein Congress expressly revoked any implied withdrawal authority, delegated limited authority to make large-tract withdrawals, and expressly reserved the authority to veto those withdrawals.  Thus, the delegation of authority to make large-tract withdrawals and the veto comprise one "coherent policy."  *See Mille Lacs Band,* 526 U.S. at 194.  This means that the delegation of authority to make large-tract withdrawals cannot function in the manner intended by Congress without the veto.  Indeed:

> One of the principal legislative goals in enacting FLPMA was to limit the executive discretionary authority over the public lands.  At the same time, Congress felt a need to delegate some of its own authority over the public lands, to avoid being overly burdened with making routine administrative decisions.  Congress reconciled these potentially conflicting objectives by delegating to the executive authority subject to various substantive and procedural constraints.  *The legislative veto provisions of the Act are the most significant of those constraints.*

Glicksman, 36 Hastings L.J. at 66 (footnotes omitted) (emphasis added).

Accordingly, the entirety of Section 204(c) must be invalidated.  This is especially true considering that this result:

> [W]ould leave intact a 'workable administrative mechanism.'"  The Secretary could make withdrawals, but only of small tracts and only in

accordance with the durational restraints in section 204(d).  Large-tract withdrawals would have to be made by Congress.  The administrative burden on Congress would not be great, because large-tract withdrawals are relatively rare.

*Id*. at 80; *see* 1 Pub. Nat. Resources L. § 4:3 (2nd ed.) (noting this result is an example of "selective severance").

Intervenors argue that Section 204(c) will remain operational if only the final seven and one-half sentences of Section 204(c)(1) are severed.  Doc. 102 at 10, 25–28.  In Intervenors' mind, these seven and one-half sentences comprise the legislative veto.  Doc. 102 at 10.  Intervenors' argument, however, is based on the arbitrary placement of a period in the middle of the second sentence.  Doc. 102 at 10.  Yet, severing mid-sentence is closer to legislating than invalidating Section 204(c).  *See American Fed'n of Gov't Employees v. Pierce*, 697 F.2d 303, 306–07 (D.C. Cir. 1982) (reversing a district court decision that severed a provision in mid-sentence rather than striking a complete section of an act.).  Moreover, this arbitrary placement of a period severs the notice and the reporting requirements from the remainder of the veto.  *See* 43 U.S.C. § 1714(c)(1) and (2).  Intervenors, however, cite no support for the proposition that the notice requirement and reporting requirements are not necessary parts of the veto.  Indeed, reserving the ability to veto would be pointless if the Secretary were not required to notify Congress of, and report the basis for, a large-tract withdrawal.  *See,* Glicksman, 36 Hastings L.J. at 80–81 (concluding that the notice and reporting requirements are both part of the legislative veto); *see also* 43 U.S.C. § 1714(c)(1) (providing that the notice triggers the 90 days in which Congress must exercise its veto power).

1

2      Even if Intervenors' suggestion were accepted, the remainder of Section 204(c)

3  would not function in a manner consistent with the intent of Congress.  The notice and

   reporting requirements are meaningless without the ability to veto because any large-tract
4
   withdrawal would take effect immediately and would remain in place unless Congress
5
   passed and the President signed legislation overturning the withdrawal.  Congress always
6
   had this authority.[6]  Yet, Congress passed FLPMA because it believed that the existing
7
8  authority to legislatively overturn a withdrawal was "insufficient and left the [Executive]

9  too much discretion to make withdrawals."  Glicksman, 36 Hastings L.J. at 82.  Thus, if

10 severance occurred mid-sentence, the remaining provisions of Section 204(c) may be

11 operative, but they will not function in a manner consistent with the intent of Congress.

12 *City of New Haven v. United States*, 809 F.2d 900, 905 (D.C. Cir. 1987) ("[T]o the extent

13
   that section 1013 is 'operable' absent the legislative veto provision, it operates in a
14
   manner wholly inconsistent with the intent of Congress in enacting [the] legislation.").
15
   Therefore, Section 204(c) must be invalidated.
16

17

18

19

20

21 _____

22 [6] Intervenors try to elevate the importance of the reporting requirements in Section
   204(c)(2) by noting Section 204(e) references them.  Doc. 102 at 20 n.13.  Section 204(e)
23 has its own constitutional infirmity.  *See Pacific Legal Found. v. Watt*, 529 F. Supp. 982,
   987, 1001–05 (D. Mont. 1981), *supplemented by* 539 F. Supp. 1194 (D. Mont. 1982).  In
24 any event, Section 204(e) supports the relief requested by NWMA because the Secretary
   can arguably still make 3-year, large-tract withdrawal in emergencies.  43 U.S.C. §
25 1714(e).  In contrast, the relief requested by Intervenors would render Section 204(e)
   obsolete because the Secretary would simply make large-tract withdrawals under Section
26 204(c).  If this Court finds that the reporting requirements in Section 204(c)(2) are
   important for purposes of Section 204(e), this Court may choose to simply invalidate
27 Section 204(c)(1).  *See Ayotte*, 546 U.S. at 329.  Under such a scenario, the instant
   withdrawal would still be unlawful.
28

III.   **CONGRESS WOULD NOT HAVE DELEGATED LARGE-TRACT WITHDRAWAL AUTHORITY WITHOUT THE CONTROL PROVIDED BY THE VETO.**

Even if Section 204(c) can function in a manner consistent with the intent of Congress without the offending language as suggested by Intervenors, this Court must still determine if Congress would have delegated the large-tract withdrawal authority without the control provided by the veto.[7] *Alaska Airlines*, 480 U.S. at 685 ("[T]he unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted").  As demonstrated above, Congress would not have delegated the authority to make large-tract withdrawals without the control provided by the veto.[8]  Therefore, Section 204(c) must be invalidated.

---

[7] Defendants mischaracterize the inquiry as "whether Congress would have *revoked* the Secretary's large-tract withdrawal authority entirely, if it had known the veto is unconstitutional."  Doc. 101 at 17 (emphasis added).  Intervenors make the same mistake. *E.g.*, Doc. 102 at 28 (Whether Congress would have preferred to *eliminate completely* the Executive's large-tract withdrawal authority . . . ." (emphasis added)).  What Defendants and Intervenors fail to grasp is that Congress revoked all implied and most expressed withdrawal authority in Section 704(a).  Thus, Congress "revoked" and/or "eliminated" the Secretary's large-tract withdrawal authority and, thereby, prohibited the Secretary from making large-tract withdrawals (except in emergencies) separately from its limited delegation of authority in Section 204(c).  There is no evidence that Congress' passage of Section 704(a) was contingent on the constitutionality of the veto in Section 204(c).  Thus, Section 704(a) cements the conclusion that Congress would not have delegated large-tract withdrawal authority without the veto in Section 204(c).

[8] That Congress believed vetoes were key to accomplish the purposes of FLPMA is evident from Congress' use of similar vetoes in other contexts.  43 U.S.C. § 1712(e)(2) (reserving veto authority if the Secretary excludes a "principal or major use," such as mining (43 U.S.C. § 1702(*l*)), from more than 100,000 acres); 43 U.S.C. § 1713(c) (reserving veto authority over sales of land in excess of 2,500 acres); 43 U.S.C. § 1714(*l*)(2) (reserving veto authority over the termination of existing withdrawals).

1

2     **A.     FLPMA's Severability Clause Is Not A Panacea.**

3          Intervenors place great importance on FLPMA's severability clause.  In their

4     mind, the existence of this clause *ipso facto* means that this Court should sever only the

5     offending language from Section 204(c).  Specifically, they argue, that because of the

6     severability clause, NWMA has to meet a heightened burden of proof before this Court

7     may invalidate Section 204(c).  Contrary to Intervenors' belief, the severability clause is

8     not a panacea.[9]

9

10         First, it is axiomatic that "the ultimate determination of severability will rarely

11    turn on the presence or absence of such a clause."  *United States v. Jackson*, 390 U.S.

12    570, 585 n.27 (1968); *see* Office of Legislative Counsel, U.S. House of Representatives,

13    House Legislative Counsel's Manual on Drafting Style, § 328 (Nov.1995) (providing that

14    "a severability clause is unnecessary unless it provides in detail which related provisions

15    are to fall, and which are not to fall, if a specified key provision is held invalid").[10]  Thus,

16    the existence of the severability clause is largely irrelevant.  *See Marbury v. Madison*, 5

17    U.S. (1 Cranch) 137, 173–79 (1803) (ability to sever unconstitutional provisions inherent

18    in the Judiciary).

19

20

21

22

23    _____

24    [9] The severability clause in FLPMA supports the relief requested by NWMA, which is to
      invalidate the large-tract withdrawal "provision," *i.e.*, Section 204(c), but preserve the
25    remainder of Section 204 and FLPMA.  *See* 43 U.S.C. § 1701 note ("If any *provision* of
      this Act or the application thereof is held invalid, the remainder of the Act and the
26    application thereof shall not be affected thereby.") (emphasis added).

27    [10] Excerpts from the Manual are attached hereto as Exhibit 2. This type of specific
      severability clause was at issue in *Leavitt v. Jane L.*, 518 U.S. 137, 139–40 (1996) (per
28    curiam).  Thus, Intervenors' reliance on that case is misplaced, especially considering
      that it involved only state law.  *Id.* at 139.

Second, NWMA does not have to meet a heightened burden of proof.  In support of their heightened burden of proof argument, Intervenors rely on a statement by the Court in *Alaska Airlines* regarding the need for "strong evidence" to strike down a statute in the face of a severability clause.  Doc. 102 at 12 (quoting *Alaska Airlines,* 480 U.S. at 686).  This statement is inapposite because the plaintiffs in *Alaska Airlines* were seeking to invalidate the entire "Employee Protection Program," which took up an entire section of the Airline Deregulation Act of 1978.[11]  480 U.S. at 680–83.  Therefore, because NWMA is not seeking to invalidate Section 204, but only one subsection thereof, the heightened burden of proof requirement is inapplicable.

**B.   It Is Evident That Congress Would Not Have Delegated The Authority To Make Large-Tract Withdrawals Without The Control Provided By The Veto**.

Even if there is a heightened burden of proof requirement, it is evident that Congress would not have delegated the authority to make large-tract withdrawals without the control provided by the veto.  In addition to the "strong evidence" provided by the Executive's abuses that lead to the passage of FLPMA and the text of FLPMA itself, the legislative history of FLPMA conclusively demonstrates that Congress would not have delegated the authority to make large-tract withdrawals without the veto.

As explained in the House Report, providing for control over large-tract withdrawals was a "major objective" of FLPMA.  H.R. Rep. No. 94-1163, at 2, *reprinted in* 1976 U.S.C.C.A.N. 6175, 6176 ("The bill will accomplish the following major

---

[11] This statement is also dicta because the Court did not resolve whether there was even an applicable severability clause.  *Alaska Airlines*, 480 U.S. at 686–87.

objectives . . . (4) establish procedures to facilitate Congressional oversight of public land operations entrusted to the Secretary of the Interior ."); *id*. at 3–4, *reprinted in* 1976 U.S.C.C.A.N. at 6177–78 ("Public concern over the possibility of excessive disposals of public lands on the one hand and excessive restrictions on the other is reflected in the inclusion of requirements for referral of certain types of actions to the Congress for review" including "withdrawals and extensions of withdrawals of 5,000 acres . . . ."); *id*. at 9, *reprinted in* 1976 U.S.C.C.A.N. at 6183 (recognizing that the legislative veto will provide Congress the "opportunity to terminate all" withdrawals affecting 5,000 acres or more without legislation.).  These sentiments were also echoed in the Conference Report. H.R. Conf. Rep. 94-1724, 58, *reprinted in* 1976 U.S.C.C.A.N. 6227, 6229.

In addition to the evidence supplied by the Committee Reports, statements by individual members of Congress reaffirm the conclusion that Congress would not have delegated the authority to make large-tract withdrawals without the control provided by the veto.[12]  *E.g.*, 122 Cong. Rec. 23,434–57 (July 22, 1976).[13] Rep. Skubitz, however, probably said it best as to why the veto was critical to the delegation of large-tract withdrawal authority :

> One of the most important reasons for adopting this bill is that it provides for congressional oversight and control over an executive agency which, at present, is free to act mostly of its own accord.

---

[12] Although NWMA relies on individual statements, it recognizes that the Committee Reports are more indicative of Congress' intent, *Garcia v. United States*, 469 U.S. 70, 76 (1984), and that the text of FLPMA is most authoritative.  *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 568 (2005).

[13] These pages from *Congressional Record* are attached hereto as Exhibit 3.

\* \* \*

I fail to understand, therefore, the vociferous opposition voiced by environmental groups to legislation which seeks to accomplish just such ends:  to vest authority with the people and the Congress rather than with an uncontrolled agency; to limit executive discretion over national land management; and to carefully outline procedures for the withdrawal, acquisition, sale, and exchange of public lands.

The management or withdrawal of Federal lands is an extremely important matter, a matter which must not be left solely in the hands of an often unresponsive and unyielding bureaucracy.

\* \* \*

We must end what often has been a historic pattern of casual or even reckless withdrawal of public lands.

It is essential that Congress be informed of, and able to oppose if necessary, withdrawals which it determines not to be in the best interests of all the people.

122 Cong Rec. 23,436–37; *see also* 122 Cong. Rec. 23,454 (Rep. Johnson).

Intervenors take individual statements out-of-context and try to argue that Congress was not trying to put a "check on the Executive's authority[.]"  Doc. 102 at 24–25.[14]  This argument ignores the history preceding FLPMA, the text of FLPMA, including Section 704(a), and the floor debates, which make clear that the veto was

---

[14] In support of their argument, Intervenors quote a 1975 statement by Rep. Melcher. Doc. 102 at 18 n.15.  Intervenors, however, ignore the next sentence:  "We were using the veto portion to say if we do not agree we have got a right to say why we do not think it is in the public interest."  Rep. Melcher went on to explain the necessity of the veto because the ability to hold oversight hearings was not enough control:  "Oversight hearings are fine, but if the Federal agency has already run over and trampled you, we do not find much relief or much satisfaction in the oversight hearing."  Excerpts from these Hearings are attached hereto as Exhibit 4.

critical to the delegation of limited authority to make large-tract withdrawals.[15]  *E.g.*, 122

Cong. Rec. 23,451 (Rep. Melcher) ("[T]here were those of us—and I include myself—

who felt that the Secretary should have the opportunity of making no withdrawals

without the review of Congress.").

Accordingly, it is evident that Congress would not have delegated the Secretary

authority to make large-tract withdrawals without the control provided by the veto.

Therefore, Section 204(c) must be invalidated.

## CONCLUSION

For the foregoing reasons, this Court should grant partial summary judgment in

favor of NWMA and deny Defendants' and Intervenors' cross-motions for partial

summary judgment.

DATED this 22nd day of February 2013.

Respectfully submitted,

/s/ Steven J. Lechner
Steven J. Lechner (CO No. 19853)
Jeffrey Wilson McCoy (CO No. 43562)
Mountain States Legal Foundation

[15] Intervenors try to distinguish *New Haven* by suggesting Congress was "'not united in its furor'" over unchecked, large-tract withdrawals.  Doc 102 at 23 (quoting *New Haven*, 809 F.2d at 906).  This argument ignores that both Houses passed Sections 704(a) and 204(c).  Moreover, just like in *New Haven*, Intervenors have not cited a single expression of support for the proposition that the Secretary be allowed to make large-tract withdrawals without the check afforded by the veto.  809 F.2d at 903 (quoting District Court's findings). And, although they cite an amendment to increase the size of large-tract withdrawals, supporters of that amendment did not object to the veto.  E.g., 122 Cong. Rec. 23,438 (Rep. Mink) ("I most certainly do not object to congressional oversight in withdrawal matters"); 122 Cong. Rec. 23,436 (Rep. Seiberling) ("Withdrawals would still be subject to disapproval by a resolution by either House.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
lechner@mountainstateslegal.com
jmccoy@mountainstateslegal.com

Attorneys for Plaintiff Northwest Mining
Association

1

## **CERTIFICATE OF SERVICE**

2          I hereby certify that on this  22nd day of February 2013, I filed the foregoing

3  document using the Court's CM/ECF system, which caused all counsel of record to be

4  served electronically.

5

6                                   /s/ Steven J. Lechner
                                    Steven J. Lechner, Esq. (CO No. 19853)
7                                   MOUNTAIN STATES LEGAL FOUNDATION
                                    2596 South Lewis Way
8                                   Lakewood, Colorado 80227
                                    Phone:  303-292-2021
9                                   Fax:  303-292-1980
                                    lechner@mountainstateslegal.com
10

11                                  Attorney for Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28