1   Melanie R. Kay (*pro hac vice*)
    Edward B. Zukoski (*pro hac vice*)
2   Earthjustice
    1400 Glenarm Place, Suite 300
3   Denver, CO  80202
    mkay@earthjustice.org
4   tzukoski@earthjustice.org
    Telephone: (303) 623-9466
5   Fax: (303) 623-8083

6   Roger Flynn *(pro hac vice)*
    Western Mining Action Project
7   P.O. Box 349, 440 Main St., #2
    Lyons, CO  80540
8   wmap@igc.org
    Telephone: (303) 823-5738
9   Fax: (303) 823-5732

10  Attorneys for Defendant-Intervenors
        Grand Canyon Trust, <u>et al.</u>,
11
                **UNITED STATES DISTRICT COURT**
12               **FOR THE DISTRICT OF ARIZONA**

13  Gregory Yount,                                  )
            Plaintiff,                              )
14                                                  )  Case No. 3:11-cv-08171-PCT-DGC
    v.                                              )  (Lead case)
15                                                  )
    Ken Salazar, Secretary of the Interior, <u>et al.</u>;  )
16          Defendants                              )
                                                    )
17  _____        )
                                                    )
18  National Mining Association, <u>et al.</u>;           )
            Plaintiffs,                             )  Case No. 3:11-cv-08038-PCT-DGC
19                                                  )
    v.                                              )
20                                                  )
    Ken Salazar, Secretary of the Interior, <u>et al.</u>;  )
21          Defendants                              )
                                                    )
22  _____        )
                                                    )
    Northwest Mining Association,                   )
23          Plaintiff,                              )  Case No. 3:12-cv-08042-PCT-DGC
                                                    )
24  v.                                              )
                                                    )
25  Ken Salazar, Secretary of the Interior, <u>et al.</u>;  )
            Defendants,                             )
26  _____        )

27

28

1

2
Quaterra Alaska Incorporated, et al.,
     Plaintiffs,
                        Case No. 3:12-cv-08075-PCT-DGC

3
v.

4
Ken Salazar, Secretary of the Interior, et al.;
     Defendants

5

6
**DEFENDANT-INTERVENORS GRAND CANYON TRUST ET AL.'S**
**REPLY IN SUPPORT OF ITS CROSS-MOTION**

7
**FOR PARTIAL SUMMARY JUDGMENT**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.   JUDICIAL RESTRAINT REQUIRES THAT THE EXECUTIVE'S
     AUTHORITY TO MAKE LARGE-TRACT WITHDRAWALS REMAINS
     EVEN IF THE LEGISLATIVE VETO IS UNCONSTITUTIONAL ...................1

     A.   Plaintiffs Must Show "Strong Evidence" That The Legislative Veto
          Is Not Severable ...................................................................................1

     B.   FLPMA's Structure And Text Do Not Provide "Strong Evidence"
          That Congress Would Have Prohibited All Executive Large-Tract
          Withdrawals Absent A Legislative Veto ....................................................2

     C.   FLPMA's Legislative History Does Not Show 'Strong Evidence'
          Contradicting Severability ...........................................................................7

     D.   Severing Only The Veto Would Leave FLPMA Fully Operative As
          A Law, And The Remaining Law Comports With Congressional
          Intent ...............................................................................................11

II.  IF THE COURT FINDS THE VETO INSEVERABLE, IT SHOULD
     ORDER FURTHER BRIEFING ON REMEDY .................................................13

CONCLUSION .............................................................................................13

1    Assuming that the legislative veto in Subsection 204(c)(1) of the Federal Land

2   Policy and Management Act ("FLPMA") is unconstitutional, it is severable.  In

3   determining what portion of a law to invalidate, this Court must exercise judicial restraint

4   and sever only the veto, unless the National Mining Association ("NMA") and Northwest

5   Mining Association ("Northwest") can identify "strong evidence" that Congress would

6   not have provided the Executive with authority to make large-tract withdrawals absent

7   the legislative veto.

8    NMA and Northwest fail to meet their heavy burden of providing "strong

9   evidence" to overcome the presumption of severability.  Contrary to their allegations,

10  FLPMA retains procedural safeguards on the Executive's authority absent the veto, in

11  line with Congress's intent.  Legislative history does not reveal that Congress would have

12  prevented large-tract Executive withdrawals absent the veto; the Senate, and some

13  FLPMA supporters in the House, did not favor limiting Executive withdrawal authority at

14  all.  NMA's and Northwest's partial summary judgment motions must be denied.

**I.    JUDICIAL RESTRAINT REQUIRES THAT THE EXECUTIVE'S AUTHORITY TO MAKE LARGE-TRACT WITHDRAWALS REMAINS EVEN IF THE LEGISLATIVE VETO IS UNCONSTITUTIONAL**

   **A.    Plaintiffs Must Show "Strong Evidence" That The Legislative Veto Is Not Severable.**

   When faced with an unconstitutional provision, courts "start with the settled

premise that severability is fundamentally rooted in a respect for separation of powers

and notions of judicial restraint."  Florida v. U.S. Dep't of Health & Human Servs., 648

F.3d 1235, 1320-21 (11th Cir. 2011) (citing Ayotte v. Planned Parenthood of N. New

Eng., 546 U.S. 320, 329-30 (2006)), aff'd in part and rev'd in part, Nat'l Fed'n of Indep.

Bus. v. Sebelius, 132 S. Ct. 2566 (2012) ("NFIB").  Courts must "try not to nullify more

of a legislature's work than is necessary, for we know that '[a] ruling of

unconstitutionality frustrates the intent of the elected representatives of the people.'"

Ayotte, 546 U.S. at 329 (quoting Regan v. Time, Inc., 468 U.S. 641, 652 (1984) (plurality

1   opinion)).  A court thus "undertakes a salvage operation; it does not demolish the

2   legislation .…"  NFIB, 132 S. Ct. at 2630 (Ginsburg, J., concurring as to remedy).

3            To effectuate these conservative principles, courts presume invalid language is

4   severable and impose a "heavy burden" on movants seeking to sever more than the

5   unconstitutional language.  Florida, 648 F.3d at 1323.  To overcome the presumption, a

6   movant must show it is "evident (as opposed to possible or reasonable)" that Congress

7   would not have enacted the provisions absent the invalid language.  Florida, 648 F.3d at

8   1327.  The burden elevates where, as here, the act in question contains a severability

9   clause.  FLPMA, Pub. L. No. 94-579, § 707 (1976).  A unanimous Supreme Court has

10  stated that "unless there is strong evidence that Congress intended otherwise, the

11  objectionable provision can be excised from the remainder of the statute."  Alaska

12  Airlines, Inc. v. Brock, 480 U.S. 678, 686 (1987) (emphasis added).[1]  Courts divine

13  Congress's intent by examining the law's text, structure, and legislative history.  Id. at

14  687.

15       **B.    FLPMA's Structure And Text Do Not Provide "Strong Evidence" That
              Congress Would Have Prohibited All Executive Large-Tract**

16       **Withdrawals Absent A Legislative Veto.**

17           With FLPMA, Congress addressed the prior, haphazard nature of Executive public

18  land withdrawals unconstrained by a statutory grant of authority.  Trust Memo. 8-9 (Doc.

19  102).  Congress adopted most Public Land Law Review Commission ("PLLRC")

20  recommendations for reforming the practice of Executive withdrawals that sprang from

21  the Midwest Oil decision, and created a two-tier system.  See United States v. Midwest

22  Oil, 236 U.S. 459 (1915).  First, Congress confirmed that it reserved for itself the power

23  to make permanent withdrawals to create national parks, forests, wilderness and certain

24  defense lands.  43 U.S.C. § 1701(a)(4); H.R. Rep. No. 94-1163, at 9 (1976), reprinted in

25  1976 U.S.C.C.A.N. 6175, 6183.  Second, Congress "delineate[d] the extent to which the

26  _____
    [1]  Northwest (but not NMA) suggests that Plaintiffs need not show "strong evidence" to
27  overcome the presumption of severability.  Nw. Reply 13.  However, the Ninth Circuit
    follows Alaska Airlines.  See United States v. Spokane Tribe of Indians, 139 F.3d 1297,
28  1299-1300 (9th Cir. 1998).

                                                  2

1   Executive may withdraw lands without legislative action."  43 U.S.C. § 1701(a)(4)

2   (emphasis added).

3       Congress squarely delegated to the Executive statutory authority to make large-

4   tract withdrawals, with numerous procedural safeguards, including:  (1) only Department

5   of the Interior (DOI) officials confirmed by the Senate may exercise withdrawal

6   authority, facilitating continued oversight by both Congress and DOI, 43 U.S.C.

7   § 1714(a); (2) withdrawals must be initiated by an application and public notice, id.

8   § 1714(b)(1); (3) for large-tract and emergency withdrawals, DOI must prepare a detailed

9   report that provides, among other things, for public hearings, weighing of alternative

10  sites, a geologic report, consultation with local governments, and an evaluation of

11  environmental and economic impacts, id. §§ 1714(c)(2) & (h); (4) DOI may make large-

12  tract withdrawals (5,000 acres or larger) only for 20 years, id. § 1714(c)(1); and

13  (5) DOI may extend such withdrawals only if the Secretary determines the purpose for

14  which the withdrawal was first made "requires" the extension.  Id. § 1714(f); see also

15  Trust Memo. 8-9.  Accordingly, through these limitations and procedures, Congress was

16  able to implement the PLLRC's recommendations to "insure proper justification for

17  proposed withdrawals, provide for public participation in their consideration, and

18  establish criteria for executive action."  Pub. Land Law Review Comm'n, One Third of

19  the Nation's Land 9 (1970) ("PLLRC Report"), excerpts attached at Ex. 1.

20      Plaintiffs argue that Congress's delegation of large-tract withdrawal authority is

21  invalid because, absent the veto, the statute that remains fails to achieve FLPMA's goals.

22  NMA asserts that without the veto, FLPMA's withdrawal authority "effectively

23  duplicat[es]" the pre-FLPMA regime in which no regulatory framework limited the

24  Executive's implied authority.  NMA Reply 3.  NMA is mistaken.  Absent the veto,

25  FLPMA still limits who can make withdrawals and for how long, defines under what

26  circumstances withdrawals can be renewed, guarantees that DOI research and prepare

27  detailed reports justifying large-tract withdrawals and that Congress receive this

28

3

1   information to evaluate large-tract withdrawals, and provides for public hearings.  See

2   supra 3.  FLPMA thus aids both branches in more rational withdrawal decisionmaking.[2]

3          Plaintiffs' argument that FLPMA's notice and detailed report requirement are

4   "meaningless" absent a veto is contrary to Chadha and Alaska Airlines.  Nw. Reply 10

5   (Doc. 113).  See also NMA Reply 5.  In severing the vetoes in those cases, the Supreme

6   Court concluded that retaining reports to Congress while severing legislative vetoes

7   preserves Congressional oversight and Congress's ability to influence or repeal the

8   Executive action.  I.N.S. v. Chadha, 462 U.S. 919, 934-35 (1983) ("Congress' oversight

9   of the exercise of this delegated authority is preserved" absent the veto through report to

10  Congress); Alaska Airlines, 480 U.S. at 678.[3]  Moreover, preparing the report ensures

11  that DOI will carefully evaluate a proposed withdrawal and to solicit public input.  This is

12  exactly how the PLLRC envisioned the reporting requirement would improve Executive

13  decisionmaking.  See PLLRC report at 55-56 ("evaluation of the merits of a proposed

14  withdrawal … are essential steps … to be consistent with sound land use planning").

15         Although the veto may be considered a check on Executive large-tract

16  withdrawals, it is but one of many.  The Supreme Court has repeatedly severed an

17

18  [2]  NMA avers that FLPMA's 20-year limit on withdrawals is effectively the same as an indefinite withdrawal, because, they allege, such withdrawals can be "indefinitely renew[ed]."  NMA Reply 4.  But 20 years is not forever.  NMA also ignores the fact that

19  the process for extending withdrawals requires Secretarial review to ensure the purposes of the extension are the same.  See New Mexico v. Watkins, 969 F.2d 1122, 1135-37

20  (D.C. Cir. 1992); Trust Memo. 11.  This is a far more restrictive process than the pre-FLPMA regime, during which Executive withdrawals could continue indefinitely, with

21  no process for reviewing whether a withdrawal was still necessary.

    [3]  Other courts agree.  See Alabama Power Co. v. U.S. Dep't of Energy, 307 F.3d 1300,
22  1308 (11th Cir. 2002) (severing veto from reporting requirement because "[t]hrough the reporting requirement, Congress will still have the ability to keep tabs on the Secretary's

23  use of … discretion."); Gulf Oil Corp. v. Dyke, 734 F.2d 797, 804 (Temp. Emer. Ct. App.
    1984) (severing veto but not reporting provision, and following Chadha in concluding

24  that without veto, Congressional oversight purposes were served through law's requirement that Executive report to Congress).  Plaintiffs' reliance on the refusal of the

25  court in City of New Haven to sever the report from the veto because that Congress was not interested in obtaining information from the executive is misplaced.  NMA Reply 5.

26  There, the report found would not have aided Congress because existing law already required the President to submit information about the executive action subject to a veto.

27  See City of New Haven, Conn. v. United States, 634 F. Supp. 1449, 1457 n.11 (D.D.C.
    1986).

28

1  unconstitutional provision when it is one of several provisions aimed at achieving the

2  statute's goal.  See, e.g., United States v. Booker, 543 U.S. 220, 264 (2005) (eliminating

3  mandatory nature of sentencing guidelines but retaining other features that help to further

4  Congress's objectives is consistent with legislative intent).[4]  Because FLPMA, absent the

5  veto, would still achieve the Act's purpose of "delineating the extent to which the

6  Executive may withdraw lands without legislative action," 43 U.S.C. § 1701(a)(4), by

7  placing real limits on who, when, and how large-tract withdrawals can be made, severing

8  only the veto comports with legislative intent.

9       Downplaying the significance of time limits, reports, hearings, and notices in

10  delineating federal withdrawal authority, Plaintiffs exalt the legislative veto as the only

11  effective check on Executive withdrawals.  See NMA Reply 5.  This argument ignores

12  how weak the veto is.  Congress purposefully delegated to the Executive authority to

13  make large-tract withdrawals "without legislative action."  The Executive need not wait

14  until a veto period runs; any withdrawal goes into effect immediately, making this veto

15  weaker than the many pre-Chadha vetoes containing "report and wait" provisions.  Id.

16  § 1714(c)(1).  Further, no veto could occur unless both houses disapproved the

17  withdrawal, making it more difficult to implement than a one-house veto.  Id.[5]

18       Plaintiffs contend FLPMA's structure demonstrates that the act will not function

19  logically absent the veto, and so all of Subsection 204(c)(1) must be severed.  Plaintiffs

20  ─────────────────
21  [4]  See also New York v. United States, 505 U.S. 144, 186 (1992) (invalidating one of a
series of provisions designed to achieve Congress's clear purpose should not frustrate the
overall purpose); NFIB, 132 S.Ct. at 2608 (severing provision authorizing a means for
22  satisfying another of the act's key provisions where remaining reforms would function
consistently with Congress's basic objectives).

23  [5]  The veto provision itself is sloppily drafted, something one would not expect if, as
24  Plaintiffs allege, Congress regarded the veto as the most important check on Executive
withdrawal authority.  The veto provision refers to a "concurrent resolution" that states
25  that "such House does not approve the withdrawal."  43 U.S.C. § 1714(c)(1).  Concurrent
resolutions generally address the sentiments of both chambers, not a single house.  The
26  veto provision also refers to a "Presidential recommendation," a reference to a procedure
not present in Subsection 204(c), but present elsewhere in FLPMA.  Id.; see 43 U.S.C.
27  § 1714(l)(2).  See also David H. Getches, Managing the Public Lands: The Authority of
the Executive to Withdraw Lands, 22 Nat. Resources J. 279, 318 n.225 (1982) (veto is
28  "fraught with interpretive problems").

5

1   again mischaracterize the law.  Contrary to NMA's assertion, loss of the veto does not

2   erase all distinctions between Subsection 204(c)'s large-tract withdrawal and Subsection

3   204(e)'s emergency withdrawal authority.  NMA Reply 7.  All other distinctions remain.

4   The emergency withdrawal provisions allow DOI to move more quickly because in an

5   emergency, DOI need not publish notice of the withdrawal in the Federal Register before-

6   hand, 43 U.S.C. § 1714(b)(2), need not hold public hearings, id. § 1714(h), need not

7   obtain the consent of agency or department heads (outside of DOI) with jurisdiction over

8   the withdrawn lands, id. § 1714(i), and need not provide reports to Congress when it

9   provides notice.  Id. § 1714(c)(2), (e).

10         Important distinctions remain between large- and small-tract withdrawals absent

11   the veto.  NMA Reply 6.  Small-tract withdrawals for "a resource use" may be indefinite

12   in duration; not so large-tract withdrawals.  43 U.S.C. § 1714(c)(1) & (d)(1).  DOI need

13   not prepare the detailed report and notify Congress when making smaller withdrawals.

14   Id. § 1714(c)(2).

15         Finally, based on a crabbed interpretation of FLPMA Subsection 204(a), Plaintiffs

16   assert that if any one of Section 204's limitations , such as the veto, is removed, all

17   Executive authority for withdrawals is eliminated.  See NMA Reply 2, 4; Nw. Reply 6

18   n.3.  This interpretation renders meaningless FLPMA's severability provision.  A more

19   reasonable construction of Subsection 204(a) provides meaning to both 204(a) and the

20   severability clause.  Subsection 204(a) confirms Congress's intent to eliminate any non-

21   statutory, implied withdrawal authority, leaving behind only two types of withdrawals:

22   Congressional withdrawals enacted legislatively and Executive withdrawals made

23   pursuant to explicit legislative authorization.[6]  As Charles Wheatley, who prepared the

24   extensive report on withdrawals that informed the PLLRC Report, verified:

25   _____

26   [6]  FLPMA implements Congress's objective of "delineat[ing] the extent to which the
     Executive may withdraw lands without legislative action," 43 U.S.C. § 1701(a)(4), by
     jointly repealing the non-statutory, implied grant of power establishing statutory
27   guidelines that define the executive's statutory withdrawal authority.  Pub. L. No. 94-579,
     § 704(a) (1976) (repeal); 43 U.S.C. § 1714(a) (grant).  The House Report confirms that
28   the two sections work in tandem.  See H.R. Rep. 94-1163, at 9 (1976) (explaining Section

6

1
2
3

> The delineation by the Act of the specific terms and conditions upon which the Secretary of the Interior can exercise withdrawal power and the persons to whom it may be delegated, make clear that Congress intended to occupy the entire field permitted under its constitutional authority over the public lands and to control and direct the executive use of withdrawal power.

4    Charles F. Wheatley, Jr., Withdrawals Under the Federal Land Policy and Management

5    Act of 1976, 21 Ariz. L. Rev. 311, 319 (1979).

6         NMA asserts that Section 204(a) is a specific provision that overrides the more

7    general severability clause.  See NMA Reply at 14.  The rule of statutory construction

8    NMA offers does not apply here, however, because this rule applies only when the

9    specific and general statutory provisions conflict.  Nat'l Cable & Telecomm. Ass'n v.

10   Gulf Power Co., 534 U.S. 327, 335-36 (2002).  There is no evidence of a conflict here.

11   Section 204(a) simply provides that all withdrawals are to be based on FLPMA, and not

12   some implied authority.  Subsection 204(a)'s "only in accordance with" clause does not

13   signal congressional intent to override the severability clause.[7]  Accord Morton v.

14   Mancari, 417 U.S. 535, 551 (1974) ("when two statutes are capable of coexistence, it is

15   the duty of the courts, absent a clearly expressed congressional intention to the contrary,

16   to regard each as effective").

17        **C.     FLPMA's Legislative History Does Not Show 'Strong Evidence' Contradicting Severability.**

18        Legislative history also fails to provide "strong evidence" to overcome the

19
20   presumption that the Court should sever only Subsection 204(c)(1)'s veto provision.

21   Plaintiffs' cites to a few snippets of legislative history does not make it "evident," let

22

23   _____

24   204's two types of withdrawal authorities by reference to Section 704's repeal); id. at 29 (discussing the Section 204's grant of authority to the Secretary in light of Section 704's repeal).  See also 122 Cong. Rec. H7597 (July 22, 1976) reprinted in FLPMA Leg. Hist. at 683 (statement of Rep. Melcher) ("clear that section 204 is a grant to the Secretary of authority" to make withdrawals).

25

26   [7] The concurrence in Miller v. Albright emphasized that statute's narrowly tailored language of "and not otherwise" as a sign of clear congressional intent to override another provision, 523 U.S. 420, 457 (1998), which is a clearer and more manifest statement of limitation than FLPMA's "only."

27

28

1    alone strongly evident, that Congress would have declined to provide the Executive with

2    large-tract withdrawal authority absent the veto.

3         The Supreme Court has "repeatedly stated that the authoritative source for finding

4    the Legislature's intent" outside of the text of the bill itself "lies in the Committee

5    Reports on the bill."  Garcia v. United States, 469 U.S. 70, 76 (1984).  Such reports are

6    "more authoritative than comments from the floor."  Id.  "Stray comments by individual

7    legislators, not otherwise supported by statutory language or committee reports, cannot

8    be attributed to the full body …."  In re Kelly 841 F.2d 908, 912 n.3 (9th Cir. 1988).

9         For good reason, Plaintiffs largely ignore the Senate, House, and Conference

10   Committee reports; those reports contain little evidence to support Plaintiffs' position.

11   The Conference Report says almost nothing about withdrawals and nothing at all about

12   vetoing withdrawals.  H.R. Rep. No. 94-1724 at 58, 66 (Conf. Rep.), reprinted in 1976

13   U.S.C.C.A.N. 6227, 6230, 6237.  The House report confirms that while the House was

14   concerned with "oversight," it intended to delegate to the Secretary "subject to certain

15   procedural controls, authority to create, modify, and terminate all withdrawals … existing

16   and proposed other than those reserved by the bill to the Congress."  H.R. Rep. No. 94-

17   1163, at 3-4, 9 (1976), reprinted in 1976 U.S.C.C.A.N. 6175, 6178 (emphasis added).

18   See also Trust Memo. 16.[8]  The House report states that the House bill terminated the

19   Secretary's implied grant of authority to make indefinite withdrawals, but replaced it with

20   "a general grant of authority to the Secretary … to make and modify withdrawals subject

21   to certain procedural requirements."  H.R. Rep. No. 94-1163, at 29.  The House report

22   nowhere indicates that, absent the veto, the House would have revoked its "general grant"

23   to the Secretary.

24        Meanwhile, the Senate did not adopt any provisions limiting the Executive's

25   withdrawal authority in S. 507, its precursor to FLPMA.  See Trust Memo. 15-16.  The

26   _____

27   [8]  Northwest cites a statement in the House Report that the veto would provide Congress
     the "opportunity to terminate all" large-tract withdrawals.  Nw. Reply 14.  The language
     Northwest quotes merely explains the bill's provisions, something courts have found "not

28   helpful" in determining legislative intent.  See Trust Memo. 16-17.

8

1    report accompanying S. 507 is similarly silent.  <u>See</u> S. Rep. No. 94-583 (1975), <u>reprinted</u>

2    <u>in</u> FLPMA Leg. Hist. at 66-183.  The Senate's silence shows that chamber had little

3    interest in regulating Executive withdrawals.

4         Documents prepared for the Conference Committee confirm that the veto was not

5    consistent with the Senate's approach.  In the Conference Committee's print, staff

6    identified and attempted to reconcile differences between the House and Senate bills.  <u>See</u>

7    Staff of Committee on Conference of S.507, 94th Cong., Federal Land Policy and

8    Management Act & Natural Resource Lands Management Act (Comm. Print 1976),

9    <u>reprinted in</u> FLPMA Legis. Hist., at 747-48 (Ex. 2).  The legislative veto language, and

10   virtually only that language, was identified as consistent with neither "the provisions" of

11   both bills nor "the <u>objectives</u> of the two Houses," but instead was "included in only one

12   version of the bill" and "staff identified no basis for a definitive recommendation."  <u>Id.</u>

13   748, 768.  This underscores that it would be "consistent" with the Senate's bill, and the

14   Senate's objectives, to have no veto at all.

15        Further, the House report shows that some FLPMA supporters opposed limits on

16   Executive withdrawal authority.  Rep. Udall, a senior member of the House Interior and

17   Insular Affairs Committee and the conference committee, filed "separate views" on the

18   House bill, stating:

19        <u>I disagree with those sections of the bill which set new procedures for
     Congressional review of Executive withdrawals of public lands</u>.  While I
20        have always been in strong favor of additional oversight of the Department of
     the Interior by the Congress and this Committee, the simple fact is that the
21        mechanism of "withdrawal" of public lands from mineral entry is currently
     the only defense we have against mining activity on the public domain.
22
     H.R. Rep. 94-1163, at 220, <u>reprinted in</u> FLPMA Leg. Hist. at 650 (Ex. 3).  Rep.
23
     Seiberling, also a member of the same House Committee and a conferee, filed "dissenting
24
     views" to the House report in which he supported Congressional oversight, but bemoaned
25
     as burdensome the requirement that the House committee "examine every proposed new
26
     withdrawal over 5,000 acres."  <u>Id.</u> at 231, <u>reprinted in</u> FLPMA Leg. Hist. at 658 (Ex. 3).
27
     Like Mr. Udall, Mr. Seiberling voted for the House bill.  122 Cong. Rec. H7630 (July 22,
28

                                            9

1   1976), reprinted in FLPMA Leg. Hist. at 716 (Ex. 4).  The fact that some of FLPMA's

2   senior supporters preferred fewer, not more, Congressional limits on withdrawals

3   undermines any claim of "strong evidence" that Congress would have vested with

4   Congress exclusive authority for large-tract withdrawals absent the veto.

5          Finding little or no evidentiary support in Senate, Conference or the House reports,

6   NMA and Northwest point to a handful of floor statements from House members (but no

7   Senators).  NMA Reply 10-11; Nw. Reply 15.  While some of these statements address

8   the importance of Congressional oversight, none state unequivocally that Congress,

9   absent a veto, would have eliminated the Executive's large-tract withdrawal authority.

10  NMA further argues that the "real debate over large tract withdrawals authority was

11  never about the veto itself" because House members assumed there would be a veto.

12  NMA Reply at 11.  But the Senate assumed that Congress would impose no limits on

13  Executive withdrawals, and all sides to the House debate also assumed that the Executive

14  should make large-tract withdrawals.[9]

15         Plaintiffs' proffered legislative history does not meet the "heavy burden" of

16  showing "strong evidence" that, absent the veto, Congress would have preferred to

17  completely eliminate Executive authority to make withdrawals.  Contrary to NMA's

18  assertion, NMA Reply 12, this is not a case like City of New Haven v. Pierce, 809 F.2d

19  900, 908 (D.C. Cir 1987), where the court could find "[n]owhere in the legislative history

20  … the slightest suggestion that the President be given statutory authority to defer funds

21  without the possible check of … a … veto."  Here, Congress was a house divided on

22  whether Congress should limit the Executive's withdrawal authority: the Senate saw no

23

24  [9]  NMA argues that when Congress was confronted with the potential unconstitutionality
    of a one-house veto for withdrawals, "it did not simply dispense with the veto," but
25  instead adopted a two-House veto.  NMA Reply 11, n.14.  This argument does not help
    Plaintiffs.  It shows that in the face of the potential unconstitutionality of the House's
26  chosen veto mechanism, Congress did not take the safest course to ensure Congressional
    control – prohibiting the Executive from making large-tract withdrawals.  Instead
27  Congress adopted a post-hoc veto that would be even harder for Congress to exercise
    while maintaining the delegation of large-tract withdrawal authority to the Executive.  In
28  short, Congress preferred weaker oversight to certain Congressional control.

10

1   need for controls, and conference committee staff did not conclude that the veto was

2   "consistent with the objectives of the two Houses."

3          This case is closer to Gulf Oil Corp. v. Dyke, in which the appellate court severed

4   the veto provision.  734 F.2d 797, 802-05 (Temp. Emer. Ct. App. 1984).  There, the court

5   found that neither the "presence of heated debate" nor descriptions of the vetoes in

6   legislative history made it "evident that Congress would have declined to enact [the laws]

7   without the … veto provisions."  Id. at 804.  Gulf Oil follows Chadha in concluding that

8   without the veto, Congressional oversight purposes were served through the laws'

9   requirement that the Executive report to Congress.  Id. at 804, citing Chadha.

10          **D.      Severing Only The Veto Would Leave FLPMA Fully Operative As A
                      Law, And The Remaining Law Comports With Congressional Intent.**

11          "A provision is further presumed severable if what remains after severance is fully

12   operative as a law."  Chadha, 462 U.S. at 934 (quotations omitted).  See also Alaska

13   Airlines, 480 U.S. at 684 (severing veto).  FLPMA is fully operational when the

14   legislative veto language is severed because the statute operates in the same manner as if

15   the veto was not exercised.  See id., 480 U.S. at 684-85; Trust Memo. 19-20.  As shown

16   above, FLPMA absent the veto also "will still function in a way consistent with

17   Congress' basic objectives in enacting the statute."  NFIB, 132 S. Ct. at 2608.  As

18   described above, FLPMA's withdrawal provisions absent the veto, like the laws at issue

19   in Chadha and Alaska Airlines, are consistent with FLPMA's purpose of delegating, with

20   procedural safeguards, authority to the Executive for time-limited withdrawals.

21          Plaintiffs imply that FLPMA will not function in the "manner" of the law

22   Congress adopted if the legislative veto is removed.  NMA Reply 7; Nw. Reply 2.  But

23   any invalidation of any part of a law will necessarily change that law's operation.  The

24   question is not whether FLPMA will perform exactly the same after severance, but

25   whether Congress would have preferred to eliminate entirely the Executive ability to

26   make any temporary large-tract withdrawals absent the veto.  "The final test, for

27   legislative vetoes as well as for other provisions, is the traditional one: the

28

11

1  unconstitutional provision must be severed unless the statute created in its absence is

2  legislation that Congress would not have enacted." Alaska Airlines, 480 U.S. at 685.

3        NMA argues that the veto is "interwoven" with and cannot be severed from the

4  large-tract withdrawal authority Congress granted the Executive because the veto

5  language is "in the very same subparagraph as the withdrawal authority."  NMA Reply 6.

6  The Supreme Court explained a century ago that proximity does <u>not</u> determine whether

7  valid and invalid parts of a law are too interwoven to sever.  "The point is not whether the

8  [valid and invalid] parts are contained in the same section, for the distribution into

9  sections is purely artificial; but whether they are essentially and inseparably connected in

10  substance, – whether the provisions are so interdependent that one cannot operate without

11  the other."  <u>Loeb v. Columbia Twp.</u>, 179 U. S. 472, 490 (1900) (citation & quotations

12  omitted).[10]  Here, language granting the Executive authority to make large-tract

13  withdrawals and to provide reports to Congress can operate without the veto.

14        Nor is the word "provision" as used in FLPMA's severability clause synonymous

15  with "subsection" or "paragraph."  NMA Reply 14; Nw. Reply 12 n.9.  Courts have

16  concluded individual words and parts of sentences are severable "provisions."  <u>See</u> Trust

17  Memo. 21-22; Robert L. Stern, <u>Separability and Separability Clauses in the Supreme</u>

18  <u>Court</u>, 51 Harv. L. Rev. 76, 106 (1937) (in severability analysis, "[t]he offending

19  provision – whether section, sentence, phrase or individual word – can be excised.").[11]

20

21

---

22  [10]  The Supreme Court has often severed words from the middle of sentences.  <u>See</u> <u>Berea</u>
   <u>College v. Kentucky</u>, 211 U.S. 45 (1908) (finding that while application of one word in a

23  sentence of law might be unconstitutional, rest of the sentence could survive); <u>El Paso &</u>
   <u>N.E. Ry. v. Gutierrez</u>, 215 U.S. 87 (1909) (severing 45 words in middle of sentence).

24  [11]  Northwest argues that the remedy Defendants seek here, "severing mid-sentence[,] is
   closer to legislating."  Nw. Reply 9.  Courts disagree.  In <u>Alabama Power</u>, 307 F.3d at

25  1307-09, the Eleventh Circuit severed the legislative veto provision which, as here, began
   mid-sentence and was in the same paragraph as the delegation of authority subject to the

26  veto.  <u>American Fed'n of Gov't Employees v. Pierce</u>, 697 F.2d 303, 306-07 (D.C. Cir.
   1982), is not to the contrary.  <u>See</u> Nw. Reply 9.  There, the court concluded that the valid

27  half of the sentence could not be severed because a thorough review of Congressional

28  intent showed the provisions in each half of the sentence were inseparable.

**II.     IF THE COURT FINDS THE VETO INSEVERABLE, IT SHOULD ORDER FURTHER BRIEFING ON REMEDY.**

The Court had broad latitude is fashioning relief.  If the Court grants Plaintiffs' motions, it need not vacate the challenged withdrawal.  5 U.S.C. § 702(1) ("Nothing herein ... affects ... the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground."); <u>Sugar Cane Growers Coop. of Fla.  v. Veneman</u>, 289 F.3d 89, 98 (D.C. Cir. 2002) (it is "simply not the law" that vacatur is automatic).  "Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed."  <u>Cal. Communities Against Toxics v. EPA</u>, 688 F.3d 989, 992 (9th Cir. 2012) (citations omitted).

Plaintiffs' and Defendants' briefing has not addressed remedy, nor the harm to the United States and Intervenors, nor whether vacatur is in the public interest.  <u>Winter v. Natural Resources Defense Council</u>, 555 U.S. 7, 20 (2008).  Accordingly, should the Court decide not to sever the legislative veto provision, the Court should order the parties to brief the relevant equitable factors and appropriate relief, if any.  Intervenors submit that vacating the withdrawal and not severing the legislative veto will have wide-ranging consequences, including on lands surrounding the Grand Canyon.  As this Court recently ruled, leaving a challenged action in place and deciding on an appropriate remedy is within the Court's discretion.  <u>Wood v. Betlach</u>, 2013 WL 474369, *13 (D. Ariz. Feb. 7, 2013) (citing <u>Idaho Farm Bureau Found. v. Babbitt</u>, 58 F.3d 1392, 1395 (9th Cir. 1995)).

## CONCLUSION

NMA and Northwest fail to meet their "heavy burden" of showing "strong evidence" that the legislative veto contained in FLPMA's large-tract withdrawal provision cannot be severed.  This Court must deny NMA's and Northwest's motions for partial summary judgment, and grant the Trust's and the United States's cross motions.

1    Respectfully submitted February 22, 2013.

2

3     /s/ Edward B. Zukoski
     Melanie R. Kay (*pro hac vice*)
     Edward B. Zukoski (*pro hac vice*)
4     Earthjustice
     1400 Glenarm Place, Suite 300
5     Denver, CO  80202
     mkay@earthjustice.org
6     tzukoski@earthjustice.org
     Telephone: (303) 623-9466
7     Fax: (303) 623-8083

8     Roger Flynn *(pro hac vice)*
     Western Mining Action Project
9     P.O. Box 349, 440 Main St., #2
     Lyons, CO  80540
10    wmap@igc.org
     Telephone: (303) 823-5738
11    Fax: (303) 823-5732

12    Attorneys for Grand Canyon Trust, the Havasupai Tribe,
     Center for Biological Diversity, Sierra Club, and
13    National Parks Conservation Association

14

15

16                              **CERTIFICATE OF SERVICE**

17    I hereby certify that I have caused the foregoing DEFENDANT-INTERVENORS GRAND

18    CANYON TRUST ET AL.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR

19    PARTIAL SUMMARY JUDGMENT with supporting exhibits to be served upon counsel

20    of record through the Court's electronic service system (ECF/CM) and by first class mail to

21    Gregory Yount at:  807 West Butterfield Road, Chino Valley, Arizona 86323.

22

23    Respectfully submitted February 22, 2013.

24     /s/ Edward B. Zukoski

25

26

27

28

                                          14