R. Timothy McCrum (*pro hac vice*; DC Bar No. 389061)
J. Michael Klise (*pro hac vice*; DC Bar No. 412420)
Thomas R. Lundquist (*pro hac vice*; DC Bar No. 968123)
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone:  202-624-2500
Facsimile:  202-628-5116

Attorneys for Plaintiff National Mining Association

Susan M. Mathiascheck (*pro hac vice*; DC Bar No. 426764)
John C. Martin (*pro hac vice*; DC Bar No. 358679)
Amy B. Chasanov (*pro hac vice*; DC Bar No. 468779)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
Phone:  202-624-2500
Facsimile:  202-628-5116

Attorneys for Plaintiff Nuclear Energy Institute

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Gregory Yount,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>Ken Salazar, et al.,<br><br>　　　　Defendants. | CV11-8171 PHX DGC<br>(Lead Case) |
| This document relates to:<br><br>National Mining Association; and<br>Nuclear Energy Institute,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>Ken Salazar, et al.,<br><br>　　　　Defendants. | CV12-8038 PCT DGC<br><br>REPLY MEMORANDUM OF<br>PLAINTIFFS NATIONAL<br>MINING ASSOCIATION AND<br>NUCLEAR ENERGY<br>INSTITUTE AND<br>OPPOSITION TO FEDERAL<br>DEFENDANTS' AND<br>DEFENDANT-INTERVENORS'<br>CROSS-MOTIONS FOR<br>PARTIAL SUMMARY<br>JUDGMENT |

**PLAINTIFFS' REPLY MEMORANDUM**

# TABLE OF CONTENTS

ARGUMENT ..................................................................................................... 1

I.     Standards Governing Severability Analysis Support Severing § 204(c)(1).............. 1

II.    FLPMA's Text, Structure, and History Further Compel Severing
§ 204(c)(1). ................................................................................................. 2

     A.    FLPMA's Plain Language Requires Severing <u>Both</u> the § 204(c)(1)
Veto and the Discretionary Authority it Was Meant to Constrain............... 2

     B.    The Structure of FLPMA Further Demonstrates That the Legislative
Veto Is Not Severable from § 204(c)(1). ...................................... 6

     C.    History Surrounding FLPMA's Passage Strongly Evidences
Congress's Intent That the Large-Tract Withdrawal Authority
Should Not Survive the Veto's Severance. .................................... 8

          1.    Pre-FLPMA Background Context Supports Plaintiffs'
Approach to Severability.................................................... 8

          2.    The PLLRC's Recommendations Further Reflect Need for
Meaningful Congressional Oversight of Withdrawals. ................... 8

          3.    Legislative History Confirms That Congress Would Not Have
Intended § 204(c)(1) to Survive the Veto's
Unconstitutionality. ....................................................... 10

III.   FLPMA's Severability Clause Supports Severing the Entire "Provision" in
which the Large-Tract Withdrawal Veto is Found – § 204(c)(1). ...................... 13

IV.   FLPMA Is Not Fully Operative without the Legislative Veto in § 204(c)(1). ...... 14

CONCLUSION .................................................................................................. 16

# TABLE OF AUTHORITIES

## CASES

*Ala. Power Co. v. U.S. Dep't of Energy*, 307 F.3d 1300 (11th Cir. 2002)......................... 6

*Alaska Airlines, Inc. v. Brock*, 480 U.S. 678 (1987) ................................................... passim

*Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320 (2006)........................... 1, 13

*Califano v. Westcott*, 443 U.S. 76 (1976) ........................................................................... 1

*Canning v. N.L.R.B.*, No. 12-1115, 2013 WL 276024 (D.C. Cir. Jan. 25, 2013) ............. 15

*Casey E. Folks*, 183 IBLA 24 (Sept. 20, 2012), *reconsideration denied* (Dec. 10, 2012) .................................................................................................................. 10

*City of New Haven*, 809 F.2d 900 (D.C. Cir. 1987) ......................................... 1, 5, 12, 15

*Dorchy v. Kansas*, 264 U.S. 286 (1924)...................................................................... 6, 13

*El Paso & Ne. Ry. Co. v. Gutierrez*, 215 U.S. 87 (1909) .................................................. 1

*INS v. Chadha*, 462 U.S. 919 (1983)................................................................................. 5

*Marbury v. Madison*, 5 U.S. 137 (1803) ........................................................................ 15

*Miller v. Albright,* 523 U.S. 420 (1998) ................................................................ 3, 13, 14

*Reno v. Am. Civil Liberties Union*, 521 U.S. 844, (1997)................................................ 13

*Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53 (2001).............................................................. 14

*United States v. Jackson*, 390 U.S. 570 (1968) ............................................................... 13

*United States v. Midwest Oil Co.*, 236 U.S. 459 (1915)...................................................... 3

## STATUTES

43 U.S.C. § 102(a)(4) ........................................................................................................ 9

43 U.S.C. § 1701 ............................................................................................................. 14

43 U.S.C. § 1701(a)(4) ...................................................................................................... 3

43 U.S.C. § 1701(a)(7) ...................................................................................................... 4

43 U.S.C. § 1701(a)(12) .................................................................................................... 4

43 U.S.C. § 1712(e)(3) ...................................................................................................... 4

43 U.S.C. § 1714(a) .......................................................................................................... 2

43 U.S.C. § 1714(c) .......................................................................................................... 2

43 U.S.C. § 1714(d)(3) ........................................................................... 7

43 U.S.C. § 1714(e) ............................................................................... 7

43 U.S.C. § 1714(f). ............................................................................... 4

43 U.S.C. § 1714(j) ............................................................................... 6

90 Stat. 2743 (1976) ............................................................................. 3

## OTHER AUTHORITIES

David H. Getches, Managing the Public Lands: The Authority of the Executive
   to Withdraw Lands, 22 NAT. RESOURCES J. 279 (1982) ................................... 2, 5, 8, 16

Robert L. Glicksman, Severability and the Realignment of the Balance of Power
   over the Public Lands: The Federal Land Policy and Management Act, 36
   HASTINGS L. J. 1 (1984) .......................................................................... 2, 12

## CONSTITUTIONAL PROVISIONS

U.S. CONST., Art. IV, § 3, cl. 2 ............................................................... 5

## LEGISLATIVE HISTORY

122 CONG. REC. 23,435-57 (1976) ........................................................... 11

122 CONG. REC. 23,436 (1976) ............................................................... 11

122 CONG. REC. 23,437 (1976) ............................................................... 11

122 CONG. REC. 23,451 (1976) ........................................................... 10, 11

122 CONG. REC. 23,452 (1976) ............................................................... 15

122 Cong. Rec. 23,453 (1976) ............................................................... 10

H. REP. NO. 94-1163 (1976) ................................................................... 11

H. REP. NO. 94-1724 (1976) ............................................................... 8, 11

H.R. 13777, 94th Cong. (2d Sess. 1976) ................................................. 11

**PLAINTIFFS' REPLY MEMORANDUM**

1   All parties agree that the legislative veto in Section 204(c)(1) of the Federal Land

2   Policy and Management Act ("FLPMA") violates the Constitution's Presentment Clause.

3   *See* Fed. Br. (Doc. 95) 6; Trust Br. (Doc. 97) 3-4.  All that remains is to determine the

4   effect of this conclusion.  This determination is an easy one:  FLPMA's language,

5   structure, and legislative history show that Congress would *not* have authorized the

6   Secretary to make long-term, infinitely renewable, unlimited-acreage withdrawals

7   without the protection of the conjoined legislative veto.  Because FLPMA § 204(c)(1)

8   would no longer "function in a *manner* consistent with the intent of Congress[,]" *Alaska*

9   *Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987) (emphasis in original), the complete

10   provision must be stricken.[1]

## ARGUMENT

## I.   Standards Governing Severability Analysis Support Severing § 204(c)(1).

13   Defendants correctly identify the standard for severing unconstitutional

14   provisions:  where it is "evident" that Congress "would not have enacted those provisions

15   which are within its power, independently of that which is not," a court should follow

16   that Congressional intent and eliminate the remaining unintended text.  *Alaska Airlines*,

17   480 U.S. at 684.[2]  Absolute certainty need not be shown for Congress's intent to be

18   "evident."  *El Paso & Ne. Ry. Co. v. Gutierrez*, 215 U.S. 87, 97 (1909).  Moreover, where

19   delegations of authority are broad, strongly implicating balance of power issues, a

20   severability analysis should reflect those issues:

> [I]t is necessary to recognize that **the absence of the veto necessarily alters the balance of powers between the Legislative and Executive Branches of the Federal Government**.  Thus, it is not only appropriate to evaluate the importance of the veto in the original legislative bargain, but also to consider the nature of the delegated authority that Congress made subject to a veto.  Some delegations of

---

[1] Plaintiffs National Mining Association ("NMA") and Nuclear Energy Institute ("NEI") (together, "Plaintiffs") have sought to avoid duplication by coordinating with Northwest Mining Association.  Plaintiffs, therefore, incorporate by reference the arguments in Northwest Mining Association's reply memorandum.

[2] *See also City of New Haven*, 809 F.2d 900, 906 (D.C. Cir. 1987); *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 330 (2006) (quoting *Califano v. Westcott*, 443 U.S. 76, 94 (1976) (Powell, J., concurring in part and dissenting in part)) ("[T]he touchstone for any decision about remedy is legislative intent . . . .'").

1   **PLAINTIFFS' REPLY MEMORANDUM**

1   power to the Executive . . . may have been so controversial *or so broad that*
2   *Congress would have been unwilling to make the delegation without a strong*
    *oversight mechanism*.

3   *Alaska Airlines*, 480 U.S. at 685 (emphasis added).  Here, the delegated authority is

4   exceedingly broad:  the Secretary may issue withdrawals up to any size, for 20 years,

5   renewable indefinitely, for any use.  *See* 43 U.S.C. § 1714(c).  Thus, the scope of the

6   delegated authority itself supports severing that authority with the veto.

7   **II.     FLPMA's Text, Structure, and History Further Compel Severing § 204(c)(1).**

8        Federal Defendants discount the abundant evidence that *Congress would not have*

9   *intended for § 204(c)(1) to survive the veto's severance*.  FLPMA's plain language,

10  structure, and history clearly evince Congress's intent that § 204(c)(1)'s sweeping large-

11  tract withdrawal authority be stricken absent "the most significant" of FLPMA's checks[3]

12  on that authority: the legislative veto.[4]

13       **A.     FLPMA's Plain Language Requires Severing <u>Both</u> the § 204(c)(1) Veto**
             **and the Discretionary Authority it Was Meant to Constrain.**

14       FLPMA's plain language provides strong evidence that Congress would not have

15  enacted § 204(c)(1) without the legislative veto.  FLPMA's text expresses Congress's

16  intent to impose meaningful oversight, explicitly restrict the Secretary's withdrawal

17  authority, and prevent large-scale withdrawals outside the specific limits enacted.

18       *§ 204(a):*  Most fundamentally, § 204(a) specifies that the Secretary may withdraw

19  lands "only in accordance with the provisions and limitations of [this section]."  43 U.S.C.

20  § 1714(a); *see also* Pl. Mot. 11.  Defendants' lone reference to this language supports

21  Plaintiffs' view.  *See* Fed. Br. 4 (acknowledging that § 204(a) authorizes the Secretary to

22  issue withdrawals "only in accordance with the provisions and limitations of [§ 204]" and

23  recognizing the various limitations on withdrawals under § 204(c), including "the

24

25  [3] *See* Prof. David H. Getches, *Managing the Public Lands: The Authority of the Executive*
    *to Withdraw Lands*, 22 NAT. RESOURCES J. 279, 329 (1982) ("[W]hen [withdrawals] are
26  used the FLPMA surrounds the process with new procedures and ultimate congressional
    checks that can undo executive actions swiftly in egregious cases.").

27  [4] Robert L. Glicksman, *Severability and the Realignment of the Balance of Power over*
    *the Public Lands: The Federal Land Policy and Management Act*, 36 HASTINGS L. J. 1,
28  66 (1984).

                                         2        **PLAINTIFFS' REPLY MEMORANDUM**

termination provision in the second sentence").  Once the legislative veto is conceded to be unconstitutional, the Secretary can no longer issue large-tract withdrawals in accordance with the " limitations" Congress specifically set forth, and thus can no longer issue such withdrawals in a "*manner* consistent with the intent of Congress."  *Alaska Airlines*, 480 U.S. at 685; *see also Miller v. Albright,* 523 U.S. 420, 457-58 (1998) (Scalia, J., concurring in judgment).

§ *704(a):*  FLPMA § 704(a) expressly "repealed" 29 statutes on withdrawals and "repealed" the Executive's implied authority to make withdrawals "resulting from acquiescence of the Congress" under *United States v. Midwest Oil Co.*, 236 U.S. 459, 490-92 (1915).  90 Stat. 2743, 2792 (1976).  This was no insignificant step, as it reversed "nearly unfettered authority in making withdrawals," Fed. Br. 13, and voided longstanding precedent.  It would be completely inconsistent with the repeal of the Secretary's broad implied authority to sever only the legislative veto and leave in place a withdrawal authority effectively duplicating that revoked.

§ *102(a)(4):*  Congress's legislative policy, given legal effect through § 204(a) and the withdrawal authorities in §§ 204(c), (d), and (e), requires that "Congress delineate the extent to which the Executive may withdraw lands without legislative action."  43 U.S.C. § 1701(a)(4).  Accordingly, § 204(c)(1) carefully defines the limitations on large Executive withdrawals.  Chief among those was the legislative veto – now recognized as unconstitutional.  The remedy that best fulfills the statutory text and legislative intent evident in § 102(a)(4) is that which restricts Executive Branch withdrawals to those subject to the carefully circumscribed  limits **delineated by Congress in the statute**.  Where, as here, Congress's carefully crafted scheme has been erased, a completely different, undelineated, and effectively unbounded Executive authority should not be presumed.

§ *202(e):*  FLPMA § 202(e) provides that "public lands shall be removed from or restored to the operation of the Mining Law of 1872 . . . only by withdrawal action

pursuant to [§ 204] or other action pursuant to applicable law."  43 U.S.C. § 1712(e)(3).[5]  This language illustrates that Congress allowed public lands to be removed from being "free and open" (30 U.S.C. § 22) to mineral exploration only if compliance with all the withdrawal limitations in FLPMA § 204 is assured.  In FLPMA § 204(c)(1), Congress was willing to allow Interior to make long-term withdrawals of large acreage *only* if Congress could override that withdrawal itself, without presentment to the President.

§ 204(c):  Defendants argue that the FLPMA § 204 language that would remain if the legislative veto language alone is severed would "significantly constrain the executive's broad pre-FLPMA authority."  Fed. Br. 10.  Yet the survival of *some* constraints is of no moment given that the grant of withdrawal authority rested on the presence of *all* the constraints, including the legislative veto.  Moreover, only the legislative veto preserves Congress's ability to act unilaterally against an excessive withdrawal.

Defendants suggest, for example, that the 20-year limit on withdrawals sufficiently limits withdrawals in the veto's absence.  *Id.*  But even a 20-year withdrawal is indefinitely renewable.  43 U.S.C. § 1714(f).  More importantly, for adversely affected parties (such as NMA and NEI members), a single 20-year withdrawal might as well be a lifetime.  As the instant withdrawal has shown, prior investments in mineral resources are "wasted" and cannot be recovered.  *See, e.g.*, Decls. of Norman M. Schwab ¶¶ 7, 11 and James D. Rasmussen ¶ 12 (attached as Exs. C and D to Pls.' Mem. in Opp. to Defs.' Mot. to Dismiss (Doc. 64)).  For most potential investors affected, as well, 20 years is well beyond planning and investment horizons, particularly when the end of 20 years may bring another 20-year withdrawal.

Defendants' reliance on § 204(c)'s Congressional notice requirements in subsection (c)(2) is also misplaced.  *See* Fed. Br. 10-11.  The D.C. Circuit specifically rejected Defendants' argument in *City of New Haven*, concluding that notice

---

[5] *See also* 43 U.S.C. §§ 1701(a)(7) and (a)(12) (addressing multiple use policy and management recognizing national interest in domestic resources).

requirements in the Impoundment Control Act of 1974 would not make up for a severed legislative veto.  809 F.2d at 907 n.19 (confirming the district court's "conclusion that Congress was not 'very much concerned with, let alone determined to achieve, further detail about [executive exercises of the delegated authority at issue] *absent a mechanism for exercising control over them*.'").[6]  FLPMA notices to Congress do not substitute for a veto and do not constrain the Secretary's withdrawal authority in any way.

Defendants fare no better on their argument that FLPMA's legislative intent is best served by requiring an Act of Congress, presented to and signed by the President, to override a large-tract withdrawal.[7]  The potential for the full legislative process does not create a viable limit on the Executive Branch's withdrawal authority.  It would require Presidential action to reverse a high-level decision within his own Executive Branch to withdraw lands.  That absurd result is not in keeping with the Congress's intent to exercise real control over Interior withdrawals of public lands.[8]  In contrast, Plaintiffs' proposed approach that the Court sever all of the large-tract withdrawal authority in FLPMA § 204(c)(1) is one that preserves significant power for Congress.[9]  Ultimately,

[6] *See also City of New Haven*, 809 F.2d at 906 ("The title of the statute itself – '*Disapproval of proposed deferrals of budget authority*' – makes it plain that Congress was preoccupied with assuring for itself a ready means of disapproving proposed deferrals.").  Likewise, here, FLPMA's legislative history confirms that Congress's driving concern was the ability to actually *invalidate* large-tract withdrawals, not just be informed about them.

[7] Defendants' argument that Congress "would [not] have revoked large-tract withdrawal authority . . . simply to avoid the presentment requirement" treats presentment with startling dismissiveness.  Fed. Br. 11.  The obvious temptation to avoid presentment was specifically contemplated by the Framers and directly impacted the Constitution's drafting.  *See INS v. Chadha*, 462 U.S. 919, 946-47 (1983).  Congress's expressed intent to avoid presentment similarly cannot be discounted here.  *Accord* Getches, 22 NAT. RESOURCES J. at 318, n. 225 (describing "simplified procedure" of the veto, "designed to avoid roadblocks that can normally inhibit or prevent legislation.").

[8] At best, Defendants' argument cuts both ways.  In the wake of a decision severing only the legislative veto and leaving intact the large-tract withdrawal authority, Congress could act, with the support of the President, to override a Secretarial withdrawal decision.  By the same token, however, were large-tract withdrawal authority invalidated along with the legislative veto authority that accompanies it, Congress presumably could act, with the support of the President, to grant the Secretary the broad withdrawal authority that the Executive now seeks to induce this Court to grant.

[9] This approach best reflects Congress's exclusive authority over withdrawals under the Property Clause.  *See* U.S. CONST., Art. IV, § 3, cl. 2.  Indeed, Congress already preserved for itself exclusive authority with respect to other types of withdrawals.  *See* 43

5

PLAINTIFFS' REPLY MEMORANDUM

none of the other limits on withdrawals relied upon by Defendants are sufficient to save § 204(c)(1).  In light of the legislative veto's unconstitutionality, Congress would have intended that the Secretary's narrowly prescribed, delegated authority under § 204(c)(1) similarly give way to Congress's superior plenary authority, and that all the large-tract withdrawal authority of § 204(c)(1) be severed.  Thus, FLPMA's plain language amply demonstrates that Congress would not have enacted § 204(c)(1) without the veto.

### B.   FLPMA's Structure Further Demonstrates That the Legislative Veto Is Not Severable from § 204(c)(1).

Defendants wrongly dismiss the "strong evidence" in FLPMA's structure confirming that the § 204(c)(1) veto cannot be severed.  Fed. Br. 9-12.  Defendants seek to dismiss Plaintiffs' argument as one of "mere proximity," yet they cannot refute the structural reality that Congress put the veto language in the very same subparagraph as the withdrawal authority itself (§ 204(c)(1)) —  a strong indication that Congress saw the withdrawal authority as "so interwoven with [the veto] that the section cannot stand alone." *Dorchy v. Kansas*, 264 U.S. 286, 290 (1924).  The cases cited by Defendants (at 9-10) are distinguishable for this very reason.  *See Alaska Airlines*, 480 U.S. at 682, 689-90 (unconstitutional veto was severable from "report and wait" provision in the same subsection (§ 43(f)(3) of Airline Deregulation Act), but grant of rulemaking authority actually subject to the veto was separately contained in § 43(f)(1)); *Ala. Power Co. v. U.S. Dep't of Energy*, 307 F.3d 1300 (11th Cir. 2002) (severing veto language in 42 U.S.C. § 10222(a)(4), where authority to collect fees subject to veto was contained in separate subsections (§ 10222(a)(1)-(3)).

Defendants also ignore other structural evidence of Congress's intent.  For example, if only the veto language is excised, FLPMA's separate treatment of large-tract (§ 204(c)) and small-tract (§ 204(d)) withdrawals would become nonsensical.  Except for the notice requirement, which is no real constraint, the large-tract withdrawal authority would differ little from that for small-tract withdrawals.  Further, at least one irrational

---

U.S.C. § 1714(j).

distinction between the two authorities would result.  Specifically, small-tract withdrawals are limited to a period of *five years* "to preserve such tract for a specific use then under consideration by the Congress."  43 U.S.C. § 1714(d)(3).  No such limitation is prescribed under § 204(c).  Thus, severing only the veto would produce an irrational statutory scheme in which small tract withdrawals are subject to greater restrictions than large tract withdrawals.

Structural support for Plaintiffs' approach to severability can also be found in § 204(e).  43 U.S.C. § 1714(e).  Pursuant to § 204(e), the Secretary retains authority – unencumbered by legislative veto – to make unlimited-acreage withdrawals lasting up to three years in an "emergency situation."  *Id.*  Three inferences can be drawn from the existence of this authority.  First, the emergency withdrawal authority would be superfluous if § 204(c)(1) were to survive without the veto, since the Secretary would be able to do under § 204(c) exactly what he would otherwise do under § 204(e), only for longer.  Thus, Congress must necessarily have preferred that the Secretary retain his three-year, unlimited emergency withdrawal authority *without* an additional unfettered, veto-less 20-year withdrawal authority, rather than retaining *both*.  Second, FLPMA's drafters must have believed that the legislative veto in § 204(c)(1) was an essential limitation on large-scale 20-year withdrawals (such as the one in this case), as distinguished from mere 3-year emergency withdrawals, not subject to extension.  And third, Congress would have to have been content with eliminating § 204(c)(1)'s invalid authority because the Secretary would retain coextensive 3-year withdrawal authority under § 204(e) to take action in those situations where deemed most needed.  The 3-year withdrawal limit would also allow adequate time for the Executive to seek legislation for a longer withdrawal.  In short, severance of § 204(c)(1), coupled with the Secretary's enduring authority under § 204(e), best allows FLPMA to "function in a *manner consistent with congressional intent.*"  *Alaska Airlines*, 809 F.2d at 906.

**PLAINTIFFS' REPLY MEMORANDUM**

1

**C.    History Surrounding FLPMA's Passage Strongly Evidences Congress's Intent That the Large-Tract Withdrawal Authority Should Not Survive the Veto's Severance.**

2

3

**1.    Pre-FLPMA Background Context Supports Plaintiffs' Approach to Severability.**

4

Defendants completely misstate the conclusions to be drawn from the pre-FLPMA

5

context for the statute's enactment.  *See* Fed. Br. 13.  After describing the Secretary's

6

broad pre-FLPMA withdrawal authority,[10] Defendants infer that a veto-less § 204(c)(1)

7

could not have posed any great concern, since "[h]ad FLPMA not passed, the executive

8

would have continued to enjoy nearly unfettered authority in making withdrawals." *Id.*

9

But what matters is that FLPMA *did* pass.  Indeed, Congress found the pre-FLPMA state

10

of affairs so objectionable that it voided prior Supreme Court precedent (*Midwest Oil*) to

11

cabin the Secretary's withdrawal authority.  *See* H. REP. NO. 94-1724, at 66 (1976)

12

(recognizing FLPMA's "repeal of practically all existing executive withdrawal

13

authority"); *see also* Getches, 22 NAT. RESOURCES J. at 315 (describing Congress's

14

"extraordinary precision" in repealing pre-existing executive withdrawal authority).  This

15

only confirms that Congress would not have been comfortable with restoring the

16

Secretary's pre-FLPMA broad, large-scale withdrawal authority – whether as a result of

17

an unconstitutional veto or otherwise.[11]

18

**2.    The PLLRC's Recommendations Further Reflected Need for Meaningful Congressional Oversight of Withdrawals.**

19

20

Defendants' characterization of the *One Third of the Nation's Land* (1970) report

21

[10] Defendants refer, without further elaboration, to an "inherent authority" to make withdrawals.  Fed. Br. 13; *see also id.* at 3.  Neither FLPMA nor the case law supports

22

the existence of any such inherent Executive authority to issue withdrawals.  *See* Getches, 22 NAT. RESOURCES J. at 286 ("[A]rguments that the executive has some inherent

23

constitutional authority to make withdrawals are without merit.").  Further, the Secretary's Record of Decision (attached as Ex. 1 to Fed. Defs.' Mot. to Dismiss in No.

24

3:12-cv-08042 (Doc. 27-1, at 2)) cites only FLPMA § 204(c) as the basis for the withdrawal in this case.  In any event, to the extent Defendants suggest that the Secretary

25

has inherent authority for this withdrawal, that issue has not been properly raised and is not before this Court.

26

[11] Congress's clear intent to repeal the Executive's pre-FLPMA statutory and implied authorities makes preposterous Defendants' reliance on a lack of legislative history

27

"purporting to repeal all of the existing express or implied authority for large-tract withdrawals if the veto were not adopted."  Fed. Br. 17.  And in any case, no legislator

28

questioned that the veto would be adopted.  *See infra* Section II.C.3.

of the bipartisan Public Land Law Review Commission ("PLLRC" or "Commission")

significantly understates the emphasis that report placed on the need for strong constraint

on Executive withdrawals. Fed. Br. 14-16. The PLLRC discussed the "Withdrawals

Problem" at length, noting "strongly voiced" concerns that gave rise to the Commission

as well as the general observation that withdrawals "have been used by the Executive in

an uncontrolled and haphazard manner." PLLRC Report at 43. The Commission also

took note of the *Midwest Oil* precedent and the resultant lack of limitations on

withdrawals. *Id.* Accordingly, the Commission specified that "[l]arge scale limited or

single use withdrawals of a permanent or indefinite term should be accomplished only by

act of Congress." *Id.* at 54. Here, the Secretary's ability to withdraw large tracts of land

for 20 years (with unlimited 20-year extensions) without Congressional action would

contradict the Commission's recommendation.

     Further, in addressing Congressional delegation of authority over other

withdrawals, the PLLRC emphasized, "this authority should be limited and exercised

only within prescribed statutory guidelines. In the exercise of its land management

functions, the executive branch is an agent of Congress and, as with any other agent, the

extent of its power and authority should be clearly defined." *Id.* at 54-55. The PLLRC's

primary concern, thus, was that Congress specifically delineate the extent of the

Secretary's authority, and that this authority be used "only within prescribed statutory

guidelines." *Id.* While the PLLRC went on to make several suggestions as to specific

provisions Congress might include – some (but not all) of which were ultimately

incorporated into § 204[12] – the overriding message was that Congress impose some set of

express procedures and limits as a prerequisite for the exercise of delegated authority.

---

[12] That the PLLRC did not specifically reference use of a legislative veto, Fed. Br. 15, only supports the weight Congress placed on the § 204(c)(1) veto. In enacting FLPMA, Congress generally embraced the PLLRC's overriding message to delineate the Secretary's withdrawal authority expressly. *See, e.g.*, 43 U.S.C. § 102(a)(4). However, when determining limits on withdrawals over 5,000 acres, Congress evidently found the PLLRC's suggested limits insufficient and concluded that a mechanism for direct Congressional intervention (*i.e.* a veto) was necessary.

**PLAINTIFFS' REPLY MEMORANDUM**

1   This is exactly what Congress did under FLPMA and exactly what is undone if only the

2   veto were severed from § 204(c).

3        Even a recent Interior Board of Land Appeals ("IBLA") decision has recognized,

4   in accordance with the PLLRC's recommendations, that FLPMA's binding constraints on

5   the Secretary's withdrawal authority cannot be circumvented:

6        The PLLRC believed that large scale withdrawals should only be made by
Congress and that other withdrawal authority should be delegated to the Executive

7        with specific guidelines. . . .  Echoing PLLRC's recommendations concerning the
roles of Congress and the Executive in making withdrawals, FLPMA declared a

8        policy that . . . "*Congress delineate the extent to which the Executive may
withdraw lands without legislative action*."  43 U.S.C. § 1701(a)(4). . . .  Congress

9        has limited the Secretary's authority to that provided in section 204 of FLPMA.

10  *Casey E. Folks*, 183 IBLA 24, 46-47 n.32 (Sept. 20, 2012), *reconsideration denied* (Dec.

11  10, 2012) (emphasis added).  Thus, the Interior Secretary's office, acting through IBLA,

12  has supported that large-scale withdrawals may only be made in accordance with § 204

13  and the "specific guidelines" it imposed, namely, the veto.

14         **3.**     **Legislative History Confirms That Congress Would Not Have
Intended § 204(c)(1) to Survive the Veto's Unconstitutionality.**

15       FLPMA's legislative history reinforces that the Secretary's § 204(c)(1) withdrawal

16  authority must be severed.  Most significantly, the 5,000-acre limit on unrestricted

17  § 204(d) withdrawals was described on the House floor as a "compromise" – some

18  members "would have said that every withdrawal is the responsibility of Congress,

19  because clearly the previous Secretaries of the Interior have abused the withdrawal

20  privilege.  The 5,000 acres already represent a very strong compromise."  122 CONG.

21  REC. 23,451 (1976) (remarks of Rep. Steiger of Arizona); *see also id.* at 23,453 (Rep.

22  Santini) ("I think it is a fair and rational compromise to set a 5,000-acre ceiling. . . .  [I]t

23  is imperative that the position of the committee be maintained.").  This legislative intent,

24  that we-will-compromise-this-far-and-no-further, is only fulfilled if, absent the veto, the

25  Secretary has no authority to withdraw over 5,000 acres of public lands.[13]

26

27  [13] As discussed in Plaintiffs' motion, other legislative debate additionally highlights the
centrality of the veto to Congress's delegation of large-scale withdrawal authority.  Pl.

28  Mot. 9-10.  As one Congressman stated, "We must end what often has been a historic

**PLAINTIFFS' REPLY MEMORANDUM**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

Defendants' characterization of the legislative history overlooks the premise for the balance struck by FLPMA's language.  The real debate over large-tract withdrawal authority was never about the veto itself.  While the "mere presence of continued and heated debates" may not be enough to withstand severability, Fed. Br. 16, even those who argued for raising the 5,000-acre threshold for the veto generally accepted the need for increased oversight and assumed that any final legislation would include an ability to override withdrawals of some size.  *See* 122 CONG. REC. 23,436 (1976) (remarks of Rep. Sieberling) (discussing proposed amendment which would "retain[] close congressional oversight.  Withdrawals would still be subject to disapproval by a resolution of either House."[14]); *id.* at 23,451 (Rep. Mink) ("I would hope that this committee would approve the amendment raising the acreage to 25,000 before imposing upon this House the affirmative duty to approve or disapprove. . . .").[15]  Evidently, all understood that the veto was an essential and irrevocable component of any large-tract withdrawal authority enacted.  Defendants' arguments regarding the Secretary's ability to react quickly and Congress's workload are similarly to no avail: they do not change the fact that Congress would not have enacted § 204(c)(1) without the legislative veto.[16]

17

18

19

pattern of causal or even reckless withdrawal of public lands.  It is *essential* that Congress be informed of, *and able to oppose if necessary*, withdrawals which it determines not to be in the best interest of all the people."  122 CONG. REC. 23,437 (1976) (remarks of Rep. Skubitz) (emphasis added).  Accordingly, the House bill under consideration included a one-House veto.  *See* H.R. 13777, 94th Cong. (2d Sess. 1976).

20

21

22

23

24

[14] Though there is no indication that Congress ever considered the possible unconstitutionality of the two-house veto ultimately adopted in § 204(c), the Department of Justice suggested that a one-House veto written into earlier version of the bill might be unconstitutional.  *See*, *e.g.*, H. REP. NO. 94-1163, at 47 (1976) ("The Department of Justice has advised this Department that the granting of this . . . one House-Committee power is of questionable constitutionality.").  Rather than eliminate the veto, the Conference Committee ultimately amended the bill to provide for concurrent rather than one-House vetoes.  *See* H. REP. NO. 94-1724, at 58 (1976).  Thus, when faced with the veto's possible unconstitutionality, Congress did not simply dispense with the veto but sought a way to ensure it stayed put.

25

26

[15] Notably, none of the proposed changes to the 5,000-acre veto threshold ever came close to permitting a withdrawal of over one million acres without Congressional oversight.  *See generally* 122 CONG. REC. 23,435-57 (1976).

27

28

[16] Defendants' reliance on the importance of the Secretary's ability to act quickly "to protect sensitive lands from private interests[,]" Fed. Br. 17, is misleading, as the Secretary would retain this ability under § 204(d) and § 204(e) where smaller tracts or especially urgent situations are at stake.  With respect to Congress's workload burdens,

11

PLAINTIFFS' REPLY MEMORANDUM

FLPMA's legislative history, thus, is most aptly compared to that in *City of New Haven*.  In *City of New Haven*, the court considered an unconstitutional legislative veto on proposed deferrals of budgetary appropriations and found the legislative history "incontrovertible" as to inseverability:

> When the numerous statements of individual legislators urging the passage of legislation to control presidential impoundments are . . . considered, the evidence is incontrovertible that the 'basic purpose' of [the provision] was to provide each House of Congress with a veto power over deferrals. . . .  As difficult (and precarious) as it may be at times to reconstruct what a particular Congress might have done had it been apprised of a particular set of facts, we refuse to entertain th[e] remarkable proposition [that Congress would have enacted the provision without the legislative veto]. . . .  [T]he "*raison d'etre*" of the entire legislative effort was to assert *control* over presidential impoundments.

809 F.2d at 907 (emphasis in original).[17]  Here, as in *City of New Haven*, "[n]owhere in the legislative history is there the slightest suggestion that the [Executive] be given statutory authority to defer funds" – or, in this case, issue a withdrawal of limitless size – "without the possible check of at least a one-House veto."  *Id.* at 908.  Because Congress clearly intended that any large-scale authority to withdraw lands be subject to the possibility of veto, § 204(c)(1)'s withdrawal authority must be severed in its entirety.

In the end, Plaintiffs' approach to severability seeks nothing novel or revolutionary.[18]  Severing all of § 204(c)(1) simply prevents restoring to the Executive Branch the unfettered withdrawal authority FLPMA expressly repealed and was specifically designed to replace.  Further, this approach leaves the Secretary free to act under the statute's remaining authorities, including that for small-tract withdrawals (§ 204(d)) and for emergency large-tract withdrawals (§ 204(e)).  Thus, severing

---

Defendants create another false syllogism.  Fed. Br. 18-19.  That is, Congress's concern about its workload in overseeing particularly small or short-term withdrawals is not at all implicated by Plaintiffs' approach to severability (where authority for large-tract, non-emergency withdrawals would rest exclusively with Congress, which can act or not act to the extent of its own choosing).  Further, as stated by Prof. Glicksman, "[t]he administrative burden on Congress would not be great, because large-tract withdrawals are[,]" at least until recently, "relatively rare."  36 HASTINGS L. J. at 80.

[17] The court in *City of New Haven* further noted the contrast between such clear legislative purpose and that reflected in *Alaska Airlines*, where "the legislative veto provision [was added] as somewhat of an afterthought."  809 F.2d at 907.

[18] *Contrast with* Fed. Br. 3 ("Plaintiffs ask the Court to impose a land-management regime that has never been in force in the history of our Nation . . . .").

**PLAINTIFFS' REPLY MEMORANDUM**

1   § 204(c)(1) is the solution which most closely reflects the executive withdrawal authority

2   originally intended and adopted by Congress.  By reconstituting § 204(c) with the very

3   unbridled authority FLPMA meant to repeal, it is Defendants rather than Plaintiffs who

4   would engraft a new, unintended withdrawal authority, and who wish to inappropriately

5   "rewrite [FLPMA] to conform it to constitutional requirements."  *Reno v. Am. Civil*

6   *Liberties Union*, 521 U.S. 844, 884-85 (1997); *see also Ayotte*, 546 U.S. at 329.  Instead,

7   consistent with Congress's clear intent, this Court should simply sever § 204(c)(1).

8   **III.    FLPMA's Severability Clause Supports Severing the Entire "Provision" in
         which the Large-Tract Withdrawal Veto is Found – § 204(c)(1).**
9

10       Defendants rely on FLPMA's severability clause to support their argument for

11   severability, but the Supreme Court has long recognized that "the ultimate determination

12   of severability will rarely turn on the presence or absence of . . . a [severability] clause."

13   *United States v. Jackson*, 390 U.S. 570, 585 n.27 (1968).  Such clauses serve as "an aid

14   merely; not an inexorable command."  *Dorchy*, 264 U.S. at 290.  And, as Defendants

15   acknowledge, any presumption of severability may be overcome by "strong evidence"

16   that severance would be inconsistent with Congress's intent.  Fed. Br. 8.

17       The specific intent expressed in § 204(a) alone suffices to show "strong evidence"

18   in this case.  Here, Justice Scalia's reasoning in *Miller v. Albright* is instructive.  523 U.S.

19   at 457-58.[19]  In *Miller*, Justice Scalia concurred in denying a claim to citizenship on

20   grounds that – despite the presence of a general severability clause – the allegedly

21   unconstitutional language could not be severed.  *Id.*  Justice Scalia wrote:

22       [I]f the mere character of [Congress's plenary naturalization power at issue] were
         not enough to render severing a limitation upon citizenship improper, the
23       [Immigration and Nationality Act ("INA")] itself contains a clear statement of
         congressional intent: "A person may only be naturalized as a citizen of the United
24       States in the manner and under the conditions prescribed in this subchapter *and
         not otherwise*. . . . [R]eliance upon the INA's general severability clause is
25       misplaced because the specific governs the general.  The question of severance
         ultimately turns on "whether the provisions are inseparable by virtue of inherent
26       character," which must be gleaned from the structure and nature of the Act.

27   _____

28   [19] There was no majority in *Miller*.  Justice Stevens, Justice O'Connor, and Justice Scalia
     each wrote an opinion, concurring in judgment.  *Miller*, 523 U.S. 420.

*Id.* (internal citations omitted; emphasis in original); *accord Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 72 (2001) (majority opinion).  FLPMA § 204(a)'s delegation of withdrawal authority "*only* in accordance with the provisions and limitations of this section" is no different from the INA's allowing naturalization "in the manner and under the conditions prescribed in this subchapter *and not otherwise*" (emphasis added).  Thus, the general, boilerplate severability clause in § 707 is defeated by Congress's specific delineation of withdrawal authority in § 204(a).  This alone is "strong evidence" that the legislative veto in § 204(c)(1) – one of the specific "limitations" referenced in § 204(a) – may not be severed, and that the entire withdrawal authority in § 204(c)(1) must fall.

Further, FLPMA's severability language actually supports severing the distinct "provision" (§ 204(c)(1)) that contains both the legislative veto and the large-tract withdrawal authority.  Section 707 states that "[i]f any provision of this Act . . . is held invalid, the remainder of the Act ...shall not be affected thereby."  43 U.S.C. § 1701 note.  Of course, a subsection in a statute qualifies as a "provision" within the purview of §707.  Indeed, Defendants themselves acknowledge that the "*provision* at issue in this case" is "43 U.S.C. § 1714(c)(1)."  Fed. Br. at 1 n.2 (emphasis added).  Accordingly, FLPMA § 707 effectively authorizes deletion of an unconstitutional provision (§ 204(c)), leaving intact the remainder of FLPMA, such as authority to withdraw less than 5,000 acres of public lands under the independent § 204(d) and authority to withdraw large tracts on an emergency basis under § 204(e).  Thus, the text of § 707 – along with the text and structure of FLPMA §§ 102(a)(4), 202(e)(3), 204, and 704 – plainly supports the remedy of severing all of § 204(c)(1) withdrawal authority.

## IV.   FLPMA Is Not Fully Operative without the Legislative Veto in § 204(c)(1).

Whatever is "evident" as to Congress's intent, the veto is also inseverable if it renders FLPMA less than "fully operative as law."  *Alaska Airlines*, 480 U.S. at 684.  Defendants conclusorily dismiss the multiple ways in which severing the veto would render FLPMA ineffective and inoperable.  As discussed earlier, FLPMA § 204(a) authorizes withdrawals "*only* in accordance with the provisions *and limitations*" set forth

**PLAINTIFFS' REPLY MEMORANDUM**

in § 204, including the legislative veto (emphasis added). *See supra* Section II.A.  In

addition, simply dropping the veto would eviscerate § 704(a)'s express repeal of the

Secretary's broad implied authority to issue withdrawals by restoring essentially the same

authority under § 204(c).  *Id.* at 10.  In the end, even if the remainder of FLPMA is "in a

purely technical sense 'operable'" without the veto, Congress clearly would not have

enacted § 204(c)(1) in its absence.  *City of New Haven,* 809 F.2d at 906, 907.[20]

Whether the Executive has frequently or infrequently exercised its purported

authority under § 204(c), and that Congress has not exercised its veto power, have no

bearing on the severability of the veto language.  *See* Fed. Br. 20.  The Executive or

Congress may choose to act in this context based upon a myriad of speculative

considerations, most of which have nothing at all to do with a veto authority.  Further,

even if their actions or inactions could be interpreted as subtle indicators of some

conscious legal interpretation as to the appropriate scope of severability applicable to the

withdrawal authority, that is, simply put, not the job of either Congress or the Executive

Branch.  *See Canning v. N.L.R.B.*, No. 12-1115, 2013 WL 276024, at *15 (D.C. Cir. Jan.

25, 2013); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).  Finally, the

actions and inactions in question do not support Defendants' position.  For example,

while 82 withdrawals of over 5,000 acres may have been issued, only a handful after the

*Chadha* decision were of a proportion at all comparable with the instant withdrawal, and

---

[20] Conversely, Defendants' reliance on legislative history is unpersuasive on this point. Defendants quote Rep. Melcher, but omit the most critical part, emphasized in italics:

> The bill says if [a withdrawal] is over 5,000 acres, we have the opportunity to review it.  If we do nothing, if neither House does nothing, then the withdrawal goes into effect, *but we do have that opportunity within 90 legislative days to object.  Then if we do object, in the exercise of our congressional responsibility, then the Secretary cannot make the withdrawal*.

122 CONG. REC. 23,452 (1976).  By severing the veto, Defendants would strip away Congress's ability to override the Secretary's action – a fundamental premise on which the withdrawal authority rests.  This not only makes § 204(c)(1) dysfunctional but also defies Congress's stated intent to exercise oversight for large-scale withdrawals.  Further, while Congress could issue properly signed legislation to "object," this option is not realistic, as it would ask the President to override his own branch's work.

no post-*Chadha* withdrawal exceeded 1 million acres except the withdrawal actions at issue now before this Court.[21]  *See* Second Decl. of David Fredley (attached hereto). Thus, it makes sense that Congress was not overly concerned about the bulk of the Secretary's post-Chadha withdrawals.  *See* Getches, 22 NAT. RESOURCES J. at 325 ("It would seem that most members of Congress would be uncomfortable overruling the executive's conservation decision on such short notice except in an outrageous case."). And by the time of the Secretary's larger post-*Chadha* withdrawals, Congress was well aware of the unconstitutionality of any veto it might otherwise issue.  *See* Pl. Mot. 15 n.12.  In any case, neither the Secretary's prior exercises of withdrawal authority nor Congress's non-issuance of a veto is dispositive of § 204(c)(1)'s legality.  Because FLPMA § 204(c)(1) without the veto is not "fully operative as law," *Alaska Airlines*, 480 U.S. at 684, it must be severed in its entirety.

## CONCLUSION

Because the unconstitutional legislative veto in FLPMA § 204(c)(1) is not severable from the remainder of the provision, all of § 204(c)(1) is unlawful.  Consistent with this Court's order, the proper remedy is that this Court declare invalid 43 U.S.C. § 1714(c)(1) and vacate the withdrawal of over one million acres of public lands under PLO 7787.  *See* Order at 46 (Doc. 87).[22]  Accordingly, Plaintiffs respectfully request this Court to grant Plaintiffs' motion and deny Defendants' cross-motion for partial summary judgment.

---

[21] Indeed, to the best of Plaintiffs' knowledge, there has never been a withdrawal exceeding one million acres since *Chadha* until this one, and Defendants' declarant identifies none.

[22] Plaintiffs seek no blanket declaratory or injunctive relief as to any prior withdrawals under § 204(c) and seek relief with respect only to the instant withdrawal of over one million acres of federal public lands under PLO 7787.

**PLAINTIFFS' REPLY MEMORANDUM**

1

2

Respectfully submitted,

3

Of Counsel:

/s/ R. Timothy McCrum
R. Timothy McCrum

4

Katie Sweeney
NATIONAL MINING ASSOCIATION

J. Michael Klise
Thomas R. Lundquist

5

101 Constitution Avenue, N.W.
Suite 500 East

CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.

6

Washington, DC  20001
(202) 463-2600

Washington, D.C.  20004-2595
(202) 624-2500

7

8

ATTORNEYS FOR PLAINTIFF NATIONAL MINING ASSOCIATION

9

Of Counsel:

/s/ Susan M. Mathiascheck
Susan M. Mathiascheck

10

Ellen Ginsberg
NUCLEAR ENERGY INSTITUTE

John C. Martin
Amy B. Chasanov

11

1776 I Street, N.W., Suite 400
Washington, D.C. 20006

CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.

12

(202) 739-8000

Washington, D.C.  20004-2595
(202) 624-2500

13

14

ATTORNEYS FOR PLAINTIFF NUCLEAR ENERGY INSTITUTE

15

16

Dated:  February 22, 2013

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' REPLY MEMORANDUM**

1

**CERTIFICATE OF SERVICE**

2

3        I hereby certify that I have caused the foregoing Reply Memorandum to be served

4    upon counsel of record through the Court's electronic service system (ECF/CM).

5

6    Dated: February 22, 2013

7

8                                    */s/ Susan M. Mathiascheck*

9                            CROWELL & MORING LLP
                            1001 Pennsylvania Avenue, N.W.
10                           Washington, D.C.  20004-2595
                            (202) 624-2500

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  R. Timothy McCrum (*pro hac vice*; DC Bar No. 389061)
   J. Michael Klise (*pro hac vice*; DC Bar No. 412420)
2  Thomas R. Lundquist (*pro hac vice*; DC Bar No. 968123)
   CROWELL & MORING LLP
3  1001 Pennsylvania Ave., N.W.
   Washington, D.C. 20004-2595
4  Phone:  202-624-2500
   Facsimile:  202-628-5116
5
   Attorneys for Plaintiff National Mining Association
6
   Susan M. Mathiascheck (*pro hac vice*; DC Bar No. 426764)
7  John C. Martin (*pro hac vice*; DC Bar No. 358679)
   Amy B. Chasanov (*pro hac vice*; DC Bar No. 468779)
8  CROWELL & MORING LLP
   1001 Pennsylvania Avenue, N.W.
9  Washington, D.C.  20004-2595
   Phone:  202-624-2500
10 Facsimile:  202-628-5116

11 Attorneys for Plaintiff Nuclear Energy Institute

12                    UNITED STATES DISTRICT COURT

13                    FOR THE DISTRICT OF ARIZONA

14

15 Gregory Yount,                          )
                                           )
16          Plaintiff,                      )
                                           )
17       v.                                 )   CV11-8171 PHX DGC
                                           )   (Lead Case)
18 Ken Salazar, et al.,                     )
                                           )
19          Defendants.                     )
                                           )
20                                          )

21 This document relates to:               )
                                           )
22                                          )
   National Mining Association; and        )
23 Nuclear Energy Institute,               )   CV12-8038 PCT DGC
                                           )
24          Plaintiffs,                     )
                                           )
25       v.                                 )   SECOND DECLARATION OF
                                           )   DAVID C. FREDLEY
26 Ken Salazar, et al.,                     )
                                           )
27          Defendants.                     )
                                           )

28

I, David C. Fredley, hereby declare as follows:

1.     My name is David C. Fredley, and my first declaration was filed in this case on August 30, 2012.  As stated in my first declaration, I am an independent consultant specializing in public lands minerals management issues.  As stated further in my first declaration, I have a B.S. degree in Geology with Honors (Chemistry Minor) from the University of Montana (1974); I served in the U.S. Navy, Submarine Service, from 1966 to 1968.  I am a Certified Mineral Examiner (CME# 001), and have 23 years of minerals management experience with the U.S. Department of the Interior, Bureau of Land Management ("BLM"), and the U.S. Department of Agriculture, Forest Service.  As part of my training and experience as a federal Miner Examiner, I have experience with the identification and interpretation of Executive and legislative withdrawals which close federal lands to mineral entry.

2.     The purpose of this declaration is to provide the Court with additional factual context for the executive agency withdrawals exceeding 5,000 acres made by the U.S. Department of the Interior pursuant to Section 204 of the Federal Land Policy and Management Act of 1976 ("FLPMA"), in response to the Declaration of Mr. Jeffrey O. Holdren of the BLM, filed on February 8, 2013.  I note that the Holdren Declaration states that there have been "approximately 82 such withdrawals," and that, "BLM's records do not show, that any of those withdrawals were 'vetoed' by Congress…."   I would also note that the Holdren Declaration does not provide any information about the land acreages and dates of the "approximately 82 such withdrawals" nor does the Declaration specifically address the withdrawals of 5,000 acres and more that had involved some affirmative actions by the U.S. Congress.

3.     My research for this declaration relied upon the Table of Public Land Orders ("PLOs"), 1942-2012, and on the BLM Lands and Realty website located at: http://www.blm.gov/wo/st/en/prog/more/lands/public_land_orders.html , and then I cross-referenced those PLOs to the appropriate *Federal Register* notice for descriptions of the withdrawal actions.   My review of the FLPMA withdrawals from 1976 to date show the following trends:

4.      From 1976 to 1983, prior to the June 23, 1983, *INS v. Chadha*, 462 U.S. 919, decision by the U.S. Supreme Court, many large Executive withdrawals exceeding 1,000,000 acres each occurred, and the vast majority of these large withdrawals involved actions by the Congress.  The first major withdrawals made by the Secretary of the Interior pursuant to FLPMA were the 1978 Alaska withdrawals of over 100 million acres (PLO 5653 and PLO 5664, 43 *Fed. Reg.* 59756 (Dec. 15, 1978)).  The lands subject to these withdrawals were the subject of intense congressional activity related to the 1971 Alaska Native Claims Settlement Act and the 1980 Alaska National Interest Lands Conservation Act (ANILCA).  These "emergency" withdrawals were instructed by the U.S. House Interior and Insular Affairs Committee.  These withdrawals made by the Secretary of the Interior, while not "vetoed" by Congress, were superseded by congressional action in ANILCA, Public Law 96-487, 94 Stat. 2371 (Dec. 2, 1980).

5.      The Secretary of the Interior issued 16 PLO withdrawals under FLPMA on February 11, 1980, for National Wildlife Refuges and other areas in Alaska (PLOs 5696 to 5711).  *See* 45 *Fed. Reg.* 9565-9716 (Feb. 12, 1980).  These withdrawals ranged from 240,000 acres to 13,400,000 acres.  Less than one year later, Congress took legislative action, with the passage of ANICLA, and those PLO withdrawals were superseded by the ANILCA authority.  These events relating to the Alaska withdrawals were described in detail by Professor David Getches in his 1982 article, "Managing the Public Lands:  the Authority of the Executive to Withdraw Lands," as published in the *Natural Resources Journal,*  v. 22, from pages 322-324.

6.      Similarly, in 1981, the Secretary withdrew 1,537,000 acres in Montana (PLO 5952, 46 *Fed. Reg.* 30086 (June 5, 1981).  The *Federal Register* notice states that the action was "in response to an emergency withdrawal resolution adopted by the House Interior and Insular Affairs Committee on May 21, 1981."

7.      After the *Chadha* decision, from 1983 to 2008, of the 47 PLO withdrawals (not counting extensions) under FLPMA listed in the *Federal Register*, only six exceeded 100,000 acres in size.  None exceeded 1,000,000 acres.  Notably, at least one of these withdrawals exceeding 100,000 acres was directed by the U.S. Congress in the Energy and Water

Development Act of 2004. *See* 70 *Fed. Reg.* 76,854 (Dec. 21, 2005). There appear to have been no FLPMA withdrawals exceeding 5,000 acres from mid-1983 through 1987, in the immediate aftermath of the 1983 *Chadha* decision.

8.     From 2009 to 2012, seven FLPMA withdrawals over 5,000 acres were issued. First, PLO 7737, 74 *Fed. Reg.* 56657 (Nov. 2, 2009) withdrew 944,343 acres in Nevada. Next, PLO 7773, 76 *Fed. Reg.* 38207 (June 28, 2011) withdrew on an emergency basis 1,010,776 acres in Northern Arizona, which involves the lands at issue in this case. This emergency withdrawal was then replaced with PLO 7787, which withdrew 1,006,545 acres for a 20-year period and this withdrawal is directly at issue in this case. *See* 77 *Fed. Reg.* 2563 (Jan. 18, 2012). Further, PLO 7783, 76 *Fed. Reg.* 59157 (Sept. 23, 2011) withdrew 147,204 acres in Colorado. The other recent withdrawals involved relatively modest acreages in California, Montana and Nevada. *See* 75 *Fed. Reg.* 77,658 (Dec. 13, 2010) (withdrawing 9,461 acres in Nevada); 77 *Fed. Reg.* 47,089 (Aug. 7, 2012) (withdrawing 28,727 acres in California); and 77 *Fed. Reg.* 60,458 (Oct. 3, 2012) (withdrawing 18,761 acres in Montana).

9.     In summary, after the *Chadha* decision, from 1983 until 2012, no withdrawal exceeded one million acres apart from the northern Arizona withdrawal now at issue in this case.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

David C. Fredley

Dated: February 22, 2013

22546888_1

4        SECOND DECLARATION OF DAVID C. FREDLEY

R. Timothy McCrum (*pro hac vice*; DC Bar No. 389061)
J. Michael Klise (*pro hac vice*; DC Bar No. 412420)
Thomas R. Lundquist (*pro hac vice*; DC Bar No. 968123)
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone:  202-624-2500
Facsimile:  202-628-5116

Attorneys for Plaintiff National Mining Association

Susan M. Mathiascheck (*pro hac vice*; DC Bar No. 426764)
John C. Martin (*pro hac vice*; DC Bar No. 358679)
Amy B. Chasanov (*pro hac vice*; DC Bar No. 468779)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
Phone:  202-624-2500
Facsimile:  202-628-5116

Attorneys for Plaintiff Nuclear Energy Institute

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gregory Yount,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>Ken Salazar, et al.,<br><br>　　　　Defendants. | CV11-8171 PHX DGC<br>(Lead Case) |
| This document relates to:<br><br>National Mining Association; and<br>Nuclear Energy Institute,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>Ken Salazar, et al.,<br><br>　　　　Defendants. | CV12-8038 PCT DGC<br><br>CONTROVERTING<br>STATEMENT OF FACTS OF<br>PLAINTIFFS NATIONAL<br>MINING ASSOCIATION AND<br>NUCLEAR ENERGY<br>INSTITUTE |

PLAINTIFFS' CONTROVERTING STATEMENT OF
FACTS

1
2

**CONTROVERTING STATEMENT OF FACTS IN OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

3   Pursuant to Local Rule of Civil Procedure 56.1(b), Plaintiffs National Mining

4   Association and Nuclear Energy Institute (together, "Plaintiffs") submit this

5   controverting statement of relevant facts in opposition to Federal Defendants' cross-

6   motion for partial summary judgment (Doc. 95).  Defendants Grand Canyon Trust *et al.*

7   did not submit a separate statement of relevant facts beyond disputing Plaintiffs' own

8   statement of material facts in support of their motion for partial summary judgment.

9   Federal Defendants' stated facts and Plaintiffs' response to each follows:

10

11   1. In July 2009, on application by the Bureau of Land Management, the Secretary of the

12   Interior proposed the withdrawal challenged in this action and the Department of the

13   Interior issued a public notice of the proposal.  *See* 74 Fed. Reg. 35,887-01 (Jul. 21,

14   2009).

15   Response: Plaintiffs do not dispute.  This presents no genuine issue of material fact.

16   2. On January 9, 2012, following environmental review and extensive public comment

17   on the 2009 proposal, the Secretary signed a record of decision, *see* Ex. 1, and a

18   public land order, *see* Ex. 2, implementing that decision.  *See also* 77 Fed. Reg. 2563-

19   01 (Jan. 18, 2012).

20   Response: Plaintiffs do not dispute.  This presents no genuine issue of material fact.

21   3. On January 9, 2012, the Secretary notified Congress of the withdrawal pursuant to

22   FLPMA subsection 204(c)(1) and submitted a report to Congress pursuant to FLPMA

23   subsection 204(c)(2).  *See* Ex. 3 (Jan. 9, 2012 notification letters and report to

24   Congress).  Congress has since taken no action under FLPMA subsection 204(c)(1) to

25   veto the withdrawal.  *See* Ex. 4, ¶ 6 (Feb. 7, 2013 Decl. of Jeffrey O. Holdren).

26   Response: Plaintiffs dispute Federal Defendants' characterization of the information

27   submitted to Congress pursuant to FLPMA § 204(c)(2) as a "report."  Plaintiffs

28   recognize that the January 9, 2012 submission to Congress was nominally entitled

**PLAINTIFFS' CONTROVERTING STATEMENT OF FACTS**

"Section 204(c) Report to Congress" and that the term "report" has been used in generic reference to such submissions.  *See* Fed. Defs.' Ex. 3 (Doc. 95-3).  However, the January 9, 2012 materials submitted to Congress are more accurately characterized as "notices" or "information."  *See* 43 U.S.C. § 1714(c)(2); *see also* 43 U.S.C. § 1714(e) (referring to "[t]he information required in subsection (c)(2) of this subsection").  Plaintiffs' disagreement with Federal Defendants' characterization of the information submitted pursuant to FLPMA § 204(c)(2) does not present a "genuine issue of material fact," LRCiv 56.1(b), such as to preclude judgment on the pending cross-motions for partial summary judgment.

Respectfully submitted,

Of Counsel:

Katie Sweeney
NATIONAL MINING ASSOCIATION
101 Constitution Avenue, N.W.
Suite 500 East
Washington, DC  20001
(202) 463-2600

_____
*/s/ R. Timothy McCrum*_____
R. Timothy McCrum
J. Michael Klise
Thomas R. Lundquist
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
(202) 624-2500

ATTORNEYS FOR PLAINTIFF NATIONAL MINING ASSOCIATION

Of Counsel:

Ellen Ginsberg
NUCLEAR ENERGY INSTITUTE
1776 I Street, N.W., Suite 400
Washington, D.C. 20006
(202) 739-8000

_____
*/s/ Susan M. Mathiascheck*____
Susan M. Mathiascheck
John C. Martin
Amy B. Chasanov
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
(202) 624-2500

ATTORNEYS FOR PLAINTIFF NUCLEAR ENERGY INSTITUTE

Dated:  February 22, 2013

**PLAINTIFFS' CONTROVERTING STATEMENT OF FACTS**

DCACTIVE-22539675.1