IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

DOMINIKA TARCZYNSKA, NY Bar No. 4431573
JOHN S. MOST, Virginia Bar No. 27176
Natural Resources Section
P.O. Box 7611 Washington, D.C. 20044-7611
 (202) 305-0447 (Tarczynska)
 (202) 616-3353 (Most)
 (202) 305-0506 (fax)
DOMINIKA.TARCZYNSKA@USDOJ.GOV
JOHN.MOST@USDOJ.GOV
*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PRESCOTT DIVISION**

| | |
|---|---|
| GREGORY YOUNT,<br><br>　　　　Plaintiff, *pro se*,<br><br>　v.<br><br>KEN SALAZAR, SECRETARY OF THE INTERIOR, *et al.*,<br><br>　　　　Federal Defendants,<br>　and<br><br>GRAND CANYON TRUST, *et al.*,<br><br>　　　　Intervenor-Defendants. | Case No. 3:11-cv-08171-PCT-DGC<br>**(Lead Case)**<br><br>**FEDERAL DEFENDANTS' REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT** |

| | |
|---|---|
| NATIONAL MINING ASSOCIATION, *et al.*,<br>         Plaintiffs,<br>   v.<br><br>KEN SALAZAR, SECRETARY<br>OF THE INTERIOR, *et al.*,<br>         Federal Defendants,<br>   and<br><br>GRAND CANYON TRUST, *et al.*,<br>         Intervenor-Defendants | Case No. 3:12-cv-08038-PCT-DGC |
| NORTHWEST MINING ASSOCIATION, *et al.*,<br>         Plaintiffs,<br>   v.<br><br>KEN SALAZAR, SECRETARY<br>OF THE INTERIOR, *et al.*,<br>         Federal Defendants,<br>   and<br><br>GRAND CANYON TRUST, *et al.*,<br>         Intervenor-Defendants. | Case No. 3:12-cv-08042-PCT-DGC |
| QUATERRA Alaska Incorporated, *et al.*,<br>         Plaintiffs,<br>   v.<br><br>KEN SALAZAR, SECRETARY<br>OF THE INTERIOR, *et al.*,<br>         Federal Defendants,<br>   and<br><br>GRAND CANYON TRUST, *et al.*,<br>         Intervenor-Defendants. | Case No. 3:12-cv-08075-PCT-DGC |

**TABLE OF CONTENTS**

REPLY MEMORANDUM ........................................................................................................ 1

ARGUMENT .......................................................................................................................... 2

I.    Neither the Language nor the Structure of the Act Shows that Congress Would Have Withheld Large-Tract Withdrawal Authority but for the Legislative Veto ................................................................. 3

II.    The Legislative History of the Act Does Not Provide Strong Evidence that Congress Would Have Withheld Large-Tract Withdrawal Authority but for the Legislative Veto ..................................................... 9

CONCLUSION ..................................................................................................................... 14

**REPLY MEMORANDUM**

Federal Defendants file this reply brief in support of their cross-motion for summary judgment (Cross-Motion). Doc. 101. As explained in Federal Defendants' opening brief, to prevail on their motions for partial summary judgment and successfully oppose this Cross-Motion, Plaintiffs must present strong evidence that the Ninety-Fourth Congress intended to condition the Secretary's large-tract withdrawal authority on validity of the legislative veto, or they must demonstrate that section 204(c), without the veto, is not fully operative as a law.

Plaintiffs have accomplished neither. Their claim that section 204(c), without the veto, is less than fully operational is contradicted by thirty-six years of successful agency practice under the Federal Land Policy and Management Act of 1976 ("FLPMA" or "the Act"), 43 U.S.C. §§ 1701-1787, during which the agency has made eighty large-tract withdrawals (i.e., 5,000 acres or greater), and Congress has never once exercised its veto. *See* Cross-Motion, Ex. 1 (Holdren Decl.) Thus, the veto provision has, in practice, had no effect on FLPMA's functioning. Plaintiffs' additional claims fail because they are premised on a mistaken construct: their unfounded belief that the Secretary, without the veto, would be empowered to exercise the largely unfettered withdrawal authority acknowledged in *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915). Only by painting this inaccurate picture of a world without the veto do Plaintiffs' opposition arguments take on the slightest sheen of reason. Without this picture, the arguments fail.

As Federal Defendants explain below, section 204(c) is fully operational without the veto. Further, if the veto alone were severed, the Secretary would still remain subject to numerous FLPMA limitations on his withdrawal authority, thus fulfilling Congress's stated objective of constraining executive withdrawal authority. 43 U.S.C. § 1701(a)(4). These limitations impose meaningful restraints on the Secretary's conduct, despite Plaintiffs' claims to the contrary. The all-or-nothing approach Plaintiffs advocate (that is, either all of FLPMA's limitations apply, including the veto, or none of them do) is unnecessary and imprudent. Such a ruling would introduce a land-management regime never in force in the history of the Republic, and one not debated by Congress in 1976. Federal Defendants respectfully request that Plaintiffs' motions be denied and Defendants' cross-motions granted.

## ARGUMENT

The Congressional grant of large-tract withdrawal authority in subsection 204(c)(1) is unaffected by the unconstitutional veto provision and, under guiding canons of statutory construction, the Court should strive to sustain it if at all possible. *Ayotte v. Planned Parenthood of N. New England,* 546 U.S. 320, 329 (2006) (the court "tr[ies] not to nullify more of a legislature's work than is necessary," lest it "frustrate[] the intent of the elected representatives of the people"); *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (the court should "refrain from invalidating more of the statute than is necessary . . . .") (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984)). Plaintiffs' opposition briefs, Doc. 110 ("NMA Opp'n"), Doc. 113 ("NWMA Opp'n"), ignore this fundamental precept. The briefs detail Plaintiffs' reasons for

2

invalidating Section 204(c), but none of the reasons is "necessary" to resolve the constitutional problem, *Ayotte,* 546 U.S. at 329*, Alaska Airlines*, 480 U.S. at 684, and none satisfies Plaintiffs' burden of showing that Congress intended to condition the withdrawal authority on veto validity.

First, Plaintiffs present a litany of FLPMA passages and structural notes which they say produce anomalies in the absence of a veto, and they warn of conflicts with the Secretary's other withdrawal authorities. Next they contend incorrectly that, if only the veto is severed, the Secretary would enjoy the broad, and largely unfettered withdrawal authority recognized in *Midwest Oil*, which they insist cannot reflect Congressional intent. Finally, Plaintiffs charge that Federal Defendants completely misstate the import of the legislative history, yet they offer instead an unfounded account, based on supposition and narrowly targeted passages, lacking in context.  We address these contentions below.

**I. Neither the Language nor the Structure of the Act Shows that Congress Would Have Withheld Large-Tract Withdrawal Authority but for the Legislative Veto.**

Plaintiffs must affirmatively show that Congress would have withheld the withdrawal authority if it could not impose a legislative veto.  They attempt to do so through a series of arguments based on the language and structure of FLPMA.  NMA Opp'n at 2-7, NWMA Opp'n at 5-9.  Plaintiffs' contentions are unavailing because they merely identify perceived or inconsequential anomalies that *might* flow from severing only the veto.  They certainly do not show that Congress would have preferred a heretofore unknown and never-debated land-management regime, in which Congress,

not the Executive, must respond to the exigencies of public land management.

Plaintiffs' first contention is based on subsection 204(a), which constrains the Secretary's withdrawal authority by requiring that it be exercised "only in accordance with the provisions and limitations of this section." 43 U.S.C. § 1714(a). Plaintiffs argue this precludes severing only the veto, because the veto is one of several "limitations" on the Secretary's withdrawal authority imposed by the Act. *See* NMA Opp'n at 2-3, NWMA Opp'n at 6. Removing this or any other limitation, Plaintiffs reason, makes it impossible for the Secretary to exercise his authority "in accordance with the . . . limitations" of section 204. *Id*.

The contention is specious, suggesting a court would never be able to sever an invalid provision where a statute cross-references that provision. Further, it ignores FLPMA's severability provision, which directs that if any provision of the Act is held invalid, the "remainder of the Act and the application thereof shall not be affected thereby." *See* 43 U.S.C. § 1701, *Note on Severability of Provisions*, Pub. L. 94-579, § 707, 90 Stat. 2743, 2792-94. As Federal Defendants explained in their opening brief, Cross-motion at 7-8, the provision creates a presumption that Congress "did not intend the validity of . . . any part of the Act, to depend upon whether the veto clause . . . was invalid." *INS v. Chadha*, 462 U.S. 919, 932 (1983).

Plaintiffs ask the Court to ignore the *express* language of the severability provision, and the presumption it creates, in favor of an exception which at best (and Federal Defendants do not concede the point) is *implicit* in section 204(a). This is hardly "strong evidence" that Congress intended to prevent a court from severing the

veto and leaving the remaining provisions in effect. *Alaska Airlines,* 480 U.S. at 686. Without citing authority NWMA misstates the applicable standard. *See* NWMA Opp'n at 13. In fact, given the presence of a severability provision, the language on which Plaintiffs rely could just as easily be read to say that the Secretary must exercise his authority "in accordance with the [constitutionally valid] limitations" of section 204. Congress clearly provided that if any one limitation is invalidated, the severability provision would operate to preserve other valid provisions. Plaintiffs' textual argument does not change that. The same is true with respect to Plaintiffs' analogous arguments concerning subsection 204(e). NMA Opp'n at 4, NWMA Opp'n at 10, n.6. In neither case is the Court relegated to the all-or-nothing choice Plaintiffs espouse.

Plaintiffs' next contention is based on subsection 704(a) of FLPMA, which the parties agree repealed the Secretary's "implied" withdrawal authority recognized in *Midwest Oil*. NMA Opp'n at 3, NWMA Opp'n at 5-6. Plaintiffs argue Congress could not have intended to repeal the Secretary's broad pre-FLPMA authority and yet allow him authority "effectively duplicating that revoked." NMA Opp'n at 3. This is not the case here. The withdrawal authority resulting from severance of the veto would in no way duplicate what the Secretary enjoyed prior to FLPMA's enactment. The present-day authority remains subject to significant constraints, unknown prior to 1976.[1]

---

[1] For example, large-tract withdrawals may not exceed twenty years in duration (since FLPMA's enactment, only Congress may make permanent withdrawals). Formal public notice and hearings are required. The agency also must perform NEPA analysis. Further, the Secretary must prepare a detailed report to Congress explaining the reasons for withdrawal, identifying present uses and users on the affected lands, explaining why present uses are incompatible with proposed uses, identifying possible alternatives, explaining the process followed in analyzing the withdrawal, analyzing impacts on local government interests and economies, and supplying a report prepared by a

The same is true with regard to subsection 102(a)(4). *See* NMA Opp'n at 3, NWMA Opp'n at 6. Plaintiffs argue that Congress's statement in subsection 102(a)(4) (declaring a policy that Congress, among other things, "delineate the extent to which the Executive may withdraw lands without legislative action") precludes the conclusion that Congress intended the Secretary to enjoy "effectively unbounded Executive authority." NMA Opp'n at 3. The fact is,, he does not have such authority. Severing only the veto leaves numerous limitations – limitations Congress intended to impose.

With respect to structure, NMA restates the proximity argument of its opening brief (i.e., that both the withdrawal authority and the veto provision must fall because they are in the same subsection), and this time cites *Dorchy v. Kansas*, 264 U.S. 286, 290 (1924) in support. Plaintiffs' reliance on *Dorchy* is unavailing. There, the Supreme Court vacated and remanded a decision of the Supreme Court of Kansas for a ruling on severability of two provisions of the state's labor relations statute (one of which had recently been invalidated, and neither of which was a legislative veto). In doing so, the Supreme Court characterized the legal question for the state court as follows: "Whether section 19 is so interwoven with the system held invalid that the section cannot stand alone, is a question of interpretation and of legislative intent."

---

qualified mining engineer, engineering geologist, or geologist. *See* § 204(c)(2). Such reporting requirements not only impose a duty to present certain information to Congress; they also force the Secretary to incorporate such considerations into his decision-making process prior to making a large-tract withdrawal. As one scholar has noted, an agency "forced to identify and consider certain factors will [presumably] not ignore them in formulating a decision." *See* David H. Getches, *"Managing the Public Lands: The Authority of the Executive to Withdrawal Lands,"* 22 NAT. RESOURCES J. 279, 320 (1982). These requirements are in fact similar to the requirements of NEPA, designed to promote informed agency decision making and public participation. Despite Plaintiffs' claims to the contrary, they serve as very real constraints on the executive's exercise of the withdrawal authority.

Plaintiffs quote a portion of this sentence as if it were the Court's holding. NMA Opp'n at 6. In fact, the case provides no support beyond simply acknowledging that courts cannot, in all instances, sever only objectionable provisions.

Far more instructive is the Supreme Court's observation in *Alaska Airlines* that the problem with interwoven provisions is not a concern "when the invalid provision is a legislative veto, which by its very nature is separate from the operation of the substantive provisions of a statute." 480 U.S. at 684-85 (noting that veto provisions contemplate that "activity under the legislation would take place so long as Congress refrained from exercising that power"). Despite Plaintiffs' efforts to link the two provisions, they are inherently and functionally distinct: one substantive, the other procedural. Their proximity simply does not evidence Congressional intent to condition the withdrawal authority on veto validity. And thirty-six years of agency practice demonstrates that, in fact, "activity under the legislation [did] take place," even as Congress "refrained from exercising [its veto] power." 480 U.S. at 684-85. Thus subsection 204(c) is "'fully operative as a law,'" *Alaska Airlines,* 480 U.S. at 684 (quoting *Buckley v. Valeo*, 424 U.S. 1, 108 (1976)).

NMA also claims that severing only the veto would make the large-tract withdrawal authority in subsection 204(c) and the small-tract authority in subsection 204(d), "nonsensical" because the provisions "would differ little," and small-tract withdrawals would be subject to "greater restrictions" than large-tract withdrawals. NMA Opp'n at 6-7. These charges are unfounded. Apart from the veto, the distinctions and similarities of the provisions (and their respective limitations) are the

7

same before and after severance.  For example, under subsection 204(d), there is no requirement that the Secretary notify Congress or provide the report required by subsection 204(c).  This is true with or without the veto.[2]

Plaintiffs also contend the emergency withdrawal authority in subsection 204(e), 43 U.S.C. § 1714(e), becomes superfluous if only the veto is severed because the Secretary "would be able to do under . . . 204(c) exactly what he would otherwise do under . . . 204(e), only for longer."  NMA Opp'n at 7.  This claim mischaracterizes the provisions.  To accomplish a large-tract withdrawal, the Secretary must first give public notice of the proposed withdrawal, which segregates the lands from operation of the general land laws for up to two years, and then the Secretary must perform environmental analysis under NEPA, before making a decision on a proposed withdrawal.  *See* 43 C.F.R. § 2310.3-2(b)(3) (detailing the "information, studies, analyses and reports" needed to make a withdrawal).

By contrast, a withdrawal under subsection 204(e) can only be made if the Secretary makes a determination that an "emergency situation exists and that extraordinary measures must be taken to preserve values that would otherwise be lost." 43 U.S.C. § 1714(e).  If such "an emergency situation exists," the withdrawal takes effect immediately and can only last up to three years.  The agency then has three

---

[2] Further, the five-year provision for withdrawals in aid of legislation, 43 U.S.C. § 1714(d)(3), § 204(d), which Plaintiffs tout as an example of greater restriction, actually represents one of three circumstances under subsection 204(d)(3) where the Secretary may exercise small-tract withdrawal authority, the other two allowing withdrawals of indefinite and twenty-year durations, in specified circumstances.  43 U.S.C. §§ 1714(d)(1), (2).  Thus, subsection 204(d) differs from subsection 204(c) in multiple respects, including intended uses, but its restrictive effects are the same, with or without the veto.

8

1  months to submit a withdrawal report to Congress (as distinguished from the
2  simultaneous submission required under subsection 204(c)). NEPA analysis and public
3  hearings and comment are not required. 43 U.S.C. § 1714(h). Thus, with or without
4  the veto, subsection 204(e) affords the Secretary a distinct means of withdrawing lands
5  on an emergency basis. At the end of the three year period, the withdrawal may only be
6  extended by use of the large-tract or small-tract procedures in subsections 204(c) and
7  204(d), and in accordance with the notice and segregation provisions of subsection
8  204(b)(1). Clearly, each procedure has its own purpose and advantages. Plaintiffs are
9  wrong in insisting that section 204(e) is rendered superfluous by severing only the veto.

In sum, the Court should sever the veto because the plain language and structure of FLPMA do not require otherwise.

**II. The Legislative History of the Act Does Not Provide Strong Evidence that Congress Would Have Withheld Large-Tract Withdrawal Authority but for the Legislative Veto.**

Plaintiffs' motions should also be denied because they fail to provide "strong evidence," in the legislative history, that "the statute created in [the] absence [of the veto provision] is legislation that Congress would not have enacted." *Alaska Airlines*, 480 U.S. at 685. They argue Congress intended to condition the withdrawal authority on veto validity, and note that, prior to FLPMA's enactment, the Public Land Law Review Commission ("PLLRC") and some members of Congress were concerned with the executive's largely unfettered withdrawal authority. Federal Defendants acknowledge that one of the Congressional objectives stated in section 102 of FLPMA, 43 U.S.C. § 1701(a)(4) (declaration of policy), was to assert its authority over public

9

lands and limit executive authority as to withdrawals.  Plaintiffs, however, grossly overstate the degree to which Congress sought to do so.

NWMA argues that Congress would not have delegated the large tract withdrawal authority without a veto and insists, in support, that "providing for control over large-tract withdrawals was a 'major objective' of FLPMA." NWMA Opp'n at 13. Contrary to Plaintiff's implication, the House Report on which NWMA relies does not state that the veto itself was a major objective.  H.R. Rep. No. 94-1163 at 3, 4, 9 (1976) *reprinted in* Legislative History of the Federal Land and Policy Management Act of 1976 (hereinafter "FLPMA Leg. His.") at 433, 434, 439.  Nor does the provision mention withdrawals at all.  Rather, it states in general terms that one of the goals of the legislation was to facilitate Congressional oversight of "public land operations."  *See id.* at 2, *reprinted in* FLPMA Leg. His. at 432, NWMA Opp'n at 14.  The other cited provisions merely reflect the fact that the withdrawal provision of the House bill (although notably not the Senate Bill, 122 Cong. Rec. S12931 (July 30, 1976) (statement of Sen. Jackson), FLPMA Leg. His. at 743 (comparing House and Senate versions of bills)), included a legislative veto provision.

NMA also discusses FLPMA's objective of imposing limitations on the executive's exercise of his withdrawal authority but the conclusions they draw are not supported by the legislative history.  *See* NMA Opp'n at 8 ("Congress would not have been comfortable with restoring the Secretary's pre-FLPMA broad, large-scale withdrawal authority"); NMA Opp'n at 9 ("the overriding message [of the PLLRC Report] was that Congress impose some set of express procedures and limits as a

prerequisite for the exercise of delegated authority"). These arguments do not demand the all-or-nothing approach Plaintiffs advocate (i.e., either all FLPMA's limitations on the withdrawal authority, including the veto, apply or none of them do). Without the veto, the Act imposes meaningful restrictions on the Secretary's authority, which is far more constrained today than it ever was in the pre-FLPMA period, as explained in argument I. *Supra* at 5, n.1. Severing the veto provision would not, as Plaintiffs suggest, NMA Opp'n at 3, return "effectively unbounded" authority to the Secretary.

Plaintiffs cite no legislative history demonstrating that the veto provision itself was the linchpin, without which Congress would have withheld large-tract withdrawal authority and assumed the heavy responsibility for this aspect of land management. As explained in Federal Defendants' opening brief, Cross-Motion at 17-18, the overwhelming evidence is that Congress had no such intention.

Plaintiffs cite remarks of members of Congress expressing that some Secretaries had abused the withdrawal authority, and debating the acreage ceiling to which notification requirements and the legislative veto would apply. *See* NMA Opp'n at 10; NWMA Opp'n at 14-15. The remarks of individual legislators, however, are of limited value in determining intent, as even NWMA acknowledges.[3] At most, they reflect that some members of Congress preferred that the large-tract withdrawal authority include a legislative veto, but this is not the question. *See Alaska Airlines v. Donovan*, 766 F.2d 1550, 1560 (D.C. Cir. 1985) *aff'd* 480 U.S. 678 (1987) ("The issue cannot be whether

---

[3] See NWMA Opp'n at 14, n. 12 ("Although NWMA relies on individual statements, it recognizes that the Committee Reports are more indicative of Congress' intent, *Garcia v. United States,* 469 US. 70, 76 (1984) and that the text of FLPMA is most authoritative. *Exxon Mobil Corp. v. Allapattah Serv., Inc.* 545 U.S. 546, 568 (2005)").

11

Congress preferred the statute with the unconstitutional provision over the same statute without that provision. Manifestly, Congress' preference is abundantly clear from its inclusion of the unconstitutional provision"). In sum, the stated concerns of PLLRC and some members of Congress, as well as the policy objectives of subsection 102(a)(4), 43 U.S.C. § 1701 (a)(4), are all still satisfied *without the veto*.

NMA also claims that certain legislators were concerned only with acreage and "evidently…understood that the veto was an essential and irrevocable component" of large-tract withdrawal authority. NMA Opp'n at 11. A close reading of those statements, however, precludes this conclusion. For example, Representative Seiberling stated that the legislative veto provision was one "of the most objectionable provisions" in the legislation. 95 Cong. Rec. H7583 *reprinted in* FLPMA Leg. His. at 669. And while he did argue for an increase in the acreage subject to the veto provision, he indicated only that such an increase would "ease the situation considerably." *Id.* Representative Mink, in arguing against the provision, stated that she was strongly opposed to "reviewing all withdrawal decisions on tracts over 5000 acres" and indicated that "*if Congress absolutely deems it necessary* to exercise control over the withdrawal system [then it should increase the acreage limit to 25,000 acres]. *Id.* at H7585 (emphasis added). The remarks of these members, even if they did not outright oppose a legislative veto, certainly do not convey that such a provision was an "essential and irrevocable" component of the withdrawal authority.

Despite Plaintiffs' contentions to the contrary, NMA Opp'n at 12, NWMA Opp'n at 16, n. 15, the Act, and its legislative history, are fundamentally different from

the statute and legislative history examined in *City of New Haven v. United States*, 809 F. 2d 900, 907 (D.C. Cir. 1987). In that case, as NMA notes, the "raison d'etre of the entire legislative effort was to assert control over presidential impoundments [of budgetary appropriations]." NMA Opp'n at 12 (citing *City of New Haven*, 809 F.2d at 907). What Plaintiff does not note, however, is that prior to the enactment of the Impoundment Control Act at issue in that case, courts had repeatedly held that the President had very little impoundment authority. *City of New Haven*, 809 F.2d at 903-04. Thus severing only the legislative veto provision while leaving the impoundment authority intact would have given the executive *more* authority than he had before enactment of the statute – which Congress could not have intended, given that the purpose of the legislation was to constrain executive authority. *Id.* Here, in contrast, severance of the veto only would still leave significant constraints on the executive's authority in place, constraints that did not exist prior to FLPMA's enactment. Moreover, in *City of New Haven*, there was not a single legislative expression of support for the proposition that the executive be allowed to defer budget authority without *at least* a one-house veto. *Id.* at 903. As noted above and in the Cross-Motion at 18-19, not only was concern expressed about the increased burden of a legislative veto, but the bill initially introduced in the Senate would have left the Secretary's "effectively unbounded" pre-FLPMA authority, NMA Opp'n at 3, intact. *See* National Resource Lands Management Act, S. 507, 94th Cong. (1975).

Further, NMA incorrectly claims that "the Secretary's ability to withdraw large tracts of lands for 20 years (with unlimited 20-year extensions) without Congressional

13

action would contradict" the PLLRC recommendation that "[l]arge-scale . . . withdrawals of a permanent or indefinite term should be accomplished only by act of Congress."  NMA Opp'n at 9.  Under FLPMA, permanent large-tract withdrawals require an act of Congress regardless.  *See* 43 U.S.C. § 1714(c)(1) (limiting large-tract withdrawals to a duration of twenty years).[4]  Moreover, it is clear that the PLLRC recommendation on this point made no reference to a legislative veto, referring instead to "Acts" of Congress (which require Presentment).  Thus it is actually Plaintiffs' theory that conflicts with the PLLRC Report, which specifically recommended that all withdrawals *not* of a permanent or indefinite term be expressly delegated to the executive.  *See* PLLRC Report at 54 (Recommendation 8).[5]

In the end, FLPMA's legislative history gives no indication that Congress would have withheld large-tract withdrawal with a veto.  Yet Plaintiffs ask the Court to impose a land-management regime never in place – one where Congress alone must vigilantly steward the public lands.  The Court should not do so.

---

[4] To the extent that Plaintiffs claim that the ability to extend a withdrawal makes its term "indefinite or permanent", *Congress* did not consider it so.  See 43 U.S.C. 1714(f) (allowing the Secretary to extend a withdrawal only upon compliance with section 204(c)(1) or (d), whichever is applicable, and only if he finds that the "purpose for which the withdrawal was first made" requires the extension); *New Mexico v. Watkins*, 969 F.2d 1122, 1135-36 (D.C. Cir. 1992).

[5] NMA's reliance on the Interior Board of Land Appeals *Casey E. Folks*, 183 IBLA 24 (Sept. 20, 2012) decision is likewise misplaced. NMA Opp'n at 10. *Casey Folks* involved the unrelated question of whether FLPMA withdrawals automatically open to the public land laws upon expiration or whether BLM must issue an opening order in accordance with 43 C.F.R. 2091.6.  In any event, Federal Defendants do not dispute the general proposition that withdrawals must comply with FLPMA's procedural requirements.  That, however, does not answer the question of which procedures survive a constitutional infirmity.

# CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that the Court deny Plaintiffs' motions for partial summary judgment and grant summary judgment in favor of defendants as to Count 1 of the NMA amended complaint, Doc. *56 (no. 3:12-cv-08038), and as to Count 7 of the NWMA complaint, Doc. *1 (No. 3:12-cv-08042).

Dated: February 28, 2013

                        Respectfully Submitted,

                        IGNACIA S. MORENO,
                        Assistant Attorney General
                        Environment and Natural Resources Division

                        /s/ John S. Most
                        JOHN S. MOST, Trial Attorney
                        Virginia Bar, No. 27176
                        DOMINIKA TARCZYNSKA, Trial Attorney
                        New York Bar, No. 4431573
                        Natural Resources Section
                        P.O. Box 7611
                        Washington, D.C. 20044-7611
                        (202) 305-0447(Tarczynska)
                        202-616-3353 (Most)
                        202-305-0506 (fax)
                        DOMINIKA.TARCZYNSKA@USDOJ.GOV
                        JOHN.MOST@USDOJ.GOV

                        *Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that I am causing the foregoing to be served upon counsel of record through the Court's electronic service system (ECF/CM).

Dated:  February 28, 2013

                       /s/ Dominika Tarczynska
                       *Counsel for Federal Defendants*