1    Melanie R. Kay (*pro hac vice*)
     Edward B. Zukoski (*pro hac vice*)
2    Earthjustice
     1400 Glenarm Place, Suite 300
3    Denver, CO  80202
     mkay@earthjustice.org
4    tzukoski@earthjustice.org
     Telephone: (303) 623-9466
5    Fax: (303) 623-8083

6    Roger Flynn *(pro hac vice)*
     Western Mining Action Project
7    P.O. Box 349, 440 Main St., #2
     Lyons, CO  80540
8    wmap@igc.org
     Telephone: (303) 823-5738
9    Fax: (303) 823-5732

10   Attorneys for Defendant-Intervenors
        Grand Canyon Trust, <u>et al.</u>,

11                  **UNITED STATES DISTRICT COURT**
12                  **FOR THE DISTRICT OF ARIZONA**

13   Gregory Yount,                          )
             Plaintiff,                      )
14                                           )   Case No. 3:11-cv-08171-PCT-DGC
     v.                                      )   (Lead case)
15                                           )
     Ken Salazar, Secretary of the Interior, <u>et al.</u>;   )
16           Defendants                      )
                                             )
17   _____        )
                                             )
18   National Mining Association, <u>et al.</u>;   )
             Plaintiffs,                     )   Case No. 3:11-cv-08038-PCT-DGC
19                                           )
     v.                                      )
20                                           )
     Ken Salazar, Secretary of the Interior, <u>et al.</u>;   )
21           Defendants                      )
                                             )
22   _____        )
     Northwest Mining Association,           )
23           Plaintiff,                      )   Case No. 3:12-cv-08042-PCT-DGC
                                             )
24   v.                                      )
                                             )
25   Ken Salazar, Secretary of the Interior, <u>et al.</u>;   )
             Defendants,                     )
26   _____        )

27

28

| | |
|---|---|
| Quaterra Alaska Incorporated, <u>et al.</u>, | ) |
| Plaintiffs, | ) Case No. 3:12-cv-08075-PCT-DGC |
| | ) |
| v. | ) |
| | ) |
| Ken Salazar, Secretary of the Interior, <u>et al.</u>; | ) |
| Defendants | ) |
| | ) |

**DEFENDANT-INTERVENORS GRAND CANYON TRUST <u>ET AL.</u>'S
REPLY IN SUPPORT OF ITS CROSS-MOTION
FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.   JUDICIAL RESTRAINT REQUIRES THAT THE EXECUTIVE'S AUTHORITY TO MAKE LARGE-TRACT WITHDRAWALS REMAINS EVEN IF THE LEGISLATIVE VETO IS UNCONSTITUTIONAL ...................1

    A.   Plaintiffs Must Show "Strong Evidence" That The Legislative Veto Is Not Severable ............................................................1

    B.   FLPMA's Structure And Text Do Not Provide "Strong Evidence" That Congress Would Have Prohibited All Executive Large-Tract Withdrawals Absent A Legislative Veto ...................................2

    C.   FLPMA's Legislative History Does Not Show 'Strong Evidence' Contradicting Severability ...................................................7

    D.   Severing Only The Veto Would Leave FLPMA Fully Operative As A Law, And The Remaining Law Comports With Congressional Intent ................................................................11

II.  IF THE COURT FINDS THE VETO INSEVERABLE, IT SHOULD ORDER FURTHER BRIEFING ON REMEDY .................................13

CONCLUSION ........................................................................13

1    Assuming that the legislative veto in Subsection 204(c)(1) of the Federal Land

2   Policy and Management Act ("FLPMA") is unconstitutional, it is severable.  In

3   determining what portion of a law to invalidate, this Court must exercise judicial restraint

4   and sever only the veto, unless the National Mining Association ("NMA") and Northwest

5   Mining Association ("Northwest") can identify "strong evidence" that Congress would

6   not have provided the Executive with authority to make large-tract withdrawals absent

7   the legislative veto.

8    NMA and Northwest fail to meet their heavy burden of providing "strong

9   evidence" to overcome the presumption of severability.  Contrary to their allegations,

10  FLPMA retains procedural safeguards on the Executive's authority absent the veto, in

11  line with Congress's intent.  Legislative history does not reveal that Congress would have

12  prevented large-tract Executive withdrawals absent the veto; the Senate, and some

13  FLPMA supporters in the House, did not favor limiting Executive withdrawal authority at

14  all.  NMA's and Northwest's partial summary judgment motions must be denied.

15  **I.   JUDICIAL RESTRAINT REQUIRES THAT THE EXECUTIVE'S**
16  **AUTHORITY TO MAKE LARGE-TRACT WITHDRAWALS REMAINS**
    **EVEN IF THE LEGISLATIVE VETO IS UNCONSTITUTIONAL**

17  **A.   Plaintiffs Must Show "Strong Evidence" That The Legislative Veto Is**
    **Not Severable.**

18

19   When faced with an unconstitutional provision, courts "start with the settled

20  premise that severability is fundamentally rooted in a respect for separation of powers

21  and notions of judicial restraint."  Florida v. U.S. Dep't of Health & Human Servs., 648

22  F.3d 1235, 1320-21 (11th Cir. 2011) (citing Ayotte v. Planned Parenthood of N. New

23  Eng., 546 U.S. 320, 329-30 (2006)), aff'd in part and rev'd in part, Nat'l Fed'n of Indep.

24  Bus. v. Sebelius, 132 S. Ct. 2566 (2012) ("NFIB").  Courts must "try not to nullify more

25  of a legislature's work than is necessary, for we know that '[a] ruling of

26  unconstitutionality frustrates the intent of the elected representatives of the people.'"

27  Ayotte, 546 U.S. at 329 (quoting Regan v. Time, Inc., 468 U.S. 641, 652 (1984) (plurality

28

1

1  opinion)).  A court thus "undertakes a salvage operation; it does not demolish the

2  legislation .…"  NFIB, 132 S. Ct. at 2630 (Ginsburg, J., concurring as to remedy).

3       To effectuate these conservative principles, courts presume invalid language is

4  severable and impose a "heavy burden" on movants seeking to sever more than the

5  unconstitutional language.  Florida, 648 F.3d at 1323.  To overcome the presumption, a

6  movant must show it is "evident (as opposed to possible or reasonable)" that Congress

7  would not have enacted the provisions absent the invalid language.  Florida, 648 F.3d at

8  1327.  The burden elevates where, as here, the act in question contains a severability

9  clause.  FLPMA, Pub. L. No. 94-579, § 707 (1976).  A unanimous Supreme Court has

10 stated that "unless there is strong evidence that Congress intended otherwise, the

11 objectionable provision can be excised from the remainder of the statute."  Alaska

12 Airlines, Inc. v. Brock, 480 U.S. 678, 686 (1987) (emphasis added).[1]  Courts divine

13 Congress's intent by examining the law's text, structure, and legislative history.  Id. at

14 687.

15      **B.**     **FLPMA's Structure And Text Do Not Provide "Strong Evidence" That**

16                **Congress Would Have Prohibited All Executive Large-Tract Withdrawals Absent A Legislative Veto.**

17      With FLPMA, Congress addressed the prior, haphazard nature of Executive public

18 land withdrawals unconstrained by a statutory grant of authority.  Trust Memo. 8-9 (Doc.

19 102).  Congress adopted most Public Land Law Review Commission ("PLLRC")

20 recommendations for reforming the practice of Executive withdrawals that sprang from

21 the Midwest Oil decision, and created a two-tier system.  See United States v. Midwest

22 Oil, 236 U.S. 459 (1915).  First, Congress confirmed that it reserved for itself the power

23 to make permanent withdrawals to create national parks, forests, wilderness and certain

24 defense lands.  43 U.S.C. § 1701(a)(4); H.R. Rep. No. 94-1163, at 9 (1976), reprinted in

25 1976 U.S.C.C.A.N. 6175, 6183.  Second, Congress "delineate[d] the extent to which the

26  

---

[1]  Northwest (but not NMA) suggests that Plaintiffs need not show "strong evidence" to overcome the presumption of severability.  Nw. Reply 13.  However, the Ninth Circuit follows Alaska Airlines.  See United States v. Spokane Tribe of Indians, 139 F.3d 1297, 1299-1300 (9th Cir. 1998).

1  Executive may withdraw lands without legislative action."  43 U.S.C. § 1701(a)(4)

2  (emphasis added).

3       Congress squarely delegated to the Executive statutory authority to make large-

4  tract withdrawals, with numerous procedural safeguards, including:  (1) only Department

5  of the Interior (DOI) officials confirmed by the Senate may exercise withdrawal

6  authority, facilitating continued oversight by both Congress and DOI, 43 U.S.C.

7  § 1714(a); (2) withdrawals must be initiated by an application and public notice, id.

8  § 1714(b)(1); (3) for large-tract and emergency withdrawals, DOI must prepare a detailed

9  report that provides, among other things, for public hearings, weighing of alternative

10  sites, a geologic report, consultation with local governments, and an evaluation of

11  environmental and economic impacts, id. §§ 1714(c)(2) & (h); (4) DOI may make large-

12  tract withdrawals (5,000 acres or larger) only for 20 years, id. § 1714(c)(1); and

13  (5) DOI may extend such withdrawals only if the Secretary determines the purpose for

14  which the withdrawal was first made "requires" the extension.  Id. § 1714(f); see also

15  Trust Memo. 8-9.  Accordingly, through these limitations and procedures, Congress was

16  able to implement the PLLRC's recommendations to "insure proper justification for

17  proposed withdrawals, provide for public participation in their consideration, and

18  establish criteria for executive action."  Pub. Land Law Review Comm'n, One Third of

19  the Nation's Land 9 (1970) ("PLLRC Report"), excerpts attached at Ex. 1.

20       Plaintiffs argue that Congress's delegation of large-tract withdrawal authority is

21  invalid because, absent the veto, the statute that remains fails to achieve FLPMA's goals.

22  NMA asserts that without the veto, FLPMA's withdrawal authority "effectively

23  duplicat[es]" the pre-FLPMA regime in which no regulatory framework limited the

24  Executive's implied authority.  NMA Reply 3.  NMA is mistaken.  Absent the veto,

25  FLPMA still limits who can make withdrawals and for how long, defines under what

26  circumstances withdrawals can be renewed, guarantees that DOI research and prepare

27  detailed reports justifying large-tract withdrawals and that Congress receive this

28

3

information to evaluate large-tract withdrawals, and provides for public hearings.  See supra 3.  FLPMA thus aids both branches in more rational withdrawal decisionmaking.[2]

Plaintiffs' argument that FLPMA's notice and detailed report requirement are "meaningless" absent a veto is contrary to Chadha and Alaska Airlines.  Nw. Reply 10 (Doc. 113).  See also NMA Reply 5.  In severing the vetoes in those cases, the Supreme Court concluded that retaining reports to Congress while severing legislative vetoes preserves Congressional oversight and Congress's ability to influence or repeal the Executive action.  I.N.S. v. Chadha, 462 U.S. 919, 934-35 (1983) ("Congress' oversight of the exercise of this delegated authority is preserved" absent the veto through report to Congress); Alaska Airlines, 480 U.S. at 678.[3]  Moreover, preparing the report ensures that DOI will carefully evaluate a proposed withdrawal and to solicit public input.  This is exactly how the PLLRC envisioned the reporting requirement would improve Executive decisionmaking.  See PLLRC report at 55-56 ("evaluation of the merits of a proposed withdrawal … are essential steps … to be consistent with sound land use planning").

Although the veto may be considered a check on Executive large-tract withdrawals, it is but one of many.  The Supreme Court has repeatedly severed an

---

[2]  NMA avers that FLPMA's 20-year limit on withdrawals is effectively the same as an indefinite withdrawal, because, they allege, such withdrawals can be "indefinitely renew[ed]."  NMA Reply 4.  But 20 years is not forever.  NMA also ignores the fact that the process for extending withdrawals requires Secretarial review to ensure the purposes of the extension are the same.  See New Mexico v. Watkins, 969 F.2d 1122, 1135-37 (D.C. Cir. 1992); Trust Memo. 11.  This is a far more restrictive process than the pre-FLPMA regime, during which Executive withdrawals could continue indefinitely, with no process for reviewing whether a withdrawal was still necessary.

[3]  Other courts agree.  See Alabama Power Co. v. U.S. Dep't of Energy, 307 F.3d 1300, 1308 (11th Cir. 2002) (severing veto from reporting requirement because "[t]hrough the reporting requirement, Congress will still have the ability to keep tabs on the Secretary's use of … discretion."); Gulf Oil Corp. v. Dyke, 734 F.2d 797, 804 (Temp. Emer. Ct. App. 1984) (severing veto but not reporting provision, and following Chadha in concluding that without veto, Congressional oversight purposes were served through law's requirement that Executive report to Congress).  Plaintiffs' reliance on the refusal of the court in City of New Haven to sever the report from the veto because that Congress was not interested in obtaining information from the executive is misplaced.  NMA Reply 5.  There, the report found would not have aided Congress because existing law already required the President to submit information about the executive action subject to a veto.  See City of New Haven, Conn. v. United States, 634 F. Supp. 1449, 1457 n.11 (D.D.C. 1986).

4

1  unconstitutional provision when it is one of several provisions aimed at achieving the

2  statute's goal.  See, e.g., United States v. Booker, 543 U.S. 220, 264 (2005) (eliminating

3  mandatory nature of sentencing guidelines but retaining other features that help to further

4  Congress's objectives is consistent with legislative intent).[4]  Because FLPMA, absent the

5  veto, would still achieve the Act's purpose of "delineating the extent to which the

6  Executive may withdraw lands without legislative action," 43 U.S.C. § 1701(a)(4), by

7  placing real limits on who, when, and how large-tract withdrawals can be made, severing

8  only the veto comports with legislative intent.

9       Downplaying the significance of time limits, reports, hearings, and notices in

10  delineating federal withdrawal authority, Plaintiffs exalt the legislative veto as the only

11  effective check on Executive withdrawals.  See NMA Reply 5.  This argument ignores

12  how weak the veto is.  Congress purposefully delegated to the Executive authority to

13  make large-tract withdrawals "without legislative action."  The Executive need not wait

14  until a veto period runs; any withdrawal goes into effect immediately, making this veto

15  weaker than the many pre-Chadha vetoes containing "report and wait" provisions.  Id.

16  § 1714(c)(1).  Further, no veto could occur unless both houses disapproved the

17  withdrawal, making it more difficult to implement than a one-house veto.  Id.[5]

18       Plaintiffs contend FLPMA's structure demonstrates that the act will not function

19  logically absent the veto, and so all of Subsection 204(c)(1) must be severed.  Plaintiffs

20

21  ---
[4]  See also New York v. United States, 505 U.S. 144, 186 (1992) (invalidating one of a series of provisions designed to achieve Congress's clear purpose should not frustrate the overall purpose); NFIB, 132 S.Ct. at 2608 (severing provision authorizing a means for

22  satisfying another of the act's key provisions where remaining reforms would function consistently with Congress's basic objectives).

23  [5]  The veto provision itself is sloppily drafted, something one would not expect if, as Plaintiffs allege, Congress regarded the veto as the most important check on Executive

24  withdrawal authority.  The veto provision refers to a "concurrent resolution" that states that "such House does not approve the withdrawal."  43 U.S.C. § 1714(c)(1).  Concurrent

25  resolutions generally address the sentiments of both chambers, not a single house.  The veto provision also refers to a "Presidential recommendation," a reference to a procedure

26  not present in Subsection 204(c), but present elsewhere in FLPMA.  Id.; see 43 U.S.C. § 1714(l)(2).  See also David H. Getches, Managing the Public Lands: The Authority of

27  the Executive to Withdraw Lands, 22 Nat. Resources J. 279, 318 n.225 (1982) (veto is "fraught with interpretive problems").

28

1  again mischaracterize the law.  Contrary to NMA's assertion, loss of the veto does not

2  erase all distinctions between Subsection 204(c)'s large-tract withdrawal and Subsection

3  204(e)'s emergency withdrawal authority.  NMA Reply 7.  All other distinctions remain.

4  The emergency withdrawal provisions allow DOI to move more quickly because in an

5  emergency, DOI need not publish notice of the withdrawal in the Federal Register before-

6  hand, 43 U.S.C. § 1714(b)(2), need not hold public hearings, id. § 1714(h), need not

7  obtain the consent of agency or department heads (outside of DOI) with jurisdiction over

8  the withdrawn lands, id. § 1714(i), and need not provide reports to Congress when it

9  provides notice.  Id. § 1714(c)(2), (e).

10      Important distinctions remain between large- and small-tract withdrawals absent

11  the veto.  NMA Reply 6.  Small-tract withdrawals for "a resource use" may be indefinite

12  in duration; not so large-tract withdrawals.  43 U.S.C. § 1714(c)(1) & (d)(1).  DOI need

13  not prepare the detailed report and notify Congress when making smaller withdrawals.

14  Id. § 1714(c)(2).

15      Finally, based on a crabbed interpretation of FLPMA Subsection 204(a), Plaintiffs

16  assert that if any one of Section 204's limitations , such as the veto, is removed, all

17  Executive authority for withdrawals is eliminated.  See NMA Reply 2, 4; Nw. Reply 6

18  n.3.  This interpretation renders meaningless FLPMA's severability provision.  A more

19  reasonable construction of Subsection 204(a) provides meaning to both 204(a) and the

20  severability clause.  Subsection 204(a) confirms Congress's intent to eliminate any non-

21  statutory, implied withdrawal authority, leaving behind only two types of withdrawals:

22  Congressional withdrawals enacted legislatively and Executive withdrawals made

23  pursuant to explicit legislative authorization.[6]  As Charles Wheatley, who prepared the

24  extensive report on withdrawals that informed the PLLRC Report, verified:

---

25  [6]  FLPMA implements Congress's objective of "delineat[ing] the extent to which the

26  Executive may withdraw lands without legislative action," 43 U.S.C. § 1701(a)(4), by
    jointly repealing the non-statutory, implied grant of power establishing statutory
    guidelines that define the executive's statutory withdrawal authority.  Pub. L. No. 94-579,

27  § 704(a) (1976) (repeal); 43 U.S.C. § 1714(a) (grant).  The House Report confirms that

28  the two sections work in tandem.  See H.R. Rep. 94-1163, at 9 (1976) (explaining Section

1
2
3

> The delineation by the Act of the specific terms and conditions upon which the Secretary of the Interior can exercise withdrawal power and the persons to whom it may be delegated, make clear that Congress intended to occupy the entire field permitted under its constitutional authority over the public lands and to control and direct the executive use of withdrawal power.

4

Charles F. Wheatley, Jr., Withdrawals Under the Federal Land Policy and Management

5

Act of 1976, 21 Ariz. L. Rev. 311, 319 (1979).

6

NMA asserts that Section 204(a) is a specific provision that overrides the more

7

general severability clause.  See NMA Reply at 14.  The rule of statutory construction

8

NMA offers does not apply here, however, because this rule applies only when the

9

specific and general statutory provisions conflict.  Nat'l Cable & Telecomm. Ass'n v.

10

Gulf Power Co., 534 U.S. 327, 335-36 (2002).  There is no evidence of a conflict here.

11

Section 204(a) simply provides that all withdrawals are to be based on FLPMA, and not

12

some implied authority.  Subsection 204(a)'s "only in accordance with" clause does not

13

signal congressional intent to override the severability clause.[7]  Accord Morton v.

14

Mancari, 417 U.S. 535, 551 (1974) ("when two statutes are capable of coexistence, it is

15

the duty of the courts, absent a clearly expressed congressional intention to the contrary,

16

to regard each as effective").

17

### C.    FLPMA's Legislative History Does Not Show 'Strong Evidence' Contradicting Severability.

18
19

Legislative history also fails to provide "strong evidence" to overcome the

20

presumption that the Court should sever only Subsection 204(c)(1)'s veto provision.

21

Plaintiffs' cites to a few snippets of legislative history does not make it "evident," let

22
23

---

24

204's two types of withdrawal authorities by reference to Section 704's repeal); id. at 29 (discussing the Section 204's grant of authority to the Secretary in light of Section 704's

25

repeal).  See also 122 Cong. Rec. H7597 (July 22, 1976) reprinted in FLPMA Leg. Hist. at 683 (statement of Rep. Melcher) ("clear that section 204 is a grant to the Secretary of authority" to make withdrawals).

26

[7] The concurrence in Miller v. Albright emphasized that statute's narrowly tailored

27

language of "and not otherwise" as a sign of clear congressional intent to override another provision, 523 U.S. 420, 457 (1998), which is a clearer and more manifest

28

statement of limitation than FLPMA's "only."

1  alone strongly evident, that Congress would have declined to provide the Executive with

2  large-tract withdrawal authority absent the veto.

3       The Supreme Court has "repeatedly stated that the authoritative source for finding

4  the Legislature's intent" outside of the text of the bill itself "lies in the Committee

5  Reports on the bill." Garcia v. United States, 469 U.S. 70, 76 (1984).  Such reports are

6  "more authoritative than comments from the floor." Id.  "Stray comments by individual

7  legislators, not otherwise supported by statutory language or committee reports, cannot

8  be attributed to the full body …." In re Kelly 841 F.2d 908, 912 n.3 (9th Cir. 1988).

9       For good reason, Plaintiffs largely ignore the Senate, House, and Conference

10  Committee reports; those reports contain little evidence to support Plaintiffs' position.

11  The Conference Report says almost nothing about withdrawals and nothing at all about

12  vetoing withdrawals.  H.R. Rep. No. 94-1724 at 58, 66 (Conf. Rep.), reprinted in 1976

13  U.S.C.C.A.N. 6227, 6230, 6237.  The House report confirms that while the House was

14  concerned with "oversight," it intended to delegate to the Secretary "subject to certain

15  procedural controls, authority to create, modify, and terminate all withdrawals … existing

16  and proposed other than those reserved by the bill to the Congress." H.R. Rep. No. 94-

17  1163, at 3-4, 9 (1976), reprinted in 1976 U.S.C.C.A.N. 6175, 6178 (emphasis added).

18  See also Trust Memo. 16.[8]  The House report states that the House bill terminated the

19  Secretary's implied grant of authority to make indefinite withdrawals, but replaced it with

20  "a general grant of authority to the Secretary … to make and modify withdrawals subject

21  to certain procedural requirements."  H.R. Rep. No. 94-1163, at 29.  The House report

22  nowhere indicates that, absent the veto, the House would have revoked its "general grant"

23  to the Secretary.

24       Meanwhile, the Senate did not adopt any provisions limiting the Executive's

25  withdrawal authority in S. 507, its precursor to FLPMA.  See Trust Memo. 15-16.  The

---

[8]  Northwest cites a statement in the House Report that the veto would provide Congress
the "opportunity to terminate all" large-tract withdrawals.  Nw. Reply 14.  The language
Northwest quotes merely explains the bill's provisions, something courts have found "not
helpful" in determining legislative intent.  See Trust Memo. 16-17.

8

report accompanying S. 507 is similarly silent.  <u>See</u> S. Rep. No. 94-583 (1975), <u>reprinted</u>

<u>in</u> FLPMA Leg. Hist. at 66-183.  The Senate's silence shows that chamber had little

interest in regulating Executive withdrawals.

Documents prepared for the Conference Committee confirm that the veto was not

consistent with the Senate's approach.  In the Conference Committee's print, staff

identified and attempted to reconcile differences between the House and Senate bills.  <u>See</u>

Staff of Committee on Conference of S.507, 94th Cong., Federal Land Policy and

Management Act & Natural Resource Lands Management Act (Comm. Print 1976),

<u>reprinted in</u> FLPMA Legis. Hist., at 747-48 (Ex. 2).  The legislative veto language, and

virtually only that language, was identified as consistent with neither "the provisions" of

both bills nor "the <u>objectives</u> of the two Houses," but instead was "included in only one

version of the bill" and "staff identified no basis for a definitive recommendation."  <u>Id.</u>

748, 768.  This underscores that it would be "consistent" with the Senate's bill, and the

Senate's objectives, to have no veto at all.

Further, the House report shows that some FLPMA supporters opposed limits on

Executive withdrawal authority.  Rep. Udall, a senior member of the House Interior and

Insular Affairs Committee and the conference committee, filed "separate views" on the

House bill, stating:

> <u>I disagree with those sections of the bill which set new procedures for</u>
> <u>Congressional review of Executive withdrawals of public lands.</u>  While I
> have always been in strong favor of additional oversight of the Department of
> the Interior by the Congress and this Committee, the simple fact is that the
> mechanism of "withdrawal" of public lands from mineral entry is currently
> the only defense we have against mining activity on the public domain.

H.R. Rep. 94-1163, at 220, <u>reprinted in</u> FLPMA Leg. Hist. at 650 (Ex. 3).  Rep.

Seiberling, also a member of the same House Committee and a conferee, filed "dissenting

views" to the House report in which he supported Congressional oversight, but bemoaned

as burdensome the requirement that the House committee "examine every proposed new

withdrawal over 5,000 acres."  <u>Id.</u> at 231, <u>reprinted in</u> FLPMA Leg. Hist. at 658 (Ex. 3).

Like Mr. Udall, Mr. Seiberling voted for the House bill.  122 Cong. Rec. H7630 (July 22,

1976), reprinted in FLPMA Leg. Hist. at 716 (Ex. 4).  The fact that some of FLPMA's senior supporters preferred fewer, not more, Congressional limits on withdrawals undermines any claim of "strong evidence" that Congress would have vested with Congress exclusive authority for large-tract withdrawals absent the veto.

Finding little or no evidentiary support in Senate, Conference or the House reports, NMA and Northwest point to a handful of floor statements from House members (but no Senators).  NMA Reply 10-11; Nw. Reply 15.  While some of these statements address the importance of Congressional oversight, none state unequivocally that Congress, absent a veto, would have eliminated the Executive's large-tract withdrawal authority. NMA further argues that the "real debate over large tract withdrawals authority was never about the veto itself" because House members assumed there would be a veto. NMA Reply at 11.  But the Senate assumed that Congress would impose no limits on Executive withdrawals, and all sides to the House debate also assumed that the Executive should make large-tract withdrawals.[9]

Plaintiffs' proffered legislative history does not meet the "heavy burden" of showing "strong evidence" that, absent the veto, Congress would have preferred to completely eliminate Executive authority to make withdrawals.  Contrary to NMA's assertion, NMA Reply 12, this is not a case like City of New Haven v. Pierce, 809 F.2d 900, 908 (D.C. Cir 1987), where the court could find "[n]owhere in the legislative history … the slightest suggestion that the President be given statutory authority to defer funds without the possible check of … a … veto."  Here, Congress was a house divided on whether Congress should limit the Executive's withdrawal authority: the Senate saw no

---

[9]  NMA argues that when Congress was confronted with the potential unconstitutionality of a one-house veto for withdrawals, "it did not simply dispense with the veto," but instead adopted a two-House veto.  NMA Reply 11, n.14.  This argument does not help Plaintiffs.  It shows that in the face of the potential unconstitutionality of the House's chosen veto mechanism, Congress did not take the safest course to ensure Congressional control – prohibiting the Executive from making large-tract withdrawals.  Instead Congress adopted a post-hoc veto that would be even harder for Congress to exercise while maintaining the delegation of large-tract withdrawal authority to the Executive.  In short, Congress preferred weaker oversight to certain Congressional control.

1   need for controls, and conference committee staff did not conclude that the veto was

2   "consistent with the objectives of the two Houses."

3       This case is closer to Gulf Oil Corp. v. Dyke, in which the appellate court severed

4   the veto provision.  734 F.2d 797, 802-05 (Temp. Emer. Ct. App. 1984).  There, the court

5   found that neither the "presence of heated debate" nor descriptions of the vetoes in

6   legislative history made it "evident that Congress would have declined to enact [the laws]

7   without the … veto provisions."  Id. at 804.  Gulf Oil follows Chadha in concluding that

8   without the veto, Congressional oversight purposes were served through the laws'

9   requirement that the Executive report to Congress.  Id. at 804, citing Chadha.

10      **D.    Severing Only The Veto Would Leave FLPMA Fully Operative As A
               Law, And The Remaining Law Comports With Congressional Intent.**

11      "A provision is further presumed severable if what remains after severance is fully

12  operative as a law."  Chadha, 462 U.S. at 934 (quotations omitted).  See also Alaska

13  Airlines, 480 U.S. at 684 (severing veto).  FLPMA is fully operational when the

14  legislative veto language is severed because the statute operates in the same manner as if

15  the veto was not exercised.  See id., 480 U.S. at 684-85; Trust Memo. 19-20.  As shown

16  above, FLPMA absent the veto also "will still function in a way consistent with

17  Congress' basic objectives in enacting the statute."  NFIB, 132 S. Ct. at 2608.  As

18  described above, FLPMA's withdrawal provisions absent the veto, like the laws at issue

19  in Chadha and Alaska Airlines, are consistent with FLPMA's purpose of delegating, with

20  procedural safeguards, authority to the Executive for time-limited withdrawals.

21      Plaintiffs imply that FLPMA will not function in the "manner" of the law

22  Congress adopted if the legislative veto is removed.  NMA Reply 7; Nw. Reply 2.  But

23  any invalidation of any part of a law will necessarily change that law's operation.  The

24  question is not whether FLPMA will perform exactly the same after severance, but

25  whether Congress would have preferred to eliminate entirely the Executive ability to

26  make any temporary large-tract withdrawals absent the veto.  "The final test, for

27  legislative vetoes as well as for other provisions, is the traditional one:  the

28

11

1   unconstitutional provision must be severed unless the statute created in its absence is

2   legislation that Congress would not have enacted." <u>Alaska Airlines</u>, 480 U.S. at 685.

3       NMA argues that the veto is "interwoven" with and cannot be severed from the

4   large-tract withdrawal authority Congress granted the Executive because the veto

5   language is "in the very same subparagraph as the withdrawal authority."  NMA Reply 6.

6   The Supreme Court explained a century ago that proximity does <u>not</u> determine whether

7   valid and invalid parts of a law are too interwoven to sever.  "The point is not whether the

8   [valid and invalid] parts are contained in the same section, for the distribution into

9   sections is purely artificial; but whether they are essentially and inseparably connected in

10  substance, – whether the provisions are so interdependent that one cannot operate without

11  the other." <u>Loeb v. Columbia Twp.</u>, 179 U. S. 472, 490 (1900) (citation & quotations

12  omitted).[10]  Here, language granting the Executive authority to make large-tract

13  withdrawals and to provide reports to Congress can operate without the veto.

14      Nor is the word "provision" as used in FLPMA's severability clause synonymous

15  with "subsection" or "paragraph."  NMA Reply 14; Nw. Reply 12 n.9.  Courts have

16  concluded individual words and parts of sentences are severable "provisions." <u>See</u> Trust

17  Memo. 21-22; Robert L. Stern, <u>Separability and Separability Clauses in the Supreme</u>

18  <u>Court</u>, 51 Harv. L. Rev. 76, 106 (1937) (in severability analysis, "[t]he offending

19  provision – whether section, sentence, phrase or individual word – can be excised.").[11]

20

21

---

22  [10]  The Supreme Court has often severed words from the middle of sentences.  <u>See</u> <u>Berea</u>
23  <u>College v. Kentucky</u>, 211 U.S. 45 (1908) (finding that while application of one word in a
    sentence of law might be unconstitutional, rest of the sentence could survive); <u>El Paso &</u>
24  <u>N.E. Ry. v. Gutierrez</u>, 215 U.S. 87 (1909) (severing 45 words in middle of sentence).

    [11]  Northwest argues that the remedy Defendants seek here, "severing mid-sentence[,] is
25  closer to legislating." Nw. Reply 9.  Courts disagree.  In <u>Alabama Power</u>, 307 F.3d at
    1307-09, the Eleventh Circuit severed the legislative veto provision which, as here, began
26  mid-sentence and was in the same paragraph as the delegation of authority subject to the
    veto.  <u>American Fed'n of Gov't Employees v. Pierce</u>, 697 F.2d 303, 306-07 (D.C. Cir.
27  1982), is not to the contrary.  <u>See</u> Nw. Reply 9.  There, the court concluded that the valid
    half of the sentence could not be severed because a thorough review of Congressional
28  intent showed the provisions in each half of the sentence were inseparable.

**II.      IF THE COURT FINDS THE VETO INSEVERABLE, IT SHOULD ORDER FURTHER BRIEFING ON REMEDY.**

The Court had broad latitude is fashioning relief.  If the Court grants Plaintiffs' motions, it need not vacate the challenged withdrawal.  5 U.S.C. § 702(1) ("Nothing herein ... affects ... the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground."); Sugar Cane Growers Coop. of Fla.  v. Veneman, 289 F.3d 89, 98 (D.C. Cir. 2002) (it is "simply not the law" that vacatur is automatic).  "Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." Cal. Communities Against Toxics v. EPA, 688 F.3d 989, 992 (9th Cir. 2012) (citations omitted).

Plaintiffs' and Defendants' briefing has not addressed remedy, nor the harm to the United States and Intervenors, nor whether vacatur is in the public interest.  Winter v. Natural Resources Defense Council, 555 U.S. 7, 20 (2008).  Accordingly, should the Court decide not to sever the legislative veto provision, the Court should order the parties to brief the relevant equitable factors and appropriate relief, if any.  Intervenors submit that vacating the withdrawal and not severing the legislative veto will have wide-ranging consequences, including on lands surrounding the Grand Canyon.  As this Court recently ruled, leaving a challenged action in place and deciding on an appropriate remedy is within the Court's discretion.  Wood v. Betlach, 2013 WL 474369, *13 (D. Ariz. Feb. 7, 2013) (citing Idaho Farm Bureau Found. v. Babbitt, 58 F.3d 1392, 1395 (9th Cir. 1995)).

**CONCLUSION**

NMA and Northwest fail to meet their "heavy burden" of showing "strong evidence" that the legislative veto contained in FLPMA's large-tract withdrawal provision cannot be severed.  This Court must deny NMA's and Northwest's motions for partial summary judgment, and grant the Trust's and the United States's cross motions.

Respectfully submitted February 22, 2013.

 /s/ Edward B. Zukoski
Melanie R. Kay (*pro hac vice*)
Edward B. Zukoski (*pro hac vice*)
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO  80202
mkay@earthjustice.org
tzukoski@earthjustice.org
Telephone: (303) 623-9466
Fax: (303) 623-8083

Roger Flynn (*pro hac vice*)
Western Mining Action Project
P.O. Box 349, 440 Main St., #2
Lyons, CO  80540
wmap@igc.org
Telephone: (303) 823-5738
Fax: (303) 823-5732

Attorneys for Grand Canyon Trust, the Havasupai Tribe,
Center for Biological Diversity, Sierra Club, and
National Parks Conservation Association

# CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing DEFENDANT-INTERVENORS GRAND

CANYON TRUST ET AL.'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR

PARTIAL SUMMARY JUDGMENT with supporting exhibits to be served upon counsel

of record through the Court's electronic service system (ECF/CM) and by first class mail to

Gregory Yount at:  807 West Butterfield Road, Chino Valley, Arizona 86323.

Respectfully submitted February 22, 2013.

 /s/ Edward B. Zukoski

1

2

**TABLE OF EXHIBITS**

3

4     Exhibit 1.    Public Land Law Review Commission, <u>One Third of the Nation's
                    Land</u> (1970) (excerpts) (also available at

5                   http://archive.org/details/onethirdofnation3431unit (last viewed Feb.
                    28, 2013))

6     Exhibit 2.    Staff of Committee on Conference of S.507, 94th Cong., Federal
                    Land Policy and Management Act & Natural Resource Lands

7                   Management Act (Comm. Print 1976), <u>reprinted in</u> SENATE COMM.
                    ON ENERGY & NATURAL RESOURCES, 95TH CONG., LEGISLATIVE

8                   HISTORY OF THE FEDERAL LAND POLICY AND MANAGEMENT ACT
                    OF 1976 (1978) (excerpts)

9

10    Exhibit 3.    H.R. Rep. 94-1163 (1976), <u>reprinted in</u> SENATE COMM. ON ENERGY
                    & NATURAL RESOURCES, 95TH CONG., LEGISLATIVE HISTORY OF

11                  THE FEDERAL LAND POLICY AND MANAGEMENT ACT OF 1976
                    (1978) (excerpts)

12    Exhibit 4.    122 Cong. Rec. H7630 (July 22, 1976), <u>reprinted in</u> SENATE COMM.
                    ON ENERGY & NATURAL RESOURCES, 95TH CONG., LEGISLATIVE

13                  HISTORY OF THE FEDERAL LAND POLICY AND MANAGEMENT ACT
                    OF 1976 (1978)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

8800343/

KF
5601
.A55
P?

# One Third of the Nation's Land

A Report to the President
and to the Congress
by the Public Land
Law Review Commission

Bureau of Land Management
Library
Denver Service Center

WASHINGTON, D.C.
June 1970

# Summary

ONE HUNDRED THIRTY-SEVEN specific recommendations are set forth below, as they appear and as they are numbered consecutively beginning in Chapter 3 and concluding in Chapter 20.[1] Not included here are (1) the basic principles set forth in A Program for the Future as underlying the detailed recommendations elsewhere in the Report, and (2) the unnumbered recommendations, which appear in italics within the various chapters subsidiary to the ones here set forth.

*Chapter Three (Planning Future Public Land Use):*
1. Goals should be established by statute for a continuing, dynamic program of land use planning. These should include:

Use of all public lands in a manner that will result in the maximum net public benefit.

Disposal of those lands identified in land use plans as being able to maximize net public benefit only if they are transferred to private or state or local governmental ownership, as specified in other Commission recommendations.

Management of primary use lands for secondary uses where they are compatible with the primary purpose for which the lands were designated.

Management of all lands not having a statutory primary use for such uses as they are capable of sustaining.

Disposition or retention and management of public lands in a manner that complements uses and patterns of use on other ownership in the locality and the region. *Page 42.*
2. Public land agencies should be required to plan land uses to obtain the greatest net public benefit. Congress should specify the factors to be considered by the agencies in making these determinations, and an analytical system should be developed for their application. *Page 45.*
3. Public lands should be classified for transfer from Federal ownership when net public benefits would be maximized by disposal. *Page 48.*
4. Management of public lands should recognize the highest and best use of particular areas of land as dominant over other authorized uses. *Page 48.*

5. All public land agencies should be required to formulate long range, comprehensive land use plans for each state or region, relating such plans not only to internal agency programs but also to land use plans and attendant management programs of other agencies. Specific findings should be provided in their plans, indicating how various factors were taken into account. *Page 52.*
6. As an essential first step to the planning system we recommend, Congress should provide for a careful review of (1) all Executive withdrawals and reservations, and (2) BLM retention and disposal classifications under the Classification and Multiple Use Act of 1964. *Page 52.*
7. Congress should provide authority to classify national forest and BLM lands, including the authority to suspend or limit the operation of any public land laws in specified areas. Withdrawal authority should no longer be used for such purpose. *Page 53.*
8. Large scale, limited or single use withdrawals of a permanent or indefinite term should be accomplished only by act of Congress. All other withdrawal authority should be expressly delegated with statutory guidelines to insure proper justification for proposed withdrawals, provide for public participation in their consideration, and establish criteria for executive action. *Page 54.*
9. Congress should establish a formal program by which withdrawals would be periodically reviewed and either rejustified or modified. *Page 56.*
10. All Executive withdrawal authority, without limitation, should be delegated to the Secretary of the Interior, subject to the continuing limitation of existing law that the Secretary cannot redelegate to anyone other than an official of the Department appointed by the President, thereby making the exercise of this authority wholly independent of public land management operating agency heads. *Page 56.*
11. Provision should be made for public participation in land use planning, including public hearings on proposed Federal land use plans, as an initial step in a regional coordination process. *Page 57.*
12. Land use planning among Federal agencies should be systematically coordinated. *Page 60.*
13. State and local governments should be given

---

[1] There are no recommendations in Chapters One and Two.

9

# EXHIBIT 2

[COMMITTEE PRINT]

# S. 507

## STAFF RECOMMENDATIONS

### SEPTEMBER 9, 1976

## FEDERAL LAND POLICY AND MANAGEMENT
## ACT OF 1976

### AND

## NATIONAL RESOURCE LANDS
## MANAGEMENT ACT

[PREPARED FOR THE USE OF THE SENATE-HOUSE
OF REPRESENTATIVES CONFERENCE ON S. 507,
94TH CONGRESS, SECOND SESSION]

748

## EXPLANATORY NOTE

At its meeting on August 30, the Committee of Conference on S. 507 instructed staff of both Houses to analyze the differences in the two versions of S. 507 and to recommend to the committee an appropriate resolution of as many differences as possible. The text that follows is the staff response to that instruction.

The portions of the text shown in roman were agreed upon by the staff as consistent with the provisions of the two versions of the bill.

The portions of the text shown in italics were agreed upon by the staff as consistent with the objectives of the two Houses and as an appropriate resolution of issues involved.

The portions of the text shown in bold face are provisions included in only one version of the bill for which staff identified no basis for a definitive recommendation.

## TABLE OF CONTENTS

### TITLE I—SHORT TITLE; POLICIES; DEFINITIONS

Sec. 101. Short title.
Sec. 102. Declaration of policy.
Sec. 103. Definitions.

### TITLE II—LAND USE PLANNING; LAND ACQUISITION AND DISPOSITION

Sec. 201. Inventory and identification.
Sec. 202. Land use planning.
Sec. 203. Sales.
Sec. 204. Withdrawals.
Sec. 205. Acquisitions.
Sec. 206. Exchanges.
Sec. 207. Qualified conveyees.
Sec. 208. Conveyances.
Sec. 209. Reservation and conveyance of mineral interests.
Sec. 210. Coordination with State and local governments.
Sec. 211. Omitted lands.
Sec. 212. Recreation and Public Purposes Act.
Sec. 213. National forest townsites.
Sec. 214. Unintentional Trespass Act.

### TITLE III—ADMINISTRATION

Sec. 301. BLM directorate and functions.
Sec. 302. Management of use, occupancy, and development.
Sec. 303. Enforcement authority.
Sec. 304. Service charges and reimbursements.
Sec. 305. Deposits and forfeitures.
Sec. 306. Working capital fund.
Sec. 307. Studies, cooperative agreements, and contributions.
Sec. 308. Contracts for surveys and resource protection.
Sec. 309. Advisory councils and public participation.
Sec. 310. Rules and regulations.
Sec. 311. Program report.
Sec. 312. Search and rescue.
Sec. 313. Sunshine in government.
Sec. 314. Recordation of mining claims and abandonment.
Sec. 315. Recordable disclaimers of interest.
Sec. 316. Correction of conveyance documents.
Sec. 317. Mineral revenues.
Sec. 318. Appropriation authorization.

(1)

750

2

## TITLE IV—RANGE MANAGEMENT

Sec. 401. Grazing fees.
Sec. 402. Grazing leases and permits.
Sec. 403. Grazing advisory boards.
Sec. 404. Management of certain horses and burros.

## TITLE V—RIGHTS-OF-WAY

Sec. 501. Authorization to grant rights-of-way.
Sec. 502. Cost-share road authorization.
Sec. 503. Corridors.
Sec. 504. General provisions.
Sec. 505. Terms and conditions.
Sec. 506. Suspension and termination of rights-of-way.
Sec. 507. Rights-of-way for Federal agencies.
Sec. 508. Conveyance of lands.
Sec. 509. Existing rights-of-way.
Sec. 510. Effect on other laws.
Sec. 511. Coordination of applications.

## TITLE VI—DESIGNATED MANAGEMENT AREAS

Sec. 601. California desert conservation area.
Sec. 602. King range.
Sec. 603. Bureau of land management wilderness study.

## TITLE VII—EFFECT ON EXISTING RIGHTS: REPEAL OF EXISTING LAWS; SEVERABILITY

Sec. 701. Effect on existing rights.
Sec. 702. Repeal of laws relating to homesteading and small tracts.
Sec. 703. Repeal of laws related to disposals.
Sec. 704. Repeal of withdrawal laws.
Sec. 705. Repeal of laws relating to administration of public lands.
Sec. 706. Repeal of laws relating to rights-of-way.
Sec. 707. Severability.

C. 101, H. 101, S. 1(a)

1    TITLE I—SHORT TITLE, DECLARATION OF

2         POLICY, AND DEFINITIONS

3              SHORT TITLE

4    SEC. 101. *This Act may be cited as the "Federal Land*

5    *Policy and Management Act of 1976".*

1   sand five hundred acres, at the end of thirty days after

2   the end of the ninety-day period provided in subsection (c)

3   of this section, whichever is later, unless the offeror waives

4   his right to a decision within such thirty-day period. Prior to

5   the expiration of such periods the Secretary may refuse

6   to accept any offer or may withdraw any land or interest

7   in land from sale under this section when he determines that

8   consummation of the sale would not be consistent with this

9   Act or other applicable law.

C. 204, H. 204 and 404

10   Sec. 204. (a) *On and after the effective date of this*

11   *Act the Secretary is authorized to make, modify, extend, or*

12   *revoke withdrawals but only in accordance with the provi-*

13   *sions and limitations of this section. The Secretary may*

14   *delegate this withdrawal authority only to individuals in the*

15   *Office of the Secretary who have been appointed by the*

16   *President, by and with the advice and consent of the Senate.*

17   *(b) (1) Within thirty days of receipt of an application*

18   *for withdrawal, and whenever he proposes a withdrawal on*

19   *his own motion, the Secretary shall publish a notice in the*

20   *Federal Register stating that the application has been sub-*

21   *mitted for filing or the proposal has been made and the extent*

22   *to which the land is to be segregated while the application is*

23   *being considered by the Secretary. Upon publication of such*

24   *notice the land shall be segregated from the operation of the*

768

20

1   *public land laws to the extent specified in the notice. The*

2   *segregative effect of the application shall terminate upon (a)*

3   *rejection of the application by the Secretary, (b) withdrawal*

4   *of lands by the Secretary, or (c) the expiration of* **one**

5   **year** *from the date of the notice.*

6   *(2) The publication provisions of this subsection are not*

7   *applicable to withdrawals under subsection (e) hereof.*

8   *(c)(1) On and after the date of approval of this Act a*

9   *withdrawal aggregating five thousand acres or more may be*

10  *made (or such a withdrawal or any other withdrawal involv-*

11  *ing in the aggregate five thousand acres or more which termi-*

12  *nates after such date of approval may be extended) only for*

13  *a period of not more than* **ten** *years by the Secretary on his*

14  *own motion or upon request by a department or agency head.*

15  *The Secretary shall notify both Houses of Congress of such a*

16  *withdrawal no later than its effective date* **and the with-**

17  **drawal shall terminate and become ineffective at the end**

18  **of ninety days (not counting days on which the Senate**

19  **or the House of Representatives has adjourned for more**

20  **than three consecutive days) beginning on the day notice**

21  **of such withdrawal has been submitted to the Senate and**

22  **the House of Representatives, if either House has adopted**

23  **a resolution stating that such House does not approve the**

24  **withdrawal.**

25  *(2) With the notices required by subsection (c)(1) of*

Case 3:11-cv-08171-DGC   Document 122   Filed 03/01/13   Page 29 of 45

21

1  this section and within three months after filing the notice

2  under subsection (e) of this section, the Secretary shall fur-

3  nish to the committees—

4      (1) a clear explanation of the proposed use of the

5      land involved which led to the withdrawal;

6      (2) an inventory and evaluation of the current nat-

7      ural resource uses and values of the site and adjacent

8      public and nonpublic land and how it appears they will

9      be affected by the proposed use, including particularly

10     aspects of use that might cause degradation of the en-

11     vironment, and also the economic impact of the change

12     in use on individuals, local communities, and the Nation;

13     (3) an identification of present users of the land

14     involved, and how they will be affected by the proposed

15     use;

16     (4) an analysis of the manner in which existing and

17     potential resource uses and users are incompatible with or

18     in conflict with the proposed use, together with a state-

19     ment of the provisions to be made for continuation or

20     termination of existing uses, including an economic

21     analysis of such continuation or termination;

22     (5) an analysis of the manner in which such lands

23     will be used in relation to the specific requirements for

24     the proposed use;

25     (6) a statement as to whether any suitable alterna-

770

22

1    tive sites are available (including cost estimates) for

2    the proposed use or for uses such a withdrawal would

3    displace;

4        (7) a statement of the consultation which has been

5    or will be had with other Federal departments and

6    agencies, with regional, State, and local government

7    bodies, and with other appropriate individuals and

8    groups;

9        (8) a statement indicating the effect of the pro-

10   posed uses, if any, on State and local government in-

11   terests and the regional economy;

12       (9) a statement of the expected length of time

13   needed for the withdrawal;

14       (10) the time and place of hearings and of other

15   public involvement concerning such withdrawal;

16       (11) the place where the records on the withdrawal

17   can be examined by interested parties; and

18       (12) a report prepared by a qualified mining engi-

19   neer, engineering geologist, or geologist which shall

20   include but not be limited to information on: general

21   geology, known mineral deposits, past and present

22   mineral production, mining claims, mineral leases,

23   evaluation of future mineral potential, present and poten-

24   tial market demands.

25   (d) A withdrawal aggregating less than five thousand

23

1   acres may be made under this subsection by the Secretary on

2   his own motion or upon request by a department or an

3   agency head—

4        (1) for such period of time as he deems desirable

5     for a resource use; or

6        (2) for a period of not more than **ten** years for any

7     other use, including but not limited to use for adminis-

8     trative sites, location of facilities, and other proprietary

9     purposes; or

10       (3) for a period of not more than five years to

11     preserve such tract for a specific use then under con-

12     sideration by the Congress.

13     (e) When the Secretary determines, or when the Com-

14   mittee on Interior and Insular Affairs of either the House of

15   Representatives or the Senate notifies the Secretary, that

16   an emergency situation exists and that extraordinary meas-

17   ures must be taken to preserve values that would otherwise

18   be lost, the Secretary notwithstanding the provisions of sub-

19   sections (c)(1) and (g) of this section, shall immediately

20   make a withdrawal and file notice of such emergency with-

21   drawal with the Committees on Interior and Insular Affairs

22   of the Senate and the House of Representatives. Such

23   emergency withdrawal shall be effective when made but

24   shall last only for a period not to exceed **one year** and may

25   not be extended except under the provisions of subsection

772

24

1   (c)(1) or (d), whichever is applicable, and (b)(1) of

2   this section. The information required in subsection (c)(2)

3   of this subsection shall be furnished the committees within

4   three months after filing such notice.

5       (f) All withdrawals and extensions thereof, whether

6   made prior to or after approval of this Act, having a specific

7   period shall be reviewed by the Secretary toward the end of

8   the withdrawal period and may be extended or further

9   extended only upon compliance with the provisions of sub-

10  section (c)(1) or (d), whichever is applicable, and only

11  if the Secretary determines that the purpose for which the

12  withdrawal was first made requires the extension, and then

13  only for a period no longer than the length of the original

14  withdrawal period. The Secretary shall report on such re-

15  view and extensions to the Committees on Interior and In-

16  sular Affairs of the House of Representatives and the Senate.

17      (g) All applications for withdrawal pending on the

18  date of approval of this Act shall be processed and ad-

19  judicated to conclusion within ten years of the date of ap-

20  proval of this Act, in accordance with the provisions of this

21  section. The segregative effect of any application not so

22  processed shall terminate on that date.

23      (h) Notwithstanding any provision of the Administra-

24  tive Procedure Act, all new withdrawals made by the Secre-

25  tary under this section (except an emergency withdrawal

25

1   made under subsection (e) of this section) shall be promul-

2   gated on the record after an opportunity for an agency

3   hearing.

4       (i) In the case of lands under the administration of any

5   department or agency other than the Department of the In-

6   terior, the Secretary shall make, modify, and revoke with-

7   drawals only with the consent of the head of the department

8   or agency concerned, except when the provisions of subsection

9   (e) of this section apply.

10      (j) The Secretary shall not make, modify, or revoke any

11  withdrawal created by Act of Congress; make a withdrawal

12  which can be made only by Act of Congress; modify or revoke

13  any withdrawal creating national monuments under the Act

14  of June 8, 1906 (34 Stat. 225; 16 U.S.C. 431–433); or

15  modify, or revoke any withdrawal which added lands to the

16  National Wildlife Refuge System prior to the date of ap-

17  proval of this Act or which thereafter adds lands to that

18  System under the terms of this Act. Nothing in this Act is

19  intended to modify or change any provision of the Act of

20  February 27, 1976 (90 Stat. 199; 16 U.S.C. 668dd(a)).

21      (k) There is hereby authorized to be appropriated the

22  sum of $10,000,000 for the purpose of processing withdrawal

23  applications pending on the effective date of this Act, to be

24  available until expended.

25      (l)(1) The Secretary shall, within fifteen years of the

774

26

1   date of enactment of this Act, review withdrawals existing

2   on the date of approval of this Act, in the States of Arizona,

3   California, Colorado, Idaho, Montana, Nevada, New Mexico,

4   Oregon, Utah, Washington, and Wyoming of (1) all Fed-

5   eral lands other than withdrawals of the public lands admin-

6   istered by the Bureau of Land Management and of lands

7   which, on the date of approval of this Act, were part of

8   Indian reservations and other Indian holdings, the National

9   Forest System, the National Park System, the National

10  Wildlife Refuge System, other lands administerd by the

11  Fish and Wildlife Service or the Secretary through the Fish

12  and Wildlife Service, the National Wild and Scenic Rivers

13  System, and the National Trails System; and (2) all public

14  lands administered by the Bureau of Land Management and

15  of lands in the National Forest System (except those in wil-

16  derness areas, and those areas formally identified as primi-

17  tive or natural areas) which closed the lands to appropriation

18  under the Mining Law of 1872 (17 Stat. 91, as amended;

19  30 U.S.C. 22 et seq.) or to leasing under the Mineral Leas-

20  ing Act of 1920 (41 Stat. 437, as amended; 30 U.S.C. 181

21  et seq.).

22      (2) In the review required by paragraph (1) of this

23  subsection, the Secretary shall determine whether, and for

24  how long, the continuation of the existing withdrawal of

1   *the lands would be, in his judgment, consistent with the*

2   *statutory objectives of the programs for which the lands were*

3   *dedicated and of other relevant programs. The Secretary*

4   *shall report his recommendations to the President, together*

5   *with statements of concurrence or nonconcurrence submitted*

6   *by the heads of the departments or agencies which admin-*

7   *ister the lands. The President shall transmit this report to*

8   *the President of the Senate and the Speaker of the House*

9   *of Representatives, together with his recommendations for*

10   *action by the Secretary, or for legislation.* **The Secretary**

11   **may act to terminate withdrawals in accordance with the**

12   **recommendations of the President unless before the end of**

13   **ninety days (not counting days on which the Senate and**

14   **the House of Representatives has adjourned for more than**

15   **three consecutive days) beginning on the day the report**

16   **of the President has been submitted to the Senate and the**

17   **House of Representatives either House has adopted a**

18   **resolution indicating otherwise.**

19     (3) *There are hereby authorized to be appropriated not*

20   *more than $10,000,000 for the purpose of paragraph (1) of*

21   *this subsection to be available until expended to the Secretary*

22   *and to the heads of other departments and agencies which*

23   *will be involved.*

# EXHIBIT 3

## SEPARATE VIEWS OF MR. UDALL

Federal legislation to establish policies and guidelines for the administration of the public domain is long overdue. The Bureau of Land Management has operated without the management authority and necessary statutory guidance for many years, and this Committee has struggled with the legislation for the past three Congresses.

The bill now finally reported, H.R. 13777, contains the basic elements of acceptable legislation which will provide specific statutory guidelines to the various Federal land management agencies to carry out their responsibilities for managing our public lands. It provides uniform procedures for conducting an inventory of resources, for developing land use plans, for granting rights of way, for conveying certain public lands to state and local governments for recreational uses, and provides for multiple use management of public lands. Yet the bill contains several serious flaws, flaws which I believe, in a few cases, tilts the balance between the public and private interests in favor of certain special interests.

Most specifically, I disagree with those sections of the bill which set forth new procedures for Congressional review of Executive withdrawals of public lands. While I have always been strongly in favor of additional oversight of the Department of Interior by the Congress and this Committee, the simple fact is that the mechanism of "withdrawal" of public lands from mineral entry is currently the only defense we have against mining activity on the public domain.

The 1872 Mining Law which, in effect, ratified the claim-staking practices that were developed in the western mining camps in the last century, does nothing to limit or control the environmental impacts of mining for hard rock minerals such as gold, silver, zinc, copper, uranium or others; it allows miners to stake out claims anywhere on public land still open to mineral entry—and that is approximately 590 million acres out of the 760 million acres of Federal land according to the Department of Interior. And, if a valid claim is filed, the mineral resource belongs to the claimant, with few requirements and with no royalty or economic returns to the American people for the value of these public resources. While the mining industry has always contended that this laissez-faire policy was necessary to foster maximum development of our mineral resources, this is certainly no longer true. Claimants may develop or not develop a claim as they see fit. A 1974 GAO study concluded that the 1872 Law *does not* foster mineral development and the existence of millions of undeveloped claims, many held for speculative purposes, is ample documentation of that conclusion.

Those of us in the Committee who have proposed legislation to modernize and reform the 1872 law for years have unfortunately been diverted from this task by the continuing battle with the Nixon-Ford

(221)

Administrations and two vetoes of the surface mining legislation that overwhelmingly passed the last two Congresses.

Reform of the 1872 law cannot be put off much longer, but until it is accomplished, I cannot vote to eliminate the only means left to protect certain critical areas from mineral development.

Furthermore, the fact is that the Committee on Interior and Insular Affairs already has oversight responsibility and authority to review and comment on withdrawals of any size proposed by the Department of the Interior. I also disagree with those provisions which will require Congressional review of all *existing* withdrawals and also eliminate Executive authority to create new Fish and Wildlife Refuges or expand existing ones.

In addition, I strongly agree with the dissenting views filed by my colleagues concerning those provisions of this bill dealing with the regulation and fee structure for grazing on the public lands. The changes in the existing grazing fee schedule incorporated in this bill are simply unacceptable and should either be deleted or significantly modified. In my opinion, it would be preferable to leave the grazing fee schedule the way it now is—based on the fair-market value of the grass. This formula was based on considerable study and data and provided for gradual increases over a 10 year period, with a built in inflation index. This bill's formula seeks to provide new subsidies for those who use and contribute to the further deterioration of the public land. Not only is it unfair to others who must compete for private grazing land, but it does not provide a fair return to the American taxpayer.

Finally, I would like to commeent briefly on those provisions in the bill which relate to the coordination of land use plans for the public lands with state and local planning. The Committee bill seeks to resolve problems of coordination between federal, state and local governments, and states that "land use plans under this section shall conform to state and local plans to the maximum extent consistent with federal law and the purposes of this Act."

I think "federal consistency" with state and local planning is an admirable goal, but in this case may be too open ended, for the requirement of consistency is not tied to any criteria as to what local and state land and state land use plans are to include.

Despite the fact that the Congress has not yet passed a land use planning assistance bill, the need for a comprehensive land use program still exists. And I am convinced that coordination between federal agencies and state and local land use agencies can only be effectively carried out when there are comprehensive state and local land use programs as perceived in H.R. 3510, the Land Use and Resource Conservation Act.

The Land Use and Resource Conservation Act does not contain *substantive* federal requirements for what state and local land use plans must contain, but it would establish procedural criteria as to what kinds of criteria must be considered in developing a state and local land use program. For example, one provision of that Act provides that, after 3 years, states that receive federal grants under the Act must have a program that assures that "public lands within the state are not damaged as a result of inconsistent land uses on non-

public lands in the same immediate geographic region" (Sec. 310(d) of H.R. 3510). This provision is to assure that state and local planning gives due consideration to protecting national parks and other important public lands from adverse impacts of development adjacent to these areas. There are numerous examples of where such development precedes unchecked and unregulated in areas adjacent to national parks and other areas because of the lack of local land use plans or controls.

Yet the language contained in section 202 of H.R. 13777 requires instead that federal plans must conform with state and local plans regardless of what these local and state plans contain, unless some specific federal law applies.

Federal consistency is a good concept and I strongly support it, but only where there is some review of the adequacy of the state and local program. For example, under the Coast Zone Management Act, as under the proposed land use bill, Federal actions must be consistent with Management Programs developed by the State—but only after the program is approved by the Secretary pursuant to the criteria of that Act. I therefore hesitate to approve the broad language of section 202 that will require federal conformance until such time as we have comprehensive land use planning for our non-federal lands.

Thus, I agree with some of the views set forth by Mr. Seiberling and the other distinguished Members of the Committee who voted not to report H.R. 13777, and I believe that these flaws must be corrected on the floor of the House or in conference if this Act is to become public law.

Mo Udall.

## DISSENTING VIEWS

HR 13777, as reported by the Committee, contains many provisions which are unworkable and are not in the public interest. We find ourselves in agreement with the comment of Secretary of the Interior Kleppe who said that this bill "would create a statutory quagmire which would be impossible to administer."

This bill should provide basic management authority for the 450 million acres of public lands in the Western states and Alaska. Instead, it contains detailed provisions that give certain interest groups, such as the mining and livestock industries, special treatment—while largely ignoring the interest of the general public in these Federally-owned lands.

Despite the complexity and importance of this bill, the markup in the full Committee was so hasty, and discussions of amendments so limited, that very few of the bill's many defects were corrected. Because of the May 15 deadline for reporting out authorization bills, we have not even had adequate time to prepare dissenting views. However, some of the bill's most objectionable provisions are described below.

### Withdrawals—Sec. 204

For many years, Congress has been promising the public to reform the 1872 Mining Law, which permits anyone to stake a claim and mine hard-rock minerals on the public lands with no benefit to the U.S. Treasury or the public. To date no such reform has taken place.

Thus, the only means by which segments of the public lands needed for various public uses—such as wildlife refuges, parks, wilderness areas, and the like—can be protected is by withdrawal from appropriation under the mining laws. The Executive Branch has exercised this authority for many years. For example, as of 1972 some 25.5 million of the 30 million acres then in the National Wildlife Refuge System were withdrawn by the Executive Branch from the public domain.

We do not suggest that Congress should not exercise oversight over this withdrawal authority. However, this bill would require the Interior Committees to examine every proposed new withdrawal over 5,000 acres, and such withdrawals could be vetoed by a resolution of disapproval of either House. The workload of the Interior Committee is already heavy. Who will have the time to examine these withdrawals and determine their fate?

Undoubtedly the mining industry will find it in their best interest to oppose most, if not all, withdrawals, just on general principles. If so, Congress is going to be subjected to a new barrage of lobbying every time a minor withdrawal is made.

Compounding this error, the bill further requires that such withdrawals will have to be reviewed by the Secretary of Interior—and the Congress—*every five years*, creating more paperwork and preventing any long-term planning for the tracts in question.

Because Section 604 repeals the Executive's existing authority to make withdrawals for additions to the Wildlife Refuge System, no new refuges could be created without going through this cumbersome

(231)

232

procedure. The net effect will be a gain for the mining industry and a loss for wildlife.

*Review of Existing Withdrawals—Sec. 404*

The most absurd feature of the bill regarding withdrawals is found in Section 404, which directs the Secretary to review all existing withdrawals—except Indian reservations, national parks, wildlife refuges, the National Wild and Scenic Rivers System and the National Trails System. This means that the Secretary must also review withdrawals for the military, Bureau of Reclamation, ERDA (Atomic energy testing sites), the Forest Service and a variety of other specific withdrawals—totalling nearly 300 million acres. Included in this figure are the withdrawals made pursuant to the Alaska Native Claims Settlement Act.

Under Section 404, once all these withdrawals are reviewed by the Department of the Interior, then the massive paperwork will be forwarded to Congress and supposedly considered. Either House of Congress could then veto any of these existing withdrawals.

The purported rationale for all this paperwork is to exert Congressional authority over the public lands, but this bill goes way overboard. Congress has always had oversight authority over the public lands, but has largely not chosen to exercise it. This bill mandates so much new work that the Interior Department and the Congress will both be swamped with paperwork to the detriment of their other responsibilities.

The required review of all BLM and Forest Service withdrawals is the most flagrant example in the bill of privileged treatment of the mining industry, which has long sought to open up protected areas for mineral exploitation. This provision will give them the leverage to do that by subjecting all existing mineral withdrawals to cumbersome paperwork and possble veto every five years.

*Grazing Sections—210, 211, 212*

Since the settlement of the West, one of the principal users of the public lands has been the livestock industry. For years, cattle and sheep grazed free on the public lands. Only since passage of the Taylor Grazing Act in 1934 has the industry paid nominal fees to use the public lands. Although the public lands are supposed to be multiple use, in reality they have been treated more as the private domain of the livestock industry.

An interagency task force undertook an in-depth study in the 1960's to compare the cost of grazing on public and private lands and came up with a formula to raise grazing fees closer to the fair market value. Even though that formula is still lower than grazing fees on private lands, the livestock industry has complained about it continually.

For example, the cost of grazing for one animal unit month (AUM) in 1975 was $1.00 on the public lands, compared to an average of $5.75 per AUM for private lands, according to the U.S. Statistical Reporting Service.

This bill sets up a complicated new fee formula. The net effect will be to *assure that grazing fees do not increase and in fact may even be lower*. Thus those who use, and sometimes abuse, the public lands enjoy a competitive advantage over livestock owners who must utilize private grazing lands.

Further, the bill provides for mandatory 10-year grazing permits, which give no flexibility to the land managers who should be able to review the intensity of use much more frequently. A recent study by the Bureau of Land Management documented that 83% of the range-lands are in fair, poor or bad condition. Yet this bill rewards the very people who are largely responsible for this shocking situation.

Finally, Section 212 sets up district grazing advisory boards with "twice as many livestock representatives as wildlife representatives." This is contrary to the provisions of the Federal Advisory Committee Act. These boards, in each of the 54 grazing districts, will be in addition to the multiple use boards recently established by the Bureau of Land Management to comply with the Federal Advisory Committee Act.

Listening to the proponents of this legislation, one would never know that the public land states, far from suffering at the hands of the Federal government as a landowner, are already receiving from the Federal government substantial revenues from timber and mineral leasing payments. In 1974 such payments to the states and counties totalled $310 million. The non-public land states receive no such windfall, yet many of us on the Committee have supported further aid to the public land states by voting for the "payments in lieu of taxes" bill which would provide an additional $125 million annually, mainly to those states. However, we cannot support a measure that would, in effect, subsidize the mining and ranching industries at the expense of other public uses.

*Enforcement Authority—Sec. 302*

Although one of the most objectionable provisions of this section was partially cleaned up by the Committee—pertaining to enforcement of regulations by the Secretary—the section remains unworkable. At present, Bureau of Land Management employees have totally inadequate authority to enforce laws and regulations relating to the natural resources of the public lands, such as destruction of archeological sites, harassment of wildlife, destruction of land by off-road vehicles. Normally, the only remedy available for BLM officials is to make a citizen's arrest or call the local sheriff, who may be many miles distant and who also may be philosophically unsympathetic to Federal regulations.

This bill does nothing to improve that situation. It directs the Secretary to offer "reasonable" contracts to state and local law enforcement officials whenever their help is needed to enforce Federal laws and regulations. *Only* if those authorities *refuse* such a contract can the Interior Department exercise enforcement authority. Thus BLM officials would *still* have to call the local sheriff.

Furthermore, there is no assurance or requirement in the bill that the local enforcement authorities will have the necessary qualifications for carrying out these added responsibilities, especially for those concerning resource management. Indeed, the Secretary cannot even take into account past unsatisfactory performance as a reason for not offering the contract. Nor, in the draft of the Committee report which we reviewed, was there any definition of what a "reasonable" contract would consist of.

For many years the National Park Service, U.S. Forest Service and Fish and Wildlife Service have had effective enforcement authority on

234

the lands they manage. Curiously, the bill gives the necessary authority for the California Desert but does not do so for the rest of our public lands, where the same kinds of problems exist.

*Inclusion of the Forest Service*

Some sections of the bill set policy for the National Forests, despite the fact that the Forest Service already has an organic act and the Humphrey-Rarick Act to guide it. Both the Administration and the House Agriculture Committee object to these provisions.

*Need for Legislation*

Legislation to establish an organic act for the Bureau of Land Management has been before this Committee in the 92nd, 93rd, and now the 94th Congress, but the Committee has never taken a bill to the floor, in part because of the controversial nature of many of the earlier bills' provisions. This bill suffers from as many of the inequities and defects as the earlier bills.

The need for an organic act for BLM has been well-documented. We would support legislation giving the Bureau the management authority it needs to utilize and protect the nation's public lands for the benefit of all the people, and repealing the many archaic public land disposal laws enacted in a different era to encourage settlement of the West. The Senate has, in fact, passed such a bill which is acceptable to both the Administration and the environmentalists.

We cannot support legislation, such as HR 13777, that gives private users priority over the public interest. If this bill reaches the floor, we urge our colleagues to reject it unless it is substantially rewritten or replaced by a reasonable and workable measure.

> JOHN F. SEIBERLING.
> PATSY T. MINK.
> JOSEPH P. VIGORITO.
> BOB ECKHARDT.
> ALAN STEELMAN.
> JONATHAN BINGHAM.
> JIM WEAVER.
> PAUL TSONGAS.

# EXHIBIT 4

CONGRESSIONAL RECORD — HOUSE

Mr. Pepper with Mr. Conyers.
Mr. O'Hara with Mr. Roe.
Mrs. Sullivan with Mr. Shipley.
Mr. Stokes with Mr. English.
Mr. Symington with Mr. Butler.
Mr. Traxler with Mr. Conlan.
Mr. Litton with Mr. Conlan.
Mr. Brinkley with Mr. Clancy.
Mr. Pithian with Derwinski.
Mr. Frey with Mr. du Pont.
Mr. Lagomarsino with Mr. Duncan of Tennessee.
Mr. Hansen with Mr. Esch.
Mr. Latta with Mr. Eshleman.
Mr. Helstoski with Mr. Devine.
Mr. Madigan with Mr. Young of Alaska.
Mr. Quillen with Mr. Robinson.
Mr. McKinney with Mr. Winn.
Mr. Ruppe with Mr. McEwen.
Mr. Peyser with Mr. Vander Jagt.
Mr. Schneebeli with Mr. Steelman.

Mr. EMERY changed his vote from "nay" to "yea."

So the motion to recommit was rejected.

The result of the vote was announced as above recorded.

The SPEAKER. The question is on the passage of the bill.

The question was taken; and the Speaker announced that the ayes appeared to have it.

Mr. ALLEN. Mr. Speaker, on that I demand the yeas and nays.

The yeas and nays were ordered.

The vote was taken by electronic device, and there were—yeas 169, nays 155, answered "present" 2, not voting 106, as follows:

[Roll No. 501]

YEAS—169

Abdnor
Addabbo
Allen
Annunzio
Archer
Armstrong
AuCoin
Baucus
Beard, R.I.
Beard, Tenn.
Bennett
Bergland
Biaggi
Boggs
Brademas
Breaux
Brooks
Brown, Calif.
Brown, Mich.
Broyhill
Burgener
Burke, Calif.
Burke, Mass.
Burleson, Tex.
Burlison, Mo.
Byron
Carney
Cederberg
Clausen,
  Don H.
Clawson, Del
Cochran
Collins, Ill.
Collins, Tex.
Conte
Corman
Daniel, R. W.
de la Garza
Delaney
Dickinson
Diggs
Downey, N.Y.
Downing, Va.
Duncan, Oreg.
Edwards, Ala.
Eilberg
Erlenborn
Fary
Fascell
Findley
Fisher
Flood
Flowers
Fountain
Giaimo
Gibbons
Goldwater
Gonzalez
Guyer
Hagedorn
Hamilton
Hanley
Harsha
Hefner
Henderson
Holt
Howard
Hubbard
Hutchinson
Ichord
Johnson, Calif.
Johnson, Colo.
Jones, N.C.
Kasten
Kazen
Kemp
Leggett
Lent
Lloyd, Calif.
Lloyd, Tenn.
Long, La.
Long, Md.
Lott
McClory
McCollister
McCormack
McDonald
McFall
McKay
Madden
Mann
Martin
Matsunaga
Melcher
Milford
Minish
Mitchell, N.Y.
Moakley
Mollohan
Montgomery
Moorhead,
  Calif.
Mosher
Moss
Murtha
Myers, Ind.
Neal
Nichols
Oberstar
O'Brien
O'Neill
Patterson,
  Calif.
Perkins
Pettis
Pickle
Pike
Pressler
Preyer
Price
Quie
Railsback
Rangel
Rees
Rhodes
Rooney
Rousselot
Ryan
St Germain
Santini
Sarasin
Sebelius
Selberling
Shriver
Shuster
Simon
Sisk
Skubitz
Slack
Smith, Nebr.
Snyder
Staggers
Steiger, Ariz.
Steiger, Wis.
Stephens
Stratton
Symms
Talcott
Taylor, Mo.
Taylor, N.C.
Thompson
Udall
Ullman
Van Deerlin
Vander Veen
Vanik
Waggonner
Walsh

ANSWERED "PRESENT"—2

Bafalis                         Haley

NOT VOTING—106

Abzug
Alexander
Anderson, Ill.
Andrews, N.C.
Andrews,
  N. Dak.
Badillo
Bell
Biester
Blouin
Boland
Brinkley
Broomfield
Butler
Chappell
Chisholm
Clancy
Clay
Conlan
Conyers
Cotter
Crane
Daniels, N.J.
Danielson
Derwinski
Devine
Dent
du Pont
English
Esch
Eshleman
Evans, Colo.
Evans, Ind.
Evins, Tenn.
Fithian
Flynt
Ford, Tenn.
Frey
Fuqua
Green
Hansen
Harkin
Hawkins
Hays, Ohio
Hébert
Heinz
Helstoski
Hightower
Hinshaw
Holland
Howe
Jarman
Jones, Okla.
Jones, Tenn.
Jordan
Karth
Krueger
LaFalce
Lagomarsino
Landrum
Latta
Lehman
Litton
Lundine
McEwen
McKinney
Mathis
Mazzoli
Meyner
Mills
Moffett
Moorhead, Pa.
Motti
Murphy, N.Y.
Nix
Nowak
O'Hara
Pepper
Peyser
Quillen
Randall
Riegle
Risenhoover
Robinson
Roe
Roncalio
Rosenthal
Rostenkowski
Roush
Ruppe
Schneebeli
Shipley
Stanton,
  James V.
Stark
Steelman
Stokes
Sullivan
Symington
Teague
Traxler
Vander Jagt
Winn
Wirth
Young, Alaska
Young, Ga.
Zeferetti

The Clerk announced the following pairs:

Wampler
Weaver
White
Whitehurst
Wiggins
Wilson, Bob
Wilson, C. H.
Wilson, Tex.
Wright
Wydler
Young, Fla.
Young, Tex.
Zablocki

NAYS—155

Adams
Ambro
Anderson,
  Calif.
Ashbrook
Ashley
Aspin
Baldus
Bauman
Bedell
Bevill
Bingham
Blanchard
Bolling
Bonker
Bowen
Breckinridge
Brodhead
Brown, Ohio
Buchanan
Burke, Fla.
Burton, John
Burton, Phillip
Carter
Cleveland
Cohen
Conable
Cornell
Coughlin
D'Amours
Daniel, Dan
Davis
Dellums
Derrick
Dingell
Dodd
Drinan
Early
Eckhardt
Edgar
Edwards, Calif.
Emery
Fenwick
Fish
Florio
Foley
Ford, Mich.
Forsythe
Fraser
Frenzel
Gaydos
Gilman
Ginn
Goodling
Gradison
Grassley
Gude
Hall, Ill.
Hall, Tex.
Hammer-
  schmidt
Hannaford
Harrington
Harris
Hayes, Ind.
Hechler, W. Va.
Heckler, Mass.
Hicks
Hillis
Holtzman
Horton
Hughes
Hungate
Hyde
Jacobs
Jefford
Jenrette
Johnson, Pa.
Jones, Ala.
Kastenmeier
Kelly
Ketchum
Keys
Kindness
Koch
Krebs
Levitas
Lujan
McCloskey
McDade
McHugh
Madigan
Maguire
Mahon
Meeds
Metcalfe
Mezvinsky
Michel
Mikva
Miller, Calif.
Miller, Ohio
Mineta
Mink
Mitchell, Md.
Moore
Morgan
Murphy, Ill.
Myers, Pa.
Natcher
Nedzi
Nolan
Obey
Oettinger
Passman
Patten, N.J.
Pattison, N.Y.
Paul
Poage
Pritchard
Regula
Richmond
Rinaldo
Roberts
Rodino
Rogers
Rose
Roybal
Runnels
Russo
Sarbanes
Satterfield
Scheuer
Schroeder
Schulze
Sharp
Sikes
Smith, Iowa
Solarz
Spellman
Spence
Stanton,
  J. William
Steed
Stuckey
Studds
Thone
Thornton
Treen
Tsongas
Vigorito
Waxman
Whalen
Whitten
Wolff
Wylie
Yates
Yatron

On this vote:
Mr. Jones of Tennessee for, with Mr. Roncallo against.
Mr. Boland for, with Mr. Blouin against.
Mr. Zeferetti for, with Mr. Wirth against.
Mr. Chappell for, with Mr. Stark against.
Mrs. Meyner for, with Mr. Mottl against.
Mr. Teague for, with Mr. Hébert against.
Mr. Krueger for, with Mr. Mathis against.
Ms. Abzug for, with Mr. Moffett against.
Mr. Duncan of Tennessee for, with Mr. Biester against.
Mr. Young of Alaska for, with Mr. Peyser against.
Mr. Robinson for, with Mr. Schneebeli against.
Mr. Quillen for, with Mr. Eshleman against.
Mr. Andrews of North Dakota for, with Mr. Clancy against.
Mr. Conlan for, with Mr. Devine against.
Mr. Hawkins for, with Mr. Helstoski against.

Until further notice:
Mr. Murphy of New York with Mr. Karth.
Mr. Cotter with Mr. Green.
Mr. Flynt with Mr. Brinkley.
Mr. Rosenthal with Mr. Ford of Tennessee.
Mr. Young of Georgia with Mr. Fuqua.
Mr. Rostenkowski with Mr. Andrews of North Carolina.
Mr. Dominick V. Daniels with Mr. Hays of Ohio.
Mr. Nix with Mr. English.
Mrs. Chisholm with Mr. Dent.
Mr. Pepper with Mr. Anderson of Illinois.
Mr. Clay with Mr. James V. Stanton.
Mr. Danielson with Mr. Broomfield.
Mr. Badillo with Mr. Bell.
Mr. Randall with Mr. du Pont.
Mr. Alexander with Mr. Landrum.
Mr. Frey with Mr. Esch.
Mr. Evans of Colorado with Mr. Lehman.
Mr. Roe with Mr. Crane.
Mr. Shipley with Mr. Butler.
Mr. Evins of Tennessee with Mr. Litton.
Mr. Stokes with Mr. Fithian.
Mr. Risenhoover with Mr. Conyers.
Mr. Harkin with Mr. Hightower.
Mr. Holland with Mr. Derwinski.
Mr. Howe with Mr. Heinz.
Mr. Evans of Indiana with Mr. Jones of Oklahoma.
Ms. Jordan with Mr. Lundine.
Mr. LaFalce with Mr. Latta.
Mr. Lagomarsino with Mr. Mazzoli.
Mr. McEwen with Mr. Mills.
Mr. Moorhead of Pennsylvania with Mr. Nowak.
Mr. Steelman with Mrs. Riegle.
Mr. Roush with Mrs. Sullivan.
Mr. Ruppe with Mr. Symington.
Mr. Traxler with Mr. Vander Jagt.

Mr. GILMAN and Mr. ANDERSON of California changed their vote from "yea" to "nay."

So the bill was passed.

The result of the vote was announced as above recorded.

A motion to reconsider was laid on the table.

Mr. MELCHER. Mr. Speaker, I ask unanimous consent that the Committee on Interior and Insular Affairs be discharged from further consideration of the Senate bill, S. 507 to provide for the management, protection, and development of the national resource lands, and for other purposes, and ask for its immediate consideration in the House.

The Clerk read the title of the Senate bill.

The SPEAKER. Is there objection to