**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gregory Yount,<br><br>     Plaintiff,<br><br>v.<br><br>Ken Salazar, et al.,<br><br>     Defendants. | No. CV11-8171-PCT DGC<br>(Lead case) |
| National Mining Association,<br><br>     Plaintiff<br><br>v.<br><br>Ken Salazar, et al.,<br><br>     Defendants | No.  CV12-8038 PCT DGC |
| Northwest Mining Association,<br><br>     Plaintiff<br><br>v.<br><br>Ken Salazar, et al.,<br><br>     Defendants. | No. CV12-8042 PCT DGC |
| Quaterra Alaska Incorporated, et al.,<br><br>     Plaintiff<br><br>v.<br><br>Ken Salazar, et al.,<br><br>     Defendants. | No. CV12-8075 PCT DGC |

Plaintiffs National Mining Association and Nuclear Energy Institute ("NMA/NEI") and Plaintiff Northwest Mining Association ("NWMA") have filed motions for partial summary judgment in this consolidated action. Docs. 73,[1] 90. Plaintiffs assert in counts one and seven of their respective complaints that the Secretary of the Department of the Interior's withdrawal of more than one million acres from mining location and entry in Northern Arizona should be vacated because § 204(c) of the Federal Land Policy Management Act ("FLPMA") is unconstitutional.

Defendants Kenneth L. Salazar, Secretary of the Department of the Interior; the Department of the Interior ("DOI"); the Bureau of Land Management ("BLM"); the Forest Service; and the Department of Agriculture (collectively, "Federal Defendants"), and Defendant-Interveners Grand Canyon Trust et al. ("the Trust") have filed cross motions for partial summary judgment on these counts. Docs. 101, 102.

The motions and cross motions have been fully briefed (Docs. 101, 102, 110, 113, 115, 117), and the Court held oral argument on March 1, 2013. For the reasons stated below, the Court finds that § 204(c)'s legislative veto, which provides that Congress can block withdrawals in excess of 5,000 acres through a resolution of both houses, is unconstitutional. The Court also finds, however, that this provision is severable from the grant of authority relied on by the Secretary in this case. The Court therefore will deny Plaintiffs' motions for partial summary judgment and grant Federal Defendants' and Defendant-interveners' cross motions.

## I.    Background.

On July 21, 2009, Secretary Salazar published notice of his intent "to withdraw approximately 633,547 acres of public lands and 360,002 acres of National Forest System lands for up to 20 years from location and entry under the Mining Law of 1872." Notice of Proposed Withdrawal, 74 Fed. Reg. 35,887, (July 21, 2009). The 2009 Notice had the

---

[1] Document 73 is docketed under case number 3:12-cv-08038-DGC because it was filed before the separate cases in this action were consolidated. Unless specifically noted, all other documents have been docketed under the lead case number, 3:11-cv-08171-DGC.

effect of withdrawing the land from location and entry for up to two years to allow time for analysis, including environmental analysis under the National Environmental Protection Act ("NEPA").  *Id.*

On August 26, 2009, the BLM, an agency within DOI, published notice of its intent to prepare an Environmental Impact Statement ("EIS") addressing the proposed withdrawal, as required by NEPA.  74 Fed. Reg. 43,152 (Aug. 26, 2009).  The purpose of the withdrawal as explained in the notice was "to protect the Grand Canyon watershed from adverse effects of locatable mineral exploration and mining, except for those effects stemming from valid existing rights."  *Id.* at 43,152-53.

After soliciting public comments, the BLM issued a notice of availability of a Draft EIS on February 18, 2011.  76 Fed. Reg. 9,594 (Feb. 18, 2011).  The Draft EIS considered four alternatives: a "No Action" alternative; the withdrawal of approximately 1,010,776 acres for 20 years; the withdrawal of approximately 652,986 acres for 20 years; and the withdrawal of 300,681 acres for 20 years.  *Id.* at 9,595.  After an extended opportunity for public comment, the BLM published a notice of availability of the Final EIS on October 27, 2011.  76 Fed. Reg. 66,747 (Oct. 27, 2011).  The Secretary issued a Record of Decision on January 9, 2012, choosing to withdraw "approximately 1,006,545 acres of federal land in Northern Arizona for a 20-year period."  *See* No. 3:12-cv-08042, Doc. 27-1 at 3.

The Secretary made this withdrawal under the authority granted in § 204 of FLPMA.  77 Fed. Reg. 2,563-01, 2,563 (Jan. 18, 2012).  Section 204(c) authorizes the Secretary to make withdrawals "aggregating five thousand acres or more . . . only for a period not more than 20 years."[2]  43 U.S.C. § 1714(c)(1).  It further provides that "[t]he Secretary shall notify both houses of Congress of such a withdrawal no later than its

---

[2] FLPMA defines a "withdrawal" as "withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program[.]"  43 U.S.C. § 1702(j).

effective date[,] and the withdrawal shall terminate and become ineffective at the end of ninety days . . . if the Congress has adopted a concurrent resolution stating that such House does not approve the withdrawal." *Id.* The Secretary submitted its notice and reports to Congress on January 9, 2012, and Congress did not pass a concurrent action within 90 days to block the withdrawal. *See* Doc. 101 at 72-88. The withdrawal therefore remains in effect.

## II. Discussion.

Plaintiffs argue that even though Congress did not exercise its authority to void the withdrawal, the legislative veto provision enabling it to do so is unconstitutional and so interwoven with the withdrawal authority given the Secretary in § 204(c) that the entire grant of authority must be struck down. *See generally* Docs. 73 & 90.[3]

### A. The Legislative Veto.

Plaintiffs contend, and Defendants do not dispute, that the provision permitting Congress to terminate a withdrawal by concurrent resolution is unconstitutional because it allows Congress to act without adhering to normal constitutional requirements. The Supreme Court in *INS v. Chadha*, 462 U.S. 919 (1983), found that where Congress delegates authority to an agency to make policy decisions that alter legal rights, thus enabling the agency to engage in "legislative action," Congress must "abide by that delegation of authority until that delegation is legislatively altered or revoked." *Id.* at 955. Congress cannot alter a decision of such an agency merely through a resolution of one or both houses because Congress must act "in conformity with the express procedures of the Constitution's prescription for legislative action: passage by a majority of both Houses and presentment to the President." *Id.* at 958. Section 204(c), which allows Congress to void the Secretary's decisions without presentment to the President, is clearly unconstitutional under *Chadha*.

---

[3] Because NMA/NEI and NWMA have joined in each other's motions, the Court will not separately identify which party asserts which arguments, but will instead refer to these parties collectively as "Plaintiffs." The Court will take this same approach with Federal Defendants and Defendant-Intervenors, referring to them only as "Defendants."

**B.     Severability.**

Plaintiffs argue that the legislative veto is not severable from the rest of § 204(c) and that the Court must therefore invalidate the entire section.  The touchstone for determining whether a challenged statutory provision is severable from other provisions is the intent of Congress.  *Carter Coal Co. v. Carter*, 298 U.S. 238, 312 (1936) (explaining that the test for severability is "What was the intent of the lawmakers?"); *Chadha*, 462 U.S. at 931-932 (noting that invalid portions of a statute are to be severed "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not.") (internal quotation marks and citations omitted); *City of New Haven v. Pierce*, 809 F.2d 900, 903 (D.C. Cir. 1987) ("[T]he question whether the unconstitutional legislative veto provision in section 1012 is severable from the remainder of that section . . . [i]s purely one of congressional intent."). Thus, the key question for the Court to decide is whether Congress would have conferred § 204(c) withdrawal authority on the Secretary in the absence of a legislative veto.

Plaintiffs argue that Congress would have discarded all of § 204(c) rather than enact a grant of authority to make withdrawals of 5,000 acres or more ("large-tract withdrawals") without a legislative veto.  Plaintiffs point to the historical and political events leading up to the FLPMA, the language, structure, and context of § 204(c), and the legislative history of the FLPMA, all as showing that Congress would not have granted the Secretary large-tract withdrawal authority had it known it could not rely on the legislative veto to control that authority. Docs. 73 at 8-13; 90 at 17-21.  The Court will address these arguments separately.

Before doing so, however, the Court notes two legal principles that will bear on the decision in this case.  First, a statute that contains an unconstitutional provision is presumed to be severable if Congress has included a severability clause in the statute. *Chadha*, 462 U.S. at 932.  "A provision is further presumed severable if what remains after severance 'is fully operative as a law.'"  *Id.* at 934 (internal citation omitted). Second, when a presumption of severability arises, the party asking the Court to strike

down a portion of the statute must present "strong evidence" that Congress would not have enacted the challenged portion of the statute in the unconstitutional provision. *Alaska Airlines v. Brock*, 480 U.S. 678, 686 (1987).

The FLPMA includes a severability clause. Congress specifically stated that "[i]f any provision of the Act or the application thereof is held invalid, the remainder of the Act and application thereof shall not be affected thereby." Act of Oct. 21, 1976, Pub. L. No. 94-579, § 707, 90 Stat. 2743; 43 U.S.C. § 1701, historical and statutory notes. This clause is similar in material respects to the severability clause in *Chadha*, where the Court emphasized that the clause applied to "'*any* particular provision of [the] Act.'" 462 U.S. at 932 (emphasis added by *Chadha*). The Court thus begins its analysis with a presumption that the legislative veto provision can be severed from the rest of § 204(c), leaving intact the Secretary's authority to make the withdrawal at issue in this case. Plaintiffs can prevail in their quest to invalidate all of § 204(c) and the Secretary's withdrawal only if they present "strong evidence" that Congress would not have granted the Secretary large-tract withdrawal authority in the absence of a legislative veto.

**B.     The Historical and Political Events Preceding the FLPMA.**

The authority to manage and regulate the use of public lands originates in the Property Clause of the U.S. Constitution, which vests in Congress the "power to dispose of and make all needful rules and regulations respecting . . . property belonging to the United States." U.S. Const., Art. IV, § 3, cl. 2. The parties agree, however, that the Executive Branch historically exercised its own authority to withdraw public lands. In 1915, the Supreme Court affirmed this authority in *United States v. Midwest Oil Company*, 236 U.S. 459 (1915), finding that Congress's "acquiescence" in a multitude of executive land withdrawals over a long period of time had "readily operated as an implied grant of power." *Id.* at 479. At various times Congress actually enacted statutes enabling the Executive to withdraw public lands for specific purposes. As the Supreme Court later summarized in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), management of public lands under these many laws "became chaotic." *Id.* at 876.

Congress responded in 1964 by forming the bipartisan Public Land Law Review Commission ("the Commission") "to study existing laws and procedures relating to the administration of the public lands."  Act of Sept. 19, 1964, Pub. L. No. 88-606, 78 Stat. 982.  After study, the Commission found that "[t]he lack of clear statutory direction for the use of the public lands has been the cause of problems ever since Congress started to provide for the retention of some of the public domain in permanent Federal ownership."  Pub. Land Law Review Comm'n, *One Third of the Nation's Land* 43 (1970) (hereinafter Commission Report); *see* Doc. 102 at 36.  The Commission found that "[t]he relative roles of the Congress and the Executive in giving needed direction to public land policy have never been carefully defined[,]" and that the Executive used its withdrawal authority in "an uncontrolled and haphazard manner."  *Id*.  The Commission recommended that Congress "establish national policy in all public land laws by prescribing the controlling standards, guidelines, and criteria for the exercise of authority delegated to executive agencies."  *Id.* at 2; *see* Doc. 102 at 35.  The Commission further suggested that

> Congress assert its constitutional authority by enacting legislation reserving unto itself exclusive authority to withdraw or otherwise set aside public lands for specified limited purpose uses and delineating specific delegation of authority to the Executive as to the types of withdrawals and set asides that may be effected without legislative action.

*Id.*; *see* Doc. 102 at 35.

Congress enacted the FLPMA in response to the Commission's findings and recommendations.  Plaintiffs rely on the first part of the Commission's language quoted above – that "Congress assert its constitutional authority by enacting legislation reserving unto itself exclusive authority to withdraw or otherwise set aside public lands" – as evidence that Congress's intent in passing the FLPMA was to reign in executive authority over public land withdrawals.  Doc. 90 at 10-11.  As Defendants point out, however, the full-text of the quoted language contains a two-part recommendation: First, that Congress spell out its own reserved authority "to withdraw or otherwise set aside public land for specified limited-purpose uses," and second, that Congress make a "specific delegation of

authority to the Executive as to the types of withdrawals and set asides that may be effected without legislative action." Doc. 102 at 15. This two-part suggestion can also be seen in the Commission's recommendation that "large scale limited or single use withdrawals of a permanent nature" should only be effectuated by an Act of Congress, while "[a]ll other withdrawal authority should be expressly delegated with statutory guidelines to insure proper justification for proposed withdrawals, provide for public participation in their consideration, and establish criteria for Executive action." Commission Report at 54, Recommendation 8; *see* Doc. 102 at 40.

The FLPMA adopted this two-part approach to managing public lands. The statute specifically states that "it is the policy of the United States that . . . Congress exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes *and* that Congress delineate the extent to which the Executive may withdraw lands without legislative action[.]" 43 U.S.C. § 1701(a)(4) (emphasis added).

To accomplish the first part of this purpose, several sections of the FLPMA reserve to Congress exclusive authority over public land actions, including preventing the Executive from modifying Congressional withdrawals for national monuments and wildlife refuges and reserving to itself the authority to designate wilderness areas. *See* 43 U.S.C. §§ 1714(j), 1782. To ensure that Congress alone could initiate action in these areas, the FLPMA expressly repealed all grants of authority to the Executive recognized in *Midwest Oil* and 29 prior statutory grants of authority. Act of Oct. 21, 1976, Pub. L. No. 94-579, § 704(a), 90 Stat. 2743, 2792.

To accomplish the second part of the Commission's recommendation, the FLPMA includes express grants of withdrawal authority to the Executive. Section 204(a) provides that "the Secretary is authorized to make, modify, extend, or revoke withdrawals but only in accordance with the provisions and limitations of this section." 43 U.S.C. § 1714(a). Section 204(b) sets forth the procedures the Secretary must follow, and the next three subsections set forth, respectively, the procedures applicable to executive

1    withdrawals over 5,000 acres, withdrawals less than 5,000 acres, and emergency

2    withdrawals.   *Id.* at § 1714(c)-(e).   Thus, the FLPMA did what the Commission

3    recommended – it reserved certain land actions for Congress alone (national monuments,

4    wildlife refuges, and wilderness areas), and it also expressly delegated authority to the

5    Executive to take other land actions through specified procedures.

6        Plaintiffs repeatedly emphasize that the FLPMA sought to reign in executive

7    authority over public lands and to place limits and statutory protections around executive

8    withdrawal authority.   That certainly is correct.   But the question to be decided in this

9    case is not whether Congress sought to reign in executive authority, but whether there is

10   "strong evidence" that Congress would have chosen to give the Executive no large-tract

11   withdrawal authority under § 204(c) if it was unable to limit that authority with a

12   legislative veto.   The recommendations of the Commission do not provide that strong

13   evidence.   Significantly, the Commission did not recommended a legislative veto.   Nor

14   did it suggest that Congress reserve large-tract withdrawal authority to itself.

15       As discussed above, the Commission was equally concerned with enabling the

16   Executive to act through controlled delegation as it was with preserving Congress's

17   reserved powers.   Even while noting the "increasing controversy" caused by the

18   Executive's use of its implied withdrawal authority, the Commission recognized that such

19   executive action stemmed from a need to manage public lands for which Congress had

20   provided inadequate statutory guidance.   Commission Report at 44; *see* Doc. 102 at 37.

21   The Commission accordingly recommended that Congress "delineat[e] specific

22   delegation of authority to the Executive as to the types of withdrawals and set asides that

23   may be effected without legislative action."   *Id.* at 2; *see* Doc. 102 at 35.   In short, the

24   Commission recommended that Congress grant withdrawal authority to the Executive

25   without a legislative veto.   This does not constitute "strong evidence" that Congress

26   would have withheld the authority absent such a veto.[4]

27   _____

28       [4] Plaintiffs argue that the fact that Congress enacted the veto provision even
     though the Commission had not recommended it suggests that Congress must have found

1

2

**C.     The Language, Structure, and Context of § 204(c).**

**1.     Policy Language.**

Plaintiffs note that the language of the FLPMA repeatedly asserts legislative control over executive authority to withdraw public lands.  Doc. 73 at 8.  They point to the FLPMA's statement in § 102 declaring that it is "the policy of the United States that . . . Congress exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes and that Congress delineate the extent to which the Executive may withdraw lands without legislative action." 43 U.S.C. § 1701(a)(4).  They also point to the FLPMA's repeal of all implied authority to the Executive and argue that this provision "bluntly expresses Congress's desire to reign in the withdrawal authority of the Executive Branch."  Doc. 73 at 8-9.  As noted above, however, such provisions simply mirror the Commission's two-part recommendation that Congress reserve for itself withdrawal authority in specified areas (an action that required eliminating any competing executive authority in those areas) and grant specific authority to the Executive in other areas.  They say little about the importance of § 204(c)'s veto provision in achieving these overall purposes.

**2.     "Only."**

Plaintiffs further point to § 204(a), which states that the "Secretary is authorized to make . . . withdrawals, but *only* in accordance with the provisions and limitations of this section."  43 U.S.C. § 1714(a), cited in Doc. 73 at 9 (emphasis added).  Plaintiffs argue that this language shows that Congress could not have intended the grant of authority in § 204(c) to exist without all the provisions and limitations that pertain to it, including the legislative veto.  Doc. 73 at 9.  This language is repeated in § 202(e): "public lands shall be removed from or restored to the operation of the Mining Law of 1872 . . . only by withdrawal action pursuant to [§ 204] or other action pursuant to applicable law."  43

the Commission's recommendations insufficient to reign in executive power.  Doc. 110 at 13, n. 12.  Given the key role the Commission Report played in the enactment of the FLPMA, however, it is equally plausible that because the primary source guiding the enactment of the FLPMA did not suggest a veto provision, Congress would have forgone such a provision had it known the provision was unconstitutional.

U.S.C. § 1712(e)(3) (quoted in Doc. 110 at 7-8).   Plaintiffs maintain that this requirement, seen in tandem with the limiting language of § 204(a) and the veto provision in § 204(c)(1), shows that "Congress was willing to allow Interior to make long-term withdrawals of large acreage *only* if Congress could override that withdrawal itself, without presentment to the President."  Doc.110 at 8 (emphasis in Pl. brief).

Plaintiffs rely on Justice Scalia's concurrence in *Miller v. Allbright*, 523 U.S. 420, 457-58 (1998).   In *Miller*, an alien plaintiff had argued that two requirements for demonstrating one's citizenship under the Immigration and Nationality Act ("INA") violated the equal protection clause of the Constitution because they required proofs of parentage from those born of U.S. citizen fathers that were not required from those born of U.S. citizen mothers.  523 U.S. at 424.  Justice Scalia opined that the Court could not sever the unconstitutional provisions and leave the rest of the statute intact because "the INA itself contains a clear statement of congressional intent: 'A person may only be naturalized as a citizen of the United States in the manner and under the conditions prescribed in this subchapter *and not otherwise.*'"  *Id.* at 457 (emphasis added by Scalia).  He found that "reliance upon the INA's general severability clause . . . is misplaced because the specific governs the general."  *Id.*  In other words, Justice Scalia found that Congress's direct statement that citizenship could be acquired in the manner specified in the statute "and not otherwise" overrode the severability clause's suggestion that invalid provisions could be eliminated, leaving the rest of the statute's requirements in place.

Plaintiffs argue that the same analysis applies here – that because Congress stated that the Secretary could exercise his withdrawal authority "only" in compliance with the relevant subsections of § 204, none of the provisions can be severed without violating Congress's intent.  For several reasons, the Court is not persuaded.

First, *Miller* did not find the challenged provisions unconstitutional, so the Court never ruled on severability.  Justice Scalia's comments are not only in a concurrence, they are dicta.

Second, the INA provision in question included the word "only" as well as the

- 11 -

words "and not otherwise."  *Id.* at 457 ("'A person may *only* be naturalized as a citizen of the United States in the manner and under the conditions prescribed in this subchapter *and not otherwise*.'" (emphasis added)).  Justice Scalia relied on the latter phrase – "and not otherwise" – for his conclusion.  Section 204(a) of the FLPMA does not include that phrase, and the presence of the single word "only" is an insufficient basis, in the Court's view, to disregard Congress's clear statement that "[i]f *any* provision of the [FLPMA] or the application thereof is held invalid, the remainder of the [FLPMA] and application thereof shall not be affected thereby."  Act of Oct. 21, 1976, Pub. L. No. 94-579, 90 Stat. § 707; 43 U.S.C. § 1701, historical and statutory notes (emphasis added).

Third, Justice Scalia reaffirmed that courts have "judicial power to sever the unconstitutional portion from the remainder [of an Act], and to apply the remainder unencumbered."  *Id.*  The operative question, he maintained, is "whether Congress would have enacted the remainder of the law without the invalidated provision."  *Id.*  That is precisely the question addressed in this order.

Finally, Justice Scalia's concurrence does not in any way eliminate the presumption of severability raised by the severability clause or the requirement that "strong evidence" must be presented to overcome that presumption.  *Chadha*, 462 U.S. at 932; *Alaska Airlines*, 480 U.S. at 686.

### 3.    Structure.

Plaintiffs argue that "the structure of 204(c) further highlights the impossibility of severing the veto alone."  Doc. 73 at 11.  They first argue that the Secretary's large-tract withdrawal authority and the legislative veto are integrated into the same provision, showing that Congress intended them to remain linked.  Subsection 204(c)(1) states, in relevant part:

> [A] withdrawal aggregating five thousand acres or more may be made . . . only for a period of not more than twenty years by the Secretary on his own motion or upon request by a department or agency head.  The Secretary shall notify both Houses of Congress of such a withdrawal no later than its effective date *and the withdrawal shall terminate and become ineffective at the end of ninety days . . . if the Congress has*

1

2

> *adopted a concurrent resolution stating that such House does*
> *not approve the withdrawal.*

3   43 U.S.C. § 1714(c)(1) (emphasis added).  The remainder of the subsection specifies the

4   precise legislative procedures for exercising the veto.  *Id.*

5         It is undisputed that Congress intended the veto to apply to large-tract withdrawals

6   and not to other grants of authority.  Thus, it is unremarkable that the veto provision and

7   the delegation of large-tract withdrawal authority appear in the same subsection.  As

8   Defendants point out, "it only makes sense from the standpoint of clarity that a veto

9   relating solely to the withdrawal authority appear in close textual proximity to that

10  authority."  Doc. 101 at 14.  The relevant question, however, is not whether Congress

11  intended the veto to serve as a potential check on large-tract withdrawals – it clearly did –

12  but whether there is "strong evidence" that Congress would have withheld the large-tract

13  withdrawal authority had it known the veto was unconstitutional.  As *Chadha* instructs,

14  mere "reluctance" to delegate authority in the absence of a legislative veto is not enough

15  to rebut the presumption of severability that attaches when Congress includes a

16  severability clause.  462 U.S. at 932 ("Although it may be that Congress was reluctant to

17  delegate final authority over cancellation of deportations, such reluctance is not sufficient

18  to overcome the presumption of severability raised by [the severability clause].").

19  Plaintiffs' textual proximity argument therefore does little to advance the view that

20  Congress would not have wanted the Court to sever the unconstitutional veto provision,

21  leaving the remainder of § 204(c) intact, particularly where the severability clause

22  permits that Court to do just that and "it is the duty of th[e] court . . . to maintain the act

23  in so far as it is valid."  *Alaska Airlines*, 480 U.S. at 686; *see also Ayotte v. Planned*

24  *Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (the court tries "not to nullify

25  more of a legislature's work than is necessary," lest it "frustrate[] the intent of the elected

26  representatives of the people") (internal quotation marks and citations omitted).

27           **4.    Notice and Reporting Requirements.**

28        Plaintiffs next argue that severing the legislative veto would leave the notice and

- 13 -

reporting requirements in § 204(c)(1) and § 204(c)(2) with no purpose.  Doc. 73 at 11-12.

As shown above, § 204(c)(1) requires that the Secretary notify both houses of Congress of a large-tract withdrawal on or before the date that that withdrawal goes into effect.  43 U.S.C. § 1714(c)(1).  Section 204(c)(2) further requires that "[w]ith the notices required by subsection (c)(1) of this section and within three months after filing the notice under subsection (e) of this section, the Secretary shall furnish to the committees" a detailed report containing twelve specific elements, collectively detailing the rationale for the withdrawal and documenting the procedures used for public consultation, data collection, and evaluation.  *See* 43 U.S.C. § 1714(c)(2).

Subsection 204(c)(2)'s explicit reference to the notice requirement in (c)(1), and the fact that the required reports are to go to the committees who may, within 30 days, either make a motion to veto that action or be discharged from further consideration (*see* § 204(c)(1)), shows that Congress envisioned the reports as aiding the committees in deciding whether to recommend a veto.  This does not resolve the question, however, of whether the reporting requirements have value without a legislative veto provision.

The Court concludes that the reporting requirements provide a meaningful limitation on executive action even if no legislative veto may be exercised.  They require the Secretary to explain the reasons for the withdrawal (§ 204(c)(2)(1)); evaluate the environmental impact of the current uses and the economic impact of the change (*id.* at (2)); identify present uses and users of the land, including how these will be affected (*id.* at (3)); explain what provisions will be made for continuation or termination of existing uses (*id.* at (4)); consult with local governments and other impacted individuals and groups, and report on the impact of the withdrawal on these parties (*id.* at (7)-(8)); state the time and location of public hearings or other public involvement (*id.* at (10)); state where the records of the withdrawal can be examined by interested parties (*id.* at (11)); and submit a report prepared by a qualified mining engineer, engineering geologist, or geologist concerning general geology, known mineral deposits, past and present mineral production, and present and future market demands (*id.* at (12)).  As Defendants argue,

such requirements "not only impose a duty to present certain information to Congress; they also force the Secretary to incorporate such considerations into his decision-making process prior to making a large-tract withdrawal." Doc. 101 at 16. Defendants equate the value of these requirements to that of preparing an EIS under NEPA. *Id.*, n. 11.

Beginning with *Chadha*, legislative veto cases have recognized the value of reporting requirements separate from the veto provisions to which they pertain. In *Chadha*, Congress gave the Attorney General authority under the INA to suspend an alien's deportation. 462 U.S. at 923. The Act required the Attorney General to provide Congress with a detailed statement of the facts, relevant law, and reasons for suspension, and it allowed for one house of Congress to block the suspension. *Id.* at 924-25. The Court struck down the one-house veto as unconstitutional, but found it severable from the grant of authority. *Id.* at 959. The Court reasoned, in part, that "Congress' oversight of the exercise of this delegated authority is preserved" under the Act's reporting requirements. *Id.* at 935. The Supreme Court found it significant that Congress would still maintain the ability to block any unwanted suspensions by means of the regular legislative process. *Id.*, n. 8.

In *Alaska Airlines*, Congress enacted an employee protection program as part of the Airline Deregulation Act of 1978 and granted the Secretary of Labor authority to write implementing regulations. 480 U.S. at 678. Similar to the statute at issue in *Chadha*, the Act included a "report and wait" provision under which the Secretary was required to submit the proposed regulations to committees of both houses of Congress, with the regulations to become effective in 60 days unless blocked by a resolution of either house. *Id.* at 682. The Supreme Court recognized that eliminating the veto would alter the Act's balance of power between Congress and the Executive Branch (*id.* at 685), but found that Congress retained significant oversight even without the veto because it would receive reports of the Secretary's action, could attempt to influence the Secretary during the waiting period, and could enact proper legislation to block the Secretary's regulations from going into effect. *Id.* at 689-90.

In *Alabama Power Company v. United States Department of Energy*, 307 F.3d 1300, 1307, n. 5 (11th Cir. 2002), Congress authorized the Secretary of Energy to make fee adjustments under the Nuclear Waste Policy Act of 1982.  The Act required the Secretary to conduct annual reviews and evaluations of existing fees and to transmit any proposed changes to Congress.  *Id.*  These changes would go into effect in 90 days unless blocked by resolution of either house of Congress.  *Id.*  The Eleventh Circuit found the reporting requirements significant even absent a veto because they would give Congress the ability to "keep tabs on the Secretary's use of administrative discretion."  *Id.* at 1308.

These cases recognize that reporting requirements have oversight value even when severed from the legislative veto to which they originally were attached.  The detailed reporting requirements in §204(c)(2) have similar value.  They not only inform Congress of the Secretary's large-tract withdrawals so that Congress can respond through the normal legislative process if warranted, they also ensure that the Secretary will consider environmental and economic impacts of the withdrawal, consider current uses of the withdrawn land, consult with local governments and other impacted individuals, hold public hearings, and consult qualified experts about the known mineral deposits, past and present mineral production, and present and future market demands.  *See* 43 U.S.C. § 1714(c)(2).  These requirements will continue to have significant meaning even after the legislative veto is invalidated.

Plaintiffs argue that *City of New Haven*, 809 F.2d 900, is more applicable here. Doc. 110 at 8-9.  In that case, Congress granted the President authority to defer congressional appropriations to the end of the fiscal year by sending a "special message" to Congress including the rationale for the deferral, its amount and intended duration, and its probable fiscal consequences.  809 F.2d at 901.  The presidential deferral was to take effect automatically, but Congress could override it with a resolution of either house.  *Id.*, *id.*, n. 1.  The D.C. Circuit acknowledged that Congress touched on the need for effective notices during congressional debate, but agreed with the District Court's findings based on "overwhelming evidence of congressional intent" that "Congress – had it known that

it could not disapprove unwanted impoundments by means of a legislative veto – would never have enacted a statute that *conceded* impoundment authority to the President." *Id.* at 903 (emphasis in original), 907, n. 19.  As the Court will discuss more fully below with respect to legislative history, such "overwhelming evidence" is not present here.

Plaintiffs further argue that cases that contain a "report and wait" requirement are inapplicable because the FLPMA permits Executive Branch withdrawals to go into effect without a waiting period, so that "without the veto, the notices contribute nothing." Doc. 73 at 12, n. 10.  Plaintiffs are correct that the absence of a waiting period gives Congress less opportunity to influence an executive decision before it takes effect, but this point does not help Plaintiffs.  If anything, the fact that the FLPMA allows executive withdrawals to go into effect immediately suggests that influencing executive action or attempting to block it through a legislative veto was less important to Congress in the FLPMA than in the "report and wait" statutes.

### 5.   Distinctions between Grants of Authority.

Plaintiffs argue that excising only the veto would nullify the distinction Congress intended to make between small-tract withdrawals (less than 5,000 acres) and large-tract withdrawals, as clearly evidenced by the fact that Congress provided for this authority in separate sections.  Doc. 110 at 10-11.  It is true that removal of the veto provision negates a key distinction between § 204(c) and § 204(d), but the veto provision is not the only important distinction between these sections.   As discussed above, the reporting requirements that attach to § 204(c) withdrawals remain and have utility independent of the veto.  Additionally, § 204(d) allows for three separate kinds of withdrawals: one for a "desirable resource use" that can be of unlimited duration, one for "any other use" that is limited to 20 years, and one for "a specific use then under consideration by the Congress" that is limited to 5 years.  43 U.S.C. § 1714(d)(1)-(3).  Withdrawals under § 204(c), by contrast, can be made only up to 20 years.  Although a large-tract withdrawal can be extended for the same period as the original withdrawal, such extensions require review by the Secretary, a repeat of the notice and reporting procedures for the original

withdrawal, and a determination that the extension is necessary to achieve the original purposes.  *Id.* at § 1714(f).  There is no provision, as there is in § 204(d), for unlimited withdrawals.  Nor does it appear that Congress intended the Secretary to make large-tract withdrawals as a way to effectuate uses under consideration by Congress as it envisioned the Secretary doing with smaller withdrawals in § 204(d)(3).  These distinctions remain even without the veto provision.  Thus, severing only that provision would not collapse Congress's separate intentions with respect to § 204(c) and § 204(d).

### 6.   Emergency Withdrawals.

Plaintiffs argue that elimination of the veto provision would effectively eliminate the need for § 204(e), which permits emergency withdrawals for up to three years, because the Secretary could use § 204(c) to withdraw the same land for up to 20 years.  Doc. 110 at 11.  This overstates the case.  Section 204(c)(2) imposes the detailed reporting requirements described above for large-tract withdrawals.   43 U.S.C. § 1714(c)(2).   Although the same notice and reports are required for emergency withdrawals, the Secretary may make emergency withdrawals before preparing the reports.  *Id.*  The fact that large-tract withdrawals made under § 204(c) become effective only after the Secretary furnishes detailed reports to Congress means that § 204(c) could not be used to make withdrawals on the same expedited basis as § 204(e) permits.  Additionally, public hearings, which are required for all other withdrawals, are not required under § 204(e).   43 U.S.C. § 1714(h).   Thus, § 204(e) retains separate significance even if the veto provision is severed from § 204(c).

Plaintiffs make a converse argument that elimination of only the veto provision in § 204(c) would render the rest of that section superfluous because the Secretary could make large-tract withdrawals for up to 3 years in an emergency situation pursuant to § 204(e), giving Congress time to enact proper legislation to extend those withdrawals for longer periods.  Doc. 110 at 11.  This argument is unpersuasive because § 204(e) applies only "if an emergency situation exists and . . . extraordinary measures must be taken to preserve values that would otherwise be lost."  43 U.S.C. § 1741(e).  Absent § 204(c)'s

- 18 -

delegation of authority, all non-emergency withdrawals of more than 5,000 acres would require an affirmative act of Congress.  This is inconsistent with Congress's express delineation of "the extent to which the Executive may withdraw lands without legislative action," particularly in light of the dual purposes of the FLPMA as expressed in § 204(a) and embodied in the Commission Report.  *See* 43 U.S.C. § 1701(a)(4); Doc. 102 at 35.

### 7.  Other Arguments.

Plaintiffs' remaining textual arguments are that neither the 20-year limitation in § 204(c) nor Congress's purported ability to reverse the Secretary's actions through the normal legislative process provides meaningful restraint on executive action absent the veto.  Doc. 110 at 8-9.  Plaintiffs argue that the 20-year limitation is "infinitely renewable," and, even if not renewed, is essentially a lifetime to those with current investments in the withdrawn area.  Doc. 110 at 8.  Plaintiffs also argue that the possibility of reversing the withdrawal through full legislative action is not a viable alternative to a legislative veto because doing so would require the President to agree to override actions of his own Secretary of the Interior.  *Id.* at 9.

The Secretary's ability under § 204(c) to withdraw public lands for up to 20 years is, undeniably, a significant grant of power that would be made more pronounced absent an immediate mechanism for legislative restraint.  Any textual arguments that Congress would not have enacted this grant of authority absent the legislative veto, however, are tempered by the fact that Congress gave the Secretary unfettered authority to make 20-year and other unlimited withdrawals under § 204(d) where public uses of smaller, but still significant, acreage was at stake.[5]  The ability to extend withdrawals made under

---

[5] The legislative history also shows that Congress increased the duration of large-tract withdrawals from 5 to 20 years.  House members who commented in floor debates indicated that they did not want Interior to be constantly saddled with paperwork or Congress to have the burden of frequent reviews.  *See, e.g.*, 122 Cong. Rec. 23,438 (1976) (statement of Rep. Mink) ("[I]f withdrawals are restricted to a maximum duration of 5 years, the Secretary will be overwhelmed with almost endless paperwork and field studies to justify, and continually rejustify, land management decisions."); *id.* at 23,436 (statement of Rep. Seiberling) ("This provision [requiring review of large-tract withdrawals subject to a veto every five years] is burdensome, time consuming, and counterproductive.").

§ 204(c) is also not unlimited.  As noted above, the procedures required for such an extension are substantial.

The argument that Congress would lack a viable means to reverse a large-tract Executive Branch withdrawal through proper legislation requiring presentment to the President, and therefore would not have granted the Secretary this authority absent the legislative veto, is also unpersuasive.  The fact that Congress clearly wanted the ability to take legislative action without presentment does not mean that, faced with the unconstitutionality of that approach, Congress would have withheld its delegation of power even when a proper legislative check on that power would still be available.[6] Withholding large-tract withdrawal authority from the Executive would have saddled Congress with the responsibility for managing and enacting – through the full legislative process – all withdrawals of land over 5,000 acres.  The legislative history discussed below suggests that Congress was not eager to assume such a burden.

Moreover, provisions of the FLPMA other than the legislative veto provide meaningful checks on executive authority.  These include § 204(a), which restricts large-tract withdrawals to the Secretary or other Senate-approved appointees, § 204(c)(1), which limits large-tract withdrawals to 20 years, and § 204(c)(2), which establishes the detailed notice and reporting requirements discussed above.  The Court cannot conclude that Congress would have viewed these restrictions as so lacking in substance that it would have reserved all large-tract withdrawal authority to itself if it could not impose

_____

[6] As noted in the legislative history section below, the House Committee that reviewed and approved the House version of the FLPMA contemplated that Congress could reverse large-tract executive withdrawals through the normal legislative process in cases where the veto had not been utilized.  The Committee noted "each House will have, for a period of 90 days, the opportunity to terminate all such withdrawals," and, "[a]bsent such timely action, it will take an Act of Congress to terminate the withdrawal if the Secretary does not do so."  H.R. Rep. No. 94-1163, at 6,183 (1976).  At least one Representative also recognized in floor debate that for certain, irrevocable decisions, a veto may be more essential, but "if land is set aside by the Secretary and exempt from the Mining Act . . . the land will still be there and Congress at any time can open them up." 122 Cong. Rec. at 23,454 (statement of Rep. Seiberling).

the one additional restriction of a legislative veto.

**D.     Legislative History.**

Congress enacted the FLPMA as Public Law 94-579 on October 21, 1976.   43 U.S.C. § 1714, historical and statutory notes.  The legislation came about as a result of bills passed in both the House (H.R. 13777) and the Senate (S. 507) that were brought together by the Committee of Conference.  H.R. Rep. No. 94-1724, at 6,228 (Conf. Rep.) (1976).  The Senate bill was put forward and enacted in lieu of the House bill, but its language was amended to contain most of the text of the House bill.  *Id.*  Significantly, only the House bill contained a legislative veto.  *Id.* at 6,229, sec. 4(d).  Additionally, only the House bill provided for repeal of all existing executive withdrawal authority.  *Id.* at 6,237.  The conferees adopted both of these provisions, but revised the House's one-house legislative veto to require a concurrent resolution of both houses.  *Id.*, *id.* at 6,229, sec. 4(d).

In support of their argument that Congress would not have enacted § 204(c) without the veto provision, Plaintiffs point to the House Report endorsing the original House Bill, the Conference Report, and the statements of various House members during floor debates.  *See* Docs. 73 at 9; 110 at 14-16; 113 at 20-23.  The Court will address each of these sources of legislative history.

**1.     House Report.**

Plaintiffs argue that the House Report indicates that "providing for control over large-tract withdrawals was a 'major objective' of FLPMA."  Doc. 113 at 20.  The House Report was issued on May 15, 1976, by the House Committee on Interior and Insular Affairs to which the original House bill had been referred.  H.R. Rep. No. 94-1163, at 6,175 (1976).  The House Committee stated that one of the "major objectives" of the bill was to "[e]stablish procedures to facilitate Congressional oversight of public land operations entrusted to the Secretary of Interior."  *Id.* at 6,176, sec. (4).  It also noted that "[p]ublic concern over the possibility of excessive disposals of public lands on the one hand and excessive restrictions on the other is reflected in the inclusion of requirements

for referral of certain types of actions to the Congress for review," including "withdrawals and extensions of withdrawals of 5,000 acres or more." *Id.* at 6,177. Commenting on the veto provision, the Committee noted that upon receiving notice from the Secretary of withdrawals or extensions totaling 5,000 acres or more, "each House will have, for a period of 90 days, the opportunity to terminate all such withdrawals," and "[a]bsent such timely action, it will take an Act of Congress to terminate the withdrawal if the Secretary does not do so." *Id.* at 6,183.

Defendants argue, and the Court agrees, that the House Report does not provide "strong evidence" that the veto was a major objective of the FLPMA.  Doc. 115 at 13. The Report provides some evidence that the House would have been averse to a final version of the FLPMA that did not include the veto provision approved in its own bill, but the strength of this evidence is reduced by the fact that the Report does not state that the veto is a major objective of the bill, only that "[e]stablish[ing] procedures to facilitate Congressional oversight of public land operations entrusted to the Secretary" is such an objective.   H.R. Rep. No. 94-1163 at 6,176.   Where the Report discusses the veto provision specifically, it does so in the context of a number of other "procedural controls," including that the Secretary must provide notice to Congress, must include with this notice other information as specified in the bill, must promulgate the withdrawal on the record and provide an opportunity for hearings, may segregate lands only for one year before taking definitive action, and may act only through the Secretary and "policy officers in the Office of the Secretary appointed by the President with the advice and consent of the Senate." *Id.* at 6,183-84.  As noted above, these provisions, independent of the veto, provide strong congressional control on large-tract withdrawals.  Taken as a whole, the House Report does not provide "strong evidence" that the veto provision alone was essential to the House's approval of the delegation of authority in § 204(c).

The separate and dissenting views of House Committee members Udall and Seiberling cast further doubt on the centrality of the veto.   Representative Udall expressed general approval of the bill's "long overdue" statutory guidelines for federal

land management, but opined that the bill contained "serious flaws."  H.R. Rep. No. 94-1163, at 221, *reprinted in* Legis. Hist. of the Fed. Land Policy and Mgmt. Act of 1976, at 650 (1978) [hereinafter FLPMA Legis. Hist.]; *see* Doc. 117-3 at 2.  "Most specifically," he stated,

> I disagree with those sections of .the bill which set forth new procedures for Congressional review of Executive withdrawals of public lands. While I have always been strongly in favor of additional oversight of the Department of Interior by the Congress and this Committee, the simple fact is that the mechanism of "withdrawal" of public lands from mineral entry is currently the only defense we have against mining activity on the public domain.

*Id.*  Representative Seiberling, dissenting on behalf of himself and five other House members, similarly took issue with the bill's limitations on executive withdrawals which he favorably cited as providing needed protection of public lands.  *Id.* at 231, *reprinted in* FLPMA Legis. Hist., 658; *see* Doc. 117-3 at 5.  He stated "[w]e do not suggest that Congress should not exercise oversight over this withdrawal authority[,]" but that the veto provision and the requirement imposed on the Committee "to examine every proposed new withdrawal over 5,000 acres" would be overly burdensome to Congress and the Interior.  *Id.*

## 2. Conference Report.

Plaintiffs argue that the sentiments of the House Committee are echoed in the Conference Report, but this Report contains even less evidence from which to infer that the veto was an absolute prerequisite to Congress's delegation of large-tract withdrawal authority.  The only mention the Report makes of the veto is to note that the conferees adopted it as part of the House amendments to the Senate Bill and that they revised it to require action from both houses.  H.R. Rep. No. 94-1724, at 6,229 (Conf. Rep.).  There is no further discussion of the veto from which to conclude that Congress would not have passed § 204(c) without it.

The Staff Recommendations of both houses, prepared at the request of the Committee of Conference, shed slightly more light on the analysis surrounding the

inclusion of the veto in the revised Senate bill that ultimately became the FLPMA.  Staff of Comm. on Conf. of S. 507, 94th Cong., Fed. Land Policy and Mgmt. Act & Natural Res. Lands Mgmt. Act (Comm. Print 1976), *reprinted in* FLPMA Legis. Hist., at 747-869; *see* Doc. 117-2 at 2-14.  The Staff identified provisions it found consistent with both the House and Senate bills in roman text, provisions it found consistent with the objectives of both houses in italics, and provisions of one house for which it had no clear recommendation in bold.  *Id.*, Explanatory Note, *reprinted in* FLPMA Legis. Hist., at 748; *see* Doc. 117-2 at 3.  With the exception of the nine lines containing the veto, the Staff placed all of proposed § 204 in italics, denoting that it was consistent with the objectives of both houses.  *Id.* at 19-22, *reprinted in* FLPMA Legis. Hist., at 767-770; *see* Doc. 117-2 at 6-14.  The veto provision was printed in bold type, showing that the Staff found § 204(c)'s grant of authority and its various procedural limitations, including the notice and reporting requirements, consistent with the objectives of both houses, but did not reach the same conclusion with respect to the veto.  Thus, while the Committee of Conference adopted the House version of § 204(c) that subsequently passed into law, there is no evidence of a strong consensus of both houses that the veto was inextricable from the grant of large-tract withdrawal authority.

### 3.    House Floor Debates.

Plaintiffs rely heavily on statements of House members during floor debates held on July 22, 1976, to show that Congress would not have granted the Secretary large-tract withdrawal authority apart from the veto.  Representative Melcher, chief sponsor of the House bill, described the veto as "congressional oversight responsibility" and stated that "[s]ince there is now no system of congressional review and congressional oversight of withdrawals, this is the first positive step that Congress has taken to . . . exercise that responsibility."  122 Cong. Rec. 23,452 (1976); *see* Doc. 73 at 9.  When debating an amendment to raise the acreage for withdrawals triggering congressional review from 5,000 to 50,000 acres, and the duration from 5 to 25 years (*id.* at 23,440), Representative Steiger stated even more strongly that "there were those of us – and I include myself –

who felt that the Secretary should have the opportunity of making no withdrawals without the review of Congress" and that "5,000 acres already represents a strong compromise." *Id.* at 23,452.  These sentiments were echoed by Representative Santini: "I think it is a fair and rational compromise to set a 5,000-acre ceiling. . . . I think it is imperative that the position of the [drafting] committee be maintained." *Id.* at 23,453. Similarly, Representative Skubitz stated that "[o]ne of the most important reasons for adopting this bill is that it provides for congressional oversight and control over an executive agency which, at present, is free to act mostly of its own accord," and that "[i]t is essential that Congress be informed of, and able to oppose if necessary, withdrawals which it determines not to be in the best interests of all the people." *Id.* at 23,437.

Other House members were less supportive of placing constraints on executive withdrawals, in general.  Representative Forsythe expressed the view that the House bill "bends too far" and would result in reluctance on the part of Interior to make withdrawals as well as open up the possibility that "the mining industry will descend on Congress every time a withdrawal is proposed to urge that it be disapproved." *Id.* at 23,440. Representative Fenwick expressed the view that "[s]ince the purpose of withdrawals is to protect the lands that belong to the people of this country, it would seem to me that the granting of permission to use the land ought to be the area where Congress raises questions, and that the protection and preservation of those lands should be encouraged . . . and not made difficult." *Id.* at 23,452.   Representative Sieberling similarly recognized that "a withdrawal is basically a protective mechanism" and called the review provisions in § 204 one of the "most objectionable provisions in the legislation." *Id.* at 23,436.  Representative Mink, who proposed the above-cited amendment, opposed both the 5,000 acre limit and the then-proposed time duration of five years because she believed these would place an unworkable burden both on the Secretary and on the House and Senate Interior Committees. *Id.* at 23,438.

Plaintiffs point out that Representative Mink and the supporters of her amendment who generally espoused less oversight never directly opposed the veto provision or

recommended removing it.  Doc. 113 at 23, n. 15.  They quote Representative Mink as saying "I most certainly do not object to congressional oversight in withdrawal matters," and to Representative Seiberling as saying that, under the proposed amendment, "withdrawals would still be subject to disapproval by a resolution of either House."  *Id.* (citing 122 Cong. Rec. 23,436, 23,438).  This does not mean, however, that these members would have opposed the delegation of large-tract withdrawal authority had they foreseen the need to remove the veto as constitutionally impermissible.  It appears, instead, that they were attempting to appease those who would disfavor any less restricted delegation of authority while still trying to raise their own objections.  This is clear from Representative Mink's statement that "[i]f Congress absolutely deems it necessary to exercise control over the withdrawal system, I suggest that we limit review to withdrawals involving 25,000 acres or more, and establish a duration period of 15 years." 122 Cong. Rec. 23,438.  Ultimately the House adopted a compromise in which it kept the 5,000 acre limit, but extended the permissible withdrawal period to 20 years.

The floor debates clearly show that some members of the House were unwilling to consider allowing the Secretary to make withdrawals of more than 5,000 acres without some form of meaningful oversight and, presumably, would not have consented to a delegation of such authority absent the veto provision, while other members, such as Representative Seiberling, expressed the value of allowing the Secretary to make such withdrawals for the protection of public lands and saw this as a more efficient and effective means of federal land management than relying on Congress to enact full legislation.  *See*, *e.g.,* 122 Cong. Rec. at 23,453 (statement of Rep. Seiberling) ("The purpose of withdrawal by the Secretary, without waiting for the lengthy process of legislation, is to be able to act promptly to set aside lands.").  Whether these members, or, more accurately, whether a majority of the House, would have found this delegation too important to eliminate cannot be answered from these isolated comments.

The statements of individual representatives ultimately carry less weight than Committee Reports in analyzing Congress's intent.  *Garcia v. United States*, 469 U.S. 70,

76 (1984) ("[W]e have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation.'") (internal citations omitted).  Here, however, the House Report is not particularly helpful in isolating the significance of the veto provision in relation to the other limitations contained in the FLPMA and in § 204 in particular.  The Conference Report merely reflects that the conferees adopted the House amendments that included the legislative veto, but provides no discussion from which to conclude that elimination of the veto alone would have caused Congress to withhold large-tract withdrawal authority.  *See Gulf Oil Corp. v. Dyke*, 734 F.2d 797, 804 (Temp. Emer. Ct. App. 1984) (stating that the mere reference to and description of vetoes in legislative reports is "not helpful in determining what Congress would have intended had it known the legislative vetoes were invalid.").

Plaintiffs argue that this case is like *City of New Haven* in which the D.C. Circuit took into account the "numerous statements of individual legislators urging the passage of legislation to control presidential impoundments" and agreed with the lower court that the "'*raison d'etere*' of the entire legislative effort was to assert *control* over presidential impoundments."  809 F.2d at 907 (emphasis in original).  Here, however, the evidence from the pre-FLPMA Commission Report, the text and structure of the FLPMA, the statements of House members, and the Committee Reports all reflect that the FLPMA was equally concerned with granting withdrawal authority to the Executive as it was with setting proper limits and procedural safeguards on the exercise of that authority. Additionally, unlike *City of New Haven*, in which the court noted that "[n]owhere in the legislative history is there the slightest suggestion that the President be given statutory authority to defer funds without the possible check of at least a one-House veto" (*id.* at 908), several House members addressing the FLPMA spoke of the need to support rather than limit the Executive's ability to withdraw public lands, and the Senate put forth its own bill that neither repealed the Executive's existing authority nor included a legislative

veto.  Upon this evidence, the Court cannot conclude, as the court did with respect to the veto in *City of New Haven*, that the veto in § 204(c) of FLPMA is inseparable from the remainder of that section.

### E.     Whether § 204(c) is Fully Operative without the Veto.

As stated in *Chadha*, the presumption of severability attaches not only where there is a severability clause, but also where "what remains after severance 'is fully operative as a law.'"  462 U.S. at 932 (internal citation omitted).  Plaintiffs argue that § 204(c) would not function in the manner Congress intended but for the veto.  *See, e.g.*, Doc. 73 at 10.  Plaintiffs argue that allowing the Secretary to make large-tract withdrawals without the legislative veto would fundamentally conflict with Congress's intent by eliminating the FLPMA's "most significant" constraint on executive withdrawals.  *See, e.g.*, Doc. 73 at 8 (quoting Prof. Robert L. Glicksman, *Severability and the Realignment of the Balance of Power over the Public Lands: The Federal Land Policy and Management Act*, 36 Hastings L.J. 1, 36 (1984)).  The Court does not agree.

The FLPMA will remain fully operative absent the legislative veto.  As courts have found in other severability cases, the notice and reporting requirements of the FLPMA will continue to function and provide both substantive and procedural restraints on executive action.  As discussed above, the various provisions of the FLPMA will continue to have distinct meaning after the veto is invalidated.  Indeed, as Defendants note, the Secretary has exercised large-tract withdrawal authority at least 82 times in the 35 years since the FLMPA was enacted and Congress has never exercised the veto once, confirming that the FLPMA functions effectively with no veto.  Doc. 101 at 25; *see* Decl. of Jeffrey O. Holdren, Doc. 101 at 90-92, ¶¶ 4, 6.

### III.    Summary and Conclusion.

Given the FLPMA's severability clause and the fact that the statute remains fully operative without the legislative veto, the Court presumes that the veto is severable from the remainder of § 204(c).  *Chadha*, 462 U.S. at 932.  Plaintiffs have not presented the "strong evidence" required to overcome this presumption.  *Alaska Airline*, 480 U.S. at

686.  The Court therefore holds that the veto is severable, and that the Secretary's large-tract withdrawal authority remains in place even after invalidation of the legislative veto. "Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem . . . [and] to enjoin only the unconstitutional applications of a statute while leaving other applications in force." *Ayotte*, 546 U.S. at 328-29.

The Court invalidates only the lines of § 204(c)(1) beginning with the statement: "and the withdrawal shall terminate and become ineffective at the end of ninety days . . . if the Congress has adopted a concurrent resolution stating that such House does not approve the withdrawal. . . ."   The preceding part of that section, which grants the Secretary large-tract withdrawal authority, and all of § 204(c)(2), setting forth detailed reporting requirements, remain in effect.

**IT IS ORDERED:**

1.   Plaintiffs' motions for partial summary judgment (Doc. 73 (3:12-cv-08038 DGC) and Doc. 90) are **denied**.

2.   Defendants' cross motions for summary judgment (Docs. 101 and 102) are **granted**.

3.   Defendants' motion for leave to file supplemental citations (Doc. 128) is **granted.**  The Clerk is directed to file the document lodged as Doc. 129.

Dated this 20th day of March, 2013.

_____
David G. Campbell
United States District Judge