Gregory Yount
807 W. Butterfield Rd
Chino Valley, Arizona 86323
928-899-7029
*Plaintiff Pro Se*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

PRESCOTT DIVISION

| | |
|---|---|
| GREGORY YOUNT<br>       Plaintiff,<br>v.<br>KEN SALAZAR, Secretary of the Interior; et al.;<br>       Defendant | Case No. 3:11-cv-08171-PCT DGC<br>(Lead Case) |
| National Mining Association, et al.;<br>       Plaintiff,<br>v.<br>KEN SALAZAR, Secretary of the Interior; et al.;<br>       Defendant | Case No. 3:11-cv-08038-PCT-DGC |
| Northwest Mining Association,<br>       Plaintiff,<br>v.<br>KEN SALAZAR, Secretary of the Interior; et al.;<br>       Defendant | Case No. 3:12-cv-08042-PCT-DGC |
| Quaterra Alaska Incorporated, et al.,<br>       Plaintiff,<br>v.<br>KEN SALAZAR, Secretary of the Interior; et al.;<br>       Defendant | Case No. 3:12-cv-08075-PCT-DGC |

# Motion to Require Defendant To Supplement the Administrative Record

On May 18, 2012, Plaintiff Yount provided new information to the Bureau of Land Management (BLM) via email (Exhibit 1) and followed up with additional new information on March 3, 2013 (Exhibit 2) after not receiving any feedback from the BLM regarding this new and substantive information regarding the Defendant's Northern Arizona Withdrawal EIS.

Plaintiff assumed that the May 18, 2012 email would be part of the Administrative Record (AR) and that the BLM would have analyzed the new information as required by law to determine if the Northern Arizona Withdrawal EIS required supplementation.

Upon receipt of the AR, Plaintiff found that the email of May 18, 2012 was not included. Plaintiff inquired of the Defendant's attorney, John Most, and received the following reply by email on February 15, 2013:

> "Mr. Yount,
> I'm writing in response to the issue you raised in your email below. As you note, the email in question post-dates issuance of the ROD. Under the Administrative Procedure Act, a court assessing agency action must "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. The whole administrative record "'consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position.' "*Arizona Rehabilitation Hosp., Inc. v. Shalala*, 185 F.R.D. 263 (D. Ariz. 1998) (quoting *Thompson v. United States Department of Labor*, 885 F.2d 551, 555 (9th Cir.1989) (quoting*Exxon Corp. v. Department of Energy*, 91 F.R.D. 26, 33 N.D.Tex.1981);*see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). Because the subject email post-dates the ROD, it could not have been considered by agency decision-makers and we therefore decline to include it in the record.
> I am aware of the NEPA regulation on "new circumstances or information," 40 C.F.R. §1502.9(c)(1)(ii), and infer from your reference below to "new and substantive information" that you may contemplate that the subject email falls within the scope of this regulation. This regulation only applies, however, if there remains "major federal action to occur." This is not a situation where further federal action remains, as in the example of a decision to authorize and construct a dam, or conduct a timber sale. In those situations, federal action remains to occur for a period of time following issuance of the ROD. Here, the federal action, that is, the withdrawal order, was authorized by the ROD and fully completed on the same day. Nothing further remained to be done when

BLM received your email in May of 2012, so re-opening the NEPA process was not required. Moreover, we note that your NEPA claims have been dismissed and do not believe this document bears on your remaining claim."

The Defendant's claim that there are no remaining federal actions to occur as a result of the Defendant's Record of Decision (ROD) is factually incorrect. The ROD and Withdrawal Order require that hundreds or possibly thousands of mineral exams be conducted to determine whether prior existing rights for the remaining mining claims in the withdrawal area exist. These mineral exams determine the property rights of the claim holders and indicate whether the claims are protected by the taking clause of the Fifth Amendment of the US Constitution.

This **is** a situation where further federal action remains, and is similar to a decision to authorize and construct a dam or conduct a timber sale in that new and substantial information regarding the dam contruction ( a newly identified endangered species such as the snail darter) or regarding a timber sale (identification of expanded habitat – spotted owl) could delay or prevent the construction of a dam or timber sale. The new and substantive information provided to the BLM by the Plaintiff has the potential to require a supplemental EIS be issued and could therefore affect the withdrawal decision and the requirement for the remaining federal action, i.e., hundreds of mineral exams.

Defendant's claim that this Plaintiff no longer has NEPA claims to persue, is correct at this time, but is besides the point. There are other Plaintiff's that could make use of this information in their NEPA complaints and the AR should relect such information.

Additionally, should the Court find that the mineral exams are further federal actions remaining, the AR should be supplemented with any and all records after the date of the ROD

Motion to Ammend the Administrative Record

1 that have resulted from new information or analyses performed by the BLM/DOI post Record of
2 Decision. Any of this information could potentially bear on this Plaintiff's remaining claims.
3     Plaintiff respectfully requests that the Court find that the mineral exams required by the
4 Defendant's ROD and Withdrawal Order are remaining further federal actions to occur, and that
5 any new and substantive information submitted (and the resulting BLM/DOI analyses) after the
6 date of the Defendant's ROD requires inclusion into the Administrative Record and that the AR
7 be ammended by such records.

Respectfully Submitted,
Dated: March 25, 2013

_____
Gregory Yount, Plaintiff *Pro Se*

# Exhibit 1

**Subject:** Re: schedule for resolving issue of the constitutionality of FLPMA sec. 204(c)(1)
**From:** Most, John (ENRD) (John.Most@usdoj.gov)
**To:** gregory_yount@northern-arizona-uranium-project.com;
**Cc:** wmap@igc.org; tzukoski@earthjustice.org; connie@cebrooks.com; wklain@lang-baker.com; AChasanov@crowell.com; rmccrum@crowell.com; SMathiascheck@crowell.com; lechner@mountainstateslegal.com; jmccoy@mountainstateslegal.com; MKlise@crowell.com; Dominika.Tarczynska@usdoj.gov; JMartin@crowell.com;
**Date:** Friday, February 15, 2013 5:06 PM

Mr. Yount, I will convey your message to DOI and discuss the matter and your points with them.

Thanks,

John Most

Sent Using U.S. DOJ/ENRD BES 5 Server

**From:** Gregory Yount [mailto:gregory_yount@northern-arizona-uranium-project.com]
**Sent:** Friday, February 15, 2013 07:01 PM
**To:** Most, John (ENRD)
**Cc:** Roger Flynn <wmap@igc.org>; Ted Zukoski <tzukoski@earthjustice.org>; Connie Brooks <connie@cebrooks.com>; wklain@lang-baker.com <wklain@lang-baker.com>; Chasanov, Amy <AChasanov@crowell.com>; McCrum, Timothy <rmccrum@crowell.com>; Mathiascheck, Susan <SMathiascheck@crowell.com>; 'lechner@mountainstateslegal.com' <lechner@mountainstateslegal.com>; 'jmccoy@mountainstateslegal.com' <jmccoy@mountainstateslegal.com>; Klise, J. Michael <MKlise@crowell.com>; Tarczynska, Dominika (ENRD); Martin, John <JMartin@crowell.com>
**Subject:** Re: schedule for resolving issue of the constitutionality of FLPMA sec. 204(c)(1)

Mr. Most,

I see your point, except that there *are* further Federal Actions remaining as a result of the ROD.

These actions would be the hundreds of *mineral exams* required by the ROD and the withdrawal order. These mineral exams are a direct result of the ROD and are required.

I believe that some of the Defendant intervenors are considering this same argument to demand that the EIS's for Energy Fuels' mines that are on standby be subject to Supplementation because these mines are subject to the Federal Action of a mineral exam.

I think that your clients should reconsider their position on this issue since there are, without doubt, further Federal Actions remaining.

The DOI should reconsider supplementation as well based on CEQ 1502.9 (c) (ii) 2.

"May also prepare supplements when the agency determines that the purpose of the Act will be furthered by doing so."

That the DOI now knows (or should know) with certainty that the uranium resource estimate for the withdrawal area is fatally flawed in all respects and is without any foundation in scienc, math, or logic and underestimates the Uranium resource by over 600%, seems to me to, meet the criteria of CEQ 1502.9 (c) (ii) 2.

How can the DOI claim any credibility at all when they know of a major flaw in the EIS, that is the starting point of all analysis for the EIS, and yet ignore it. Credibility is what section 1502.9 (c) (ii) 2 is speaking to. The DOI should listen.

That my NEPA claims have been dismissed is irrelevant. This information should be available to those litigants that have NEPA claims.

In light of the fact that there are other Federal Actions (impacts) remaining (the Mineral Exams), Section 1502.9(c) 1(ii) requires supplements when:

"There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed actions or its *impacts*."

Please convey to your clients the above information for their consideration.

Gregory Yount

---

**From:** "Most, John (ENRD)" <John.Most@usdoj.gov>
**To:** Gregory Yount <gregory_yount@northern-arizona-uranium-project.com>
**Cc:** Roger Flynn <wmap@igc.org>; Ted Zukoski <tzukoski@earthjustice.org>; Connie Brooks <connie@cebrooks.com>; "wklain@lang-baker.com" <wklain@lang-baker.com>; "Chasanov, Amy" <AChasanov@crowell.com>; "McCrum, Timothy" <rmccrum@crowell.com>; "Mathiascheck, Susan" <SMathiascheck@crowell.com>; "'lechner@mountainstateslegal.com'" <lechner@mountainstateslegal.com>; "'jmccoy@mountainstateslegal.com'" <jmccoy@mountainstateslegal.com>; "Klise, J. Michael" <MKlise@crowell.com>; "Tarczynska, Dominika (ENRD)" <Dominika.Tarczynska@usdoj.gov>; "Martin, John" <JMartin@crowell.com>
**Sent:** Friday, February 15, 2013 11:47 AM
**Subject:** RE: schedule for resolving issue of the constitutionality of FLPMA sec. 204(c)(1)

Mr. Yount,
I'm writing in response to the issue you raised in your email below. As you note, the email in question post-dates issuance of the ROD. Under the Administrative Procedure Act, a court assessing agency action must "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. The whole administrative record "'consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position.' "*Arizona Rehabilitation Hosp., Inc. v. Shalala*, 185 F.R.D. 263 (D. Ariz. 1998) (quoting *Thompson v. United*

*States Department of Labor*, 885 F.2d 551, 555 (9th Cir.1989) (quoting *Exxon Corp. v. Department of Energy*, 91 F.R.D. 26, 33 N.D.Tex.1981);*see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). Because the subject email post-dates the ROD, it could not have been considered by agency decision-makers and we therefore decline to include it in the record.

I am aware of the NEPA regulation on "new circumstances or information," 40 C.F.R. §1502.9(c)(1)(ii), and I infer from your reference below to "new and substantive information" that you may contemplate that the subject email falls within the scope of this regulation. This regulation only applies, however, if there remains "major federal action to occur." This is not a situation where further federal action remains, as in the example of a decision to authorize and construct a dam, or conduct a timber sale. In those situations, federal action remains to occur for a period of time following issuance of the ROD. Here, the federal action, that is, the withdrawal order, was authorized by the ROD and fully completed on the same day. Nothing further remained to be done when BLM received your email in May of 2012, so re-opening the NEPA process was not required. Moreover, we note that your NEPA claims have been dismissed and do not believe this document bears on your remaining claim.

Sincerely,
John Most
202-616-3353

**From:** Gregory Yount [mailto:gregory_yount@northern-arizona-uranium-project.com]
**Sent:** Wednesday, February 13, 2013 7:51 AM
**To:** Most, John (ENRD); Tarczynska, Dominika (ENRD); Martin, John
**Cc:** Roger Flynn; Ted Zukoski; Connie Brooks; wklain@lang-baker.com; Chasanov, Amy; Most, John (ENRD); McCrum, Timothy; Mathiascheck, Susan; 'lechner@mountainstateslegal.com'; 'jmccoy@mountainstateslegal.com'; Klise, J. Michael
**Subject:** Re: schedule for resolving issue of the constitutionality of FLPMA sec. 204(c)(1)

Mr. Most,

I started reviewing the Administrative Record. I found that an email that I wrote to Scott Florence was not included, at least it is not hyperlinked under my name. While this letter was written after the Record of decisionwas published, it specifically challenges the endowment analysis in the EIS for the withdrawal with new and substantive information. This email should have been part of the administrative record.

Gregory Yount


----- Forwarded Message -----
**From:** "Florence, Scott R" <SlFloren@blm.gov>
**To:** Gregory Yount <gregory_yount@northern-arizona-uranium-project.com>
**Sent:** Monday, May 21, 2012 7:15 AM
**Subject:** RE: Uranium Endowment as Analyzed in FEIS

Mr. Yount:
Thank you for your email, however, due to the lawsuit I cannot offer any further response. I will send this to the appropriate subject matter experts and other appropriate agency personnel so they may see your comments.
Scott Florence
District Manager

BLM Arizona Strip District
435-688-3301

**From:** Gregory Yount [mailto:gregory_yount@northern-arizona-uranium-project.com]
**Sent:** Friday, May 18, 2012 5:33 PM
**To:** Florence, Scott R
**Subject:** Uranium Endowment as Analyzed in FEIS

Mr. Scott Florence,

Recently, I have been studying USGS Circular 1051, "The 1987 Estimate of Undiscovered Uranium Endowment in Solution-Collapse Breccia Pipes in the Grand Canyon Region of Northern Arizona and Adjacent Utah." During the comment period for the DEIS, I had not recently read this circular and pretty much glossed over the Endowment Analysis as it pertained to the basic endowment of the withdrawal area.

I did have some comments as to how the amount of uranium resource in drilled targets was calculated.

In preparing for my lawsuit, I "studied" USGS Circular 1051 and was shocked to learn that the analysis in the EIS for the mineable amount of uranium is fatally flawed and is based on assumptions that have no basis in actual fact and are not consistent with known uranium production in the Hack-Pinenut control area and is not consistent with Circular 1051.

From the EIS:
Assumption: The USGS has estimated that the statistical average uranium endowment (greater than 0.01 percent ore grade) within the proposed withdrawal area is 163,380 tons $U_3O_8$. This is OK!

➤ Assumption: Only a portion of the uranium endowment would be economical to mine. This portion has been estimated in the past at 10%, but was increased to 15% to account for likely lower ore grades being economical to mine than was the case historically. This yields 24,508 tons $U_3O_8$ as yet undiscovered within the proposed withdrawal area. This is completely and utterly false!

➤ Assumption: Based on the historical average amount mined per breccia pipe, a typical breccia pipe mine would yield 1,500 tons $U_3O_8$.
This is is not consistant with Circular 1051, The circular defines class size and actual production does as well.

➤ Assumption: Based on these conditions, the undiscovered uranium endowment would yield 16 mines. This is incorrect.

From the EIS:
........ the 2010 USGS estimate of uranium resources within the proposed withdrawal area focuses specifically on the uranium "endowment," a term explicitly defined as the uranium occurring in rock that exceeds 0.01 percent grade $U_3O_8$. The uranium endowment would consist of mineralized breccia pipes, but these are not necessarily

breccia pipes with uranium grades that are economical for mining. Historically, the percent grade of uranium from ore bodies that have been or could be mined ranges from 0.53% to 1.08%, as shown in Table B-5.

This is where the mistake in analysis starts. This statement does not grasp the actual analytical model that was used in Circular 1051, nor does the writer understand the basis of the size-frequency distribution model created for the Hack-Pinenut control area.

The Hack-Pinenut control model defines 4 deposit class sizes and each of these class sizes are endowed with a grade percentage of .17% with a cutoff grade of .01%. Meaning that the data that was used to arrive at the .17% average grade, used "ore" that was greater than .01%. The cut off grade during this time period for mining was .10 to .15% I believe. Meaning that all of the deposits defined in the Hack-Pinenut contol area were mine grade. The actual controlling factor was the size of the deposit.

The 14 Class 1 deposits of 140 tons were too small to mine. The 4 Class two deposit would still be too small to mine. That leaves the three Class 3 and one Class 4 deposit sizes as mineable. The Class 3 deposit would yield 2,142,000 lbs of U3O8 and the Class 4 deposit would yield 21,420,000 lbs of uranium.

The above is the size and yield criteria defined for the analysis used to estimate the endowment of the uranium province in the circular. The circular also states that the amount of ore at less than .1% is less than 20% of the total (page 9 of the Circular) in an actual mineable deposit and brings the average grade down to .21% from the .5 to .7% that was normally mined.

The Undiscovered Endowment calculated by Circular 1051 is the mineable endowment, less the Class 1 and 2 deposits. The Class 1 and 2 deposit sizes only account for only 3% of the endowment estimated in Circular 1051. Thus 97% of the endowment estimated by the Circular is mineable, because that endowment is contained in deposit sizes that are mineable.

An endowment estimate using just the production and defined resource in the Hack-Pinenut control areas (5 mines and a cutoff grade of 0.6 %)will yield an endowment for the withdrawal area that is nearly 3 times the estimate calculated in the FEIS Appendix B.

The Hack-Pinenut controll area also defines the percentage of mineralized pipes to target pipes as 39% and the percentage of ore grade mineable pipes to target pipes as 15%. This is just math. The number of targets in the control area is 33, the number of mineralized pipes is 13, and the number of actual mines was 5. No need to ask anyone or make something up as was done in the EIS.

The analysis in the FEIS for the uranium endowment in the withdrawal area is hopelessly in error and that is not even factoring in the hidden pipes or that the withdrawal area contains deposit sizes that are greater than found outside the withdrawal area according to comments submitted for the DEIS.

The EIS should have re-analyzed the data used for the 1987 Estimate with a cutoff grade of .20% and possibly a different deposit size distribution and then calculate a more expressly definitive estimate for the endowment of mineable uranium. The 1987 Estimate is an estimate for mineable uranium, but this is not easily understood this way if one just skims the analysis and is not used to modeling techniques.

I am making you aware of this information so that you can pass this on to those who

might need to evaluate it and reconsider publishing a supplemental to the EIS.
I will be using this analysis in a more detailed form in my lawsuit. I did not want your agency to hear about this error for the first time in my briefs for my lawsuit.
Please give me a short reply letting me know you received this Email.
Best Regards,
Gregory Yount

# Exhibit 2

**Subject:** Fwd: Reply to Withdrawal Area Uranium Endowment and the RFD
**From:** Horyza, Christopher (choryza@blm.gov)
**To:** gregory_yount@northern-arizona-uranium-project.com;
**Date:** Tuesday, March 5, 2013 3:46 PM

# Dear Mr. Yount,

I am in receipt of the trailing unsolicited email message that you sent to me on Sunday, March 3, 2013. This response is on behalf of myself and the other BLM staff who also received your email.

As I am sure you are aware, the subject of your email - "Withdrawal Area Uranium Endowment and the RFD" – is also one of the subjects that is at issue in <u>Yount v. Salazar</u>, a lawsuit you initiated challenging the Secretary of the Interior's January 2012 decision to withdraw certain Public and National Forest System lands in Arizona from location and entry under the Mining Law of 1872 for a period of 20 years subject to valid existing rights. Your lawsuit (which has been consolidated with three other lawsuits challenging the Withdrawal) is currently pending before the United States District Court for the District of Arizona.

# Given that this matter is in active litigation, I am unable to respond directly to your concerns at this time but have forwarded your March 3 email to our attorneys in DOI's Office of the Solicitor and the Justice Department to make sure that they were aware of your views on this matter.

# Sincerely,

# Chris Horyza


*Chris Horyza*
Planning and Environmental Coordinator
BLM State Office
602-417-9446


On Sun, Mar 3, 2013 at 2:28 PM, Gregory Yount <gregory_yount@northern-arizona-uranium-project.com> wrote:

> Mr. Horyza,

This email is regarding the method that was used to reduce the uranium endowment for the withdrawal area from that determined in SIR 2010-5025 to 15% of that value in the RFD in the EIS for the Northern Arizona Withdrawal. From my reading of the Administrative Record, I believe that you participated in the review of the RFD material. I believe that you should be made aware of the following commentary and anlaysis. It points out that the RFD assumption, that only 15% of the endowment for the withdrawal area was minable, is unsupportable and has no basis in reality.

I have been reading the emails and memos in the Administrative Record and have been very disappointed in the level of attention to detail, what constitutes actual data, and using a logical argument rather than a scientific basis for determining what is data, information, and analysis.

For example, various members of the "team" that formulated and reviewed the RFD came to the conclusion that the "15%" reduction in the endowment was peer review because SIR 2010-5025 was peer reviewed. This is not the case. Such that it was, SIR 2010-5025 was peer reviewed and the endowwment figure provided was 162,964 tons U3O8 or 325,892,000 pounds of uranium. The RFD authors (SWCA) are the ones to reduce this amount by 85%. There were no scientific papers or analysis that supported this proposition.

The basis upon which they did this was not peer reviewed scientifically. There was a group think review for the RFD that was conducted regarding this 15% figure and as to whether it was a logical thing to do and not whether is was scientifically supportable. Cutting the SIR 2010-5025 endowment for the withdrawall area by 85% was never scientifically peer reviewed. In point of fact, the RFD authors specifically cited only one published instance, "Wenrich and Sutphin 1988" , the RFD authors stating in their October 4, 2010 memo:

"We found one useful assumption in available literature. Weinrich and Sutphin 1988 estimate that approximately 8% of breccia pipes are mineralized and that approximately 10% of mineralized breccia pipes might be economically viable. *These assumptions were not described in any detail in the literature and no backup data were presented."*

*Pretty thin ice to hand an EIS on!*

The Uranium endowment for the withdrawal area is the starting point for the entire EIS. This much was definately understood by those writing the EIS. Why then, was such an important and pivital assumption not fact checked with the author, Karen Wenrich. I contacted Wenrich and asked what she meant by that statement and she replied that this was an article for the public, not a published scientific paper and that in the editing process she made a mistake and that the above referenced percentages are out of context. These percentages refer to a specific subset of breccia pipes on the Haulapai Indian Reservation and not to breccia pipes in general according to Wenrich.

Why was Wenrich not contacted by Chris Garrett to fact check such an important and pivital analytical assumption, especially when the rest of the available scientific literature makes no reference or similar statement regarding these percentages. A simple real world analysis would have shown that the 15% assumption was flawed.

The RFD authors and those that reviewed the RFD understand that they are stating that 85% of the all uranium in the withdrawal area is low grade material (less than 0.1%) and is not minable. The 1987 Estimate of Undiscovered Uranium Endowment in Solution-Collapse Breccia Pipes in the Grand Canyon Region of Northern Arizona and Adjacent Utah (Circular 1051), a peer reviewed scientific publication states the matter quite differently.
Circular 1051 states that Low Grade rock (.01 to .09%) U3O8 is generally a very small part of the entire (minable) deposit.

**From Circular 1051:**
*Study of considerable data from Energy Fuels Nuclear, Inc's., exploration drilling indicates that there probably are no large bodies of mineralized rock having average grades in the 0.01 to 0.09 percent U308 range within the stratigraphic interval under consideration in our assessment.*
*The amount of low-grade ( < 0.10 U308) material in ore-grade deposits is small, as is shown by the unpublished 1979 DOE graph of the distribution of uranium inventory by grade for the Hack No. 2 deposit, where, at a 0.01 percent U308 cutoff, the inventory is 20 percent of the total inventory and has an average grade of 0.21 percent U308.*

Therefore, the idea that because the cutoff grade for the endowment was .01% that most of the uranium bearing rock was low grade and uneconomic was entirely wrong. What makes the breccia pipe province unique is the very fact that nearly all of the uranium in an ore grade pipe is minable and that pipes that are not minable have insignificant amounts of uranium as far as the uranium endowment is concerned.

## TESTING THE RFD 15% ASSUMPTION

*If Chris Garrett's hypothesis were true*, it would mean that 85% of the 325,928,000 pounds of uranium endowment for the withdrawal area is low grade. This would be 277,038,800 pound of low grade uranium "ore" that was unminable.
How much tonnage of rock in breccia pipes does this represent and is there any drilling or geologic evidence for this amount of breccia pipe hosted low grade material? Using a median value for the low grade material of .05% U3O8 or 1.0 pounds per ton, it is evident that it would take 277,038,800 tons of rock to host this low grade uranium mineralization.
A typical minable ore body in a breccia pipe contains from 100,000 to 500,000 tons of ore. The Circular 1051 endowment analysis considered only the stratagraphic region in the pipe where ore grade material is found to determine the uranium endowment. Using a middle value of 300,000 tons for an ore body, it would take **923 mineralized breccia pipes** with very large low grade mineralized bodies to host the unminable low grade ore that the RFD states exists.

### *This is the real world consequence of the 85% low grade assumption.*
The breccia pipe density for the withdrawal area is about 0.28 pipes per square mile and the withdrawal area is 1687 Sq Miles. The number of pipes in the withdrawal area would then be estimated at 472 breccia pipes. If the RFD were correct, this would mean that **all** of the estimated 472 pipes in the withdrawal area would be low grade mineralized pipes, meaning all of the breccia pipes in the withdrawal area would have a low grade 300,000 ton mineralized breccia body in the ore zone *plus another 451 breccia pipes that do not exist in the withdrawal area would have this endowment as well*. This is impossible, and is at odds with all geological knowledge of the region, **but also at odds with the RFD's assertion that only 8% of pipes are mineralized.**
There exists no geological evidence, USGS report, or published drilling results that would support this scenario. (see excerpt from Circular 1051 above )
The RFD contention that 85% of the SIR 2010-5025 endowment figure for the withdrawal area is unminable is false and has no basis in reality.
It seems beyond reason, that such a simple analysis and calculation would show the error of the RFD author's assumptions, but that these supposed experts at SWCA were incapable of doing such or even capable of asking these kinds of questions. Institutionally, this fundamental question must be addressed.
Chris Garrett stated on several occasion in the AR that there was no method to determine the minable and economic portion of the uranium endowment for the withdrawal area. This is simply not true. An understanding of Circular 1051 would indicate that the endowment calculated was, essentially, the

economically minable amount of uranium. Chris Garrett and others did not fundementally understand this, as it is evedent they did not understand the scientific basis for the Size, Frequency, Distribution Analysis conducted.

Furthermore, USGS Circular 994: Uranium Resource Assessment by the Geologic Survey: Methodology and Plan to Update the National Resource Base is the guide book on how a Size, Frequency, Distribution is done. From page 2 of Circular 994 it states:

> "Endowment is defined as the amount of uranium in recognizable concentrations in rocks that average 0.01 percent $U_3O_8$ or more. Although the initial estimate of endowment is termed the conditional endowment by DOE (U.S. Department of Energy, 1980), we modify the equation to calculate unconditional endowment directly. *From the unconditional endowment, one may segregate, using different grade cutoffs, the economic portion or potential uranium resources.*"

Why is it that the professionals at SWCA were unable to find or use this methodology that would be based in science and the original endowment analysis? Why was it that these was no one at the USGS or the BLM that would direct them to this asset? All that was required was to rerun the endowment analysis at a higher grade cutoff value. The program for doing so is still available (online), it will run on a windows 98 platform. The directions for using the program are included.

There are many other WHYs to be asked.

However, it should be aboundantly clear that there was a MAJOR institutional failure at the BLM/DOI with regards to the endowment resource. Additionally, it is not safe to assume that other parts of the EIS do not suffer from this same failure. My belief and analysis, is that they do.

This commentary and analysis is being given a wide distribution to those that participated in reviewing the RFD and Appendix B. It is my hope that there are those who would really look at what I have presented, do their own research, and do the right thing.

I am available to answer any questions you may have.

Gregory Yount
Manager
The NAU Project, LLC

928-899-7029

## CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing to be served upon counsel of record by first class mail to:

Edward B. Zukoski

Melanie R. Kay (*pro hac vice*)

Edward B. Zukoski (*pro hac vice*)

Earthjustice

1400 Glenarm Place, Suite 300

Denver, CO 80202

Attorney for Defendant-Intervenors

Grand Canyon Trust, et al.


JOHN S. MOST, VA Bar No. 27176

Natural Resources Section

P.O. Box 7611

Washington, D.C. 20044-7611

Counsel for Defendants


R. Timothy McCrum (*pro hac vice*; DC Bar No. 389061)

J. Michael Klise (*pro hac vice*; DC Bar No. 412420)

Thomas R. Lundquist (*pro hac vice*; DC Bar No. 968123)

CROWELL & MORING LLP

1001 Pennsylvania Ave., N.W.

Washington, D.C. 20004-2595

Attorneys for Plaintiff National Mining Association

Susan M. Mathiascheck (*pro hac vice*; DC Bar No. 426764)

John C. Martin (*pro hac vice*; DC Bar No. 358679)

Amy B. Chasanov (*pro hac vice*; D.C. Bar No. 468779)

CROWELL & MORING LLP

1001 Pennsylvania Avenue, N.W.

Washington, D.C. 20004-2595

Attorneys for Plaintiff Nuclear Energy Institute

Constance E. Brooks

(*pro hac vice* Colo. Bar. No. 18258)

C. E. BROOKS & ASSOCIATES, P.C.

303 East 17th Avenue, Suite 650

Denver, Colorado 80203

Attorneys for Plaintiffs Quaterra Alaska, Inc.; *et al.*

Steven James Lechner

Mountain States Legal Foundation

2596 S. Lewis Way

Lakewood, Co 80227

Attorney for Plaintiff Northwest Mining Association

Dated: March 25, 2013

_____

Gregory Yount

807 W. Butterfield Rd

Chino Valley, Arizona 86323

928-899-7029

*gregory_yount@northern-arizona-uranium-project.com*

*Plaintiff Pro Se*