R. Timothy McCrum (*pro hac vice*; DC Bar No. 389061)
J. Michael Klise (*pro hac vice*; DC Bar No. 412420)
Thomas R. Lundquist (*pro hac vice*; DC Bar No. 968123)
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: 202-624-2500
Facsimile: 202-628-5116

Attorneys for Plaintiff National Mining Association

Susan M. Mathiascheck (*pro hac vice*; DC Bar No. 426764)
John C. Martin (*pro hac vice*; DC Bar No. 358679)
Amy B. Chasanov (*pro hac vice*; DC Bar No. 468779)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Phone: 202-624-2500
Facsimile: 202-628-5116

Attorneys for Plaintiff Nuclear Energy Institute

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Gregory Yount,<br><br>　　　Plaintiff,<br><br>　　v.<br><br>Ken Salazar, et al.,<br><br>　　　Defendants. | **CV11-8171 PHX DGC**<br>**(Lead Case)** |
| This document relates to:<br><br>**National Mining Association; and Nuclear Energy Institute,**<br><br>　　　Plaintiffs,<br><br>　　v.<br><br>Ken Salazar, et al.,<br><br>　　　Defendants. | **CV12-8038 PCT DGC**<br><br>**PLAINTIFFS' MOTION FOR RECONSIDERATION AND MEMORANDUM OF LAW** |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

I.   Congress's *Singular* Intent in FLPMA Was to Rein in Unconstrained Executive Authority. ........................................................................................... 2

   A.   Severing the Legislative Veto Undermines FLPMA's Dual Policy Goals. ......................................................................................................... 2

   B.   Severing the Legislative Veto Contravenes FLPMA's Repeal of Implied Withdrawal Authority under *Midwest Oil*. ..................................... 4

II.  *Miller v. Albright* Weighs Against Severing the Legislative Veto. ....................... 5

III. Severing the Legislative Veto Overlooks Congress's Plenary Property Clause Authority Over Withdrawals. ................................................................... 6

IV.  The Structure of FLPMA Confirms the Inseverability of the Legislative Veto. ..................................................................................................................... 7

   A.   FLPMA's Notice Provision is not a Significant Constraint on Large-Tract Withdrawal Authority. ..................................................................... 7

   B.   The Court Misapprehended FLPMA's Smaller-Tract Withdrawal Authority. .................................................................................................. 8

   C.   The Court Misapprehended the "Check" Represented by the Legislative Veto in § 204(c)(1). ................................................................. 9

V.   The Legislative History Supports Plaintiffs' Position. ........................................... 9

CONCLUSION ............................................................................................................ 12

# TABLE OF AUTHORITIES

## CASES

*Alaska Airlines v. Brock*, 480 U.S. 678 (1987) .................................................................... 7

*Caroll v. Nakatani*, 342 F.3d 934 (9th Cir. 2003) ................................................................. 1

*Casey E. Folks*, 183 IBLA 24 (Sept. 20, 2012), *reconsideration denied* (Dec. 10, 2012) ................................................................................................................................ 4

*City of New Haven v. Pierce*, 809 F.2d 900 (D.C. Cir. 1987) .......................................... 4, 7

*Marks v. United States*, 430 U.S. 188 (1977) ....................................................................... 6

*Miller v. Albright*, 523 U.S. 420 (1998) ........................................................................... 5, 6

*Shapiro ex rel. Shapiro v. Paradise Valley Unified*, 374 F.3d 857 (9th Cir. 2009) ............ 1

*Tavilla v. Cephalon, Inc.*, 870 F. Supp. 2d 759 (D. Ariz. 2012) .......................................... 1

*United States v. Midwest Oil Co.*, 236 U.S. 459 (1915) ...................................................... 2

## STATUTES

43 U.S.C. § 1701(a)(4) ................................................................................................ 2, 3, 4

43 U.S.C. § 1714(a) .............................................................................................................. 5

43 U.S.C. §§ 1714(c)(1) ....................................................................................................... 8

43 U.S.C. §§ 1714(d) ........................................................................................................... 8

90 Stat. 2792 (1976) ............................................................................................................. 4

## OTHER AUTHORITIES

H.R. REP. NO. 94-1163 (1976) ..................................................................................... 10, 11

National Resource Lands Management Act, S. 507, 94th Cong. (1976) ......................... 10

STAFF OF THE H. COMM. ON RESOURCES, 107TH CONG., HISTORICAL INFORMATION OF THE COMMITTEE ON RESOURCES AND ITS PREDECESSOR COMMITTEES ................................................................................................................ 11

## RULES

LRCiv 7.2(g) ..................................................................................................................... 1, 6

LRCiv 7.2(g)(1) .................................................................................................................... 1

## TREATISES

GEORGE COGGINS & ROBERT GLICKSMAN, PUB. NAT. RESOURCES L. § 4:3 (2d. ed. 2011) ............................................................................................................................ 3

# REGULATIONS

43 C.F.R. § 4.1(b)(2) ................................................................................................................. 4

Pursuant to Local Civil Rule 7.2(g), Plaintiffs National Mining Association ("NMA") and Nuclear Energy Institute ("NEI") respectfully move for this Court to reconsider its decision denying Plaintiffs' motion for partial summary judgment and granting Defendants' cross-motion for summary judgment (Doc. 130). In that decision, the Court agreed with Plaintiffs that the legislative veto in FLPMA § 204(c), 43 U.S.C. § 1714(c), is unconstitutional under the Supreme Court's precedent in *INS v. Chadha*, 462 U.S. 919 (1983). However, the Court ruled against Plaintiffs in finding the unconstitutional veto provision to be severable from the remainder of § 204(c), leaving in place, without a major constraint Congress had enacted, the Secretary of Interior's authority to make large-tract withdrawals under FLPMA. For the reasons set forth below, Plaintiffs request pursuant to LRCiv 7.2(g) that this Court reconsider its holding, and alter or amend its ruling to grant Plaintiffs' motion for partial summary judgment and deny Defendants' cross-motion.[1]

## INTRODUCTION

To prevail on a motion for reconsideration, a movant must make "a showing of manifest error or a showing of new facts or legal authority that could not have been brought to [the Court's] attention earlier with reasonable diligence." *See, e.g.*, *Tavilla v. Cephalon, Inc.*, 870 F. Supp. 2d 759, 777 (D. Ariz. 2012) (quoting LRCiv 7.2(g)(1)); *see also Caroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003). While reconsideration is granted "only in rare circumstances[,]" *id.*, it is available where a movant has properly identified "with specificity the matters that the movant believes were overlooked or misapprehended by the Court . . . and any specific modifications being sought in the Court's Order." LRCiv 7.2(g)(1).

---

[1] Where a timely motion for reconsideration is made, the motion also "is construed as a motion to alter or amend a judgment under [Federal] Rule [of Civil Procedure] 59(e). *Shapiro ex rel. Shapiro v. Paradise Valley Unified*, 374 F.3d 857, 863 (9th Cir. 2009). Consistent with the local rules, in responding to a motion to alter or amend judgment, this Court is permitted "to reconsider and amend a previous order." *Carroll*, 342 F.3d at 945.

1   **MOTION FOR RECONSIDERATION**

Plaintiffs identify such matters below.  NMA and NEI believe that the Court's conclusion on the severability issue raised in Plaintiffs' and Defendants' cross-motions for summary judgment misapprehended Congress's intent in FLPMA.  Plaintiffs have argued that "strong evidence" exists supporting that Congress would not have enacted an Executive large-tract withdrawal authority absent the attached legislative veto.   Plaintiffs believe that this evidence, in combination with other evidence speaking to Congress's intent, call for this Court to reconsider its decision that the veto in FLPMA § 204(c)(1) may be severed.

## ARGUMENT

**I.      Congress's *Singular* Intent in FLPMA Was to Rein in Unconstrained Executive Authority.**

    **A.      Severing the Legislative Veto Undermines FLPMA's Dual Policy Goals.**

In its decision, the Court recognized FLPMA's express declaration of policy, including a dual intent that (1) "Congress exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes" and (2) "Congress delineate the extent to which the Executive may withdraw lands without legislative action[.]"  43 U.S.C. § 1701(a)(4); Op. at 8.  As the Court stated, these purposes relate back to the prior recommendations of the Public Land Law Review Commission.  Op. at 7.

The Court correctly recognized that the first of FLPMA's dual purposes is reflected in various provisions preserving withdrawal authority in Congress, including FLPMA's unusual and striking repeal of the Executive's prior implied withdrawal authority under *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915).  Op. at 8.  Plaintiffs respectfully suggest, however, that the Court misapprehended the second purpose. Specifically, the Court framed the second purpose as an intent to "grant specific [withdrawal] authority to the Executive[,]" *id*. at 10, and reasoned, therefore, that Congress and the Commission were "equally concerned with enabling the Executive to act through controlled delegation as it was with preserving Congress's reserved powers."

*Id*. at 9; *see also id*. at 27.  Such a characterization of purpose deviates from the plain language.  While FLPMA indeed grants withdrawal authority to the Executive, the delegation *itself* was not FLPMA's purpose.  Its express purpose was rather to "*delineate the extent* to which the Executive" may exercise that authority.  43 U.S.C. § 1701(a)(4) (emphasis added).  Congress's concern was not the granting of authority but instead the need to carefully define and thereby limit authority, *i.e.*, to control and rein in the Executive.  *See* Pl. Reply at 3, 9-10; Pl. Br. at 8, 10.[2]  Thus, while § 204(c)(1)'s veto may be irrelevant to a bare intent to delegate authority (not present here), it directly implements FLPMA's actual intent *to specifically delineate authority*.

Such a characterization of this purpose not only is at odds with the plain text but also is contrary to longstanding agreement within the scholarly community.  *See* Pl. Mot. at 13 (quoting GEORGE COGGINS & ROBERT GLICKSMAN, PUB. NAT. RESOURCES L. § 4:3 (2d. ed. 2011) ("It will be difficult to argue that the basic congressional intent underlying FLPMA can be carried out simply by exercising the vetoes, because Congress *preeminently* intended to reassert control over federal land use and classification.  Invalidation of the vetoes only would return unfettered and unsupervised discretion to the executive branch, the very result that FLPMA was enacted to prevent.") (emphasis added)).[3]

The Secretary of Interior's own prior statements as to Congress's purpose under FLPMA and with respect to withdrawals, specifically confirm Plaintiffs' position.  In fact, Congress's purpose to specifically delimit the extent of Executive authority is firmly recognized within the Department of Interior and underscored in the Interior Board of Land Appeals' ("IBLA's") recent decision emphasizing that "FLPMA declared a policy

---

[2] The legislative history further bears out this understanding of Congress's express intent. Pl. Br. at 10.

[3] George Cameron Coggins is the distinguished Frank Edwards Tyler Professor Emeritus with the University of Kansas Law School.  Robert L. Glicksman is the J.B. & Maurice C. Shapiro Professor of Environmental Law at the George Washington University law School.  They are co-authors of the leading multi-volume treatise, PUBLIC NATURAL RESOURCES LAW.  Notably, their scholarly views regarding FLPMA were developed over many years of study and analysis.

that . . . '*Congress delineate the extent to which the Executive may withdraw lands without legislative action*'" and that Congress accordingly "has limited the Secretary's authority to that provided in section 204 of FLPMA." Pl. Reply at 10 (quoting *Casey E. Folks*, 183 IBLA 24, 47, 48 n.32 (Sept. 20, 2012), *reconsideration denied* (Dec. 10, 2012) (emphasis added)).[4]

The Court's misapprehension of FLPMA's purpose taints various aspects of the Court's decision. In distinguishing this case from the D.C. Circuit's opinion in *City of New Haven v. Pierce*, 809 F.2d 900 (D.C. Cir. 1987), the Court noted that "the FLPMA was equally concerned the granting withdrawal authority to the Executive as it was with setting proper limits and procedural safeguards on the exercise of that authority." Op. at 27. In so stating, the Court created a false duality consisting of (1) the grant of authority and (2) the limits imposed. Congress's grant of the authority was not on an equal footing with the constraints, as the Court perceived, but was *subject to* those constraints, because the constraints would "delineate the extent" of the authority being conveyed. *See* 43 U.S.C. § 1701(a)(4). Thus, *City of New Haven* is germane and weighs heavily against severing the legislative veto in the present case.

**B.    Severing the Legislative Veto Contravenes FLPMA's Repeal of Implied Withdrawal Authority under *Midwest Oil*.**

Plaintiffs believe that the Court's decision overlooks and misunderstands the significance of FLPMA's repeal provision as an expression of Congress's intent to retain direct control over large scale withdrawals. *See* FLPMA § 704(a), 90 Stat. 2792 (1976). Consistent with FLPMA's dual purpose to reassert Congress's withdrawal authority and rein in Executive withdrawal authority, FLPMA expressly repealed the Executive's implied authority under *Midwest Oil*, and that "severing the legislative veto alone would effectively undo [its] carefully devised repeal by returning to the Secretary the sort of

---

[4] Significantly, the IBLA's recognition of Congress's purpose in enacting FLPMA is tantamount to the Secretary's own such recognition, as the IBLA "decides finally for the Department [of Interior] appeals to the head of the Department." 43 C.F.R. § 4.1(b)(2).

unfettered withdrawal authority that predated FLPMA and drove its enactment." Pl. Br. at 10; *see also* Pl. Reply at 3, 8.

The Court's decision, however, overlooked the significance of Congress's historic override of the Supreme Court precedent (a rather extraordinary measure). It correctly links the repeal to Congress's first express purpose ("ensure that Congress alone could initiate action"), Op. at 8,[5] but does not address its relevance to Congress's other purpose to specifically delineate Executive authority. The Court further does not address the veto's centrality to the repeal's efficacy. *See* Pl. Br. 10. By not addressing these issues, the Court's decision overlooked the repeal's clear expression of Congress's foremost intent (which the Court had acknowledged) to control exercises of withdrawal authority – an intent that is eviscerated without the veto.

## II. *Miller v. Albright* Weighs Against Severing the Legislative Veto.

In its decision, Plaintiffs respectfully suggest that the Court has mischaracterized the holding in *Miller v. Albright*, 523 U.S. 420, 457-58 (1998). First, Plaintiffs believe the Court misapprehended the nature and weight of Justice Scalia's opinion, joined by Justice Thomas, concurring in judgment in *Miller*. The Court asserts that Justice Scalia's comments lack weight because they are "in a concurrence, [and] they are dicta." Op. at 11. But this characterization overlooks that there was no majority (or even plurality) opinion in *Miller*. Rather, six justices, who were split among three different opinions resting on different grounds, agreed that the petitioner's claim for relief failed. Justice Stevens, joined by Chief Justice Rehnquist, issued an opinion concluding that the constitutional claim failed on the merits. 523 U.S. at 423. Justice O'Connor, joined by Justice Kennedy, issued an opinion finding that the claim failed on account of third-party standing issues, and on the merits. *Id*. at 445. Justice Scalia, joined by Justice Thomas, did not reach the merits but held that the plaintiff's claim must fail because the relief requested was unavailable, in part due to the inseverability of the claimed

---

[5] This oversight is a further illustration of how the Court's error in misunderstanding Congress's dual purposes has spilled over into other areas of the Court's analysis.

unconstitutional language. *Id*. at 452, 457-58. Because Justice Scalia's opinion concurred on the narrowest grounds, it is deemed to be the controlling opinion and, therefore, is not dicta but precedential authority. *See Marks v. United States*, 430 U.S. 188, 193 (1977).

Given the controlling weight of Justice Scalia's opinion, the Court's remaining analysis of *Miller* is all the more critical. *See* Op. at 11-12. However, the Court also mistakenly discounted the application of *Miller* in this case. Specifically, the Court overlooked that the phrase "and not otherwise" (the language used in the provision at issue in *Miller*) means precisely that action may be taken "only" in accordance with whatever provisions, conditions, or limitations are set forth in the statute. Plaintiffs respectfully submit that application of *Miller* to this case confirms that the veto in § 204(c)(1) may not be severed." The Court relied on Justice Scalia's recognition of the applicable standards governing severability, and the fact that a presumption might be raised by the presence of a severability clause. Op. at 12. Yet, that presumption does not alter Justice Scalia's holding that, in the face of a statute containing a severability clause, a more specific provision "overrode the severability clause's suggestion that invalid provisions could be eliminated." *Id*. at 11.

**III. Severing the Legislative Veto Overlooks Congress's Plenary Property Clause Authority Over Withdrawals.**

As addressed in Plaintiffs' briefing, this case implicates Congress's plenary power over disposal of federal lands. *See* Pl. Reply at 5-6 & n.9, 13-14. Given FLPMA's narrow, limited delegation of withdrawal authority to the Executive, Plaintiffs have argued that any residual authority attached to the unconstitutional veto should "give way to Congress's superior plenary authority." Pl. Reply at 6. In the face of these arguments, however, this Court did not address Congress's plenary authority under the Property Clause. Plaintiffs believe that it was "manifest error" for the Court to overlook this issue and its bearing on the severability analysis. LRCiv 7.2(g).

### IV. The Structure of FLPMA Confirms the Inseverability of the Legislative Veto.

Other provisions of FLPMA confirm that Congress would not have conferred large-tract withdrawal authority on the Executive without the legislative veto.

#### A. FLPMA's Notice Provision is not a Significant Constraint on Large-Tract Withdrawal Authority.

Plaintiffs ask the Court to reconsider its reliance on the notice requirements of §§ 204(c)(1) and (2) as sufficient means of Congressional oversight absent the veto reflects "manifest error." *See* Op. at 15-16. On the one hand, the Court held that such cases as *Alaska Airlines v. Brock*, 480 U.S. 678 (1987), apply, despite the fact that they contain "report-and-wait" style provisions that differ from FLPMA § 204(c)(1), which allows a withdrawal to enter effect immediately upon issuance and without a waiting period. Op. at 17. On the other hand, the Court also cited *Alaska Airlines* as holding that the relevant reporting provision provided sufficient opportunity for oversight because Congress "would receive reports of the Secretary's action, could attempt to influence the Secretary *during the waiting period*, and could enact proper legislation to block the Secretary's regulations *from going into effect*." *Id*. at 15 (emphasis added). The Court's decision overlooks these distinctive features and therefore does not support that § 204(c)'s notice provisions, which differ significantly from those in *Alaska Airlines*, actually exert meaningful oversight absent the veto.

In addition, though the Court's decision acknowledged Plaintiffs' analogy to *City of New Haven*, Op. at 16-17, it appears to have overlooked the case's specific holding and application in this case. In *City of New Haven*, the D.C. Circuit recognized that "Congress was not 'very much concerned with, let alone determined to achieve, further detail about future Presidential impoundments *absent a mechanism for exercising control over them*.'" 809 F.2d at 907, n.19 (emphasis in original). This Court's decision bypassed this point without directly addressing why Congress's interest in receiving information on large-tract withdrawals under FLPMA constituted a meaningful "mechanism for exercising control" over large-tract withdrawals. The Court identifies no

reason why the holding in *City of New Haven* would not apply in the present case. Accordingly, the notice provisions should not save § 204(c)(1) from being stricken.

### B. The Court Misapprehended FLPMA's Smaller-Tract Withdrawal Authority.

The Court correctly recognized that *the "Secretary's ability under § 204(c) to withdraw lands for up to 20 years is, undeniably, a significant grant of power that would be made more pronounced absent an immediate mechanism for legislative restraint." Id.* at 19 (emphasis added). Yet, the Court also concluded that arguments that such authority would not have been granted without the veto were "tempered by the fact that Congress gave the Secretary unfettered authority to make 20-year and other unlimited withdrawals under § 204(d) where public uses of smaller, but still significant, acreage was at stake." *Id.*

The Court's reasoning misconceives § 204(d) and how it differs from § 204(c). The Court wrongly characterized § 204(d) as authorizing "unlimited" withdrawals, *id.*, when in fact, as the Court elsewhere recognized, § 204(d)'s provisions are expressly limited to withdrawals of less than 5,000 acres – far short of the grant of authority to withdraw over a million acres (or even all federal public lands in the western U.S., for that matter) under § 204(c)(1). *Contrast* 43 U.S.C. §§ 1714(c)(1) and (d). Indeed, a 5,000-acre withdrawal would be less than one-half of one percent of the § 204(c)(1) withdrawal in this case.

Plaintiffs believe that the Court's ruling to collapse the two separate withdrawal authorities is a fundamental misapprehension that distorts its analysis. That is, Congress's granting of broad, veto-less authority under § 204(d) for smaller tracts does not imply any willingness to provide for such similar, virtually unfettered authority under § 204(c)(1) for tracts whose size has no upper limit. Instead, Congress logically had lesser concern about withdrawals of less than 5,000 acres than very large ones. The Court should reconsider its ruling to take account of Congress's disparate treatment of the two different withdrawal authorities.

### C. The Court Misapprehended the "Check" Represented by the Legislative Veto in § 204(c)(1).

Plaintiffs believe the Court placed undue weight on the fact that, absent the veto, Congress could still override Executive withdrawals through ordinary legislation. *See* Op. at 20 (stating that "a proper legislative check on [Congress's delegation of withdrawal] power would still be available" absent the veto). This argument overlooks the significant difference between the legislative veto mechanism included in § 204(c)(1), and formal, signed and presented, Article I legislation, and misapprehends Plaintiffs' argument. Importantly, Plaintiffs do not contend that the Congress would somehow lose the legislative power it always has, with or without the veto. Rather, Plaintiffs have argued that formal Article I legislation does not substitute as a "check" in the same sense as a legislative veto, which takes the significant step of bypassing prescribed constitutional legislative procedures that are time consuming and less certain of outcome since they require presentment to the President – a specific concern of the Constitution's Framers. *See* Pl. Reply at 5 & nn.7-8. The Court erred by overlooking the distinction between what Congress sought to do through the veto, and Congress's more limited power under Article I.[6]

### V. The Legislative History Supports Plaintiffs' Position.

Further strong evidence against severing the legislative veto comes from the legislative history. Thus, we ask the Court to reconsider its view that the legislative history supports severability.

One example involves the Court's characterization of the original Senate bill. The Court observed that "only the House bill contained a legislative veto[,]" and "only the House bill provided for repeal of all existing executive withdrawal authority." Op. at 21. These accounts of the House bill are not as significant as they may seem, however,

---

[6] In addressing the availability of formal legislative action, the Court describes the legislative history as supporting that "Congress was not eager to assume . . . [the] burden" of "managing and enacting . . . all withdrawals of land over 5,000 acres." Op. at 20. This, however, is also a misapprehension, as it misstates the burden with which Congress was concerned, which was the burden of reviewing executive withdrawals as opposed to that associated with the full legislative process. *See* Pl. Reply at 11 n.16.

because only the House bill addressed withdrawal authority at all. *See* National Resource Lands Management Act, S. 507, 94th Cong. (1976). Thus, the absence of a relevant repeal provision or veto in the Senate bill says nothing about the Senate's intent as to withdrawals. That intent instead must be ascertained from the provisions ultimately enacted in FLPMA, including Congress's policy declarations, repeal of implied withdrawal authority, withdrawal provisions, and the veto, as addressed in Plaintiffs' briefing. All of these provisions in the plain text of FLPMA reflect a common *expressed intent of the Congress* that the veto not be severed. In addition, whatever the Senate's views with respect to the prospect of the veto's unconstitutionality, the Court tended to overlook that legislative history on the House's views *alone* (and in combination with evidence from plain language and structure)[7] is enough to demonstrate that the provision would not have passed without the unconstitutional veto. A consensus of both houses is not required.

The Court also overlooked that the legislative veto in § 204(c)(1) is precisely the type of withdrawal "oversight" considered to be a "major objective" of FLPMA. *See* Op. at 21-22. On this point, the Court acknowledged correctly that the House Report "provides some evidence that the House would have been averse to a final version of the FLPMA that did not include the veto provision approved in its own bill[.]" *Id*. at 22. However, the Court then set aside this evidence (and the confirmatory evidence from the statute's plain language) based on the view that Congress spoke generally of "oversight" as a major objective without specifically naming the veto. *Id*. at 22.

Congress, however, specifically identified the veto with its "oversight" objective in the House Report. *See* H.R. REP. NO. 94-1163, at 3-4 (1976) (listing "referral to Congress of withdrawals and extensions of withdrawals of 5,000 acres or more" as a

---

[7] Plaintiffs respectfully suggest that, to the extent the Court has only separately evaluated the plain language, structure, and legislative history, this is further "manifest error." It is erroneous to consider each area of evidence in isolation, rather than considering the cumulative evidence from all sources, in determining whether the applicable evidentiary standard for severability is met.

requirement under the heading of "OVERSIGHT PROCEDURES").[8]  In any case, to conclude that general references to the importance of "oversight" are unsupportive for failure to specifically call out the veto is asking of Congress too much.  There can be no doubt that, at least with respect to withdrawals, when Congress spoke of oversight, it was talking about the veto.  Because the Court's analysis overlooks the veto's connection with Congress's "major objective" of oversight, the Court should reconsider its reading of the legislative history.

The Court also overlooked significant information concerning the views of House members opposed to excessive Congressional review procedures.  For example, the Court relied on statements by Representative Udall, Op. at 22-23, yet overlooked that he spoke only for himself in his "separate views" at the conclusion of the House Report.  H.R. REP. NO. 94-1163, at 222.  Representative Sieberling (*see* Op. at 23) similarly offered his dissenting views on behalf of just himself and seven other representatives of the House, constituting but a small minority of the Committee on Interior and Insular Affairs (46 members at the time).  *See* STAFF OF THE H. COMM. ON RESOURCES, 107TH CONG., HISTORICAL INFORMATION OF THE COMMITTEE ON RESOURCES AND ITS PREDECESSOR COMMITTEES, 1807-2002 433 (Comm. Print 107-G 2002).  At most, these statements reflect some minority inclination toward severability, but they do not raise any question about the House's or Congress's dominant views as a whole.  Other evidence put forward by Plaintiffs does that.

Finally, and most importantly, the Court's decision fails to acknowledge what the opinions of those voicing opposing viewpoints actually say about Congress's intent on the whole.  For example, in responding to Plaintiffs' observation that Representative Mink and other supporting her amendments to the withdrawal provision did not propose

---

[8] The Court quotes other language from this section of the House Report, but apparently overlooks the heading. *See* Op. at 21-22 (acknowledging "[p]ublic concern over the possibility of excessive disposals of public lands on the one hand and excessive restrictions on the other" and the resulting "inclusion of requirements for referral of certain types of actions to the congress for review," including the large-tract withdrawal referral/veto).

1  eliminating the veto, the Court reasoned that such House members "were attempting to
2  appease those who would disfavor any less restricted delegation of authority while still
3  trying to raise their own objections." Op. at 26.  Plaintiffs do not disagree.  Yet the Court
4  overlooked that the need to appease other members of Congress "who would disfavor any
5  less restricted delegation of authority" means exactly that Congress, on the whole, would
6  not settle for any broader delegation, *i.e.*, one lacking the veto.  In other words, Congress
7  would not have enacted § 204(c)(1) without the veto.  Ultimately, Plaintiffs believe that,
8  correctly understood, the plain language, structure, and legislative history together
9  constitute "*strong evidence*," and that this Court's contrary conclusion is the result of the
10 errors described above.  Plaintiffs therefore respectfully ask this Court to grant
11 reconsideration, and amend or alter the order accordingly.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for reconsideration should be granted, and the order should be modified to hold that the unconstitutional legislative veto in FLPMA § 204(c)(1) may not be severed.

|   |   |
|---|---|
|   | Respectfully submitted, |
| Of Counsel: | /s/ R. Timothy McCrum |
|   | R. Timothy McCrum |
| Katie Sweeney | J. Michael Klise |
| NATIONAL MINING ASSOCIATION | Thomas R. Lundquist |
| 101 Constitution Avenue, N.W. | CROWELL & MORING LLP |
| Suite 500 East | 1001 Pennsylvania Avenue, N.W. |
| Washington, DC  20001 | Washington, D.C.  20004-2595 |
| (202) 463-2600 | (202) 624-2500 |

ATTORNEYS FOR PLAINTIFF NATIONAL MINING ASSOCIATION

|   |   |
|---|---|
| Of Counsel: | /s/ Susan M. Mathiascheck |
|   | Susan M. Mathiascheck |
| Ellen Ginsberg | John C. Martin |
| NUCLEAR ENERGY INSTITUTE | Amy B. Chasanov |
| 1776 I Street, N.W., Suite 400 | CROWELL & MORING LLP |
| Washington, D.C. 20006 | 1001 Pennsylvania Avenue, N.W. |
| (202) 739-8000 | Washington, D.C.  20004-2595 |
|   | (202) 624-2500 |

ATTORNEYS FOR PLAINTIFF NUCLEAR ENERGY INSTITUTE

Dated:  April 3, 2013

# CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing Motion for Reconsideration to be served upon counsel of record through the Court's electronic service system (ECF/CM) and by first-class mail to Gregory Yount at the following address: 807 West Butterfield Road, Chino Valley, Arizona 86323.

Dated: April 3, 2013

> */s/ R. Timothy McCrum*
> R. Timothy McCrum
> CROWELL & MORING LLP
> 1001 Pennsylvania Avenue, N.W.
> Washington, D.C. 20004-2595
> (202) 624-2500

22906248