WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gregory Yount, et. al., | No. CV11-08171-PCT-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| Kenneth Lee Salazar, Secretary of the Interior, et al., | |
| Defendant. | |

Plaintiffs National Mining Institute ("NMI") and Nuclear Energy Institute ("NEI") have filed a motion for reconsideration of the Court's order of March 20, 2013. Doc. 135. In that order, the Court found, as Plaintiffs had argued, that the legislative veto provision in § 204(c) of the Federal Land Policy Management Act ("FLPMA") was unconstitutional, but also found, contrary to Plaintiffs' arguments, that the legislative veto was severable from that section's grant of authority to the Secretary of the Department of Interior to make large-tract land withdrawals. Doc. 130. Northwest Mining Association ("NWMA") has joined the motion. Doc. 136. For the reasons that follow, the Court will deny the motion.

**I.   Legal Standard.**

Motions for reconsideration "are 'disfavored' and will be granted only upon a showing of 'manifest error' or 'new facts or legal authority that could not have been raised earlier with reasonable diligence.'" *In re Rosson,* 545 F.3d 764, 769 (9th Cir.2008) (citation and brackets omitted); *see S.E.C. v. Kuipers,* No. 09–36016, 2010 WL

3735788, at *3 (9th Cir. Sept.21, 2010); LRCiv 7.2(g)(1). Mere disagreement with an order is an insufficient basis for reconsideration. *See Ross v. Arpaio,* No. CV 05–4177–PHX–MHM, 2008 WL 1776502, at *2 (D. Ariz. 2008). Nor should reconsideration be used to ask the Court to rethink its analysis. *Id.; see N. W. Acceptance Corp. v. Lynnwood Equip., Inc.,* 841 F.2d 918, 925–26 (9th Cir.1988).

## II.   Discussion.

Plaintiffs argue that the Court's severability finding was clear error because (1) the Court overlooked or misapprehended matters showing that Congress' intent in the FLPMA was to constrain executive-branch withdrawal authority, (2) *Miller v. Albright* weighs against severability, (3) severing the veto overlooks Congress' plenary Property Clause authority over land withdrawals, (4) the structure of the FLPMA confirms the inseverability of the veto, and (5) the legislative history of the FLPMA supports Plaintiffs' position.

### A.   Congress' Intent.

Plaintiffs note that the Court correctly cited to Congress' dual intent in enacting the FLPMA as reflected in the recommendations of the Public Land Law Review Commission (the "Commission") and stated in the FLPMA's declaration of policy, that Congress "(1) exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes" and (2) "that Congress delineate the extent to which the Executive may withdraw lands without legislative action[.]" Doc. 135 at 6; quoting 43 U.S.C. § 1701(a)(4); *see* Doc. 130 at 8. Plaintiffs argue, however, that the Court overlooked the FLPMA's singular intent to reign in executive authority and erroneously concluded that Congress "was equally concerned with enabling the Executive to act through controlled delegation as it was with preserving Congress's reserved powers." Doc. 135 at 7-8. They reason that the FLPMA's second purpose, "to delineate the extent [of the Executive's withdrawal authority] without legislation," was, itself, concerned with controlling and reigning in the executive more than with granting the executive authority. *Id.* Thus, they argue, severing the legislative veto from the

FLPMA's grant of authority would defeat Congress' intent because it would give the Executive unsupervised discretion to make withdrawals, returning it to the kind of unfettered authority the FLPMA was intended to constrain.  *Id.* at 7, citing George Coggins & Robert Glicksman, Pub. Nat. Resources L. § 4:3 (2d. ed. 2011).

      Plaintiffs have not shown that the Court's analysis was in error.  The Court did not overlook Congress's concern with placing limits on executive withdrawals, but expressly noted that Congress was concerned with granting the executive a "controlled delegation" of withdrawal authority.  Doc. 130 at 9.  This is consistent with the Commission's recommendation, quoted in the Court's order, that "[a]ll other withdrawal authority should be expressly delegated with statutory guidelines to insure proper justification for proposed withdrawals, provide for public participation in their consideration, and establish criteria for Executive action."  Doc. 102 at 40, quoting Commission Report at 54, Recommendation 8.  The Court found a lack of "strong evidence" that the veto could not be severed from Congress's grant of authority.  The Court based this finding, in part, on the fact that the Commission did not propose a veto.  Doc. 130 at 9.  The Court also noted that, structurally, the FLPMA set forth the procedures the Executive must follow to effect particular types of withdrawals.  *Id.* at 8-9.  For withdrawals over 5,000 acres – those to which the legislative veto in § 204(c) applies – Congress required the Secretary to submit a detailed list of reports on such things as the reason for the withdrawal, the environmental and economic impacts, consultations with local governments and other impacted groups, public hearings, and a geological report.  *Id*. at 14, citing § 204(c)(1).  The Court found that these requirements provide "a meaningful limitation on executive action even if no legislative veto may be exercised."  *Id.*  As the Court noted, this finding is consistent with other cases in which courts have struck down veto provisions but retained grants of authority on the basis of congressional reporting requirements.  *See id.* 15-16, citing, *e.g.*, *INS v. Chadha*, 462 U.S. 919, 935 (1983); *Alaska Airlines v. Brock*, 480 U.S. 678, 689-90.  Plaintiffs may disagree with the Court's analysis that the FLPMA contains sufficient restraints on executive land withdrawals absent the veto to satisfy

Congress's dual intent, but that disagreement is not a basis for reconsideration.

Plaintiffs also argue that severing the veto contravenes the FLPMA's repeal of implied executive branch withdrawal authority. Doc. 135 at 8-9. They argue that the Court failed to address how this historic repeal relates to Congress's purpose of delineating executive withdrawal authority, and failed to address the centrality of the veto to the repeal's efficacy. *Id.* at 9. The Court discussed FLPMA's repeal of *Midwest Oil* and 29 grants of statutory authority as accomplishing Congress's first purpose of reserving certain types of withdrawal authority to itself. Doc. 130 at 8. While the Court did not expressly discuss how the repeal also fit with Congress's purpose of delineating the extent of executive withdrawal authority, the FLPMA's repeal of prior sources of authority and its concurrent enactment of a single, unified source of authority clearly go hand in hand. Contrary to Plaintiffs' argument, severing the veto as one limitation on the executive's newly-defined withdrawal authority does not negate Congress's purpose in repealing prior grants of executive authority, nor does it effectively grant the executive the same level of unfettered withdrawal authority it enjoyed prior to the FLPMA. As the Court noted in its order, the FLPMA replaced a formerly "chaotic" scheme for the management of public lands with one in which the respective roles of Congress and the Executive are clearly set forth. Doc. 130 at 6-9. Congress included the legislative veto as a check on executive withdrawals over 5,000 acres, but severing the veto provision does not eviscerate the FLPMA's entire statutory scheme which, as noted, includes reserving certain types of withdrawals exclusively to Congress, doing away with prior grants of authority to the executive, and setting forth the procedures for three different kinds of executive withdrawals. *See* Doc. 130 at 7-9. It also does not leave withdrawals over 5,000 acres completely unregulated, but, as discussed above, requires a number of substantive and procedural steps as part of the Executive's deliberative process, thereby adding a significant check on executive withdrawals that did not exist prior to FLPMA. In summary, the Court is not persuaded that severing the FLPMA's veto provision from its grant of authority is inconsistent with Congress's intent to delineate executive

authority or its repeal of the Executive's implied withdrawal authority under *Midwest Oil*.

**B.    *Miller v. Allbright*.**

Plaintiffs argue that the Court erred by misapprehending the weight and applicability of Justice Scalia's opinion regarding the inseverability of a provision of the Immigration and Nationality Act ("INA") challenged on equal protection grounds in *Miller v. Allbright*, 523 U.S. 420, 457-58 (1998). Doc. 135 at 9-10. Plaintiffs first argue that the Court erred in identifying this part of Justice Scalia's opinion as dicta because, they note, *Miller* had no majority opinion; rather, its dismissal was decided on the opinions of six justices put forth in three separate concurrences. *Id.* at 9. Plaintiffs argue, without analysis, that Justice Scalia's concurrence was on the narrowest grounds and is therefore deemed the controlling opinion of the Court. *Id.* at 10, citing *Marks v. United States*, 430 U.S. 118, 193 (1977). They also argue that the Court erred in finding that Justice Scalia's opinion did not apply to the facts in this case. *Id.* at 10. The Court need not address whether and to what extent Justice Scalia's opinion is entitled to precedential weight because the Court ultimately based its analysis on distinguishing that opinion from the facts in this case, and Plaintiffs have not shown that the Court's analysis was in error.

In *Miller*, the foreign-born daughter of a U.S. citizen father and an alien mother challenged the constitutionality of a provision of the INA that required an affirmative act establishing the paternity of U.S. citizen fathers not required of U.S. citizen mothers. 523 U.S. 425-25, 432. Justice Scalia opined that in light of Congress's plenary power over citizenship, the Court did not have the authority to remove a precondition of citizenship, and the INA's general severability clause did not override its more specific language which stated that "[a] person may only be naturalized as a citizen of the United States in the manner and under the conditions prescribed in this subchapter *and not otherwise*." *Id.* at 457-458, quoting 8 U.S.C. § 1421(d) (emphasis added by Justice Scalia). Plaintiffs argue that the Court failed to recognize that the word "only" in § 204(a) of the FLPMA, which states that the "Secretary is authorized to make . . . withdrawals, but only in

accordance with the provisions and limitations of this section" (43 U.S.C. § 1714(a)), has the same meaning as "and not otherwise" in the INA.  Doc. 135 at 10.  The Court addressed this argument in its order and found, among other things, that the single word "only" was not the equivalent of the language Justice Scalia emphasized as overriding the general severability provision in the INA, and that the word "only" was insufficient to disregard Congress's clear statement that "[i]f *any* provision of the [FLPMA] or the application thereof is held invalid, the remainder of the [FLPMA] and application thereof shall not be affected thereby."  Doc. 130 at 12, quoting Act of Oct. 21, 1976, Pub. L. No. 94-579, 90 Stat. § 707; 43 U.S.C. § 1701, historical and statutory notes (emphasis added).

Justice Scalia's concurring opinion in *Miller* also relied on additional factors that are not present here.  Justice Scalia ultimately concurred in the dismissal in *Miller* on the grounds that the Court was unable to grant the petitioner her requested declaratory relief because she had not met the requirements for citizenship under any existing statute, and there was no way to find she had citizenship under the INA without doing "radical statutory surgery" beyond the purview of the Court.  *Miller*, 527 U.S. at 459.  This was because in an equal protection challenge, courts are faced not with the question of whether to sever a single provision that is clearly unconstitutional, but with having to choose how to remedy alleged inequalities between separate provisions, something that is not at issue here.  *See id.* at 458-459.

Finally, Justice Scalia reaffirmed in *Miller* that a severability analysis requires an individualized assessment "as to whether Congress would have enacted the remainder of the law without the invalidated provision."   527 U.S. at 457-58, citing *New York v. United States*, 505 U.S. 144, 186 (1992).  "The question of severance," he went on to note, "ultimately turns on 'whether the provisions are inseparable by virtue of inherent character,' . . . which must be gleaned from the structure and nature of the Act."  *Id.* at 458, quoting *Carter v. Carter Coal Co.,* 298 U.S. 238, 322 (1936).  Here, unlike the documentation of parentage put forth as the exclusive criteria for establishing citizenship under the INA, the veto provision in the FLPMA is not "inseperable by virtue of inherent

character" from the remaining provisions and limitations in that act. The veto did not place any additional obligations upon the Secretary when making withdrawals, but rather gave Congress the ability to assert its own limitation which was both optional and entirely separate from what the Secretary is required to do. As demonstrated throughout its order, the Court thoroughly analyzed the "structure and nature" of the FLPMA and concluded that the veto provision was severable. *Miller* does not compel a different result.

### C. Congress's Plenary Property Clause Authority.

Plaintiffs argue that because this case implicates Congress's plenary power over the disposal of federal lands under the Property Clause of the U.S. Constitution, it was "manifest error" for the Court not to address this authority as part of its severability analysis. Doc. 135 at 6. Plaintiffs misstate the proper analysis. The Court recognized that the Property Clause "vests in Congress the 'power to dispose of and make all needful rules and regulations respecting . . . property belonging to the United States.'" Doc. 130 at 6, quoting U.S. Const., Art. IV, § 3, cl. 2. The question before the Court, however, was not whether Congress had plenary power over land withdrawals, but whether there was "strong evidence" that Congress would not have delegated § 204(c) withdrawal authority to the Secretary in FLPMA absent the veto provision. *See* Doc. 130 at 5-6. The Court concluded that such strong evidence was lacking. *Id.* at 28. The fact that Congress has plenary power over land withdrawals does not change this result or show that the Court's analysis was in error. Moreover, the Court's severance of only the unconstitutional veto provision in § 204(c) is consistent with Supreme Court precedent holding that, whenever possible, courts should limit their corrective action to invalidating only the unconstitutional provision of a statute (*Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328-29 (2006)) and with the Court's finding of a lack of strong evidence that Congress would not have delegated authority to the Secretary under § 204(c) without the veto. The fact that Congress has plenary power over land withdrawals does not compel a different conclusion.

**D.     The Structure of the FLPMA.**

**1.     Notice and Reporting Requirements.**

Plaintiffs argue that the Court's reliance on the FLPMA's notice and reporting requirements as a significant restraint on executive authority was "manifest error." Doc. 135 at 11. They note that the FLPMA's statutory scheme, which allows Secretarial withdrawals to take immediate effect at the time the required notice and reports are filed, is substantially different from the "report and wait" provisions the Court cited to in *Alaska Airlines*, in which Congress, upon receiving notice, would have 60 days in which it "could attempt to influence the Secretary *during the waiting period*, and could enact proper legislation to block the Secretary's regulations *from going into effect*." *Id.* at 7, quoting Doc. 130 at 15. (emphasis added by Plaintiffs). Plaintiffs argue that the Court overlooked these distinctions.

Contrary to Plaintiffs' assertion, the Court squarely addressed the distinction between the FLPMA and the "report and wait" statutes in *Alaska Airlines* and other legislative veto cases, noting that "Plaintiffs are correct that the absence of a waiting period gives Congress less opportunity to influence an executive decision before it takes effect[.]" Doc. 130 at 17. "[B]ut," the Court went on to say, "this point does not help Plaintiffs." *Id.* The Court reasoned that "[i]f anything, the fact that the FLPMA allows executive withdrawals to go into effect immediately suggests that influencing executive action or attempting to block it through a legislative veto was less important to Congress in the FLPMA than in the 'report and wait' statutes." *Id.* Significantly, even with these timing differences, Congress retains the same ability, absent the veto, to overturn disfavored executive actions under FLPMA through the normal legislative process that the Supreme Court found significant to its severability analysis in both *Chadha* and *Alaska Airlines*. *Se*e 462 U.S. at 935, n. 8; 480 U.S. at 689-990.[1] In addition, as the

---

[1] Plaintiffs argue that the Court put undue weight on the check provided by the normal legislative process because it overlooked the differences between a veto, which bypasses time-consuming and less-certain constitutional procedures, and full legislation requiring presentment to the President. Doc. 135 at 13. The Court did not make this error. Rather, it stated that "[t]he fact that Congress clearly wanted the ability to take

- 8 -

Court explained, the detailed reporting requirements in the FLMPA

> not only inform Congress of the Secretary's large-tract withdrawals so that Congress can respond through the normal legislative process if warranted, they also ensure that the Secretary will consider environmental and economic impacts of the withdrawal, consider current uses of the withdrawn land, consult with local governments and other impacted individuals, hold public hearings, and consult qualified experts about the known mineral deposits, past and present mineral production, and present and future market demands.

Doc. 130 at 17, citing 43 U.S.C. § 1714(c)(2).  In light of these findings, it was not "manifest error" for the Court to conclude that the FLPMA's notice and reporting requirements "will continue to have significant meaning even after the legislative veto is invalidated." *Id.*

Plaintiffs also argue that the Court sidestepped the D.C. Circuit's specific holding in *City of New Haven v. Pierce*, which recognized that "Congress was not 'very much concerned with, let alone determined to achieve, further detail [from reports] about future Presidential impoundments *absent a mechanism for exercising control over them*'" (809 F.2d at 907, n.19 (emphasis in original)), because the Court did not explain how, absent the veto provision in FLPMA, Congress would have a meaningful "mechanism for exercising control" over large-tract withdrawals.  Doc. 135 at 11-12.  This argument lacks merit.  As already discussed, the Court pointed to numerous ways in which the reporting requirements in the FLPMA provide meaningful checks on executive withdrawal authority.  Additionally, the Court distinguished *City of New Haven* because the "overwhelming evidence of congressional intent" the D.C. Circuit relied upon for finding the veto provision not severable is not present here.  *See* Doc. 130 at 16-17, 27-28.

### 2.  Smaller-Tract Withdrawal Authority.

Plaintiffs argue that the Court erred when it stated that any textual arguments that Congress would not have granted large-tract withdrawal authority to the Secretary absent

---

legislative action without presentment does not mean that, faced with the unconstitutionality of that approach, Congress would have withheld its delegation of power even when a proper legislative check on that power would still be available." Doc. 130 at 20.  Plaintiffs merely seek to have the Court rethink its analysis on this issue.

- 9 -

the veto were "tempered by the fact that Congress gave the Secretary unfettered authority to make 20-year and other unlimited withdrawals under § 204(d) where public uses of smaller, but still significant, acreage was at stake." Doc. 135 at 12, quoting Doc. 130 at 19. Plaintiffs argue that the Court wrongly characterized § 204(d)'s withdrawal authority as "unlimited," thus failing to acknowledge that it applies only to withdrawals of less than 5,000 acres, an important distinction between such small-tract withdrawals and the withdrawal at issue in this case. Doc. 135 at 12. Plaintiffs are in error. The Court specifically noted that the withdrawal authority in § 204(d) was limited to withdrawals in which "smaller, but still significant, acreage was at stake." Doc. 130 at 19. Within the context of these smaller withdrawals, the Court noted that Congress granted the Secretary unfettered authority, a contrast to the multiple checks that apply to withdrawals authorized under § 204(c). *See, e.g.*, Doc. 130 at 14-16, 20-21. The Court did not, as Plaintiffs argue, collapse the distinctions in these two sections. Instead, it found that Congress's unfettered grant of authority in 204(d) tempered any reliance on the structure and text of FLPMA to show that Congress was primarily concerned with reigning in executive authority and would not therefore have delegated large-tract withdrawal authority to the Secretary absent the veto. At most, the structural and textual differences between Sections 204(c) and 204(d) cut both ways. On one hand, they show that Congress wanted to treat large-tract withdrawals differently from small-tract withdrawals and did so by placing these delegations of authority in separate sections and applying separate constraints. On the other hand, they show that Congress favored allowing the Executive to continue to make land-management decisions, including public land withdrawals, even while it repealed implied and statutory authority to do so. In light of this analysis, it was not error for the Court to conclude that the structure and text of these provisions fail to provide strong evidence that Congress would have withheld its grant of large-tract withdrawal authority absent the legislative veto.

### E. Legislative History.

Plaintiffs argue that the Court overlooked strong evidence in the FLPMA's

legislative history against severing only the legislative veto.

### 1. Senate Bill.

Plaintiffs do not dispute that, of the original House and Senate bills preceding the FLPMA, only the House bill contained a legislative veto and a repeal of existing executive withdrawal authority. *See* Doc. 130 at 21. Plaintiffs argue, rather, that the Court erred in giving significance to this distinction because only the House bill addressed withdrawals at all. Doc. 135 at 13-14. What this says, however, is that the Senate bill would have kept the status quo, allowing the Executive to continue exerting both implied and statutory withdrawal authority unchanged by the FLPMA. This hardly comports with Plaintiffs' arguments that in enacting the FLPMA Congress was primarily concerned with reigning in the executive with respect to federal land management decisions. Plaintiffs rightly argue that what is important is the final legislation which, in this case, included the legislative veto. *Id.* at 14. But when posed with the question of what Congress would have done had it known the veto was unconstitutional, it is relevant to the Court's analysis that one house of Congress initially had not included any curbs on existing executive withdrawal authority as part of its proposed bill.

### 2. The House Views.

Plaintiffs argue that even if only the House would not have passed § 204(c) of the FLPMA absent the legislative veto, the opposition of one house, alone, is enough to show that it would not have passed. Doc. 135 at 14. Plaintiffs further argue that the Court mischaracterized evidence from the House Report, the separate statements of House members, and statements made in floor debate, all of which provide "strong evidence" that the House, and – by extension – Congress as a whole, would not have enacted the FLPMA absent the veto. *Id.* at 14-16.

Plaintiffs first argue that the Court failed to recognize the veto as representing the kind of "oversight" the House Report identified as a "major objective" of the FLPMA. *Id.* at 14. Plaintiffs misconstrue the Court's analysis. The Court recognized that "one of the 'major objectives' of the bill, as stated in the House Report, was to '[e]stablish

procedures to facilitate Congressional oversight of public land operations entrusted to the Secretary of Interior.'" Doc. 130 at 21, quoting H.R. Rep. No. 94-1163, at 6,176, sec. (4) (1976). It went on to cite the Report's reference to the veto provision as part of that oversight. *Id.* at 21-22. But the Court also noted that

> [w]here the Report discusses the veto provision specifically, it does so in the context of a number of other "procedural controls," including that the Secretary must provide notice to Congress, must include with this notice other information as specified in the bill, must promulgate the withdrawal on the record and provide an opportunity for hearings, may segregate lands only for one year before taking definitive action, and may act only through the Secretary and "policy officers in the Office of the Secretary appointed by the President with the advice and consent of the Senate."

*Id.* at 22, citing H.R. Rep. No. 94-1163, at 6,183-84. The Court found that, "[t]aken as a whole, the House Report does not provide 'strong evidence' that the veto provision alone was essential to the House's approval of the delegation of authority in § 204(c)." *Id.* Plaintiffs' disagreement with this conclusion is not grounds for reconsideration.

Plaintiffs also argue that the Court erred in citing the views of House Committee members who voiced opposition to the veto because it overlooked that the statements made by Representative Udall were presented as "separate views," and those made by Representative Sieberling on behalf of himself and seven other members were presented as "dissenting views," thus representing the views of only a small minority of the House Committee. Doc. 135 at 15.[2] The Court correctly identified these statements as separate and dissenting views and noted simply that they "cast further doubt on the centrality of the veto." Doc. 130 at 22-23. Given that a presumption of severability applies absent "strong evidence" that Congress would not have passed FLPMA without the veto, the Court does not agree that it was insignificant or erroneous to note that eight members of the committee that recommended the House bill specifically objected to – and presumably would readily have eliminated – the veto.

---

[2] Plaintiffs state that the Committee consisted of 46 members. The voting totals listed in the House Report, however, indicate a total of 36 members. H.R. Rep. No. 94-1163, at 6,207.

- 12 -

1 Plaintiffs argue that they put forth sufficient contrary evidence showing that "Congress's dominant views as a whole" would not have favored severability. Doc. 135 at 15-16. They refer to statements made by House members in floor debates and to the Court's recognition that some members who pushed for less congressional oversight did not oppose the veto directly, possibly in order to "appease those who would disfavor any less restricted delegation of authority." Doc. 135 at 16, quoting Doc. 130 at 26. Plaintiffs argue that the Court's acknowledgment of the need of those disfavoring a high degree of oversight to appease members who thought differently shows that "Congress, on the whole, would not settle for any broader delegation, *i.e.*, one lacking the veto." *Id*. Plaintiffs' arguments fail to recognize, as the Court pointed out, that the statements concerning the veto during floor debates represent only a handful of comments going both ways and are insufficient to show that Congress would not have enacted the FLPMA but for the veto. *See* Doc. 130 at 26. Where, as here, severability is presumed on the basis of the FLPMA's severability clause, those opposing severability bear the burden of putting forth "strong evidence" that severance would violate Congress's intent. The Court's finding that this evidence was lacking in the legislative record which, unlike *City of Newhaven*, provides no "overwhelming evidence of congressional intent" with respect to the veto, was not clear error.

**IT IS ORDERED** that Plaintiffs' motion for reconsideration (Doc. 135) is **denied**.

Dated this 16th day of May, 2013.

David G. Campbell
United States District Judge

- 13 -