Steven J. Lechner (*Pro Hac Vice*, CO No. 19853)
Jeffrey Wilson McCoy (*Pro Hac Vice*, CO No. 43562)
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
lechner@mountainstateslegal.com
jmccoy@mountainstateslegal.com

Attorneys for Plaintiff Northwest Mining Association

Gregory Yount
807 W. Butterfield Road
Chino Valley, Arizona 86323
(928) 899-7029
Gregory_yount@northern-arizona-uranium-project.com

Plaintiff *Pro Se*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GREGORY YOUNT,<br><br>            Plaintiff,<br><br>      v.<br><br>S.M.R. JEWELL, *et al*.,<br><br>            Defendants. | No. CV11-8171-PCT-DGC<br>(Lead Case)<br><br>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW FOR PLAINTIFFS NORTHWEST MINING ASSOCIATION AND GREGORY YOUNT-** |
| NATIONAL MINING ASSOCIATION and NUCLEAR ENERGY INSTITUE,<br><br>            Plaintiffs,<br><br>      v. | No. CV12-8038-PCT-DGC |

| | |
|---|---|
| S.M.R. JEWELL, *et al.*, | |
| Defendants. | |
| NORTHWEST MINING ASSOCIATION, | |
| Plaintiff, | No. CV12-8042-PCT-DGC |
| v. | |
| S.M.R. JEWELL, *et al.*, | |
| Defendants. | |
| QUATERRA ALASKA, INC. *et al.*, | |
| Plaintiffs, | No. CV12-8075-PCT-DGC |
| v. | |
| S.M.R. JEWELL, *et al.*, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES............................................................................ vi

MOTION FOR SUMMARY JUDGMENT ................................................... Unnumbered

MEMORANDUM OF LAW........................................................................... 1

ARGUMENT .............................................................................................. 1

I.    PLAINTIFFS HAVE STANDING TO CHALLENGE THE
      WITHDRAWAL ................................................................................. 1

      A.    NWMA Has Standing To Challenge The Withdrawal ............. 1

      B.    Gregory Yount Has Standing To Challenge The
            Withdrawal ........................................................................ 3

II.   THE SECRETARY'S DECISION TO WITHDRAW OVER
      ONE MILLION ACRES OF LAND FROM LOCATION AND
      ENTRY UNDER THE MINING LAW WAS ARBITRARY,
      CAPRICIOUS, AND/OR OTHERWISE NOT IN
      ACCORDANCE WITH LAW ............................................................. 3

      A.    The Record Does Not Support The Secretary's
            Assumption That The Withdrawal Is Necessary To
            Protect Water Resources ................................................... 6

      B.    The Record Does Not Support The Secretary's
            Assumption That The Withdrawal Is Necessary To
            Protect Cultural Resources ................................................ 9

      C.    The Record Does Not Support The Secretary's
            Assumption That The Withdrawal Is Necessary To
            Protect Other Resources ................................................... 10

      D.    The Secretary Underestimated The Effect Of The
            Withdrawal On Mineral Development In The Area ................. 14

III.  THE FOREST SERVICE'S DECISION TO CONSENT TO
      THE WITHDRAWAL OF OVER 355,000 ACRES OF

FOREST SERVICE LAND FROM LOCATION AND ENTRY UNDER THE MINING LAW WAS ARBITRARY, CAPRICIOUS, AND/OR OTHERWISE NOT IN ACCORDANCE WITH LAW .............................................. 16

A.     The Forest Service Failed To Comply With The Kaibab National Forest Plan ................................................. 16

B.     The Forest Service Failed To Provide Adequate Justification For Consenting To The Withdrawal .................... 21

IV.     ROD'S RELIANCE ON AMERICAN INDIAN RELIGIOUS AND SPIRITUAL OBJECTIONS TO MINING AS A BASIS FOR THE WITHDRAWAL VIOLATES THE ESTABLISHMENT CLAUSE OF THE U.S. CONSTITUTION ....... 22

A.     Religious Objectives Override Secular Purposes ...................... 24

B.     DOI Is Not Neutral ................................................. 28

CONCLUSION ............................................. 30

CERTIFICATE OF SERVICE ........................................ 31

# TABLE OF AUTHORITIES

**Page**

## Cases

*Access Fund v. U.S. Dep't of Agric.*,
  499 F.3d 1036 (9th Cir. 2007) ................................................... 24, 27, 29

*Badoni v. Higginson*, 638 F.2d 172 (10th Cir. 1980) ....................................... 28

*Bear Lodge Multiple Use Ass'n v. Babbitt*,
  2 F. Supp. 2d 1448 (D. Wyo. 1998) ............................................. 28, 29

*Bowen v. Georgetown University Hospital*,
  488 U.S. 204 (1988) ............................................................... 17

*Cholla Ready Mix, Inc. v. Civish*,
  382 F.3d 969 (9th Cir. 2004) ..................................................... 27

*Deffeback v. Hawke*,
  115 U.S. 392 (1885) ................................................................ 14

*Ecology Ctr. v. Castaneda*,
  574 F.3d 652 (9th Cir. 2009) ..................................................... 17

*Friends of Southeast's Future v. Morrison*,
  153 F.3d 1059 (9th Cir. 1998) ................................................. 17, 18, 19

*Greenpeace Action v. Franklin*,
  14 F.3d 1324 (9th Cir.1992) ....................................................... 6

*Havasupai Tribe v. U.S.*,
  752 F. Supp. 1471 (D. Ariz. 1990) ............................................. 29

*Hunt v. Washington State Apple Advertising Comm'n*,
  432 U.S. 333 (1977) ................................................................. 2

*Idaho Sporting Cong., Inc. v. Rittenhouse*,
  305 F.3d 957 (9th Cir. 2002) ..................................................... 17

*Lemon v. Kurtzman*,
  403 U.S. 602 (1971) ............................................................... 24, 28

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) .................................................................................. 2

*McCreary County v. Am. Civil Liberties Union of Ky.,*
  545 U.S. 844 (2005) .............................................................................. 24, 25

*Mitchell v. Helms,*
  530 U.S. 793 (2000) .................................................................................. 24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,*
  463 U.S. 29 (1983) ................................................................................. 4, 22

*Native Ecosystems Council v. U.S. Forest Serv.,*
  418 F.3d 953 (9th Cir. 2005) ............................................................... 5, 17, 22

*Natural Arch & Bridge Society v. Alston,*
  209 F. Supp. 2d 1207 (D. Utah 2002) ....................................................... 28, 29

*Navajo Nation v. U.S. Forest Service,*
  535 F.3d 1058 (9th Cir. 2007) .................................................................. 28, 29

*Sierra Forest Legacy v. Sherman,*
  646 F.3d 1161 (9th Cir. 2011) .................................................................... 18

*Stone v. Graham,*
  449 U.S. 39 (1980) .................................................................................... 25

*Yount v. Salazar,*
  CV11-8171-PCT DGC, 2013 WL 93372 (D. Ariz. Jan. 8, 2013) ....................... 2, 5

**Constitutional Provisions**

U.S. Const. amend. 1 .................................................................................. 22, 24

**Statutes**

Arizona Wilderness Act of 1984,
  Pub. L. 98–406, Title III, 98 Stat 1485 (August 28, 1984) ................... 14

Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.* ............ 1

  43 U.S.C. § 1701(a)(12) ........................................................................ 14

43 U.S.C. § 1701(7) ........................................................... 4

43 U.S.C. § 1702(c) ........................................................... 4

43 U.S.C. § 1702(l) ........................................................... 4

43 U.S.C. § 1712 ........................................................... 4

43 U.S.C. § 1714(i) ........................................................... 21

43  U.S.C. § 1732(a) ........................................................... 4

General Mining Law of 1872, 30 U.S.C § 22, *et seq.* ...................................... 1, 28

National Forest Management Act, 16 U.S.C. § 1600 *et seq.* ......................... 16

16 U.S.C. § 1601(d) ........................................................... 16

16 U.S.C. § 1604(a) ........................................................... 16

16 U.S.C. § 1604(e) ........................................................... 16

16 U.S.C. § 1604(f)(4) ........................................................... 18

16 U.S.C. § 1604(i) ........................................................... 17

National Historic Preservation Act, 16 U.S.C. § 470 *et seq* ......................... 10

16 U.S.C. § 470a(d)(6)(A) ........................................................... 27

16 U.S.C. § 470a(d)(6)(B) ........................................................... 27

16 U.S.C. § 478 ........................................................... 19

Mining and Minerals Policy Act of 1970, 30 U.S.C. § 21a ......................... 14, 28

30 U.S.C § 29 ........................................................... 28

30 U.S.C § 611 ........................................................... 15

**<u>Rules</u>**

Fed. R. Civ. P. 56 ...........................................................

1
2

## **Regulations**

3

36 C.F.R. § 228.8............................................................................... 7–8, 11

36 C.F.R. § 228.8(e) ......................................................................... 13

36 C.F.R. § 800.2(c) ......................................................................... 27

43 C.F.R. § 3809.420(a)(4) ............................................................... 11

43 C.F.R. § 3809.420(b)(5) ............................................................... 7

43 C.F.R. § 3809.420(b)(7) ............................................................... 12

43 C.F.R. § 3809.420(b)(8) ............................................................... 10

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# MOTION FOR SUMMARY JUDGMENT

Plaintiffs, Northwest Mining Association ("NWMA") and Gregory Yount, pursuant to Fed. R. Civ. P. 56, respectfully move for summary judgment on their remaining claims because there is no genuine issue as to any material fact and because Plaintiffs are entitled to a judgment as a matter of law.  Complaint; NWMA Doc. *1 at ¶¶ 56–63 (First Claim for Relief); *id.* at ¶¶ 64–74 (Second Claim for Relief); Yount Doc. *9, Claim 6. [1]  Plaintiffs' claims seek to hold unlawful and set aside the Record of Decision ("ROD") and Public Land Order ("PLO") 7787, which withdrew over 1 million acres from operation of the Mining Law, 30 U.S.C. § 22 *et seq*, because the Secretary's actions were arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law.  In the alternative, NWMA seeks to hold unlawful and set aside the Forest Service's consent to the withdrawal of approximately 355,874 acres of Forest Service land.

Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). Actions under the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq*, and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.,* are reviewable under the Administrative Procedure Act ("APA") , which "dictates that [courts] should 'hold unlawful and set aside agency action . . . [that is] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Natural*

---

[1] In keeping with this Court's method, an asterisk before a document number indicates that the cited document was filed prior to consolidation and was docketed using the original case number.

*Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, 877 (9th Cir. 2005) (quoting  5 U.S.C. § 706(2)(A)).  Support for NWMA and Gregory Yount's Motion for Summary Judgment is set forth in the following Memorandum of Law, the attached Declarations, Statement of Undisputed Facts, and Excerpts from the Administrative Record.

## MEMORANDUM OF LAW

On January 9, 2012, then-Secretary of the Interior, Ken Salazar, signed the Record of Decision ("ROD") for the Northern Arizona Withdrawal.  AR00001.  That same day, the Secretary also signed Public Land Order ("PLO") 7787, which implemented the ROD by withdrawing 1,006,545 acres from entry and location under the Mining Law, 30 U.S.C. § 22 *et seq*, for twenty years.  AR000025.[1]  On March 6, 2012, Northwest Mining Association ("NWMA") filed this action seeking judicial review of, *inter alia*, the Secretary's withdrawal.  Complaint; Doc. *1.  As demonstrated below the withdrawal is arbitrary and capricious and otherwise violates the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.* [2]

## ARGUMENT

### I.    PLAINTIFFS HAVE STANDING TO CHALLENGE THE WITHDRAWAL.

#### A.    NWMA Has Standing To Challenge The Withdrawal.

NWMA has standing to challenge the withdrawal.  *See* Docs. *53; 87 at 10–13. Prior to the withdrawal, several of NWMA members were actively engaged in exploration and development programs designed to explore for, discover, and produce the high-grade uranium breccia pipe deposits located on the withdrawn lands.  Declaration of Lawrence

---

[1] The withdrawal consists of three parcels: the North Parcel (~549,995 acres); the East Parcel (~134,454 acres); and the South Parcel (~322,096 acres).  AR000004; *see also* AR001745 (Map depicting the withdrawal area).  The Forest Service purportedly consented to the withdrawal of 355,874 acres of land, including the entire South Parcel and portions of the East Parcel.  AR000024; AR001745.

[2] Pursuant to this Court's Order (Doc. 141), Plaintiffs National Mining Association and Nuclear Energy Institute ("NMA/ NEI") and Quaterra Alaska, *et al.* ("Quaterra") are also concurrently filing motions for summary judgment.  NWMA expressly incorporates the arguments of these Plaintiffs as they relate to NWMA's remaining claims for relief.

Turner ("Turner Decl.") ¶ 5; Declaration of Karen Wenrich ("Wenrich Decl.") ¶ 6;

Declaration of Thomas Howell ("Howell Decl.") ¶ 4.[3]  These members have expended

substantial time and money exploring for and locating claims in the area which is now

withdrawn.  Turner Decl. ¶ 6; Wenrich Decl. ¶ 9; Howell Decl. ¶ 7.  But for the

withdrawal, these members would have been able to engage in notice- and plan-level

operations on their claims without being subjected to a mandatory, costly, and time-

consuming validity examination.  Turner Decl. ¶ 9; Wenrich Decl. ¶ 13; Howell Decl. ¶

10.  Furthermore, these members would have been able to continue to explore the area and

carry out plans to locate new claims in the area.  Turner Decl. ¶ 8; Wenrich Decl. ¶ 11;

Howell Decl. ¶ 9.

        As a result of the withdrawal, and the consequent additional costs of exercising

their right to develop a mining claim, several of NWMA's members have abandoned

some or all of their mining claims.  Turner Decl. ¶ 10; Wenrich Decl. ¶ 10; Howell Decl. ¶

8.  As a result, these members have suffered injury in fact by the challenged actions. This

Article III injury will be redressed by a favorable decision.  Therefore, NWMA has

standing to challenge the withdrawal.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555,

560–61 (1992); *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343

(1977); *Yount v. Salazar*, CV11-8171-PCT DGC, 2013 WL 93372, **5–7 (D. Ariz. Jan. 8,

2013).

---

[3] The declarations of NWMA's members are attached to Plaintiffs' Statement of
Undisputed Material Facts in Support of Motion for Summary Judgment as Exhibits 1–3.

### B.    Gregory Yount Has Standing To Challenge The Withdrawal.

Gregory Yount has two hard rock mining claims, Makapuu #2 and #3, in the Northern Arizona Withdrawal Area.  Declaration of Gregory Yount ("Yount Decl.") ¶ 2.[4] These were valuable mineral properties prior to the segregation and withdrawal.  *Id.* Yount expended hundreds of man hours and tens of thousands of dollars exploring and developing these two claims.  *Id.*  Now, due to the withdrawal, Yount's mining claims have little to no value at all.  *Id.* at ¶ 3.  But for the withdrawal, Yount would have already proceeded, or would proceed in the near future, with the approval process for his Plan of Operations and begun to drill in an attempt to prove discovery of valid existing mineral rights.  *Id.*  Instead, the withdrawal has frozen all of Yount's work on the claims.  *Id.; see also* Doc. *27; 87 at 13-15.

## II.    THE SECRETARY'S DECISION TO WITHDRAW OVER ONE MILLION ACRES OF LAND FROM LOCATION AND ENTRY UNDER THE MINING LAW WAS ARBITRARY, CAPRICIOUS, AND/OR OTHERWISE NOT IN ACCORDANCE WITH LAW.

This Court should hold unlawful and set aside the ROD and PLO 7787 because the Secretary unlawfully withdrew over one million acres in violation of FLPMA. The record does not support the withdrawal and, in fact, demonstrates that the ends sought by the withdrawal would be achieved even if the lands remained open to mineral entry and location.  As a result, the Secretary acted arbitrarily, capriciously, and failed to manage the public lands in accordance with FLPMA's multiple-use mandate.

---

[4] Gregory Yount's declaration is attached to Plaintiffs' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment as Exhibit 4.

In passing FLPMA, Congress instructed the Secretary of the Interior to "manage the public lands under principles of multiple use, in accordance with the land use plans developed . . . under [43 U.S.C. § 1712] . . . ."  43  U.S.C. § 1732(a) (emphasis added); 43 U.S.C. § 1701(7) (it is the policy of Congress that the public lands be managed "on the basis of multiple use").  Although "multiple use" is not a precise concept one thing is sure:  Congress did not intend for the Secretary to make a land management decision until all the facts had been considered.  *See* 43 U.S.C. § 1702(c) (defining "multiple use").

The withdrawal prevents exploration and development under the Mining Law, a "principal or major use" under FLPMA, 43 U.S.C. § 1702(l), on over one million acres of land purportedly to protect other resources in the area.  AR000010–12.  The record demonstrates, however, that the withdrawal will not significantly protect resources any more than leaving the area open to mining exploration and development would.  The record demonstrates that the impacts from mining are speculative and, at worst, insignificant.  The current statutory and regulatory scheme provides substantial protection of area resources from any purported impacts of mining.  Therefore, the withdrawal eliminates mining while providing no additional benefit to other resources.  As a result, the withdrawal is arbitrary, capricious, and not in accordance with law.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (An agency's decision is arbitrary and capricious if it has "offered an explanation for its decision that runs counter to the evidence before the agency").

The ROD lists four purported reasons for the withdrawal: (1) the withdrawal will help protect water resources until more information can be gathered about the effects of

mining on water; (2) the withdrawal will help protect cultural and tribal resources; (3) the withdrawal will help protect other resources; and (4) the withdrawal will still allow some economic benefits from mining for those lucky few who exposed a valuable mineral deposit prior to the withdrawal.[5]  AR000010–12; *but see also Yount*, 2013 WL 93372 at *8 ("Yount has effectively lost his opportunity to validate the claims in which he has made substantial personal investments.").

The record indicates that the purported effects of mining on these resources are speculative, and that these resources would already be adequately protected by existing laws and regulations.  As a result, no withdrawal was needed to protect water, cultural, and other resources. Instead the withdrawal arbitrarily prohibits the development of valuable mineral deposits in the area.  Furthermore, the record contradicts the Secretary's assertions about the economic impacts of the withdrawal.

Agency action is arbitrary and capricious if the agency has not presented "a rational connection between the facts found and the choices made."  *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (internal quotations omitted).  In this case, the Secretary failed to make a rational connection between the facts

---

[5] As demonstrated by NMA/NEI the stated reasons for the withdrawal are illusory.  Only the first offered reason is even remotely similar to the stated reason for the proposed withdrawal.  The Federal Register notice for the proposed withdrawal provided that "[t]he purpose of the withdrawal, *if determined to be appropriate*, would be to protect the Grand Canyon watershed from adverse effects of locatable hardrock mineral exploration and mining."  AR000053 (emphasis added).  That the Secretary needed to create additional reasons for the withdrawal at the last minute demonstrates that the decision was arbitrary and capricious.  But, even if the Secretary's *post hoc* justifications are accepted as legitimate reasons to withdraw over one million acres of land, the record does not provide any support for the Secretary's stated reasons for the withdrawal.

in the record and the choice to withdraw over one million acres of land from operation of the Mining Law.

As demonstrated below, applicable laws and regulations provide sufficient direction for the protection of resources while providing for multiple use of the area. *See* AR005929 (Then-Undersecretary for Natural Resources and Environment, Department of Agriculture, Mark Rey's June 2008 testimony against a proposed withdrawal of the same area because existing law provides protection of resources and allows for multiple use). Accordingly, this Court should hold unlawful and set aside the ROD and PLO 7787.

### A.   The Record Does Not Support The Secretary's Assumption That The Withdrawal Is Necessary To Protect Water Resources.

The first stated reason for the withdrawal is that the effects of mining on water resources are uncertain but, because the potential impacts might be severe, the withdrawal is necessary in order to prevent unacceptable impacts to water resources.  AR000009–10. As demonstrated by NMA/NEI, the record demonstrates that water resources are not at risk as a result of mining, as acknowledged by various agency officials.[6]

Furthermore, the record demonstrates that the effects of mining are only uncertain, and potentially significant, when one makes spurious presumptions that the BLM itself

---

[6] As also demonstrated by NMA/NEI, the purported uncertain effects of mining on water resources is not an adequate justification for the withdrawal.  Although an agency's conclusion is not necessarily arbitrary and capricious when based on uncertain evidence, that conclusion is arbitrary if the agency does not base its decision on "the best available scientific data" and if it fails to ground "its decision in a consideration of the relevant factors." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1337 (9th Cir.1992).  As demonstrated by NMA and NEI, the BLM did not use the best available scientific data. Furthermore, as demonstrated below, the BLM failed to ground its decision in a consideration of the relevant factors.  As a result, in this case, the BLM's uncertainty demonstrates that the decision to withdraw over one million acres was arbitrary and capricious.

rejected as unlikely.  For example, the Final Environmental Impact Statement ("FEIS") provides that, if the area is left open to location and entry, the potential risk to quality of the R-aquifer wells in the South Parcel ranges from "None to Major."  AR002075.  The major end of the spectrum, however, is only possible if "mine drainage were to reach the R-aquifer and not be mitigated."  AR002069.  Even the BLM admits that "although possible, these impacts are not considered likely because of the removal of contaminated sump water during mining, reclamation of the mines, monitoring, and the low permeability conditions that typically occur in the breccia pipe and in the hundreds of feet of intervening rock formation between the aquifer and the mining openings."  AR002069.

In the North Parcel, the FEIS also characterizes the potential impact to perched aquifer wells from the no-action alternative as "None to Major."  AR002075.  The FEIS, however, gets to "Major" only through two layers of speculation: "if an impact were to occur, it *could be* major."  AR002063.  Yet, the preceding page of the FEIS indicates that impacts are not likely to occur.  AR002062 ("Water quality impacts to perched springs or wells would not be expected to occur during mining or if the perching layer is not re-established because the mine openings would be expected to drain the perched aquifer, and movement of mine contaminants to the spring or well would not be possible.").

These conclusions demonstrate that the Secretary only cursorily considered the effect of the current statutory and regulatory scheme on mitigating potential impacts to water resources.  BLM regulations require that all mining activities comply with both federal and state water quality standards.  43 C.F.R. § 3809.420(b)(5) ("[a]ll operators shall comply with applicable Federal and State water quality standards"); 36 C.F.R. §

228.8 (Forest Service regulations requiring compliance with Federal and State water quality standards).  Although the FEIS provides that "it must be assumed that state and federal regulations have been and are being met," the BLM did not consistently apply this principle.  AR002074.  For example, when this principle was applied when analyzing potential impacts to perched aquifer springs and wells from no withdrawal, the BLM determined that "drilling operations that occurred after the regulations were adopted on March 5, 1984 (ADWR 2008), are considered to represent no impact or a negligible impact to the quantity and quality of perched groundwater available to perched aquifer springs or wells."  AR002074.

Despite acknowledging that drilling operations under current regulations would represent "no impact or a negligible impact," the FEIS still concluded that, under the no-action alternative, potential impact to the quantity and quality of discharge from perched aquifer wells was assumed to be no impact to *major impact* for the North Parcel.  AR002077.  This conclusion was purportedly based on the number of anticipated mines, the assumption that "zero to half" of the anticipated number of mines "might be located within the perched groundwater zone that supports a well," and the "salient conclusion[]" that "[i]f no such reclamation or preventive measures are taken, then depletion of the perched aquifer would be expected to continue."  AR002076–77.  Yet that "none to major" conclusion is not consistent with the assumption that operators will comply with applicable laws and regulations.[7]

---

[7] NWMA's Executive Director, Laura Skaer, submitted comments on the DEIS demonstrating that current law and regulations were adequate to protect the resources in the area.  AR096476–78.  The BLM dismissed similar comments because "[t]he DEIS

Therefore, the Secretary vastly overstated the potential risk of impacts from mining on water resources in the area and the ROD's conclusion that mining development should be slowed to allow further study of the impacts of mining is unreasonable.[8] As demonstrated above, impacts of mining on water resources are only uncertain, and potentially substantial, when it is assumed that mining operations will not comply with the law. If the Secretary and the BLM had correctly assumed that mining operations will comply with current laws and regulations, then BLM's own analysis demonstrates that mining will have little to no impact on water resources in the area. As a result, the Secretary's assumption that the withdrawal was necessary to protect water resources was arbitrary and capricious.

### B. The Record Does Not Support The Secretary's Assumption That The Withdrawal Is Necessary To Protect Cultural Resources.

The second purported reason for the withdrawal is to protect cultural and tribal resources in the area. AR000011. Once again, the record demonstrates that a withdrawal is not needed in order to protect these resources. The FEIS provides that, under the no action alternative, continued mining and exploration "could" have a direct and/or indirect

---

acknowledges the extensive framework of existing regulations applicable to hard-rock mining in the area." *See, e.g.,* AR002455. As demonstrated above, the BLM's failure to consistently acknowledge current regulations led to a faulty analysis.

[8] In the East Parcel, the BLM was unable to conclude that mining could have a major impact on water resources, even with their "conservative assumptions." AR002065. Under the no-action alternative, the FEIS characterizes the potential impact to water resources in the East Parcel as "Negligible" for perched aquifer springs, "None to Negligible" for perched aquifer wells, "Negligible" for water quantity of R-aquifer Springs, "None to Moderate" for water quality of R-aquifer springs, "none" for R-aquifer wells, and "Negligible to Moderate" for surface waters. AR002075. As a result, there is no support for the Secretary's assumption that the potential effects of mining on water resources would be "unacceptable" in the East Parcel. AR000010.

impact on cultural resources in the area, but no cumulative impact.  AR002218.

Importantly, however, "[d]irect impacts would be mitigated through established

regulations and procedures of avoidance and mitigation."  AR001698.

As with water quality standards, mining operations are required to comply with all

applicable statutes and regulations and take certain steps to prevent impacts to cultural

resources.  43 C.F.R. § 3809.420(b)(8).  Mining operations must comply with the National

Historic Preservation Act, 16 U.S.C. § 470 *et seq.  See, e.g.,* AR029831 (Decision Memo

for Vane Minerals Uranium Exploration Drilling Project noting compliance with National

Historic Preservation Act ).  In the ROD, however, the Secretary failed to acknowledge

the mitigating effects of the current statutory and regulatory scheme and instead based his

decision on the conclusory statement that the tribes "believe that continued uranium

mining will result in the loss of their functional use of the area's natural resources."[9]

AR000011.  The Secretary failed to discuss what, if any, evidence supports the tribe's

beliefs or the BLM's purported analysis of impacts from mining on cultural resources.  As

a result, the Secretary's assumption that the withdrawal was necessary to protect cultural

resources was arbitrary and capricious.

**C.     The Record Does Not Support The Secretary's Assumption That The
Withdrawal Is Necessary To Protect Other Resources.**

The third purported reason for the withdrawal is that it will protect "other

resources[,]" specifically visual resources and fish and wildlife.  AR000011.  For

example, the Secretary concluded that the withdrawal would reduce truck traffic, which

---

[9] Even the Secretary recognized that "there is only one eligible traditional cultural
property" in the area.  AR000011.

"could create a major cumulative effect to visual resources." *Id.*  This conclusion is contradicted by the FEIS, which characterizes the expected effect to visual resources under the no action alternative as "moderate."[10]  AR002177.  The FEIS defines moderate impact to visual resources as "[v]isual impacts that would partially retain the existing character of the landscape, and while attracting the attention of the casual viewer, would not dominate the view."  AR002175.  Once again, these impacts are overstated as the BLM failed to analyze how the current regulatory scheme would mitigate any purported impacts to visual resources.  *See* 36 C.F.R. § 228.8 (Forest Service regulations providing that an operator "shall, to the extent practicable, harmonize operations with scenic values through such measures as the design and location of operating facilities, including roads and other means of access, vegetative screening of operations, and construction of structures and improvements which blend with the landscape."); 43 C.F.R. § 3809.420(a)(4) (BLM regulations requiring operators to comply with mitigation measures).  As a result, it is unlikely that visual resources would be significantly impacted in the absence of the withdrawal.

The other resource cited by the Secretary is fish and wildlife: "[a]s a result of projected surface and groundwater effects, wildlife may be impacted."  AR000011.  Any potential impact to water resources, however, are unlikely and insignificant.  *Supra* Part II.  For surface effects, the Secretary based his decision on the purported potential

---

[10] The FEIS does provide that some locations "may" have a major impact to visual resources, but the BLM still concluded that "the expected changes in visual quality . . . could lead to moderate impact to visual resources in the proposed withdrawal area." AR002177.

exposure of wildlife to uranium and other radionuclides.  AR000011.   The record

demonstrates that the Secretary's "concerns" are unfounded.

For example, anticipated soil disturbance in each Parcel under the no action

alternative is less than 1% of the Parcel area.  AR001694.  For the proposed alternative,

impacts of soil contamination *could* range from below to above applicable remediation

standards.  AR001695.  This is the same potential impact under all of the alternatives.  *Id.*

For impacts to vegetation, about 1.4% of the area is potentially disturbed, and the worst

case scenario is disturbances would be "measurable but not apparent."  AR001695.

Potential direct impacts to fish and wildlife are also speculative.  The FEIS

provides that "very little research has actually been performed to develop taxa specific

plant and wildlife threshold levels for uranium or other metals . . . ."  AR002136.  The

BLM determined, however, that future site-specific analysis would provide more accurate

information about any potential impacts to wildlife.  AR002137 ("a more detailed,

quantitative analysis of the possible effects of chemical and radiation hazards to general

wildlife species that occur within the proposed withdrawal area could be contained in

future site-specific analyses of proposed new mining projects.").  A site-specific analysis

would provide "more precise information on the locations of exploration sites, mine sites,

and roads" which "would be useful to better understand the magnitude, extent, and

duration of impacts to wildlife and fish species."  AR002137.

As with other resources, there are already laws and regulations in place that help

determine and minimize impacts on a site-by-site basis.  43 C.F.R. § 3809.420(b)(7)

(BLM regulations requiring that an operator "shall take such action as may be needed to

prevent adverse impacts to threatened or endangered species, and their habitat which may be affected by operations."); 36 C.F.R. § 228.8(e) (Forest Service regulations requiring that an operator "shall take all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations."); AR002146 ("impacts associated with new access points . . . would need to be studied as part of the plan of operations as well as for the ADOT right-of-way application that is required for temporary construction within an existing transportation corridor").  Any potential impacts to fish and wildlife would be studied, and mitigated, when an operator submits a proposed plan of operations.  Despite the BLM's recognition that a site-specific approach would provide better information about potential impacts to wildlife, and despite the fact that current regulations protect wildlife from negative impacts from mining, the Secretary determined that a withdrawal would best protect wildlife because wildlife *might* be impacted by mining.

    But even the worst case scenario in the FEIS, which was based on speculative presumptions, demonstrates that mineral exploration and development would have no apparent impact on wildlife.  The FEIS provides that, under the no-action alternative, "[i]mpact to overall quality and quantity of unfragmented habitat would be measurable but not apparent.  Individuals may experience reduced viability or mortality; however, these impacts would not alter wildlife distribution in the study area or result in changes to overall wildlife population viability."  AR002146.

    Therefore, the record demonstrates that impacts to wildlife from mining will not be widespread, and instead depends on where surface-disturbing activities may occur.

Furthermore, impacts are not likely to be significant and can be mitigated through the current statutory and regulatory scheme under which mining operations are regulated. Accordingly, the Secretary's assumption that the withdrawal was necessary to protect wildlife was arbitrary and capricious.

### D.   The Secretary Underestimated The Effect Of The Withdrawal On Mineral Development In The Area.

Finally, the Secretary tried to justify the withdrawal because it would not result in the complete cessation of mining.  AR000011.  Although some mining might continue within the withdrawn area, the Secretary severely underestimated the impact of the withdrawal on the development of mineral resources in the area.  In fact, as demonstrated by the other plaintiffs' memos, the record demonstrates that the BLM grossly underestimated the amount of uranium in the withdrawn area.

Furthermore, it is irrelevant whether some mining will continue if the withdrawal arbitrarily limits mining exploration and development.  With the Mining Law, Congress set out an objective of increasing the Nation's wealth by facilitating development of the Nation's minerals.  *Deffeback v. Hawke*, 115 U.S. 392, 402 (1885).  Congress reaffirmed this policy when it passed both the Mining and Minerals Policy Act of 1970, 30 U.S.C. § 21a, and FLPMA, 43 U.S.C. § 1701(a)(12).  The Secretary's decision also thwarts Congress's purposes in passing the 1984 Arizona Wilderness Act, which designated over 250,000 acres of federal land on or near the Arizona Strip in northern Arizona as wilderness and released about 600,000 acres of land in the same area for multiple use, including mining.  Pub. L. 98–406, Title III, 98 Stat 1485 (August 28, 1984).  The

withdrawal thwarts Congress's purposes in passing these statutes because it prevents further exploration for enormous mineral wealth in the area.

The withdrawal also stymies further development on existing claims by substantially increasing the time and cost involved in getting a plan of operations approved.  NWMA members can no longer engage in notice- or plan-level operations without first submitting to a validity examination.  AR000006.  As the Secretary admitted, "[d]etermining the validity of a mining claim is a complex and time-consuming legal, geological, and economic evaluation that is done on a claim-by-claim basis."  AR000006.  As a result, some mining claimants will choose to not pursue development of their mining claims because of this costly and time-consuming process.[11]

As demonstrated above, the withdrawal does not increase the protection of other resources in the area.  The withdrawal impedes mining exploration and development on over one million acres of land without providing any additional benefit to other resources in the area.  The Secretary's decision unnecessarily prevents multiple use of the area, and unnecessarily prevents citizens from increasing the Nation's wealth by facilitating development of the Nation's minerals.  Accordingly, this Court should grant NWMA's motion for summary judgment and hold unlawful and set aside the ROD and PLO 7787.

---

[11] Also of note is that the BLM never discussed the effect of the withdrawal on other types of minerals in the withdrawn area.  The Department of Interior recognized that there are "known deposits" of "uncommon varieties" in the withdrawn area.  AR00049; *see* 30 U.S.C. § 611.  Despite this, the BLM failed to analyze the impact of preventing exploration and development these other locatable minerals.

**III.   THE FOREST SERVICE'S DECISION TO CONSENT TO THE WITHDRAWAL OF OVER 355,000 ACRES OF FOREST SERVICE LAND FROM LOCATION AND ENTRY UNDER THE MINING LAW WAS ARBITRARY, CAPRICIOUS, AND/OR OTHERWISE NOT IN ACCORDANCE WITH LAW.**

The Forest Service also acted arbitrarily, capriciously, and/or not in accordance with law when it purportedly consented to the withdrawing of Forest Service lands.  This provides an additional and independent basis for holding unlawful and setting aside the ROD and PLO 7787 with respect to the 355,874 acres of Forest Service land withdrawn. On January 5, 2012, Thomas Tidwell, Chief of the Forest Service, sent a letter to the Director of the BLM, which purportedly consented to "the withdrawal of lands studied in the EIS managed by the Forest Service."  AR003098.  Like FLPMA, the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*, sets forth "multiple use" and "sustained yield" as the guiding principles for the Forest Service's National Forest management.  16 U.S.C. § 1601(d) ("It is the policy of the Congress that all forested lands in the National Forest System shall be maintained . . . to secure the maximum benefits of multiple use sustained yield management in accordance with land management plans."). The Forest Service ignored NFMA's multiple use mandate and the Kaibab National Forest Plan when it purportedly consented to the withdrawal.

**A.   The Forest Service Failed To Comply With The Kaibab National Forest Plan.**

To fulfill its multiple use mandate, the Forest Service uses a multi-step planning and decisionmaking process.  First, the Forest Service must develop a Forest Plan for each individual National Forest.  16 U.S.C. § 1604(a).  Each Forest Plan must "provide for multiple use and sustained yield."  16 U.S.C. § 1604(e).  Second, "the Forest Service

implements each Forest Plan by approving or disapproving site-specific actions." *Native Ecosystems Council*, 418 F.3d at 957 n.1.  Of course, "all subsequent agency action[s] . . . must comply with NFMA and the governing forest plan." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009); *Idaho Sporting Cong., Inc. v. Rittenhouse,* 305 F.3d 957, 962 (9th Cir. 2002).  Specifically, NFMA requires that "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans."  16 U.S.C. § 1604(i).

Importantly, the Forest Service only has the authority to "change the legal consequences of completed acts," including the legal consequences of a governing Forest Plan, "if Congress conveys such authority in an express statutory grant." *Friends of Southeast's Future v. Morrison,* 153 F.3d 1059, 1070 (9th Cir. 1998) (citing *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988)).  In *Friends of Southeast's Future*, the court held that the Forest Service violated NFMA by proposing a timber sale without first conducting an area analysis, as required by the Forest Plan.  *Id.* at 1070.  The Forest Service argued that it complied with the consistency requirement of § 1604(i) because it amended the Forest Plan to remove the area analysis requirement shortly after issuing the decision for the proposed timber sale.  *Id.*  The court rejected the Forest Service's argument because 1604(i) "requires timber sales to be consistent with a single Forest Plan, not selected elements of two Plans." *Id.* (internal citation omitted).  The Ninth Circuit made clear that Congress, through § 1604(i), did not convey to the Forest Service the authority to retroactively amend a Forest Plan to be consistent with previous decisions.  *See id.*

In *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161 (9th Cir. 2011), the court reexamined whether the Forest Service has the authority to retroactively amend Forest Plans.  In *Sierra Forest Legacy*, the plaintiffs challenged a timber harvesting project, approved in 2004, and argued that the decision violated NFMA because it failed to comply with species monitoring requirements in the governing Forest Plan.  *Id.* at 1168–69.  The Forest Service argued that the project did not need to comply with the monitoring requirements because the requirement was removed in 2007, and a different section of NFMA, 16 U.S.C. § 1604(f)(4), provides the authority to retroactively amend Forest Plans.  *Id.* at 1188.

Judge Reinhardt, whose opinion controlled the disposition of this issue, ruled that the Forest Service does not have the authority to retroactively amend a Forest Plan.[12]  *Id.* at 1169–70.  In so doing, he noted that *Friends of Southeast's Future* was controlling, and that § 1604(f)(4) does not "provide the 'necessary express statutory grant' to enable the Forest Service to promulgate a retroactive amendment."  *Id.* at 1188.  Judge Reinhardt further opined that no plausible interpretation of § 1604(f)(4) grants the Forest Service the authority to retroactively amend a Forest Plan.  *Id.* at 1190.  Based on the plain language and context of the statute, he stated that the words "[p]lans developed in accordance with this section shall be amended in any manner whatsoever . . ." only referred to the

---

[12] Judge Noonan concurred in the result on the issue.  *Sierra Forest Legacy v. Sherman*, 646 F.3d at 1170.  Judge Fisher wrote a dissenting opinion on the issue, which argued that § 1604(f)(4) gives the Forest Service the authority to retroactively amend a Forest Plan. *Id.*  Judge Reinhardt's opinion controlled the disposition of the issue because it was the narrowest opinion, and is cited for its persuasive authority.  *Id.* at 1169.

procedures of amending a Forest Plan, not the ability to retroactively amend a Forest Plan to conform with a previous decision. *Id.* at 1190–91 (citing 16 U.S.C. § 1604(f)(4)).

The teachings of *Friends of Southeast's Future* and *Sierra Forest Legacy*, as well as the plain language of NFMA, demonstrate that the Forest Service must comply with the Forest Plan in effect at the time it makes a decision. The Forest Service does not have the power to retroactively amend a Forest Plan to validate a previous decision that violates the Forest Plan. C*f. Mount Royal Joint Venture v. Kempthorne,* 477 F.3d 745, 750 (D.C. Cir. 2007) (BLM amending resource management plan in advance to allow for contemplated withdrawal*)*.

The Kaibab National Forest Land Management Plan ("Forest Plan") was originally released in 1988 and has been amended several times, most recently in 2004. AR013320. The Forest Service's purported consent to the withdrawal changed the legal consequences of exploring for and developing mineral resources in the Kaibab National Forest. Not only are no new claims allowed to be located, those with mining claims can no longer engage in notice-level operations without first submitting to a mineral examination. AR0000006. Under the existing Forest Plan, however, these national forest lands were open to operation of the Mining Law. AR013381, AR013384, AR013368, AR001745; AR013325–26; *see also* 16 U.S.C. § 478. As a result, the decision to consent to the withdrawal violated the Kaibab National Forest Plan.

Most of the Forest Service land withdrawn by PLO 7787 is in the Tusayan Ranger District of the Kaibab National Forest. AR001745; AR013325; AR013327. Specifically, the geographic areas withdrawn are geographic areas 08, 09, and 10. AR013327. The

Forest Plan expressly contemplates the development of locatable minerals in Geographic

Areas 08 and 09.  AR013381, AR013384.  The only contemplated restriction on locatable

mineral exploration and development within Geographic Area 10 is within heritage sites.

AR013368.

Additionally, the withdrawal removes portions of geographic area 16 in the North

Kaibab Ranger District from entry and location under the Mining Law.  AR001745;

AR013325–26.  The Forest Plan provides that those portions of Geographic Area 16

which are not in the Grand Canyon National Game Preserve, including the portions

affected by the withdrawal, are open for location and entry under the Mining Law.

AR013390.

The Forest Plan proposes withdrawals from mineral entry and location in other

areas of the Forest.  For example, in the Tusayan Ranger District, the Forest Plan

contemplates withdrawals in: Special Area 6, AR013418–19; Special Area 7, AR013421–

22; Land Use Zone 21, AR013434–36; and Land Use Zone 22, 013438–39.  The EIS for

the Forest Plan provides that "[t]he only new withdrawals contemplated are those needed

to protect areas with high resource values such as existing and proposed developed

recreation sites involving large capital investments, research natural areas and threatened

and endangered plant habitat."  AR073758.  The Forest Plan identifies those resources and

areas that are not appropriate for mining.  The areas withdrawn by PLO 7787 were not

identified in the Forest Plan as potential withdrawal areas and, as a result, the Forest Plan

violated NFMA when it consented to the withdrawal. [13]

_____

[13] The EIS for the Forest Plan demonstrates why those areas withdrawn by PLO 7787

1    In an attempt to get around the requirements of NFMA, the ROD provides that

2    "[w]ithdrawal decisions are outside the authority of National Forest Planning, so no plan

3    amendment is required."[14]  AR000012.  This statement is incorrect, however, because

4    FLPMA gives the Forest Service the express authority to refuse to allow the Secretary of

5    the Interior to withdraw Forest Service Lands.  43 U.S.C. § 1714(i) ("In the case of lands

6    under the administration of any department or agency other than the Department of the

7    Interior, the Secretary shall make, modify, and revoke withdrawals only with the consent

8    of the head of the department or agency concerned").  As a result, withdrawal decisions

9    are not outside the authority of Forest Service planning because the Forest Service can

10   refuse to consent to a withdrawal when the proposed withdrawal would violate NFMA

11   and the applicable Forest Plan.  As a result, the Forest Service violated NFMA when it

12   consented to the withdrawal.  Accordingly, this Court should hold unlawful and set aside

13   the ROD and PLO 7787 with respect to the Forest Service lands.

**B.   The Forest Service Failed To Provide Adequate Justification For Consenting To The Withdrawal.**

In addition to failing to comply with the Forest Plan, the Forest Service failed to

articulate sufficient reasons for consenting to the withdrawal.  In the letter consenting to

---

were not considered for a withdrawal in the Forest Plan.  For example, the EIS provides that "[p]otential cumulative effects of both leasable and locatable developments primarily involve social and economic impacts.  Cumulative impacts to wildlife and visual resources from mineral developments are considered insignificant when viewed in light of *the small area likely to be directly impacted through mining* and oil and gas production activities and mitigation measures available to offset impacts on wildlife habitats." AR073840–41 (emphasis added).

[14] This statement is belied by, the *Federal Register* notice of the ROD, which provided that "Forest plans for the Kaibab National Forest would be amended to reflect the intent of the withdrawal."  AR003198.

the withdrawal, the Chief of the Forest Service provided two sentences of justification

"The [Withdrawal] EIS acknowledges that impacts are possible from uranium mining in

the area, including impacts to water resources.  Important cultural and other resource

values would also be protected by the withdrawal."  AR003098.  The consent letter fails

to consider the Forest Service's multiple use mandate, the governing Forest Plan, the

likelihood that "potential" effects will occur, the severity of the "potential" effects, or the

effectiveness of the current regulatory scheme in mitigating impacts from mining.

Accordingly, the Forest Service's decision to consent to the withdrawal was arbitrary and

capricious.  *State Farm Mut. Auto Ins. Co.*, 463 U.S. at 50 ("It is well-established that an

agency's action must be upheld, if at all, on the basis articulated by the agency itself");

*Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d at 960 ("[T]he agency must

present a 'rational connection between the facts found and the conclusions made.'").

## IV.   ROD'S RELIANCE ON AMERICAN INDIAN RELIGIOUS AND SPIRITUAL OBJECTIONS TO MINING AS A BASIS FOR THE WITHDRAWAL VIOLATES THE ESTABLISHMENT CLAUSE OF THE U. S. CONSTITUTION.

Pro se plaintiff Gregory Yount alleged that the withdrawal violated the First

Amendment of the U.S. Constitution.  11-8171, Docket No. 9, Claim 6.

Yount asserts that Interior has embraced tribal beliefs and elevated them over the

beliefs of all other citizens. In particular, it elevates and endorses tribal religious beliefs

over his own beliefs. Yount Decl. ¶ 4.

Yount asserts: "My religious beliefs do not include that landscapes, mountain

ranges, and land forms have spiritual and religious significance or embody gods or spirits

of any kind. Interior, through the rationale for the withdrawal, is telling me that the land

IS sacred in these ways by providing a beneficial use of the withdrawal area for Native Americans so that Native American religious feeling and beliefs will not be negatively impacted by uranium mining." Yount Decl. ¶ 5.

Yount continues: "I have lost a governmental benefit, the ability to make and pursue mining claims in the withdrawal area, based on Interior's endorsement of Native American religious beliefs to justify the withdrawal. I used to explore the withdrawal area many times each year, I now have little or no reason to return there because I am excluded from developing my current mining claims or making new claims. Yount Decl. ¶ 6.

Yount states in his declaration that "Interior, through its endorsement of Native American religious beliefs, is compelling me to accept these beliefs and ideas that the land is sacred; that Native American religious feelings are superior and essentially more important than my beliefs; and in turn, that they are more important than my ability to explore and mine uranium in the withdrawal area." Yount Decl. ¶ 7.

If this Court concludes that the Interior Secretary incorrectly determined that uranium mining would adversely affect water quality and quantity in the Grand Canyon watershed, this Court must consider whether the withdrawal violates the Establishment Clause of the First Amendment due to DOI determination that the uranium mining impacts to American Indian beliefs could not possibly be mitigated.  Alternatively, if this Court finds that the secular purpose of protecting water quality and quantity was inadequate and not supported by the evidence, then the other purpose of the withdrawal, implementing protection for American Indian religious beliefs, violates the Establishment Clause and the withdrawal can be set aside on this ground.

The First Amendment of the Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I. The Ninth Circuit follows the *Lemon v. Kurtzman* test to determine whether a particular government activity violates the Establishment Clause. *Access Fund v. U.S. Dep't of Agric.*, 499 F.3d 1036, 1042 (9th Cir. 2007). An action or policy violates the Establishment Clause under *Lemon* if (1) it has no secular purpose, (2) its primary effect is to advance or inhibit religion, and (3) it involves excessive entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).[15]

The withdrawal's secular purposes are inadequate for lack of supporting data and the other purpose of protecting American Indian resources has the primary effect of advancing or endorsing American Indian religious beliefs and traditions, and creating a preference for American Indian religious activities on federal lands.

## A.   Religious Objectives Override Secular Purposes.

The first prong of the *Lemon* test asks whether the challenged action has a secular purpose or whether it was taken for "the ostensible and predominant purpose of advancing religion." *Access Fund*, 499 F.3d at 1043 (*quoting McCreary County v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 860 (2005)). Under the FEIS, the purpose of the proposed action was to protect the natural, cultural, and social resources in the Grand

---

[15]In recent years, the last two *Lemon* criteria have been discussed together by the Supreme Court. *See Mitchell v. Helms*, 530 U.S. 793, 807-08 (2000) (Only considers the first and second factors of the *Lemon* test because the excessive entanglement analysis involves the same analysis as the primary effect factor.) The Ninth Circuit analysis also focuses on purpose and effect of the government action when analyzing an Establishment Clause violation. *Access Fund*, 499 F.3d at 1043-46. Plaintiff Gregory Yount will follow this approach as well.

Canyon watershed from possible adverse effects of uranium mining.  AR001625 (FEIS 1-5).  The DOI Secretary's rationale for the withdrawal was based on the limited data regarding effects of mining on water quality and quantity in the Grand Canyon watershed and the potential risk of great harm, on the need to protect American Indian sacred and traditional resources, and on the broad purpose of protecting other resources such as plants and wildlife.  AR000009-000012 (ROD).

In *Mount Royal Joint Venture*, 477 F.3d at 757-58, the court held that the withdrawal of lands from mining to protect American Indian areas of traditional spiritual importance did not violate the Establishment Clause because there were several secular purposes for the withdrawal, such as protecting resources within an ACEC, habitat for the endangered peregrine falcon, seasonally important elk and deer habitat, and aquifers that provide potable water.  As established in other memoranda, there is no evidence supporting the conclusion that mining would have a significant impact on water quality and quantity, and instead there is substantial evidence to the contrary.

Unlike the case of *Mount Royal Joint Venture*, the secular purposes identified in the FEIS are inadequate because the studies cited are contradicted by other findings in the FEIS and cannot be said to support the determination that uranium mining will adversely affect the Grand Canyon watershed or adversely impact plants and wildlife.  *See McCreary County*, 545 U.S. at 864-65 (When there is a sham or the secular purpose is secondary, it is not adequate basis.); *Stone v. Graham*, 449 U.S. 39, 41 (1980).  There was not an adequate basis for withdrawing the lands to protect water resources or plants and wildlife, so the protection of American Indian resources, particularly the tribes'

connection to the land and their religious beliefs and traditions, became one of the main purposes for the withdrawal. The ROD clearly articulates the objective to promote and advance American Indian sacred values and beliefs.

Shortly after the publication of the USGS Scientific Investigation Report 2010-5025 (SIR 2010-5025) that documents analysis of data regarding effects of mining on the watershed, the federal agencies concluded there was no reason for the withdrawal. AR042831-042832 (Alternatives Development Meeting Notes, 2/17/10); 042839 (E-mail from Scott Florence to Jim Kenna, 02/18/10). The NPS repeatedly commented that the EIS had to pay special attention to American Indian feelings of place and values relating to the entire landscape. AR003546 (Briefing Statement from Steven Martin, NPS); 004343 (NPS DEIS Ch.4 Comments, Mar. 15, 2010). NPS commented repeatedly that American Indians believe that any disturbance or hole drilled in the earth is a "wound to the earth," and that the feeling and association to the land must be analyzed in the EIS. AR004344-004345, 004350 (DEIS Ch.4 NPS Comments, Mar. 15, 2010); 050773 (DEIS Ch.4 Comments, Aug. 3, 2010); 076337-076338 (Preliminary DEIS Comments, June 15, 2010). NPS also concluded that it was impossible to mitigate impacts of mining because it is an irreversible desecration and drilling into the earth is a "cultural taboo." AR076343, 076336, 076342 (Preliminary DEIS Comments, June 15, 2010); 074165, 074175 (DEIS Comments, Mar. 15, 2010); 079916 (Preliminary FEIS Comments, Aug. 18, 2011). Based on NPS comments, the FEIS analyzed these religious/value based feelings under the definition of cultural landscape and ethnographic resources. AR 001916 (FEIS 3-214); 069464 ("The concept of 'cultural landscape' or 'ethnographic

1  landscape' is taken from scholarly literature and is used in the EIS exclusively in this

2  sense.") (E-mail from Connie Stone to Adrienne Tremblay 090611).

3        The EIS included an American Indian Resources Impacts Section, which used the

4  NPS comments including that drilling and mining "wounds the earth" and "kills

5  [American Indian] deities and sacred lands."  AR002221-002223, 002225 (FEIS 4-219-

6  221, 4-223).  The ROD justifies the withdrawal due to the inability to mitigate impacts

7  from mining on American Indian religious and traditional resources.  AR000009-000011,

8  (ROD at 9, 11).  The impacts to American Indian resources could not be mitigated due to

9  the belief that mining "may degrade the values of those lands to the tribes that use them."

10  *Id.*

11        A federal action may protect American Indian religious beliefs and traditions, but

12  only when these religious beliefs are tied to a specific site that also has historical and

13  cultural significance making it eligible for listing under the NHPA.  *See e.g. Access Fund*,

14  499 F.3d at 1043-45; *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 975-76 (9th Cir.

15  2004).  The FEIS only identified one traditional cultural property, Red Butte.  AR001913

16  (FEIS 3-211). *See* AR000011 (ROD); 16 U.S.C. § 470a(d)(6)(A)-(B).  The FEIS identifies

17  other sites as having significant cultural and traditional value to the tribes and assumes

18  they are eligible under the NHPA.  AR001905-001912 (FEIS 3-203-210).

19        Specific traditional resources and religious beliefs are also protected by other laws

20  when a specific concrete site is identified for protection.  *See* 16 U.S.C. § 470a(d)(6)(A)-

21  (B); 36 C.F.R. § 800.2(c); Exec. Order No. 13007, 61 F.R. 26771 (1996).  However, these

22  sites do not cover the entire one million acres of land that were withdrawn.  For example,

the FEIS notes possible Ancestral Puebloan sites.  AR001912 (FEIS 2-210).

Instead of protecting only those identified sites, the DOI Secretary withdrew the entire one million acres of land based on the conclusion that American Indian religious and sacred beliefs assumed that mining irreversibly desecrates the land.  AR000009, 000011 (ROD).  *See* AR001913-001915 (FEIS 3-211-213) (Every tribe identified in the FEIS considers the Grand Canyon, the withdrawal area, and any surrounding traditional land sacred because of the lands connection with their tribes spiritual and religious beliefs.).  This nonsecular purpose for the withdrawal independently violates the Establishment Clause.

### B.    DOI Is Not Neutral.

The withdrawal also fails to meet the second and third prong of *Lemon*.  The primary effect of the withdrawal is to endorse or advance Native American religion at the expense of the statutory direction governing the National Forest.  *See Natural Arch & Bridge Society v. Alston*, 209 F. Supp. 2d 1207, 1223-24 (D. Utah 2002); *Bear Lodge Multiple Use Ass'n v. Babbitt*, 2 F. Supp. 2d 1448, 1455 (D. Wyo. 1998) (*citing Badoni v. Higginson*, 638 F.2d 172, 179 (10th Cir. 1980)).  The National Forest are open under the 1872 Mining Law unless withdrawn.  30 U.S.C. §§ 21a, 22, 29.  The National Forests are also to be managed for multiple use and sustainable yield.  16 U.S.C. § 29.

The withdrawal gives the American Indians "veto power" to prohibit otherwise lawful land uses, such as mineral development, based solely on their religious beliefs and has deprived all others of the right to develop the National Forest minerals.  *See Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058, 1063-64 (9th Cir. 2007).  The withdrawal

also creates a preference for American Indian religious activities over all other uses on federal lands by endorsing the belief that drilling into the earth is a "wound to the earth." *See* AR002221-002223, 002225 (FEIS at 4-219-221,4-223).  As a result, Yount has lost access to his mining claims due to the cost-prohibitive and uncertain validity exam.  The heightened regulation also burdens his rights to his mining claims.  The withdrawal's mandatory ban on uranium mining to protect American Indian religious and sacred beliefs violates the Establishment Clause.  *Natural Arch & Bridge Society*, 209 F. Supp. 2d at 1223-24; *Bear Lodge*, 2 F. Supp. 2d at 1455. *See Access Fund*, 499 F.3d at 1046 (noting the *Bear Lodge* and *Natural Arch and Bridge Society* decisions hold that a mandatory access ban violates the Establishment Clause because the "only reason for the closure was to facilitate current religious practices.").

Allowing continued mineral exploration and development on the withdrawn land would not prevent American Indians from accessing the area to perform any religious rituals nor amount to substantial burden on their right to exercise their religion.  In *Navajo Nation*, the court held that the use of recycled wastewater to make artificial snow on a sacred mountain is "offensive to the [American Indian's] religious sensibilities" but does not substantially burden their free exercise of religion. 535 F.3d at 1067, 1070.  *See also Havasupai Tribe v. U.S.*, 752 F. Supp. 1471, 1486 (D. Ariz. 1990).  The American Indian's belief that any drilling in the withdrawal will "wound the earth" and impact the entire area's religious character "cannot dictate the decisions that the government makes in managing what is, after all, its land."  *Navajo Nation,*535 F.3d at 1073 (internal quotations omitted).

1   Therefore, the withdrawal violates the Establishment Clause for having an

2   inadequate secular purpose, advancing American Indian religious beliefs at the expense of

3

4   all other uses, and creating a preference for American Indian religious activities on public

5   land.

6   ### CONCLUSION

7   For the foregoing reasons, this Court should grant Plaintiffs' Motion for Summary

8   Judgment.

9

10   DATED this 6th day of December 2013.

11   Respectfully submitted,

12

13   /s/ Jeffrey Wilson McCoy

14   Jeffrey Wilson McCoy (CO No. 43562)
    Steven J. Lechner (CO No. 19853)

15   Mountain States Legal Foundation
    2596 South Lewis Way

16   Lakewood, Colorado 80227

17   (303) 292-2021
    (303) 292-1980 (facsimile)

18   jmccoy@mountainstateslegal.com
    lechner@mountainstateslegal.com

19

20   Attorneys for Plaintiff Northwest Mining
    Association

21

22

23

24

25

26

27

28

1
2
3
4                                    Respectfully submitted,

5                                    Gregory Yount
6                                    807 W. Butterfield Road
7                                    Chino Valley, Arizona 86323
                                     Phone: 928-899-7029
8                                    Gregory_yount@northern-arizona-uranium-
                                     project.com
9
10                                   Plaintiff *Pro Se*
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 6th day of December 2013, I filed the foregoing

document using the Court's CM/ECF system, which caused all counsel of record to be

served electronically, and by first class mail to Gregory Yount at the following address:

807 West Butterfield Road, Chino Valley Arizona 86323.

/s/ Jeffrey Wilson McCoy
Jeffrey Wilson McCoy, Esq. (CO No. 43562)
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
Phone:  303-292-2021
Fax:  303-292-1980
jmccoy@mountainstateslegal.com

Attorney for Plaintiff Northwest Mining Association