Susan M. Mathiascheck (*pro hac vice*; DC Bar No. 426764)
John C. Martin (*pro hac vice*; DC Bar No. 358679)
Amy B. Chasanov (*pro hac vice*; DC Bar No. 468779)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Phone: 202-624-2500
Facsimile: 202-628-5116

Attorneys for Plaintiff Nuclear Energy Institute

R. Timothy McCrum (*pro hac vice*; DC Bar No. 389061)
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: 202-624-2500
Facsimile: 202-628-5116

Attorneys for Plaintiff National Mining Association

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Gregory Yount, <br><br> Plaintiff, <br><br> v. <br><br> Ken Salazar, et al., <br><br> Defendants. | CV11-8171 PHX DGC <br> (Lead Case) |
| This document relates to: <br><br> National Mining Association; and Nuclear Energy Institute, <br><br> Plaintiffs, <br><br> v. <br><br> Ken Salazar, et al., <br><br> Defendants. | CV12-8038 PCT DGC <br><br> **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW** <br><br> **ORAL ARGUMENT REQUESTED** |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Nuclear Energy Institute ("NEI") and National Mining Association ("NMA") ("Plaintiffs") respectfully move for summary judgment on Counts 2-4 of their Amended Complaint [No. CV12-8038, Dkt. 56].[1]  Because the withdrawal under Public Land Order ("PLO") 7787, and the associated Final Environmental Impact Statement ("FEIS"), Record of Decision ("ROD"), and Section 204(c)(2) Notice to Congress, violated the National Environmental Policy Act ("NEPA"), the Federal Land Policy and Management Act of 1976 ("FLPMA"), and the Administrative Procedure Act ("APA") the withdrawal should be vacated.  A Statement of Facts ("SF") accompanies this motion pursuant to LRCiv 56.1(a).

## MEMORANDUM OF LAW

### I.      The Parties Have Standing to Challenge the Withdrawal.

NEI and NMA have constitutional and prudential standing.[2]  Article III standing requires a showing of "injury in fact," "fairly traceable" to the defendant, that is likely to be redressed by a favorable decision.[3]  The withdrawal has caused NEI's and NMA's members "concrete and particularized" injury that  is likely to be redressed by the relief sought.  NEI and NMA have provided supporting declarations.  SF9.[4]

For prudential standing, Plaintiffs must "establish (1) that there has been a final agency action adversely affecting [them], and (2) that, as a result, [they] suffer[] legal wrong or that [their] injury falls within the 'zone of interests' of the statutory provision."[5]  Under NEPA, this "zone of interests" includes environmental interests and interests that

---

[1] Plaintiffs incorporate the NEPA, APA, and FLPMA arguments of "Co-Plaintiffs" Northwest Mining Association ("NWMA"), Board of Supervisors, Mojave County, Arizona ("County") and Quaterra Resources, Inc. ("Quaterra").

[2] *See generally Yount v. Salazar*, No. CV11-8171-PCT DGC, 2013 WL 93372 (D. Ariz. Jan. 8, 2013).

[3] *Bennett v. Spear*, 520 U.S. 154, 162 (1997); *see also Yount*, 2013 WL 93372, at *3.

[4] *See also Yount*, 2013 WL 93372, at *4 (Plaintiffs have Article III standing).

[5] *Yount*, 2013 WL 93372, at *13.

DCACTIVE-25920931.8

are "primarily economic, as long as [the plaintiff] also alleges an environmental interest or economic injuries that are 'causally related to an act within NEPA's embrace.'"[6]

The Court has already confirmed Plaintiffs' prudential standing.[7]  That holding continues to apply at this summary judgment stage, as it was supported by declarations setting forth "specific facts" establishing prudential standing.[8]  SF10-12.  The attached supplemental declaration provides additional detail on Uranium One's environmental injuries.  *See id.*, Ex. A.[9]  Plaintiffs' prudential standing is further "self-evident" in the record, which repeatedly recognizes the environmental superiority of the withdrawn deposits.[10]  *See* SF10, Exs. 16 (AR5072) and 28 (AR35323).  This evidence amply demonstrates NEI's and NMA's prudential standing.[11]

## II.    Standard of Review

Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[12]  FLPMA and NEPA actions are reviewed under the APA, which "dictates that [courts] should 'hold unlawful and set aside agency action . . . [that is] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"[13]  "[A]n agency's action must be upheld, if at all,

---

[6] *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1103 (9th Cir. 2005).

[7] The prudential standing standard is not the same as the Article III standard and does not require a particularized and concrete injury-in-fact. *See Yount*, 2013 WL 93372, at *19. For further discussion of prudential standing requirements, see *id.* at *15, *17-*20.

[8] Fed. R. Civ. Pro. 56(e).

[9] The facts in Mr. Schwab's supplemental declaration were set forth in NEI's and NMA's First Supplemental Response to Federal Defendants' Discovery, served on Defendants Sept. 10, 2013.  *See* Dkt. Nos. 159-3 and 159-4.

[10] *Sierra Club v. EPA*, 292 F.3d 895, 900-01 (D.C. Cir. 2002).

[11] One Plaintiff's confirmed standing allows Plaintiffs' collective NEPA claims to proceed without further inquiry into the standing of any other.  *See, e.g.*, *Bd. of Nat. Res. of State of Wash. v. Brown*, 992 F.2d 937, 942 (9th Cir. 1993) (citations omitted).

[12] Fed. R. Civ. P. 56(a).

[13] *Nat. Res. Def. Council v. Nat'l Marine Fisheries Serv.* 421 F.3d 872, 877 (9th Cir. 2005).

DCACTIVE-25920931.8

1   on the basis articulated by the agency itself."[14]

2   **III.   Interior's Alternatives Analysis Violated NEPA.**

3       The Department of Interior's ("Interior" or "DOI") alternatives analysis was

4   inadequate.  First, DOI did not rigorously explore and objectively evaluate the "No

5   Action" alternative.  Second, DOI failed to consider reasonable alternatives warranting

6   analysis.  Finally, DOI failed to account for significant changed circumstances.

7       **A.   Interior Failed To Rigorously Explore and Objectively Evaluate
            "Alternative A," the "No Action" Alternative.**

8       NEPA requires rigorous exploration of a "no action" alternative.[15]  Interior's "No

9   Action" analysis falls short.   Interior acknowledged critical information gaps on, among

10  other things, the size and value of the uranium endowment and mining's impacts on

11  various resources.  *See infra*, Section IV.  Lacking full, accurate information, " Interior

12  could not give [i]nformed and meaningful consideration" to the extent of mining and

13  corresponding economic and environmental impacts under the "No Action" alternative.[16]

14      The "No Action" analysis also does not adequately consider potential mitigation

15  measures.  CEQ regulations expressly require that an alternatives analysis "[i]nclude

16  appropriate mitigation measures not already included in the proposed action or

17  alternatives."[17]  "[O]mission of a reasonably complete discussion of possible mitigation

18  measures would undermine the 'action-forcing' function of NEPA.  Without such a

19  discussion, neither the agency nor other interested groups and individuals can properly

20

21  ───────────────

22  [14] *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 32 (1983);
    *id*. at 50.

23  [15] 40 C.F.R. §§ 1502.14(a), (d); *see also Bob Marshall Alliance v. Hodel*, 852 F.2d 1223,
    1228 (9th Cir. 1988).

24  [16] *Bob Marshall Alliance*, 852 F.2d at 1228.

25  [17] 40 C.F.R. § 1502.14(f); *see also id*. at § 1502.16(h) (analysis must include "[m]eans to
    mitigate adverse environmental impacts (if not fully covered under § 1502.14(f))").  40
26  C.F.R. § 1505.2(c) requires agency record "[s]tate whether all practicable means to avoid
    or minimize environmental harm from the alternative selected have been adopted, and if
27  not, why they were not."  This necessarily presumes that ***for each alternative***, the agency
    has considered potential mitigation.

28

3

1  evaluate the severity of the adverse effects."[18]

2      The FEIS concedes that it made no meaningful effort to address potential

3  mitigation.  *See* SF38, Ex. 6 (FEIS, AR1664) ( stating only "[t]he mitigation of potential

4  effects from exploration or development would continue under the applicable surface

5  managing agency regulations"); SF39, Ex. 6 (FEIS, AR2415, 2418-19, 2438) (rejecting

6  consideration of mitigation, instead noting "[a]ppropriate mitigation for mining would be

7  developed when site-specific NEPA analysis is undertaken for a particular mine

8  proposal" and adding that Interior was "currently reviewing various mitigation measures,

9  Best Management Practices, and monitoring, that could be potentially considered").[19]

10      At best, the FEIS provides empty assertions.  *See*, *e.g.*, SF41, Ex. 6 (FEIS,

11  AR2132) (listing potential mitigation but omitting discussion of efficacy other than to

12  conclusorily note "[e]ven with these measures" impacts may occur).  By contrast, the

13  record demonstrates the opposite: current regulations and practices will be effective in

14  avoiding adverse impacts.[20]  Even the FEIS's response to comments recognizes the

15  effectiveness of the existing regulatory framework, though this point is conspicuously

16  absent from the FEIS's substantive analysis.  *See*, *e.g.*, SF41, Ex. 6 (FEIS, AR2448)

17  ("The DEIS . . . acknowledges the existing regulations and their effectiveness.").

18      Interior's "No Action" analysis is, therefore, inadequate.  "An essential component

19

20  ---

[18] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989).

21  [19] Chapter 4 identifies some regulatory mitigation requirements below headers labeled
22  "Compliance with Environmental Regulations and Permitting."  The water resource
   section notes that approved plans of operations may include "stipulations or required
   mitigation measures" and lists measures.  SF40, Ex. 6 (AR2072-73).  Appendix B
23  identifies regulatory measures.  Yet, the FEIS's impacts analysis ignores such mitigation
   and does not address its effectiveness.  This "'mere listing,'" without "supporting
24  analytical data" is insufficient.  *League of Wilderness Defs./Blue Mts. Biodiversity
   Project v. Forsgren*, 309 F.3d 1181, 1192 (9th Cir. 2002).

25  [20] *See*, *e.g.*, SF42, Ex. 32 (AR42830) ("Current regulations should protect surface water
   resources during mining operations and reclamation."); SF42, Ex. 34 (AR45775) (did not
26  appear to be "any hard evidence to support [any effects under the current regulatory
   process]"); SF70-72, Exs. 22 (AR6831), 20 (AR6824), 21 (AR6828) (absence of adverse
27  impacts to water resources).

28

4

of a reasonably complete mitigation discussion is an assessment of whether proposed

mitigation measures can be effective."[21]  That harms may be uncertain does not excuse

failure to address mitigation's effectiveness.[22]  Neither is it sufficient that there may be

future site-specific mitigation analysis.[23]  Indeed, here, because all withdrawal

alternatives prevent new mineral development, the FEIS was the *only* opportunity to

evaluate mitigation for any project not under prior valid existing rights and, thus, the *only*

opportunity to "fairly evaluate[]" mitigation under the "No Action" alternative.[24]

Because the FEIS's failed to adequately address the effectiveness of mitigation and the

existing regulatory regime in the first instance, it is deficient under NEPA.

## B.   Interior Failed To Consider a Reasonable Range of Alternatives.

The FEIS prematurely eliminated from detailed consideration several reasonable

alternatives deserving of full analysis and failed to consider other reasonable alternatives

of which Interior was well aware.

### 1.   Interior Should Have Analyzed a Shorter-Term Withdrawal.

Interior declined detailed consideration of a less-than-twenty-year withdrawal,

reasoning that "it is quite possible that a shorter term withdrawal would simply be

renewed, resulting in no meaningful difference between a 10-year and a 20-year

withdrawal."  *See* SF18, Ex. 61 (FEIS, AR1659).  Yet the ROD admits that additional

---

[21] *S. Fork Band Council v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009); The FEIS need not include a complete mitigation plan for all operations, but mitigation must "be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Methow Valley*, 490 U.S. at 352; *see also*, *e.g.*, *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 979 (9th Cir. 2006) (upholding alternatives analysis for action to open land where " EIS provided . . . stipulations and [Required Operating Procedures] *for each alternative* and also *outlined their purpose and effectiveness with respect to various resources*") (emphasis added); *Okanogan Highlands Alliance*, 236 F.3d at 477 (effectiveness of mitigation adequately addressed where "[e]ach mitigating process was evaluated separately and given an effectiveness rating").

[22] *See S. Fork Band Council*, 588 F.3d at 727 ("BLM's limited understanding of the hydrologic features of the area does not relieve BLM of the responsibility under NEPA to discuss mitigation of reasonably likely impacts at the outset.").

[23] *Id.*

[24] *Methow Valley*, 490 U.S. at 352.

1    monitoring and study could show that withdrawn lands "will be appropriate for re-

2    opening to the Mining Law" in the future.  SF61, Ex. 1 (AR12).  While "quite possible"

3    that a shorter withdrawal would be renewed, it is also "quite possible" that it would not.

4    By "simply dismiss[ing] out of hand any proposal which would have reduced" the

5    withdrawal period, Interior failed to take a "hard look" at all reasonable alternatives.[25]

6                **2.    Interior Should Have Analyzed an Additional Withdrawal of**
                 **Intermediate Geographic Scale.**
7
              Although DOI considered three different-sized withdrawals, it did not analyze at
8
     least one other reasonable alternative.  BLM recognized that there were 200,000 acres in
9
     the north parcel with low resource value and little likelihood of drainage into the Grand
10
     Canyon and concluded that excluding them from withdrawal "would reduce the total
11
     withdrawal area to about 800,000 acres. . . ." SF76, Ex. 62 (AR81803-04).[26]  The FEIS
12
     omits such an alternative without explanation, despite its greater consistency with
13
     FLPMA's multiple-use "policy objectives than the [FEIS] alternatives."[27]
14
              Interior recognized the reasonableness and utility of such an alternative.  A June
15
     2011 briefing to the agency directors identified, among the options for a preferred
16
     alternative:  "[s]elect[ing] from one of the alternatives already analyzed but mix and
17
     match by parcel"; and "[c]reat[ing] an entirely new alternative but within the range of the
18
     existing analysis."  *See* SF, Ex. 9 (AR3254).  The briefing listed "Pros" for the "mix-and-
19
     match" option, noting that it "better addresses public comments and issues and provides
20
     flexibility for the Secretary [and] allows the Secretary to evaluate individual parcels on
21
     their own merit." The third option, a new alternative, would "provide[] the greatest
22
     flexibility for the Secretary to refine a preferred alternative."  *Id*.  Both options listed a
23

24   [25] *Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 373 F. Supp. 2d 1069, 1088-89
     (E.D. Cal. 2004).
25
     [26] Though this email post-dates FEIS publication, the suggested alternative is based on
26   information in the FEIS and underlying record.

27   [27] *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999); *see*
     43 U.S.C. §§ 1701(a)(7), (12), 1732(a).
28

                                              6

single "Con": DOI feared delay.  *Id*.  The agencies ultimately adopted neither of the latter options, preferring a self-imposed, non-binding schedule.[28]  NEPA, however, requires a "hard look at reasonable alternatives,"[29] not alternatives analyzed by a particular date.

### 3.    Interior Should Not Have Eliminated Alternative E.

Ninth Circuit courts have required analysis of mitigation-based alternatives.[30] Like the alternatives in those cases, Alternative E "clearly falls within the range of . . . reasonable alternatives, and should have been considered."[31]  Given a purpose and need to protect the watershed from potential adverse effects from mining, an withdrawal alternative that protected the watershed from adverse effects, without preventing mining, was reasonable.[32]  Interior considered just such a non-withdrawal alternative, prematurely abandoning it.  *See* SF2, Ex. 6 (FEIS, AR1660-61).  Interior's belated decision to cut "Alternative E" violates NEPA.

Alternative E originated in comments from BLM's Arizona Resource Advisory Council ("RAC"), a stakeholder group appointed by the Secretary to advise on the proposed withdrawal and EIS. SF23, Ex. 30 (AR41810).  Their comments led to Alternative E – a non-withdrawal option that "will look at best management practices and regulations that are not currently in place but could be initiated to limit environmental impacts."  SF25, Ex. 32 (AR428234); *see also* SF26, Ex. 14 (AR4771 & 004776-81) (last

---

[28] The National Park Service ("NPS") identified an ironic concern about this alternative: NPS "fe[lt] that option 3 is an admission that the DEIS is flawed."  SF21, Ex. 37 (AR66870).  Any such flaw, of course, should have been corrected, not concealed.

[29] *Klamath-Siskiyou Wildlands Ctr.*, 373 F. Supp. 2d at 1089.

[30] *See, e.g.*, *Muckleshoot Indian Tribe*, 177 F.3d at 813, 814 (U.S. Forest Service ("Forest Service") wrongly eliminated alternative proposing deed restrictions placing lands under more stringent standards, and should have considered additional alternative involving speculative funding); *Border Power Plant Working Group v. Dep't of Energy*, 260 F. Supp. 2d 997, 1029 (S.D. Cal. 2003) (EA should have considered alternative conditioning right-of-way on specific controls, mitigation, and other requirements).

[31] *Muckleshoot Indian Tribe*, 177 F.3d at 814.

[32] *Cf. Soda Mt. Wilderness Council v. Norton*, 424 F. Supp. 2d 1241, 1264 (E.D. Cal. 2006).

7

version of Alternative E discussion before Interior abandoned).

Alternative E was seen as an effective alternative to withdrawal in keeping with the "purpose and need." *See, e.g.*, SF27, Ex. 46 (AR72835) (urging broad purpose and need because it supported "consideration of some of the more creative alternatives put forth by the RAC and scoping commenters"); SF30, Ex. 55 (AR74292-95) ("Alternative E addresses the identified concern that while protection of environmental and cultural resources in the Grand Canyon watershed is considered crucial, certain changes in the applicable regulations could address these concerns in the absence of a withdrawal action."); SF29, Ex. 25 (AR47768-69) ("[I]mpacts are not likely to be significant after application of all mitigating measure[s]").  Because it permitted some new mining, it was also consistent with FLPMA's multiple-use mandate.[33]  Interior memoranda confirm that Alternative E was essential:

> The inclusion of [Alternative E] is supported by CEQ regulations, . . which states we should include reasonable alternatives not within the jurisdiction of the lead Agency and 1502.14(a) which states we should rigorously explore and objectively evaluate all reasonable alternatives….
> . . . .
> Considering that the alternative was raised many times in the scoping process . . . and based on the supportive language of the CEQ regulations and Bureau's handbook the alternative appears to be reasonable.
> . . . .
> Insuring integrity of the process and protecting the Secretary's decision space has been paramount throughout this effort.  Eliminating this alternative would jeopardize both of these [goals]."

SF31, Ex. 54 (AR73440-42); *see also* SF, Ex. 15 (AR4774-75).  Yet, responding to concerns from the Solicitor, DOI abandoned Alternative E.  SF33, Ex. 48 (AR072872).

Interior's rationale for eliminating Alternative E is unfounded.  The FEIS states that Alternative E was eliminated because it could take years and was "speculative." SF24, Ex. 6 (FEIS, AR1661).  While an agency need not analyze alternatives "so remote from reality as to depend on, say, the repeal of the antitrust laws,"[34] that is not this case.

---

[33] *See Muckleshoot Indian Tribe*, 177 F.3d at 813.

[34] *Kilroy v. Ruckelshaus*, 738 F.2d 1448, 1454 (9th Cir. 1984).

Alternative E required no statutory changes.  While rulemaking takes time and the precise outcome may be uncertain, nothing prevents Interior from implementing Alternative E, just as it has done in other rulemakings.  *See* SF28, Ex. 56 (AR80677) (prior changes "includ[ing] enhanced regulation, much like that envisioned under Alternative E").

DOI's rationale also ignores the fact that not all elements of Alternative E require formal rulemaking.  *See* SF32, Ex. 54 (AR73441) (describing non-regulatory components, including regional monitoring programs and a standing interagency workgroup to advise on "monitoring, research needs, and operating and reclamation performance standards").[35]  These elements of Alternative E were far from speculative: the FEIS describes Interior's intent to develop a "comprehensive Best Management Practices and Monitoring Plan" to address future uranium mining impacts and stating "*The plan will be implemented through current BLM and Forest Service procedures.*" SF35, Ex. 6 (FEIS, AR2560-61) (emphasis added).

### C.  The FEIS's Range of Alternatives Neglected Changed Circumstances, Including a Shift in the Purpose and Need For Action.

Interior also failed to take the required "hard look" at reasonable alternatives by ignoring important changed circumstances.  "[W]here changed circumstances affect the factors relevant to the development and evaluation of alternatives, [an agency] must account for such change in the alternatives it considers."[36]  A shift in the agency's purpose and need is a change that may affect the range of alternatives to be considered.[37]

Here, the record shows that Alternative B was selected as the preferred alternative *not* because of any purpose or need to protect against adverse impacts – the EIS's stated

---

[35] In fact, upon eliminating Alternative E, the Interagency Executive Oversight Team decided to "[p]ut [the] non-regulatory pieces [of Alternative E] into mitigation" discussion.  SF34, Ex. 36 (AR51823).  This never occurred.

[36] *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005) (citing *Alaska Wilderness Recreation & Tourism Ass'n*, 67 F.3d at 730-31).

[37] *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021-22 (9th Cir. 2009) ("The introduction of . . . new objectives" in a supplemental EIS was a change to be accounted for in alternatives analysis).

DCACTIVE-25920931.8

underlying purpose (*see* SF4, Exs. 5 (AR545) and 6 (AR1625)) – but instead "based on the *need to fully understand the impacts of uranium mining on water quality and other resources* in the Grand Canyon watershed."  SF48, Ex. 23 (AR7277) (emphasis added); *see also infra*, Section V(A)(2)(1).  Interior apparently realized that it lacked  any likely adverse impacts, and shifted from preventing impacts to obtaining additional information. *See* SF60-61, Ex. 1 (AR9).[38]  This shift is a changed circumstance necessitating consideration of additional reasonable alternatives.[39]

For example, Interior should have considered an information-gathering alternative to foster better understanding of potential impacts.  DEIS comments submitted by the Arizona Geological Survey ("AZGS") urged such an alternative, proposing to allow continued exploration (under "existing rigorous standards"), along with studies and development of new techniques.  *See* SF36, Ex. 18 (AR6067).  Interior did not consider this alternative.[40]

The shift to an information-gathering purpose and need also underscores that DOI should have examined a shorter withdrawal.  Since it became clear that mining impacts were speculative and information was needed, continuing to refuse to consider a shorter withdrawal is particularly egregious.[41]  A shorter withdrawal would allow information-

---

[38] *See also*, *e.g.*, SF47, Ex. 10 (AR3473) (endorsing withdrawal based "not [on] what we know [but] what we don't know.  The DEIS states in many places that *we just don't know now what the true impact will be on a number of important resources*.")

[39] Interior also should have revised its purpose and need statement to reflect its newly-realized information need.  *See* 40 C.F.R. § 1502.13.  But even assuming that Interior need not have done so, its recognition that it needed more time and information was a changed circumstance calling for reconsideration of more alternatives.

[40] The FEIS responds only that AZGS's proposed alternative "is covered . . . as the No Action Alternative" and that the "'proof of concept model' suggested . . . could be implemented for mining operations regardless of the Secretary's decisions on withdrawal."  SF37, Ex. 6 (FEIS, AR2351).  Although both AZGS's proposal and the "No Action" alternative would allow mining, only the former systematically couples mining with additional study, cooperative project development and experimentation, and tailored monitoring.  Though similar measures might be pursued under the existing alternatives, the FEIS nowhere suggests that they would be.

[41] Not considering a shorter withdrawal, even though it had failed to fulfill its information obligations *before* completing the FEIS and the ROD renders *any* withdrawal

(continued…)

gathering and informed decisionmaking for any further action.  Under existing alternatives, DOI and stakeholders must wait 20 years no matter what DOI learns.

Both an information-gathering and a shorter withdrawal alternative were viable, reasonable,[42] and more consistent with FLPMA's multiple-use mandate than DOI's alternatives.[43]  Because Interior did not consider these, it violated NEPA.

## IV.    Interior Violated NEPA By Failing to Adequately Identify Data Gaps and Justify Not Obtaining Missing Information.

An EIS's purpose is to avoid speculation and ensure data is gathered and analyzed *prior* to decisionmaking.[44]  An EIS must contain "high quality" information and "[a]ccurate scientific analysis[.]"[45]  The agency must first identify missing information and uncertainties.[46]  If the information is relevant to adverse environmental impacts and is essential to a reasoned choice among alternatives, the agency must fill the gap with independent research.[47]  Only if an agency finds that costs are exorbitant or research

---

(continued…)

unacceptable: the entire NEPA process is meaningless if, at its conclusion, the agency still has no understanding of the impacts it was meant to evaluate.  *Cf. Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 733 (9th Cir. 2001) (agency could not act before obtaining full information on potential impacts, as "[t]hat is precisely the information and understanding that is required *before* a decision that may have a significant adverse impact on the environment is made and precisely why an EIS must be prepared in this case").  *See also* Section V(A)(2)(A), *infra* (need for more information does not support withdrawal under FLPMA).

[42] *See Citizens for a Better Henderson*, 768 F.2d at 1057.

[43] *See Muckleshoot Indian Tribe*, 177 F.3d at 813.

[44] *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1179 (9th Cir. 1982);  *see also Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1216 (9th Cir. 1998).

[45] 40 C.F.R. § 1500.1(b); *see also Seattle Audubon Soc. v. Espy,* 998 F.2d 699, 704–05 (9th Cir. 1993); *N. Carolina Alliance for Transp. Reform, Inc. v. U.S. Dep't of Transp.*, 151 F. Supp. 2d 661, 695 (M.D.N.C. 2001) (lack of explanation as to why more accurate data and modeling were not used violates NEPA).

[46] 40 C.F.R. § 1502.22.

[47] 40 C.F.R. § 1502.22(a); *Save Our Ecosystems v. Clark,* 747 F.2d 1240, 1249 (9th Cir. 1984).

11

methods are unknown may it analyze impacts without filling this gap.[48]  The EIS must then include a statement regarding the relevance of the incomplete or unavailable information, a discussion of the existing scientific evidence, and the agency's evaluation of impacts based on scientifically acceptable research or methodology.[49]

## A.   The FEIS Did Not Include All Required 1502.22 Information.

The FEIS repeatedly admits that essential information on the uranium resource endowment *and* environmental impacts associated with the withdrawal was missing or uncertain.  For many resources, in sections entitled "Incomplete or Unavailable Information," the FEIS admits it was unable to conduct basic analyses due to incomplete, unavailable, and uncertain information.  *See, e.g.,* SF44.[50]  The FEIS overlooks other critical areas of missing information; where missing information is identified, the FEIS omits the determinations required by § 1502.22.

Three of the most important issues to Interior's analysis and a reasoned choice among alternatives are the size of the uranium endowment, the value of that endowment, and the impacts of uranium mining.[51]

First, because the main difference among alternatives is acreage, the uranium endowment is the linchpin of the reasonably foreseeable development ("RFD") scenario and a reasoned selection among alternatives.  Interior fully understood that existing endowment estimates were outdated, *see* SF51, Ex. 53 (AR73324); SF43, Ex. 17 (AR6058-59).  Yet, the U.S. Geological Survey's ("USGS's") 2010 report that informed

---

[48] 40 C.F.R. § 1502.22(b).

[49] *Id.* § 1502.22(b)(1)-(4); *see also Mont. Wilderness Ass'n v. McAllister*, 666 F.3d 549, 554 (9th Cir. 2011), *aff'd*, 460 F. App'x 667 (9th Cir. 2011).

[50] For some resources, the FEIS did not include a separate section entitled "Incomplete or Unavailable Information," but the text nonetheless identifies missing data and uncertainties.  *See, e.g.,* FEIS at 4-108 (data not available on soil resources); 4-233 ("[e]ffects are quantified where possible" for wilderness characteristics resources).

[51] Plaintiffs do not suggest that other issues for which data were not available were not essential to a reasoned choice: Interior must make that determination under § 1502.22(a).  *See Native Village of Point Hope v. Salazar,* 730 F. Supp. 2d 1009, 1018 (D. Alaska 2010) (it is *the agency's burden* to make specific findings).

DCACTIVE-25920931.8

1   the FEIS did no original work and merely recycled prior estimates.  SF52, Ex. 47

2   (AR72858).  USGS thus significantly underestimated the undiscovered uranium

3   endowment and did not adequately account for hidden breccia pipes.[52]  The FEIS did not

4   identify this missing information and uncertainty.  Instead, it falsely asserts that "[t]here

5   was no incomplete or unavailable information necessary to form the impacts analysis for

6   geology and mineral resources."  SF54, Ex. 6 (FEIS, AR2041).  Failing to identify this

7   information violates § 1502.22.

8        Second, without a reliable uranium resource estimate, Interior could not properly

9   quantify economically mineable ore.  The FEIS states that available information on

10  breccia pipes is insufficient to do so.  SF53, Ex. 6 (FEIS, AR2491).[53]  This uncertainty

11  creates significant misinformation.  For example, it causes the FEIS to vastly

12  underestimate economic impacts—especially because these deposits are uniquely high

13  grade and economical to mine.  *See*, *e.g.*, SF8, Exs. 31 (AR42327) and 26 (AR13201-06).

14  Without a credible estimate of economically mineable uranium, Interior cannot determine

15  how much would be mined under each alternative, nor can it credibly determine

16  socioeconomic impacts of mining or the scope and size of environmental impacts.  *But*

17  *see* SF54, Ex. 6 (FEIS, AR2277-78) ("Incomplete or Unavailable Information" related to

18  effects on economic conditions fails to identify this uncertainty).

19       Third, although Interior's primary justification for selecting full withdrawal was

20  the potential for adverse impacts to water resources, the FEIS acknowledges incomplete

21  information on such impacts.  The "Incomplete and Uncertain Information" section on

22  water notes that "[i]ncomplete and unavailable information adds to uncertainty of

23  analyses" and highlights the lack of quantitative data for groundwater springs, including

24

25  [52] *See* SF52, Exs. 4 (AR97), 17 (AR6058); 33 (AR45625); 38 (AR67023) (documents show that endowment estimate does not account for hidden, buried, or concealed breccia pipes; note that hidden breccia pipes are "wild card in the resource estimates").

26  [53] The record indicates that alternative approaches for estimating the value of the uranium

27  endowment were suggested but rejected, despite lack of confidence in Interior's approach.  SF53, Ex. 40 (AR68177-78).

28

13

1   perched aquifer springs and wells.  SF55.

2       The FEIS's treatment of the scope and value of the uranium endowment and water

3   resource impacts does not satisfy § 1502.22.  Missing information on those issues was

4   clearly relevant to potentially significant impacts and a reasoned choice among the

5   alternatives.[54]  Yet after Interior identified missing information and uncertainties, there

6   was *no* mention of § 1502.22, *no* analysis of whether missing information was "essential

7   to a reasoned choice among alternatives," and *no* discussion of whether the information

8   was obtainable or whether the method of obtaining the information was unknown or the

9   costs exorbitant.  Even assuming the information essential to a reasoned choice among

10  alternatives was unobtainable or too expensive,[55] the FEIS was required to say so and to

11  include the detailed statement required under §§ 1502.22(b)(1)-(4).

12      In April 2009, *before* the initial two-year segregation, the BLM Director asked

13  other agencies to compile a list of the studies "that *would be needed* to be completed" to

14  support a conventional withdrawal decision process, SF45, Ex. 41 (AR72782) (emphasis

15  added); *see also id.*, Ex. 11 (AR3891-92).  USGS, NPS, the Forest Service, and BLM

16  proposed detailed studies and budgets.  *See* SF45 (identifying study issues, including

17  questions on resource availability, water quality and flow, transport of dissolved uranium,

18  and impacts of past mining).  While the record is unclear, it appears that many planned

19  studies were never conducted.  These data problems carried forward to the FEIS.  After

20  the DEIS, BLM still believed it had inadequate information on impacts of a full

21  withdrawal, resulting in a widespread lack of confidence in the DEIS.[56]

22

23  [54] 40 C.F.R. § 1502.22(a); *Save Our Ecosystems,* 747 F.2d at 1244 n.5.

24  [55] The definition of exorbitant cannot be controlled by an agency's alleged lack of funding.  *See*, *e.g.*, SF51, Ex. 53 (AR73333) (record suggests USGS's $58,000 study to update the uranium resource estimate was not pursued due to "no new funding").

25  [56] *See*, *e.g.*, SF69, Ex. 24 (AR8076) (email editing DEIS press release because "the

26  science based analysis does not support risks to water"); SF66, Ex. 12 (AR4560) (Secretary briefing noting "there is not enough hydrologic data for these areas to quantify

27  with any certainty the effects of uranium mining on the groundwater system(s)"); *see also infra*, Section V(A)(2).

28

1    Interior camouflaged these data gaps, making unsupported and overly cautious

2    assumptions, thereby "distorting the decisionmaking process by overemphasizing highly

3    speculative harms."[57]  This is precisely what CEQ sought to avoid in revoking earlier

4    regulations that had required "worst-case" analysis,[58] and in replacing those regulations

5    with § 1502.22(b)(4), requiring evaluation of those impacts which are "*reasonably*

6    *foreseeable . . . . provided that the analysis of the impacts is supported by credible*

7    *evidence, is not based on pure conjecture, and is within the rule of reason.*"[59]  BLM's

8    adoption of one-sided, overly conservative assumptions to mask data gaps and

9    uncertainties violates that standard.

10        **B.    The ROD Footnote Cannot Absolve The FEIS's Deficiencies.**

11        The ROD includes a conclusory footnote stating that the USGS report, the FEIS,

12   and the ROD all acknowledge uncertainty with respect to water quality and quantity but

13   that "information that would help resolve that uncertainty is not 'essential to making a

14   reasoned choice among alternatives.' (see 40 C.F.R. sec 1502.22)."  SF50, Ex. 1 (AR10,

15   n.1).  The post hoc rationalization in the ROD cannot save the FEIS.

16        First, the § 1502.22 analysis must be part of the agency's EIS, not in later

17   document seeking to rationalize a predetermined outcome.[60]  Postponing § 1502.22

18   analysis to the ROD violates a core NEPA principle that "guarantees that the relevant

19   information will be made available to the larger audience that may also play a role in both

20

21

---

22   [57] *Methow Valley*, 490 U.S. at 356.

23   [58] *See id.*

24   [59] *See* SF49 & 55, Ex. 6 (FEIS addresses lack of information by conservative assumptions and admits lack of data on hydrologic relationships and water resources); SF49, Ex. 22 (AR6830) (given unknowns and because science does not support DEIS's conclusion, BLM relies on "precautionary principle").

25

26   [60] *Rock Creek Alliance v. U.S. Forest Serv.*, 703 F. Supp. 2d 1152, 1180-81 (D. Mont. 2010), *aff'd in part sub nom.*, *Rock Creek Alliance v. U.S. Fish & Wildlife Serv.*, 663 F.3d 439 (9th Cir. 2011) (may not address EIS deficiency in later document; information must be available in decisionmaking).

27

28

15

the decisionmaking process and the implementation of that decision."[61]

Second, the footnote's explanation is wholly inadequate. Interior claims the information is not essential because "there is data regarding dissolved uranium concentrations near six previously-mined sites to inform a reasoned choice, and the EIS used reasonable conservative assumptions to estimate impacts as a method of addressing such unknowns." SF50, Ex. 1 (AR10, n.1). Even if DOI's assumptions were correct, this justification addresses only certain water impacts, a minor subset of the information that Interior repeatedly admits was unavailable or uncertain. *Cf.* SF61, Ex. 1, (AR9-10) (describing lack of information on various resource impacts).

### C.   The FEIS Must Be Vacated and Remanded To the Agency.

The FEIS's data deficiencies go to the heart of the alternatives and impacts analyses, and selection of an alternative. Given the uncertainties about the uranium resource, its value, and potential watershed impacts – the supposed basis of the withdrawal – "there can be no reasoned choice among alternatives and no accurate prediction of the impact of the proposed action."[62] When, as here, an agency fails to comply with CEQ regulations, the decision is arbitrary and capricious and warrants remand.[63]

## V.   The Withdrawal Violated FLPMA and the APA.

The record does not reflect significant adverse impacts to the Grand Canyon watershed. Yet, the Secretary issued a full withdrawal, violating FLPMA and the APA. *See* SF6, Ex. 1 (AR7). The Secretary also violated FLPMA by acting contrary to BLM's resource management plan. Each of these independent defects requires reversal.

---

[61] *Methow Valley,* 490 U.S. at 349.

[62] *Cabinet Res. Grp. v. U.S. Fish & Wildlife Serv.*, 465 F. Supp. 2d 1067, 1099 (D. Mont. 2006) (setting aside EIS under 40 C.F.R. §§ 1502.22(a) and (b)); *see also Friends of the Earth v. Hall,* 693 F. Supp. 904, 932 (W.D. Wash. 1988) (quoting *Methow Valley,* 833 F.2d at 818).

[63] *Native Village of Point Hope,* 730 F. Supp. 2d at 1018 (failure to follow 1502.22); *see also Montana Wilderness Ass'n,* 666 F.3d 549, at 560; *Seattle Audubon,* 998 F.2d at 704.

A.   **The Secretary's Withdrawal Is Arbitrary and Capricious Because It Is Unsupported By the Evidence Before the Agency.**

Agency decisionmaking will be reversed where the agency's explanation "runs counter to the evidence before the agency."[64]  The ROD offers several rationales for withdrawal; none are supported by the evidence.

1.   **The FEIS Failed to Demonstrate Adverse Impacts to the Grand Canyon Watershed – the Supposed Basis for the Withdrawal.**

From the outset, Interior recognized that available scientific evidence indicated that mining did not result in adverse impacts to water resources (and biota supported by water) and likely would not support withdrawal.  *See*, *e.g.*, SF67, Ex. 45 (AR72832) (evidence "does not actually fit the purpose of the withdrawal," and withdrawal "may not be appropriate and legal").  The record is replete with acknowledgements by agency experts and key officials that development of the breccia pipes in the withdrawn area would *not* result in such impacts under *any* scenario, including "No Action."[65]  As an NPS hydrogeologist put it, the analysis failed to "establish impacts to water resources from uranium mining" and "instead creates enough confusion and obfuscation of hydrogeologic principles to create the illusion that there could be adverse impacts if uranium mining occurred."  SF70, Ex. 22 (AR6831).  Summarizing the issue, the NPS Chief of Water Resources explains, "[t]here exists no information we could find that would contradict [the finding that adverse water impacts would not occur], nor any hypotheses suggested as to how contamination of park waters might physically occur. . ." SF71, Ex. 22 (AR6830).  NPS aptly confessed "[t]his is obviously a touchy case where

---

[64] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

[65] *See e.g.,* SF69, Ex. 24 (AR8076) ("The science based analysis does not support risks to water, in most parts of the analysis area to any part of Grand Canyon National Park, and certainly not at a regional scale."); SF, Ex. 21 (AR6828) (DEIS "grossly overestimates the potential for impacts to water resources" and gives "no explanation of how potential contaminants might travel from the mine areas to the regional water table, but it is assumed that somehow that occurs and then contaminants flow many miles through the regional aquifer with no dilution, no degradation, and no attenuation to discharge at springs"); SF73, Ex. 39 (AR67603-04).

17

1   the hard science doesn't strongly support a policy position." *Id.*[66]

2       BLM fully understood that the science did not support a full withdrawal.  Emails

3   exchanged after the FEIS but before the ROD reveal that BLM's Arizona Strip District

4   Manager was still "bother[ed by] . . . the justification for the whole withdrawal[,]" noting

5   that much was known about the south parcel and that "*there were very few, if any,*

6   *resource values or concerns in*" parts of the north parcel.  SF74, Ex. 60 (AR81794)

7   (emphasis added).  He realized that the rationale in the November 2011 draft ROD was

8   "very weak and not very compelling for withdrawal of the above areas."  *Id.*

9   (AR81795).[67]  The Project Manager agreed, noting there "could well be vulnerabilities in

10  a legal challenge," and "based on the EIS, [he] c[ould not] see a way to strengthen the

11  rationale for withdrawal and still make these factual points in the ROD."  SF75, Ex. 61

12  (AR81798);[68] *see also id.*, Ex. 60 (AR081794) (agreeing).  Although the ROD omits such

13  conclusions, the record behind the ROD reveals that the withdrawal was not the result of

14  a *need* to protect against adverse impacts but rather a *perception* of a need to protect

15  against adverse impacts.[69]

16      However, "[w]ithdrawals . . . must be justified in accordance with the Department

17  of the Interior Land Withdrawal Manual 603 DM 1 and the BLM regulations at 43 CFR

18  2310."  Ex. 65 (AR80612).  This manual, with which "[b]ureaus and offices must

19

20  _____

21  [66] NPS—the most vocal withdrawal supporter—saw that full withdrawal was
    unnecessary.  *See* SF66, Ex. 12 (AR4561) ( "withdrawal areas could be reduced by about
    28% with no significant impact upon Grand Canyon National Park resources.").

22  [67] The same rationales are in the final ROD.  *Compare* Ex. 59 (AR80957-77) (Nov. 29,
23  2011 draft ROD) *with* Ex. 1 (Final ROD).

24  [68] *See also* SF76, Ex. 62 (AR8180-04) (emails highlighting low resource value, distant
    location, and divergent groundwater flow at significant portions of the north parcel,
    concluding that the withdrawal should be reduced by some 200,000 acres).

25  [69] *See*, *e.g.*, SF68, Ex. 34 (AR45775) (Forest Service Lands and Mineral Staff Officer for
26  the Kaibab National Forest Recreation: the initial segregation (which immediately
    preceded the withdrawal, and was based on the same "purpose and need") was issued not
27  due to true concern about current mining practices but rather based on "proximity to the
    Grand Canyon and yes, the *perception* of impacts on the Park" (emphasis added)).

28

1  comply,"[70] requires that "withdrawals *shall be kept to a minimum* consistent with the

2  demonstrated needs of the applicants."[71]  "Demonstrated need" in turn incorporates a

3  justification for withdrawal and an explanation of why existing law is insufficient.[72]

4
5      The record does not support that the watershed is actually at risk from mining, nor

6  that existing regulations and mining practices are not sufficient to protect resources and

7  maintain other public values.  Instead, the record makes clear that mineral development

8  in much of the withdrawn area would not result in adverse impacts.  Thus there is no

9  "rational connection between the facts found and the conclusions made."[73]  DOI's

10 insistence on implementing a full withdrawal, despite the lack of any demonstrated need

11 and the contrary evidence, violates FLPMA and the APA.

12               **2.      Interior's Other Rationales Are Also Unsupported.**

13     Interior asserted several subsidiary rationales in the ROD: gathering data,

14 continuation of mining under the withdrawal consistent with valid existing rights

15 determinations; mitigating impacts to tribal resources; and adopting "a cautious and

16 careful approach."  SF60.  The record illustrates that these rationales were adopted in the

17 middle of the ROD drafting process to justify an alternative that Interior knew was

18 unsupported.  None of these new rationales were emphasized in initial ROD drafts.

19 August and September 2011 drafts relied on the FEIS's purpose and need (protecting the

20 watershed), and asserted that "mineral withdrawal . . . will reduce the mining-related risk

21 to the physical and biological integrity of the resources within the Grand Canyon

22 watershed."[74]  For the first time, a November 29, 2011 draft ROD mentions the

23 uncertainty and the need for additional information, alongside the other subsidiary

---

24   [70] Ex. C (011 Departmental Manual ("DM") 1.2(B)).

25   [71] Ex. D (603 DM 1.1(A)) (emphasis added).

26   [72] *Id*. (603 DM 1.1(A)(3) (emphasis added); *see also* 43 C.F.R. § 2300.5(h).

27   [73] *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005).

     [74] SF65, Ex. 58 (AR80939-56); *id*., Ex. 57 (AR80883).

28

19

1    rationales.  SF65, Ex. 59 (AR80957-77).  Contemporaneous email exchanges among

2    BLM officials articulate the reason for these late changes—BLM knew the watershed

3    rationale for a full withdrawal was not supported by the record.  *See* SF74-75.  Interior's

4    new and equally unsupported rationales rendered the ROD a procedural nicety,

5    undermining the purpose behind a record of decision.[75]  While NEPA does not mandate

6    particular results, and agencies may issue a decision based on countervailing non-

7    environmental interests, pretextual rationales to avoid scientific conclusions are not

8    authorized.  Such hollow rationalizations are inconsistent with NEPA's requirements for

9    "reasoned decision[making],"[76] and the APA's proscription against "explanation[s] . . .

10   that run[] counter to the evidence before the agency."[77]

### a.    The need to gather data

12          The ROD cites "uncertainty due to limited data" as justification for withdrawal:

13   "[a] twenty-year withdrawal will allow for additional data to be gathered and more

14   thorough investigation of groundwater flow paths, travel times, and radionuclide

15   contributions from mining as recommended by USGS."  Ex. 1, AR9.  This rationale is

16   neither supported by the evidence, nor sufficient as a basis for withdrawal.

17          Nowhere does the record suggest that research would alter the conclusion that full

18   withdrawal was unnecessary, *supra* Section V(A)(I), much less that *twenty years more*

19   *were* needed.[78]  The Secretary also does not explain why withdrawal is needed to conduct

---

[75] *See* 43 Fed. Reg. 55,978, 55,985 (Nov. 29, 1978) (describing purpose "[to] procedurally link NEPA's documentation to NEPA's policy, [to] relate the EIS process to agency decisionmaking, [and to] ensure that EISs are actually considered by Federal decisionmakers . . . .").

[76] *Sierra Club v. Bosworth*, 510 F.3d 1016, 1026 (9th Cir. 2007) (overturning NEPA categorical exclusion where agencies relied on *post-hoc* data for predetermined decision).

[77] *Motor Vehicles Mfrs.* 463 U.S. at 50.

[78] The very purpose of the Secretary's initial segregation of land was to allow scientific studies, data collection, and NEPA analysis to evaluate whether a withdrawal might be warranted, despite BLM's contrary belief.  *See* SF2, Exs. 3 (AR53) and 25 (AR8392). Where BLM's presumably sophisticated scientists and policy-makers long recognized that two years would yield the needed information, the ROD's contrary rationale is all the more unconvincing.

1    research.  Given that existing science indicated no adverse impacts, research is fully

2    served by other alternatives.[79]  The need for further research rationale is an admission

3    that the FEIS was inadequate, making the withdrawal inherently arbitrary and capricious.

4    In an analogous case, the District of Utah rejected BLM's rationale that "[t]oo many

5    questions remain unanswered to grant [a] right-of-way at this time":

6           [B]ecause the DOI was relying upon the information in the FEIS to inform
            its decision on [the] right-of-way application, and because *it was the DOI's*
7           *obligation under NEPA to prepare an adequate FEIS*, the DOI's decision to
            deny [the] right of way application because of its own failure to prepare an
8           adequate FEIS was arbitrary and capricious.[80]

9    Here, as in *Skull Valley*, the need for additional research does not justify withdrawal

10   under FLPMA, as Interior was required to fully evaluate the issues in the first place.

11               **b.      *Continued mining pursuant to valid existing rights***

12          That mining (and attendant economic benefits) will continue in the withdrawn area

13   pursuant to valid existing rights does not justify withdrawal.  This is merely a by-product

14   of FLPMA: its provisions make all withdrawals subject to valid existing rights.[81]

15   Allowing continued mining under valid existing rights is not a basis for withdrawal, but

16   an unavoidable legal consequence of FLPMA.  This rationale is not credible, not only

17   because it appears at the eleventh hour,[82] but also because it contradicts with the very

18   essence of withdrawal, which prevents creation of valid existing rights and mining

19   pursuant to them.[83]  The Secretary's objective to preclude location of new claims that

20   _____

21   [79] The Secretary relies heavily on the fact that withdrawal will allow new research in
     concert with mining pursuant to valid existing rights.  SF61, Ex. 1 (AR12).  However, the
22   scope of potential research and data is significantly expanded without the withdrawal (or
     under a smaller withdrawal), since more mining could occur.  Thus, if the rationale for
23   withdrawal is to gather additional data, the "No Action" alternative is the logical choice.

     [80] *Skull Valley Band of Goshute Indians v. Davis*, 728 F. Supp. 2d 1287, 1295 (D. Utah
24   2010) (emphasis in original; internal citation omitted).

25   [81] *See* 43 U.S.C. § 1701 Note (h).

     [82] *Cf. Bosworth*, 510 F.3d at 1026.
26
     [83] *See* SF63, Ex. 1 (AR12) (ROD notes that "withdrawal prevents new mining claims . . .
27   from being located and property rights from being established"); *see also id.*, Ex. 7
     (AR3102) (final decision memorandum notes that "prohibition of new mining claims . . .

28

                                                21

                                                                              (continued…)

1    might frustrate some future (perhaps better-supported) withdrawal provides no basis for

2    the instant withdrawal.

3                    **c.**    ***Need to mitigate impacts to tribal resources***

4           The ROD lists another pretextual[84] rationale: the need to mitigate impacts to tribal

5    resources.  Providing no factual substantiation, the ROD recognizes that: "there is only

6    one eligible traditional cultural property[,]"; "the entire area" is recognized by nearby

7    tribes and used for tribal purposes; and all the tribes "uniformly believe that continued

8    uranium mining will result in the loss of their functional use of the area's natural

9    resources."  SF62, Ex. 1 (AR11).  The record does not support, however, that adverse

10   impacts to cultural resources would actually occur absent a withdrawal.  *See* summary

11   judgment briefs of co-plaintiffs.

12                   **d.**    ***Interest in taking a "cautious and careful approach"***

13          The ROD also adds the "precautionary" rationale, providing a threadbare

14   discussion: "the set of circumstances and the unique resources located in this area support

15   a cautious and careful approach."  SF60 & 64, Ex. 1 (AR9).  The ROD concludes that

16   "[a]s this area contains unique landscapes, is a sacred place for numerous tribes, and

17   receives visitors from all over the world, it is appropriate to tread carefully."  SF64, Ex. 1

18   (AR11-12).  Not only is this final "catchall" rationale unsupported in the record, it would

19   support any withdrawal, anywhere, anytime.  Such an overbroad and unspecific rationale

20   to ensure the lands' protection is insufficient to support withdrawal.[85]

_____

(continued…)

means that no additional valid existing rights will be established during the 20-year
withdrawal").

[84] The final decision memorandum to the Secretary recommending withdrawal makes no
mention of impacts to tribal or cultural resources.  SF57, Ex. 7 (AR3103) (including only
a vague, one-sentence pronouncement that the Grand Canyon National Park is "a unique
world icon, and it is a sacred place for numerous tribes").

[85] *See State of New Mexico v. Watkins*, 969 F.2d 1122, 1135 (D.C. Cir. 1992) (Congress's
notification requirement in FLPMA § 204(c)(2) requires a "clear explanation of the
proposed use" which demands "a proposed use far more specific than 'protection of the
land.'").

In sum, all four subsidiary rationales articulated for the first time in the ROD fail, rendering the Secretary's decisionmaking "arbitrary and capricious."[86]

### 3. The ROD and PLO Are Arbitrary and Capricious Because They Rely on Inaccurate and Incomplete Information.

The ROD and PLO rely upon the significant factual inaccuracies and omissions evidenced in the FEIS. *See supra*, Section IV; co-plaintiff summary judgment briefs.[87] The FEIS also overlooks important indirect effects[88], including different or additional environmental impacts which would occur as a result of mineral development at alternative sites where deposits would be less concentrated, or would require more disruptive operations.[89]  Interior must not take "uninformed" action.[90]  When an agency acts based on significant inaccuracies and omissions in an EIS, its action is by definition uninforme, and runs "counter to the evidence before the agency."[91]

In *Natural Resources Defense Council v. U.S. Forest Service*, a case involving the National Forest Management Act's ("NFMA's") analogous context, the Forest Service admitted to an error in its calculation of timber market demand, incorporated into the FEIS.[92]  Because the Forest Service subsequently relied on its mistaken calculation to

---

[86] *Cf. Skull Valley*, 728 F. Supp. 2d at 1295-97; *Trout Unlimited v. U.S. Dep't of Agric.*, 320 F. Supp. 2d 1090, 1108-09 (D. Colo. 2004) (FLPMA action "arbitrary and capricious" where "record is devoid of any verifiable evidence, save conclusory predictions"); *see also* 603 DM 1.1.

[87] BLM plainly acknowledges that the FEIS left many things unknown.  *See, e.g.* SF43, Ex. 17 (AR6058-59); *see also, supra*, Section IV.  "If the record is not complete, then the requirement that the agency decision be supported by 'the record' becomes almost meaningless."  *Gifford Pinchot Task Force*, 378 F.3d at 1071.

[88] *See* 40 C.F.R. §§ 1502.16(b), 1508.8.

[89] *See, e.g.*, Ex. 6 (AR2401) (comment urges consideration of "environmental impact caused by the equivalent replacement energy source either in the USA or a foreign country").

[90] *Skull Valley*, 728 F. Supp. 2d at 1297.

[91] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also id.*; *cf. Ocean Mammal Inst. v. Gates*, 546 F. Supp. 2d 960, 981-82 (D. Haw. 2008) ("Notwithstanding the different legal requirements under the CZMA and NEPA, Defendants' reliance on its flawed NEPA analysis . . . render its determinations pursuant to the CZMA arbitrary and capricious.").

[92] *See* 421 F.3d 797, 802, 812 (9th Cir. 2005).

23

choose among alternatives, the Ninth Circuit held that its explanation was "counter to the evidence before the agency."[93]  The erroneous demand calculation "fatally infected [the Forest Service's] balance of economic and environmental considerations, rendering [its decision] arbitrary and capricious in violation of the APA."[94]

Here, the FEIS's defects similarly skew the FLPMA decision process, preventing any semblance of the required balancing of competing environmental and multiple-use interests.[95]  Land may not be closed to mineral development "for no purpose."[96]  If the deposits are shown to have high economic potential, the Secretary's balancing may favor development of the resource; however, an underestimate of the endowment and its value artificially elevates the environmental risks.  Likewise, consideration of available information, the current regulations, and mitigation reduces environmental concerns and bolsters the case for economic development; reliance on outdated and unrealistic information exaggerates the risks and undervalues the mining's benefits.  The FEIS's errors and omissions, which were adopted in the FLPMA decision documents, "fatally infected" the Secretary's balancing, rendering the withdrawal arbitrary and capricious.[97]

## B.    The Withdrawal Contravenes the RMP.

The withdrawal also violates FLPMA because by violating BLM's governing resource management plan ("RMP").[98]

---

[93] *Id.* at 807.  The court rejected the government's argument that this error was "harmless."  *Id.*  Errors are only harmless "when a mistake of the administrative body is one that *clearly* had *no bearing* on the procedure used or the substance reached."  *Id.* (emphasis in original).  Miscalculation of demand could not be harmless error because the NFMA required the agency to balance the competing need for timber harvest versus environmental preservation and recreational use; exaggeration of the timber demand could inappropriately elevate that goal over the others.  *Id.* at 808.

[94] *Id.* at 816.

[95] *See, e.g.,* 43 U.S.C. §§ 1701(a)(7), (12), 1732(a); *see also* NWMA Motion for Summary Judgment.

[96] *Natural Res. Def. Council*, 421 F.3d at 808.

[97] *Id.* at 816.

[98] February 2008 *Arizona Strip Field Office Record of Decision and Approved Resource Management Plan,* ("Arizona Strip ROD" and "RMP") (Ex. 27).

24

1.     **The Withdrawal Does Not Comply With BLM's Resource Management Plan.**

Currently, 626,678 acres of the withdrawn area are managed under the Arizona Strip RMP.  SF77, Ex. 6 (AR1626-27).  The RMP, last revised shortly before the Secretary's initial segregation, directly addresses the need to protect the area's resources. The approach taken in the RMP was selected because it would "provide[] a high level of protection of natural and cultural resources, while providing for a wide range of beneficial uses of the environment."  SF78, Ex. 27 (AR30097).  Consistent with this objective, the RMP includes specific provisions and mitigation measures for, *inter alia,* Areas of Critical Environmental Concern ("ACECs"), "cultural resources, special status species, and/or other sensitive resources in ACECs."  SF79, Ex. 27 (AR30121, 30176 (Decision MA-TE-21), AR30215 (Decision MA-MI-02)).  The RMP does *not* authorize or contemplate the instant withdrawal. *See* SF82, Ex. 6 (FEIS, AR1641).

The RMP provides that, except for areas specified in the RMP, subject lands should remain *open* to mineral development.  SF80, Ex. 27 (AR30214); *see* SF81, Ex. 27 (AR30215, 30256).  The RMP identifies only 118,743 acres to remain withdrawn from mining, allows over 1.5 million acres to be open to mineral development without restriction, and identifies some restrictions on mineral development for approximately 328,000 acres.  SF80, Ex. 27 (AR30215) (Decision LA-MI-03).  Thus, both the 2009 initial segregation and the 2012, 20-year withdrawal conflict with BLM's 2008 decision in the RMP.

2.     **FLPMA Required "Amendment" of the RMP.**

FLPMA § 302(a) requires the Secretary to manage lands in accordance with land use plans.[99]  This is not to say that BLM has no means of withdrawing land open under an RMP.  It must simply amend the plan where a proposed action may change "the scope

---

[99] 43 U.S.C. § 1732(a) (emphasis added); *see also* 43 C.F.R. § 1610.5-3(a) ("All future resource management authorizations and actions . . . and subsequent more detailed or specific planning, shall conform to the approved plan.").

of resource uses" or the "terms, conditions and decisions" of the plan.[100] As the Supreme

Court has recognized, these provisions "prevent BLM from taking actions inconsistent

with the provisions of a land use plan.  Unless and until the plan is amended, such actions

can be set aside as contrary to law pursuant to 5 U.S.C. § 706(2)."[101]  Thus, courts

consistently invalidate agency actions contrary to management plans and without

required plan amendment.[102]

      BLM's withdrawal of 626,678 acres in the Arizona Strip – more than one third of

all lands designated as open to mineral entry and location under the 2008 RMP –

constitutes a "meaningful" change to the plan.[103]  Indeed, at least one key BLM decision-

maker recognized that amendment was required.  AR83, Ex. 43 (AR72790) (noting

withdrawal was not reflected in RMP and that "to close to location is an RMP decision,

which suggests it would be analyzed in the RMP/EIS."); *id*., Ex. 50 (AR73022-25)

(proposing timeline for the EIS *and* a plan amendment, and noting amendment "is needed

because the lands included in this withdrawal proposal were not proposed for closure to

mine location in the . . . RMP.").[104]

      In an effort to stay on schedule, BLM officials suggested using FLPMA's simpler

---

[100] *See Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 556 (9th Cir. 2006)
(quoting 43 C.F.R. § 1610.5-5); *see also 43 C.F.R.id*. at §§ 1610.2, 1610.3; *see also* 516
DM 11.5.  *Cf. Mt. Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 757 n.12, 758 (D.C.
Cir. 2007).

[101] *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 69 (2004) (plans may not
"prescribe" any particular action **but can and do "constrain"** agency action) (emphasis
added).

[102] *See, e.g., Klamath Siskiyou Wildlands Center*, 468 F.3d at 556-57 (action violated
FLPMA because BLM did not amend plan; action did not meet maintenance conditions
because decision not to protect the red tree vole "altered the [RMP's] terms and
conditions");  *Or. Natural Res. Council Fund*, 492 F.3d at 1128, 1135; *Douglas Timber
Operators, Inc. v. Salazar*, 774 F. Supp. 2d 245, 260-61 (D.D.C. 2011);  43 C.F.R. §
1610.5-5.

[103] *Klamath Siskiyou Wildlands Ctr*., 468 F.3d at 557.

[104] Another official argues amendment is unnecessary because lands were already
segregated.  SF84, Ex. 44 (AR72792).  However, the same official concedes that "an
amendment is required to 'implement new or revised policy that changes land use plan
decisions.'"  *Id*.; *see also* Ex. B (excerpts from BLM handbook).

DCACTIVE-25920931.8

1   maintenance process instead.[105]  Although the record does not make clear how, when, or

2   even if, BLM indeed implemented this process,[106] DOI's apparent claim that a

3   "maintenance" action can absolve its failure to amend is contrary to FLPMA and its

4   implementing regulations.[107]  The withdrawal is unlawful and should be vacated.

5   **VI.     The Section 204(c) Notice to Congress Violated FLPMA and the APA.**

6         FLPMA §§ 204(c)(1) and (2) require the Secretary to provide Congress with

7   notice of any withdrawal of 5,000 acres or more.  This requirement "is . . . a fundamental

8   part of the scheme by which Congress has reserved a right to disapprove administrative

9   withdrawals."[108]  This Court explained that the notices "ensure that the Secretary will

10  consider environmental and economic impacts of the withdrawal, consider current uses of

11  the withdrawn land . . . and consult qualified experts about the known mineral deposits,

12  past and present mineral production, and present and future market demands."[109]

13        Here, the Secretary's notice[110] to Congress is deficient.  First, the notice relies

14  upon and incorporates the inaccuracies and omissions that pervade the FEIS and ROD.

15  Because the FEIS's defects are carried forward into the notice, it fails to provide

16

17  [105] SF84, Ex. 43 (AR72789) ("[t]he BLM director has already petitioned the Secretary
     and he has decided to propose the withdrawal *even though it doesn't conform to our*
18  *[Land Use Plan]*"; amendment "will really cloud and further complicate the issue (and
     add time to an already tight schedule)" even though "a recommendation for a withdrawal
19  . . . *would normally be made and supported by the LUP*." (emphasis added)).

20  [106] While the ROD states that the RMP (decision LA-MI-03) "is changed through plan
     maintenance under 43 CFR 1610.5-4 to update acreages open or withdrawn to mineral
21  entry,"  SF86, Ex. 1 (AR13),  it is unclear whether maintenance actually occurred.

22  [107] BLM may use "maintenance" only in limited circumstances, such as "to reflect minor
     changes in data," or "refining or documenting a previously approved decision
23  incorporated in the plan." 43 C.F.R. § 1610.5-4.  Unlike plan amendment, "[m]aintenance
     *shall not result in expansion in the scope of resource uses or restrictions*, or change the
     term, conditions, and decisions of the approved plan. . . ." *Id*. (emphasis added).

24  [108] *State of New Mexico*, 969 F.2d at 1136; *see also Mt. Royal Joint Venture*, 477 F.3d at
25  749.

     [109] *Yount*, 2013 WL 1149776, at *10; *see also Casey E. Folks, Jr.*, *et al. (On*
26  *Reconsideration)*, 183 IBLA 359, 377 (May 2, 2013).

27  [110] *See* Ex. 8 ("Section 204(C) Report to Congress On the Withdrawal to Protect the
     Grand Canyon Watershed, Adjacent to the Grand Canyon National Park" ("Notice").

28

27

information required by the statute.  Second, even if the FEIS and ROD were adequate, the Secretary's notice would violate FLPMA because it does not include all of the information statutorily required.[111]  Finally, because this failure to comply with § 204(c)(2) is not "harmless," the withdrawal violates FLPMA and should be vacated.

## A.   The Notice to Congress is Deficient Because It Relies on an Inaccurate and Legally Insufficient FEIS and ROD.

Key portions of the Secretary's notice directly incorporate the FEIS.  Thus, the omissions and inaccuracies in the FEIS render that notice inaccurate and insufficient.[112]  For example, § 204(c)(2)(2) requires "an inventory and evaluation of the current natural resources uses and values of the site . . . ."  *See* SF90, Ex. 8 (AR3106).  In response, the notice refers to the "inventory and evaluation of the natural, cultural, and social resources . . . addressed in the [FEIS]."  *Id*.  The notice also identifies "key findings" from the USGS report on which the FEIS relies, including a one-sentence estimate of the tonnage of the uranium resource and comparison to the quantity of total undiscovered uranium in northern Arizona.  *Id*. (AR3107-08).  Nothing more is said about the quantity, quality, or value of the mineral resource.  Instead, Congress must read through the over 1500-page FEIS, which, as discussed previously, provides an inaccurate and incomplete evaluation of the resource and its value.  *See supra* Section IV.

Other aspects of the Secretary's notice are similarly deficient.  Section 204(c)(2)(8) requests "[a] statement indicating the effect of the proposed uses, if any, on State and local government interests and the regional economy."  In response, the notice relies on the FEIS's RFD scenarios in Appendix B, which are based on an improperly calculated and erroneous estimate of the uranium endowment and its value.  SF94, Ex. 8 (AR3113); *see also supra*, Section IV.  Because Interior relied on a flawed FEIS, the notice does not provide Congress the full and accurate information FLPMA requires.

---

[111] *See* 43 U.S.C. §§ 1714(c)(2)(1)-(12).

[112] The full FEIS was also included as an appendix to the notice.  *See* SF88 .

DCACTIVE-25920931.8

**B.   The Notice to Congress Fails to Provide All Information Required.**

The Notice also excludes required information or provides only cursory, misleading responses.  For example, FLPMA requires "a clear explanation of the proposed use of the land involved which led to the withdrawal."[113]  The Notice refers to the ROD's "history of mining exploration" in the area.  SF89, Ex. 8 (AR3106).  This solitary reference to *historic* operations says nothing about proposed *future* uses.  To comply with FLPMA, the notice must identify an actual future use for the withdrawn land, not mere protection of land.[114]  The Secretary's notice does not identify even one proposed use for the withdrawn land, depriving Congress of basic information required.

Similarly, the Secretary must address "aspects of [the proposed] use that might cause degradation of the environment, and also the economic impacts of the change in use on individuals, local communities, and the Nation."[115]  With respect to economic impacts, the notice asserts that while the withdrawal might reduce annual mining-related employment, total mining-related employment would actually increase at sites subject to valid existing rights.  SF91, Ex. 8 (AR3109).  Increased employment at locations without any change in existing uses is not an impact of a "change in use" from the withdrawal.[116]  Employment, revenue, secondary development, and other impacts from the prevention of new claim development are addressed only cursorily, if at all.  With respect to environmental degradation, the notice summarily assumes that degradation will be reduced and ignores environmental degradation that might result from the withdrawal.[117]

The same issues are ignored in the Notice's response to § 204(c)(2)(6) (seeking

---

[113] 43 U.S.C. § 1714(c)(2)(1).

[114] *See State of New Mexico*, 969 F.2d at 1135 (Congress intended "the purpose of the withdrawal encompass a proposed use far more specific than 'protection of land'"; if purpose is to prohibit mining, FLPMA requires "the use to which the land will be put.").

[115] 43 U.S.C. § 1714(c)(2)(2).

[116] 43 U.S.C. § 1714(c)(2)(2).

[117] *See supra*, Section IV(A) (uranium endowment); *see also* SF8, Ex. 25 (AR8383), Ex. 6 (AR1659).

29

1   identification of replacement sites for uses displaced by the withdrawal).  The notice

2   merely acknowledges that "uranium resources do exist on Federal lands that remain open

3   to location and entry" in other areas, SF93, Ex. 8 (AR3111), but says nothing about

4   whether they provide "any suitable alternative."

5   ### C.    These Failures Render the Withdrawal Unlawful Under FLPMA.

6       An inadequate notice undermines statutory policy that "Congress exercise its

7   constitutional authority to withdraw or otherwise designate or dedicate Federal lands for

8   specified purposes and that Congress delineate the extent to which the Executive may

9   withdraw lands without legislative action."[118]  As in *State of New Mexico v. Watkins*,

10  "[b]y reducing, without right, the notice and opportunity for Congress to intervene, the

11  agencies have not violated FLPMA in a trivial way.  Rather, they have disregarded clear

12  legislative directions on a matter fundamental to the Act."[119]

13      Omissions and misreporting in the Notice render it ineffective in its dual purposes

14  of guiding Secretarial action and imposing Congressional oversight.[120]  Far from

15  "harmless," the notice's § 204(c)(2) violation skews perception of the resources, the

16  lands' preexisting uses, and the impact of withdrawal, exaggerating any protective effect

17  and understating adverse economic and other impacts.[121]  Because the withdrawal fails to

18  comport with FLPMA, it is "not in accordance with law" and should be vacated.[122]

19  ### CONCLUSION

20      Accordingly, Plaintiffs respectfully request this Court grant Plaintiffs summary

21  judgment and vacate the withdrawal under PLO 7787.

22

23

24  [118] *State of New Mexico*, 969 F.2d at 1136, 1137-38.

25  [119] *Id.*

26  [120] *See Yount*, 2013 WL 1149776, at *10.

27  [121] *Cf. Natural Res. Def. Council*, 421 F.3d at 808.

    [122] 5 U.S.C. § 706(2)(A).

28

DCACTIVE-25920931.8

Respectfully submitted,

*/s/ Susan M. Mathiascheck*

Of Counsel:
Susan M. Mathiascheck
John C. Martin

Ellen Ginsberg
Amy B. Chasanov
NUCLEAR ENERGY INSTITUTE
CROWELL & MORING LLP
1776 I Street, N.W., Suite 400
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Washington, D.C.  20004-2595
(202) 739-8000
(202) 624-2500

ATTORNEYS FOR PLAINTIFF NUCLEAR ENERGY INSTITUTE

*/s/ R. Timothy McCrum*

Of Counsel:
R. Timothy McCrum
CROWELL & MORING LLP
Katie Sweeney
1001 Pennsylvania Avenue, N.W.
NATIONAL MINING ASSOCIATION
Washington, D.C.  20004-2595
101 Constitution Avenue, N.W.
(202) 624-2500
Suite 500 East
Washington, DC  20001
(202) 463-2600

ATTORNEYS FOR PLAINTIFF NATIONAL MINING ASSOCIATION

Dated: Dec. 6, 2013

31

1

**CERTIFICATE OF SERVICE**

2

     I hereby certify that I have caused the foregoing Motion for Summary Judgment to

3

be served upon counsel of record through the Court's electronic service system

4

(ECF/CM) and by first class mail to Gregory Yount at the following address: 807 West

5

Butterfield Road, Chino Valley Arizona 86323.

6

Dated: December 6, 2013

7

                              */s/ Susan Mathiascheck*_____

                              Susan Mathiascheck

8

                              CROWELL & MORING LLP

                              1001 Pennsylvania Avenue, N.W.

9

                              Washington, D.C.  20004-2595

                              (202) 624-2500

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DCACTIVE-25920931.8