1
2
3
4
5

Constance E. Brooks (*pro hac vice* Colo. Bar. No. 18258)
Michael B. Marinovich (*pro hac vice* Colo. Bar. No. 24677)
C. E. BROOKS & ASSOCIATES, P.C.
303 East 17th Avenue, Suite 650
Denver, Colorado 80203
(303) 297-9100 (telephone)
(303) 297-9101 (facsimile)
connie@cebrooks.com
mike@cebrooks.com

6
7
8
9

William Klain, # 015851
wklain@lang-baker.com
LANG BAKER & KLAIN, P.L.C.
8767 E. Via de Commercio, Suite 102
Scottsdale, AZ  85258
(480) 947-1911(telephone)
(480) 970-5034 (facsimile)

10

Attorneys for the Plaintiffs

11
12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PRESCOTT DIVISION

13

Gregory Yount,

14

    Plaintiff;

15

v.

16

S.R.M. Jewell, Secretary of the Interior; *et al.*

17

18

    Defendants;

and

19

Grand Canyon Trust, *et al.*

20

    Defendant-Intervenors.

21
22
23
24
25
26
27

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Civil. No. 3:11-CV-08171-DGC**

**PLAINTIFFS' QUATERRA RESOURCES INC. AND ARIZONA UTAH LOCAL ECONOMIC COALITION MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**

National Mining Association; Nuclear
Energy Institute,

      Plaintiffs;

v.

S.R.M. Jewell, Secretary of the Interior;
*et al.,*

      Defendants;

and

Grand Canyon Trust, *et al.*,

      Defendant-Intervenors.

**Civil No. 3:12-cv-08038-DGC**

Northwest Mining Association,

      Plaintiff,

v.

S.R.M. Jewell, Secretary, Department of
the Interior; *et al.,*

      Defendants;

and

Grand Canyon Trust, *et al.*

      Defendant-Intervenors.

**Civil No. 3:12**-cv-0842-DGC

Quaterra Alaska, Inc., Arizona Utah
Local Economic Coalition, on behalf of
member the Board of Supervisors,
Mohave County, Arizona;

      Plaintiffs;

v.

S.R.M. Jewell, Secretary of the Interior;
*et al.*

      Defendants;

and

Grand Canyon Trust, *et al.*

      Defendant-Intervenors.

Civil No. 3:12-8075-DGC

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

MOTION FOR SUMMARY JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM OF POINTS AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . 3

I.    **ROD IS ARBITRARY AND CAPRICIOUS UNDER NEPA AND FLPMA**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        **A.    Standard of Review.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        B.    ROD's Conclusion That Risk of Harm is Significant Although
           Improbable Not Supported. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
               1.    *Chapter C Findings Undercut by Location and*
                   *Data Quality Issues.* . . . . . . . . . . . . . . . . . . . . . . 4
               2.    *Unknown Risks to Groundwater Exaggerated*
                  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
               3.    *SIR 2010-5025 Excludes Existing Regulatory*
                   *System.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
               4.    *Unavailable Information Rule Ignored.* . . . . . . . 7
               5.    *Soil Samples Misused.* . . . . . . . . . . . . . . . . . . . . 8
               *6.    Ecotoxicity Pathways.* . . . . . . . . . . . . . . . . . . . . . 9
        **C.    NAW Violates FLPMA.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
               1.    *Boundaries Not Revised to Reflect Watersheds*
                  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
               2.    *Endowment and Viable Deposit Calculations*
                   *Flawed.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
               3.    *Misstated Endowment and RFD Understates*
                   *Social and Economic Impacts Analysis* . . . . . . 10

III.   PROTECTION OF AMERICAN INDIAN RESOURCES EXCEEDS
STATUTORY AUTHORITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.   QUATERRA AND AULEC HAVE STANDING. . . . . . . . . . . . . . . . . . . . 18
        **A.    Standard of Review.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        **B.    Quaterra's Standing.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        **C.    AULEC's Standing.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

V.    **CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

Cases                                                                              Page

*Am. Motorcyclist Ass'n v. Watt*, 534 F. Supp. 923 (D. Cal. 1981). . . 13, 15, 20, 22, 24

*Bennett v. Spear*, 520 U.S. 154 (1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*California v. Block*, 690 F.2d 753 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Cent. Delta Water Agency v. U.S.*, 306 F.3d 938 (9th Cir. 2002). . . . . . . . . . . . . . . . 19

*Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961 (9th Cir. 2003). . . 22, 23

*City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975). . . . . . . . . . . . . . . . . . . . . . 24

*City of Rialto v. West Cost Loading Corp.*, 581 F.3d 865 (9th Cir. 2009). . . . . . . . . . 18

*City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004).. . . . . . . . . . . . . . . . . . . 22

*Cloud Found. v. U.S. Bureau of Land Mgmt.*, 802 F.2d 1192
    (D. Nev. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Douglas County v. Babbitt*, 48 F.3d 1495 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . 24

*Havasupai Tribe v. United States*, 752 F. Supp. 1471 (D. Ariz. 1990),
    *aff'd sub nom. Havasupai Tribe v. Robertson*, 943 F.2d 32
    (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977). . . . . . . . . . . 20, 21

*Klamath Siskiyou Wildlands v. Boody*, 468 F.3d 549 (9th Cir. 2006). . . . . . . . . . 12, 13

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). . . . . . . . . . . . . . . . . . . . . . . . 19

*Natl. Resources Defense Council v. U.S. Forest Service*, 421 F.3d 797
    (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir. 2007). . . . . . . . . 17

*Northern Alaska Environmental Center v. Kempthorne*, 457 F.3d 969
    (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Port of Astoria, Or. v. Hodel*, 595 F.2d 467 (9th Cir. 1979). . . . . . . . . . . . . . . . . . 19

*Quechan Tribe of Ft. Yuman Indian Reservation v. U.S. Dep't of the Interior*,
    927 F. Supp.2d 921 (D. Cal. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Rogers v. U.S.*, 575 F. Supp. 4 (D. Mont. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*South Fork Band Council of Western Shoshone v. U.S. Dep't of Interior*,
    588 F.3d 718 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

1

## <u>TABLE OF AUTHORITIES</u> (cont'd.)

2

3
*Spindex Physical Therapy USA, Inc. v. United Healthcare of AZ,*
661 F. Supp.2d 1076 (D. Ariz. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

4
*State of Utah v. Babbitt*, 137 F.3d 1193 (10th Cir. 1998).. . . . . . . . . . . . . . . . . . . 24

5
*The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) (*en banc*). . . . . . . . . 3

6
*U.S. v. Shumway*, 199 F.3d 1093 (9th Cir. 1999)åäàÅí]ÅÅÄ. . . . . . . . . . . . . . . . 19

7

**Federal Statutes**                                                        **Page**

8

9
30 U.S.C. §21a.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

30 U.S.C. §§28-42. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

10

11
42 U.S.C. §4331(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

12
42 U.S.C. §4332(2)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

13
42 U.S.C. §4332(2)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 23

14
43 U.S.C. §1701(a)(12). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

15
43 U.S.C. §1701(a)(6).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

16
43 U.S.C. §1701(a)(8).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

17
43 U.S.C. §1712(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-24

18
43 U.S.C. §1712(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

19
43 U.S.C. §1712(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

20
43 U.S.C. §1712(c)(5).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

21
43 U.S.C. §1712(c)(9).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 15, 22-24

22
43 U.S.C. §1714(c)(2)(2).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

23
43 U.S.C. §1714(c)(2)(7).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 22, 24

24
43 U.S.C. §1714(c)(2)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

25
43 U.S.C. §1714(c)(2)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

26
43 U.S.C. §1739(e).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-24

27
5 U.S.C. §706(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## <u>TABLE OF AUTHORITIES</u> (cont'd.)

**Federal Regulations**                                        **Page**

40 C.F.R. §1502.16(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 23

40 C.F.R. §1502.22. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7

40 C.F.R. §1506.2(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15, 22, 23

43 C.F.R. §1610.3-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

43 C.F.R. §1610.3-1(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

43 C.F.R. §1610.3-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

43 C.F.R. §1610.3-2(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

43 C.F.R. §1610.5-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

43 C.F.R. §3809.100. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

40 C.F.R. §1502.16(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 19

40 C.F.R. §1502.22. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7

40 C.F.R. §1506.2(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14, 17-19

43 C.F.R. §1610.3-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

43 C.F.R. §1610.3-1(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

43 C.F.R. §1610.3-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

43 C.F.R. §1610.3-2(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

43 C.F.R. §1610.5-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

43 C.F.R. §3809.100. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Arizona Statutes**                                             **Page**

Ariz. Rev. Stat. §§49-241-251. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Ariz. Rev. Stat. §§49-255-255.03. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Ariz. Rev. Stat. §§45-598-599. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Arizona Administrative Code**                                  **Page**

Ariz. Admin. Code §§R12-15-801-852. . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

1

**<u>TABLE OF AUTHORITIES</u>** (cont'd.)

2   Ariz. Admin. Code §§R18-9-101-E323. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

3   Ariz. Admin. Code R18-9-A901-C90. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, L.R. 56.1, and the Case Management Order (ECF 143) Plaintiffs Quaterra Alaska, Inc. (Quaterra), Arizona Utah Local Economic Coalition , on behalf of named member Mohave County, Arizona; (AULEC) file this motion for summary judgment to set aside the Department of the Interior (DOI) Secretary's Public Land Order 7787 (PLO 7787) which closed roughly one million acres of Forest Service (FS) and Bureau of Land Management (BLM) lands in Northern Arizona (hereafter Northern Arizona withdrawal or NAW) from operation of the Mining Laws, 30 U.S.C. §§28-42.  Quaterra incorporates by reference the statements of fact and legal arguments of Northwest Mining Association (NWMA), National Mining Association (NMA) and Nuclear Energy Institute (NEI).  As grounds for the motion for summary judgment, Plaintiffs establish that:

1.    The ROD violates both the Federal Land Management and Policy Act (FLPMA) and National Environmental Policy Act (NEPA) because:

a.    ROD findings are from a 2010 U.S. Geological Service Scientific Investigative Report 2010-5025 (SIR 2010-5025) which does not include (I) peer review changes for water quality findings, Statement of Facts (SOF) ¶47; (ii) expert National Park Service (NPS) hydrology comments that FEIS, which used the SIR 2010-5025, greatly exaggerates possible impacts to aquifers and the watershed, SOF¶48-49; (iii) excludes the robust regulatory system designed to preclude any risk of significant harm, ¶¶40-46; (iv) assumes impact to perched aquifers using assumptions at odds with the facts, ¶46; (v) assumes 'legacy of contamination' due to past uranium mining without disclosing that two sites were unreclaimed and levels were generally within EPA limits, except for one site. *Id.* ¶¶22-24; and (vi) SIR 2010-5025 study of ecotoxicity pathways stated that it was not intended to be used to reach conclusions or standards, SOF¶53;

b.      NAW justified due to possible harms that while improbable would be significant, even though the Final Environmental Impact Statement (FEIS) and underlying record contradict the risk of significant harm. ¶¶54-57;

c.      ROD cites need for more data to support the NAW but contradicts this need when it states that it need not comply with the unavailable information rule, 40 C.F.R. §1502.22, because the data are not essential for a decision, SOF¶13;

d.      The NAW violates FLPMA by using legislative boundaries to define the withdrawal when 120,000 acres of the North Parcel west of Kanab Creek is in another watershed, lacks significant resources, and is 30 miles from the Grand Canyon, SOF¶¶5, 19-20, and should have been excluded;

e.      The NAW estimate of resources lost and costs to the State and local communities grossly understated estimates of viable uranium resources due to unsupported facts and assumptions, and so the FEIS understates the social and economic impacts to the State and local governments, SOF¶¶58-66;

f.      Bureau of Land Management (BLM) did not reconcile conflicts with state and local government plans as required by both NEPA and FLPMA, SOF¶¶92-98;

2.      The Secretary exceeds his authority and acts contrary to law by separately justifying the NAW on the basis that it would not possible to fully mitigate impacts on tribal beliefs and feelings about mining SOF¶¶12, 67-83.

a.      The NAW establishes protection for "traditional use areas" by adopting an extra-legal definition, SOF¶¶75-78;

b.      The conclusion that it is not possible to mitigate effects of mining is based on a premise that mining irreversibly alters how the Indians feel about the land or desecrates the land, SOF¶¶77-82;

c.    Precedent consistently limits protection to sites where historical, cultural and religious practices occur as opposed to the viewpoint that mining will irreversibly desecrate the areas generally associated with tribes;

3.    Plaintiffs provide additional argument to support standing and to supplement the opposition to the Motion to Dismiss, Dkt. No. 72 and exhibits..

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    ROD IS ARBITRARY AND CAPRICIOUS UNDER NEPA AND FLPMA

### A.    Standard of Review

"The appropriate inquiry under the [APA] is whether the agency's decision was 'arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.'" *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006) (quoting 5 U.S.C. §706(2)(A).   A federal agency decision, which misinterprets or relies on inaccurate or unsupported information, is arbitrary and capricious.  *Natural Res. Defense Council v. U.S. Forest Service*, 421 F.3d 797, 806-07 (9th Cir. 2005).

When compliance of NEPA is at issue, an agency's decision will be reversed as arbitrary and capricious under the APA "if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*) (internal quotations and citations omitted).

### B.    ROD's Conclusion That Risk of Harm is Significant Although Improbable Not Supported

1
2
3
4
5

    The ROD states that the NAW is necessary because the USGS report (SIR 2010-5025) acknowledged uncertainty due to limited data and while there is a low probability of impacts, there is also potential high risk.  Ex. 2, AR000009 (ROD). The quotes from the SIR 2010-5025 are modified by analysis of the existing regulatory system and other data which alter the potential for high risk.

6
7

        1.    *Chapter C Findings Undercut by Location and Data Quality Issues*

8
9
10
11
12

    SIR 2010-5025, Ch. B reported "Samples from 15 springs and 5 wells in the region contained dissolved uranium concentrations greater than the U.S. Environmental Protection Agency maximum contaminant level for drinking water." SOF¶26.  The ROD repeats the same sentence.

13
14
15
16
17
18

    Neither SIR 2010-5025 nor the ROD disclose that about 11 of the 15 the springs and at least one of the wells with dissolved uranium are not in the NAW. Several were quite a distance from the former mine sites.  SOF¶27.  About 11 springs, a well and a stream are associated with the abandoned Orphan Mine located on the South Rim.  *Id*.  The SIR 2010-5025 concludes that the lack of reclamation is a factor.  SOF¶¶27-28.  This too is omitted in the ROD.

19
20

    The 2009 water samples that were taken within the NAW boundaries but did not correlate to mining (few and inconclusive).  SOF¶30.

21
22
23
24
25

    During the peer review, the data quality for the water samples was questioned.  SOF¶47.  The review recommended excluding data from the Hermit Mine and all of the data before 1990 due to issues of filtration, testing, and preservation.  *Id.*  The exclusion of the data slightly modified the conclusions both as to the percent of compliance and the number of samples.  *Id.* The version of SIR

26
27

2010-5025 Chapter C in the record does not appear to have been revised because it still shows the Hermit Mine violation data and the pre-1990s data.

2.   *Unknown Risks to Groundwater Exaggerated*

The ROD's conclusion of the extent of the unknown data was contradicted by significant dissent from the NPS Water Resources Division in Fort Collins Colorado.   SOF¶¶48-49.   NPS expert hydrologist Larry Martin in a crisis of conscience refused to comment on the DEIS due to the exaggeration of potential impacts to the R-aquifer.   *Id.*   Martin stated that the DEIS in his professional opinion greatly exaggerated possible impacts to watershed and groundwater and otherwise obfuscated the effects of mining on the R-aquifer.   *Id*.   Martin also concluded that dilution and distance to the R-aquifer would attenuate any release of water from a mine, SOF¶48, which contradicts the conclusion regarding uncertainty and risk of great harm. Martin's detailed comments criticizing the assumptions and conclusions were reviewed and supported by his superiors even though the conclusions did not support the administration's policy. *Id.*   As one example, Martin commented that the EIS use of the dissolved uranium data from the Orphan Mine (within the GCNP) was improper because it was not representative of mining conditions today and any pollutants will flow away from the park. SOF¶49. Notwithstanding the controversy, the BLM did not change the EIS. The Orphan Mine data was kept because it presented reasonably foreseeable impacts and conditions, SOF¶50.

Other commenters concluded there was little or no risk of contamination of the R-aquifer.   The FEIS states that the Arizona aquifer protection permitting system protects any contact with the R-aquifer.   SOF¶¶57, 94. There was agreement that the geologic character of Hermit and Supai formations prevent any contaminated water flowing to the R-aquifer.  SOF¶¶37-38, 54-55.

1
2
3
4

Furthermore, the west portion of the North parcel is located in another watershed and groundwater basin.  SOF¶¶5, 19-20.  The surface water in the South Parcel would also drain away from the R-aquifer.  SOF¶19, 56.  Thus, there is no potential significant harm.

5

3.    *SIR 2010-5025 Excludes Existing Regulatory System*

6
7
8
9
10
11
12
13
14
15

The Arizona Department of Environmental Quality (ADEQ) regulates uranium mining activities in Arizona.  The ADEQ issues both federal and state water and air quality permits and sets environmental controls, financial assurance, and reclamation.  ADEQ administers the Aquifer Protection Permit (APP) program and the Arizona Pollutant Discharge Elimination System (AZPDES) program to protect groundwater resources.    See  Ariz.  Rev.  Stat.  §§49-241-251, 49-255-255.03; Ariz. Admin. Code §§R18-9-101-E323; R18-9-A901-C905.  The Arizona Department of Water Resources (ADWR) requires a permit to drill or replace a water well and imposes conditions to limit cross contamination.  Ariz. Rev. Stat. §§45-598-599; Ariz. Admin. Code §§R12-15-801-852.

16
17
18
19
20
21
22
23
24
25

By relying on the SIR 2010-5025 which did not assess the regulatory system for uranium mining in Arizona, the ROD's assumption of potential harm is flawed.  The comments from the ADEQ and other state agencies strongly object to the NAW on the basis that the current system works well.  SOF¶94.  The state agencies rejected the estimates of water quality and groundwater impacts stating instead that the claimed risks and impacts to water quality and groundwater were addressed in the aquifer permit system.  *Id*.  As to perched aquifers, DEQ notes that one mine pierced a perched aquifer associated with a livestock pond and fully reclaimed it.  *Id*.  Thus, the risk of major harm to perched aquifers is contradicted by the DEQ direct experience.

26
27

1
2
3
4
5

The FEIS also contradicts the ROD where it concludes the state's aquifer protection program will protect the perched aquifers and springs or wells. SOF¶45. The ROD's focus on perched aquifers did not reflect potability or the rarity of an aquifer associated with a spring.   Perched aquifers are used to reduce dust. SOF¶42.

6

4.     *Unavailable Information Rule Ignored*

7
8
9
10
11
12
13
14
15
16
17
18

The ROD repeatedly refers to the lack of data to support the NAW.  The Council on Environmental Quality (CEQ) rules provide that when information essential to the decision is unavailable and costs of obtaining it are not exorbitant, the agency must include it in the EIS.  40 C.F.R. §1502.22(a).  DOI did not follow the unavailable information rule.  It did not conclude that the costs of developing the unavailable information would be exorbitant.  Instead, the ROD concludes that the lack of data is not essential to the decision, because the EIS uses "reasonably conservative assumptions" and relies on data from six mine sites.  SOF¶13.  If unavailable data is the most often cited reason for the NAW, it is not credible for DOI to conclude that such data are not essential or that conservative assumptions are a substitute.

19
20
21
22
23
24
25

Even assuming *arguendo* that the costs are exorbitant or the means of obtaining the information are unknown, the FEIS must address any "catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason."  40 C.F.R. §1502.22(b).  The conservative assumptions do not meet §1502.22(b) "credible scientific evidence" and there is no discussion of catastrophic consequences.

26
27

For example, the FEIS assumes that mining on the North Parcel will have a major impact on 13.3% of the perched aquifers, when a mine shaft intersects the the perched aquifers.  SOF¶41.  The FEIS contradicts this finding where it states the APP program protects aquifers from contamination.  SOF¶45.

5.   *Soil Samples Misused*

In support of the NAW, the ROD also states studies done in areas where operations temporarily suspended, "[u]ranium and arsenic consistently detected in mining areas above natural background levels."  SOF¶14.  SIR 2010-5025 Ch. B then describes the higher readings as a "varied legacy of contamination."  SOF¶22.  These sites have been on standby and are not reclaimed and the majority of samples are within EPA standards, and do not meet the definition of contamination.  EPA defines contaminated sediments as

> [S]oils, sand, organic matter, or minerals that accumulate on the bottom of a water body and contain toxic or hazardous materials that may adversely affect human health or the environment.

EPA's Contaminated Sediment Management Strategy, EPA-823-R-98-001, at 1 (April 1998).

With the exception of the flash flooding at Hack Canyon, the soil samples are generally within EPA standards for uranium and arsenic and cannot be described as contaminated.  The origins of the transport of uranium bearing rock in Hack Canyon was debated.  SIR 2010-5025 Chapter B refers to a 1984 flash flood and ACERT notes that this flood moved about 10-12 tons of rock.  SOF¶23.  Others stated that the soil movement may have come from earlier reclamation of the original Hack mine.  SOF¶24.  USGS rejected both comments but did not address how waste rock from Hack 1-3 was transported when the reclamation put the waste rock into the shaft and sealed it.  SOF¶25.

1
2
3

The SIR 2010-5025 Ch. B does acknowledge that the transported rock would not affect water quality due to dilution.   Ex. 6, SIR 2010-5025 Ch. B, AR000111.

4

6.      *Ecotoxicity Pathways*

5
6
7
8
9
10
11

The SIR 2010-5025 Chapter D also addressed whether increased radiation and exposure to trace elements would adversely affect plants and wildlife. SOF¶53.  The report summarized existing literature and identified the data gaps noting that caution should be used when applying the information to plants or animals in Northern Arizona.  The study was prepared on the assumption the FEIS would do a risk assessment.  *Id.* The FEIS did not do a risk assessment so the questions raised in Chapter D were not used.

12

**C.   NAW Violates FLPMA**

13

1.      *Boundaries Not Revised to Reflect Watersheds*

14
15
16
17
18
19
20
21

BLM determined early in the process that portions of the NAW, most notably lands west of Kanab Creek were in a different watershed.  SOF¶5.  As BLM said several times, mining this area will not affect the Grand Canyon watershed, it lacks the resources, and it is 30 to 40 miles away from the GCNP.  *Id.*  A similar case was made for part o the South Parcel.  BLM nevertheless did not change the scope of the withdrawal.  More importantly, it never explained why it continued to keep the lands outside the watershed within the preferred alternative, when the purpose of the withdrawal was to protect the Grand Canyon Watershed.

22

2.      *Endowment and Viable Deposit Calculations Flawed*

23
24
25
26

The SIR 2010-5025 Chapter A adjusted an assessment of the uranium endowment to reflect the NAW boundaries but did not alter the assumptions or methodology used in the 1990 Finch Report.  SOF¶58.  As one BLM employee put it, USGS did not do any original research it just recycled the 1990 report.  *Id.*

27

The major issue however is that USGS worked from visible breccia pipes, just as was done in 1990.  Quaterra and others objected on the basis that the current claims were located using aerial mapping and reconnaissance, not simply visible breccia pipes. By excluding hidden breccia pipes, USGS cut the likely endowment 250%.   The principal author of SIR 2010-5025 Chapter A acknowledges that hidden pipes are a wild card and could change the results significantly.  USGS did not change its estimates.  Instead, USGS responded that the one hidden pipe in the control group accounted for the hidden pipes.  Even USGS estimates the ratio is 3.65 hidden pipes for every visible pipe.  SOF¶59.

The FEIS then reduced the USGS endowment by 85% relying on a single sentence from a 1987 Wenrich paper that hypothesized 10% of the breccia pipes were viable.  The increase from 10% to 15% and broader range of mineral grades does not compensate for discounting the economic impacts by 45%.

The consequences for the assessment are significant. FLPMA requires BLM to provide a Mineral Report estimating the minerals within the area to be withdrawn and the cost to the local communities, the state and the Nation.  43 U.S.C. 1714(c)(2)(12).   The Mineral Report the same endowment and development numbers as the SIR 2010-5025.  Thus, the report significantly understated the loss in severance taxes to the state and communities as well as the loss to the nation.

3.   *Misstated Endowment and RFD Understates Social and Economic Impacts Analysis*

NEPA requires that the EIS disclose not just the environmental impacts but the related social and economic impacts. 42 U.S.C. §4332(2)(C). FLPMA requires that the assessment of the withdrawal fully analyze the economic effects and the costs to the state and the local communities. 43 U.S.C. §1714(c)(2)(2) (economic impacts on communities, tribes and Nation). 1714(c)(2)(8) (effects on state, local

government and regional economies).  While the FEIS covers these topics, the conclusions would be quite different if the endowment and viable uranium deposits had used 50% of the endowment and the endowment had been revised to account for the hidden breccia pipes.  In preparing an EIS, a federal agency must give economic and social impacts the same 'hard look' required for environmental impacts.  Natural Res. Defense Council, 421 F.3d at 811-12.

BLM had, from the outset, a report prepared by TetraTech that documented the jobs, tax revenues and impacts to the state and local economies if the withdrawal were not adopted and if the withdrawal were adopted.  The State of Arizona adopted those conclusions in its scoping comments.

The FEIS economic analysis discounted the report concluding instead that uranium mining would not add many jobs.  The FEIS excluded from the analysis the impacts on northern Utah where many employees have lived.  Most significantly from AULEC's perspective, the EIS did not account for the future severance tax payments that are now lost for more than 20 years.  The FEIS only restated past severance taxes rather than projecting the severance taxes under Alternatives A, C and D.  Since there has only been one mine producing since the fall of 2009 past severance taxes do not reflect what the state might receive.

## II.    FEIS FAILED TO IDENTIFY AND RECONCILE INCONSISTENCIES WITH LOCAL LAND USE PLANS

The CEQ regulations require an agency to discuss possible conflicts between the proposed action and the objectives of local land use plans and policies of the area, 40 C.F.R. §1502.16(c), and the extent to which such inconsistencies may be reconciled.  40 C.F.R. §1506.2(d); *Quechan Tribe of Ft. Yuman Indian Reservation v. U.S. Dep't of the Interior*, 927 F. Supp.2d 921, 946 (D. Cal. 2013).

Under FLPMA, the decision to withdraw one million acres of public land from multiple use is a major land management decision that amends the Arizona Strip RMP.  43 U.S.C. §1712(e).  BLM must amend the RMP if a proposed action may change "the scope of resource uses" or change "the terms, conditions and decisions of the approved plan."  43 C.F.R. §1610.5-5; *Klamath Siskiyou Wildlands v. Boody*, 468 F.3d 549, 556 (9th Cir. 2006) (The decision to change the level of protection for the red tree vole based on new information altered the terms and conditions of the RMP, and was therefore considered an amendment.  *Id.* at 556-60.).  See *Cloud Found. v. U.S. Bureau of Land Mgmt.*, 802 F.2d 1192, 1206-07 (D. Nev. 2011) ("[A]ny changes to resource allocations in an RMP must be developed through the official amendment process.").  BLM must, therefore, coordinate with local governments, identify conflicts with local plans and policies, and attempt to reconcile them.  43 U.S.C. §1712(c)(9).  This did not occur.

BLM initially concluded that the proposed NAW required a plan amendment.  AR072789.  Instead of disclosing how the proposed NAW would change the RMP, BLM is now issuing technical amendments.

The Arizona Strip RMP allowed mineral exploration and development on the public lands except where restricted by wilderness, withdrawals, or specific areas identified in the RMP.  SOF¶1.  The impacts to and from uranium mining were also an issue during the RMP process and uranium mining was specifically addressed with stipulations and/or mitigation measures, such as ACEC designation to protect cultural resources.[1]  The decision to withdraw the public lands in Northern Arizona changed the RMP resource allocations by closing more than 700,000 acres to

---

[1]  The ROD incorrectly stated that mining was not an issue in the 2008 RMP.  SOF¶18.

1   mining.   Therefore, the withdrawal required an RMP amendment.   *Klamath*

2   *Siskiyou Wildlands*, 468 F.3d at 556; *Cloud Found*., 802 F.2d at 1206-07.

3   BLM must coordinate any RMP revision with the land use planning and

4   management programs of other local governments.  43 U.S.C. §1712(c)(9).  BLM

5   must be apprised of local land use plans, consider how the proposed change

6   affects those plans, resolve any inconsistencies between the federal land use

7   plans and local plans, to the extent practicable and consistent with federal law, and

8   provide for meaningful involvement of local government officials.  *Id*.; 43 C.F.R.

9   §§1610.3-1, 1610.3-2; *Am. Motorcyclist Ass'n v. Watt*, 534 F. Supp. 923, 936 (D.

10  Cal. 1981).  BLM must also document how a withdrawal affects local governments'

11  interests and the regional economy.  43 U.S.C. §1714(c)(2)(2), (7), (8).

12  AULEC members were cooperating agencies throughout the EIS process

13  Doc. 72-2, Johnson Decl. ¶14; SOF¶¶84, but they were excluded from the

14  development of the alternatives, which is the heart of the EIS.  40 C.F.R. §1502.14.

15  SOF¶91.   The alternatives were discussed only after the federal agencies had

16  determined the alternatives.   See AR041806, 041807, 042828, 042829.   The

17  agendas for three of the cooperating agency meetings identified Alternatives

18  Development as one issue to be discussed in the meetings, but the meeting notes

19  show that this discussion was limited to a summary of federal agencies suggested

20  alternatives.   AR040828, 042474,  042905, 045651.   The handouts for these

21  meetings that summarized the RAC Recommendations on the alternatives and the

22  Report on the EIS Alternative Development Workshops were further only provided

23  to the cooperating agencies the day before or the day of the cooperating agency

24  meetings.  AR040827, 043016.   The federal agencies also rejected a proposed

25  cooperating agency meeting to develop the cooperators' recommendation on a

26  preferred alternative.  BLM stated that their preference and rationale were clearly

27  made in the comments they submitted.  AR067222.  The Defendants failure to

provide the Coalition members meaningful participation in the development of the alternatives violates FLPMA.  43 U.S.C. §1712(c)(9); 43 C.F.R. §§1610.3-1(a)(4).

The FEIS and the ROD admitted that the FEIS was inconsistent with Mohave County Resolution 2009-040 and Resolution 2008-10, as well as the Coalition's Resolution that opposed the withdrawal.  AR001642-43 (NAW FEIS); AR000021 (NAW ROD).  But BLM did not try much less make "every practicable effort," to resolve these inconsistencies.  See Doc. 72-2, Johnson Decl. ¶23, 29; Ex. 81, Johnson 2nd Decl. ¶28.   The NAW conflicts with the Coalition members' land use plans and policies.   Coalition member, Mohave County, requested coordination "on land use as a way to resolve the inconsistencies and to minimize harm to its interest in managing roads and air quality, and being in a position to fund other land use and environmental projects, such as desert tortoise protection." Ex. 81, Johnson 2nd Decl. ¶28.  The Coalition members identified resolutions documenting opposition to the withdrawal and in support of the current RMP. AR034124 (Mohave County Resolution No. 2009-040); Doc. 72-2, Johnson Decl. ¶30. The Coalition members submitted comments that focused on the conflicts with local land use plans and policies, and the importance of uranium mining to the local governments' economies.   AR003420 (San Juan County DEIS Comments), 044372 (Coalition Comments to DOI Secretary), 082169 (Kane County Comments to DOI Secretary).  At a public hearing on September 7, 2011, the Coalition's counsel also informed BLM that the EIS did not describe the proposed withdrawal's inconsistencies with local land use plans and policies, nor did it analyze how these inconsistencies would be resolved. Ex. 81, Johnson 2nd Decl. ¶¶29-30; AR096782 (Scott Florence's Notes of Sept. 7, 2011 Public Hearing).

Scott Florence, Arizona Strip District Manager, acknowledged that the withdrawal was not consistent with local land use plans and polices, and that the

FEIS did not describe or attempt to resolve any inconsistencies.  Ex. 81, Johnson 2nd Decl. ¶30.

The Defendants failure to describe the withdrawal's inconsistencies with local land use plans and policies, and to resolve these inconsistencies violates FLPMA and NEPA.   43 U.S.C. §1712(c)(9); 43 C.F.R. §§1610.3-1(a)(3), 1610.3-2(a); 40 C.F.R. §1506.2(d); *Am. Motorcyclist Ass'n*, 534 F. Supp. at 936. (The regulations require federal agencies to address how inconsistencies between a proposed action and local land use plans are addressed and resolved.)

## III.   PROTECTION OF AMERICAN INDIAN RESOURCES EXCEEDS STATUTORY AUTHORITY

The Interior Secretary exceeds his authority and acts contrary to law by separately justifying the NAW on the basis that it was not possible to mitigate impacts on affected American Indian religious beliefs and feelings about mining. SOF¶¶12, 70, 73-82.  The NAW establishes protection for "traditional use areas," based on an extra-legal definition and American Indian beliefs that mining irreversibly alters the land or desecrates the land.  SOF¶¶75-82.  These premises lack statutory or regulatory support and are contrary to precedent that consistently limits protection of Indian cultural resources to sites where historical, cultural, and religious practices occur.

### A.   Existing Laws Protect American Indian Resources

The FEIS recognized the legal framework that protects American Indian resources. AR001912-13; 002221-29.  The federal laws include the Archeological and Historic Preservation Act (AHPA) ( recovery, protection, and preservation of historical and archeological data that might be lost or destroyed), 16 U.S.C. §§469, 469a-1, Archaeological Resource Protection Act (ARPA) (protection of archaeological resources and sites on public and Indian lands; 16 U.S.C. §§470aa-

470mm;  the Native American Graves Protection and Repatriation Act (NAGPRA) (protects and repatriates American Indian cultural items), 25 U.S.C. §3002(a); and the National Historic Preservation Act (NHPA) (evaluation of federal undertakings to avoid impacts on cultural or historical resources) 16 U.S.C. §470f.  Traditional cultural properties (TCPs) may be eligible for listing on the National Register.16 U.S.C. §470a(d)(6)(A)-(B); 36 C.F.R. §800.2(c)(2).   American Indian Religious Freedom Act (AIRFA), 42 U.S.C. §1996, provides for access to sacred sites. Access to sacred sites is also assured under Exec. Order No. 13007, 61 F.R. 26771 (1996).

**B.     NAW Protection of "Traditional Use Areas" Lacks Statutory or Regulatory Support**

The ROD concludes that some impacts to tribal resources could not be mitigated because "any mining within the sacred and traditional places of tribal peoples may degrade the values of those lands to the tribes that use them." SOF¶78.  Elsewhere the ROD notes that there is only one traditional cultural property, but that "the entire area is recognized as the traditional homeland and use area for seven tribes." *Id*.  As argued by NEI and NMA, the purpose of the withdrawal to protect American Indian traditional use areas was not part of the notice of proposed withdrawal.  The objective was identified only in the final ROD.

The ROD's finding is based on ethnographic or cultural landscapes areas that are linked to Indian cultures and traditions.  SOF¶¶70, 75-82.  Despite recognizing that these terms derived from literature and "are not intended to imply any kind of landscape level protection," (SOF ¶75), the ROD adopted the definition to support the withdrawal.  The FEIS addressed the impacts mining would have on the American Indian cultural and ethnographic landscapes.  SOF¶¶75-77.  The

FEIS concluded that due to the belief that mining wounds the earth, it is not possible to fully mitigate impacts.  SOF¶78.  This is in stark contrast to the FEIS' conclusion regarding cultural resources where it was found that any impacts to these resources would be fully mitigated.  SOF¶71.  The impacts on American Indian cultural landscapes are defined by how individuals would feel about the land during and after mining.

The broader term encompasses the NPS' view that tribal beliefs or values should enjoy the same protection as cultural sites.  SOF¶¶79-82.  Thus the tribes opposition to any mining is the basis to justify the NAW.  SOF¶¶73-82.  The NPS commented that the tribes had lost their culture landscapes due to past mining, the Snowbowl ski area, and other development on federal lands.  SOF¶82.

The laws and regulations protect a wide range of cultural resources and identifiable sites that are sacred or traditionally important to American Indians. There is no basis to extend the same protection for sweeping areas of land based on cultural or ethnographic landscapes that lack boundaries.

The NPS comments demonstrate that the scope of protection adopted in the ROD exceeds any statutory authority and contradicts long established precedent. As the AGS Director wrote, the NPS viewpoint would give Indian tribes veto rights over all of the public lands.  SOF¶83.  The federal court reached a similar conclusion more than 20 years ago in  *Havasupai Tribe v. United States*, 752 F. Supp. 1471, 1486 (D. Ariz. 1990), *aff'd sub nom. Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991). "Moreover, the Havasupai apparently have thousands of other religious sites within their former aboriginal lands. . . .  Giving the Indians a veto power over activities on federal land that would easily require de facto beneficial ownership of some rather spacious tracts of public property." *Id.* at 1486 (internal quotations omitted).  *See also Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058, 1063-64 (9th Cir. 2007).  The NAW provides the affected Indian tribes

a "veto power" over the one million acres of public land based on values and feelings. *See* SOF¶¶70, 73-82.

The Ninth Circuit has also upheld a lower court's decision that BLM's approval of a mining project on Mt. Tenabo was not arbitrary or capricious because the project would not harm the areas specifically identified by the tribes as sacred. *South Fork Band Council of Western Shoshone v. U.S. Dep't of Interior*, 588 F.3d 718, 724 (9th Cir. 2009). In so holding, the court noted that Executive Order 13007 contemplates protecting ceremonial uses of sacred sites, but no tribe had "articulate[d] the manner in which they seek agency accommodation for the entire mountain." *Id.* Similar to this case, the Secretary of the Interior withdrew over one million acres of land from mining based on the cultural and religious significance that seven tribes place on the entire NAW area. SOF¶¶73-82. The FEIS also concluded that any impacts that mining may have on American Indian resources may not be mitigated due to the fact that any type of drilling on the earth is considered a "wound to the earth" that can never by remediated in the eyes of American Indian tribes. SOF¶¶70, 78. The FEIS and Secretary of Interior are seeking protection of the entire NAW area without articulating why such protections are warranted and without identifying specific sites, and instead they rely on the broad assertion that the entire area is a cultural landscape that must be protected to appease American Indian beliefs and feelings. This is contrary to the legal precedent.

**IV.    QUATERRA AND AULEC HAVE STANDING**

**A.    Standard of Review**

Standing has two components, Article III case or controversy and prudential standing. *City of Rialto v. West Cost Loading Corp.*, 581 F.3d 865, 877 (9th Cir. 2009). For Article III standing, a plaintiff must "demonstrate that he has suffered 'injury in fact,' that is 'fairly traceable' to the actions of the defendant, and that the

injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Prudential standing requires a plaintiff's injury-in-fact to be "arguably within the zone of interest" of the statute the plaintiff claims the agency violated. *Port of Astoria, Or. v. Hodel*, 595 F.2d 467, 474 (9th Cir. 1979) (internal quotations omitted).

Standing is an "indispensable part of the plaintiff's case" and must be supported at each stage of litigation. *Id.* At summary judgment, the plaintiff "must 'set forth' by affidavit or other evidence 'specific facts,'" which will be taken to be true. *Id.* Plaintiff need only show a genuine issue of material fact as to standing. *Cent. Delta Water Agency v. U.S.*, 306 F.3d 938, 947 (9th Cir. 2002).

## B.   Quaterra's Standing

Within the North Parcel of the NAW, Quaterra holds an estimated 500 unpatented mining claims and Exploration Permits on seven sections of school trust lands. Doc. 72-1, Spiering Decl. ¶7. Since 2005, Quaterra has invested over $12 million on the exploration and drilling programs for its mining claims. Id. at ¶¶7, 9-11, 19. Quaterra has a legally protected property interest in its unpatented mining claims and state land leases. *U.S. v. Shumway*, 199 F.3d 1093, 1098-99 (9th Cir. 1999); *Rogers v. U.S.*, 575 F. Supp. 4, 7-8 (D. Mont. 1982).

The Notice of Segregation and NAW abruptly changed Quaterra's exploration and drilling program. Doc. 72-1, Spiering Decl. ¶¶12, 14-19, 24-31. These decisions froze all activity because the threat of a validity exam on its claims would add substantial costs, delays, and uncertainty to development. *Id.* 43 C.F.R. §3809.100. Quaterra, like other affected companies, did not exercise its NOIs and suspended further investment. Doc. 72-1, Spiering Decl. ¶12, 16. The NAW also prevents Quaterra from locating any new claims. *Id.* at ¶19.

The NAW and the applicable regulations deny Quaterra access to its mining claims without the costly and uncertain validity exam, preclude location of new claims, reduce the value of its investment made to date, cost Quaterra substantial time and money, and put at risk those claims not yet drilled. *Id.* at ¶¶16, 18-19, 29-31. While drilling is indefinitely suspended until a mineral examination occurs, Quaterra must continue to pay the annual maintenance fees of $140,000 and state lease rentals. Doc. 72-1, Spiering Decl. ¶32. The denial of access, and additional regulatory delay and expense are injuries-in-fact traceable to the NAW.

A decision setting aside the NAW would allow Quaterra to develop its mining claims as it originally planned without a mandatory, expensive and time-consuming mineral examination. Even if the DOI were to again propose the withdrawal, the requirement that it address the relevant factors and conform to federal law would reasonably exclude a significant portion of the North Parcel. The record suggests there was substantial support to exclude public lands west of Kanab Creek. SOF¶¶5, 19-20 (Coconino County DEIS Comments); (concerns about North Parcel withdrawal justification).

Quaterra's injuries to its unpatented mining claims fall within the zone of FLPMA's interest. 43 U.S.C. §§1701(a)(12) (manage public lands to implement the Mining and Minerals Policy Act of 1970, 30 U.S.C. §21a); 1712(c)(1) (mineral development is one of five major multiple uses). See *Am. Motorcyclist Ass'n v. Watt.*, 534 F. Supp. at 932 (D. Cal. 1981) *aff'd* 714 F.2d 962 (9th Cir. 1983); Doc. 87, Order on Mot. to Dismiss at 28.

### C.   AULEC's Standing

AULEC has standing to sue on behalf of its member Mohave County, because Mohave has standing to sue in its own right, the Coalition seeks to protect interests that are germane to its purpose, and the lawsuit does not require the participation of individual members. *Hunt v. Wash. State Apple Adver. Comm'n,*

432 U.S. 333, 343 (1977).  The claims asserted are germane to AULEC's purposes of facilitating the local governments' coordination and participation in the EIS process and consolidating the counties' resources to limit the serious economic, environmental, and social impacts of the withdrawal.  Doc. 72-2, Johnson Decl. ¶3. AULEC's requested declaratory and injunctive relief does not require individual member participation.  *See Hunt*, 432 U.S. at 344; *Spindex Physical Therapy USA, Inc. v. United Healthcare of AZ*, 661 F. Supp.2d 1076, 1084 (D. Ariz. 2009).

AULEC member Mohave County identified how the NAW injures its interests in land management, environmental protection, and revenue and economic interests.  ECF Doc. 72-2, Johnson Decl. ¶¶7-16, 24, 27, 31-37; Ex.81, Johnson 2nd Decl. ¶¶27-34.  Mohave County is authorized by state law to develop and enforce environmental standards, to develop plans to conserve the natural resources and protect air and water quality, and to protect the local economy.  Doc. 72-2, Johnson Decl. ¶¶7-13.  The County's plan to reduce particulate emissions to improve the air quality through road improvement projects in the eastern part of the County have been suspended due to lack of revenues that followed the notice of segregation.  Id. at ¶¶11, 32-33, 35; Ex. 81, Johnson 2nd Decl. ¶¶14, 20.  Mohave County's management and protection of the desert tortoise and its habitat has also been impacted by lack of revenues. Ex. 81, Johnson 2nd Decl. ¶¶14, 21-26.  The NAW injures the County's economic interests by reducing severance taxes paid by the mining companies to the State and distributed to the County, costing the County about 1,078 new jobs and keeping the local governments from earning about $40 million annually from payroll.  Doc. 72, Ex.2, Johnson Decl. ¶¶27, 36. Economic reports forecast that Mohave County would take in $168 million in state severance taxes.  Id.  These environmental, land management, and economic interests are all proprietary interests of the County and satisfy the injury-in-fact test.

*City of Sausalito v. O'Neill*, 386 F.3d at 1197-99; *Am. Motorcyclist Ass'n*, 534 F. Supp. at 932.

AULEC documents how Defendants violated the procedural rules under both NEPA and FLPMA by failing to coordinate with local governments, to weigh their comments, and, to the extent possible, to reach consistency between the federal action and local land use plans and policy.  42 U.S.C. §§4331(a), 4332(2)(C); 43 U.S.C. §§1712(a), 1712(c)(9), 1714(c)(2)(7), 1739(e); 40 C.F.R. §§1502.9(b), 1502.16(c), 1506.2(d). *City of Sausalito*, 386 F.3d at 1197 (quoting *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969-70 (9th Cir. 2003)).

The cooperating agency Memorandum of Understanding recognized the expertise of Mohave County and other AULEC members in "natural resources and environmental quality."  Ex. 80.  AULEC members were granted cooperating agency status to address a wide range of issues including environmental quality and land management.  There was however scant coordination and no effort to reduce conflicts between the NAW and the county plans.  Doc. 72-2, Johnson Decl. ¶14.  DOI recognized that the NAW conflicted with the counties' interests and plans but never sought to resolve or minimize the conflicts.  Ex. 81, Johnson 2nd Decl. ¶¶27-30.  For instance, BLM assured the counties that the economic deficiencies the counties identified were corrected in the FEIS. *Id* at ¶33. SOF¶¶89-90. Instead, the FEIS reduced its estimated economic impacts by almost half, in contradiction with the AULEC members' comments.  *Id*.

A procedural injury must be tied to a concrete interest that is threatened by the failure to comply with a procedural requirement.  *City of Sausalito*, 386 F.3d 1186 at 1197.  Mohave County developed and implements environmental standards through its General Plan.  Doc. 72-2, Johnson Decl. ¶¶7-13.  DOI's failure to coordinate and to resolve inconsistencies with local plans threatens Mohave County's concrete environmental, land management, and economic

interests, which FLPMA and NEPA were intended to protect.  NEPA requires federal agencies to consider the comments and views of local agencies that "are authorized to develop and enforce environmental standards."  42 U.S.C. §4332(2)(C); 40 C.F.R. §§1502.9(b), 1502.16(c), 1506.2(d).  FLPMA requires BLM to coordinate and resolve conflicts with public land management.  43 U.S.C. §§1712(a), (c)(9); 1739(e).

The NAW threatens Mohave County's concrete interests in implementing its General Plan by directly cutting off significant severance tax revenues.  Without revenues otherwise paid to Mohave County, it cannot fully implement its land use plans such as improving dirt roads to reduce air emissions.  Doc. 72-2, Johnson Decl. ¶¶15-16, 24, 27, 32-37; Ex. 81, Johnson 2nd Decl. ¶¶14, 20, 26, 28.  Mohave County would use the increased revenues to improve the 1,277 miles of unpaved public roads, thereby improving the air quality and reducing soil erosion in the County.  Doc. 72-2, Johnson Decl. ¶¶11, 33; Ex. 81, Johnson 2nd Decl. ¶¶14-20.  The County would also be able to address management and protection of the desert tortoise and its habitat.  Ex. 81, Johnson 2nd Decl. ¶¶14, 21-26, 28.

In establishing redressability, AULEC need only show that the decision could be influenced by correcting an agency's decision.  *Citizens for Better Forestry*, 341 F.3d at 975-76 (standards for redressability and immediacy are relaxed for procedural injuries).  An order setting aside the withdrawal would ensure that Defendants followed the legally required procedures, in particular, reducing conflicts with local land use plans and interests, and actual coordination with local governments that would resolve the inconsistencies with local plans.

NEPA requires federal agencies to coordinate with and to consider the comments and views of local governments that "are authorized to develop and enforce environmental standards."  42 U.S.C. §4332(2)(C); see 42 U.S.C. §4331(a), 40 C.F.R. §§1502.9(b), 1502.16(c), 1506.2(d).  As a local government

with land use planning and environmental protection authority, Mohave County falls within the zone of interests that NEPA was designed to protect. See *California v. Block*, 690 F.2d 753, 776 (9th Cir. 1982); *City of Davis v. Coleman*, 521 F.2d 661, 672 (9th Cir. 1975). AULEC establishes a concrete interest through Mohave County's General Plan, which provides for concrete actions to improve air quality, a NEPA interest. See *Douglas County v. Babbitt*, 48 F.3d 1495, 1501 (9th Cir. 1995) ; *City of Davis*, 521 F.2d at 672.

FLPMA requires public lands to be managed to protect the environmental, air, and water resources, as well to promote "multiple use and sustainable yield." 43 U.S.C. §§1701(a)(8), 1712(c)(1), (5). FLPMA also requires close coordination and involvement for land management decisions and reduction in land use conflicts. 43 U.S.C. §§1701(a)(6), 1712(a), 1712(c)(9), 1714(c)(2)(7), 1739(e). AULEC's claimed injuries to its members environmental, land management, economic, and procedural interests fall within the zone of interests that FLPMA was designed to protect. *See State of Utah v. Babbitt*, 137 F.3d 1193, 1216 (10th Cir. 1998); *Am. Motorcyclist Assoc*, 534 F. Supp. at 932; Doc. 87, Court's Order on Mot. to Dismiss at 28.

## V.   CONCLUSION

For the reasons stated above, Plaintiffs urge this Court to find the NAW unlawful and to set it aside.

Dated: December 6, 2013.

Respectfully Submitted,

/s/ Constance E. Brooks                     /s/ William Klain
CONSTANCE E. BROOKS                   WILLIAM KLAIN, # 015851
connie@cebrooks.com                        wklain@lang-baker.com
MICHAEL MARINOVICH                       Lang Baker & Klain, P.L.C.
mike@cebrooks.com                           8767 E. Via de Commercio, Suite 102
C. E. Brooks & Associates, P.C.         Scottsdale, AZ  85258
303 East 17th Avenue, Suite 650        Tel. 480-947-1911 Fax.
Denver, Colorado 80203                     480-970-5034
Tel. 303-297-9100 Fax. 303-297-
9101

Attorneys for the Plaintiffs Quaterra Alaska, Inc.; Quaterra Resources, Inc.; and the Arizona Utah Local Economic Coalition on behalf of named member, the Board of Supervisors, Mohave County, Arizona.

## CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing Motion for Summary Judgment, Memorandum in Support, the Statement of Facts and Appendix to be served upon counsel of record through the Court's electronic service system (ECF/CM) and by first class mail to Gregory Yount at the following address: 807 West Butterfield Road, Chino Valley, Arizona 86323.

Dated: December 6, 2013.

                                        /s/ Constance E. Brooks
                                        Constance E. Brooks
                                        C. E. Brooks & Associates, P.C.
                                        303 East 17th Avenue, Suite 650
                                        Denver, Colorado 80203
                                        Tel. 303-297-9100 Fax. 303-297-9101

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Plaintiffs Motion and Memorandum for Summary Judgment