Constance E. Brooks (*pro hac vice* Colo. Bar. No. 18258)
Michael B. Marinovich (*pro hac vice* Colo. Bar. No. 24677)
C. E. BROOKS & ASSOCIATES, P.C.
303 East 17TH Avenue, Suite 650
Denver, Colorado 80203
(303) 297-9100 (telephone)
(303) 297-9101 (facsimile)
connie@cebrooks.com
mike@cebrooks.com

William Klain, # 015851
wklain@lang-baker.com
LANG BAKER & KLAIN, P.L.C.
8767 E. Via de Commercio, Suite 102
Scottsdale, AZ  85258
(480) 947-1911(telephone)
(480) 970-5034 (facsimile)

Attorneys for the Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PRESCOTT DIVISION

| | |
|---|---|
| Gregory Yount, | ) |
| | ) |
| Plaintiff; | ) **Civil. No. 3:11-CV-08171-DGC** |
| | ) |
| v. | ) |
| | ) **PLAINTIFFS QUATERRA** |
| S.R.M. Jewell, Secretary of the Interior; *et al.* | ) **RESOURCES INC. and** |
| | ) **ARIZONA UTAH LOCAL** |
| | ) **ECONOMIC COALITION** |
| Defendants; | ) **STATEMENT OF FACTS IN** |
| | ) **SUPPORT OF MOTION FOR** |
| and | ) **SUMMARY JUDGMENT** |
| | ) |
| Grand Canyon Trust, *et al.* | ) |
| | ) |
| Defendant-Intervenors. | ) |

National Mining Association; Nuclear
Energy Institute,                                )
                                                 )
                                                 )      **Civil No. 3:12-cv-08038-DGC**
        Plaintiffs;                              )
                                                 )
v.                                               )
                                                 )
S.R.M. Jewell, Secretary of the Interior;        )
*et al.,*                                        )
                                                 )
        Defendants;                              )
                                                 )
and                                              )
                                                 )
Grand Canyon Trust, *et al.*,                    )
                                                 )
        Defendant-Intervenors.                   )

Northwest Mining Association,                    )
                                                 )
        Plaintiff,                               )
                                                 )
v.                                               )      **Civil No. 3:12**-cv-0842-DGC
                                                 )
S.R.M. Jewell, Secretary, Department of          )
the Interior; *et al.*,                          )
                                                 )
        Defendants;                              )
                                                 )
and                                              )
                                                 )
Grand Canyon Trust, *et al.*                     )
                                                 )
        Defendant-Intervenors.                   )

Quaterra Alaska, Inc., Arizona Utah              )
Local Economic Coalition, on behalf of           )
member the Board of Supervisors,                 )
Mohave County, Arizona;                          )      Civil No. 3:12-8075-DGC
                                                 )
        Plaintiffs;                              )
v.                                               )
                                                 )
S.R.M. Jewell, Secretary of the Interior;        )
*et al.*                                         )
                                                 )
        Defendants;                              )
                                                 )
and                                              )
                                                 )
Grand Canyon Trust, *et al.*                     )
                                                 )
        Defendant-Intervenors.                   )

1    Plaintiffs Quaterra Resources, Inc. and the Arizona-Utah Local Economic

2    Coalition (AULEC) on behalf of named member Mohave County submit the

3    Statement of Facts and Appendix from the Administrative Record (AR) in support

4    of the Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and L.R. 56.1.

5    The Table of Contents lists each document by Exhibit number, administrative

6    record cite and document name.  The citations refer to the exhibit number and

7    administrative record citation only.

8    Existing Land Management and Regulatory Scheme

9    1.    The Arizona Strip Resource Management Plan of 2008 (2008 RMP)

10   designated or expanded Areas of Critical Environmental Concern (ACEC) to protect

11   cultural and sacred resources.  Ex. 1, AR 082691, 082726-27, 082751, 082850-51,

12   082847-082854. The ACECs protect unique cultural and heritage sites, geologic

13   features, and sensitive or listed plants and include Johnson Spring, Lost Mountain

14   Spring, Moonshine Ridge, Kanab Creek, and Marble Canyon.  *Id.*  The ACECs

15   require special surface use limits, including no Off-Highway Vehicle use, rights-of-

16   way avoidance, and mitigation measures to protect resources.  *Id.* AR082847-54.

17   The 2008 RMP FEIS addressed the cumulative effects of future uranium mining,

18   *Id.* at AR083174, -205, -224, -332, -334, -382-3, -436, -446, -464, -535, -538, -670,

19   and proposed withdrawal from future mining. *Id.* AR083809.

20   2.    The 2008 RMP Final Environmental Impact Statement (FEIS) states that

21   "erosion-related impacts are effectively controlled under existing regulations;

22   therefore, the overall impact to stream function in all three parcels would be

23   expected to be negligible but might be moderate in some locations."  Ex. 3,

24   AR002089.  Soil, water, and flood related controls are designed for site specific

25   hydrologic conditions, as shown by the regulations in the Ex. 3, AR002072, and

26   remove concern regarding flood or wind blown contamination from mining activities.

27   3.    Modern uranium mining techniques and modern regulatory structure result

28

in no to negligible adverse impacts on water quality, air quality, or land resources. Ex. 39, AR003308.

4.      Under the Bureau of Land Management (BLM) rules, surface conditions are returned to their natural state during reclamation, as shown by the Hermit Mine, the only mine developed after 1984 and fully reclaimed.  Hermit Mine site's average uranium concentration is below levels known to naturally occur in the region and none of the arsenic soil samples exceeded these levels.  Ex. 6, AR000110-14.

Proposed Withdrawal

5.      The NAW boundaries were based on Cong. Raul Grijalva's bill, which correlated to the mining claims filed as of 2008. Ex. 3, AR001623.  The boundaries do not reflect resources, aquifers or delineation of the Grand Canyon watershed except to exclude private and state lands or minerals.  Ex. 9, AR072824.  As a result 120,000 acres of the North parcel west of Kanab Creek is not in the Grand Canyon watershed and aquifer flows are northwesterly.  Ex. 10, AR072832.

6.      DOI described "the purpose of a 20-year withdrawal of public lands from locatable hardrock mineral exploration and mining is to protect the Grand Canyon Watershed, whose waters, if contaminated, may harm natural, cultural, and social resources."  Ex. 3, AR001625; Ex. 11, AR000545.  The term "'cultural" resources "[was used] in an inclusive manner meaning not just archy or Native American resources but the entire social/lifestyle/recreation values people hold dear in the study area." Ex. 12, AR072835.

7.      The Purpose and Need for the DEIS and FEIS state:

> Surface water and groundwater including seeps springs wells and runoff that may ultimately flow into the Colorado River which is used for agricultural municipal commercial domestic and recreational purposes by people throughout the southwestern United States. Cultural resources including prehistoric and historic sites places of traditional religious and cultural importance including Traditional Cultural Properties and other places of significance to American Indians.

1 Ex. 11; *see also* Ex. 3, AR001625.

2 8.     DOI did not identify a preferred alternative.  Ex. 11, AR000490, AR000594.

3 9.     DOI received more than 290,000 comments, all but 1% were form letters.

4 Coconino County, which opposed mining, recommended excluding land west of

5 Kanab Creek from the North Parcel of the NAW. Ex. 63, AR003343-50.   The

6 Arizona Resource Advisory Council (RAC) changed its position to oppose the

7 NAW.  Ex. 13, AR008076.

8 10.    The Secretary announced the preferred alternative on June 21, 2011, when

9 he approved an emergency withdrawal. Ex. 14, AR003651; 76 Fed. Reg. 37826

10 (2011).

11 11.    The NAW closes 1,006,545 acres to mining: North Parcel (549,995 acres)

12 is adjacent to the Kaibab Forest already closed to mining and the GCPNM; South

13 Parcel (322,096 acres) is located in Kaibab National Forest; and East Parcel

14 (134,454 acres) on public land east of GCNP and adjacent to VCNM and the

15 Navajo Reservation.  Ex. 2, AR 000004, 000008.

16 <u>Record of Decision</u>

17 12.    The ROD lists four reasons for the withdrawal: (1) uncertain effects to

18 surface and ground waters and risk of significant harm; (2) potential impacts to

19 tribal resources which could not be mitigated, because mining within sacred and

20 traditional places of tribal peoples may degrade the values of those lands; (3)

21 potentially 11 mines will proceed even with the NAW, so mining will in fact continue

22 and benefit the communities; and (4) the circumstances and unique resources

23 located in this area support a cautious and careful approach.  Ex. 2, AR000009.

24 13.    Notwithstanding lack of data, the ROD concluded that the unavailable

25 information was not essential to the decision because data from six former mine

26 sites and the conservative assumptions were sufficient. Ex. 2, AR000010.

27 14.    The ROD noted that studies and in areas where operations temporarily

28

1   suspended, "[u]ranium and arsenic were two elements consistently detected in the

2   areas disturbed by mining in quantities above natural background levels." Ex. 2,

3   AR000009. The ROD also cites dissolved uranium in 15 springs and 5 wells. *Id.*

4   15.    The ROD rejected comments that the NAW embraced the richest uranium

5   deposits.   Ex. 2, AR000018.   The ROD finds that the comment was not

6   peer-reviewed and did not provide geological information.

7   16.    The comments correlated uranium drill records to breccia pipes in relation

8   to the geologic formations found in the NAW. Ex. 18, AR005359-5362; *see also*

9   Ex. 22, AR059912-938.

10  17.    The ROD prohibits any use of the mining claim surface without a mineral

11  examination to prove that sufficient quantity and quality of ore is exposed to support

12  investment. Ex. 2, AR000006-7.

13  18.    The ROD and the FEIS did not consider the Arizona Strip RMP land use

14  decisions because "uranium mining was not a major issue at the time it was being

15  written." Ex. 2, AR000019. *Cf.* SOF ¶2.

16  19.    District Manager Scott Florence commented on the ROD rationale:

17           There is much we do know about the geo-hydrology of the south
             parcel which has been studied extensively. . . .  there is a ground
18           water divide from which water moves north (to the canyon) or south
             (away from the canyon). . . . In addition, there were very few, if any,
19           resource values or concerns in these areas." Ex. 34, AR081794. BLM
             Chris Horyza responded that [Florence's comments] "weaken the
20           rationale for the withdrawal decision (as it has been suggested to us)
             even further. *Id.*
21
22  20.    Florence later commented on the draft ROD: "The data evaluated for 1,014

23  water samples from 428 sites indicate that about 70 sites have exceeded the

24  primary or secondary maximum contaminant levels for certain major ions and trace

25  elements, such as arsenic, iron, lead, manganese, radium, sulfate, and uranium."

26  He interpreted the report to read the "95% of all samples were below the EPA

27  standard for dissolved uranium and of the 70 sites, these were exceeded only for

28

arsenic, ion, lead and sulfide (not dissolved uranium and the others listed)." Ex. 35, AR081796. There appears to be discrepancies between the USGS Report and the USGS Fact sheet on the correct wording, but no changes were made because it directly quoted the USGS Report.  In the same email chain, Florence wrote:

> areas on the northeast and west portions of the north parcel that I pointed out have low resource values, are 40-45 miles from the canyon and/or don't drain into the canyon at all total about 200,000 acres. . . .groundwater movement in the northeast end of the north parcel is to the north . . . away from the canyon.

Ex. 36, AR081803.  Later Horyza wrote there is no "way to strengthen the rationale for the withdrawal and still make these factual points in the ROD." Ex. 35, AR081799.

Effects of Uranium Mining on Water and Soils

*Soils*

21.    The USGS assumed the task of developing data relevant to the proposed withdrawal including estimating the amount of uranium resources within the proposed and previously withdrawal areas, investigating the environmental effects of previous mine operations, and compiling available toxicological information on exposure pathways and biological effects of uranium and associated decay products relevant to species occurring in the region. Ex. 6, AR000066.  USGS produced its report entitled Hydrological, Geological, and Biological Site Characterization of Breccia Pipe Uranium Deposits in Northern Arizona, SIR 2010-5025 (SIR-2010-5025).

22.    SIR 2010-5025, Ch. B found a "varied legacy of contamination" from mining in the Kanab Creek area.  The soil 'contamination' was dust from three standby mine sites, except for Hack Complex, and reclaimed mines, Hermit and Pigeon. The soil exceeded background levels next to mine sites but were generally within EPA limits.  Ex. 6, AR000184-185, AR000190-191.

23.    SIR 2010-5025 Ch. B concluded that flash floods eroded a terrace and

1   carried waste rock from Hack 1 into the ephemeral streambed.  Ex. 6, AR000111.

2   24.     Other experts suggested that the soil transport could have come from the

3   original Hack mine reclamation, next to Hack 1.  Reclamation for Hack 1-3 put the

4   waste rock into the mine shaft rather than covering it with soil.  Ex. 28, AR042327.

5   25.     Otton rejected criticism of the conclusion: "[I]t is clear that much larger

6   volumes of reclaimed waste rock have been moved down channel by flood events

7   since reclamation was finished." Ex. 29, AR067443-44.  BLM does not address the

8   fact that waste rock was put in the shaft.  Energy Fuels Nuclear (EFN) spent

9   $800,000 on reclamation and did not leave waste rock.  Ex. 28, AR042327.

10  *Water*

11  26.     Chapter C of SIR 2010-5025 compiled more than a thousand water samples

12  to determine the correlation between dissolved uranium and trace elements and

13  mining.  It found:

14          Samples from 15 springs and 5 wells in the region contained dissolved
15          uranium concentrations greater than the U.S. EPA maximum
            contaminant level for drinking water. These springs and wells are
            close by or in direct contact with mineralized ore bodies, and those
16          concentrations are related to natural processes, mining, or to both.

17  Ex. 6, AR000202.  The study could not correlate the exceedances to mining other

18  than the Orphan mine.  The ROD uses the same statement regarding dissolved

19  uranium without including the lack of correlation.

20  27.     SIR 2010-5025 Ch. C does not explain that about 11 of the 15 springs and

21  at least one well are not located in GCNP.  Ex. 6, AR000241, AR000244.  As

22  displayed on the maps, Figures 9 and 10, springs with exceedances are near the

23  Orphan Mine within the GCNP.  *Id.*

24  28.     Congress confirmed purchase of the Orphan Mine 1962 and mining ceased

25  in 1979.   Public Law 87-457.   NPS initiated reclamation in September 2008,

26  although Energy Fuels Nuclear offered to reclaim it in the 1980s. Ex. 3, AR002454.

27  Its unreclaimed condition and location on an exposed canyon face two miles from

28

1    the Colorado River on the South Rim of GCNP facilitated runoff and contamination

2    of  Horn Spring and Horn Creek.  Ex. 6, AR000242.

3    29.     Mining at the Orphan mine occurred before modern environmental laws and

4    regulations that significantly reduced environmental impacts.  Ex. 19, AR008523.

5    30.     USGS also collected groundwater samples in 2009 from 24 sites in August

6    and September 2009 to evaluate connections with the R-aquifer and the Coconino

7    Aquifer.  The mineral concentrations detected correlated to geographic area and

8    groundwater source but "[r]elations of uranium and 13 other trace elements to

9    mining activity were few and inconclusive."  Ex. 6, AR000202.

10   31.     "[W]ater chemistry in mined area similar to that of nominated areas (limited

11   data set).  The limited samples (n=24) indicate dissolved uranium concentrations

12   in areas without mining generally similar to those with active or reclaimed mines."

13   Ex. 30, AR003950-51.

14   *Redwall-Muav Aquifer*

15   32.     The depth to water in regional Redwall-Muav Limestone aquifer system

16   ranges from 2,500 feet to more than 3,800 feet below land surface.  Ex. 20,

17   AR003888.

18   33.     The FEIS states that "AAC Title 12, Chapter 15, Article 8 requires proper

19   construction and abandonment of wells to prevent cross-contamination of different

20   aquifers."  Ex. 3, AR002060-61.  Both the R-aquifer and perched aquifers are

21   protected by these regulations which were adopted in 1984.  *Id.*

22   34.     The FEIS concludes that radionuclide migration to the R-aquifer is highly

23   unlikely and would be mitigated based on site-specific conditions.  Ex. 3,

24   AR002072-73.  Distance and dilution mitigate impacts to the R-aquifer.  Ex. 24,

25   AR006820; see also Ex. 43, AR042839; Ex. 33, AR042831.

26   35.     SIR 2010-5025 Ch. C also addressed potential impacts to the R-aquifer but

27   could not correlate recharge or water movement to the R-aquifer, which is more

28

than 1,000 feet below the base of a typical uranium mine.  The mine is between 800 and 1500 feet from the surface. Ex. 6, AR000202; Ex. 3, AR002065-66, AR002053. The R-aquifer flows north towards Utah where it lies thousands of feet below the surface. Ex. 3, AR002063.  The FEIS concludes that mining would have minimal impacts on the quantity of the water in the R-aquifer.  Ex. 3, AR002069.

36.    The FEIS addressed theoretical contamination from downward migration of surface or ground waters to the R-aquifer through fractures, faults, sinkholes, or breccia pipes. The FEIS concluded such migration is unlikely based on the region's hydro-geologic features.   Ex. 3, AR002053.   The R-aquifer is covered by a 1,000-foot thick, unsaturated and practically impermeable layer of Supai Group Sandstone.  Ex. 3, AR002601.

37.    Spencer and Wenrich prepared a report on water movement within perched aquifers to the R-aquifer and concluded that it is unlikely that water would move from breccia pipes to an aquifer. Ex. 28, AR042327.

38.    SWCA the EIS contractor reported that after refining the hydro-geological models:

> there isn't much basis for concern about pollution of the regional (Redwall) R-aquifer because of the distance of most mines from the discharge springs in the lower Kanab Ck and capacity for dilution. On the south parcel there are many springs that discharge from the R aquifer close to the rim but the direction of flow turns south as you move away from the rim. On the east parcel, because of its small size and proximity to the discharge points in the canyon there is more concern.  The main concerns on the north parcel are effects to small springs that would be associated with perched water tables.

Ex. 43, AR042839. BLM considered revising NAW using hydro-geological models to reduce the NAW size.  Ex. 44, AR043021.

39.    The FEIS concludes that "deep drilling operations are projected to represent no impact or a negligible impact to R-aquifer water quality." Ex. 3, AR002069. The finding reflects factors of dilution and distance, such as speed of water moving through a fissure and the distance, as well as the Supai formation that sits above

the R-aquifer.  Fissures and cracks are less likely to allow water movement due the geology at the pipe that tends to seal itself and the Supai formation is less permeable.

*Perched Aquifers*

40.    SIR 2010-5025 Ch. C also addressed effects of mining on perched aquifers. Ex. 6, AR000102.  "Perched aquifer zones in the proposed withdrawal area are characterized as being commonly small, thin, discontinuous and generally dependent on annual recharge to sustain yield to springs and wells." Ex. 3, AR002053.

41.    The FEIS assumes uniform drilling in the North Parcel to conclude 13.3% of the perched aquifers may be intersected by drilling and that it may be a major impact on springs since there is less dilution.  Ex. 3, AR001689, 002063.

42.    Perched aquifers may be used at a mine site to control dust.  Montgomery & Associates reported that the "[p]yrite cap was usually encountered at top of ore body, which caused any perched groundwater to be highly mineralized and non-potable."  Ex. 31, AR043807-808.  Most perched aquifers are not connected to a spring and are of poor quality.  *Id.*

43.    Blind breccia pipes have no cone of depression to trap water for the development of perched aquifers so the risk of impacts to perched aquifers from blind breccia pipe uranium mining is substantially lower. Ex. 22, AR059912.

44.    The FEIS appendices list springs and wells associated with a perched aquifer for the North Parcel within the NAW.  Ex. 5, AR002860-62.  Only eight springs are classified as perennial, three as intermittent or ephemeral.  *Id.* Appendix D lists wells registered with Arizona Department of Water Resources (DWR), although many are not in use. Ex. 4, AR002827-002858. Depth is the only information that may connect the wells to the location of perched aquifers.  Ex. 5, AR002860-62.

45.     The FEIS states that there is minimal risk of impact to perched aquifers "because the regulations are protective of groundwater, deep drilling operations that occurred after the regulations were . . . are considered to represent no impact or a negligible impact to the quantity and quality of perched groundwater available to perched aquifer springs or wells."  Ex. 3, AR002074.

46.     The FEIS states, drilling will temporarily affect quantity of water in a perched aquifer where operations drill into the trapped water.  Ex. 3, AR002061.

47.     USGS peer review found that the quality of uranium data was robust and reliable but there were data quality issues related to the older samples.  Ex. 20, AR003893, 3894. Hoffman recommended that USGS exclude the data from the Hermit Mine and all pre-1990s data.  *Id.* If the SIR 2010-5025 Chapter C were changed the conclusion would state "In re-evaluation 68% of 473 samples had values less than 5 ug/L; 90% of samples had values less than 17.7 ug/L and 95% had values less than 29 ug/L."  Ex. 20, AR003895.  The SIR 2010-5025 Ch. C retains the original data, and the FEIS and ROD used the original conclusions.

48.     Larry Martin NPS hydrologist declined to provide comments on the DEIS because he concluded that "potential impacts grossly overestimated and even they are very minor to negligible."  Ex. 24, AR006820.  Martin's comments generated controversy within NPS but after careful review, his superiors agreed with his conclusions.  Bill Jackson wrote:

> This is obviously a touchy case where the hard science doesn't strongly support a policy position.  Probably the best way to "finesse" this would be fall back on the "precautionary principle" and take the position that in absence of even more complete certainty that there is no connection between uranium mines and regional ground water."

Ex. 26, AR006830.

49.     NPS hydrologist Larry Martin criticized the inclusion of the Orphan Mine data because it overstated the impacts from uranium mining on water quality. Ex. 21, AR004219. Martin wrote:

1
2
3
4

> data from Horn Creek which is affected by unreclaimed mine site immediately adjacent to canyon rim and projected to represent anticipated future conditions that could occur from mining breccia pipes several miles from the rim and on the opposite side of the groundwater divide. if contaminants did flow from the future mine sites to the regional R aquifer, flow would be toward the south and away from the canyon.

5   50.    USGS defended use of the Orphan Mine data as representative of mining

6   conditions and reasonably foreseeable impacts.   Ex. 27, AR066752; Ex. 20,

7   AR003893.

8   51.    The FEIS cites Orphan mine as evidence of the uncertainty of hydrogeologic

9   conditions below mine sites, even though the NAW does not have similar

10  hydrogeologic conditions.  Ex. 6, AR000242; Ex. 3, AR001766, AR002064.

11  52.    NPS commented throughout the EIS process that studies showing lack of

12  adverse impact should not be construed as concluding that "mining exploration and

13  development does not impact critical resources in the Grand Canyon watershed."

14  Ex. 64, AR003997; Ex. 45, AR004114; Ex. 46, AR003544.

15  53.    SIR 2010-5025 Ch. D addressed potential ecotoxicity based on literature

16  survey.  SIR 2010-5025 Ch. D, Hinck, *et al.*, *Biological Pathways of Exposure and*

17  *Ecotoxicity Values for Uranium and Associated Radionuclides*. Ex. 6, AR000399-

18  000411.  The report cautions that it cannot be used to make conclusions regarding

19  pathways or impacts of uranium exposure on wildlife and vegetation.  *Id.*

20  Factual Contradictions Between ROD and FEIS / Record

21  54.    Even when data analysis showed no impact, the FEIS assumed: "If an

22  impact is possible, but cannot be quantified, it must be assumed that the impact

23  might or might not exceed thresholds for drinking water, which would constitute as

24  much as a major impact." Ex. 32, AR082484.

25  55.    Based on the SIR 2010-5025 and other reports, the federal cooperators did

26  not believe there was a factual basis to withdraw the NAW to protect the R-aquifer.

27         The precipitation in the north parcel is estimated to be between 1 and

28

12 per year for the hydrology studies it is assumed to have of precipitation per year. The discharge for each spring was rounded up to the nearest GPM. There are no wells in the perched zones dilution calculation was completed for the Redwall Muav aquifer using the following assumptions average pump of 3-5 GPM concentration of 4 ug/l per minute and 18 mines total within the 20-year time frame. This information was used to determine how much spring discharge would be needed to dilute the concentration of dissolved uranium in water source enough to return water to drinking water quality. The dilution calculation came to 250 GPM. The springs in the area are easily at that level. Based on this there is no basis for withdrawing the north parcel based on contamination of the Redwall Muav aquifer since even looking at the worst-case scenario reveals numerous opportunities for dilution to occur. The levels seen for arsenic were less than the multiples allowed for drinking water therefore less discharge would be required to meet drinking water standards for arsenic.

Ex. 33, AR042831; see also Ex. 43, AR042839-40.

56.     The meeting minutes express the view that there was sound basis to reduce the size of the South Parcel.  "On the south parcel there are many springs that discharge from the aquifer close to the rim but the direction of flow turns south as you move away from the rim."  *Id.*

57.     The SIR 2010-5025 data analysis did not reflect current law or regulations. Ex. 6, AR000057.  BLM assumed that the FEIS had to incorporate existing law and rules.  Ex. 62, AR072730.

Endowment and Reasonable Foreseeable Development

58.     USGS an estimated 375 million pounds of mineable uranium within the NAW or 164,000 Tons. Ex. 6, AR000092.  These calculations used the data from USGS Circular 1051 (Finch *et al.* 1990) adjusted for a smaller land area.  BLM explained:

They recycled the 1990 Finch estimate of uranium endowment with some slight corrections for acreage. If you go back to the 1990 Finch estimate: the USGS took a control plot on the North parcel centered around Hack-Pinenut, estimated a per square mile endowment on that control plot, and then extrapolated the endowment to the entire area. If the South parcel feels like it comes up short in discoveries, it could be that the 1990 Finch estimate was in error in extrapolating Hack-Pinenut to the south parcel. Or it could also be that the exposure of breccia pipes is different on the South, with more blind pipes that have little surface expression and will only come to discovery with advanced remote sensing techniques.

Ex. 37, AR072856.

59.    The FEIS and SIR 2010-5025 Ch. A excluded blind breccia pipes even though potentially significant.

> Hidden breccia pipe are wild card in resource estimates; one exploration exec reports 2-3 hidden pipes are present for every 1 that have surface expression; no way of evaluating at this time
> Surface estimate usually low by factor 2.5:1 based upon drilling v. final production is the claim but the actual ratio given in Chapter A is 3.65:1 based on consultant report evaluating 6 mined deposits (sample small and thus error bars on this estimate of ratio may be large).

Ex. 38, AR045625-045628.

60.    Quaterra calculated the mineralized breccia pipe density at different stratigraphic levels in the Grand Canyon and surrounding area to prove that there may be 220 mineralized breccia pipes within the NAW.[1] Ex. 22, AR059922. Using survey data, Quaterra assumed half of the mineralized pipes are economically viable and using the historic estimate of 3 million pounds per developed breccia pipe, the total economically viable uranium potential in the NAW could total 330 million pounds, not the 45 million pounds estimated by the FEIS. *Id*. at 9-11.

61.    Nearly all known mineralized pipes in the region have been found in a north-south trending mineralized "corridor." The withdrawal boundaries were based on located mining claims as of 2008.  "More than three dozen pipes have been drilled outside of the corridor by Energy Fuels Nuclear. The pipes had large and well developed structures but lacked significant mineralization." *Id.*

62.    Relying on SIR 2010-5025 Ch. A's analysis, the reasonable foreseeable development team (RFD) assumed only 15% of the uranium endowment would be economic. Ex. 77, AR005144. This conclusion lacks any supporting data and contradicts other information that breccia pipe uranium grades are among the highest in the US.

---

[1]  BLM recognized Gene Spiering's expertise.  Ex. 77, 78, 79, AR005144; AR043893; AR043814.

63.    The BLM Mineral Examiner's report concludes:

> Failure to develop uranium resources on the subject lands that have the potential of becoming part of the second most important uranium-producing region in the United States has far reaching economic implications, which are beyond the scope of this report.

The BLM Mineral Report classifies the uranium potential of the NAW as "(H/D)"; the highest classification for potential and level of certainty. Ex. 57, AR000416.

64.    The FEIS responded that Hack 2 was a surrogate for hidden breccia pipes. Ex. 3, AR002427.  This response would assume a ratio of one hidden pipe for every three pipes, while all of the comments suggested the ration was 2.5 or 3.65 to one.  There are only three pipes in the Hack Complex, since Hack 1 mined the original Hack pipe.  Ex. 8, AR081657.

65.    The FEIS concluded that the withdrawal will not impair 12% of the most favorable endowment, but will "seriously affect the potential development of the only uranium mineralized area" on federal lands.  *Id.* Ex. 5, AR002860-002862. USGS 2010-5025 did not consider data developed since 1990. Ex. 6, AR000092.

66.    Omission of more recent data, (Ex. 22, AR059920-24) failure to estimate for hidden breccia pipes, withdrawal boundaries based on located claims 86-87, which reflect industry determinations of potential, and misuse of the Wenrich study to adopt the 15% cut off are all errors that understate the viable uranium resource. Ex. 8, AR081718-9. The higher endowment further shows that mining would be a long-term industrial activity providing jobs and income for 42 years, not the 20 years assumed in the FEIS.  Id.

Cultural Resources

67.    The NAW area includes reservations and traditional/cultural sites for the Hualapai or Walapai (Hualapai: Hwalbáy[1]), Hopi, Havasupai, Southern Paiute, Zuni and Navajo Nation tribes.  All tribes were cooperating agencies and were consulted pursuant to NHPA/ARPA rules.  Ex. 3, AR002323.

68.     The FEIS described cultural resources by landscape and site.

> The Kanab Plateau and House Rock Valley are encompassed by the Grand Canyon Regional Landscape of the Southern Paiute. The Kanab Plateau parcel includes the Kanab Creek ecoscape, Kanab Creek, Kanab Creek Ghost Dance site, Yellowstone and Antelope Spring, trails, and resource areas. The House Rock parcel includes the Colorado River, pre-Euro-American trail systems, Aesak cultural landscape, resource areas, Cane Ranch, Mormon Honeymoon Trail. The Tusayan parcel includes Red Butte, resource areas, Hopi Trails, and Navajo cultural landscapes.

Ex. 3, AR002214-21; Ex. 47, AR042951.  The sites listed for the Kanab Plateau are included in ACECs under the 2008 RMP.  *Supra* ¶2.

69.     The FEIS addresses the potential impacts of mining on cultural historic and archaeological resources and concludes that such impacts are negligible due to existing laws and regulations that either require avoidance or mitigation of any impacts.  Depending on the individual location of mines, cultural resources may not be disturbed at all.  Ex. 3, AR002215.

70.     The FEIS also concludes that traditional cultural practices and sacred physical tribal sites and objects are protected from direct and indirect impacts of mining activities under FLPMA, NEPA, the ARPA, the NHPA, NAGPRA, the RLUIPA, as well as several corresponding regulations.   Ex. 3, AR002216, AR002223. The remaining Native American resources discussed in the FEIS which may not be mitigated, are individual sensibilities, specifically, the belief that mining the earth for commercial gain is "wounding" the earth. Ex. 3, AR002221.

71.     The regulations require a cultural resources inventory prior to all mining activities that involve surface disturbance.  The FEIS concludes that there would be "no cumulative impacts to cultural resources are anticipated under Alternative A, [the No Action alternative]."  Ex. 3, AR002216-2218.

72.     SWCA commented: "drill sites can be moved, at least to a point, to avoid sensitive resources (we've done that here)." Ex. 47, AR050279.   "Seems misleading to say any of the hundreds of sites could be potentially impacted.. . .

and is really not a good impact analysis. It would be impossible to impact all those sites with the acreage of disturbance even if intentionally locating mining on top of cultural sites. Doesn't consider any mitigation and loses distinction among alternatives." Ex. 47, AR050286.

American Indian Resources or Cultural Landscapes

73.    All of the tribes opposed uranium mining and supported the NAW. The detailed comments identified specific sites as sacred or having cultural significance. *See* Ex. 3, AR001905-22.

74.    The comments did identify land areas that were historically important: (1) a 108 mile stretch along the south side of the Grand Canyon and the Colorado River, for the Hualapai, Ex. 7, AR003369 (2) all of Arizona for the Hopi, (3) lands within and around the Grand Canyon for the Hopi and Havasupai, Ex. 7, AR003366, [Hopi] (4) the Grand Canyon for the Navajo Nation, and (5) all of northern Arizona for the Southern Paiute.  Ex. 3, AR001916; Ex. 7, AR003388, AR003394.

75.    In the NAW FEIS, "The concept of 'cultural landscape' or 'ethnographic landscape' is taken from scholarly literature and is used in the EIS exclusively in this sense.  These terms are not intended to imply any kind of landscape level protection." Ex. 3, AR001916; Ex. 49, AR069464; Ex. 75, AR073041. The Solicitor reviewed the definition of "cultural landscape" and "ethnographic landscape".  Ex. 49, AR0069464.  Connie Stone foresaw years of litigation over the term.  *Id.*

76.    The FEIS discusses cultural resources in Chapter 3, 3.11 and cumulative impacts in Chapter 4, 4.11.  Ex. 3, AR001905-001912, 002214-002219.  The FEIS concludes that existing regulations fully mitigate impacts on cultural resources.  Ex. 3, AR002216, 002218.

77.    The FEIS discusses Indian resources in FEIS 3.12 and impacts in 4.12. Ex. 3, AR001912-001922, AR002219-002229.  The FEIS defines American Indian resources as places that are important to American Indian cultures and traditions,

and may be "individual landforms or large landscapes; they may be associated with sacred beings or ancestors, places where people came and still come to hunt game or gather plant resources, or archaeological sites."  Ex. 3, AR001583, AR001912. They include "cultural landscapes; rivers, creeks, and springs; known activity areas; and trails and subsistence areas."  *Id.*  *See* Ex. 3, AR002221.  The FEIS also uses the term "ethnographic landscape."  *See* Ex. 3, AR001583, AR001905, AR001912, AR001916.  Cultural resources are defined as a "physical phenomena associated with past or present cultures and include archaeological sites and historic buildings and structures, as well as places of traditional and cultural importance."  Ex. 3, AR001905.  *See* Ex. 3, AR002214.

78.     The FEIS concludes that due to the belief that mining wounds the earth it is not possible to fully mitigate impacts. Ex. 3, AR002221-002223, AR002225.  The ROD also concluded that "any mining within the sacred and traditional places of tribal peoples may degrade the values of these lands to the tribes that use them." Ex. 2, AR000009.  Despite only recognizing one traditional cultural property, the ROD states that "the entire area is recognized as the traditional homeland and use are for seven tribes."  Ex. 2, AR000011.

79.     NPS commented that the tribal perspective believed that "each hole drilled into the earth is a wound to the earth and there is a cumulative impact to drilling hundreds/thousands of these holes for exploratory drilling projects. Full mine operations or exploratory drilling have the same adverse impact from a tribal perspective." Ex. 50, AR004345; *see also* Ex. 51, AR043769.

80.     Based on NPS comment, the FEIS replaced the word "beliefs" with "Thus, Alternative A would result in the most considerable impacts to tribal sense of place, value, attitudes about the study area." Ex. 52, AR004350.

81.     The conclusion that reclamation would not 'restore the setting and integrity' of a traditional cultural property' reflects NPS views. Ex. 53, AR004501; *see also*

1   Ex. 54, AR076343. ("[T]he primary issue is with drilling into the earth, a cultural

2   taboo, which is seen as irreversible desecration of these sites.")

3   82.    In the same comments, NPS stated:

4          1) Each tribe has sacred places across the landscape, 2) Most of
           these are not on tribal land, 3) These places are being steadily
5          impacted (Snowbowl, Woodruff Butte, Taylor, Mt Graham, etc), 4)
           Tribes see this as inhibiting their ability to practice their religion and a
6          methodic destruction of their culture."

7   Ex. 54, AR076342. SWCA appears to agree but one person commented that some

8   of the sites listed are a bit far removed to include in the EIS. *Id*.

9   83.    Other cooperators questioned the phrase "wounding the earth."  AGS Singh

10  wrote: "if there was a cultural site a federal agency would not grant a permit to mine

11  there.  A site survey for archeological materials is conducted before the site is

12  approved."  As to DEIS 4.12, Singh wrote:

13         if perception of adverse effects is as important as a physical impact,
           this becomes a no-win situation."  and "Any wounding of the earth
14         through drilling or mining.  How does this square with wells that they
           drill for water? Coal mining is being conducted in the Black Mesa; with
15         many tribal persons employed there.   Many local persons helped
           locate uranium deposits in the Four Corners area in the 1940s and
16         1950s and work in them.

17  Ex. 55, AR052123.

18  Coordination

19  84.    The AULEC members except for Garfield County and Fredonia signed

20  cooperating agency agreements in February 2010.  Ex. 80, AR056730-056781.

21  85.    AULEC members scheduled a public hearing on the NAW regarding the

22  economic impacts and invited Scott Florence. Ex. 66, AR069454; Ex. 67,

23  AR069459.

24  86.    Two uranium mills can process uranium from NAW, Shootaring in Garfield

25  County and White Mesa Mill in San Juan County.  These mills are important to the

26  local economies.  Uranium mining would bring the second mill out of stand-by

27  status. Ex. 65, AR003420; Ex. 8, AR081668.

28

87.    The FEIS did not consider the newer mill in Garfield County even though the shorter distance would reduce emissions and hauling and would provide income to southern Utah communities.  Ex. 3, AR002253-54.

88.    Without the withdrawal, uranium mining would contribute $168 million to Arizona over a 42-year period from severance taxes alone.   Corporate and individual income tax revenues would contribute another $2 billion over the same time period.  The NAW will cost the State of Arizona nearly 400 jobs directly related to mining and 688 jobs indirectly related to mining. Ex. 56, AR004627.

89.    Local and state governments commented that the FEIS understated the economic impacts.   Ex. 58, AR044372; Ex. 65, AR003420.   BLM redid the economic impacts analysis but cut the impacts significantly. Ex. 59, AR068620; Ex. 60, AR003590.

90.    FEIS cited current severance taxes statewide for years 2005 to 2010, but did not project severance taxes from uranium mining.  Ex. 3, AR001986-89.  Only one mine produced uranium in the NAW in 2009 and 2010.

91.    Coalition cooperating agencies were not invited to the federal agency cooperating agency meetings, including the alternative development meetings. Ex. 68, AR040664; Ex. 69, AR040666; Ex. 33, AR042829.

92.    BLM added the word "coordination" to a cooperating agency agenda for the first time in May 2011. Ex. 61, AR066645. BLM recognized that the NAW conflicted with the local government plans and objectives but did not try to reconcile conflicts. *See* Ex. 3, AR001642-43.

Position of State of Arizona

93.    All Arizona agencies, except for AzGFD opposed the NAW.  The Arizona legislature adopted resolutions opposing the NAW.  Ex. 70, AR066677; Ex. 71, AR035277.

94.    The Arizona Department of Environmental Quality (DEQ) strongly questioned

the conclusions in the FEIS.

> As the lead regulatory agency responsible for protection of Arizona's environment, ADEQ closely regulates uranium mining activities in Northern Arizona. The environmental risks posed by mining in Arizona have been successfully managed by both state and federal environmental requirements currently in place.  The State of Arizona has adopted the Aquifer Protection Permit program specifically designed to protect its precious groundwater resources. . . . DEIS does not give full consideration to modern uranium mining technology or ADEQ issued permits that require environmental controls, financial assurance, and reclamation.

Ex. 39, AR003308.  DEQ questioned the DEIS's basis for impacts to perched aquifers or R-aquifers because it was contrary to the agency's observation of one minor perched aquifer due to a livestock pond.  *Id.* at AR003309. The assumption of 1 gpm of water draining with 400 ug/L reaching the R-aquifer is unsupported. *Id.* Also, the assumption in SIR 2010-5025 that recharge between the surface and the R-aquifer will carry radionuclides fails to distinguish between mines and natural recharge.  *Id.* at AR003310.

95.     AGS concluded that a thirty metric ton load of uranium could be dumped into the Colorado River and the levels of radiation and arsenic would still be within EPA standards. Ex. 72, AR003319, AR003327-28.  Donald Bills, principal author of SIR 5025 Ch. C did not disagree.  Ex. 73, AR052126.

96.     The Colorado River has a natural concentration of uranium of 4 parts per billion (ppb), amounting to 86,000 to 176,400 pounds of uranium carried annually. Ex. 72, AR003324, AR003326.

97.     The Arizona Land Department estimated that the withdrawal would cost the state between $1.5 million and $18.5 million per mine that would have been developed on the 35 school sections. *Id.* at AR003315; Ex. 74, AR003302.

1   December 6, 2013.

2   Respectfully Submitted,

3   /s/ Constance E. Brooks                    /s/ William Klain
    CONSTANCE E. BROOKS                        WILLIAM KLAIN, # 015851
4   connie@cebrooks.com                        wklain@lang-baker.com
    MICHAEL MARINOVICH                         Lang Baker & Klain, P.L.C.
5   mike@cebrooks.com                          8767 E. Via de Commercio, Suite 102
    C. E. Brooks & Associates, P.C.            Scottsdale, AZ  85258
6   303 East 17th Avenue, Suite 650            Tel. 480-947-1911 Fax.
    Denver, Colorado 80203                     480-970-5034
7   Tel. 303-297-9100 Fax. 303-297-
8   9101

9   Attorneys for the Plaintiffs Quaterra Alaska, Inc.; Quaterra Resources, Inc.; and the
    Arizona Utah Local Economic Coalition on behalf of named member, the Board of
10  Supervisors, Mohave County, Arizona.

11                          **CERTIFICATE OF SERVICE**

12          I hereby certify that I have caused the Statement of Facts in Support of the

13  Motion for Summary Judgement and the Appendix to be served upon counsel of

    record through the Court's electronic service system (ECF/CM) and by first class
14
    mail to Gregory Yount at the following address: 807 West Butterfield Road, Chino
15
    Valley, Arizona 86323.
16

17  Dated: December 6, 2013

18                                        /s/ Constance E. Brooks
                                          Constance E. Brooks
19                                        C. E. Brooks & Associates, P.C.
                                          303 East 17th Avenue, Suite 650
20                                        Denver, Colorado 80203
                                          Tel. 303-297-9100 Fax. 303-297-9101
21

22

23

24

25

26

27

28