1   Matthew L. Campbell
2   (New Mexico State Bar No. 138207) (*pro hac vice* pending)
    Native American Rights Fund
3   1508 Broadway
    Boulder, CO 80302
4   (303) 447 – 8760
    Fax (303) 443 – 7776
5   mcampbell@narf.org
6   Attorney for *Amici Curiae*

7

8           IN THE UNITED STATES DISTRICT COURT
9             FOR THE DISTRICT OF ARIZONA
                    PRESCOTT DIVISION
10

11

12
    Gregory Yount;                          CASE NO. 3:11-cv-08171-DGC
13                                           (Lead Case)
            Plaintiff, *pro se,*
14
    v.
15                                           **AMICI CURIAE INDIAN PEAKS**
    S.M.R. Sally Jewell, Secretary of the   **BAND, SAN JUAN SOUTHERN**
16                                           **PAIUTE TRIBE, AND**
    Interior, *et al.,*                     **MORNINGSTAR INSTITUTE'S**
17                                           **LIMITED BRIEF IN SUPPORT OF**
            Federal Defendants;             **UNITED STATES' CROSS-MOTION**
18                                           **AND RESPONSE TO MOTIONS FOR**
    and                                      **SUMMARY JUDGEMENT**
19
    Grand Canyon Trust, *et al.*
20
            Intervenor- Defendants.
21

22

23

24

25

26

27

28

| | |
|---|---|
| National Mining Assocation, *et al.*, | CASE NO. 3:12-cv-08038-DGC |
| Plaintiffs, | |
| v. | |
| S.M.R. Sally Jewell, Secretary of the Interior, *et al.*, | |
| Federal Defendants; | |
| and | |
| Grand Canyon Trust, *et al.* | |
| Intervenor- Defendants. | |
| American Exploration & Mining Association; | CASE NO. 3:12-cv-08042-DGC |
| Plaintiff, | |
| v. | |
| S.M.R. Sally Jewll, Secretary of the Interior, *et al.* | |
| Federal Defendants; | |
| and | |
| Grand Canyon Trust, *et al.* | |
| Intervenor- Defendants. | |
| Quaterra Alaska Incorporated, *et al.*, | CASE NO. 3:12-cv-08075-DGC |
| Plaintiff, | |
| v. | |
| S.M.R. Sally Jewell, Secretary of the Interior, *et al.*, | |
| Federal Defendants; | |
| and | |
| Grand Canyon Trust, *et al.* | |
| Intervenor- Defendants. | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

INTEREST OF AMICI CURIAE ...................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.    INTRODUCTION ................................................................................................ 2

II.    THE NAW DOES NOT VIOLATE THE ESTABLISHMENT
CLAUSE ............................................................................................................. 3

    a.  THE ESTABLISHMENT CLAUSE PERMITS BROAD
ACCOMMODATIONS OF RELIGIOUS PRACTICES ................................. 3

    b.  UNDER ANY ESTABLISHMENT CLAUSE TEST, THE
NAW IS CONSTITUTIONAL ...................................................................... 4

        1.  UNDER *CUTTER*, THE NAW IS CONSTITUTIONAL ................................. 4

           i.    THE FEDERAL GOVERNMENT HAS PLACED
MANY BURDENS ON TRIBAL RELIGIOUS AND
CULTURAL PRACTICES AND THE NAW
ALLEVIATES SOME OF THOSE BURDENS ................................... 5

          ii.   THE NAW TOOK ADEQUATE ACCOUNT
OF THE BURDENS IMPOSED ON NON-
BENEFICIARIES ......................................................................... 7

        iii.   THE NAW IS ADMINISTERED
NEUTRALLY AMONG DIFFERENT FAITHS ................................. 10

        2.  UNDER THE COERCION TEST, THE NAW IS
CONSTITUTIONAL ........................................................................... 12

III.    VIOLATE THE AMERICAN INDIAN VALUES ARE "PUBLIC VALUES"

UNDER FLPMA ................................................................................. 14

CONCLUSION ................................................................................. 17

CERTIFICATE OF SERVICE ................................................................................. 19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INTEREST OF AMICI CURIAE

The Indian Peaks Band ("Indian Peaks") is one of five bands within the federally recognized Paiute Indian Tribe of Utah ("PITU").[1] The San Juan Southern Paiute Tribe ("San Juan") is a federally recognized tribe.[2] PITU and San Juan are descendants of the Southern Paiute who traditionally occupied the Northern Arizona Withdrawal ("NAW") area.[3] The Southern Paiute consider the Grand Canyon, the Arizona Strip, Kaibab National forest, and other parts of the region integral to their culture as discussed further in this brief.[4] The PITU participated in government-to-government consultation on the proposed withdrawal beginning in August 2009 and the government recognized that San Juan has an interest in the area covered by the withdrawal due to its historical ties to the area.[5] Both tribes have an interest in the outcome of this matter.

The Morning Star Institute is a non-profit Indian rights organization devoted to Native Peoples' traditional and cultural advocacy, arts promotion, and research. Founded in 1984, Morning Star is a leading organization in the areas of Native Peoples' religious freedom, cultural property rights, and sacred lands protection. Thus, Morningstar has an interest in protecting native culture, including within the NAW.

---

[1] 78 Fed. Reg. 26,384, 26,387 (May 6, 2013).
[2] *Id.*
[3] Administrative Record ("A.R.") 000011, 001913-1919, 003038-3041.
[4] A.R. 001913-1919.
[5] A.R. 000020, 001913-1919, 002323-2324.

ARGUMENT[6]

I.    INTRODUCTION

Plaintiffs Gregory Yount and the American Exploration & Mining Association ("Yount") have made an as-applied constitutional challenge to the Secretary of Interior's ("Secretary") exercise of the Federal Land Policy and Management Act of 1976 ("FLPMA") withdrawal provision. Yount asserts that the Secretary's Record of Decision ("ROD") relies on American Indian religious and spiritual objections to mining and that such reliance violates the Establishment Clause.[7] Doc. 167 at 32-40. Yount's assertion is misplaced because accommodating American Indian cultural and spiritual practices does not violate the Establishment Clause under any test.

Plaintiffs Quaterra Resources Inc. and Arizona Utah Local Economic Coalition ("Quaterra") assert that protection of Indian cultural resources under federal law is limited to sites where historical, cultural, and religious practices occur, and that the NAW exceeds any statutory authority in protecting those resources. Doc. 173 at 2-3, 23. Quaterra's claims are flawed because FLPMA provides ample authority for the NAW.

---

[6] We agree with and adopt the United States statement of facts as outlined in Doc 199.

[7] Yount misconstrues the ROD and FEIS's stated reasons for implementing the NAW. *See* Doc. 167 at 33. As the U.S. has pointed out, there were a variety of reasons for the withdrawal. Doc. 198 at 26-7, 58; Doc. 199 at 4-6. Even if the impact of mining on American Indian beliefs were the only reason for the NAW, however, it would still be constitutional under the Establishment Clause.

1      II.      THE NAW DOES NOT VIOLATE THE ESTABLISHMENT CLAUSE.

2             a.   THE ESTABLISHMENT CLAUSE PERMITS BROAD ACCOMMODATIONS OF
3                  RELIGIOUS PRACTICES.

4             The Constitution does not "require complete separation of church and state; it

5      affirmatively mandates accommodation, not merely tolerance, of all religions, and

6      forbids hostility toward any." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984); *see Trunk v.

7      City of San Diego,* 629 F.3d 1099, 1106 (9th Cir. 2011). In other words, "the

8      government may (and sometimes must) accommodate religious practices and [] it may

9      do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals*

10     *Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987). Indeed, when the government

11     accommodates religious practices "it follows the best of our traditions. For it then

12     respects the religious nature of our people and accommodates the public service to their

13     spiritual needs." *Walz v. Tax Comm'n,* 397 U.S. 664, 672 (1970) (internal citations

14     omitted).

15            The "limits of permissible state accommodation to religion are by no means

16     coextensive with the noninterference mandated by the Free Exercise Clause. To equate

17     the two would be to deny a national heritage with roots in the Revolution

18     itself." *Walz,* 397 U.S. at 673. It is clear that "there is room for play in the joints between

19     the Clauses, some space for legislative action neither compelled by the Free Exercise

20     Clause nor prohibited by the Establishment Clause." *Cutter v. Wilkinson,* 544 U.S. 709,

21     719 (2005) (internal citations omitted). Accommodations, such as the NAW, are well

22     within the parameters of what courts have found permissible.

3

b.  UNDER ANY ESTABLISHMENT CLAUSE TEST, THE NAW IS CONSTITUTIONAL.

This Circuit typically applies the *Lemon* test[8] to determine whether the Establishment Clause is violated, *see Barnes-Wallace v. City of San Diego,* 704 F.3d 1067, 1082-83 (9th Cir. 2013); *Card v. City of Everett,* 520 F.3d 1009, 1013-16 (9th Cir. 2008), and it only strays from that path occasionally. *See, e.g., Rubin v. City of Lancaster,* 710 F.3d 1087, 1091-92 (9th Cir. 2013); *Newdow v. Rio Linda Union School Dist.,* 597 F.3d 1007, 1017 (9th Cir. 2010). As the United States has shown, the NAW is Constitutional under the *Lemon* test as applied by this Circuit's controlling precedent of *Access Fund v. U.S. Dep't of Agric.,* 499 F.3d 1036 (9th Cir. 2007) and *Cholla Ready Mix, Inc. v. Civish,* 382 F.3d 969 (9th Cir. 2004). Doc. 198 at 60-63. These cases control the outcome of Yount's Establishment Clause claim. Nevertheless, if the Court were to stray from this established precedent upholding agency accommodation of religious practices on public lands, the NAW also passes muster under other Establishment Clause tests.

1.  UNDER *CUTTER*, THE NAW IS CONSTITUTIONAL

Recently, the Supreme Court in *Cutter* applied a somewhat different test to the question of accommodation of religion.  544 U.S. at 718, n.6. There, the Court was faced with the question of whether the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), which prohibits substantial burdens on religious prisoners' rights without a

---

[8] Under *Lemon*, an action will be found Constitutional under the Establishment Clause if it: 1) has a secular purpose; 2) does not have a principal or primary effect of advancing or inhibiting religion; and 3) does not foster an excessive government entanglement with religion. *Lemon v. Kurtzman,* 403 U.S. 602, 612-13 (1971).

compelling interest, was a constitutional accommodation. *Id.* at 712-13, 715. The Court held that it was because it did three things. First, the accommodation alleviated "government created burdens on private religious exercise." *Cutter*, 544 U.S. at 720 (citing *Board of Education of Kiryas Joel v. Grumet,* 512 U.S. 687, 705 (1994)). Second, the government took adequate account of the burdens the requested accommodation may impose on non-beneficiaries. *Cutter*, 544 U.S. at 720 (citing *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985)). Finally, the accommodation was administered neutrally among different faiths. *Cutter*, 544 U.S. at 720; *Kiryas Joel*, 512 U.S. at 702-07. The NAW is a constitutional accommodation under the *Cutter* criteria.

### i. THE FEDERAL GOVERNMENT HAS PLACED MANY BURDENS ON TRIBAL RELIGIOUS AND CULTURAL PRACTICES AND THE NAW ALLEVIATES SOME OF THOSE BURDENS.

The federal government has long placed many burdens on tribal religious and cultural practices through explicit policies to assimilate tribes as well as through the acquisition of traditional and historical tribal lands. The "past federal policy was to assimilate American Indians into United States culture, in part by deliberately suppressing, and even destroying, traditional tribal religions and culture in the 19th and early 20th centuries." *Bear Lodge Multiple Use Ass'n v. Babbit*, 175 F.3d 814, 817 (10th Cir. 1999); *see* Kristen A. Carpenter, Limiting Principles and Empowering Practices in American Indian Religious Freedoms, 45 Conn. L. Rev. 387, 408 (2012). "By the late 19th Century federal attempts to replace traditional Indian religions with Christianity grew violent. In 1890 for example, the United States Calvary shot and killed 300 unarmed Sioux men, women and children en route to an Indian religious ceremony

called the Ghost Dance[.]" *Bear Lodge Multiple Use Ass'n*, 175 F.3d at 817. Indeed, the government administered Indian trust funds to pay Christian denominations to educate the Indians in Christianity – a policy upheld by the Supreme Court. *Rueben Quick Bear v. Leupp*, 210 U.S. 50, 81-82 (1908). In addition to these overt policies, the government's acquisition of American Indian lands made it difficult for American Indians to practice their religions at sacred sites. *See, e.g., Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451 (1988) (upholding road through a sacred site even if it would "virtually destroy the . . . Indians' ability to practice their religion.").

The American Indians that historically lived within the NAW area were directly impacted by these federal policies. Christian and government boarding schools were set up all over in northern Arizona to indoctrinate the American Indians into Christianity, or civilization. Annual Report of Comm'r of Indian Affairs, Report of Agents in Arizona 366 (1894); Annual Report of Comm'r of Indian Affairs, Report of Agents in Arizona 3, 5 (1888); Annual Report of Comm'r of Indian Affairs, Report of Agents in Arizona 2-3, 5, 8 (1882). While the Tribes in northern Arizona never ceded ownership of NAW lands, the Indian Claims Commission held that the tribes' title had been lost or their property had been taken by the federal government in the nineteenth century. *See e.g., Southern Paiute Nation v. United States,* 14 Ind.Cl.Comm. 618, 619-21 (1965); *Hualapai Tribe of the Hualapai Reservation v. United States,* 11 Ind.Cl.Comm. 447, 456 (1962). The FEIS details this history. *See* A.R. 003036-3044. As a result of this history, the Forest Service and BLM now assert authority over the NAW lands.

The adoption and application of the Mining Law of 1872 to the withdrawal lands, among the other federal policies and practices outlined above, burdened the religious and cultural practices of the American Indians in this area. *See* A.R. 002221-2229; *Havasupai Tribe v. United States,* 752 F.Supp. 1471, 1485, 1493-1500 (D. Ariz. 1990). The NAW alleviates some of these federally-created burdens, but not completely. The NAW will prevent new mining claims, thus accommodating American Indian religious and cultural practices to some extent. The NAW, however, still allows mining to go forward if there is a valid existing right. A.R. 001668. Because mining will still exist, the American Indian practitioners will still be burdened in the exercise of their religion, but to a more defined extent because there are a finite number of mines that might be developed during the withdrawal period. The Ninth Circuit has recognized that when a "government action challenged under the Establishment Clause explicitly violates some of the core tenets of the religion it allegedly favors, such action will typically be considered permissible accommodation rather than impermissible endorsement." *Access Fund,* 499 F.3d at 1045. The NAW is a permissible accommodation that alleviates some of the historic government-created burdens to American Indian religious and cultural practices.

ii.   THE NAW TOOK ADEQUATE ACCOUNT OF THE BURDENS IMPOSED ON NON-BENEFICIARIES.

When an accommodation to religion is made, the government must "take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries[.]" *Cutter*, 544 U.S. at 720. An accommodation must "not override

other significant interests." *Id.* at 722. An accommodation will be upheld, however, even if non-religious individuals or groups are burdened. *See, e.g., Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos,* 483 U.S. 327, 338 (1987).

First and foremost, companies have to comply with federal regulations all the time, and complying with the law is not truly a burden that should be considered in this analysis. Still, impacts to mining here will not be nearly as severe as burdens the Supreme Court has recognized as permissible. For example, in *Amos,* the Court upheld an exemption to Title VII of the Civil Rights Act of 1964 for religious organizations even though it permitted employment discrimination against nonpractitioners of a religious organization's faith. 483 U.S. at 338-39. This immense burden was upheld as constitutional. *Id.* Further, the Supreme Court in *Gillette v. United States* "upheld a military draft exemption, even though the burden on those without religious objection to war (the increased chance of being drafted and forced to risk one's life in battle) was substantial." *Kiryas Joel*, 512 U.S. at 725 (Kennedy, J. concurring) (citing *Gillette*, 401 U.S. 437 (1971)).

In *Cutter*, the Court assumed that RLUIPA would not be applied in an unbalanced way, and that the burdens on prison security would be appropriately balanced. 544 U.S. at 722. In accordance with this approach, the Secretary appropriately weighed the burdens on mining, the environment, cultural and historical resources, and recreation, among others. A.R. 002003-2320. The main interest affected by the NAW is the ability to locate future mining claims under the Mining Law and the indirect benefits mining on those future claims may bring. The Secretary took proper account of the burdens on

mining by exhaustively analyzing them and determining that other public values warrant slowing the pace of mining to that of the 1980s. A.R. 000011-12; 000074; 002003-2320.

In extreme cases, the Supreme Court has held that an accommodation that gives an absolute right to religious practitioners over others can create too great of a burden on non-beneficiaries. In *Caldor,* the government relieved a burden that was placed on religious practitioners by private industry by arming "Sabbath observers with an absolute and unqualified right not to work on whatever day they designate[d] as their Sabbath." 472 U.S. at 709. The burden imposed on private industry by an absolute and unqualified right was too extreme. *Id.* at 710-11. Here, the federal government has not delegated authority to American Indian tribes to determine when, where, and to what extent a withdrawal under FLPMA will be enacted. The Secretary retains authority to make these determinations and has not given an "absolute and unqualified" right to American Indians. If American Indians did have the absolute right in this instance, they would prohibit all forms of mining in the NAW, regardless of valid existing rights. A.R. 002221-2223. That is not what the NAW does, and it is certainly not a "veto" for Native Americans as Yount and Quaterra assert. Rather, this is a land management decision.[9]

---

[9] No court has ruled that a religious accommodation violates the Establishment Clause simply because it limits some uses of government property or because it restricts public access to, or activities on, public property. Rather, in numerous contexts, courts have upheld such limits. *See, e.g., Good News Club v. Milford,* 533 U.S. 98, 112-14 (2001) (public school facilities may be used for religious purposes); *Lamb's Chapel v. Center Moriches Union Free School Dist.,* 508 U.S. 384, 394-95 (1993) (same); *Van Zandt v. Thompson,* 839 F.2d 1215, 1216 (7th Cir. 1988) ("prayer room" in state capitol building); *Hawley v. City of Cleveland,* 24 F.3d 814 (6th Cir. 1994) (Catholic Diocese chapel in Cleveland Hopkins International Airport). In these cases, the government's designation of public property for religious uses imposed limitations on other incompatible uses. Yet, as these cases make clear, limiting some uses of government property does not in itself render a government accommodation unconstitutional.

The Secretary, through the FEIS, properly weighed all the interests and burdens before going forward with the NAW, and the burden of complying with the law is well within the type of burdens the Supreme Court has found permissible.

### iii. THE NAW IS ADMINISTERED NEUTRALLY AMONG DIFFERENT FAITHS.

As in *Cutter*, the accommodation here is administered neutrally. 544 U.S. at 720. An "absolute rule of neutrality" is not required, because doing so would evince hostility toward religion that is forbidden. *Trunk*, 629 F.3d at 1106. "[N]uetrality is not so narrow a channel that the slightest deviation from an absolutely straight course leads to condemnation" by the First Amendment. *Id.* (quoting *McCreary*, 545 U.S. at 876). The fact that an accommodation facilitates the practice of religion does not render it unconstitutional. *Amos*, 483 U.S. at 334-37; *Hobbie*, 480 U.S. at 144-45. Nor does the fact that an accommodation may single out a particular religion, for that shows nothing more than the uniqueness of that group's situation. *Kiryas Joel*, 512 U.S. at 726 (Kennedy, J., concurring). After all, "[m]ost accommodations cover particular religious practices." *Id.*

With regard to American Indians, the federal government recognized long ago that "each Indian tribe has had its own religion and its own code of ethics, and therefore it is not possible to present one brief summary of Indian religion and Indian ethics." Inst. for Gov't Research, The Problem of Indian Administration 845 (1928) ("Meriam Report"). The FEIS recognizes that different tribes have different beliefs about the NAW

area and Grand Canyon, and each was treated equally. A.R. 001912-1922; 002221-2229. Thus, there is no neutrality issue here.

Additionally, the NAW was established under a general law – FLPMA's withdrawal provision, 43 U.S.C. § 1714 – and not a specific statute passed to specifically benefit any one tribe. The NAW does not single out a particular religious sect for special treatment. The accommodation applies to many different American Indian beliefs and any other religious practitioners that want to access the NAW area. Thus, the statute here is markedly different from that in *Kiryas Joel,* where the Supreme Court struck down a law that carved out a separate school district to serve exclusively a community of Satmar Hasidim Jews. 512 U.S. at 690. There, the law "single[d] out a particular religious sect for special treatment." *Kiryas Joel*, 512 U.S. at 706. One of the main neutrality problems with the statute in *Kiryas Joel*, which is not the case here, was that the religious community "did not receive its new governmental authority simply as one of many communities eligible for equal treatment under a general law[.]" 512 U.S. at 703. Here, the Secretary has applied FLPMA in constitutional way.

Similar to the Forest Service's decision in *Access Fund*, the NAW does not reflect that the Secretary favors "tribal religion[s] over other religions or that [the BLM] would not protect sites of historical, cultural, and religious importance to other groups[.]" 499 F.3d at 1045. Contrary to Yount's assertions, nothing in the record indicates that BLM disapproves of non-Indian religious practices, or that BLM's actions disapprove his religious choices. *Id*. The NAW simply reduces burdens on Indian religious exercise

occasioned by the government's ownership and management of the site, and does this in a neutral way by accommodating many different religious and cultural beliefs.

Even if the Court were to find that the NAW is not neutral, it has long been held that the government can single out and protect American Indian religious practices without violating the Establishment Clause because such protection is rationally related to Congress' unique obligation toward the Indians. *See Rupert v. USFWS*, 957 F.2d 32, 34-36 (1st Cir. 1992); *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1216-17 (5th Cir. 1991). This alone makes the NAW constitutional.

In conclusion, the NAW relieves government burdens placed on religion, takes adequate account of the burdens it imposes, and is applied in a neutral manner. Thus, under *Cutter*, the NAW is constitutional.

2.     UNDER THE COERCION TEST, THE NAW IS CONSTITUTIONAL.

Yount alludes to the concept of coercion without citing any support. Doc. 167 at 33 (referencing the U.S. "compelling" him to accept beliefs). Under the coercion test, which is seldom used, the NAW is likewise constitutional. The Establishment Clause permits the government to accommodate private religious practices on public property, as long as the government does "not coerce anyone to support or participate in religion or its exercise." *Lee v. Weisman*, 505 U.S. 577, 587 (1992); *Newdow,* 597 F.3d at 1039. The Ninth Circuit has relied on three factors to assess coercion: 1) has the state acted; 2) does the action amount to coercion; and 3) is the object of the coercion religious rather than secular? *Inouye v. Kemna,* 504 F.3d 705, 713 (9th Cir. 2007) (internal citation

omitted). The government has acted here, but the action does not amount to coercion. Even if there was coercion, the object of the coercion is secular, not religious.

With regard to coercion, this is not a case like *Lee* or *Inouye*. In both of those cases, individuals were, as a practical matter, forced to participate in religious activities chosen by the state. *See Lee,* 505 U.S. at 587-88 (students were "obliged to attend" religious prayer); *Inouye,* 504 F.3d at 713-14 (state "ordered" participation in a program rooted in religious faith). In this instance, no one is forced to participate in any religious ceremonies or activities.

Even if the Court were to find coercion, the object of the coercion is secular. In *Lee* and *Inouye*, the object of the coercion was religious in nature. In *Lee*, students were subjected to religious prayer at graduation. 505 U.S. at 581. In *Inouye*, a parolee was required to participate in a religious treatment program as part of his parole. 504 F.3d at 709-10. Here, there is no such religious coercion. The object of the coercion here is complying with government regulations under FLPMA, not the required participation in religious prayer or programs. Further, the Ninth Circuit in *Access Fund* rightly found that accommodations that "mitigate interference" with religious practices "would not give rise to a finding of an impermissible religious motivation." 499 F.3d at 1044; *see also Cholla Ready Mix,* 382 F.3d at 975-76 (same). The Supreme Court has come to the same conclusion. *Amos,* 483 U.S. at 335-36 (alleviating significant governmental interference to religious practice is a permissible purpose). As described above in Section II(B)(1)(i), the NAW alleviates some of the burdens the federal government has placed on American Indian religious practices, and thus was a secular accommodation.

As a result, the NAW easily passes muster under the coercion test because it does not force anyone to participate in religious activities and it is secular.

III.   AMERICAN INDIAN VALUES ARE "PUBLIC VALUES" UNDER FLPMA.

Quaterra asserts that protection of Indian cultural resources is limited to sites where historical, cultural, and religious practices occur, and that the NAW exceeds any statutory authority in protecting cultural resources. Doc. 173 at 2-3, 23. Quaterra then lists certain laws that exist to protect American Indian resources, which apply with full force here, but fails to recognize other authorities that apply. *Id.* at 23-4. FLPMA provides ample authority for the protection and use of cultural resources.[10]

The Secretary has broad authority and discretion to "make, modify, extend, or revoke withdrawals" under FLPMA. 43 U.S.C. § 1714(a) (2012); 43 C.F.R. § 2300.0-3 (2013); *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 756 (D.C. Cir. 2007) (". . . Congress delegated to the Secretary considerable withdrawal authority[.]"). In relevant part, the "term 'withdrawal' means withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program . . ." *Id.* at § 1702(j); 43 C.F.R. § 2300.0-5(h). The only limitation on the Secretary's authority to

---

[10] As the U.S. pointed out, "multiple use" also provides ample authority and discretion to the Secretary to manage the lands here. Doc. 198 at 24-5. Additionally, the statutes and executive orders that Quaterra cites actually mandate that the federal government accommodate American Indian religious practices.

make a withdrawal is that it must be "in accordance with the provisions and limitations of [43 U.S.C. § 1714]." *Id.* § 1714(a).

FLPMA does not define what "other public values" means.[11] This makes sense because Congress gave the Secretary broad discretion to determine the "other public values" that should be maintained. *Mount Royal Joint Venture*, 477 F.3d at 756. In this instance, the Secretary clearly identified many public values and purposes for the withdrawal, including maintaining traditional use areas and American Indian resources. *See* A.R. 000009-12; 001621-1626.

Quaterra would have the court ignore American Indian beliefs, cultural practices, and uses of the land in the NAW area as if they were not "other public values" under FLPMA. For example, Quaterra asserts that the protection of "Traditional Use Areas" lacks statutory support, and that it "encompasses the NPS' view that tribal beliefs or values should enjoy the same protection as cultural sites." Doc. 173 at 24-25. While American Indians were not legally citizens until 1924, they are now U.S. citizens and are part of the "public" whose values should be considered. *See* Act of June 2, 1924, Pub. L. No. 68-175, 43 Stat. 253 (1924) (providing for citizenship of American Indians). Further, federal law and policy recognizes that preserving and maintaining American Indian culture, religion, history, identity, etc. is of public value to the nation as a whole. *See* A.R. 001912-1913 (outlining laws that apply); *Cholla Ready Mix*, 382 F.3d at 975 ("It is clear from Cholla's complaint that defendants' actions have the secular purpose of

---

[11] One court found that wilderness preservation is a "public value" under FLPMA. *Mtn. States Legal Foundation v. Andrus*, 499 F.Supp. 383, 391 (D. Wyo. 1980).

carrying out state construction projects in a manner that does not harm a site of religious, historical, and cultural importance to several Native American groups and the nation as a whole."). The FEIS recognized this by highlighting American Indian values in the American Indian Resources section of the FEIS, which included traditional use areas. A.R. 001912-1922.

American Indians, including the Southern Paiute, have important archeological sites, landforms, geographic features, hunting and gathering areas, trails, mineral collecting areas, springs, cultural sites, sacred sites, and historic sites all throughout the NAW area. A.R. 001912-1922. Within the NAW area there are at least 2,535 *known* archaeological sites, and likely many more. A.R. 001907. That is just the archaeological sites and does not get into the trails, hunting and gathering areas, mineral collecting areas, etc. To the Southern Paiute, these cultural resources are bound together. A.R. 07044-7045. The Paiute have traditional stories and songs that talk about these areas and their importance to the people. A.R. 07050-7051.

For instance, the Southern Paiutes had a system of trails and specialists who moved along the trails carrying messages, goods, and services. A.R. 07054-7055. A knotted string, called tapitcapi (literally "the knotted") was sent out via a runner to other Paiute people to inform them of events. *Id.* These runners traveled along trails specifically created by Southern Paiute people. *Id.* The trails were complex because they passed from water source to water source across rugged terrain. *Id.* In order to remember the trail routes, the runners would know a song that told the way thus keeping the people alive. *Id.* The trail songs described the path to be followed as well as encouraged the

runner by recounting stories of beings that traveled or established the same trail. *Id.* These trails recount the cultural importance of this area to the Paiute, particularly for the afterlife. *Id.* The Tribes in this area don't want their traditional land to end up like portions of the Navajo reservation. *See* Dan Frosch, *Amid Toxic Waste, a Navajo Village Could Lose Its Land,* N.Y. Times, Feb. 19, 2014, *available at* http://www.nytimes.com/2014/02/20/us/nestled-amid-toxic-waste-a-navajo-village-faces-losing-its-land-forever.html?_r=1.

FLPMA gave the Secretary broad authority to maintain "other public values" by limiting mining. 43 U.S.C. §§ 1702(j), 1714; *see Mount Royal Joint Venture*, 477 F.3d at 756 (Secretary can withdraw land for any purpose so long as the Congress does not disapprove). The American Indians that traditionally lived in this area are part of the public and value this area immensely for many reasons, and the Secretary rightly relied on those values.

CONCLUSION

For these reasons, we respectfully ask the Court to deny the Plaintiffs' Motions for Summary Judgment on establishment clause and the other grounds addressed.


DATED this 25th day of February, 2014


*Matthew Campbell*
Matthew L. Campbell
New Mexico Bar No. 138207
Native American Rights Fund
1506 Broadway
Boulder, CO 80302
Phone: 303 - 447 - 8760
mcampbell@narf.org

*Counsel for Amici Curiae*

1

## **CERTIFICATE OF SERVICE**

2

I hereby certify that I have caused the Amicus Curiae Brief in Support of

3

the United States' Cross-Motion and Response to Motions for Summary

4

5

Judgment to be served upon counsel of record via email and First Class Mail to:

6

7    Gregory Yount                    Amy Beth Chasanov, John C Martin,
     807 W Butterfield Rd.             Timothy McCrum, Susuan Mary
8    Chino Valley, AZ 86323            Mathiascheck, and Thomas Richard
                                       Lundquist
9                                      Crowell & Moring LLP - Washington,
     Constance E Brooks and Michael B  DC
10   Marinovich                        1001 Pennsylvania Ave. NW, Ste. 1100
     CE Brooks & Associates PC         Washington, DC 20004-2595
11   303 E 17th Ave Ste 650            Email: achasanov@crowell.com
     Denver, CO 80203                  jmartin@crowell.com
12   Email: connie@cebrooks.com        rmccrum@crowell.com
13   mike@cebrooks.com                 smathiascheck@crowell.com
                                       tlundquist@crowell.com
14   William George Klain
15   Lang Baker & Klain PLC - Scottsdale,
     AZ                                Gary Frank Urman, John C Lacy, and
16   8767 E Via De Commercio, Ste. 102 Marian Conrad LaLonde
17   Scottsdale, AZ 85258              DeConcini McDonald Yetwin & Lacy
     Email: wklain@lang-baker.com      PC - Tucson
18                                     2525 E Broadway Blvd., Ste. 200
19                                     Tucson, AZ 85716-5300
     Jeffrey Wilson McCoy and Steven   Email: gurman@dmyl.com
20   James Lechner                     jlacy@dmyl.com
     Mountain States Legal Foundation  mlalonde@dmyl.com
21   2596 S Lewis Way
22   Lakewood, CO 80227
     Email:                            Dominika Natalia Tarczynska
23   jmccoy@mountainstateslegal.com    US Dept of Justice
24   lechner@mountainstateslegal.com   P.O. Box 663
                                       Washington, DC 20044-0663
25                                     Email: dominika.tarczynska@usdoj.gov

26

27

28

1

John S Most
US Dept of Justice - Natural Resources

2

Section
P.O. Box 7611

3

Washington, DC 20044

4

Email: john.most@usdoj.gov

5

Edward B Zukoski and Alison Christine
Flint
Earthjustice - Denver, CO
1400 Glenarm Pl., Ste. 300
Denver, CO 80202
Email: tzukoski@earthjustice.org
aflint@earthjustice.org

6

7

Roger Flynn
Western Mining Action Project
P.O. Box 349
Lyons, CO 80540
Email: wmap@igc.org

8

9

10

11

12

13

DATED this 25th day of February, 2014

14

15

16

*Matthew Campbell*

17

*Counsel for Amici Curiae*

18

19

20

21

22

23

24

25

26

27

28