ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

DOMINIKA TARCZYNSKA, NY Bar No. 4431573
JOHN S. MOST, VA Bar No. 27176
Natural Resources Section
P.O. Box 7611 Washington, D.C. 20044-7611
 (202) 305-0447 (Tarczynska)
 (202) 616-3353 (Most)
 (202) 305-0506 (fax)
DOMINIKA.TARCZYNSKA@USDOJ.GOV
JOHN.MOST@USDOJ.GOV
*Counsel for Federal Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PRESCOTT DIVISION**

| | |
|---|---|
| GREGORY YOUNT, | Case No. 3:11-cv-08171-PCT-DGC (Lead Case) |
| Plaintiff, *pro se*, | |
| v. | **CORRECTED VERSION OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT, AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT** |
| S. M. R. JEWELL, SECRETARY OF THE INTERIOR, *et al.*, | |
| Federal Defendants, | |
| and | |
| GRAND CANYON TRUST, *et al.*, | |
| Intervenor-Defendants. | |

| | |
|---|---|
| NATIONAL MINING ASSOCIATION, *et al.,* | Case No. 3:12-cv-08038-PCT-DGC |
| Plaintiffs, | |
| v. | |
| S. M. R. JEWELL, SECRETARY OF THE INTERIOR, *et al.,* | |
| Federal Defendants, | |
| and | |
| GRAND CANYON TRUST, *et al.,* | |
| Intervenor-Defendants | |
| AMERICAN EXPLORATION & MINING ASSOCIATION, | Case No. 3:12-cv-08042-PCT-DGC |
| Plaintiff, | |
| v. | |
| S. M. R. JEWELL, SECRETARY OF THE INTERIOR, *et al.,* | |
| Federal Defendants, | |
| and | |
| GRAND CANYON TRUST, *et al.,* | |
| Intervenor-Defendants. | |
| QUATERRA Alaska Incorporated, *et al.,* | Case No. 3:12-cv-08075-PCT-DGC |
| Plaintiffs, | |
| v. | |
| S. M. R. JEWELL, SECRETARY OF THE INTERIOR, *et al.,* | |
| Federal Defendants, | |
| and | |
| GRAND CANYON TRUST, *et al.,* | |
| Intervenor-Defendants. | |

**TABLE OF CONTENTS**

CROSS-MOTION FOR SUMMARY JUDGMENT ............................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES......................................................... 2

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................... 2

LEGAL BACKGROUND............................................................................................................ 7

    A.     The Mining law of 1872 ................................................................................... 7

    B.     The Federal Land Policy and Management Act............................................ 8

    C.     The National Environmental Policy Act of 1969........................................... 9

    D.     The National Forest Management Act ......................................................... 11

STANDARD OF REVIEW...................................................................................................... 11

ARGUMENT............................................................................................................................. 12

    I.     Many of Plaintiffs' FLPMA Claims and All Their Free-Standing
             APA Claims Must Be Dismissed Because Plaintiffs Do Not Identify
             any Legal Standard that the Withdrawal Allegedly Violated ....................... 12

    II.    The Withdrawal Decision Fully Complies with FLPMA ............................. 17

    III.   Plaintiffs' NEPA Claims are Non-Justiciable and Lack Merit ..................... 25

    IV.   The Forest Service Consent Decision Fully Complies with NFMA.............. 54

    V.    The Withdrawal Decision does not Violate the Establishment
             Clause .................................................................................................................. 57

CONCLUSION .......................................................................................................................... 60

# Federal Defendants' Cross-Motion for Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Federal Defendants the Secretary of the Interior, the United States Bureau of Land Management, an agency of the U.S. Department of the Interior, the United States Forest Service, an agency of the U.S Department of Agriculture, and the other Federal officials named as defendants in these consolidated actions, hereby cross-move for summary judgment as a matter of law on all counts in the operative complaints, Doc. 27 (No. 11-cv-8171) (Second Amended Complaint of Gregory Yount, *pro se*), Doc. 56 (No. 12-cv-8038) (Amended Complaint of the National Mining Association and the Nuclear Energy Institute, hereafter "NMA/NEI"), Doc. 1 (No. 12-cv-8042) (Complaint of American Exploration & Mining Association, formerly Northwest Mining Association, hereafter "AEMA"), Doc. 30 (No. 12-cv-8075) (Amended Complaint of Quaterra Resources Inc. and the Arizona Utah Local Economic Coalition, hereafter, the "Coalition"), and on all contentions in Plaintiffs' Motions for Summary Judgment (Docs. 167, 170, 173) (Civil Action No. 11-cv-08171).

This motion is supported by the administrative record and the points and authorities set out in Federal Defendants' Memorandum in Support of their Cross Motion for Summary Judgment and in Opposition to Plaintiffs' Motions for Summary Judgment, which follows.

## Federal Defendants' Corrected Memorandum in Support of their Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motions for Summary Judgment

### INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs in these consolidated actions ask the Court to invalidate a legally-permissible and well-informed decision by the Department of the Interior ("Interior"), with the consent of the United States Forest Service where applicable, to protect the Grand Canyon watershed from impacts of escalating mining activity.  For the reasons set out below, the Court should leave this protective measure in place.

The lands at issue, located on a geologic formation known as the Colorado Plateau, surround the Grand Canyon National Park ("Park"), one of our Nation's most treasured landscapes.  Each year, millions of Americans and international travelers cross these lands to reach the Park and revel in its breathtaking beauty, highlighted by a twisting, mile-deep gorge, carved over eons by the unceasing flow of the Colorado River.  Among the plateau's many and varied geologic resources is uranium, first discovered there in 1947.  In its natural state, uranium, like gold, silver, copper, and other elements, is frequently "hosted" by underground geologic features known as "breccia pipes," which can extend several thousand feet below the earth's surface.[1]

Although the Park has been closed to "location and entry" of mining claims under the Mining Law of 1872, 30 U.S.C. §§ 22-54 (the "Mining Law") since 1908, much of the surrounding federal land has remained open to mining activities under this

---

[1] *See* AR 66 (Scientific Investigations Report 2010-5025, "Hydrological, Geological, and Biological Site Characterization of Breccia Pipe Uranium Deposits in Northern Arizona," United States Geological Survey ["USGS"], 2010).  Throughout this memorandum, citations to the administrative record ("AR") appear in this format.

law which, for purposes of agency approval, are largely non-discretionary, assuming regulatory prerequisites are met.  AR 12.  From the 1950s to the 1990s, claim holders mined uranium from a total of ten breccia pipes in the lands at issue, with activity peaking in the 1980s.  AR 5 (Record of Decision for the Northern Arizona Withdrawal) ("ROD").  In the 2000s, the "modest" activity of preceding decades, *see* AR 84, gave way to a surge in activity, as the price per pound for uranium oxide ($U_3O_8$) soared from $15 in 2004 to $135 in June 2007. AR 3, 430.  Prospectors staked thousands of new claims, producing a five-fold increase in total mining claims on the lands.  This surge generated expressions of concern, by the public and by federal agencies, about impacts to the "natural, cultural, and social resources" of the Grand Canyon region.  AR 3.

On January 9, 2012, in response to a July 2009 application for withdrawal submitted by the U.S. Bureau of Land Management ("BLM"), AR 44-51, the Secretary of the Interior issued the challenged ROD and public land order ("PLO"), under authority of section 204(c) of the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. § 1714.  AR 1 (ROD), AR 25 (PLO).  As explained herein, this withdrawal authority is broad and reflects the Secretary's great discretion.  Codifying longstanding executive authority, FLPMA defines a withdrawal as a "withholding an area of Federal land" from operation of "some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program." 43 U.S.C. § 1702(j).  Exercise of this broad authority is limited only by a twenty-year limit on large withdrawals (i.e., withdrawals of 5,000 acres or more) and by certain procedural

3

and notice requirements.  In accord with section 204, the challenged decision withdrew from "location and entry" under the Mining Law, for twenty years, approximately 1.007 million acres of public and National Forest System lands, subject to valid existing rights.  *See* 77 Fed. Reg. 2563-01 (Jan. 18, 2012).  Because valid existing rights are not affected by the withdrawal, the decision does not prevent mining.  Thus the ROD explained that mining is expected to continue at four mines approved prior to the withdrawal decision and is reasonably foreseeable at seven other sites.  AR 11.  This level of activity would be comparable to that of the 1980s, when claim holders mined six breccia pipes.  AR 9.

The Secretary's withdrawal decision was made only after significant public input and more than two years of study by BLM and numerous cooperating agencies.  These efforts culminated in the issuance of a detailed, 1,500-page Final Environmental Impact Statement ("FEIS"), prepared in compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C §§ 4321-4347, and expressly incorporating the noted 2010 USGS Report, a peer-reviewed study of hydrological, geological, and biological factors associated with uranium mining in northern Arizona.  *See* note 1, *supra*.  This and other record evidence establish that the Secretary founded his decision to withdraw the lands and slow the pace of mining on legitimate, scientifically-grounded concerns as to the potential effects of mining on a variety of resources and uses, in particular: (i) impacts to water resources, including drinking water for millions in seven states in the United States and Mexico; (ii) impacts to the sacred and traditional places of tribal peoples; and (iii) the area's "circumstances" and impacts to its "unique resources," including

visual resources, wildlife, and air quality.  AR 9.

Plaintiffs present a myriad of reasons why, in their view, the Secretary's protective decision should be set aside, but none is sufficient to sustain their claims.  In some instances, they vaguely contend that the decision violates FLPMA, under the standard of review of the Administrative Procedure Act ("APA"), 5 U.S.C.  §§ 551 *et seq*., and, in other instances, that it simply violates the APA, without any reference to another statute or standard.  Such claims fail because Plaintiffs have not identified any specific statutory standard that confines the Secretary's exercise of discretion in making withdrawals, nor could they in this case.  The claims therefore fail to satisfy restrictions in two related provisions of the APA: section 701, which precludes review of claims "committed to agency discretion by law," and section 702, which requires that a plaintiff be adversely affected or aggrieved "within the meaning of a relevant statute." Because Plaintiffs identify no meaningful standard by which to judge the Secretary's exercise of discretion, these claims should be dismissed.

Plaintiffs NMA/NEI and the Coalition also claim that the decision violates NEPA, yet they fail to demonstrate Article III and prudential standing to assert NEPA claims.  These claims are non-justiciable and, in any event, contradicted by the record. Like their NEPA arguments, Plaintiffs' remaining claims under FLPMA, the National Forest Management Act ("NFMA"), and the Establishment Clause are unsupported in law and fact.  Many fail because they are premised on the fiction that mining is environmentally harmless, but the record does not support Plaintiffs' zero-impact myth. To the contrary, it establishes beyond dispute that, even with modern regulatory

safeguards, responsible operators, and the hope that accidents can be avoided, uranium mining has adverse environmental effects.   The Secretary thus acted within his authority in deciding to protect uses and resources *other than* uranium mining.

Another recurring but specious theme of Plaintiffs is the suggestion that the *sole* purpose of withdrawal is to protect water resources.  *See, e.g.*, NMA/NEI Br. 17 (Doc. 170), Coalition Br.. 9 (Doc. 173).[2]  Building on this premise, all three plaintiff groups argue that because water resources are not, in their view, threatened by mining, the Secretary's decision is therefore arbitrary.  *See id.;* NMA/NEI Br. 17; AEMA Br. 6 (Doc. 167).

In support of this single-purpose theory, NMA/NEI refer to water resources as the "supposed basis for the withdrawal," NMA/NEI Br. 17, and the Coalition points to references to the "watershed" in the July 21, 2009 Notice of Proposed Withdrawal, 74 Fed. Reg. 35887.  That notice refers to "protect[ing] the Grand Canyon watershed," *id.*, which both plaintiff groups incorrectly construe to mean "water resources."  Indeed, as the Notice and Record of Decision indicate, the withdrawal was made in part to protect the Grand Canyon watershed – a geographic area with a wider array of values than just water resources – from the potentially severe impacts  of uranium mining.  But it was also made to protect other resource values, including wildlife, visual resources, and cultural resources. The Notice's stated concern for "significant values and irreplaceable resources," *id.* (stating both terms in the plural), should dispose of any question whether the Notice somehow confined the Secretary's decision-making discretion to protection

---

[2]  Citations in this memorandum to Plaintiffs' opening briefs refer to the page numbers located at the bottom of each page, not the ECF page numbers.

1   of any single resource.

2       To prevail on summary judgment, Plaintiffs must establish that *all* grounds

3

4   identified by the Secretary for his decision are arbitrary.  If any single ground is rational

5   and supported by the record, the withdrawal decision must be sustained.  Because

6   Plaintiffs have not demonstrated any instance of arbitrary conduct, Federal Defendants

7   are entitled to judgment as a matter of law.

8                            **LEGAL BACKGROUND**

9

10              **A.  The Mining Law of 1872**

11      The Mining Law, 30 U.S.C. §§ 22-54, made public lands available to American

12   citizens "for the purpose of mining valuable mineral deposits . . . ."  30 U.S.C. § 22,

13

14   *United States v. Coleman*, 390 U.S. 599, 602 (1968); *Cameron v. United States*, 252

15   U.S. 450, 460 (1920).  It authorizes citizens to "locate" valid mining claims upon

16   "discovery" of valuable mineral deposits and compliance with applicable legal

17   requirements.  *Chrisman v. Miller,* 197 U.S. 313, 322-23 (1905).  As long as lands

18   remain "open" to location and entry, a citizen, on his own initiative, may locate a

19

20   mining claim.  *See* 43 C.F.R. Part 3832; *see also Independence Min. Co., Inc. v.*

21   *Babbitt*. 105 F.3d 502, 507 n.6 (9th Cir. 1997) (referring to the agency's non-

22   discretionary duty to process applications under the Mining Law).[3]

23

24   _____

25   [3] Mining claimants often locate claims before making a discovery, to protect their
     interests as against rival claimants while working to make the physical exposure
26   required to establish a valid claim.  This act of pre-discovery location gives the mining
     claimant the right of *pedis possessio*, as against other claimants. *See Union Oil Co. v.*
27   *Smith*, 249 U.S. 337, 346-47 (1919).  However, only upon discovery of a valuable
     mineral deposit is a mining claim valid and enforceable against the United States.  *Id.* at
28   348-49; *Hafen v. United States*, 30 Fed. Cl. 470, 473 (1994).  A valid claim affords its

                                        7

Mining regulations do not require that claims be developed within a specific timeframe, and they impose no diligence requirements on claimants. Mining operations, like mining claim location, are claimant-initiated and are ordinarily driven by market conditions. Before conducting most extractive mining activities, operators must obtain approval of a plan of operations, either from the Forest Service ("Service"), 36 C.F.R. § 228.4, or from the Bureau of Land Management ("BLM"). 43 C.F.R. §§ 3809.11, 3809.412. To approve a plan of operations on withdrawn lands, the relevant surface-managing agency must conduct a mineral examination to determine the validity of a mining claim; that is, whether the claimant had discovered, by the time of withdrawal, a valuable mineral deposit. *See United States v. Pass Minerals, Inc.*, 168 IBLA 115, 122 (2006). If the mineral examination concludes there are no valid existing rights, the plan of operations will not be approved. 43 C.F.R. § 3809.100.

## B.  The Federal Land Policy and Management Act

In 1976, Congress enacted the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701-1787, creating a "broad statutory framework" that sets forth "the goals and management requirements that [Congress] envisioned for public lands." *Gardner v. BLM*, 638 F.3d 1217, 1222 (9th Cir. 2011). Section 204(a) of the act authorizes the Secretary to "make, modify, extend, or revoke, withdrawals but only in accordance with the provisions of [section 204]." 43 U.S.C. § 1714(a). "Withdrawal" is defined as "withholding an area of Federal Land from settlement, sale, location, or entry, under some or all of the general land laws for the purpose of limiting

---

holder the right to possess, occupy, and extract minerals from federal lands.  30 U.S.C. § 26; *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 47 (D.D.C. 2003).

activities under those laws in order to maintain other public values in the area . . . ." *Id.* § 1702(j).   Subsection 204(c)(1) limits the Secretary's withdrawal authority by providing that, for tracts of 5,000 acres or more, withdrawals shall not exceed twenty years in duration.   *Id.* § 1714(c)(1).   The Secretary's authority extends to lands managed by BLM or other federal agencies.   *Id.* §§ 1702(j) (defining withdrawal authority as applying to "Federal land"), 1714(i) (authorizing the Secretary to withdraw lands administered by another agency only with the agency's consent).   As noted, withdrawals are made subject to valid existing rights.   *Id.* § 1701 Note, Pub. L. 94-579 § 701(h); *see also* 43 U.S.C. § 1714.

### C.      The National Environmental Policy Act of 1969

NEPA serves the dual purpose of informing agency decision makers of the environmental effects of proposed federal actions, so that "important effects will not be overlooked or underestimated," and insuring that relevant information is made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision."   *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989); *see also W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 487 (9th Cir. 2011) (noting dual purposes).   NEPA's intent is to focus the attention of agencies and the public on a proposed action so that its consequences may be studied before implementation. 42 U.S.C. § 4321; 40 C.F.R. § 1501.1(c); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989).

To assist in meeting these goals, NEPA requires preparation of an Environmental Impact Statement ("EIS") for "major Federal actions significantly

affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3. The EIS must examine, among other things, "alternatives to the proposed action," and the project's direct, indirect and cumulative impacts. 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. §§ 1502.16, 1508.7. The court employs a "rule of reason standard to evaluate whether an environmental impact statement 'contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *Save the Peaks Coal. v. U.S. Forest Serv.*, 669 F.3d 1025, 1035 (9th Cir. 2012) (quoting *League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1130 (9th Cir. 2010)). Agencies need not consider alternatives that they "deem[] remote[,] speculative[,] . . . infeasible, ineffective, or inconsistent with the basic policy objectives . . ." *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1180 (9th Cir. 1990). "The 'range of alternatives that must be considered in the EIS need not extend beyond those reasonably related to the purposes of the project.'" *Westlands Water Dist. v. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (quoting *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 524 (9th Cir. 1994)).

Judicial review of agency NEPA compliance is deferential. *Marsh*, 490 U.S. at 375. The "role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97-98 (1983). In a case like this, where an agency is "making predictions [] within its area of special expertise" as opposed to simple findings of fact, a reviewing court must "generally be at its most deferential." *Id.* at 103; *Conservation Cong. v. U.S.*

10

1    *Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013) (same).

2        **D.      The National Forest Management Act**

3

4        The National Forest System is administered by the Forest Service, an agency of

5    the U.S. Department of Agriculture.   The Organic Administration Act of 1897,

6    16 U.S.C. §§ 471-482, provided that lands may be reserved as National Forests.   In

7    1960, Congress enacted the Multiple-Use Sustained-Yield Act, directing that the Forest

8    Service manage forests for outdoor recreation, range, timber, watershed management,

9
wilderness, and fish and wildlife in a manner that will best meet the needs of the

10

11   American people, under principles of multiple-use and sustained yield, 16 U.S.C.

12   §§ 528-531, but not so as "to affect the use or administration of the mineral resources of

13
national forest lands . . . . " *Id*. § 528.   In 1976, Congress enacted the National Forest

14

15   Management Act ("NFMA"), amending and repealing various provisions of the

16   foregoing acts, and enacting new provisions.  16 U.S.C. §§ 1600 *et seq*., Pub. L. 94-588

17   (1976).   Under NFMA, the agency develops land and resource management plans. 16

18   U.S.C.  §§ 1600(1),  (3),  1604(e),  (g)(3).    These plans establish broad goals and

19
objectives and guide management activities, ensuring consideration of economic and

20

21   environmental factors.   *Id*. § 1604(g)(1)-(3).   As flexible guidance documents, Forest

22   Plans may be "amended in any manner whatsoever."  *Id*. § 1604(f)(4).

23                              **STANDARD OF REVIEW**

24

25       Challenges to agency actions are reviewed under the standard of the

26   Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  *Lujan v. Nat'l Wildlife*

27   *Fed'n*, 497 U.S. 871, 872 (1990).   Under the APA, a court may set aside agency action

28

                                        11

that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that is not supported by "substantial evidence."  *See* 5 U.S.C. § 706(2)(A), (E). This standard of review is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.* ("*Motor Vehicles*"), 463 U.S. 29, 43 (1983); *Peck v. Thomas*, 697 F.3d 767, 772 (9th Cir. 2012), *cert. denied*, 133 S.Ct. 1289 (2013).  "Agency action is valid if the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Conservation Cong.,* 720 F.3d at 1054 (quoting *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir.2010)) (additional citations and quotes omitted). When reviewing scientific judgments and technical analyses within the agency's expertise, the reviewing court must be at its "most deferential." *Lands Council*, 629 F.3d at 1074 (quoting *Balt. Gas & Elec. Co.*, 462 at 87, 103).

## ARGUMENT

I.      **Many of Plaintiffs' FLPMA Claims and All Their Free-Standing APA Claims Must Be Dismissed Because Plaintiffs Do Not Identify any Legal Standard that the Withdrawal Allegedly Violated.**

Plaintiffs claim the withdrawal decision is arbitrary under section 706 of the APA, which permits a court, if the equities so counsel, to "hold unlawful and set aside" agency action that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  Section 701, however, excepts from judicial review action that is "committed to agency discretion by law."  *Id.* § 701(a)(2).  Complementing this provision, Section 702 provides that a person "adversely affected or aggrieved by agency action *within the meaning of a relevant statute*, is entitled to judicial review thereof."  *Id.* § 702 (emphasis added); *see Or.*

*Natural Res. Council v. Thomas ("ONRC")*, 92 F.3d 792, 798 (9th Cir. 1996) (discussing the relationship between sections 701 and 702). Thus, for review to occur, a "relevant statute" must provide a standard to make review meaningful.

The Supreme Court has explained that Section 701's exception applies where "statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (quoting S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)). Thus, where a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," judicial review is precluded. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *see also Oryszak v. Sullivan*, 576 F.3d 522, 525 (D.C. Cir. 2009) ("Because the APA does not apply to agency action committed to agency discretion by law, a plaintiff who challenges such an action cannot state a claim under the APA."). Thus, where action is authorized without "statutory restrictions or definitions describing precise qualifications," courts "may review only whether the Secretary followed whatever legal restrictions applied to his decision-making process." *Drakes Bay Oyster Co. v. Jewell*, 2014 WL 114699 at *6 (9th Cir. 2014) (citing *Ness Inv. Co. v. U.S. Dep't of Agriculture,* 512 F.2d 706, 715 (9th Cir. 1975) and construing APA sec. 701(a)(2)).

Under these principles, nearly all of Plaintiffs' claims brought pursuant to the APA and FLPMA,[4] and all free-standing APA claims not associated with any specific statute, must be dismissed due to Plaintiffs' failure (and inability) to identify any legal

---

[4] The two exceptions to this statement are NMA's and the Coalition's claims that the withdrawal violated FLPMA's planning provisions, and NMA's and the Coalition's claims that the notice to Congress violated FLPMA. As explained below, these claims fail for other reasons.

restriction that the Secretary violated in making the withdrawal.  Plaintiffs have not

alleged, nor could they, that the withdrawal was not limited to 20 years, or that the

Secretary failed to satisfy applicable procedural requirements, review of which is

permissible under *Drakes Bay* and *Ness*.  Claims in the first category (i.e., those

brought pursuant to the APA and FLPMA) fail because of Plaintiffs' failure to identify

any legal standard in FLPMA that the Secretary allegedly violated.[5]  Claims in the

second category (i.e., the "free-standing claims) also fail because Plaintiffs reference no

statute at all.[6]  Beyond determining that FLPMA's legal requirements are met (e.g., that

the withdrawal does not exceed twenty years and complies with procedural

requirements), the Court may not review the Secretary's exercise of his discretionary

---

[5]  This category includes: the Coalition's claim that the record does not support the
agency's conclusions drawn from the levels of dissolved uranium in the 20 water
samples taken from various wells and springs as discussed in the USGS Report,
Coalition Br. 4-5; that it does not support the agency's conclusions in regard to
groundwater contamination and soil contamination, *id*. at 5-6; and that the agency
ignored the existing Arizona regulatory regime for mine permitting, and thus
misperceived the likely impacts of mining operations.  *Id*. at 6-7.  The first category
also includes the contentions advanced by NMA/NEI that the record does not support
the agency's conclusions in regard to groundwater contamination, NMA/NEI Br. 17-19;
that it does not support a need to gather more data on groundwater flow paths, *id*. at 19-
21; that it does not support a need to mitigate impacts to tribal resources, *id*. at 22; that
it does not support a need to proceed cautiously and carefully in light of the area's
"unique resources," *id*. at 22-23; and that it is insufficient to allow the agency to
properly balance competing uses in its FLPMA decision-making process, *id*. at 23-24.
This category also includes NMA/NEI's claim that the withdrawal contravenes BLM's
governing Resource Management Plan, *id*. at 24-27, and a claim that the mere fact of
continued mining does not justify withdrawal, *id*. at 21-22.

[6]  This second category includes AEMA's claims that the record does not support a need
to protect water resources, AEMA Br. 6-9, a need to protect cultural resources, *id*. at 9-
10, or a need to protect 'other resources", *id*. at 10-14, and that it does not support
Interior's estimate of the lands' uranium endowment.  Should AEMA clarify, in reply,
that these claims were intended to assert FLPMA violations, they are nonetheless
unreviewable, like the first category of claims, because as noted the FLPMA
withdrawal provision itself provides no standard.

14

authority.  *See Drakes Bay,*  2014 WL 114699 at *6.

More specifically, in the absence of any extrinsic standard, the APA does not permit review because there is no "meaningful standard" to guide judicial review. *ONRC*, 92 F.3d at 798, quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (additional citation omitted).  The APA cannot provide the basis for a claim because the act is "merely a vehicle for carrying substantive challenges to court."  *Id*. at 796; *see also El Rescate Legal Servs. v. Executive Office of Immigration Review*, 959 F.2d 742, 753 (9th Cir. 1991) ("Section 702 does not create substantive rights."); *Public Lands for the People, Inc. v. United States Dep't of Agric.*, 733 F. Supp. 2d 1172, 1180 (E.D. Cal. 2010) ("A claim that an agency acted arbitrarily and capriciously for purposes of the APA cannot 'stand free of any other law.'").

The Ninth Circuit's reasoning in *ONRC* is instructive here.  The statute at issue expressly exempted certain Forest Service timber sales from compliance with specified environmental and natural resource laws.  Because of the exemption, Plaintiffs challenged the sales solely on "free-standing" APA claims, without asserting violation of any substantive standard.  92 F.3d at 795-96.  In affirming the district court's dismissal, the Ninth Circuit explained it is "well-settled that the touchstone of reviewability under section 701(a)(2) is whether there is 'law to apply.'"  *Id.* at 798, quoting *Citizens to Preserve Overton Park*, 401 U.S. at 410.  The court rejected an argument that the decision in the *Motor Vehicles* case, *see* 463 U.S. at 43, impliedly authorizes APA review independent of any other statute.  The court explained that section 706(2), in enumerating grounds for vacatur, "merely define[s] what is arbitrary

and capricious *assuming judicial review is available*." *ONRC,* 92 F.3d at 798 (citing

*Heckler,* 470 U.S. at 828) (emphasis added).  But if there is no legal standard, it is

> legally irrelevant whether an agency has made a "finding" that is "contrary to
> the evidence before it" or that is "so implausible that it couldn't be ascribed to
> a difference in view or the product of agency expertise."

*Id.* at 798-99 (quoting the standards stated in *Motor Vehicles*).  This is so because the

agency would be "perfectly free" on remand, to "conform its finding to the evidence

before it or give a more plausible explanation, yet reach the same ultimate decision it

made [previously]."  *Id.* at 799.

Plaintiffs' claims in this case suffer the same problem: the absence of a guiding

standard.  *See, e.g.,* NMA/NEI Brief at 17-23 (arguing decision is arbitrary because the

rationales articulated in the ROD are not supported by the evidence, without reference

to a substantive standard); *id.* at 23-24 (arguing the withdrawal is arbitrary because the

Secretary relied on inaccurate or incomplete information, citing no substantive

standard); AEMA Br. 3-15 (arguing the record does not support withdrawal, again

without citing no a substantive standard); *id.* at 21-22 (asserting that the Forest Service

failed to articulate sufficient reasons for consenting to the withdrawal); Coalition Br. 9-

11 (claiming the information relied upon by the agency was flawed and "violates

FLPMA," without reference to a substantive standard).   These claims (and the

additional claims in footnotes 5 and 6 not mentioned in this paragraph) should be

dismissed because of Plaintiffs' failure to ground them in a legal standard.

The absence of a guiding statutory standard is directly attributable to the nature

of the withdrawal authority – an executive power unique in its origin and operation.  As

discussed in Federal Defendants' motion for partial summary judgment, Doc. 95 at 3, 13, FLPMA did not grant the executive withdrawal authority; it codified (and defined limits on) pre-existing executive power inherent in Article II of the Constitution, implied by congressional acquiescence in the 19th century, and exercised since the earliest days of the Republic.  *Id*. at 3 (citing *Grisar v. McDowell*, 73 U.S. 363, 381 (1867)).  The Court should reject Plaintiffs' attempts to undermine that authority, made in disregard of FLPMA's carefully crafted adjustments to the executive-legislative balance of power.  When President Ford, in 1976, signed FLPMA into law, he consented on behalf of the executive to temporal limitations on the withdrawal authority and certain procedural requirements, but he did not yield the executive's traditional authority to determine the circumstances in which withdrawal is appropriate.

## II.   The Withdrawal Decision Fully Complies with FLPMA.

Should the Court conclude that Plaintiffs' FLPMA claims and their free-standing APA claims are reviewable, it should nonetheless reject them.  The Secretary's decision is fully supported by the record.  As explained below, the agencies "considered the relevant factors" and "articulated a rational connection" between the facts found and the decision made: to slow the pace of mining and conserve these resources for twenty years, while engaging in further study.  *Conservation Cong.,* 720 F.3d at 1054.  This cautious and protective approach to land management fully complies with FLPMA.

### A.   Interior's Well-Supported Estimate of the Uranium Endowment is Sound and Entitled to Deference.

Interior estimated the uranium endowment based on the noted 2010 USGS Report, AR 57-415, prepared at the request of the Secretary and incorporated by

reference into the FEIS.  AR 1628.  All three plaintiff groups challenge that estimate, contending it significantly understates the endowment.  NMA/NEI Br. 23-24; AEMA Br. 14-15; Coalition Br. 9-11.  As a result, they reason, the Secretary's decision is arbitrary, not only for purposes of FLPMA, but also for purposes of NEPA, as discussed Argument III, *infra*.  Plaintiffs' theories misapprehend the record and the law.

First, the 2010 USGS report is scientifically sound and the Secretary's reliance on its endowment estimate is entitled to deference.  *See Lands Council*, 629 F.3d at 1074 (when reviewing scientific judgments and technical analyses within an agency's expertise, a court must be at its "most deferential") (quoting *Balt. Gas & Elec. Co.,* 462 U.S. at 103).  Plaintiffs assail the report for not accounting for hidden breccia pipes, NMA/NEI Br. 13, Coalition Br. 11, and for merely recycling an outdated 1990 USGS report.  *Id.* at 9.  AEMA appears to adopt these reasons as well.  *See* AEMA Br. 14.

Such criticisms are unfounded.  The report, which was peer-reviewed, *see* AR 3893, 82092, is a detailed 359-page scientific study of the effects of mining on the region's natural resources.  It carefully analyzed geological, hydrological, and biological factors related to uranium mining in five separate studies, assembled in a single report.  *See* AR 66 (identifying the five studies).  The results of the first study, concerning the endowment, appear in Chapter A, "Uranium Resource Availability in Breccia Pipes in Northern Arizona."  AR 84.

Chapter A explained that in 1990, the USGS had estimated the presence in northern Arizona of a "mean undiscovered endowment" of 1.315 million tons of uranium oxide, in a study area much larger than the withdrawal area, encompassing

1    lands northward to the Utah border and southward to Valle, Arizona.  AR 66.  The

2    report defined "endowment" as the uranium estimated to occur in rock with a grade of

3

4    at least 0.01 per cent $U_3O_8$, *see* AR 87 (by way of comparison, 0.43 per cent was the

5    average grade of uranium removed from the Orphan Lode, AR 89, the region's first

6    uranium mine).[7]  The report also explained that the "mean undiscovered endowment" is

7    determined based on the average of a range of estimates, from 333,948 tons of $U_3O_8$

8    with a high probability of occurrence, to 2,757,230 tons with a low probability of

9

10   occurrence.  In other words, USGS did not make a single estimate, but rather a series of

11   probability-based estimates, and relied on the mean of those estimates to determine the

12   endowment.  Plaintiffs take no exception with this statistically sensible methodology.

13        USGS also employed qualitative methods in estimating the endowment.  As the

14   report explained, the agency divided the northern Arizona region into areas based on

15

16   their geologic favorability (by accounting for propensities in the formation and

17   preservation of uranium deposits), then evaluated the undiscovered endowment of those

18   areas by comparing their characteristics to a well-exposed and explored control area –

19

20   the "Hack-Pinenut control area." AR 92-93. By this method, the 1990 Report concluded

21   that the endowment *density* in "favorable area A" (encompassing the withdrawal area)

22   was approximately 112.4 tons of uranium oxide per square mile.  AR 93, 95.

23        In its 2010 report, USGS adjusted this figure downward, having discovered an

24   error in the 1990 report's figure for total surface area.  In particular, in 2010, USGS

25

26   studied digital cartographic data in a geographic information system (GIS) and

---

[7] The fact that USGS included such low-grade uranium in its computations sorely undercuts Plaintiffs' theory that the agency skewed the numbers to produce a lower endowment figure.  Unsurprisingly, Plaintiffs take no exception with this methodology.

19

determined, based on its analysis, that the surface area for Favorable Area A is actually 16.3% larger than the figure used in 1990 (i.e., 10,750 square miles, as compared to the 1990 figure of 9,247 square miles). AR 95. Based on the greater surface area, the agency concluded that the endowment density figure in 1990 should have been 96.6 tons per square mile, not 112.4 tons, as the 1990 study had reflected. *Id.* Based on the proposal to withdraw 1,687 square miles, the 2010 report calculated the mean uranium endowment *for the withdrawal area* by multiplying square miles by the revised density figure, producing an estimated endowment of 162,964 tons of uranium oxide. AR 96.

Plaintiffs' contention that the 2010 USGS report simply recycled the 1990 report is thus flatly contradicted by the record, which demonstrates that the agency carefully reexamined its data, obtained new data, considered mineral studies postdating the 1990 report, AR 87, and estimated the endowment accordingly. Although the adjustment was downward, and thus not favorable to Plaintiffs' economic interests, these circumstances nonetheless refute the Coalition's charge that USGS did not do any "original" work in preparing the 2010 report. Coalition Br. 9.

The record also demonstrates that USGS did in fact consider hidden breccia pipes, though not in the manner Plaintiffs insist on, and for good reason. The report notes considerable uncertainties in resource estimation, and explains that the question is not only how many breccia pipes exist, but whether they are mineralized. AR 90. It notes that "detection of the presence of unexposed breccia pipes on plateaus is more difficult" than elsewhere. *Id*. This is because circular features on plateau surfaces that might suggest the presence of hidden breccia pipes can have other origins, such as

sinkholes from dissolution of limestone; collapse features caused by dissolution of gypsum beds; and zones of stratabound, oxidized copper-mineralized breccias. *Id.*

The report also acknowledged that mining companies had recently conducted airborne electromagnetic geophysical surveys to identify hidden breccia pipes, with two favorable finds, but added that surface observation of "circular features" (even those with "concentric, inward-dipping beds" and "visible alterations," classic indicators of hidden breccia pipes) is not enough.   AR 92.   "[O]nly drilling can determine with certainty whether a breccia pipe is present and if it contains uranium mineralization." *Id.*   This same passage noted the additional difficulty of using surface features to identify hidden breccia pipes in the case of "gently rolling plateau surfaces," *id.*, a characteristic of the withdrawal area, because they have "very limited dissection" and "do not provide the three-dimensional exposure necessary to recognize breccia pipes." *Id.* Plaintiffs, representing mining interests, are understandably prone to optimism, but given the documented uncertainties which the agency disclosed, the scientists at USGS need not join in this optimism.   Their peer-reviewed "scientific judgments" and choice of methods are entitled to deference. *Lands Council*, 629 F.3d at 1074.

Second, Plaintiffs' claims fail because they do not establish any violation of FLPMA.   Unable to present a convincing violation of FLPMA's withdrawal provisions, Plaintiffs turn to other FLPMA provisions.   NMA argues the defects in the endowment estimate and elsewhere "fatally infected" the Secretary's multiple-use balancing in the decision making process. NMA/NEI Br. 24.   In a similar vein, AEMA argues that the decision "unnecessarily prevents multiple uses of the area . . . ." AEMA Br. 15.

These contentions lack merit.  The Ninth Circuit has made clear that broad expressions of concern and desire for improvement, such as multiple use provisions, "can hardly be considered concrete limits upon agency discretion."  *Perkins v. Bergland,* 608 F.2d 803, 806 (9th Cir. 1979).  Their language "'breathes discretion at every pore.'"  *Id.* (quoting *Strickland v. Morton*, 519 F.2d 467, 469 (9th Cir. 1975)) (reviewing land classification decisions under the Classification and Multiple Use Act of 1964).  For this very reason, the ROD explains that the multiple use standards of both FLPMA and NFMA afford the agencies "substantial discretion to balance the competing uses on particular parcels of land; [they do] not require every use on every parcel." AR 4.  Plaintiffs' vague references to "multiple use" do not explain how or why the withdrawal violates this standard.  The Court should reject Plaintiffs' suggestion that the multiple-use standard somehow operates to preclude withdrawal.

Finally, the Coalition argues that defects in the endowment estimate violated FLPMA because they were carried forward into the Secretary's report to Congress, in both the economic evaluation required by section 204(c)(2)(2), and in the geologic report required by section 204(c)(2)(12).  Coalition Br. 10-11.  NMA/NEI advance a similar argument.  NMA/NEI Br. 28.  These claims are unreviewable and fail to state a claim for relief because section 701(i) of FLPMA provides that the "adequacy of reports required by the Act to be submitted to the Congress or its committees shall not be subject to judicial review."  43 U.S.C. § 1701(i), Statutory Notes; *NRDC v. Hodel*, 865 F.2d 288, 316-17 (D.C. Cir. 1988) (involving OCSLA reporting requirement).[8]

---

[8] NMA/NEI also assert several deficiencies in the report to Congress, unrelated to the uranium endowment, and argue these failures render the withdrawal unlawful.  These

**B.     Plaintiffs' remaining FLPMA claims and their Free-Standing Claims Lack Merit.**

The Coalition complains that because a small portion of the withdrawn lands are actually located outside of the watershed, BLM should have "change[d] the scope of the withdrawal." Coalition Br. 9.  It also complains that, if the purpose of the withdrawal is to protect the watershed, BLM should have explained why lands outside the watershed were included in the proposal.  Plaintiffs cite no authority for such obligations, and make no attempt to explain how these circumstances amount to a FLPMA violation or even what FLPMA provisions are implicated.  As discussed, *supra* at 6, "watershed" does not mean "water resources," and the Secretary, in the exercise of his authority, was not confined to protection of a single resource.  Indeed, the record reflects that he based his decision on concern for multiple resources and uses, in particular: (i) water resources; (ii) the sacred and traditional places of tribal peoples; and (iii) the set of "circumstances" and the area's "unique resources," including visual resources, wildlife, and air quality. AR 9.  The record amply supports these concerns. [9]  For these reasons and because FLPMA provides "a great deal of discretion in deciding how to achieve [its] objectives," *Gardner,* 638 F.3d  at 1222 (quoting *Norton v. S. Utah Wilderness Ass'n*, 542 U.S. 55, 66 (2004)), the Coalition's claims should be rejected.

---

claims are unreviewable for the same reason: section 701(i) precludes it.

[9]  With respect to record support for impacts to water resources, *see* Argument III, *infra* at 50-55.  With respect to record support for impacts to sacred and traditional places of tribal peoples, *see* AR 4, 9, 11 (ROD); AR 2214-29 (FEIS).  With respect to record support for impacts to other resources, *see* AR 11-12 (ROD); AR 2174-2201 (FEIS) (discussing impacts to visual resources under no action alternative), AR 2006-2030 (FEIS) (discussing impacts to air quality under no action alternative); AR 2131-2140 (FEIS) (discussing impacts to fish and wildlife under no action alternative).

1    NMA/NEI further contend that because the "supposed basis for the withdrawal"

2   was protection of the "watershed" (a term they too incorrectly construe to mean water

3   resources), the decision was arbitrary for purposes of FLPMA because the record, so

4   they claim, indicates "that mining did not result in adverse impacts to water resources."

5   NMA/NEI Br. 17.  AEMA and the Coalition advance similar contentions.  AEMA Br.

6   6-9, Coalition Br. 5-6.  All three refer to statements of individual employees on the

7   appropriateness of withdrawal.  These individuals do not speak for the agencies, and

8   their pronouncements do not bind the Secretary as a matter of law.[10]   But more

9   importantly, none of Plaintiffs' attacks on the USGS report can erase the fact that

10  historical mining activities in the region have impacted water and soil resources,

11  resulting in water and soil samples with elevated contaminant levels, AR 110-11, 191,

12  as discussed more fully in the NEPA argument which follows.  Although there may be

13  uncertainties regarding the manner in which contaminants migrate to the aquifer, it

14  cannot be disputed that fractures, faults, sinkholes and breccia pipes themselves can

15  provide pathways.  AR 207.  It also cannot be disputed that floods, storms, winds, and

16  debris flows can likewise transport contaminants.  AR 204.  The Secretary's decision to

17  take a cautious approach, given this evidence, the non-discretionary nature of the

18  Mining Law's operation, and the unique resources at issue, was reasonable.[11]

---

[10]  *See WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1186-87 (10th Cir. 2013) ("a diversity of opinion by local or lower-level agency representatives will not preclude the agency from reaching a contrary decision, so long as the decision is not arbitrary and capricious and is otherwise supported by the record") (citing *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659 (2007)), *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1168 (10th Cir. 2002).

[11]  The Coalition's claim that BLM violated FLPMA by failing to coordinate with local

**III.    Plaintiffs' NEPA Claims are Non-Justiciable and Lack Merit.**

   **A. Plaintiffs Lack Standing to Bring NEPA Claims**

The Court should dismiss the NEPA claims advanced by NMA/NEI and the Coalition, because these plaintiffs have failed to establish *both* Article III and prudential standing to bring NEPA claims, even if they have established Article III standing to assert FLPMA claims, a point Federal Defendants do not contest.[12] Plaintiffs cannot simply rely on the Court's prior determination that their standing "allegations [were] sufficient at the pleading stage," Doc. 87 at 45 ("MTD Op."); *see*

---

counties and "reconcile" the withdrawal with local land use plans is similarly without basis.   FLPMA's withdrawal provisions do not require coordination with local governments.  *See* 43 U.S.C. § 1714.  The "coordination" provisions that the Coalition relies upon appear in the section of FLPMA pertaining solely to land use plans, not withdrawals.  43 U.S.C. § 1712(c)(9).  Here the Secretary was not acting under that provision, nor could he have as this section of FLPMA expressly provides that land use plan amendments cannot be used to implement withdrawals and recognizes that §1714 is the provision under which withdrawals are made.  43 U.S.C. § 1712(e)(3).  Nor was a land use plan decisions required because the Arizona Strip Resource Management Plan ("RMP") expressly recognizes that lands may be withdrawn from operating of the mining law.  *See* AR 30214 ("Allow entire Arizona Strip FO to remain open to mineral leasing location and sale except where restricted by . . . withdrawals . . . .").  Moreover, as detailed below in the NEPA section, BLM did consider the local counties' land use plans and resolutions regarding the withdrawal.  AR 1642-43.  However, local communities cannot trump public land planning decisions merely by passing resolutions disagreeing with a federal action—particularly when the county where the majority of the land in which the proposed action is occurring supports it.

[12] In motions to dismiss, Federal Defendants argued that Plaintiffs lacked Article III standing to bring these actions and the Court analyzed injury to each group of Plaintiffs in general across all of their claims.  Now, the inquiry is to focus solely on Plaintiffs' NEPA claims.  *See Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 704 (D.C. Cir. 1988) ("rather than passing a composite judgment on the standing of [plaintiff] with regard to the mass of regulations before us, we evaluate *the nature of* [*plaintiff's*] *objection* to each challenged regulation in order to determine whether [plaintiff] can contest these measures in court") (emphasis added).

*also e.g. id.* at 20, 31;[13] they bear the burden of establishing standing "at every stage of the litigation." *Krotter v. Starbucks Corp.*, 628 F.3d 1139, 1141 (9th Cir. 2010). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). Plaintiffs' burden is much greater at the summary judgment stage than at the motion to dismiss stage. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (recognizing that at summary judgment "the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'").

Plaintiffs must establish that they have (1) Article III standing to bring their NEPA claims, which means that they must establish that they "'suffered injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision,'" MTD Op. 5 (quoting *Bennett v. Spear*, 520 U.S. 154, 162 (1997), and (2) prudential standing, *i.e.* that the interest they seek to protect is within NEPA's environmental zone of interest, *see id.* at 25; *see also, e.g., Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 937-40 (9th Cir. 2005). "[O]n any given claim the injury that supplies constitutional standing must be the same as the injury within the requisite 'zone-of-interests' for purposes of prudential standing." *Mountain States Legal Found. v. Glickman,* 92 F.3d 1228, 1232 (D.C. Cir. 1996). "[I]f plaintiffs established an interest sufficiently aligned with the purposes of the [statute] for prudential standing, but failed to show (for example) an adequate causal relation between the agency decision attacked and any injury to that interest, [the court] could

---

[13] The Court expressly distinguished cases finding that mining and logging companies lacked prudential standing to bring NEPA claims on the basis that those cases "arose at the summary judgment stage and not, as here, at the pleading stage." MTD Op. 31.

not adjudicate the claims—even if plaintiffs had constitutional standing with respect to some other interest that was outside the requisite 'zone.'" *Id.*

As this Court previously recognized, "NEPA seeks to protect environmental interests . . . . As a result, 'purely economic interests do not fall within NEPA's zone of interests' and a plaintiff asserting such interests lack prudential standing under NEPA." MTD Op. 25-26 (quoting *Ashley Creek*, 420 F.3d at 940). Moreover, for a plaintiff's interest to fall within NEPA's zone of interests, it "must be 'systematically, not fortuitously' or 'accidentally' aligned with those that Congress sought to protect'" through NEPA. MTD Op. 29 (quoting *Cal. Forestry Ass'n v. Thomas*, 936 F. Supp. 13, 22 (D.D.C. 1996).[14]  As detailed below, neither NMA/NEI nor the Coalition have established Article III injury to an interest within NEPA's zone of interests.

Moreover, each of Plaintiffs' NEPA arguments demonstrates that their true purposes have nothing to do with furthering NEPA's environmental objectives. To the contrary, they attempt to use "NEPA's various procedural provisions[,] designed to further the goal of environmental protection[,]" *Ashley Creek*, 420 F.3d at 945, to argue

_____

[14] Since this Court's January 8, 2013 decision, a number of courts have rejected creative attempts by plaintiffs with economic interests to bring NEPA claims under the guise of an environmental injury. *See, e.g., W. Wood Preservers Inst. v. McHugh*, 925 F. Supp. 2d 63, 71 (D.D.C. 2013) (holding that preserved wood products trade association lacked Article III and prudential standing to bring NEPA claims despite its arguments that the challenged regulations bias the marketplace in favor of competing environmentally harmful materials); *Moyle Petroleum v. LaHood*, 2013 WL 1981947, at *3 (D. Utah May 13, 2013) (finding that owner of property along highway interchange project lacked Article III and prudential standing for NEPA claims because his environmental concerns were generalized grievances lacking geographic nexus to his property and his true interests were in property access and revenues); *Thompson Metal Fab, Inc. v. U.S. Dep't of Transp.*, 289 F.R.D. 637, 642 (D. Or. 2013) (rejecting plaintiff's assertion that its economic interests were intertwined with the environment because it uses river over which proposed bridge was to be built to transport products).

that BLM failed to consider less environmentally protective actions and *overstated* the

environmental impacts of mining. *See, e.g.,* NMA/NEI Br. 3-11; Coalition Br. 4-9.

These arguments undercut Plaintiffs' claims of concern for the environment and

highlight why they are "peculiarly *un*suitable prox[ies] for those whom Congress

intended to protect' in enacting NEPA. . . ." *Cal. Forestry*, 936 F. Supp. at 22 (quoting

*Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 927 (D.C. Cir. 1989)).

      1.  <u>NMA and NEI Lack Standing to Bring NEPA Claims</u>

NMA/NEI's brief provides only the most cursory treatment of standing.  It

appears that the sole interest and injury on which they base both their Article III and

prudential standing for the NEPA claims is the possibility that one of their members,

Uranium One, will mine uranium ore deposits in Utah or other western states "where

the ore deposits are of a lower grade and concentration" which they contend will

require a greater ground disturbance to recover the same amount of uranium thereby

causing greater environmental impacts and higher costs.  *See* Doc. 171-1 ¶¶ 7-10.  That

Uranium One has no concrete plans to mine uranium at these alternative sites is stated

explicitly in Norman Schwab's declaration:

> Uranium One is still deciding which of its uranium deposits at other sites
> it will mine.  This is a complex and confidential business decision that
> depends on a number of factors, including the specific characteristics of
> the properties currently held by Uranium One, the price of uranium, the
> costs associated with mining a given deposit, and available capital and
> the return on investment.

*Id.* at ¶ 7.  Such speculative injury, dependent on a number of factors, including the

often fluctuating price of uranium, is insufficient to establish "injury in fact" for Article

III purposes, which requires a showing of "an invasion of a legally protected interest

which is (a) concrete and particularized . . . and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan*, 504 U.S. at 560 (internal citations omitted).  And, since "the injury that supplies constitutional standing must be the same as the injury within the requisite 'zone-of-interests' for purposes of prudential standing," *Mountain States,* 92 F.3d at 1232, this speculative injury that does not meet the Article III standards cannot form the basis for NMA/NEI's prudential standing.[15]

Moreover, NMA/NEI's arguments are analogous to those the Ninth Circuit rejected in *Ashley Creek*; which involved a NEPA challenge to a BLM-prepared EIS related to a mine and reclamation plan for a phosphate mine by a mining company, which owned phosphate deposits located 250 miles away from the proposed site.  420 F.3d at 936.  The plaintiff argued that BLM failed to consider as an alternative the mining of *its* phosphate deposits, which it claimed would be "not only cost-effective, but . . . also environmentally superior to the proposed action." *Id.*  The court found the plaintiff lacked Article III standing because it did not have the required "geographic nexus" to the area that would be affected by the proposed action. *Id.* at 938.  Similarly, here, environmental harms resulting from mining ore deposits in Utah or other western states lack such a nexus.  The court also held that the plaintiff lacked prudential standing because its injury was "purely economic," despite the claim that its deposits

---

[15] Thus, plaintiffs cannot assert, for example, an economic injury that meets Article III's concrete and immediacy requirements but separately assert a different injury to an environmental interest that fails to meet those standards in order to establish prudential standing.  The same injury must satisfy both.   This Court's prior ruling cited a lack of authority for the proposition that "the injury [asserted for prudential standing purposes] must be as concrete and immediate as that required for Article III standing."  MTD Op. 34.  Federal Defendants respectfully submit that the D.C. Circuit's *Mountain States* decision requiring the same injury to meet Article III and prudential standing standards provides the authority this Court previously found lacking.

were "environmentally superior." *See id.* at 945.  Likewise here, the Court must reject Uranium One's attempt to give an environmental cloak to its true economic interests.

It is clear that Uranium One's current concern about the environment is "merely pretextual," MTD Op. 31,[16] given that Uranium One did not raise this issue in comments during the NEPA process.  In fact, neither Uranium One nor NEI submitted any comments whatsoever.  NMA's comments said nothing about these environmental concerns.   AR 82090.   Similarly, in *American Independence Mines v. U.S. Dep't Agriculture*, the court rejected such *post hoc* attempts by mining plaintiffs to link their economic interest in mining to the environment, by arguing that the proposed road closure would not only deny them mine access, but would also increase sediment loads thereby causing environmental impacts.  733 F. Supp. 2d 1241, 1266-67 (D. Idaho 2010), *aff'd* No. 11-35123, 2012 WL 3542264 (9th Cir. Aug. 17, 2002).  The court found that amending the complaint to add such allegations would be futile not only because they "fail[ed] to show Plaintiffs' economic interests and the environmental effects of the proposed action are intertwined," but also because plaintiffs had failed to raise this environmental interest in their comments and were thus "foreclosed from raising the argument now." *Id.*  Similarly here, by failing to raise these concerns about potential environmental impacts to other areas in their comments, NMA/NEI is foreclosed from basing their prudential standing on such arguments.  Moreover, in concluding that the mining company lacked prudential standing, the court in *American Independence Mines* explained that the company's economic concerns were not

---

[16]  *See also Kanoa, Inc. v. Clinton*, 1 F. Supp. 2d 1088, 1093 (D. Haw. 1998) (requiring showing of "non-pretextual environmental injury.")

"'interrelated with the environmental affects' of the proposed action in this case." *Id.*

1266-67 (quoting *Ashley Creek*, 420 F.3d at 943). The same is true with respect to the

NMA/NEI concerns. They are unrelated to the environmental effects of the withdrawal

itself, that is, enhancing protection of water resources, the sacred and traditional places

of tribal peoples, wildlife, visual resources, and air quality. Instead, they relate to

environmental concerns far-removed from the withdrawn lands, in Utah and in other

western states. NMA/NEI therefore fail to establish that they have prudential standing.

### 2. The Coalition Lacks Standing to Bring NEPA Claims

Likewise the Coalition fails to establish that it has *both* Article III and prudential

standing to bring NEPA claims. Although the Coalition's argument is replete with lofty

rhetoric about its interests in land management and environmental protection in the

local counties and their procedural interests in the NEPA process, *see* Coalition Br. 29-

31, without an injury to those environmental interests the Coalition lacks standing to

bring NEPA claims. *See Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1237 (10th

Cir. 2012) ("In order to show an injury in fact [to satisfy Article III] for a procedural

violation of NEPA, [plaintiffs] must show the agency's violation 'created an increased

risk of actual, threatened or imminent *environmental harm.*'") (quoting *Sierra Club v.

U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002)).[17]   The Coalition's

---

[17] In *Wyoming,* the state and a county near Yellowstone National Park lacked Article III
standing to bring a NEPA challenge to the decision restricting snowmobile access to the
park. 674 F.3d at 1238. Like here, the state and county had argued that NPS violated
NEPA by failing to consider alternatives that allowed more snowmobile use, by making
the decision in the face of scientific evidence showing that more snowmobile use could
be allowed without adverse environmental impacts, and by failing to consider the
county's comments. *Id.* at 1237. The court also found that they lacked standing to
bring claims under the NPS Organic Act based on speculative assertions of lost tax

assertion that the withdrawal will decrease Mohave County's tax revenues, which the county could have used to pave roads, thereby improving air quality, and to protect desert tortoise habitat, fails to establish either Article III or prudential standing. Buster Johnson's Declaration makes clear that Mohave County's purported intentions to use tax revenues for these purposes are speculative. *See* Doc. 188-6 ¶ 20 ("Extra revenues from mining *could* be directed by the Board of Supervisors to pave or hard-surface existing unpaved dirt roads in the County"); ¶ 26 ("The County *could* allocate additional revenues from severance taxes to the desert tortoise programs . . .") (emphases added). Such "'conjectural' or 'hypothetical'" injury fails to satisfy Article III. *Lujan*, 504 U.S. at 560. Thus, it cannot be asserted as the basis for prudential standing. *Mountain States*, 92 F.3d at 1232.

Additionally, as Mohave County explained in its comment letters, its "interest in this issue is based on the detrimental *economic impact*" of the withdrawal, AR 3400 (emphasis added), which is outside of NEPA's environmental "zone of interests." Neither Mohave County nor the Coalition raised environmental concerns about paving roads or desert tortoises in their comments, *see* AR 3400-01, 6308-09, 8020-30, 8039-49, 34124, 44372-77, 66795-96, 69504, 69513, 69913-17, thus they cannot rely on such interests now as a basis of their standing. *See Am. Independence Mines*, 733 F. Supp. 2d at 1266-67. In any event, the withdrawal will actually improve air quality by reducing truck traffic on unpaved roads. AR 11. It is clear that this new-found environmental interest is a "pretext" manufactured for prudential standing purposes,

revenues, the county's upkeep obligations on trails that could be used by displaced snowmobilers and their regulatory interests in air quality. *Id.* at 1232-36.

which this Court should not countenance.

**B. The Analysis of Alternatives Complied With the Requirements of NEPA**

    1.  <u>BLM's Discussion of the "No Action" Alternative and Mitigation Measures Was Adequate</u>

NMA/NEI challenge BLM's discussion of the "no action" alternative by arguing that BLM overestimated the environmental impact that would have occurred had the lands remained open to new mining claim location and development by failing to consider mitigation measures.  *See* NMA/NEI Br. 3-5.  Not only is this argument a perversion of the purposes behind NEPA's "no action" alternative and mitigation requirements, it is unsupported by the record.   The CEQ regulations require federal agencies to "[u]se all practicable means . . . to *restore and enhance* the quality of the human environment and *avoid or minimize any possible adverse effects* of their actions upon the quality of the human environment."  40 C.F.R. §1500.2 (f) (emphasis added).  As the ROD recognized "the withdrawal does not result in environmental harm, and is itself a practical means to minimize or avoid such harm."  AR 13.

The purpose of the mitigation discussion is for the agency to "to describe what mitigating efforts it could pursue to off-set the damages that would result from the [the selected action]."  *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998); *see also* 40 C.F.R. §1505.2(c) (requiring agency to "[s]tate whether all practicable means to avoid or minimize environmental harm *from the alternative selected* have been adopted. . . .") (emphasis added).[18]  The "no action"

---

[18]  As courts have recognized, the discussion of mitigation measures "requirement is implicit in NEPA's demand that an EIS must discuss 'any adverse environmental effects which cannot be avoided *should the proposal be implemented*.'"  *Okanogan*

alternative serves as the environmental baseline of the government "doing nothing" and "is the standard by which the reader may compare the other alternatives."  *Kilroy v. Ruckelshaus*, 738 F.2d 1448, 1453 (9th Cir. 1984).  Here, by definition, that meant that mining would proceed under the current management scheme with the mitigation practices that are inherent therein, which is exactly what BLM analyzed as the "no action" alternative.  *See* AR 1656-57 ("The mitigation of potential effects from exploration or development would continue under the applicable surface managing agency regulations. This alternative . . . reflects the current management situation for all federal lands within the area proposed for the withdrawal").

The FEIS analyzed possible mitigation measures in connection with all alternatives, including the "no action" alternative.  *See* AR 1656-57, 2020-21, 2042, 2072-73, 2111-13, 2127, 2131-32, 2159-61, 2165-66, 2216, 2223.  Existing BLM and Forest Service regulations require operators to implement design features to prevent unnecessary or undue degradation or to minimize all adverse environmental impacts on surface resources.  AR 2072. The FEIS separately detailed "examples" of mitigation measures" applicable to air, water, soil, vegetation, special status special, cultural and American Indian resources.  *See* AR 2021 (detailing air quality control measures implemented in Arizona 1 mine compliance plan), 2072-73 (water related mitigation),[19]

*Highlands Alliance v. Williams*, 236 F.3d 468, 473 (9th Cir. 2000) (quoting *Robertston*, 490 U.S. at 351-52 (quoting NEPA, 42 U.S.C. §1502.16(h))) (emphasis added).  The cases Plaintiffs cite involve environmental plaintiffs arguing that the agency failed to consider mitigation of the environmental impacts of the selected alternative.   None of them stand for the novel proposition that a NEPA claim can be based on the assertion that if the agency had considered mitigation of the "no action" alternative it would have demonstrated that the proposed environmentally protective action was unnecessary.

[19] For example, for water resources, examples of mitigation measures include lined

2111-13 (soil related mitigation), 2127 (vegetation related mitigation), 2159-61, 2165-66 (conservation measures related to special status species), 2211 (soundscapes related mitigation), 2216 (cultural resources related mitigation).   The FEIS does not, as Plaintiffs contend, merely "list" such measures.  Throughout each resource discussion the FEIS discusses the efficacy of these sample mitigation measures.  *See, e.g.,* AR 2087 (discussing efficacy of perimeter berms); 2115 (discussing efficacy of dust management practices); 2117 (discussing mitigation thru aggressive remedial action and monitoring after closure); 2145 (discussing impact of low speed limits).

NEPA does not require anything more, particularly since the FEIS was not analyzing a specific mining operation.  *See N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) ("Because it is impossible to know which, if any areas of the [project area] are most likely to be developed, BLM development of more specific mitigating measures cannot be required at this stage."); *Okanogan Highlands*, 236 F.3d at 476 (finding that discussion of mitigation was measures "in 'bullet' form" and in "somewhat general terms" was not deficient where "[t]he exact environmental problems that will have to be mitigated are not yet known because the Project does not exist").  It would be virtually impossible to predict every possible mitigation scenario, let alone every possible mining project that would require mitigation.  Including all mitigation measures that could possibly apply to every location where mines may be developed and then attempting to analyze their impacts in more than general terms

---

below-grade evaporation ponds, perimeter berms and diversion channels, engineered ore pads, methods of controlling mine drainage, monitoring requirements, point of compliance contingency measures, reclamation efforts, and interim management plans that discuss periods of temporary or seasonal closure and monitoring.  AR 2072-73.

1    would make the analysis meaningless.

2          2.   BLM Considered a Reasonable Range of Alternatives

3          NMA/NEI's second NEPA argument, that BLM failed to consider an

4    appropriate range of alternatives, is likewise without merit.  All of the alternatives that

5    NMA/NEI contends that BLM should have analyzed—(1) a shorter-term withdrawal,

6    (2) another withdrawal of intermediate geographic scale, (3) imposing new

7    requirements on mineral exploration and development and program initiatives (what

8    Plaintiffs refer to as "Alternative E"), and (4) an "information gathering" alternative—

9    would be more environmentally impactful than the withdrawal, but presumably more

10   economically favorable for the mining industry.  NMA/NEI Br. 6-12.  Just like their

11   "mitigation" argument, this runs contrary to NEPA's environmental goals.

12         As an initial matter, where the "the proposed agency action has a primary and

13   central purpose to conserve and protect the natural environment, rather than to harm it"

14   the "alternatives requirement must be interpreted less stringently." *Kootenai Tribe of*

15   *Idaho v. Veneman*, 313 F.3d 1094, 1120 (9th Cir. 2002), *abrogated on other grounds by*

16   *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011).  "[I]t would turn

17   NEPA on its head. . . to require that [BLM] conduct in-depth analyses of

18   environmentally damaging alternatives that are inconsistent with [its] conservation

19   policy objectives."  *Id.* at 1122.[20]  Thus, Plaintiffs' NEPA challenge based on a failure

_____

[20] Agencies are required to "use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will *avoid or minimize adverse effects of these actions upon the quality of the human environment*." 40 C.F.R. §1500.2(e) and (f) (emphasis added); *see also Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1129 (8th Cir. 1999) (rejecting argument that agency should have considered "*increased* visitor levels" because "[t]here is no need for the agency to

1   to consider more environmentally impactful alternatives fails.

2         Even if Plaintiffs' could bring a NEPA claim on this basis, they fail to show that

3
4   BLM's alternatives analysis was unreasonable.  *See Westlands*, 376 F.3d at 868.  The

5   FEIS examined in detail four different alternatives, which covered the broad range of

6   alternatives.  The alternatives ranged from no withdrawal, which would have allowed

7   mining and location of new mining claims to proceed under the existing mining laws

8
9   and regulations (Alternative A: the "no action" alternative), through partial withdrawals

10   of intermediate size (Alternative C: 648,805 acres withdrawn; Alternative D: 292,088

11   acres withdrawn), to the selected alternative of a complete withdrawal of 1,006,545

12   acres (Alternative B).   AR 1655-57.  BLM also considered but eliminated from

13
14   detailed analysis six additional alternatives—two of which NMA/NEI contend should

15   have been analyzed fully.  AR 1658-60.  As NEPA requires, the FEIS "briefly

16   discuss[ed] the reasons for their having been eliminated." 40 C.F.R. §1502.14(a).

17         All of the alternatives that NMA/NEI contend should have been analyzed in the

18
19   FEIS were in fact considered by BLM either as alternatives eliminated from further

20   consideration or addressed in response to comments on the DEIS.  *See* AR 1659-61

21   (explaining why shorter duration withdrawal and new mining requirements alternatives

22   were eliminated from detailed analysis); AR 3254 (discussion at June 2011 briefing of

23
24   pros and cons of alternative that would have allowed Secretary to "mix and match"

25   parcels to be withdrawn); AR 2351 (response to Arizona Geological Survey comments

26
27   pursue alternatives that are contrary to the goals of [NEPA].");  *Soda Mountain Wilderness Council v. Norton*, 424 F. Supp. 2d 1241, 1263 (E.D. Cal. 2006) ("NEPA

28   enables an agency, and the public it serves, to evaluate whether the government has other options it could take that might *be less damaging to the natural environment*.").

proposing "information gathering" alternative).  Thus, because "[t]he record shows that the EIS team considered and directly responded to suggestions" about alternatives, the objectives of "foster[ing] informed decisionmaking and informed public participation" of NEPA's alternatives requirement were met.  *Westlands*, 376 F.3d at 872 (quoting *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982); *see also Envtl. Prot. Info. Ctr. v. Blackwell*, 389 F. Supp. 2d 1174, 1201 (N.D. Cal. 2004) ("Courts have held that an agency may address an alternative in a public comment."); *NRDC v. Hodel*, 865 F.2d 288, 296 (D.C. Cir.1988) (discussion of alternatives may be adequate because of inclusion of interested parties' comments and government's responses).

Moreover, while the shorter-duration and smaller geographic area alternatives were not specifically analyzed in the FEIS, they were within the range of alternatives BLM considered. AR 1655-57.   All that NEPA requires is consideration of "a reasonable range sufficient to inform the public and the agency of the possible alternative options which could be selected." *Soda Mountain*, 424 F. Supp. 2d at 1263. It does not require discussion of every "mid-range alternative," *Westlands*, 376 F.3d at 871, nor does it require separate "discuss[ion of] alternatives similar to alternatives actually considered," *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 955 (9th Cir. 2008), or alternatives with "substantially similar consequences," *Headwaters, Inc.*, 914 F.2d at 1181.  Moreover, BLM's NEPA guidance explicitly recognizes that various parts of separate alternatives can be "mixed and matched" to develop a new complete alternative. *See* AR 29940 (BLM Handbook).

Nor was it unreasonable for BLM to reject alternatives that did not meet the

stated purpose and need for the action,[21] *Westlands*, 376 F.3d at 868—which was to "protect the natural, cultural, and social resources in the Grand Canyon watershed from the possible adverse effects of reasonably foreseeable locatable mineral exploration and development" and "to address the possibility of negative impacts from hardrock mining, which is expected to increase absent a withdrawal." AR 1625-26.  NMA/NEI's proposed "information gathering" alternative—*i.e.* an alternative that would have allowed mining exploration and development to proceed unfettered while BLM conducted additional studies—would have done nothing to slow the pace of mineral exploration and development in the area or protect the watershed, and thus would not have met the purpose and need.  Moreover, it would have had the same impacts as the "no action" alternative.  AR 2351.  Similarly, a withdrawal of a shorter duration, either 10 or 5 years, would not have served this purpose and need "[s]ince protection of the Grand Canyon watershed is a long-term need and mining interest is foreseeable in the long term."  AR 1659.   Likewise, "Alternative E" would not serve the stated purpose and need because it would require a lengthy and uncertain rulemaking process (which may well be further delayed by legal challenges from various interested parties) to amend BLM and Forest Service surface management regulations, 43 C.F.R. § 3809 and

---

[21] Contrary to NMA/NEI's assertion, the "purpose and need" for the action remained consistent throughout the NEPA process.  *Compare* AR 1625 *with* 2.  As is recognized in the ROD, although BLM found there is a "low probability of impacts [resulting from uranium mining, those impacts are] potential[ly] high risk."  AR 9.  This does not represent a "shift" in the agency's purpose, but rather a "cautious and careful approach" that was warranted due to an acknowledged lack of certainty in potential impacts to the unique resources in this area, which provide water to millions of people living in seven states.  *Id.*  While the ROD indicated that additional studies would be conducted during the twenty year withdrawal period, those were not a justification for the withdrawal; rather studies done during the withdrawal period would better inform "future decisionmaking in the area."  AR 10.

36 CFR §§228.1-228.15, to implement new mineral exploration and development requirements—during which time mining exploration and development with their associated impacts would have been allowed to proceed unfettered.

**C. Interior's Analysis of the Environmental Impacts of the Withdrawal Complied With NEPA.**

As required under NEPA, the FEIS "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Save the Peaks*, 669 F.3d at 1035. BLM "focus[ed its] attention on environmental consequences of a proposed project, [and] ensure[ed] that important effects will not be overlooked or underestimated…" *Robertson*, 490 U.S. at 349. This Court should decline to engage in Plaintiffs' attempt to "fly speck" the FEIS and "hold it insufficient on the basis of [alleged] inconsequential, technical deficiencies." *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1020 (9th Cir. 2012).

The FEIS relies on the USGS Report, which looked at the possible geological, geochemical, hydrological and biological effects of uranium mining on the region, AR 66, 57-415, based upon available historical water quality data, AR 202, 240, 254, and additional soil and water sampling performed by USGS in 2009, AR 110, 202, 240, 249, 1784. Additionally, the FEIS devotes 250 pages of detailed analysis to the environmental impacts of each of the four alternatives on air, water, soil, vegetation, fish and wildlife, special status species, visual resources, soundscapes, cultural and American Indian resources, wilderness, wilderness characteristics, and recreational resources. AR 2003-2214. BLM received 296,461 comments on the DEIS, AR 2327, analyzed all substantive comments and provided responses to each in an over 300-page

40

table contained in the FEIS. AR 2329-640. Approximately 135 of these substantive comments related to water resources. AR 2328. This effort satisfies NEPA's dual purpose of ensuring that the environmental consequences of the proposed action were not ignored and promoting public participation. That Plaintiffs, or even this Court, may not agree that the environmental impacts of uranium mining are sufficiently significant or sufficiently certain to warrant the withdrawal is not grounds to overturn the decision under NEPA. *See Northwest Coal. for Alternatives to Pesticides v. Lyng*, 844 F.2d 588, 590-91 (9th Cir. 1988) ("[T]he reviewing court may not substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action.").

1. Plaintiffs' Challenges to Interior's Methodology In Analyzing Water Impacts are Without Merit.

The Coalition criticizes the methodologies used in the water impacts analysis and asserts that BLM "exaggerated" unknown risks to groundwater contamination. Coalition Br. 12-13. However, since BLM and USGS were "making predictions, within [their] area of special expertise . . . [the] court must generally be at its most deferential." *Balt. Gas & Elec. Co.*, 462 U.S. at 103. "This court must decline Plaintiffs' invitation to 'resolve disagreement among various scientists as to methodology.'" *Greer Coal., Inc. v. U.S. Forest Serv.*, 470 F. App'x 630, 634 (9th Cir. 2012) (quoting *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985). None of Plaintiffs' quibbles with the FEIS establish that BLM failed to consider a significant environmental consequence of the withdrawal.

First, the Coalition's challenge to the location and data quality of the water and soil sampling USGS relied upon, Coalition Br. 4-5; 8-9, fails because that methodology

1   was reasonable in light of the region's history and current status of uranium mining

2   operations, and the various ways in which impacts of uranium mining can manifest

3   themselves in water resources.[22]   Contrary to the Coalition's suggestion, there is

4   nothing misleading about the location of the water samples USGS relied upon; such

5   locations are clearly identified on maps located in the report.   AR 241-42, 248

6   (historical dataset), 250 (2009 data set).   The historical data set contained 1,014 water

7   samples from 428 sites, collected between 1963 and 2009, with most samples having

8   been collected in the 1990-95 time period.  AR 240.[23]  The 2009 sampling contained 24

9   additional samples,[24] of which all of the wells and three of the springs sampled were

10  located within the withdrawal area, and the remaining springs are either in the Park or

11  the Kanab Creek Wilderness—such sampling was done in locations where there were

12  no mines, reclaimed mines or active mines that were on standby.  AR 249-50.  Based

13  on these analyses USGS found that samples from 15 springs and five wells exceeded

---

[22] "[T]he timing and location of water quality information in the area is important, because the potential effects of breccia-pipe uranium mining and other activities may be localized and appear rapidly (for examples, a flash flood), or may be more spatially dispersed during longer timescales (for example, groundwater discharging at springs some distance from mine sites)." AR 240.  Moreover, there is uncertainty connected with the potentially long transit times for a packet of water that might have been in contact with an ore body to reach a sample site, and the dilution factors associated with the perched water-bearing zones and regional flow system. AR 249, 253-54, 2064.

[23] The Coalition's assertion that the USGS peer review of the dataset recommended that Hermit Mine and all pre-1990 data be excluded is incorrect.  Coalition Br. 4; Doc. 170 ¶ 47.  The review generally found "the quality of uranium data to be robust and reliable," AR 3893, but raised concerns about sites where multiple samples were taken in a single year (including the Hermit Mine well), and recommended that a median value for that year's samples be used.  AR 3894-95.

[24] Because only a handful of the available water quality samples were located in proximity to legacy or proposed current mining sites, the USGS collected 24 additional water samples in 2009 in unmined versus mined areas.  AR 202, 240, 249.

EPA maximum allowable levels of dissolved uranium for drinking water and 70 sites exceeded primary or secondary maximum contaminant levels of certain major ions and trace elements such as arsenic, iron, lead, manganese, radium, sulfate and uranium.  AR 202, 254.   When looking at surface impacts, "[s]urface soil, stream sediment, and mined waste-rock samples were collected at six sites that represent various stages of mining: mined and reclaimed (Hermit, Pigeon, and the Hack mine complex); partially mined and on hold (Kanab North); and mineralized and explored by drilling, but not mined (Kanab South)."  AR 110.  Elevated radioactivity levels and uranium and arsenic at above background levels were found in sites disturbed by mining.  AR 110-11, 190-91.[25]  At the time USGS conducted its sampling there were no active uranium mining operations within the withdrawal area, AR 249-30, *see also* AR 2719 (listing active/inactive/standby mines in the area), and USGS recommended that additional sampling and monitoring continue as mines do become active, AR 253-54.  Plaintiffs have not shown anything unreasonable about USGS's methods or conclusions.

Similarly, the Coalition's assertions that BLM failed to consider Arizona's Aquifer Protection Permit ("APP") program, which the Coalition alleges is sufficient to

---

[25] The Coalition's criticisms of the soil sampling are likewise without merit.  Coalition Br. 8-9. As explained in the USGS report samples at a number of sites, not just the Hack Mine, showed levels of uranium and arsenic above background concentrations. AR 110-11, 190-91.  With respect to the source of the contaminated soil at Hack Canyon, it is not the role of this Court to resolve what the Coalition terms the "debate[]" regarding the origins of the uranium bearing rock at the Hack Canyon site. *Greer*, 471 F. App'x at 634. Not only should the Court defer to USGS's analysis of rock formations at the Hack Mine site and its conclusion that not all of the waste rock material was disposed of into the shafts and not thereby sealed from transport down the canyon, AR180, 183-84, but no matter what the source this does not impact the reasonableness of USGS's overall conclusions.  If anything, the Coalition's argument highlights the petty nature of their quibbles with the USGS report.

protect the aquifers from contamination, Coalition Br. 6-8, are factually incorrect.  The

FEIS does discuss the APP program and assumes for purposes of the FEIS that such

state regulations have been and are being met.  AR 2074.  Although wells and

boreholes are highly controlled by state regulation and can be constructed to prevent

cross-contamination of different aquifers, AR 2074, such conclusions do not carry over

to perched aquifer springs and mine openings themselves.  As the FEIS states, the

"[e]stimated probability of an impact to quantity and quality of discharges at a perched

aquifer *spring* in the North Parcel is 13.9%," which could result from a mine being

located within the groundwater drainage for a perched aquifer spring.  *Id.*  Moreover,

there is a huge disparity in size of the typical exploratory borehole (6 inches in

diameter) and the mine openings (150 feet or more in diameter), which provides a very

different surface area available for dissolving minerals.  AR 2061.  There was nothing

unreasonable about BLM's consideration of the APP program.

That Plaintiffs can point to emails from a National Park Service ("NPS")

employee disagreeing with the FEIS's conclusions about the risks to groundwater

resulting from uranium mining, Coalition Br. 5-6; NMA/NEI Br. 17, does not render

the withdrawal "arbitrary and capricious."  *See Utahns for Better Transp.*, 305 F.3d at

1168 (comments from agency employee expressing a "difference of opinion" did not

render agency's final decision arbitrary or capricious).[26]  Mr. Martin does not speak for

---

[26] *See also Nat'l Ass'n of Home Builders*, 551 U.S. at 659; *WildEarth Guardians*, 703
F.3d at 1186-87; *Nat'l Fisheries Inst., Inc. v. Mosbacher*, 732 F. Supp. 210, 227
(D.D.C. 1990) ("That the administrative record . . . reflects a certain amount of
disagreement among the countless individuals involved in developing or commenting
on the [plan] is inevitable . . . .").

the NPS; in fact, his supervisor indicated that he "thought [Mr. Martin] could have better qualified his opinion by recognizing that while there is no evidence to date to contradict his conclusion, it would take additional sampling combined with chemical tracing to determine with even greater certainty whether contaminants stemming from mining have entered either the regional aquifer or springs entering the park." AR 6830. Mr. Martin's supervisor concluded that a "precautionary principle" was the best approach in the absence of "complete certainty that there is no connection between uranium mines and regional ground water." *Id.* The uncertainty and "disagreement among researchers" regarding hydraulic connectivity to the R-aquifer, and uncertainty about the exact location of the anticipated mine sites relative to the groundwater divide, are disclosed in the FEIS. AR 2078-79. Due to these uncertainties, the FEIS provides a range of potential impacts to R-aquifer spring water quality under Alternative A. AR 2075 ("none to moderate" for North and East parcels; "none to major" for South Parcel).[27]  Additionally, Mr. Martin's comments focus on rock permeability, AR 6828, they do not recognize that fractures, faults, sinkholes, and breccia pipes occurring in the area can serve as pathways for contamination to travel into surface and groundwater, AR 207, or that flash floods and debris flows caused by winter storms and intense

---

[27] Contrary to the Coalition's assertion, Coalition Br. 5, dissolved uranium data from the Orphan Mine was not used as part of the historical dataset USGS relied upon. Rather springs and stream sites down gradient from the Orphan Mine were used in the report to show a causal relation between the Orphan Mine and elevated dissolved uranium concentrations at those down gradient sites. This data demonstrates that dissolved uranium flows down gradient from the mine, which is on the north side of the groundwater divide, and towards the Colorado River. AR 208, 217, 245. This analysis informs the understanding regarding water movements from mine sites generally. The fact that the Orphan Mine is not representative of current post-mining practices is explicitly stated in the FEIS. AR 2065.

1    summer thunderstorms that can likewise transport contaminants, AR 204.

2        The Court should reject Plaintiffs' attempts to "flyspeck" the USGS Report and

3    FEIS, latching onto potential inconsistencies or places where experts disagree.   USGS

4

5    and the BLM's reasonable analyses should be given the appropriate deference.

6        2.   BLM Did Not Violate the "Unavailable Information Rule"

7        Plaintiffs' claim that BLM violated 40 C.F.R. §1502.22 because the FEIS did not

8    include a statement about missing and unavailable information specifically referencing

9
     §1502.22, NMA/NEI Br. 13-15, Coalition Br. 15-16, is unsupported by the language of
10
     the regulation and elevates form over the function of NEPA.  The regulation requires
11
12   that if in "evaluating reasonably foreseeable significant adverse effects on the human

13   environment" the agency finds that "there is incomplete or unavailable information, the

14
     agency shall always make clear that such information is lacking."  40 C.F.R. § 1502.22.
15
     If the agency determines that such incomplete or unavailable information is "relevant to
16
17   reasonably foreseeable adverse impacts" *and* "is essential to a reasonable choice among

18   alternatives" the agency must (a) include the information in the EIS, if the costs of

19
     obtaining it are not exorbitant; *or* (b) if the costs are exorbitant or the means to obtain it
20
     are not known, the EIS must include certain statements about the nature of the
21
22   incomplete information, the existing evidence, and the approach employed by the

23   agency for evaluating impacts.  40 C.F.R. § 1502.22(a) and (b).

24       Courts are "unwilling to give a hyper-technical reading of [40 C.F.R. §1502.22]
25
     to require the [agency] to include a separate, formal disclosure statement in the
26
     environmental impact statement to the effect that . . . data is incomplete or unavailable."
27

28

                                        46

1   *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1172-73 (10th Cir. 1999).[28]   Where, as

2   here, the USGS report and FEIS contain sufficient disclosures regarding the limitations

3   of the available data to ensure that "participants in the environmental review process

4   were aware of the relevance of the [unavailable data], the scarcity of such data, and the

5   studies and reports the [agency] used[,]" the regulation's functions have been fulfilled.

6

7   *Id.*[29] *See, e.g.,* AR 9-10 (ROD acknowledging uncertainty in USGS report "as data is

8   sparse in this region and often limited"); AR 253 (describing limitations of USGS

9   groundwater sampling collected in 2009); AR 2070-71 (FEIS 4.4.2 "Incomplete or

10   Unavailable Information" Section of "Water Resources" Chapter); AR 191 (USGS

11

12   report listing future studies that would "improve [] understanding of mine-related

13   effects"); 254 (USGS proposed "Future Water-Quality Investigations").

14

15         Moreover, "the § 1502.22(b) analysis is required only if the incomplete

16   information is . . . essential to a reasonable choice among alternatives."  *League of*

17   *Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*, 163 F. Supp.

18   2d 1222, 1255 (D. Or. 2001), *rev'd on other grounds,* 309 F.3d 1181 (9th Cir. 2002).  If

19

20   the agency determines that the missing information is *not essential* to this reasoned

21   choice it is not required to undertake an analysis as to whether the information was

22   ───────────────
23   [28] *See also Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 673 F.3d 518, 532 (7th Cir.
    2012) ("The [§1502.22] regulations do not prescribe the precise manner through which
24   an agency must make clear that information is lacking. The manner by which the Forest
    Service elected to convey its lack of information was not a clear error of judgment or
25   otherwise contrary to law.").

26   [29] "To demonstrate a violation of NEPA on th[e] basis [of 40 C.F.R. § 1502.22],
    Plaintiffs must show (1) the missing information is essential to a reasoned decision
27   between the alternatives, and (2) that the public was unaware of the limitations of the
    data the Forest Service relied on."  *Trout Unlimited v. U.S. Dep't of Agric.*, 320 F. Supp.
28   2d 1090, 1111 (D. Colo. 2004) (citing *Colo. Envtl. Coal.,* 185 F.3d at 1172–73).

"unobtainable" because of exorbitant costs or unknown means. *See Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 496-97 (9th Cir. 2014). As the ROD explained, while there is "acknowledged uncertainty with respect to water quality and quantity . . . information that would help resolve that uncertainty *is not essential to making a reasoned choice among alternatives*" because there is "data regarding dissolved uranium concentrations near six previously-mined sites to inform reasoned choice and the EIS used reasonable conservative assumptions to estimate impacts as the method of addressing such unknowns." AR 10 fn.1 (emphasis added).[30] That determination is entitled to deference. *See Point Hope*, 740 F.3d at 498 (deferring to agency's conclusion that missing information was not "'essential' to informed decisionmaking").[31] It was not unreasonable for the Secretary to conclude that he could make a reasoned choice among alternatives—and choose an environmentally protective alternative—based upon available evidence of water impacts of historical uranium

---

[30] Contrary to Plaintiffs contention, NMA/NEI Br. 13-14, 17, section 1502.22 applies only to unavailable information that is relevant to "evaluating reasonably foreseeable significant adverse effects on the *human environment*," not to economic impacts. 40 C.F.R. § 1502.22 (emphasis added). Courts have made it clear that in analyzing impacts to the "human environment" in the context of NEPA "the agency must evaluate the 'environmental impact' and any unavoidable adverse environmental effects of its proposal. . . . NEPA does not require the agency to assess *every* impact or effect of its proposed action, but only the impact or effect on the environment." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983) (emphasis in original).

[31] Even if a formal § 1502.22(b) statement was required there is nothing in the regulations that requires that this statement be made in the FEIS rather than in the ROD. Moreover, even if the Court were to find that the statement should have been in the FEIS, any error was harmless because the statement in the ROD makes clear that the agency considered the unavailability of evidence and the public was made aware as to the basis of the BLM's decision to proceed without such information. *See Half Moon Bay*, 857 F.2d at 512 (finding that agency's "final decision complies with NEPA's requirements" despite insufficiencies in the EIS because the ROD, which incorporated EPA's suggestions, represents the final decision of the agency).

mining operations, the potential seriousness if impacts occurred to a resource that supplies water to millions of people in seven states, and, as discussed above, BLM's assessment of impacts to other resources.

The Coalition's assertion that "[t]he ROD repeatedly refers to the lack of data to support the [withdrawal]" is factually incorrect.  Coalition Br. 7.  The ROD recognized that "obtaining additional data to address that uncertainty. . . will nevertheless be helpful for future decisionmaking in the area." AR 10 fn.1.  This acknowledgment about the usefulness of future studies in no way undermines the BLM's ability to make a reasoned choice based on the information about impacts that it did have.  *See Point Hope,* 740 F.3d at 498 (affirming agency's assessment that information was not essential despite recognition that "certain items of presently missing or incomplete information will be known . . . at a later stage of . . . environmental review."); *Churchill Cnty v. Norton,* 276 F.3d 1060, 1081-82 (9th Cir. 2001) (finding that acknowledgement of need for further study of groundwater resources due to incomplete understanding of hydrologic system did render the agency unable to make a reasoned choice between alternatives); *Am. Iron & Steel Inst. v. EPA*, 115 F.3d 979, 1004 (D.C. Cir. 1997) ("Possessing imperfect scientific information, [the agency] had to decide whether to proceed on that basis or to invest the resources to conduct the perfect study.  It chose to do the former.  This is the type of decision to which this court will generally apply the deferential standard of 5 U.S.C. § 706(2)(A).").

3.   The Secretary's "Cautious and Careful" Approach Was Reasonable

Contrary to NMA/NEI's assertion, there was nothing improper about the

Secretary's "cautious and careful approach" in the face of a certain amount of uncertainty regarding potentially high risk environmental consequences.  NMA/NEI Br. 15.  As the cases Plaintiffs themselves cite recognize, NEPA's purpose is to "ensure[] that important effects will not be overlooked or underestimated *only to be discovered after the resources have been committed or the die otherwise cast*."  *Robertson,* 490 U.S. at 349 (emphasis added).  Here, the Secretary took an environmentally protective action which would allow future studies "*before* the environmentally harmful actions are put into effect."  *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009) (citing *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 733 (9th Cir. 2001)).[32]  What Plaintiffs advocate—that Interior should have allowed mining to proceed until it had conclusive evidence that harm to the environment was occurring—was not what NEPA intended.

Plaintiffs' reliance on *Robertson* is misplaced.  In that case the Court was asked to resolve whether an agency was *required* to do a "worst case analysis," which an earlier version of 40 CFR § 1502.22 (1985) had expressly required.  *See* 490 U.S. at 354.  The Court found that "although the prior regulations [which were amended a few years earlier] may well have expressed a permissible application of NEPA, the Act itself does not mandate that uncertainty in predicting environmental harm be addressed *exclusively* in this manner."  *Id.* at 354 (emphasis added).  The Court did not find that an agency is precluded from taking a cautious approach.  To the contrary, numerous

---

[32] *See also Churchill Cnty.*, 276 F.3d at 1072-73 ("NEPA also 'emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that the agency will not act on incomplete information, *only to regret its decision after it is too late to correct.*'") (quoting *Blue Mountains,* 161 F.3d at 1216) (emphases added).

1  cases have supported intentionally conservative assessments of environmental impacts.

2  *See, e.g., Greer Coal., Inc. v. U.S. Forest Serv.*, CV09-8239-PCT-DGC, 2011 WL

3
4  671750, at * 20 (D. Ariz. Feb. 16, 2011) (Campbell, J.) (holding that plaintiffs "failed

5  to undermine the reasonableness of Defendants' reliance on . . . analysis [that] was

6  intentionally conservative, overstating the groundwater effect of the hypothetical . . .

7  development"), *aff'd* 470 F. App'x 630 (9th Cir. 2012).[33]

8
9  **D. BLM Fully Complied With Its NEPA Obligations Toward The Counties**

10      BLM provided the local counties extensive opportunities to participate in the

11  NEPA process.  The two counties in Arizona where the withdrawal area is located,

12  Coconino County (location of all of the South and East parcels and a portion of the

13
14  North parcel) and Mohave County (location of a portion of the North parcel), and four

15  neighboring Utah counties were granted cooperating agency status.  AR 1630-31.  BLM

16  held two public scoping meetings, five meetings with cooperating agencies (including

17
18  [33] Contrary to the Coalition's argument, BLM's analysis of social and economic
19  impacts do not form the basis of a NEPA claim.  Coalition Br. 10-11.  While the Ninth
    Circuit found a NEPA violation based on the agency's *overstatement* of economic
    benefits and *understatement* of the environmental impacts of the project in *NRDC v.*
20  *U.S. Forest Serv.*, it did so because it found that had the agency known that the project
    did not have as significant an economic upside it may have selected a less
21  environmentally damaging alternative.  421 F.3d 797, 811-12 (9th Cir. 2005).  This
22  rationale is inapplicable here where Plaintiffs contend that BLM *understated* the
    economic benefits of uranium mining and *overstated* the environmental benefits of the
23  withdrawal—arguing that if it had known the true economic impacts on the mining
    industry and local communities it would not have selected the more environmentally
24  protective action.  Moreover, Plaintiff's argument is without basis as the FEIS devotes
25  68 pages to discussing the social and economic impacts of the withdrawal, AR 2252-
    2320, and, as explained above, BLM's analysis of the uranium endowment was
26  reasonable.  BLM's approach was well-balanced since a greater endowment estimate
27  and more anticipated mines would have also meant more environmental impacts
    associated with mining, which would not have swayed the balance of the Secretary's
28  decision.

the counties), and three meetings or hearings with the Coalition.  AR 2321-23.[34]

Coconino County, where the majority of the withdrawal area was located, supported the withdrawal, passing a resolution opposing uranium mining in proximity to the Park and its watershed and requesting a moratorium on the mineral leasing of State Trust lands and a permanent congressional withdrawal of the South and East parcels.  AR1642.  On the other hand, Mohave County, where a portion of the North Parcel is located, opposed the withdrawal and passed a resolution urging Congress to preserve access to the uranium reserves of northern Arizona.  *Id.*  The FEIS discussed these resolutions, considered the proposed withdrawal's consistency with Coconino and Mohave counties' land use plans, and explained that the proposed action was inconsistent with Mohave County's resolution.  *Id.*[35]  The FEIS also analyzed the social and economic impacts of the withdrawal and alternatives on the two Arizona and four Utah counties.  AR 2252-320.

NEPA does not require anything more.  Contrary to the Coalition's assertion, the CEQ regulations do not require BLM to "reconcile" its decision with local land use

---

[34] The Coalition contends that the counties were not provided meaningful participation in the development of alternatives, however, they cite to no case law that suggests that NEPA requires this.  This may be because "[b]eyond providing adequate notice and beginning a meaningful dialogue with members of the public about a proposed action, the affirmative duties NEPA imposes on a government agency during the scoping period are limited." *Kootenai*, 313 F.3d at 1117.

[35] BLM did not consider consistency with Kane, Washington, Garfield and San Juan counties' plans because, as it explained in the FEIS, the withdrawal was not located within those counties.  AR 1643.  Nevertheless, the FEIS noted that these counties, along with Mohave County, had formed the Coalition and passed a resolution opposing the withdrawal, which resolution was inconsistent with the proposed action.  *Id.*

plans.[36]   All the regulations require is that the EIS "*discuss* any inconsistency of a proposed action with any approved State or local plan and laws . . . [and] *describe* the extent to which the agency *would reconcile* its proposed action with the plan or law." 40 C.F.R. § 1506.2(d) (emphasis added); *see also Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 927 F. Supp. 2d 921, 946 (S.D. Cal. 2013) (finding that "Plaintiff has failed to show that the BLM failed to *analyze* the Project's consistency with local laws under NEPA") (emphasis added).   The FEIS fully complied with these requirements.   NEPA is not a vehicle to allow local counties to trump federal decisions simply by passing resolutions stating that they disagree.   Here, the two counties where the withdrawal area is located had opposing views on the withdrawal and each passed a resolution reflecting its position.   The FEIS reported those resolutions and the extent to which they are inconsistent with the withdrawal and Interior chose not to reconcile the withdrawal with the Mohave Resolution.[37]   The Coalition has failed to establish a violation of NEPA.

---

[36] The Court should strike all extra record evidence the Coalition attempts to submit in support of this argument through the Declaration of Buster Johnson.   Doc. 188-6. Particularly egregious is the attempt to use this Declaration as a vehicle to bring into the record a video recording of a September 7, 2011 Coalition public hearing, which the Court expressly ruled should not be included in the administrative record, Doc. 160. *See Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.,* 460 F.3d 1125, 1144 (9th Cir. 2006) ("[R]eview of agency action under NEPA is limited to the administrative record and may only be expanded beyond the record to explain agency decisions.").

[37]   BLM went beyond what is required under the regulations, which only require discussion of consistency with local "plan[s] and law[s]," 40 C.F.R. § 1506.2(d), and considered consistency of resolutions passed by counties to specifically oppose the withdrawal.   It is plainly unavailing to fault the BLM for failing to reconcile the withdrawal with one of two antithetical resolutions of equal stature.

**IV.    The Forest Service Consent Decision Fully Complies with NFMA.**

AEMA contends that the Forest Service, in consenting to the withdrawal with respect to approximately 356,000 surface acres under its management, violated the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600-1687 (1976), by ignoring its "multiple use" standard, by failing to comply with the governing Forest Plan for the Kaibab National Forest, and by failing to justify its consent decision. These arguments should be dismissed for lack of subject matter jurisdiction because they do not challenge final agency action, as required by the APA, 5 U.S.C. § 704, and they fail to state a cause of action, because NFMA governs management of renewable surface resources, not unrenewable subsurface resources, over which Interior has jurisdiction.

**A. AEMA Fails to Identify Final Agency Action**

AEMA is barred from challenging the consent decision to the withdrawal because this consent is not final agency action subject to APA challenge.  The APA authorizes judicial review of "final agency action."  5 U.S.C. § 704.  To be "final," an agency action "must mark the consummation of the agency's decision making process" and must be an action "by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett*, 520 U.S. at 177–78 (citations omitted); *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 930 (9th Cir. 2010) (same).  The consent decision is not final agency action because it does not represent the consummation of any decision-making process, nor do any legal consequences for Plaintiffs flow from it.  *See Sierra Forest Legacy v. U.S. Forest Serv.*, 598 F.Supp.2d 1058, 1069 (N.D. Cal. 2009) (holding that the concurrence of the National Marine

Fisheries Service and the U.S. Fish and Wildlife Service in the Forest Service's "no effect" determination under the Endangered Species Act were not final agency actions and were therefore unreviewable).  Further, the APA defines an "action" as a discrete rule, license, order, sanction, or relief, or denial thereof, or failure to act.  *See S. Utah Wilderness Alliance*, 542 U.S. at 62 (citing 5 U.S.C. § 551(13)).  The consent decision does not fit any of the enumerated acts.  In the end, any withdrawal decision, to which a surface managing agency consents, may only be made by the Secretary of the Interior.

**B.  AEMA Fails to State a Cause of Action**

AEMA argues that the Forest Service consent was inconsistent with the Kaibab National Forest plan and thus violated NFMA's requirement that "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i). AEMA misunderstands the applicability of this subsection, and NFMA generally, to mineral resources.  NFMA provides for planning in regard to "*renewable resources,*" 16 U.S.C. §§ 1604(e), 1607, 1610, and does not address minerals or other non-renewable resources.  For this reason the ROD notes that withdrawal decisions are "outside the authority of National Forest Planning."  AR 12.[38]  Accordingly, AEMA fails to state a cause of action under NFMA.

_____

[38] Even assuming that NFMA required planning for nonrenewable resources, the Forest Service's consent to the withdrawal of National Forest System lands still would not violate the consistency requirement of 16 U.S.C. § 1604(i) because it applies to various means of *authorizing* "the use and occupancy of National Forest System lands."  A withdrawal does not authorize the use and occupancy of federal lands, rather it "withhold[s] an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws," 43 U.S.C. § 1702(j), subject to valid existing rights, Pub. L. 94–579, title VII, § 701(h), 90 Stat. 2786 (1976).

55

Plaintiff's further insistence that, under the Kaibab Forest plan, the lands at issue are "open" to the operation of the mining laws, also misapprehends the legal effect of that plan.  The mining laws apply to the lands at issue by virtue of 16 U.S.C. § 482, not by any action of the Forest Service.  *Wilderness Soc'y v. Dombeck*, 168 F.3d 367, 374 (9th Cir. 1999).  Plaintiffs' suggestion that a Forest Plan designated these lands as open to mining, and that the consent decision therefore contravenes that designation, is untenable, and ignores BLM's stewardship of the mineral estate.

Finally, the authority conferred on the Secretary of the Agriculture to manage the National Forests expressly excludes authority to administer laws "affecting the surveying, prospecting, locating, appropriating, entering, relinquishing, reconveying, certifying, or patenting" of National Forest System lands, such as the mining laws.  16 U.S.C. § 472.  For this reason, a forest plan may neither open lands to location and entry or withdraw them from same.  The Court should reject the contention that the Forest Service consent violated section 1604(i) because it applies only to the "approval or disapproval of specific projects that implement . . . [a] forest plan."  *Utah Envtl. Cong. v. Richmond*, 483 F.3d 1127, 1131 (10th Cir. 2007).   The consent decision does not do so because, as the ROD noted, withdrawal decisions are "outside the authority of National Forest Planning."  AR 12.[39]

---

[39] AEMA further argues that in consenting to the withdrawal of the lands at issue, the Forest Service violated the "multiple use" and "sustained yield" principles of 16 USC §1601(d)(1), which Plaintiff selectively quotes, thereby obscuring the subsection's concern with "appropriate forest cover."  AEMA also fails to note that for purposes of NFMA the terms "multiple use" and "sustained yield" must be construed "in accordance with" and "under the principles of " the Multiple-Use Sustained-Yield Act of 1960" (16 U.S.C. §§ 528-31), which defines both of those terms (16 U.S.C. § 531) 16 U.S.C. §§ 1604(e), (g).  Those definitions, by their very terms, apply to the "various

**V.     The Withdrawal Decision does not Violate the Establishment Clause.**

The First Amendment of the Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. U.S. Const., amend. I.   The Supreme Court has noted that this provision "does not require complete separation of church and state . . . ." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984).   Rather, "it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Id.*   Stated otherwise, "the government may (and sometimes must) accommodate religious practices and . . . it may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144–45 (1987).

Government action conforms to the Establishment Clause if: "(1) the action has a 'secular ... purpose,' (2) the 'primary effect' of the action 'neither advances nor inhibits religion' and (3) the action does 'not foster an excessive government entanglement with religion.'" *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971) (internal citations and quotations omitted); *Access Fund v. U.S. Dept. of Agric.*, 499 F.3d 1036, 1043 (9th Cir. 2007) (same).   In *Access Fund*, the Ninth Circuit noted that some cases have characterized the Establishment Clause inquiry as "answering the question of whether the government, through its actions, impermissibly endorses religion." *Id.* (citing *Agostini v. Felton*, 521 U.S. 203, 235 (1997); *Cnty. of Allegheny v. Am. Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 592 (1989)).

Under these standards, the withdrawal challenged in this case is constitutionally

_____

*renewable surface resources* of the national forests." *id.* (emphasis added), not nonrenewable subsurface resources.

sound.  First, it achieves the secular purpose of protecting a variety of resources and uses in the Grand Canyon watershed from the impacts of escalating mining activity. And, even if the purpose of the withdrawal was solely to protect the area due to its religious importance to Native Americans (which it is not), it would still pass the secular purpose test, since "carrying out government programs to avoid interference with a group's religious practice is a legitimate, secular purpose." *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 975 (9th Cir. 2004).  Second, the "primary effect" of the decision is not to advance religion.  Rather it is to slow the pace of mining activities in order to protect multiple non-mineral resources and uses.  And finally, the decision does not "foster an excessive government entanglement with religion," because it does not regulate religious practices. *See Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 758 (D.C. Cir. 2007) (sustaining a withdrawal that "neither regulate[d] religious practices nor increase[d] Native American influence over management of the [lands at issue]").

Plaintiff Gregory Yount contends that the withdrawal violates the Establishment Clause because Interior has "embraced tribal beliefs," and thus compels him to accept "beliefs and ideas that the land is sacred." Yount Br. 22.  Neither charge is supported by the record and in fact Plaintiff cites no record evidence at all.  Mr. Yount acknowledges that Interior's objective effort to protect water resources is secular in purpose, but argues that if the Court finds that this objective is not supported by the evidence, or is inadequate, then "the other purpose of the withdrawal, implementing protection for American Indian religious beliefs, violates the Establishment Clause and the

58

withdrawal can be set aside on this ground." *Id.* at 23. This is incorrect because it ignores the decision's objectives of protecting other resources, such as wildlife, air quality, and visual resources. AR 9. Mr. Yount further argues that *Mount Royal Joint Venture* is distinguishable from the case at bar because the FEIS does not support the decision's underlying conclusion that mining would cause adverse effects. This assertion fails for the reasons set out above, in arguments II, III, and IV.

Mr. Yount also argues that federal action may "only" protect Native American religious beliefs that are "tied to a specific site that also has historical and cultural significance making it eligible for listing under the National Historic Preservation Act [('NHPA')]." Just because the cases Mr. Yount relies on – *Access Fund* and *Cholla Ready Mix, Inc.* – involved NHPA-eligible sites, does not mean this is the only circumstance in which the Secretary may protect these values. Neither case supports Mr. Yount's stated legal proposition and, in each case, the court rejected claims of an establishment clause violation. Further, if a particular action violates the Establishment Clause, it is legally irrelevant whether it is protected by a federal law (NHPA or otherwise), since, of course, federal laws must be consistent with the First Amendment.

Finally Mr. Yount argues that the decision violates the second and third prongs of *Lemon* because Interior was not "neutral" in its decision-making. Yount Br. 28-30. In support he asserts that the decision creates a "preference for American Indian religious activities over all other uses" and gives Native Americans "'veto power' to prohibit otherwise lawful land uses, such as mineral development, based solely on their

religious beliefs . . . ."  *Id.* at 28-29.[40]  This is not true.  As explained herein, it was the Secretary who ordered the withdrawal, and he did so to protect several values.  Prior to withdrawal, Native Americans had no "veto power" to prohibit mining, and following it, this is still the case.  The incidental beneficial effects of the withdrawal are shared by a wide variety of users of the public lands, all of whom will benefit from elimination of noise, pollution, and destruction of non-mineral resources.  That some subset of those users may engage in religious practices does not amount to excessive entanglement.

Here, the government reached a legally permissible conclusion, supported by ample record evidence, that mining may impact water resources, even if the likelihood is low, as well as other resources, including wildlife, air quality, and visual resources, and further may degrade the values of the lands at issue to the tribes that use them.  This does not show a lack of neutrality.  It shows a concern for many "public values," in full accord with FLPMA.  43 U.S.C. § 1702(j).  The decision should be sustained.

## CONCLUSION

For the foregoing reasons, Federal Defendants are entitled to judgment as a matter of law, and respectfully request that Plaintiffs' motions for summary judgment

---

[40]  The Coalition also challenges Interior's consideration of sacred and traditional lands not because it violates the Establishment Clause, but because the Secretary simply lacks the legal authority to adopt protections for these.  Coalition Br. 16-18.  This contention ignores the explicit authority in FLPMA allowing the Secretary to protect "other public values."  43 U.S.C. § 1702(j).  It is also contradicted by the holding in *Access Fund*, in which the Ninth Circuit sustained a Forest Service ban on rock climbing at Cave Rock, in order to protect the Washoe Tribe's cultural and religious practices and beliefs.  499 F.3d at 1042-46; *see also Cholla Ready Mix, Inc.*, 382 F.3d at 975-77 (sustaining a policy against using materials from a site of religious significance to certain tribes in state construction projects), *Mount Royal*, 477 F.3d at 750, 758 (upholding withdrawal from mineral entry in part to protect "areas of traditional religious importance to Native Americans").

1  be denied and that judgment be entered in Federal Defendants' favor on all counts.[41]

2         Dated: February 28, 2014

3
                                      Respectfully Submitted,
4
                                      ROBERT G. DREHER,
5                                     Acting Assistant Attorney General
6                                     Environment and Natural Resources Division

7                                      /s/ John S. Most
8                                     JOHN S. MOST, Trial Attorney
                                      Virginia Bar, No. 27176
9                                     DOMINIKA TARCZYNSKA, Trial Attorney
10                                    New York Bar, No. 4431573
                                      Natural Resources Section
11                                    P.O. Box 7611
                                      Washington, D.C. 20044-7611
12                                    (202) 305-0447(Tarczynska)
13                                    202-616-3353 (Most)
                                      202-305-0506 (fax)
14                                    DOMINIKA.TARCZYNSKA@USDOJ.GOV
15                                    JOHN.MOST@USDOJ.GOV

16                                    Counsel for Federal Defendants

17

18

19

20

21

22

23

24

25

26

---

27  [41] In the event the Court concludes that the decision does not comport with law, Federal
    Defendants respectfully request an opportunity to submit a brief on appropriate remedy
28  before any judgment is entered.

1

## CERTIFICATE OF SERVICE

2

3      I hereby certify that I am today causing the foregoing to be served upon counsel
of record through the Court's electronic service system (ECF/CM) and am transmitting
4  via FedEx a copy of same to *pro se* plaintiff Gregory Yount.

5  Dated:  February 28, 2014

6

7                                    */s/ John S. Most*
                                    *Counsel for Federal Defendants*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28