1   Matthew L. Campbell
2   (New Mexico State Bar No. 138207) (*pro hac vice* pending)
    Native American Rights Fund
3   1508 Broadway
    Boulder, CO 80302
4   (303) 447 – 8760
    Fax (303) 443 – 7776
5   mcampbell@narf.org
6   Attorney for *Amici Curiae*

```
FILED        LODGED
RECEIVED       COPY

   FEB 2 6 2014

CLERK U S DISTRICT COURT
   DISTRICT OF ARIZONA
BY                  DEPUTY
```

7

8           IN THE UNITED STATES DISTRICT COURT
9               FOR THE DISTRICT OF ARIZONA
                    PRESCOTT DIVISION
10

11

12
    Gregory Yount;
13                                          CASE NO. 3:11-cv-08171-DGC
              Plaintiff, *pro se,*          (Lead Case)
14
    v.
15                                          **AMICI CURIAE INDIAN PEAKS
    S.M.R. Sally Jewell, Secretary of the   BAND, SAN JUAN SOUTHERN
16                                          PAIUTE TRIBE, AND
    Interior, *et al.,*                     MORNINGSTAR INSTITUTE'S
17                                          LIMITED BRIEF IN SUPPORT OF
              Federal Defendants;          UNITED STATES' CROSS-MOTION
18                                          AND RESPONSE TO MOTIONS FOR
    and                                     SUMMARY JUDGEMENT**
19
    Grand Canyon Trust, *et al.*
20
              Intervenor- Defendants.
21

22

23

24

25

26

27

28

1

2    National Mining Assocation, *et al.,*             CASE NO. 3:12-cv-08038-DGC

3             Plaintiffs,

4    v.

5    S.M.R. Sally Jewell, Secretary of the Interior, *et*

6    *al.,*

7             Federal Defendants;

8    and

9    Grand Canyon Trust, *et al.*

10            Intervenor- Defendants.

11    American Exploration & Mining Association;    CASE NO. 3:12-cv-08042-DGC

12             Plaintiff,

13    v.

14    S.M.R. Sally Jewll, Secretary of the Interior, *et a*

15             Federal Defendants;

16    and

17    Grand Canyon Trust, *et al.*

18            Intervenor- Defendants.

19    Quaterra Alaska Incorporated, *et al.,*     CASE NO. 3:12-cv-08075-DGC

20             Plaintiff,

21

22    v.

23    S.M.R. Sally Jewell, Secretary of the Interior, *et*

24    *al.,*

25             Federal Defendants;

26    and

27    Grand Canyon Trust, *et al.*

28            Intervenor- Defendants.

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ i

INTEREST OF AMICI CURIAE ............................................................................................... 1

ARGUMENT ............................................................................................................................ 2

I.   INTRODUCTION ............................................................................................. 2

II.  THE NAW DOES NOT VIOLATE THE ESTABLISHMENT
     CLAUSE ........................................................................................................... 3

     a. THE ESTABLISHMENT CLAUSE PERMITS BROAD
        ACCOMMODATIONS OF RELIGIOUS PRACTICES .............................. 3

     b. UNDER ANY ESTABLISHMENT CLAUSE TEST, THE
        NAW IS CONSTITUTIONAL ..................................................................... 4

            1. UNDER *CUTTER*, THE NAW IS CONSTITUTIONAL .................... 4

                 i.    THE FEDERAL GOVERNMENT HAS PLACED
                       MANY BURDENS ON TRIBAL RELIGIOUS AND
                       CULTURAL PRACTICES AND THE NAW
                       ALLEVIATES SOME OF THOSE BURDENS .................................... 5

                 ii.   THE NAW TOOK ADEQUATE ACCOUNT
                       OF THE BURDENS IMPOSED ON NON-
                       BENEFICIARIES .......................................................................... 7

                 iii.  THE NAW IS ADMINISTERED
                       NEUTRALLY AMONG DIFFERENT FAITHS ................................ 10

            2. UNDER THE COERCION TEST, THE NAW IS
               CONSTITUTIONAL ............................................................................. 12

III. VIOLATE THE AMERICAN INDIAN VALUES ARE "PUBLIC VALUES"

1

UNDER FLPMA .................................................................................................. 14

2

3

CONCLUSION ......................................................................................................... 17

4

CERTIFICATE OF SERVICE ...................................................................................... 19

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

INTEREST OF AMICI CURIAE

2

The Indian Peaks Band ("Indian Peaks") is one of five bands within the federally

3

recognized Paiute Indian Tribe of Utah ("PITU").[1] The San Juan Southern Paiute Tribe

4

5 ("San Juan") is a federally recognized tribe.[2] PITU and San Juan are descendants of the

6 Southern Paiute who traditionally occupied the Northern Arizona Withdrawal ("NAW")

7 area.[3]  The Southern Paiute consider the Grand Canyon, the Arizona Strip, Kaibab

8

9 National forest, and other parts of the region integral to their culture as discussed further

10 in this brief.[4]  The PITU participated in government-to-government consultation on the

11 proposed withdrawal beginning in August 2009 and the government recognized that San

12

13 Juan has an interest in the area covered by the withdrawal due to its historical ties to the

14 area.[5] Both tribes have an interest in the outcome of this matter.

15 The Morning Star Institute is a non-profit Indian rights organization devoted to

16 Native Peoples' traditional and cultural advocacy, arts promotion, and research.

17

18 Founded in 1984, Morning Star is a leading organization in the areas of Native Peoples'

19 religious freedom, cultural property rights, and sacred lands protection. Thus,

20 Morningstar has an interest in protecting native culture, including within the NAW.

21

22

23

24

25

26

27

28

---

[1] 78 Fed. Reg. 26,384, 26,387 (May 6, 2013).
[2] *Id*.
[3] Administrative Record ("A.R.") 000011, 001913-1919, 003038-3041.
[4] A.R. 001913-1919.
[5] A.R. 000020, 001913-1919, 002323-2324.

ARGUMENT[6]

I.    INTRODUCTION

Plaintiffs Gregory Yount and the American Exploration & Mining Association ("Yount") have made an as-applied constitutional challenge to the Secretary of Interior's ("Secretary") exercise of the Federal Land Policy and Management Act of 1976 ("FLPMA") withdrawal provision. Yount asserts that the Secretary's Record of Decision ("ROD") relies on American Indian religious and spiritual objections to mining and that such reliance violates the Establishment Clause.[7] Doc. 167 at 32-40. Yount's assertion is misplaced because accommodating American Indian cultural and spiritual practices does not violate the Establishment Clause under any test.

Plaintiffs Quaterra Resources Inc. and Arizona Utah Local Economic Coalition ("Quaterra") assert that protection of Indian cultural resources under federal law is limited to sites where historical, cultural, and religious practices occur, and that the NAW exceeds any statutory authority in protecting those resources. Doc. 173 at 2-3, 23. Quaterra's claims are flawed because FLPMA provides ample authority for the NAW.

---

[6] We agree with and adopt the United States statement of facts as outlined in Doc 199.

[7] Yount misconstrues the ROD and FEIS's stated reasons for implementing the NAW. *See* Doc. 167 at 33. As the U.S. has pointed out, there were a variety of reasons for the withdrawal. Doc. 198 at 26-7, 58; Doc. 199 at 4-6.  Even if the impact of mining on American Indian beliefs were the only reason for the NAW, however, it would still be constitutional under the Establishment Clause.

1    II.    THE NAW DOES NOT VIOLATE THE ESTABLISHMENT CLAUSE.

2          a.    THE ESTABLISHMENT CLAUSE PERMITS BROAD ACCOMMODATIONS OF
3                RELIGIOUS PRACTICES.

4          The Constitution does not "require complete separation of church and state; it

5    affirmatively mandates accommodation, not merely tolerance, of all religions, and
6
7    forbids hostility toward any." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984); *see Trunk v.*

8    *City of San Diego,* 629 F.3d 1099, 1106 (9th Cir. 2011). In other words, "the
9
10   government may (and sometimes must) accommodate religious practices and [] it may
11   do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals*

12   *Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987). Indeed, when the government
13
14   accommodates religious practices "it follows the best of our traditions. For it then

15   respects the religious nature of our people and accommodates the public service to their

16   spiritual needs." *Walz v. Tax Comm'n,* 397 U.S. 664, 672 (1970) (internal citations

17   omitted).

18
19         The "limits of permissible state accommodation to religion are by no means

20   coextensive with the noninterference mandated by the Free Exercise Clause. To equate

21   the two would be to deny a national heritage with roots in the Revolution

22   itself." *Walz,* 397 U.S. at 673. It is clear that "there is room for play in the joints between
23
24   the Clauses, some space for legislative action neither compelled by the Free Exercise

25   Clause nor prohibited by the Establishment Clause." *Cutter v. Wilkinson,* 544 U.S. 709,

26   719 (2005) (internal citations omitted). Accommodations, such as the NAW, are well
27
28   within the parameters of what courts have found permissible.

3

b.   UNDER ANY ESTABLISHMENT CLAUSE TEST, THE NAW IS
CONSTITUTIONAL.

This Circuit typically applies the *Lemon* test[8] to determine whether the Establishment Clause is violated, *see Barnes-Wallace v. City of San Diego,* 704 F.3d 1067, 1082-83 (9th Cir. 2013); *Card v. City of Everett,* 520 F.3d 1009, 1013-16 (9th Cir. 2008), and it only strays from that path occasionally. *See, e.g., Rubin v. City of Lancaster,* 710 F.3d 1087, 1091-92 (9th Cir. 2013); *Newdow v. Rio Linda Union School Dist.,* 597 F.3d 1007, 1017 (9th Cir. 2010). As the United States has shown, the NAW is Constitutional under the *Lemon* test as applied by this Circuit's controlling precedent of *Access Fund v. U.S. Dep't of Agric.,* 499 F.3d 1036 (9th Cir. 2007) and *Cholla Ready Mix, Inc. v. Civish,* 382 F.3d 969 (9th Cir. 2004). Doc. 198 at 60-63. These cases control the outcome of Yount's Establishment Clause claim. Nevertheless, if the Court were to stray from this established precedent upholding agency accommodation of religious practices on public lands, the NAW also passes muster under other Establishment Clause tests.

1.   UNDER *CUTTER*, THE NAW IS CONSTITUTIONAL

Recently, the Supreme Court in *Cutter* applied a somewhat different test to the question of accommodation of religion. 544 U.S. at 718, n.6. There, the Court was faced with the question of whether the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), which prohibits substantial burdens on religious prisoners' rights without a

---

[8] Under *Lemon*, an action will be found Constitutional under the Establishment Clause if it: 1) has a secular purpose; 2) does not have a principal or primary effect of advancing or inhibiting religion; and 3) does not foster an excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).

4

compelling interest, was a constitutional accommodation. *Id.* at 712-13, 715. The Court held that it was because it did three things. First, the accommodation alleviated "government created burdens on private religious exercise." *Cutter*, 544 U.S. at 720 (citing *Board of Education of Kiryas Joel v. Grumet,* 512 U.S. 687, 705 (1994)). Second, the government took adequate account of the burdens the requested accommodation may impose on non-beneficiaries. *Cutter*, 544 U.S. at 720 (citing *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985)). Finally, the accommodation was administered neutrally among different faiths. *Cutter*, 544 U.S. at 720; *Kiryas Joel*, 512 U.S. at 702-07. The NAW is a constitutional accommodation under the *Cutter* criteria.

> i. THE FEDERAL GOVERNMENT HAS PLACED MANY BURDENS ON TRIBAL RELIGIOUS AND CULTURAL PRACTICES AND THE NAW ALLEVIATES SOME OF THOSE BURDENS.

The federal government has long placed many burdens on tribal religious and cultural practices through explicit policies to assimilate tribes as well as through the acquisition of traditional and historical tribal lands. The "past federal policy was to assimilate American Indians into United States culture, in part by deliberately suppressing, and even destroying, traditional tribal religions and culture in the 19th and early 20th centuries." *Bear Lodge Multiple Use Ass'n v. Babbit*, 175 F.3d 814, 817 (10th Cir. 1999); *see* Kristen A. Carpenter, Limiting Principles and Empowering Practices in American Indian Religious Freedoms, 45 Conn. L. Rev. 387, 408 (2012). "By the late 19th Century federal attempts to replace traditional Indian religions with Christianity grew violent. In 1890 for example, the United States Calvary shot and killed 300 unarmed Sioux men, women and children en route to an Indian religious ceremony

called the Ghost Dance[.]" *Bear Lodge Multiple Use Ass'n*, 175 F.3d at 817. Indeed, the government administered Indian trust funds to pay Christian denominations to educate the Indians in Christianity – a policy upheld by the Supreme Court. *Rueben Quick Bear v. Leupp*, 210 U.S. 50, 81-82 (1908). In addition to these overt policies, the government's acquisition of American Indian lands made it difficult for American Indians to practice their religions at sacred sites. *See, e.g., Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451 (1988) (upholding road through a sacred site even if it would "virtually destroy the . . . Indians' ability to practice their religion.").

The American Indians that historically lived within the NAW area were directly impacted by these federal policies. Christian and government boarding schools were set up all over in northern Arizona to indoctrinate the American Indians into Christianity, or civilization. Annual Report of Comm'r of Indian Affairs, Report of Agents in Arizona 366 (1894); Annual Report of Comm'r of Indian Affairs, Report of Agents in Arizona 3, 5 (1888); Annual Report of Comm'r of Indian Affairs, Report of Agents in Arizona 2-3, 5, 8 (1882). While the Tribes in northern Arizona never ceded ownership of NAW lands, the Indian Claims Commission held that the tribes' title had been lost or their property had been taken by the federal government in the nineteenth century. *See e.g., Southern Paiute Nation v. United States,* 14 Ind.Cl.Comm. 618, 619-21 (1965); *Hualapai Tribe of the Hualapai Reservation v. United States,* 11 Ind.Cl.Comm. 447, 456 (1962). The FEIS details this history. *See* A.R. 003036-3044. As a result of this history, the Forest Service and BLM now assert authority over the NAW lands.

The adoption and application of the Mining Law of 1872 to the withdrawal lands, among the other federal policies and practices outlined above, burdened the religious and cultural practices of the American Indians in this area. *See* A.R. 002221-2229; *Havasupai Tribe v. United States,* 752 F.Supp. 1471, 1485, 1493-1500 (D. Ariz. 1990). The NAW alleviates some of these federally-created burdens, but not completely. The NAW will prevent new mining claims, thus accommodating American Indian religious and cultural practices to some extent. The NAW, however, still allows mining to go forward if there is a valid existing right. A.R. 001668. Because mining will still exist, the American Indian practitioners will still be burdened in the exercise of their religion, but to a more defined extent because there are a finite number of mines that might be developed during the withdrawal period. The Ninth Circuit has recognized that when a "government action challenged under the Establishment Clause explicitly violates some of the core tenets of the religion it allegedly favors, such action will typically be considered permissible accommodation rather than impermissible endorsement." *Access Fund,* 499 F.3d at 1045. The NAW is a permissible accommodation that alleviates some of the historic government-created burdens to American Indian religious and cultural practices.

ii.   THE NAW TOOK ADEQUATE ACCOUNT OF THE BURDENS IMPOSED ON NON-BENEFICIARIES.

When an accommodation to religion is made, the government must "take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries[.]" *Cutter*, 544 U.S. at 720. An accommodation must "not override

other significant interests." *Id.* at 722. An accommodation will be upheld, however, even if non-religious individuals or groups are burdened. *See, e.g., Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos,* 483 U.S. 327, 338 (1987).

First and foremost, companies have to comply with federal regulations all the time, and complying with the law is not truly a burden that should be considered in this analysis. Still, impacts to mining here will not be nearly as severe as burdens the Supreme Court has recognized as permissible. For example, in *Amos,* the Court upheld an exemption to Title VII of the Civil Rights Act of 1964 for religious organizations even though it permitted employment discrimination against nonpractitioners of a religious organization's faith. 483 U.S. at 338-39. This immense burden was upheld as constitutional. *Id*. Further, the Supreme Court in *Gillette v. United States* "upheld a military draft exemption, even though the burden on those without religious objection to war (the increased chance of being drafted and forced to risk one's life in battle) was substantial." *Kiryas Joel*, 512 U.S. at 725 (Kennedy, J. concurring) (citing *Gillette*, 401 U.S. 437 (1971)).

In *Cutter*, the Court assumed that RLUIPA would not be applied in an unbalanced way, and that the burdens on prison security would be appropriately balanced. 544 U.S. at 722. In accordance with this approach, the Secretary appropriately weighed the burdens on mining, the environment, cultural and historical resources, and recreation, among others. A.R. 002003-2320. The main interest affected by the NAW is the ability to locate future mining claims under the Mining Law and the indirect benefits mining on those future claims may bring. The Secretary took proper account of the burdens on

mining by exhaustively analyzing them and determining that other public values warrant slowing the pace of mining to that of the 1980s. A.R. 000011-12; 000074; 002003-2320.

In extreme cases, the Supreme Court has held that an accommodation that gives an absolute right to religious practitioners over others can create too great of a burden on non-beneficiaries. In *Caldor,* the government relieved a burden that was placed on religious practitioners by private industry by arming "Sabbath observers with an absolute and unqualified right not to work on whatever day they designate[d] as their Sabbath." 472 U.S. at 709. The burden imposed on private industry by an absolute and unqualified right was too extreme. *Id.* at 710-11. Here, the federal government has not delegated authority to American Indian tribes to determine when, where, and to what extent a withdrawal under FLPMA will be enacted. The Secretary retains authority to make these determinations and has not given an "absolute and unqualified" right to American Indians. If American Indians did have the absolute right in this instance, they would prohibit all forms of mining in the NAW, regardless of valid existing rights. A.R. 002221-2223. That is not what the NAW does, and it is certainly not a "veto" for Native Americans as Yount and Quaterra assert. Rather, this is a land management decision.[9]

---

[9] No court has ruled that a religious accommodation violates the Establishment Clause simply because it limits some uses of government property or because it restricts public access to, or activities on, public property. Rather, in numerous contexts, courts have upheld such limits. *See, e.g., Good News Club v. Milford,* 533 U.S. 98, 112-14 (2001) (public school facilities may be used for religious purposes); *Lamb's Chapel v. Center Moriches Union Free School Dist.,* 508 U.S. 384, 394-95 (1993) (same); *Van Zandt v. Thompson,* 839 F.2d 1215, 1216 (7th Cir. 1988) ("prayer room" in state capitol building); *Hawley v. City of Cleveland,* 24 F.3d 814 (6th Cir. 1994) (Catholic Diocese chapel in Cleveland Hopkins International Airport). In these cases, the government's designation of public property for religious uses imposed limitations on other incompatible uses. Yet, as these cases make clear, limiting some uses of government property does not in itself render a government accommodation unconstitutional.

1    The Secretary, through the FEIS, properly weighed all the interests and burdens

2    before going forward with the NAW, and the burden of complying with the law is well

3    within the type of burdens the Supreme Court has found permissible.

4

5              iii.    THE NAW IS ADMINISTERED NEUTRALLY AMONG DIFFERENT
                       FAITHS.
6

7    As in *Cutter*, the accommodation here is administered neutrally. 544 U.S. at 720.

8    An "absolute rule of neutrality" is not required, because doing so would evince hostility

9    toward religion that is forbidden. *Trunk*, 629 F.3d at 1106. "[N]uetrality is not so narrow

10   a channel that the slightest deviation from an absolutely straight course leads to

11   condemnation" by the First Amendment. *Id.* (quoting *McCreary*, 545 U.S. at 876). The

12   fact that an accommodation facilitates the practice of religion does not render it

13   unconstitutional. *Amos*, 483 U.S. at 334-37; *Hobbie*, 480 U.S. at 144-45. Nor does the

14   fact that an accommodation may single out a particular religion, for that shows nothing

15   more than the uniqueness of that group's situation. *Kiryas Joel*, 512 U.S. at 726

16   (Kennedy, J., concurring). After all, "[m]ost accommodations cover particular religious

17   practices." *Id.*

18

19   With regard to American Indians, the federal government recognized long ago

20   that "each Indian tribe has had its own religion and its own code of ethics, and therefore

21   it is not possible to present one brief summary of Indian religion and Indian ethics." Inst.

22   for Gov't Research, The Problem of Indian Administration 845 (1928) ("Meriam

23   Report"). The FEIS recognizes that different tribes have different beliefs about the NAW

24

25

26

27

28

area and Grand Canyon, and each was treated equally. A.R. 001912-1922; 002221-2229. Thus, there is no neutrality issue here.

Additionally, the NAW was established under a general law – FLPMA's withdrawal provision, 43 U.S.C. § 1714 – and not a specific statute passed to specifically benefit any one tribe. The NAW does not single out a particular religious sect for special treatment. The accommodation applies to many different American Indian beliefs and any other religious practitioners that want to access the NAW area. Thus, the statute here is markedly different from that in *Kiryas Joel,* where the Supreme Court struck down a law that carved out a separate school district to serve exclusively a community of Satmar Hasidim Jews. 512 U.S. at 690. There, the law "single[d] out a particular religious sect for special treatment." *Kiryas Joel*, 512 U.S. at 706. One of the main neutrality problems with the statute in *Kiryas Joel*, which is not the case here, was that the religious community "did not receive its new governmental authority simply as one of many communities eligible for equal treatment under a general law[.]" 512 U.S. at 703. Here, the Secretary has applied FLPMA in constitutional way.

Similar to the Forest Service's decision in *Access Fund*, the NAW does not reflect that the Secretary favors "tribal religion[s] over other religions or that [the BLM] would not protect sites of historical, cultural, and religious importance to other groups[.]" 499 F.3d at 1045. Contrary to Yount's assertions, nothing in the record indicates that BLM disapproves of non-Indian religious practices, or that BLM's actions disapprove his religious choices. *Id*. The NAW simply reduces burdens on Indian religious exercise

occasioned by the government's ownership and management of the site, and does this in a neutral way by accommodating many different religious and cultural beliefs.

Even if the Court were to find that the NAW is not neutral, it has long been held that the government can single out and protect American Indian religious practices without violating the Establishment Clause because such protection is rationally related to Congress' unique obligation toward the Indians. *See Rupert v. USFWS,* 957 F.2d 32, 34-36 (1st Cir. 1992); *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1216-17 (5th Cir. 1991). This alone makes the NAW constitutional.

In conclusion, the NAW relieves government burdens placed on religion, takes adequate account of the burdens it imposes, and is applied in a neutral manner. Thus, under *Cutter*, the NAW is constitutional.

> 2.   UNDER THE COERCION TEST, THE NAW IS CONSTITUTIONAL.

Yount alludes to the concept of coercion without citing any support. Doc. 167 at 33 (referencing the U.S. "compelling" him to accept beliefs). Under the coercion test, which is seldom used, the NAW is likewise constitutional. The Establishment Clause permits the government to accommodate private religious practices on public property, as long as the government does "not coerce anyone to support or participate in religion or its exercise." *Lee v. Weisman*, 505 U.S. 577, 587 (1992); *Newdow,* 597 F.3d at 1039. The Ninth Circuit has relied on three factors to assess coercion: 1) has the state acted; 2) does the action amount to coercion; and 3) is the object of the coercion religious rather than secular? *Inouye v. Kemna,* 504 F.3d 705, 713 (9th Cir. 2007) (internal citation

12

omitted). The government has acted here, but the action does not amount to coercion. Even if there was coercion, the object of the coercion is secular, not religious.

With regard to coercion, this is not a case like *Lee* or *Inouye*. In both of those cases, individuals were, as a practical matter, forced to participate in religious activities chosen by the state. *See Lee,* 505 U.S. at 587-88 (students were "obliged to attend" religious prayer); *Inouye,* 504 F.3d at 713-14 (state "ordered" participation in a program rooted in religious faith). In this instance, no one is forced to participate in any religious ceremonies or activities.

Even if the Court were to find coercion, the object of the coercion is secular. In *Lee* and *Inouye*, the object of the coercion was religious in nature. In *Lee*, students were subjected to religious prayer at graduation. 505 U.S. at 581. In *Inouye*, a parolee was required to participate in a religious treatment program as part of his parole. 504 F.3d at 709-10. Here, there is no such religious coercion. The object of the coercion here is complying with government regulations under FLPMA, not the required participation in religious prayer or programs. Further, the Ninth Circuit in *Access Fund* rightly found that accommodations that "mitigate interference" with religious practices "would not give rise to a finding of an impermissible religious motivation." 499 F.3d at 1044; *see also Cholla Ready Mix,* 382 F.3d at 975-76 (same). The Supreme Court has come to the same conclusion. *Amos,* 483 U.S. at 335-36 (alleviating significant governmental interference to religious practice is a permissible purpose). As described above in Section II(B)(1)(i), the NAW alleviates some of the burdens the federal government has placed on American Indian religious practices, and thus was a secular accommodation.

1   As a result, the NAW easily passes muster under the coercion test because it does not

2   force anyone to participate in religious activities and it is secular.

3       III.   AMERICAN INDIAN VALUES ARE "PUBLIC VALUES" UNDER FLPMA.

4

5       Quaterra asserts that protection of Indian cultural resources is limited to sites where

6   historical, cultural, and religious practices occur, and that the NAW exceeds any

7   statutory authority in protecting cultural resources. Doc. 173 at 2-3, 23. Quaterra then

8
    lists certain laws that exist to protect American Indian resources, which apply with full
9

10  force here, but fails to recognize other authorities that apply. *Id.* at 23-4. FLPMA

11  provides ample authority for the protection and use of cultural resources.[10]

12
        The Secretary has broad authority and discretion to "make, modify, extend, or
13

14  revoke withdrawals" under FLPMA. 43 U.S.C. § 1714(a) (2012); 43 C.F.R. § 2300.0-3

15  (2013); *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 756 (D.C. Cir. 2007)

16
    (". . . Congress delegated to the Secretary considerable withdrawal authority[.]"). In
17

18  relevant part, the "term 'withdrawal' means withholding an area of Federal land from

19  settlement, sale, location, or entry, under some or all of the general land laws, for the

20
    purpose of limiting activities under those laws in order to maintain other public values in
21

22  the area or reserving the area for a particular public purpose or program . . ." *Id.* at §

23  1702(j); 43 C.F.R. § 2300.0-5(h). The only limitation on the Secretary's authority to

24

25

26  _____

27      [10] As the U.S. pointed out, "multiple use" also provides ample authority and
    discretion to the Secretary to manage the lands here. Doc. 198 at 24-5. Additionally, the
28  statutes and executive orders that Quaterra cites actually mandate that the federal
    government accommodate American Indian religious practices.

make a withdrawal is that it must be "in accordance with the provisions and limitations of [43 U.S.C. § 1714]." *Id.* § 1714(a).

FLPMA does not define what "other public values" means.[11] This makes sense because Congress gave the Secretary broad discretion to determine the "other public values" that should be maintained. *Mount Royal Joint Venture*, 477 F.3d at 756. In this instance, the Secretary clearly identified many public values and purposes for the withdrawal, including maintaining traditional use areas and American Indian resources. *See* A.R. 000009-12; 001621-1626.

Quaterra would have the court ignore American Indian beliefs, cultural practices, and uses of the land in the NAW area as if they were not "other public values" under FLPMA. For example, Quaterra asserts that the protection of "Traditional Use Areas" lacks statutory support, and that it "encompasses the NPS' view that tribal beliefs or values should enjoy the same protection as cultural sites." Doc. 173 at 24-25. While American Indians were not legally citizens until 1924, they are now U.S. citizens and are part of the "public" whose values should be considered. *See* Act of June 2, 1924, Pub. L. No. 68-175, 43 Stat. 253 (1924) (providing for citizenship of American Indians). Further, federal law and policy recognizes that preserving and maintaining American Indian culture, religion, history, identity, etc. is of public value to the nation as a whole. *See* A.R. 001912-1913 (outlining laws that apply); *Cholla Ready Mix,* 382 F.3d at 975 ("It is clear from Cholla's complaint that defendants' actions have the secular purpose of

---

[11] One court found that wilderness preservation is a "public value" under FLPMA. *Mtn. States Legal Foundation v. Andrus,* 499 F.Supp. 383, 391 (D. Wyo. 1980).

1   carrying out state construction projects in a manner that does not harm a site of religious,

2   historical, and cultural importance to several Native American groups and the nation as a

3
    whole."). The FEIS recognized this by highlighting American Indian values in the
4
5   American Indian Resources section of the FEIS, which included traditional use areas.

6   A.R. 001912-1922.

7
        American Indians, including the Southern Paiute, have important archeological
8
9   sites, landforms, geographic features, hunting and gathering areas, trails, mineral

10  collecting areas, springs, cultural sites, sacred sites, and historic sites all throughout the

11  NAW area. A.R. 001912-1922. Within the NAW area there are at least 2,535 *known*
12
    archaeological sites, and likely many more. A.R. 001907. That is just the archaeological
13
14  sites and does not get into the trails, hunting and gathering areas, mineral collecting

15  areas, etc. To the Southern Paiute, these cultural resources are bound together. A.R.

16  07044-7045. The Paiute have traditional stories and songs that talk about these areas and
17
18  their importance to the people. A.R. 07050-7051.

19      For instance, the Southern Paiutes had a system of trails and specialists who

20  moved along the trails carrying messages, goods, and services. A.R. 07054-7055. A
21
22  knotted string, called tapitcapi (literally "the knotted") was sent out via a runner to other

23  Paiute people to inform them of events. *Id.* These runners traveled along trails

24  specifically created by Southern Paiute people. *Id.* The trails were complex because they
25
26  passed from water source to water source across rugged terrain. *Id.* In order to remember

27  the trail routes, the runners would know a song that told the way thus keeping the people

28  alive. *Id.* The trail songs described the path to be followed as well as encouraged the

runner by recounting stories of beings that traveled or established the same trail. *Id.* These trails recount the cultural importance of this area to the Paiute, particularly for the afterlife. *Id.* The Tribes in this area don't want their traditional land to end up like portions of the Navajo reservation. *See* Dan Frosch, *Amid Toxic Waste, a Navajo Village Could Lose Its Land,* N.Y. Times, Feb. 19, 2014, *available at* http://www.nytimes.com/2014/02/20/us/nestled-amid-toxic-waste-a-navajo-village-faces-losing-its-land-forever.html?_r=1.

FLPMA gave the Secretary broad authority to maintain "other public values" by limiting mining. 43 U.S.C. §§ 1702(j), 1714; *see Mount Royal Joint Venture*, 477 F.3d at 756 (Secretary can withdraw land for any purpose so long as the Congress does not disapprove). The American Indians that traditionally lived in this area are part of the public and value this area immensely for many reasons, and the Secretary rightly relied on those values.

1

CONCLUSION

2

For these reasons, we respectfully ask the Court to deny the Plaintiffs' Motions for

3

Summary Judgment on establishment clause and the other grounds addressed.

4

5

6

DATED this 25th day of February, 2014

7

8

*Matthew Campbell*

9

Matthew L. Campbell
New Mexico Bar No. 138207

10

Native American Rights Fund
1506 Broadway

11

Boulder, CO 80302

12

Phone: 303 - 447 - 8760
mcampbell@narf.org

13

14

*Counsel for Amici Curiae*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18

1

## **CERTIFICATE OF SERVICE**

2

3

4

5

I hereby certify that I have caused the Amicus Curiae Brief in Support of the United States' Cross-Motion and Response to Motions for Summary Judgment to be served upon counsel of record via email and First Class Mail to:

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gregory Yount
807 W Butterfield Rd.
Chino Valley, AZ 86323

Constance E Brooks and Michael B
Marinovich
CE Brooks & Associates PC
303 E 17th Ave Ste 650
Denver, CO 80203
Email: connie@cebrooks.com
mike@cebrooks.com

William George Klain
Lang Baker & Klain PLC - Scottsdale,
AZ
8767 E Via De Commercio, Ste. 102
Scottsdale, AZ 85258
Email: wklain@lang-baker.com

Jeffrey Wilson McCoy and Steven
James Lechner
Mountain States Legal Foundation
2596 S Lewis Way
Lakewood, CO 80227
Email:
jmccoy@mountainstateslegal.com
lechner@mountainstateslegal.com

Amy Beth Chasanov, John C Martin,
Timothy McCrum, Susuan Mary
Mathiascheck, and Thomas Richard
Lundquist
Crowell & Moring LLP - Washington,
DC
1001 Pennsylvania Ave. NW, Ste. 1100
Washington, DC 20004-2595
Email: achasanov@crowell.com
jmartin@crowell.com
rmccrum@crowell.com
smathiascheck@crowell.com
tlundquist@crowell.com

Gary Frank Urman, John C Lacy, and
Marian Conrad LaLonde
DeConcini McDonald Yetwin & Lacy
PC - Tucson
2525 E Broadway Blvd., Ste. 200
Tucson, AZ 85716-5300
Email: gurman@dmyl.com
jlacy@dmyl.com
mlalonde@dmyl.com

Dominika Natalia Tarczynska
US Dept of Justice
P.O. Box 663
Washington, DC 20044-0663
Email: dominika.tarczynska@usdoj.gov

19

1   John S Most                                    Edward B Zukoski and Alison Christine
    US Dept of Justice - Natural Resources         Flint
2   Section                                        Earthjustice - Denver, CO
3   P.O. Box 7611                                  1400 Glenarm Pl., Ste. 300
    Washington, DC 20044                           Denver, CO 80202
4   Email: john.most@usdoj.gov                     Email: tzukoski@earthjustice.org
                                                   aflint@earthjustice.org
5

6                                                  Roger Flynn
                                                   Western Mining Action Project
7                                                  P.O. Box 349
8                                                  Lyons, CO 80540
                                                   Email: wmap@igc.org
9

10

11

12
        DATED this 25th day of February, 2014
13

14

15                                            *Matthew Campbell*
16                                            *Counsel for Amici Curiae*

17

18

19

20

21

22

23

24

25

26

27

28