Edward B. Zukoski (*pro hac vice*)
Alison C. Flint (*pro hac vice*)
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO  80202
tzukoski@earthjustice.org
aflint@earthjustice.org
Telephone: (303) 623-9466
Fax: (303) 623-8083

Roger Flynn (*pro hac vice*)
Western Mining Action Project
P.O. Box 349, 440 Main St., #2
Lyons, CO  80540
wmap@igc.org
Telephone: (303) 823-5738
Fax: (303) 823-5732

Attorneys for Defendant-Intervenors
Grand Canyon Trust, et al.,

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gregory Yount,<br>          Plaintiff,<br><br>v.<br><br>Sally Jewell, Secretary of the Interior, et al.;<br>          Defendants,<br><br>and<br><br>Grand Canyon Trust, et al.,<br>          Intervenor-Defendants. | Case No. 3:11-cv-08171-PCT-DGC<br>(Lead case) |
| National Mining Association, et al.;<br>          Plaintiffs,<br><br>v.<br><br>Sally Jewell, Secretary of the Interior, et al.;<br>          Defendants,<br><br>and<br><br>Grand Canyon Trust, et al.,<br>          Intervenor-Defendants. | Case No. 3:11-cv-08038-PCT-DGC |

American Exploration & Mining Association,
        Plaintiff,

v.

Sally Jewell, Secretary of the Interior, <u>et al.</u>;
        Defendants,

and

Grand Canyon Trust, <u>et al.</u>,
        Intervenor-Defendants.

Case No. 3:12-cv-08042-PCT-DGC

Quaterra Alaska Incorporated, <u>et al.</u>,
        Plaintiffs,

v.

Sally Jewell, Secretary of the Interior, <u>et al.</u>;
        Defendants,

and

Grand Canyon Trust, <u>et al.</u>,
        Intervenor-Defendants.

Case No. 3:12-cv-08075-PCT-DGC

**DEFENDANT-INTERVENORS GRAND CANYON TRUST ET AL.'S
CROSS-MOTION FOR SUMMARY JUDGMENT AND MEMO IN SUPPORT,
AND MEMO IN OPPOSITION TO PLAINTIFFS' MOTIONS
FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

CROSS-MOTION FOR SUMMARY JUDGMENT ........................................................... 1

MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY
JUDGMENT .................................................................................................................... 1

STANDARD OF REVIEW ............................................................................................. 2

ARGUMENT ................................................................................................................... 2

I.      DOI COMPLIED WITH FLPMA ...................................................................... 2

        A.      FLPMA Grants The Secretary Broad Discretion To Make
                Large-Tract Withdrawals ........................................................................ 2

        B.      Ample Record Evidence Supports The Withdrawal's Resource
                Protection Purposes ................................................................................ 4

                1.      Water resources ........................................................................... 5

                2.      American Indian tribal and cultural resources .................................. 8

                3.      Visual resources and wildlife ......................................................... 8

                4.      Uranium endowment and economic impacts .................................... 9

        C.      Plaintiffs' Allegations That DOI Failed To Properly Notify
                Congress Fail To State A Claim ........................................................... 10

        D.      The Withdrawal Cannot Conflict With Federal Land Use Plans ............... 11

                1.      The Withdrawal did not violate BLM's land use plan ..................... 12

                2.      The Withdrawal did not violate Forest Service planning rules ........ 13

        E.      DOI Complied With FLPMA And NEPA Requirements For Disclosing
                Conflicts With Local Land Use Plans .................................................... 15

II.     DOI DID NOT VIOLATE NEPA ..................................................................... 16

        A.      The FEIS Properly Evaluated Mitigation Measures For Alternative A ...... 16

        B.      The FEIS Evaluated A Range Of Reasonable Alternatives ...................... 17

                1.      DOI need not have analyzed an 800,000-acre withdrawal ............. 18

                2.      DOI properly dismissed detailed analysis of "Alternative E" ........ 19

                3.      DOI need not have considered a shorter-term withdrawal ............. 20

        C.      The Purpose And Need For The Withdrawal Did Not Change ................. 21

        D.      The FEIS Properly Identified Data Gaps .............................................. 22

III.  THE SECRETARY PROPERLY EXERCISED DISCRETION TO PROTECT
      AMERICAN INDIAN AND CULTURAL RESOURCES ................................... 24

      A.   The Lands And Resources Of The Grand Canyon Region Sustain
           American Indian Tribes' Cultural And Spiritual Identities ....................... 24

      B.   Protection Of American Indian Resources Falls Squarely
           Within The Secretary's Authority ................................................. 25

      C.   The Withdrawal Does Not Violate The Establishment Clause .................. 28

IV.   EVEN IF THIS COURT FINDS ANY OF PLAINTIFFS' CLAIMS HAS
      MERIT, IT SHOULD PERMIT ADDITIONAL BRIEFING ON REMEDY ...... 30

CONCLUSION ........................................................................... 30

1

2

## **TABLE OF AUTHORITIES**

### CASES

Access Fund v. U.S. Department of Agriculture,
    499 F.3d 1036 (9th Cir. 2007) ................................................................25-26, 29, 30

Arkansas v. Oklahoma,
    503 U.S. 91 (1992)........................................................................................... 2

Association of Public Agency Customers, Inc. v. Bonneville Power
    Administration, 126 F.3d 1158 (9th Cir. 1997) ........................................................ 16

Bear Lodge Multiple Use Association v. Babbitt,
    2 F. Supp. 2d 1448 (D. Wyo. 1998)...............................................................30

Bear Lodge Multiple Use Association v. Babbitt,
    175 F.3d 814 (10th Cir. 1999) ...................................................... 25

California Coastal Commission v. Granite Rock Co.,
    480 U.S. 572 (1987)............................................................................ 14

California Forestry Association v. Bosworth,
    No. 2:05-CV-00905-MCE-GGH, 2008 WL 4370074 (E.D. Cal. Sept. 24, 2008) ...... 14

Cholla Ready Mix, Inc. v. Civish,
    382 F.3d 969 (9th Cir. 2004) ...................................................... 26, 29, 30

City of Angoon v. Hodel,
    803 F.2d 1016 (9th Cir. 1986) ...................................................... 19

Cloud Foundation v. U.S. Bureau of Land Management,
    802 F. Supp. 2d 1192 (D. Nev. 2011)....................................................... 13

Conservation Northwest v. Rey,
    674 F. Supp. 2d 1232 (W.D. Wash. 2009).................................................. 22

Center for Biological Diversity v. U.S. Department of Interior,
    623 F.3d 633 (9th Cir. 2010) ....................................................... 16

Environmental Protection Information Center v. U.S. Forest Service,
    451 F.3d 1005 (9th Cir. 2006) ...................................................... 17

Fortune v. Thompson,
    No. CV-09-98-GF-SEH, 2011 WL 206164 (D. Mont. Jan. 20, 2011) ....................... 26

Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,
   546 U.S. 418 (2006)..............................................................................28

Great Old Broads for Wilderness v. Kimbell,
   709 F.3d 836 (9th Cir. 2013) ................................................................ 19

Greer Coalition, Inc. v. U.S. Forest Service,
   No. CV09-8239-PCT-DGC, 2011 WL 671750 (D. Ariz. Feb. 16, 2011) .................... 5

Half Moon Bay Fishermans' Marketing Association v. Carlucci,
   857 F.2d 505 (9th Cir. 1988) ................................................................ 23

Havasupai Tribe v. United States,
   752 F. Supp. 1471 (D. Ariz. 1990) ....................................................... 27, 28

Hellon & Associates, Inc. v. Phoenix Resort Corp.,
   958 F.2d 295 (9th Cir. 1992) ................................................................ 10

Idaho Farm Bureau Federation v. Babbitt,
   58 F.3d 1392 (9th Cir. 1995) ................................................................ 30

Idaho Sporting Congress, Inc. v. Alexander,
   222 F.3d 562 (9th Cir. 2000) ................................................................ 23

Karuk Tribe of California v. U.S. Forest Service,
   681 F.3d 1006 (9th Cir. 2012) ................................................................ 2

Klamath Siskiyou Wildlands Center v. Boody,
   468 F.3d 549 (9th Cir. 2006) ................................................................ 12

Klamath-Siskiyou Wildlands Center v. U.S. Forest Service,
   373 F. Supp. 2d 1069 (E.D. Cal. 2004) ..................................................... 20

Laguna Greenbelt, Inc. v. U.S. Department of Transportation,
   42 F.3d 517 (9th Cir. 1994) ................................................................ 19

Lands Council v. McNair,
   537 F.3d 981 (9th Cir. 2008) (en banc) ................................................. 6, 10

Lemon v. Kurtzman,
   403 U.S. 602 (1971)..............................................................................29

Life of the Land v. Brinegar,
   485 F.2d 460 (9th Cir. 1973) ................................................................ 19

Lyng v. Northwest Indian Cemetery Protective Association,
    485 U.S. 439 (1988) ........................................................................................... 28

Marsh v. Oregon Natural Resources Council,
    490 U.S. 360 (1989) ........................................................................................ 5, 7

Mineral Policy Center v. Norton,
    292 F. Supp. 2d 30 (D.D.C. 2003) ..................................................................... 20

Montana Wilderness Association v. Connell,
    725 F.3d 988 (9th Cir. 2013) ............................................................................. 18

Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile
    Insurance Co.,463 U.S. 29 (1983) ................................................................ 2, 4, 14

Mount Royal Joint Venture v. Kempthorne,
    477 F.3d 745 (D.C. Cir. 2007) .................................................................... passim

Natural Arch & Bridge Society v. Alston,
    209 F. Supp. 2d 1207 (D. Utah 2002) ................................................................ 30

Natural Resources Defense Council, Inc. v. Morton,
    458 F.2d 827 (D.C. Cir. 1972) ........................................................................... 20

Natural Resources Defense Council v. U.S. Forest Service,
    421 F.3d 797 (9th Cir. 2005) ........................................................................ 8, 21

Navajo Nation v. U.S. Forest Service,
    535 F.3d 1058 (9th Cir. 2008) (en banc) ...................................................... 27, 28

Neighbors of Cuddy Mountain v. U.S. Forest Service,
    137 F.3d 1372 (9th Cir. 1998) ........................................................................... 17

New York v. Nuclear Regulatory Commission,
    681 F.3d 471 (D.C. Cir. 2012) ......................................................................... 7-8

Northern Alaska Environmental Center v. Kempthorne,
    457 F.3d 969 (9th Cir. 2006) ....................................................................... 16, 17

Norton v. Southern Utah Wilderness Alliance,
    542 U.S. 55 (2004) ........................................................................................... 14

Perkins v. Bergland,
    608 F.2d 803 (9th Cir. 1979) ............................................................................ 14

v

Renee v. Duncan,
    686 F.3d 1002 (9th Cir. 2012) ................................................................. 10-11

River Runners for Wilderness v. Martin,
    593 F.3d 1064 (9th Cir. 2010) .................................................................. 2, 5

Rock Creek Alliance v. U.S. Forest Service,
    703 F. Supp. 2d 1152 (D. Mont. 2010).................................................... 14, 23

South Fork Band Council of Western Shoshone of Nevada v. U.S. Department of
    Interior, 588 F.3d 718 (9th Cir. 2009) ......................................................... 27

Sierra Forest Legacy v. Rey,
    577 F.3d 1015 (9th Cir. 2009) ..................................................................... 21

Skull Valley Band of Goshute Indians v. Davis,
    728 F. Supp. 2d 1287 (D. Utah 2010)............................................................. 7

Western Oil & Gas Association v. EPA,
    633 F.2d 803 (9th Cir. 1980) ....................................................................... 30

Western Radio Services Co. v. Espy,
    79 F.3d 896 (9th Cir. 1996) ........................................................................... 3

Wilderness Society v. U.S. Forest Service,
    850 F. Supp. 2d 1144 (D. Idaho 2012) ......................................................... 16

Wood v. Betlach,
    922 F. Supp. 2d 836 (D. Ariz. 2013) ............................................................ 30

**STATUTES**

5 U.S.C. § 552(b)(3) ......................................................................................... 28

16 U.S.C. §§ 431-433 ....................................................................................... 12

16 U.S.C. § 470a(d)(6)(A)-(B) ......................................................................... 25

16 U.S.C. §§ 470w-3, 470hh ........................................................................... 28

16 U.S.C. § 1604(i)........................................................................................... 13

30 U.S.C. § 22 .................................................................................................. 11

42 U.S.C. § 1996 .............................................................................................. 25

43 U.S.C. § 1701(i) (statutory notes) ................................................................. 11

43 U.S.C. § 1701(a)(8) .......................................................................................... 25

43 U.S.C. § 1702(j) ................................................................................................. 2

43 U.S.C. § 1712(a) .............................................................................................. 11

43 U.S.C. § 1712(c)(9) .......................................................................................... 15

43 U.S.C. § 1712(e)(3) .................................................................................... 11, 12

43 U.S.C. § 1714(i) ......................................................................................... 11, 13

43 U.S.C. § 1714(a) .............................................................................................. 11

43 U.S.C. § 1714(b) .............................................................................................. 12

43 U.S.C. § 1714(c) ............................................................................................. 2, 3

43 U.S.C. § 1714(d)-(e) .......................................................................................... 3

43 U.S.C. § 1732(a) .............................................................................................. 11

Pub. L. No. 98-406, 98 Stat. 1485 (1984) ........................................................... 10

### EXECUTIVE ORDERS

Exec. Order No. 13,007, 61 Fed. Reg. 26,771 (May 24, 1996) ......................... 25

### REGULATIONS

36 C.F.R. § 60.4 ................................................................................................... 24

40 C.F.R. § 1502.22 ............................................................................................. 22

40 C.F.R. § 1502.22(a) ......................................................................................... 22

40 C.F.R. § 1502.22(b) .................................................................................... 22, 23

40 C.F.R. § 1506.2(d) ........................................................................................... 15

43 C.F.R. § 1610.1(a)-(b) ..................................................................................... 11

43 C.F.R. § 1610.5-3(a) ........................................................................................ 11

43 C.F.R. § 2300.0-5(h) .......................................................................................... 2

43 C.F.R. §§ 2310.1-2310.1-4 ........................................................ 12

43 C.F.R. § 2310.1-2(c)(3) ................................................... 11, 13

43 C.F.R. § 2310.3-3 ..................................................................... 11

## OTHER AUTHORITIES

46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981) .................................... 16

65 Fed. Reg. 69,998, 70,007 (Nov. 21, 2000) ..................................... 20

David H. Getches, Managing the Public Lands: The Authority of the Executive to
    Withdraw Lands, 22 Nat. Resources J. 279 (1982) ......................... 3

Kristen A. Carpenter, Limiting Principles and Empowering Practices in American
    Indian Religious Freedoms, 45 Conn. L. Rev. 387 (2012) ................ 25

**CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, Intervenor-Defendants Grand Canyon Trust and the Havasupai Tribe, et al. (collectively, the Trust) respectfully cross-move for summary judgment on Plaintiffs' claims in their summary judgment motions (Dkt. ## 167, 170, 173).[1]  As set forth in the following memorandum and supporting Statement of Facts (SOF), the Northern Arizona Withdrawal complies with the Federal Land Policy and Management Act (FLPMA), the National Forest Management Act (NFMA), the National Environmental Policy Act (NEPA), the Administrative Procedure Act (APA), and the U.S. Constitution.  The Trust adopts specified portions of Federal Defendants Department of the Interior et al.'s (collectively, DOI) cross-motion for summary judgment and supporting memorandum (Dkt. # 198).

**MEMORANDUM IN SUPPORT OF CROSS-MOTION
FOR SUMMARY JUDGMENT**

In response to widespread concern by congressional leaders, local governments, American Indian tribes, and environmentalists about the potentially devastating impacts of unprecedented levels of uranium mining on public lands surrounding the Grand Canyon, DOI conducted a comprehensive process to study those impacts and weigh the costs and benefits of increased mining activity on the area's world-class natural and cultural resources.  DOI concluded that the anticipated pace of development could have significant harmful impacts, and the Interior Secretary exercised his broad discretion to withdraw the area from new mining claims for 20 years.

Plaintiffs throw the kitchen sink at the Secretary's decision, but none of their arguments has merit.  Plaintiffs' claims rest on their subjective belief that mining a highly toxic mineral in the backyard of one of the world's most beloved natural icons, and in the ancestral homeland of many American Indian tribes, can have no adverse impacts.  On

---

[1] The Trust refers to Plaintiffs National Mining Association and Nuclear Energy Institute as "NMA;" to American Exploration and Mining Association (formerly Northwest Mining Association) and Gregory Yount as "AEMA;" and to Quaterra Resources Inc. and Arizona Utah Local Economic Coalition as "Quaterra."

the contrary, ample evidence supports the Secretary's decision, and the record shows that DOI complied with all legal requirements in making the Withdrawal.

## STANDARD OF REVIEW

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Karuk Tribe of Cal. v. U.S. Forest Serv., 681 F.3d 1006, 1017 (9th Cir. 2012).  In APA record review cases, the Court may grant summary judgment based on the administrative record.  Id.; see also DOI Br. 11-12 (describing deferential APA standard of review).  The agency need only "articulate a satisfactory explanation for its action." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  If the record supports the agency's factual determinations, they should be upheld, even if the record could support alternative findings. Arkansas v. Oklahoma, 503 U.S. 91, 112-13 (1992); see also River Runners for Wilderness v. Martin, 593 F.3d 1064, 1070 (9th Cir. 2010) ("The agency's action need only be a reasonable, not the best or most reasonable, decision." (quotations and citation omitted)).

## ARGUMENT

### I.    DOI COMPLIED WITH FLPMA.

#### A.    FLPMA Grants The Secretary Broad Discretion To Make Large-Tract Withdrawals.

Although FLPMA limits the duration of withdrawals 5,000 acres or larger to 20 years and establishes a process DOI must follow in making the withdrawal, the Secretary has nearly limitless discretion to identify a withdrawal's purpose or scope.  The Secretary may make withdrawals "in order to maintain . . . public values in the area" or to "reserv[e] the area for a particular public purpose." 43 U.S.C. § 1702(j); accord 43 C.F.R. § 2300.0-5(h).  The law does not limit the "public values" that a withdrawal may "maintain," or the "particular public purpose" the Secretary may seek to achieve.  See 43 U.S.C. § 1714(c).

2

1    FLPMA thus "vested the executive with broad new withdrawal authority" for

2 large tracts, "subject to certain procedural requirements," while imposing "[f]ew

3 substantive restrictions."  David H. Getches, Managing the Public Lands: The Authority

4 of the Executive to Withdraw Lands, 22 Nat. Resources J. 279, 317-18 (1982) (emphasis

5 added) (Dkt. # 97.1 at 14-70).  While FLPMA limits the purposes for which small-tract or

6 emergency withdrawals may be made, withdrawals "5,000 acres and larger [] may be

7 made . . . for any purpose," as long as the Secretary reports to Congress.  Id. at 318-22

8 (emphasis added); compare 43 U.S.C. § 1714(c) (large withdrawals), with id. §§ 1714(d)-

9 (e) (small-tract and emergency withdrawals).  The D.C. Circuit put it similarly: "FLPMA

10 permits the Secretary to withdraw such a land tract for any purpose so long as the

11 Congress does not disapprove."  Mount Royal Joint Venture v. Kempthorne, 477 F.3d

12 745, 756 (D.C. Cir. 2007) (emphasis added) (finding FLPMA did not prevent Secretary

13 from making large-tract withdrawal of lands Congress proposed to protect).  The

14 Secretary must specify the withdrawal's purpose, but Congress placed few, if any,

15 meaningful limits on the purpose the Secretary may choose.[2]

16    NMA argues that internal policy guidance requires that "withdrawals shall be kept

17 to a minimum consistent with the demonstrated needs of the applicants."  NMA Br. 18-19

18 (emphasis removed).  FLPMA contains no such limitations, as detailed above, and the

19 manual NMA cites does not bind DOI.[3]  In any event, the Withdrawal's boundaries are

20 the minimum consistent with the Bureau of Land Management's (BLM) needs.  BLM

21 proposed the Withdrawal largely in response to proposed legislation – endorsed by

22 Arizona's then-governor, an impacted county, and Indian tribes – to permanently

23 _____

24 [2] FLPMA provides no support for NMA's suggestion that large withdrawals can only be justified by a showing that they will prevent "significant adverse impacts."  NMA Br. 16.

25 [3] For agency pronouncements to be binding, they must: (1) affect individual rights and obligations, not be general statements of policy or agency procedure; and (2) be

26 promulgated in accordance with the procedural requirements of the APA.  W. Radio Servs. Co. v. Espy, 79 F.3d 896, 901 (9th Cir. 1996) (Forest Service not bound by agency

27 manual).  The DOI manual NMA cites meets neither requirement.  On its face, it is labeled "[p]olicy," and there is no evidence the manual was promulgated pursuant to the

28 APA.  See 011 DM 1.2(A) (manual functions as "the primary source of information on . . . policy and general procedures") (Dkt. #171.1 at 45).

1   withdraw lands surrounding the Grand Canyon to protect them from a threatened surge in

2   uranium mining.  SOF ¶ 2.  The Withdrawal and the legislative proposal "cover[]

3   essentially the same area."  SOF ¶ 1.

    **B.   Ample Record Evidence Supports The Withdrawal's Resource**
         **Protection Purposes.**

        Throughout the public process leading to the Withdrawal, DOI identified the

    purpose of protecting a variety of "natural, cultural, and social resources" within a

    geographic area generally encompassing the Grand Canyon watershed.  SOF ¶¶ 2-3; see

    also DOI Br. 6, 23.  Based on the results of peer-reviewed scientific studies by the U.S.

    Geological Survey (USGS), an exhaustive NEPA analysis, and consultation with

    American Indian tribes, local governments, and other stakeholders, the Secretary

    exercised his broad discretion to withdraw the area to safeguard its unique natural,

    cultural, and social resources from potentially significant harm associated with

    unprecedented levels of mineral exploration and development.  SOF ¶ 12.

        The Secretary identified four rationales for the Withdrawal generally

    corresponding to four major categories of resources: (1) protection of water resources; (2)

    protection of American Indian tribal and cultural resources; (3) protection of wildlife and

    visual resources; and (4) maintenance of the economic benefits associated with continued

    mining.  Id.[4]  Under FLPMA's lenient standards for large-scale withdrawals and the

    APA, any one of these four rationales is sufficient to support the Withdrawal.  See Motor

    Vehicle Mfrs. Ass'n, 463 U.S. at 43 (agency need only "articulate a satisfactory

    explanation for its action" (emphasis added)); see also DOI Br. 7.

        Plaintiffs claim the Withdrawal is arbitrary and capricious because the record does

    not support any of the Secretary's rationales.  NMA Br. 17-23, Quaterra Br. 4-11, AEMA

    Br. 3-15.[5]  To reach that conclusion, Plaintiffs rely on their subjective belief that mineral

---

[4] The record support for each of these rationales is addressed infra at 5-10.

[5] NMA claims that protection of cultural resources, visual resources, and wildlife, and
continued mining were "pretextual" and "subsidiary rationales" addressed for the
first time in the ROD and inconsistent with the Withdrawal's allegedly sole purpose of
protecting water resources.  NMA Br. 19-20, 22; see also Quaterra Br. 16; AEMA Br. 5

exploration and development activities under existing laws and regulations have <u>no</u>
impacts.  <u>See</u> AEMA Br. 3-15; Quaterra Br. 6-7; NMA Br. 19.  This self-serving belief
ignores substantial record evidence of adverse impacts associated with mining activities
and the fact that DOI's exhaustive analysis <u>assumed</u> compliance with existing laws and
regulations, yet still found impacts to resources.  <u>See</u> SOF ¶¶ 10-11; DOI Br. 5-6, 33-35.

At most, Plaintiffs demonstrate that there is uncertainty and some difference of
opinion about potential impacts to certain resources – a point DOI forthrightly
acknowledges in the record.  That there is conflicting evidence, however, does <u>not</u> render
the Withdrawal arbitrary.[6]  Ultimately, Plaintiffs quarrel with the Secretary's policy
decision to slow the pace of mineral exploration and development in order to protect
other public values in the face of uncertainty.  As this Court recognized in an APA case
involving public lands, "[t]he question . . . , however, is not whether the [Withdrawal] is a
good idea.  The question is whether Plaintiffs have carried the considerable burden of
showing that the action . . . is arbitrary . . . ."  <u>Greer Coal., Inc. v. U.S. Forest Serv.</u>, No.
CV09-8239-PCT-DGC, 2011 WL 671750, at *3 (D. Ariz. Feb. 16, 2011), <u>aff'd</u>, 470 F.
App'x 630 (9th Cir. 2012).  Plaintiffs do not carry that considerable burden.

### 1.  Water resources

The Withdrawal area's water resources are critically important to American Indian
tribes, recreational users, wildlife, ecosystem health, and the downstream water needs of
26 million users in an otherwise arid region.  SOF ¶ 17.  The area's unique hydrogeology,
however, means that mined breccia pipes can act as conduits for migration of uranium-
laced water into the regional Redwall-Muav aquifer (R-aquifer) and the perched aquifers

n.5.  This argument has no record support.  <u>See</u> DOI Br. 6, 23; SOF ¶¶ 2-3; <u>infra</u> at 21-22.
[6] <u>See</u> <u>Marsh v. Or. Natural Res. Council</u>, 490 U.S. 360, 378 (1989) ("When specialists
express conflicting views, an agency must have discretion to rely on the reasonable opinions
of its own qualified experts even if, as an original matter, a court might find contrary views
more persuasive."); <u>River Runners for Wilderness</u>, 593 F.3d at 1070 (agency's decision
need only be "founded on a rational connection between the facts found and the choices
made" and "need only be a reasonable, not the best or most reasonable, decision"
(quotations and citations omitted)).

above – the ultimate sources of the area's springs, seeps, and streams that flow into the Colorado River.  SOF ¶¶ 17-29.

Based on peer-reviewed USGS science documenting a legacy of water contamination associated with past uranium mining,[7] existing regulatory requirements, and a series of conservative assumptions to account for scientific uncertainty about groundwater flow paths and other variables, the Final Environmental Impact Statement (FEIS) found varying risks of impacts to water quantity and quality from uranium mining and exploration under the different alternatives.  SOF ¶¶ 23-28.  For example, absent the Withdrawal, the FEIS found potentially "major" impacts to R-aquifer water quality at certain South Rim springs and to public drinking water wells at Tusayan.  SOF ¶ 26.[8] The Secretary determined that the risk of such serious impacts – however remote – was unacceptable.  SOF ¶¶ 12, 29; see also DOI Br. 24, 44-46.  That determination is entitled to substantial deference: courts are "to be most deferential when the agency is making predictions . . . at the frontiers of science" and has supported its conclusions "with studies that the agency, in its expertise, deems reliable."  Lands Council v. McNair, 537 F.3d 981, 993-94 (9th Cir. 2008) (en banc) (quotations and citations omitted), overruled on other grounds, Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008).

---

[7] For example, drainage from the abandoned Orphan Mine on the South Rim of the Grand Canyon has contaminated the R-aquifer, leading the National Park Service to warn hikers not to drink from nearby Horn Creek "unless death by thirst is the only other option."  SOF ¶¶ 20, 23.  USGS scientists warned that R-aquifer discharge associated with the Orphan Mine "represent[s] the upper end of potential contamination" from future mines.  SOF ¶ 20.

[8] In other categories, the FEIS found no or negligible impacts.  For example, any water quality impact to the Colorado River from contaminated R-aquifer springs would be negligible because of dilution by the large volume of water.  SOF ¶ 26 & n.4.  Nevertheless, as the Lower Colorado River Water Quality Partnership warned, "the effects of increased mining within the subject area may affect consumer confidence over the safety and reliability of the Colorado River for its use as a municipal drinking water supply."  SOF ¶ 22.  The FEIS also found that existing regulations adequately safeguard groundwater from adverse impacts associated with drilling operations, but not from other mining activities.  SOF ¶ 25.  Contrary to Quaterra's and AEMA's allegation, the FEIS did not conclude that existing regulations will protect groundwater from all mining activity.  See SOF ¶¶ 25-28; Quaterra Br. 7, 8; AEMA Br. 8; DOI Br. 43-44.

1    Relying on a handful of conflicting opinions regarding the risks to groundwater,

2    and the general scientific uncertainty about groundwater movement, Plaintiffs assert that

3    the Secretary's water-protection rationale is unsupported.  See Quaterra Br. 5; NMA Br.

4    17-21; AEMA Br. 6-9.[9]  As DOI correctly argues, conflicting opinions and scientific

5    uncertainty cannot demonstrate that the Secretary's water-protection rationale was

6    arbitrary.  See DOI Br. 24, 40-46, 49-51.[10]  Under such circumstances, the APA mandates

7    that the Secretary's decision – whichever side he chooses – is reasonable and must be

8    upheld.  See Marsh, 490 U.S. at 378.  In the face of uncertainty and a risk of potentially

9    major harm to the water resources of the Grand Canyon, the Secretary was entitled to take a

10   precautionary approach.  See SOF ¶ 19 (FEIS warning that, because travel time of

11   groundwater to springs and wells may be longer than the time that has passed since mining

12   began in the area, other instances of R-aquifer contamination may exist but not yet be

13   known); SOF ¶ 23 (USGS recommending that "[a] more thorough investigation . . . is

14   required to better understand groundwater flow paths, travel times, and contributions from

15   mining impacts.");[11] cf. New York v. Nuclear Regulatory Comm'n, 681 F.3d 471, 482

16

---

17   [9]  Some experts in the record opined that the FEIS was too conservative and
     underestimated potential impacts to groundwater.  SOF ¶ 26 (Professor of Hydrogeology
18   criticizing analysis for underestimating potential for groundwater contaminant transport).
     Quaterra is wrong that "[t]here was agreement that the geologic character of Hermit and
19   Supai formations prevent any contaminated water flowing to the R-aquifer." Quaterra
     Br. 5.  Agency experts repeatedly acknowledged that, despite generally low permeability
20   of rock layers around the R-aquifer, extensively fractured areas such as breccia pipes
     provide potential pathways for dissolved metals to reach the aquifer. SOF ¶ 18. Even
21   Dr. Wenrich, a scientist who opposed withdrawal and had a financial interest in uranium
     mining claims in the area, acknowledged that breccia pipes provide "excellent conduit[s]
22   for rain water and snow melt to enter the aquifer system."  SOF ¶¶ 18 & 26 n.4.
     [10] DOI also dispenses with Quaterra's arguments fly-specking the FEIS and USGS
23   Report.  DOI Br. 41-46; Quaterra Br. 4-9.  Quaterra claims, for example, that an email
     exchange discussing the uncertainty of groundwater flow paths in portions of the North
24   Parcel somehow invalidates the entire water-protection rationale.  See Quaterra Br. 6, 9;
     SOF ¶ 8.  DOI was under no obligation to exclude areas based on uncertain hydrology,
25   particularly where the Secretary determined that a cautious approach to prevent
     potentially significant harm was warranted.
26   [11] Skull Valley Band of Goshute Indians v. Davis does not, as NMA claims, stand for the
     proposition that "[t]he need for further research rationale is an admission that the FEIS
27   was inadequate."  NMA Br. 21.  Skull Valley stands for the limited proposition that DOI
     may not justify a decision on the basis that its own EIS is inadequate where the agency
     could easily have remedied the inadequacies.  728 F. Supp. 2d 1287, 1295-98 (D. Utah
28   2010).  DOI has made no such admission in this case, and the information that DOI seeks

1  (D.C. Cir. 2012) (for NEPA purposes, agency must balance probability of harm against

2  seriousness of the impact, should it occur).[12]

### 2.   American Indian tribal and cultural resources

4  The Secretary made the Withdrawal to protect not only water resources, but also

5  American Indian tribal and cultural resources.  SOF ¶¶ 12, 39.  Plaintiffs claim that this

6  rationale also lacks record support.  NMA Br. 22; AEMA Br. 9-10.  The substantial

7  evidence showing significant and irreparable harm to those resources is discussed below

8  in response to Plaintiffs' Establishment Clause arguments.  Infra at 24-30.

### 3.   Visual resources and wildlife

10  The record amply supports the Secretary's rationale that the Withdrawal protects

11  the area's visual resources and wildlife, contrary to AEMA's assertions.  AEMA Br. 10-

12  14.  The FEIS found a huge increase in exploration projects and hundreds of thousands of

13  additional ore hauling trips over dirt roads would greatly increase fugitive dust absent the

14  Withdrawal, which "could create a major cumulative effect to visual resources" and

15  obscure iconic vistas near the Grand Canyon.  SOF ¶ 40.

16  Second, the Secretary's conclusion that "wildlife may be impacted" by uranium

17  mining absent the Withdrawal is well supported.  SOF ¶ 41.  AEMA cherry-picks a few

18

19  to obtain over the 20-year Withdrawal does not now exist.  NMA's reliance on Natural
Resources Defense Council v. U.S. Forest Service (NRDC) fails for similar reasons: here

20  there is no admitted error that "fatally infected" DOI's analysis or "r[an] counter to the
evidence before the agency."  See NMA Br. 23-24; NRDC, 421 F.3d 797, 800 & n.2,

21  802, 807, 816 (9th Cir. 2005) (agency admitted significant error in projected market
demand).

22  [12] Indeed, given the Secretary's broad discretion to make large-scale withdrawals for
virtually any enumerated purpose, supra at 2-3, DOI was under no obligation to show any

23  risk of significant harm and was even free to make the Withdrawal to guard against what
NMA characterizes as "a perception of a need to protect against adverse impacts" to

24  water resources.  See NMA Br. 18; e.g., SOF ¶ 22 (downstream water users' concern
over public confidence in water supply, even if no actual risk of contamination).

25  Implicitly recognizing this point, NMA is forced to rely on a non-binding departmental
manual that conflicts with FLPMA by requiring withdrawals be "kept to a minimum

26  consistent with [] demonstrated needs."  NMA Br. 18-19; supra at 3.  And contrary to
NMA's characterization, the fact that agency staffers discussed how best to articulate the

27  water-protection rationale and corresponding scientific uncertainty in the ROD does not
somehow negate record evidence supporting that rationale.  See NMA Br. 18.  Rather, it

28  shows careful drafting and decision-making by DOI.

quotes from the FEIS to allege that bulldozing, drilling, mine construction and operation, and ore transport "would have no apparent impact on wildlife," AEMA Br. 13 (emphasis added).  But the record shows the Withdrawal will result in "fewer acres directly and indirectly affected, fewer roads and power lines built, [and] fewer haul trips generated," rendering the magnitude of the threat to wildlife "significantly less."  SOF ¶ 41.  Arizona Game and Fish Department staff expressed concern about mining impacts on wildlife habitat, and the state Game and Fish Commission endorsed the Withdrawal because of the harm uranium mining could pose to wildlife.  Id.  The U.S. Fish and Wildlife Service agreed with BLM that the Withdrawal would "remove potential threats" to imperiled wildlife.  Id.  Given abundant evidence supporting the Secretary's rationales, and the Secretary's broad withdrawal authority, AEMA's claims must fail.

### 4.    Uranium endowment and economic impacts

Finally, Plaintiffs dispute the Secretary's rationale that the Withdrawal will allow uranium mining – and its economic benefits – to continue but slow the pace of that development.  SOF ¶¶ 12, 47.  Quaterra claims that DOI understated the Withdrawal's economic impacts because DOI's estimates of the area's uranium endowment and the economically recoverable proportion of the endowment are flawed.  Quaterra Br. 9-11; see also NMA Br. 24; AEMA Br. 14-15 (related arguments).  The record proves otherwise.  The Trust adopts the portions of DOI's brief illustrating that its endowment calculation is scientifically sound and entitled to substantial deference.  DOI Br. 17-22.

Quaterra disputes DOI's estimate in the Reasonably Foreseeable Development Scenario that 15% of the endowment would be economical to mine.  Quaterra Br. 10-11.  The 15% estimate was part of a complex set of reasonable assumptions and calculations regarding the amount of economically recoverable uranium.  SOF ¶ 43.  The figure itself was derived from a 1988 USGS study and then adjusted upwards to account for lower ore grades that are likely to be mined in the future.  Id.  Quaterra provides no explanation why the estimate is flawed and instead simply argues that DOI should have adopted Quaterra's own inflated assumption that 50% of the endowment is economically

1    recoverable.  See Quaterra Br. 10-11.  DOI's reasonable calculations are entitled to "a

2    particularly deferential review of [the] agency's predictive judgments about areas that are

3    within [its] field of discretion and expertise."  See Lands Council, 537 F.3d at 993

4    (quotations and citations omitted).  DOI relied on the 15% figure and other conservative

5    assumptions to thoroughly analyze the economic impacts of the Withdrawal.  See SOF

6    ¶ 42-46.[13]

7        Plaintiffs' remaining arguments regarding economic impacts are equally meritless.

8    For example, the record clearly refutes Quaterra's claim that DOI failed to "project[]"

9    severance tax payments to the counties.  Quaterra Br. 11.  The FEIS projected severance

10   tax revenues under each alternative.  SOF ¶ 45.[14]

### C.  Plaintiffs' Allegations That DOI Failed To Properly Notify Congress Fail To State A Claim.

12       The Trust agrees with DOI that this Court lacks jurisdiction to hear Plaintiffs'

13   claim that the Withdrawal must be set aside because of alleged inadequacies in DOI's

14   report to Congress.  DOI Br. 22; NMA Br. 27-30; Quaterra Br. 10.  The Ninth Circuit has

15   long held that courts cannot "redress an injury based on an allegedly inadequate report

16   that an agency is obligated to file with Congress."  Renee v. Duncan, 686 F.3d 1002,

---

[13] If anything, the FEIS likely overstated the Withdrawal's economic impacts.  Although DOI went to great lengths to correct errors in its draft economic impacts analysis – even hiring a consultant to revise portions of the analysis – DOI did not address the findings of a report concluding that DOI inflated the economic benefits of mining.  SOF ¶ 46.

[14] Quaterra's claim that DOI failed to take a "hard look" at these impacts under NEPA fails for the same reason.  Quaterra Br. 11.  AEMA also argues that the Withdrawal "thwarts Congress's purposes in passing" other laws such as the Mining Law of 1872 and the Arizona Wilderness Act of 1984.  AEMA Br. 14-15.  AEMA ignores Congress's clear intent in passing FLPMA to provide the Secretary with broad discretion to make large-scale withdrawals of land from the operation of the Mining Law.  See supra at 2-3.  The Withdrawal is entirely consistent with the congressional scheme for determining which lands are open to mineral entry.  See id.; Hellon & Assocs., Inc. v. Phoenix Resort Corp., 958 F.2d 295, 297 (9th Cir. 1992) ("Congress must be presumed to have known of its former legislation and to have passed new laws in view of the provisions of the legislation already enacted." (quotations and citation omitted)).  The Arizona Wilderness Act placed no limits on that scheme.  See Pub. L. No. 98-406, 98 Stat. 1485 (1984).  Nor did that act say anything about how DOI was to manage lands not designated as wilderness.  See id.; SOF ¶ 15 (ROD explaining that Withdrawal is consistent with Arizona Wilderness Act).

1016 (9th Cir. 2012).  FLPMA itself (section 701(i)) provides that reports required by that law are not subject to judicial review.  43 U.S.C. § 1701(i) (statutory notes).

### D.   The Withdrawal Cannot Conflict With Federal Land Use Plans.

Plaintiffs argue that the Withdrawal violated FLPMA and NFMA because it allegedly conflicts with land management plans that Plaintiffs claim specify whether lands are open or closed to mining.  These arguments fail because those plans cannot open or close lands to mining.

FLPMA's withdrawal provisions permit only the Interior Secretary to withdraw lands from mineral entry.  43 U.S.C. § 1714(a); 43 C.F.R. § 2310.3-3.  For National Forest lands, the Secretary may evaluate withdrawing such lands only after the Forest Service's Chief or Secretary of Agriculture consents to submittal of a withdrawal application, and then may implement a withdrawal on Forest lands "only with the consent of" one of those officers.  See 43 U.S.C. § 1714(i); 43 C.F.R. § 2310.1-2(c)(3).

FLPMA provides separate authority requiring BLM to "develop, maintain, and . . . revise land use plans [also called resource management plans or RMPs] which provide by tracts or areas for the use of the public lands."  43 U.S.C. § 1712(a).  Under FLPMA, BLM "authorizations and actions . . . shall conform to the approved plan."  43 C.F.R. § 1610.5-3(a); accord 43 U.S.C. § 1732(a).  Mid-level BLM officials are responsible for adopting and implementing RMPs.  43 C.F.R. § 1610.1(a)-(b).

Congress made clear, however, that RMPs cannot make (or undo) mineral withdrawals.  "[P]ublic lands shall be removed from or restored to the operation of the Mining Law of 1872 . . . only by withdrawal action pursuant to [FLPMA] section 1714 . . . ."  43 U.S.C. § 1712(e)(3) (emphasis added); see also DOI Br. 24-25 n.11.  Congress decided to open public lands generally to mining.  See 30 U.S.C. § 22 (1872 mining law mandating that public lands containing valuable mineral deposits "shall be free and open to exploration and purchase").  Decisions to close public lands to mineral entry can be made only by act of Congress or by express authority delegated by

11

1   Congress, such as FLPMA's withdrawal authority or the Antiquities Act (which permits

2   the President to withdraw lands).  16 U.S.C. §§ 431-433.[15]

### 1.       The Withdrawal did not violate BLM's land use plan.

4       DOI followed proper procedures in approving the Withdrawal.  BLM submitted a

5   withdrawal application to the Interior Secretary; the Forest Service's Chief consented to

6   the application; and following environmental analysis, and with Forest Service consent,

7   the Secretary issued a decision acknowledging that the relevant RMP for the Arizona

8   Strip was modified through plan maintenance "to update acreages open or withdrawn to

9   mineral entry."  SOF ¶¶ 2, 12-14.

10      NMA argues that the Withdrawal "conflict[s] with" the applicable RMP which

11  allegedly "provides that" certain areas "should remain open to mineral development," and

12  "allows over 1.5 million acres to be open to mineral development."  NMA Br. 25; see

13  also Quaterra Br. 12-13 (making similar argument).  NMA misunderstands the law.

14  Pursuant to FLPMA, the RMP cannot "open" or "allow" land to be open to mineral entry.

15  43 U.S.C. § 1712(e)(3).  The Mining Law of 1872 did that.  While FLPMA's planning

16  provisions dictate how BLM can manage impacts from mining activities, the RMP can

17  only reflect what Congress, the President, or the Secretary has done to open or close

18  lands.  Here, the Secretary used his withdrawal authority to close lands to mineral entry.

19  There thus can be no "conflict" between the Withdrawal and the RMP.[16]

20      None of the cases Plaintiffs cite helps their argument.  In Klamath Siskyou

21  Wildlands Center v. Boody, 468 F.3d 549, 556 (9th Cir. 2006), the Ninth Circuit held that

22  where BLM "changed the terms and conditions" of the RMP in a way that could destroy

23  wildlife and habitat in a manner not previously contemplated, BLM must amend its RMP

---

24  [15] BLM may use the RMP process to recommend areas for withdrawal.  See Mount Royal

25  Joint Venture, 477 F.3d at 752.  But FLPMA does not require that BLM use the RMP
    process when submitting "applications" for withdrawals.  See 43 U.S.C. § 1714(b); 43

26  C.F.R. §§ 2310.1-2310.1-4 (setting out application procedures).  The decision to
    withdraw remains the Secretary's alone.

27  [16] Even if this Court concludes that the Withdrawal must be consistent with BLM's RMP,
    it is consistent.  See DOI Br. 24-25 n.11; SOF ¶ 14 (applicable RMP states lands open to

28  mineral entry except where withdrawn).

1   rather than approve the change through plan "maintenance."  Here, the Withdrawal did

2   not change the RMP because RMPs cannot make or modify withdrawals.  Similarly,

3   Quaterra cites <u>Cloud Foundation v. U.S. Bureau of Land Management</u>, 802 F. Supp. 2d

4   1192, 1206-07 (D. Nev. 2011), for the proposition that "changes to resource allocations

5   in an RMP must be developed through the official amendment process."  Quaterra Br. 12.

6   But an RMP cannot "allocate" lands to mineral entry.[17]

7               **2.      The Withdrawal did not violate Forest Service planning rules.**

8               AEMA contends the Chief's consent to the Withdrawal violates NFMA and the

9   1988 Kaibab Forest Plan because the Withdrawal is inconsistent with that plan, which

10  allegedly "provides" that certain forest lands "are open for location and entry."  AEMA

11  Br. 16-21.  This argument fails for the same reason as the argument that the Withdrawal

12  violated BLM's consistency provision: forest plans cannot by law open or close lands to

13  mineral entry.  Congress opened national forests in the 1872 Mining Law; a decision to

14  close such lands through withdrawal is one reserved to the Secretary, with the consent of

15  the Chief or Agriculture Secretary, or to Congress or the President.  A Forest Plan, like an

16  RMP, can only reflect the fact that some lands are open and others closed.  The Secretary

17  correctly concluded no plan amendment was required.  SOF ¶ 13.[18]

18              AEMA further argues that the Forest Service did not adequately justify its consent

19  to the Withdrawal, alleging that the Chief's consent letter contains only two sentences of

20  explanation.  AEMA Br. 21-22.  But FLPMA does not supply a standard against which

21  the Chief's consent must be weighed.  <u>See</u> 43 U.S.C. § 1714(i); 43 C.F.R. § 2310.1-

22  ─────────────────────

[17] AEMA cites a statement in the Federal Register that the Arizona Strip RMP and
23  Kaibab Forest Plan "would be amended to reflect the intent of the withdrawal."  AEMA
    Br. 21 n.14.  This statement does not and cannot change the law, which requires no such
24  amendment.  To the extent this statement means anything, it is properly read to mean
    BLM and the Forest Service intended to make the ministerial modification of updating
25  the number of acres open or closed to mineral entry in their plans.

[18] AEMA cites several cases holding that Forest Service actions that approve "use and
26  occupancy" of National Forest lands must generally comply with the Forest Plan.  <u>See</u>
    AEMA Br. 17-19.  None of these cases involve mineral withdrawals, which a Forest Plan
27  cannot approve or modify.  Further, a mineral withdrawal is not an "instrument[] <u>for</u> the
    use and occupancy" of Forest lands because it withholds permission for such use and
28  occupancy.  <u>See</u> 16 U.S.C. § 1604(i) (emphasis added); DOI Br. 55 n.38.

2(c)(3).  And while under the APA the consent must be upheld "on the basis articulated by the agency," Motor Vehicle Mfrs. Ass'n, 463 U.S. at 50, the Forest Service had ample basis for its decision, articulated not only in the Chief's letter (which provides basis enough), but also in the FEIS, in whose preparation the Service was deeply involved. SOF ¶ 5.

In attempting to manufacture a standard which the Chief's consent must meet, AEMA asserts the Chief "fail[ed] to consider the Forest Service's multiple use mandate." AEMA Br. 22.  But that mandate, standing alone, "breathes discretion at every pore," and thus "can hardly be considered [to set] concrete limits upon agency discretion."  Perkins v. Bergland, 608 F.2d 803, 806 (9th Cir. 1979) (quotations and citation omitted); see also DOI Br. 22.[19]  The multiple use concept encourages agencies to consider and balance different uses.  But because "not all uses are compatible," it does not require that every use occur on each acre of public land.  See Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 58 (2004).  Here, the Forest Service had ample evidence to conclude that limiting a single use (hardrock mining) would benefit other values.  The one court to review the identical claim – that a mineral withdrawal violated the multiple use mandate – found such balancing sufficient.  Mount Royal Joint Venture, 477 F.3d at 756-57.[20]

---

[19] See also Cal. Forestry Ass'n v. Bosworth, No. 2:05-CV-00905-MCE-GGH, 2008 WL 4370074, at *4 (E.D. Cal. Sept. 24, 2008) (multiple use mandate "imposes few, if any, judicially reviewable constraints on the Forest Service's exercise of its discretion").

[20] While DOI is correct that forest plans can neither make nor undo withdrawals (which is enough to defeat AEMA's claim), this Court should not conclude that the Forest Service lacks authority to regulate mining impacts under NFMA.  See DOI Br. 55-56.  The Forest Service, through NFMA, may regulate such impacts.  See Cal. Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 585 (1987) ("under [NFMA], the Forest Service . . . is responsible for the management of the surface impacts of mining on federal forest lands" (citations omitted)); Rock Creek Alliance v. U.S. Forest Serv., 703 F. Supp. 2d 1152, 1184 (D. Mont. 2010) (Forest Service must ensure compliance with NFMA and forest plans when approving mining plans).

### E.   DOI Complied With FLPMA And NEPA Requirements For Disclosing Conflicts With Local Land Use Plans.

Quaterra alleges that DOI failed to comply with FLPMA's land use planning provisions regarding consultation with local governments and NEPA's mandates concerning consistency with local plans.  Quaterra Br. 11-15.  These claims lack merit.

FLPMA's provision upon which Quaterra relies, 43 U.S.C. § 1712(c)(9), applies to land use planning and not to mineral withdrawals.  Because the Withdrawal was not a plan decision, FLPMA's provisions concerning RMPs do not control, and so DOI need not have complied with them.  See DOI Br. 24-25 n.11.

Further, DOI correctly explains that EISs need only "discuss any inconsistency of a proposed action with any approved State or local plan and laws . . . [and] describe the extent to which the agency would reconcile its proposed action with the plan or law."  40 C.F.R. § 1506.2(d) (emphasis added); DOI Br. 53.  The FEIS does so, reconciling the Withdrawal by favoring one county's support for the action.  DOI Br. 51-53; SOF ¶ 4 (Coconino County's support for withdrawal).  DOI thus fully complied with NEPA.

No evidence Quaterra cites supports a contrary conclusion.  Quaterra points to a letter from several counties discussing the importance of uranium mining to local economies.  Quaterra Br. 14 (citing AR44372).  But that letter does not describe local law, regulation, or policy with which the Withdrawal conflicts; it merely opposes the Withdrawal.  See SOF ¶ 4.  Further, Quaterra alleges BLM staffer Scott Florence "acknowledged . . . that the FEIS did not describe or attempt to resolve any inconsistencies" between the Withdrawal and local policy.  Quaterra Br. 14-15; see also DOI Br. 53 n.36.  But Mr. Florence's notes merely paraphrase the counties' allegations.  See SOF ¶ 4.

Quaterra grumbles that county organizations were denied "meaningful participation in the development of the alternatives" because they were not invited to several meetings.  Quaterra Br. 13-14.  But NEPA's mandate of "meaningful public

1    participation" does not require that federal agencies invite local governments to every

2    meeting of agency staff developing an EIS.  See DOI Br. 52 n.34.[21]

3    **II.    DOI DID NOT VIOLATE NEPA.**

4        **A.    The FEIS Properly Evaluated Mitigation Measures For Alternative A.**

5        NMA alleges that the FEIS failed to properly address mitigation measures as part

6    of Alternative A, the "no action" alternative.  NMA Br. 3-5.  NMA's arguments fail.[22]

7    No caselaw supports NMA's novel suggestion that agencies must analyze and assess the

8    effectiveness of mitigation measures for the "no action" alternative.  The purpose of that

9    alternative is to "allow[] policymakers and the public to compare the environmental

10   consequences of the status quo to the consequences of the proposed action."  Ctr. for

11   Biological Diversity v. U.S. Dep't of Interior, 623 F.3d 633, 642 (9th Cir. 2010)

12   (emphasis added); accord Wilderness Soc'y v. U.S. Forest Serv., 850 F. Supp. 2d 1144,

13   1159 (D. Idaho 2012) ("no action" is the "doing nothing" alternative); SOF ¶ 6 (FEIS

14   describing purpose of "no action" alternative).[23]  Thus, the agency need not dream up

15   new mitigation to change the status quo as part of the "no action" alternative.  All the

16   cases NMA relies on address whether the agency properly analyzed mitigating the

17   impacts of action alternatives.[24]  None hold that agencies must develop mitigation

18   measures to reduce the impact of the "no action" alternative.

19   ───────────────────

20   [21] Quaterra further claims that "BLM did not . . . make 'every practicable effort' to
     resolve [] inconsistencies" between county resolutions and the Withdrawal.  Quaterra Br.

21   14.  But neither of the NEPA nor FLPMA provisions Quaterra cites requires DOI to make
     "every practicable effort" to resolve such inconsistencies.

22   [22] The Trust adopts DOI's arguments on this issue.  DOI Br. 33-36.

23   [23] See also Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin., 126 F.3d
     1158, 1188 (9th Cir. 1997); Council on Environmental Quality (CEQ), 40 Most Asked

24   Questions about NEPA, Question 3A, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981)
     (explaining that no action alternative addresses either "continuing with the present course
     of action until that action is changed," or "the proposed activity . . . not tak[ing] place.").

25   [24] NMA cites a statement in Northern Alaska Environmental Center v. Kempthorne, 457

26   F.3d 969, 979 (9th Cir. 2006), that the FEIS there provided mitigation (in the form of
     lease stipulations and "Required Operating Procedures") "for each alternative."  NMA

27   Br. 5 n.21.  This statement makes no sense applied to the "no action" alternative.  The
     action at issue in that case was a decision whether to lease land for oil and gas.  457 F.3d
     at 973.  It is hard to imagine what lease stipulations or operating procedures could be

28   applied to, or minimize impacts of, non-existent leases under the "no action" alternative.

1   In any case, the FEIS did address existing mitigation measures, explaining that

2   under "no action," "[t]he mitigation of potential effects from exploration or development

3   would continue under applicable surface managing agency regulations."  SOF ¶ 6.  The

4   FEIS identified numerous ways in which existing laws, practices, and land use plan

5   requirements will mitigate effects under each alternative, including "no action."  See SOF

6   ¶ 10; DOI Br. 34-35.  And because each alternative, including that of "no action,"

7   assumed mitigation measures, compliance, and design features are built into mining

8   exploration and development, the FEIS's discussion of impacts necessarily addressed

9   whether those measures would eliminate impacts.  See SOF ¶ 11; DOI Br. 35.  That

10  meets NEPA's requirements.  See Envtl. Prot. Info. Ctr. v. U.S. Forest Serv., 451 F.3d

11  1005, 1015 (9th Cir. 2006) (mitigation analysis sufficient where "Project incorporates

12  mitigation measures throughout the plan of action, so that the effects are analyzed with

13  those measures in place").  The FEIS did more than offer a "perfunctory description" of

14  mitigation measures found insufficient in Neighbors of Cuddy Mountain v. U.S. Forest

15  Service, 137 F.3d 1372, 1380 (9th Cir. 1998).[25]

16         **B.     The FEIS Evaluated A Range Of Reasonable Alternatives.**

17         The FEIS evaluated in detail four alternatives: Alternative A, the "no action" (no

18  withdrawal) alternative; Alternative B, the proposed (and adopted) million-acre, 20-year

19  withdrawal; Alternative C, to withdraw about 650,000 acres for 20 years, protecting the

20  largest area "with concentrations of cultural, hydrologic, recreational, visual, and

21  biological resources;" and Alternative D, to withdraw nearly 300,000 acres for 20 years

22  to protect a "high concentration of cultural, hydrologic, recreational, visual, and

23  biological resources."  SOF ¶¶ 6-7.  NMA argues DOI violated NEPA by not analyzing at

24  least seven total alternatives, including: an alternative of withdrawing 80% of the land

25  [25] NMA attacks the FEIS's commitment to develop best management practices in the
    future for "particular mine proposal[s]" that may be submitted later.  NMA Br. 4.  But no
26  mine proposals were at issue in the Withdrawal.  Further, the Ninth Circuit upheld a
    similar BLM mitigation analysis in an EIS where the agency "represented that additional
27  protective measures may be developed as part of NEPA evaluations of subsequent permit
    authorizations, including [mineral] exploration and development plans."  N. Alaska
28  Envtl. Ctr., 457 F.3d at 979.

proposed; a modified "no-action" alternative; and a short-term withdrawal.  NMA Br. 5-9.  NMA's claims lack merit.

### 1.    DOI need not have analyzed an 800,000-acre withdrawal.

DOI need not have analyzed an 800,000-acre withdrawal alternative.  NMA Br. 6-7.  DOI analyzed in detail alternatives reflecting the ends of the spectrum – withdrawing one million acres as Congress proposed, or nothing – and two mid-range alternatives.  By varying the amount of land to be withdrawn, these alternatives permitted the public and the Secretary to understand the trade-offs between uranium mining and natural and cultural resource protection.  See SOF ¶ 7.  Where an agency considers both ends of the spectrum and alternatives in between, an additional mid-range alternative is not necessary, particularly where plaintiffs fail to "explain why another alternative was necessary to foster informed decisionmaking and public participation."  Mont. Wilderness Ass'n v. Connell, 725 F.3d 988, 1004-05 (9th Cir. 2013); see also DOI Br. 38.  Here, NMA does not explain why an alternative that would withdraw 800,000 acres – between the amount to be withdrawn by alternatives B and C – was necessary to foster informed public participation.[26]

Further, the FEIS already analyzed an alternative (Alternative C) that would have cut 200,000 acres from the northeast and west portions of the proposed North Parcel withdrawal, the same amount and general location that NMA suggests DOI should have considered removing.  See NMA Br. 6; SOF ¶ 8.  Because the FEIS generally disclosed impacts by each of the three parcels, DOI already had before it the information it needed

---

[26] Neither of the two record documents NMA cites aids its cause.  One document is an email conversation between mid-level BLM employees (drafted after the FEIS was complete) implying that DOI should consider withdrawing 800,000 acres because 200,000 acres in the North Parcel had low resource value and little likelihood of drainage into the Grand Canyon.  See NMA Br. 6 (citing AR81803-04); see also supra at 7 n.10.  Except in very general terms, the BLM staffers did not identify the location of the 200,000 acres that DOI should have evaluated removing, making it difficult to understand this supposed alternative.  See SOF ¶ 8 (BLM employee email suggesting removal of 200,000 acres "on the northeast and west portions of the north parcel," but providing no other location information).  The other document suggested that DOI could review more alternatives without defining what those alternatives might be.  See NMA Br. 6 (citing AR3254); SOF ¶ 9.

to understand the impacts of NMA's 800,000-acre alternative by combining the impacts to the North Parcel under Alternative C, and the impacts of Alternative B for the East and South parcels.  No consideration of a free-standing 800,000-acre alternative was required.  See Great Old Broads for Wilderness v. Kimbell, 709 F.3d 836, 854 (9th Cir. 2013) (no need for supplemental EIS where the selected alternative was "primarily made of elements from [a]lternatives . . . that were analyzed – as elements – in the final EIS").

**2.      DOI properly dismissed detailed analysis of "Alternative E."**

DOI properly reviewed, briefly addressed, and dismissed analyzing in detail "Alternative E."  See SOF ¶ 9.  Like Alternative A, that alternative would have withdrawn zero acres, but would have required land management agencies to adopt "new locatable mineral exploration and development requirements" including "changing [agency] regulations."  Id.  NMA claims DOI's basis for dismissing this alternative from detailed discussion was erroneous because some internal staff discussions initially found such an approach attractive and reasonable.  NMA Br. 7-9.

But agencies need not "consider an alternative whose effect cannot be reasonably ascertained, and whose implementation is deemed remote and speculative."  Life of the Land v. Brinegar, 485 F.2d 460, 472 (9th Cir. 1973); see also City of Angoon v. Hodel, 803 F.2d 1016, 1021-22 (9th Cir. 1986) (alternative premised on Congressional action "must be ascertainable and reasonably within reach").  Nor must an agency consider alternatives that would not achieve the project's purpose.  Laguna Greenbelt, Inc. v. U.S. Dep't of Transp., 42 F.3d 517, 523-525 (9th Cir. 1994).

DOI properly dismissed Alternative E from detailed consideration because it was speculative and would not achieve the Withdrawal's purpose, which, in the face of unprecedented levels of claim-staking, "is to protect the natural, cultural, and social resources in the Grand Canyon watershed from the possible adverse effects of the reasonably foreseeable locatable mineral exploration and development that could occur."  SOF ¶ 3.  DOI concluded that even if new regulations were proposed under Alternative E, the agency could not foresee when, if ever, regulations might be completed, or the

19

content of completed regulations.  SOF ¶ 9.  Harm from staking, exploration, and mining would continue unabated for years under Alternative E until and unless regulations were proposed, comment was taken, draft and final regulations were considered, and the regulations went into effect, assuming a court did not enjoin their implementation or a later administration did not terminate the regulatory process.  See also DOI Br. 39-40.[27]  Until regulations could be adopted, miners could locate claims, implement discovery plans, and construct and operate new mines.  Waiting on an uncertain process of indefinite duration did not meet the Withdrawal's purpose and provided no additional, foreseeable protection over the "no action" alternative.[28]

> **3.    DOI need not have considered a shorter-term withdrawal.**

DOI properly explained that it need not have analyzed in detail the alternative of a shorter-term, 10-year withdrawal because it would not have met the purpose and need of long-term protection of the area.  See DOI Br. 39; SOF ¶ 9; NMA Br. 5-6.  DOI's decision was particularly reasonable because the Withdrawal was proposed in part in response to legislation that sought the million acres' permanent withdrawal.  See SOF ¶¶ 1-2.[29]

---

[27] The last overhaul of DOI's hardrock mining regulations took a dozen years to resolve. It began in 1991; a final rule was not adopted until November 2000.  65 Fed. Reg. 69,998, 70,007 (Nov. 21, 2000).  Within weeks, a new administration proposed amending the rules again, which took another seven months; that decision spawned additional years of litigation.  Mineral Policy Ctr. v. Norton, 292 F. Supp. 2d 30, 34-35 (D.D.C. 2003).

[28] See Natural Res. Def. Council, Inc. v. Morton, 458 F.2d 827 (D.C. Cir. 1972).  There, the D.C. Circuit upheld an agency decision not to examine alternatives as too "remote and speculative" because they required "basic changes . . . in . . . policies," "making them available, if at all, only after protracted debate and litigation not meaningfully compatible with the time-frame of the needs to which the underlying proposal is addressed."  Id. at 838.  Here, similarly, an alternative requiring a years-long process to change agency policies did not meet the Withdrawal's purpose of preventing mining damage.

[29] The one case NMA cites to support its argument is inapposite.  See Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv., 373 F. Supp. 2d 1069, 1088-89 (E.D. Cal. 2004).  There, the court found the Forest Service failed to examine a range of reasonable alternatives where it analyzed only the "no action" alternative, an action alternative, and one other alternative that was "nearly identical" to the action alternative.  That is not the case here, where the three action alternatives varied in the area protected and the amount of mining that would likely occur.

1

### C.     The Purpose And Need For The Withdrawal Did Not Change.

2        NMA alleges the Withdrawal was adopted not because it protected against adverse

3   impacts, but because, at the last minute, DOI found a new purpose: the "need to fully

4   understand the impacts of uranium mining on water quality and other resources."  NMA

5   Br. 9-10 (emphasis removed).  NMA's claims ignore the facts and law.

6        DOI never wavered in articulating the Withdrawal's purpose.  That stated purpose

7   – to protect the Grand Canyon watershed from potential impacts of hardrock mining

8   exploration and development – remained consistent from the time the proposal was

9   announced in 2009.  SOF ¶¶ 2-3; DOI Br. 39 n.21.  Ignoring this evidence, NMA alleges

10  that a passage in the ROD indicating that the Withdrawal would, among other things,

11  allow land managers to gather more data on uranium mining's impacts somehow altered

12  the Withdrawal's purpose and required DOI to evaluate a broader range of alternatives.

13  NMA Br. 10.  But the Withdrawal's expressly stated purpose is the same in the ROD as

14  in the draft and final EIS.  SOF ¶ 3.  While the ROD stated that the Withdrawal would

15  allow additional data gathering, it also disclosed numerous ways the Withdrawal would

16  meet its stated purpose of protecting the values of the Grand Canyon watershed.  SOF

17  ¶ 12.  The mere fact that an additional benefit included data gathering did not transform

18  the purpose against which the reasonableness of alternatives is measured.[30]

19        Neither of the cases NMA cites compels consideration of additional alternatives

20  that go beyond the Withdrawal's express purpose.  See NMA Br. 9.  In Sierra Forest

21  Legacy v. Rey, 577 F.3d 1015, 1021-22 (9th Cir. 2009), the court found that an agency

22  that shaped its alternatives in light of a previous EIS that articulated a demonstrably

23  different purpose and need than the challenged action likely failed to consider a range of

24  reasonable alternatives.  Here, DOI hewed to the same purpose and need from the start.

25  In NRDC, 421 F.3d at 811-14, the court found the agency failed to consider a range of

26  _____

27  [30] NMA also alleges draft testimony of the BLM director shows the Withdrawal's
    purpose was modified to include data gathering.  NMA Br. 10.  NMA conveniently omits
    the fact that the director's final testimony did not contain the language NMA avers is
28  indicative of a changed purpose.  See SOF ¶ 3.

1   reasonable alternatives where admittedly flawed economic data formed the linchpin of

2   the entire analysis.  Here, NMA's unfounded allegations of a change in purpose do not

3   resemble the flawed factual basis for the EIS in NRDC.

4   **D.     The FEIS Properly Identified Data Gaps.**

5          NMA complains that DOI failed to provide information necessary to a reasoned

6   choice among alternatives concerning "the size of the uranium endowment, the

7   [financial] value of that endowment, and the impacts of uranium mining," particularly on

8   groundwater.  NMA Br. 12; see also Quaterra Br. 7 (making similar arguments).  NMA's

9   allegations lack merit.

10         Agencies must "make clear" in an EIS when "there is incomplete or unavailable

11  information."  40 C.F.R. § 1502.22.  "If the incomplete information relevant to

12  reasonably foreseeable significant adverse impacts is essential to a reasoned choice

13  among alternatives, and the overall costs of obtaining it are not exorbitant," the EIS "shall

14  include the information."  Id. § 1502.22(a).  If the agency has determined the information

15  is essential to a reasoned choice and the cost is too exorbitant or the means to obtain the

16  information "are not known," it must make additional findings.  See id. § 1502.22(b).

17         DOI here complied with NEPA's mandates.  First, DOI forthrightly disclosed that

18  specific types of information were not available or difficult to obtain, and explained why

19  it reasonably relied on existing information.  See SOF ¶¶ 16, 30.[31]

20         Second, as DOI explains, the Secretary reasonably concluded that the unavailable

21  information was not "essential to a reasoned choice" among alternatives, thereby

22  completing its duties under 40 C.F.R. § 1502.22.  DOI Br. 47-49; SOF ¶ 16.  DOI

23  prepared peer-reviewed studies to understand potential impacts to water (and other)

24  resources and modeled the likely impacts of mining on the economy and other resources,

25  hiring a consultant to improve that analysis after the draft EIS's publication.  See supra at

---

26  [31] See also Conservation Nw. v. Rey, 674 F. Supp. 2d 1232, 1252 (W.D. Wash. 2009)

27  (agency acknowledgement "of some discrepancies or holes in the data provided
    evidences a conservative approach that should be commended under NEPA, not

28  criticized").

6-10; SOF ¶¶ 12, 23-28, 42-46.  DOI was not shooting in the dark.  It gathered available data, refined it, developed new data, and presented it to the public.  In the face of some uncertainty, DOI chose a conservative course to protect iconic landscapes, wildlife, and cultural resources while allowing some mining to continue without foreclosing future mining upon the Withdrawal's expiration.

NMA alleges that DOI's statement that unavailable information concerning water quality and quantity was "not essential to making a reasoned choice among alternatives" came too late in the NEPA process.  NMA Br. 15-16.  But the case upon which NMA relies is inapplicable.  The district court in Rock Creek Alliance held that an agency could not introduce new data four years after its ROD, which admitted that the data in the EIS was inadequate.  703 F. Supp. 2d at 1180-81.  Here, in contrast, DOI concluded that unavailable data was not essential as part of the agency's decision, not long after the fact.  See also Idaho Sporting Cong., Inc. v. Alexander, 222 F.3d 562, 568 (9th Cir. 2000) (explaining that NEPA not violated where agency "incorporated [necessary analysis] into its final decision"); Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci, 857 F.2d 505, 511-12 (9th Cir. 1988).[32]

NMA also alleges that the ROD's determination concerning unavailable information is insufficient because it applies only to a "minor subset" of data DOI "admits was unavailable."  NMA Br. 16.  NMA ignores DOI's full explanation.  DOI stated that additional information was not "essential to making a reasoned choice" because: (1) as explained in the ROD's "preceding paragraph," the USGS Report identified incomplete data broadly for water resources while synthesizing and explaining significant volumes of existing data upon which a reasoned decision could be made; and (2) the FEIS "used reasonable conservative assumptions to estimate impacts" to water

---

[32] NMA alleges that DOI's analysis "overemphasiz[ed] highly speculative harms" and was "based on pure conjecture," thus somehow running afoul of CEQ's decision to repeal regulations requiring an analysis of "worst case" scenarios.  NMA Br. 15.  DOI's prudent analysis of water resources, based on peer-reviewed science, is far from "conjecture."  Further, NMA ignores CEQ's definition that "reasonably foreseeable" impacts includes low probability, catastrophic events.  40 C.F.R. § 1502.22(b).

1   resources and address unknowns.  SOF ¶ 16; see also DOI Br. 48-49.  DOI's explanation

2   is sufficient to comply with NEPA.

3   **III.  THE SECRETARY PROPERLY EXERCISED DISCRETION TO PROTECT AMERICAN INDIAN AND CULTURAL RESOURCES.**

4       The Secretary adopted the Withdrawal in part because "mining within the sacred

5   and traditional places of tribal peoples may degrade the values of those lands to the tribes

6   that use them," and impacts to tribal resources likely could not be mitigated.  SOF ¶¶ 12,

7   39 (explaining that seven tribes "uniformly believe that continued uranium mining will

8   result in the loss of their functional use of the [] natural resources" of their "traditional

9   homeland and use area").  The Secretary's decision to protect the tribes' cultural and

10  religious values and uses of their aboriginal homelands from the devastating impacts of

11  uranium mining fell squarely within his authority.

12      **A.  The Lands And Resources Of The Grand Canyon Region Sustain American Indian Tribes' Cultural And Spiritual Identities.**

13

14      The aboriginal homelands of the Havasupai Tribe and numerous other American

15  Indian tribes in the region encompass what are now the public lands subject to the

16  Withdrawal.  SOF ¶ 31.  The physical integrity of those lands and their rich natural

17  resources sustain the tribes' cultural and spiritual identities.  SOF ¶¶ 31-32.  For example,

18  the Grand Canyon and its waters serve as the locus of human origin for the Havasupai,

19  and, as a result, their people cannot be separated from it.  SOF ¶ 33.  As one Havasupai

20  official put it, "if our water were polluted, we could not relocate to . . . someplace else

21  and still survive as the Havasupai Tribe.  We are the Grand Canyon."  Id.

22      The larger cultural landscape of the Grand Canyon region is comprised of

23  numerous smaller areas, discrete sites, and specific resources of cultural and religious

24  significance, including subsistence areas used for hunting and gathering, sacred springs

25  and water sources, archaeological sites, and ceremonial locations.  SOF ¶¶ 34-38.[33]  As

26  DOI recognized, road construction, drilling, truck traffic, and other mineral exploration

27  _____
    [33] The federal government has identified a small percentage of those places as

28  "Traditional Cultural Properties" (TCPs), see 36 C.F.R. § 60.4, but most enjoy no formal designation.  SOF ¶ 35.

1   and development activities despoil this cultural landscape and fundamentally disturb the

2   tribes' cultural and spiritual identities.  See SOF ¶¶ 36, 38-39.

3        **B.**     **Protection Of American Indian Resources Falls Squarely Within The Secretary's Authority.**

4

5        The Secretary's broad discretion to make large-scale withdrawals undoubtedly

6   encompasses protection of American Indian resources.  See supra at 2-3; see also 43

7   U.S.C. § 1701(a)(8) (FLPMA requires that the public lands be managed "in a manner that

8   will protect the quality of . . . historical . . . and archaeological values").  In addition,

9   federal land management agencies generally have broad authority to protect cultural

10  landscapes and sacred sites and accommodate tribes' traditional values and uses, in

11  furtherance of American Indian religious freedom and tribal self-determination.  See Bear

12  Lodge Multiple Use Ass'n v. Babbitt, 175 F.3d 814, 817-18 & nn.4-6 (10th Cir. 1999).[34]

13       For example, the American Indian Religious Freedom Act of 1978 (AIRFA)

14  declares that "it shall be the federal policy of the United States to protect and preserve for

15  American Indians their inherent right of freedom to believe, express, and exercise the[ir]

16  traditional religions . . . including but not limited to access to sites."  42 U.S.C. § 1996.

17  The National Historic Preservation Act (NHPA) requires federal agencies to consult with

18  tribes whenever their actions affect historic properties of cultural or religious

19  significance.  16 U.S.C. § 470a(d)(6)(A)-(B).  And, in recognition of the site-specific

20  nature of Indian religious practices, an executive order requires agencies to

21  "accommodate access to and ceremonial use of Indian sacred sites by Indian religious

22  practitioners" and "avoid adversely affecting the physical integrity of . . . sacred sites."

23  Exec. Order No. 13,007, § 1, 61 Fed. Reg. 26,771 (May 24, 1996).[35]

24       Federal law and policy thus authorize – and in some cases require – protection of

25  tribes' cultural and religious values and practices.  See, e.g., Access Fund v. U.S. Dep't

26  ────────────────────
[34] See also Kristen A. Carpenter, Limiting Principles and Empowering Practices in American Indian Religious Freedoms, 45 Conn. L. Rev. 387, 399-411, 436-37 (2012).

27  [35] The executive order makes clear that Indian tribes – not the federal government – are responsible for identifying sacred sites "by virtue of [their] established religious

28  significance to, or ceremonial use by, an Indian religion."  Id. § 1(b)(iii).

1    of Agric., 499 F.3d 1036, 1042-46 (9th Cir. 2007) (upholding ban on rock climbing to

2    protect tribe's religious practices and beliefs); Cholla Ready Mix, Inc. v. Civish, 382 F.3d

3    969, 975-77 (9th Cir. 2004) (upholding policy against using materials from an area of

4    religious, cultural, and historical significance to tribes in state construction projects);

5    Mount Royal Joint Venture, 477 F.3d at 750, 758 (upholding FLPMA withdrawal in part

6    to protect "areas of traditional religious importance to Native Americans").[36]  More

7    generally, "[t]he Supreme Court has counseled that the Constitution . . . affirmatively

8    mandates accommodation, not merely tolerance, of all religions . . . [and] the government

9    may (and sometimes must) accommodate religious practices."  Access Fund, 499 F.3d at

10   1042 (quotations and citations omitted).  Protection and accommodation of American

11   Indian place-based cultural and religious values and practices thus fall squarely within

12   DOI's authority.

13          Consistent with this law and policy, DOI engaged in formal government-to-

14   government consultation with seven tribes and conducted detailed inventories and studies

15   of the region's cultural and tribal resources.  SOF ¶¶ 34-36.  Those efforts revealed that

16   activities associated with mineral exploration and development may irreparably harm the

17   tribes' cultural and religious values and practices.  SOF ¶¶ 36, 38.[37]  Accordingly, the

18   Secretary concluded the Withdrawal was warranted, in part, to prevent "potential impacts

19   to tribal resources [that] could not be mitigated."  SOF ¶ 39.

20          Quaterra alleges the Secretary "exceed[ed] statutory authority" by protecting

21   American Indian resources.  Quaterra Br. 15-18.  Quaterra fails, however, to identify the

22   statutory authority allegedly exceeded or the legal violation that occurred.  See id.

23          Quaterra claims existing laws protect American Indian resources.  Id. at 15-16.

24   But Quaterra's recitation of those laws fails to address how they guard against mining's

25   _____
     [36] See also, e.g., Fortune v. Thompson, No. CV-09-98-GF-SEH, 2011 WL 206164, at *2-
26   3 (D. Mont. Jan. 20, 2011) (upholding restriction of motorized vehicle use in portions of
     national forest sacred to tribe).
27   [37] For example, disturbance to sacred springs or gathering areas where tribes collect
     traditional plants for subsistence, medicinal, and ceremonial purposes "would disrupt the
28   function and cultural association of th[ose] resources."  SOF ¶ 38.

damage to the tribes' cultural and religious values and practices.  As DOI concluded,

while impacts to discrete archaeological resources could be effectively mitigated under

existing laws like the NHPA, impacts to cultural landscapes, sacred sites, traditional use

areas, and other resources may suffer irreparable harm under the existing regulatory

regime.  Compare SOF ¶ 37 (impacts to cultural resources that may be eligible for

protection under the NHPA), with SOF ¶ 38 (impacts to other American Indian

resources); SOF ¶ 39 (ROD concluding harm to those resources may be irreparable).

Quaterra's attempt to distinguish the archaeological sites that BLM addressed as

"Cultural Resources" from cultural landscapes, sacred sites, traditional use areas, and

other tribal resources fails for the same reasons.  Quaterra claims that the latter should not

enjoy the same protection as the former.  Quaterra Br. 16-18; see also AEMA Br. 27-28

(similar argument).  But it is precisely because laws such as the NHPA do not always

protect American Indian resources that agency accommodation may be necessary.[38]

In support of its argument, Quaterra relies on a few unsuccessful court challenges

to agency failures to accommodate American Indian cultural and religious values and

practices.  See Quaterra Br. 17-18.  Those cases stand for the limited proposition that

certain laws do not per se compel agencies to prioritize those values and practices.  See S.

Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior, 588 F.3d 718, 723-

24 (9th Cir. 2009) (concluding that tribes were unlikely to succeed on the merits of their

FLPMA claim); Navajo Nation v. U.S. Forest Serv., 535 F.3d 1058, 1070-73 (9th Cir.

2008) (en banc) (Religious Freedom Restoration Act (RFRA) did not prevent agency

from approving project on sacred mountain over tribes' opposition); Havasupai Tribe v.

United States, 752 F. Supp. 1471, 1485-86 (D. Ariz. 1990) (approval of plan of

operations for uranium mine did not violate tribe's First Amendment right to Free

Exercise of religion).  These cases provide no support, however, for the proposition that

---

[38] See, e.g., SOF ¶ 35 (FEIS recognizing that many places of cultural and religious importance to the tribes "have not been through the formal nomination process as TCPs, [but] are no less important to American Indians and their cultures"); id. (Cultural Resources Preservation Coalition explaining that environmental and historic preservation laws do not fully protect American Indian resources).

1   agencies lack <u>authority</u> to make those accommodations.[39]  On the contrary, the Ninth

2   Circuit and other courts have routinely upheld the government's authority to do so.  <u>See</u>

3   <u>supra</u> at 25-26 & n.36.[40]

4           Finally, Quaterra claims that the Secretary sought "protection of the entire

5   [Withdrawal] area without articulating why such protections are warranted and without

6   identifying specific sites."  Quaterra Br. 18.  This statement ignores the record, which is

7   replete with information about why protection of sacred sites, traditional use areas, and

8   other locations of cultural and religious significance is warranted.  <u>See</u> SOF ¶¶ 31-39.

9   Moreover, while DOI recognized the importance of the entire Grand Canyon region as a

10  cultural landscape for numerous tribes, BLM's cultural resources inventory, the FEIS,

11  and other documents identify specific sites, areas, and locations of significance to the

12  tribes – including hunting and gathering areas, springs, trails, ceremonial sites,

13  "ecoscapes" defined by watersheds, and smaller cultural landscapes – that could be

14  harmed by mining activity.  <u>See</u> SOF ¶¶ 32-35, 38.[41]

15          **C.      The Withdrawal Does Not Violate The Establishment Clause.**

16          Given the Secretary's clear authority to protect and accommodate American

17  Indian cultural and religious values and practices on the public lands, AEMA's allegation

---

18  [39] The Supreme Court has made clear this important distinction.  In the context of

19  denying a Free Exercise challenge to a decision to permit timber harvesting and road
    construction in an area sacred to several tribes, the Court explained that "[n]othing in our
    opinion should be read to encourage governmental insensitivity to the religious needs of

20  any citizen" and that the government "should not [be] discourage[d] . . . from
    accommodating religious practices like those engaged in by the Indian respondents."

21  <u>Lyng v. Nw. Indian Cemetery Protective Ass'n</u>, 485 U.S. 439, 453-54 (1988).

22  [40] Quaterra claims the Secretary's accommodation of the tribes' cultural and religious
    values and practices gives them "veto rights over all of the public lands."  Quaterra Br.

23  17-18; <u>see also</u> AEMA Br. 28-29.  Quaterra confuses a rationale sometimes relied upon
    in cases rejecting claims that the government was <u>required</u> to prioritize protection of

24  certain religious practices or beliefs.  <u>See</u> Navajo Nation, 535 F.3d at 1063-64; <u>Havasupai</u>
    <u>Tribe</u>, 752 F. Supp. at 1486.  Even in that context, however, the Supreme Court has

25  expressly rejected this sort of parade-of-horribles rationale.  <u>Gonzales v. O Centro</u>
    <u>Espirita Beneficente Uniao do Vegetal</u>, 546 U.S. 418, 435-36 (2006) (instructing that

26  government cannot rely on a slippery-slope argument in response to a RFRA claim); <u>see</u>
    <u>also</u> DOI Br. 59-60 (addressing "veto power" claim).

27  [41] Notably, DOI need not – and often may not – identify particular sites due to the
    sensitive and confidential nature of the tribes' beliefs and practices.  <u>See</u> 16 U.S.C.

28  §§ 470w-3, 470hh; 5 U.S.C. § 552(b)(3); SOF ¶ 34.

1    that the Withdrawal violates the Establishment Clause is baseless.  AEMA Br. 22-30.

2    The Trust adopts DOI's arguments disposing of this claim.  DOI Br. 57-60.

3         The Ninth Circuit in Access Fund, 499 F.3d at 1042-46 (applying test from Lemon

4    v. Kurtzman, 403 U.S. 602, 612-13 (1971), in rejecting Establishment Clause claim), and

5    Cholla Ready Mix, 382 F.3d at 975-77 (same), dispensed with each of AEMA's

6    arguments, and that precedent controls the result here.  Mount Royal Joint Venture is also

7    directly on point.  There the D.C. Circuit rejected an Establishment Clause challenge

8    where, as here, "[t]he Secretary enunciated several secular purposes for withdrawing the

9    [lands in question], including protection of aquifers and the environment" and the

10   withdrawal "neither regulate[d] religious practices nor increase[d] Native American

11   influence over management of the [area]."  477 F.3d at 750, 758.

12        That the Withdrawal area derives its historical and cultural importance in part

13   from the tribes' religious beliefs and practices in no way undermines the Secretary's

14   secular goals of protecting American Indian resources for their historic and cultural

15   importance and avoiding interference with the tribes' religious practices and beliefs.

16   Access Fund, 499 F.3d at 1044; Cholla Ready Mix, 382 F.3d at 975.[42]

17        Moreover, nothing in the record shows that the practical effect of the Withdrawal

18   is to endorse the tribes' religions over other religions.  See Cholla Ready Mix, 382 F.3d

19   at 976.  "Rather, the facts reflect only that [Plaintiffs], whatever their religious beliefs,

20   would prefer to continue [mineral exploration and development activities], and the

21   [Withdrawal] prevents them from doing so."  See Access Fund, 499 F.3d at 1045.  As in

22   Mount Royal Joint Venture, the Withdrawal "does not primarily affect religious interests;

23   on the contrary, it protects all non-mineral resources in the [area]."  477 F.3d at 758.

24   "That a group of religious practitioners benefits in part from the [Withdrawal] does not

25
     _____

     [42] Contrary to AEMA's claim that the Withdrawal's secular purposes were a "sham,"
26   AEMA Br. 25, DOI's "thorough documentation of an extensive array of historic, cultural,
     archaeological and traditional values that are historic rather than religious by nature"
27   leaves no reason to think that the Secretary was in fact acting based on impermissible
     religious motivation.  See Access Fund, 499 F.3d at 1044-45 (quotation and citation
28   omitted).

1    establish endorsement." <u>Access Fund</u>, 499 F.3d at 1045.  Moreover, "[t]he institutions

2    benefitted here, Native American tribes, are not solely religious in character or purpose.

3    Rather, they are ethnic and cultural in character as well." <u>Cholla Ready Mix</u>, 382 F.3d at

4    977.  Finally, as in <u>Access Fund</u>, the Withdrawal "does not involve [DOI] in any respect

5    in [the tribes'] religious practice." 499 F.3d at 1046.  AEMA identifies no evidence to

6    the contrary.[43]  The Withdrawal easily satisfies the <u>Lemon</u> test as a permissible

7    accommodation of the tribes' historic, cultural, and religious values and practices.

8    **IV.    EVEN IF THIS COURT FINDS ANY OF PLAINTIFFS' CLAIMS HAS
         MERIT, IT SHOULD PERMIT ADDITIONAL BRIEFING ON REMEDY.**

9            The Trust agrees with DOI that, should the Court rule in Plaintiffs' favor on any

10   claim, additional briefing on remedy is warranted.  DOI Br. 61 n.41.  Although vacatur is

11   the presumptive remedy under the APA, remand without vacatur may be appropriate

12   "when equity demands" to prevent serious harm to the environment or public health or to

13   avoid thwarting the objective of the statute at issue.  <u>See</u> <u>Idaho Farm Bureau Fed'n v.</u>

14   <u>Babbitt</u>, 58 F.3d 1392, 1405-06 (9th Cir. 1995); <u>W. Oil & Gas Ass'n v. EPA</u>, 633 F.2d

15   803, 813 (9th Cir. 1980); <u>Wood v. Betlach</u>, 922 F. Supp. 2d 836, 852-53 (D. Ariz. 2013).

16   Because vacatur of the Withdrawal could cause serious environmental harm and thwart

17   NEPA's objectives, the Trust requests an opportunity to brief these issues in more detail.

18                                   **CONCLUSION**

19           The Trust respectfully requests that the Court deny Plaintiffs' motions for

20   summary judgment, and grant the Trust's cross-motion for summary judgment.

21

22

23

24

---

25   [43] The Ninth Circuit has expressly rejected AEMA's attempt to rely on out-of-circuit
26   district court cases suggesting that a mandatory, rather than voluntary, governmental
     program or policy might violate the Establishment Clause.  <u>See</u> AEMA Br. 29 (citing
27   <u>Natural Arch & Bridge Soc'y v. Alston</u>, 209 F. Supp. 2d 1207, 1223-24 (D. Utah 2002);
     <u>Bear Lodge Multiple Use Ass'n v. Babbitt</u>, 2 F. Supp. 2d 1448, 1455 (D. Wyo. 1998));
28   <u>Access Fund</u>, 499 F.3d at 1046 (distinguishing <u>Natural Arch</u> and <u>Bear Lodge</u>).

Respectfully submitted March 6, 2014.


 /s/ Alison Flint
Alison Flint *(pro hac vice)*
Edward B. Zukoski (*pro hac vice*)
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO  80202
tzukoski@earthjustice.org
aflint@earthjustice.org
Telephone: (303) 623-9466
Fax: (303) 623-8083

Roger Flynn *(pro hac vice)*
Western Mining Action Project
P.O. Box 349, 440 Main St., #2
Lyons, CO  80540
wmap@igc.org
Telephone: (303) 823-5738
Fax: (303) 823-5732

Attorneys for Grand Canyon Trust, the Havasupai Tribe,
Center for Biological Diversity, Sierra Club, and
National Parks Conservation Association

### <u>CERTIFICATE OF SERVICE</u>

1

2    I hereby certify that on March 6, 2014, I filed the foregoing document using the Court's
     CM/ECF system, which caused all counsel of record to be served electronically.

3

4    Additionally, I hereby certify that on March 6, 2014, I will serve a copy of the foregoing
     document via U.S. Mail to the following party:

5

6    **Gregory Yount**
     **807 W. Butterfield Road**

7    **Chino, Valley, AZ  86323**

8    Respectfully submitted March 6, 2014.

9                                                    <u>/s/ Alison Flint</u>

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28