Susan M. Mathiascheck (*pro hac vice*; DC Bar No. 426764)
Amy B. Chasanov (*pro hac vice*; DC Bar No. 468779)
John C. Martin (*pro hac vice*; DC Bar No. 358679)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
Phone:  202-624-2500
Facsimile:  202-628-5116

Attorneys for Plaintiff Nuclear Energy Institute

R. Timothy McCrum (*pro hac vice*; DC Bar No. 389061)
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone:  202-624-2500
Facsimile:  202-628-5116

Attorneys for Plaintiff National Mining Association

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gregory Yount, <br><br> Plaintiff, <br><br> v. <br><br> S.M.R. Jewell, Secretary of the Interior, et al., <br><br> Defendants. | CV11-8171 PHX DGC <br> (Lead Case) |
| This document relates to: <br><br> National Mining Association; and Nuclear Energy Institute, <br><br> Plaintiffs, <br><br> v. <br><br> S.M.R. Jewell, Secretary of the Interior, et al., <br><br> Defendants. | CV12-8038 PCT DGC <br><br> NEI'S AND NMA'S OPPOSITION TO CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT <br><br> ORAL ARGUMENT REQUESTED |

# TABLE OF CONTENTS

Table of Authorities................................................................................................... ii

I.   Plaintiffs Have Standing To Pursue Their NEPA And FLPMA
     Claims.......................................................................................................1

     A.   As This Court Has Held, Plaintiffs Have Standing Under
          NEPA. ...........................................................................................2

     B.   As This Court Has Held, Plaintiffs Have Article III Standing..................4

     C.   Plaintiffs May Seek Review of the FLPMA 204(c)(2) Notice. .................6

II.  Interior's Withdrawal Violated NEPA. .....................................................7

     A.   Interior Was Required to Consider Mitigation and Existing
          Regulations Under *All* Alternatives – Including "No Action."..................7

     B.   Interior Failed to Consider a Reasonable Range of
          Alternatives. .................................................................................9

          1.   Interior should have considered a shorter withdrawal
               time period. ...........................................................................10

          2.   Interior should have considered a smaller geographic
               area. ......................................................................................11

          3.   Interior should have included Alternative E. ...............................12

     C.   Interior's Purpose and Need Did Shift, Without Any
          Corresponding Reconsideration of Alternatives. .......................................13

     D.   Interior's Failure To Identify And Address Data Gaps
          Violated NEPA..............................................................................15

          1.   Section 1502.22 requires the analysis Plaintiffs seek. ...................16

          2.   Interior's ROD cannot replace the analysis required in
               an EIS. .................................................................................18

          3.   Interior cannot avoid NEPA's hard look requirement
               by adopting a "cautious and careful" approach,
               unsupported by the evidence.........................................................20

III. Interior Violated FLPMA And The APA In Issuing The Withdrawal................21

     A.   Interior's FLPMA Decisionmaking Was Unsupported By the
          Record. .........................................................................................23

          1.   There are relevant standards for determining whether
               the withdrawal complied with FLPMA. .......................................23

          2.   Interior's withdrawal is unsupported by the evidence. ..................24

     B.   Interior's FLPMA Decisionmaking Was Inconsistent with the
          RMP. ..........................................................................................29

CONCLUSION ................................................................................30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Independence Mines and Minerals Co. v. U.S. Department of Agriculture*,
  733 F. Supp. 2d 1241 (D. Idaho 2010) .......................................................... 3

*American Iron & Steel Institute v. EPA*,
  115 F.3d 979 (D.C. Cir. 1997) .................................................................... 19

*Ashley Creek Phosphate Co. v. Norton*,
  420 F.3d 934 (9th Cir. 2005) ............................................................... 3, 4, 7

*Cabinet Res. Grp. v. U.S. Fish & Wildlife Serv.*,
  465 F. Supp. 2d 1067 (D. Mont. 2006) .................................................. 16, 18

*Chevron USA Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) .................................................................................. 21

*Churchill Cnty. v. Norton*,
  276 F.3d 1060 (9th Cir. 2001) ................................................................. 9, 19

*Citizens for Better Forestry v. Dep't of Agric.*,
  341 F.3d 961 (9th Cir. 2003) ..................................................................... 5, 6

*Cnty. of Trinity v. Andrus*,
  438 F. Supp. 1368 (E.D. Cal. 1977) ............................................................ 23

*Conserv. Congress v. U.S. Forest Serv.*,
  555 F. Supp. 2d 1093 (E.D. Cal. 2008) ........................................................ 3

*Conservation Nw. v. Sherman*,
  715 F.3d 1181 (9th Cir. 2013) ...................................................................... 7

*Consol. Salmonid Cases*, 713 F. Supp. 2d 1116 (E.D. Cal. 2010) .................................. 28

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
  623 F.3d 633 (9th Cir. 2010) ...................................................................... 22

*Davis v. Mineta*,
  302 F.3d 1104 (10th Cir. 2002) ................................................................... 15

*Dichter-Mad Family Partners, LLP v. U.S.*,
  709 F.3d 749 (9th Cir. 2013) ...................................................................... 22

*Drakes Bay Oyster Co. v. Jewell*,
  --- F.3d ---, 2014 WL 114699 (9th Cir. 2014) ....................................... 21, 24

*Envtl. Def. Fund, Inc. v. Corps of Eng'rs of U.S. Army,*
  492 F.2d 1123 (5th Cir. 1974) ................................................................. 10

*Great Basin Mine Watch v. Hankins,*
  456 F.3d 955 (9th Cir. 2006) .................................................................... 9

*Greer Coal., Inc. v. U.S. Forest Serv.,*
  No. CV09-8239-PCT-DGC, 2011 WL 671750 (D. Ariz. Feb. 16, 2011) ................. 22

*Guerrero v. Clinton,*
  157 F.3d 1190 (9th Cir. 1998) ................................................................... 7

*Half Moon Bay Fisherman's Mktg. Ass'n v. Carlucci,*
  857 F.2d 505 (9th Cir. 1988) ................................................................... 18

*Heckler v. Cheney,*
  470 U.S. 821 (1985) .............................................................................. 21

*Idaho Sporting Congress Inc. v. Alexander,*
  222 F.3d 562 (9th Cir. 2000) ................................................................... 18

*Kilroy v. Ruckelshaus,*
  738 F.2d 1448 (9th Cir. 1984) ................................................................. 13

*Klamath Siskiyou Wildlands Ctr. v. Boody,*
  468 F.3d 549 (9th Cir. 2006) ................................................................... 29

*Klamath Water Users Prot. Ass'n v. U.S. Dep't of Interior,*
  189 F.3d 1034 (9th Cir. 1999), *aff'd sub nom.* 532 U.S. 1 (2001) ..................... 24

*Kootenai Tribe of Idaho v. Veneman,*
  313 F.3d 1094 (9th Cir. 2002) ................................................................. 10

*Lands Council v. McNair,*
  537 F.3d 981 (9th Cir. 2008) (en banc) ................................................. 17, 28

*Lands Council v. Powell,*
  395 F.3d 1019 (9th Cir. 2005) ................................................................. 21

*Metcalf v. Daley,*
  214 F.3d 1135 (9th Cir. 2000) ................................................................. 10

*Mont. Wilderness Ass'n v. Connell,*
  725 F.3d 988 (9th Cir. 2013) ............................................................. 12, 18

*Mont. Wilderness Ass'n v. McAllister,*
  658 F. Supp. 2d 1249 (D. Mont. 2009), *aff'd,* 666 F.3d 549 (9th Cir. 2011) ................................................................................................. 17

*Mountain States Legal Foundation v. Glickman,*
  92 F.3d 1228 (D.C. Cir. 1996) .............................................................. 4, 5

*Mt. Royal Joint Venture v. Kempthorne*,
477 F.3d 745 (D.C. Cir. 2007) ................................................................. 6, 22

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
177 F.3d 800 (9th Cir. 1999) ........................................................... 10, 12, 13

*Nat'l Solid Waste Mgmt. Ass'n v. Daviess Cnty., Ky.*,
446 F.3d 647 (6th Cir. 2006) ...................................................................... 4

*Native Fish Soc'y v. Nat'l Marine Fisheries Servs.*,
--- F. Supp. 2d ----, 2014 WL 199093 (D. Or. 2014) ................................ 10

*Native Village of Point Hope v. Jewell*,
740 F.3d 489 (9th Cir. 2014) ............................................................... 19, 25

*Native Village of Point Hope v. Salazar*,
730 F. Supp. 2d 1009 (D. Alaska 2010) ................................... 17, 18, 19, 25

*Natural Res. Def. Council v. U.S. Forest Serv.*,
421 F.3d 797 (9th Cir. 2005) ....................................................... 13, 28, 29

*Ness Inv. Corp. v. U.S. Dep't of Agric.*,
512 F.2d 706 (9th Cir. 1975) ................................................................... 24

*Norton v. S. Utah Wilderness Alliance*,
542 U.S. 55 (2004) ................................................................................... 30

*NRDC v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988) ............................................................. 7, 28

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
402 F.3d 846 (9th Cir. 2005) ................................................................... 28

*Or. Nat. Res. Council Fund v. Brong*,
492 F.3d 1120 (9th Cir. 2007) ................................................................. 22

*Or. Natural Desert Ass'n. v. Bureau of Land Mgmt.*,
531 F.3d 1114 (9th Cir. 2008) ................................................................. 17

*Or. Natural Res. Council v. Thomas*,
92 F.3d 792 (9th Cir. 1996) ..................................................................... 24

*Perkins v. Bergland*,
608 F.2d 803 (9th Cir. 1979) ............................................................... 6, 27

*Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*,
415 F.3d 1078 (9th Cir. 2005) ................................................................... 2

*Reed v. Salazar*,
744 F. Supp. 2d 98 (D.D.C. 2010) ........................................................... 24

*Renee v. Duncan,*
686 F.3d 1002 (9th Cir. 2012) ................................................................................. 7

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989)................................................................................... 8, 9, 21, 28

*Sierra Club v. Andrus,* 487 F. Supp. 443 (D.D.C. 1980),
*aff'd, Sierra Club v. Watt,* 659 F.2d 2013 (D.C. Cir. 1981)........................................ 27

*Skull Valley Band of Goshute Indians v. Davis,*
728 F. Supp. 2d 1287 (D. Utah 2010)............................................................ 22, 28, 29

*Soda Mt. Wilderness Council v. Norton,*
424 F. Supp. 2d 1241 (E.D. Cal. 2006) .......................................................... 9, 14, 15

*State of New Mexico v. Watkins,*
969 F.2d 1122 (D.C. Cir. 1992)................................................................................ 28

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior,*
608 F.3d 592 (9th Cir. 2010) ................................................................................... 21

*United States v. 14.02 Acres of Land More or Less in Fresno Cnty.,*
547 F.3d 943 (9th Cir. 2008) .................................................................. 10, 11, 12, 30

*Village of Arlington Heights v. Metropolitan Housing Develop. Corp.,*
429 U.S. 252 (1977)................................................................................................... 4

*W. Watersheds Project v. Kraayenbrink,*
632 F.3d 472 (9th Cir. 2010) ................................................................................... 20

*Wyoming v. U.S. Dep't of Agric.,*
277 F. Supp. 2d 1197 (D. Wyo. 2003), *vacated as moot on other*
*grounds,* 414 F.3d 1027 (10th Cir. 2005) ................................................................... 9

*Yount v. Salazar,*
933 F. Supp. 2d 1215 (D. Ariz. 2013) ................................................................. 7, 22

*Yount v. Salazar,*
No. CV11-8171-PCT DGC, 2013 WL 93372 (D. Ariz. Jan. 8, 2013) ................ *passim*

**Statutes**

5 U.S.C. § 702 ........................................................................................................ 21

5 U.S.C. § 706(2)..................................................................................................... 30

43 U.S.C. § 1701 ......................................................................................... 6, 22, 27

43 U.S.C. § 1701 Note................................................................................................ 6

43 U.S.C. § 1702(j)............................................................................................ 23, 28

43 U.S.C. § 1712(a) ........................................................................................... 29

43 U.S.C. § 1714(c)(2) ......................................................................................... 6

43 U.S.C. § 1732(a) ........................................................................................... 29

Act of Oct. 21, 1976, Pub. L. No. 94-579, § 704, 90 Stat. 2743, 2792 ............................ 22

**Regulations**

40 C.F.R. § 1500.1(b) .......................................................................................... 10

40 C.F.R. § 1502.13 ............................................................................................ 14

40 C.F.R. § 1502.14 .................................................................................... 8, 10, 13

40 C.F.R. § 1502.22 ...................................................................................... *passim*

40 C.F.R. § 1508.14 ............................................................................................ 18

43 C.F.R. § 46.130(a) ............................................................................................ 8

43 C.F.R. § 46.420 ...................................................................................... 10, 14

43 C.F.R. § 1610.2 .............................................................................................. 29

43 C.F.R. § 1610.3 .............................................................................................. 29

43 C.F.R. § 1610.5-3(a) ....................................................................................... 29

43 C.F.R. § 1610.5-5 ........................................................................................... 29

43 C.F.R. § 2300.0-1(a) ................................................................................ 23, 28

43 C.F.R. § 2300.0-5(h) ...................................................................................... 23

43 C.F.R. § 2310 ................................................................................................. 24

43 C.F.R. § 2310.1-1 ........................................................................................... 24

43 C.F.R. § 2310.1-2(c) ....................................................................................... 24

43 C.F.R. § 2310.3-2(b)(3) ................................................................................... 24

43 C.F.R. § 2310.3-3(b)(2) ..................................................................................... 6

**Other Authorities**

51 Fed. Reg. 15,618 (Apr. 25, 1986) ............................................................... 16, 19

011 Departmental Manual 1 ................................................................................ 24

516 Departmental Manual 11.5 ........................................................................... 29

603 Departmental Manual 1.1 ..................................................................... 24, 28

BLM National Environmental Policy Act Handbook (BLM, H-1790-1) ........................ 14

H.R. Rep. 94-1163, 1976 U.S.C.C.A.N. 6175 .................................................... 6

Prof. David H. Getches, *Managing the Public Lands: The Authority of the Executive to Withdraw Lands*, 22 Nat. Resources J. 279, 286 (1982)........................ 22

## <u>NEI'S AND NMA'S OPPOSITION TO CROSS-MOTION AND REPLY</u>

The Government and Intervenors (together, "Defendants") suggest that because Plaintiffs represent miners, they cannot have any legitimate basis to challenge the Department of Interior's ("Interior") withdrawal.  Because the Government intended to protect the environment, its action is beyond reproach, and certainly beyond judicial review sought by private citizens and companies, irrespective of any harm that they may suffer as a result.  This is an overly simplistic, and incorrect, depiction of this case.

Plaintiffs do not dispute that the Government has discretion in its decision-making. That discretion is, however, not unbounded.  Interior's actions are subject to meaningful National Environmental Policy Act ("NEPA") requirements, Federal Land Policy and Management Act ("FLPMA") standards, and Administrative Procedure Act ("APA") principles imposed to assure rational, evidence-based decision-making.  Plaintiffs' claims do not "pervert" these statutory requirements merely because Plaintiffs represent miners.  Plaintiffs' members merely seek to continue in their business of conducting safe, environmentally responsible, economic mining, in compliance with the law.  It is not the nature of the challenging party that determines the standards to which Interior is held: FLPMA, NEPA, and the APA do that.  Because Interior abused its discretion and violated many statutory and regulatory requirements, its decision-making is unsupported and does not merit this Court's deference or earn its affirmation.[1]

## I.    Plaintiffs Have Standing To Pursue Their NEPA And FLPMA Claims.

This Court has already determined that Plaintiffs have NEPA (prudential) standing under the undemanding standard that applies,[2] and that Plaintiffs have Article III standing.  The Government presents no reason for this Court to change its conclusion.

---

[1] NEI and NMA incorporate by reference the arguments of Plaintiffs Quaterra/AULEC and AEMA as they relate to remedy and NEI's and NMA's remaining claims for relief.

[2] *Yount v. Salazar*, No. CV11-8171-PCT DGC, 2013 WL 93372, at *19-*21 (D. Ariz. Jan. 8, 2013).

**A.      As This Court Has Held, Plaintiffs Have Standing Under NEPA.**

The parties agree that standing requirements differ at the pleadings and summary judgment stages.  At the pleadings stage, however, Plaintiffs went beyond what was then required and set forth "specific facts" to conclusively demonstrate standing (including numerous factual declarations), and Plaintiffs have since supplemented that evidence.[3] The Government has refuted none of this evidence.  Instead, it simply reargues contentions that this Court has already rejected.  This Court's denial of the Government's motion to dismiss on standing grounds remains correct now: "NMA and NEI can satisfy Article III by their members' very real economic injuries . . ., and satisfy NEPA prudential standing by the environmental interests they and their members possess in limiting the disruptive effects of uranium mining."[4]

The Government again claims that Plaintiffs' standing claims are pretextual.[5]  Yet, it offers nothing new to refute Plaintiffs' evidence or the Court's prior conclusions.  As this Court explained, a plaintiff may assert interests "primarily economic, as long as [the plaintiff] also alleges an environmental interest or economic injuries that are 'causally related to an act within NEPA's embrace.'"[6]  This Court concluded that NEI, NMA, and Uranium One Americas ("Uranium One"), demonstrated an economic injury that is inextricably "coupled with" environmental considerations, and that Plaintiffs' factually-supported environmental interests are "systematically, rather than merely fortuitously, within the zone of interests protected by NEPA."[7]  "In a day when environmentally

---

[3] *See* Pls. Br. at 1-2 [Dkt. 170]; Pls. Statement of Facts ("SF") 9-12 [Dkt. 171] (describing Plaintiffs' evidence, including smaller mining footprint in withdrawn area).

[4] *Yount*, 2013 WL 93372, at *20.  This Court did not make a composite judgment (*see* Gvt. Br. [Dkt. 198] at 25 n.12), but specifically held Plaintiffs had NEPA standing.

[5] Gvt. Br. at 27 & n.14, 30-31 [Dkt. 198].

[6] *Yount*, 2013 WL 93372, at *19 (quoting *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1103 (9th Cir. 2005)).

[7] *Id*. at *18.  The Court also recognized that if Plaintiffs must mine lower-grade deposits (like Uranium One's Utah deposits), this necessarily produces a greater environmental footprint (and greater economic costs) than mining in the withdrawn area.  *Id.*; *see also* Pls. SF10-12 (citing Dkt. 64-1 (Sweeney Decl. ¶¶ 6-10; Ginsberg Decl. ¶¶ 6-8 & Ex. 2-3; Schwab Decl. ¶¶ 5-6; Rasmussen Decl., Ex. 1 and 2, at 3 (noting reclamation costs)); Ex.

(continued…)

friendly business is often good business, the fact that NMA and NEI have economic

interests . . . does not make their asserted environmental interests invalid."[8]

Similarly, without refuting Plaintiffs' evidence, the Government asserts (at 27-28)

that Plaintiffs' substantive arguments "undercut" any legitimate environmental concern.

This argument misses the point:  Plaintiffs do not seek environmental destruction.

Rather, Plaintiffs question, for example, whether the record supports Interior's selected

alternative and whether other alternatives were similarly, or perhaps even more,

protective.[9]  This position fully supports NEPA's goals and APA review standards:  it in

no way undermines Plaintiffs' standing.

Finally, standing is a fact-specific inquiry.  The Government's reworked attempt

(at 29-31) to force the legal holdings of other cases onto these unique facts still fails.[10]

For example, this Court analyzed *American Independence Mines and Minerals Co. v.*

*U.S. Department of Agriculture*, 733 F. Supp. 2d 1241 (D. Idaho 2010), and disagreed

with the Government:  "NMA and NEI present a stronger case" linking their

environmental concerns to their economic injuries.[11]  *Ashley Creek* is likewise inapposite.

---

(continued…)

A [Dkt. 171.1] (Suppl. Schwab Decl. ¶¶ 5-10 & Ex. 1)).

[8] *Yount*, 2013 WL 93372, at *19.

[9] *See*, *e.g.*, Pls. Br. at 3-11, 13-14.

[10] The Government (at 27, n.14) cites to non-binding, post-January 2013 case law.  Those cases present different facts (*e.g.*, plaintiffs failed to identify any member with standing, and referenced only generalized environmental interests), and do not alter the test for standing under NEPA.  They have no effect on this Court's prior ruling.

[11] *Yount*, 2013 WL 93372, at *18.  The Government also argues (at 30) that Plaintiffs lack standing because they did not allege their specific standing claims in comments.  The Government presents no convincing case that they must do so.  Even assuming *arguendo* that a litigant must allege standing in their comments, the purpose of putting the agency on notice of potential injuries from the withdrawal was met here.  *See* Pls. SF10; Sweeney Decl. ¶ 9 (NMA comments asserted "[h]igher grade deposits, such as the breccia pipes, produce more uranium with less environmental footprint"); Ex. 73 (AR59915-16) (Quaterra comments stated Arizona Strip includes "areas where uranium exploration and development would have the best chance of success with the least impact on the environment"); Ex. 79 (AR96478) (NWMA comments urged BLM "to consider the environmental impacts of *not* developing the uranium resource").  *See*, *e.g.*, *Conserv. Congress v. U.S. Forest Serv.*, 555 F. Supp. 2d 1093, 1106 (E.D. Cal. 2008).

1
2
3

There, the plaintiff did "not link[] its pecuniary interest to the physical environment or to the environmental impacts of the project[.]"[12]  The Government has not raised any new factual or legal arguments that support this Court upending its prior holding.[13]

4

**B.     As This Court Has Held, Plaintiffs Have Article III Standing.**

5
6
7
8
9
10
11

Ignoring the Court's earlier ruling on Article III standing, the Government attempts a novel argument, asserting that Plaintiffs' injuries for Article III and NEPA standing must be the *same.*  The Government argues (at 26, 29) that NEI and NMA must show a single injury that is both concrete and particularized under Article III and satisfies NEPA's prudential standing requirements.  This Court has already held that Plaintiffs have Article III standing[14] and explicitly *rejected* the Government's argument that "the purposes of prudential standing demand the same injury in fact as Article III standing."[15]

12
13
14
15
16
17
18

The Court's prior decision was correct.  The Ninth Circuit does not require that Plaintiffs' Article III and NEPA standing injuries be identical.  Given the distinct functions and origins of these two standing requirements,[16] requiring the same injury to satisfy both types of standing would be arbitrary.  The Government cites one case, *Mountain States Legal Foundation v. Glickman,* 92 F.3d 1228, 1232 (D.C. Cir. 1996).  No other Court of Appeals appears to have ever endorsed it,[17] and even the D.C. Circuit conceded it "found no cases" on the point.[18]  Further, *Mountain States* provides strong

19
20

---

[12] *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005).

21

[13] So long as one Plaintiff in this case has NEPA standing, NEI's and NMA's NEPA claims may proceed.  Pls. Br. at 2 n.11; *see also, e.g., Village of Arlington Heights v. Metropolitan Housing Develop. Corp*., 429 U.S. 252, 264 & n.9 (1977).

22

[14] *Yount*, 2013 WL 93372, at *4-*5.

23

[15] *Id.* at *19.

[16] *Id.*

24
25
26

[17] Plaintiffs are aware of one circuit judge opinion concurring in the denial of a petition for rehearing, asserting the Government's view in *dicta*, and stating no authority in support.  *Nat'l Solid Waste Mgmt. Ass'n v. Daviess Cnty., Ky.*, 446 F.3d 647, 649 (6th Cir. 2006) (Clay, J., concurring in denial of pet. for reh'g).

27

[18] *Mt. States*, 92 F.3d at 1232; *see also Yount*, 2013 WL 93372, at *5 (citing and quoting very next page of *Mountain States* when holding Plaintiffs had Article III standing).

28

4

legal and policy reasons for recognizing the standing of parties with "regulated" property interests: "[W]here the statute governs the use of public property, and thus the 'regulated' entity and the decisionmaking agency are one and the same, denial of standing to private parties adversely affected by excessive agency zeal would leave the countervailing values with no conceivable champion in the courts."[19]  That is true here— if industry is denied NEPA standing then the scales will tip in favor of environmental interests, without any balancing to protect those most affected by agency decisionmaking. There is "no reason to suppose that Congress would have intended so drastic a tilt."[20]

Even assuming *arguendo* that there was a legal requirement that the injuries for Article III and NEPA standing be identical, Plaintiffs have met that burden.  Plaintiffs suffer a concrete economic harm, having been barred from pursuing claims in the withdrawn area.[21]  This economic injury is inextricably intertwined with Plaintiffs' environmental interests.[22]  In finding that Plaintiffs had NEPA standing, this Court simultaneously held that Plaintiffs' intertwined economic and environmental injury satisfied constitutional *and* NEPA standing requirements.[23]

---

[19] 92 F.3d at 1237.  This Court has rejected Plaintiffs' standing as "regulated" entities under the "zone of interests" test and as the target of Interior's actions.  Plaintiffs respectfully resubmit these arguments to preserve them for appeal.  *See* Pls. Mem. in Opp. to Defs' Mot. to Dismiss and Renewed Mot. to Dismiss [Dkt. 64] ("Pls. MTD Opp.") at 17-20.

[20] *Mt. States,* 92 F.3d at 1237.

[21] *Yount*, 2013 WL 93372, at *4-5.

[22] Contrary to the Government's assertion (at 28-29), this Court held that Plaintiffs' "economic harm" is not "speculative."  *Id.* at *5.  Plaintiffs' members are in the business of uranium mining, and the withdrawal prevents operations in the withdrawn area. Uranium One has supplied detailed factual information identifying its leased deposits in Utah. For the Court to find a real and imminent injury, Uranium One need not disclose its confidential decision-making regarding where substitute operations will actually proceed, particularly given that this withdrawal forced the company to change its previous plans.  *See id.*; *Citizens for Better Forestry v. Dep't of Agric.*, 341 F.3d 961, 971-72 (9th Cir. 2003) (plaintiffs need not *prove* specific effects in *precise* location).

[23] The Government also misrepresents Article III's "geographic nexus" test. Gvt. Br. at 29.  The test requires a nexus between "the individual asserting the claim and the location suffering an environmental impact."  *Citizens for Better Forestry*, 341 F.3d at 971.  A "geographic nexus" exists here: Plaintiffs' members are connected both to the land withdrawn (effectively barred from mining existing claims or pursuing new ones), and to

(continued…)

### C.   Plaintiffs May Seek Review of the FLPMA 204(c)(2) Notice.

Defendants incorrectly argue that Plaintiffs cannot challenge Interior's compliance with the FLPMA 204(c)(2) Notice to Congress ("Notice"), 43 U.S.C. § 1714(c)(2).[24] First, FLPMA expressly implements a policy favoring judicial review, rendering FLPMA causes of action presumptively reviewable.[25]  Second, while Congress did explicitly bar review of FLPMA's Section 311 annual "reports",[26] the Notice challenged by Plaintiffs is not an annual "report" exempt from judicial review.  In 204(c)(2), Congress did not use the term "report" to describe the informational requirements that Plaintiffs challenge.[27] Congress itself differentiated between the 204(c)(2) information and other FLPMA "reports," referring to the former as a "referral to Congress."[28]  "The congressional committee knew how to exempt certain agency action from judicial review within [FLPMA]," and Congress's failure to bar review for this Notice creates a presumption of review.[29]  Interior's FLPMA regulations confirm that the Notice is *not* a "report": Interior sends "notices" to Congress conveying the 204(c)(2) "information."[30]

Surrounding FLPMA provisions and Congressional intent confirm this interpretation.  Congress required the 204(c)(2) information so that it could decide

---

(continued…)

any alternate deposits *they themselves will mine in the future* (and at which greater land disturbance would occur).  In *Ashley Creek*, there was no nexus because the plaintiff had nothing to do with the phosphate deposits subject to NEPA analysis.  420 F.3d at 938.

[24] Gvt. Br. at 22-23 & n.8; Int. Br. at 10-11 [Dkt. 208].  Plaintiffs presented the foregoing legal arguments before and summarize them here.  *See* Pls. MTD Opp. at 14-16. Defendants do not respond to Plaintiffs' claims on the merits regarding Interior's Notice.

[25] *See* 43 U.S.C. § 1701(a)(6); *see also Perkins v. Bergland*, 608 F.2d 803, 805-06 & n.6 (9th Cir. 1979).

[26] 43 U.S.C. § 1701 Note (denying review as to the "adequacy of *reports* required by the Act to be submitted to the Congress or its committees") (emphasis added).

[27] *Id*. § 1714(c)(2)(1)-(11) (includes "explanation", "inventory", "evaluation", "analysis", and "statement"); *but see id*. § 1714(c)(2)(12) (engineering or geologist "report").

[28] *See* H.R. Rep. 94-1163, 1976 U.S.C.C.A.N. 6175, 6177-78.

[29] *Perkins,* 608 F.2d at 805-06 & n.6; *Mt. Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 757 (D.C. Cir. 2007) (Notice was "statutorily-required 'Notification to Congress'").

[30] 43 C.F.R. § 2310.3-3(b)(2).

1   whether to overrule a large-scale withdrawal.[31]  Even without the veto, this Court found

2   that the Notice continues to have "significant meaning" as it requires the Secretary to

3   carefully "consider environmental and economic impacts of the withdrawal[.]"[32]

4   Plaintiffs' Notice claims are reviewable.  Because Defendants did not respond to the

5   substance of Plaintiffs' Notice arguments (Pls. Br. at 27-30), if the Court agrees that any

6   information in the Notice is deficient or inaccurate, it must find a FLPMA violation.

7   **II.     Interior's Withdrawal Violated NEPA.**

8         **A.     Interior Was Required to Consider Mitigation and Existing
                 Regulations Under *All* Alternatives – Including "No Action."**

9         Plaintiffs argued that Interior failed to rigorously and objectively evaluate the "No

10  Action" alternative because (1) numerous information gaps and inaccuracies in the FEIS

11  precluded meaningful understanding of impacts under all the alternatives (including "No

12  Action"), and (2) Interior's "No Action" analysis failed to meaningfully account for

13  reasonable mitigation measures, current regulations, and modern mining practices.[33]

14  "Analysis of the 'no-action alternative' is at the heart of the NEPA process; thus, failure

15  to provide a valid one casts a shadow over the process as a whole."[34]  The deficiencies in

16  Interior's alternatives analysis are fatal: an accurate understanding of the aggregate level

17  of economic and environmental harm under each of the alternatives—taking into account

18  reasonably foreseeable mitigation and the effect of existing regulations—is critical to a

19  rigorous exploration and evaluation of the alternatives and selection of an alternative.

20        The Government asserts (at 33) that requiring consideration of available mitigation

---

[31] *Yount v. Salazar*, 933 F. Supp. 2d 1215, 1226 (D. Ariz. 2013).

[32] *Id.* at 1227.  The Government relies on a single D.C. Circuit case for the generic notion that Congressional notices are not subject to review, but that case was premised on the "[l]ack[ of] a provision for judicial review."  *NRDC v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988).  Here, review is presumptively available.  Cases like *Guerrero v. Clinton*, 157 F.3d 1190 (9th Cir. 1998) and *Renee v. Duncan*, 686 F.3d 1002 (9th Cir. 2012), which involve routine annual reports, are also inapplicable here.  *See also* Pls. MTD Opp. at 15-16.

[33] *See* Pls. Br. at 3-5, 11-15.

[34] *Conservation Nw. v. Sherman*, 715 F.3d 1181, 1188 (9th Cir. 2013).

1    options under its "No Action" alternative is "a perversion of . . . NEPA."  There is

2    nothing "perverse" about considering mitigation, current regulations, and mining

3    practices, and their effectiveness, under the "No Action" alternative.  This is precisely

4    what NEPA requires—careful consideration of the status quo under the "No Action"

5    alternative, which, here, is the continuation of mining with all the attendant permitting

6    and regulatory protections.[35]  Under the Council on Environmental Quality's ("CEQ")

7    binding regulations, Interior must "rigorously explore and objectively evaluate *all*

8    reasonable alternatives" (including "No Action"), and apply "appropriate mitigation

9    measures" including those "*not already included in* the proposed action *or*

10   *alternatives*."[36]  These regulations do not except the "No Action" alternative.[37]  When, as

11   here, there is relevant mitigation under a "No Action" alternative, it must be considered.

12          Defendants' contorted reading of the case law ignores a critical distinction in this

13   case.  Many agency actions subject to NEPA analyze projects that would impose new

14   activity on land where there is currently "no action" (or very little action).  Thus, the "No

15   Action" alternative is usually as the name implies.  Here, because Interior's proposed

16   action *removed* land from its current, active use, the "No Action" alternative, in one

17   sense, involved the most "action."  While there may not always be "appropriate

18   mitigation measures" under the "No Action" alternative, considering mitigation and the

19   existing regulatory framework under the status quo here is necessary to rigorously

20   evaluate and choose among all alternatives.

21          Even were the Court to find that the regulations do not require consideration of

---

23   [35] The Government (at 34) acknowledges that the "No Action" alternative is an analysis of "doing nothing." *See also* Int. Br. at 16.

24   [36] 40 C.F.R. §§ 1502.14(a)-(b), (d), (f) (emphasis added).  Interior's NEPA regulations likewise require the alternatives analysis to consider "appropriate mitigation measures or best management practices."  43 C.F.R. § 46.130(a).

26   [37] *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989) ("CEQ regulations require that the agency discuss possible mitigation measures . . . in discussing alternatives to the proposed action, [40 C.F.R.] § 1502.14(f) . . . .").

1    mitigation measures under the "No Action" alternative, Interior's NEPA analysis is

2    nonetheless flawed.  Absent a withdrawal, any mining would incorporate modern

3    practices, reasonable mitigation, and up-to-date regulatory and permitting requirements.[38]

4    Ignoring that reality, Interior's FEIS addressed mitigation in the most conclusory of

5    ways.[39]  Vaguely asserting that impacts may occur even with mitigation (Pls. SF41, Ex. 6

6    (FEIS, AR2132)), and despite the effectiveness of existing regulations, without more

7    substantial support, does not satisfy NEPA's hard look.[40]  Neglecting to meaningfully

8    consider realistic mitigation scenarios and current regulatory requirements, the FEIS's

9    "No Action" alternative analysis paints such an antiquated and incomplete picture of

10   environmental risks that it renders the alternatives analysis meaningless.

**B.**    **Interior Failed to Consider a Reasonable Range of Alternatives.**

12   The Government rehashes many of the same rationales offered in the FEIS for

13   eliminating alternatives from detailed consideration.  While this Court may "defer to a

14   'fully informed and well-considered agency decision, [it] need not forgive a clear error of

15   judgment.'"[41]  Interior may not need to consider in detail *all* of the alternatives raised, but

16   its analysis is deficient for having considered such a narrow range.

17   The Government argues first that it need not conduct as stringent an alternatives

18   analysis because the proposed action sought to benefit the environment.[42]  Reasonable

19   [38] It is not sufficient for the Government to assert that site-specific mitigation will be
considered for a future project—particularly when Interior's selected alternative
precludes all (or almost all) foreseeable mining projects for the next 20 years.  Interior
cannot ignore its own reasonable, planned mitigation measures (*e.g.*, "Comprehensive
Best Management Practices and Monitoring," Pls. SF35, Ex. 6 (FEIS, AR2560-61)).  Nor
can Interior ignore measures in the discarded "Alternative E."  *See* Pls. SF29-30, 32, 34.

[39] *See* Pls. Br. at 4-5 & nn.19-20.

[40] *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 973 (9th Cir. 2006).

[41] *Soda Mt. Wilderness Council v. Norton*, 424 F. Supp. 2d 1241, 1261 (E.D. Cal. 2006)
(quoting *Churchill Cnty. v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001)).

[42] At least one court has recognized that this argument "represents a significant departure
from Supreme Court NEPA precedent," which recognizes "that NEPA, which merely
prescribes a process, does not contain any such substantive components."  *Wyoming v.
U.S. Dep't of Agric.*, 277 F. Supp. 2d 1197, 1203 n.1 (D. Wyo. 2003), *vacated as moot on
other grounds*, 414 F.3d 1027 (10th Cir. 2005) (citing *Robertson*, 490 U.S. at 350-51).

alternatives that may protect the environment in ways different from the proposed action (and which are *more* consistent with statutory objectives[43]) cannot simply be ignored.[44] This would undermine NEPA's requirement that agencies take a "hard look," "objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made."[45]  An agency is not absolved of the requirement to "rigorously explore and objectively evaluate all reasonable alternatives,"[46] no matter how beneficial its proposed action may appear.[47]  A rigorous alternatives analysis is not contrary to NEPA's environmental goals, but is required to "insure that ["high quality"] environmental information is available to public officials and citizens before decisions are made and before actions are taken."[48]  Here, Interior has not fulfilled its NEPA obligation to consider a reasonable range of alternatives.

> **1.    *Interior should have considered a shorter withdrawal time period.***

Interior did not consider a withdrawal for less than 20 years (the maximum period FLPMA authorizes), and did not provide a reasonable explanation for its failure to consider such an obvious alternative.[49]  That watershed protection is a long-term interest – the rationale stated in the FEIS and repeated by the Government (at 37, 39) – is *not*

---

[43] *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999).

[44] The one case cited by the Government (at 36) recognized "a proper concern with alternatives" in that "plaintiffs ha[d] urged that an excess of conservation will be harmful to the environment by precluding appropriate actions in developing roads useful for fighting fires, or insects, or other hazards."  *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1120 (9th Cir. 2002).

[45] *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).

[46] 40 C.F.R. § 1502.14(a).

[47] *See* 43 C.F.R. § 46.420(c) (requires "reasonable number of examples covering the full spectrum of reasonable alternatives"); *Envtl. Def. Fund, Inc. v. Corps of Eng'rs of U.S. Army*, 492 F.2d 1123, 1135 (5th Cir. 1974) (NEPA "would be thwarted by ending the search for other possibilities at the first proposal which establishes an ecological plus, even if such a positive value could be demonstrated with some certainty").

[48]  40 C.F.R. § 1500.1(b).

[49] *Cf. Native Fish Soc'y v. Nat'l Marine Fisheries Servs.*, --- F. Supp. 2d ----, 2014 WL 199093, at *10 (D. Or. 2014) ("Where a feasible [mid-point] alternative would meet the project's purpose and need, it should be considered."); *accord Wild Fish Conservancy v. Nat'l Park Serv.*, --- F. Supp. 2d ----, 2014 WL 1260450, at *9 (W.D. Wash. 2014).

itself a reason for dismissing analysis of a shorter withdrawal period, especially where, as here, Interior has expressly acknowledged that it may wish to re-open withdrawn lands in the future.[50]  As Interior acknowledged, this is simply a reason why a withdrawal might "possibl[y]" be renewed.[51]  In light of Interior's findings that the environmental impacts on the watershed from uranium mining were anticipated to be low risk but required further study,[52] a shorter withdrawal was reasonable and met Interior's purpose and need.

### 2.       Interior should have considered a smaller geographic area.

While an agency need not consider every conceivable alternative, NEPA requires more than selecting two random, mid-range alternatives.  At issue is not just the number of alternatives, but *what* alternatives were considered.  Here, Interior knew (1) "mixing and matching" parcels, or creating an entirely new mid-range alternative, would "better address public comments and issues" and "provide[] the greatest flexibility . . . to refine a preferred alternative"; and (2) the withdrawn area could be reduced by 20 percent (200,000 acres) without impact.[53]  Yet Interior's alternatives did not reflect this or offer the public or agency decision-makers the benefit of this information.[54]  Interior proffered only one reason for not refining the DEIS alternatives' geographic size and composition: it would take more time.[55]  The National Park Service ("NPS") offered another reason:

---

[50] Pls. SF61, Ex. 1 (ROD, AR12).

[51] Pls. SF18, Ex. 6 (FEIS, AR1659).

[52] *See*, *e.g.*, Pls. SF13, Ex. 6 (FEIS, AR1586, 1689-1702, AR2075-76), SF56, Ex. 7 (AR3102), SF60, Ex. 1 (ROD, AR9); SF61, Ex. 1 (ROD, AR12); Pls. Br. at 5-6, 10-11.

[53] Pls. SF19-20, Ex. 9 (AR3254); SF76, Ex. 62 (AR81803-04).  Contrary to Intervenors' contentions (at 18 n.26), Ex. 62 is not a conversation between "mid-level BLM employees" but involved two leads in the EIS process: BLM's Arizona Strip District Manager and the Project Manager for the entire EIS (Arizona State BLM Office Planning and Environmental Coordinator).  Ex. 62 post-dates the FEIS but relies on information before the agency in the EIS process.  *See*, *e.g.*, Pls. SF19-20, Ex. 9 (AR3254).

[54] Intervenors argue (at 18-19) that Alternative C already reduces the withdrawn area in parts of the North Parcel by 200,000 acres.  Plaintiffs' suggested alternative is different and would withdraw *more* acreage than Alternative C.  *See* Pls. SF76, Ex. 62 (AR81803-04); Ex. 6 [Dkt. 171.3] (FEIS, AR1578-79) (Alternative C would reduce withdrawn area by 350,000 acres).

[55] Pls. SF20, Ex. 9 (AR3254).  While Ex. 9 does not specify exactly what additional areas

11                                                           (continued…)

that such refining might be "an admission that the DEIS is flawed."[56]  These flimsy

justifications condemn rather than excuse Interior's failure to develop reasonable

alternatives "necessary to foster informed decisionmaking and public participation."[57]

### 3.    Interior should have included Alternative E.

Defendants dismiss Alternative E, the technical, non-withdrawal alternative

belatedly eliminated from detailed consideration.  They assert it is speculative and time-

consuming, and therefore not in keeping with Interior's purpose and need to protect the

Grand Canyon watershed.[58]  This characterization belies Interior's own conclusions as to

the feasibility of Alternative E's implementation, as well as governing case law.  First,

Alternative E was not simply an alternative to issue new regulations; it included

substantial *non*-regulatory components[59] that would *not* involve any "lengthy and

uncertain rulemaking process."[60]  Second, Interior recognized the importance of

Alternative E, and that the proposed regulatory changes under Alternative E were not so

speculative as to shield the alternative from further consideration.[61]  Interior admitted that

failure to include this alternative "would jeopardize" its goals of "[i]nsuring integrity of

_____

(continued…)

might be eliminated from withdrawal, or exactly what other portions might be "mixed
and matched," it is not Plaintiffs' job to divine this.  Interior identified the need to refine
its withdrawal alternatives but neglected to do so.

[56] Pls. SF21, Ex. 37 (AR66870).

[57] *Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1005 (9th Cir. 2013).  In *Montana
Wilderness*, by contrast, the plaintiff "d[id] not explain why another alternative was
necessary to foster informed decisionmaking and public participation."  *Id.*

[58] Gvt. Br. at 39-40; Int. Br. at 19-20.

[59] *See* Pls. Br. at 9 & n.35; Pls. SF32, Ex. 54 (ARR73441), SF35, Ex. 6 (AR2560-61).

[60] Gvt. Br. at 39.

[61] Pls. Br. at 8-9 (and exhibits cited).  Indeed, Alternative E's inclusion of expanded
regulatory and other requirements was *more* consistent with Interior's need for action
based on "concern that existing laws and regulations are not adequate to sufficiently
protect local resources," as originally stated in preliminary DEIS drafts.  *See* Ex. 74
(AR74060); Ex. 75 (AR74095); Ex. 76 (AR74113); Ex. 77 (AR74140).  Alternative E
further serves Interior's purpose and need to protect the watershed while meeting
FLPMA's goal of balancing multiple uses.  *See Muckleshoot*, 177 F.3d at 813.

the process and protecting the Secretary's decision space."[62]  Agencies are *required* to consider alternatives outside of their jurisdiction,[63] including in some cases alternatives requiring "legislative action."[64]  Here, rulemaking *within* Interior's ordinary jurisdiction, similar to that which Interior has promulgated in the past,[65] is a reasonable alternative.  Moreover, as Interior further recognized, "concern over the speculative nature of the alternative can be addressed by evaluating a range of potential outcomes and clearly acknowledging that the outcome would be dependent on the regulatory process."[66]  Any uncertainty associated with a future rulemaking does not overcome Alternative E's critical importance as the only non-withdrawal action alternative.

### C.   Interior's Purpose and Need Did Shift, Without Any Corresponding Reconsideration of Alternatives.

Another significant inadequacy in Interior's alternatives analysis is its tacit change in the purpose and need for action, and its failure to reconsider its alternatives in light of this change.  The record reveals a change in the true purpose and need for action: a shift from watershed protection to the need for more information.[67]  Interior's shift in its purpose and need renders its alternatives analysis problematic:  If the essential purpose and need was to fill in existing information gaps, Interior should have considered a shorter withdrawal period to allow for research, or allowing some activity to develop the missing information (as opposed to one that prevented new projects and their study).[68]

An EIS must "examine[] a complete set of reasonable alternatives . . . tailored to

---

[62] Pls. SF31, Ex. 54 (AR73440-42); *see also id.*, Ex. 15 (AR4774-75).

[63] 40 C.F.R. § 1502.14(c).

[64] *See, e.g., Kilroy v. Ruckelshaus*, 738 F.2d 1448, 1454 (9th Cir. 1984); *Muckleshoot*, 177 F.3d at 814.

[65] *See* Pls. Br. at 9 (citing Pls. SF28, Ex. 56 (AR80677)).

[66] *See* Ex. 54 (AR73442) [Dkt. 172.3].

[67] *See* Pls. Br. at 9-11.

[68] *See id.*; *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005) ("*NRDC*") (changes in circumstances relevant to alternatives must be considered).

meet the goals set out in the purpose and need statement."[69]   "The 'need' for action may

be described as the underlying problem or opportunity to which the agency is responding

with the action.  The 'purpose' may refer to the goal or objective that [BLM] is trying to

achieve, . . ."[70]  Defendants contest whether Interior changed its purpose and need.[71]

Plaintiffs agree that the purpose and need articulated in the FEIS was "to protect the

natural, cultural, and social resources in the Grand Canyon watershed from the possible

adverse effects" of mining and "to address the possibility of negative impacts . . . ."[72]

Yet the record clearly demonstrates this is not the *actual* purpose and need that ultimately

guided the agency.  Rather, the absence of data supporting environmental risks to the

watershed became the "need" and Interior's desire to fill in information gaps became the

"purpose."  Interior realized midway through the EIS process that it could not

demonstrate actual risks warranting withdrawal and manufactured a new purpose—and

violated NEPA when it did so without revisiting its alternatives analysis.[73]

Interior's error was foretold in a comment by NPS's Chief for Science and

Resource Management, who worried early in the process "that if the existing information

analysis is not able to assess impacts, the result will be considered a non-impact."[74]  This

---

[69] *Soda Mt. Wilderness Council*, 424 F. Supp. 2d at 1271; *see also* 40 C.F.R. § 1502.13.

[70] 43 C.F.R. § 46.420(a)(1); *see also* BLM, H-1790-1 – BLM National Environmental Policy Act Handbook – (Public) at 35 (Jan. 2008), *available at* http://www.blm.gov/pgdata/etc/medialib/blm/wo/Information_Resources_Management/policy/blm_handbook.Par.24487.File.dat/h1790-1-2008-1.pdf.

[71] *See* Gvt. Br. at 39, n.21; Int. Br. at 21-22.

[72] Pls. SF4, Ex. 6 (AR1625-26).

[73] *See* Pls. Br. at 9-10 (citing record evidence of shift).  Contrary to the Government's contention, the need for additional study was not a purely prospective goal, distinct from the instant action's purpose and need.  The ROD identified "uncertainty due to limited data" and the ability of a withdrawal to "allow for additional data to be gathered" as the first and primary rationale for the withdrawal, under a header captioned "RATIONALE FOR THE DECISION."  Pls. SF60, Ex. 1 (AR9).  Numerous additional documents illustrate Interior's shifting understanding of risks and need for more information.  *See*, *e.g.*, Pls. SF48, Ex. 23 (AR7277); SF47, Ex. 10 (AR3473); SF71, Ex. 22 (AR6830) (noting absence of "hard science" to support withdrawal); SF56, Ex. 7 (AR3102) (Final Decision Memorandum emphasizing uncertainty and need for additional data-gathering).

[74] Ex. 69 (AR4018).

1    was precisely what happened.  Interior "finessed" the absence of "hard science" to

2    rationalize its pre-selected alternative.[75]  While agencies may have a preferred alternative,

3    an agency may not predetermine the NEPA analysis by committing itself to an outcome,

4    as then the agency has failed to take an unbiased, hard look at the environmental

5    consequences of its actions, and has acted arbitrarily and capriciously.[76]  NEPA required

6    Interior to reconsider its alternatives analysis (*i.e.*, the no action alternative, a shorter

7    withdrawal, or a new alternative with further study), rather than simply select an existing

8    alternative in no way tailored to the purpose and need for further study.  Interior's actions

9    contravened NEPA's purpose to "ensure that the agency is candid about the action it is

10   taking,"[77] and violated NEPA's regulatory requirements and "hard look" mandate.

11         **D.    Interior's Failure To Identify And Address Data Gaps Violated NEPA.**

12         Fundamental information about the uranium endowment in the withdrawn area,

13   and the impacts from mining that uranium, is missing in the FEIS.  This missing

14   information triggered a NEPA duty to follow the specific analysis in 40 C.F.R. §

15   1502.22.  And, while Interior's FEIS identified *some* missing information, it did not

16   disclose all known missing information.[78]  Interior's failure "to attempt any assessment of

17   the importance of the missing information calls into question the validity of the

18   [agency's] conclusions about the impacts of the proposed action."[79]  Given the

---

[75] *See* Pls. SF49, 71 & Ex. 22 (AR6830) [Dkt. 171.6].

[76] *Davis v. Mineta*, 302 F.3d 1104, 1111-13 (10th Cir. 2002).

[77] *Soda Mt. Wilderness Council*, 424 F. Supp. 2d at 1262.

[78] Record evidence shows Interior misinterpreted 1502.22 during the EIS drafting and did not identify all missing information.  In a May 2010 DEIS draft, Interior identified incomplete or unavailable information on geologic and mineral resources, including uncertainties about the amount of undiscovered uranium.  Ex. 70 (AR46137).  Comments in the margins instructed the authors *not* to mention missing information unless "critical to understanding the potential for 'reasonably foreseeable ***significant*** impacts.'"  *Id.* (AR46120) (emphasis in original).  The FEIS reveals that, despite the significance of the endowment estimate to understanding the withdrawal's impacts, the authors *deleted the entire discussion of missing information*.  *See* Pls. SF54, Ex. 6 (FEIS, AR2041); Ex. 67 (DEIS excerpt, AR929) (omitting discussion); *see also* Pls. Br. at 12-13.

[79] *Cabinet Res. Grp. v. U.S. Fish & Wildlife Serv.*, 465 F. Supp. 2d 1067, 1100 (D. Mont.

15

(continued…)

1  uncertainties and lack of data, "there can be no reasoned choice among alternatives and

2  no accurate prediction of the impact of the proposed action until the [agency] has

3  assessed the importance of the missing information."[80]  Failure to follow 1502.22

4  violates NEPA.

5          Interior admitted to fundamental data gaps regarding (1) the activities it ultimately

6  decided to forbid (*e.g.*, quality and quantity of the uranium endowment including hidden

7  breccia pipes, and contamination associated with mining) and (2) the very environmental

8  values the withdrawal sought to protect (*e.g.*, water quality and flow, recreational and

9  tribal resources, and animal and human effects).[81]  Given that these data are directly

10  linked to the alleged purpose and need for action, this Court should not defer to Interior's

11  post hoc rationalizations that the missing information was not essential to a reasoned

12  choice among the alternatives.  Interior's failure to follow the regulation's unambiguous

13  steps is more than a technical oversight.  Interior not only violated the procedural

14  requirements of 1502.22, but its violation calls into question the entire environmental

15  impact analysis, its duty to inform itself and the public, and its alternative choice.[82]

16              *1.      Section 1502.22 requires the analysis Plaintiffs seek.*

17          The Government (at 46) attempts to shirk its NEPA duties under 1502.22,

18  claiming Plaintiffs' argument "elevates form over function" and imposes a "hyper-

19  technical reading" of the NEPA regulations.  The Government is wrong.  The plain

20  language of 1502.22 requires agencies to identify missing information, determine

21  whether that missing information was relevant or essential, *and*, if so, whether the cost of

22  _____

23  (continued…)

    2006).

24  [80] *Id.*

25  [81] *See generally* Pls. SF43-SF49, SF51-55 (data gaps in FEIS and record); Pls. SF50 (data gaps discussed in ROD); Pls. Br. at 12-15 & Pls. SF44, 49-50, 53-55.

26  [82] 51 Fed. Reg. 15,618, 15,620 (Apr. 25, 1986) (1502.22 revised to "better inform the

27  decisionmaker and the public"), 15,621 ("analysis must be supported by credible scientific evidence, not based on pure conjecture, and be within the rule of reason").

28

obtaining the missing information was exorbitant, or the means of doing so unknown. Recent Ninth Circuit case law confirms that—at least in this Circuit—*it is the agency's burden to make these specific findings in the EIS*.[83]  In *Native Village of Point Hope v. Salazar*, the Court held that "the plain language of § 1502.22" "requires the agency to make the [1502.22] findings" in an EIS, and that failure to make these findings (or reliance on "post-hoc justification" as to whether information was relevant or essential) renders the agency's action arbitrary and capricious.[84]

The Government argues that the missing information was not "essential to a reasonable choice among the alternatives" and therefore it need not undertake the 1502.22 analysis.  Interior cannot find that important information is missing and then leapfrog to a conclusion that this information was unnecessary.  Courts have found this mistake to "amount[] to a 'fail[ure] to consider an important aspect of the problem'" and arbitrary and capricious decisionmaking not worthy of deference.[85]  This is not a new "hyper-technical" hurdle:  Interior was aware of this obligation when it published the FEIS.  In litigation a year earlier raising 1502.22 violations, the Alaska District Court remanded another Interior EIS to the agency to comply with the same NEPA obligations.

Finally, in a footnote (Gvt. Br. at 48 n.30), the Government argues that Plaintiffs raise only impacts to the "human environment," and that it need not consider such economic or social impacts.  The Government's position is inconsistent with NEPA's

---

[83] The Government argues that Plaintiffs—not the agency—have the burden.  Gvt. Br. at 47 n.29 (citing a nonbinding district court opinion from the Tenth Circuit).  Interior made this same argument in *Native Village of Point Hope v. Salazar* and the district court explicitly rejected it.  730 F. Supp. 2d 1009, 1018 & n.46 (D. Alaska 2010).

[84] *Id.* at 1018 & n.47 (quoting *Or. Natural Desert Ass'n. v. Bureau of Land Mgmt.,* 531 F.3d 1114, 1141 (9th Cir. 2008)).  *See also* Int. Br. at 22 (citing Government briefing to explain Interior's compliance).  The Government cannot rely on non-binding case law from the Seventh and Tenth Circuits (Gvt. Br. at 46-47 & n.28) when the Ninth Circuit has held 1502.22 requires specific findings.  *Native Village*, 730 F. Supp. 2d at 1018.

[85] *Mont. Wilderness Ass'n v. McAllister*, 658 F. Supp. 2d 1249, 1256 (D. Mont. 2009), *aff'd*, 666 F.3d 549, 554 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)).

definition of the "human environment," which requires consideration of economic and

social effects when they are "interrelated" with "natural or physical environmental

effects."[86]  This Court found that the "human environment" impacts Plaintiffs discuss are

"interrelated" with environmental effects.[87]  In any event, Plaintiffs argued that

information regarding strictly environmental impacts (*e.g.*, impacts on water resources)

was also missing and required a full 1502.22 analysis.[88]  Interior's failure to make these

findings renders its FEIS and the decisionmaking based upon that FEIS fatally flawed.

### 2.    *Interior's ROD cannot replace the analysis required in an EIS.*

The Government cites no evidence in the record or the FEIS that Interior ever

completed the first step of the 1502.22 analysis: determining whether the incomplete

information relevant to impacts is essential to a reasoned choice among the alternatives.

Nor could Plaintiffs uncover any record evidence that this required analysis was

undertaken.  The Government cites a footnote in its ROD and the discussion of outdated

mining impacts from six historical sites to argue that additional information on water

quality and quantity was not needed.[89]  This argument fails for multiple reasons.

First, reliance on the ROD is misplaced.  The 1502.22 analysis must be in the EIS,

not an after-the-fact analysis in the ROD.[90]  CEQ, in promulgating this version of

1502.22, confirmed this requirement must be fulfilled within the FEIS: "[t]he evaluation

---

[86] 40 C.F.R. § 1508.14.

[87] *Yount*, 2013 WL 93372, at *18-*19, *23.

[88] *See, e.g.*, Pls. Br. at 12 & n.51, 14-15.

[89] Gvt. Br. at 48-49; *see also* Int. Br. at 6 & n.7.

[90] *See* Pls. Br. at 15-16; *see also Native Village*, 730 F. Supp. 2d at 1018;
*Mont. Wilderness Ass'n*, 666 F.3d at 554, 560 (obligation to include the 1502.22
statement "in the FEIS"); *Cabinet Res. Grp.*, 465 F. Supp. 2d at 1100 (FEIS must satisfy
1502.22).  Nor do the facts of *Half Moon Bay Fisherman's Mktg. Ass'n v. Carlucci*, 857
F.2d 505, 512 (9th Cir. 1988), support the Government.  There, NEPA was satisfied by
the ROD only because the Corps had taken additional steps *since* the SEIS and agreed to
future actions.  Intervenors (at 23) cite *Idaho Sporting Congress Inc. v. Alexander,* 222
F.3d 562, 568 (9th Cir. 2000), but that case reiterated the holding in *Half Moon Bay* and
found reports conducted *after* the final decision did not comply with NEPA.

of impacts under § 1502.22 is an integral part *of an EIS*."[91]  Even if this analysis in the ROD (instead of FEIS) were legally sufficient, the ROD covers just *one* category of impacts (water resources) and ignores numerous other areas where Interior admitted data were uncertain or missing.[92]  Moreover, Interior asserts conflicting positions in the FEIS and ROD, both of which cannot be simultaneously true:  Interior's ROD relied on out-of-date mining impacts to comply with 1502.22, but elsewhere Interior acknowledged that such historic data is unrepresentative of present and future mining.[93]

Second, the administrative record belies Interior's convenient post hoc rationalization that it had sufficient information to make a reasoned choice among the alternatives.  Interior knew of significant data gaps that required additional study, described this information as "needed" (that is, essential), and developed cost estimates that demonstrate the expenses to develop this information were not exorbitant.[94]

Third, the Government (at 48-49) claims that its ROD statements are entitled to deference.  Even if the ROD's band aid language was broad enough to cover all the data limitations (which it is not), deference is not warranted.  In *Native Village of Point Hope,* the court found 1502.22 violations and remanded the EIS.  Interior subsequently issued a Supplemental EIS with a 98-page Section 1502.22 appendix analyzing each piece of incomplete or unavailable information identified in the EIS and indicating whether it was "essential" to a reasoned choice among alternatives.  The Ninth Circuit only "deferred" to the agency's decisionmaking *after* Interior completed the analysis that Plaintiffs seek here.[95]  Here, Interior has never articulated why missing information was not essential.[96]

---

[91] 51 Fed. Reg. at 15,621 (emphasis added).

[92] Pls. Br. at 15-16.

[93] *Compare* Pls. SF50, Ex. 1 (ROD, AR10, n.1) (relying on outdated historic data) *with* Ex. 6 [Dkt. 171.4] (FEIS, AR2065) ("The Orphan Lode Mine is a singularly poor example of post-mining practices . . . .").

[94] Pls. Br. at 14 & n.55.

[95] *Native Village of Point Hope v. Jewell*, 740 F.3d 489, 495 (9th Cir. 2014) (discussing analysis after district court remand).

1

### 3. *Interior cannot avoid NEPA's hard look requirement by adopting a "cautious and careful" approach, unsupported by the evidence.*

2

3          The Government argues (at 49-51) that, given the uncertainty, adopting the most

4     "conservative" alternative was appropriate.[97]  This approach is inconsistent with

5     1502.22(b), which requires an EIS's analysis of low probability, "catastrophic

6     consequences" to rely on "credible scientific evidence," not "pure conjecture."  Interior is

7     required to take a "hard look" at the environmental consequences of all the alternatives,

8     and failure to make predictions "within the rule of reason" renders its decisionmaking

9     arbitrary and capricious.[98]  Interior's approach here lacked credible scientific evidence–

10    even for the notion that withdrawal would actually be the most "conservative" approach.

11          Even if 1502.22(b) does not apply,[99] Interior's approach is inconsistent with

12    NEPA's intent.  As a procedural statute, NEPA's purpose is not as simplistic as

13    preventing all environmental harm.  Agencies cannot default to what they view as the

14    most "protective" alternative, particularly when, as here, the alternative presents little

15    evidence of any significant risk of harm to the environment.  Instead, "'[t]he purpose of

16    NEPA is to require disclosure of relevant environmental considerations that were given a

17
─────────────────────

(continued…)

18

19    [96] The Government (at 49) argues its admission in the ROD that future studies might be
      useful does not undermine its analysis.  None of the three cases cited relieve Interior of
20    its duty to comply with NEPA now.  *Native Village* involved a statute where more
      specific environmental information is contemplated at each stage of NEPA review.  740
21    F.3d at 493.  In *Churchill County v. Norton,* which did *not* involve a 1502.22 claim but
      reviewed whether the agency failed to adequately consider impacts, the agency conducted
22    new studies and relied on current information on groundwater resources to make a
      reasoned analysis of the impacts.  276 F.3d 1060, 1082 (9th Cir. 2001), *opinion amended*
23    *on denial of reh'g,* 282 F.3d 1055 (9th Cir. 2002).  *American Iron & Steel Institute v.*
      *EPA*, 115 F.3d 979 (D.C. Cir. 1997), was not a NEPA case and did not discuss 1502.22.

24    [97] *See also* Pls. SF49.

25    [98] 40 C.F.R. § 1502.22(b)(1); *see also W. Watersheds Project v. Kraayenbrink*, 632 F.3d
      472, 485, 486 (9th Cir. 2010).

26    [99] Section 1502.22(b) is triggered when the costs are exorbitant or the means of obtaining
      the information unknown.  While Plaintiffs have argued neither of these situations exists,
27    it is Interior's role to make that determination, and the record indicates Interior never
      conducted the proper analysis.

28

'hard look' by the agency, and thereby to permit informed public comment on proposed action and any choices or alternatives that might be pursued with less environmental harm.'"[100]  An EIS should "['] generate information and discussion on those consequences of greatest concern to the public and of greatest relevance to the agency's decision,' rather than distorting the decisionmaking process by overemphasizing highly speculative harms."[101]  Given all the deficiencies in its FEIS, Interior's analysis and selection of an alternative lacks record support and does not meet NEPA's "hard look" requirement.

**III.    Interior Violated FLPMA And The APA In Issuing The Withdrawal.**

The Government (at 13) argues that "nearly all" of Plaintiffs' FLPMA claims are unreviewable because they are "free-standing APA claims not associated with any specific statute" or do not "identify any legal restriction that the Secretary violated in making the withdrawal."  This argument is without merit.  First, while the APA shields some actions from review when there is no legal standard to apply, this "narrow exception"[102] does not apply.  Here, FLPMA allows review as Plaintiffs are persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute."[103]  Second, as discussed in Plaintiffs' motion and detailed below, governing legal standards demonstrate that the Secretary's discretion is not boundless.  Third, the Government's inventive theory that its withdrawal is immune to FLPMA litigation is a new interpretation that contradicts the plain language of FLPMA and is not entitled to deference.[104]  Specifically, the Government's position contradicts Congress's

---

[100] *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 601 (9th Cir. 2010) (quoting *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005)).

[101] *Robertson*, 490 U.S. at 354, 356 (citations omitted).  Although the worst case scenario requirement was deleted from 1502.22, the reasoning of *Robertson* and need for an EIS to focus on "reasonably foreseeable impacts" is just as valid.

[102] *Heckler v. Cheney,* 470 U.S. 821, 830 (1985); *Drakes Bay Oyster Co. v. Jewell,* ---F.3d ---, 2014 WL 114699, at *6 (9th Cir. 2014) (citing same).

[103] 5 U.S.C. § 702.

[104] *Chevron USA Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

unequivocal policy favoring judicial reviewability of FLPMA actions.[105]   Congress's purpose to rein in the agency's previous unlimited discretion under *Midwest Oil* would be undermined by denying FLPMA review.[106]   As proof, courts have repeatedly and correctly reviewed a wide range of FLPMA challenges under the APA's "arbitrary and capricious" standard.[107]   Review is likewise warranted here.

Plaintiffs raised three FLPMA challenges:  (1) the withdrawal was arbitrary and capricious because none of the rationales offered by the agency were supported by record evidence; (2) the withdrawal was inconsistent with the governing Resource Management Plan ("RMP"); and (3) the Notice was deficient and did not include all statutorily required information.[108]   As discussed below, clear statutory, regulatory, and other standards and requirements render Interior's decisionmaking arbitrary and capricious.[109]

---

[105] 43 U.S.C. § 1701(a)(6); *see also* Section I.C., *supra*.

[106] *See Yount*, 933 F. Supp. 2d at 1222-23; *see also* Act of Oct. 21, 1976, Pub. L. No. 94-579, § 704, 90 Stat. 2743, 2792 (repealing preexisting executive withdrawal authority). Despite FLPMA's express repeal of prior withdrawal authorities, the Government (at 17) again implies it has "inherent" executive authority to make withdrawals.  Neither FLPMA nor the case law supports such authority.  *See* Prof. David H. Getches, *Managing the Public Lands: The Authority of the Executive to Withdraw Lands*, 22 Nat. Resources J. 279, 286 (1982).  Even so, that claimed authority is not at issue here.

[107] *See, e.g.*, *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1124 (9th Cir. 2007) (decisions violating FLPMA reviewed under APA); *Mt. Royal Joint Venture*, 477 F.3d at 757-58 (reviewing claim that FLPMA withdrawal was "arbitrary and capricious"); *Greer Coal., Inc. v. U.S. Forest Serv.*, No. CV09-8239-PCT-DGC, 2011 WL 671750, at *6 (D. Ariz. Feb. 16, 2011) (FLPMA land exchange reviewed under APA); *Skull Valley Band of Goshute Indians v. Davis*, 728 F. Supp. 2d 1287, 1295-98 (D. Utah 2010) (FLPMA action "arbitrary and capricious"); *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 646-47 (9th Cir. 2010) (FLPMA land exchange "arbitrary and capricious").

[108] The Government (at 22-23 & n.8) argued that Plaintiffs could not challenge Interior's Notice on jurisdictional grounds, and Plaintiffs responded in Section I.C.  Having failed to raise any substantive argument in their response, Plaintiffs caution that Defendants cannot raise substantive responses for the first time in their final brief.  *See, e.g.*, *Dichter-Mad Family Partners, LLP v. U.S.*, 709 F.3d 749, 777 n.15 (9th Cir. 2013).

[109] All the Plaintiffs in this case discuss multiple deficiencies in Interior's FEIS and ROD in their motions.  *See, e.g.*, Pls. Br. at 3-16, 17-24, 28-30; Quaterra Br. at 3-11.  Given the division of arguments decided among the Plaintiff parties in the opening briefing, NEI and NMA cast some of their NEPA arguments, also addressed in other Plaintiffs' briefs, within their FLPMA claims, and vice versa.  *See, e.g.*, Pls. Br. at 10-11, n.41 (need for additional information failed to support withdrawal under either NEPA or FLPMA), 23 (FLPMA argument references NEPA discussion and briefing by other Plaintiffs regarding

**A.**   **Interior's FLPMA Decisionmaking Was Unsupported By the Record.**

**1.**   *There are relevant standards for determining whether the withdrawal complied with FLPMA.*

FLPMA defines the term "withdrawal" as a withholding of federal land to "limit[] activities . . . to maintain other public values in the area or reserve[] the area for a particular public purpose or program."[110]   Thus, the Secretary may not issue a withdrawal for any reason or no reason at all.   A withdrawal must actually "maintain other public values" or serve some other specific "public purpose or program."   Plaintiffs argued (at 17-23) that Interior violated FLPMA as its withdrawal was not just unnecessary to "maintain other public values" but jeopardized other public values by resulting in a greater aggregate environmental footprint.

FLPMA regulations also limit Interior's exercise of withdrawal authority and the purpose of any given withdrawal.   The Secretary has broad authority to withdraw federal land "*where appropriate.*"[111]   That authority is not unlimited.   Courts have found the requirement to take "'appropriate' action . . . cannot be held so indeterminable as to preclude judicial review in the face of a clear congressional intent to place some limits on agency discretion."[112]   Congress was driven by just such an intent when it enacted FLPMA.[113]   The regulations also require that a withdrawal *not* occur absent actual "need

_____

(continued…)

inaccuracies/omissions in NEPA analysis), 28 (endowment estimate concerns cited in NEPA discussion referenced in FLPMA argument); *see also* 43 C.F.R. § 2310.3-2(b)(3) (compliance with CEQ NEPA regulations required by FLPMA regulations).   In other words, the deficiencies NEI and NMA discuss as FLPMA and APA violations on the basis of arbitrary and capricious decisionmaking (Pls. Br. at 16-24, 28-30)—and to which Defendants have had ample opportunity to respond—are also claims under NEPA and the APA, violating NEPA's "hard look" standard and the APA's prohibition of unsupported, arbitrary and capricious action.   In both cases, the same inaccuracies, omissions, and defects resulted in arbitrary and capricious action.   *Compare* Pls. Amended Compl. [Case No. 3:12-cv-8038-DGC, Dkt. 56] ¶¶ 108-10, 119-21 *with ¶¶* 111-18.

[110] 43 U.S.C. § 1702(j); *see also* 43 C.F.R. § 2300.0-5(h).

[111] 43 C.F.R. § 2300.0-1(a) (emphasis added).

[112] *Cnty. of Trinity v. Andrus*, 438 F. Supp. 1368, 1378 (E.D. Cal. 1977).

[113] *See supra*, Section III & n.107.

1   for a withdrawal"[114] or without any supportable "public purpose" or "justification."[115]

2   They also require compliance with NEPA regulations.[116]

3   FLPMA's regulatory requirements are augmented by Interior's *binding*

4   *Departmental Manual ("DM")*.[117]  Courts have scrutinized Interior's actions against the

5   DM's standards in various circumstances.[118]  Interior's DM sets forth standards for a

6   withdrawal, requiring, *inter alia,* that "withdrawals *shall be kept to a minimum,*" defining

7   "demonstrated need" to mean include "*a justification for the lands to be withdrawn,*" and

8   noting that "[i]f a withdrawal is intended to protect a particular resource" there must be

9   "*an explanation of why existing law or regulation cannot protect or preserve the*

10   *resource.*"[119]  FLPMA and Interior's implementing regulations and guidance limit the

11   Secretary's action and provide law that allows for concrete review by this Court.[120]

12   ## 2.   *Interior's withdrawal is unsupported by the evidence.*

13   Plaintiffs demonstrate that Interior offered only sham reasons for its withdrawal,

14   and its selected alternative was unsupported by the record.  As shown in Plaintiffs'

15   motion, neither the Government's primary reason—protection of the watershed—nor any

---

16   [114] 43 C.F.R. § 2310.1-1.

17   [115] *Id.* at § 2310.1-2(c).

18   [116] *Id.* § 2310.3-2(b)(3).  As discussed, Interior has not complied with NEPA in this case.

19   [117] *See* Pls. Br. at 18-19 & n.70; *see also* Ex. C (011 DM 1.1, 1.2(B)) [Dkt. 171.1]
("Bureaus and offices must comply . . . [with] the DM, except to the extent that the
20   provisions are superseded by appropriate authority."); *see also* Ex. 65 (AR80613) [Dkt.
172.5] ("Withdrawals . . . must be justified in accordance with . . . 603 DM 1 and the
BLM regulations at 43 CFR 2310.").

21   [118] *See, e.g.*, *Reed v. Salazar*, 744 F. Supp. 2d 98, 108 n.4 (D.D.C. 2010) (relying on DM
provisions; noting that changes to DM are published in the Federal Register); *Klamath*
22   *Water Users Prot. Ass'n v. U.S. Dep't of Interior*, 189 F.3d 1034, 1040 (9th Cir. 1999),
*aff'd sub nom.* 532 U.S. 1, 121 (2001) (citing DM requirement).

23   [119] Ex. D (603 DM 1.1(A), 1.1(A)(3)) [Dkt. 171.1] (emphases added); *see also* Pls. Br. at
24   19 & nn.71-72 (quoting and citing same).

25   [120] These requirements distinguish this case from Defendants' citations, which involve
those rare circumstances where there truly was no law to apply.  *See Or. Natural Res.*
26   *Council v. Thomas*, 92 F.3d 792, 795 (9th Cir. 1996) (Recessions Act provided absolute
discretion); *Drakes Bay Oyster Co.*, 2014 WL 114699, at *6 (9th Cir. 2014) (Interior not
27   required to extend permit and legislation had no statutory restrictions); *Ness Inv. Corp. v.*
*U.S. Dep't of Agric.*, 512 F.2d 706, 715 (9th Cir. 1975) (same).

28

of its additional rationales offered in the ROD are supported by the record.[121]

Defendants argue that individual employees do not speak for or bind the agency. In an administrative record case, the statements and conclusions of individuals play a central role in any court's determination as to whether the agency's decision is supported by the record.[122]  Here, Plaintiffs cite to statements of government employees who were not "local or lower-level agency representatives"[123] or expressing a minor difference of opinion that the agency had the discretion to reconcile.[124]  Many of the conclusions in the record are from key EIS participants and their opinions reflect a *consensus view* among those responsible for the EIS after reviewing all of the evidence.

The Government also attempts to muddy the waters by emphasizing historical mining problems.  The Government recognizes elsewhere that these historical impacts were unrepresentative of the present and what would happen in a modern uranium mining operation absent the withdrawal.[125]

The Government also claims that its uranium endowment estimate is entitled to deference.  It was the government—not Plaintiffs—who first said the updated USGS uranium estimates were simply "recycled"[126] from the prior 1990 report.  This is true. The investigations that USGS relied upon in Chapter A for the endowment estimate were

---

[121] *See* Pls. Br. 17-23; *see also, e.g.*, Ex. 72 (AR55123) ("'minor impacts' ascribed to [No Action alternative]").  Plaintiffs do not confuse the terms "water resources" and "watershed."  Plaintiffs' arguments focused on water because that was Interior's overarching concern; however, Plaintiffs also discussed the lack of support for impacts on other resources as well.  *See, e.g.*, Pls. Br. at 17-19 (discussing absence of impacts both to water and supported biota, addressing absence of resources of concern), 22 (impacts to tribal resources); *see also* Pls. SF44, SF61, SF73, Ex. 39 (AR67603-04).

[122] For example, in *Native Village*, the Ninth Circuit relied on *one BOEM analyst's email exchanges with his supervisor* to find that Interior's one billion barrel oil hypothetical oil scenario was arbitrary and capricious. *See* 740 F.3d at 499-501, 502-03.

[123] Gvt. Br. at 24 & n.10.

[124] Int. Br. at 5, 7; Gvt. Br. at 24 & n.10.

[125] *See supra* Section II(D)(2) & n.94.

[126] Ex. 47 (AR72858).

1   largely based on stale 1980s research.[127]  While the USGS reviewed prior research on the

2   uranium estimate within the larger Grand Canyon area of Northern Arizona generally, the

3   purpose of Chapter A of the USGS report was to calculate what part of the total 1990

4   undiscovered uranium endowment was not available based on prior withdrawals and the

5   proposed withdrawal.[128]  Despite the articulated need to study and quantify the uranium

6   estimate,[129] USGS's stale 1990 uranium information was only updated to correct a data

7   error (Gvt. Br. 19-20).  Interior and USGS failed to substantively update the underlying

8   uranium estimate, significantly underrepresented the quality of the hidden breccia pipes,

9   and conducted no rigorous peer review of the Chapter A uranium estimate.[130]  The key

10  EIS players were concerned about relying on this fundamentally flawed information.[131]

11         This error is not insignificant:  it is carried through the EIS analysis, as the

12  uranium endowment estimates drive the economic and environmental impacts analysis.

13

---

14  [127] Ex. 66 (additional USGS Report excerpts, AR87-AR88 (1980s mineral appraisals)).

15  [128] *Id.* (additional USGS Report excerpts, AR84 (examining portion of 1990 uranium
    endowment estimate not available based on prior and proposed withdrawals); AR87
16  (topic to estimate uranium resource based on Finch 1990 estimate); AR92 (discussing
    Finch 1990 estimate); AR97 (uranium in withdrawn area based on Finch 1990 estimate)).

17  [129] *See, e.g.*, Ex. 11 [Dkt. 171.6] (AR3891) (since August 2009, USGS saw need to
18  "evaluate previous assumptions using more recent data that may be available from
    company sources and new publications to estimate the amount of Uranium in the area").

19  [130] *See* Pls. Br. at 12-14; Pls. SF52-54; Quaterra Br. at 9-10; Quaterra SF58-66; Ex. 66
20  (additional USGS Report excerpts, AR97).  While some of the underlying studies may
    have been peer-reviewed, the Government's cites do not demonstrate that USGS's
21  Chapter A uranium estimate underwent a rigorous peer review.  *See* Gvt. Br. at 18 (citing
    AR3893 and AR82092).  One document is an undated, unsigned letter from USGS to
22  BLM stating an *intent* to peer review *Chapter C* of the report (not the uranium estimate).
    Ex. 68 (AR3893) ("[USGS's] intention is to ultimately present our findings and
23  interpretations in a peer-reviewed, USGS publication").  The second is an email
    indicating the report "is in the peer review process" but which has no description of that
24  process (*e.g.*, inside versus outside reviewers) or whether it was completed.  Ex. 78
    (AR82092).  While Chapter A includes an acknowledgment that other USGS employees
25  reviewed earlier drafts, the extent of the review is not disclosed.

26  [131] *See, e.g.*, Ex. 71 (AR54887-88) (discussing uranium endowment and other areas of
    uncertainty, but arguing that "quantifying that uncertainty implies that we know more
27  than we really know"); *id.* ("Bottomline is one could number crunch and create outputs
    covering such a broad range of endowment, mineralization, tons, mines, and economics
    that virtually any number becomes theoretically possible").

28

These defects, in turn, infected the Secretary's compliance with FLPMA's broad multiple-use mandate—which requires the agency to manage public lands "on the basis of multiple use and sustained yield"[132] while protecting ecological and environmental resources.  Interior's failure to comply with a multiple use mandate is reviewable.  In *Sierra Club v. Andrus,* the court found that the "provisos" in 43 U.S.C. § 1701, which include FLPMA's multiple-use mandate, "indicate a congressional intent to set some limit on the Secretary's discretion."[133]  The "provisos and conditions would be meaningless if they did not limit the Secretary's discretion in following the general operational directive to manage, protect, and administer the relevant resources in accordance with enunciated statutory standards."[134]

In sum, the record demonstrates that, unable to find any evidence that adverse impacts to water or other resources would occur as a result of continued mining, Interior nonetheless maintained unfounded assertions that (1) underestimated the uranium endowment and understated its economic value; and (2) exaggerated levels of harm to water and other resources – all to support its predetermined policy position to undertake a 20-year, large-scale withdrawal.  Even if Interior's decision was not predetermined, these defects "fatally infected" the Secretary's decisionmaking by skewing the necessary "balanc[ing] of economic and environmental considerations," rendering the withdrawal arbitrary and capricious.[135]  Given these errors, Interior's withdrawal was not

---

[132] 43 U.S.C. § 1701(a)(7).

[133] 487 F. Supp. 443, 448-49 (D.D.C. 1980), *aff'd*, *Sierra Club v. Watt*, 659 F.2d 2013 (D.C. Cir. 1981).

[134] *Sierra Club*, 487 F. Supp. at 449.  *Perkins* (*see* Int. Br. at 14) actually adds support for the reviewability of Plaintiffs' claims.  The court concluded that FLPMA's policy favoring review "remove[d] any doubt" as to the reviewability of the decision, despite the Secretary's similarly broad discretion to impose "appropriate" terms.  608 F.2d at 805-06.  The court also granted narrow review under a different multiple use statute to "ascertain whether the agency's factual findings . . . are arbitrary and capricious."  *Id.* at 807.

[135] *NRDC*, 421 F.3d at 816; *see also Skull Valley*, 728 F. Supp. 2d at 1297 (proscribing "uninformed" agency action); Pls. Br. at 23-24.  Contrary to Intervenors' assertions (at 7, n.11), *Skull Valley* and *NRDC* held that it was *the errors* in the EIS documents—not the government's admissions of them—that "fatally infected" the agency's decisionmaking

(continued…)

27

"appropriate"[136] to "maintain other public values,"[137] and the size of the withdrawal

certainly was not "kept to a minimum."[138] Nor was the withdrawal "justif[ied]" by any

"demonstrated need" given the existence of effective regulations and permitting.[139]

Interior's approach presumes limitless discretion: it can invoke any withdrawal

anywhere, regardless of the factual evidence. Here, there is a wealth of law—including

FLPMA, Interior's implementing regulations, Interior's binding FLPMA guidance, and

case law—cabining Interior's discretion and requiring withdrawals to be supported by a

real need based on concrete facts. Interior's selection of the "most conservative"

approach provides only illusory protection of this land, and does not satisfy FLPMA.[140]

Under well accepted principles of administrative law, an agency's decisionmaking should

be set aside when it "'entirely failed to consider an important aspect of the problem' or

offered an explanation 'that runs counter to the evidence before the agency or is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise.'"[141] This court should not rubber stamp Interior's withdrawal when, as here, it

is inconsistent with both FLMPA's requirements and Congress's intent.[142]

---

(continued…)

and caused it to be impermissibly uninformed. *NRDC*, 421 F.3d at 807-10, 816 (reliance on EIS error was "clear error of judgment" that affected selection of alternatives); *Skull Valley*, 728 F. Supp. 2d at 1294, 1295-98 (decision based on an inadequate FEIS was uninformed, arbitrary and capricious agency action).

[136] 43 C.F.R. § 2300.0-1(a).

[137] 43 U.S.C. § 1702(j).

[138] Ex. D (603 DM 1.1(A), 1.1(A)(3)); *see also supra* Section II.B.2.

[139] Ex. D (603 DM 1.1(A), 1.1(A)(3)).

[140] *See State of New Mexico v. Watkins*, 969 F.2d 1122, 1135 (D.C. Cir. 1992) (FLPMA's notice requirements demand "a proposed use far more specific than 'protection of the land'"); *Robertson*, 490 U.S. at 354, 356; *see also supra*, Section II(D)(3) (addressing flaws in Interior's overcautious approach); *cf. Consol. Salmonid Cases*, 713 F. Supp. 2d 1116, 1165 n.19 (E.D. Cal. 2010) ("It may be scientifically justifiable to build a margin of error (i.e. to take a precautionary approach) . . . but this must be properly justified and disclosed by the record.").

[141] *Lands Council v. McNair,* 537 F.3d 981, 987 (9th Cir. 2008).

[142] *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2005).

1

**B.     Interior's FLPMA Decisionmaking Was Inconsistent with the RMP.**

2

Surprisingly, it is Intervenors (at 11-13), and not the Government, that respond to

3 Plaintiffs' detailed arguments that the withdrawal was inconsistent with the governing

4 RMP.  Interior argues conclusorily, in a footnote, that there is no law to apply, and that

5 the withdrawal was consistent with the RMP.[143]  Both Defendants are wrong.[144]

6

FLPMA § 302(a) plainly requires that land management actions conform with

7 approved land management plans, like the Arizona Strip RMP.[145]  Under Interior's own

8 regulations and guidance, when a withdrawal would alter "the scope of resource uses" or

9 the "terms, conditions and decisions" of the plan, formal plan amendment is required.[146]

10 This Circuit has invalidated decisions that did not comply with the governing RMP.[147]

11

Here, Intervenors argue that the withdrawal is valid irrespective of the RMP, since

12 the RMP itself has no capacity to produce a withdrawal.  This argument is a red herring.

13 While an RMP itself does not withdraw land, FLPMA and Interior's regulations require

14 an action to withdraw land to conform with the preexisting RMP.[148]  The Supreme Court

15 has made clear that when a withdrawal contradicts land use expectations contemplated in

16 the RMP, then the RMP must be amended to reflect the agency's changed plan:

17

18

19

> The statutory directive that BLM manage 'in accordance with' land
> use plans, and the regulatory requirement that authorizations and
> actions 'conform to' those plans, prevent BLM from taking actions
> inconsistent with the provisions of a land use plan.  Unless and until

20 [143] Gvt. Br. at 14, n.5, 24-25 n.11 (dismissing argument); *but see id.* at 13 n.4 (Plaintiffs'
claim that the "withdrawal violated FLPMA's planning provisions" reviewable).

21 [144] Pls. Br. at 24-27.

22 [145] 43 U.S.C. § 1732(a); *see also id.* § 1712(a); 43 C.F.R. § 1610.5-3(a) ("All future
resource management authorizations and actions . . . and subsequent more detailed or
23 specific planning, shall conform to the approved plan.").

24 [146] 43 C.F.R. §§ 1610.5-5, 1610.2, 1610.3; Ex. 6 (516 DM 11.5).

[147] *See* Pls. Br. at 25-27 (and footnotes, citing, *e.g.*, *Klamath Siskiyou Wildlands Ctr. v.*
25 *Boody*, 468 F.3d 549, 556 (9th Cir. 2006)).

26 [148] *See supra* nn.146-47.  Intervenors similarly claim an RMP cannot "allocate" lands to
mineral entry or other uses, but that is exactly what RMPs do.  While a separate action
27 may be required to implement land allocations, this does not mean that the RMP is
irrelevant with no legal force.  Actions not in accordance with an RMP remain unlawful.

28

1   the plan is amended, such actions can be set aside as contrary to law
    pursuant to 5 U.S.C. § 706(2).[149]

2
3   Defendants suggest that no amendment was necessary because the withdrawal is

    consistent with the RMP, which does not keep lands open "where withdrawn."[150]

4
5   Defendants' reading is defied by the plain text of the RMP:  Interior should "[a]llow [the]

    *entire* Arizona Strip [Field Office] to remain open to mineral leasing, location, and sale

6   except *where restricted by* wilderness designation, *withdrawals*, *or other specific areas*

7   *identified in this RMP*."[151]  This "Desired Future Condition" must be read in context with

8   the next set of decisions: "Land Use Allocations" for locatable minerals, which quantify

9   the precise acreage associated with preexisting withdrawals (118,743 acres) and acreage

10  open to mining under the RMP (1,534,396 acres open without restrictions).[152]

11  Considering the RMP document as a whole, the terms "identified in this RMP" describe

12  the agency's intent that lands not restricted or withdrawn in 2008, when the RMP was

13  issued, should be kept *open*.[153]  Agency emails in the record confirm this

14  interpretation.[154]  Interior's nonconformance with the RMP is a FLPMA violation.

15                              **CONCLUSION**

16          Plaintiffs respectfully request that this Court grant Plaintiffs summary judgment,

17  deny Defendants summary judgment, and vacate the withdrawal.

18
    _____

19  [149] *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 69 (2004).

20  [150] Int. Br. at 12 n.16 & Int. SF14 (citing AR30214); *see also* Gvt. Br. at 25 n.11.

    [151] Pls. SF80, Ex. 27 (RMP, AR30214) (emphasis added); *see also* Pls. SF79-80
21  (sensitive Areas of Environmental Concern open for mineral exploration/development).

22  [152] Pls. SF80, Ex. 27 (RMP, AR30215).

    [153] Pls. Br. at 25-27; Pls. SF80-82.
23
    [154] Pls. Br. at 26 & n.104; Pls. SF83-84.  Plaintiffs argued that amendment (not
24  "maintenance") was required, and it was unclear if even maintenance had occurred.  Pls.
    Br. at 26-27 & nn.104-107; Pls. SF84, 86.  Interior's required five-year review confirms
25  BLM knew corrective action to the RMP was needed to address the withdrawal, but no
    action was taken at least until eight months later. Ex. F (BLM Arizona State Office,
26  Arizona Strip Field Office RMPs Evaluation (Aug. 2012) at 7 ("[m]aintenance"
    suggested to "[a]ddress . . . 2012 Northern Arizona Withdrawal").  The Court may take
27  judicial notice of this government record available online.  *See*, *e.g.*, *United States v.*
    *14.02 Acres of Land More or Less in Fresno Cnty.*, 547 F.3d 943, 955 (9th Cir. 2008).

28

                                    30

1

Respectfully submitted,

2

3

*/s/ Susan M. Mathiascheck*
Of Counsel:                              Susan M. Mathiascheck
                                         John C. Martin
4                                        Amy B. Chasanov
Ellen Ginsberg                           CROWELL & MORING LLP
5    NUCLEAR ENERGY INSTITUTE            1001 Pennsylvania Avenue, N.W.
     1776 I Street, N.W., Suite 400      Washington, D.C.  20004-2595
     Washington, D.C. 20006              (202) 624-2500
6    (202) 739-8000

7

8                    ATTORNEYS FOR PLAINTIFF NUCLEAR ENERGY INSTITUTE

9                                        */s/ R. Timothy McCrum*
Of Counsel:                              R. Timothy McCrum
                                         CROWELL & MORING LLP
10                                       1001 Pennsylvania Avenue, N.W.
Katie Sweeney                            Washington, D.C.  20004-2595
11   NATIONAL MINING ASSOCIATION         (202) 624-2500
     101 Constitution Avenue, N.W.
     Suite 500 East
12   Washington, DC  20001
     (202) 463-2600
13

14                 ATTORNEYS FOR PLAINTIFF NATIONAL MINING ASSOCIATION

15

16   Dated: April 30, 2014

17

18

19

20

21

22

23

24

25

26

27

28

31

1

### CERTIFICATE OF SERVICE

2

I hereby certify that I have caused the foregoing Opposition to Defendants' Cross-

3

Motions for Summary Judgment and Reply in Support of Plaintiffs' Motion for Summary

4

Judgment to be served upon counsel of record through the Court's electronic service

5

system (ECF/CM) and by first class mail to Gregory Yount at the following address: 807

6

West Butterfield Road, Chino Valley Arizona 86323.

7

Dated: April 30, 2014

8

*/s/ Susan Mathiascheck*_____
Susan Mathiascheck

9

CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.

10

Washington, D.C.  20004-2595
(202) 624-2500

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28