Steven J. Lechner (*Pro Hac Vice*, CO No. 19853)
Jeffrey Wilson McCoy (*Pro Hac Vice*, CO No. 43562)
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
lechner@mountainstateslegal.com
jmccoy@mountainstateslegal.com

Attorneys for Plaintiff American Exploration & Mining Association

Gregory Yount
807 W. Butterfield Road
Chino Valley, Arizona 86323
(928) 899-7029
Gregory_yount@northern-arizona-uranium-project.com

Plaintiff *Pro Se*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GREGORY YOUNT,<br><br>        Plaintiff,<br><br>        v.<br><br>S.M.R. JEWELL, *et al.*,<br><br>        Defendants. | No. CV11-8171-PCT-DGC<br>(Lead Case)<br><br>**AEMA AND GREGORY YOUNT'S RESPONSE TO DEFENDANTS' AND INTERVENORS' CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| NATIONAL MINING ASSOCIATION and NUCLEAR ENERGY INSTITUE,<br><br>        Plaintiffs,<br><br>        v.<br><br>S.M.R. JEWELL, *et al.*, | **ORAL ARGUMENT REQUESTED**<br><br>No. CV12-8038-PCT-DGC |

| | |
|---|---|
| Defendants. | |
| AMERICAN EXPLORATION & MINING ASSOCIATION, | |
| Plaintiff, | No. CV12-8042-PCT-DGC |
| v. | |
| S.M.R. JEWELL, *et al.*, | |
| Defendants. | |
| QUATERRA ALASKA, INC. *et al.,* | |
| Plaintiffs, | No. CV12-8075-PCT-DGC |
| v. | |
| S.M.R. JEWELL, *et al.*, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ v

INTRODUCTION ......................................................................................... 1

ARGUMENT ................................................................................................ 2

I.      THIS COURT SHOULD GRANT AEMA'S SUMMARY
        JUDGMENT ON ITS FLPMA CLAIMS, AND DENY
        DEFENDANTS AND INTERVENORS' CORRESPONDING
        MOTIONS FOR SUMMARY JUDGMENT ....................................... 2

        A.      Withdrawal Decisions Must Comply With FLPMA's
                Multiple Use Mandate .......................................................... 2

        B.      Multiple Use Provides A Reviewable Legal Standard For
                This Court To Apply .............................................................. 5

        C.      The Withdrawal Fails To Reasonably Balance Uses On
                Over 1,000,000 Acres Of Public Land .................................. 10

II.     THIS COURT SHOULD GRANT AEMA SUMMARY
        JUDGMENT ON ITS NFMA CLAIM, AND DENY
        DEFENDANTS AND INTERVENORS' CORRESPONDING
        MOTIONS FOR SUMMARY JUDGMENT ....................................... 15

        A.      The Forest Service's Consent To The Withdrawal Is
                Reviewable Under the APA. .................................................. 15

        B.      The Forest Service Violated NFMA And Its Own
                Regulations By Failing To Comply With The Governing
                Forest Plan ............................................................................ 17

        C.      The Forest Service's Consent Violates NFMA's
                Multiple-Use Mandate .......................................................... 20

III.    THIS COURT SHOULD GRANT GREGORY YOUNT'S
        MOTION FOR SUMMARY JUDGMENT, AND DENY
        DEFENDANTS AND INTERVENORS' CORRESPONDING
        MOTIONS FOR SUMMARY JUDGMENT ....................................... 21

1

2    A.    The Cultural And Tribal Resources Justifications For The
3          Withdrawal Are Not Secular. ....................................................   24

4    B.    The Withdrawal Has An Effect Of Advancing Or
5          Endorsing Religion. ....................................................................   27

6  CONCLUSION .............................................................................   30

7  CERTIFICATE OF SERVICE ......................................................   32

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## CASES

*Access Fund v. U.S. Dept. of Agriculture.*,
    499 F.3d 1043 (9th Cir. 2007) ................................................. 23, 24, 25, 26, 27

*Agostini v. Felton*,
    521 U.S. 203 (1997) ...................................................... 27

*Bennett v. Spear*,
    520 U.S. 154, 178 (1997) ................................................ 17

*Cammack v. Waihee*,
    932 F.2d 765 (9th Cir.1991) ........................................... 27

*Ctr. for Food Safety v. Vilsack*,
    734 F. Supp. 2d 948 (N.D. Cal. 2010) ...................................... 30

*Cholla Ready Mix, Inc. v. Civish*,
    382 F.3d 969 (9th Cir. 2004) ........................................... 23, 24

*Citizens for Clean Air v. U.S. E.P.A.*,
    959 F.2d 839 (9th Cir. 1992) ........................................... 16

*Clark v. Busey*,
    959 F.2d 808 (9th Cir. 1992) ........................................... 16

*Colorado Envtl. Coal. v. Dombeck*,
    185 F.3d 1162 (10th Cir. 1999) ................................................. 8

*Fed. Commc'ns Commission v. NextWave Personal Commc'ns*,
    537 U.S. 293 (2003) ...................................................... 30

*Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*,
    914 F.2d 1174 (9th Cir. 1990) ...................................... 7

*Lemon v. Kurtzman*,
    403 U.S. 615 (1971)...................................................... 24, 27, 30

*Lipsman v. Sec'y of Army*,
    257 F. Supp. 2d 3 (D.D.C. 2003) ........................................... 19

*Lynch v. Donnelly,*
    465 U.S. 668 (1984)..................................................................... 27

*Lyng v. Northwest Indian Cemetery Protective Association,*
    485 U.S. 439 (1988)................................................................... 22, 23, 24

*Lyng v. Payne,*
    476 U.S. 926 (1986)..................................................................... 19

*McCreary County v. Am. Civil Liberties Union of Ky.,*
    545 U.S. 844 (2005)..................................................................... 24, 25

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,*
    463 U.S. 29 (1983)....................................................................... 11

*Mount Royal Joint Venture v. Kempthorne,*
    477 F.3d at 757 (2007)............................................................... 12, 13, 25

*Mountain States Legal Found. v. Hodel,*
    668 F. Supp. 1466 (D. Wyo. 1987)............................................. 19

*Nat'l Wildlife Fed'n v. U.S. Forest Serv.,*
    592 F. Supp. 931 (D. Or. 1984) ................................................. 6,7

*Nat'l Wildlife Fed'n v. U.S. Forest Serv.,*
    801 F.2d 360 (9th Cir. 1986) ...................................................... 6

*Navajo Nation v. USFS,*
    535 F.3d 1058 (9th Cir. 2008) ................................................... 22, 24

*Pac. Rivers Council v. Thomas,*
    873 F. Supp. 365 (D. Idaho 1995) ............................................. 18

*Perkins v. Bergland,*
    608 F.2d 803 (9th Cir. 1979) ..................................................... 5, 6

*Pinnacle Armor v. United States,*
    648 F.3d 708 (9th Cir. 2011) ...................................................... 6

*Rocky Mountain Oil & Gas Ass'n v. Watt,*
    696 F.2d 734 (10th Cir. 1982) ................................................... 7, 9

*Seattle Audubon Soc. v. Moseley*,
    80 F.3d 1401 (9th Cir. 1996) ................................................................ 7, 9

*Stone v. Graham*,
    449 U.S. 39 (1980) ................................................................................ 25

*Strickland v. Morton*,
    519 F.2d 467 (9th Cir. 1975) ................................................................. 5

*Theodore Roosevelt Conservation P'ship v. Salazar*,
    661 F.3d 66 (D.C. Cir. 2011) ................................................................. 8

*U.S. v. Midwest Oil Co.*,
    236 U.S. 459 (1915) .............................................................................. 3

*United States v. Shumway*,
    199 F.3d 1093 (9th Cir. 1999) .............................................................. 20

*Utah v. Andrus*,
    486 F.Supp. 995 (D.Utah 1979) ........................................................... 7

*Vernon v. City of Los Angeles*,
    27 F.3d 1385 (9th Cir. 1994) ................................................................. 27

## ADMINISTRATIVE DECISION

*National Wildlife Fed'n v. BLM*,
    140 IBLA 85 (1997) .............................................................................. 8, 9

## STATUTES

5 U.S.C. § 551(13) ....................................................................................... 16

5 U.S.C. § 704 ............................................................................................. 16

5 U.S.C. § 706 ............................................................................................. 16

5 U.S.C. § 706(2)(A) .................................................................................... 5

16 U.S.C. § 470, *et seq* ............................................................................... 13

16 U.S.C. § 478 ........................................................................................... 19

16 U.S.C. § 1604(e)(1) ........................................................... 18

16 U.S.C. § 1604(i) ............................................................... 20

30 U.S.C. § 21a .................................................................... 15

30 U.S.C. § 22 ..................................................................... 20

Federal Land Policy and Management Act

    Pub. L. No. 94-579, § 704(a), 90 Stat. 2743 (1976) ................. 3

    43 U.S.C. § 1701(7) ......................................................... 2

    43 U.S.C. § 1701(a)(12) .................................................. 15

    43 U.S.C. § 1702(c) ....................................................... 3, 4

    43 U.S.C. § 1702(j) ....................................................... 2, 10

    43 U.S.C. § 1712 ............................................................. 2

    43 U.S.C. § 1714(c) ........................................................ 8

    43 U.S.C. § 1714(c)(1) .................................................... 3

    43 U.S.C. § 1714(c)(2) .................................................... 3

    43 U.S.C. § 1714(c)(2)(2) ................................................ 3

    43 U.S.C. § 1714(c)(2)(3) ................................................ 4

    43 U.S.C. § 1714(i) ....................................................... 16, 19

    43 U.S.C. § 1732(a) ........................................................ 2

    43 U.S.C. § 1732(b) ........................................................ 9

## **REGULATIONS**

36 C.F.R. § 228.4 ................................................................ 19, 20

36 C.F.R. § 228.4(a) ........................................................... 19

36 C.F.R. § 228.5 ........................................................................................ 19

36 C.F.R. § 228.8 ........................................................................................ 19

43 C.F.R. § 2300.0-1(a) ................................................................................ 2

43 C.F.R. § 3809.415(b) ............................................................................... 9

**LEGISLATIVE HISTORY**

H. Rep. No. 94-1163 (1976), *reprinted in* Senate Comm. on Energy and
Natural Resources, 95th Cong., *Legislative History of the Federal Land
Policy and Management Act,* at 436 (1978) .................................................. 4, 5

**OTHER AUTHORITIES**

United States Department of Agriculture, *Final Environmental Impact
Statement for the Kaibab National Forest Land and Resource
Management Plan* at 9, 256 (February 2014), *available at*
http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprd3791591.p
df .................................................................................................................. 18

**INTRODUCTION**

On February 20, 2014, Defendants filed a Cross-Motion for Summary Judgment and Response to Plaintiffs' Motions for Summary Judgment.  Doc. 198.[1]  On March 6, 2014, Intervenors filed their Cross-Motion for Summary Judgment and Response to Plaintiffs' Motions for Summary Judgment.  Doc. 208.  These parties argue that the Secretary has nearly limitless authority to make large-tract withdrawals, including the challenged withdrawal that removed more than 1,000,000 acres from application of the Mining Law.  The Secretary's authority to withdraw public lands is not limitless, however, and when the record demonstrates that the Secretary failed to rationally balance various uses of public lands, the decision must be held unlawful and set aside.[2]  Furthermore, the Forest Service is not required to consent to every withdrawal proposed by the Secretary.  Instead, the Forest Service must comply with its own regulations and governing forest plans, and make an independent decision whether a withdrawal is appropriate for the relevant Forest Service lands.  Finally, as Gregory Yount demonstrates, all withdrawal decisions must comply with the First Amendment of the U.S. Constitution.

---

[1] All page numbers cited are to the page number assigned by the CM/ECF System.  An asterisk before a document number indicates that the cited document was filed prior to consolidation and was docketed using the original case number.

[2] Pursuant to this Court's Order (Doc. 141), Plaintiffs National Mining Association and Nuclear Energy Institute ("NMA and NEI") and Quaterra Alaska, *et al.* ("Quaterra") are also concurrently filing Responses to Defendants and Intervenors' Cross-Motions for Summary Judgment and Replies in support of their Motions for Summary Judgment.  AEMA expressly incorporates the arguments of those Plaintiffs as they relate to AEMA's remaining claims for relief.

1

## ARGUMENT

2
3

I.    **THIS COURT SHOULD GRANT AEMA'S SUMMARY JUDGMENT ON ITS FLPMA CLAIMS, AND DENY DEFENDANTS AND INTERVENORS' CORRESPONDING MOTIONS FOR SUMMARY JUDGMENT.**

4
5

A.    **Withdrawal Decisions Must Comply With FLPMA's Multiple Use Mandate.**

6
7

Defendants attempt to quickly dismiss all of Plaintiffs' Motions for Summary

8

Judgment by arguing that there is no legal standard that restricts the Secretary's discretion

9

to make withdrawals.  Doc. 198 at 16.  As demonstrated in NMA and NEI's response,

10
11

FLPMA's withdrawal provision sets out the legal standard that withdrawal provisions

must comply with in order to be upheld.  NMA and NEI Response/Reply at Section III-A-

12
13

1.  FLPMA requires that withdrawals be made "for the purpose of limiting activities under

14

those laws in order to maintain other public values in the area or reserving the area for a

15
16

particular public purpose or program," 43 U.S.C. § 1702(j), and the Department of

Interior's regulations only authorize withdrawals "where appropriate."  43 C.F.R. §

17
18

2300.0-1(a).

19

In addition, contrary to Defendants' suggestions, a withdrawal decision must

20
21

conform to FLPMA's multiple-use mandate.  Doc. 198 at 24–25.  In passing FLPMA,

Congress instructed the Secretary of the Interior to "manage the public lands under

22
23

principles of multiple-use, in accordance with the land use plans developed . . . under [43

24
25

U.S.C. § 1712] . . . ."  43 U.S.C. § 1732(a) (emphasis added); 43 U.S.C. § 1701(7) (it is

26

the policy of Congress that the public lands be managed "on the basis of multiple use").[3]

27
28

---

[3] Defendants' argument that FLPMA codified the "longstanding" implied executive authority to make withdrawals is incorrect.  Doc. 198 at 6.  Instead, FLPMA expressly

1    FLPMA defines "multiple use" as:

2    [T]he management of public lands and their various resource values so that
     they are utilized in the combination that will best meet the present and
3    future needs of the American people; making the most judicious use of the
     land for some or all of these resources or related services over areas large
4    enough to provide sufficient latitude for periodic adjustments in use to
     conform to changing needs and conditions; the use of some land for less
5    than all of the resources; a combination of balanced and diverse resource
     uses that takes into account the long-term needs of future generations for
6    renewable and non-renewable resources, including, but not limited to,
     recreation, range, timber, *minerals*, watershed, wildlife and fish, and natural
7    scenic, scientific and historical values; and harmonious and coordinated
     management of the various resources without permanent impairment of the
8    productivity of the land and the quality of the environment with
     consideration being given to the relative values of the resources and not
9    necessarily to the combination of uses that will give the greatest economic
     return or the greatest unit output.
10

11
12

13   43 U.S.C. § 1702(c) (emphasis added).

14        FLPMA's notice and reporting requirements demonstrate that Congress intended

15   that the Secretary manage withdrawals under FLPMA's multiple-use mandate.  43 U.S.C.

16   § 1714(c)(1); 43 U.S.C. § 1714(c)(2).  For example, FLPMA requires that the Secretary

17
18   inventory and evaluate "the current natural resource uses and values of the site . . . and

19   how it appears they will be affected by the proposed use," including "the economic impact

20
21   of the change in use on individuals, local communities, and the Nation."  43 U.S.C. §

22   1714(c)(2)(2).  Furthermore, the Secretary must conduct "an analysis of the manner in

23   which existing and potential resource uses are incompatible with or in conflict with the
24

25
     _____

26   revoked that implied authority, and then granted the Secretary limited authority to
     withdraw lands from application of public land laws.  Pub. L. No. 94-579, § 704(a), 90
27   Stat. 2743, 2792 (1976) ("Effective on and after the date of approval of this Act, the
     implied authority of the President to make withdrawals and reservations resulting from
28   acquiescence of the Congress (U.S. v. Midwest Oil Co., 236 U.S. 459) and the following
     statutes and parts of statutes are repealed." (repealing 29 statutes)).

proposed use, together with a statement of the provisions to be made for continuation or termination of existing uses, including an economic analysis of such continuation or termination." 43 U.S.C. § 1714(c)(2)(3).  As a result, when the Secretary makes a withdrawal, he or she must explain how the withdrawal "will best meet the present and future needs of the American people." 43 U.S.C. § 1702(c).

These provisions require the Secretary to justify his withdrawal decision within the context of managing the public lands for multiple use and they compel the Secretary to give a reasonable explanation for any withdrawal decision.  The notice and reporting requirements are not meaningless procedural requirements that allow the Secretary to make withdrawals for any reason.  Instead, as this Court previously concluded, "the reporting requirements provide a meaningful limitation on executive action . . . ."  Doc. 130 at 14.

The legislative history further demonstrates that Congress intended the Secretary's withdrawal decision to conform with FLMPA's multiple-use mandate.  The withdrawal provision is just another land management tool that the Secretary can use to manage public lands in furtherance of FLPMA's multiple use principles.  As the House Committee on Interior and Insular Affairs stated, "[s]ubsection (e) [of Section 202 of FLPMA] authorizes the Secretary to implement his land use plans by management decisions. However, he will have to use the withdrawal procedures of this bill where the implementation action involves the application of the mining law . . . ."  H. Rep. No. 94-1163, at 6 (1976), *reprinted in* Senate Comm. on Energy and Natural Resources, 95th Cong., *Legislative History of the Federal Land Policy and Management Act,* at 436

(1978); *id.* at 10, *Legislative History of the Federal Land Policy and Management Act* at 440 ("*Since withdrawals go to the heart of basic Federal land policies*, [the Secretary] will be able to delegate action only to policy officers in the Office of the Secretary appointed by the President with the advice and consent of the Senate." (emphasis added)). As a result, the Secretary's multiple-use mandate does not disappear when he or she attempts to exercise FLPMA's withdrawal provision.

Therefore, FLPMA requires withdrawals to further the goal of managing the public lands for multiple use.  As a result, if the record does not support the Secretary's determination that the withdrawal will provide for multiple use and sustained yield of natural resources, then this Court must hold unlawful and set aside the withdrawal as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.A. § 706(2)(A).

**B.     Multiple Use Provides A Reviewable Legal Standard For This Court To Apply.**

Defendants further argue that multiple use is not a legally reviewable standard and, thus, this Court should reject any claims which rely on FLPMA, or NFMA's, multiple-use mandate.  Doc. 198 at 25.  Defendants solely rely on the decades old case *Perkins v. Bergland*, 608 F.2d 803 (9th Cir. 1979), in an attempt to discredit AEMA's claims.

*Perkins* relies on dicta from *Strickland v. Morton*, 519 F.2d 467, 469 (9th Cir. 1975), that the multiple use principle "breathe[s] discretion at every pore."[4]  While it is

_____

[4] Importantly, the *Perkins* court did not not rule that multiple use decisions were unreviewable , as Defendants contend.  Instead, it recognized that judicial review is available.  *Perkins*, 608 F.2d at 807.  Furthermore, as demonstrated by NMA and NEI, the court concluded that FLPMA's policy favoring review "remove[d] any doubt" as to the

unsurprising that an agency has some discretion to implement its organic act, the *Perkins* court did little analysis of FLPMA's multiple-use mandate and simply concluded that narrow review is appropriate.  608 F.2d at 807.  Defendants are not bothered by the *Perkin*s court's lack of analysis and would end any review with that solidary case.  In short, Defendants ask this Court to declare that FLPMA's multiple use standard can never provide justification for setting aside an agency decision.  However, if one looks to cases, and decisions by the Department of the Interior itself, after *Perkins* it becomes clear that FLPMA's multiple-use mandate, in conjunction with the APA standard of review, does provide a standard for this Court to apply in this case.  *Cf. Pinnacle Armor v. United States*, 648 F.3d 708, 720 (9th Cir. 2011) ("abuse of discretion" standards of APA "are adequate to allow a court to determine whether the [agency] is doing what it is supposed to be doing").

Since *Perkins*, courts have rejected the contention that an agency action cannot be set aside for failure to comply with the multiple-use mandate.  For example, the U.S. District Court for the District of Oregon has stated that while the multiple use and sustained yield standards are broad, "they do exist" and multiple use and sustained yield "is not entirely discretionary."  *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 592 F. Supp. 931, 938-39 (D. Or. 1984), *amended*, 643 F. Supp. 653 (D. Or. 1984), *order vacated in part*, *appeal dismissed in part*, 801 F.2d 360 (9th Cir. 1986) (upholding Forest Service's multiple-use decision to allow timber sales because decision was supported by the record);

reviewability of the decision, despite the Secretary's similarly broad discretion to impose "appropriate" terms.  608 F.2d at 805–06; NMA and NEI Response/Reply at Section III-A-2.

*see id.* at 938 n. 15 ("To some extent emphasis on one use will entail impairment of another use.  It is the extent of this impairment that is determinative.").

Similarly, the Ninth Circuit has made clear that FLPMA's multiple-use mandate does set concrete limits on agency action.  *Seattle Audubon Soc. v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996) (rejecting environmental group's claim that the Forest Service should have chosen a management alternative that would have reduced logging, and increased the viability of the northern spotted owl, because "the selection of an alternative with a higher likelihood of viability would preclude any *multiple use compromises contrary to the overall mandate of the NFMA*." (emphasis added)); *Headwaters, Inc. v. Bureau of Land Mgmt*, 914 F.2d 1174, 1183 (9th Cir. 1990) (finding that the BLM complied with FLPMA's multiple-use mandate because the management plan contained a multiple use analysis).

Although the Ninth Circuit upheld the agencies' decisions in both of these cases, the court stated that an agency action could violate the multiple-use mandates of FLPMA and NFMA in certain situations.  In *Headwaters*, the court further articulated that an agency's compliance with its organic act should be viewed on a planning unit rather than a site-specific level.  914 F.2d at 1183 (citing *Rocky Mountain Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 738 & n.4 (10th Cir. 1982)).  While it is unlikely that a site-specific project can be managed for competing uses, "by looking at the overall use of the public lands . . . one can accurately assess whether or not BLM is carrying out the broad purposes of the statute." *Rocky Mountain Oil & Gas Ass'n*, 696 F.2d at 738 n.4 (quoting *Utah v. Andrus*, 486 F.Supp. 995, 1003 (D.Utah 1979)).  As a result, while an agency may have broad

discretion to choose one use over another at a site-specific level, an agency has far less

discretion to eliminate a use over a large area of public land.  *Id.*; 43 U.S.C. § 1714(c)

("The Secretary shall notify both Houses of Congress" of any withdrawal aggregating

more than 5,000 acres.).  This is especially true if the reason for eliminating a use is not

reasonably supported by the record before the agency.  *Cf. Theodore Roosevelt*

*Conservation P'ship v. Salazar*, 661 F.3d 66, 76 (D.C. Cir. 2011) ("*In light of FLPMA's*

*multiple-use and sustained-yield mandates*, the Bureau did not act arbitrarily or

capriciously" (emphasis added)); *Colorado Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1171

(10th Cir. 1999) (After studying "the administrative record, and giving a practical

interpretation to the Forest Service's regulatory mandate, consistent with the 'overall

multiple use objectives' and 'inherent flexibility' of the National Forest Management

Act," held that agency decision did not violate NFMA, Forest Service regulations, "and

was not arbitrary and capricious.").

The IBLA has also agreed that FLPMA's multiple use provision provides a limit

on agency discretion.  *Nat'l Wildlife Fed'n v. BLM*, 140 IBLA 85 (1997).  In *National*

*Wildlife Fed'n*, the IBLA affirmed an and Administrative Law Judge's decision that "[t]he

BLM violated the multiple-use mandate . . . when it authorized livestock grazing in five

canyons in the Comb Wash Allotment without engaging in a reasoned and informed

decisionmaking process showing that it had balanced competing resource values in order

to best meet the present and future needs of the American people." *Id.* at 86.  The IBLA

and the parties agreed that the "BLM must conduct some form of balancing of competing

resource values in order to comply with the statute," and that the competing values must

be rationally considered.  *Id.* at 101.

Although FLPMA's multiple-use mandate does not require every use on every acre of land, it does prevent the Secretary from arbitrarily or unreasonably balancing purported competing uses, especially at a planning unit level.  It is not sufficient for the Secretary to simply list the purported competing uses affected by his decision.  In order to comply with FLPMA, the purported competing uses must be rationally balanced and considered, and the Secretary cannot make a decision that is not supported by the record.  *Seattle Audubon Soc. v. Moseley*, 80 F.3d at 1404; *Nat'l Wildlife Fed'n*, 140 IBLA at 101.  If a decision eliminates one use on over a million acres of public lands with no corresponding benefit to other uses or resources, that decision is arbitrary, capricious, or otherwise not in accordance with FLPMA's multiple-use mandate.[5]  *Rocky Mountain Oil & Gas Ass'n*, 696 F.2d at 738 n.4 ("[B]y looking at the overall use of the public lands . . . one can accurately assess whether or not BLM is carrying out the broad purposes of the statute.").  As demonstrated previously, and further demonstrated below, the Secretary's withdrawal decision failed to reasonably balance competing resource values and, as a result, should be held unlawful and set aside.

---

[5] Furthermore, the record demonstrates that the withdrawal was not justified by FLPMA's requirement that "[i]n managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).  The record demonstrates that a withdrawal is not necessary to protect area resources and that leaving the area open for entry and location under the Mining Law will not cause unnecessary or undue degradation.  Doc. 167 at 13–25.  This is especially true because, in the mining context, "unnecessary or undue degradation" is interpreted as an impact that is not necessary when conducting mining operations. *Andrus*, 486 F.Supp. at 1005 n. 13; 43 C.F.R. § 3809.415(b) (Providing that mining operations can prevent unnecessary or undue degradation by assuring that "operations are 'reasonably incident' to prospecting, mining, or processing operations . . . .").

### C. The Withdrawal Fails To Reasonably Balance Uses On Over 1,000,000 Acres Of Public Land.

The Secretary violated FLPMA because he failed to rationally balance purported competing uses on over 1,000,000 acres of public land.[6]  As the record demonstrates, the future anticipated impacts from mining are minimal, and a withdrawal is unnecessary to protect other resources in the withdrawal area.[7]  As a result, the withdrawal fails to reasonably balance multiple uses of the public land because it eliminates a legitimate use with no significant corresponding benefit to other uses.  Accordingly, the withdrawal should be held unlawful and set aside.

Defendants argue that Plaintiffs must challenge every resource mentioned in the Secretary's ROD to prevail on their claims.  Doc. 198 at 10.  As established by NMA and NEI in their response, this is not true because the Secretary's primary stated reason for the withdrawal, both before and after the flawed NEPA process, was protection of water resources.  NMA and NEI Response at Section III-A-2.  Finally, even if Defendants were correct that Plaintiffs must challenge every resource mentioned in the ROD, Plaintiffs

---

[6] This failure to balance competing use not only violates FLPMA's multiple-use mandate, but the requirement in FLPMA's withdrawal provisions that withdrawals be made "for the purpose of limiting activities under those laws in order *to maintain other public values in the area or reserving the area for a particular public purpose or program*."  43 U.S.C. § 1702(j) (emphasis added).  As the record demonstrates, the withdrawal fails to balance purported competing uses on the public land and fails to achieve the purported reasons for the withdrawal.  Doc. 167 13–25.  Therefore, whether this Court applies the "maintain other public values" standard of review articulated in NMA and NEI's response, or the standard or review applying FLPMA's multiple-use mandate, this Court should hold the withdrawal unlawful and set it aside.

[7] Defendants imply that only uranium mining is affected by the withdrawal.  Doc. 198 at 9 ("The Secretary thus acted within his authority in deciding to protect uses and resources *other than* uranium mining." (emphasis in original)).  This is simply not true.  The withdrawal applies to all locatable minerals, although the BLM failed to analyze the effects of the withdrawal on other locatable minerals.  Doc. 167 at 25 n.11.

have met that burden and demonstrated that the record does not support the Secretary's decision with respect to those other resources mentioned in the ROD.[8]  Doc. 167 at 13–25 (demonstrating that the record does not support any of the Secretary's purported justifications for the withdrawal).

With regard to every resource, the Secretary made one common mistake:  he failed to take into account the mitigating effect of current laws and regulations.  Throughout the entire ROD, the Secretary talks in conditional language and fails to analyze the mitigating effect of current laws and regulations, and the mitigating effect of site-specific plans of operations.  Doc. 167 at 16–24.  Because the Secretary failed to analyze an important aspect of the issue, his decision to withdraw over 1,000,000 acres of land was necessarily arbitrary and capricious.  *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 50 (1983) (Agency action is arbitrary and capricious if, *inter alia*,  the agency "entirely failed to consider an important aspect of the problem . . . .").

Furthermore, the record demonstrates that the future anticipated impacts from mining are not enough to reasonably justify prohibiting a valid use on over 1,000,000 acres of land.  This is especially true when one views the record with the required assumption that mitigation will be effective.  Doc. 167 at 13–15.

---

[8] Defendants incorrectly argue that AEMA's claims are free standing APA claims.  Doc. 198 at 17 n. 6.  AEMA's remaining claims are firmly based upon FLPMA and NFMA.  AEMA Complaint (Doc. *1) at ¶¶ 56–63, ¶¶ 64–66 & 69–74;  *see also* Doc. 167 at 13 ("This Court should hold unlawful and set aside the ROD and PLO 7787 because the Secretary unlawfully withdrew over one million acres in violation of FLPMA . . . the Secretary acted arbitrarily, capriciously, and failed to manage the public lands in accordance with FLPMA's multiple-use mandate.");  *id.* at 26–32.

As demonstrated previously, the record indicates that future anticipated impacts to water resources are inconsequential. *See e.g.,* Doc. 167 at 16–19.  Intervenors argue that the likelihood of the risk does not matter because "[t]he Secretary determined that the risk of such serious impacts – *however remote* – was unacceptable."  Doc. 208 at 16 (emphasis added).  But the purported likelihood of any impacts does affect the reasonableness of the Secretary's decision.  The decision to withdraw over 1,000,000 acres from application of the Mining Law is not a proportional or reasonable response to a very minor chance of an impact to water resources.

Similarly, there is no likelihood of impacts to any cultural resources.  Specific cultural resources can, and will be protected.  Doc. 167 at 19–20.  The FEIS clarifies how impacts to specific cultural sites would be mitigated.  AR002216.  When describing the potential impacts to cultural resources, the FEIS provides that "[e]xploration sites are routinely moved to avoid sensitive resources, including cultural resources."  AR002217.

Intervenors and their Amici Curiae attempt to argue that the entire withdrawal area is a sacred resource and, thus, impacts can never be fully mitigated.  Doc. 208 at 34–35; Doc. 201 at 20.  As demonstrated by Quaterra, this argument is unreasonable and has no support from either the record or relevant precedent.  Doc. 173 at 24–26.  Despite the contention that the entire withdrawal area is a sacred resource, Amici Curiae only identify purported specific cultural resources in furtherance of its argument that the entire withdrawal area should be protected. [9]  For example, Amici Curiae state that the

---

[9] Amici Curiae cite *Mount Royal Joint Venture v. Kempthorne,* 477 F.3d 745, 756 (D.C. Cir. 2007) for the proposition that the "Secretary can withdraw land for any purpose so long as the Congress does not disapprove".  Doc. 201 at 21.  This is disingenuous.  In that

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"Southern Paiutes had a system of trails and specialists who moved along the trails carrying messages, goods, and services."  Doc. 201 at 20.  Although these trails have apparently not been inventoried, they are still specific cultural resources that can be protected on a site specific level, if necessary.  Amici Curiae fail to explain how current laws and regulations that protect cultural resources are not sufficient to protect these purported trails.  If these trails are important cultural resources, a 1,000,000 acre withdrawal is not necessary to protect them.  As with every cultural resource in the area, impacts from mining will be mitigated through compliance with laws and regulations, and through site-specific planning.  16 U.S.C. § 470, *et seq.* (NHPA); AR002218 ("Direct impacts would be mitigated through established regulations and procedures of avoidance and mitigation.").

Intervenors also argue that the record indicates that the withdrawal decision is supported because of the anticipated impacts to visual resources and wildlife.  Doc. 208 at 18–19.  With respect to visual resources, the record indicates that the difference in impacts between no withdrawal and a full withdrawal are not significant enough to justify the withdrawal.  *See* AR002192–93; Doc. 167 at 21.  For example, the FEIS expressly provides that the anticipated visual impacts from the withdrawal "may result in similar impact to views" as the no-action alternative in the North Parcel.  AR002193.  For all

case, the D.C. Circuit upheld the large-tract withdrawal because it found that the Secretary followed "FLPMA's land management guidelines" and that the Secretary's actions were "neither arbitrary nor capricious."  *Mount Royal Joint Venture v. Kempthorne,* 477 F.3d at 758.  In any event, the dicta relied upon by Amici Curiae is not applicable because the D.C. Circuit erroneously believed that Congress could disapprove of a withdrawal by exercising the legislative veto in FLPMA.  *Id.* at 755–56.  As this Court emphatically ruled, that legislative veto is unconstitutional.  Doc. 130 at 4.

Parcels, the anticipated visual impacts absent a withdrawal are "moderate" and "would not dominate the view." AR002175, AR002177.

With respect to wildlife resources, while the FEIS provides that impact to wildlife would be "significantly less" as a result of the withdrawal, the actual analysis, when viewed as a whole, demonstrates that the difference between no withdrawal and a full withdrawal is minimal. AR002146. Under both alternatives, impacts to quality and quantity of unfragmented habitat would not be apparent (under the no-action alternative, impact would be measureable), and wildlife distribution or wildlife population viability would not be altered. AR002146–47. Impacts for both alternatives are anticipated to be long-term, but the impacts from the no-action alternative are considered "moderate" because the amount of acres impacted is only 1.1% more than the no-action alternative. *Id*. Despite the language in the FEIS, these differences cannot be reasonably described as "significant."[10]

Defendants argue that impacts from historical mining activities are representative of what impacts mining would have today. Doc. 198. at 27. Historic mining impacts are not representative of potential future impacts because mining technology, laws, and regulations change over time. *See* Doc. 170 at 30; NMA and NEI Response at Section II-D-2. The Secretary's decision should have been based on the anticipated future impacts

_____

[10] Intervenors impliedly assume that the Secretary only had the option to choose between the no-action alternative and the proposed alternative. Intervenors SOF ¶¶ 40–41 (comparing only Alternative A and Alternative B). Intervenors fail to note that the differences in impacts between the 1,000,000 acre withdrawal and the other examined alternatives are fewer than the already insignificant differences between the full withdrawal and no withdrawal. *See, e.g.,* AR002147 (impacts from Alternative C described as "minor"). Despite this, the Secretary chose the most extreme alternative, withdrawing over 1,000,000 acres of land from application of the mining law.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

of mining, which includes the current statutory and regulatory scheme that governs mining.  As demonstrated above, the record shows that any future impacts from mining do not support the decision to withdraw over 1,000,000 acres.

Finally, Defendants argue that mining will continue at levels comparable to previous levels.  Doc. 198 at 7.  This statement is untrue and mining operations are almost completely stymied as a result of the withdrawal.  Doc. 197 at 24–25.  Even if mining operations would continue at previous levels despite the withdrawal, that would not automatically provide justification for preventing people from exercising rights guaranteed by the Mining Law.  Mining is a legitimate, and favored, use of the public lands.  30 U.S.C. § 21a; 43 U.S.C. § 1701(a)(12).  The decision to eliminate new mining operations, even if some operations would continue, must be reasonable and supported by the record.  At the very least, the elimination of new mining operations must be reasonably balanced with some other use of the public lands.  Because the record demonstrates that the significant loss of mining is not balanced by a significant protection of other resources, the Secretary's withdrawal decision was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with FLPMA.

## II.   THIS COURT SHOULD GRANT AEMA SUMMARY JUDGMENT ON ITS NFMA CLAIM, AND DENY DEFENDANTS AND INTERVENORS' CORRESPONDING MOTIONS FOR SUMMARY JUDGMENT.

### A.   The Forest Service's Consent To The Withdrawal Is Reviewable Under the APA.

Defendants argue that AEMA cannot challenge the Forest Service's consent to the withdrawal because the consent was not final agency action.  Doc. 198 at 57–58.  Within the meaning of the APA, the Forest Service's consent is reviewable.

The APA provides that "[a] preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."  5 U.S.C. § 704; *see also* 5 U.S.C. § 706 (providing for judicial review of "agency action"), 5 U.S.C. § 551(13) (defining "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act").  As a result, courts "do not simply review whether [the final decision] was arbitrary or capricious" rather, courts conduct a review of the "entire agency action." *Citizens for Clean Air v. U.S. E.P.A.*, 959 F.2d 839, 845–46 (9th Cir. 1992). (citing 5 U.S.C. §§ 704, 706, 551(13)).  Thus, "[t]he scope of judicial review of final agency action includes the power to review the intermediate and procedural agency actions leading up to the final challenged result."  *Clark v. Busey*, 959 F.2d 808, 811 (9th Cir. 1992).

FLPMA requires that the Secretary obtain the Forest Service's consent before the Secretary can withdraw Forest Service lands.  43 U.S.C. § 1714(i) (Except for emergency withdrawals, "[i]n the case of lands under the administration of any department or agency other than the Department of the Interior, the Secretary *shall* make, modify, and revoke withdrawals *only with the consent of the head of the department or agency concerned*." (all emphasis added)).  If the Forest Service refused to give its consent, then the 355,874 acres of Forest Service land could not have been withdrawn.  Doc 205-1 at 12 (Defendants conceding that 43 U.S.C. § 1714(i) "authorize[es] the Secretary to withdraw lands administered by another agency *only with the agency's consent*." (emphasis added)).  The Forest Service's consent is a required preliminary, procedural, or intermediate agency action and is thus reviewable upon review of the Secretary's ROD.

As a result and contrary to Defendants' assertions, the Forest Service's consent to the withdrawal did determine rights or obligations, and legal consequences flowed from the Forest Service's consent decision. *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (Agency action is reviewable when it "has direct and appreciable legal consequences."). As this Court has ruled, the rights of AEMA's members have been limited as a result of the withdrawal. Doc. 87 at 11–13. Not only do AEMA's members have to submit to a mineral examination before engaging in notice-level operations, AEMA's members are no longer allowed to locate new mining claims in the areas of the forest that were withdrawn. If the Forest Service had refused to consent to the withdrawal, which it was authorized to do under FLPMA, the rights of AEMA's members would not have been diminished. Accordingly, the Forest Service's consent is reviewable agency action within the meaning of the APA.

**B.      The Forest Service Violated NFMA And Its Own Regulations By Failing To Comply With The Governing Forest Plan.**

Defendants argue that NFMA does not require the Forest Service to consider mineral resources or mining in its planning process, as a result, the Forest Service did not have to comply with its Forest Plan when it chose to consent to withdrawing 355,875 acres of Forest Service land. Doc. 198 at 58–59. Defendants argue that NFMA only requires a Forest Plan to cover renewable resources. *Id.* Defendants misstate the requirements of NFMA. *Id.*

First, the Forest Service chose to cover mining in the Kaibab National Forest Plan. The Purpose and Need section of the Forest Plan EIS provides that "[t]he implementing regulations require that a number of analyses be done during the planning process"

including "estimating probable occurrence of minerals and potential for future mineral development . . . ." AR073634.  Furthermore, Issue 13 in the Purpose and Need section is Minerals Management.  AR073640.  Despite Defendants' contention that the Forest Service did not need to consider mineral resources or mining, the planning process for the Forest Plan, and the Forest Plan itself, indicates the opposite.[11]  Accordingly, Forest Service decisions must be consistent with the sections of the Forest Plan that govern minerals and mining activities.  *Pac. Rivers Council v. Thomas*, 873 F. Supp. 365, 372–73 (D. Idaho 1995).

In *Pac. Rivers Council*, a mining group argued, as Defendants argue here, that forest plans do not govern mining activities.  *Id.* at 372.  Despite 16 U.S.C. § 1604(e)(1) only directing "planning for effective management of recreation, range, timber, watershed, wildlife and fish, and wilderness resources" the court ruled that mining activities were covered by the Forest Plans at issue because "mining activities are discussed in the plans, and terms and conditions on such activities, including mitigation measures, are provided for in the plans." *Id.* at 372–73.  Furthermore, the court noted that the Forest Service regulations "require anyone intending to engage in mining operations to notify the Forest Service when such operations 'might cause disturbance of surface resources.'" *Id.* at 374

---

[11] The Forest Service added language to the Final EIS for the proposed Forest Plan to conform to the withdrawal decision.  United States Department of Agriculture, *Final Environmental Impact Statement for the Kaibab National Forest Land and Resource Management Plan* at 9, 256 (February 2014), *available at* http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprd3791591.pdf (cited portions attached hereto as Exhibit 1) (providing that mining and the withdrawal are outside the scope of the planning process).  Despite this new language, the Final EIS still provides that "the proposed plan provides direction for uses, goods and services including diverse recreation opportunities, traditional use, livestock grazing, energy transmission and development, *mineral and mining activities*, and special uses." *Id.* at iii (emphasis added).

(quoting 36 C.F.R. § 228.4(a)); *see also* 16 U.S.C. § 478 (mining operations must comply with rules and regulations covering national forests); 36 C.F.R. § 228.8 (Mining operations "shall be conducted so as, where feasible, to minimize adverse environmental impacts . . . .").

Therefore, the Forest Service is responsible for managing operations involving non-renewable resources within Forest Service lands. *Cf. Mountain States Legal Found. v. Hodel*, 668 F. Supp. 1466, 1476 (D. Wyo. 1987) (ruling that the Department of Agriculture is required by law "to promulgate rules and regulations regarding its policies and procedures pertaining to recommendations on" oil and gas leasing). Accordingly, Forest Service decisions must be consistent with all parts of the governing forest plan, not just those sections that govern renewable resources.[12]

Finally, Defendants imply that only approval or disapproval of specific projects that implement a forest plan must be consistent with the governing forest plan. Doc. 198 at 59. NFMA provides that "[r]esource plans and permits, contracts, *and other instruments for the use and occupancy of National Forest System lands* shall be consistent

---

[12] Defendants cite the ROD in an attempt to argue that withdrawal decisions are outside the authority of National Forest planning. Doc. 198 at 59. The Secretary's interpretation of NFMA and Forest Service regulations are not entitled to deference. *Lyng v. Payne*, 476 U.S. 926, 939 (1986) ("an agency's construction of *its own regulations* is entitled to substantial deference") (emphasis added). Furthermore, the Secretary's interpretation of 43 U.S.C. § 1714(i) is not entitled to deference. *Lipsman v. Sec'y of Army*, 257 F. Supp. 2d 3, 8 (D.D.C. 2003) (when an agency shares responsibility for the administration of a statute with other agencies, the court owes the agency's statutory interpretation no *Chevron* deference). The Forest Service, through its regulations and planning processes, clearly interprets mining operations and withdrawal decisions to be within the authority of National Forest planning. Doc. 167 at 30 (demonstrating that the Kaibab National Forest Plan proposes withdrawals for other purposes); 36 C.F.R. §§ 228.4, 228.5, 228.8 (regulations governing mining operations within Forest Service lands).

with the land management plans." 16 U.S.C. § 1604(i) (emphasis added).  The Forest

Service's consent to the withdrawal affects the use and occupancy, including on the

ground activity, of the Kaibab National Forest.  *United States v. Shumway*, 199 F.3d 1093,

1103 (9th Cir. 1999) ("The owner of a mining claim owns property, and is not a mere

social guest" of the government and is entitled to "possessory right and title . . . .").

Furthermore, the consent acts as a de facto disapproval of certain activities which are

authorized under the Forest Plan.  Absent a withdrawal, a miner is able to use and occupy

Forest Service land for mineral exploration and location.  30 U.S.C. § 22.  As a result of

the withdrawal, any use of Forest Service lands for mineral exploration is automatically

disapproved, contrary to the governing Forest Plan.

The Forest Service's decision to consent to the withdrawal also affects the use and

occupancy of Forest Service lands at a site-specific level.  As demonstrated above, as a

result of the withdrawal, a miner cannot use Forest Service lands for notice-level

operations without first submitting to a mineral examination.  36 C.F.R. § 228.4.  In other

words, all notice-level operations are disapproved unless and until a miner submits to a

costly and time consuming mineral examination.  Because these restrictions are not

consistent with the Forest Plan in place at the time of the Forest Service's consent to the

withdrawal, the consent violates NFMA.  Accordingly, this Court should hold unlawful

and set aside the Forest Service's consent to the withdrawal.

**C.**      **The Forest Service's Consent Violates NFMA's Multiple-Use Mandate.**

As demonstrated above, the multiple-use mandate provides a limitation on Forest

Service decisionmaking.  *See, supra,* Section I-B.  The Forest Service's two sentence

explanation fails to rationally balance the various uses of Forest Service land.  AR003098.

The Forest Service failed to independently analyze the parts of the record that pertain to

the 355,874 acres of Forest Service land withdrawn and instead adopted the Secretary's

analysis, which looked at, and analyzed, the entire 1,000,000 acre withdrawal area.[13]  *Id.*

The record demonstrates that the anticipated future impacts to the resources in the South

Parcel, which is entirely Forest Service Land, are not significant.  AR2075 (Comparing

purported impacts to water resources in each parcel among alternatives.); AR002217–21

(examining purported impacts to cultural resources on every parcel); Doc. 167 at 16–24

(demonstrating that the purported impacts to resources are insignificant for every parcel).

Accordingly, this Court should hold unlawful and set aside the Forest Service's consent to

the withdrawal.

III.    **THIS COURT SHOULD GRANT GREGORY YOUNT'S MOTION FOR
        SUMMARY JUDGMENT, AND DENY DEFENDANTS AND
        INTERVENORS' CORRESPONDING MOTIONS FOR SUMMARY
        JUDGMENT.**

        Plaintiff Yount claims, that in the absence of a secular purpose for the Defendant's

withdrawal decision, that the decision violates the Establishment Clause of the U.S.

Constitution.  Area Native Americans, through the EIS process (Government to

Government consultation), essentially petitioned the Secretary of the Interior for relief; to

determine that their free exercise of religion was being violated by uranium mining in the

Northern Arizona Withdrawal (NAW) area, that exploration drilling and mining wounded

---

[13] Because the Forest Service failed to articulate an independent basis for consenting to
the withdrawal, the consent fails to comply with NFMA's multiple-use mandate for the
same reasons the Secretary's analysis fails to comply with FLPMA's multiple-use
mandate.

the earth, that the earth is sacred and should not be dug up for commercial reasons, and that repeated wounding of the earth can kill their deities and by extension a sacred site. *See* Doc. 167 at 36–37.

The Secretary provided that relief for the area's Native Tribes, indicating that the impacts to American Indian resource could not be mitigated due to their belief that mining "may degrade the values of those lands to the tribes that use them."  AR000009, AR000011.

If the tribes had sued in Federal Court to obtain this result, it would have been denied based on Supreme Court precedent of *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988), and Ninth Circuit Court's *Navajo Nation v. USFS*, 535 F.3d 1058 (9th Cir. 2008).  There is literally nothing to distinguish the rational of the Secretary's decision on behalf of the area's Native Americans and the pleadings of the Plaintiffs in *Lyng*.  The Supreme Court decided in *Lyng*, that there was no undue or substantial burden on Native American rights to exercise their religion and that Plaintiffs were neither coerced nor penalized for their religious practices.

The Court noted that: "no disrespect for these practices is implied when one notes that such beliefs could easily require de facto beneficial ownership of some rather spacious tracts of public property.  Even without anticipating future cases, the diminution of the Government's property rights, and the concomitant subsidy of Indian religion, would in this case be far from trivial. . . ." *Lyng v. NWICPA.*, 485 U.S. at  453.  The Court also recognized that to find for the Plaintiffs would create "a religious preserve for a single group in violation of the **establishment clause**." *Id.* at 445 (emphasis added).

However, the Court also stated that "[t]he Constitution does not permit government to discriminate against religions that treat particular physical sites as sacred . . . ." *Id.* at 453.

The more than one million acre Northern Arizona Withdrawal does not qualify as a particular physical site. No other religious group has been given a Free Exercise beneficial use of such a large tract of land. That the Secretary provided such relief to Native Americans in the withdrawal decision was anticipated by the decision in *Lyng* where it was stated that doing so would diminish the Governments property rights and provide a subsidy for Indian religion, *i.e.*, the very definition of an Establishment Clause violation.

A federal action may protect American Indian religious beliefs and traditions, but only when these religious beliefs are tied to a specific site that also has historical and cultural significance making it eligible for listing under the NHPA. *See e.g. Access Fund v. U.S. Dept. of Agriculture*, 499 F.3d 1043, 1043-45 (9th Cir. 2007); *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 975-76 (9th Cir. 2004).

The Defendants argue in their Cross-motion for Summary Judgment (Document 205-1) that Plaintiff Yount relies on – *Access Fund* and *Cholla Ready Mix, Inc* – involving NHPA-eligible sites and claims that neither case supports Yount's stated legal proposition and, in each case the court rejected claims of an establishment clause violation. While the court rejected claims of an establishment clause violation, it did so because the particular areas involved ***were*** a particular discrete religious site (Cave Rock and Woodruff Butte).

The over one million acre withdrawal cannot be understood or recognized as a particular discrete religious site or traditional cultural property. Size matters!

Recognizing one religious group, American Indians, as beneficiaries of a one million acre traditional cultural property or defining it as a discrete religious site cannot be understood as anything but an endorsement of Native American religion.  No other religion has a one million acre traditional cultural property on the public lands.

The fact that these two cases found against an establishment clause claim is not in any way supportive of the Defendant's position since these two cases are not analogous to the case at hand as demonstrated above and simply do not apply.  The controlling precedents are *Lyng*, 485 U.S. 439, and *Navajo Nation v. USFS*, 535 F.3d 1058.

Even if the court were to consider that the *Access Fund* and *Cholla Ready Mix, Inc* cases might be applicable or instructive, Yount's establishment clause claim is valid because the Defendants' decision does not pass the "*Lemon* test".  *Lemon v. Kurtzman*, 403 U.S. 615 (1971).  A review of the *Access Fund* analysis of the *Lemon* test is instructive.

### A.   The Cultural And Tribal Resources Justifications For The Withdrawal Are Not Secular.

The first prong of the *Lemon* test asks whether the challenged action has a secular purpose or whether it was taken for "the ostensible and predominant purpose of advancing religion."  *Access Fund*, 499 F.3d at 1043 (*quoting McCreary County v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 860 (2005)).  Under the FEIS, the purpose of the proposed action was to protect the natural, cultural, and social resources in the Grand Canyon watershed from possible adverse effects of uranium mining.  AR001625.

The DOI Secretary's rationale for the withdrawal was based on the limited data regarding effects of mining on water quality and quantity in the Grand Canyon watershed

and the potential risk of great harm, on the need to protect American Indian sacred and traditional resources, and on the broad purpose of protecting other resources such as plants and wildlife.  AR000009-000012 (ROD).  In *Mount Royal Joint Venture*, 477 F.3d at 757-58, the court held that the withdrawal of lands from mining to protect American Indian areas of traditional spiritual importance did not violate the Establishment Clause because there were several secular purposes for the withdrawal.

Unlike the case of *Mount Royal Joint Venture*, the secular purposes identified in the FEIS are inadequate because the studies cited are contradicted by other findings in the FEIS and cannot be said to support the determination that uranium mining will adversely affect the Grand Canyon watershed or adversely impact plants and wildlife.  *See McCreary County*, 545 U.S. at 864-65 (When there is a sham or the secular purpose is secondary, it is not adequate basis.); *Stone v. Graham*, 449 U.S. 39, 41 (1980).

Additionally, the *Access Fund* decision contemplates that the Forest Service acted pursuant to a secular purpose – the preservation of a historic cultural area.  The decision noted that "[a]t every opportunity, the Forest Service reaffirmed its desire to protect Cave Rock as a cultural, historical, and archaeological monument."  499 F.3d at 1043.  Also noting that a traditional cultural property is a discretely defined property.  *Id.*  Defendants did not take every opportunity during the EIS process to inform the public that the whole of the withdrawal area was to be considered a traditional cultural property and afforded the protection available to such properties.  Defendants did not do so because the NAW area does not qualify as a traditional cultural property.  The Secretary admitted such in the

1   ROD: "there is only one eligible traditional cultural property (Red Butte on the South

2   Parcel) . . . ."  AR000011.  Red Butte is a very small percentage of the withdrawal area.

3       Defendants did not articulate or advance any significant cultural or historic

4   arguments that would allow the entire NAW area to be included in the NRHP, but instead

5   describe its significance based on Native American religious doctrine: "[m]any of these

6   tribes include the Grand Canyon in their creation stories, and all continue to use all or

7   portions of the withdrawal area for traditional tribal purposes.  All seven tribes, the

8   Havasupai Tribe, Hualapai Tribe, Hopi Tribe, Navajo Nation, Kaibab Band of Paiutes, the

9   Paiute Indian Tribe of Utah, and the Zuni Tribe, uniformly believe that continued uranium

10

11  mining will result in the loss of their functional use of the area's natural resources."

12  AR000011.

13

14      In contrast, the Forest Service in *Access Fund* stated that the significance of Cave

15  rock was "not based on 'Washone religious doctrine' but rather on the secularly-derived

16

17  historic ethnographic record."  499 F.3d at  1044.  The Forest Service chose a historic

18  period from 1885 to 1965 as the time period management of activities at Cave Rock.

19  Thus, current and historic activities were considered in the secularly-derived historic and

20

21  ethnographic record.

22

23      No such consideration was given in the withdrawal decision.  Instead, the Secretary

24  only considered that Native American creation stories include the Grand Canyon and that

25  they uniformly believe that continued uranium mining will result in the loss of their

26

27  functional use of the area's natural resources.

28

The Secretary, by only considering ancestral American Indian religious beliefs, and ignoring the last 150 years or more of historical ethnographic use (cattle grazing, mining, timber harvest, tourism, etc.) of the withdrawal area when making his decision, has endorsed American Indian religious doctrine and thus has advanced American Indian religion.

**B.    The Withdrawal Has An Effect Of Advancing Or Endorsing Religion.**

The effect prong of *Lemon* "asks whether, irrespective of the government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Access Fund*, 499 F.3d at 1045 (citing *Lynch v. Donnelly,* 465 U.S. 668, 690 (O'Connor, J., concurring)); *see also Vernon v. City of Los Angeles,* 27 F.3d 1385, 1398 (9th Cir. 1994).  The test also considers whether non-adherents might view the challenged action as disapproval of their religious choices.  *Cammack v. Waihee,* 932 F.2d 765, 777-78 (9th Cir.1991).  In addressing these issues, a court often looks to "the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between government and religious authority." *Agostini v. Felton,* 521 U.S. 203, 232 (1997) (quoting *Lemon,* 403 U.S. at 615 (discussing effect and entanglement together) (internal quotations omitted).

As a practical matter, the withdrawal decision can and is perceived as an endorsement of area Native American Indian religious beliefs and practices because area Native Americans specifically sought and lobbied for a ban on uranium mining due to their religious beliefs and received one.  The ROD states; "it is likely that the potential impacts to tribal resources could not be mitigated.  Any mining within the sacred and

traditional places of tribal peoples may degrade the values of those lands to the tribes that use them."  AR000009.

In other words, how area Native Americans feel about how mining affects their cultural and religious use of the withdrawal area could not be mitigated.  The Defendant's withdrawal decision endorses Native American religious practices because it creates a religious preserve on over one million acres of public land where a formerly encouraged activity, mining, can no longer be pursued based solely on the religious objections of area Native Americans.  No other religion in the United States has such a preserve.  To the extent that some mining will still go forward, this is due only to the fact that prior existing rights give property rights against the US Government and not the goal of eliminating mining in the withdrawal area.

Additionally, the Defendants' actions excessively entangle government in area Native American religious practices.  The FEIS provides:

> It is important to note that many American Indians view exploratory drilling and mining as wounding the earth. Past mining activities that are visible on the surface are seen as wounds that cannot scab over or heal (Nuvamsa 2008). Any drilling into the earth, regardless of size, is considered a wound to the earth. In commenting on other projects in the withdrawal area, the Hopi have repeatedly stated that the earth is sacred and should not be dug up for commercial reasons (Forest Service 1986a). Other tribes believe that repeated wounding of the earth can kill their deities and by extension a sacred site. In their lawsuit against the U.S. government over the Canyon Uranium Mine, the Havasupai stated that "the Canyon Mine site is sacred and any mining will interfere with their religious practices at and near the mine, and will kill their deities, and destroy their religion" (Havasupai Tribe v. United States 1992).

AR002223.

This viewpoint, as described in the FEIS[14] and promoted in the ROD, that the reason that Native American religious objections to mining in the withdrawal area cannot be mitigated stand in sharp contrast to the actual practices of area Native Americans with regard to mining.  Specifically, the Navajo and Hopi both mine coal or benefit from commercial mining on their lands.  They routinely drill and rip the land to mine coal for commercial gain.  In fact, mining is a primary source of income for both tribes.  This contrary practice was identified to the Defendant by Plaintiff Yount in submitted public comments.  AR081831; AR081854–55; AR081878–80.

Defendants, by ignoring that mining is an everyday activity for many of the area's Native Americans and is indeed a major source of their income, is promoting a Native American religious belief (mining will kill their religion) that area Native Americans do not practice on their own lands.  By promoting such a religious belief in the decision for the withdrawal, the Secretary has impermissibly embroiled the Government in the religious affairs of area Native Americans by promoting a belief that few currently follow, *i.e.*, the Secretary is reinforcing an ancestral religious dogma that present day Native Americans don't uniformly or economically follow or practice.

---

[14] The NPS repeatedly commented that the EIS had to pay special attention to American Indian feelings of place and values relating to the entire landscape. AR003546 (Briefing Statement from Steven Martin, NPS); 004343 (NPS DEIS Ch.4 Comments, Mar. 15, 2010). NPS commented repeatedly that American Indians believe that any disturbance or hole drilled in the earth is a "wound to the earth," and that the feeling and association to the land must be analyzed in the EIS. AR004344-004345, 004350 (DEIS Ch.4 NPS Comments, Mar. 15, 2010); 050773 (DEIS Ch.4 Comments, Aug. 3, 2010); 076337-076338 (Preliminary DEIS Comments, June 15, 2010). NPS also concluded that it was impossible to mitigate impacts of mining because it is an irreversible desecration and drilling into the earth is a "cultural taboo." AR076343, 076336, 076342 (Preliminary DEIS Comments, June 15, 2010); 074165, 074175 (DEIS Comments, Mar. 15, 2010); 079916 (Preliminary FEIS Comments, Aug.18, 2011).

The withdrawal decision fails the "secular purpose" and the "effect of advancing or endorsing religion" prongs of *Lemon*.  The withdrawal decision as articulated in the ROD violates the Establishment Clause of the US Constitution and the decision should be voided by the Court on this basis.

## **CONCLUSION**

For the foregoing reasons, this Court should grant Plaintiffs' Motion for Summary Judgment and deny Defendants' and Intervenors' Motions for Summary Judgment.[15]

DATED this 30th day of April 2014.

Respectfully submitted,

/s/ Jeffrey Wilson McCoy

Jeffrey Wilson McCoy (CO No. 43562)
Steven J. Lechner (CO No. 19853)
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
jmccoy@mountainstateslegal.com
lechner@mountainstateslegal.com

Attorneys for Plaintiff American Exploration &
Mining Association

---

[15] Intervenors request additional briefing on remedy, if this Court grants Plaintiffs'' Motions for Summary Judgment.  Doc. 208 at 40.  Additional briefing is not necessary because vacatur is the presumptive remedy and equity does not demand otherwise.  *Fed. Commc'ns Commission v. NextWave Personal Commc'ns,* 537 U.S. 293, 300 (2003) (In all cases agency action must be set aside if the action was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." (internal quotations omitted)).  Because, a withdrawal is not necessary to prevent irreparable harm to the resources in the withdrawal area, see *supra* Part I-C, a remand without vacatur would be inappropriate.  *Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 951 (N.D. Cal. 2010) ("[T]he Ninth Circuit has only found remand without vacatur warranted by equity concerns in limited circumstances, namely serious irreparable environmental injury.").  Accordingly, equity does not demand that the withdrawal remain in place on remand.

1

2

3   Respectfully submitted,

4

5   Gregory Yount
    807 W. Butterfield Road
6   Chino Valley, Arizona 86323
    Phone: 928-899-7029
7   Gregory_yount@northern-arizona-uranium-
    project.com
8

9   Plaintiff *Pro Se*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of April 2014, I filed the foregoing document using the Court's CM/ECF system, which caused all counsel of record to be served electronically, and by first class mail to Gregory Yount at the following address:  807 West Butterfield Road, Chino Valley Arizona 86323.

/s/ Jeffrey Wilson McCoy
Jeffrey Wilson McCoy, Esq. (CO No. 43562)
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
Phone:  303-292-2021
Fax:  303-292-1980
jmccoy@mountainstateslegal.com

Attorney for Plaintiff American Exploration & Mining Association