Constance E. Brooks (*pro hac vice* Colo. Bar. No. 18258)
C. E. BROOKS & ASSOCIATES, P.C.
303 East 17TH Avenue, Suite 650
Denver, Colorado 80203
(303) 297-9100 (telephone)
(303) 297-9101 (facsimile)
connie@cebrooks.com

William Klain, # 015851
wklain@lang-baker.com
LANG BAKER & KLAIN, P.L.C.
8767 E. Via de Commercio, Suite 102
Scottsdale, AZ  85258
(480) 947-1911(telephone)
(480) 970-5034 (facsimile)

Attorneys for the Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PRESCOTT DIVISION

| | |
|---|---|
| Gregory Yount, | ) |
|     Plaintiff; | ) **Civil. No. 3:11-CV-08171-DGC** |
| v. | ) |
| S.R.M. Jewell, Secretary of the Interior; *et al.* | ) **PLAINTIFFS QUATERRA RESOURCES INC. and ARIZONA UTAH LOCAL ECONOMIC COALITION COMBINED OPPOSITION AND REPLY TO DEFENDANTS AND DEFENDANT-INTERVENORS MOTIONS FOR SUMMARY JUDGMENT** |
|     Defendants; | ) |
| and | ) |
| Grand Canyon Trust, *et al.* | ) |
|     Defendant-Intervenors. | ) |

National Mining Association; Nuclear
Energy Institute,

      Plaintiffs;

v.

S.R.M. Jewell, Secretary of the Interior;
*et al.,*

      Defendants;

and

Grand Canyon Trust, *et al.*,

      Defendant-Intervenors.

                               **Civil No. 3:12-cv-08038-DGC**

American Exploration & Mining
Association

      Plaintiff,

v.

S.R.M. Jewell, Secretary, Department of
the Interior; *et al.,*

      Defendants;

and

Grand Canyon Trust, *et al.*

      Defendant-Intervenors.

                                **Civil No. 3:12**-cv-0842-DGC

Quaterra Alaska, Inc., Arizona Utah
Local Economic Coalition, on behalf of
member the Board of Supervisors,
Mohave County, Arizona;

      Plaintiffs;

v.

S.R.M. Jewell, Secretary of the Interior;
*et al.*

      Defendants;

and

Grand Canyon Trust, *et al.*

      Defendant-Intervenors.

                                Civil No. 3:12-8075-DGC

**TABLE OF CONTENTS**

Page

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    PLAINTIFFS HAVE STANDING TO CHALLENGE THE WITHDRAWAL. . 2
      A.    Standing Relaxed for Procedural Injury . . . . . . . . . . . . . . . . . . . . . 3
      B.    AULEC Standing Genuine, Not a Pretext. . . . . . . . . . . . . . . . . . . . 4

II.   FLPMA WITHDRAWAL CRITERIA PROVIDE LAW TO APPLY. . . . . . . . 7
      A.    FLPMA Provides for a Presumptive Right to Judicial Review. . . . . 7
      B.    FLPMA Rewrote the Executive Branch Withdrawal Authority. . . . . 8
            1.    Executive Withdrawal Authority Repealed. . . . . . . . . . . . . . 8
            2.    FLPMA Provides Law to Apply. . . . . . . . . . . . . . . . . . . . . 10

III.  THE NAW STATED PURPOSE IS UNSUPPORTED. . . . . . . . . . . . . . . 11
      A.    NAW to Protect Grand Canyon Watershed. . . . . . . . . . . . . . . . . 11
            1.    Definition of Watershed Limited to Hydrology. . . . . . . . . . 11
            2.    Lands Withdrawn Outside of Grand Canyon Watershed. . . . 13
      B.    No Adverse Impacts to Water Resources, §1714(c)(2)(2). . . . . . 14
            1.    Hard Science Did Not Support Policy Favoring the NAW. . . 14
            2.    Conclusion of Risk and Unacceptable Impacts Unsupported.15
            3.    Water Samples Skewed Data and Not Corrected. . . . . . . . 16
      C.    Mitigation of Impacts on Tribal Beliefs is Prohibited Post Hoc
            Rationalization. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
            1.    Post Hoc Rationale for Withdrawal.. . . . . . . . . . . . . . . . . . 18
            2.    The Sacred Classification Based on Extra-legal Definition. . 19
            3.    DOI and GCT Authority Distinguished. . . . . . . . . . . . . . . . 21
      D.    Mineral Endowment and Foregone Resources
            §1714(c)(2)(3) & (12). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
      E.    Economic Impacts Underestimated, §1714(c)(2)(8). . . . . . . . . . . 23
      F.    The Withdrawal Does Not Comply With the RMP, §1733(a). . . . . 24

IV.   FLPMA AND NEPA MANDATE COUNTY COORDINATION . . . . . . . . . 25

V.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

ADDENDUM

1.  43 U.S.C. §1701, n. 704, Pub. L. 94-579, 90 Stat. 2792

3.   One Third of the Nation's Land, Report to the Public Land Law Review
     Commission (1970) (selected pages)

3.  Charles F. Wheatley, Withdrawals under the Federal Land Management and
Policy Act (FLPMA), 21 ARIZ. L. REV. 311 (1979)

1

# **TABLE OF AUTHORITIES**

2

**CASES**                                                                   **PAGE**

3  *Access Fund v. U.S. Dep't of Agric.,* 499 F.3d 1036 (9th Cir. 2007). . . . . . . . . . . 21

4  *Amigos Bravos v. U.S. Bureau of Land Mgmt.,* 816 F. Supp.2d 1118

5     (D. N.M. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6  *Bennett v. Spear,* 520 U.S. 154 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

7  *Calif. Forestry Ass'n v. Thomas*, 936 F. Supp. 13 (D. D.C. 1996). . . . . . . . . . . . 6

8  *Calif. Wilderness Coal. v. U.S. Dep't. of Energy,* 631 F.3d 1072
9     (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

   *City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004). . . . . . . . . . . . . . . . . 26
10
11  *Ctr. for Biological Diversity v. Bureau of Land Mgmt.,* 937 F. Supp.2d 1140 (N.D. Calif. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 271

12  *Cholla Ready Mix, Inc. v. Civish,* 382 F.3d 969 (9th Cir. 2004). . . . . . . . . . . . . 21

13  *Citizens for Better Forestry v. U.S. Dep't. of Agric.,* 341 F.3d 961

14     (9th Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

15  *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402 (1971). . . . . . . . 7

16  *City of Davis v. Coleman,* 521 F.2d 661 (9th Cir.1975). . . . . . . . . . . . . . . . . . . . 3

17  *Cloud Found. v. U.S. Bureau of Land Mgmt.,* 802 F.2d 1192

18     (D. Nev. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

19  *Day v. Bond,* 500 F.3d 1127 (10th Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . 2

20  *Dunlop v. Bachowski,* 421 U.S. 560 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21  *Earth Island Inst. V. U.S. Forest Serv.,* 697 F.3d 1010
       (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17, 18,
22
   *Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658 (D.C. Cir.1996). . . . . . . . . . . . . . . 3
23
   *Greenpeace Action v. Franklin,* 14 F.3d 1324 (9th Cir. 1992). . . . . . . . . . . . . . 14
24
   *Havasupai Tribe v. United States,* 752 F. Supp. 1471 (D. Ariz. 1990), *aff'd sub nom*.
25     Havasupai Tribe v. Robertson, 943 F.2d 32 (9th Cir. 1991). . . . . . . . . . . . . . 21

26  *Klamath Siskiyou Wildlands v. Boody,* 468 F.3d 549 (9th Cir. 2006). . . . . . . 24, 25

27

28

1

**TABLE OF AUTHORITIES** (cont'd.)

*Lassen Motorcycle Club*, 133 IBLA 104, 108 (1995). . . . . . . . . . . . . . . . . . . . . 12

*Motor Vehicle Mfrs. Ass'n. of U.S. Inc. v. State Farm Mut. Auto Ins.*

    463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Mount Evans Co. v. Madigan,* 14 F.3d 1444 (10th 1994). . . . . . . . . . . . . . . . . 6

*Mount Royal Joint Venture v. Kempthorne,* 477 F.3d 745 (D.C. Cir. 2007). . 21, 22

*Natural Res. Defense Council v. U.S. Forest Serv.,* 421 F.3d 797

    (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 23, 24

*Natural Res. Defense Council v. U.S. Dep't of the Interior,*

    113 F.3d 1121 (9th Cir.1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Northern Plains Res. Council, Inc. v. Surface Transp. Bd.,* 668 F.3d 1067

    (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Nw. Envtl. Defefense Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520

    (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Norton Const. Co. v. U.S. Army Corps of Eng'rs,* 2007 WL 1431907 (N.D. Ohio May
14, 2007) aff'd, 280 F. App'x 490 (6th Cir. 2008).. . . . . . . . . . . . . . . . . . . . . . 11

*Perkins v. Bergland,* 603 F.3d 803 (9th Cir. 1979). . . . . . . . . . . . . . . . . . . . . 78

*Port of Astoria, Or. v. Hodel,* 595 F.2d 467 (9th Cir. 1979). . . . . . . . . . . . . . . . 2

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't
of Agric.*, 415 F.3d 1078 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*So. UT Wilderness Alliance,* 2012 WL 1184350 (IBLA 2012). . . . . . . . . . . . 11, 12

*Southwestern Ctr. for Biological Diversity v. U.S. Forest Serv.,* 100 F.3d 1443

    (9th Cir.1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Wyo. v. U.S. Dep't of Interior,* 674 F.3d 1220 (10th Cir. 2012). . . . . . . . . . . . . 4

*Yount v. Salazar,* 2013 WL 93372 (D. Ariz. Jan. 8, 2013). . . . . . . . . . . . . . . . . 6

# TABLE OF AUTHORITIES (cont'd.)

**STATUTES**                                                                 **PAGE**

5 U.S.C. §§701-706. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5 U.S.C. §706(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

42 U.S.C. §4332(2)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

43 U.S.C. §§141-142 (repealed). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

43 U.S.C. §§1701-1784. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

43 U.S.C. §1701, n. 704, 90 Stat. 2792, . . . . . . . . . . . . . . . . . . . . . . . . . . 8

43 U.S.C. §1701(a)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

43 U.S.C. §1701(a)(12). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

43 U.S.C. §1702(j). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 23

43 U.S.C. §1702(m). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

43 U.S.C. §1712(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 31

43 U.S.C. §1712(c)(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

43 U.S.C. §1712(e).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

43 U.S.C. §1714. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

43 U.S.C. §1714(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

43 U.S.C. §1714(c)(2)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

43 U.S.C. §1714(c)(2)(2)-(12). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

43 U.S.C. §1714(c)(2)(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

43 U.S.C. §1714(c)(2)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

43 U.S.C. §1714(c)(2)(12). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

43 U.S.C. §1714(l). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

43 U.S.C. §1732(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

43 U.S.C. §1733(c).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

43 U.S.C. 1739(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

1

### <u>TABLE OF AUTHORITIES</u> (cont'd.)

2

**REGULATIONS**                                                          **PAGE**

3   40 C.F.R. §§1502.9(b), 1502.16(c), 1506.2(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

4   40 C.F.R. §1502.14. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

5   40 C.F.R. §1502.16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

6   40 C.F.R. §1508.8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 28

7   43 C.F.R. §1610.5-3(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

8   43 C.F.R. §§1610.5-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

9   43 C.F.R. §2301-0.0-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

10  43 C.F.R. §2310.0-3(b(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

11  43 C.F.R. §2310.3-2(c)(v). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

12  43 C.F.R. §2310.3-2(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

13  43 C.F.R. §2310.3-2(b)(1)-(10). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

14  43 C.F.R. §2310.3-2(b)(3)(iii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

15  43 C.F.R. §2310.3-2(b)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 25

16  43 C.F.R. §2310.3-2(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

17

**BLM MANUALS AND HANDBOOKS**                                           **PAGE**

18  H-1601-5, Land Use Planning Handbook, Glossary. . . . . . . . . . . . . . . . . . . . 11, 12

19  H-8431.07, Glossary Visual Resource Contrast Rating. . . . . . . . . . . . . . . . . . . 14

20  DM-8100-1 The Foundation for Managing Cultural Resources (Dec. 3, 2004). . 12

21  DM-8110-1 Identifying and Evaluating Cultural Resources (Dec. 3, 2004). . . . . 12

22  DM-8120-1 Tribal Consultation under Cultural Resource Authorities

23     (Dec. 3, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

24  DM-8130-1 Planning for Uses of Cultural Resources (Dec. 3, 2004). . . . . . . . . 12
    2
25  DM-8140-1 Protecting Cultural Resources (Dec. 3, 2004). . . . . . . . . . . . . . . . . 12

26

27

28

**<u>TABLE OF AUTHORITIES</u>** (cont'd.)

*One Third of the Nation's Land, Report to the Public Land Law Review Commission* (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

Charles F. Wheatley, *Withdrawals under the Federal Land Management and Policy Act (FLPMA)*, 21 ARIZ. L. REV. 311 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1

**INTRODUCTION**

2      Plaintiffs, Quaterra Resources Inc. (Quaterra) and the Arizona-Utah Local

3  Economic Coalition (AULEC), filed this action to challenge the Northern Arizona

4  withdrawal  (NAW) and Final Environmental Impact Statement (FEIS) pursuant to

5  the Administrative Procedure Act (APA), 5 U.S.C. §§701-706, for violation of Federal

6  Land Management and Policy Act (FLPMA), 43 U.S.C. §§1701-1784, and the

7  National Environmental Policy Act (NEPA), 42 U.S.C. §4332(2)(C).  In this combined

8  opposition to the motions for summary judgment by the Federal Defendants, the

9  Secretary, Department of the Interior and the Bureau of Land Management (DOI)

10  and the Intervenors, Grand Canyon Trust, *et al*. (GCT), Plaintiffs demonstrate that

11  (1) AULEC established the facts and chain of causation to support Article III and

12  prudential standing for its NEPA claims; (2) this challenge to the NAW is justiciable

13  in light of FLPMA's presumption of judicial review and the criteria in Section 204; 43

14  U.S.C. §1714; (3) the record and statutory language contradict DOI's argument that

15  it correctly exercised its implied and statutory authority to close the public lands to

16  mining, when FLPMA repealed any implied withdrawal authority; (4) efforts to

17  dismiss the facts as fly-specking fail since the scientific contradictions discredit the

18  conclusion that uranium mining in the current regulatory environment may result in

19  unacceptable harm to the Grand Canyon resources; (5) the Secretary's last-minute

20  rationale that the NAW is necessary to protect sacred lands and mitigate impacts on

21  religious beliefs is arbitrary and capricious when general beliefs that mining wounds

22  the earth separate from cultural sites or religious practices do not enjoy statutory

23  protection and the Secretary's claim of authority to protect tribal areas or aboriginal

24  territories as sacred marks a reversal in federal policy and precedent; and (6) both

25  FLPMA and NEPA require consultation and to try to resolve conflicts between state

26  and local governmental interests and those of DOI and this did not occur.

27

28

Combined Opposition and Reply of Quaterra and AULEC to
                                                  DOI and GCT Motions for Summary Judgment

1  **I.  PLAINTIFFS HAVE STANDING TO CHALLENGE THE WITHDRAWAL**

2      Plaintiffs Quaterra and AULEC established the elements of Article III and

3  prudential standing for the FLPMA and NEPA claims through extrinsic evidence,

4  including declarations and documents.[1]  ECF Nos. 188-6, Buster Johnson 2ndDecl.

5  ¶¶27-34.; 72-2 Decl. Of Buster Johnson at ¶¶7-16, 24, 27, 31-37; and 72-1, Decl. of

6  Gene Spiering, ¶¶7-12.  DOI's attack on AULEC's NEPA standing largely ignores

7  that Plaintiffs correctly stated the standard for standing at the summary judgment

8  stage, Pl. Br. at 22-23, and provided extrinsic evidence in addition to what was

9  provided in opposition to the Motion to Dismiss.  ECF 188-6, Ex. 81.  The evidence

10  establishes a clear chain of causation between the environmental harm suffered due

11  to the withdrawal by DOI and redressability.

12      Prudential standing requires that the injury-in-fact be "arguably within the zone

13  of interest" of the statute that the plaintiff claims the agency violated.  *Port of Astoria,*

14  *Or. v. Hodel*, 595 F.2d 467, 474 (9th Cir. 1979) (internal quotes omitted).  This Court

15  has already confirmed Plaintiffs' standing under FLPMA and AULEC's prudential

16  standing under NEPA.   This Court's reasoning also applies at the summary

17  judgment stage since it was supported by extensive declarations, exhibits, and other

18  "specific facts."  See *Bennett v. Spear*, 520 U.S. 154, 167-68 (1997); *Day v. Bond*,

19  500 F.3d 1127, 1132 (10th Cir. 2007) (Defendants will only prevail on standing

20  grounds if "the record is *devoid of evidence* raising a genuine issue of material fact

21  that would support the plaintiff's ultimate burden of proving standing." (emphasis

22  added)).

23

24

25  —————————————————

26  [1]  DOI does not renew its standing challenge for the Quaterra or AULEC FLPMA
claims.

27

28              Combined Opposition and Reply of Quaterra and AULEC to
DOI and GCT Motions for Summary Judgment

1

## A.    Standing Relaxed for Procedural Injury

2      AULEC's NEPA claims are procedural and DOI's reliance on Tenth Circuit

3   case law ignores the fact that the Ninth Circuit applies a more relaxed test of

4   probability when the legal claim involves a procedural injury in fact.  ECF No. 173,

5   Pl. Br. at 23.  A plaintiff must show that it is "*reasonably probable* that the challenged

6   action will threaten [their] concrete interests."  *City of Sausalito v. O'Neill*, 386 F.3d

7   1186, 1197 (9th Cir. 2004) (emphasis added); *see also Amigos Bravos v. U.S.

8   Bureau of Land Mgmt.*, 816 F. Supp.2d 1118, 1129 (D. N.M. 2011) (discussing both

9   standards).  A plaintiff need not prove "direct environmental effects" *Citizens for

10   Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 973 (9th Cir. 2003), or "that the

11   challenged federal project will have particular environmental effects..." *City of Davis

12   v. Coleman,* 521 F.2d 661, 670–71 (9th Cir.1975), but only that a plaintiff's injury is

13   not at the end of a "lengthy chain of conjecture." *Citizens*, 341 F.3d at 974

14   (distinguishing *Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658, 667 (D.C. Cir.1996)).

15      AULEC's basis for standing is simple and well grounded.  Mohave County's

16   General Plan explicitly details air quality mitigation by paving dirt roads to reduce

17   dust particulates. ECF No. 188-6, ¶8; 2nd Statement of Fact (SF) ¶15.  Tax revenues

18   are used for all road improvement projects.  ECF No. 188-6, ¶¶6, 8.  Mohave

19   County, however, suspended all road improvement projects due to the lack of tax

20   revenues that followed the notice of segregation. ECF No. 188-6, ¶¶11, 32-33, 35.

21   Thus, it is clear that Mohave County's injury is environmental in nature and causally

22   connected to the NAW.  *Sausalito*, 386 F.3d at 1197-99.  Indeed, Mohave County's

23   codified and pre-existing concern for air quality and those directly related statements

24   by Buster Johnson are precisely the type of hard evidence that indicate a reasonable

25   probability of environmental injury.  *Citizens*, 341 F.3d at 974.  BLM recognized

26   Mohave County's expertise with regards to natural resources and environmental

27

28

1    quality when it executed that Memorandum of Understanding between cooperating

2    agencies, 2nd SF ¶16, and cannot now claim that Mohave County does not have a

3    concrete interest in those same issues.

4         **B.    AULEC Standing Genuine, Not a Pretext**

5         DOI does not dispute the facts relating to AULEC's standing but attempts to

6    disparage AULEC's standing by claiming the county's environmental interests are

7    pretextual, hypothetical and speculative.  DOI Br. at 25.

8         DOI argues that tax revenues that could be used to protect desert tortoise

9    habitat and to pave roads in order to improve air quality are conjectural or

10   hypothetical and do not create an "*increased risk* of actual, threatened or imminent

11   environmental harm."  *See Wyo. v. U.S. Dep't of Interior*, 674 F.3d 1220, 1237 (10th

12   Cir. 2012) (emphasis added), DOI Br. at 31.  The *Wyoming* case is distinguished on

13   its facts because the revenues were related to sales taxes generated by the

14   snowmobile businesses, which in turn depended on an unknown number of tourists.

15   The Tenth Circuit distinguished its earlier decision in *Mount Evans Co. v. Madigan,*

16   *14* F.3d 1444, 1451 (10th 1994) holding that statutorily directed revenues granted

17   standing and wrote: "We do not foreclose the argument that reduced tax revenues

18   can provide a state with Article III standing. *Id*. Rather, a state must show a "fairly

19   direct link between the state's status as a ... recipient of revenues and the legislative

20   or administrative action being challenged."  *Wyoming,* 674 F.3d at 1235.

21        This case is conforms to the *Mount Evans* holding.  Mohave County enjoys the

22   statutory right to a share of mining severance taxes paid for operations in Mohave

23   County.  ECF No. 188-6, ¶¶8, 9, 10, 12, 14, 26.  The withdrawal is intended to

24   preclude most, if not all, mining, thus directly depriving the county of tax revenues

25   that would otherwise be paid and used for environmentally beneficial projects.  The

26   number of claims and significant investments already made demonstrate that but for

27

28   Page 4                          Combined Opposition and Reply of Quaterra and AULEC to
                                      DOI and GCT Motions for Summary Judgment

the withdrawal, mines would proceed to development and pay taxes to the State. The County has proven the link and the FEIS admits that severance tax revenues are reduced.  AR002285, 002296.

The evidence and record contradict DOI.  DOI cannot dispute state tax laws, the county's authority to provide for environmental protection, or the fact that the County has in fact provided for environmental protection.  ECF Nos. 72-2, ¶¶11-12; 188-6, ¶¶17, 20-21.  DOI advances the novel contention that because Mohave County provided comments regarding economic impacts, it cannot claim standing in subsequent litigation.  DOI Br. at 23.  No court has imposed such a hurdle for standing.  *See also* NMA/ NEI Reply Brief at 2-3.  It is also not entirely true because Mohave County also explained that the NAW contradicted the General Plan.

DOI claims that upgrading roads, including the Diamond Bar Road, between the GCNP and western Mohave County, to reduce particulates has no connection to the withdrawal.  DOI Br. at 32-33.  But the County testifies that it put this project on hold due to lack of revenues traceable to the withdrawal.  ECF No. 188-6, ¶20. The NAW impacts on Mojave County's interests are not pretext, but reflect the causal connection between the revenue impacts from the NAW that diminish county services, including its road upgrade program and other environment projects, which depend on tax revenues.

AULEC showed that projected state revenues that flow to Mohave County from the mining industry are significantly reduced as a result of the withdrawal and would be redressed if the withdrawal is set aside.  ECF Nos. 72-2, 13-14, ¶¶36-37; 188-6, ¶¶5, 13-14.  *See also Yount v. Salazar*, No. CV11-8171-PCT DGC, at 12, 2013 WL 93372 (D. Ariz. Jan. 8, 2013).  These revenues are directed by statute to be paid to the county, as was true in *Mount Evans v. Madigan*, 14 F.3d at 1451.

Combined Opposition and Reply of Quaterra and AULEC to DOI and GCT Motions for Summary Judgment

1   DOI's argument that the NAW reduces dust is irrelevant, DOI Br. at 32,

2   because the road upgrades are needed to address the current problem of 700,000

3   tourist trips on the Diamond Bar road, which cause significant dust and contribute

4   to air quality degradation in the Class I air shed for the GCNP. ECF No. 188-6, ¶¶14-

5   21.  The loss of severance tax revenues that Mohave County would have otherwise

6   received prevented Mohave County from beginning this work.  *Id.*

7   DOI further misconstrues AULEC's economic interests as a basis for standing.

8   DOI Br. at 32.  AULEC does not deny that it has an economic interest in the mining

9   tax revenues that would be generated if the NAW were set aside.  ECF No. 188-6,

10  ¶¶7-9. It is well settled, however, that AULEC "may have standing under NEPA even

11  if [its] interest is primarily economic, as long as [AULEC] also alleges an

12  environmental interest or economic injuries that are causally related to an act within

13  NEPA's embrace." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of*

14  *Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1103 (9th Cir. 2005) (internal quotes

15  omitted).  AULEC's interest in air quality, erosion, and desert tortoise habitat are well

16  embedded in state law and the record, ECF No. 188-6, ¶¶11, 14, 21-26, 32-33, 35,

17  as well as AULEC's more general environmental concerns that BLM must coordinate

18  with Mohave County to try to resolve the conflicts between BLM and Mohave

19  County's General Plan.   *See* 43 U.S.C. §§1712(a), 1712(c)(9), 1714(c)(2)(7),

20  1739(e); 40 C.F.R. §§1502.9(b), 1502.16(c), 1506.2(d).   AULEC is a uniquely

21  suitable entity that was intended to benefit under NEPA. *California Forestry Ass'n*

22  *v. Thomas*, 936 F. Supp. 13, 22 (D. D.C. 1996).

23  **II.    FLPMA WITHDRAWAL CRITERIA PROVIDE LAW TO APPLY**

24  The Plaintiffs ask this Court to set aside the withdrawal because the stated

25  reasons for the withdrawal as necessary to protect the resources in the Grand

26  Canyon watershed were disproven and the later-added rationale of not being able

27

28

1    to fully mitigate the impacts of mining on tribal resources refers to the belief that

2    drilling wounds the earth.  This accommodation contradicts long-standing legal

3    position of the United States and lacks the necessary statutory underpinnings.  Pl.

4    Br. at 16-18.  In response, Defendants first argue that (1) the FLPMA challenges are

5    not justiciable because there is no law to apply; DOI Br. at 12-13, and (2) further that

6    the withdrawal does not violate FLPMA.  DOI Br. at 14-24.  As shown below, FLPMA

7    provides for judicial review, even in cases involving discretionary actions and FLPMA

8    provides law to apply because the criteria for the notice to Congress are extended

9    by regulation to the withdrawal application.  43 C.F.R. §2310.3-2(b).

10   **A.    FLPMA Provides for a Presumptive Right to Judicial Review**

11   Citing Section 701 and *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401

12   U.S. 402, 410 (1971) DOI first argues that FLPMA is drawn so broadly that there is

13   no law to apply.  DOI Br. at 12-15.  The APA judicial review exemption, however,

14   applies only in "rare instances," *id.* and the agency bears "the heavy burden of

15   overcoming the strong presumption that Congress did not mean to prohibit all judicial

16   review of [the agency's] decision." *Dunlop v. Bachowski,* 421 U.S. 560, 567 (1975).

17   DOI fails to meet this burden.  FLPMA establishes a presumption of judicial

18   review.  *Perkins v. Bergland*, 603 F.3d 803, 815 (9th Cir. 1979) citing 43 U.S.C.

19   §1701(a)(6).  The *Perkins* case concerned Forest Service discretion to reduce

20   grazing permits under FLPMA.  The Ninth Circuit rejected the argument that there

21   was no judicial review of a discretionary agency decision under the APA and held

22   that FLPMA established a presumption of judicial review and that the reduction was

23   arbitrary for lack of evidence. *Id.*

24   This case involves review of the DOI's discretion to withdraw public lands  and

25   the lack of evidence to support the decision's stated rationale.  For the same

26

27

28

Combined Opposition and Reply of Quaterra and AULEC to
                               DOI and GCT Motions for Summary Judgment

1  reasons, there is a right to judicial review and the decision can be set aside if not

2  supported in the record.

3       **B.    FLPMA Rewrote the Executive Branch Withdrawal Authority**

4            1.    *Executive Withdrawal Authority Repealed*

5       DOI incorrectly argues that the Secretary has implied authority to withdraw

6  public land from mining and that Section 204 merely codified the Executive Branch

7  authority.  DOI Br. at 11, 16-17.  FLPMA repealed all such authority.  The law stated:

8       Effective on and after the date of approval of this Act, the implied
        authority of the President to make withdrawals and reservations
9       resulting from the acquiescence of the Congress (U.S. v. Midwest Oil.
        Co., 236 U.S. 459) and the following statutes and parts of statutes are
10      repealed:

11  Addendum 1, 90 Stat. 2792, 43 U.S.C. §1701, n. 704 (a).  This section also repealed

12  about 29 laws, in whole or in part, relating to withdrawal authority, including the

13  Pickett Act, 43 U.S.C. §§141-142, which granted Interior Secretary the authority to

14  withdraw lands temporarily in aid of legislation or study.

15       Section 204 reflects Congress' response to the Public Land Law Review

16  Commission's conclusion that the Executive branch had arbitrarily closed 75% of

17  federal lands to mineral uses.[2]  Addendum 2, *One Third of the Nation's Land, Report*

18  *to the Public Land Law Review Commission,* at 52-53 (1970).[3]  The Commission

19  concluded that the haphazard and unnecessary use of withdrawals and

20  classifications affected virtually all of the public domain and interfered with mineral

21  _____

22  [2] Congress appointed a bipartisan commission to "review of existing public land laws
    and regulations and recommend revisions necessary therein."  *One-Third of the*
23  *Nation's Land* at ix.  The Commission conducted a number of studies, issued
    reports, and finally recommendations.

24
    [3]   Charles F. Wheatley, under contract to the Commission, documented the
25  withdrawals, land classifications, and other segregative land policies and their impact
    on mineral development.  Charles F. Wheatley, *Withdrawals under the Federal Land*
26  *Management and Policy Act (FLPMA)*, 21 ARIZ. L. REV. 311, 317 (1979).

27
                 Combined Opposition and Reply of Quaterra and AULEC to
28                                                DOI and GCT Motions for Summary Judgment

1   uses. *Id.* at 51-52, 43, 248.  The Commission recommended that Congress assert

2   its constitutional authority over federal lands by delineating specific delegation of

3   authority to the Executive for other withdrawals and otherwise repealing previous

4   authority. *Id.* at 51-53.  The Commission also recommended that Congress require

5   DOI to review and revoke withdrawals and classifications, most of which were

6   unnecessary. *Id.* at 56.  Congress adopted the Commission's recommendations to

7   repeal the express and implied withdrawal authority and delegated discrete

8   withdrawal authority.

9       Section 204 was intended to preclude withdrawals that would interfere with

10  mineral development by limiting the Secretary's discretion. *Wheatley* at 317-318,

11  323-324; *One-Third of the Nation's Land* at 121 ("Public land mineral policy should

12  encourage exploration, development, and production of minerals on the public

13  lands.").  FLPMA incorporates the Mining and Minerals Policy Act, 43 U.S.C.

14  §1701(a)(12), designates mineral development one of five principal or major multiple

15  uses. *Id.* §1702(m); requires a land use plan amendment if a principal use is

16  precluded, §1712(e); and mandates withdrawal review and revocation, §1714(l).

17          2.   *FLPMA Provides Law to Apply*

18      FLPMA provides the criteria for this Court to evaluate the Secretary's actions.

19  43 U.S.C. §1714(c)(2)(2)-(12).  *Natural Res. Defense Council v. U.S. Forest Serv.*,

20  421 F.3d 797, 802, 812 (9th Cir. 2005).  The Secretary may withdraw land from

21  mining and mineral leasing "but only in accordance with the provisions and

22  limitations of this section." 43 U.S.C. §1714(a).  Section 204 embodies the grant of

23  authority and the procedural requirements, including published notice of proposed

24  withdrawals (§204(b)), notice to Congress (§204(c)(2))), public hearings (§204(h)),

25  time limits on withdrawals (§204(c) and (e)), and withdrawal review and revocation

26  (§204(a)(l)).  The issues listed in §204(c)(2) for the congressional notice are

27

28

Combined Opposition and Reply of Quaterra and AULEC to
                        DOI and GCT Motions for Summary Judgment

incorporated in the regulations for determining whether to make the withdrawal.  43 C.F.R. §2310.3-2(b).  These include documentation of whether the withdrawal is necessary based on threat of degradation due to the proposed use and the economic impacts if national or regional.  *Id.* at §2310.3-2(b)(1).

The relevant factors to consider in the withdrawal notice to Congress were adopted in the withdrawal regulations.  The withdrawal application must document how the "proposed use" would result in environmental degradation or otherwise harm other resources and values.  43 U.S.C. §1714(c)(2)(2); 43 C.F.R. §2310.3-2(b). Similarly, the economic impacts of the withdrawal and consultation with state and local government officials also impose procedural elements and consistency with other FLPMA provisions including the Mining and Mineral Materials Act, 43 U.S.C. §1701(a)(12); 43 C.F.R. §2310.3-2(b)(5).  The substantive and procedural steps were intended to ensure that DOI did not return to the previous haphazard pattern that closed more than 75% of the public lands to mineral development.

**III.    THE NAW STATED PURPOSE IS UNSUPPORTED BY THE EVIDENCE**

In the opening brief, Plaintiffs documented how the stated purpose of the NAW to protect the Grand Canyon watershed could not be sustained and thus the NAW is arbitrary and capricious.  Plaintiffs also demonstrated that the NAW FEIS violated FLPMA and NEPA, because it does not disclose or analyze the scientific contradictions and unavailable information and failed to address conflicts with state and local government plans.  ECF No. 173, Pl. Br. at 1-2.

Combined Opposition and Reply of Quaterra and AULEC to
                                                                         DOI and GCT Motions for Summary Judgment

1

2

### A.    NAW to Protect Grand Canyon Watershed

#### 1.    *Definition of Watershed Limited to Hydrology*

3

4

5

6

7

"The purpose of the withdrawal, if determined to be appropriate, would be to protect the Grand Canyon watershed from adverse effects of locatable hardrock mineral exploration and mining."  ECF No. 174, SF ¶¶6,7, 12; AR000053. Despite voluminous reports, it was apparent by early 2010 that uranium mining could not be shown to create risks to the Grand Canyon watershed.

8

9

10

11

12

13

14

Interior defends the withdrawal on the basis of an expansive definition of the Grand Canyon watershed, which the watershed encompasses all resources, including wildlife, visual, and cultural resources and includes significant values and irreplaceable resources.  DOI Br. at 6, 23, fn 9.  But watershed is a geographic term requiring a hydrological connection.  2ⁿᵈ SF ¶17.   DOI's explanation contradicts BLM's planning handbook, which uses watershed in the context of landscape planning.[4]  H-1601-5, Land Use Planning Handbook, Glossary.[5]

15

16

17

18

19

A watershed is a geographically specific term that distinguishes lands within its boundaries to land outside of its boundaries.  *Norton Const. Co. v. U.S. Army Corps of Eng'rs*, 2007 WL 1431907 (N.D. Ohio May 14, 2007) aff'd, 280 F. App'x 490 (6th Cir. 2008) ("Informal definitions provided by the [Army] Corps and

20

21

22

[4]  BLM must follow Handbook and Manual direction and, while not binding on  the Interior Board of Land Appeals, the Board will affirm so long as reasonable and consistent with the law.  *So. UT Wilderness Alliance*,  2012 WL 1184350 at 15 (IBLA 2012) *citing Lassen Motorcycle Club*, 133 IBLA 104, 108 (1995).

23

24

25

26

[5]  "Watershed approach – a framework to guide watershed management that: (1) uses watershed assessments to determine existing and reference conditions; (2) incorporates assessment results into resource management planning; and (3) fosters collaboration with all landowners in the watershed. The framework considers both ground and surface water flow within a hydrologically defined geographical area."  Glossary, H-1601-1.

27

28

Combined Opposition and Reply of Quaterra and AULEC to DOI and GCT Motions for Summary Judgment

1    [Environmental Protection Agency] state that a watershed is the area where all

2    waters flow to a single point. The USGS defines a watershed with a drainage basin

3    which is [t]he land area drained by a river or a stream." (Internal quotes omitted)).

4        The term watershed is not used in the BLM manuals or handbooks governing

5    cultural resources or Tribal Consultation.   DM-8120-1 Tribal Consultation under

6    Cultural Resource Authorities (Dec. 3, 2004); *see also* DM-8100, 8110, 8130, 8140.

7        BLM policies regarding management of cultural and visual resources do not

8    support DOI's expansive definition of watershed to encompass all values or

9    resources.  BLM withdrawal regulations define cultural resources as

10         fragile and nonrenewable physical remains of human activity found in

11         districts, sites, structures, burial mounds, petroglyphs, artifacts, objects, ruins, works of art, architecture or natural settings or features which

12         were important to prehistoric, historic or other land and resource use events.

13    43 C.F.R. §2301-0.0-5.

14        BLM policy defines viewshed as "the landscape that can be directly seen

15    under favorable atmospheric conditions, from a viewpoint or along a transportation

16    corridor."  Visual Resource Contrast Rating, H-8431.07, Glossary.  BLM does not

17    regulate noise but the National Park Service commissioned a study on noise which

18    concluded no impact to uses within the GCNP.  2nd SF ¶4. Thus, the BLM guidance

19    contradicts DOI's rationale that the published purpose of the NAW would include

20    cultural and religious resources and significant values not mentioned in the

21    mandatory notices.[6]

22             2.   *Lands Withdrawn Outside of Grand Canyon Watershed*

23        Interior must provide a reasonable and well-informed rationale for including

24    more than 120,000 acres of land outside of the Grand Canyon watershed as part of

25

26    [6]  The NAW proponents also focused on the issues of water quality and soils in the watershed.  2nd SF ¶1.

27

28    

1   the withdrawn area.  *Natural Res. Defense Council v. U.S. Dep't of the Interior*, 113

2   F.3d 1121, 1124 (9th Cir.1997).  Nothing in the record supports it.

3       The NAW boundaries were based on the legislative proposal introduced by

4   Cong. Grijalva in 2008 but were never refined to conform to the Grand Canyon

5   watershed.  ECF No. 174, SF¶9.  Interior offers no rationale for withdrawing land

6   outside of the Grand Canyon watershed despite a legal obligation to articulate facts

7   found and choices made.  *Natural Res. Defense Council*, 113 F.3d at 1124.

8       Lands west of Kanab Creek are part of the Virgin River watershed.  ECF No.

9   174, SF ¶5.  Withdrawing these lands, therefore, will not protect the Grand Canyon

10  watershed.  Thus, the geographic divide between the Grand Canyon watershed and

11  the Virgin River watershed contradicts the stated basis for the withdrawal.  The

12  Secretary's rationale to include the western portion of the North Parcel is as

13  disconnected from facts as Grand Canyon watershed is from the Virgin River

14  watershed.

15      DOI dismisses this inconvenient fact as quibbling but this area is about 22%

16  of the North Parcel, ECF No. 174, SF ¶15, and includes several hundred claims

17  located outside the Grand Canyon watershed but are within the NAW.  AR001745.

18      **B.**    **No Adverse Impacts to Water Resources, §1714(c)(2)(2)**

19      FLPMA requires that DOI document the risk that the proposed use prompting

20  the withdrawal will degrade resources.  43 U.S.C. 1714(c)(2)(2); 43 C.F.R. §2310.3-

21  2(b).  NEPA requires that DOI disclose and analyze the direct, indirect, and

22  cumulative impacts of each alternative, including the "no action" alternative.  40

23  C.F.R. §1502.16.  DOI must also "[d]evote substantial treatment to each alternative

24

25

26

27

28

             Combined Opposition and Reply of Quaterra and AULEC to
                                        DOI and GCT Motions for Summary Judgment

1   considered in detail including the proposed action so that reviewers may evaluate

2   their comparative merits." *Id.* §1502.14.[7]

3        An agency must use the "best available scientific data" to ground its decision

4   upon a reasonable rationale after consideration of the relevant factors. *Greenpeace*

5   *Action v. Franklin*, 14 F.3d 1324 (9th Cir. 1992). The ubiquitous lack of supporting

6   data regarding adverse impacts of uranium mining to water resources are not

7   "technical deficiencies" but are exactly the relevant factors that the Interior must

8   consider when developing a reasonable rationale for a land management decision.

9   *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1020 (9th Cir. 2012);

10  AR008076; AR072832.

11            1.   *Hard Science Did Not Support Policy Favoring the NAW*

12       The comments of Larry Martin are not merely the opinion of one employee,

13  as claimed by DOI. DOI Br. at 24. The NPS Water Resources Division was

14  assigned to comment on the water issues relating to the DEIS by the NPS Office of

15  Natural Resources, Stewardship and Science. The Division head reviewed and

16  agreed with Martin's analysis. ECF No. 174, SF¶¶53, 54. Bill Jackson wrote:

17       That being said, both Gary and I think Larry basically has it right, and
     that the information both in the USGS report and the DEIS support his
18       generalized conclusion. There exists no information we could find that
     would contradict his conclusion, nor any hypotheses suggested as to
19       how contamination of the park waters might physically occur.

20  AR006830. In writing to Bert Frost, WOSO, Jackson suggested that NPS could

21  finesse the gap between the hard science and the policy position, by favoring caution

22  until there is complete certainty that mining would have no impact. *Id.* This

23  discussion was directed to the Associate Director of SRSS and Washington. *Id*.

24  

25  [7] Plaintiffs incorporate the NMA/NEI argument on NEPA issues, including no action
26  alternative, range of alternatives, and unavailable information, respectively, at 7-9,
   9-13, 15-21.

27  

28

1

    2. *Conclusion of Risk and Unacceptable Impacts Unsupported*

2    The ROD recognized the lack of data proving a risk of contamination but then

3  concluded that any impact would be unacceptable.  ECF No. 174, SF ¶13.  The

4  FEIS and the record do not support the conclusion of harmful impact due to dilution

5  and distance.  *Id*. SF ¶39.  The State documented the levels of uranium and arsenic

6  that are naturally occurring in the Colorado River.  *Id*. SF ¶¶14, 96.  The state also

7  concluded that an entire truck of uranium ore could tip into the Colorado River

8  without increasing uranium levels above EPA limits.  2nd SF ¶4.

9    The FEIS also concluded that contamination of the Redwall Aquifer was

10  extremely unlikely based on the region's 1,000-foot thick, unsaturated and practically

11  impermeable layer of Supai Group Sandstone.  ECF No. 174, SF ¶¶36-37.  Similarly,

12  perched aquifers are hydrologically isolated, *Id.* at SF ¶¶40-46; see also AR043807-

13  808, discontinuous, AR042327, and do not provide enough water even for dust

14  control.  *Id.*  Thus, even if pierced by a uranium mine, the effects would be

15  geologically constrained, and as found by Arizona Department of Environmental

16  Quality (AzDEQ), quickly and easily reclaimed.  ECF No. 174, SF ¶94.  Even agency

17  experts and key officials acknowledged that breccia pipe mining in the withdrawal

18  area would not result in adverse impacts under any scenario.   AR008076,

19  AR006828.

20

    3. *Water Samples Skewed Data and Not Corrected*

21    DOI argues that the 2009 samples showed water contamination due mining.

22  DOI Br. at 43, n.25.  The 2009 water sampling however could not distinguish

23  between mining and background levels.  2nd SF ¶2.

24

25

26

27

28

Combined Opposition and Reply of Quaterra and AULEC to
                      DOI and GCT Motions for Summary Judgment

1
2
3
4
5
6
7

The USGS SIR 2010-5025 Part C included water samples from springs and creeks near or adjacent to the Orphan Mine, ECF No. 174, SF ¶47,[8] gathered from outside of the withdrawal area in either the GCNP or elsewhere, *Id.* SF ¶26, and the analysis did not take into account Arizona's rigorous Aquifer Protection Permit program, *Id.* SF ¶94.[9]  These facts show that the ROD's conclusion that mining left a legacy of contamination in the area was based on poor information or failure to understand hydro-geologic principles.  AR006831.

8
9
10
11
12
13
14

Several springs that indicated exceedances were located near the Orphan mine, where water flows and erosion contribute to contamination of a nearby creek and springs.  ECF No. 174, SF ¶¶27,28.  AR000242.  USGS justified the inclusion on the basis that they were due to mining practices and represented the issues that would need to be addressed.  *Id.* SF ¶55.[10]  This response illustrates how the ROD relies on SIR 2010-5025 conclusions to justify the NAW and assumed that mining would occur in violation of state and federal laws.

15
16

_____

17
18

[8]  DOI errs when it states that USGS did not use the Orphan Mine data.  DOI Br. at 43, n.25.  USGS used the data.  *Infra* n.10.

19

[9]  DOI incorrectly states that there is no regulation of the perched aquifers.  ECF No. 174, SF ¶33.

20
21

[10]  AR066752.  In response to peer review comments, the SIR 1010 Part C author wrote:

22
23
24
25
26

> Even though studies on the Orphan Mine are based on the impacts of historical mining practices, they are still some of the only and more complete studies on mining impacts in the Grand Canyon Watershed. Current and future mines, even with improved mining practices are still going to have to address similar problems of potential air, surface, and groundwater water contamination and impacts. The Orphan Mine data represents the upper end (not worst case ... ) of the types contamination issues that will have to be addressed and the types and amounts of uranium potentially released to the environment.

27
28

Combined Opposition and Reply of Quaterra and AULEC to DOI and GCT Motions for Summary Judgment

The USGS peer review recommended changes to Part C of the SIR 2010-5025 but no changes were made.  ECF No. 174, SF ¶47.  As a result both the FEIS and the ROD continued to use the 66% number of samples having less than 5 ug/l instead of 68%.  *Id.*  DOI responds that the peer review recommended insignificant changes, such as removal of some well sample data and thus insignificant.  DOI Br. at 42.  Deleting the samples increased the number of virtually no pollution samples by 2%, from 66% to 68%.  This would also change other conclusions including those in the ROD.

The record therefore demonstrates that the Secretary ignored important facts, acknowledged that the stated purpose of the withdrawal lacked hard evidence, but nevertheless proceeded with the NAW, despite the lack of evidence to the contrary. Withdrawing more than one million acres from mining when the evidence does not support adverse impacts to water resources or the watershed is the prototypical arbitrary and capricious agency action that justifies setting aside agency action under section 706 of the APA.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 42 (1983).

## C.   Mitigation of Impacts on Tribal Beliefs is Prohibited Post Hoc Rationalization

Plaintiffs documented how the ROD's determination that the entire NAW was sacred is based on a ethno-landscape definition reflecting aboriginal territories, contrary to federal law and precedent and that religious beliefs or feelings independent of a specific site enjoy no protection.  ECF No. 173, at 16-18.  Tribal beliefs that the mining would desecrate the land is the only impact that could not be mitigated.  ECF No. 174, SF ¶¶69, 70.  *See Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.,* 100 F.3d 1443, 1450 (9th Cir.1996);  NEI/NMA Motion for Summary Judgment, ECF No. 170, at 19-23.

Combined Opposition and Reply of Quaterra and AULEC to DOI and GCT Motions for Summary Judgment

1    Citing 43 U.S.C. §1702(j) DOI argues that the Secretary has the authority to

2   protect "other resources" such as cultural and tribal areas.  DOI Br. at 60, fn 40;

3   AR000011.  While cultural and religious practice sites are protected, this cannot

4   save the withdrawal when the stated purpose was protection of the Grand Canyon

5   watershed and the need to protect tribal beliefs that mining would wound the earth

6   or the determination that the entire area was sacred do not fall within the definition

7   of cultural resources or protection of tribal practices.  Federal law does not authorize

8   open-ended closure of federal lands based on generalized beliefs not tied to specific

9   site or practice.  Federal law does not support the expansive landscape definition of

10  sacred areas derived from aboriginal territories.

11              1.    *Post Hoc Rationale for Withdrawal*

12    DOI expanded the published reason for the withdrawal in the ROD after the

13  close of the comment period on the DEIS and release of the FEIS.  ECF No. 174,

14  SF¶12.  The broader tribal resources rationale was the sole basis to justify the large

15  withdrawal.

16    The record-hardened purpose of the NAW, however, has always been to

17  prevent contamination of water resources in the Grand Canyon watershed, because

18  such contamination would adversely affect natural, social and cultural resources. 2nd

19  SF at ¶20; AR001625, AR000545.  The relevant documents, including the initial

20  Proposed Withdrawal, the 2-year Segregation, the Emergency Withdrawal, and both

21  the DEIS and the FEIS all generally provide that "the purpose of a 20-year

22  withdrawal of public lands from locatable hardrock mineral exploration and mining

23  is to protect the Grand Canyon Watershed, *whose waters*, if contaminated, may

24  harm natural, cultural, and social resources." *Id*. (emphasis added).  Although this

25  statement implicates "other resources," the irreducible minimum required by the

26  record is a hydrological connection between the waters and the other resource. *Id*.

27

The record does not establish, nor could it, that visual resources, tribal or cultural resources, or any other resource in the Grand Canyon watershed, would be harmed by water produced or used during uranium mining.  2nd SF ¶21.  *Supra* at 12-14. Similarly, the perched aquifers are isolated hydrological features, geological barriers make contamination nearly impossible, and ADEQ regulations adequately prevent adverse impacts.  ECF No. 174, SF ¶94, AR002601; AR043807-808; AR042327. There is no hydrological connection to the "other public values" in the watershed.

2. *The Sacred Classification Based on Extra-legal Definition*

DOI argues that because the ROD concluded that the "*entire area* is recognized as the traditional homeland and use area for seven tribes," ECF No. 174, SF ¶78 (emphasis added), that the withdrawal can be separately upheld as a valid exercise of discretion.  DOI Brf. at 57, n.40.  GCT argues that the entire 277 mile stretch of the Grand Canyon and the millions of acre-feet of water that flow through it are the "locus of human origin for the Havasupai Tribe." GCT Brf. at 24.[11]

FLPMA does not authorize DOI to protect "other public values" outside of those listed in FLPMA, 43 U.S.C. §1702(j), or consistent with other environmental laws, §1733(c).  Indeed the only impact not mitigated is the belief that "each hole drilled into the earth is a wound to the earth." AR004345.  Specifically, DOI claims authority to protect vast expanses of federal land not connected to geographically

---

[11]  Neither DOI nor GCT addresses the fact that the withdrawn land is not in the Grand Canyon or the national park.  The national park, national monuments and Indian reservations buffer the Grand Canyon and the Colorado River. ECF No. 174, SF ¶2.  There is, however, only one officially recognized traditional cultural site in the entire withdrawal area.  *Id*.  The other cultural sites in the North Parcel are protected under area of critical environmental concern designation, based on tribal input, *Id.* at SF ¶1, or have been designated wilderness.  2nd SF ¶11.

identifiable sites of religious significance.  The ROD finds that the entire withdrawal area as sacred when the FEIS clearly does not.  *Compare* AR000053 *with* AR0001912-13.

Plaintiffs previously demonstrated that the NAW determination that the entire area was sacred was based on a new definition of tribal area that was based on aboriginal territories.  ECF No. 173 at 16-19.  The definition and determination was new, which also means there is no documentation in rule or policy.

Federal courts do not recognize traditional use areas or aboriginal areas as entitled to protection.  ECF No. 173 at 16-18; citing *Havasupai Tribe v. U.S.*, 752 F. Supp. 1471, 1486 (D. Ariz. 1990), *aff'd sub nom. Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991).  DOI's position contradicts the United States position is virtually all other cases by adopting aboriginal territory as a management action to exclude other principal uses of public lands.  The Secretary has not, merely accommodated "place-based" practices as GCT argues, but has, instead, cloaked an entire withdrawal area religious significance to justify a withdrawal originally based on protecting water resources.  As argued by NEI and NMA, the subsidiary rationale of protecting tribal resources is unsupported, pretextual in nature, and proves that the Interior knew the withdrawal could not stand on the original grounds, which ran counter to the evidence gathered by the Interior leading up to the ROD. *Motor Vehicle*, 463 U.S. at 50.

### 3.   *DOI and GCT Authority Distinguished*

Defendants and Intervenors cite three cases said to support DOI's authority to withdraw more than a million acres in order to protect American Indian resources. *Id*.; *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 972 (9th Cir. 2004); *Access Fund v. U.S. Dep't of Agric.*, 499 F.3d 1036, 1039 (9th Cir. 2007);  *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 758 (D.C. Cir. 2007).  *Cholla* dealt with the

Woodruff Butte, a unique land feature that covers less than 640 acres where religious practices were connected to an exact geographic site. 382 F.3d at 975. Similarly, *Access Fund* involved a specific cave that was a "sacred site" for more than 1,500 years. 499 F.3d at 1039. Finally, *Mount Royal Joint Venture* involved an area less than 2% the size of the withdrawal here. 477 F.3d at 758.

Each of these cases tied religious or cultural significance or practice to an identifiable geographic marker. Federal law clearly protects such sites and practices. The FEIS concludes that existing law would fully protect sites and practices, but would not necessarily mitigate individual sensibilities, specifically, the belief that mining the earth for commercial gain is "wounding the earth." ECF No. 174, SF ¶75.

Unlike the cited authority, DOI also justified the withdrawal on the generalized belief that mining would wound the earth. GCT Br. at 27. Citing *Access Fund*, GCT argues that the Secretary has accommodated the Havasupai religious practices. *Id*. at 26. This is far more than accommodation because declaring a million acres sacred based largely on aboriginal territories is very different from religious practices recognized in the American Indian Religious Freedom Act.

The Havasupai historical areas do not include the North Parcel or the East Parcel. Applying GCT's logic, then the entire Arizona Strip merits protection, in light of the Kaibab Paiute statement that it should have management. 2nd SF ¶14. In short, the NAW is not based on statutorily protected sites or practices but instead can be explained only as accommodating persons opposed to mining or extending protection to historical aboriginal territories.

### D.   Mineral Endowment and Foregone Resources §1714(c)(2)(3) & (12)

FLPMA requires that a withdrawal fully disclose the value of the minerals to be closed to development. 43 U.S.C. §1714(c)(2)(12); 43 C.F.R. §2310.3-2(b)(3)(iii).

1    DOI used flawed data to reach an endowment estimate.  These errors were

2    included in the Secretary's geologic report submitted to Congress pursuant to 43

3    U.S.C. 1714(c)(2)(12).  Plaintiffs adopt the NEI/NMA discussion at 7, 28-31.

4        Based on data from a 1990 report, USGS estimated the total available

5    uranium endowment to be 164,000 tons. ECF No. 174, SF¶58.  The BLM grossly

6    underestimated breccia pipes by 250% and further reduced this amount by 85% to

7    24,508 tons based on a non peer reviewed citation, rationalizing that because the

8    cut-off grade in the endowment model was .01%, 85% of the endowment was low

9    grade and uneconomical to mine. AR002491.  To the contrary, there is almost no

10   low-grade uranium ore in the withdrawal area. AR042327.

11       Thus, the Secretary ignored an essential element to the withdrawal analysis:

12   the extent the mineral resource is present in the proposed withdrawal area.  *See*,

13   *Motor Vehicle*, 463 U.S. at 43.  Indeed, the Secretary uses the 1990 data to support

14   a withdrawal of more than a million acres when the 1990 report was not prepared for

15   a withdrawal.  ECF No. 174, ¶¶58-60; *N. Plains Res. Council, Inc. v. Surface Transp.*

16   *Bd.*, 668 F.3d 1067, 1086 (9th Cir. 2011) ("Reliance on data that is too stale to carry

17   the weight assigned to it may be arbitrary and capricious.")  The inaccurate uranium

18   assessment therefore also violates 43 U.S.C. §1714(c)(2)(12); 43 C.F.R. §2310.3-

19   2(b)(3)(iii), since the Mineral Report did not accurately report the endowment and

20   DOI knew it was flawed.  Without a properly characterized uranium endowment, the

21   balance between competing interests is necessarily skewed and fatally taints the

22   decision making process with an abuse of discretion. *Natural Res. Defense Council*,

23   421 F.3d at 816.

24       **E.    Economic Impacts Underestimated, §1714(c)(2)(8)**

25       FLPMA requires that the assessment of the withdrawal fully analyze the

26   economic effects and the costs to the state and local communities.  43 U.S.C.

27

§§1714(c)(2)(2);  1714(c)(2)(8);  43  C.F.R.  §2310.3-2(b).    NEPA  also  requires disclosure of the economic and social impacts.  40 C.F.R. §§1508.8; 1505.2(b). Improperly balancing the economic and environmental considerations is a fatal flaw when balancing multiple uses.  *See*, *Natural Res. Defense Council*, 421 F.3d at 816.

Interiors' economic assessment was flawed for two primary reasons.  First, assessing  the  economic  effects  is  impossible  if  the  uranium  endowment  is  not properly estimated.  *Supra* at 25-26.  Secondly, the Interior offered no economic analysis with regards to lost future severance tax payments and did not quantify those losses to state and local governments.  ECF No. 174, ¶¶87-90.  A report prepared by Tetra Tech shows that uranium mining would produce 1,078 jobs, $40 million in employment opportunity, $2 billion in federal and state corporate income taxes; $168 million in state severance taxes, and $9.5 million in claims payments and  fees  to  local  governments.    AR035785.    Analyzing  the  foregone  mineral resources from a perspective that fails to consider the full economic repercussions does  not  accord  with  43  U.S.C.  §§1714(c)(2)(2)  and  1714(c)(2)(8),  43  C.F.R. §2310.3-2(b), and is therefore arbitrary and capricious.

## F.    The Withdrawal Does Not Comply With the RMP, §1733(a)

The Secretary must manage lands in accordance with resource management plans.  43 U.S.C. §1732(a), 43 C.F.R. §1610.5-3(a).  To the extent that a proposed action will alter the scope of resource use or the "terms, conditions and decisions" of the plan, the BLM must amend the RMP. 43 C.F.R. §§1610.5-5; *See also Klamath Siskiyou Wildlands v. Boody*, 468 F.3d 549, 556 (9th Cir. 2006)(The decision to change  the  level  of  protection  for  the  red  tree  vole,  based  on  new  information, altered  the  terms  and  conditions  of  the  RMP,  and  was  therefore  considered  an amendment.); *See also*, *Cloud Found. v. U.S. Bur. of Land Mgmt.*, 802 F.2d 1192,

1206-07 (D. Nev. 2011)("[A]ny changes to resource allocations in an RMP must be developed through the official development process.").**12**

DOI's defense that the withdrawal is a land use decision separate from the RMP, DOI Br. at 25, fn 11, is contradicted by the withdrawal regulations, which call for RMP revision.   43 C.F.R. §2310.0-3(b)(3) ("Withdrawals made pursuant to section 204 of the Federal Land Policy and Management Act of 1976 may be used in appropriate cases, to carry out management decisions.").   FLPMA requires that management decisions to be made through the land use planning process.   43 U.S.C. §1712(e); *see also* 43 C.F.R. §2310.3-2(c).  Closing a million acres to mining is a management decision.

Neither the text nor the force or effect of the Arizona strip RMP authorizes the Secretary to withdraw 626,678 acres that lie within the Arizona Strip.  AR001641; AR001626-27.  Instead, the RMP provides that the land within the RMP area should remain open to mineral development, ECF No. 174, SF ¶4, AR030214, except for no more than 118,743 acres identified for withdrawal.  *Id*. AR030215.  Thus, the withdrawal removes more than five times the amount of land contemplated by the RMP last revised in 2009.

Withdrawing 626,678 acres when the RMP recommends a withdrawal of more than 118,743 acres is a fundamental change in the terms and the decisions made under the RMP.  *Klamath Siskiyou Wildlands*, 468 F.3d at 556; *Cloud Found.*, 802 F.2d at 1206-07.  DOI failed to follow basic plan amendment procedures in violation of FLPMA.

---

**12**  Plaintiffs incorporate the NMA, NEI brief.

1

## IV.    COUNTY COORDINATION MANDATED BY BOTH FLPMA and NEPA

2      DOI incorrectly assumes that the coordination obligation only applies to NEPA.

3   DOI Br. at 51, n.33, 52-53.  Section 202(a), 43 U.S.C. §1712(a), also requires BLM

4   to coordinate with local governments as to land use planning, land management and

5   programs and Section 202(c)(9) requires BLM to make its plans consistent to the

6   extent practicable.  Section 204(c)(2) also requires consultation and coordination.

7      Despite several meetings, the record shows that BLM did not make this a

8   meaningful process.  Instead, the AULEC members' comments were dismissed and

9   most of the important cooperating agency meetings occurred without state and local

10  governments.  ECF No. 188-6 ¶¶5-6, 27-28.[13]

11     One important example is the fact that Coconino County, which had previously

12  supported the entire withdrawal reversed its support for the NAW and recommended

13  reducing the size of the North Parcel.  AR003343-003350.  This coupled with

14  Mohave County's position would have removed most of Mohave County from the

15  NAW.  Other than expressing surprise that Coconino County changed its position,

16  BLM did not consider changing the boundaries.

17  ## V.    CONCLUSION

18     Quaterra and AULEC ask this Court to set aside the NAW and remand it to

19  BLM to determine how to proceed, in accordance with the APA states that the courts

20  "shall . . . hold unlawful and set aside agency action, findings, and conclusions found

21

22  [13] DOI objects to the Johnson Declaration discussing the video transcript which this
23  Court held was not part of the administrative record but which related to the public
    hearing sponsored by AULEC.  DOI Br. n36.  The declaration addresses standing
24  issues and is not limited to the administrative record.  *Nw. Envtl. Def. Ctr. v.*
    *Bonneville Power Admin.*, 117 F.3d 1520, 1527-28 (9th Cir. 1997)("Article III standing
25  requirement does not apply to agency proceedings and affidavits to establish
    standing are considered not to supplement the administrative record on the merits,
26  but to determine if the party meets Article III and prudential standing).

27

1   to be . . . arbitrary, capricious . . . or otherwise not in accordance with law." 5 U.S.C.

2   §706(2)(A).  In most cases, the court will vacate unlawful agency action and remand

3   to the agency for further proceedings.  *Calif. Wilderness Coalition v. U.S. Dept. of*

4   *Energy*, 631 F.3d 1072 (9th Cir. 2012).

5        GCT requests separate briefing as to the remedy should this Court set aside

6   the NAW.  GCT Br. at 30.  This is unnecessary because when an agency has no

7   specific mandate or has discretion to act, courts should not direct a particular course

8   of action.  *Center for Biological Diversity v. Bur. of Land Management*, 937 F.

9   Supp.2d 1140, 1161 (N.D. Calif. 2013) (declining to impose specific lease terms after

10  finding BLM violated NEPA by not fully addressing the fracking issues).  Instead the

11  appropriate approach is to set aside and remand the matter, thus allowing the

12  agency to decide how to proceed.  The weight of authority favors a remedy that

13  would set aside the agency decision and remand to allow the agency to evaluate the

14  legal findings and determine the best way to proceed.

15  Dated:      April 30, 2014.

16   Respectfully Submitted,

17  /s/ Constance E. Brooks              /s/ William Klain
    CONSTANCE E. BROOKS                  WILLIAM KLAIN, # 015851
18  connie@cebrooks.com                  wklain@lang-baker.com
    MICHAEL MARINOVICH                   Lang Baker & Klain, P.L.C.
19  mike@cebrooks.com                    8767 E. Via de Commercio, Suite 102
    C. E. Brooks & Associates, P.C.      Scottsdale, AZ  85258
20  303 East 17th Avenue, Suite 650      Tel. 480-947-1911 Fax. 480-970-5034
    Denver, Colorado 80203
21  Tel. 303-297-9100 Fax. 303-297-9101

22  Attorneys for the Plaintiffs Quaterra Alaska, Inc.; Quaterra Resources, Inc.; and the
23  Arizona Utah Local Economic Coalition on behalf of named member, the Board of
    Supervisors, Mohave County, Arizona.

24

25

26

27
                 Combined Opposition and Reply of Quaterra and AULEC to
28                                          DOI and GCT Motions for Summary Judgment

1

2
## **CERTIFICATE OF SERVICE**

3
     I hereby certify that I have caused the Combined Opposition and Reply to the

4
Defendants' and Intervenors' Motions for Summary Judgment and Oppositions to

Defendants' and Defendant-Intervenors Motion for Summary Judgment to be served

5
upon counsel of record through the Court's electronic service system (ECF/CM) and

6
by first class mail to Gregory Yount at the following address: 807 West Butterfield

Road, Chino Valley, Arizona 86323.

7

8
Dated: April 30, 2014.

9

10
                                 */s/ Constance E. Brooks*
                                 Constance E. Brooks

11
                                 C. E. Brooks & Associates, P.C.
                                 303 East 17th Avenue, Suite 650

12
                                 Denver, Colorado 80203
                                 Tel. 303-297-9100 Fax. 303-297-9101

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>ADDENDUM TO PLAINTIFFS OPPOSITION AND REPLY</u>

1.      43 U.S.C. §1701, n. 704, Pub. L. 94-579, 90 Stat. 2792

2.      *One Third of the Nation's Land, Report to the Public Land Law Review Commission* (1970) (selected pages)

3.      Wheatley, *Withdrawals under the Federal Land Management and Policy Act (FLPMA)*, 21 Ariz. L. Rev. 311 (1979)

4.      *So. Utah Wilderness Alliance,* 2012 WL 1184350 (IBLA 2012)

90 STAT. 2792

PUBLIC LAW 94-579--0CT. 21, 1976 REPEAL OF WITHDRAWAL LAWS

Effective date.

Sec. 704. (a) Effective on and after the date of approval of this Act, the implied authority of the President to make withdrawals and reservations resulting from acquiescence of the Congress (U.S. v. Midwest Oil Co., 236 U.S. 459) and the following statutes and parts of statutes are repealed: Act of

Chapter

Section

Statute at Large

43 U.S. Code

Oct. 2, 1888 1069 25:527 662. Only the following portion under the section headed'U.S. Geological Survey: The last sentence of the paragraph relating to investigation of irrigable lands in the arid region, including the proviso at the end thereof. Mar. 3, 1891 561 24 26:1103 16 U.S.C. 471. Mar. 1, 1893-— 183 21 27:510. 33 U.S.C. 681. Aug. 18, 1894 - 301 4 28:422 641. Only that portion of the first sentence of the second paragraph beginning with "and the Secretary of the Interior" and ending with "shall not be approved.' May 14, 1898 - 299 10 30:413 687a-4. Only the fifth proviso of the first paragraph. June 17, 1902 1093.— 3. 32:388 416. Only that portion of section three preceding the first proviso. Apr. 16, 1906 — 1631 1 j. 34:116 561. Only the words "withdraw from public entry any lands needed for townsite purposes", and also after the word "case", the word "and". June 27, 1906 3559 4 34:520. 561. Only the words "withdraw and". Mar. 15, 1910 96 36:237. 643. June25, 1910421 1,2 36:847 141, 142, 16 U.S.C. 471(a). All except the second and third provisos. June 25, 1910 431 13 36:858 148. Mar. 12, 1914 37 1 38:305 975b. Only that portion which authorizes the President to withdraw, locate, and dispose of lands for townsites. Oct. 5, 1914 316 1 38:727. 569(a). June 9, 1916 137. 2 39:219 Under "Class One," only the words "withdrawal and." Dec. 29, 19169 1039:865 300. June 7, 1924348 9 43:655 16 U.S.C. 471. Aug. 19, 1935 561 "Sec. 4" 49:661 22 U.S.C. 277c. In "Sec. 4", only paragraph "c" except the proviso thereof. Mar. 3, 1927 299 4 44:1347 25 U.S.C. 398d. Only the proviso thereof. May 24, 1928 729 4 45:729.. 49 U.S.C. 214. Dec. 21, 1928 42 9 45:1063 617h. Mar. 6, 1946 58 69:36 617h. First sentence only. June 16, 1934.— 557 "Sec. 40(a)"... 48:977. 30 U.S.C. 229a. The proviso only. May 1, 1936 254 2 49:1250. May 31, 1938 304 52:593 25 U.S.C. 497. July 20, 1939 334 53:1071 16 U.S.C. 471b. May 28, 1940 — 220 1 54:224 16 U.S.C. 552a. All except the second proviso. Apr. 11, 1956 203 8 70:110. 620B. Only the words "and to withdraw public lands from entry or other disposition under the public land Aug. 10, 1956

10 U.S.C. 4472, 9772. Aug. 16, 1952 P.L. 87-590. 4 76:389 616c. Only the words "and to withdraw public lands from entry or other disposition under the public land laws."

43 USC 617h.

Chapter 949-. 9772

70A: 588

(b) The second sentence of the Act of March 6, 1946 (60 Stat. 36; 43 U.S.C. 617(h)), is amended by deleting "Thereafter, at the direction of the Secretary of the Interior, such lands" and by substituting therefor the following: "Lands found to be practicable of irrigation and reclamation by irrigation works and withdrawn undej* the Act of March 6, 1946 (43 U.S.C. 617(h))».
REPEAL o r LAW RELATING TO ADMINISTRATION OF PUBLIC LANDS

Effective date.

SEC 705. (a) Effective on and after the date of approval of this Act, the following statutes or parts of statutes are repealed:



# One Third
# of the Nation's
# Land

A Report to the President
and to the Congress
by the Public Land
Law Review Commission

88003431

**PREFACE**

T HE SYSTEM of private land ownership in most of the states can be traced to the public land system developed after the Revolutionary War. In order to form and maintain the Union, those states asserting claims west of their traditional boundaries ceded their interests to the National Government. This Federal public domain grew as the Nation's sovereignty became established across the continent.

Contrary to the traditions of sovereigns elsewhere in the world, the United State disposed of much of the land at nominal prices and encouraged private ownership. At the same time, in order to promote the common school system and, later, institutions of higher learning, Congress granted substantial acreages to new states as they were formed.

In two years, the Nation will celebrate the 100th anniversary of the establishment of Yellowstone as the first national park, when Americans became aware that some of the rare public domain should be set aside and dedicated to provide for their enjoyment, ". . . in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." [1]

Although the National Government provided for the reservation of forest resources in 1891 and subsequently set aside other lands for various purposes, the emphasis continued on disposal well into this century as detailed in the *History of Public Land Law Development*, prepared for this Commission as part of its study program.[2]

Despite the fact that controversy surrounded the establishment of many different types of programs on public domain lands, Professor Gates, in the *History* referred to above, came to the following conclusion:

Many Americans take great pride in the national parks, enjoy the recreational facilities in the national forests, and in large numbers tour the giant dams and reservoirs of the Reclamation Service. National pride in the possession and enjoyment of these facilities seems to be displacing the earlier views.

The increased demand for the use of the public lands during and after World War II gave rise to a need for new management and disposal tools concerning the public lands. The inability of Congress and the administrators of public lands to resolve all the conflicting demands being made on the lands led to a multitude of suggestions for various amendments or additions to the body of public land laws. The interrelationships among all segments of public land law led to the conclusion that a broad review should be undertaken in order to assure that no facet of public land policy was being overlooked.

In reporting out the legislation which resulted in the establishment of the Public Land Law Review Commission, both of the committees of Congress that were involved stated:

It is the considered opinion of the committee that the necessary comprehensive study required of the public land laws cannot be carried out successfully by this committee acting alone. The committee believes that due to the many and varied factors, considerations, and interests involved, only a bipartisan commission supplemented by an advisory council made up of the many interested users of the public lands would be in a position to coordinate and supervise effectively such a broad study.

H.R. 8070, if enacted as amended, will establish such a bipartisan commission to conduct a review of existing public land laws and regulations and recommend revisions necessary therein. The commission and its staff would be assisted by liaison officers from Federal agencies with a direct interest.[3]

The Commission as established is comprised of 19 members: Six appointed by the Speaker of the House of Representatives and six appointed by the President of the Senate, equally divided between the two major parties from among the membership of the respective Committees on Interior and Insular Affairs; six appointed by the President of the United States from persons outside of the Federal Government; and a Chairman elected by the 18 appointed members.

The full text of the statute creating the Commission appears in Appendix A to this report.[4] Certain salient provisions must, however, be kept in mind:

1. Section 10 of the Commission's Organic Act defines as follows the lands concerning which the Commission was charged with responsibility for making recommendations:

As used in this Act, the term "public lands" includes (a) the public domain of the United States, (b) reservations, other than Indian reservations, created from the public domain, (c) lands permanently or temporarily withdrawn, reserved, or withheld from private appropriation and disposal under the public land laws, including the mining

---

[1] 16 U.S.C. § 1 (1964).
[2] Paul Wallace Gates and Robert W. Swensen, *History of Public Land Law Development*. PLLRC Study Report, 1968.

[3] H. R. Rep. No. 1008, 88th Cong., 1st Sess. 8 (1964); S. Rep. No. 1444, 88th Cong., 2d Sess. 5 (1964).
[4] 43 U.S.C. §§ 1391–1400 (1964) *as amended*, (Supp. IV, 1969).

Management goals were not established for most of the withdrawn lands other than the national forests and national parks, and those that were established were broad and general.

Finally, in 1934, the Taylor Grazing Act [3] ended the era of unrestricted entry of the remaining unappropriated public domain and provided a classification authority to enable the Secretary of the Interior to determine how those public lands might best serve the public interest. Thus, by 1934, although numerous disposal laws remained on the statute books, Congress had armed the Secretary with broad authority to preclude the operations of all of them except the mining law, which had been excluded from the withdrawal and classification authority conferred in the Pickett and Taylor acts. Nevertheless, the Secretary continued to make withdrawals suspending the operation of the mining laws in certain situations without express statutory authority.

With increasing use pressures on all the public lands in the post-World War II period, Congress in 1960 and 1964 set forth broad public land management goals for the national forests and the unappropriated public domain administered by BLM. The Multiple Use and Sustained Yield Act of 1960 [4] declared that the national forests are established and "shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes," and directed the Secretary of Agriculture to develop and administer the renewable surface resources of the national forests for "multiple use" and "sustained yield."

The Classification and Multiple Use Act of 1964 [5] provided similar temporary authority for BLM administered lands and, in addition, directed the Secretary of the Interior to develop criteria to be used in determining which of those public lands should be disposed of and which should be retained in Federal ownership for multiple use management. But the basic thrust of both of these acts relative to the management of public lands was to give the agencies authority to manage the lands for recreation and other purposes for which prior authority was lacking or unclear.

The 1964 act was a recognition by Congress that the existing pattern, by which the old goals of the traditional disposal laws had generally been subordinated to broad Secretarial discretion to nullify them on a case-by-case basis in response to individual applications, was no longer an acceptable public land policy. Hence, it provided a new approach on an interim basis until this Commission could submit its recommendations. The new authority provided the

Secretary with a broad planning charter with directions to identify those factors which ought to be considered in determining whether lands should be disposed of or retained in Federal ownership. Moreover, it gave him a broader authority to suspend the operation of the public land laws in aid of his classification function than he possesses under the authority conferred on him by the Pickett Act or the Taylor Grazing Act. However, the act did not provide goals for either disposal or retention and, with respect to retained lands, the multiple use authority which it conferred suffered from the same vice as its 1960 predecessor for the national forests—failure to specify or provide standards for determining priorities of use or guidelines for resolving conflicts.

The lack of clear statutory direction for the use of the public lands has been the cause of problems ever since Congress started to provide for the retention of some of the public domain in permanent Federal ownership. The relative roles of the Congress and the Executive in giving needed direction to public land policy have never been carefully defined, and this has been a source of friction throughout the years. As related to land use planning, the use of the executive withdrawal power has long been a problem; and in recent years administrative actions under the multiple use acts have created new problems.

The 1960 and 1964 acts were primitive first steps toward sound public land management, and as such they take on an historical significance because the start had to be slow. If viewed nonetheless as being "late" for their purposes, we must remember that both the Executive and Congress share the responsibility for failure to anticipate the needs of the public that dictated a form of management guide for these lands.

The Withdrawals Problem

Concern about problems associated with the "withdrawal" and "reservation" of public domain lands was strongly voiced in the deliberations which led to the creation of the Commission, and was a recurring subject of complaint in the Commission's public meetings. The contractor study of withdrawals indicates that they have been used by the Executive in an uncontrolled and haphazard manner.[6]

Withdrawals have been used since the earliest days of the Republic when the President was given statutory authority to set aside land for public purposes such as military reservations, Indian trading posts, lighthouses, and townsites. During the 19th century

---

[3] 43 U.S.C. §§ 315 et seq. (1964).

[4] 16 U.S.C. §§ 528–531 (1964).

[5] 43 U.S.C. §§ 1411–1418 (1964).

[6] Charles F. Wheatley, Jr., *Withdrawals and Reservations of Public Domain Lands*, Ch. XI, PLLRC Study Report, 1969.

national forests is a case in point. Lands originally acquired for other purposes were made available—and properly so—for various kinds of winter sports developments. However, there must be flexibility so that, where possible, operators of winter sport facilities can also use the land in other seasons for other sports such as golf. We think that this approach is proper and should be extended to all nonspectator outdoor recreation activities. There should not be preconceived ideas or arbitrary limitations on the type of activities. Similarly, arbitrary limitations should not be placed on the kind of timber, for example, or livestock to be produced or grazed on the public lands. We see no reason, for example, why the Federal Government should assign the public lands the role of meeting national needs for sawtimber rather than some other class of timber. Rather, the agencies should be responsive to local, regional, and national needs in making land available for various uses.

The 1964 Act is a temporary multiple use management authorization which is scheduled to expire six months after the submission of this report. *We believe those lands that, as a result of the review and classification we recommend in this chapter, remain in Federal ownership under BLM administration, should be managed for the broadest range of values they can produce, consistent with the goals and objectives outlined in this chapter and elsewhere in the report. Consequently, we further recommend that BLM be provided permanent multiple use management authority.*

The Commission has found that existing land use planning procedures are to a large extent informal and, therefore, fail to provide users and others interested in public lands with assurance that plans will not be changed casually in response to what may happen to be the strongest pressures in a particular case. We recognize the need for a degree of flexibility in land use plans. But we also recognize that planning can be used to avoid irrevocable decisions that limit flexibility. If the public land agencies do not develop formal zoning where values are high and conflicts are likely, the public is likely to lose confidence in land use plans.

*To provide the positive statutory direction and strengthening for "multiple use" management which we now find to be seriously lacking, we recommend that Congress provide for a "dominant use" zoning system.* This would extend to some of the lands administered by BLM and the Forest Service the principle which Congress has already applied to the public lands generally in establishing certain areas for primary uses of national significance.

However, granting this kind of zoning authority to the agencies would eliminate the need for Congress to become involved in land use planning for areas of less than national significance.

The agencies in fact use primary use designation as a matter of course now. Not all of a national forest, for example, will be subject to a number or a combination of uses. Instead, within the total area of a national forest, there are established zones, each designated, in effect, for a dominant use to the total or partial exclusion of other uses. The result is that, while there may be a multiplicity of land uses within the boundaries of a national forest, its whole area is by no means subject to multiple use. If, for example, recreation is the dominant use in one zone, grazing may be excluded in the zone as well as all other uses considered to be incompatible with recreation. If this results in a single use of a given area, but other areas within the same forest are subject to other uses, the objective of multiple use is achieved under Forest Service practice, even in the unlikely case that each subdivision within the forest were zoned for a dominant but different use.

Our recommendation would give not only statutory recognition to the foregoing technique, but also direction to its use. Areas of national forest and unreserved public domain lands would be classified to identify those areas that have a clearly identifiable highest use. These would be specified as "dominant use" areas; other uses would be allowed where compatible. Thus, the same sort of relationship between dominant and secondary uses would exist on these lands as now exists, for example, between the dominant and secondary uses of national wildlife refuges and national recreation areas.

We are not suggesting that the dominant use zones be established by Congress. It should be clear that establishment of these zones on the ground is to be a function of the administrative agencies, arrived at through the improved comprehensive land use planning process we recommend in this chapter. However, we do believe that legislative endorsement of this technique is necessary to make it fully effective.

As a practical matter, all public lands will not be placed in one dominant use zone or another. It should be clearly established that only those areas that have an identifiable highest primary use at the time of classification should be placed in a dominant use category. The remaining lands would remain in a category where all uses are considered equal until such time as a dominant use becomes apparent.

This approach to providing for multiple uses on the ground will provide a sense of stability to those users of the public lands who fear a constant encroachment on lands devoted primarily to their use. It will reinforce the actions of the administrators so that they will not be subject to a barrage of claims from all sides that a particular use ought to be permitted or barred, all in the name of "multiple use."

51

It will also provide a guide for investment of Federal funds in management practices. For example, investments in timber management should be directed primarily to timber dominant areas, while investments in recreation should be directed primarily to recreation dominant areas, as we recommend elsewhere.

## Comprehensive Land Use Plans

> Recommendation 5: All public land agencies should be required to formulate long range, comprehensive land use plans for each state or region, relating such plans not only to internal agency programs but also to land use plans and attendant management programs of other agencies. Specific findings should be provided in their plans, indicating how various factors were taken into account.

Legislative direction for land use planning by the Federal agencies is virtually absent. Nevertheless, as we have pointed out previously, the agencies do, in varying degrees, develop land use plans, and we commend them for their efforts. However, a statutory requirement to prepare such plans would give them greater credence and support and would assure that they are prepared in all cases as a matter of course. Further, formal plans will facilitate congressional oversight of the land use planning process and public scrutiny of the plans, as necessary ingredients of the planning coordination we recommend later in this chapter.

The plans, as part of a dynamic process, should not be inflexible, but subject to modification as conditions change. The lessons of city planning, which have long been preoccupied with "comprehensive" land use plans, demonstrate that static, fixed-arrangement plans are virtually useless to rapidly developing communities and areas with changing economic and social composition and, especially, changing values. Schematic land use plans are useful for crystallizing opinions and influencing expectations, but should be understood to be impermanent. The procedures by which they may be changed should be well known public information.

Agencies should provide specific findings in their plans which will clearly reveal how the general factors Congress has specified for consideration were treated. In this way other agencies and the public will not only be aware of the basis for the planning, but will also know what factors will influence changes in the original land use plan. Further, the information will be useful in determining whether the policy objectives and guidelines established by Congress have been properly and fully considered in the planning process.

## Land Classification and Withdrawals in Land Use Planning

The basic concept of classifying land for particular uses is an old one that is well recognized in zoning practices by local governments. It also has been used for years in public land management in the form of legislative and executive withdrawals and reservations of public domain lands for specific purposes.

We have previously endorsed the principle of designating or classifying lands for primary or dominant uses in this fashion as an appropriate and orderly means of planning for public land use. However, there is an urgent need to make a new start in the overall planning process on the public lands under better Congressional guidelines and with new administrative tools.

## Review of Withdrawals and Classifications

> Recommendation 6: As an essential first step to the planning system we recommend, Congress should provide for a careful review of (1) all Executive withdrawals and reservations, and (2) BLM retention and disposal classifications under the Classification and Multiple Use Act of 1964.[22]

At present virtually all of the public domain in all 50 states has been withdrawn from entry under one or more of the public land laws. Approximately 264 million acres are withdrawn under specific orders for particular purposes. Some 163 million acres were withdrawn in 1934 and 1935 in the 11 contiguous western states to implement the Taylor Grazing Act. Early in 1969 entries and state selection of the public lands in Alaska were suspended for a period of two years to enable Congress to consider legislation to resolve the problem of native claims.

We experienced great difficulty in trying to determine with any precision the extent of existing Executive withdrawals and the degree to which withdrawals overlap each other. We have found that the agencies do not have accurate records that show the purposes for which specific areas have been withdrawn and the uses that can be made of such areas under the public land laws.

A complete review of all existing withdrawals should be undertaken immediately to provide a basis for eliminating those that no longer serve a useful purpose, and for modifying those that are unnecessarily large in scope and area. This is a necessary step to "free" the public lands of encumbrances to effective land use planning for the future. It should be carried out as the initial effort under the formal withdrawal review program we recommend later in

---

[22] n. 5, supra.

this chapter. In the opinion of the Commission 10 years is a reasonable time for a review of all existing withdrawals and rejustification for renewal of those found to be required. Consequently, *we recommend that all existing withdrawals terminate at the end of a 10-year period unless expressly effected as new withdrawals under the laws and procedures we recommend.*

### Reclamation and Petroleum Withdrawals

In order to carry out the recommendations we make in Chapter Ten relative to the retention and management or disposition of public lands for intensive agriculture use, *we recommend that priority be given to the review of reclamation withdrawals in situations where land may be needed for intensive agriculture and the land is arable under existing physical and hydrological conditions.*

The Bureau of Reclamation conducts many programs in the western states to bring supplemental water supplies to private lands already farmed and, to a limited extent, to develop Federal lands not currently under cultivation.

Some of the lands withdrawn for proposed reclamation projects may be desired now for private development with existing water supplies. A choice must be made between developing the lands at public expense in the future or making them available for private development and use at private expense now.

If all such withdrawn lands are made available for immediate private development only the best lands might be used and the remaining inferior lands may make the proposed reclamation project economically infeasible. These conflicting factors should be evaluated by an accelerated withdrawal review program. This would guard against extended withdrawals of land for proposed projects whose possible benefits cannot be realized, if at all, until so far into the future that they cannot match the benefits readily available from disposal of selected lands to private agricultural development.

In the process of reviewing all existing withdrawals, attention will be given, of course, to a review of the need for the naval petroleum reserves. We believe, however, that *early consideration should be given to a review of Naval Petroleum Reserve No. 4 on the North Slope of Alaska* under the same procedures that are established for reviewing other withdrawals.

### BLM Classification

We have also found that the actions of the Bureau of Land Management under the Classification and Multiple Use Act of 1964 have paralleled to a considerable extent the liberal use of the withdrawal power by the public land agencies. In less than four years, under the 1964 Act, as of April 1, 1970, it classified 154.4 million acres of public land for retention and either classified or "identified" about 4.5 million acres for disposal. These classifications have a very substantial effect on land uses in the future. Despite the obvious need for careful planning, it is apparent that they were made in a hurried manner on the basis of inadequate information.

It was found that, for various reasons of expediency, the Bureau concentrated on large scale retention with little land use planning on its part and virtually none on the part of local and state planning authorities (although coordination was effected with them). Thus, the classifications were not preceded by necessary comprehensive efforts to gather information pertinent to resource capabilities and future development probabilities or by systematic attempts to state alternative uses within the context of regional or state development goals.

The Commission recognizes that BLM acted under a congressional mandate to make its classifications "as soon as possible," pursuant to an authority of *temporary* duration. Moreover, the agency was attempting to develop a comprehensive planning approach, which it previously lacked, concurrently with its disposal-retention classifications. Furthermore, the Bureau did consult with local interests and was, at least to some extent, responsive to the immediate desires of local agencies and inhabitants. Nevertheless, the extensive acreage classified for retention within the relatively short time involved is in itself evidence that the classifications were not preceded by comprehensive land use planning.

Fortunately, such classifications are not irrevocable. They can and should be changed as BLM's planning system becomes more refined and extensive and new development pressures arise. Moreover, Congress can change them anytime it sees fit. In any event, as an initial and necessary step in the implementation of the Commission recommendations on land use planning, the classifications under the 1964 Act should be carefully reviewed by both the Congress and executive branch.

### Classification of National Forest and BLM Lands

> Recommendation 7: Congress should provide authority to classify national forest and Bureau of Land Management lands, including the authority to suspend or limit the operation of any public land laws in specified areas. Withdrawal authority should no longer be used for such purpose.

Land use "classifications" are currently a confusing amalgam of: (1) legislative and executive

porary withdrawals in aid of legislation have remained in effect although (1) the legislation was never introduced; or (2) it was rejected by Congress; or (3) the purpose of the proposed legislation could no longer be realized.

With increasing pressure for the highest and best use of the nation's resources, *time limits on the duration of temporary withdrawals should not only be imposed as previously recommended, but the duration of proposed withdrawals within the mandatory time limits should be explained and clearly justified.*

Current uncertainty as to the effective date of withdrawals should be remedied by requiring that a withdrawal order be published within a definite time and specifically state its effective date.[28] This would conform withdrawal practice to that with respect to classifications under the Classification and Multiple Use Act and eliminate uncertainty about the validity of entries made before the specified date.

Knowledge that an application for withdrawal does segregate the covered lands from entry has frequently led to administrative inertia in completing action on the proposed withdrawal. The Commission is aware of the need for immediate segregation of lands for Federal programs in some circumstances. However, there appears to be no valid reason for substantial delay in completing action once an application has been filed. *We, therefore, recommend that a time limit of not more than 6 months be imposed upon the segregative effect of withdrawal applications and that safeguards be imposed against multiple application renewals.*

Review Program

> Recommendation 9: Congress should establish a formal program by which withdrawals would be periodically reviewed and either rejustified or modified.

With nearly all public domain land now subject to some form of withdrawal, a continuation of these withdrawals in their existing form could defeat the purpose of the Commission recommendations. Therefore, it is essential to the operation of a new withdrawal system that existing withdrawals be phased

[28] Under present practice, the filing of a notice of a proposed withdrawal with the appropriate land office and the notation thereof on the land office records is deemed the effective date of withdrawal. Although the notice of a proposed withdrawal is published in the Federal Register, the publication date is not construed as the effective date of the segregative effect of the notice. This position may well be inconsistent with sections 5(a) and 7 of the Federal Register Act which appear to require publication in the Federal Register as the effective date of a notice to the public. 44 U.S.C. §§ 305(a), 307 (1964).

56

out and reinstated where warranted under the new system.

Only in one period of time—1956–1961—has there been a vigorous program of withdrawal review. This did produce a relatively significant number of revocations or downward adjustments in the size of outstanding withdrawals while it was operative. However, the authority of the Secretary of the Interior to effect modifications or revocations of withdrawals of lands administered by an agency outside the Department of the Interior is limited. Existing procedures give the administering agency a veto power over any modifications or changes in a withdrawal made for its benefit. Thus, the effectiveness of any agency review is dubious unless legislation is enacted requiring mandatory reconsideration on a periodic basis. The responsibility for review and, where required, the modification and termination of withdrawals, should rest with the same officer who is given the delegated authority to effect withdrawals. Agencies having the administrative jurisdiction over withdrawn lands should be required to supply information periodically, at least once every 5 years, concerning land uses and a justification for continuance of each withdrawal. *A comprehensive periodic report of the findings made by the reviewing agency in respect to continuances and renewals should be submitted to Congress.*

If any agency desires to renew a withdrawal for a period of more than ten years from the date of the initial withdrawal, renewal should be subject to legislative approval. This could be done either by Act of Congress—possibly an annual omnibus act— or by allowing the officer executing the delegated power to renew such withdrawals, subject to reporting the action to Congress with detailed justification, and neither house disapproving within a specified period of time.

Executive Withdrawal Authority

> Recommendation 10: All Executive withdrawal authority, without limitation, should be delegated to the Secretary of the Interior, subject to the continuing limitation of existing law that the Secretary cannot redelegate to anyone other than an official of the Department appointed by the President, thereby making the exercise of this authority wholly independent of public land management operating agency heads.

In 1952 [29] the President delegated all of his withdrawal authority from all sources to the Secretary of the Interior, but with certain limitations. The delega-

[29] Exec. Order No. 10355, May 26, 1952, 3 C.F.R., 1949–1953 Comp., p. 873.

school funds established as a result of these grants, however, generate only a small fraction of the total amount spent on education by the past or present public land states. In no state does the trust fund generate more than 6.8 percent of the total expended, and in all but 4 states less than 3 percent is so generated. *While the Commission does not oppose dedicating grant lands to education, it favors leaving to the state legislatures the decision as to how and when to apply this policy.*

Lands granted for a particular purpose have been considered to be held in trust by the state for the purpose granted. If the lands are disposed of, the proceeds, in turn, are to be held in trust for the grant's stated purpose.[10]

In modern times these restrictions have frequently proved to be obsolete and burdensome. In Ohio, for example, a provision which required the state to obtain the consent of the inhabitants of the township in which the land was located prior to a sale of school grant lands and then invest the proceeds for the use of schools in that township, led the state to seek and secure congressional relief from the grant restrictions. Under a 1968 Act of Congress,[11] the proceeds from such sales may now be used for whatever educational purposes the Ohio legislature deems appropriate.

Faced with problems similar to those of Ohio, other states have acted unilaterally, by amendment to state constitutions or by state legislation, to relieve themselves of burdensome restrictions. Such practices are of questionable legality, however, because the actions seem to attempt to nullify the conditions of grants from the United States.

The Commission believes that lands granted to the states will better serve the purposes for which they were granted if unrealistic and narrow restrictions on the grants are removed. The disposition and management of such lands, as well as the funds generated by them, should now be left to the discretion of the various state legislative bodies.

## Alaska

With over 95 percent of all of its land federally owned, Alaska, for more than one reason, presents a unique situation. At the time of the last official census, there were slightly more than 1,500 acres of public land for each person in the state.

The Alaska Statehood Act[12] granted to the state more than 104 million acres to be selected from the unreserved public lands within the state. Recognizing

that the viability of the state government and the growth potential of the state would be determined in its formative years by the availability of land and resources for economic activity, the Act designated that 102,550,000, acres of the total grant were to be for general state purposes.

The right to select land under mineral lease expired on January 3, 1969; the right to make selections of other lands continues until 1984. The state has selected about 25 percent of the land necessary to satisfy its grants.

The Commission has concluded that, in accordance with the view of Congress at the time of the state's admission, the general role of federally owned lands in Alaska should be oriented to facilitate the state's selection rights in order to serve the objective or regional economic growth and assurance of the viability of Alaska as a state. If the state is allowed to complete its selection process expeditiously, it may be anticipated that it will select those lands that will be more valuable in non-Federal than in Federal ownership. It will then be the responsibility of the state to determine the future role of these lands in its economy. Haphazard disposals of Federal public lands thereafter could be contrary to the well developed plans made by the state for regional and local land use, and could burden the state and local governments with additional responsibility without corresponding benefit.

Lack of cadastral surveys, Federal agency classifications, and Federal and state administrative delays have all contributed to the delay in satisfaction of the grants to Alaska. But the primary impediment to completion of the state selection program is the claims asserted by the Alaskan natives to most of the land available for selection.

The United States, while reserving the right to extinguish aboriginal claims, traditionally and consistently sought to recognize the rights, through purchase or other form of cession, of those native groups owning land prior to the acquisition of an area. When this country purchased Alaska from Russia in 1867, there were many native inhabitants (classified as Aleuts, Indians, and Eskimos) in the territory.

Whenever the question has arisen, Congress has taken the opportunity to assert and reassert that the claims of natives to the use, occupancy, and ownership of land in Alaska would be protected, and statutes, including the Statehood Act, that might be in conflict with such rights, whatever they may be, contain provisions asserting that they are not intended to, and do not have the effect of, jeopardizing those rights.[13] We believe that we, as a Nation, must provide for an equitable settlement of the claims asserted by the Alaskan natives.

---

[10] See Lassen v. Arizona, 385 U.S. 458 (1967).

[11] Act of May 13, 1968, 82 Stat. 120.

[12] See § 6 of the Alaska Statehood Act, 72 Stat. 339, as amended, 48 U.S.C. p. 9026 (1964).

[13] See § 4, *id.* at 9025.

# WITHDRAWALS UNDER THE FEDERAL LAND POLICY MANAGEMENT ACT OF 1976

Charles F. Wheatley, Jr.[*]

The Federal Land Policy Management Act of 1976 [FLPMA][1] enacted major changes in the existing body of law governing withdrawals of public lands. The Act repealed twenty-nine withdrawal statutes enacted between 1888 and 1952,[2] expressly reversed *United States v. Midwest Oil Co.*,[3] a Supreme Court decision authorizing withdrawals by the Executive without express congressional authorization,[4] and substituted a comprehensive new system for the withdrawal of public lands. As such, FLPMA is clearly the most significant exercise of congressional legislative powers over public land withdrawals in the nation's history.

The power to withdraw lands from the operation of the myriad of public land laws enacted by Congress providing for the sale, lease, and use of disposal of public lands, has been subject to long standing controversy. The extensive use of withdrawals, which preclude the operative effect of an existing statute providing for a different disposal or use, made it clearly foreseeable that such conflicts and disputes would arise.[5] The problems caused by Congress' extensive use of its with-

---

[*]   Member of firm of Wheatley & Wollesen, Washington, D.C. Mr. Wheatley was the contractor with the Public Land Law Review Commission for the STUDY OF WITHDRAWALS AND RESERVATIONS OF PUBLIC DOMAIN LANDS, 1969.

   1.  43 U.S.C. §§ 1701-1782 (1976).
   2.  Pub. L. No. 94-579, § 704(a), 90 Stat. 2744 (1976).
   3.  236 U.S. 459 (1915).
   4.  Pub. L. No. 94-579, § 704(a), 90 Stat. 2744 (1976).
   5.  In 1970 the Public Land Law Review Commission reported to the President that:
       At present virtually all of the public domain in all 50 states has been withdrawn from entry under one or more of the public land laws. Approximately 264 million acres are withdrawn under specific orders for particular purposes. Some 163 million acres were withdrawn in 1934 and 1935 in the 11 contiguous western states to implement the Taylor Grazing Act. Early in 1969 entries and state selection of the public lands in Alaska were suspended for a period of two years to enable Congress to consider legislation to resolve the problem of native claims.

drawal power was augmented by the Executive withdrawal power which helped lead to the creation of the Public Land Law Review Commission [PLLRC].[6] Based on its extensive analysis of the problems involved in the withdrawal and reservation of public lands, the PLLRC made a number of recommendations for changes in the withdrawal system—recommendations which were acted upon by Congress in FLPMA.

Congress' enactment of FLPMA was designed to come to grips with a number of the problems dealing with the existing system of withdrawals that had been outlined by the PLLRC. As such, review of the new legislative provisions can best be undertaken in the context of three major problem areas: (a) whether the Executive should continue to make withdrawals without express authorization by Congress; (b) whether withdrawals should be subject to detailed procedures and guidelines established by Congress; and (c) how and when existing withdrawals should be reviewed to determine whether they meet the established overall national policy for the best use of public lands in the public interest.

## CONGRESSIONAL EXERCISE OF CONSTITUTIONAL AUTHORITY TO WITHDRAW FEDERAL LANDS AND TO DELINEATE THE EXTENT TO WHICH THE EXECUTIVE MAY WITHDRAW LANDS WITHOUT LEGISLATIVE ACTION

Withdrawals and reservation of public lands since the founding of the United States have been accomplished by three means: (1) express withdrawals by Congress in legislation, for example, national parks and military reservations; (2) withdrawals by the Executive pursuant to delegations of authority from Congress; and (3) withdrawals by the Executive without statutory authority.[7]

Direct express withdrawals by Congress have posed few problems

---

We experience great difficulty in trying to determine with any precision the extent of existing Executive withdrawals and the degree to which withdrawals overlap each other. We have found that the agencies do not have accurate records that show the purposes for which specific areas have been withdrawn and the uses that can be made of such areas under the public land laws.

PUBLIC LAND LAW REVIEW COMMISSION, ONE THIRD OF THE NATION'S LAND 52 (1970) [hereinafter cited as PLLRC].

6. Concern about problems associated with the "withdrawal" and "reservation" of public domain lands was strongly voiced in the deliberations which led to the creation of the Commission, and was a recurring subject of complaint in the Commission's public meetings. The contractor study of withdrawals indicates that they have been used by the Executive in an uncontrolled and haphazard manner. *Id.* at 43.

7. C. WHEATLY, STUDY OF WITHDRAWALS AND RESERVATIONS OF PUBLIC DOMAIN LANDS 1 (1969).

because they are carefully scrutinized by the executive branch before being recommended.[8] Further, while withdrawals by the Executive pursuant to congressional delegation have incurred the problems of application of proper procedures and guidelines to assure consistency with the overall public interest, they have not raised the issue of a basic conflict between the legislative and executive branches as to which possesses the authority and responsibility for withdrawals of public lands. It is the third category, withdrawals by the Executive without statutory authority, that poses the threshold question of the respective roles of the legislative and executive branches in the withdrawal process.

A review of the relative roles of the Congress and President in the history of withdrawals provides the necessary background to the problem. The Constitution gives Congress the power to "dispose of and make all needful Rules and Regulations respecting Territory or Property belonging to the United States."[9] During the early days of the Republic, Congress enacted specific statutes authorizing the President to establish military reservations, Indian trading posts, lighthouses, and townsites.[10] Many of these withdrawals by the Executive became so commonplace that the original statutory authority was never questioned or determined. Subsequently, during the later part of the nineteenth century, Congress adopted the practice of making direct withdrawals of land for certain purposes, or of authorizing the Executive to make withdrawals for certain specified objectives.[11] For example, in 1872 Congress directly withdrew lands creating the Yellowstone National Park,[12] and until the present time, all additions and modifications to the national park system have been by express legislation.[13] In 1888, Congress authorized the Geological Survey to recommend lands to be

---

8. *See* PLLRC, *supra* note 5, at 2.
    We find that when proposed land uses are passed on by the Congress, they receive more careful scrutiny in the executive branch before being recommended; furthermore, in connection with congressional action, the general public is given a better opportunity to comment and have its views considered. We conclude that Congress should not delegate broad authority for these types of actions.
*Id.*

9. U.S. CONST. art. IV, § 3, cl. 2. The Supreme Court has stated:
    Not only does the Constitution (art. IV, § 3, cl. 12) commit to Congress the power "to dispose of and make all needful rules and regulations respecting" the lands of the United States, but the settled course of legislation . . . and repeated decisions of this court, have gone upon the theory that the power of Congress is exclusive and that only through its exercise in some form can rights in lands belonging to the United States be acquired.
Utah Power & Light Co. v. United States, 243 U.S. 389, 404 (1917). *See* United States v. San Francisco, 310 U.S. 16, 29-30 (1940); Gibson v. Chouteau, 80 U.S. (13 Wall.) 92, 99 (1871); United States v. Fitzgerald, 40 U.S. (15 Pet.) 526, 537 (1840).

10. C. WHEATLY, *supra* note 7, at 2.

11. *Id.*

12. 16 U.S.C. § 21 (1976).

13. C. WHEATLY, *supra* note 7, at 2.

reserved for power sites, under certain prescribed criteria.[14]  An important act of the era relating to the withdrawal process was the National Forest Act of 1891[15] wherein Congress authorized the President to withdraw public lands for national forests.  But while this represented a delegation of the power to withdraw lands from Congress to the Executive, Congress exhibited a continuous supervision of the executive action, vacating various withdrawals from time to time and amending others.[16]  In 1902, Congress enacted the Reclamation Act[17] and in 1906 the Antiquities Act,[18] both authorizing withdrawals of land for specified purposes.

## The Midwest Oil Co. Case

It was not until the twentieth century that the problem of the executive power to withdraw lands without express congressional authority came into sharp focus.  On September 27, 1909, President Taft, by executive order, withdrew approximately three million acres of land believed to contain oil in California and Wyoming from location under the placer mining laws, "in aid of proposed legislation affecting the use and disposition of the petroleum deposits on the public domain."  Challenges to the validity of this order reached the Supreme Court in 1915 in the now famous decision of *United States v. Midwest Oil Company*.[19]  The Court was presented with elaborate arguments by the United States on the authority of the Executive to withdraw lands under alleged "inherent" authority emanating from the Constitution, but it declined to base its decision on that ground.  It affirmed the executive withdrawals "in the light of the legal consequences flowing from a long continued practice to make orders like the one here involved."[20]  Referring to some eighty years of practice where withdrawals had been made without express statutory authority, the Court concluded that Congress had affirmed that power by implication.  Thus, the Court based its decision on the premise that although the Executive by its action cannot create a power to withdraw lands, such authority can be deemed to have been vested in the Executive by congressional acquiescence in a long established practice of withdrawing lands:

> [The President's practice of withdrawing lands by Executive orders] were known to Congress, as principal, and in not a single instance

---

14. Act of Oct. 2, 1888, ch. 1069, 25 Stat. 526 (1889) (current version at 43 U.S.C. § 622 (1976)).
15. Act of Mar. 3, 1891, ch. 561, § 24, 26 Stat. 1103 (1891).
16. C. WHEATLY, *supra* note 7, at 278-83.
17. Act of June 17, 1902, ch. 1093, § 3, 32 Stat. 388 (codified at 43 U.S.C. § 416 (1976)).
18. Act of June 8, 1906, ch. 3060, § 2, 34 Stat. 225 (codified at 16 U.S.C. § 431 (1976)).
19. 236 U.S. 459 (1915).
20. *Id.* at 469.

was the act of the agent [the President] disapproved. Its acquiescence all the more readily operated as an implied grant of power in view of the fact that the exercise was not only useful to the public but did not interfere with any vested right of the citizen.[21]

### The General Withdrawal Act of 1910

After the 1909 withdrawals, Congress enacted the General Withdrawal [Pickett] Act of 1910.[22] The Act resulted from the request of President Taft for statutory authority to clarify his withdrawal power,[23] and was the only act, prior to FLPMA, wherein Congress sought to enact general legislation delegating authority to the Executive to withdraw and reserve the public lands of the nation.[24] The Pickett Act provided that all withdrawals thereunder were to be open to mining for metalliferous minerals, and continued earlier restrictions on creation of forest reserves in certain states.[25]

Subsequent to the Pickett Act and through the late 1930's, most withdrawals were made pursuant to the terms of the Act. The broad general withdrawals in 1934 and 1935 of all "vacant unappropriated" public lands in conjunction with the Taylor Grazing Act[26] were made pursuant to the authority delegated to the President by the Pickett Act.[27]

### The 1941 Opinion of the Attorney General

In 1940 and 1941, the issue arose as to the authority of the President to make a withdrawal of lands from the operation of the mining law, which the Pickett Act had expressly provided was to be operable as to withdrawals thereunder. Attorney General Jackson, when he first considered the matter in 1940, decided that Congress in enacting the Pickett Act of 1910 had intended to circumscribe the complete authority available to the President to withdraw lands.[28] Indeed, close analy-

---

21. *Id.* at 475.
22. Act of June 25, 1910, ch. 421, § 1, 36 Stat. 847 (repealed Pub. L. No. 94-579, § 704(a), 90 Stat. 2792 (1976)).
23. C. WHEATLY, *supra* note 7, at 4.
24. The Act provided that:
    The President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States, including Alaska, and reserve the same for water-power sites, irrigation, classification of lands, or other public purposes to be specified in the orders of withdrawals, and such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress.
Act of June 25, 1910, ch. 421, § 1, 36 Stat. 847 (1910) (repealed Pub. L. No. 94-579, § 704(a), 90 Stat. 2792 (1976)).
25. 43 U.S.C. § 142 (1970).
26. 43 U.S.C. § 315-315r (1976).
27. *See* C. WHEATLY, *supra* note 7, at 4.
28. Unpublished Op. of Att'y Gen., July 25, 1940 (withdrawn) *reprinted* in C. WHEATLY, *supra* note 7, at app. B-6 to B-11.

sis of the legislative history of that Act supports this conclusion.[29] The opinion, however, was never published. Secretary Ickes and other government agencies sought to have the Attorney General change his opinion. Subsequently, a memorandum was prepared in the Justice Department under the supervision of Assistant Attorney General Fahy, who reported to the Attorney General that the matter was close, but that in Fahy's opinion, the nonstatutory authority of the President should be affirmed.[30] In 1941, Attorney General Jackson issued a new opinion affirming the inherent authority of the President to make "permanent" withdrawals of public lands and limited the Pickett Act to "temporary" withdrawals.[31] The 1941 Opinion was based on the conclusion that Congress in the Pickett Act had intended to limit the inherent authority of the Executive to act only as to "temporary" withdrawals and therefore left untouched the continued implied power of the Executive to withdraw lands with the acquiescence of Congress. Although the 1941 Opinion was not premised on any inherent constitutional power in the Executive to withdraw lands, subsequent decisions within the Department of the Interior developed such a rationale for executive action.[32]

The theory that the Executive possess an inherent authority under the Constitution to withdraw public lands, apart from the acquiescence of Congress, had been argued by the United States in the *Midwest* case,[33] but the Supreme Court's decision that the power of the Executive rested only on the "acquiescence of Congress"[34] would appear to be an indirect rejection of the position. Proponents of the theory urge its continued validity, although no court has yet to confirm it.[35] The implications of the existence of such a power are clear. Even if Congress did act to clearly limit a certain type of withdrawal, the President, acting under his assumed inherent constitutional power, if valid, could disregard the mandate of the legislation.[36]

After the issuance of the 1941 Opinion of the Attorney General, the President in 1952 delegated all of the authority to withdraw lands, whether under specific statute, the Pickett Act, or any other source of authority, to the Secretary of the Interior.[37] The Secretary increasingly

---

29.  *See* C. WHEATLY, *supra* note 7, at 88-103.
30.  *Id.* at 5 app. B-14 to B-22.
31.  *Id.*
32.  See Lyman v. Crunk, 68 Interior Dec. 190 (1961) (Secretary ruled he possessed implied withdrawal authority to make "temporary" withdrawals despite the 1910 Pickett Act).
33.  United States v. Midwest Oil Co., 236 U.S. 459, 468 (1915).
34.  *Id.* at 483.
35.  *See* C. WHEATLY, *supra* note 7, at 5.
36.  Attorney General Jackson in his unpublished 1940 Opinion expressly noted such a possibility as a reason for denying the existence of such a power. Unpublished Op. of Att'y Gen., June 25, 1940 (withdrawn), *reprinted in* C. WHEATLY, *supra* note 7, app. B-6 to B-11.
37.  Exec. Order No. 10,355, 17 Fed. Reg. 4831 (1952).

relied upon the nonstatutory authority set forth by the Attorney General in the 1941 Opinion. For example on January 27, 1967, the Director of the BLM withdrew 86,000,000 acres of public lands from all entry under the mining and mineral leasing laws for protection of possible geothermal steam resources and other minerals on the lands.[38] After congressional inquiry, this was later reduced to 1,050,900 acres. Similarly, on January 28, 1967, the BLM withdrew all lands containing oil shale deposits in Colorado, Utah, and Wyoming using its asserted inherent authority.[39]

Based on the above development of the law of withdrawals, presenting a confused, unresolved conflict between the authority of the Congress and the President to make withdrawals, the PLLRC recommended that Congress enter the field and set the standards that could expressly govern the Executive in making withdrawals.[40] Congress adopted that recommendation in FLPMA. This Article will now focus upon a discussion of FLPMA's treatment of withdrawals.

## FLPMA

Congress undertook to legislate clearly and directly on the subject of withdrawal authority in the Federal Land Policy Management Act of 1976. In unequivocal terms, Congress provided that it was setting statutory guidelines for all withdrawals of public lands, which in its view would govern all executive action. In section 102(a) Congress declared it is the policy of the United States that "the Congress exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes and that Congress delineate the extent to which the Executive may withdraw lands without legislative action."[41] Section 204(a) of the Act provides that "the Secretary is authorized to make, modify, extend, or revoke withdrawals but only in accordance with the provisions and limitations of this section."[42] These provisions, coupled with the expansive definition of "withdrawals,"[43]

---

38. 32 Fed. Reg. 1001-02 (1967).
39. *Id.* at 1058.
40. PLLRC, *supra* note 5, at 2. In its report the Commission recommended that:
   Congress assert its constitutional authority by enacting legislation reserving unto itself exclusive authority to withdraw or otherwise set aside public lands for specified limited purpose uses and delineating specific delegation of authority to the Executive as to the types of withdrawals and set asides that may be effected without legislative action.
*Id.*
41. 43 U.S.C. § 1701(a)(4) (1976).
42. *Id.* § 1714(a).
43. The act defined withdrawal as follows:
   The term "withdrawal" means withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or

clearly cover any implied or inherent ,executive withdrawal authority. But the most important provision covering executive withdrawal power is section 704(a) which expressly revoked the implied authority of the Executive to make withdrawals.[44] Since there may be some confusion in this result a brief discussion might be in order.

The House Conference Report's[45] comment on section 704(a) stated that the section provided "for the repeal of *practically all* existing executive withdrawal authority."[46] While use of the words "practically all" might imply that some inherent executive withdrawal authority was left outstanding, another more plausible explanation is that the Act expressly repealed twenty-nine prior statutes leaving some small miscellaneous statutes authorizing particular withdrawals still on the books.

The Secretary of the Interior, in commenting to Congress adversely on the proposed express repeal of the *Midwest Oil* decision, stated that this would raise the issue of the President's inherent authority under the Constitution to withdraw lands.[47] The legislative history of FLPMA,[48] however, confirms the clear language Congress used in

---

reserving the area for a particular public purpose or program; or transferring jurisdiction over an area of Federal land, other than "property" governed by the Federal Property and Administrative Services Act, as amended (40 U.S.C. 472 (1976)) from one department, bureau or agency to another department, bureau or agency.
*Id.* at § 1702(j).
  44. Section 704(a) provides in pertinent part: "Effective on and after the date of approval of this Act, the implied authority of the President to make withdrawals and reservations resulting from acquiescence of the Congress and the following statutes and parts of statutes are repealed. . . ." Pub. L. No. 94-579, 90 Stat. 2743, 2792 (1976).
  45. H.R. REP. No. 94-1724, 94th Cong., 1st Sess. 66 (1976). The House Conference Report stated: "The House Amendments (but not the Senate bill) provided for repeal of practically all existing executive withdrawal authority. The conferees agreed to this repeal to the extent provided for by the House." *Id.*
  46. *Id.* (emphasis added).
  47. H.R. REP. No. 94-1163, 94th Cong., 2d Sess. 52 (1976). The Secretary stated:
    The draft would repeal the Pickett Act, 43 U.S.C. §§ 141-142 (1970), and eliminate any implied Presidential withdrawal power, see United States v. Midwest Oil Co., 236 U.S. 459 (1915). Thus, the proposed Organic Act would be the only basis for withdrawal authority. A cursory analysis discloses that the proposed repealer would effectively resurrect the very issue underlying the *Midwest Oil* case: how much inherent withdrawal power does the Executive possess constitutionally?
*Id.*
  48. *Id.* at 9 provides in pertinent part:
    *With certain exceptions, H.R. 13777 will repeal all existing law relating to executive authority to create, modify, and terminate withdrawals and reservations.* It would reserve to the Congress, the authority to create, modify, and terminate withdrawals for national parks, national forests, the Wilderness System, Indian reservations, certain defense withdrawals, and withdrawals for National Wild and Scenic Rivers, National Trails, and for other "national" recreation units, such as National Recreation Areas and National Seashores. It would also specifically reserve to the Congress the authority to modify and revoke withdrawals for national monuments created under the Antiquities Act and for modification and revocation of withdrawals adding lands to the National Wildlife Refuge System. These provisions will insure that the integrity of the great national resource management systems will remain under the control of the Congress.
    For the protection of statutory programs for the public lands and other statutory management programs, the bill grants to the Secretary of the Interior, subject to certain

the repealer section leaving to Congress exclusive control over withdrawals.[49] The delineation by the Act of the specific terms and conditions upon which the Secretary of the Interior can exercise withdrawal power and the persons to whom it may be delegated, make clear that Congress intended to occupy the entire field permitted under its constitutional authority over the public lands and to control and direct the executive use of withdrawal power.

It thus appears clear that FLPMA bars all claims of implied authority in the Executive as far as Congress is concerned. The only avenue left to support such a claim would be to attack the constitutionality of the Act itself. Such an approach would have to be based on the contention that if the authority of the President to withdraw lands rests on an independent grant from the Constitution, Congress' clear action in FLPMA to repeal and bar such inherent withdrawal activity is unconstitutional. In view of the language of article IV, section 3, clause 2 of the Constitution and the cases construing Congress' authority thereunder over the public lands,[50] the possibility of such a ruling appears remote.

Should such a contention be made, however, the escape route of the 1941 Attorney General Opinion ruling that the 1910 Pickett Act only intended to apply to "temporary" not "permanent" withdrawals could not be followed. Congress in the 1976 Act has expressly closed any such loophole by expressly providing that "the implied authority of the President to make withdrawals . . . resulting from the acquiescence of the Congress is repealed."[51]

## THE DETAILED PROCEDURES AND GUIDELINES ESTABLISHED BY CONGRESS FOR WITHDRAWALS

The second major problem area FLPMA dealt with was to establish uniform procedures and standards to govern withdrawals delegated to the Executive. Of course, to the extent that Congress expressly withdrew lands for a particular purpose, the detailed consideration given in the legislative process, including input from the Executive in the form of reports and recommendations, assured thorough evaluation of the public interest. Accordingly, the problem arose only with respect to withdrawals undertaken by the Executive.

Few of the prior statutes delegating authority to the Executive to

---

procedural controls, authority to create, modify, and terminate all withdrawals and reservations for all public purposes and departmental agency programs, existing and proposed, other than those reserved by the bill to the Congress. . . . (emphasis added).
49.  Pub. L. No. 94-579, § 704(a), 90 Stat. 2743, 2792 (1976).
50.  *See* cases cited *supra* note 9; C. WHEATLY, *supra* note 7, at 47-50.
51.  *See* Pub. L. No. 94-579, § 704(a), 90 Stat. 2743, 2792 (1976).

withdraw public lands prescribed any procedures or standards to gov-
ern the process.[52] While the Pickett Act contained a number of express
limitations upon the Executive in use of the withdrawal powers dele-
gated thereunder, such as permitting metalliferous mining,[53] and
prohibiting the withdrawal of lands for forest reserves in certain
states,[54] the Act did not contain any specified procedures or criteria for
the withdrawal or revocation of withdrawals of lands. Most of the
other statutes delegating withdrawal authority to the Executive did not
detail the procedures and standards for exercising this power.[55]

Another subsidiary problem arose from the use of the classifica-
tion powers by the Secretary of the Interior under section 7 of the Tay-
lor Grazing Act as amended in 1936[56] or the Classification and
Multiple Use Act of 1964[57] to avoid conforming to existing statutory
limitations governing withdrawals.[58] These resulted in *de facto* with-
drawals by use of the classification process which undercut the integrity
of the then existing laws and orders for withdrawals.

Congress expressly dealt with the problem areas caused by the lack
of procedures and standards, and the subsidiary issue of the *de facto*
withdrawals in FLPMA, by providing detailed procedures the Secre-
tary must follow before a withdrawal can become effective, as well as
providing for congressional and judicial review of his withdrawal deci-
sions. The remaining sections of this Article will focus on those proce-
dures and the congressional and judicial review provided in the Act.

## Procedures

### Notice and Hearing

Section 204(a)[59] of FLPMA requires that all withdrawals be ac-
complished only through certain prescribed procedures applicable to

---

52. *See, e.g.,* Act of March 3, 1807, ch. 34, § 2, 2 Stat. 437 (1807); Act of March 1, 1847, ch. 32, § 2, 9 Stat. 146 (1847); Act of March 1, 1817, ch. 22, 3 Stat. 347 (1817). For a discussion of congressional withdrawals, *see generally* C. WHEATLY, *supra* note 7, at 50-130.
53. 43 U.S.C. § 142 (1976) (repealed by Pub. L. No. 94-579, § 704a, 90 Stat. 2792 (1976)).
54. *Id.* (repealed by Pub. L. No. 94-579, § 704a, 90 Stat. 2792 (1976)).
55. In recent years, Congress was becoming increasingly concerned with the matter. In the Defense Withdrawal Act of 1958, Congress prohibited executive withdrawals of land in excess of 5,000 acres and set forth a list of specifications for all applications for withdrawals requiring approval by a specific act of Congress. 43 U.S.C. §§ 155-158 (1976).
56. 43 U.S.C. § 315 (1976) (originally enacted as Act of June 28, 1934, ch. 865, 48 Stat. 1269 (1934)).
57. *Id.* § 1421.
58. Under both section 7 of the Taylor Act and section 1 of the 1964 Classification Act, it is clear that the Secretary of Interior may, by means of a classification, determine to retain particular public lands in Federal ownership. *See* Carl v. Udall, 309 F.2d 653, 657-58 (D.C. Cir. 1962); Linn Land Company v. Udall, 255 F. Supp. 382 (D. Ore. 1966); Richardson v. Udall, 253 F. Supp. 72, 79 (D. Idaho, 1966). In Calvin B. Neely, A 30235, Interior Dec. Oct. 12, 1964, the Secretary held that lands could be classified under section 7 of the Taylor Act without the necessity for a formal withdrawal of the lands.
59. 43 U.S.C. § 1714(a) (1976).

all authorized executive withdrawals.[60] Under these procedures, when the Secretary of the Interior receives an application for withdrawal, or decides to initiate one himself, he must publish a notice of the proposed withdrawal in the Federal Register within thirty days of the request.[61] The publication of the notice has the effect of temporarily withdrawing or "segregating" the lands from entry under the public land laws to the extent set forth in the notice.[62] This initial segregative effect of the notice terminates upon (a) rejection of the application by the Secretary, (b) withdrawal of lands by the Secretary, or (c) the expiration of two years from the date of the notice.[63]

This provision imposes a beneficial change on the prior practice. While publication of notice in the Federal Register had been followed by the Secretary, there had been no specified limit to the segregative effect of such publication. Accordingly, it was not uncommon for lands to be segregated and thus effectively withdrawn by the publication of such notice and to remain as such for a number of years. Under FLPMA, the Secretary is required to act on the proposed withdrawal within a maximum period of two years after publication of notices.

The one exception to the notice provision of section 204(a) is found in section 204(e)[64] for emergency situations. If the Secretary determines that such an emergency exists, or if so notified by either the Committee on Interior and Insular Affairs of either the House of Representatives or the Senate, and finds that "extraordinary measures must be taken to preserve values that would otherwise be lost,"[65] the Secretary may make any emergency withdrawal which shall last for a period not to exceed three years. Such an emergency withdrawal would also be exempt from the provisions of section 204(c) governing proposed withdrawals.

Section 204(h)[66] provides that all new withdrawals, except emergency withdrawals, made by the Secretary shall be promulgated after an "opportunity for a public hearing."[67] Congress clearly desired full

---

60. 43 U.S.C. § 1714(j) (1976), prohibits the Secretary from making, modifying or revoking any withdrawals created by act of Congress and bars any withdrawal which can be made by act of Congress, including those relating to national monuments under the Antiquities Act of June 8, 1906, 16 U.S.C. §§ 431-433 (1976) or the National Wildlife Refuge System.
61. 43 U.S.C. § 1714(b)(1) (1976).
62. *Id.* The Act, as amended in conference, permitted the Secretary of the Interior to publish notice of a proposed withdrawal prior to his noting his records of the proposal. *See* H.R. REP. No. 94-1724, 94th Cong. 2d Sess. 10 (1976).
63. *See id.* at 11.
64. 43 U.S.C. § 1714(e) (1976).
65. *Id.*
66. *Id.* § 1714(h).
67. *Id.*

public participation and input into the withdrawal process.[68]

*Review by Congress*

Section 204(c)[69] of FLPMA provides a mechanism for review of proposed withdrawals in excess of 5,000 acres by the Congress, with a veto power in the Congress by enactment of a concurrent resolution. Section 204(c)(1)[70] provides that proposed withdrawals in excess of 5,000 acres, can be made only for a period of not in excess of twenty years, and the Secretary is required to notify both Houses of Congress no later than its effective date. The withdrawal shall terminate and become ineffective if Congress enacts a concurrent resolution disapproving it within ninety days.[71] The Act sets forth detailed provisions for the expedited resolution of the matter within the ninety-day period in the House and Senate.[72]

There appears to be some ambiguity in the language of Section 204(c)(1) as to whether one or both Houses of Congress can veto a proposed withdrawal. The language states:

> [T]he withdrawal shall terminate and become ineffective at the end of ninety days (not counting days on which the Senate or the House of Representatives has adjourned for more than three consecutive days) beginning on the day notice of such withdrawal has been submitted to the Senate and the House of Representatives, *if the Congress has adopted a concurrent resolution stating that such House does not approve the withdrawal.*[73]

Normally, a concurrent resolution adopted by Congress implies a resolution adopted by both Houses. But the remainder of the statutory language says that the resolution would state "that such House" does not approve the withdrawal. The House Report on the legislation provided that a proposed resolution may be vetoed separately by each House.[74] The Joint Conference Report, however, noted that the House version had been changed in conference to require a concurrent resolution by both Houses.[75] Thus, the ambiguity may be resolved by the Confer-

---

68. *See* Achterman & Fairfax, *The Public Participation Requirements of the Federal Land Policy and Management Act,* within this Symposium.
69. 43 U.S.C. § 1714(c) (1976).
70. *Id.* § 1714(c)(1).
71. *Id.*
72. *Id.*
73. *Id.* (emphasis added).
74. H.R. Rep. No. 94-1163, 94th Cong., 2d Sess. 9 (1976). The Report states:
   Upon receipt of notice, each House will have, for a period of 90 days, the opportunity to terminate all such withdrawals, except emergency withdrawals, by a resolution of that House. Absent such timely action, it will take an Act of Congress to terminate the withdrawal if the Secretary does not do so.
*Id.* at 9.
75. H.R. Rep. No. 94-1724, 94th Cong., 1st Sess. 58 (1976). The House Conference Report stated:
   (d)   The conferees adopted the House provisions for referral to Congress and possible veto of certain management decisions excluding public lands from one or more principal

ence Report as requiring a concurrent resolution adopted by *both* Houses of Congress. Section 204(c)(2) sets forth detailed information that must be provided in the notice required to be given to the Senate and House of proposed withdrawals in excess of 5,000 acres.[76] These provisions are designed to develop factual information to assure that lands proposed to be withdrawn for a specified purpose do not have some superior overriding use or purpose antithetical to that to be furthered by the proposed withdrawal. As such, the information required by Congress is designed to enable it to evaluate the basic policy objectives of the Act set forth in section 102(a),[77] and the land use planning criteria of section 202.[78]

For withdrawals under 5,000 acres, section 204(d)[79] of the Act permits the Secretary to undertake such withdrawals subject to certain limitations. If the withdrawal is for a "resource use" it may be made for

---

uses. As to this and other veto provisions of the House amendments, the conferees revised the House amendments to require adverse actions by concurrent resolution. . . .
*Id.*

76. 43 U.S.C. § 1714(c)(2) (1976). Section 204(c)(2) provides:
With the notices required by subsection (c)(1) of this section and within three months after filing the notice under subsection (e) of this section, the Secretary shall furnish to the committees—
(1) a clear explanation of the proposed use of the land involved which led to the withdrawal;
(2) an inventory and evaluation of the current natural resource uses and values of the site and adjacent public and nonpublic land and how it appears they will be affected by the proposed use, including particularly aspects of use that might cause degradation of the environment, and also the economic impact of the change in use on individuals, local communities, and the Nation;
(3) an identification of present users of the land involved, and how they will be affected by the proposed use;
(4) an analysis of the manner in which existing and potential resource uses are incompatible with or in conflict with the proposed use, together with a statement of the provisions to be made for continuation or termination of existing uses, including an economic analysis of such continuation or termination;
(5) an analysis of the manner in which such lands will be used in relation to the specific requirements for the proposed use;
(6) a statement as to whether any suitable alternative sites are available (including cost estimates) for the proposed use or for uses such a withdrawal would displace;
(7) a statement of the consultation which has been or will be had with other Federal departments and agencies, with regional, State, and local government bodies, and with other appropriate individuals and groups;
(8) a statement indicating the effect of the proposed uses, if any, on State and local government interests and the regional economy;
(9) a statement of the expected length of time needed for the withdrawal;
(10) the time and place of hearings and of other public involvement concerning such withdrawal;
(11) the place where the records on the withdrawal can be examined by interested parties; and
(12) a report prepared by a qualified mining engineer, engineering geologist, or geologist which shall include but not be limited to information on: general geology, known mineral deposits, past and present mineral production, mining claims, mineral leases, evaluation of future mineral potential, present and potential market demands.
77. *See id.*
78. *Id.* § 1702.
79. *Id.* § 1714(d).

such period as the Secretary "deems desirable."[80] A "resource use" is not directly defined in the Act, but the use of the word resource in the definition of "multiple use" indicates that it relates to the use of a particular resource with periodic adjustments to conform to changing needs and conditions, and may involve the use of land for "less than all of the resources."[81] Withdrawals of less than 5,000 acres may be made by the Secretary for a period of not more than twenty years for uses other than a resource use, including use for administrative sites, location of facilities, and other proprietary uses.[82] If a withdrawal is deemed desirable to preserve a tract for a specific use, then under consideration by the Congress, a withdrawal cannot exceed five years.[83]

In summary, the detailed notice and public hearing procedures set forth in FLPMA together with review and veto power by Congress, provide a completely new system for the promulgation of withdrawals. Obviously the data specified by the Act and required of the Secretary to meet these new procedural requirements will have the beneficial effect of subjecting withdrawals to a closer public and congressional scrutiny than hereto afforded. This, coupled with adherence to the planning goals of section 202[84] should result in a more judicious use of the withdrawal power in the public interest.

### Guidelines for Public Land Use as Affecting Withdrawals

Although section 204 of FLPMA prescribes new procedures for notice, hearings, and congressional review of proposed executive withdrawals, it does not specifically set forth the criteria governing withdrawals. However, the data required to be presented to Congress for withdrawals of over 5,000 acres[85] suggests the information Congress

---

80. *Id.* § 1714(d)(1).
81. "Multiple use" is defined in Section 103(c) as,
the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.
43 U.S.C. § 1702(c) (1976).
82. *Id.* § 1714(c)(2).
83. *See id.* § 1714(d)(3).
84. *Id.* § 1712.
85. *See id.* § 1714(c)(2).

deems important for review of such withdrawals. It appears that in making withdrawals, the Secretary might be bound by the guidelines set forth in section 202[86] of the Act for "land use planning." Section 202(e)(3),[87] for example, provides that withdrawals are a permissible tool that *may be* used by the Secretary in land use planning required under section 202.[88] Yet, section 202(a) provides in mandatory language that the Secretary:

> Shall . . . develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands. *Land Use plans shall be developed for the public lands regardless of whether such lands previously have been* classified, *withdrawn*, set aside, or otherwise designated for one or more uses.[89]

Section 212, as well as section 204 governing withdrawals, are part of Title II governing "land use planning and land acquisition and disposition." Arguably, the entire statutory scheme requires that in making a withdrawal under section 204, the Secretary be governed by the mandatory criteria for land use planning set forth in section 202. Otherwise a withdrawal under section 204 could be used for purposes contrary to the maintenance of the land use planning criteria mandated by Congress in section 202 for the proper management of public lands.

The criteria for land use plans are set forth in section 202(c) in mandatory language.[90] To the extent that the Secretary undertakes a withdrawal that contravenes these criteria, it would appear that the withdrawal would be subject to challenge.[91]

### *Judicial Review*

An interesting unresolved question is the extent to which private parties would have standing to challenge a proposed withdrawal in the courts. Since this issue is discussed in another Article in this Sympo-

---

86.  *Id.* § 1712.

87.  *Id.* § 1712(e)(3). Section 202(e)(3) provides in pertinent part:
> Withdrawals made pursuant to section 204 of this Act may be used in carrying out management decisions, but public lands shall be removed from or restored to the operation of the Mining Law of 1872, as amended, or transferred to another department, bureau, or agency only by withdrawal action pursuant to section 204 or other action pursuant to applicable law. . . .
*Id.*

88.  *Id.* Under other circumstances it is clear that the Secretary must use a withdrawal under section 204 if he desires to suspend the operation of the Mining Law of 1872 or transfer lands to another Department or agency. *See id.*

89.  43 U.S.C. § 1712 (1976) (emphasis added).

90.  *See id.* § 1712(c) (providing that "In the development and revision of land use plans, the Secretary *shall* . . ." (emphasis added)).

91.  In reporting on the legislation, the Secretary of the Interior took the position that there was an unwarranted overlapping of responsibility under the management section, section 202, and the withdrawal section, section 204. *See* H.R. REP. No. 94-1163, 94th Cong., 2d Sess. 45-47 (1976). However, it does not appear that the Secretary ever contended that he should not follow the criteria for management studies set forth in section 202(b) when making withdrawals under section 204.

sium,[92] it is sufficient to note here that the provision of section 204(h),[93] providing for public hearings, clearly shows that Congress intended for the withdrawal process to be subjected to public participation at mandatory public hearings. Thus, assuming that Congress itself did not exercise its veto power by enactment of a concurrent resolution within the prescribed ninety-day period, it appears that in the absence of any specific judicial review procedures in the Act, the general provisions of the Administrative Procedure Act [APA],[94] to the extent applicable, should provide a remedy of judicial review. This is buttressed by the declaration of policy in section 102(a) that "judicial review of public land adjudications be provided by law."[95]

## REVIEW OF EXISTING WITHDRAWALS

Because of the extensive prior use of withdrawals of public lands embracing hundreds of millions of acres under the varied withdrawal procedures previously in effect, an important consideration is the extent to which such withdrawals are to be reviewed and made subject to the new FLPMA procedures and criteria. FLPMA fails to provide for mandatory review of prior withdrawals except when such withdrawals were made only for a "specific period."[96] Of interest here is whether the extensive "temporary" withdrawals by the executive fall within the scope of section 204(f).[97] It appears that since a "temporary" withdrawal is one for a specific period, in contrast with a permanent withdrawal which has no time period, section 204(f) should apply.

As to prior permanent withdrawals with no "specific period", other sections of the Act require their evaluation in regard to the land use planning requirements of section 202.[98] Section 202(a) requiring the Secretary to develop land use plans for the use of public lands ex-

---

92. See Frishberg, Hickey & Kleiler, *The Effect of the Federal Land Management and Policy Act on Adjudication Procedures in the Department of the Interior and Judicial Review of the Adjudication Decisions,* within this Symposium.

93. 43 U.S.C. § 1714(h) (1976).

94. 5 U.S.C. §§ 551, 559 (1976). The Secretary of the Interior aceeded that the provisions of the APA, generally apply to the notice and procedures governing withdrawals. *See* H.R. REP. No. 94-1163, 94th Cong., 2d Sess. 47 (1976).

95. 43 U.S.C. § 1701(b) (1976).

96. *Id.* § 1714(f). Section 204(f) provides that all withdrawals and extension thereof, whether made prior to or after the Act, "having a specific period . . . shall be reviewed by the Secretary toward the end of the withdrawal period and may be extended only upon compliance with the provisions" of subsection (c)(1) or (d) "whichever is applicable, and only if the Secretary determines that the purpose for which the withdrawal was first made requires the extension, and then only for a period no longer than the length of the original withdrawal period." It should be noted that in section 701(c) of FLPMA, Congress provided that "all withdrawals, reservations, classifications, and designations in effect as of the date of approval of this Act shall remain in full force and effect until modified under the provisions of this Act or other applicable law." Pub. L. No. 94-579, § 701(c), 90 Stat. 2744 (1976).

97. 43 U.S.C. § 1714(f) (1976).

98. *See id.* § 1712.

pressly provides that: "Land use plans shall be developed for the public lands regardless of whether such lands previously have been classified, withdrawn, set aside, or otherwise designated for one or more uses."[99] Thus, prior withdrawals with no "definite period" are subject to review under the criteria of section 202 for land use plans, but as noted previously, the Secretary has discretion in promulgating such plans as to whether to utilize the withdrawal authority.[100] The lands previously withdrawn are subject to a new land use plan, but not necessarily to any modification under the section 204 withdrawal procedures.

## CONCLUSION

Review of Federal Land Use Policy and Management Act of 1976 clearly marks it as the most important enactment by Congress relating to the subject of withdrawals in the over two hundred year history of the nation's public lands. In the Act, Congress clearly undertook to exercise its full constitutional authority over the public lands. Congress carved out certain types of withdrawals which could be undertaken only by itself with express legislation. As to other withdrawals, to the extent they exceed 5,000 acres, Congress retained the veto power by means of concurrent resolution adopted by both Houses. Any withdrawal by the Executive under an inherent authority from Congress was expressly repealed, thus reversing *United States v. MidWest Oil Co.*, under which the President had long asserted an implied authority based on congressional acquiescence to withdraw lands without statutory authority. The detailed procedures and criteria to apply to the withdrawal process for all withdrawals made by the Secretary of the Interior, either for his department or for other departments and agencies, codify for the first time a single uniform set of guidelines to govern the withdrawal process. As such, FLPMA represents a constructive, long-needed action by Congress to provide a reasonable and necessary program for withdrawal actions relating to the nation's public lands.

---

99. *Id.* § 1712(a).
100. See text & note 88 *supra.*

Westlaw.

2012 WL 1184350 (I.B.L.A.)

Department of the Interior (D.O.I.)

**\*1** SOUTHERN UTAH WILDERNESS ALLIANCE

IBLA 2011-138 & IBLA 2012-34

March 8, 2012

**\*1** UTU-87112-A

Potash Leasing

Consolidation Effected; Petitions for Stay Denied

APPEARANCES:

Stephen H.M. Bloch, Esq.

David Garbett, Esq.

Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
A. John Davis, Esq.

Craig D. Galli, Esq.

Hadassah M. Reimer, Esq.

Shawn T. Welch, Esq.

Holland & Hart LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101
James E. Karkut, Esq.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Office of the Regional Solicitor
U.S. Department of the Interior
Federal Building, Suite 6201
125 South State Street
Salt Lake City, UT 84138-1180

<u>ORDER</u>

The Southern Utah Wilderness Alliance (SUWA) has appealed from and petitioned for an immediate stay of the effect of two decisions of the Bureau of Land Management (BLM). It appealed, first, from a February 17, 2011, Decision Record (DR) and Finding of No Significant Impact (FONSI), of the Deputy State Director, Lands and Minerals, Utah State Office, BLM, approving the Sevier Lake Competitive Potash Leasing Proposal (Leasing Proposal), and, second, from an October 28, 2011, DR and FONSI, of the Field Manager, Fillmore (Utah) Field Office (FFO), West Desert District, BLM, approving the Sevier Lake Exploratory Testing Proposal (Testing Proposal).[FN1][FN2] The DR/FONSIs were based, respectively, on a February 2011 Environmental Assessment (EA) (DOI-BLM-UT-W020-2010-0014-EA) and an October 2011 EA (DOI-BLM-UT-W020-2011-0015-EA), which were prepared pursuant to section 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C) (2006), and its implementing regulations, 40 C.F.R. §§ 1500.1-1518.4. [FN3]

**\*2** We hereby consolidate the two appeals for purposes of final disposition of the two stay petitions, since a stay of the effectiveness of either BLM decision, whether to lease the affected lands or to authorize exploration operations, inevitably affects Peak's ability to undertake exploration operations on the leased lands. Because SUWA has failed to carry its burden to satisfy the criteria for a stay in the case of both appeals, we will deny its petitions for an immediate stay of BLM's February 2011 DR/FONSI, approving competitive potash leasing, and BLM's October 2011 DR/FONSI, approving the exploratory testing of the leased land.

*I. Background*

On or about November 7, 2008, Peak requested BLM to offer 64 parcels, encompassing a total of close to 126,000 acres of public land, in and around the Sevier Lake (Lake), a generally dry lake bed containing brine with dissolved potassium and associated salts (potash) in underground deposits, for competitive potash leasing, pursuant to the MLA, 30 U.S.C. §§ 181-287 (2006), and implementing regulations, 43 C.F.R. Part 3500. [FN4] The Lake, which is situated in the Great Basin area of west central Utah, contains an estimated 5.2 million tons of potash, which is critical to the production of commercial fertilizers. *See* Exploratory Testing DR at 4 ("Data from historic exploration indicates a substantial resource of mineral-saturated brine, but the testing data is nearly twenty years old and is not adequate for developing a site-specific operational extraction plan"); Exploratory Testing EA at 6; Leasing EA at 20.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*2** In order to address the potential environmental consequences of leasing the close to 126,000 acres of public land and two alternatives thereto, BLM, using an **\*3** inter-disciplinary team (IDT) of experts, prepared the Leasing EA. [FN5][FN6] The proposed action (Alternative A) would approve the proposed competitive potash leasing of a total of approximately 125,762 acres of public land in 64 parcels, Alternative C would approve the competitive potash leasing of a total of approximately 96,000 acres of public land in 49 parcels, and the no action alternative (Alternative B) would not approve any potash leasing. *See* Leasing EA at 16, 25-27.

At the time of preparation of the Leasing EA, "[n]o specific plans" had been provided "for development" of the proposed potash leases. Leasing EA at 1. Thus, BLM analyzed the potential impacts of development of the proposed potash leases under a Reasonably Foreseeable Development (RFD) scenario, "based upon known available processes and technology."*Id.*;*see id.* at 15, 16, 65 ("[T]he [environmental] impact analysis assumes that the leasing action is tied to a reasonably foreseeable development scenario"), E-43 ("Specific mining plans cannot be analyzed because there are a number of ways to mine this resource based on economics and other factors"). Approximately half of the total potash deposit is likely to be extracted, from wells, at the rate of 400,000 tons per year for a total of 6.5 years, preceded by 2 to 3 years of preparatory work, and followed by 3 to 5 years of reclamation. *See* Leasing EA at 18, 20, 25; Leasing DR at 1. The potassium-rich groundwater, totaling approximately 39 billion gallons (or 120,000 acre-feet) per year, would be pumped from the ground and conveyed, by approximately 300 miles of collection ditches, to a series of solar evaporation ponds, encompassing approximately 47,000 acres, surrounded by approximately 250 miles of dikes or berms, where, following evaporation of the water, the potash would be crushed, dried, and bagged over an area totaling approximately 500 acres. [FN7]*See* Leasing EA at **\*4** 18, 26. Most of the facilities, including the brine wells, collection ditches, and evaporation ponds, would be located on the potash leases.

Peak does not currently hold any water rights for appropriation of the briny groundwater, which would be processed for the recovery of potash, or fresh groundwater, which would be used in processing operations. *See* Leasing EA at 18, 59-61, 73-74. Further, efforts by Peak to obtain approval by the State Engineer, Utah Division of Water Rights, of sufficient water rights to pursue potash production operations have been opposed by BLM, the Fish and Wildlife Service (FWS), U.S. Department of the Interior, and the County of Millard, Utah. Protests are currently pending before the State Engineer, who has complete authority over "when and whether the water rights are granted [.] *Id.* at E-28.

**\*3** The Lake is generally dry, but occasionally contains water, as a result of precipitation and/or inflow from the Sevier River, which is mostly depleted upstream for irrigation purposes, or the local aquifer, thus, despite its high saline content, providing valuable habitat, for varying periods of time, for migratory birds. *See* Leasing EA at 28, 32, 45, 49, 55-59, 61-63, Appendix D (Migratory Birds List & TES Species Summary). BLM acknowledged in its EA that development had the potential to deplete surface and groundwater resources, given the large quantities of brine and freshwater

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

needed for processing the brine, which could potentially adversely affect the availability of water for humans and wildlife in the surrounding area. *See* Leasing EA at 12-13, 73-75. BLM acknowledged the extent to which development would result in the depletion of briny groundwater, underlying the leased land, with the extraction of 120,000 acre-feet per year well exceeding the expected 42,000 acre-feet per year groundwater recharge, and its potential effects on surface water and associated aspects of the human environment, which would be monitored. *See* Leasing EA at 12-13, 26, 58, 74. BLM also noted that the availability of briny groundwater and freshwater would have to be determined by the State Engineer, which might limit the availability sufficient to scale back or preclude potash development. *See* Leasing EA at 9, 59-61, 73-74, E-39 to E-40. In any event, BLM provided that its approval of any plan of development (POD) would require submission of a detailed hydrologic analysis, assessing, *inter alia*, the potential consequences for surface and groundwater, and a plan detailing efforts to avoid or mitigate adverse effects to inventoried wildlife. *See* Leasing EA at 22-23, 24-25, 68, 69, 74. BLM also provided that any lease issued would require Peak to replace any drinking water lost or negatively impacted, in terms of its quality or quantity, by **\*5** development operations, in order to maintain existing land uses. *See* Leasing EA at 13, 22, 74, E-26 to E-27, E-40 to E-41.

BLM also acknowledged in its EA that development of the potash resources, including the diversion of freshwater for potash production, has the potential to create fugitive dust, which is already known to be generated by wind storms that, each year, stir up large quantities of dust that are known to travel hundreds of miles to Salt Lake City and other inhabited areas along the Wasatch Front, adversely affecting air quality. *See* Leasing EA at 10, 30-33, 65-66. BLM, however, provided that its approval of any POD would require submission of a plan for avoiding or mitigating any adverse air quality impacts from fugitive dust. *See* Leasing EA at 10, 25, 65.

In his February 2011 DR, the Deputy State Director decided to approve the Leasing Proposal, thus approving the offering of 64 parcels, totaling 125,762 acres of public land in and around the Lake, for competitive potash leasing, subject to various stipulations designed to minimize or avoid the adverse environmental consequences of leasing and exploration and development. *See* Leasing DR at 1, 2-6. However, he noted that a single entity would be limited to 96,000 acres, the maximum acreage, under 43 C.F.R. § 3503.37, which could be held by any one lessee in any one state. *See* Leasing DR at 1. He further held that each lessee would specifically be required, *inter alia*, as a matter of lease stipulation, to submit and obtain BLM approval of a fugitive dust control plan and a wildlife inventory and mitigation plan, prior to BLM approval of a plan for exploration or development, or any surface-disturbing activities. *See* Leasing DR at 3-4, 5-6.

**\*4** The Deputy State Director concluded that leasing conformed, as required by section 302(a) of the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1732(a) (2006), with the Warm Springs RMP. *See* Leasing DR at 6, 7. In his FONSI, he further concluded, after considering the context and intensity criteria of 40 C.F.R. § 1508.27, that BLM was not required, by section 102(2)(C) of NEPA, to prepare an environmental impact statement (EIS) because leasing was not

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

likely to significantly impact the quality of the human environment.

SUWA appealed timely from the Deputy State Director's February 2011 DR/FONSI.

Absent any stay of the effect of the February 2011 DR/FONSI, BLM went forward with the approved competitive potash lease sale on April 5, 2011. Peak was declared the successful high bidder for all 64 parcels, having submitted bids that met or exceeded the estimated fair market value (FMV) of each of the parcels, and otherwise found to be qualified to hold Federal potash leases. However, the acreage **6** awarded exceeded the maximum 96,000 acres permitted, by 43 C.F.R. § 3503.37, to be held by any one lessee in any one state. Thus, following the lease sale, Peak relinquished a total of approximately 30,590.04 acres of land originally sought, bringing its lease offer down to approximately 95,171.96 acres of land, in 52 parcels, which were considered the lands likely to best advance its exploration and development plans. [FN8]

Effective June 1, 2011, BLM issued 52 competitive potash leases, UTU-88387 through UTU-88390, UTU-88401 through UTU-88430, UTU-88433 through UTU-88457, and UTU-88461 through UTU-88463, to Peak, covering 95,171.96 acres of public land in and around the Lake. *See* 30 U.S.C. § 283 (2006). Each of the leases precludes any surface-disturbing activity until BLM approves an exploration or development plan. *See* 43 C.F.R. § 3592.1(a). Importantly, special stipulations, incorporated into each lease, also required Peak, before undertaking any surface-disturbing activity, under an exploration or development plan, to, *inter alia*,

> (1) engage in a hydrologic analysis that encompasses, *inter alia*, documenting the basic hydrogeology underlying the lake bed and associated areas, determining the potential impacts of development to surface and groundwater, and providing for monitoring and responding to actual adverse impacts to surface and groundwater;
> (2) replace any surface or groundwater resources lost or adversely affected, in terms of quality or quantity, by potash development, in order to maintain existing land uses;
> (3) after conducting a baseline inventory, prepare a plan for avoiding or minimizing adverse impacts to wildlife, including migratory birds, and their habitat, incorporating, *inter alia*, survey/monitoring, rescue and rehabilitation, and adaptive management; and
> (4) prepare a dust control plan, incorporating, *inter alia*, the treatment of roads and other disturbed surfaces, the stabilization of piles, and the identification of high wind events and other conditions under which work will cease.

**5** On November 4, 2011, well after BLM's February 2011 decision to approve competitive potash leasing, SUWA requested the Board to immediately stay the effect **7** of that decision, during the pendency of its appeal in IBLA 2011-138. [FN9] SUWA explained that it had deferred seeking a stay of BLM's decision to issue leases, since BLM had not thereby approved any surface-disturbing activity, and that it finally sought a stay right after BLM approved Peak's exploratory testing proposal. *See* Petition (IBLA 2011-138) at 1 n.1, 2-3. BLM and Peak both oppose any stay.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

On June 6, 2011, Peak submitted a proposal, pursuant to 43 C.F.R. § 3592.1(b), to undertake exploratory testing operations on its leased land, summarized, by BLM, as follows:

> [Peak will] conduct proposed *brine resource confirmation sampling* to develop a better understanding of the distribution of dissolved salts in groundwater occurring within the Sevier Lake potassium lease[s][,] . . . collect *baseline hydrologic data* for use in evaluating potential hydrologic impacts that could result from brine removal and freshwater extraction for potential future project operations[,] . . . [and] conduct a *screening-level geotechnical study* to assess the conceptual design and feasibility of structures that would be built to support the operation of a potash facility. [Emphasis added.]

Exploratory Testing DR at 1; *see* Exploratory Testing EA at 6-14. In general, exploratory testing operations were designed "to support the potential future economic recovery of potash resources from [F]ederal lands by confirming the potential value of the resource and providing baseline data for assessing the potential environmental impacts of commercial production."Exploratory Testing EA at 3. Most importantly, "[b]rine resource sampling will verify *the economic viability of potential commercial production of marketable mineral products at Sevier Lake*."*Id.* at 6, emphasis added.

**\*8** Basically, Peak will (1) drill up to 712 exploratory testing wells, from 50 to 300 feet deep, in order to test the quality, quantity, and geographic extent of the underlying minerals in the lake bed; [FN10] (2) drill 10 monitoring wells, from 250 to 1,500 feet deep, in order to monitor groundwater and assess the underground hydrology inside and outside the lake bed; and (3) drill or excavate 44 borings or pits, from 20 to 150 feet deep, in order to conduct a geotechnical study, which will assess the conceptual design and feasibility of development facilities and structures. *See* Exploratory Testing EA at 7-8, 10-11, 13-15. None of the exploratory test well drilling will be preceded by the clearing of vegetation and soil grading, in order to create well pads, since it will occur in the lake bed, which is devoid of vegetation. The creation of well pads in the case of monitoring well drilling will disturb a total of 2.5 acres. Borings/pits, ranging in size from 1,125 to 10,000 square feet, will be excavated to a total depth of from 20 to 150 feet. Access to all of the well and boring/pit sites will be provided by existing access roads, and short cross-country routes, using tracked vehicles. Drilling, excavation, and associated activity will temporarily disturb the surface of the affected public lands, and be fully reclaimed following completion of testing, monitoring, and study.

**\*6** In order to address the potential environmental consequences of the proposed action (Alternative A) of exploring for potash in the leased land and a no action **\*9** alternative (Alternative B), BLM, using its IDT, prepared the October 2011 EA (Testing EA).[FN11]

In his October 2011 DR, the Field Manager decided to approve the Exploratory Testing Proposal, thus approving the drilling or excavating and testing/studying of up to 712 exploratory testing wells, 10 monitoring wells, and 44 borings/pits and related activity, subject to various project design features and mitigation measures designed to minimize or avoid the adverse environmental consequences of exploration operations. *See* Exploratory Testing DR at 1-4. He particularly noted that the approved "[b]rine resource sampling will verify the economic viability of potential

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

commercial production of marketable mineral products at Sevier Lake." *Id.* at 4. He concluded that exploratory testing conformed, as required by section 302(a) of FLPMA, with the Warm Springs RMP. *See* Exploratory Testing DR at 4, 5. In his FONSI, the Field Manager concluded, after considering the context and intensity criteria of 40 C.F.R. § 1508.27, that BLM was not required, by section 102(2)(C) of NEPA, to prepare an EIS because testing was not likely to significantly impact the quality of the human environment.

SUWA appealed timely from the Field Manager's October 2011 DR/FONSI, requesting an immediate stay of BLM's decision to approve exploratory testing, during the pendency of its appeal in IBLA 2012-34. BLM and Peak both oppose any stay.

Despite the automatic stay of the effect of the October 2011 DR/FONSI, during the 30-day appeal period and, thereafter, for a 45-day period, during the pendency of SUWA's stay petition, Peak went forward with the approved exploratory testing. *See* Peak Motion to Intervene (IBLA 2012-34) at 3 ("Peak Minerals' exploration program is currently underway"); Peak Opposition (IBLA 2011-138) at 4 ("The exploration activity . . . is expected to last four months, with some wells drilled this fall, and others in the spring and summer of 2012"), 13 ("Drilling, assaying and geotechnical tasks in the lake area will take up to six months to complete. Bore hole drilling activity started on Sevier Lake during the second week of November and to date 40 bore holes have been drilled and completed."(citing Nov. 2011 Dye Declaration, ¶5, at 3-4)); Peak Opposition (IBLA 2012-34) at 10 ("[T]o date 89 bore holes have been drilled and completed" (citing Dec. 2011 Dye Declaration, ¶5, at 4)); Exploratory Testing EA at 14.

**\*10** We will consider both stay petitions together, since, whether we are addressing BLM's decision to lease, thus basically authorizing exploration and development of the leased lands, or its resulting decision to specifically authorize exploration of the leased lands, what is, ultimately, at stake is the disturbance of the leased lands. Whether we are persuaded to stay the leasing decision, the decision to approve exploration operations, or both, the effect will be to suspend any further disturbance of the surface of the leased lands, which is SUWA's most immediate aim in seeking either or both stays. [FN12][FN13]

*II. Petition for a Stay*

**\*7** Appeals from BLM decisions approving competitive potash leasing and exploration operations on leased lands are governed, respectively, by 43 C.F.R. §§ 3501.30 and 3598.5. They, respectively, provide only that appeals from BLM potash leasing decisions, under 43 C.F.R. Part 3500, and appeals from BLM decisions approving exploration operations on leased lands, under 43 C.F.R. Part 3590, may be brought under 43 C.F.R. Part 4.

Since the specific regulations applicable to competitive potash leasing and exploration operations on leased lands do not "otherwise provide[]," the effectiveness of BLM competitive potash leasing

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

and exploration operations approval decisions is governed by 43 C.F.R. § 4.21. 43 C.F.R. § 4.21(a). Such a BLM decision is not automatically effective upon issuance or during the 30-day period of time provided, by 43 C.F.R. Part 4, for filing an appeal, and, when a stay petition is filed during the 30-day appeal period, the decision will only become effective once the Board denies the petition or fails to act on the petition within 45 days after the 30-day appeal period. *See* 43 C.F.R. §§ 4.21(a) and (b)(4).

It is important to note, however, that, even though a BLM decision may go into effect because the Board fails to act on a stay petition, either because we fail, for whatever reason, to act on a pending petition during the specified time period for Board action, or because no petition was filed, we may, nevertheless, act on a request **11** for a stay filed after the 30-day appeal period or even after the expiration of the specified time period for Board action. *See Robert E. Oriskovich*, 128 IBLA 69, 70 (1993); *David M. Burton*, 11 OHA 117, 120, 125, 127 (1995).

In any event, a petition for a stay must, under 43 C.F.R. § 4.21(b)(1), show sufficient justification based on the relative harm to the parties if the stay is granted or denied; the likelihood of the appellant's success on the merits; the likelihood of immediate and irreparable harm if the stay is not granted; and whether the public interest favors the granting of the stay. The party requesting the stay has the burden of showing that a stay is warranted by satisfying *each of the criteria specified in the rule*. 43 C.F.R. § 4.21(b)(2); *Oregon Natural Resources Council Action*, 148 IBLA 186, 188 (1999). Failure to satisfy any one of the criteria justifies denial of the petition.

SUWA principally contends that BLM's decisions to approve the competitive potash leasing and exploratory testing of the close to 96,000 acres of public land in the Lake violates the environmental review requirement of section 102(2)(C) of NEPA. Its primary objection is to the adequacy of BLM's Leasing EA, since it maintains that the Exploratory Testing EA mostly tiers to the Leasing EA, and, thus, the validity of BLM's decision to approve exploration operations, as well to originally approve leasing and development, *relies on the adequacy of the Leasing EA*. [FN14]

**8** SUWA argues, first and foremost, that BLM failed, in the Leasing EA, to adequately consider the likely direct, indirect, and cumulative impacts of leasing and development of the leased lands to air quality, surface and groundwater quantity, and migratory birds, and to do so in an EIS, given the likely significance of these impacts. *See* Petition (IBLA 2011-138) at 4-7; [FN15] SOR (IBLA 2011-138) at 9-21. It **12** asserts that BLM completely deferred any analysis of the likely effects of *any development* of the leased lands for the extraction, recovery, and processing of potassium brines. It states that BLM failed to adequately consider the likelihood that development would deplete surface and groundwater of the leased and surrounding lands, thus degrading or eliminating valuable habitat for migratory birds, and, together with the disturbance associated with development activities, promoting the creation of fugitive dust (particulate matter), thus degrading air quality and threatening public health close to the Lake and more than a hundred miles away in Salt Lake City, and elsewhere along the Wasatch Front. *See* Petition (IBLA 2011-138) at 5, 6; SOR (IBLA 2011-138) at 9-15. It

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

noted that the dewatering would dry not only the Lake, but also the surrounding agricultural fields, normally irrigated by freshwater diverted for use in potash production.

SUWA also contends that BLM's decision to lease violates the land use planning requirements of section 202(c) of FLPMA, 43 U.S.C. § 1712(c) (2006), because it failed to consider whether leasing was contrary to the nomination of the leased lands by the Utah Clean Air Alliance (UCAA) for designation as part of an Area of Critical Environmental Concern (ACEC).[FN16] *See* Petition (IBLA 2011-138) at 7; SOR (IBLA 2011-138) at 21-23.

### A. Likelihood of Success on the Merits

### Whether BLM Complied with Section 102(2)(C) of NEPA

SUWA contends that BLM violated section 102(2)(C) of NEPA by failing, in its Leasing EA, to consider the likely impacts of leasing and developing the Lake on air quality, surface and groundwater quantity, and migratory birds, and, in the alternative, by failing, given their significance, to consider such impacts in an EIS. *See* Petition (IBLA 2011-138) at 4-7; SOR (IBLA 2011-138) at 9-21; Reply Brief (IBLA 2011-138) at 4-17. It argues that BLM considered the potential effects of exploring for potash, but completely failed to consider the potential effects of *developing potash*, despite the fact that each lease, by affording the lessee the "'exclusive right and privilege to . . . drill for, mine, extract, remove, beneficiate, concentrate, or otherwise process and dispose of the potassium deposits,'" results in the "'irreversible [and] irretrievable' commitment of resources" in the leased lands to **\*13** development. Petition (IBLA 2011-138) at 4 (*quoting* Potassium Lease (Form 3520-7 (March 2010)), §2, at 1); SOR (IBLA 2011-138) at 9 (*quoting* 43 U.S.C. § 4332(2)(C) (2006)). SUWA concludes: "The BLM's 'lease first, think later' approach . . . means that the agency has leased lands--and therefore granted a development right--without understanding the impacts of that decision," in violation of section 102(2) (C) of NEPA. Petition (IBLA 2011-138) at 5.

**\*9** Section 102(2)(C) of NEPA requires consideration of the potential environmental impacts of a proposed action in an EIS if that action is a "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (2006). A BLM decision to proceed with a proposed action, based on an EA tiered to a programmatic EIS, will be upheld, as being in accord with section 102(2) (C) of NEPA, where the record demonstrates that BLM has, considering all relevant matters of environmental concern, taken a "hard look" at potential environmental impacts, and made a convincing case that no significant impact will result that was not already addressed in the EIS or that any such impact will be reduced to insignificance by the adoption of appropriate mitigation measures. *Wyoming Outdoor Council*, 173 IBLA 226, 235 (2007).

Importantly, in assessing the adequacy of an EA, we will generally be guided by the "rule of reason," such that the EA need only briefly discuss the likely impacts of a proposed action: "'By nature, it is intended to be an overview of environmental concerns, not an exhaustive study of all environmental

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

issues which the project raises.'"*Bales Ranch, Inc.*, 151 IBLA 353, 358 (2000) (*quoting Don't Ruin Our Park v. Stone, 802 F. Supp. 1239, 1247 (M.D. Pa. 1992)*).

An appellant seeking to overcome such a decision carries the ultimate burden to demonstrate, with objective proof, that BLM failed to consider a substantial environmental question of material significance to the proposed action, or otherwise failed to abide by section 102(2)(C) of NEPA. *Bales Ranch, Inc.*, 151 IBLA at 357.

BLM's decision, after environmental review, to issue a FONSI, and not prepare an EIS, "implicates agency expertise." *Greater Yellowstone Coalition v. Flowers, 359 F.3d 1257, 1274 (10th Cir. 2004)*. Thus, where, in assessing environmental impacts, BLM properly relies on the professional opinion of its technical experts, concerning matters within the realm of their expertise and which is reasonable and supported by record evidence, an appellant challenging such reliance must demonstrate, by a preponderance of the evidence, error in the data, methodology, analysis, or conclusion of the expert. *Wyoming Outdoor Council*, 173 IBLA at 235 (citing *Fred E. Payne*, 159 IBLA 69, 77-78 (2003)). A mere difference of opinion, even of expert opinion, will not suffice to show that BLM failed to fully comprehend the true nature, magnitude, or scope of the likely impacts. *Id.*

**\*14** We do not doubt that BLM was required to address the potential environmental consequences of potash exploration and development, before approving any lands in the Lake for potash leasing, since, absent a stipulation precluding any surface or underground activity, leasing results in an irrevocable commitment of the resources of the leased lands to exploration and development. [FN17]*See, e.g., Conner v. Burford, 848 F.2d 1441, 1448-51 (9th Cir. 1988)*, *cert. denied*, 489 U.S. 1012 (1989); *Sierra Club v. Peterson, 717 F.2d 1409, 1414-15 (D.C. Cir. 1983)*; *Center for Native Ecosystems*, 170 IBLA 331, 345 (2006). However, prior to approving the Leasing Proposal in the February 2011 DR/FONSI, BLM, which was well aware that potash leases would provide the lease holder with "exclusive rights to the mineral leased," plainly considered the reasonably foreseeable environmental implications of developing the leased lands for the production of potash. Leasing EA at 2, 15, 16, 65. It did so, given the general state of knowledge regarding the affected environment, potential development, and likely environmental consequences of development, at the time of preparation of the Leasing EA, deferring only more site-specific environmental analysis until after submission by Peak of a POD. *See* Leasing EA at 2, 15, 16, 66, 73. BLM's analysis included the likely effects of development, as reasonably foreseen, generally on, *inter alia*, the quantity of surface and groundwater, air quality, and migratory birds. *See* Leasing EA at 10, 11, 12-13, 30-33, 65-66, 68-69, 73-75, 83, E-3 to E-4, E-17 to E-18, E-22 to E-24, E-25 to E-26, E-41, E-42.

**\*10** We find no fault with this approach, since the specific dimensions of development were entirely dependent on the results of the anticipated exploratory testing and related activity, which Peak intended, at the time of leasing, to initially pursue, and which Peak thereafter proposed and BLM approved, after preparing a separate EA, specifically addressing the particular environmental

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

implications of such activities. *See, e.g.*, Peak Answer (IBLA 2011-138) at 5 ("Prior to the submission of a mining plan, Peak Minerals will undertake exploration to delineate the extent of the resource and collect geologic and geotechnical data and other information necessary to determine whether development is feasible, and if so, design facilities, prepare an operations plan, and propose mitigation measures and adaptive management plans required by lease stipulations" (citing Declaration of Richard Dye, dated Oct. 6, 2011 (Ex. 1 attached to Answer), ¶4, at 2)). The specific dimensions of development were, **\*15** clearly, not reasonably foreseeable at the time of issuance of BLM's February 2011 DR/FONSI.

Further, BLM's consideration of the likely effects of development on water resources, air quality, and migratory birds, at the time of issuance of the February 2011 DR/FONSI, was fundamentally hampered by the fact that, no matter what Peak proposed in the way of development, the likely nature and scope of actual development was entirely dependent on the State's adjudication of Peak's water rights applications, which had not yet occurred. Given that fact, the particular nature and scope of development were a matter of pure speculation at that time, and certainly not reasonably foreseeable.

SUWA does not begin to suggest specifically what development activities BLM should have considered, or the environmental impacts likely to be caused by such anticipated activities, which BLM failed to adequately consider in the Leasing EA. It appears that SUWA is no more equipped to engage in environmental review, amounting to a "'crystal-ball inquiry,'" than BLM, and such an inquiry is fundamentally not required by NEPA. *Howard B. Keck, Jr.*, 124 IBLA 44, 50 (1992), *aff'd, Keck v. Hastey*, No. S92-1670-WBS-PAN (E.D. Cal. Oct. 4, 1993) (*quoting Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission, 481 F.2d 1079, 1092 (D.C. Cir. 1973)*).

BLM was not, when considering approval of leasing, required to mandate submission of a POD, to which Peak must remain firmly committed, regardless of the considerable uncertainties regarding whether and/or how the potash resource underlying the Lake would be exploited, since this would be a pointless task. Nonetheless, BLM cannot simply ignore the implications of development at the leasing stage. Despite SUWA's assertions to the contrary, BLM did not ignore such implications, but, rather, to the best of its ability, considered the environmental ramifications of an RFD Scenario, or what it considered to be the reasonably foreseeable dimensions of development. [FN18] It also adopted appropriate mitigation **\*16** measures with respect to likely significant impacts associated with such anticipated development, providing generally for more site-specific environmental review and decisionmaking concerning actual development, once formulated and proposed.

**\*11** BLM recognized the site-specific environmental ramifications of development of the leased lands would be fully considered upon submission of a POD, whereupon they could be assessed in a realistic context: "[T]he extraction and development of th[e] [potash] resource would only be allowed . . . under an approved mine plan, as well as other required state and [F]ederal approvals. An approved mine plan is a detailed plan as described in 43 CFR 3592.1 that, once completed, would

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

be subject to NEPA compliance."Leasing EA at 2; *see id.* at 15, 20("[A]ll necessary approvals . . . would be obtained prior to construction disturbance or operations on or off-lease"). However, it did not leave Peak entirely to its own devices, providing that, in leasing the lands, Peak would be required, by lease stipulation, to develop plans for avoiding or minimizing the adverse effects of the actual proposed development to water resources, air quality, and migratory birds and other wildlife, which, together with state and Federal permitting requirements, would ensure the absence of any significant impact. [FN19]*See* Leasing DR at 3-6; Leasing EA at 10, 12-13, 65, 66, 73, 74, E-17 to E-18, E-22, E-24 to E-25, E-26, E-27 to E-28, E-32 to E-35, E-40 to E-42, E-43 to E-44; Nov. 2011 Dye Declaration, ¶7, at 5-6.

We think that all this fully conforms to the "rule of reason," which fundamentally guides environmental review, under section 102(2)(C) of NEPA. *See, **\*17** e.g., Northern Alaska Environmental Center v. Kempthorne, 457 F.3d 969, 974, 976-77 (9th Cir. 2006)* (oil and gas leasing); *Town of Crestone*, 178 IBLA 79, 85-86 (2009) (oil and gas leasing); *Western Watersheds Project*, 175 IBLA 237, 247-53 (2008) (geothermal leasing); *Santa Fe Northwest Information Council, Inc.*, 174 IBLA at 109-15 (right-of-way grant); *Howard B. Keck, Jr.*, 124 IBLA at 48-50 (land exchange).

After carefully reviewing BLM's Leasing EA, we are not persuaded that SUWA has carried its burden to demonstrate that BLM failed, in the EA, to adequately consider the environmental ramifications of leasing, and subsequent exploration and development of the leased lands, for the potential production of potash.

Finally, SUWA contends that BLM violated section 102(2)(C) of NEPA by failing to prepare an EIS, when it is clear that "SUWA 'has alleged facts which, if true, show that a proposed project may significantly degrade some human environmental factor.'" Petition (IBLA 2011-138) at 6 (*quoting Southern Utah Wilderness Alliance*, 166 IBLA 140, 175 (2005) (*quoting Columbia Basin Land Protection Association v. Schlesinger, 643 F.2d 585, 597 (9th Cir. 1980)*)); *see* SOR (IBLA 2011-138) at 15. It specifically cites to two of the intensity (or severity of impact) criteria of 40 C.F.R. § 1508.27 as supporting its conclusion that leasing and development is likely to significantly impact the environment, specifically, the "'[u]nique characteristics of the geographic area,'" given its "'proximity to . . . ecologically critical areas,'" and the existence of "'cumulative significant impacts'" to air quality, thus threatening public health. [FN20] Petition (IBLA 2011-138) at 6 (*quoting* 40 C.F.R. § 1508.27)).

**\*12** SUWA explains that the Lake is a "critically important resource" for migratory birds and that leasing and development of the Lake is likely, together with natural wind events, to result in a cumulative significant impact to air quality, thus threatening public health close to the Lake and more than a hundred miles away in Salt Lake City, and elsewhere along the Wasatch Front. SOR (IBLA 2011-138) at 17; **\*18** *see id.* at 16-21.It notes that the presence of "'one or more significance factors can justify setting aside a FONSI and remanding either for further consideration of those

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

[significance] factors or preparation of an EIS.'" Petition (IBLA 2011-138) at 6 (*quoting Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 235 (D.D.C. 2003)).

SUWA provides no convincing argument or supporting evidence that, contrary to BLM's determinations, the Lake, which, over time, provides an infrequent source of water, possesses "[u]nique characteristics" by virtue of its status as an "ecologically critical area[]," or that leasing and development of the Lake, which is expected to inundate a large area of land in the Lake and be undertaken pursuant to dust control measures, is likely, together with natural wind events, to result in any "cumulatively significant impact[]" to air quality, thus threatening public health, within the meaning of 40 C.F.R. § 1508.27. *See* Leasing FONSI at 2, 3; Leasing EA at E-3 to E-4, E-5; Peak Answer (IBLA 2011-138) at 19-20, 22-23. Nothing cited by SUWA reaches such conclusions. *See* SOR (IBLA 2011-138) at 17, 19-20, 20-21; Reply Brief (IBLA 2011-138) at 12-13, 14, 15; Letter to FFO from U.S. Environmental Protection Agency, dated Oct. 20, 2010; Memorandum to FFO from FWS, dated Oct. 20, 2010.

To the extent that SUWA indicates that satisfaction of one or more of the intensity criteria requires the preparation of an EIS, or at least reevaluation of a FONSI, we think that it misunderstands 40 C.F.R. § 1508.27. The fact that any proposed action satisfies any one or more intensity criteria does not, under 40 C.F.R. § 1508.27, automatically compel a finding that the action is likely to have a significant impact, thus requiring preparation of an EIS. Thus, even were the Lake to possess unique characteristics, by virtue of its status as an ecologically critical area, this does necessarily mean that the impacts of leasing and development are likely to be significant.

Rather, 40 C.F.R. § 1508.27 merely states that the presence of any one or more intensity criteria must be "considered" *in determining the likely significance of the proposed action*. As we said in *Wyoming Outdoor Council*, 173 IBLA at 246-47:

> Even assuming that the [geographic area at issue] is properly considered [to have "unique characteristics,"] . . . as we recently noted in *Missouri Coalition for the Environment*, 172 IBLA 226 (2007), the presence of one or more of the intensity criteria does not compel BLM to find the existence of a significant impact. Referring to 40 C.F.R. § 1508.27, we agreed with BLM that **\*13** the regulatory provisions identify only . . . many matters that an agency "should" consider in determining the intensity or severity of the impact of the proposed action **\*19** and this analysis is only one element of the determination of whether an action "significantly" affects the environment, "which is itself a component of the analysis of whether to prepare an EIS." . . . Indeed, the regulations . . . do not *require* an agency to prepare an EIS simply because the impacts of the proposed action are "highly controversial" or "largely unknown," [or meet any of the other intensity criteria] . . . .

172 IBLA at 249 (quoting 40 C.F.R. § 1508.27 . . .).
We think that this understanding accords with *Fund for Animals*, which we read to hold that an impact is likely to be significant where it not only fits within the basic parameters of one or more of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

the intensity criteria, but it is also, as a consequence, likely to be considered significant, and thus satisfies one or more of the "'*significance* factors[.]'" *Fund for Animals v. Norton*, 281 F. Supp. 2d at 235, emphasis added. Indeed, we note that the court in *Fund for Animals* relied on the "approach" taken by the "Ninth Circuit," particularly in *Public Citizen v. Department of Transportation*, 316 F.3d 1002 (9th Cir. 2003), [FN21] which had specifically held, as reported by the district court: "'If [DOT's] action is ***environmentally 'significant'*** *according to any of these criteria* [set forth in 40 C.F.R. 1508.27(b)], then DOT erred in failing to prepare an EIS.'"281 F. Supp. 2d at 219 (*quoting*316 F.3d at 1023), 235, emphasis added.

After carefully reviewing BLM's Leasing FONSI, and the underlying Leasing EA, we are not persuaded that SUWA has carried its burden to demonstrate that BLM failed to make a convincing case that the leasing, and subsequent exploration and development of the leased lands, for the potential production of potash, is not likely to significantly impact any aspect of the human environment, and thus BLM did not err in deciding not to prepare an EIS. [FN22]

**\*20** *Whether BLM Complied with Section 202(c) of FLPMA*

SUWA contends that, by failing to consider UCAA's nomination of the Sevier Dry Lake Bed as an ACEC, which had been submitted as part of the decisionmaking process for the Leasing Proposal, BLM violated section 202(c) of FLPMA. [FN23]*See* Petition (IBLA 2011-138) at 7; SOR (IBLA 2011-138) at 21-23; Reply Brief (IBLA 2011-138) at 17-19. It notes that BLM is required by section 202(c) of FLPMA "to prioritize ACEC designation in the land use planning process," and specifically, by the applicable provisions of the BLM Manual, to "promptly" or "immediately" "review ACEC nomination[s]." Petition (IBLA 2011-138) at 7, and SOR (IBLA 2011-138) at 22 (citing BLM Manual, § 1613.21.E. (Rel. 1-1541 (9/29/88))). It thus concludes that BLM's "neglect" to consider the ACEC nomination, in the course of deciding whether to approve leasing, "does not satisfy BLM's FLPMA obligation[.]" Petition (IBLA 2011-138) at 7.

**\*14** The Field Manager reports that the Field Office received an "incomplete 'Nomination'" of the Sevier Dry Lake Bed as an ACEC, by electronic mail, from UCAA on October 25, 2010, while it was in the process of preparing the final EA for the Leasing Proposal. Declaration of Michael Gates, Field Manager, FFO, dated Oct. 11, 2011 (Ex. A attached to BLM Answer (IBLA 2011-138)), ¶2, at unpaginated (unp.) 1. BLM thus stated in the final EA that, absent a description of the relevance and importance values of the proposed ACEC or, generally, a rationale for ACEC designation, the "ACEC nomination . . . is not relevant to BLM's decision regarding the leasing of potash on the Sevier Dry Lake Bed," and, in any event, "may only be considered through a land use planning process," and thus was "beyond the scope of th[e] EA."Leasing EA at E-44.

The Field Manager now notes that documentation supporting the proposal was later discovered by the Field Office at the State Office, following issuance of the February 2011 DR/FONSI, approving the Leasing Proposal. *See* Gates Declaration, ¶3, at unp. 2. Thus, it is quite possible that this

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

documentation was available to the State Office, and could have been considered as part of BLM's lease decisionmaking.

**\*21** Nonetheless, the Field Manager states that, shortly before issuance of the October 2011 DR/FONSI, approving the Exploratory Testing Proposal, the Field Office was in the process of determining, in accordance with the relevance and importance criteria of 43 C.F.R. § 1610.7-2(a), whether the ACEC nomination "warrants further consideration as a potential ACEC," in BLM's land use planning process, and "expect[s] to make a preliminary decision on the nomination within the next month." [FN24][FN25] Gates Declaration, ¶4, at unp. 2. We have yet to be formally advised of BLM's preliminary decision, or whether BLM is pursuing potential designation of the ACEC. However, it is clear that BLM is seriously considering the ACEC nomination, in pursuance of its land use planning obligation. We are not persuaded that BLM failed to act in a timely fashion.

SUWA is certainly correct that BLM, as the delegate of the Secretary of the Interior, is directed by section 202(c) of FLPMA to "give priority to the designation and protection of areas of critical environmental concern," and specifically to do so "[i]n the development and revision of land use plans [.]" [FN26] 43 U.S.C. § 1712(c) (2006). BLM was not, however, engaged in the land use planning process when it was deciding whether to approve the Leasing Proposal. Nor, importantly, was BLM required to undertake land use planning for the specific purpose of addressing whether to approve the Sevier Dry Lake Bed as an ACEC, *before deciding whether to approve the Leasing Proposal*.

**\*22** Land use planning is certainly a critical task pursued by BLM, as directed by section 202(a) of FLPMA, 43 U.S.C. § 1712(a) (2006), but it is not to the exclusion of the performance of its usual management functions with respect to the public lands, including the processing of proposals for mineral leasing, pursuant to the MLA.

**\*15** We note that the Manual provision, purportedly providing for prompt or immediate consideration of ACEC nominations, appears to be no longer in effect. [FN27][FN28] BLM is required by regulation, and specifically by the current Manual, to consider, *inter alia*, public proposals for RMP amendments or revisions. *See* 43 C.F.R. §§ 1610.4-9, 1610.5-5, and 1610.5-6; Land Use Planning Handbook H-1601-1, BLM Manual, §§ VI.A. to VI.D., and VII.A. through VII.C. (Rel. 1-1693 (03/11/05)). While agency-wide procedural requirements in the BLM Manual are not binding on the Board, they are binding on BLM, and will generally be enforced by the Board, when they are "reasonable and consistent with the law[.]" *Lassen Motorcycle Club*, 133 IBLA 104, 108 (1995).

However, we find nothing, in law or policy, to indicate that the requirement that ACEC nominations be considered demands that BLM cease any ongoing decisionmaking, in the interest of resolving the qualifications of the affected lands for ACEC status, or in making a final decision regarding ACEC designation. Nor do we find error in BLM's ultimate conclusion, in the final EA, that it was not

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

required to, and indeed cannot, consider the ACEC nomination outside the land use planning process. *See* Leasing EA at E-44 ("ACEC nominations may *only* be considered through a land use planning process. Since no plan amendment [or revision] is proposed, consideration of the nomination is beyond the scope of this EA."(Emphasis added)).

Moreover, we have long held that, in taking appropriate management actions regarding the public lands and their resources, BLM is not required to await a further decision regarding the amendment or revision of an existing land use plan when such actions already comport with the existing land use plan. We find nothing in section 202 of FLPMA or its implementing regulations that would require BLM to postpone or deny a proposed action pending completion of amendment or revision of **\*23** an existing land use plan that currently supports that action. [FN29]*Oregon Natural Resources Council v. BLM*, 150 F.3d 1132, 1139 (9th Cir. 1998) ("The language of [43 U.S.C. §] 1712 [(2006)] does not . . . establish a clear duty of when to revise the [land use] plans, nor does it create a duty to cease actions during such revisions"); *Colorado Environmental Coalition*, 161 IBLA 386, 396 (2004) ("[A]lternative uses of the land 'need not be considered anew each time BLM decides to . . . grant leave to undertake an activity,'"*quoting Southern Utah Wilderness Alliance*, 122 IBLA 165, 173 (1992). Further, we have stated that "[n]othing in NEPA or [its implementing] . . . regulations requires BLM to postpone or deny a proposed action that is covered by the EIS for the current land use plan, in order to preserve alternatives during the course of preparing a new land use plan and EIS."*Colorado Environmental Coalition*, 169 IBLA 137, 144 (2006).

**\*16** We are, therefore, not persuaded that SUWA is likely to succeed in establishing that BLM violated section 202(c) of FLPMA in deciding to approve the Leasing Proposal, before determining whether to designate the Sevier Dry Lake Bed as an ACEC.

### B. Relative Harms/Immediate & Irreparable Harm/Public Interest

We are clearly not persuaded that BLM's decision to lease the close to 96,000 acres of public land in the Lake, or to explore for, or even develop, the underlying potash resources is likely to negatively impact the quantity of surface and groundwater, air quality, migratory birds, or any other aspect of the human environment, in a substantial or, certainly, a significant manner. [FN30] For the foreseeable future, we are certainly not persuaded that the exploration operations, which have already been approved, portend such impacts. Further, even were development to portend such impacts, it is not likely to occur in the foreseeable future, and certainly not before the Board acts on the pending appeals, since it must undergo separate NEPA review and BLM decisionmaking, and is subject to permitting **\*24** not only by BLM, but also by other Federal, State, and local authorities. *See* Leasing EA at 7, 8-9 (Table 1-1 (Potential Authorizations, Permits, Reviews, and Approvals)).

We thus find little evidence to support the conclusion that any alleged adverse environmental consequences of BLM's decisions weigh in favor of a stay of either the February 2011 DR/FONSI, approving the Leasing Proposal, or the October 2011 DR/FONSI, approving the Exploratory Testing

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Proposal. *See* Petition (IBLA 2011-138) at 8, 9-10.

SUWA has simply failed to demonstrate that environmental injury is "'sufficiently likely,'" thus "'favor[ing] the issuance of a[] [stay] . . . to protect the environment.'" Petition (IBLA 2011-138) at 7, 8 (*quoting [Amoco Production Co. v. Village of Gambell, Alaska, 480 U.S. 531, 545 (1987)](#)*). Nor are we persuaded that SUWA is likely to succeed in demonstrating that BLM violated section 102(2)(C) of NEPA, section 202(c) of FLPMA, or any other Federal statute, thus favoring a stay. *See* Petition (IBLA 2011-138) at 10-11; *[Monsanto Co. v. Geertson Seed Farms, 561 U.S. ____, 130 S. Ct. 2743, 2756-57 (2010)](#)* (No presumption is raised in favor of a stay simply by virtue of the fact that a question of the adequacy of NEPA review, and thus compliance with the statute, is at issue in a pending case).

We are, however, convinced that granting a stay of the effect of BLM's decisions to lease the Lake, and/or specifically to approve the exploratory testing, for potential potash resources will immediately preclude exploration operations, which are currently ongoing. Such operations will benefit Peak, which has already heavily invested in leasing, exploration, and development, with monies obtained through equity financing, as well as its employees, contractors, suppliers, and consultants. [FN31]*See* Peak Opposition (IBLA 2011-138) at 13, 14 ("Peak Minerals invested over $19,000,000 in bonus bids to secure the potash leases, has engaged in multi-million dollar contracts to perform necessary permitting and planning, and since July has spent over $139,000 to contractors to plan for and begin drilling and other work" (citing Nov. 2011 Dye Declaration, ¶¶5-6, at 3-5)); Peak Opposition (IBLA 2012-34) at 9, 10 (citing Dec. 2011 Dye Declaration, ¶¶5, 6, at 3-5); Leasing EA at 69-72.

**\*17 \*25** We are also convinced that granting a stay of the effect of BLM's decisions to lease the Lake, and/or specifically to approve the exploratory testing, for the potential potash resources will, ultimately, delay the likely discovery and exploitation of such valuable minerals, under the MLA. Of particular note is the fact that development of the potash deposits underlying the leased lands has the potential to reduce the Nation's considerable dependence on foreign sources of potash, as well as provide a form of potash (potassium sulfate) highly preferable to the usual form of potash (potassium chloride), which is a critical component of commercial fertilizers. *See* Peak Opposition (IBLA 2011-138) at 2 ("The Sevier Lake potash project would be one of only four *natural* production sources of potash in the world requiring no chemical processing. . . . Currently the United States imports approximately 80 percent of the potash fertilizer used on its farms[.]" (citing Ambrosio Declaration, ¶3, at 2)); Leasing EA at 3, 5.

Discovery and exploitation will also benefit Peak, which can generate profits from extracting and selling such minerals, and the State of Utah, the United States, and, ultimately, the public, which will receive rents, royalties, and other financial and non-financial compensation from the recovery, sale, and beneficial use of such minerals. *See* Leasing EA at 5.

Absent any substantial adverse environmental consequences or likely success on the merits of a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

NEPA or other statutory violation, we conclude that not only the balance of harms and immediate/irreparable harm, but also the public interest in mineral development under the MLA weigh in favor of leasing, exploring for, and potentially developing the potash resources in the Lake. *See* Petition (IBLA 2011-138) at 8-9, 11-12.

In summary, because SUWA has failed to carry its burden to demonstrate that it is likely to succeed on the merits of its appeals and satisfies the other criteria for a stay, with respect to the Deputy State Director's February 2011 DR/FONSI, approving the competitive potash leasing of public land in and around the Sevier Lake, or the Field Manager's October 2011 DR/FONSI, approving the exploratory testing of the potash resources in the leased land, we will deny SUWA's petition to stay either decision during the pendency of the respective appeals.

Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, the petitions for a stay are denied.

James L. Byrnes

Acting Administrative Judge

FN1. SUWA's appeals from BLM's February and October 2011 DR/FONSIs were docketed, respectively, as IBLA 2011-138 and IBLA 2012-34. In its notice of appeal in IBLA 2011-138, SUWA did not seek a stay of BLM's February 2011 DR/FONSI, but, in that and subsequent pleadings, expressly retained the right to do so.

FN2. Both proposals are currently being pursued by Peak Minerals, Inc. (Peak). Motions by Peak to intervene in IBLA 2011-138 and IBLA 2012-34, were granted, respectively, by orders dated Apr. 19, and Dec. 15, 2011.

FN3. Both EAs were tiered to the September 1986 Final Environmental Impact Statement (FEIS), which was prepared by BLM in connection with its promulgation of the applicable land use plan (April 1987 Warm Springs Resource Area Resource Management Plan (RMP)). While the RMP does not specifically authorize potash leasing, it does generally authorize the leasing and development of solid minerals under the Mineral Leasing Act (MLA), 30 U.S.C. §§ 181-287 (2006), which necessarily includes potash leasing. *See* Leasing EA at 3, 5-6, E-6 to E-7.

FN4. The public lands are specifically situated in T. 20 S., R. 10 W., Ts. 21-23 S., R. 11 W., and Ts. 20-24 S., R. 12 W., Salt Lake Meridian, Millard County, Utah. *See* Leasing EA at 2. SUWA states that the close to 126,000 acres of public land proposed for leasing constitutes "almost the entire surface area of Sevier Lake," which generally covers an area approximately 27 miles long and up to 12 miles wide. Petition for Immediate Stay (Petition) (IBLA 2012-34) at 9; *see* February 2011 EA (Leasing EA) at 55.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN5. A draft EA was prepared, following a public scoping period, and issued on Sept. 20, 2010, for public comment. SUWA and others submitted comments during the 35-day public comment period, which were considered by BLM in finalizing the EA.

FN6. Incorporated in the Leasing EA are several appendices, principally Appendix A (Interdisciplinary Team Analysis Record Checklist), which set forth BLM's evaluation of all critical resource values, whether or not they were afforded detailed analysis in the body of the EA, and Appendix E (Public Comments on Draft EA/BLM Responses), which summarized public comments and BLM responses regarding the Draft EA. These documents are separately paginated, with each page denoted by the letter of the appendix, followed by a sequential page number. We will cite to the pages of the appendices of the EA using that format.

FN7. Potash production would also require large quantities of freshwater, totaling approximately 293 million gallons (or 900 acre-feet) per year. *See* Leasing EA at 18, 26, 74. At the time of preparation of the Leasing EA, it was "assumed that wells needed for fresh water supply . . . would be located off lease," *and thus would not be covered by any of the public lands proposed for potash leasing. Id.* at 20; *see id.* at 26. Rather, they were expected to require separate authorization. *See id.* at 8.

FN8. The relinquished lands can be leased to the next highest qualified bidder(s). However, we find no evidence of any leasing.

FN9. BLM argues that, since its February 2011 DR/FONSI only "authorized a lease sale," SUWA's stay petition was "necessarily . . . limited to that authorization," and, since the sale had already occurred by the time the petition was filed, the petition was "moot[.]" Response to Petition for Stay (Response) (IBLA 2011-138) at 6. Since we regard BLM's DR/FONSI as having approved leasing, by means of a competitive sale and issuance of leases, we do not regard the petition as moot, because we can still suspend any further activity under the leases, during the pendency of the appeal of the DR/FONSI, and, if we find merit to the appeal, we could order cancellation of the leases, as having been improvidently issued in violation of law. We thus also reject Peak's assertion that "BLM's leasing decision . . . cannot be stayed at this juncture." Opposition to Petition for Stay (Opposition) (IBLA 2011-138) at 5.

FN10. Most of the wells (654) would be shallow wells, ranging from 50 to 100 feet deep, situated, in a grid pattern, across the Lake, which will be drilled using a direct push drill, a small, tracked, self-contained unit, which hydraulically inserts a 1-inch diameter pipe into the ground, without the need for drilling fluids, in order to extract a core sample and brine. The remaining wells (58), interspersed among the shallow wells throughout the Lake, would be approximately 300 feet deep, which will be drilled using a larger sonic rig, which hydraulically inserts a 1-inch diameter pipe into the ground, aided by sonic vibration to achieve a greater depth, without the need for drilling fluids, in order to extract a core sample and brine. *See* Exploratory Testing EA at 8; Declaration of Richard Dye, Vice President, Project Development, Peak, dated Nov. 15, 2011 (Ex. 2 attached to Peak

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Opposition (IBLA 2011-138)), ¶5, at 4.

> Peak is attempting to access the lake bed during the late summer and early winter, in order to avoid accumulations of water, later in the season, which will require the drill equipment to be placed on a barge, at much greater expense.*See* Exploratory Testing EA at 8; Nov. 2011 Dye Declaration, ¶6, at 5. It later reported that the upper part of the lake bed was flooded by runoff from the Sevier River, requiring Peak to partially switch to floating drill platforms in this portion of the Lake. *See* Declaration of Richard Dye, dated Dec. 5, 2011 (Ex. 2 attached to Peak Opposition (IBLA 2012-34)), ¶¶5, 6, at 3, 4, 5-6). It noted that it needed to complete drilling before any more of the Lake was flooded.

FN11. A draft EA was prepared, following a public scoping period, and issued on Aug. 3, 2011, for public comment. SUWA and others submitted comments during the 30-day public comment period, which were considered by BLM in finalizing the EA.

FN12. Most immediately, SUWA seeks a stay in each case in order to prevent any further surface disturbance associated with the drilling of up to 712 wells and drilling/excavation of up to 44 borings/pits. *See* Petition (IBLA 2011-138) at 3, 8, 9; Petition (IBLA 2012-34) at 2, 15-16, 17.

FN13. SUWA has, in addition to its Petition, filed a statement of reasons (SOR) for its appeal and a reply brief in IBLA 2011-138. While it has not specifically filed an SOR in IBLA 2012-34, SUWA clearly relies on the SOR filed in IBLA 2011-138 in the case of the second appeal. *See* Petition (IBLA 2012-34) at 11, n.6 ("This appeal is fully briefed").

FN14. *See* Petition (IBLA 2011-138) at 2 ("The Exploratory Testing [FONSI and DR] . . . relies on the Leasing EA for much of its environmental analysis. . . . The BLM's approval of the Exploratory Testing EA is premised on the validity of the Sevier Lake Leasing EA and its authorization of leasing the lake [] bed of Sevier Lake for potash development."), 3; Petition (IBLA 2012-34) at 2 ("The Sevier Lake Testing EA . . . relies on the Sevier Lake Leasing EA for significant environmental analysis. . . . The errors of the Sevier Lake Leasing EA have now become the errors of the . . . Sevier Lake Testing EA."), 3, 11 ("The Sevier Lake Testing EA is based on the analysis of the Sevier Lake Leasing EA; without that prior analysis the BLM's decision to approve Peak Minerals' exploration and testing in the Sevier Lake area cannot stand"), 19; Exploratory Testing EA at 5 ("This Exploration EA incorporates by reference the entire Leasing EA").

FN15. SUWA's Petitions are virtually identical, especially concerning its likelihood of succeeding on the merits, and thus we will generally cite to the Petition filed in IBLA 2011-138.

FN16. We are not persuaded that SUWA clearly argued that BLM specifically violated section 102(2) (C) of NEPA by failing to consider the likely effects of leasing on the proposed ACEC. *See* Petition (IBLA 2011-138) at 2, 7; SOR (IBLA 2011-138) at 21-23; Reply Brief (IBLA 2011-138) at 17-19. In any event, BLM's failure to do so did not violate section 102(2)(C) of NEPA.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN17. The environmental consequences of exploration and development are considered to be, as defined by 40 C.F.R. § 1508.8(b), the "[i]ndirect" effects of the proposed leasing, since, while they are "later in time or farther removed in distance" from the leasing, they are "caused by the [proposed] action," at issue in the Leasing EA, and are "reasonably foreseeable," and thus must be considered in the EA. *See* 40 C.F.R. § 1508.25; *Santa Fe Northwest Information Council, Inc.*, 174 IBLA 93, 109-10 (2008); Leasing EA at 65.

FN18. Peak explains:

> Because BLM's decision to lease did not include any proposed ground-disturbing activity and BLM did not have any information regarding where exploration or development activities would occur within the dry lake bed, BLM's analysis relied on a reasonably foreseeable development ("RFD") scenario based on available information and prior experience permitting other potash development activities in Utah. . . . Whether development of the Sevier leases is economically feasible, and if so, the details of exactly how the Sevier leases would be developed, however, remain uncertain. For example, the amount of brine water that may be produced as part of the development, the quality of the brines, the concentration of the brines both laterally within the Sevier leases and at depth, *the exact location of wells, and the layout of dikes, evaporation ponds, and other facilities cannot be known until further exploration occurs*. [Emphasis added.]

Answer (IBLA 2011-138) at 4 (citing Declaration of David Waite, Project Manager, CH2M Hill, dated Oct. 7, 2011 (Ex. 2 attached to Answer), at ¶¶6-7, at 3-5)).

FN19. SUWA argues that BLM improperly relied on "unanalyzed mitigation efforts" to conclude that leasing and development would not significantly impact migratory birds or the public health. Petition (IBLA 2011-138) at 6 (citing *Center for Native Ecosystems*, 170 IBLA at 350); *see* SOR (IBLA 2011-138) at 18-19, 20. BLM did not set forth any specific mitigation measures upon which it relied to reach a FONSI, in deciding to approve leasing, and thus did not need to assess their adequacy to reduce any significant impacts to insignificance. Rather, it basically provided that, once Peak reached the development phase, it was required to propose and adopt a plan *for ensuring that no significant impact would result*. We find no NEPA violation.

FN20. SUWA also argues that BLM erred, in analyzing the Leasing Proposal under the context criteria of 40 C.F.R. § 1508.27, incorrectly concluding that the Proposal "'does not have [any] international, national, regional, or state-wide importance.'" SOR (IBLA 2011-138) at 16 n.5 (*quoting* Leasing FONSI at 1). Rather, it indicates that, owing to the importance of the Lake for migratory birds, the Proposal has regional importance. *See* SOR (IBLA 2011-138) at 16, n.5. We are not persuaded that SUWA has offered any convincing argument rebutting BLM's conclusion that the Proposal's effects are to the "locality," in accordance with 40 C.F.R. § 1508.27(a), especially given the general impermanence of water in the Lake, and its similarity to other areas in the vicinity: "The Sevier Lake is within the Basin and Range Physiographic Province, which is noted for numerous north-south oriented mountain ranges, separated by broad, flat valley floors." Leasing FONSI at 2;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*see id.* at 1-2.

FN21. *Rev'd on other grounds*, 541 U.S. 752 (2004).

FN22. SUWA argues that, by holding that the proposed leasing "'*will not* significantly affect the quality of the human environment,'" BLM has applied the wrong standard for issuance of a FONSI. SOR (IBLA 2011-138) at 15 (*quoting* Leasing FONSI at 1). While it is true that a FONSI is improperly issued where there is any evidence that the environment *may* be significantly impacted, we think that BLM rightly issues a FONSI, when it determines that no significant impact *will* occur, thus ruling out the likelihood of any significant impact.

FN23. To the extent that SUWA objects to "BLM's decision to [effectively] reject" UCAA's ACEC nomination, presumably by failing to consider it during the NEPA review of the Leasing Proposal, SOR (IBLA 2011-138) at 23, the Board clearly has no jurisdiction to adjudicate SUWA's claim that BLM erred, since such a land use planning decision, even were it to have been made, is committed solely to BLM's jurisdiction. *See, e.g., Southern Utah Wilderness Alliance*, 128 IBLA 52, 66-67 (1993); *Harold E. Carrasco*, 90 IBLA 39, 41 (1985).

FN24. 43 C.F.R. § 1610.7-2 directs BLM to identify and consider "potential" ACECs "throughout the resource management planning process," stating that an area of the public lands can be considered a potential ACEC only when "both" the relevance and importance criteria, set forth in the regulation, are "met[.]" Such criteria generally require the presence of a specified significant value, resource, system, process, or hazard (relevance), which shall have "substantial significance and values" (importance). 43 C.F.R. § 1610.7-2(a).

FN25. BLM's consideration of the relevance and importance criteria for ACEC designation is documented in the record. *See* Evaluation Report for ACEC UCAA Nomination of Sevier Dry Lake, dated August 2011. On Oct. 20, 2011, the Field Manager concurred in the Report, in which BLM's IDT had determined that the Sevier Dry Lake Bed "does not meet" these criteria. *Id.* at 12. However, the Report is marked "Not For Public Release," and thus may not represent a final determination.

FN26. ACECs are generally defined, by section 103(a) of FLPMA, 43 U.S.C. § 1702(a) (2006), as areas of the public lands "where special management attention is required (when such areas are developed or used or where no development is required)," in order to "protect and prevent irreparable damage" to the values which ACEC designation seeks to recognize.

FN27. *See* http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_ and_Bulletins/blm_manual.html (last visited Jan. 6, 2012).

FN28. We note, however, that the cited former BLM Manual provision only directed BLM, when land use planning was not underway or imminent, to preliminarily determine, "'on a timely basis,'"

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

whether a nominated ACEC met the relevance and importance criteria of 43 C.F.R. § 1610.7-2(a), for potential designation as an ACEC. SOR (IBLA 2011-138) at 22 (*quoting* BLM Manual, § 1613.21.E. (Rel. 1-1541 (9/29/88))).

FN29. We note that the RMP, which certainly addressed the question of designating ACECs and, in fact, designated 6 ACECs, chose not to designate Sevier Lake as an ACEC. *See* Leasing EA at A-3, E-5.

FN30. While any new adverse environmental impacts of the Leasing Proposal must be taken into account, it is important to note that the Lake and surrounding area "have already been impacted by significant exploration and development operations over the past 30 years," including "a five mile [long brine] canal and 3,000 acres of [solar] evaporation ponds with associated dikes, embankments and roads, [and] over 700 plus historical exploration drill holes from the late 1980's," scattered across the Lake. Peak Opposition (IBLA 2011-138) at 12 (citing Nov. 2011 Dye Declaration, ¶8, at 6); *see* Leasing EA at 29.

FN31. Peak also notes that the pendency of SUWA's original stay petition has already resulted in a substantial drop in the value of the equity shares that have already been sold, in order to provide the funding necessary to pursue exploration operations and development planning, and threatens to undermine future equity sales, necessary for full development of the potash resource, and thus the economic viability of the entire enterprise, and the company. *See* Declaration of Lance D'Ambrosio, President, Peak, dated Nov. 17, 2011 (Ex. 1 attached to Peak Opposition (IBLA 2011-138)), ¶¶5-9, at 3-4.

2012 WL 1184350 (I.B.L.A.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.