1  SAM HIRSCH
   Acting Assistant Attorney General
2  Environment and Natural Resources Division
   U.S. Department of Justice
3  DOMINIKA TARCZYNSKA, NY Bar No. 4431573
   JOHN S. MOST, VA Bar No. 27176
4  Natural Resources Section
   P.O. Box 7611 Washington, D.C. 20044-7611
5  (202) 305-0447 (Tarczynska)
   (202) 616-3353 (Most)
6  Counsel for Federal Defendants

7
   ALISON FLINT (pro hac vice)
8  EDWARD B. ZUKOSKI (pro hac vice)
   Earthjustice
9  1400 Glenarm Place, Suite 300
   Denver, CO  80202
10 Telephone: (303) 623-9466

11 ROGER FLYNN (pro hac vice)
   Western Mining Action Project
12 P.O. Box 349, 440 Main St., #2
   Lyons, CO  80540
13 Telephone: (303) 823-5738
   Counsel for Defendant-Intervenors
14

15          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF ARIZONA
16                 PRESCOTT DIVISION

17
   GREGORY YOUNT,                        Case No. 3:11-cv-08171-PCT-DGC
18                                        (Lead Case)
            Plaintiff, pro se,
19                                        **FEDERAL DEFENDANTS' AND
      v.                                  INTERVENOR-DEFENDANTS'
20                                        JOINT REPLY MEMORANDUM IN
   S. M. R. JEWELL, SECRETARY            SUPPORT OF THEIR CROSS-
21 OF THE INTERIOR, et al.,              MOTIONS FOR SUMMARY
                                          JUDGMENT**
22
            Federal Defendants,
23     and
24
   GRAND CANYON TRUST, et al.,
25
            Intervenor-Defendants.
26

27

28

| | |
|---|---|
| NATIONAL MINING ASSOCIATION, *et al.,* | Case No. 3:12-cv-08038-PCT-DGC |
| Plaintiffs, | |
| v. | |
| S. M. R. JEWELL, SECRETARY OF THE INTERIOR, *et al.,* | |
| Federal Defendants, | |
| and | |
| GRAND CANYON TRUST, *et al.,* | |
| Intervenor-Defendants | |
| AMERICAN EXPLORATION & MINING ASSOCIATION, | Case No. 3:12-cv-08042-PCT-DGC |
| Plaintiff, | |
| v. | |
| S. M. R. JEWELL, SECRETARY OF THE INTERIOR, *et al.,* | |
| Federal Defendants, | |
| and | |
| GRAND CANYON TRUST, *et al.,* | |
| Intervenor-Defendants. | |
| QUATERRA Alaska Incorporated, *et al.,* | Case No. 3:12-cv-08075-PCT-DGC |
| Plaintiffs, | |
| v. | |
| S. M. R. JEWELL, SECRETARY OF THE INTERIOR, *et al.,* | |
| Federal Defendants, | |
| and | |
| GRAND CANYON TRUST, *et al.,* | |
| Intervenor-Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION .......................................................................................................... 1

ARGUMENT ................................................................................................................. 2

I.  Claims Challenging the Secretary's Reasons for the Withdrawal are not
    Reviewable ........................................................................................................... 2

II. The Withdrawal Decision Fully Satisfies FLPMA .................................................. 7

    A.  The Reasons for Withdrawal Are Fully Supported by the
        Record ........................................................................................................... 7

    B.  The Withdrawal Decision Fully Satisfies the Multiple-Use
        Directive ...................................................................................................... 14

    C.  The Adequacy of the Report to Congress is not Reviewable ......................... 15

    D.  The Decision did not Contravene the Governing BLM Resource
        Management Plan .......................................................................................... 16

    E.  The Withdrawal Complied with Legal requirements for Disclosing
        Conflicts with Local Land Use Plans ............................................................. 18

III. The Withdrawal Decision Fully Satisfies NEPA .................................................... 19

    A.  Plaintiffs' Claims Fall Outside NEPA's "Zone of Interests." ........................ 19

    B.  BLM's Consideration of the "No Action" Alternative –
        Including Existing Mitigation Measures – Complied with
        NEPA ........................................................................................................... 22

    C.  BLM Considered a Range of Reasonable Alternatives .................................. 23

    D.  There Was No Shift In Purpose and Need That Required
        Reconsideration of Alternatives .................................................................... 30

    E.  BLM Did Not Violate the "Unavailable Information Rule." .......................... 33

IV. The Forest Service Consent Decision Fully Complies with NFMA .......................... 37

    A.  AEMA Fails to Challenge Agency Action ...................................................... 38

B.    AEMA Fails to State a Cause of Action ........................................................ 39
C.    The Withdrawal Did Not Violate the Forest Plan ........................................... 40

V.    The Withdrawal Properly Protects American Indian Resources and
Religious Interests ...................................................................................... 41

VI.   Remedy ........................................................................................................ 44

CONCLUSION ........................................................................................................ 45

Federal Defendants, the Secretary of the Interior ("Secretary"), the U.S. Bureau of Land Management ("BLM"), the U.S. Forest Service, and the federal officials named in these consolidated actions, and Intervenor-Defendants, the Grand Canyon Trust and Havasupai Tribe, *et al*. (the "Trust"), hereby jointly reply in support of their cross-motions for summary judgment.  Doc. 205-1 ("Fed. Defs' Br."); Doc. 208 ("Trust Br.").

## INTRODUCTION

Claiming violations of three environmental statutes and the Establishment Clause, Plaintiffs ask the Court to invalidate the Secretary's well-informed decision to protect numerous natural and cultural resources within the Grand Canyon watershed from adverse impacts of mining activity.  For the reasons discussed below, the Court should sustain the decision and enter judgment for Defendants.

First, none of Plaintiffs' claims alleging violations of the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1787, has merit.  Federal Defendants (but not the Trust) further contend that Plaintiffs, in arguing that the reasons for withdrawal are unsubstantiated, have failed to identify any specific legal standard that is violated, contrary to the Administrative Procedure Act ("APA").  *See* 5 U.S.C. § 701(a)(2).  Judicial review is therefore improper.  Should the Court deem review proper, it must uphold the Secretary's decision if even one of the bases provided in the Record of Decision ("ROD") is supported by the record.  Here, all four rationales for the withdrawal – protection of water resources, American Indian resources, and wildlife and visual resources, and allowing some continued mining – are well supported.  The decision not only complies with FLPMA's multiple-use directive, 43 U.S.C. § 1732(a); it fosters the provision's objectives by allowing continued mining while protecting various resources and ensuring that a portion of the uranium endowment is preserved for future use.  This is in complete harmony with section 103(c) of FLPMA, which

defines multiple-use management to include consideration of the "long-term needs of future generations for renewable and nonrenewable resources." 43 U.S.C. § 1702(c).

Second, Plaintiffs' National Environmental Policy Act ("NEPA") claims must be rejected. Federal Defendants (but not the Trust) urge the Court to decline review of the claimed violations because the economic interests Plaintiffs seek to protect fall outside NEPA's zone of interests. Plaintiffs thus fail to state a cause of action. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387-88, n.4 (2014). Should the Court consider the claims, Defendants agree they should be rejected because BLM's Final Environmental Impact Statement ("FEIS") took the "hard look" NEPA mandates.

Third, Plaintiffs' National Forest Management Act ("NFMA") claims also are without merit. Federal Defendants (but not the Trust) additionally contend the Court need not reach the merits of these claims because they fail to state a cause of action.

Finally, Federal Defendants and the Trust contend that Plaintiffs' claims regarding the Establishment Clause and American Indian resources lack merit. The challenged decision clearly satisfies the controlling three-part test for permissible government conduct in *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971).

## ARGUMENT

## I.   Claims Challenging the Secretary's Reasons for the Withdrawal are not Reviewable.[1]

In their opening brief, Federal Defendants pointed to Plaintiffs' failure to identify a legal standard that the withdrawal allegedly violates and argued this failure requires the Court to decline review of the Secretary's reasons for withdrawal.   Fed. Defs' Br. 12-17; *see also* 5 U.S.C. § 701 (a)(2) (excepting from judicial review action "committed to agency discretion by law").   The Supreme Court has explained that

---

[1] The Trust does not join the argument in this section.

section 701's exception applies where a statute is "drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (quoting S. Rep. No. 79-752, at 26 (1945)).  The withdrawal provisions here are so drawn,[2] as the D.C. Circuit implicitly recognized in characterizing FLPMA as allowing withdrawals "for any purpose . . . ." *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 756 (D.C. Cir. 2007) ("*Mt. Royal*").  In short, these provisions offer no "meaningful standard against which to judge the agency's exercise of discretion," *Heckler v. Chaney*, 470 U.S. 821, 830 (1985), and judicial review is therefore precluded.[3]

In response, Plaintiffs argue there is law to apply, but these claims are hollow. NMA and NEI (hereafter "NMA"), joined by the other Plaintiffs, contend that section 701's exception is not applicable because Plaintiffs are "persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute.'"  Doc. 212 ("NMA Reply") 21 (quoting 5 U.S.C. § 702).  They erroneously invoke section 702's general conferral of a right to judicial review as a reason why section 701's exception does not apply. This circular reasoning strains the plain meaning of section 702 and, if adopted, would render the exception in section 701 superfluous.  The Court should reject the argument.

---

[2] As used herein, the phrase "withdrawal provisions" refers to FLPMA Section 204, 43 U.S.C. § 1714, which codifies and places certain limits on executive withdrawal authority, and Section 103(j), 43 U.S.C. § 1702(j), which defines "withdrawal."

[3] Plaintiffs AEMA and Mr. Yount (hereafter "AEMA") contend the D.C. Circuit, in making this characterization, failed to recognize the unconstitutionality of Section 204's legislative veto provision. Doc 213 ("AEMA Reply") 12-13 n.9. The concern is of no consequence because the Court *severed* the offending veto provision upon finding it unconstitutional.  *Yount v. Salazar*, 933 F. Supp. 2d 1215, 1235 (D. Ariz. 2013).  The remainder of section 204 survived intact and remains "fully operative as a law." *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987).  Notably, section 103, 43 U.S.C. § 1702(j)—which specifically addresses the *purposes* for which withdrawals may be ordered—also survived intact and remains fully operative.

Next NMA argues, somewhat contradictorily, that in enacting FLPMA section 102(a)(6), 43 U.S.C. § 1701(a)(6), Congress established, an "unequivocal policy *favoring* judicial reviewability of FLPMA actions."   NMA Reply 21-22 (emphasis added).   Quaterra and the Arizona Utah Local Economic Coalition (hereafter "the Coalition" or "Coal.") advance a similar argument, also based on section 102(a)(6). Doc. 214 ("Coal. Reply") 7-8.  As an initial matter, it is difficult to grasp how a policy can be "unequivocal" if it merely favors a certain circumstance.  In any event, the contention is contradicted by the plain language of section 102(a)(6), which declares a policy that "judicial review of public land adjudication decisions *be provided by law*." 43 U.S.C. § 1701(a)(6) (emphasis added).  Such language does not ensure a right of review in *any* circumstance – and certainly not where a statute, by its broad language, precludes review.  In fact, the Court has already rejected NMA's similar argument that this provision gives it standing to assert NEPA claims.   Unconvinced, the Court explained,

> [Section 102(a)(6)] merely underscores that NMA and NEI have an avenue to assert their claims under the FLPMA. NMA and NEI present no authority for converting the language . . . into a basis for asserting prudential standing under NEPA, bypassing the zone of interests test.

*Yount v. Salazar*, No. CV11-8171-PCT DGC, 2013 WL 93372, at *17 (D. Ariz. Jan. 8, 2013).   Here too, Plaintiffs cite no authority for their strained construction, which would bypass established legal principles precluding review where no meaningful standard is available.  These very principles are in fact "provided by law," as section 102(a)(6) contemplates.  Thus a decision recognizing them stands in complete harmony with section 102(a)(6).

Plaintiffs also argue review is permissible because "courts have repeatedly and correctly reviewed a wide range of FLPMA challenges. . . ." NMA Reply 22.  In other

4

words, because the withdrawal was made pursuant to FLPMA, they reason, review is proper.  *Id.*  Yet only one of the five cases NMA cites, *Mt. Royal*, even involved a withdrawal.  The other four involved different actions under FLPMA, none of which establish that review is permissible here.[4]  And although *Mt. Royal* involved a withdrawal, it did not address the decisive question: whether Section 701's exception applied.  Nor did it address whether Plaintiffs' claims here, untethered to any substantive standard, are reviewable.  *Mt. Royal* thus lends no support to Plaintiffs' legal theory.  But it does support Federal Defendants' position because, in sustaining the withdrawal, the Court emphasized the Secretary's broad authority, observing that FLPMA allows withdrawal "for any purpose. . . ." 477 F.3d at 756.  This observation remains correct today, as discussed in footnote 3, *supra*.

In addition, NMA and the Coalition incorrectly argue that BLM's regulations at 43 C.F.R. Part 2300 and provisions of the Departmental Manual limit the "exercise of withdrawal authority and the purpose of any given withdrawal."  NMA Reply 23-24. Both plaintiff groups cite 43 C.F.R. § 2300.0-1(a), which states that the Part 2300 regulations set forth procedures implementing the Secretary's authority "where appropriate" to make withdrawals.  Plaintiffs read the quoted phrase to establish that the

---

[4] For example, *Oregon Natural Resources Council Fund v. Brong ("ONRC")*, 492 F.3d 1120 (9th Cir. 2007), involved a challenge to a BLM fire salvage and timber project, and *Greer Coalition, Inc. v. U.S. Forest Service*, No. CV09-8239-PCT-DGC, 2011 WL 671750 (D. Ariz. Feb. 16, 2011), involved a FLPMA land exchange.  NMA cites both for the undisputed proposition that review of alleged FLPMA violations occurs under the arbitrary and capricious standard.  *ONRC*, 492 F.3d at 1124, *Greer*, 2011 WL 671750 at *6.  NMA also relies on *Skull Valley Band of Goshute Indians v. Davis*, 728 F. Supp. 2d 1287, 1297 (D. Utah 2010), for its finding that BLM's decision denying a FLPMA right-of-way was arbitrary. Finally, NMA relies on *Center for Biological Diversity v. Deptartment of Interior*, 623 F.3d 633, 646-47 (9th Cir. 2010), also a land exchange case, for its holding that BLM's approval violated NEPA and FLPMA by unjustifiably assuming that mining would occur on the federal and private lands "in the same manner" and "to the same extent," whether the exchange occurred or not.  None of these cases supports the proposition that review here is permissible.

1    authority is not unlimited.  Federal Defendants agree.  But even though the phrase

2    contemplates a degree of limitation, it is nonetheless devoid of any meaningful standard

3    by which to judge secretarial action, and it says nothing about the purposes of

4    withdrawal.  It cannot plausibly be construed to impose substantive limits on the

5    Secretary's authority.  Plaintiffs read far too much into this simple phrase.[5]

6

7         NMA also misconstrues Interior's Departmental Manual, claiming it provides

8    "law that allows for concrete review. . . ."  NMA Reply 24.  The cited provisions,

9    however, simply establish procedures for withdrawal applications and they set no limits

10   on the reasons for withdrawal.  Moreover, the cited Manual chapter does not "have the

11   independent force and effect of law" under Ninth Circuit precedent because it is merely

12   a policy statement and was not promulgated pursuant to the APA.  *W. Radio Servs. Co.*

13   *v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996); *see also* Trust Br. 3 n.3.  NMA does not

14   allege that the chapter affects individual rights or was promulgated or amended

15   pursuant to the APA.  The cited provisions are thus not enforceable.

16

17        AEMA further contends, without citing any case law, that FLPMA's multiple-

18   use directive provides a reviewable legal standard.  AEMA Reply 5-9.  The argument

19   ignores the stated purpose of withdrawal: precluding one use (location and entry) in

20   order to protect other uses, or even to reserve an area for a single, particular use.[6]

21   _____

22   [5] Nor is Plaintiffs' position aided by the regulation at 43 C.F.R. § 2310.1-1, which
     discusses the appropriateness of "early consultation" between BLM and agency-
23   applicants seeking withdrawal, to "assist in determining the need for a withdrawal;" nor
     by the regulation at § 2310.1-2(c), which advises as to specific information required in
24   a withdrawal application; nor by the regulations at § 2310.3-2(b)(1), -(b)(3) and -(b)(5),
     which require the agency-applicant to comply with NEPA and to furnish a report on
25   existing uses, resource conflicts, and economic effects, as well as a statement of
     intended consultations.  None of these provisions can fairly be read to impose a
26   substantive standard for judging the Secretary's reasons for withdrawal.

27   [6] *See* 43 U.S.C. § 1702(j) (defining withdrawal as the withholding of federal land "from
     settlement, sale, location, or entry, under some or all of the general land laws . . . in
28   order *to maintain other public values* in the area or *reserving* the area for a *particular*

AEMA's expansive construction of the reach of the multiple-use directive is not supported by the plain language of FLPMA, and accepting it would render the withdrawal provisions in sections 204 and 103 superfluous.  The Court should therefore decline to consider whether the record substantiates the reasons for withdrawal.

**II.     The Withdrawal Decision Fully Satisfies FLPMA.**

   **A.   The Reasons for Withdrawal Are Fully Supported by the Record.**

   Should the Court conclude that section 701 does not preclude review, it should nonetheless reject claims challenging the reasons for the withdrawal.  *See Fed. Defs'* Br. 17-24, 41-46; Trust Br. 4-10.  The agencies "considered the relevant factors" and "articulated a rational connection" between the facts found and the decision made: that is, to slow the pace of mining, suspend location and entry, and conserve certain resources for twenty years.  *See Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013) (stating APA standard of review).

   The ROD identifies the rationales and each is consistent with the withdrawal's purpose of protecting a variety of "natural, cultural, and social resources" from impacts of uranium mining.  AR 12.  Any one of these rationales is sufficient to support the withdrawal decision.  *See Organized Vill. of Kake v. U.S. Dep't of Agric.*, 746 F.3d 970, 980 (9th Cir. 2014) (stating affirmance is required "if *any* of the reasons given are not arbitrary and capricious").  To prevail here, Plaintiffs must demonstrate that *each* rationale is arbitrary, capricious, or otherwise contrary to law.  *See id.*; Fed. Defs' Br. 7; Trust Br. 4.  They have not satisfied this formidable burden.

   Disregarding the ROD's clear articulation of the withdrawal's purposes, Plaintiffs claim that any purpose or rationale beyond protection of water resources was improper.  Coal. Reply 11-13, 17-19; NMA Reply 24-25, 27-28.  In particular, the

_____

*public purpose or program*") (emphasis added).

Coalition asserts that BLM's use of the word "watershed" in stating the withdrawal's purposes somehow constrained the Secretary to consider only protection of resources with "a hydrological connection" to the watershed. Coal. Reply 11-12, 18-19.[7] This is incorrect, as explained in Defendants' opening briefs. Fed Defs' Br. 6-7, 23; Trust Br. 4 n.5, 21-22. And even if the Secretary's consideration was so limited, BLM in fact identified numerous hydrological connections to resources the withdrawal is designed to protect. *E.g.*, Doc. 204 ("Trust SOF") ¶¶ 34, 38, AR 2224 ("disturbance to [springs] . . . would disrupt the[ir] function and cultural association" for American Indian tribes); *id.* ¶ 41 AR 11 (wildlife impacts "a result of projected surface and groundwater effects").

Relying on this "watershed" definition theory, the Coalition also claims that the withdrawal's boundaries do not "conform" to the watershed. Coal. Reply 12-13. The argument fails because the Coalition points to no law or record evidence restricting the Secretary's withdrawal authority in this manner. That some portion of the North Parcel may fall outside the Coalition's definition of watershed is inconsequential. *See* Coal. Reply 12-13; Fed. Defs' Br. 6, 23; Trust Br. 7 n.10, 18 & n.26.[8]

---

[7] For example, the Coalition claims Federal Defendants' "expansive definition of the Grand Canyon watershed" conflicts with BLM's "framework to guide watershed management" in the agency's Land Use Planning Handbook. *Id.* at 11. Withdrawals, however, are not land use planning decisions (nor did the  challenged decision implement any sort of watershed management), and there is no evidence that BLM intended its non-binding Handbook to restrict the Secretary's withdrawal authority. *See infra* at 16-18; Trust Br. 11-13. The only record evidence the Coalition cites – draft National Park Service testimony addressing various issues affecting Grand Canyon National Park – does not even support  its theory. Doc. 214-1 ("Coalition 2d SOF") ¶ 17 (citing AR 4592-93). To the contrary, the testimony highlights the interconnected nature of the region's water and other resources, explaining that "[t]he watersheds and aquifers that nourish the park's unique flora and fauna extend well beyond the boundaries of Grand Canyon National Park." AR 4593.

[8] Ironically, had the Secretary applied the Coalition's theory, it would have resulted in *additional* areas being withdrawn to ensure protection of all lands within the Grand Canyon watershed. *See* AR 1745 (map depicting, for example, portions of Kanab

1        **1.     Water Resources**

2        The record amply supports the Secretary's conclusion that the risk of "serious

3  impact" to water resources absent the withdrawal would be "unacceptable."  AR 9-10;

4  *accord* Fed. Defs' Br. 23-24, 40-46; Trust Br. 5-8.  Nonetheless, Plaintiffs argue that

5  uranium mining can have no adverse impacts on water resources and that the

6  withdrawal thus lacked a valid basis.  *See* Coal. Reply 13-17; AEMA Reply 12.[9]  In

7  support, the Coalition unjustifiably fly-specks the FEIS and USGS Report, but fails to

8  explain how the alleged deficiencies render the withdrawal arbitrary and capricious.

9  *See* Coal. Reply 14-17; *Earth Island Inst. v. Forest Serv.*, 697 F.3d 1010, 1020 (9th Cir.

10  2012) (rejecting "inconsequential, technical deficiencies").

11       The Coalition first claims that an Arizona Geological Survey ("AGS") study of a

12  theoretical spill of uranium ore directly into a tributary of the Colorado River, AR 3308,

13  illustrates a lack of harmful impacts to water resources in the Colorado River.  Coal.

14  Reply 15.  Yet the primary water-protection concern articulated throughout the 2010

15  USGS Report, the FEIS, and the ROD is adverse impact to aquifers – *not* a direct spill.

16  *See* Trust SOF ¶¶ 18-20, 23, 25-29.  Indeed, while BLM did not rely on the AGS study

17  due to a conflict of interest by one of its authors, BLM concluded that its finding in the

18  FEIS that any water quality impact to the Colorado River would be negligible was

---

Creek basin not encompassed by the withdrawal).

[9] AEMA claims that withdrawal of over a million acres is not "proportional" to the probability that significant harm to water resources might occur.  AEMA Reply 12. Because FLPMA does not mandate that withdrawals be "proportional" to anything, it is unsurprising that AEMA fails to identify any authority supporting its claim.  *See id.*; Trust Br. 7-8.  The Coalition makes a puzzling assertion that Federal Defendants failed to use the "best available scientific data" – a requirement that applies in the Endangered Species Act (ESA) context.  *See* Coal. Reply 14 (citing *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1337 (9th Cir. 1992) (ESA biological opinion supported by analysis of best available scientific data)); *see also* Doc. 167 ("AEMA Br.") 6 n.6 (same).  None of the applicable statutes in this case contains such a requirement.  In any event, the Secretary *did* consider the best available scientific data, including the comprehensive USGS Report.  *See* Doc. 199 ("Fed. Defs' SOF") 5-7; Trust SOF ¶¶ 12, 23-24, 42.

1    entirely consistent with the study's results.  *Id.* ¶ 26 & n.4.

2         The Coalition next downplays what BLM found to be potentially "major"

3    impacts to groundwater-fed springs and wells because a "practically impermeable" rock

4    layer overlaying the regional aquifer reduces the probability of those impacts occurring.

5    *See* Coal. Reply 15; Trust SOF ¶¶ 26-27.  This ignores ample scientific evidence in the

6    record that fractures, faults, sinkholes, and breccia pipes themselves provide potential

7    pathways for contaminated water to travel through otherwise confining rock layers and

8    enter the regional aquifer.  *See* Fed. Defs' Br. 24; Trust SOF ¶¶ 18-19.[10]  The

9    Secretary's policy decision to take a precautionary approach to prevent such significant

10   (if unlikely) impacts is entitled to substantial deference.  *See Organized Vill. of Kake*,

11   746 F.3d at 975 (court may not "substitute its judgment for that of the agency" (quoting

12   *FCC v. Fox Television Stations*, 556 U.S. 502, 513-14 (2009))); Fed. Defs' Br. 24, 49-

13   51; Trust Br. 6-8.[11]

14
15        The Coalition also questions the USGS's analytical methods, complaining that

16   the USGS relied on "skewed" data in its study that documented high concentrations of

17   dissolved uranium "related to mining processes" in groundwater-fed springs and wells

18   throughout the region.  *See* Coal. Reply 15-17; Fed. Defs' Br. 42-43; Trust SOF ¶ 23,

19   AR 255.  The Court should defer to the agency on these "questions of methodology,"

20   *Bear Lake Watch, Inc. v. FERC.*, 324 F.3d 1071, 1077 (9th Cir. 2003), especially since

21
22
23   _____

24   [10]  Indeed, this is precisely what occurred at the abandoned Orphan Mine, where
     contaminated groundwater now discharges into Horn Creek.  Trust Br. 6 & n.7.

25   [11]  The Coalition claims that comments by National Park Service ("NPS") staffer Larry
     Martin show that the "hard science" does not support the Secretary's decision.  Coal.

26   Reply 14.  That Mr. Martin disagrees with the conclusions in the FEIS does not render
     the withdrawal arbitrary and capricious.  *See Marsh v. Or. Natural Res. Council*, 490

27   U.S. 360, 378 (1989); *Greenpeace*, 14 F.3d at 1336 ("that some scientists dispute the
     [agency's] analyses and conclusions" is insufficient; "[i]f it were, agencies could only

28   act upon achieving a degree of certainty that is ultimately illusory").

the Coalition's disagreements are either inconsequential or inaccurate.  For example, the USGS documented the locations of its sampling sites, including those located down-gradient from the abandoned Orphan Mine (the limitations of which BLM forthrightly disclosed).  *See* Coal. Reply 16 (attacking locations of sampling sites); Fed. Defs' Br. 41-43; Trust SOF ¶ 20.[12]  And contrary to the Coalition's suggestion, the USGS was not required to "take into account Arizona's rigorous Aquifer Protection Permit program," Coal. Reply 16, in its review of *existing* "water chemistry data . . . in order to understand better the source and distribution of dissolved uranium in the Grand Canyon region," AR 202.  The FEIS predicts *future* impacts, while assuming compliance with applicable law, including the Arizona program.  *See* Fed. Defs' Br. 5-6, 34-35; Trust Br. 5, 17.  The Secretary's conclusion that uranium mining threatens water resources is well supported by the FEIS and the USGS science documenting past contamination.[13]

## 2.    Assessment of the Uranium Endowment

NMA and the Coalition next contend the estimate of the area's uranium endowment is understated and thus the withdrawal's economic impacts are also understated.  NMA Reply 25-27, Coal. Reply 21-23.  BLM based its endowment estimate on the 2010 USGS Report, AR 57-415, incorporated into the FEIS.  AR 1628; *see also* Fed. Defs' Br. 17-21 (explaining USGS's conservative methodologies and noting that the report updated a 1990 assessment of the uranium endowment).

---

[12] As the Coalition recognizes, contamination related to the Orphan Mine provides "some of the only and more complete studies on mining impacts in the Grand Canyon Watershed" and "[c]urrent and future mines, even with improved mining practices are still going to have to address similar problems of potential . . . groundwater . . . contamination and impacts."  Coal. Reply 16 n.10 (quoting AR 66752); *see also* Trust SOF ¶ 20.

[13] For the same reasons, any claim that BLM failed to take a "hard look" at impacts to water resources under NEPA also fails.  *See* Fed. Defs' Br. 40-46; Trust Br. 10 n.14.

In particular, USGS noted its conservative approach to estimating uranium mineralization of hidden breccia pipes, explaining that "only drilling can determine with certainty whether a breccia pipe is present and if it contains uranium mineralization." AR 92. The scientists at USGS need not embrace Plaintiffs' optimistic view of the extent of uranium mineralization, given documented uncertainties in doing so. *Id*. Nor need they be as encouraged as Plaintiffs are based on the airborne electromagnetic geophysical surveys they tout, which produced just two favorable finds. *Id*. USGS's "scientific judgments" and its choice of methods are entitled to great deference. *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) (when reviewing scientific judgments and technical analyses within an agency's expertise, a court must be at its "most deferential") (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)).

Disregarding this deferential standard, Plaintiffs advance a series of trifling arguments. The Coalition charges that the agency "used flawed data to reach an endowment estimate," but it fails to explain why it is flawed (beyond claiming it understates the endowment). Coal. Reply 21. NMA charges that the estimate was "largely based on stale 1980s research," NMA Reply 25-26, an argument that the Coalition echoes, and contends the decision should be set aside on that basis. *See* Coal. Reply 22 (citing *N. Plains Res. Council v. Surface Transp. Bd*., 668 F.3d 1067, 1086 (9th Cir. 2011) ("*Northern Plains*")). But *Northern Plains* is easily distinguished.

There the court set aside a decision of the Surface Transportation Board that authorized a railway line based on old aerial photography, without record evidence indicating whether habitat and wildlife populations had changed in the intervening years. The court held this did not constitute the required "hard look" under NEPA. *Id*. Unlike the habitat and wildlife resources at issue in *Northern Plains*, uranium levels are

not dynamic – the lapse of a few decades does not diminish Earth's uranium endowment.  It was therefore reasonable for BLM to rely on the two 1980s-era mineral appraisals referenced in the 2010 Report.  AR 87-88.  NMA's criticism of those reports as "stale" finds no support in *Northern Plains* or in the administrative record.[14]

### 3.       Tribal and Cultural Resources

Defendants address AEMA's claim that the record does not support the purpose of protecting American Indian resources below, in connection with Plaintiffs' Establishment Clause and related claims.  *See* AEMA Reply 12-13.

### 4.       Visual and Wildlife Resources

The Secretary's decision was based on protection of a number of resources, including wildlife and visual resources.  *See* AR 9, 11 (explaining that the decision would benefit "the set of 'circumstances' and the area's 'unique resources,'" including visual resources and wildlife).  Assuming Plaintiffs' claims are reviewable, if all other reasons for withdrawal were unsubstantiated, the withdrawal should be sustained because the record amply supports the Secretary's determination that the withdrawal would avoid harm to wildlife and visual resources that would otherwise occur, absent withdrawal.  *See* Fed. Defs' Br. 23 & n.9; Trust Br. 8-9; Trust SOF ¶¶ 40-41; *supra* at 7 (explaining that any one rationale is sufficient to sustain the decision).

Only AEMA attacks this rationale.   AEMA concedes wildlife and visual resources will be adversely impacted absent withdrawal, but claims that the "difference in impacts" (between withdrawal and "no action") are not "significant enough to justify

---

[14] NMA also inaccurately charges that the 2010 Report did not undergo a rigorous peer review.  NMA Reply at 26.  To the contrary, the 2010 Report was indeed peer reviewed.  AR 3893 (stating that peer review would occur), 82092 (stating that the report was in the peer review process).  And in any event, peer review is not required. *See Lands Council v. Martin*, 529 F.3d 1219, 1226 (9th Cir. 2008) (finding "no legal requirement that a methodology [relied on in a NEPA analysis] be peer reviewed").

1   withdrawal." AEMA Reply 13-14. FLPMA imposes no such significance threshold for

2   withdrawals, and the Court should decline AEMA's invitation to establish such a

3   standard judicially, effectively substituting its judgment for that of the agency.

4          **B.**        **The Withdrawal Decision Fully Satisfies the Multiple-Use Directive.**

5          All Plaintiffs claim the withdrawal decision violates FLPMA's multiple-use

6   directive. NMA Reply 26-27, AEMA Reply 2-5, Coal. Reply 23. The claims fail

7   because mining remains a permissible use today. Thus the decision actually promotes

8   the objectives of multiple-use management by protecting wildlife, water quality, and

9   other values, while allowing continued mining and ensuring that a portion of the

10  endowment is preserved for future use. *See* 43 U.S.C. § 1702(c) (defining multiple-use

11  management to include consideration of "the long-term needs of future generations for

12  renewable and nonrenewable resources"); AR 4 (noting same consideration); *id.* 12

13  (noting goal of "sustainable long-term uranium development"). And although "location

14  and entry" are temporarily suspended, this does not contravene the directive, which in

15  fact contemplates "use of some land for less than all of the resources." 43 U.S.C. §

16  1702(c); AR 4 (stating "every use [is not required] on every parcel"); *accord New*

17  *Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 710 (10th Cir. 2009).[15]

18

19

20         NMA also argues that a faulty assessment of the uranium endowment "infected

21  the Secretary's compliance" with the multiple-use directive. NMA Reply 27. The

22  Coalition similarly argues that the decision-making process was "skewed and fatally

23

24  ─────────────────────
[15] AEMA argues that Congress intended the Secretary to manage withdrawals under the
25  multiple-use directive, AEMA Reply 3, and suggests Defendants seek a declaration
    "that FLPMA's multiple use standard can never provide justification for setting aside
26  an agency decision." *Id.* at 4. Defendants made no such argument. Rather, they
    responded on the merits, noting the Secretary's "substantial discretion." Fed. Defs' Br.
27  22. Given the Secretary's reasonable exercise of that discretion, the Court should reject
    the claim that the multiple-use directive operates to preclude withdrawal, or that it
28  somehow trumps the withdrawal authority in section 204(a), 43 U.S.C. § 1714(a).

1    tainted" by the flawed endowment assessment.  Coal. Reply 22.[16]  This argument fails
2    because even if the assessment were deficient, which it is not, the Secretary's decision
3    is entirely consistent with the multiple-use directive.

### C.    The Adequacy of the Report to Congress is not Reviewable.

Section 701(i) of FLPMA provides that the "adequacy of reports required by this
Act to be submitted to the Congress or its committees shall not be subject to judicial
review."  43 U.S.C. § 1701(i) (Stat. Notes).  Despite this clear directive, NMA contends
section 701(i) does not preclude review, because Interior's section 204(c)(2)
submission, AR 3104-16, is not a "report."  NMA Reply 6-7; Coal. Reply 22 (alleging
the uranium assessment violates section 204(c)(2)).  NMA takes this position now
despite repeated references in its complaint and prior briefs to the fact that section
204(c)(2) requires a "report" to Congress.  Doc. 56 ¶¶ 66-67, 76-77 (No. 12-cv-08038);
Doc. 73 at 11, 12 (No. 12-cv-08038).  And although NMA carefully refers in summary
judgment briefing to a "Notice" requirement, AEMA continues to refer to a "reporting
requirement."  AEMA Reply 3-4.

Plaintiffs' argument fails because several courts, including this one, have
deemed the submission to Congress required by section 204(c)(2) a "report."  *Yount v.*
*Salazar*, 933 F. Supp. 2d at 1226; *New Mexico v. Watkins*, 969 F.2d 1122, 1134 (D.C.
Cir. 1992) (referring to a "report," and to section 204(c)(2)'s *reporting* requirement);
*Mt. Royal,* 477 F.3d at 755.  AEMA's reliance on the FLPMA legislative history, in
particular, H.R. Rep. 94-1163, is unavailing because the House report itself refers to a
"reporting requirement."  *See* LEGISLATIVE HISTORY OF THE FEDERAL LAND POLICY &

---

[16] Plaintiffs' reliance on *Natural Resources Defense Council v. U.S. Forest Service*, 421
F.3d 797 (9th Cir. 2005), and similar cases is unavailing because here there is no error –
whether admitted or not – that "fatally infected" the Secretary's decision.  *See* Trust Br.
8, 21-22.

MANAGEMENT ACT ("FLPMA Leg. His.") at 439 (discussing requirements of section 204(c)(2) and explaining that "other arrangements *for reporting* will be specified . . . in the usual  manner") (emphasis added).[17]   Further, even if Congress had not enacted section 701(i), the section 204(c)(2) report—under any label—would still be unreviewable, under separation of powers principles.  *See NRDC v. Hodel*, 865 F.2d at 316-19 (holding, in the absence of an express non-reviewability provision, that a "reporting provision" in the Outer Continental Shelf Lands Act was not subject to judicial review); *NRDC v. Lujan*, 768 F. Supp. 870, 881 (D.C. Cir. 1991) (similar result).  This is so because courts conclude that where Congress requires the Executive to provide information, and does not require that information be provided to others, the courts lack jurisdiction to review the adequacy of that information.  *See Guerrero v. Clinton*, 157 F.3d 1190, 1194-95 (9th Cir. 1998); *Renee v. Duncan*, 686 F.3d 1002, 1016-17 (9th Cir. 2002).  Plaintiffs' claims that the report to Congress violates FLPMA, and thereby renders the withdrawal decision arbitrary, should be rejected.

**D.     The Decision did not Contravene the Governing BLM Resource Management Plan.**

Decisions to close such lands may be made only by act of Congress, the President (under the Antiquities Act), or by the Secretary (or certain other agency officials) under the FLPMA authority.   43 U.S.C. § 1714(a); 43 C.F.R. § 2310.3-3. And while FLPMA provides *separate* authority requiring BLM to develop and maintain resource management plans (RMPs), Congress has directed that RMPs may not make or terminate withdrawals.   43 U.S.C. § 1712(e)(3) ("lands shall be removed from or

---

[17] *See also* FLPMA Leg. His. at 935 (section 701(i) "forbids judicial review of the adequacy of reports required by S. 507.  The adequacy of such reports is a matter for resolution between the Congress and the President."); *NRDC v. Hodel*, 865 F.2d 288, 317 (D.C. Cir. 1988) (referring to a provision in the Outer Continental Shelf Lands Act as "in essence, a reporting provision," even though word "report" was not used).

restored to the operation of the Mining Law of 1872 . . . *only* by withdrawal action pursuant to [FLPMA]") (emphasis added).   Thus, an RMP may only reflect what Congress, the President, or the Secretary have determined in regard to mineral entry.

Plaintiffs' attempts to distinguish this statutory scheme are unavailing.   The Coalition's implication that all "management decisions," including withdrawals, must be "made through the land use planning process," Coal. Reply 24, ignores the noted restrictions on land use planning.   NMA's argument that the Secretary may not order withdrawal until the Secretary ensures that the withdrawal complies with the RMP, NMA Reply 29, fares no better.   Nothing in Section 204 suggests that the Secretary's withdrawal actions are constrained by or contingent upon an RMP that, by law, cannot open or close lands to mineral entry.   *See* Trust Br. 12.[18]

Relying on *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004) (*Norton*), NMA incorrectly argues that "when a withdrawal contradicts land use expectations contemplated in the RMP, then the RMP must be amended. . . ."   NMA Reply 29-30 (citing *Norton*, 542 U.S. at 69).   *Norton* had nothing to do with mineral withdrawals. Instead, that case stands for the proposition that plaintiffs cannot seek to enforce an RMP provision under 5 U.S.C. § 706(1) of the APA where no clear, mandatory duty

---

[18] NMA's assertion that FLPMA prohibits any withdrawal unless and until the RMP designates the lands as closed would create conflict between FLPMA's distinct planning and withdrawal provisions.   For example, under Section 204, the Secretary may make emergency, three-year withdrawals that take effect immediately.   43 U.S.C. § 1714(e).   Under NMA's reading, however, the Secretary could not make any emergency withdrawal in areas designated as open to mineral entry in the corresponding RMP unless and until BLM first completed a months- (or years-) long process of amending the RMP.   *See* 43 C.F.R. § 1610.5-5 (requiring preparation of environmental assessment or EIS and a thirty-day-wait period before plan amendment becomes effective).   Nothing in FLPMA's plain language or legislative history implies that Congress sought to hobble the Secretary's withdrawal authority through the RMP planning process in a manner that would make emergency withdrawals impossible.   *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must . . . interpret [a] statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an harmonious whole." (citations omitted)).

exists.  *See Norton*, 542 U.S. at 69-72.  Further, the relevant RMP's statement as to how acreage open to mineral entry, AR 30215, creates no mandatory duty under FLPMA. Because an RMP may not open or close lands to mineral entry, it cannot create an enforceable, binding provision with which a withdrawal could conflict.[19]

> **E.      The Withdrawal Complied with Legal Requirements for Disclosing Conflicts with Local Land Use Plans.**

The Coalition argues that BLM failed to undertake "meaningful" coordination with local governments – a duty allegedly mandated by NEPA and FLPMA – because the agency did not accede to every local government demand, and did not invite local governments to "most of the important" meetings.  Coal. Reply 25.  But no provision of FLPMA or NEPA (nor any case law) required that BLM invite local governments to every internal staff meeting on the withdrawal.  Nor could the Secretary have made the withdrawal consistent with all local demands since some governments opposed the withdrawal while at least one supported it.[20]  Fed. Defs' Br. 51-53; Trust Br. 15-16. The Coalition's claims lack merit.[21]

---

[19] To the extent that NMA and the Coalition now argue that BLM's failure to amend the Arizona Strip RMP violates FLPMA, the claim should be rejected as unpled.

[20] The Coalition's assertion that Coconino County "reversed its support for the [Withdrawal] and recommended reducing the size of the North Parcel," Coal. Reply 25, misrepresents the facts.  In the letter the Coalition cites, Coconino County mused that "there is a possibility that" some portion of the North Parcel "could be left out of the withdrawal area . . . ."  AR 3344.  But the County highlighted its official policy position on the Withdrawal: "*the Board of Supervisors supports Alternative B, the Proposed Action, which would involve a 20-year withdrawal of 1,010,776 acres of [BLM] lands from operation of the Mining Law . . . .*"  AR 3343 (emphasis in original).

[21] The Coalition argues that the Johnson Declaration (Doc. 188-6) should not be struck because it addresses "standing issues."  Coal. Reply 25.  But the Coalition plainly tries to use Mr. Johnson's testimony to address more than standing; it uses the declaration to support its *merits* arguments concerning BLM's alleged duty to ensure consistency with local plans.  *See, e.g.*, Doc. 173 ("Coal. Br.") 14-15 (citing Johnson Decl. to allege BLM staffer "acknowledged that the withdrawal was not consistent with local land use plans").  The Court cannot rely on such extra-record evidence to address the merits. Fed. Defs' Br. 53 n.36.

**III.    The Withdrawal Decision Fully Satisfies NEPA.**

As the Ninth Circuit has repeatedly recognized, "the policy of NEPA is first and foremost to protect the natural environment.  NEPA may not be used to preclude lawful conservation measures . . . and to force federal agencies, in contravention of their own policy objectives, to develop and degrade scarce environmental resources."  *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1123 (9th Cir. 2002), *abrogated on other grounds by Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011).  Yet, that is exactly what Plaintiffs are attempting to do by using NEPA as a sword to protect their economic interests and arguing that BLM *overestimated* the environmental impacts of uranium, failed to consider *less* environmentally protective alternatives, and could not take a cautious approach in the face of some uncertainty regarding possibly serious environmental impacts.  Thus, as detailed below, Plaintiffs are outside of NEPA's "zone of interests" and have failed to establish a NEPA violation.

**A.    Plaintiffs' Claims Fall Outside NEPA's "Zone of Interests."**[22]

Although Federal Defendants framed the "zone of interests" issue as a question of prudential standing in their opening brief, the Supreme Court has since held that "prudential standing is a misnomer." *Lexmark*, 134 S. Ct. at 1387 (quoting *Ass'n of Battery Recyclers, Inc. v. EPA,* 716 F.3d 667, 675–76 (D.C. Cir. 2013) (Silberman, J., concurring)).  Rather, resolving whether a plaintiff comes within the zone of interests requires the court "to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id*. Although the Supreme Court recognized that "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction," it did not abrogate the "zone of interests" inquiry. *Id*. at 1387 n.4 (quoting *Verizon, Md., Inc. v. Pub. Serv.*

[22] The Trust does not join in the argument in this section.

19

*Comm'n of Md.,* 535 U.S. 635, 642-43 (2002)).   The Court found that the "zone-of-interests test is therefore an appropriate tool for determining who may invoke the cause of action [under the relevant statute]." *Id.* at 1388-89.  The Court held that a plaintiff who may have an Article III injury in fact, but is outside the zone of interests protected by the Lanham Act, "cannot invoke the protection of the Lanham Act." *Id* at 1390.[23] Because Plaintiffs fail to demonstrate harm to environmental interests and the economic interests they seek to protect are outside of NEPA's "zone of interests," they fail to state a valid NEPA claim and judgment should be entered in Defendants' favor.  *See, e.g.*, *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 937-40 (9th Cir. 2005).   The Court's prior ruling on "zone of interests" was expressly confined to the pleading stage, *see Yount*, 2013 WL 93372, at *19, *28, and now the Court must look to whether Plaintiffs have established this element under the higher standard applicable at summary judgment—which they have failed to do.

The Coalition's central argument is that Mohave County has a statutory right to share in the mining severance taxes paid in connection with mining within the county, and that because the withdrawal, in the Coalition's view, will preclude "most, if not all, mining," those tax revenues will be reduced.  *See* Coal. Reply 4-5.  As an initial matter, this is inaccurate—BLM has estimated that under the withdrawal eleven mines are expected to operate in the withdrawn area, ten of which will be in the North Parcel where Mohave County is located.  *See* AR 2757.  Moreover, while there may be a link between mining and severance taxes paid, the Coalition fails to show that reduced revenues will impair its environmental interests.  All the Coalition argues is that the county "could" use such tax revenues to pave roads or fund desert tortoise programs,

---

[23] In light of this intervening decision, Federal Defendants no longer contend that the Coalition and NMA lack Article III standing to bring their NEPA claims.

*see* Fed. Defs' Br. 32 (quoting Buster Johnson Declaration), and that it previously put a road paving project on hold due to lack of funding, *see* Coal. Reply 5.  If such vague assertions about future intentions to use revenues for environmentally beneficial projects were sufficient, then the "zone of interests" test would lose all meaning.  It could be bypassed by anyone arguing that he intends to use some small portion of revenues from environmentally damaging projects for environmental good.  Moreover, the Coalition's vague assertion that it has "more general environmental concerns that BLM must coordinate with Mohave County to try to resolve the conflicts between BLM and Mohave County's General Plan," *id.* at 6, is likewise insufficient to bring them within NEPA's zone of interests because it fails to identify any specific conflict between the withdrawal and environmentally protective provisions in the county's plan.

Likewise, nothing that NMA argues in reply undermines the fact that its entire "zone of interests" argument is founded on Uranium One's undefined plans to potentially mine other uranium deposits in Utah.  *See* Doc. 171-1 ("Schwab Decl.") ¶¶ 7-10.  While such arguments were sufficient to survive a motion to dismiss, given that Uranium One's plans are still undefined, NMA has still not substantiated its claim of harm with evidence appropriate at the summary judgment stage.  Consequently, NMA fails to meet its burden.  NMA attempts, for the first time, to argue that it is raising real environmental concerns and that the alternatives it is advancing are "perhaps even more protective" than the withdrawal.  *See* NMA Reply 3.  But NMA offers nothing more than its own conclusory assertions for this proposition—and, as explained below, such assertions are without merit.  NMA's environmental interest thus remains pretextual and its NEPA arguments are nothing more than vehicles to protect its economic interests derived from mining.

1

2

**B.    BLM's Consideration of the "No Action" Alternative—Including Existing Mitigation Measures—Complied with NEPA.**

3

4

5

6

7

8

The BLM took the requisite hard look at the "no action" alternative—which would have allowed mineral location and mining to continue in the area—and provided "a reasonably thorough discussion of the significant aspects of [its] probable environmental consequences" in the EIS.   *Save the Peaks Coal. v. U.S. Forest Serv.,* 669 F. 3d 1025, 1035 (9th Cir. 2012) (quotation and citations omitted).   Neither of NMA's arguments challenging this analysis has merit.   *See* NMA Reply 7-9.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

First, none of Plaintiffs' arguments undermine the reasonableness of BLM's analysis of the environmental and economic impacts of the "no action" alternative.   *See* Fed. Defs' Br. 40-46, Trust Br. 4-10, *supra* pp. 9-11, 13-14 (addressing challenges to analysis of resource impacts); *see* Fed. Defs' Br. 17-22, Trust Br. 9-10, *supra* pp. 11-13 (addressing challenges to analysis of uranium endowment).   Moreover, to the extent Plaintiffs base their NEPA claim on the analysis of economic impacts, their claim fails because they have not demonstrated that the alleged errors resulted in a flawed environmental impacts analysis.   *See Ariz. Cattle Growers' Ass'n v. Cartwright*, 29 F. Supp. 2d 1100, 1118 (D. Ariz. 1998) (denying NEPA claims where "Plaintiffs have only challenged the determination by pointing to economic consequences [and] have failed to point to *environmental* consequences" because "[u]nder NEPA the failure to discuss economic consequences is of little concern."); *see also* Fed. Defs' Br. 51 n.33. NEPA does not require the EIS to address "an economic concern that is not tethered to the environment." *Ashley Creek*, 420 F.3d at 943.[24]

25

26

Second, NMA's claim that BLM failed to consider mitigation measures in

27

28

[24] While the Trust joins Federal Defendants' argument that the FEIS' economic impact analysis complied with NEPA, the Trust does not join in the argument that the Court should not review the adequacy of the FEIS' economic impacts analysis.

connection with the "no action" alternative likewise fails.  NMA fails to identify any court ruling that an agency must consider *new* mitigation measures in analyzing the "no action" alternative, and the Court should reject NMA's invitation to be the first.  In its reply, NMA recasts its "mitigation" argument, conceding that what "NEPA requires [is] careful consideration of the status quo under the 'No Action' Alternative, which, here, is the continuation of mining with all the attendant permitting and regulatory protections."  NMA Reply 8.   But that is exactly what BLM analyzed as the "no action" alternative.  *See* Fed. Defs' Br. 33-35; Trust Br. 16-17.[25]  Plaintiffs offer no response to Defendants' identification of instances where existing mitigation measures are discussed in the FEIS.  *See* Fed Defs' Br. 34-35; Trust Br. 17.  Instead, Plaintiffs simply dismiss the discussion as "conclusory," but they offer no specific examples of existing mitigation measures that BLM failed to consider.  NMA Reply 9.[26]  Thus, Plaintiffs have failed to establish that BLM's discussion of the "no action" alternative or mitigation measures was arbitrary and capricious.

## C.  BLM Considered A Range of Reasonable Alternatives.

None of Plaintiffs' arguments in reply undercuts the reasonableness of BLM's alternatives analysis.  NMA ignores clear Ninth Circuit precedent which holds that an agency need not "consider alternatives less restrictive of developmental interests," particularly where those alternatives "would be inconsistent with the [environmentally protective] policy objective" of the proposed action.[27]  *Kootenai Tribe*, 313 F.3d at

_____

[25] NMA argues that because the "no action" alternative here involved the "most 'action'" in terms of continued mining, NEPA mandates an analysis of new mitigation measures.  NMA Reply 8.  NMA provides no support for this novel argument.

[26] The case NMA cites, *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 973 (9th Cir. 2006), to attack the FEIS's analysis of mitigation impacts is inapposite as it concerns the level of detail agencies must use to describe the impacts of individual projects as part of a cumulative impacts analysis.

[27] As an initial matter, Federal Defendants do *not* argue that a rigorous consideration of

1120-21.[28]  NMA weakly argues that Interior could not ignore "alternatives that may protect the environment in *ways different* from the proposed action[,]" yet does not even attempt to explain the "different" ways in which its proposed alternatives are environmentally protective.  *See* NMA Reply 10 (emphasis added).  On their face, these alternatives—a withdrawal of fewer acres, a withdrawal of a shorter time period, an information gathering alternative in lieu of withdrawal, or an alternative that permits mining exploration and development to continue while changes to regulations and other measures are pursued in lieu of withdrawal (referred to by NMA as "Alternative E")— are less environmentally protective than the withdrawal.  Thus, NEPA did not require BLM to consider such alternatives.  *See Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 601 (9th Cir. 2010) (NEPA's purpose is to "permit informed public comment on proposed action and any choices or *alternatives that might be pursued with <u>less</u> environmental harm*.") (emphasis added) (quoting *Lands Council v. Powell,* 395 F.3d 1019, 1027 (9th Cir. 2005)).

---

alternatives was unnecessary because the withdrawal was environmentally protective. *See* NMA Reply 10.  Rather, Federal Defendants' position is that BLM was not legally required to consider the *less* environmentally protective alternatives that NMA advances.  For that reason, NMA's reliance on *Environmental Defense Fund Inc. v. Corps of Engineers*, 492 F.2d 1123, 1135 (5th Cir. 1974), is misplaced. *See* NMA Reply 10 n.47.  There, the Fifth Circuit held that an agency may not halt consideration of "other *more ecologically sound* courses of action" once it finds an environmentally protective one.  *Id.* at 1135 (emphasis added).  By contrast, here BLM considered several alternatives in addition to the environmentally protective proposed action.

[28] NMA attempts to dismiss this binding Ninth Circuit precedent by relying on a footnote in a district court case from the Tenth Circuit.  *See* NMA Reply 9 n.42 (citing *Wyoming v. U.S. Dep't of Agric.*, 277 F. Supp. 2d 1197, 1203 n.1 (D. Wyo. 2003), *vacated and remanded*, 414 F.3d 1207 (10th Cir. 2005)).  NMA ignores the other cases cited by Federal Defendants, *see* Fed. Defs' Br. 36-37 n.20, including *Friends of Boundary Waters Wilderness v. Dombeck*.  Although that case's "zone of interests" holding has been rejected by the Ninth Circuit, *see Ashley Creek*, 420 F.3d at 942*,* the case nevertheless illustrates that even when those advancing economic interests are permitted to advance NEPA claims, such claims cannot be based on arguments that the agency failed to consider a more environmentally impactful alternative.  *See Boundary Waters*, 164 F.3d 1115, 1129 (8th Cir. 1999) (rejecting argument that agency was required to consider "*increased* visitor use levels" alternative).

1      Even if the Court were to permit NEPA claims based on the alleged failure to

2  consider such alternatives, Plaintiffs' claims nevertheless fail because they have not

3  demonstrated that BLM's alternatives analysis was unreasonable.  *See Grand Canyon*

4  *Trust v. U.S. Bureau of Reclamation*, 623 F. Supp. 2d 1015, 1026 (D. Ariz. 2009)

5  (Campbell, J.) ("We uphold an agency's . . . discussion of alternatives so long as the

6  alternatives are reasonable and the agency discusses them in reasonable detail.'")

7  (quoting *Citizens Against Burlington Inc. v. Busey,* 938 F.2d 190, 195 (D.C. Cir.

8  1991)).   As NMA concedes, BLM was not required to consider in detail *all* the

9  alternatives raised.  *See* NMA Reply 9, 11.  Plaintiffs have failed to "introduce specific,

10  evidentiary facts in support of their contention that the final EIS improperly failed to

11  consider reasonable and viable alternative[s]."  *Friends of the Earth v. Coleman,* 513

12  F.2d 295, 298 (9th Cir. 1975).

13

14                    **1.      Shorter Duration Withdrawal**

15      BLM considered the possibility of including a shorter duration withdrawal (five

16  or ten years) as an alternative and ultimately eliminated it from detailed analysis,

17  explaining the reasons for doing so in the EIS, as provided for by 40 C.F.R. §

18  1502.14(a).    AR 569 (DEIS); 1658-59 (FEIS).    *See also Pac. Coast Fed'n of*

19  *Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1101 (9th Cir. 2012) ("NEPA permits

20  agencies to eliminate alternatives from detailed analysis so long as they 'briefly discuss

21  the reasons for their having been eliminated.'" (quoting 40 C.F.R. § 1502.14(a))).

22  BLM also received and responded to public comments about a shorter duration

23  withdrawal.  *See* AR 2349.  Such record evidence of consideration and discussion about

24  a potential alternative demonstrates that NEPA's objectives of "foster[ing] informed

25  decisionmaking and informed public participation" have been met.  *Westlands Water*

26  *Dist. v. U.S. Dept. of Interior*, 376 F.3d 853, 872 (9th Cir. 2004) (quoting *California v.*

27

28

                                                    25

1   *Block*, 690 F.2d 753, 767 (9th Cir. 1982)); *see also* Fed Defs' Br. 38 (collecting cases

2   holding discussion of potential alternative in comments to be sufficient).

3          Moreover, Plaintiffs have not established that it was unreasonable for BLM to

4   eliminate this alternative from further consideration given the goals of long-term Grand

5   Canyon watershed protection and the foreseeability of mining interest in the area in the

6   future, which goals would not have been met by a shorter term withdrawal.  Contrary to

7   NMA's contention, these long-term goals are not "simply a reason why a withdrawal

8   might 'possib[ly]' be renewed." NMA Reply 11 (alternations in original).  Rather,

9   BLM determined that because there was a high probability that a shorter withdrawal

10   would need to be renewed, there was "no meaningful difference between a 10-year and

11   a 20-year withdrawal." AR 1659.[29]  An agency need not analyze in detail alternatives

12   that have "substantially similar" "environmental consequences" as those considered.[30]

13   *Te-Moak Tribe*, 608 F.3d at 602; *see also Headwaters Inc. v. BLM,* 914 F.2d 1174,

14   1180-81 (9th Cir. 1990).  The reasonableness of BLM's decision to eliminate a five or

15   ten year withdrawal from further detailed analysis is highlighted by the lengthy nature

16   of the process for implementing a withdrawal—in this case taking five years thus far.

17

18

19   _____

20   [29] Contrary to NMA's assertion, NMA Reply 11, the Secretary's acknowledgement that
based on the results of studies and analyses performed on "the previously-approved
mines and mining claims with valid existing rights . . . it may well be that these lands or
a portion thereof will be appropriate for re-opening to the Mining Law at some point in
the future," AR 12, does not support the conclusion that a shorter duration withdrawal
should have been considered.  Nothing in this statement indicates a belief that the lands
should be reopened in less than twenty years and the Secretary's language make clear
that this is merely a possibility contingent on the results of future studies.

21   [30] The cases NMA relied on requiring consideration of mid-point alternatives are
distinguishable in that there the court concluded that mid-way alternatives could meet
the project's purpose and need. *See Native Fish Soc'y v. Nat'l Marine Fisheries Serv.,* -
-- F. Supp. 2d ----, No. 3:12-cv-00431-HA, 2014 WL 199093, at *10 (D. Or. Jan. 16,
2014); *Wild Fish Conservancy v. Nat'l Park Serv.,* --- F. Supp. 2d ----, No. C12-5109
BHS, 2014 WL 1260450, at *9 (W.D. Wash. Mar. 26, 2014).  Here, the agency found
that the purpose of long-term protection would not have been met by a shorter-term
withdrawal.

1    *See* Fed. Defs' SOF 2-3.

2              **2.    Another Intermediate Geographic Area Withdrawal**

3          Contrary to NMA's contention, NEPA did not require BLM to consider a *third*

4    mid-range alternative (800,000 acre withdrawal)—one that would have withdrawn

5    200,000 fewer acres than Alternative B (1.007 million acre withdrawal), but 150,000

6    acres more than Alternative C (650,000 acre withdrawal) and 500,000 more acres than

7

8    Alternative D (300,000 acre withdrawal).[31]   As NMA itself acknowledges "an agency

9    need not consider every conceivable alternative," NMA Reply 11; *see also Westlands*,

10   376 F.3d at 871, and NMA has not shown how its additional mid-range alternative

11   differed substantially or had substantially different consequences from those mid-range

12   alternatives that were already considered.  *See Headwaters*, 914 F.2d at 1180-81.

13         NMA's proposed mid-range alternative is well within the range of alternatives

14   that BLM considered, and thus no consideration of it as a free-standing alternative was

15   required.  As the Trust explained in its opening brief, Alternative C already considered

16   an approximately 200,000-acre reduction in the North Parcel—which is exactly what

17   NMA appears to be advocating as its mid-range alternative.  *See* AR 1685 (Alternative

18   B withdrawing 549,995 acres in North compared to Alternative C withdrawing 351,967

19   acres in North); Trust Br. 18-19.  NMA's sole response is that *overall* its mid-range

20   alternative would have withdrawn fewer acres than Alternative C, NMA Reply 11 n.54,

21

22

---

23   [31] NMA's description of exactly what it is proposing as the third mid-range alternative

24   is exceedingly vague and does not identify—other than in the most general terms—the location of the 200,000 acres that would not have been withdrawn.  NMA argues that it is "not [its] job to divine" how the alternatives could have been mixed and matched, *see*

25   NMA Reply 11-12 n.55.  However, this fails to meet Plaintiffs' burden for identifying a "specific, detailed counterproposal" and does not "demonstrate[] that [their proposed

26   alternative] would be environmentally less harmful," as is necessary to sustain a NEPA claim.  *City of Angoon v. Hodel*, 803 F.2d 1016, 1022 (9th Cir. 1986); *see also*

27   *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 576 (9th Cir. 1998) (recognizing "that the burden is on the party challenging the agency action to offer

28   feasible alternatives").

because Alternative C also reduced the withdrawn acreage in other parcels, *see* AR 1685.  This, however, ignores the fact that the EIS presented the impacts of each alternative on a parcel-by-parcel basis and thus information regarding the impacts of NMA's mid-range alternative was available to the public and decisionmakers. Moreover, as the case law recognizes, the Secretary could have selected an alternative for implementation that was comprised of parts of the different alternatives analyzed in the EIS.  *See Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 854 (9th Cir. 2013) (sustaining selected alternative comprised of elements of three alternatives analyzed).  Plaintiffs offer no response and have not shown how a third mid-range alternative would "foster informed decision making and public participation."  *Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1005 (9th Cir. 2013).[32]

### 3. "Alternative E"

It was likewise reasonable for BLM to consider, but eliminate from further consideration, an alternative that would have imposed new mining requirements—what NMA refers to as "Alternative E."  AR 1659-60.  Although BLM initially considered

---

[32] The documents NMA relies upon to argue that BLM should have considered a mixing and matching option in the EIS are briefing papers for a high level executive briefing, which explained the pros, cons and schedule of three options—(1) proceeding with the alternatives identified in the DEIS, (2) mixing and matching portions of different alternatives with different parcels, or (3) developing entirely new alternatives with new parcel boundaries.  *See* AR 3203-60. There is nothing improper about presenting information about how long each of these options would extend the decision process given the fact that the temporary withdrawal was then set to expire the following month. *See, e.g.,* AR 3255-59.  The other documents NMA cites are no more convincing.  AR 66870 reflects the NPS's position—that was not adopted by the briefing papers' drafters—that the third option should not be presented. *See* AR 66898. AR 81803-04 is an email that postdates the FEIS in which the author suggests that an 800,000 acre withdrawal could be selected based on the information that has already been made available.  Moreover, it does not state, as NMA contends, that the withdrawn area could be reduced by 200,000 acres "without impact"—rather it states that these 200,000 acres have low resource values, are 40-50 miles from the canyon, and/or do not drain into the canyon.  AR 81804; *see also* Trust Br. 18 n.26.  That is not the same thing as "no impact."

28

including this alternative in an early administrative draft of the DEIS, it ultimately decided to eliminate it from detailed consideration because *most* of its elements would require amending regulations, a speculative process that could take years and thus would not meet the immediate purpose and need for the action.  *See* AR 1660; *see also* AR 51837-43.  As required by 40 C.F.R. § 1502.14(a), BLM briefly described this alternative in the EIS and explained the reasons why it had been eliminated.  *See* AR 1660.  BLM also explained that "changing the regulatory requirements could be proposed as a subsequent action in conjunction with any of the withdrawal alternatives, including the No Action Alternative," and that the other components of this alternative "could be implemented under any alternative independent of a withdrawal action or a regulatory change."  AR 1661.

Plaintiffs have not shown that BLM's reasons for eliminating this alternative were arbitrary and capricious.[33]  *See Protect Lake Pleasant, LLC v. Johnson*, No. CIV07-454PHXRCB, 2007 WL 1486869, at *12-13 (D. Ariz. May 21, 2007) (finding nothing "arbitrary and capricious" in an agency's elimination of alternatives it found infeasible in light of the stated purpose and need), *aff'd*, 252 F. App'x 856 (9th Cir. 2007).  As the Trust pointed out, the recent track record for amending mining regulations demonstrates that the process can take over a decade and spawn years of

---

[33] NMA's reliance on documents showing that BLM initially considered including this alternative in the DEIS is misplaced.  *See* NMA Reply 12.  As these documents indicate, there was extensive analysis and discussion of this potential alternative, however, due to its speculative nature, the Executive Oversight Team ultimately determined that eliminating it was "critical to ensure the integrity of the Secretary's decision-making process regarding the proposed withdrawal and the BLM's ongoing compliance with NEPA."  AR 51840; *see also* AR 72872.  Cooperators involved in the NEPA process were advised at the time why the alternative had been eliminated from further consideration.  *See* AR 51842-43 (draft letter and scheduling for providing notice to Cooperating Agencies, counties, tribes, Utah and Arizona Congressional Delegations, and other contacts).  If anything, these documents bolster the conclusion that there was informed decisionmaking and public participation.  *See Westlands*, 376 F.3d at 870-72.

litigation.  *See* Trust Br. 20 n.27.  During this time, the lands would be subjected to the environmental harms caused by staking, exploration and mining described in the "no action" alternative.   The case law makes clear that an agency is not required to analyze speculative alternatives that require "protracted debate and litigation not meaningfully compatible with the time-frame of the needs to which the underlying proposal is addressed."  *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978).[34]  NMA offers no response to these points, simply arguing that Alternative E also included *non*-regulatory components, which portions of the alternative could be adopted without rulemaking (presumably more quickly).  However, it does not even attempt to articulate exactly what an alternative that adopted *just* the non-regulatory part of Alternative E would look like or how it would meet the purpose and need of protecting the area's resources.[35]  *See City of Angoon*, 803 F.2d at 1022.

### D.   There Was No Shift In Purpose and Need That Required Reconsideration of Alternatives.

As this Court has recognized, "[t]he *stated* goal of a project necessarily dictates the range of 'reasonable' alternatives[.]"  *Grand Canyon Trust*, 623 F. Supp. 2d at 1026 (emphasis added) (quoting *City of Carmel–By–The–Sea v. U.S. Dep't. of Transp.*, 123

---

[34]  Although there may be instances in which an agency is required to consider an alternative that requires "legislative action," courts look to the nature of the process that would be required to determine the reasonableness of such an alternative.  *See Kilroy v. Ruckelshaus*, 738 F.2d 1448, 1454 (9th Cir. 1984) (finding alternative that would have required changes in legislation to be "substantially remote from reality").

[35]  NMA's argument that "Alternative E" was "*more* consistent" with the "Purpose and Need," as it was articulated in early "preliminary DEIS drafts" of the DEIS, fails for a number of reasons.  *See* NMA Reply 12 n.61.  The Court should look to the purpose and need as it was articulated by the agency in the documents that NEPA required the agency to make public—the DEIS and the FEIS—not early working drafts that did not reflect the agency's final thinking.  Moreover, NMA offers nothing more than its own conclusory assessment that this alternative is *more* consistent with the purpose and need.  Finally, an agency need not consider an alternative that could hypothetically meet the purpose and need, but for the fact that it is "remote," "speculative," "infeasible,"  or "ineffective."  *See Headwaters*, 914 F.2d at 1180-81.

1   F.3d 1142, 1155 (9th Cir. 1997)).  The Court should "uphold an agency's definition of

2   objectives so long as the objectives the agency chooses are reasonable."  *Id.* (quoting

3   *Citizens Against Burlington,* 938 F.2d at 196).   Here the purpose of the proposed

4   withdrawal, as it was first articulated in the July 15, 2009 Petition/Application to the

5   Secretary requesting the lands be withdrawn, was "to protect the Grand Canyon

6   watershed from adverse effects of locatable hardrock mineral exploration and mining."

7   AR 44; *see also* Fed. Defs' SOF 2-3; Trust SOF ¶¶ 2-3.   That purpose and need

8   remained consistent throughout the notice of proposed withdrawal, the Draft EIS

9   ("DEIS"), the FEIS and the ROD.   *See* AR 53 (July 21, 2009 *Fed. Reg.* notice); AR

10  496-97, 545-46 (DEIS); AR 1573, 1625-26 (FEIS); AR 2 (ROD); Trust SOF ¶¶ 2-3.

11

12          Plaintiffs do not challenge the reasonableness of the agency's definition of its

13  objectives; instead they argue that the "purpose and need" clearly stated in the Petition,

14  DEIS, FEIS and ROD—which NMA concedes has remained constant—was not the

15  "true" purpose.  *See* NMA Reply 13-14.   They cite no case to support their novel

16  proposition that a court should attempt to divine a different purpose than the one

17  expressly articulated by the agency based on isolated statements in record documents.[36]

18  Moreover, NMA's selective quotation of record documents does not demonstrate that

19  BLM changed its purpose and need, instead those documents merely demonstrate that

20  BLM acknowledged information gaps and expected that the withdrawal period would

21  permit time for additional study.   The "Rationale for Decision" section of the ROD

22  does indicate that "the EIS acknowledged uncertainties due to limited data," but

23

24

_____

25  [36] *Soda Mountain Wilderness Council v. Norton*, 424 F. Supp. 2d 1241 (E.D. Cal. 2006), is inapposite.  In that case the agency acknowledged that the purpose and need was not clearly articulated in the environmental assessment ("EA") at issue and the agency itself directed the court to background information and the administrative record in an effort to identify the purpose, which the court likewise found to be unclear.  *Id.* at 1261-62.  The case did not involve a situation where, as here, the agency had clearly and consistently articulated the purpose and need for the decision.

26

27

28

concludes that even with these uncertainties, and even though the probability was low, the potential impacts were "high risk." AR 9. That the ROD then explains that the twenty-year withdrawal will allow for additional data to be gathered and more thorough investigation is not a change in purpose as NMA contends. Similarly, statements in the final recommendation memo to the Secretary, acknowledging uncertainty and recognizing that data gathered in the next twenty years "can help inform *future decisions* that will occur at the end of the withdrawal period," do not indicate a change in purpose and need. AR 3102 (emphasis added).[37] All such studies would still be undertaken with the greater goal of protecting the region's resources from effects of mineral exploration and development—not merely for the sake of study.

Finally, even if BLM had changed its purpose and need as Plaintiffs contend, this would not undermine BLM's analysis of alternatives. NMA contends that BLM should have considered—a withdrawal of shorter duration and an alternative that "allow[s] some activity to develop the missing information." NMA Reply 13. As the record demonstrates, BLM considered the first and reasonably rejected it. As for the second proposal, the selected alternative already "allows some activity" sufficient to develop additional data, because it does not prohibit mining on pre-existing claims with valid existing rights. Thus, although Plaintiffs perpetuate the myth that no uranium mining development will occur in the area because of the withdrawal, that is simply not the case. BLM has estimated that up to eleven mines can be expected to operate in the withdrawn area on claims with valid existing rights over the next twenty years. *See* AR

---

[37] Likewise, the other documents NMA relies upon—language in a draft version the testimony of the BLM Director, which was not included in the final version of the testimony, *compare* AR 7277 (draft) *with* 7867-70 (final version), and excerpts from emails between agency employees, *see* NMA Reply 14 n.73—do not establish a changed purpose and need. *See also* Trust SOF ¶ 3.

2757.[38]   Indeed, suits have been filed and litigated regarding resumption of active

operations at mines in the withdrawn area after the withdrawal.  *See Ctr. for Biological*

*Diversity v. Salazar*, 791 F. Supp. 2d 687 (D. Ariz. 2011) (Campbell, J.), *aff'd* 706 F.3d

1085 (2013) (Arizona 1 Mine); *Grand Canyon Trust v. Williams*, No. CV13-8045-PCT-

DGC, 2013 WL 4804484 (D. Ariz. Sept. 9, 2013) (Campbell, J.) (Canyon Mine).

**E.      BLM Did Not Violate the "Unavailable Information Rule."[39]**

Plaintiffs' claim that Interior violated 40 C.F.R. § 1502.22 by failing to address

"data gaps," NMA Reply 15, distorts both the record and the law.  In the FEIS, BLM

disclosed where information was "incomplete or unavailable information" in full

compliance with § 1502.22.  The Secretary explained in the ROD that this information

was not "essential to a reasoned choice among alternatives."  Accordingly, none of the

additional § 1502.22 disclosures were required.  *See* Fed. Defs' Br. 47-48; Trust Br. 22.

NMA distorts *Native Village of Point Hope v. Salazar*, 730 F. Supp. 2d 1009 (D.

Alaska 2010), when it argues that the Ninth Circuit requires "specific findings" about

---

[38] NMA for the first time in its reply argues that the NEPA process was "predetermined."  *Compare* NMA Reply 15 *with* Doc. 170 ("NMA Br.") 3-16.  The Court should decline to consider this claim made for the first time in reply.  *See Matsumaru v. Sato*, 521 F. Supp. 2d 1013, 1014 n.1 (D. Ariz. 2007).  Even if the claim were properly presented, however, NMA has failed to clear the "high hurdle" facing "[t]hose alleging predetermination." *Defenders of Wildlife v. Hall*, 807 F. Supp. 2d 972, 984 (D. Mont. 2011).  "[Predetermination] only occurs when an agency has made 'an irreversible and irretrievable commitment of resources' based upon a particular environmental outcome, prior to completing its requisite environmental analysis."  *Id.* (quoting *Metcalf v. Daley,* 214 F.3d 1135, 1143 (9th Cir. 2000)).  None of the documents NMA relies upon show a commitment of resources.  Moreover, *Davis v. Mineta*, 302 F.3d 1104, 1112-14 (10th Cir. 2002), is inapposite because it involved a situation where there was record evidence showing that a Finding of No Significant Impact was planned and prepared even before the agency completed the EA, which is the document that evaluates whether there are significant impacts.  There is no similar evidence here where the agency prepared a full EIS.

[39] The Trust does not join Federal Defendants' arguments concerning unavailable information here.  However, the Trust agrees, for the reasons stated in its opening brief, that Plaintiffs' arguments that the Federal Defendants failed to comply with 40 C.F.R. §1502.22 are unpersuasive.  Trust Br. 22-24.

the relevance and non-essentialness of the missing information *in the EIS*.  NMA Reply 17.  In *Point Hope*, which was not a *Ninth Circuit* decision as NMA contends, *see id*. n.84, another district court within the circuit found that the agency had failed to determine whether the missing information was relevant or essential at the time, and refused to credit "post-hoc rationalization made by [defendants'] lawyers" *in briefing* that the missing information was not relevant or essential.  730 F. Supp. 2d at 1018.[40]

Here, to the contrary, the explanation in the ROD is not a *post-hoc* rationalization by counsel; it was a determination by the Secretary *at the time* he made the decision to withdraw.  *See* AR 10, n.1.  None of the other cases NMA cites dictate when an agency must explain that information is not "essential to a reasoned choice among alternatives," of require that explanation be made in the EIS, rather than the ROD.  In *Cabinet Resource Group v. U.S. Fish & Wildlife Service*, the court found that the agency had failed "to attempt *any* assessment of the importance of the missing information. . . ."  465 F. Supp. 2d 1067, 1100 (D. Mont. 2006) (emphasis added).  In *Montana Wilderness Ass'n v. McAllister*, the court disagreed with the agency's assessment that the information was not relevant, and required the agency to consider the missing information further.  666 F.3d 549, 560 (9th Cir. 2011).  Neither case addressed the specific form or location of the agency's finding regarding the non-essential nature of the missing information.[41]  Here the Secretary *did* assess whether the information was "essential to a reasoned choice among alternatives," AR 10 n.1, and it

---

[40] District Court decision from other districts "[are] not binding on this court."  *Kentera v. Fremont Inv. & Loan*, No. CV-10-8259-PCT-GMS, 2012 WL 1438683, at *2 (D. Ariz. Apr. 26, 2012).

[41] Likewise, while the preamble to CEQ's rulemaking promulgating the revised version of § 1502.22 does state that "[t]he evaluation of impacts under § 1502.22 is an integral part of an EIS," the preamble does not state that an agency's *finding* that the information is not essential must be in the EIS. NEPA Regulations, Incomplete or Unavailable Information 51 Fed. Reg. 15,618, 15,621 (Apr. 25, 1986).

is clear that the "decision maker ha[d] the information necessary to consider environmental factors and make a reasoned decision." *Half Moon Bay Fisherman's Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 511 (9th Cir. 1988) (finding no NEPA violation where post EIS report prepared by the EPA, which was incorporated into the ROD, filled information gaps in EIS). Moreover, even if the regulations did dictate the location of that assessment, such "trivial violation of the[] regulations [would] not give rise to any independent cause of action."  40 C.F.R. § 1500.3; *see also* Fed. Defs' Br. 46-47 (courts are unwilling to give a hyper-technical reviewing of § 1502.22).

Contrary to NMA's assertion, the Secretary's explanation in the ROD is sufficient and entitled to deference.  *See Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 498 (9th Cir. 2014).[42]  It was reasonable for the Secretary to conclude that he could make a reasoned choice among alternatives—and choose an environmentally protective alternative—based upon available evidence of historical uranium mining impacts to water resources, the potential seriousness of impacts to a resource that supplies water to millions of people in seven states, and BLM's assessment of impacts to other resources. *See* AR 9-12.[43]  "Scientific *certainty* . . . is not 'essential to a reasoned choice among alternatives.'"  *Idaho Wool Growers Ass'n v. Vilsack*, --- F. Supp. 2d ----, No. 1:12-CV-469 AWT, 2014 WL 1230029, at *4 (D. Idaho Mar. 25,

---

[42] Although the agency on remand in *Point Hope* chose to prepare a Supplemental EIS with an appendix analyzing the incomplete or unavailable information and the Ninth Circuit then deferred to the agency's determination that the information was not "essential," nothing in the decision dictates that that is the manner in which the agency must analyze the incomplete or unavailable information.  *See Point Hope,* 740 F.3d at 498.   The Secretary's analysis and explanation in the ROD is just as entitled to deference.

[43] NMA claims that Interior's § 1502.22 explanation fails because it asserts conflicting positions in the FEIS and ROD—specifically, that the ROD relied on what they allege are "out of date mining impacts" to comply with § 1502.22, while acknowledging that historic data is unrepresentative of present and future mining. NMA Reply 19.  In fact, Interior's positions do not conflict.  *See supra* pp. 10-11.

2014) (emphasis in original). The word "essential" does not simply mean useful, helpful or relevant; rather it is something that is "absolutely necessary; indispensible; requisite." *Webster's New World Dictionary*, 464 (3d College ed. 1988).  That BLM prepared budgets in 2009 for some studies that may not have been completed, *see* NMA Reply 19; NMA Br. 14, is not evidence that such studies were "essential" to the Secretary's choice among alternatives.  Similarly, NMA's reliance on commentary in early drafts of the DEIS explaining the purpose of the "incomplete or unavailable information" section in the EIS is likewise misplaced.  As the commentary explained, that section has a specific purpose delineated in § 1502.22 and is not "a place to describe information that it would be nice to have." AR 46120.  Contributors to the EIS were instructed:

> Is the missing or incomplete information relevant to 'reasonably foreseeable adverse significant impacts'? If so, then you need to do the 4 things listed in 40 CFR 1502.22(b).  If not, then don't mention them here but describe in your analysis methodologies how the analysis addresses these topics through assumptions, modeling or inference.

AR 46120; *see also* AR 46137.[44]  Further demonstrating that, during the drafting of the EIS, BLM actively considered whether the information was relevant and essential to a reasoned choice among alternatives and determined that it was not (as is specifically set out in the ROD).  AR 10 n.1; *see also* Fed. Defs' Br. 47-49.  Clearly, determinations about the relevance of the missing information were affirmatively integrated into the EIS process, and were not *post hoc* rationalizations as NMA claims. NMA Reply 16.

---

[44] NMA claims that BLM "deleted" a discussion of missing information on geologic and mineral resources appearing in a preliminary working draft of the DEIS.  NMA Reply 15 n. 78 (citing AR 46137).  The statements at issue reflected the fact that the uranium endowment estimate, was just that—an estimate, with all the inherent uncertainties and assumptions.  A discussion of those uncertainties and assumptions was incorporated into the relevant affected environment, impact assessment methodology, and RFD scenarios sections of the EIS.  *See* AR 1737-38, 1742-43, 2040-41, 2730-33, 2735-37, 2739-42.  Such consideration is precisely what § 1502.22 contemplates.

In response to Defendants' argument that the withdrawal was an appropriate conservative choice in the face of uncertainty, NMA tries to undermine the Secretary's decision by arguing that there was no "credible scientific evidence" that the withdrawal "would actually be the more 'conservative' approach," NMA Reply 20, but offers nothing more than its own speculation to contradict the BLM's analysis of the USGS Report in the FEIS and the ROD, which concluded that although "the likelihood of a serious impact may be low," the impacts could be "significant." AR 9-10; *see also* Fed. Defs' SOF 5-7; Trust SOF ¶¶ 23-29.  Although there was an acknowledged uncertainty of the risks, it is "incorrect to imply that Defendants could not act in light of that uncertainty.  Contrary to Plaintiffs' contention, Defendants have not adopted 'a decide first, study later approach.'  They have identified a *risk* . . . and they have reasonably concluded that the risk is sufficient to warrant action." *Idaho Wool Growers*, 2014 WL 1230029, at *4 (rejecting arguments that agency could not take action to protect against disease transmission between domestic and bighorn sheep when the transmission science was "incomplete") (emphasis in original).

## IV.     The Forest Service Consent Decision Fully Complies with NFMA.

AEMA argues the Forest Service's consent decision violated NFMA's multiple use directive, 16 U.S.C. § 529, and contravened the governing Forest Plan for the Kaibab National Forest.  AEMA Reply 17-21.  These arguments lack merit.  The withdrawal could not conflict with the Forest Plan for the same reason it could not conflict with BLM's resource management plan: forest plans cannot by law open or close lands to mineral entry.  *See supra* 16-17.  Nor does the withdrawal contravene NFMA's multiple-use directive, which applies to various *renewable* surface resources. In any event, these claims should be dismissed for failure to challenge reviewable "agency action," 5 U.S.C. § 704, and for failure to state a cause of action, because

1   Interior, not Agriculture, is vested with authority to manage mineral resources, 16

2   U.S.C. § 472, including the withdrawal of those minerals from location and entry.  43

3   U.S.C. §§ 1714(a), 1702(g).[45]

4       **A.    AEMA Fails to Challenge Agency Action.**

5       The APA provides for judicial review of specified "agency action," as that term

6   is defined by 5 U.S.C. § 551(13).  5 U.S.C. § 701.  Section 704 further provides that a

7   "preliminary, procedural, or intermediate agency action or ruling not directly

8   reviewable is subject to review on the review of the final agency action."  *Id*. § 704.

9   

10  AEMA argues that this language opens the consent decision to direct APA challenge in

11  this Court.  AEMA Reply 16.  The argument fails for two reasons.

12      First, for a claim against the government to proceed, the APA requires that a

13  litigant challenge an agency action, within the meaning of a statute.  *See* 5 U.S.C.

14  §§ 701-702; *Norton*, 542 U.S. at 61-64 (noting that "sections 702, 704, and 706(1) [of

15  the APA] all insist upon an "agency action.").  Action is defined as a discrete rule,

16  license, order, sanction, or relief, or denial thereof, or failure to act.  5 U.S.C. § 551(13).

17  

18  The consent decision does not fit any of these acts and thus is not challengeable.[46]

19  

---

20  [45] The Trust disagrees with Federal Defendants' position that the consent decision is
    not final agency action.  The Trust contends the consent decision marks the consum-
21  mation of the Forest Service's decisionmaking, and has legal consequences because
    without it, a withdrawal could not encompass Forest Service lands.  *See Bennett v.*
22  *Spear*, 520 U.S. 154, 177-78 (1997).

23  [46] It is plainly not a rule (i.e., "an agency statement of ... future effect designed to
    implement, interpret, or prescribe law or policy"), a "sanction" (i.e., a "prohibition ... or
24  ... taking [of] other compulsory or restrictive action"), nor does it grant any "relief" to
    any person.  *Norton*, 542 U.S. at 62 (quoting 5 U.S.C. §§ 551(4), (10), & (11)).  It is not
25  itself a "license" or the functional equivalent thereof, *see* 5 U.S.C. § 551(6), because it
    does not authorize anyone to undertake any activity.  *See Oregon Natural Desert Ass'n*,
26  465 F.3d at 983 (finding Forest Service "annual operating instructions" were properly
    deemed a license because it was part of a permit authorizing individuals to graze in
27  National Forest).  It also is not an "order," i.e., "a final disposition, whether affirmative,
    negative, injunctive, or declaratory in form, of an agency in a matter other than rule
28  making but including licensing."  *See* 5.U.S.C. § 551(6).

38

Second, the argument misconstrues Section 704. The second sentence (discussing the "preliminary, procedural, or intermediate agency action") may only reasonably be read to refer back to the "final agency action" stated in the first sentence, and should not be read in isolation, as AEMA's argument requires. The cases AEMA relies on provide no support because they involve cases where the "preliminary, procedural, or intermediate agency action" sought to be challenged was one undertaken by the *same* agency that made the final decision. Here, two distinct agencies took action. First, the Forest Service, as the surface-managing agency, provided the legally-necessary consent (which standing alone has no legal effect). Second, the Secretary withdrew from operation of the Mining Law resources falling under his authority, and did so by issuing a Public Land Order. It is the latter decision that causes the injuries alleged in these actions. AEMA cites no decision holding that a preliminary decision by one agency (which will not be implemented unless affirmatively adopted by another) is reviewable agency action for purposes of 5 U.S.C. § 704.

## B.    AEMA Fails to State a Cause of Action

Despite AEMA's protestations, the Kaibab National Forest Plan says nothing germane to the Forest Service's consent to withdrawal of surface acreage it manages. Many of the decisions AEMA cites are irrelevant because they concern the application of NFMA's planning provisions to renewable surface resources, as defined by the Multiple-Use Sustained-Yield Act, 16 U.S.C. §§ 528-531, and for which the Forest Service has plenary regulatory authority. And with respect to the cited decisions involving mineral resources, AEMA misconstrues the Forest Service's authority conferred by 16 U.S.C. §§ 478, 482, and 551, as regulating operations authorized by the United States mining laws, insofar "as they affect surface resources on all National Forest System lands under the jurisdiction of the Secretary of Agriculture," 36 C.F.R. §

228.2, and "the responsibility for managing [mineral] resources [which] is in the Secretary of the Interior," 36 C.F.R. § 228.1.

### C.      The Withdrawal Did Not Violate the Forest Plan

The Forest Service, through forest planning, has no authority to open or close lands to operation of the mining laws.  *See* Fed. Defs' Br. 24-25 n.11; Trust Br. 11-14. Thus the consistency requirement of 16 U.S.C. § 1604(i), applicable when the agency issues an "instrument" authorizing "the use and occupancy of National Forest System lands," is inapplicable here because withdrawal decisions are "outside the authority of National Forest Planning," AR 12 (ROD).

AEMA relies to no avail on *Pacific Rivers Council v. Thomas*, 873 F. Supp. 365, 372–73 (D. Idaho 1995).  AEMA Reply 18-19.  The decision examined the relevance of forest plans to mining operations, which the court correctly identified is "in the *permitting process and ongoing conduct of mining operations,*" 873 F. Supp. at 372 (emphasis added), since "terms and conditions on [mining] activities, including mitigation measures, are provided for in the plans."  *Id*. at 373.  This holding aligns with the consistency requirement of Section 1604(i), which applies when the agency issues an "instrument" (such as a site-specific resource plan, resource permit, or contract) that *authorizes* "the use and occupancy of National Forest System lands."  16 U.S.C. § 1604(i); *see also Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 962 (9th Cir. 2002).   NFMA and *Pacific Rivers* do not address whether a Forest Plan can open or close lands to mineral entry, and FLPMA makes clear that Forest Plans

1 cannot do so.[47]

2 **V.    The Withdrawal Properly Protects American Indian Resources and**
3 **Religious Interests.**

4      The Secretary's decision to protect American Indian resources from the impacts

5 of uranium mining fell squarely within his authority to withdraw lands "to maintain

6 [their] . . . public values," 43 U.S.C. § 1702(j), and to otherwise safeguard tribes'

7 cultural and religious values and uses of their aboriginal homelands.  *See* Fed. Defs' Br.

8 60 n.40; Trust Br. 2-3, 25-26; Doc. 207 ("Amicus Br.") 12-17. The courts have

9 repeatedly affirmed similar accommodations – including another large-tract withdrawal

10 designed to protect "areas of traditional religious importance to Native Americans" – as

11 precisely within the bounds of the First Amendment of the U.S. Constitution.  *See Mt.*

12 *Royal*, 477 F.3d at 750, 758; *accord* Fed. Defs' Br. 57-60 & n.40 (citing cases and

13 applying Establishment Clause test); Trust Br. 25-30 & n.39 (same).  Moreover, the

14 record here amply supports the Secretary's exercise of authority: BLM's consultation

15 with seven tribes, review of published literature, detailed resource inventories, and

16 exhaustive NEPA analysis revealed that uranium mining may irreparably harm

17 numerous identified sacred sites, traditional use areas, and other resources of cultural

18 and religious significance.  *See* Trust Br. 26-28, Trust SOF ¶¶ 31-39.

19      Despite this clear authority, AEMA and the Coalition claim that the

20 Establishment Clause and other inapplicable legal authority precluded the Secretary

21 from protecting American Indian resources in the withdrawal area.  AEMA Reply 21-

---

[47] AEMA also claims that in consenting to the withdrawal, the Forest Service "failed to independently analyze the parts of the record that pertain to the . . . Forest Service land withdrawn and instead adopted the Secretary's analysis, which looked at, and analyzed, the entire . . . withdrawal area."  AEMA Reply 21.  The argument fails because the FEIS examined impacts to *all* resources, including Forest Service land.  Further, it examined the impact to each resource by parcel (North, East and South).  *See also* Trust SOF ¶ 5 (describing Forest Service involvement in EIS preparation).

30; Coal. Reply 17-21.[48]   Unable to identify any legal support for their arguments, Plaintiffs attempt to characterize this as a Free Exercise – rather than an Establishment Clause – issue.   *See* AEMA Reply 21-24 (asserting that cases rejecting Free Exercise claims demonstrate Establishment Clause violation); Coal. Reply 20 (claiming that Free Exercise cases demonstrate aboriginal lands and traditional use areas not entitled to protection).[49]   Whether the tribes would be able to obtain the same protections offered by the withdrawal if they had sued in court is irrelevant.   *See* Trust Br. 27-28. Moreover, it is well established that "there is room for play in the joints between the Free Exercise and Establishment Clauses, allowing the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause."   *Cutter v. Wilkinson*, 544 U.S. 709, 713 (2005) (quotation marks and citations omitted).   As the Ninth Circuit and other courts have routinely held, the government's accommodation of tribes' cultural and religious beliefs and uses of federal public lands falls squarely within those joints.   *See, e.g.*, *Access Fund v. U.S. Dep't of Agric.*, 499 F.3d 1036, 1042-46 (9th Cir. 2007); *Mt. Royal*, 477 F.3d at 750, 758.

Plaintiffs' primary objection appears to be that the Secretary improperly "cloaked [the] entire withdrawal area [with] religious significance."   Coal. Reply 19-20;

---

[48] The Coalition's argument that protection of American Indian resources is a *post hoc* rationale is meritless.   Coal. Reply 18-19.   In the Draft EIS, FEIS, and ROD, BLM and the Secretary consistently identified protection of those resources as one of several primary purposes for the withdrawal.   *See supra* p. 8 (addressing Coalition's "watershed" definition argument).

[49] AEMA is mistaken that the Supreme Court in *Lyng v. Northwest Indian Cemetery Protection Association* "recognized that to find for the [Indian] Plaintiffs would create 'a religious preserve for a single group in violation of the establishment clause.'"   *See* AEMA Reply 22 (quoting *Lyng*, 485 U.S. 439, 445 (1988)).   The relevant passage describes dicta from the lower court's opinion that *had* the government chosen to accommodate the tribes' religious practices by *not* constructing the road, its decision would *not* have violated the Establishment Clause.   *Lyng*, 485 U.S. at 445.   In this case, the Secretary made just such a decision to accommodate the tribes' cultural and religious practices and beliefs, rendering a Free Exercise challenge unnecessary.

*accord* AEMA reply 22-24, 28 (claiming the withdrawal "create[d] a religious preserve" without identifying "particular physical site[s]").  This characterization lacks record and legal support.  Based on ample record evidence, the Secretary acknowledged that the physical integrity of the entire withdrawal area is vital to the tribes because it encompasses their aboriginal homelands, the locations of their creation stories, and lands and resources that sustain their place-based cultural and religious identities.  *See* Trust SOF ¶ 39 (quoting AR 11).[50]  BLM also, however, identified numerous discrete areas and resources of cultural and religious significance located throughout the withdrawal area that could suffer irreparable harm from mining activities.  Trust SOF ¶¶ 34, 38-39 (identifying springs, ceremonial sites, hunting and gathering areas, and trails in each of the three withdrawal parcels and concluding that mining could result in loss of their functional use by the tribes).  These sites are in addition to the thousands of documented archaeological sites that could be eligible for listing on the National Register of Historic Places (NRHP).  *See id.* ¶¶ 35, 37.[51]

As a legal matter, neither the Establishment Clause nor other authority imposes a size restriction on lands that may be protected to accommodate American Indian cultural and religious beliefs and practices.  Indeed, the courts have upheld similar decisions to protect large tracts of public lands encompassing "areas of traditional

---

[50] The Court should disregard AEMA's and the Coalition's unsupported attempts to denigrate and question the sincerity of the tribes' deeply held cultural and religious beliefs.  *See, e.g.*, AEMA Reply 29; Coal. Reply 21.

[51] AEMA advances its own subjective belief that all areas and resources of cultural and religious significance to the tribes should be characterized as "cultural" in nature – and therefore encompassed by BLM's conclusion that impacts to "cultural" (as opposed to "American Indian") resources could be mitigated.  AEMA Reply 12-13.  AEMA identifies no support for its novel re-characterization of the record.  *See id.*  The tribes – not the federal government, and most certainly not AEMA – are the only entities suited to identify and characterize their sacred sites.  *See* Trust Br. 25 n.35, 28 n.41.  Accordingly, BLM properly "addresse[d] potential impacts to places that tribes define as traditionally important regardless of their NRHP eligibility status."  Trust SOF ¶ 35.

religious importance to Native Americans." *Mt. Royal*, 477 F.3d at 750, 758 (upholding nearly 20,000-acre withdrawal);[52] *accord Fortune v. Thompson*, No. CV-09-98-GF-SEH, 2011 WL 206164, at *1, *3 (D. Mont. Jan. 20, 2011) (upholding motorized vehicle restrictions across nearly 130,000-acres and flatly rejecting plaintiffs' claim that the result was "a cathedral for the Blackfeet religion"). As the court in *Fortune* recognized, "[t]he Ninth Circuit has placed no . . . acreage limitation [on public lands subject to accommodation] if the governmental action complies with the *Lemon* test." *Id.* at *3 n.5. The Court should reject Plaintiffs' invitation to impose new and unsupported limitations on well-established and controlling Establishment Clause jurisprudence.

## VI.    Remedy

Under the APA, courts may remand an unlawful agency action without vacatur "when equity demands," for example, when necessary to prevent serious harm to the environment or public health. *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995) (retaining endangered species listing to avoid possible extinction of the species); *see also Wood v. Betlach*, 922 F. Supp. 2d 836, 851-52 (D. Ariz. 2013) (Campbell, J.) (retaining state Medicaid program to avoid denial of benefits to low-income residents).[53]

In the typical NEPA case, remand with vacatur has few environmental consequences because the proposed project, usually involving significant effects,

---

[52] As this case demonstrates (and contrary to Plaintiffs' characterization of case law), courts have *not* held that protection of American Indian resources that happen to not be NRHP-eligible necessarily violates the Establishment Clause. *See* Fed. Defs' Br. 59.

[53] Courts have also left an unlawful action in place where vacatur would have severely disruptive consequences or thwart the objective of the statute at issue. *See Cal. Cmtys. Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 993-94 (9th Cir. 2012) (remanding without vacatur to avoid disruption to power supply); *W. Oil & Gas Ass'n v. U.S. E.P.A.*, 633 F.2d 803, 813 (9th Cir. 1980) (retaining non-attainment designations to avoid thwarting purpose of the Clean Air Act).

remains uninitiated; vacatur maintains the status quo.  This case is different.  An order of vacatur would open the area to location and entry under the Mining Law, which could lead to a rush to stake additional uranium claims and to conduct exploration activities to prove valuable discoveries.  Contrary to AEMA's assertion, AEMA Reply 30 n.15, the environmental impact of these activities—exploration in particular—could be significant, including the establishment of legal entitlements under the Mining Law to undertake mining activities that could have significant and long-lasting impacts.  Exploration and development during remand would be "grandfathered" from subsequent withdrawal the way the four existing mines were under the current withdrawal.  Mining operations during remand could also secure valid existing rights, and lead to development of more mines than BLM predicted, potentially impacting groundwater and other resources.  *See* Trust SOF ¶¶ 26-29, 38-41.  For all these reasons, Defendants respectfully renew their request for additional briefing should the Court find the Secretary's conduct unlawful.  For the same reasons, should the court deny this request, Defendants respectfully request that the Court refrain from vacating the decision as part of any remedy.

### CONCLUSION

For the foregoing reasons, Defendants are entitled to judgment as a matter of law, and respectfully request that Plaintiffs' motions for summary judgment be denied and that judgment be entered in Defendants' favor on all counts.

Dated: June 6, 2014

Respectfully Submitted,

SAM HIRSCH,
Acting Assistant Attorney General
Environment and Natural Resources Division

 /s/ John S. Most

1

JOHN S. MOST, Trial Attorney
Virginia Bar, No. 27176
DOMINIKA TARCZYNSKA, Trial Attorney
New York Bar, No. 4431573
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0447(Tarczynska)
202-616-3353 (Most)
202-305-0506 (fax)
DOMINIKA.TARCZYNSKA@USDOJ.GOV
JOHN.MOST@USDOJ.GOV

*Counsel for Federal Defendants*

/s/ Alison Flint
Alison Flint *(pro hac vice)*
Edward B. Zukoski *(pro hac vice)*
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO  80202
aflint@earthjustice.org
tzukoski@earthjustice.org
Telephone: (303) 623-9466
Fax: (303) 623-8083

Roger Flynn *(pro hac vice)*
Western Mining Action Project
P.O. Box 349, 440 Main St., #2
Lyons, CO  80540
wmap@igc.org
Telephone: (303) 823-5738
Fax: (303) 823-5732

*Counsel for Grand Canyon Trust, the Havasupai Tribe, Center for Biological Diversity, Sierra Club, and National Parks Conservation Association*

1

2

### CERTIFICATE OF SERVICE

3

4

5

I hereby certify that I am today causing the foregoing to be served upon counsel of record through the Court's electronic service system (ECF/CM) and am emailing a copy of same to *pro se* plaintiff Gregory Yount, to be followed by a copy via U.S. Mail to sent on June 9, 2014.

6

Dated:  June 6, 2014

7

8

       */s/ John S. Most*
       *Counsel for Federal Defendants*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28