1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    Gregory Yount, et al.,                    No.   CV11-8171 PCT-DGC
                                                      CV12-8038 PCT DGC
10                        Plaintiffs,                  CV12-8042 PCT DGC
                                                      CV12-8075 PCT DGC
11   v.

12   Kenneth Lee Salazar, et al.,              **ORDER**

13                        Defendants.

14

15           This case concerns a withdrawal by the Secretary of the Interior of more than one

16   million acres of federal land from uranium mining.  The withdrawn land surrounds Grand

17   Canyon National Park and includes a North Parcel of approximately 550,000 acres, an

18   East Parcel of approximately 135,000 acres, and a South Parcel of some 322,000 acres.

19   The withdrawal will close these lands to the exploration and development of uranium

20   mining claims for 20 years, although mining of a few existing claims will be permitted.

21   Plaintiffs in this case include counties, associations, companies, and an individual with

22   interests in uranium mining.  They ask the Court to set aside the withdrawal as illegal

23   under several federal statutes.

24           Motions for summary judgment have been filed by Plaintiffs American

25   Exploration & Mining Association ("AEMA") and Gregory Yount (Doc. 167), Plaintiffs

26   Nuclear Energy Institute and National Mining Association ("NEI and NMA") (Doc. 170),

27   and Plaintiffs Arizona Utah Local Economic Coalition ("the Coalition") and Quaterra

28   Resources, Inc. (Doc. 173).  Defendant United States and Defendant-Intervenors Center

for Biological Diversity, Grand Canyon Trust, Havasupai Tribe, National Parks Conservation Association, and the Sierra Club (collectively "Defendants") have filed cross-motions for summary judgment.  Docs. 198, 208.  The Court heard oral argument on September 9, 2014.  For reasons that follow, the Court will grant summary judgment in favor of Defendants and not set aside the Secretary's withdrawal decision.

**I.     Background.**

Lands around the Grand Canyon have seen mining activity since the late 1800s. AR 84.  When President Theodore Roosevelt created the Grand Canyon Preserve in 1906, he withdrew much of the land from mining, but mines were opened on land surrounding the canyon when uranium deposits were discovered in the 1940s and 1950s. AR 2.  Uranium near the canyon is found in breccia pipes – pipe-shaped mineral deposits that extend thousands of feet underground.  Five of these pipes were mined for uranium in the 1950s, with the Orphan Mine producing more than 2,000 tons of uranium between 1952 and 1969.  AR 84.  Exploration increased when uranium prices spiked in the 1970s. AR 2.  Much of the exploration was in the North Parcel.  AR 84.

During the 1970s, the U.S. Geological Survey ("USGS") began studying uranium deposits in the area and produced maps detailing breccia pipe deposits.  In the 1980s and 1990s, six new uranium mines produced almost 1.5 million tons of uranium and more than 900 exploration holes were drilled in the Tusayan Ranger District.  AR 2.

Many of the uranium mines were put on standby status when the price of uranium dropped in the 1990s, but a price rise in 2004, followed by a surge to more than $130 per pound in 2007, prompted renewed interest in uranium mining and thousands of new mining claims were located.  AR 3.  These new claims prompted concerns about the potential impact of uranium mining on the Grand Canyon watershed and led Arizona Congressman Raúl Grijalva to introduce legislation that would permanently withdraw more than one million acres around the canyon from mining.  *Id.*

On July 21, 2009, Interior Secretary Ken Salazar published a notice of intent to withdraw 633,547 acres of public lands and 360,002 acres of National Forest land for up

to 20 years from location and entry under the Mining Law of 1872.  *See* Notice of Proposed Withdrawal, 74 Fed. Reg. 35,887 (July 21, 2009).   The notice had the immediate effect of withdrawing the lands for a period of two years to permit analysis and study under the National Environmental Protection Act ("NEPA").   The Bureau of Land Management ("BLM") published a notice of its intent to prepare an Environmental Impact Statement ("EIS"), with the stated purpose "to protect the Grand Canyon watershed from adverse effects of locatable mineral exploration and mining, except for those effects stemming from valid existing rights."   74 Fed. Reg. 43,152-53 (Aug. 26, 2009).

In accordance with NEPA, BLM issued its Draft EIS ("DEIS") on February 18, 2011 (76 Fed. Reg. 9,594), and, after an extended comment period, issued its Final EIS ("FEIS") on October 27, 2011 (76 Fed. Reg. 66,747).   The Department of the Interior ("DOI") issued a Record of Decision ("ROD") on January 9, 2012, which withdrew 1,006,545 acres from mining pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1714.   AR 1-23.   This 2012 decision, referred to in this order as "the Withdrawal," is challenged by Plaintiffs in this case.

On January 8, 2013, the Court granted in part and denied in part Defendants' motions to dismiss several claims for lack of standing.   Doc. 87.   The Court dismissed all claims under NEPA brought by Plaintiffs Yount, AEMA, and Quaterra, leaving only NEPA claims by NEI, NMA, and the Coalition.   Plaintiffs' claims under the FLPMA and the Administrative Procedures Act ("APA") remain.   Plaintiff Yount also alleges that the Withdrawal's stated purpose of protecting the cultural and religious heritage of Native American tribes violates the Establishment Clause of the United States Constitution. Doc. 27, ¶ 144-148.

## II.    The Withdrawal Decision.

The Secretary decided to proceed with the Withdrawal after evaluating possible effects of uranium mining in the DEIS and FEIS.   These documents included a detailed analysis of four different alternatives: (a) no withdrawal of land from uranium mining,

referred to in the FEIS as the "no action" alternative; (b) withdrawal of the proposed 1,006,545 acres; (c) withdrawal of 648,802 acres; and (d) withdrawal of 292,086 acres. AR 13-14.  Before selecting these alternatives, BLM considered other possible courses of action including a shorter withdrawal period of 10 years, a withdrawal limited to lands with a low mineral potential, phased mining, a permanent withdrawal, a change in federal law to provide additional environmental protections, and the adoption of new mining regulations.  BLM eliminated each of these alternatives before preparing the FEIS, and the Secretary ultimately selected the full withdrawal alternative.  AR 14-15.

In preparation for the EIS, the Secretary directed USGS to prepare a scientific report on various issues raised by the proposed withdrawal.  In response, the USGS prepared Scientific Investigations Report 2010-5025 (the "USGS Report").  AR 57-415. With this report in hand, BLM prepared the DEIS and published it in February 2011 for a 45-day public comment period.  The public comment period was later extended to 75 days, and more than 296,000 comments were received.  BLM also hosted four public meetings and held community meetings with various tribes to discuss the DEIS.  AR 17.

The DEIS, FEIS, and ROD relied heavily on the USGS Report.  In the report, USGS analyzed soil and sediment samples at six sites that experienced various levels of uranium mining north of the Grand Canyon, including reclaimed uranium mine sites, approved sites where mining was temporarily suspended, and exploratory sites that were drilled but not mined.  Uranium and arsenic were consistently detected in these areas at levels above natural background.  AR 9.  Samples from 15 springs and five wells in the region contained dissolved uranium concentrations greater than EPA maximum concentrations for drinking water.  USGS was uncertain whether these concentrations resulted from mining, natural processes, or both.  *Id.*  USGS also found that floods, flash floods, and debris flows caused by winter storms and intense summer thunderstorms transported substantial volumes of trace elements and radionuclides.  *Id.*

USGS also evaluated an additional 1,014 water samples from 428 sites and found that about 70 sites exceeded the primary or secondary maximum contaminant levels for

certain major ions and trace elements such as arsenic, iron, lead, manganese, radium, sulfate, and uranium.  AR 10.  USGS noted that fractures, faults, sinkholes, and breccia pipes occur throughout the area and are potential pathways for downward migration of contaminants, but concluded that a more thorough investigation is required to understand groundwater flow paths, travel times, and contributions from mining.  AR 9-10.

In addition to this analysis of potential contamination, the FEIS found that the "no action" alternative would result in significantly more mining activity than would occur under the full Withdrawal: 19 more uranium mines, 211,280 more ore truck trips, 16 more miles of power lines, 1,200 more acres disturbed for mining, and 200,000,000 more gallons of water used in mining.  AR 2774.  This was true even though some uranium mining would continue under the Withdrawal.  *Id.*

One common problem was encountered by all of the withdrawal studies: the size of the proposed withdrawal area and its location as remote forest and rural land meant that relatively little data was available for analysis.  The FEIS and ROD acknowledged this lack of information.  *See, e.g.,* AR 9; AR 2070-71.  In particular, these documents noted uncertainty about the potential impacts of uranium mining on perched and deep aquifers, including the R-aquifer (the principal aquifer in the area), and about the effects of increased radionuclide exposure on plants and animals.  AR 10.

In the face of these uncertainties, the FEIS and ROD adopted "a cautious and careful approach."  AR 9.  This approach was deemed warranted for several reasons, expressed in these words by the ROD:

> Crafted by the immense power of the Colorado River, the Grand Canyon and the greater ecosystem that surrounds it have long been recognized as one of the Nation's most treasured landscapes.  The area is known as a home or sacred place of origin to many Native Americans, including the Havasupai, Hualapai, Navajo, Hopi, Zuni, Southern Paiute, and others, and its cultural significance goes back thousands of years. . . . The Park is a world heritage site and an international icon.

* * *

> The Grand Canyon and the greater ecosystem surrounding it is a cornerstone of the region's economy with hunting, fishing, tourism, and other outdoor recreation generating billions of dollars in economic activity in the area. Millions of people living in seven states in the U.S. and in Mexico depend upon the Colorado River for water for drinking, irrigation, and individual use, as well as for hydropower.

AR 4-5.

The FEIS ultimately found that the risk of groundwater contamination from uranium mining was low, but that the possible consequences of such contamination were severe. AR 9. Faced with even a remote prospect of severe contamination in waters adjacent to the Grand Canyon, DOI chose to err on the side of caution. It elected to proceed with the full Withdrawal for a period of 20 years.

In addition to risks of groundwater contamination, the ROD opted for the full Withdrawal because "[a]ny mining within the sacred and traditional places of tribal people may degrade the values of those lands to the tribes who use them." AR 9, 11. The ROD also found that "[t]he volume of truck traffic expected without a withdrawal could create a major cumulative effect to visual resources resulting from dust emissions of vehicle passage." AR 11. The ROD further noted that even with the Withdrawal in place, up to eleven uranium mines would be permitted to operate in the withdrawn area on the basis of existing claims, a pace of development "roughly equivalent to the pace of development that occurred during the peak of uranium interest during the 1980s." AR 9. Thus, "even with a full withdrawal, the economic benefits of continued uranium mining could still be realized by local communities." AR 11. The ROD noted that "[w]hile the lands are withdrawn, studies can be initiated to help shed light on many of the uncertainties identified by USGS in [the USGS Report] and by BLM in the EIS." *Id*.

III.   Standing.

Defendants argue that Plaintiffs NEI, NMA, and the Coalition cannot establish

standing for the remaining NEPA claims.  To establish Article III standing, a plaintiff must show "that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision."  *Bennett v. Spear*, 520 U.S. 154, 162 (1997).  Plaintiffs must also show prudential standing, which examines whether "a particular plaintiff has been granted a right to sue by the statute under which he or she brings suit."  *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1199 (9th Cir. 2004).  Prudential standing analysis historically has required NEPA plaintiffs to show that their alleged injury falls within NEPA's zone of interests.  *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 861 (9th Cir. 2005).

The Supreme Court's recent decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 134 S. Ct. 1377, 1387 (2014), has changed the terms of discussion for prudential standing.  It explained that "prudential standing is a misnomer as applied to the zone-of-interests analysis," and recast the test as a matter of statutory interpretation "which asks whether this particular class of persons ha[s] a right to sue under this substantive statute."  *Id.*  *Lexmark* directs courts to "determine the meaning of the congressionally enacted provision creating a cause of action."  *Id*. at 1388.

### A.     NEI and NMA.

Defendants argue that NEI and NMA's alleged injury is speculative, that the injury does not fall within NEPA's zone of interest, and that any claim that the injury is environmental as opposed to economic is a pretext.  Doc. 198 at 29-31.[1]  In its ruling on Defendants' motion to dismiss, the Court engaged in a lengthy analysis of Plaintiffs' standing.  Doc. 87.  The Court found that NEI and NMA had shown Article III standing because the Withdrawal imposed expensive and years-long examination processes on their members and reduced the value of existing mining claims and claim investments.  *Id*. at 8.  The Court noted that private economic losses due to governmental action are

---

[1] Citation to documents in the Court's docket will be to page numbers added to the top of each page by the Court's CMECF system, not to page numbers at the bottom of each page.

1    routinely found sufficient to show injury for purposes of Article III standing.  *Id*.  The
2    Court stands by this decision.  NEI and NMA have clearly shown that their members
3    suffered financial harm as a result of the Withdrawal.  *Id*. at 6-10.

4         In assessing whether injury to NEI and NMA fell within NEPA's zone of interest,
5    the Court found that NEI and NMA had alleged a link between the Withdrawal and an
6    environmental injury that, if supported, would bring them within NEPA's zone of
7    interests.  *Id*. at 31.  Specifically, NEI and NMA claimed to have environmental interests
8    in reducing aggregate mining impacts by conducting environmentally responsible mining
9    operations.  They alleged that mining rich breccia pipes found around the Grand Canyon
10   produces less environmental disturbance than mining lower quality uranium ore in other
11   locations, and that the Withdrawal therefore would force them to engage in more
12   environmentally harmful mining.  Taking these allegations as true, the Court found that
13   NEI and NMA had identified an injury within NEPA's zone of interests.  *Id*.  The Court
14   also observed that the cases cited by Defendants arose at the summary judgment stage,
15   not the pleading stage.  *Id*.  This case is now at the summary judgment stage, and
16   Plaintiffs must present proof – and not merely allege – that they have standing.  *Lujan v.*
17   *Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("In response to a summary judgment
18   motion . . . the plaintiff can no longer rest on such "mere allegations," but must "set
19   forth" by affidavit or other evidence "specific facts[.]").

20        Purely economic injuries do not fall within NEPA's zone of interests.  *Ashley*
21   *Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005).  But this does not
22   mean that plaintiffs who assert economic injuries are precluded from bringing suit under
23   NEPA.  A plaintiff can sue under NEPA "even if his or her interest is primarily
24   economic, as long as he or she also alleges an environmental interest or economic injuries
25   that are 'causally related to an act within NEPA's embrace.'"  *Ranchers Cattlemen Action*
26   *Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1103 (9th
27   Cir. 2005), as amended (Aug. 17, 2005).

28        In its previous order, the Court noted that the parties had cited no authority for the

proposition that a plaintiffs' environmental injury must also satisfy the requirements of Article III standing.  Doc. 87 at 32-33.  The Court therefore held that NEI and NMA "can satisfy Article III standing by their members' very real economic injuries discussed above, and satisfy NEPA prudential standing by the environmental interests they and their members possess in limiting the disruptive effects of uranium mining." *Id.* at 33.  In other words, the Court found that one of their injuries (economic harm caused by the Withdrawal) could satisfy Article III standing, while a different injury (being forced to engage in more environmentally disruptive mining) could satisfy NEPA.

The Court now concludes that this was error.  In this round of briefing, Defendants have cited case law holding that "the injury that supplies constitutional standing must be the same as the injury within the requisite 'zone of interests' for purposes of prudential standing." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1231 (D.C. Cir. 1996); *see also Douglas Timber Operators, Inc. v. Salazar*, 774 F. Supp. 2d 245, 256 (D.D.C. 2011) (same).  The Ninth Circuit appears to have applied the same requirement in a recent unpublished opinion, holding that the plaintiff could not bring suit under NEPA because the plaintiff's "economic injury . . . suffices for Article III standing but does not fall within NEPA's zone of interests . . . [and Plaintiff's] environmental injury . . . is within NEPA's zone of interests but will not be redressed by a favorable decision [and thus does not satisfy Article III standing]." *Oberdorfer v. Jewkes*, No. 12-36082, 2014 WL 3644015 *1 (9th Cir. July 24, 2014).  In other words, Article III standing and the NEPA zone of interests test must be satisfied by the same injury.  *See Mountain States*, 92 F.2d at 1231 ("[I]f plaintiffs established an interest sufficiently aligned with the purposes of the ESA for prudential standing, but failed to show (for example) an adequate causal relation between the agency decision attacked and any injury to that interest, we could not adjudicate the claim – even if plaintiffs had constitutional standing with respect to some other interest that was outside the requisite 'zone.'").

Neither *Mountain States* nor *Oberdorfer* provides any rationale for the requirement that one injury must satisfy both forms of standing.  *Mountain States*

1   describes the requirement as "obvious," but also notes that it could find no other case that

2   adopted it.  92 F.3d at 1231.  And *Oberdorfer* cites no authority for this requirement.

3          The Court concludes, nonetheless, that the single-injury requirement makes sense.

4   In *Lexmark*, the Supreme Court explained that whether a plaintiff comes within a

5   statute's zone of interests requires courts "to determine, using traditional tools of

6   statutory interpretation, whether a legislatively conferred cause of action encompasses a

7   particular plaintiff's claim."  134 S. Ct at 1387.  The focus is on legislative intent.  In this

8   case, the stated purpose of NEPA is entirely environmental – to "promote efforts which

9   will prevent or eliminate damage to the environment and biosphere[.]"  42 U.S.C. § 4321.

10  "Section 101 of NEPA declares a broad national commitment to protecting and

11  promoting environmental quality."  *Robertson v. Methow Valley Citizens Council,* 490

12  U.S. 332, 348 (1989).  Given *Lexmark*'s focus on legislative intent and the exclusively

13  environmental purposes of NEPA, it makes sense to require that the gravamen of

14  Plaintiffs' complaint – the wrong that brings them to court – must fall within NEPA's

15  zone of interests.  Requiring that a concrete, Article III injury fall within that zone of

16  interests will ensure that the animating wrong asserted by Plaintiffs comports with the

17  environmental purposes for which NEPA was enacted.  The claims will align with

18  congressional intent – the primary consideration after *Lexmark*.

19         The Court will follow *Mountain States* and *Oberdorfer*.  To pursue a claim under

20  NEPA, "the injury that supplies constitutional standing must be the same as the injury

21  within the requisite 'zone of interests.'"  *Mountain States*, 92 F.3d at 1231.[2]

22         NEI and NMA do not satisfy this requirement.  Their economic injury – the

23  expensive and lengthy claim examination process and the loss of value in existing claims

24  and investments – satisfies Article III standing because it constitutes injury in fact, is

25  traceable to the Withdrawal, and likely would be redressed if the Court were to set aside

26

27         [2] NEPA does not afford a private right of action, but courts hold that an aggrieved
   party can obtain review under the APA for violations of NEPA provided their claims fall
28  within NEPA's zone of interests.  *Ashley Creek*, 420 F.3d at 939; *Ocean Advocates*, 402
   F.3d at 861.

the Withdrawal.  *Lujan*, 504 U.S. at 560.  But the injury is a purely economic injury and therefore does not fall within NEPA's zone of interests.  *Ashley Creek*, 420 F.3d at 940.

Conversely, NEI and NMA's environmental injury – being forced to engage in more environmentally disruptive mining – falls within NEPA's zone of interests, but it is not a concrete injury sufficient to satisfy Article III.  NEI and NMA rely on the affidavit of a Vice President of Mining at Uranium One, a member of both NEI and NMA. Doc. 171-1 at 5-8.  The affidavit describes uranium claims held by Uranium One in Utah and asserts generally that they are of lower quality and more difficult to mine than breccia pipes.  But the affidavit fails to provide any concrete evidence regarding when, how, or even whether Uranium One will actually mine these deposits.  *Id.*  The affidavit states that Uranium One "is still deciding which of its uranium deposits at other sites it will mine."  *Id.*, ¶ 7.  Because the affidavit does not state that such mining will occur and provides no specific information about the grade of the uranium to be mined or what environmental impacts would result from mining it, NEI and NMA have failed to show that they are "imminently threatened with a concrete and particularized 'injury in fact'" as a result of the need to mine less concentrated uranium ore.  *Lexmark*, 134 S. Ct. at 1386.  Their alleged environmental harm therefore does not satisfy the injury-in-fact requirement for Article III standing.  *Id*.

In short, NEI and NMA fail to establish a single injury that both satisfies the requirements of Article III and falls within NEPA's zone of interests.  They therefore cannot assert a NEPA claim under the requirement recognized in *Mountain States* and *Oberdorfer*.  The Court will enter summary judgment on NEI and NMA's NEPA claims.

## B.    The Coalition.

In ruling on the motions to dismiss, the Court found that the Coalition had standing to bring NEPA claims on behalf of its member Mohave County.  Doc. 87.  The Court engaged in an extensive analysis of the County's proprietary interests and procedural injury (*id.* at 16-24), and found that these interests and injuries satisfied Article III standing requirements and fell within NEPA's zone of interests under cases

such as *Douglas Cnty. v. Babbitt*, 48 F.3d 1495 (9th Cir. 1995), and *City of Davis v. Coleman*, 521 F.2d 661, 672 (9th Cir. 1975) (Doc. 87 at 45).   Defendants do not challenge most of this analysis in their motion for summary judgment.   They instead argue that the County (and therefore the Coalition) lacks standing because its injury is speculative and it failed to raise its environmental concerns before the agency.   The Court disagrees with both assertions.

The Coalition has shown that Mohave County "has a mandate to retain environmental quality and to capitalize on its wealth of natural, built and human resources."   12-cv-8075, Doc. 30, ¶ 24.[3]   As stated in the County's General Plan, this mandate includes "the 'growth of communities that maintain the health and integrity of its valuable environmental features'; the protection of 'wetlands, washes, aquifer recharge areas, areas of unique flora and fauna, and areas with scenic, historic, cultural and recreational value'; and avoiding industrial development that has the 'undesired effect of increasing air pollution.'"   *Id.*

The Coalition has also shown that the Withdrawal will reduce Mohave County's available funds to pave its roads (thereby reducing dust and erosion) and protect desert tortoise habitat.   Doc. 72-2, ¶¶ 27, 32-34; Doc. 188-6, ¶¶ 7, 14-28.   Projected state revenues that flow to Mohave County from the mining industry will be reduced as a result of the Withdrawal.   The Coalition has presented evidence that, but for the Withdrawal, "there would be over a 40-year period: 1,078 new jobs in the project area; $40 million annually from payroll; $29.4 billion in output; $2 billion in federal and state corporate income taxes; $168 million in state severance taxes; and $9.5 million in mining claims payments and fees to local governments."   12-cv-8075, Doc. 30, ¶ 127; *see also* Doc. 72-2 at 13-14, ¶¶ 36-37.   Loss of the county's share of this revenue will impair its ability to pave its 1,277 miles of unpaved roads and manage its desert tortoise habitat, both stated goals of its Land Use Plan.   12-cv-8075, Doc. 30, ¶¶ 25-31.

---

[3] Citations to pleadings filed before the cases were consolidated are preceded by the original case number.

Defendants argue that these environmental injuries are speculative because the County's declarations merely assert that increased mining revenues "could" be devoted to these purposes.  The Court does not agree.  The Coalition has presented evidence that improved air quality through the paving and maintenance of dirt roads and improved conservation efforts for the desert tortoise habitat are existing objectives in the County's written plans, (Doc. 188-6, ¶¶ 17, 19-21, 23-25); that the Coalition sought the NEPA-mandated dialogue with BLM to reconcile the Withdrawal decision with these existing County plans, (*id.* at ¶¶ 29-30); and that the County will, as a result of the Withdrawal, experience a significant reduction in revenues that could be applied to all County objectives, including the existing environmental objectives, (*id.* at ¶¶ 9-13).  The Court does not find these injuries speculative or pretextual.

Nor is the Court persuaded by the government's contention that the County cannot assert its environmental interests in this case because it failed to assert them during the EIS process.   Buster Johnson's declarations state that BLM did not allow local governments to submit supplemental economic data about how the Withdrawal would affect their communities, disregarded Mohave County's comprehensive plan and its environmental protections, and ignored notices and invitations from Coalition members demanding reconciliation of inconsistencies between the Withdrawal and their local plans and policies.  Docs. 72-2 at 9-10; 188-6, ¶¶ 28-35.  "Mohave County requested BLM to coordinate on land use as a way to resolve the inconsistencies and to minimize harm to its interests in managing roads and air quality, and being in a position to fund other land use and environmental projects, such as desert tortoise protection."  Doc. 188-6, ¶ 28 (citing A.R. 56740, 56743-44).  This evidence is sufficient to show that the Coalition raised issues within the NEPA zone of interests during the NEPA process.  The Coalition has satisfied the zone of interests test and shown its standing to pursue claims under NEPA.

**IV.    NEPA Claims.**

In light of these standing rulings, the Court will address the following NEPA claims brought by the Coalition: that BLM violated the NEPA requirements of adequate

consultation with local governments (12-cv-8075, Doc. 30, ¶¶ 150-58), and that the FEIS failed to address scientific controversies including disputes regarding the impacts of uranium mining on water resources, the estimates of the uranium endowment, the amount and distribution of mineable uranium, and the adverse economic impacts of the Withdrawal on Arizona and its communities (*id*. at ¶¶ 159-64).  Although some of these arguments are addressed in NEI and NMA's motion for summary judgment, they were incorporated by reference in the Coalition's motion and raised in its complaint.  The Court will not address NEI and NMA's arguments about BLM's alleged failure to consider adequate alternatives (Doc. 170 at 4-12) because the Coalition did not make that NEPA claim in its complaint (12-cv-8075, Doc. 30, ¶ 57).

## A.    Standard of Review.

### 1.    NEPA Claims.

"NEPA is our basic national charter for protection of the environment."  *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008) (internal quotes omitted).  "NEPA seeks to make certain that agencies will have available, and will carefully consider, detailed information concerning significant environmental impacts, and that the relevant information will be made available to the larger [public] audience."  *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp*., 545 F.3d 1147, 1153 (9th Cir. 2008) (internal quotes omitted) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, (1989)).

NEPA's "requirements are procedural."  *City of Carmel-By-The-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1150 (9th Cir. 1997) (citing *Laguna Greenbelt, Inc. v. U.S. Dept. of Transp.*, 42 F.3d 517, 522 n.1 (9th Cir. 1994)).  The statute establishes factors to be considered in agency action, but does not mandate a particular substantive result.  *Id*. (citing *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)).  In reviewing compliance with NEPA, a court will not substitute its judgment for that of the agency "concerning the wisdom or prudence of a proposed action."  *Oregon Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987).  Instead,

the court will "defer to an agency's decision that is 'fully informed and well-considered'" and does not constitute a "clear error of judgment." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998) (citations omitted).

A key procedural requirement of NEPA is the preparation of an EIS. *City of Carmel-By-The-Sea*, 123 F.3d at 1150. In reviewing an EIS, courts apply a "rule of reason" and determine whether the EIS contains "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Id.* (quoting *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992)). NEPA does not require courts to "settle disputes between scientists, [but rather] dictates that [courts] defer to agency opinion if it is not otherwise shown to be arbitrary or capricious." *Id.* at 1151-52 (*Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377 (1989) ("Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.'") (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)))).

## 2. APA Review.

In applying NEPA, the Court must evaluate the Withdrawal decision under the APA. *See Akiak Native Cmty. v. USPS*, 213 F.3d 1140, 1146 (9th Cir. 2000). The Court may set aside DOI's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action should be overturned only when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (internal quotes and citation omitted).

1

### 3. Plaintiffs' Arguments.

2      Plaintiffs' motions and responses identify numerous alleged deficiencies in the

3   USGS Report, FEIS, and ROD.  The briefs often delve into minute detail, taking issue

4   with specific facts BLM did or did not consider and arguing that conclusions drawn from

5   the evidence are flawed.  The Court seeks to address all of Plaintiffs' arguments, but it

6   will not do so in the detail set forth in Plaintiffs' scores of pages of briefing.

7      As noted, the Court must apply a "rule of reason" and ask whether an EIS contains

8   a "reasonably thorough discussion of the significant aspects of the probable

9   environmental consequences."  *Oregon Envtl. Council v. Kunzman*, 817 F.2d 484, 492

10   (9th Cir. 1987) (citation omitted).  Reasonable thoroughness, not correct-in-every-detail,

11   is the standard.  Courts should not "fly speck" an EIS and "'hold it insufficient on the

12   basis of inconsequential, technical deficiencies.'"  *Earth Island Inst. v. U.S. Forest Serv.*,

13   697 F.3d 1010, 1020 (9th Cir. 2012) (quoting *Oregon Envtl. Council*, 817 F.2d at 492).

14

### B. Failure to Consult with State and Local Governments.

15      NEPA requires federal agencies to "cooperate with State and local agencies to the

16   fullest extent possible to reduce duplication between NEPA and State and local

17   requirements."  40 C.F.R. § 1506.2(b).  Such cooperation should include joint planning,

18   environmental research and studies, public hearings, and environmental assessments.  *Id*.

19   The Coalition argues that BLM did not make the NEPA process meaningful and that

20   comments of Coalition members "were dismissed and most of the important cooperating

21   agency meetings occurred without state and local governments."  Doc. 214 at 33.

22      The record shows that BLM granted Coconino and Mohave Counties cooperating

23   agency status in the EIS process, as well as Kane, San Juan, and Washington Counties in

24   Utah.  AR 1630-31.  Defendants note that BLM provided these counties with several

25   opportunities to participate in the NEPA process, including holding two public scoping

26   meetings, five meetings with cooperating agencies, and three meetings or hearings with

27   the Coalition specifically.  Doc. 205-1 at 54-55.  Defendants also argue that the FEIS

28   specifically considered Mohave County's resolution opposing the Withdrawal and

1   discussed any inconsistencies with local plans.  *Id.* at 55-56.

2        The FEIS does address the county and local plans that may be impacted by the

3   Withdrawal, including noting that Coconino County passed a resolution opposing

4   uranium mining near Grand Canyon National Park.  AR 1642.  It also discussed Mohave

5   County's General Plan and that its resolution urging Congress to preserve access to

6   northern Arizona's uranium reserves.  *Id*.  The FEIS noted that the resolution was

7   inconsistent with the Withdrawal (*id*.) and discussed the existing purposes of the general

8   plans in affected counties (AR 1946-1951).  It also addressed the economic impacts of

9   the proposed alternatives on the affected counties, basing its analysis "on comments

10  received during scoping, comments on the Draft EIS, and input from tribal consultation

11  and cooperating agencies."  AR 2254.  Given this record, as well as the presumption of

12  legality that attends BLM's actions in this case, the Court cannot conclude that the

13  Counties were denied meaningful participation.  *Nw. Ecosystem Alliance*, 475 F.3d at

14  1140 (review is highly deferential and presumes validity of agency's action).

15       The Coalition also argues that BLM failed to comply with the requirement in 40

16  C.F.R. § 1506.2(d) that BLM "discuss any inconsistency of a proposed action with any

17  approved State or local plan and laws" and, "[w]here an inconsistency exists . . . describe

18  the extent to which the agency would reconcile its proposed action with the plan or law."

19  Specifically, the Coalition argues that the Withdrawal is inconsistent with resolutions of

20  Mohave County and the Coalition opposing the Withdrawal, and yet the FEIS fails to

21  reconcile these inconsistencies.  Doc. 173 at 22.  But the regulations do not require BLM

22  to describe efforts to reconcile the Withdrawal with resolutions; they require BLM to

23  describe efforts to reconcile the Withdrawal with "any approved State or local plan and

24  laws."  40 C.F.R. § 1506.2(d).  The Coalition does not argue that the resolutions were

25  approved State or local plans or laws.  Moreover, as already noted, the FEIS did discuss

26  County plans and did not identify inconsistencies with the Withdrawal.  *See* AR 1642-43.

27  What is more, the ROD described the various county resolutions and concluded that

28  "[t]he withdrawal will be consistent with the Coconino County Resolution 2008-09, but

1    inconsistent with Mohave County Resolution 2008-10 and 2009-040."   AR 21.   The

2    Court concludes that BLM's consideration of local plans and laws did not violate NEPA.

3    *See Quechan Tribe of Fort Yuman Indian Reservation v. U.S. Dep't of Interior*, 927 F.

4    Supp. 2d 921, 946 (S.D. Cal. 2013) ("BLM considered the inconsistencies with local law

5    and reasonably concluded there was no conflict.").

6         The Coalition also argues that the Withdrawal decision excluded consideration of

7    the Arizona Department of Environmental Quality ("ADEQ") Aquifer Protection Permit

8    ("APP") program and the Arizona Pollutant Discharge Elimination System.   Doc. 173 at

9    14-15.   The Coalition argues that the ROD is flawed because it relied on the USGS

10   Report, which did not assess the regulatory system for uranium mining in Arizona.   *Id.*

11        The record reflects that ADEQ itself commented on the DEIS, that the comments

12   discussed the existing Arizona regulations, and that the comments did not assert that the

13   Withdrawal would be inconsistent with the state regulatory framework.   Doc. 182-4.

14   Rather, ADEQ asserted that the Withdrawal was unnecessary in light of the existing state

15   regulations.   The Coalition cites no regulation that requires action under NEPA where

16   there is no inconsistency with local or state environmental plans.

17        Further, even if the Withdrawal was inconsistent with the Arizona regulatory

18   framework, NEPA does not require that a project fail because of such an inconsistency,

19   only that the inconsistency be discussed and that the agency describe the extent to which

20   it would reconcile its actions with the existing law.   40 C.F.R. § 1506.2(d).   The FEIS

21   does acknowledge ADEQ's APP program and its regulatory effects on uranium mining in

22   the region (Doc. 175-3 at 40), stating that "[f]or purposes of this EIS, it is assumed that

23   mines comply with all applicable state and federal regulations" (*id*. at 33).   The

24   Coalition's claim that the Withdrawal violates NEPA because the ROD failed to consider

25   Arizona's existing regulatory scheme is without merit.

26        **C.   Failure to Address Information Gaps.**

27        When there is incomplete or unavailable information for evaluating foreseeable

28   environmental effects in an EIS, 40 C.F.R. § 1502.22 requires an agency to make clear

1    that information is lacking.  When the information is essential, and is not obtained by an

2    agency because of exorbitant costs or because methods to obtain it are unknown, the

3    agency must explain the missing information's relevance and what existing evidence is

4    evaluated in its place, and must provide an evaluation based on theoretical approaches.

5    40 C.F.R. § 1502.22.

6         As noted above, the FEIS acknowledged incomplete information regarding

7    essential aspects of the Withdrawal, including impacts on water resources and the extent

8    of the uranium endowment in the withdrawn area.  Doc. 170 at 14-15.  Plaintiffs argue,

9    however, that the government failed to comply with the requirements of § 1502.22 and

10   made "unsupported and overly cautious assumptions" that distorted the decision-making

11   process and overemphasized speculative harms.  *Id.* at 16 (citing *Robertson*, 490 U.S. at

12   356).  They argue that a footnote in the ROD stating that additional information about

13   water quality was not essential cannot save the FEIS because such a determination should

14   have been made earlier in the NEPA process.  Doc. 170 at 16-17.  They also claim that

15   the footnote does not address other information deficiencies.  *Id.*

16                    **1.      Obligations Under 40 C.F.R. § 1502.22.**

17        The government asserts that its obligations under § 1502.22 were not triggered

18   because the agency reasonably concluded that the information missing from the FEIS

19   "was not 'essential' to informed decisionmaking."  *Native Vill. of Point Hope v. Jewell*,

20   740 F.3d 489, 498 (9th Cir. 2014).  As noted, this determination was set forth in a

21   footnote in the ROD.  Doc. 198 at 51; AR 10 n. 1.  Plaintiffs argue that the determination

22   in *Point Hope* was made early in the EIS process and therefore was available during the

23   study period when participants could comment on it.  740 F.3d at 498.[4]  They argue that

24   postponing the "non-essential" determination until the ROD was particularly improper in

25   light of NEPA's requirement "that an EIS analyze environmental consequences of a

26   _____

27        [4] In their reply, Plaintiffs assert that *Point Hope* is merely a district court decision
     that is not binding on this Court (Doc. 225 at 38), but the Ninth Circuit decided the case
28   in 2014.  *See Native Vill. of Point Hope v. Jewell*, 740 F.3d 489 (9th Cir. 2014).

1   proposed plan as soon as it is 'reasonably possible' to do so."  *Id*. at 497.

2       As a preliminary matter, even if the unavailable information was essential to the

3   agency's decision, § 1502.22 does not require a separate, formal disclosure in the FEIS.

4   *Colorado Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1172-73 (10th Cir. 1999) ("[W]e are

5   unwilling to give a hyper-technical reading of the regulations to require the Forest

6   Service to include a separate, formal disclosure statement in the environmental impact

7   statement to the effect that lynx population data is incomplete or unavailable.  Congress

8   did not enact [NEPA] to generate paperwork or impose rigid documentary

9   specifications." (citation omitted)).  Plaintiffs argue that the FEIS should have explicitly

10  stated whether the information was essential and, if so, why it was unobtainable or too

11  expensive, but they cite no authority for such a requirement.  Doc. 170 at 15.  Courts

12  have held that where participants in the environmental review process are made aware of

13  the relevance of missing information, "[t]he regulations do not prescribe the precise

14  manner through which an agency must make clear that information is lacking."  *Habitat*

15  *Educ. Ctr., Inc. v. U.S. Forest Serv.*, 673 F.3d 518, 532 (7th Cir. 2012).  Additionally, the

16  regulations themselves provide that "any trivial violation of these regulations [does] not

17  give rise to any independent cause of action."  40 C.F.R. § 1500.3.

18      In any event, the FEIS does describe incomplete and unavailable information.

19  Indeed, Plaintiffs acknowledge that the FEIS "repeatedly admits" that information on

20  uranium deposits and the environmental impacts associated with the Withdrawal is

21  "missing or uncertain," that this admission is contained in sections of the FEIS titled

22  "Incomplete or Unavailable Information," and that other portions of the FEIS text discuss

23  missing data and uncertainties.  *See* Doc. 170 at 13 & n. 50.  As one example, a section of

24  the FEIS titled "Incomplete or Unavailable Information" discusses missing information

25  regarding groundwater quality, groundwater movement, and the effects of mining on

26  groundwater in areas around the Grand Canyon.  AR 2070-71.  This section describes

27  how such information might be obtained in the future, and explains the data relied on in

28  the FEIS and the assumptions made when data was not available.  *Id.*    While

acknowledging the missing information, the FEIS also states that it relies on the "best available information and conservative assumptions" to make reasonable assessments that would "provide the decision-maker with an adequate basis for weighing the relative potential for impacts to water resources." *Id.* Furthermore, the FEIS was based on the USGS Report, which in turn acknowledges uncertainty regarding the effects of the Withdrawal on water quality and quantity. Doc. 173 at 9; AR 9 (the USGS Report "acknowledged uncertainty due to limited data").

These disclosures satisfy § 1502.22's requirement that the FEIS identify missing information. The further disclosure requirements set forth in § 1502.22(b) apply only if the missing information is essential, and in this case DOI deemed it non-essential. *Point Hope*, 740 F.3d at 497 ("Nor did BOEM go through the steps required by § 1502.22(b) if it had found "essential" information to be unobtainable."); *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*, 163 F. Supp. 2d 1222, 1255 (D. Or. 2001) ("the § 1502.22(b) analysis is required only if the incomplete information is relevant to reasonably foreseeable significant adverse impacts and is essential to a reasonable choice among alternatives"), *rev'd on other grounds*, 309 F.3d 1181 (9th Cir. 2002). Although DOI did not make clear until the ROD that it regarded the missing information as non-essential, this did not mislead participants. Those involved in the EIS process knew from the USGS Report, the DEIS, and the FEIS that information was missing. The Court also agrees with the Seventh and Tenth Circuits that § 1502.22 does not prescribe a precise time or place for compliance with its requirements. *Habitat Educ. Ctr.*, 673 F.3d at 532; *Colorado Envtl. Coal.*, 185 F.3d at 1172-73. The Court concludes that the FEIS's treatment of missing information satisfies the rule of reason.

### 2. Uranium Endowment Estimate.

The extent of the uranium endowment in the withdrawn area was estimated in the USGS Report. AR 58-415. The report concluded that 48% of the 1.3 million tons of all undiscovered uranium in favorable areas in northern Arizona, as estimated in a 1990 U.S. Geological Survey, could be found in the area slated for withdrawal or in previously

1    withdrawn areas.  AR 84.  In other words, 48% of the uranium in northern Arizona would

2    be off-limits to mining if the Withdrawal occurred.

3         To reach this estimate, the USGS Report began its analysis with a 1990 survey

4    that estimated the uranium endowment in all of northern Arizona, including Grand

5    Canyon National Park, two national monuments, a game preserve on forest lands, and

6    tribal lands.  *Id*.  That survey was the result of an agreement with the U.S. Department of

7    Energy to update undiscovered uranium resources in specific areas of the United States.

8    AR 87.  The survey estimated that 1.3 million tons (2.6 billion pounds) of undiscovered

9    uranium existed in breccia pipes in northern Arizona.  *Id*.  Because the exact amount of a

10   deposit cannot be known without drilling or mining, the endowment estimate was the

11   mean of a range of estimates from high probability of occurrence to low probability of

12   occurrence.  *Id*.

13        The USGS Report also examined other mineral resource studies in the Grand

14   Canyon area, all of which were undertaken prior to the 1990 estimate and none of which

15   provided quantitative resource estimates, but which did provide additional context for the

16   1990 estimate.  *Id*.  It then engaged in a discussion of the uncertainties inherent in

17   uranium resource estimates for breccia pipes.  AR 90.  Those uncertainties include where

18   breccia pipes are located if they are unexposed (as many are), as well as the extent to

19   which the pipes are mineralized.  AR 90-92.  The density of uranium in unexposed

20   breccia pipes is particularly difficult to gauge without drilling, a process that can be

21   disruptive and expensive given the depths to which breccia pipes can extend.  *Id*.

22        With these limitations in mind, USGS assessed the applicability of the 1990

23   estimate and the techniques used to reach it and determined what adjustments were

24   necessary.  AR 95.  For example, the USGS recognized that the proposed withdrawal

25   area would cover a smaller surface area than was assessed in the 1990 study and made

26   adjustments for that decrease. AR 66, 95.  The USGS made an overall adjustment for the

27   mean density of the undiscovered endowment in the proposed area, adopting an

28   endowment density of 96.6 tons per square mile, the density applicable to the portion of

1    the Withdrawal in which most of the undiscovered uranium endowment was thought to

2    lie.  AR 92-93.

3           Moreover, USGS identified unknown information when undertaking both the

4    estimate and making the Withdrawal decision.  *See, e.g.*, AR 6058 (noting the unknowns

5    in relation to the uranium resource estimate).  The estimate was made using the best

6    information available and was peer-reviewed within the agency.  Plaintiffs had the

7    opportunity to comment on the methodology, which they did during the EIS process.

8           Plaintiffs vigorously dispute the government's estimate.  They argue that USGS

9    did not do any original research – "it just recycled the 1990 report" – and that the

10   adjustments made by USGS are unsupported.  Doc. 173 at 17-18.  Plaintiffs present their

11   own estimate, which comes in at five times more uranium ore than the USGS estimate.

12   Then  Plaintiffs' estimates were presented to BLM during preparation of the EIS, BLM

13   provided this response:

14

15               [T]hese alternative approaches have not been developed or
                 peer reviewed to the extent that they can replace or
16               superseded the USGS endowment assessment presented in
                 [the USGS Report].  As with many scientific fields, new
17               information is constantly being collected which leads to new
                 or refined conclusions.  However, at present, the USGS
18               Report contains the best credible information available
                 regarding the uranium endowment estimate and was
19               therefore used as the basis for the reasonably foreseeable
20               development scenarios in the EIS.

21

22   AR 18.

23           The Court does not doubt the sincerity of Plaintiffs' views, but it must "defer to an

24   agency's decision that is fully informed and well-considered," so long as the decision

25   does not evince a "clear error of judgment."  *Blue Mountains*, 161 F.3d at 121 (citations

26   omitted).  NEPA does not require the court to "settle disputes between scientists, [but

27   rather] dictates that [courts] defer to agency opinion if it is not otherwise shown to be

28   arbitrary or capricious."  *City of Carmel-By-The-Sea*, 123 F.3d at 1151-52 (citing *Laguna*

1    *Greenbelt*, 42 F.3d at 526; *Marsh*, 490 U.S. at 377).   The Court cannot conclude that

2    BLM's estimate of the uranium endowment constituted a clear error of judgment or was

3    arbitrary and capricious.

4                    **3.      Water Resources Impacts.**

5            Plaintiffs complain that the FEIS adopted an impermissibly cautious approach

6    regarding water impacts that was not supported by science.   Doc. 173 at 12-14.

7    Specifically, Plaintiffs argue that some of the well samples were taken outside of the

8    withdrawn area and that the risks to groundwater were exaggerated, as evidenced by the

9    highly conservative assumptions made in the FEIS and by "significant dissent" from a

10   National Park Service hydrologist. *Id*. at 12-14.  This hydrologist concluded that uranium

11   mining presented little or no risk of contamination to the R-aquifer, but the FEIS was not

12   changed to reflect this opinion. *Id*. at 13-14.

13          The government argues that there was nothing misleading about the location of the

14   springs that were tested, and that any argument that groundwater near closed or

15   abandoned mines should not be tested lacks merit because there were no active uranium

16   mines in the withdrawal area when the testing was done.   Doc. 198 at 45-46.   The

17   government also asserts that disagreement from one employee expert about the impacts

18   on groundwater does not render the Withdrawal arbitrary and capricious. *Id*. at 46.

19          Plaintiffs argue that the potential for adverse impacts to groundwater is so low as

20   to not support the stated rationale for the Withdrawal of protecting water resources.

21   Importantly, however, the agency never attempted to disguise the uncertainty or the low

22   probability of contamination from mining; it simply determined that even a low risk was

23   too great given the proximity of potential mining operations to the Grand Canyon.

24          The FEIS detailed the incomplete or unavailable information and the scientific

25   uncertainties related to impacts on water resources.   AR 2070-71.  It analyzed water

26   quality samples from 687 locations in the study area and a 6-mile buffer around each of

27   the parcels under each of the proposed alternatives.  AR 1784-85.  These buffers allowed

28   for consideration of groundwater and surface water features adjacent to the parcels and

provided relevant information in the absence of more proximate data.  The FEIS concluded that the chances of groundwater contamination from uranium mining are low, and noted that the only evidence of such contamination from previous mines comes from the unreclaimed Orphan Mine.  AR 1762-1766.  That same low probability is reflected in the ROD, which acknowledged that "the probability of any impact to springs ranged from 0% (in the South and East Parcels with full withdrawal) to 13.3% (in the North Parcel with no withdrawal)."  AR 10.  The FEIS also noted significant uncertainty as to the impacts on deep aquifer springs and the R-aquifer.  AR 1768.  Even assuming a relatively high concentration of potential discharge from mines to the R-aquifer, the FEIS found that no spring in that aquifer would exceed EPA minimum concentrations for drinking water.  AR 10.

The ROD and FEIS did find, however, that there was a small but potentially major risk to some water sources.  Historical water data for 1,014 water samples from 428 sites indicated that about 70 sites exceeded contaminant levels for major ions or trace elements such as arsenic iron, lead, manganese, sulfate, radium, and uranium.  AR 202.  Samples from 15 springs and 5 wells in the region contained dissolved uranium concentrations exceeding maximum contaminant levels for drinking water.  *Id*.  Dissolved uranium concentrations in the North Parcel, where the majority of the uranium endowment was believed to exist and where the majority of historical mining has taken place, were 16 times higher than those typical for the Grand Canyon region.  *Id*.  The ROD concluded that the risk from uranium mining, when considered in light of uncertainties about geology and groundwater flow in the area, justified the Withdrawal decision.

The record does reflect some disagreement among experts within the relevant agencies.  One hydrologist decided not to comment on the draft FEIS because he believed it went "to great lengths in an attempt to establish impacts to water resources from uranium mining" and "create[d] enough confusion and obfuscation of hydrogeologic principles to create the illusion that there could be adverse impacts if uranium mining occurred."  AR 6820.  While the Court does not wish to discount the views of this

hydrologist, surely one internal expert's disagreement with a conclusion reached by other internal experts does not make a final agency decision arbitrary or capricious.  If it did, agency actions would survive APA review only when there was complete unanimity among internal experts, an unlikely outcome on difficult questions.  The practical reality is that a certain amount of "disagreement among the countless individuals involved in developing or commenting on" a plan is to be expected.  *Nat'l Fisheries Inst., Inc. v. Mosbacher*, 732 F. Supp. 210, 227 (D.D.C. 1990).  Internal disagreements are not necessarily bad – they can be viewed as "indicat[ing] that the debate was as open and vigorous as Congress intended."  *Id*.  Thus, courts have not found that a difference of opinion among government employees shows "the agency ignored its own experts," and have held that "a diversity of opinion by local or lower-level agency representatives will not preclude the agency from reaching a contrary decision, so long as the decision is not arbitrary and capricious and is otherwise supported by the record."  *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1186-87 (10th Cir. 2013).

Moreover, although it is true as Plaintiffs contend that the data was sparse and the uncertainties substantial in this investigation, BLM openly acknowledged uncertainty on how water resources might be impacted.  It candidly recognized a low probability of groundwater contamination from uranium mining.  It nevertheless examined the available science, solicited and considered comments both internally and from the public, and ultimately concluded that the uncertainties, coupled with even a low potential for major adverse effects, warranted a level of precaution that justified the Withdrawal.  The Court does not find this arbitrary or capricious.[5]

### 4.    Other Scientific Controversies.

Plaintiffs argue that tests on contaminated soil samples were misrepresented in the USGS Report because they came from unreclaimed mining sites (Doc. 173 at 16-17), and

[5] Quaterra and the Coalition argue that portions of the withdrawal area lie outside the Grand Canyon watershed, could have no effect on water resources at the Grand Canyon, and therefore should not have been included in the Withdrawal.  Doc. 173 at 17. But this one-paragraph argument fails to address the other reasons for the Withdrawal and how those reasons apply to lands near the Canyon but outside its watershed.  *Id.*

1    that the FEIS and ROD did not do a risk assessment on radiation and exposure effects on

2    plants and wildlife (*id*. at 17).  These do not amount to NEPA violations.

3         The USGS Report accurately describes where soil samples were obtained, whether

4    the mine sites were or were not reclaimed, and how the concentrations of uranium and

5    arsenic found at the sites compared to background levels.  AR 110-111.  The Court does

6    not find the presentation of this data misleading.

7         With respect to risks from radiation exposure, the Coalition's brief accurately

8    summarizes the USGS Report:

9

10        [The Report] addressed whether increased radiation and
          exposure to trace elements would adversely affect plants and
11        wildlife.  The report summarized existing literature and
          identified the data gaps noting that caution should be used
12        when applying the information to plants or animals in
          Northern Arizona.
13

14

15   Doc. 173 at 17 (record citations omitted).[6]  The Coalition argues that the report was

16   prepared on the assumption that the FEIS would include a risk assessment, but that no

17   such assessment was done.  The Coalition does not explain, however, how this violated

18   NEPA.  To the extent the Coalition is again arguing that the Withdrawal decision was not

19   based on sufficiently reliable science, the Court cannot agree.  "NEPA does not require us

20   to decide whether an EIS is based on the best scientific methodology available.  Nor does

21   NEPA require us to resolve disagreements among various scientists as to methodology.

22   Instead, '[o]ur task is simply to ensure that the procedure followed by the Service

23   resulted in a reasoned analysis of the evidence before it.'"  *Greer Coal., Inc. v. U.S.*

24   *Forest Serv*., 470 F. App'x 630, 633 (9th Cir. 2012)) (quoting *Friends of Endangered*

25   *Species, Inc., v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985)).

26   _____

27        [6] The USGS Report explicitly acknowledged "that toxicity data for many
     radionuclides and biological receptors are lacking," but found nonetheless that
28   recommendations in the report "could be useful in the environmental impact statement to
     be developed."  AR 399.

- 27 -

1    **V.      FLPMA Claims.**

2          The "FLPMA requires that 'the public lands be managed in a manner that will

3    protect the quality of scientific, scenic, historical, ecological, environmental, air and

4    atmospheric, water resource, and archeological values.'"   *Desert Citizens Against*

5    *Pollution v. Bisson*, 231 F.3d 1172, 1179 (9th Cir. 2000) (quoting 43 U.S.C.

6    § 1701(a)(8)).   The FLPMA permits challenges "by land users to ensure appropriate

7    federal guardianship of the public lands which they frequent." *Id.* at 1177.   Where an

8    agency does not demonstrate exacting compliance with the FLPMA, the error may be

9    deemed harmless if the agency action nonetheless satisfies the purposes of the statute.

10   *See Sagebrush Rebellion, Inc. v. Hodel*, 790 F.2d 760, 764 (9th Cir. 1986) ("We agree

11   that the notices did not comply in every respect with the terms of section 204(b).

12   However, we find the error to be harmless since the purposes of FLPMA's notice

13   requirement were fully satisfied.").   Moreover, claims that an agency violated the

14   FLPMA are viewed under the discretionary review standard of the APA.   *See Desert*

15   *Citizens*, 231 F.3d at 1180.

16         **A.      Reviewability of Claims.**

17         Plaintiffs challenge, among other things, the ROD's stated purposes for the

18   Withdrawal.   The government argues, without citation to legal authority, that the Court

19   lacks jurisdiction to review these claims because Plaintiffs have articulated no legal

20   standard by which the Court can evaluate them and the Withdrawal constitutes an action

21   committed entirely to the agency's discretion.   Doc. 198 at 15 (citing 5 U.S.C. § 706).

22         Challenges to agency actions are reviewed under the standard of the APA, using

23   the legal framework of the violated statute.   5 U.S.C. §§ 701-706.   Under the APA, "[a]

24   person suffering legal wrong because of agency action, or adversely affected or aggrieved

25   by agency action within the meaning of a relevant statute, is entitled to judicial review

26   thereof."   5 U.S.C. § 702.   The APA excludes only a narrow window of agency action

27   from review.   *Id.* § 701.   "This narrow exception to the presumption of judicial review of

28   agency action under the APA applies 'if the statute is drawn so that a court would have

no meaningful standard against which to judge the agency's exercise of discretion.'" *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1082 (9th Cir. 2014), (citing *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *Webster v. Doe*, 486 U.S. 592, 599 (1988) (exception applies where there is "no law to apply") (internal quotation marks and citation omitted)).

Plaintiffs argue that there is a presumptive right to judicial review of actions under the FLPMA.  *See Perkins v. Bergland*, 608 F.2d 803, 805-06 (9th Cir. 1979) ("[The] FLPMA explicitly provides that 'it is the policy of the United States that . . . judicial review of public land adjudication decisions be provided by law.' . . . [and] this declaration of policy at the outset of FLPMA removes any doubt Congress might otherwise have allowed to obscure the reviewability of . . . decisions[.]") (citing 43 U.S.C. § 1701(a)(6).  In response, Defendants assert that the presumption of judicial review is not a right to judicial review where no substantive legal standard applies.  Doc. 225 at 8.  The government asks the Court to apply the narrow exception of § 701 to preclude review of the purposes of the Withdrawal.  Doc. 198 at 15.  While the government asserts that the Court has jurisdiction to review whether the Secretary complied with the procedural requirements for withdrawals under *Drakes Bay Oyster Co.* and *Ness Inv. Corp. v. U.S. Dept. of Agric., Forest Serv.*, 512 F.2d 706 (9th Cir. 1975), it argues that Plaintiffs have failed to identify any legal standards or statutes that provide a substantive guide for review.  Doc. 198 at 16-20.  The Court is not persuaded.

The FLMPA does provide legal standards for withdrawals.  It allows withdrawals only "where appropriate" under the regulations, 43 C.F.R. § 2300.0-1(a), and, beginning at 43 C.F.R. § 2310.3-1, the regulations set forth specific procedural requirements.  Those requirements include publication and public meetings, *id.*, and scientific studies of the proposed withdrawal area, including studies on land use, water use, environmental assessments or impact statements, cultural resources, wilderness uses, mineral resources, biological assessments, and economic impacts, *id.* § 2310.3-2.  The regulations also specify the agency's obligations in regard to the size and duration of withdrawals.  *Id.* § 2310.3-4.

1    In addition, the FLPMA's definitions section states that "[t]he term 'withdrawal'

2    means withholding an area of Federal land from settlement, sale, location, or entry, under

3    some or all of the general land laws, *for the purpose of limiting activities under those*

4    *laws in order to maintain other public values in the area or reserving the area for a*

5    *particular public purpose or program*[.]"  43 U.S.C. § 1702(j) (emphasis added).  The

6    statute mandates that the Secretary provide, within three months after filing a notice of

7    withdrawal, "a clear explanation of the proposed use of the land involved which led to the

8    withdrawal."  §1714(c)(2)(1).

9    Furthermore, even if the validity of the stated purpose for the Withdrawal was not

10   reviewable, the APA clearly provides a standard of review by which to judge the nature

11   of the agency's decision-making process and, thereby, its justification for the stated

12   purposes of the Withdrawal.  Under the APA, actions by the Secretary to withdraw land,

13   like other agency actions, are "valid if the agency considered the relevant factors and

14   articulated a rational connection between the facts found and the choices made."

15   *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013) (quoting

16   *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010)).  The statute requires an

17   explanation of the proposed use that led to the withdrawal, 43 U.S.C. § 1714(c)(2)(1), as

18   well as extensive study and procedure prior to withdrawal, 43 U.S.C. § 1714(c)(2), and

19   expresses a presumption of judicial review of the final withdrawal decision, 43 U.S.C. §

20   1701(a)(6).[7]

21   Given these statutory and regulatory requirements, the Court cannot accept the

22   government's claim that the Withdrawal is unreviewable under the FLPMA and APA.

23   **B.    Merits of FLPMA Claims.**

24   Section 204 of the FLPMA provides the Secretary of the Interior with the

25   authority to make, modify, revoke, and extend withdrawals, subject to valid existing

26   _____

27   [7] NEI and NMA also note that "withdrawals must be justified in accordance with
     the Department of the Interior Land Withdrawal Manual 603 DM 1 and the BLM
28   regulations at 43 CFR 2310."   Doc. 170 at 19.   That language follows directly from
     BLM's Energy and Mineral Policy.  AR 80613.

- 30 -

rights.  43 U.S.C. § 1714.  A "withdrawal" means "withholding [of] an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program."  *Id.* § 1702(j).  The withdrawn lands must be managed under principles of multiple-use and sustained yield unless provided otherwise by another law.  *Id.* § 1732(a).

### 1.     Purpose and Scope of Withdrawal.

The ROD justifies the Withdrawal on the basis of (1) threats and uncertainty regarding the effects of uranium mining on water resources, (2) impact of uranium mining on cultural and tribal resources, (3) the need for more study of the impact of uranium mining on other resources, including wildlife, and (4) the existence of pre-approved mines and valid existing rights (VER's) in the withdrawn area that will not be affected by the Withdrawal.  AR 9-12.  Plaintiffs argue that none of these reasons for the Withdrawal is supported by evidence in the record.  Doc. 170 at 18; Doc. 214 at 19; Doc. 167 at 13.  The Court does not agree.

Plaintiffs argue that the record does not support the ROD's first justification for the Withdrawal: that investigations revealed potential harmful effects of uranium mining on water resources, and that even though the likelihood and extent of the impact was uncertain, it was unacceptable enough to warrant the Withdrawal.  Doc. 167 at 16; *see also* AR 9-10.  Plaintiffs AEMA and Yount argue that had BLM adequately considered the application of existing regulations when assessing the potential impacts on perched aquifers, the speculative harm discussed in the FEIS would be largely mitigated.  Doc. 167 at 18-19.  Plaintiffs NEI and NMA point to evidence in the record where BLM employees express concern about the lack of knowledge regarding the geo-hydrology in the North and East Parcels, as well as the fact that there is a groundwater divide between parcels in the Withdrawal.  Doc. 170 at 18.  They argue that "BLM fully understood that the science did not support a full withdrawal."  *Id*. at 19.

The FEIS's findings on potential impacts to water resources are discussed in this

order's earlier sections.  BLM acknowledged uncertainty regarding groundwater flow, recharge, aquifers, and other hydrologic features.  Looking at available data and making conservative assumptions, it predicted only a low probability of contamination from uranium mining.  BLM did not hide this conclusion or pretend to find with certainty that contamination would occur if uranium mining proceeded at a market-dictated pace.  The FEIS also "acknowledges the extensive framework of existing regulations applicable to hard-rock mining in the area."  AR  2455; *see also* AR 2074 (assuming that regulations under the APP Program are met).

Despite this uncertainty – and, in part, because of it – DOI decided to err on the side of protecting the environment.  Its task was predictive, and predictive in an area where sparse data precluded reasonable certainty.  The Court cannot conclude that its decision to proceed cautiously was legally inappropriate.  Where an agency is "making predictions, within its area of special expertise, at the frontiers of science . . . a reviewing court must generally be at its most deferential."  *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).

AEMA and Yount argue that DOI was not justified in basing its decision on uncertainty – that DOI instead was obligated to obtain the information necessary to eliminate the uncertainty.  As support, Plaintiffs cite *Skull Valley Band of Goshute Indians v. Davis*, 728 F. Supp. 2d 1287 (D. Utah 2010).  Although *Skull Valley* did find that DOI was unjustified in denying the requested action on the basis of incomplete information, and should have obtained the missing information, it is distinguishable from this case.  The court in *Skull Valley* noted that DOI itself found the FEIS to be inadequate.  *Id.* at 1295.  The court also found that "the DOI, acting through the BLM, has readily available mechanisms which it could have invoked to obtain the information it found lacking the in the FEIS."  *Id.* at 1297.  In this case, by sharp contrast, DOI did not find the FEIS to be inadequate, nor did it have readily available sources for the information that was missing in the withdrawal area.[8]

---

[8] Because DOI's stated purpose of protecting water resources supports its decision,

1

### 2.   Estimate of Uranium Endowment.

2    Plaintiffs argue that the FEIS, by underestimating the amount of uranium, violated

3    the FLPMA requirement that a withdrawal fully disclose the value of minerals to be

4    closed to development.  Docs. 170 at 25; 173 at 18; 214 at 29-31.  Plaintiffs NEI and

5    NMA argue that the inaccurate uranium estimate "skew[s] the FLPMA decision process,

6    preventing any semblance of the required balancing of competing environmental and

7    multiple-use interests" because it "artificially elevates the environmental risks."

8    Doc. 170 at 25.  Plaintiffs Quaterra and the Coalition assert that the consequences for the

9    allegedly flawed assessment "are significant" because it "understated the loss in

10   severance taxes to the state and communities as well as the loss to the nation."  Docs. 173

11   at 18; 214 at 29-31.

12    The FLPMA requires agency reports to Congress, including "a report prepared by

13   a qualified mining engineer, engineering geologist, or geologist which shall include but

14   not be limited to information on: general geology, known mineral deposits, past and

15   present mineral production, mining claims, mineral leases, evaluation of future mineral

16   potential, present and potential market demands."   43 U.S.C. § 1714(c)(2)(12).   The

17   implementing regulations require "[a] mineral resource analysis prepared by a qualified

18   mining engineer, engineering geologist or geologist[.]" 43 C.F.R. § 2310.3-2(b)(3)(iii).

19    As already noted, DOI's estimate of the uranium endowment was based on the

20   USGS Report prepared at the request of the Secretary.  AR 57-415.  The report includes a

21

22   the additional purposes listed in the ROD need not also support the Withdrawal.
     Nevertheless, DOI's concern regarding impacts on tribal and natural resources and its
23   understanding that mining would continue even after the Withdrawal and could
     contribute to the local economy and generate additional data with which to make future
24   environmental decisions, are valid considerations.   AR 9-12.   Plaintiffs point to no
     authority that would prohibit the approach adopted by the government in this case.  The
25   only case law cited by Plaintiffs, *New Mexico v. Watkins*, 969 F.2d 1122, 1135 (D.C. Cir.
     1992), was not reviewing an agency's original purpose for a withdrawal, but rather
26   whether an agency could change purposes in order to extend a withdrawal.  The D.C.
     Circuit explicitly distinguished the procedures for withdrawals from those for extending
27   withdrawals.  *Id*.  Plaintiffs also argue that these additional reasons for the Withdrawal
     were developed late in the ROD-preparation process, but cite no authority to suggest that
28   late-breaking rationales are prohibited under NEPA or FLPMA when they are supported
     by the FEIS.  The FEIS addressed each of these additional purposes.

chapter on the uranium endowment prepared by government experts in the field, and discusses how the experts adjusted 1990 estimates to reach their conclusion.  AR 84-102.  The USGS Report made adjustments to the 1990 estimates in light of additional information and the area of the proposed withdrawal.  Nothing in the FLPMA or its implementing regulations requires that the estimate be exact; rather, "known mineral deposits" are to be identified and "future mineral potential" is to be identified.  43 U.S.C. § 1714(c)(2)(12); 43 C.F.R. § 2310.3–2(b)(3)(iii).  The USGS Report addressed "future mineral potential" and was a peer-reviewed, scientific study.  AR 3893, 82092.  The Court's role is not to second-guess such scientific analysis by agency experts.

### 3.   Failure to Coordinate With Counties.

The Coalition argues that the agency's alleged failure to engage in meaningful participation and coordination with the counties violated the FLPMA.  Doc. 214 at 33.  The Coalition acknowledges that several meetings were held, but asserts that its "members' comments were dismissed and most of the cooperating agency meetings occurred without state and local governments."  *Id.*  Plaintiffs rely on 43 U.S.C. § 1712, the FLPMA provision dealing with land use plans.  Subsection (a) requires public involvement in the development plans and subsection (c)(9) requires that the Secretary, "to the extent he finds practical, keep apprised of State, local, and tribal land use plans; assure that consideration is given to those [] plans that are germane in the development of land use plans for public lands; assist in resolving, to the extent practical, inconsistencies between Federal and non-Federal Government plans, and [] provide for meaningful public involvement of State and local government officials [] in the development of land use programs, land use regulations, and land use decisions for public lands."

These regulations deal with land use plans, not agency withdrawal obligations.  In addition, the obligations are largely the same as under NEPA:  the agency must consider local land use plans and provide meaningful participation for State and local governments.  The Court has found that the NEPA obligation was satisfied.  Public meetings were held and comments were submitted by local counties and included in the

1   FEIS and ROD.  Counties were granted cooperating agency status (AR 1630-31), and the

2   EIS discussed the county and local plans that may be impacted by the Withdrawal (AR

3   1642, 1946-1951) and the economic impacts of the proposed alternatives on the affected

4   counties (AR 2254).  The Court cannot conclude that the FLPMA required more.[9]

5   　　　　　C.   Other allegations.

6   　　　　　Plaintiffs argue that DOI's notice to Congress of the Withdrawal was deficient

7   (Doc. 170 at 27), that the Forest Service's consent to the Withdrawal was arbitrary and

8   capricious (Doc. 167 at 26), and that the Withdrawal violated the BLM Resource

9   Management Plan (Doc. 170 at 24).

10   　　　　　1.   Notice to Congress.

11   　　　　　Plaintiffs NEI and NMA argue that the government's notice to Congress regarding

12   the Withdrawal violated the FLPMA and the APA.  Doc. 170 at 27.  They argue that the

13   notice violated the FLPMA because it incorporated the allegedly faulty portions of the

14   FEIS.  Doc. 170 at 28.  They argue that the notice was also deficient because it failed to

15   provide all the information required under the FLPMA, including "a clear explanation of

16   the proposed use of the land involved which led to the withdrawal" as required by 43

17   U.S.C. § 1714(c)(2)(1), and accurate information regarding "the economic impact of the

18   change in use on individuals, local communities, and the Nation" as required by

19   § 1714(c)(2)(2).  Doc. 170 at 30.

20   　　　　　The government contends that the savings provision of the FLPMA precludes

21   judicial review of the required reports to Congress, including the notices required by

22   § 1714(c).  Doc. 225 at 19.  The Court agrees.  The statutory notes to the FLPMA state

23   that "the adequacy of reports required by this Act to be submitted to the Congress or its

24   committees shall not be subject to judicial review."  43 U.S.C. § 1701(j) (Stat. Notes).

25   _____

26   　　　[9] To show that its members were denied meaningful participation, the Coalition
asserts that alternatives were discussed only after BLM had determined them, notes of
27   meetings reflect only brief discussions, and handouts were not distributed until the day
before meetings.  Doc. 173 at 21.  The Court is reluctant, however, to judge the level of
28   coordination by the length of meeting notes or when handouts were distributed.  Such
minute judicial oversight is not contemplated by the FLPMA or the APA.

1    Further, where reports to Congress are not expressly statutorily subjected to judicial

2    review, courts generally find it inappropriate to subject such reports – which essentially

3    are checks between the legislative and executive branches – to review.  *Natural Res. Def.*

4    *Council, Inc. v. Hodel*, 865 F.2d 288, 317 (D.C. Cir. 1988) (noting that "[c]ongressional

5    reporting requirements are, of course, legion in federal law. . . . [but] petitioners have

6    failed to provide a single pertinent authority that suggests, much less holds, that these

7    commonplace requirements are judicially reviewable").

8           At oral argument, Plaintiffs asserted that the notice to Congress is not a "report to

9    Congress" within the meaning of the statutory notes.  *See* 43 U.S.C. § 1701(j) (Stat.

10   Notes).   The Court acknowledges that "a reporting-to-Congress obligation is entirely

11   different than a congressionally imposed requirement that an Executive Branch

12   department or agency gather information and make that information, upon compilation,

13   publicly available."  *Hodel*, 865 F.2d at 319 n.30.  Nevertheless, Plaintiffs point to no

14   authority that would authorize judicial review of the contents of the FLPMA notice

15   separate and apart from the review allowed under the APA of the sufficiency of agency's

16   actions.  The only authority Plaintiffs cite is, again, *Watkins*, 969 F.2d at 1136, where the

17   D.C. Circuit noted that "[t]he reporting requirement [of the FLPMA] is not just a

18   formality.  It is instead a fundamental part of the scheme by which Congress has reserved

19   the right to disapprove administrative withdrawals."  In *Watkins*, however, DOI modified

20   the purpose for a withdrawal and extended the withdrawal "without ever reporting to

21   Congress."  *Id.*   That is not the situation here.   A detailed report was provided to

22   Congress regarding the Withdrawal.  AR 3104-15.

23          Even if the notice is judicially reviewable, the Court does not find it deficient.

24   The Court does not agree that incorporation of the FEIS and ROD somehow tainted the

25   notice.   The FEIS and ROD note deficiencies in information about the uranium

26   endowment and water impacts, and both documents were attached to the notice and cited

27   repeatedly.  Additionally, the notice contains separate sections for the twelve disclosure

28   categories in 43 U.S.C. § 1714(c)(2), provides appropriate summaries, and cites

1    applicable portions of the ROD, FEIS, and other relevant management plans.  AR 3104-

2    15.  The proposed use of the land and a discussion of the economic impacts of the

3    Withdrawal is included in those documents.

4                    **2.      Forest Service's Consent.**

5            Plaintiffs argue that the Forest Service acted arbitrarily, capriciously, and not in

6    accordance with the law when it consented to the Withdrawal because it ignored the

7    multiple use mandate of the National Forest Management Act ("NFMA") and the Kaibab

8    National Forest Plan.  Doc. 167 at 26; *see also* AR 3098 (Department of Agriculture's

9    consent to the Withdrawal).  Plaintiffs argue that the Forest Service's consent did not

10   comply with the existing Forest Plan and therefore was essentially a retroactive

11   amendment to the plan, which courts have found impermissible.  *Id*. at 26-30.

12           The government argues that this claim does not appropriately challenge agency

13   action under the APA because it is DOI, not the Department of Agriculture (where the

14   Forest Service is located), that has authority to manage mineral resources.  *Id*.  It further

15   asserts that the Withdrawal does not contravene the multiple use mandate because "forest

16   plans cannot by law open or close lands to mineral entry" and that the Withdrawal

17   cannot, therefore, conflict with the Forest Plan.  Doc. 225 at 41.

18                   **a.      Agency Action.**

19           An "agency action" under the APA "includes the whole or a part of an agency

20   rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."

21   5 U.S.C. § 551(13).  The Forest Service's consent constitutes a license.  Under the APA,

22   a "'license' includes the whole or a part of an agency permit, certificate, approval,

23   registration, charter, membership, statutory exemption or other form of permission."

24   § 551(8)).  The Forest Service's consent to the Withdrawal clearly was an approval.

25           The consent also had legal ramifications.  It was required under the FLPMA if the

26   Withdrawal was to encompass Forest Service lands, as it did.  43 U.S.C. § 1714(i).

27   While the government is correct that DOI, not the Department of Agriculture, has final

28   authority to manage mineral resources, the APA provides review, upon final agency

action, for a "preliminary, procedural, or intermediate agency action or ruling not directly reviewable[.]"  5 U.S.C. § 704.  "The scope of judicial review of final agency action includes the power to review the intermediate and procedural agency actions leading up to the final challenged result."  *Clark v. Busey*, 959 F.2d 808, 811 (9th Cir. 1992).  Defendants argue that Plaintiffs have cited no case law that would authorize such review if the intermediate or preliminary action is taken by an agency other than the one making the final determination, but nothing in the language of the APA so limits the review of the Court, and the government has cited no case law that would support such a limitation.  The Forest Service's consent was a license under the APA, was a required preliminary action for the Withdrawal, and had legal consequences.  The Court therefore concludes that it is a reviewable agency action.

### b.       Contravention of Forest Plan.

Plaintiffs argue that the Forest Service's consent ignored NFMA requirements that "multiple use" and "sustained yield" be the guiding principles for forest management.  Doc. 167 at 26 (citing 16 U.S.C. § 1604(e)).  Plaintiffs assert that because consent to the Withdrawal required contravention of the existing plan, and the Forest Service cannot retroactively amend a forest plan, the consent was arbitrary and capricious.  Doc. 167 at 27-29.

The ROD stated that the Forest Service's management plans do not apply to regulation of mineral resources, and explicitly found that "withdrawal decisions are outside the authority of National Forest Planning, so no plan amendment is required.  Any development of existing mining claims that can prove valid existing rights will follow the same standards and guidelines identified in applicable Forest Plans."  AR 12.

The NFMA applies to the management of forests and rangelands and their "renewable resources."  Doc. 167 at 26; 16 U.S.C. § 1600(1)-(3) (Congressional findings in the Act related to "renewable resources" from the Nation's public and private forests and rangelands).  Minerals, of course, are not renewable resources.  The NFMA requires the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and

resource management plans for units of the National Forest System, coordinated with the land and resource management planning processes of State and local governments and other Federal agencies."  16 U.S.C. § 1604(a).  In development of plans, the Secretary of Agriculture is charged with assuring that the plans "provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple-Use Sustained-Yield Act of 1960 [16 U.S.C. §§ 528-531]." *Id.* § 1604(e)(1). That act in turn requires multiple uses and sustained yields for, again, "renewable surface resources."  *Id.* § 528.  Indeed, the 1960 act explicitly states that "[n]othing herein shall be construed so as to affect the use or administration of the mineral resources of national forest lands."  *Id.*

In addition, FLPMA's withdrawal provision permits only the Secretary of the Interior to withdraw lands from mineral entry.  43 U.S.C. § 1714(a); *see also* 43 C.F.R. § 2310.3-3 (with two narrow exceptions not applicable here, "the allowance or denial, in whole or in part, of a withdrawal, modification or extension application, may only be made by the Secretary [of the Interior].").

These statutes and regulations make clear that the Secretary of Agriculture and the forest plans created within his agency do not have authority to open or close lands to mining.  That power has been delegated by the FLPMA to the Secretary of the Interior. The ROD therefore correctly concluded that Forest Service management plans do not apply to mining-related withdrawals.  Such plans may provide some regulation of mining on Forest Service lands when mining is otherwise permitted, as it will be for existing valid claims in the withdrawal area, but they do not have the legal effect of opening or closing those lands to mining.  Given this fact, the Withdrawal was not an amendment of any mining right granted by a Forest Service plan.

AEMA also argues that the Forest Service failed to provide sufficient justification for consenting to the Withdrawal, focusing primarily on the shortness of the Forest Service letter of consent.  The letter contained this explanation:

1
2
3
4
5
6

> The Forest Service has been a cooperator in the preparation of the Environmental Impact Statement (EIS) that considered the effects of this potential withdrawal and has been engaged in the process since it began. . . .  The EIS acknowledges that impacts are possible from uranium mining in the area, including impacts to water resources.  Important cultural and other resource values would also be protected by the withdrawal.  The Forest Service supports the withdrawal of its lands.

7
8

AR 3098.

9
10
11
12
13
14

This letter identifies the Forest Service's reasons for consenting.  Those reasons comport with reasons stated in the ROD – the possible impacts of uranium mining on water resources and the protection of important cultural resources.  The letter makes clear that it is referring the consideration of these issues in the FEIS, in which the Forest Service participated.  Because the Court has found these reasons to be sufficient for DOI's decision, it also finds them sufficient for the Forest Service decision.

15
16
17
18
19
20
21
22
23
24
25

AEMA argues that the letter fails to address the Forest Service's multiple use mandate, but, as noted above, that mandate refers to renewable resources.  16 U.S.C. § 528.   AEMA also argues that the Forest Service fails to address the likelihood of adverse environmental impacts, the severity of those impacts, or the sufficiency of existing regulatory schemes to protect against such impacts, but these matters are addressed in the FEIS to which the Forest Service letter refers.  The Court concludes that the Forest Service, like DOI, can choose to proceed cautiously in the face of uncertainty regarding environmental impacts near the Grand Canyon or in the Kaibab National Forest.  The Forest Service participated in the EIS process, understood the uncertainties described in the FEIS, and yet specifically concluded that it "supports the withdrawal of its lands." AR 3098.  The Court does not find that conclusion arbitrary or capricious.

26

### 3.    BLM's Resource Management Plan.

27
28

Plaintiffs argue that the Withdrawal contravenes BLM's resource management plan ("RMP") and that an amendment of the RMP was therefore required.  Doc. 170 at

25-28.  Defendants argue that withdrawals are outside the authority of BLM and that RMPs need not contemplate nor encompass them – that withdrawal decisions are to be made by Congress, the President, or the Secretary, entirely separate from RMPs. Doc. 225 at 20.

More than 300,000 acres of the withdrawal land is managed under the Arizona Strip RMP.  AR 1626-27.  Plaintiffs argue that the RMP does not contemplate the Withdrawal, but rather specifies that the lands should remain open to mining.  Doc. 170 at 26.  The RMP, however, specifically excludes withdrawals in its contemplation of future mineral leases, locations, and sales on that land.  AR 30214 (stating under "desired future conditions" that it would "[a]llow entire Arizona Strip FO to remain open to mineral leasing, location, and sale *except where restricted by wilderness designation, withdrawals*, or specific areas identified in this RMP") (emphasis added).  Plaintiffs appear to argue that this phrase contemplates only existing withdrawals, but the plain language is not so limited.  Plaintiffs' argument that the RMP conflicts with the Withdrawal is therefore without merit.

Plaintiffs argue that an amendment to the RMP was required for the Withdrawal, but point to no language that would require amendments to RMPs, and the Court has been unable to locate any in 43 U.S.C. § 1714.  Moreover, while § 1712 does require that land use plans be updated and revised, Plaintiffs never pled a claim based on the Secretary's failure to update a land use plan.

### 4.  Tribal Resources.

Although they do not label it as a claim under the FLPMA, the Coalition and Quaterra argue that BLM's consideration of tribal resources in the FEIS and ROD exceeds statutory authority.  Doc. 173 at 23.  They object to the ROD's conclusion that "[a]ny mining within the sacred and traditional places of tribal people may degrade the values of those lands to the tribes who use them" (AR 9), arguing that DOI has no statutory authority to reach this conclusion.  Plaintiffs cite various statutes that grant protection to Native American interests and argue that the broad tribal concerns

1    addressed in the FEIS and ROD do not fall within any of these statutes.

2         The FLPMA, however, requires that "the public lands be managed in a manner

3    that will protect the quality of scientific, scenic, historical, ecological, environmental, air

4    and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8). At

5    least two of the listed values – historical and archeological – apply to the tribal interests

6    addressed in the FEIS and ROD. Far from exceeding statutory authority, these values fall

7    squarely within the FLPMA.

8         Plaintiffs cite *Havasupai Tribe v. United States*, 752 F. Supp. 1471, 1486 (D. Ariz.

9    1990), and its concern about granting tribes "a veto power over activities on federal

10   land[.]" The tribes in that case, however, argued that they had a First Amendment free

11   exercise right to block development of their historical lands, a proposition which, if

12   accepted, truly would grant them veto power. Nothing similar is at work here. DOI

13   considered tribal resources in the FEIS and ROD as part of its obligation under the

14   FLPMA. It did not grant tribes a First Amendment veto over mining.

15   **VI.    Establishment Clause.**

16        Plaintiff Yount argues that one of the government's stated justifications for the

17   Withdrawal – that uranium mining in the Withdrawal area impacts cultural and tribal

18   resources and the impact cannot be mitigated effectively (AR 9-12) – is a violation of the

19   First Amendment's Establishment Clause. Doc. 167 at 32-40. In assessing whether

20   government action violates the Establishment Clause, the Ninth Circuit follows *Lemon v.*

21   *Kurtzman*, 403 U.S. 602 (1971). *See Access Fund v. U.S. Dep't. of Agric.*, 499 F.3d

22   1036, 1042 (9th Cir. 2007). Under the *Lemon* test, "an action or policy violates the

23   Establishment Clause if (1) it has no secular purpose; (2) its principal effect is to advance

24   religion; or (3) it involves excessive entanglement with religion." *Access Fund*, 499 F.3d

25   at 1043 (citing 403 U.S. at 612-13). The Supreme Court has also phrased the

26   establishment inquiry as "whether the government, through its actions, impermissibly

27   endorses religion." *Id.* (citing *Agostini v. Felton*, 521 U.S. 203, 235 (1997); *Cnty. of*

28   *Allegheny v. Am. Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 592-

93 (1989) (adopting endorsement and discussing it more generally).  The Withdrawal easily passes these tests.

### A.   Secular purpose.

Plaintiff Yount cites no record evidence to show that the purpose of the Withdrawal was anything but secular.  In fact, the ROD states four purposes for the Withdrawal, each of which is secular: (1) to protect against threats and uncertainty regarding water resources, (2) to protect against the impact of uranium mining on cultural and tribal resources, (3) the need for more study of the impact of uranium mining on other resources including wildlife, and (4) the existence of pre-approved mines and valid existing rights in the withdrawn area.  AR 9-12.

Yount contends that because he has urged the Court to hold that the threats to water resources were not legitimate, that non-secular purpose was inadequate.  Doc. 167 at 35-36.  But even if the protection of tribal and cultural resources was the only purpose asserted by the government, the protection of cultural and traditional values has been held to be a proper secular purpose.  *Access Fund*, 499 F.3d at 1043 (holding that Forest Service's purpose to preserve a historic cultural area was a proper secular purpose); *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 752 (D.C. Cir. 2007) (finding that a withdrawal that stated as one of its purposes the protection of areas of traditional religious importance to Native Americans did not violate the Establishment Clause).

Yount argues that a federal action may only protect American Indian religious beliefs and traditions if they "are tied to a specific site" eligible for listing under the National Historic Preservation Act ("NHPA").  Doc. 167 at 37.  In support, he cites *Access Fund* and *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969 (9th Cir. 2004), but neither case holds that this is a requirement.  As noted above, the FLPMA authorizes DOI to consider historical and archeological values without regard to whether they concern NHPA sites.

### B.   Principal Effect and Excessive Entanglement.

Yount contends that the Withdrawal violates the second and third prongs of the

1   *Lemon* test because the DOI was not "neutral" in its decisionmaking.  Doc. 167 at 38.  He

2   argues that "[t]he withdrawal gives the American Indians 'veto power' to prohibit

3   otherwise lawful land uses," and "creates a preference for American Indian religious

4   activities over all other uses on federal lands."  Doc. 167 at 38-39.

5        As the FEIS and ROD make clear, the Withdrawal does not primarily affect

6   religious interests; it primarily affects uranium mineral resources and seeks to protect

7   water and other natural and historical resources from the effects of mining those

8   resources.  Additionally, it "neither regulates religious practices nor increases Native

9   American influence over management of the [area]."  *Mount Royal*, 477 F.3d at 758.  No

10   veto power is conferred on any tribe through the authorization of the Withdrawal.

11   **VII.   Conclusion.**

12        Ultimately, the question in this case is whether DOI, when faced with uncertainty

13   due to a lack of definitive information, and a low risk of significant environmental harm,

14   can proceed cautiously by withdrawing land for a period of time under the FLPMA.  The

15   Court can find no legal principle that prevents DOI from acting in the face of uncertainty.

16   Nor can the Court conclude that the Secretary abused his discretion or acted arbitrarily,

17   capriciously, or in violation of law when he chose to err on the side of caution in

18   protecting a national treasure – Grand Canyon National Park.

19        **IT IS ORDERED** that Defendants' motions for summary judgment (Docs. 198,

20   208) are **granted**.  Plaintiffs' motions for summary judgment (Docs. 167, 170, 173) are

21   **denied**.  The Clerk shall enter judgment accordingly and terminate this matter.

22        Dated this 30th day of September, 2014.

David G. Campbell
United States District Judge